**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BYJU'S ALPHA, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 24-10140 (BLS) |
| BYJU'S ALPHA, INC.,<br>Plaintiff,<br><br>v.<br><br>REVERE MASTER SPV LLC SERIES VII, REVERE MASTER SPV LLC, REVERE MANAGER LLC, REVERE SECURITIES LLC, KYLE M. WOOL, JEROME F. NILES, JOSHUA A. SHIPLEY, AND JOHN AND JANE DOES 1-10<br><br>Defendants. | Adv. Pro. Case No. |

## COMPLAINT

Plaintiff BYJU's Alpha, Inc. (the "Debtor") alleges as follows:

## PRELIMINARY STATEMENT

1. This action is one of several brought by the Debtor to recover $533 million that was stolen from it. Between April and July 2022, those funds—the "Alpha Funds"—were siphoned through a scheme that routed the Debtor's money to Camshaft Capital Fund, LP ("Camshaft Fund"), a small, unproven hedge fund in Miami, and then onward to OCI Limited ("OCI"), a fraudulent English "procurement" company whose purported London "Head Office" was a WeWork-style co-working facility and whose principal, Rupin Banker ("Banker"), had a criminal conviction for fraud in the United Arab Emirates, in three tranches structured as purported

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is: 1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

"investments." After reaching OCI, the Alpha Funds did not stop. They were moved further—through yet another intermediary—to be roundtripped back to Byju Raveendran ("Raveendran") and his affiliates. That intermediary was Revere Master SPV LLC Series VII ("Revere"). Upon information and belief, Revere received approximately $480 million of the Alpha Funds from OCI, retained [redacted] as a "fee" for its trouble, and transferred the remaining funds onward—ultimately facilitating the return of the stolen money to Raveendran personally through BYJU's Global Pte Ltd., a Singapore entity that Raveendran individually owned.

2. The scheme worked as follows. In the First Transfer, in April and May 2022, the Debtor wired $318 million from its JPMorgan Chase account in California to Camshaft Fund's U.S. Bank account in California. Of that amount, $300 million was promptly transferred to OCI's Lloyds Bank account in London pursuant to a Promissory Note, with $18 million withheld as "prepaid interest" and split between the Debtor and Camshaft (the "First Transfer"). In the Second Transfer, in July 2022, the Debtor wired another $215 million from its Silicon Valley Bank account in California to Camshaft Fund's Northern Trust account in New Jersey, of which approximately $190.8 million was transferred to OCI's Barclays account pursuant to a second Promissory Note (the "Second Transfer"). In the Third Transfer, on July 15, 2022, Camshaft Fund "loaned" an additional $16.52 million—representing most of the Debtor's "prepaid interest" from the Second Transfer—to OCI via a third Promissory Note, with approximately $15.1 million wired to OCI's Barclays account (the "Third Transfer"). Following the completion of these three fraudulent transfers, the Debtor was despoiled of $533 million.

3. But the scheme did not end with OCI. The Alpha Funds were never intended to remain with OCI or be used for "legitimate commercial purposes," as Raveendran falsely swore under penalty of perjury. The truth—revealed by the sworn declaration of OCI's founder, Oliver

Chapman ("Chapman"), provided as part of the Court-approved OCI Settlement pursuant to Bankruptcy Rule 9019—is far more sinister. Chapman's declaration "itemizes down to the cent what happened to the Alpha Funds once OCI received the money," and it demonstrates that the vast majority of the Alpha Funds were, in effect, roundtripped right back to Raveendran and his affiliates through a series of opaque transfers to BYJU's Global Pte Ltd., a corporate vehicle in Singapore that Raveendran individually owned. In other words, Raveendran's plot was to siphon hundreds of millions of dollars of corporate assets for personal use.

4. Revere was a critical link in this chain of opaque transfers. It served as yet another intermediary—another entity in a deliberately constructed daisy chain designed to move the Alpha Funds beyond the reach of the Debtor and its creditors. After the Alpha Funds flowed from OCI, approximately $480 million passed through Revere, which upon information and belief retained [redacted] as a "fee" and sent the rest onward. Revere was not a passive bystander. By receiving and processing approximately $480 million of the Alpha Funds in exchange for a multi-million-dollar fee, and by facilitating the onward movement of those funds to entities controlled by or for the benefit of Raveendran, Revere served as another indispensable intermediary in the fraudulent transfer scheme that the Court has already found was designed to defraud the Debtor's creditors.

5. The OCI Settlement, approved by this Court on December 1, 2025, has now confirmed what the structure of the Transfers always suggested. OCI was the recipient of a pure, unadulterated actual fraudulent transfer in which it gave no value in exchange for the Alpha Funds. Its purported London "Head Office" was a co-working facility. Of its eight purported offices outside of London, investigators visited six and found no OCI presence at any of them. OCI included in its marketing materials the names and biographies of individuals who denied ever

having worked for the company. Photographs of purported executives were "lifted from the internet." OCI's principal, Banker, had a criminal conviction for fraud in the United Arab Emirates and is the subject of an ongoing money laundering case brought by the Indian Directorate of Enforcement. OCI failed to disclose any of the $533 million in promissory notes on its publicly filed financial statements, instead apparently recording the funds as revenue. And yet, through OCI, $480 million of the Alpha Funds flowed to Revere—an entity that, upon information and belief, served no legitimate commercial purpose in this chain other than to further obscure the movement of stolen money.

6. This action seeks to recover from Revere the full amount of the fraudulently transferred Alpha Funds that it received as a mediate transferee of the avoided transfers, totaling no less than $480,000,000.00. This action also seeks to recover from the primary limited liability company, Revere Master SPV LLC ("Revere Master"), Revere's manager, Revere Manager LLC ("Revere Manager"), Revere's affiliated broker, Revere Securities LLC ("Revere Securities"), the current or former principals—Kyle M. Wool ("Wool"), Jerome F. Niles ("Niles"), and Joshua A. Shipley ("Shipley") of Revere and/or its related entities—who, upon information and belief, directed and controlled Revere's activities relevant to this action and who ultimately received transfers of some or all of the fees that Revere received in connection with its role in the fraudulent transfer scheme.

7. The initial transfers from the Debtor to Camshaft Fund have already been voided by this Court. On February 27, 2025, the Court entered a Memorandum Opinion granting the Debtor's motion for partial summary judgment, finding, *inter alia,* that the transfers of the Alpha Funds to Camshaft Fund constituted actual fraudulent transfers (the "MSJ Opinion") [*BYJU'S Alpha Inc. v. Camshaft Capital Fund LP, et al., Adv. Pro. No. 24-50013 (Bankr. D. Del.)* [D.I. 383,

attached hereto as **Exhibit A**]. On March 14, 2025, the Court entered a Judgment Order formally avoiding the transfers and entering judgment against Camshaft Fund in the amount of $533,000,000.00, plus prejudgment interest at a rate of 5.04% (compounded quarterly) beginning as of March 3, 2023, and post-judgment interest in accordance with 28 U.S.C. § 1961(a) (the "Judgment Order"). [*BYJU'S Alpha Inc. v. Camshaft Capital Fund LP, et al., Adv. Pro. No. 24-50013 (Bankr. D. Del.)* [D.I. 388, attached hereto as **Exhibit B**]. But the chain of liability does not end with Camshaft or OCI. Revere was a critical subsequent intermediary through which the Alpha Funds were moved—and it was compensated for its services. As a mediate transferee of the avoided transfers, Revere must now be held accountable.

8. The Debtor's path to this action has been hard-fought. Camshaft Fund and its founder William Morton ("Morton") were held in contempt for refusing to disclose what happened to the Alpha Funds. It was not until Camshaft Fund's fund administrator produced documents in late April 2024 that the Debtor learned the funds had been transferred to OCI. And it was not until the OCI Settlement, approved on December 1, 2025, that the Debtor obtained Chapman's sworn declaration tracing the flow of the Alpha Funds from OCI onward—including through Revere—"down to the cent." OCI's willingness to come forward and reveal the truth about what happened to the Alpha Funds—in contrast to the years of stonewalling, deception, and obstruction by Raveendran, his brother Riju, and their cohorts—underscores a central truth of this case: OCI was a sham enterprise, manipulated by Banker and Raveendran, through which the Alpha Funds were laundered and moved beyond the Debtor's reach.

## JURISDICTION AND VENUE

9. On February 1, 2024 (the "Petition Date"), the Debtor, a corporation organized and existing under the laws of the State of Delaware, filed a voluntary petition for relief under Title 11

of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

10. This Court has jurisdiction over these proceedings under 28 U.S.C. § 1334(b). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

11. Upon information and belief, Revere is a series of a Delaware limited liability company with its registered agent at VCorp Services, LLC, 108 W. 13th Street, Suite 100, Wilmington, DE 19801. Revere is a domestic entity subject to personal jurisdiction in this Court under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7004(f).

12. This Court also has personal jurisdiction over Revere based on its systematic and repeated contacts with the United States in connection with the fraudulent transfer scheme at issue in this case. Revere received and processed approximately $480 million of the Alpha Funds, which originated from the Debtor, a Delaware corporation, and were transferred through multiple U.S.-based accounts before being moved offshore. The brunt of the Debtor's injury was felt in the United States.

13. Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

14. This adversary proceeding is initiated under, at a minimum, Bankruptcy Rule 7001(a)(1).

15. On October 29, 2025, this Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming the Amended Combined Disclosure Statement and Chapter 11 Plan of BYJU's Alpha, Inc.* (the "Plan"). The Plan expressly provides that the Bankruptcy Court "shall retain jurisdiction over all Retained Causes of Action," which are defined to include all Claims and Causes of Action arising out of or in connection with "the Alpha Funds, including the transfer of some or all of those funds from the Camshaft Entities, OCI Limited, and other successor transferees." Plan, Article II, Part A, No. 125 The Plan further contemplates that "additional

litigation will be brought against the successor transferees of the Alpha Funds, only some of whom are known at this time," and provides that the Bankruptcy Court's retention of jurisdiction over such claims "is understood to be a material component of the Plan, given the Bankruptcy Court's familiarity with the litigation surrounding the Alpha Funds." Plan, Article III, Part B, No. 1 As of the date hereof, the Plan has not yet gone effective.

16. Pursuant to Rule 7008-1 of the Local Rules of the U.S. Bankruptcy Court for the District of Delaware, the Debtor consents to the entry of final orders and judgments by the Court on these claims to the extent that it is determined that the Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## THE PARTIES

17. Plaintiff-Debtor BYJU's Alpha, Inc. is a Delaware corporation with its principal place of business in the State of Illinois. The Debtor was formed on September 27, 2021, as a special purpose financing vehicle of its former ultimate corporate parent, Think & Learn Private Ltd. ("T&L"), an Indian entity. Until March 3, 2023, T&L wholly owned the Debtor through an intermediate subsidiary, BYJU's Pte. Ltd. The Debtor has never had any material active business operations. On March 3, 2023, Timothy R. Pohl ("Pohl") became the Debtor's sole director and sole officer, and he has remained in these roles at all times through the present.

18. Defendant Revere Master SPV LLC Series VII is, upon information and belief, a series of a limited liability company formed and existing under the laws of the State of Delaware, with its registered agent at VCorp Services, LLC, 108 W. 13th Street, Suite 100, Wilmington, DE 19801.

19. Defendant Revere Master SPV LLC is, upon information and belief, a limited liability company formed and existing under the laws of the State of Delaware, with its registered agent at VCorp Services, LLC, 108 W. 13th Street, Suite 100, Wilmington, DE 19801.

20. Defendant Revere Manager LLC, is upon information and belief, a limited liability company formed and existing under the laws of the State of Delaware, with its registered agent at VCorp Services, LLC, 108 W. 13th Street, Suite 100, Wilmington, DE 19801. Upon information and belief, Revere Manager LLC is or was the manager of Revere.

21. Defendant Revere Securities LLC, is upon information and belief, a limited liability company formed and existing under the laws of the State of Delaware, with its registered agent at Corporation Services Company, 251 Little Falls Drive, Wilmington, DE 19808. Upon information and belief, Revere Securities LLC is or was a broker dealer for the Revere entities who also took a portion of the Alpha Funds as a commission.

22. Defendant Kyle M. Wool was, upon information and belief, the Managing Member of Revere Manager LLC and President of Wealth Management of Revere Securities, the entity associated with Revere, who directed and controlled the activities of Revere relevant to this action and who ultimately received transfers of some or all of the fees that Revere received in connection with the fraudulent transfer scheme.

23. Defendant Jerome F. Niles was, upon information and belief, Managing Director of Revere Securities, who directed and controlled the activities of Revere relevant to this action and who ultimately received transfers of some or all of the fees that Revere received in connection with the fraudulent transfer scheme.

24. Defendant Joshua A. Shipley was, upon information and belief, Vice President of Revere Securities, who directed and controlled the activities of Revere relevant to this action and

who ultimately received transfers of some or all of the fees that Revere received in connection with the fraudulent transfer scheme.

25. Defendants John Does 1-10 and Jane Does 1-10 (collectively, the "Doe Defendants") are persons or entities whose true names and capacities are presently unknown to the Debtor. Upon information and belief, the Doe Defendants received transfers of some or all of the fees or funds that Revere received in connection with the fraudulent transfer scheme. The Debtor will amend this Complaint to state the true names and capacities of the Doe Defendants when such information is ascertained.

26. Relevant non-party OCI Limited is a private limited liability company organized and existing under the laws of the United Kingdom with its registered office at Burton Varley Ltd., Suite 3, 2nd Floor, Didsbury House, 748-754 Wilmslow Road, Manchester, England M20 2DW.

27. Relevant non-party Rupin Banker is a structuring advisor and member of the senior leadership team of OCI, and, upon information and belief, he is a resident of London, United Kingdom.

28. An investigation into OCI has revealed that OCI is a sham enterprise. OCI's purported "Head Office" in London is a WeWork-style co-working facility. Of its eight purported offices outside of London, investigators visited six and found no OCI presence at any of them. OCI included in its marketing materials the names and biographies of individuals who denied ever having worked for the company, with photographs "lifted from the internet." Seven of the ten purported members of the leadership team named in OCI's marketing presentation do not reference their tenures at OCI on their LinkedIn profiles today, despite having otherwise extensive career histories listed.

29. OCI's principal, Banker, has been the subject of numerous fraud allegations and criminal proceedings across multiple jurisdictions, including a criminal conviction in the United Arab Emirates for using forged documents to fraudulently withdraw funds from a bank account, and an ongoing money laundering case brought by the Indian Directorate of Enforcement in March 2025.

30. These facts—which were publicly available or ascertainable through reasonable diligence—further confirm that OCI was not a legitimate counterparty through which hundreds of millions of dollars should have been processed. The BYJU's-Camshaft-OCI arrangement was, as the OCI Complaint alleged "inherently deceptive and fraudulent, as confirmed by its unnecessary complexity." The information uncovered so far suggests the Promissory Notes were never intended to be repaid, and that the Debtor's purported "investment" in Camshaft Fund was never intended to be redeemed for cash. OCI was, in effect, "Camshaft 2.0"—another sham enterprise through which the Alpha Funds were moved further beyond the Debtor's reach. And Revere was the next link in that chain.

## FACTUAL BACKGROUND
## <u>THE DEBTOR'S TERM LOAN ARRANGEMENT AND DEFAULTS</u>

31. On November 24, 2021, GLAS Trust Company LLC ("GLAS"), as Administrative and Collateral Agent, the Lenders, the Debtor, T&L, and certain other T&L subsidiaries as guarantors, closed on a $1.2 billion term loan facility memorialized in a Credit and Guaranty Agreement (the "Credit Agreement"). The Credit Agreement imposed on the Debtor and its affiliated guarantors various financial reporting and guarantee covenants, including requirements that T&L furnish audited annual and unaudited quarterly financial statements to GLAS, and that T&L's subsidiary Whitehat Education Technology Private Ltd. ("Whitehat India") execute an Onshore Guarantee Deed by April 1, 2022.

32. From March to September 2022—the same period in which the Alpha Funds were being siphoned—the Debtor and its affiliates defaulted on these covenants no fewer than four times, each of which independently empowered the Lenders to accelerate the term loans and exercise control of the Debtor. These defaults and the resulting remedies have been upheld by both the Delaware Chancery Court and the Delaware Supreme Court.

## OCI FRAUDULENTLY RECEIVED THE DEBTOR'S ALPHA FUNDS

33. There are three precedent transfers (collectively, the "Transfers") that ultimately lead to the subsequent transfer to Revere. At each stage, a network of intermediaries—including Camshaft Fund and OCI—played critical facilitative roles, each collecting fees along the way.

### A. The First Transfer: The Debtor's April and May 2022 Transfer of $318 Million to OCI via Camshaft Fund

34. In late March 2022, with the Debtor already in default, T&L and OCI took concrete steps to structure, document, and execute a $318 million fraudulent transfer to OCI via Camshaft Fund—the "First Transfer." OCI, primarily through Banker, played a pivotal role in structuring and effectuating the First Transfer (and the later Transfers as well). Through a chain of intermediaries and "finders," Banker ultimately connected with Morton, the founder of Camshaft Fund, on or about March 31, 2022. Morton agreed to serve as the vehicle through which the Alpha Funds would be routed to OCI.

35. By April 21-22, 2022, the terms of the First Transfer were largely finalized, with the size of the transaction set at $318 million, with $18 million in prepaid interest. On April 28, 2022, the Debtor, Camshaft Fund, and OCI executed four related agreements to effectuate the First Transfer: (i) a Subscription Agreement for Camshaft Capital Fund, LP; (ii) a Side Letter Agreement; (iii) a Second Amended and Restated Limited Partnership Agreement; and (iv) an

unsecured, three-year Promissory Note by OCI (the "April Promissory Note"). The Debtor transferred the full $318 million via three wire transfers on April 27-28, 2022, from its JPMorgan Chase commercial checking account in California to Camshaft Fund's U.S. Bank account in California.

36. Moving the $300 million from Camshaft Fund to OCI was far more cumbersome and not completed until May 10, 2022, when U.S. Bank made the $300 million wire transfer in dollars out of the United States to OCI's Lloyds Bank account in London.

**B. The Second Transfer: The Debtor's July 2022 Transfer of $215 Million to OCI via Camshaft Fund**

37. On July 12, 2022, the Debtor, Camshaft Fund, and OCI executed three related agreements to effectuate the Second Transfer: (i) an Additional Subscription Booklet; (ii) a Side Letter Agreement (the "July Side Letter"); and (iii) an unsecured, three-year Promissory Note by OCI. On July 12-13, 2022, the Debtor transferred $215 million via three wire transfers from its Silicon Valley Bank checking account in California to Camshaft Fund's Northern Trust demand deposit account in New Jersey. Then, on July 14, 2022, Camshaft Fund transferred $190,812,300 to OCI's Barclays account.

**C. The Third Transfer: Camshaft Fund's July 2022 Transfer of $16.52 Million to OCI**

38. On July 15, 2022, Camshaft Fund made yet another loan to OCI, this time in the amount of $16,520,000—the "Third Transfer." This amount represented most of the prepaid interest that the Debtor had "earned" under the July Side Letter, and it was "loaned" to OCI via a third unsecured, three-year Promissory Note (and together with the April and the July 12 Promissory Notes, the "Promissory Notes") executed by Chapman on behalf of OCI. On July 15, 2022, Camshaft Fund transferred $15,095,150 from its JPMorgan account to OCI's Barclays account.

**THE AFTERMATH OF THE TRANSFERS**

39. Following the completion of these three fraudulent transfers, the Debtor was despoiled of $533,000,000. Camshaft Management had received at least approximately $10,667,500 in fees through "prepaid interest." OCI had received the bulk of the Alpha Funds, which it has never repaid pursuant to the three Promissory Notes. And a chain of intermediaries—including, as detailed below, Revere—collected millions of dollars in fees for facilitating the movement of the stolen funds.

40. The Debtor was the clear loser. It was left insolvent, if not already so, having defaulted on the Credit Agreement and transferred over 80% of its cash on hand to Camshaft Fund. After the Second Transfer, the Debtor had approximately $131 million in available funds across its known bank and brokerage accounts, with no other material liquid assets.

**THE COURT-APPROVED 9019 SETTLEMENT WITH OCI: UNMASKING OCI AS A SHAM AND TRACING THE ALPHA FUNDS TO REVERE**

41. On May 5, 2025, the Debtor initiated an adversary proceeding against OCI and Banker, seeking to recover from OCI under Section 550 of the Bankruptcy Code and asserting claims against both OCI and Banker for aiding and abetting breaches of fiduciary duties. OCI filed a motion to dismiss, which was fully briefed and pending decision. *BYJU's Alpha Inc. v. Banker*, Case No. 25-50822 (BLS) (Bankr. D. Del.)

42. After good-faith, arm's-length negotiations, the Debtor and OCI agreed to the terms of a settlement (the "OCI Settlement"). On November 15, 2025, the Debtor filed a Motion Pursuant to Bankruptcy Rule 9019 seeking approval of the OCI Settlement. [D.I. 50, attached hereto as **Exhibit C**] In connection with that motion, OCI's founder, Chapman, provided a sworn declaration (the "Chapman Declaration") itemizing down to the cent what happened to the Alpha Funds once OCI received the money.

43. This Court approved the OCI Settlement on December 1, 2025, pursuant to Bankruptcy Rule 9019. *BYJU's Alpha Inc. v. Banker*, Case No. 25-50822 (BLS) (Bank. D. Del.)

44. The Chapman Declaration filed in support of the 9019 Motion destroyed the false narrative that Raveendran had constructed. Raveendran had sworn under penalty of perjury that the money had been sent to OCI to procure "services to T&L and its subsidiaries in relation to the procurement of IT equipment, such as electronic tablets, and advertising (including marketing via various media)." That testimony has now been proven untrue. The truth, as Chapman laid bare in his declaration, is far more sinister: the vast majority of the Alpha Funds were, in effect, roundtripped back to Raveendran and his affiliates through a series of opaque transfers—including through Revere—to BYJU's Global Pte Ltd., a corporate vehicle in Singapore that Raveendran individually owned. In other words, Raveendran's plot was to siphon hundreds of millions of dollars of corporate assets for personal use, and Revere was a necessary link in that chain.

45. The OCI Settlement was not a capitulation—it was a strategic victory for the estate. OCI, unlike Raveendran and his wife and business partner, Divya Gokulnath, chose to come forward with the truth. The Debtor determined that the consideration provided by OCI and Chapman under the Settlement—including, critically, the Chapman Declaration tracing the Alpha Funds from OCI through Revere and onward—provided important value to the Debtor and its estate in unraveling the truth behind what happened to the Alpha Funds and holding wrongdoers accountable, all without further delay and expense. Claims against Banker continue.

46. The Chapman Declaration is now part of the evidentiary record in this case, and it traces the Alpha Funds from OCI through Revere "down to the cent." The OCI Settlement thus did more than resolve claims against OCI—it laid the factual foundation for this action and others like it against subsequent transferees of the Alpha Funds.

47. Moreover, OCI was not a legitimate counterparty. It was a fraudulent enterprise whose purported London "Head Office" was a co-working facility, whose purported international offices did not exist, whose leadership team was fabricated in marketing materials with photographs "lifted from the internet," and whose principal had a criminal conviction for fraud. OCI failed to disclose any of the $533 million in promissory notes on its publicly filed financial statements, instead apparently recording the funds as revenue. These facts are not merely background—they are essential context for what followed. The Alpha Funds were never a legitimate investment or payment for procurement services. They were stolen money, moved through a sham hedge fund (Camshaft), a fraudulent intermediary (OCI), and then through Revere—another entity in the deliberately constructed chain—and ultimately roundtripped back to the man who orchestrated the theft. At every stage, the entities involved collected fees for their participation, and at every stage, the red flags were unmistakable.

**REVERE'S ROLE IN THE FRAUDULENT TRANSFER SCHEME**

48. As now established by the Chapman Declaration, approximately $480 million of the Alpha Funds flowed from OCI to Revere. Specifically, the Chapman Declaration outlines that Revere received the following transfers from OCI: (i) $150,000,000.00 on June 28, 2022 (in three $50 million tranches); (ii) $103,750,000 on June 29, 2022 (in two tranches of $50,000,000 and $53,750,000); (iii) $25,375,000 on July 7, 2022, (iv) $150,000,000 on July 15, 2022 (in three $50 million tranches); and (v) $50,500,000 on July 18, 2022. Revere was a critical link in the chain of opaque transfers designed to move the Alpha Funds beyond the reach of the Debtor and its creditors.

49. Upon receiving approximately $480 million of the fraudulently transferred Alpha Funds, upon information and belief, Revere retained [redacted] as a "fee" and transferred the

remaining funds onward—ultimately facilitating the roundtripping of the Alpha Funds to Raveendran personally through BYJU's Global Pte Ltd. ("BYJU's Global"), the Singapore entity that Raveendran individually owned.

50. [redacted]

51. [redacted]

52. Revere was not a passive bystander. By receiving and processing approximately $480 million of the Alpha Funds in exchange for a multi-million-dollar fee, and by facilitating the onward movement of those funds, Revere served as another intermediary in the fraudulent transfer scheme that the Court has already found was designed to defraud the Debtor's creditors. The Chapman Declaration confirms that Revere was an integral part of this chain. No legitimate financial institution would receive and process $480 million through a complex, multi-layered chain of transfers originating from a sham hedge fund and a fraudulent English companywithout recognizing the glaring red flags or without asking basic questions about the source and purpose of the funds.

53. The entities involved in this chain were themselves sham enterprises. Camshaft Fund was founded by a 23-year-old with no formal training, experience, or apparent qualifications

in investing or money management, operating out of an address registered to an IHOP in Miami, with approximately 90% of its assets under management directly attributable to the Debtor's $533 million transfer. OCI's headquarters consisted of a co-working space in London, its purported international offices did not exist, and its leadership team was fabricated in marketing materials. The entire arrangement was inherently deceptive and fraudulent, as confirmed by its unnecessary complexity. No reasonable financial professional could have facilitated the movement of $480 million through such a chain without recognizing these red flags. Furthermore, Raveendran himself admitted that the money was hidden "someplace the Lenders will never find it." The Alpha Funds were being moved through a deliberately opaque chain of entities—Camshaft, OCI, Revere, and onward—precisely to place them beyond the reach of the Debtor's creditors.

## CAUSES OF ACTION

### COUNT ONE: RECOVERY OF A SUBSEQUENT TRANSFER (AGAINST REVERE, REVERE MASTER, REVERE MANAGER, REVERE SECURITIES, WOOL, NILES, SHIPLEY, AND THE DOE DEFENDANTS)

54. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

55. As alleged herein, upon information and belief, Revere received approximately $480 million of the Alpha Funds from OCI or other intermediaries in the fraudulent transfer chain, retained [redacted] as a fee, and facilitated the onward transfer of the remaining funds to entities controlled by or for the benefit of Raveendran.

56. The initial transfers of the Alpha Funds from the Debtor to Camshaft Fund have been avoided by this Court. *See* MSJ Opinion; Judgment Order (D.I. 388, entered Mar. 14, 2025).

57. Revere is a mediate transferee within the meaning of Section 550(a)(2) of the Bankruptcy Code because it received a portion of the Alpha Funds—approximately $480 million—from the initial transferee or a subsequent transferee thereof.

58. Upon information and belief, Revere Master, Revere Manager, Revere Securities, Wool, Niles, and Shipley are subsequent transferees within the meaning of Section 550(a)(2) of the Bankruptcy Code because, as principals of Revere who directed and controlled its activities in connection with the fraudulent transfer scheme, they ultimately received transfers of some or all of the fees that Revere received.

59. Upon information and belief, the Doe Defendants are subsequent transferees within the meaning of Section 550(a)(2) of the Bankruptcy Code because they received transfers of some or all of the fees or funds that Revere received in connection with the fraudulent transfer scheme.

60. Revere, Revere Master, Revere Manager, Revere Securities, Wool, Niles, and Shipley are not entitled to the protections of Section 550(b) of the Bankruptcy Code because they did not take the transferred property "for value . . . in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b). Specifically:

(a) *Lack of Good Faith.* Revere participated in a transaction involving the movement of hundreds of millions of dollars through a complex, multi-layered series of transfers that, as the Debtor now knows from Chapman's sworn declaration, were designed to route the Alpha Funds to Raveendran personally via a Singapore entity he individually owned. No good-faith transferee would facilitate the movement of approximately $480 million through such a scheme. The entire arrangement was "inherently deceptive and fraudulent, as confirmed by its unnecessary complexity." The entities involved in the chain were themselves sham enterprises: Camshaft Fund was founded by a 23-year-old operating out of an IHOP in Miami, and OCI's headquarters consisted of a co-working space in London, its purported international offices did not exist, and its leadership team was fabricated in marketing materials.

(b) *Knowledge of Red Flags.* The structure of this transaction exhibited numerous red flags that "should have led [transferees] to discover the Debtor's fraudulent purpose." See MSJ Opinion at 24. The Court specifically identified that: (1) the transaction was exponentially larger than that which a fund as small and new as Camshaft would typically handle; (2)

Camshaft had virtually no downside exposure; (3) Camshaft received excessive fees upfront; and (4) the terms of the deal did not line up with its economic substance. *Id.* at 24-25. The multi-layered transfer of approximately $480 million from OCI to Revere—and Revere's retention of a multi-million-dollar fee for facilitating the onward movement of those funds—bears the hallmarks of the same scheme. No reasonable financial professional could have participated in this transaction without recognizing these same red flags.

(c) *Active Participation and the Evidence Produced Through the 9019 Process.* The Debtor now possesses Chapman's sworn declaration, produced as part of the Court-approved OCI Settlement pursuant to Bankruptcy Rule 9019, which traces the flow of the Alpha Funds "down to the cent" from OCI onward, including through Revere. Revere did not merely receive an incidental payment. Upon information and belief, it received approximately $480 million of the fraudulently transferred Alpha Funds, retained [redacted] as a fee, and facilitated the further movement of those funds to entities controlled by or for the benefit of Raveendran—serving as another intermediary in a chain designed to siphon the Debtor's assets for the personal use of its former controller. The 9019 Settlement process has now validated this evidence and established the factual predicate for this action.

61. Upon information and belief, the Doe Defendants are not entitled to the protections of Section 550(b) of the Bankruptcy Code for similar reasons—they did not take the transferred property for value, in good faith, and without knowledge of the voidability of the transfer avoided.

62. During the course of this proceeding, the Debtor may learn of additional subsequent transfers made to or for the benefit of Revere, Revere Master, Revere Manager, Revere Securities, Wool, Niles, Shipley, and/or the Doe Defendants in connection with the avoided transfers of the Alpha Funds. The Debtor intends to recover all subsequent transfers of the Alpha Funds made to or for the benefit of Defendants. The Debtor reserves the right to amend this Complaint to include additional transfers, additional subsequent transferees, and additional relevant information that may become known to the Debtor through formal discovery or otherwise, and for such amendments to relate back to the filing date of this Complaint.

63. Accordingly, Revere, Revere Master, Revere Manager, Revere Securities, Wool, Niles, Shipley, and the Doe Defendants are liable to the Debtor under Sections 544(b)(1) and 550(a)(2) of the Bankruptcy Code and applicable state law (e.g., 6 Del. C. §§ 1304(a)(2) and 1305)

as mediate and subsequent transferees for the full amount of the property they received, totaling no less than $480,000,000.00 (as to Revere) and amounts to be determined (as to Revere Master, Revere Manager, Revere Securities, Wool, Niles, Shipley, and the Doe Defendants), subject to the single-satisfaction rule of 11 U.S.C. § 550(d), plus interest from the relevant dates and costs and fees to the extent available, for the benefit of the Debtor's bankruptcy estate.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff BYJU's Alpha, Inc. requests that this Court enter judgment and grant the following relief:

a. Recovery from Revere, Revere Master, Revere Manager, Revere Securities, Wool, Niles, Shipley, and the Doe Defendants, pursuant to 11 U.S.C. § 550(a)(2) and applicable state law (including 6 Del. C. §§ 1304(a)(2) and 1305), of the value of the property Revere, Revere Master, Revere Manager, Revere Securities, Wool, Niles, Shipley, and the Doe Defendants received as subsequent transferees of the avoided fraudulent transfers, totaling no less than $480,000,000.00 (as to Revere) and amounts to be determined (as to Revere Master, Revere Manager, Revere Securities, Wool, Niles, Shipley, and the Doe Defendants);

b. Prejudgment and post-judgment interest at the applicable rate;

c. Attorneys' fees, costs, and expenses incurred in this adversary proceeding to the extent permitted by law; and

d. Such other and further relief as this Court deems just, proper, or equitable under the circumstances.

Dated: March 13, 2026

**ESBROOK P.C.**

*/s/ Scott J. Leonhardt*
Scott J. Leonhardt (DE 4885)
800 N. King Street, Suite 301
Wilmington, DE 19801
Phone: (302) 650-7540
E-Mail: scott.leonhardt@esbrook.com

-and-

Christopher J. Esbrook
(*Pro Hac Vice* forthcoming)

Kirk Watkins (*Pro Hac Vice* forthcoming)
321 N. Clark Street, Suite 1930
Chicago, IL 60654
Phone: (312) 319-7680
E-mail: christopher.esbrook@esbrook.com
kirk.watkins@esbrook.com

*Proposed Special Litigation Counsel to the Debtor*