**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BYJU'S ALPHA, INC.,<br><br>Debtor. | Case No. 24-10140 (BLS)<br><br>Chapter 11 |
| BYJU'S ALPHA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>REVERE MASTER SPV LLC SERIES VII, REVERE MASTER SPV LLC, REVERE MANAGER LLC, REVERE SECURITIES LLC, KYLE M. WOOL, JEROME F. NILES, JOSHUA A. SHIPLEY, AND JOHN AND JANE DOES 1-10,<br><br>Defendants. | Adversary Proceeding<br><br>No. 26-50221 (BLS) |

**APPENDIX OF EXHIBITS TO REVERE DEFENDANTS' MOTION TO DISMISS ADVERSARY COMPLAINT**

**GELLERT SEITZ BUSENKELL & BROWN LLC**
Michael Busenkell (DE 3933)
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Phone: (302) 425-5812
Mbusenkell@gsbblaw.com

*Attorneys for Defendants Revere Master SPV LLC Series VII, Revere Master SPV LLC, Revere Manager LLC, Revere Securities LLC, Kyle M. Wool, Jerome F. Niles, Joshua A. Shipley*

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
Howard W. Schub
330 Madison Avenue, 27th Floor
New York, New York 10017
Phone: (212) 413-9060
Howard.Schub@nelsonmullins.com
Lee B. Hart
201 17th Street NW
Atlanta, GA 30363
Phone: (404) 322-6349
Lee.Hart@nelsonmullins.com

Dated: April 28, 2026
Wilmington, Delaware

| **Exhibit** | **Document Title** | **Page** |
|---|---|---|
| 1 | Anuj Suvarna, *Byju Raveendran Infuses 50% of $800 Mn in Latest Funding Round; Valuation up at $22 Bn*, VCCIRCLE (Mar. 11, 2022), https://www.vccircle.com/byju-raveendran-infuses-50-of-800-mn-in-latest-funding-round-valuation-up-at-22-bn | A0001-A0010 |
| 2 | Declaration of Timothy R. Pohl, *In re BYJU's Alpha, Inc.*, Case No. 24-10140 (Bankr. D. Del.) (Feb. 2, 2024) [D.I. 7] | A0011-A0047 |
| 3 | Complaint [Redacted], *BYJU's Alpha, Inc. v. Camshaft Capital Fund, LP, et al.*, Adv. Pro. No. 24-50013 (BLS) (Bankr. D. Del.) (Feb. 2, 2024) [Adv. D.I. 5] | A0048-A0160 |
| 4 | Second Amended Complaint, *BYJU's Alpha, Inc. v. Camshaft Capital Fund, LP, et al.*, Adv. Pro. No. 24-50013 (BLS) (Bankr. D. Del.) (Apr. 24, 2024) [Adv. D.I. 153]. | A0161-A0586 |
| 5 | Motion for Partial Summary Judgment, *BYJU's Alpha, Inc. v. Camshaft Capital Fund, LP, et al.*, Adv. Pro. No. 24-50013 (BLS) (Bankr. D. Del.) (Jul. 8, 2024) [Adv. D.I. 275] | A0587-A0597 |
| 6 | Memorandum Opinion, *BYJU's Alpha Inc. v. Camshaft Capital Fund LP, et al.*, Adv. Pro. No. 24-50013 (Bankr. D. Del.) (Feb. 27, 2025) [D.I. 383] | A0598-A0641 |
| 7 | Judgment Order on Motion for Summary Judgement, *BYJU's Alpha, Inc. v. Camshaft Capital Fund, LP, et al.*, Adv. Pro. No. 24-50013 (BLS) (Bankr. D. Del.) (Mar. 14, 2025) [Adv. D.I. 388] | A0642-A0646 |
| 8 | Complaint, *BYJU's Alpha Inc. v. Byju Raveendran, et al.*, Adv. Pro. No. 25-50526 (BLS) (Bankr. D. Del.) (Apr. 9, 2025) [Adv. D.I. 1]. | A0647-A0697 |
| 9 | Complaint, *BYJU's Alpha Inc. v. OCI Limited and Rupin Banker*, Adv. Pro. No. 25-50822 (BLS) (Bankr. D. Del.) (May 5, 2025) [Adv. D.I. 5] | A0698-A0874 |
| 10 | Declaration of Oliver Philip Chapman, *BYJU's Alpha Inc. v. OCI Limited and Rupin Banker*, Adv. Pro. No. 25-50822 (BLS) (Bankr. D. Del.) (Jul. 14, 2025) [Adv. D.I. 25] | A0875-A0903 |
| 11 | Defendant OCI Limited's Motion to Dismiss Or in the Alternative, To Stay This Case in Favor of Arbitration, *BYJU's Alpha Inc. v. OCI Limited and Rupin Banker*, Adv. Pro. No. 25-50822 (BLS) (Bankr. D. Del.) (Jul. 14, 2025) [Adv. D.I. 23] | A0904-A0909 |
| 12 | Debtor's 9019 Motion Pursuant to Bankruptcy Rule 9019 for Entry of an Order Approving Compromise and Agreement Between the Debtor, GLAS Trust Company LLC, and OCI Limited, *BYJU's Alpha Inc. v. OCI Limited and Rupin Banker*, Adv. Pro. No. 25-50822 (BLS) (Bankr. D. Del.) (Nov. 15, 2025) [Adv. D.I. 50] | A0910-A0927 |

| | | |
|---|---|---|
| 13 | Opinion Granting Plaintiffs' Motion for Default Against Byju Raveendran, *BYJU's Alpha Inc. v. Byju Raveendran, et al.*, Adv. Pro. No. 25-50526 (BLS) (Bankr. D. Del.) (Nov. 20, 2025) [Adv. D.I. 143] | A0928-A0951 |
| 14 | Order Approving Compromise and Agreement Between the Debtor, GLAS Trust Company LLC, and OCI Limited, *BYJU's Alpha Inc. v. OCI Limited and Rupin Banker*, Adv. Pro. No. 25-50822 (BLS) (Bankr. D. Del.) (Dec. 1, 2025) [Adv. D.I. 63] | A0952-A0955 |
| 15 | Amended Opinion Granting Plaintiffs' Motion for Default Against Byju Raveendran, *BYJU's Alpha Inc. v. Byju Raveendran, et al.*, Adv. Pro. No. 25-50526 (BLS) (Bankr. D. Del.) (Dec. 8, 2025) [Adv. D.I. 167] | A0956-A0976 |
| 16 | Declaration of J. Michael McNutt, *BYJU's Alpha Inc. v. Byju Raveendran, et al.*, Adv. Pro. No. 25-50526 (BLS) (Bankr. D. Del.) (Apr. 2, 2026) [Adv. D.I. 205] | A0980-A3092 |

**GELLERT SEITZ BUSENKELL & BROWN LLC**

*/s/ Michael Busenkell*
Michael Busenkell (DE 3933)
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Phone: (302) 425-5812
Mbusenkell@gsbblaw.com

-and-

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

Howard W. Schub
330 Madison Avenue, 27th Floor
New York, NY 10017
Phone: (212) 413-9060
Howard.Schub@nelsonmullins.com
Lee B. Hart
201 17th Street NW
Atlanta, GA 30363
Phone: (404) 322-6349
Lee.hart@nelsonmullins.com

*Attorneys for Defendants Revere Master SPV LLC Series VII, Revere Master SPV LLC, Revere Manager LLC, Revere Securities LLC, Kyle M. Wool, Jerome F. Niles, Joshua A. Shipley*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 28, 2026, true and correct copies of the within and foregoing *Appendix of Exhibits to Revere Defendants' Motion to Dismiss Adversary Complaint* were served via CM/ECF on all parties registered to receive electronic notices.

*/s/ Michael Busenkell*

# EXHIBIT 1

Subscribe

IND MEA

VCCiRCLE

Advertisement

Home / TMT /
Byju Raveendran Infuses 50% Of $800 Mn In Latest Funding Round; Valuation Up At $22 Bn

# Byju Raveendran Infuses 50% Of $800 Mn In Latest Funding Round; Valuation Up At $22 Bn

By Anuj Suvarna

11 Mar 2022

Listen to Story




Byju's founder and CEO Byju Raveendran has made a personal investment of $400 million (around Rs 3,060 crore) of the total $800 million (about Rs 6,100 crore) the latest round of funding in the edtech firm. This is understood to have pumped up its valuation at around $22 billion.

The fundraising round was participated by investors Sumeru Ventures, Vitruvian Partners and BlackRock.

Byju's, run by Think and Learn Pvt. Ltd, got some of the largest cheques from institutional investors over the past year.

Advertisement

Most recently in October 2021, the edtech decacorn raised close to $300 million in its series F round of funding led by Oxshott Capital Partners. In June, Byju's raised $1.5 billion from UBS Group, Abu Dhabi sovereign fund ADQ, and Blackstone Group, among others, at a

“We continue to witness accelerated growth in India and international markets through both organic and inorganic routes. Our sustained focus is on achieving our long-term goals around creating life-long value for our learners. For that, we are imagining and reimagining the way students will learn, unlearn and relearn in the future. Our aspiration is to build something that will last for decades," Raveendran said.

Over the past months, the of the Bengaluru-based online tutoring company has strengthened its senior leadership team with the appointment of two new vice presidents (VPs) across engineering as well as in reliability, security and cloud engineering. In December 2021, Byju’s had announced the appointment of Rachna Bahadur as the Senior Vice President to lead its global expansion plans.

Advertisement

Byju's became a unicorn (start-up with a valuation of $1 billion and above) in 2018, has been ramping up its acquisition strategy this year in a bid to enter newer edtech categories of upskilling, test prep and higher learning, while fortifying its presence across key international geographies including the US.

Mike Risman, Managing Partner of Vitruvian said, “As a leader in the edtech space, Byju’s strong growth and expansion in national and international markets has been very promising.  We look forward to working with Byju’s as it builds on and accelerates its compelling growth trajectory.”

In February, Byju’s said it will invest as much as $200 million to operate and expand Byju’s Tuition Centre over the next 12 to 18 months, Mrinal Mohit, chief operating officer, Byju’s, told VCCircle in a virtual interaction. The company hopes to enrol one million students into the programme over the next two years and launch 500 such tuition centres across 200 cities this year. Byju’s hopes to create more than 10,000 jobs across the country with Byju’s Tuition Centre.

Advertisement

Byju’s offline and hybrid forays follow Aakash Educational Services’ plans of adding more physical centres in 2022. VCCircle recently reported that the company plans to add at least 75 more centres this year. Aakash also claimed it has not given up any of its physical centres

Byju's Byju Raveendran | fund raising | valuation | Sumeru Ventures | Vitruvian Partners | BlackRock

## Recommended Articles




15 April

BlackRock urges investors to spread hedge fund bets amid market swings



13 April

Grapevine: Jhunjh Vena Energy in ne

Share article on

Leave Your Comments

Get daily update with our newsletter Subscribe Now !

SUBSCRIBE TO NEWSLETTER

Advertisement

## Related Articles



TMT

Khetika, Clarity Labs, Axten Hospitals raise funding

Subscribe IND MEA

VCCIRCLE




TMT

French digital-infra provider Legrand scouts for acquisitions in India




TMT

Venture Highway-backed CheQ turns profitable, eyes UPI payments foray



TMT

Aliste, Intellithink, Unbound, Cohoma Coffee raise funding



HEALTHCARE

PE-backed Indira IVF and listed MosChip strike M&A deals




INFRASTRUCTURE

Nexus Venture Partners harvests more from its 'fund returner' bet

Advertisement

Google News

Follow VCCircle on Google News for the latest updates on Business and Startup News

FOLLOW

NEXT ARTICLE

Advertisement

**Home / Finance /**

**Paytm Payments Bank Barred By RBI From Onboarding New Customers**

11 Mar 2022

Listen to Story




Credit: VCCircle

The Reserve Bank of India (RBI), in its latest order issued today, directed Vijay Shekhar Sharma-led Paytm Payments Bank Ltd to stop the onboarding of new customers. The central bank has said its action is based on “certain material supervisory concerns" observed in the bank.

The Paytm Payments Bank, owned by Softbank-and Alibaba Group-backed One97 Communications, has also been directed to appoint an IT audit firm to conduct a comprehensive System Audit of its IT system, the RBI order said. “Onboarding of new customers by Paytm Payments Bank Ltd will be subject to specific permission to be granted by RBI after reviewing a report of the IT auditors," the central bank said.

“This action is based on certain material supervisory concerns observed in the bank," the RBI said.

Advertisement

A Paytm spokersperson said the company is evaluating the RBI order and will respond soon.

Paytm Payments Bank had earlier said it received over 926 million UPI transactions in December, becoming the first beneficiary bank in the country to achieve this landmark.

In December, the payments bank had received the status of scheduled payments bank.

Advertisement

registered a total of 2,507.47 million beneficiary transactions, compared to 964.95 million in the same quarter in 2020. This is a year-on-year increase of 159.85%.

On March 8, the share price of Paytm had hit a new 52-week low of Rs. 728.50 apiece and has been plunging over the past month amid the battering that the markets.

A month prior, Paytm announced an initial public offering (IPO) at an issue price of Rs 2,150 apiece, commanding a valuation of close to $20 billion. While the largest Indian IPO issue got oversubscribed, Paytm's equity value got corrected to $14.5 billion on the day of its listing, which was still close to double the size from the closest fintech peer RazorPay.

Advertisement

Paytm was founded in August 2010 by Vijay Shekhar Sharma. Besides US-based Softbank and Chinese Alibaba Group, Paytm Payments Bank's parent One97 Communications also counts SAIF Partners, Alibaba Group's affiliate Ant Group and global billionaire investor-owned Berkshire Hathaway among its key investors.

Paytm Payments Bank | RBI

## Recommended Articles




15 April

Foreign investors sell Indian bonds faster after RBI FX curbs, see earnings risk in equities



14 April

RBI turns down Ujj bank

Share article on

Leave Your Comments

Advertisement

## Related Articles




FINANCE

EAAA India Alts marks first close of new PE fund



FINANCE

GIFT City finance hub grants first family office permit




FINANCE

Avataar Venture Partners' Mohan Kumar on third fund, investment strategy, and more



FINANCE

Tiger Global-backed Groww's quarterly profit more than doubles on trading surge



FINANCE

CVC Capital-controlled Aavas Financiers names former Kotak exec new MD and CEO




FINANCE

India's startup funding sinks to seven-year low in Q1 as angels turn wary




FINANCE

SP Group unit's investors okay two-month debt extension

Advertisement

Subscribe IND MEA

VCCIRCLE

Google News

Follow VCCircle on Google News for the latest updates on Business and Startup News

FOLLOW

MOSAIC

FOLLOW US

ABOUT US

ADVERTISE WITH US

CONTACT US

COPYRIGHT

PRIVACY POLICY

TERMS OF USE

COMPANY LISTING

TAG LISTING

RESOURCE LIBRARY

OUR PRODUCTS

TECHCIRCLE

VCCEDGE

EVENTS

TRAINING

SALESEDGE

EDGE INSIGHTS

BECOME A PREMIUM MEMBER

PREMIUM

DOWNLOAD OUR APP

# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| BYJU'S ALPHA, INC.,[1] | ) | |
| | ) | Case No. 24-10140 (JTD) |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF TIMOTHY R. POHL,**
**DIRECTOR, CEO, AND SECRETARY OF BYJU'S ALPHA, INC.,**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION**

I, Timothy R. Pohl, hereby declare under penalty of perjury:

1. I became BYJU's Alpha Inc. (the "Debtor")'s sole director and officer on March 3, 2023 after the Debtor, and its former parent company and affiliates, defaulted on $1.2 billion of term loans. After I was appointed, I discovered that former management had transferred over half a billion dollars of the Debtor's assets outside of the reach of the Debtor and its creditors. As a result, I was left with a Debtor that had minimal funds and limited books and records, but numerous unanswered questions, including where $533 million of its funds had gone. As set forth in this Declaration, with the support of the Debtor's secured lenders, this chapter 11 petition is designed to answer those questions and, in the process, facilitate the efficient maximization of the value of the Debtor's estate for the benefit of its stakeholders.

2. The Debtor, a Delaware corporation, was created as part of an "edtech" conglomerate. Its former ultimate parent company, Think & Learn Private Ltd. ("T&L"), incorporated in India, was once one of the most successful start-ups worldwide, and, at one time, was valued at $22 billion. T&L and its affiliates do business under the trade name "BYJU's," and

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address is 16192 Coastal Highway, Lewes, Delaware 19958.

their eponymous founder, Byju Raveendran, built the companies to bring educational software and access to children across the globe.

3. The Debtor's role in this enterprise was simple: to raise funds as a borrower under a "Term Loan B" financing facility. As a Delaware corporation, the Debtor gave T&L access to Western capital markets. In November 2021, the Debtor borrowed $1.2 billion in term loans (the "Term Loans") from certain lenders (the "Lenders") in accordance with and governed by various loan documents, including a Credit Agreement (defined below) and collateral and security agreements. Many of the original acquirers of those Term Loans remain among the largest creditors of this estate. The Term Loans are guaranteed by T&L and five other T&L affiliates, who, along with the Debtor, are collectively defined in the Credit Agreement as the "Loan Parties."

4. Within months of issuance, the Loan Parties (including the Debtor) repeatedly defaulted on their loan covenants. This led to a myriad of forbearances and amendments. In just about a year, the Loan Parties had acknowledged and agreed that four "Specified Defaults" had occurred and had not been cured. As described in additional detail below, the period since has been a series of failed negotiations, along with litigation, as the Lenders sought to enforce their contractual rights and remedies to protect their substantial investment in the Debtor and the other Loan Parties.

5. I became involved during one of the many breakdowns in negotiations when I was contacted by the Lenders' counsel about the possibility of serving as a director and officer at the Debtor. I had no prior involvement with, or knowledge of, the situation, or any prior relationships with the Loan Parties (including the Debtor) or the Lenders. The Lenders were considering exercising their remedial rights, which included taking control via their Administrative and Collateral Agent, GLAS Trust Company LLC ("GLAS"), of the common stock of the Debtor,

which had been pledged as part of the collateral package securing the Term Loans. The Lenders in fact exercised their rights on March 3, 2023: they sent a default notice, accelerated the Term Loans, directed GLAS, as their Agent, to take control of pledged common stock in the Debtor, and put in place new management. I became the sole officer and director of the Debtor, pursuant to the terms of an Independent Director Agreement effective as of that same day, March 3, 2023.

6. When I took this position, I was informed that the Lenders believed that the Debtor had more than $500 million in cash in its possession and control, and my immediate concern was locating and securing those liquid assets. I had no visibility into where the $500 million-plus was, or if it existed at all. Upon the Lenders' exercise of remedies on March 3, 2023, their Agent, GLAS, sent letters to over 300 financial institutions in an effort to locate those funds. I then followed up on those efforts. The Debtor's former management eventually disclosed to me (pursuant to a court order obtained in litigation) three financial institutions where the Debtor had active bank accounts. By the time I was granted access to those accounts, as of May 22, 2023, they contained less than $550,000 in the aggregate.

7. I also reached out to T&L, its advisors, and the Debtor's former management, attempting to commence a dialogue and obtain the books and records of the Debtor. They either ignored or refused each one of my requests for information related to the Debtor. They also denied the existence and materiality of the "Events of Default" (as defined under the Credit Agreement)—despite previously stipulating to them in writing—and also disputed the propriety of the Lenders' exercise of their remedial rights and thus of my appointment. In May 2023, I, along with GLAS, filed a suit in Delaware Chancery Court pursuant to the Delaware General Corporation Law seeking a declaration that I was properly put in place as the Debtor's sole director and sole officer.

8. Over the spring and summer of 2023, while the Delaware action was progressing, I was informed that, during a conversation between the Lenders' advisors and T&L, Byju Raveendran himself remarked that "the money"—a reference to the over $500 million the Lenders believed was in the Debtor's accounts—"is someplace the Lenders will never find it." Additionally, as discovery in the Delaware litigation revealed, Riju Ravindran (Byju's brother), the former director and officer of the Debtor, had little, if any, understanding of the business or the terms of the Credit Agreement.

9. With the assistance of the counsel I had retained to represent the Debtor, I continued to attempt to obtain as much information as I could from the three financial institutions at which the Debtor maintained bank accounts. Those institutions eventually provided some historical transaction records for those accounts. By August 2023, records I obtained indicated that, in April and July 2022, the Debtor had transferred a total of approximately $533 million to a hedge fund known as Camshaft Capital Fund. Upon further investigation into Camshaft and its regulatory disclosures, I was informed that these funds appeared to make up more than 90% of Camshaft's regulatory assets under management, Camshaft was run by an individual in his mid-20's with little apparent formal financial investment experience, and Camshaft's business address was listed in a filing with the SEC as being inside an International House of Pancakes—an IHOP.

10. I asked Camshaft for more information, but Camshaft was not cooperative. Its lawyers refused to provide me with basic information, and issued a conflicting series of statements regarding the funds transferred to it by the Debtor under its prior management.

11. In September 2023 (while we awaited results of the August 2023 trial in the Delaware litigation), GLAS brought a state law fraudulent transfer lawsuit against Camshaft in Florida (where Camshaft was headquartered). At the time, the Debtor did not have the funds to

pursue litigation to seek to recover its assets, and I was aware of and supported efforts by GLAS to do so. Unfortunately, little progress was made by GLAS through either formal or informal information requests, as Camshaft continued to be uncooperative and adversarial.

12. On November 2, 2023, the Delaware Chancery Court ruled in the Delaware litigation. The court found that an Event of Default had occurred under the Credit Agreement and that the subsequent actions taken by GLAS and me were valid, including my appointment as the sole director and sole officer of the Debtor. In so ruling, the court rejected Riju Ravindran's argument that the court had to wait on the resolution of separate litigation in New York (which was commenced after the Delaware litigation and could take years) filed by the Debtor's former affiliates against GLAS and certain Lenders under the Credit Agreement, in which they raised the same defenses to clearly acknowledged Events of Default. Although the Delaware court confirmed my authority as the sole director and sole officer of the Debtor, the Debtor's former management and T&L still refused to provide me with any information or respond to the notices I had sent, through counsel, on May 3 and June 1, 2023, requesting the Debtor's books and records and notifying the management of the BYJU's enterprise of its missed May 25, 2023 interest payment, respectively.

13. Over the past few months, more difficulties involving the BYJU's empire have become public. In addition to the departure of various senior executives, board members, and the resignation of T&L's auditor, multiple entities have brought insolvency proceedings against T&L in India. On January 22, 2024, GLAS, as the Lenders' Agent, commenced its own insolvency proceeding against T&L. Shortly thereafter, T&L's long-overdue audited financial statements for the year ended March 31, 2022 became public, and T&L's new auditor reported that "a material uncertainty exists that may cast significant doubt on [BYJU's] Group's ability to continue as a

going concern." Most recently, T&L announced a $200 million equity rights offering at a $250 million valuation, less than 2% of the BYJU's organization's peak valuation from 2022. In a press release that accompanied the announcement, T&L stated it was launching the rights offering to "clear immediate liabilities and meet operational requirements."

14. Against this backdrop, I have met with the Debtor's counsel and counsel to the Lenders to try to develop the most productive and appropriate path forward for the Debtor. Priority one continues to be to locate, secure, and recover the assets transferred away from the Debtor—to get back the money prior management hid "someplace the Lenders will never find it." Given the facts and circumstances, including (but not limited to) the various pending litigations and admitted intentional transfers of the Debtor's assets to hinder creditors, I believe that chapter 11 is the only appropriate, effective, and efficient means to administer the Debtor's remaining assets.

15. However, the Debtor does not possess sufficient funds to administer the Debtor's assets, including the investigation and pursuit of litigation claims (such as for fraudulent transfer, the breach of fiduciary duties, and conversion), or even to continue its involvement in the pending litigations. It requires funding to do so. The Lenders have proposed to provide the Debtor with significant funding conditioned upon the Debtor commencing a chapter 11 case, pursuant to a debtor-in-possession loan.

16. I am ready to move expeditiously. I authorized counsel to commence an adversary proceeding against Camshaft concurrently with the filing of the Debtor's bankruptcy petition, and expect to seek the Court's assistance to enjoin the further transfer and dissipation of the $533 million as soon as the funds are located. I further anticipate the Debtor potentially commencing additional proceedings against other parties, such as T&L and/or its affiliates and the Debtor's former management—and any other person or entity to which any portion of the Debtor's funds

or any interests therein were transferred, or which engaged in tortious or other conduct. And I will be investigating the numerous other transfers of the Debtor's cash, including millions of dollars of transfers made by former management *after* their removal and my appointment. Because the Debtor's former management withheld the Debtor's books and records from me, I also will be determining if the Debtor has any secured or unsecured creditors beyond the Lenders.

17. For the reasons set forth in more detail below, I believe this bankruptcy filing is the best way to maximize the value of the Debtor's assets, to locate, secure, and recover the funds transferred away from it for no apparent value, and to ultimately distribute the proceeds in a fair and equitable manner pursuant to the Bankruptcy Code under the auspices of this Court.

**Background and Qualifications**

18. For over three decades, I have worked for, with, and opposite distressed companies in in-court and out-of-court restructurings, as a lawyer, investment banker, financial advisor, and director. I graduated from the University of Chicago Law School in 1991, and joined the law firm of Jones Day as an associate in the firm's Business Restructuring and Reorganization practice. From 1999 to 2008, I was an attorney at Skadden, Arps, Slate, Meagher & Flom LLP, where I became a partner and eventually the Co-Head of its Corporate Restructuring Group.

19. In 2009, following the onset of the 2008 financial crisis, I joined the Restructuring and Capital Solutions Group at Lazard, where I was a Managing Director until I retired in 2019. At Lazard, I continued to represent clients in restructuring matters as an investment banker and financial advisor. I served as an expert witness in a number of cases, testifying on corporate governance and valuation.

20. After retiring from Lazard, I founded TRP Advisors, LLC, through which I have provided strategic advice to a number of companies, financial institutions, and private equity firms with respect to distressed situations, troubled portfolio companies, and acquisition opportunities

over the last 3½ years. I also have served as an independent director for over 20 other companies in a variety of industries and for which I led internal investigations in several situations and testified in court.

* * *

21. On February 1, 2024 the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the U.S. Code (the "Bankruptcy Code") with the U.S. Bankruptcy Court for the District of Delaware (the "Court"). Additionally, the Debtor has filed a motion for interim use of cash collateral and authority to continue to use its cash management systems, which will allow the Debtor to meet any necessary obligations pending approval of a proposed debtor in possession loan facility provided by the Lenders.

22. Except as otherwise indicated, all facts in this Declaration are based upon my personal knowledge, my discussions with the Debtor's advisors and stakeholders (including certain of the Lenders and GLAS's advisors), my review of relevant documents and information concerning the Debtor's affairs and restructuring initiatives, including the decisions and rulings of the Delaware Chancery Court, or my experience, knowledge, and familiarity with the Debtor. I am over the age of 18, and if called upon to testify, I would testify competently to the facts set forth in this Declaration.

23. To better familiarize the Court with the Debtor, its business, and the circumstances leading to this chapter 11 case, my Declaration is organized into five parts as follows:

- **Part I** provides a general overview of the Debtor's corporate history and business operations;
- **Part II** offers detailed information on the Debtor's prepetition organizational and capital structure, to the extent I have been able to obtain that information after I became the Debtor's sole director and sole officer;
- **Part III** describes the circumstances leading to the commencement of this chapter 11 case, including the Debtor's prepetition efforts;

- **Part IV** lays out the anticipated next steps in chapter 11; and
- **Part V** provides the evidentiary support for the First Day Motions (defined below) that the Debtor has contemporaneously filed to facilitate this chapter 11 case.

**Part I: Corporate History and Business Operations**

24. Incorporated on September 27, 2021 in Delaware, the Debtor, throughout its existence, has been a single-purpose financing vehicle. It never had any business operations of its own. Rather, the Debtor was formed to be the borrower on a "Term Loan B" financing facility that T&L was still structuring at the time.

25. T&L, formed in 2011 in India by two former teachers, was the Debtor's ultimate corporate parent. It rose to become the self-proclaimed "world's largest edtech company," purportedly reaching children around the globe with its online educational services. T&L and its subsidiaries conduct business under the trade name "BYJU's," the name of its eponymous founder, Byju Raveendran.

26. As I discuss in Part II.B, *infra*, ultimately, on November 24, 2021—just under two months into its corporate existence—the Debtor borrowed $1.2 billion in term loans in accordance with various loan documents, including a Credit and Guaranty Agreement (the "Credit Agreement") and collateral and security agreements. I understand that the intended purpose of the $1.2 billion was for T&L's general business growth outside of India.

27. Because the Debtor (a Delaware Corporation) never had operations of its own, its principal obligation was to comply with its fiduciary duties and the terms of the Credit Agreement, including its obligation to make interest and amortization payments when due, along with various other covenants. Other than certain regulatory and administrative tasks (*e.g.*, making certain annual state filings), I am currently unaware of the Debtor having undertaken any other obligations

over the course of its corporate existence (though, again, I do not have full visibility into the Debtor's historical affairs, as former management has not shared that information with me).

28. From its formation until March 3, 2023, to my knowledge, the Debtor's sole director and sole officer was Byju Raveendran's younger brother, Riju Ravindran. Riju Ravindran signed the Credit Agreement and several other loan documents, including amendments to the Credit Agreement, on the Debtor's behalf. He also sat on the board of T&L and, on information and belief, was and remains a T&L shareholder.

29. I became the Debtor's sole director and sole officer on March 3, 2023, following a change of control effectuated pursuant to GLAS exercising its remedial rights as the Lenders' Agent under the Credit Agreement. *See* Part III.B, *infra*.

## Part II: The Debtor's Prepetition Organizational and Capital Structure

### A. The Debtor's Prepetition Organizational Structure.

30. Until March 3, 2023, the Debtor was an indirect subsidiary of T&L, owned by its intermediate corporate parent BYJU's Pte. Ltd. ("BYJU's Pte."), a Singapore entity. T&L and five of its affiliates guaranteed the Debtor's Term Loans, including BYJU's Pte.[2]

[2] The five affiliates are BYJU's Pte., Neuron Fuel Inc. ("Neuron Fuel"), Great Learning Education Pte. Ltd. ("GLE"), Tangible Play, Inc. ("Tangible Play"), and Epic! Creations Inc. ("Epic").

31. A simplified version of the Debtor's pre-March 3, 2023 corporate organizational structure is reflected in the following chart:




32. As discussed in more detail in Part III.A.(1-2), *infra*, soon after receiving the proceeds of the Term Loans, the Debtor and its then-affiliates breached multiple loan covenants, enabling the Lenders' Agent, GLAS, to take control of the Debtor's stock, which had been pledged by BYJU's Pte. As a result, after a period of time, GLAS exercised its contractual rights and became the holder of 100% of the common stock of the Debtor.

33. The Debtor's corporate organizational structure on and after March 3, 2023 is reflected in the following chart:




**B. The Debtor's Prepetition Capital Structure.**

34. The Lenders entered into the Credit Agreement on November 24, 2021 for the purpose of supplying the Debtor with $1.2 billion in Term Loans. As noted above, the Credit Agreement referred to the Debtor, along with T&L and the other guarantors, as the "Loan Parties." I understand from GLAS that the Term Loans were syndicated and that there are, as of mid-January 2024, over 100 distinct lenders of record holding the Term Loans. The Term Loans were accelerated by GLAS on March 3, 2023. As of the Petition Date, the outstanding principal amount of the Term Loans is approximately $1,189,513,685 and the outstanding accrued and unpaid premium, interest, fees and expenses is approximately $267,548,427.

35. As of the Petition Date, the Debtor's issued and outstanding share capital consists of one class of 1,000 shares of common stock. No shares of common stock carry any special rights, and each share of common stock is entitled to one vote. The common stock is not publicly traded, and GLAS has owned all outstanding shares of common stock since March 3, 2023.

## Part III: Events Leading to This Chapter 11 Case

### A. The Debtor's Immediate Defaults on Its Loan Covenants.

36. Within four months after entering into the Credit Agreement and borrowing $1.2 billion, on March 16, 2022, the Debtor and the other Loan Parties defaulted on their covenants under the Credit Agreement. By October 10, 2022, there were at least four "Defaults," which are known as the "Specified Defaults," each of which then matured into "Events of Default" on November 24, 2022. Every one of those Events of Defaults separately and independently enabled the Lenders, as they did on March 3, 2023, to direct GLAS to accelerate the Term Loan obligations and take ownership of the pledged common stock in the Debtor.

#### 1. The Four Independent Defaults.

37. The Credit Agreement included certain financial reporting and guarantee obligations—

(a) Under Section 5.1(a) of the Credit Agreement, by the 180th day after the end of T&L's fiscal year on March 31, T&L had to provide its annual audited financials to GLAS;

(b) Under Section 5.1(b) of the Credit Agreement, by the 75th day following the end of Q1, Q2, and Q3 of each fiscal year of T&L, T&L was required to furnish to GLAS unaudited consolidated financial statements for that fiscal quarter and the then-elapsed portion of the then-current fiscal year, along with comparative figures for the corresponding periods of the prior fiscal year; and

(c) Under Section 5.9 of the Credit Agreement, the Loan Parties, including the Debtor, covenanted that one of their Indian affiliates, Whitehat Education Technology Private Ltd. ("Whitehat India"), would sign an Onshore Guarantee Deed by no later than April 1, 2022, guaranteeing the full amount of the Debtor's Term Loans (the "Guarantee").

38. Each of those loan covenants was breached. Though the Q3 FY 2021-22 unaudited financial statements were due on March 16, 2022, T&L only provided financials for the then-elapsed portion of its fiscal year. T&L did not furnish any information for just the quarter itself or comparative figures for the corresponding period of the prior fiscal year. Almost two years later, this missing information still has not been provided.

39. On April 1, 2022, Whitehat India failed to provide the Onshore Guarantee Deed as of that date. The Lenders agreed to temporarily waive the April 1st deadline until October 8, 2022, but Whitehat India failed to obtain the Guarantee by the extended deadline. Whitehat India never provided the required Guarantee.

40. On September 13, 2022, T&L failed to provide comparative figures for the Q1 FY 2022-23 quarterly period. Sixteen months later, this missing information has still not been provided.

41. Finally, T&L failed to deliver audited annual financial statements for FY 2021-22, as of the September 27, 2022 deadline. It took more than 15 months, until January 2024 before T&L finally publicly filed its audited financial statements for FY 2021-22.

**2. The Lenders' Extensive Negotiations to Cure those Defaults, and a Series of Forbearances.**

42. I have become generally familiar with the historical negotiations between the Lenders and the Debtor's former management, T&L, and their representatives. In summer 2022, after the first two Defaults, an *ad hoc* group of Lenders formed. The Lenders engaged legal and financial advisors, and, through counsel, reached out to the Loan Parties in an effort to resolve the outstanding Defaults and restructure the Term Loans.

43. To express their concern about the lack of information-sharing and evaluate T&L's and its subsidiaries' overall financial health, the Lenders' counsel sent T&L a letter on August 29,

2022. Among other information, the Lenders requested "[c]ash balances by entity & region, as of August 26, 2022, including a list of all bank accounts, current balances, location and name of account holding entity with respect to the Parent Guarantor [*i.e.*, T&L] and any of its Subsidiaries[.]" The Lenders stated that they "fully expect . . . that cash sitting at the Borrower or any Guarantor under the Credit Agreement remain with such entities in the accounts where the cash currently resides[.]"

44. Over the next five months, the Lenders reiterated their concerns, while attempting to find a compromise with the Loan Parties. The Lenders first proposed, on October 3, 2022, a Term Sheet providing a roadmap for the Loan Parties to resolve the outstanding defaults. Under this roadmap, T&L, on behalf of all Loan Parties (including the Debtor), entered into a series of eight amendments to the Credit Agreement while negotiating with the Lenders. In these amendments, among other things, the parties memorialized the Loan Parties' acknowledgement that the four aforementioned reporting and Guarantee breaches, defined under Amendment No. 2 as "Specified Defaults," matured into "Events of Default" following T&L's failure to cure them within a 45-day cure period, ending November 24, 2022.

45. The parties entered into Amendment No. 7, which is dated as of January 6, 2023 and which Riju Ravindran also signed. Under Amendment No. 7, the Lenders agreed to forbear from exercising remedies, including accelerating the Term Loans, until no later than February 10, 2023 so that the parties could continue efforts to restructure the Term Loans. In exchange, the Loan Parties made three concessions:

(a) The Loan Parties amended the Credit Agreement to explicitly state that "none of the Specified Defaults can be cured or remedied (or deemed to be cured or remedied) until specifically waived by the Required Lenders[.]" This language was recorded in four sections of Amendment No. 7.

(b) The Loan Parties acknowledged that its Credit Agreement obligations were "enforceable and non-avoidable obligations."

(c) The Loan Parties reaffirmed that their failure to cure the Specified Defaults "entitles" the Lenders to send a default notice and exercise remedies. The Delaware Chancery Court later stated that this language "gave GLAS the right to send to BYJU's Alpha a default notice."

46. On February 10, 2023, the forbearance period under Amendment No. 7 expired by its own terms.

**B. The Lenders' Agent's Exercise of Remedies.**

47. The next week, on or about February 18, 2023, the Lenders' counsel contacted me. He told me that certain Lenders were considering exercising remedies against the Debtor, including accelerating the outstanding Term Loans and directing their Agent to take control of the pledged common stock in the Debtor. He told me that the Lenders wanted someone with extensive restructuring experience to serve as the Debtor's new sole director and sole officer. I understood that the Lenders' exercise of remedies would not be consensual and could be contested, and that a major part of the anticipated role would be locating and recovering the Debtor's assets.

48. I agreed to accept the role, making it clear that I would retain counsel of my choosing for the Debtor, would make my own determinations regarding the Debtor's obligations, and act consistent with my duties to the Debtor. I also indicated what my fee would be in order to accept this particular assignment, considering the range of fees charged in the market for independent directors for distressed companies, the litigious nature of this specific situation, the lack of information regarding D&O insurance coverage, the uncertainty regarding available funds for the Debtor, and the request to be the sole director and sole officer. Those terms were accepted by the Agent (and about-to-be owner of the Debtor) and the Lenders' steering committee, and I signed an Independent Director Agreement effective as of March 3, 2023 containing those terms.

**1. The Lenders' Agent's Exercise of Control over the Debtor, and My Appointment as the Debtor's Sole Director and Sole Officer.**

49. On March 3, 2023, GLAS, at the Lenders' direction, gave formal notice of Events of Default and accelerated the Term Loans, causing almost $1.2 billion in principal (along with additional interest, premiums, and fees) to become immediately due and payable. As noted above, under the Loan Documents, 100% of the common stock of the Debtor had been pledged to GLAS as loan collateral. As the Agent, GLAS, acting at the Lenders' direction, effectuated a change of control of the Debtor by taking control of that pledged stock and its voting rights.

50. GLAS thus became the Debtor's sole shareholder in its capacity as the Collateral Agent. Through an Action by Written Consent of the Sole Stockholder, GLAS removed Riju Ravindran, appointed me as Debtor's sole director, and amended the Debtor's Bylaws to provide that the board and any officer designated by the board would control the Debtor's accounts.

51. In my capacity as the Debtor's sole director, consistent with the GLAS's directions, I executed a Written Consent of the Board to immediately remove all existing officers (again, Mr. Ravindran) and appoint myself to serve as CEO and Secretary.

**2. My Immediate Efforts to Locate and Secure the Debtor's Assets.**

52. As described above, I had learned that the Lenders believed, based upon their negotiations and discussions with the Debtor, T&L, and its advisors and the financial information they had received, that the Debtor had over $500 million of Term Loan proceeds in its possession or control, but those parties would not disclose to the Lenders or their advisors where those funds were located. Thus, in collaboration with GLAS, I prioritized locating and securing the Debtor's assets. I retained Quinn Emanuel Urquhart & Sullivan LLP ("Quinn") to represent the Debtor in this effort and to provide general legal advice.

53. Therefore, also on March 3, 2023, GLAS sent a letter to over 300 financial institutions in the United States. These financial institutions were chosen based on the belief that they were capable of maintaining corporate accounts in excess of $500 million. GLAS's letter gave notice to those financial institutions that there had been a change of control of the Debtor and that I had been given "exclusive control" over all of the Debtor's accounts, and requested them to indicate if they had any accounts holding funds belonging to the Debtor. GLAS further instructed the financial institutions to "immediately" revoke all other access to any such accounts. While GLAS received some responses, to my knowledge, no institution responded by disclosing that it held the Debtor's funds.

54. Two months later (and following unsuccessful renewed negotiations, as discussed below), on May 3, 2023, I directed Quinn to send a second round of notices to the same over-300 financial institutions. As before, while some of the financial institutions responded, none of them disclosed holding the Debtor's funds in response to the notices sent on May 3, 2023.

55. At the same time, I instructed Quinn to send separate notices to T&L's management team (its then-CFO and then-General Counsel, among others) and legal and financial advisors. As the sole director and sole officer of the Debtor, I requested the Debtor's books and records and information about its assets. In particular, I requested the Debtor's financial records, including bank accounts information, the Debtor's governance materials (*e.g.*, board minutes and resolutions), the Debtor's contracts, and any other information about the Debtor's assets. I received no response to either letter.

**3. BYJU's' Re-initiation of Negotiations, then Disengagement.**

56. Soon after GLAS exercised its remedial rights, I was informed by the Lenders that Byju Raveendran approached the Lenders to restart settlement discussions. Therefore, I monitored the status of negotiations while avoiding any actions that might disrupt those negotiations. While

those discussions continued over the next two months, no settlement was reached. However, I was informed that, as part of those discussions, in an effort to assuage the Lenders' concerns about the whereabouts of the over $500 million of Debtor funds, on March 27, 2023, the Loan Parties' outside counsel confirmed to the Lenders' outside counsel that he watched his client access certain cash balances in the United States and saw the account balance, which reflected an amount of cash consistent with the Loan Parties' assertions that the funds had not been dissipated. I later learned that the amount shown and disclosed to the Lenders' counsel was consistent with the total amount of transfers from the Debtor to Camshaft Capital Fund in April and July 2022.

**C. The 225 Action in Delaware to Validate My Appointment.**

57. On May 3, 2023, GLAS and I filed a lawsuit in the Delaware Court of Chancery, seeking a declaration that, pursuant to the Delaware General Corporation Law, 8 *Del. C.* § 225, I had been validly appointed as the Debtor's director and officer, among other related relief. *GLAS Tr. Co. LLC v. Ravindran*, C.A. No. 2023-0488-MTZ (Del. Ch. 2023) (the "225 Action").

58. When I authorized the filing of the 225 Action, I believed it likely that the Debtor had in its bank accounts (over which I did not yet have control) a material amount of cash. Part of my rationale for commencing the litigation, which included immediately filing a motion seeking a *Status Quo* Order to obtain control of the Debtor's accounts and assets during the pendency of the litigation, was to locate and secure that cash and any other assets belonging to the Debtor.

59. Indeed, just weeks earlier, in mid-March 2023, T&L had furnished to GLAS, for distribution to the Lenders, unaudited quarterly financial statements for the period ended December 31, 2022. Those financial statements showed that, as of December 31, 2022, the Debtor had an amount of Rupees equivalent to over $[redacted] million (based on prevailing currency exchange rates) in "Cash and Bank."

**1. BYJU's' Concealment of $533 Million of the Debtor's Cash.**

60. Five days after filing the 225 Action, during a May 8, 2023 call, Byju Raveendran told one of the Lenders' advisors that the Debtor no longer had that money. Rather, "**<u>the money is someplace the Lenders will never find it</u>**." I subsequently learned of those comments, and later received a copy of the Lenders' advisor's handwritten notes of the call, taken on a piece of scratch paper (reproduced in part below).




2. **My On-Going Efforts to Locate the $533 Million.**

61. On May 22, 2023, the Delaware Chancery Court entered a *Status Quo* Order, authorizing me to remain in control of the Debtor as sole director and sole officer, pending a final decision of the merits. As part of the Order, the Chancery Court further required the Debtor's former director and officer, Riju Ravindran, to "immediately" provide me with "access to and exclusive control over all the accounts[,] . . . documents, and information of the Company," as "necessary" for me to "perform [my] roles as sole director and officer[.]" The *Status Quo* Order also restricted me from taking "any action outside the ordinary course of business," including "filing a bankruptcy petition[.]"

62. On May 24, 2023, my litigation counsel in Delaware received three bank account numbers from Riju Ravindran's counsel, which I later learned through my and Quinn's investigation were not all of the Debtor's financial accounts. Notwithstanding the Delaware

Court's order, other than those three account numbers, I did not receive any other information from Mr. Ravindran about the Debtor. I did not receive information about any historical transfers or transactions or investments made by the Debtor, any contracts the Debtor had entered into, or any insurance policies available to the Debtor or its current or former management.

63. I spent the next two months working with the financial institutions that held those three Debtor bank accounts, obtaining access to information about those accounts. This was a time-consuming and laborious process, as the bank records were provided in piecemeal fashion. As information slowly trickled in, Quinn and I identified two more bank accounts in the Debtor's name—one open and the other one closed—that Mr. Ravindran had failed to disclose. We similarly pursued information about those accounts and their historical activity. I am not aware of any other bank accounts in the Debtor's name.

**3. The Deposition of the Debtor's Former Director and Officer.**

64. On July 14, 2023, the Debtor's former director and officer, Riju Ravindran, was deposed by the Debtor's counsel in the 225 Action. Mr. Ravindran's deposition, key parts of which were publicly revealed during trial in the 225 Action, showed a lack of oversight and a failure by him to act in the best interests of the Debtor when it became distressed.

**4. My Findings from the Debtor's Bank Statements, including the Discovery of Camshaft Capital Fund.**

65. My review of the Debtor's five sets of bank statements revealed the following: *First*, the Debtor does not have sufficient funds to repay the due and payable Term Loans, nor to make the periodic amortization or interest payments that were due by the terms of the loan agreements. Across all five known accounts, there was less than $4 million in cash as of March 3, 2023, when I became the Debtor's sole director and sole officer (but at which time I did not yet

have access to the bank accounts). Then, there was less than $550,000 in cash on hand as of end of day on May 22, 2023, when the Delaware Chancery Court entered the *Status Quo* Order.

66. *Second*, from March 3, 2023 to May 22, 2023, the Debtor's former management had made around 200 transfers out of the bank accounts, each without my knowledge or consent. Transfers were made to various non-affiliated third parties. This included millions of dollars in payments to what appear to be a number of financial institutions, the names of which I did not recognize.

67. *Third*, in late July 2023, I learned that an additional bank account belonging to the Debtor existed, which was an investment account.

68. After obtaining copies of the bank statements for that account, I was able to more thoroughly review and examine the bank statements across all of the Debtor's accounts known to me. I preliminarily determined that across six transfers from two of Debtor's accounts in April and July 2022, the Debtor had transferred $533,000,100.00 to a hedge fund located in Miami, Florida called Camshaft Capital Fund. The Debtor's former management and representatives never told me about Camshaft Capital Fund, or what consideration, if any, the Debtor had received from Camshaft Capital Fund.

69. Upon further investigation, I learned that Camshaft Capital Fund was founded in August 2020 by an individual named William Cameron Morton—then 23 years old with no apparent formal training in investing and money management, and no apparent qualification to manage a hedge fund—and which once listed on federal and state regulatory filings the address of an International House of Pancakes in Miami as its principal place of business. Specifically, hedge funds file a so-called "Form D" with the SEC in connection with an exempt offering of securities under the federal securities laws. In its Form D filed on September 11, 2020, when it launched,

Camshaft Capital Fund disclosed an address at 285 NW 42nd Avenue in Miami, which I understand has been the address of an IHOP since at least the 1990's. Camshaft Capital Fund disclosed the same address for Mr. Morton, who was identified as the Chief Executive Officer.




70. The Debtor's historical bank accounts (at least those that I know of) disclose no evidence of the Debtor having received any return accruing from its enormous purported investment in the Camshaft Capital Fund, and no capital account balances, financial statements, investor updates, or other reports or information from Camshaft Capital Fund have been shared with me.

71. I shared the discovery of the transfers to Camshaft Capital Fund with the Lenders and GLAS's counsel in August 2023. Shortly thereafter, on September 5, 2023, GLAS sued Camshaft Capital Fund and two of its affiliates (collectively, "<u>Camshaft</u>") in state court in Miami, seeking to avoid the $533 million in transfers, among other relief. *See GLAS Tr. Co. LLC v. Camshaft Cap. Fund, LP*, 2023-022640-CA-01 (Fla. 11th Cir. Ct. 2023) (the "<u>Camshaft Action</u>").

72. At that time, the Debtor did not have remaining funds sufficient to pursue any legal rights or remedies. I also was then subject to the restrictions of the Delaware Chancery Court's *Status Quo* Order. For those reasons, I supported GLAS bringing the Camshaft Action following the discovery of the Debtor's transfers, and I actively monitored the lawsuit.

73. In public, the Loan Parties took the position that the Credit Agreement did not restrict the transfer of funds to Camshaft Capital Fund.[3] They did not indicate, nor do any available books and records indicate, any rationale for the Debtor to make an investment in or transfer funds to Camshaft.

74. I was also informed by the Lenders that T&L's management had told the Lenders in mid-September 2023 that the $533 million transferred to Camshaft was still available to T&L, the inference being that the funds still were being held by one of the Debtor's former affiliates. T&L added that some of its shareholders and board advisors had verified that the cash continued to exist. I understand that the Lenders requested their own form of third-party cash verification, but T&L never agreed on terms for such cash verification.

75. Separately, the Lenders also informed me that BYJU's released a vague statement on September 13, 2023 stating that the beneficiary of the fraudulent transfers was a BYJU's "offshore subsidiary". Presumably, those funds were thus outside of the reach of BYJU's creditors.

### D. The Victory in the 225 Action, and My Continued Efforts to Locate, Secure, and Recover the Debtor's Assets.

76. On November 2, 2023, the Delaware Chancery Court orally announced its decision in the 225 Action, on a telephonic conference that I attended. Based on Whitehat India's failure to procure the required Guarantee, the Delaware Chancery Court found that there was at least one valid Event of Default outstanding as of March 3, 2023, then granted virtually all of the relief GLAS and I had requested. The Chancery Court specifically declared that the enforcement steps

[3] *See, e.g., Creditors claim Byju's sent $500mn to fund registered at pancake house*, FIN. TIMES, (Sept. 13, 2023), https://www.ft.com/content/076850e8-7254-4400-bd9a-c25afa43ca25 (quoting a spokesperson for BYJU's saying that the Credit Agreement with "the lenders does not prohibit or restrict the movement or investment of monies").

on March 3, 2023 were valid and effective as to the removal of Riju Ravindran as the Debtor's preexisting director and officer. The Chancery Court also declared that I was properly put in place as the sole director and sole officer of the Debtor. Eleven days later, on November 13, 2023, the Chancery Court entered its Final Order and Judgment, which also dissolved the *Status Quo* Order. Mr. Ravindran and his co-defendants never moved to stay the effectiveness of the Final Order and Judgment.

77. As noted, on September 5, 2023, GLAS commenced the Camshaft Action. I monitored developments in the Camshaft Action, and Quinn and I reviewed statements made by Camshaft in its court filings about what happened to the $533 million and who owned it. In particular, Camshaft suggested that the Debtor[4] had invested $533 million in Camshaft Capital Fund and that the Debtor, not some other BYJU's entity, continued to hold that investment interest through that day. Here is what Camshaft wrote, with key portions highlighted:

> Camshaft's October 10, 2023 Motion to Dismiss
>
> GLAS's specious Complaint purports to ask the Court to seize $533 million in assets owned by BYJU's Alpha Inc. ('BYJU's') a non-party to this litigation invested into Camshaft Fund, based on statutory fraudulent transfer claims that require Plaintiff to prove, among other things, that BYJU's is "liable" to GLAS.
>
> Camshaft's October 10, 2023 Motion to Dismiss
>
> It is clear on the face of GLAS's Complaint that BYJU's is "materially interested, either legally or beneficially, in the subject-matter of the suit" so as to be an indispensable party. After all, it is BYJU's funds that GLAS is seeking to obtain.
>
> Camshaft's November 3, 2023 Motion to Dismiss Reply
>
> The borrower BYJU's is an indispensable party because Plaintiff is requesting that the Court seize BYJU's' approximately $500 million investment in Camshaft, and it is impossible to adjudicate that relief

[4] In the quoted excerpts, Camshaft erroneously uses "BYJU's" as a shorthand for the Debtor, BYJU's Alpha. Based on how it defined terms, it is my understanding that Camshaft intended to refer solely to the Debtor in each of these excerpts, in its capacity as a subsidiary of the overall BYJU's enterprise, and not the BYJU's enterprise as a whole.

without affecting BYJU's' material interests in that property. Plaintiff's Response completely fails to address the straightforward issue that BYJU's has an interest in the investment property and has clear due process rights under Florida law to defend that interest.

78. Informed by Camshaft's above representations, on November 20, 2023, one week after the Delaware Chancery Court entered judgment in the 225 Action validating my control over the Debtor's accounts and records, I wrote to Camshaft, requesting the records of the Debtor's purported interest in the Fund. I explained that "former management of [the Debtor] . . . failed to provide to me information regarding the [Camshaft] Transfers and Documents," thus "I lack this information[.]" I then asked for "any and all information in the possession or control of Camshaft regarding the Investment, the Transfers, and Documents," and listed specific categories of requests. In short, I asked Camshaft for documents the Debtor already would have received in the past, and should have still had in its possession, had former management actually provided me with the Debtor's books and records.

79. On December 4, 2023, Camshaft's counsel responded, stating—contrary to its earlier representations in court—that "BYJU's Alpha is a former limited partner of Camshaft Capital Fund," that the Debtor now has a "zero-balance capital account," without specifying why this is the case. Because the Debtor purportedly was a former limited partner, Camshaft rejected my information demand in its entirety.[5]

80. On the very same day, Camshaft sued the Debtor with no prior notice, seeking a declaratory judgment that it would not have to provide any such information. *See Camshaft Cap.*

---

[5] Relatedly, on November 21, 2023, GLAS, at the Lenders' direction, invoked its contractual information rights under the Credit Agreement to formally demand of T&L "a detailed written explanation of the business reasons for and purposes" of the Camshaft transfers, along with "complete account records . . . associated with any transfer of funds or investment of monies" to Camshaft and "a detailed written explanation of the current status of the funds[.]" I received a copy of that information demand. T&L failed to provide any information in response, and the Lenders gave a notice of default on January 16, 2024.

*Fund, LP v. BYJU's Alpha, Inc.*, Case No. 2023-027523-CA-01 (Fla. 11th Cir. Ct. 2023). In that lawsuit, Camshaft claimed that, "[i]n the first quarter of 2023, and prior to Mr. Pohl's appointment as a director of BYJU's [Alpha], BYJU's [Alpha] transferred one hundred percent of its interest in Camshaft to a third party pursuant to the terms of the [Limited Partnership Agreement]." I understood Camshaft's allegation to mean that the $533 million remained invested in Camshaft Capital Fund (at least as of the first three months in 2023), but that the Debtor had transferred the limited partnership interest on account of those funds to an unknown third party. More recently, I learned that, just weeks ago, on January 14, 2024, Byju Raveendran personally told the Lenders over a Zoom call that the $500-plus million transferred to Camshaft Capital Fund still existed, "in cash and cash equivalents."

81. The implication of Camshaft's allegations is that the Debtor's former management, presumably acting at the direction of T&L, directed the Debtor to transfer an interest in some type of investment, funded initially by the Debtor's $533 million, to a third-party (presumably a former affiliate) for no consideration in return. As of today, I have no further information about these funds or any transfers or investments thereof.

82. Setting aside Camshaft, in November and December 2023, I instructed Quinn to send letters to 18 entities that, based on the statements of the five bank accounts that I had reviewed, had received over $400 million from the Debtor on or after March 16, 2022, when the Debtor first defaulted on the Credit Agreement.

83. Four of the letters were to law firms or other professional service firms, including Kasowitz Benson Torres LLP ("Kasowitz") and White & Case LLP. In the letters to Kasowitz and White & Case, Quinn requested the firm's client and work files for their representation of the Debtor and for the return of any retainer. In the other 14 letters, Quinn asked the recipient to

confirm if they were holding (or ever held) any of the Debtor's assets and, if so, to provide a description of those assets.

84. The majority of the entities did not respond and none indicated the location of any assets. With respect to law firms, Kasowitz refused to turnover its client file, and White & Case never responded. With respect to the others, two of them said that the referenced transfers were credited to the accounts of other entities (which were not identified). I did not learn anything substantive from the other letters.

**E. The Debtor's Go-Forward Options.**

85. As described above, as part of its final order on November 13, 2023, the Delaware Chancery Court dissolved its interim restriction on my authority to file a bankruptcy petition for the Debtor. Thereafter, I began discussions with GLAS, as the Debtor's sole shareholder and also as the Lenders' Agent, about the need for the Debtor to obtain financing in order to defend itself with respect to the various pending litigations (including the appeal in the 225 Action and Camshaft's new suit against the Debtor), and to affirmatively pursue its available rights and remedies in an effort to recover its assets. The remaining funds in the Debtor's bank accounts, by the time I was given access and control, were almost completely depleted in funding the litigations that had occurred to date and paying my management fee.

86. As these discussions progressed, GLAS's advisors informed me that the Lenders were willing to continue to fund the Debtor's expenses but only through a debtor-in-possession credit facility (the "<u>DIP Credit Facility</u>") to fund a chapter 11 case. Given that the Lenders have liens on substantially all of the Debtor's assets and, to my current knowledge, are the Debtor's only material creditors, I do not believe there to be any other readily available sources of financing available to the Debtor. After extensive negotiations, I agreed with the Lenders on the key terms of the DIP Credit Facility (as memorialized in a term sheet that is being filed concurrently with

this bankruptcy petition) in the aggregate principal amount of up to $260 million, pursuant to which the Lenders will provide up to $25 million of new money term loans, approximately $5 million of which was funded prepetition as a bridge loan. I expect that the Debtor will be seeking the Court's approval of this DIP Credit Facility in the coming weeks.

87. With this funding in place, I believe that filing the Debtor for chapter 11 is the best step to maximize the value of the Debtor's estate, obtain recoveries for the Debtor's creditors, and equitably distribute those recoveries:

88. **First**, I believe that chapter 11 facilitates the efficient and effective maximization of the value of the Debtor's estate. Sections 544, 548, and 550 of the Bankruptcy Code provide an efficient and effective legal pathway for a debtor to pursue and recover fraudulent transfer and related claims for the benefit of the entire estate. Bankruptcy courts of course have the subject matter expertise to try such cases. Just as importantly, however, bankruptcy courts are adept at housing all aspects of that kind of litigation in a single forum, including the pursuit of recovery from immediate and mediate transferees located in various locations and in receipt of property that will augment the estate, which, based upon what I have learned to date, appears to be a certainty in this case. Accordingly, the Debtor commenced a fraudulent transfer adversary proceeding against Camshaft concurrently with the filing of its bankruptcy petition pursuant to chapter 5 of the Bankruptcy Code. Additionally, the Bankruptcy Code and Federal Rules of Bankruptcy Procedure, including Bankruptcy Rule 2004, provide a debtor and its stakeholders with the investigatory tools to legally compel third parties to provide relevant information, which is particularly important when the ultimate destination of voidable transfers is an unknown.

89. Relatedly, the automatic stay will avoid significant legal fees being spent on litigation in Delaware, Florida, and other forums. There is now pending multiple related litigations

in various forums, all involving the same fundamental subject matter: legal control over the Debtor, its assets, and recovery of those assets. Parallel litigations in different forums will only needlessly deplete the Debtor's estate and reduce recoveries to the Debtor's stakeholders.

90. **Second**, time is of the essence. Based upon public information, it appears that the BYJU's conglomerate is in financial distress and in need of cash. T&L is facing the Indian equivalent of multiple involuntary bankruptcy petitions, including by GLAS, and on information and belief, missed payroll in recent months. T&L's prior auditor resigned, and its current auditor reportedly said that "a material uncertainty exists" with respect to the BYJU's organization's ability to continue as a going concern. T&L has admitted intentionally hindering the Debtor's creditors by hiding and/or transferring the Debtor's money, and in so doing, absent effective and swift legal relief, nothing stops it from inappropriately squandering that money or moving it yet again. BYJU's has publicly stated that it is in immediate need of cash.

91. **Third**, the Debtor requires funding to protect its interests and pursue its claims. The only available source of that funding is the Lenders, who have offered to fund such efforts, but only if the Debtor accesses the effectiveness and efficiency available to it inside of chapter 11.

92. **Finally**, the Debtor needs to understand all of its potential obligations, including if there are any creditors outside of GLAS and the Lenders, and what obligations it owed. As noted, because the Debtor's former management has refused to provide me with the Debtor's books and records, I currently lack this information.

## Part IV: Anticipated Next Steps in Chapter 11

93. My immediate focus is on locating and securing the $533 million, by far the largest known asset of the estate. Concurrently with commencing this chapter 11 case, the Debtor is initiating a fraudulent transfer adversary proceeding against Camshaft, the initial recipient of the $533 million. Expedition will be critical as I do not know where the $533 million went, if

Camshaft still has the funds, or who is the nominal beneficial owner of any investments made with those funds.

94. I expect that, in the coming weeks, the Debtor will be filing motions under Bankruptcy Rule 2004 to obtain discovery from, among others, the Debtor's prior management/representatives and a number of the Debtor's former affiliates. The Debtor further will be investigating the collectability of any judgment against Mr. Ravindran (who resides abroad), including what D&O insurance, if any, is available.

95. Moreover, aside from the $533 million Camshaft transfers, the Debtor also made more than $400 million in transfers to other entities after its first Event of Default. I plan to investigate and evaluate these transfers, then pursue the Debtor's claims against these third parties as the circumstances warrant.

## Part V: The First Day Motions

96. With these go-forward options in mind, and to facilitate this chapter 11 case, the Debtor has contemporaneously filed two motions seeking immediate or expedited relief (the "First Day Motions"). I have reviewed both of the First Day Motions.

97. The First Day Motions are designed to facilitate the Debtor's transition into chapter 11 with as little disruption as possible while seeking to maximize the value of its estate through this chapter 11 case. I believe the First Day Motions achieve these goals. I further believe that the relief requested in the First Day Motions is necessary and essential to ensuring that the Debtor's immediate financial needs are met, and that the Debtor (and other constituencies) will not suffer any immediate and irreparable harm as a result of the commencement of the chapter 11 case.

### A. Motion to Authorize Continued Maintenance and Use of Prepetition Bank Accounts

98. As of the Petition Date, the Debtor has less than $4 million in cash, in which the original Loan Parties to the Prepetition Credit Agreement (the "Prepetition Secured Parties") assert a security interest pursuant to the Prepetition Credit Agreement and the additional loan extended under the Prepetition Credit Agreement by participating lenders (the "Bridge Loan"). Almost all of this cash is currently held by GLAS in an account for the benefit of the Debtor (the "GLAS Account"). Following the Petition Date, the Debtor intends to open a new bank account (the "Postpetition Bank Account") at a bank to be determined (such bank, together with JPM and SVB (each as defined below), the "Banks"), which, upon entry of the final order approving the relief requested in the Final DIP Order,[6] will receive the proceeds of the DIP Credit Facility and the balance of cash proceeds of the Bridge Loan . Additionally, the Debtor also holds less than $20,000 in three bank accounts (the "Existing Bank Accounts" and together with the Postpetition Bank Account, the "Bank Accounts") at JPMorgan Chase & Co. ("JPM") and Silicon Valley Bank, a division of First-Citizens Bank & Trust Company ("SVB"). Each of the Banks is or will be party to a Uniform Depository Agreement with the U.S. Trustee.

99. The Existing Bank Accounts are general operating accounts that historically, among other things, were used to pay amounts owed to the Debtor's prepetition secured creditors, covered expenses incurred in connection with the Debtor's ongoing existence and were transferred to the Debtor's prior affiliates, presumably to help fund their operations. Access to the Bank Accounts and the GLAS Account (together, the "Accounts") will be essential to paying chapter 11

[6] "Final DIP Order" means the final order approving the relief requested in the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Authorizing the Debtor to Obtain Postpetition Financing, (III) Granting Senior Postpetition Security Interests, and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief.*

case costs, including the approved fees of the Debtor's professionals and pursuing claims to recover the Debtor's assets for equitable distribution of the estate. Accordingly, the Debtor's continued access to the Accounts is essential to the success of this chapter 11 case.

100. It is my understanding that the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "<u>U.S. Trustee Guidelines</u>") require chapter 11 debtors to, among other things, close all existing bank accounts and open new accounts (which must be designated "Debtor in Possession" bank accounts) and obtain, establish, and maintain separate "Debtor in Possession" accounts. Here, authorizing the Debtor's continued use of the Accounts is particularly warranted given that the Debtor has no operations, uses and will use the Accounts for limited purposes, and has and will have the ability to easily monitor cash inflows and outflows. Strict compliance with the Operating Guidelines under these circumstances—including the requirement to close the Accounts and reopen new bank accounts—would provide no apparent benefit to the Debtor's estate or creditors. Specifically, disrupting the Debtor's use of the Accounts would prevent the Debtor from accessing the funds needed to administer the chapter 11 case.

101. I also understand that section 345(b) of the Bankruptcy Code contains certain deposit, investment, and reporting requirements. The Debtor seeks a temporary waiver of strict compliance with section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines with respect to the Accounts to the extent applicable. All of the Accounts comply (and will comply) with section 345(b) of the Bankruptcy Code because they are or will be maintained at banks that are authorized depositories in accordance with the U.S. Trustee Guidelines. However, out of an abundance of caution, to the extent that such Accounts are not already in compliance with section 345(b) of the Bankruptcy Code, I believe that cause exists for the Court to grant a temporary waiver

of the requirements of section 345 of the Bankruptcy Code so that the Debtor may conduct the proper diligence to come into compliance with such requirements.

**B. DIP and Cash Collateral Motion**

102. As of the Petition Date, the Debtor has approximately $1,455,000,000 in outstanding borrowings under the Prepetition Credit Agreement, including approximately $5.0 million outstanding under the Bridge Loan. Aside from these obligations, as far as I am aware, the Debtor has no other secured or unsecured debt.

103. Access to the Debtor's cash is necessary to ensure the Debtor's ability to pay ordinary course obligations as they arise pending Court approval of the proposed DIP Credit Facility, if any arise prior thereto.

104. The Debtor has reached an agreement with the Prepetition Secured Parties, who assert a security interest in the Debtor's cash, to use the Debtor's cash subject to an approved budget. I believe that the request to use Debtor's cash on a consensual basis is reasonable given that the requested relief will preserve the value of the Prepetition Secured Parties and provides adequate protection as I understand that term to mean under the Bankruptcy Code.

105. I also have worked closely with the Debtor's advisors to ensure that the approved budget includes those amounts that will be necessary to preserve and maximize the value of the Debtor's estate. The cash collateral motion only seeks authority to expend amounts in the approved budget during the period prior to a final hearing on the motion that will avoid any immediate and irreparable harm to the Debtor.

106. For these reasons, I believe that the Debtor's continued use of its cash is necessary to preserve the value of its estate and maximize its value for the benefit of all stakeholders.

**Conclusion**

107. I became the Debtor's director and officer almost a year ago, yet the Debtor unfortunately remains a long way away from having found and securing its assets. I believe that chapter 11 is an appropriate and effective means to finally compel uncooperative counterparties to provide information, and then, based on that information, recover funds and pursue claims for the benefit of the Debtor's estate, all under this Court's judicial oversight.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: February 2, 2024

/s/ *Timothy R. Pohl*
Name: Timothy R. Pohl
Title: Director, CEO, and Secretary
BYJU's Alpha, Inc.

# EXHIBIT 3

Case 24-50013-JTD Doc 5 Filed 02/02/24 Page 3 of 48

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BYJU'S ALPHA, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 24-10140 (JTD) |
| BYJU'S ALPHA, INC.,<br>Plaintiff,<br><br>v.<br><br>CAMSHAFT CAPITAL FUND, LP, CAMSHAFT CAPITAL ADVISORS, LLC, and CAMSHAFT CAPITAL MANAGEMENT, LLC<br><br>Defendants. | Adv. Pro. Case No. 24-50013 (JTD) |

**COMPLAINT FOR AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS**

Plaintiff BYJU's Alpha, Inc. (the "Debtor"), for its Complaint against Defendants Camshaft Capital Fund, LP ("Camshaft Fund"), Camshaft Capital Advisors, LLC ("Camshaft Advisors"), and Camshaft Capital Management, LLC ("Camshaft Management," and together with Camshaft Advisors and Camshaft Fund, "Camshaft"), alleges as follows:

**PRELIMINARY STATEMENT**

1. This action is perhaps the most valuable asset of the Debtor's estate. It arises from the fraudulent transfer and concealment of *over half a billion dollars* of cash away from the Debtor and its creditors, the troubling details of which are still coming to light.

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is: 16192 Coastal Highway, Lewes, Delaware 19958.

2. The Debtor was a special purpose financing vehicle formed in September 2021 by "BYJU's," the trade name of the self-proclaimed world's largest education technology conglomerate, to borrow $1.2 billion in five-year term loans in November 2021. Mere months later, in April 2022, the Debtor, under the control of its former management and former ultimate corporate parent in India, made the first of six transfers in the total amount of just over $533 million, nearly half of the original loan amount, to Camshaft Fund. The Debtor made those transfers on the heels of two defaults and the entry into one temporary waiver of the second default, as the following illustration shows. After the transfers, the Debtor was left woefully undercapitalized and deeply insolvent, with assets less than a tenth of its liabilities.




3. There is no dispute that the transfers occurred, as they are acknowledged by both the Debtor's former management and Camshaft, as well as bank statements of the Debtor showing the transfers to Camshaft. Yet no legitimate reason has been given for them, *ever*, including throughout the course of several pre-petition litigations. The Debtor's currently-available books and records, following a contested change of control in March 2023, do not reveal that the Debtor received any consideration from Camshaft in exchange for the $533 million. Even assuming the Debtor received a limited partnership interest in Camshaft Fund, there was no legitimate reason for the Debtor to have chosen an unknown and unproven hedge fund to manage over half a billion of its capital. Indeed, there is no reason to believe that Camshaft Fund was chosen for its

investment acumen or track record, or because the Debtor wanted to deploy its cash to maximize a return on investment. If those were the goals, there were far superior options.

4. Rather, it appears Camshaft Fund was selected in furtherance of a deliberate scheme to hinder, delay, and defraud creditors. Camshaft Fund, for its part, was founded in August 2020 by William Cameron Morton—then 23 years old with no formal training in investing and money management and no apparent qualification to manage a hedge fund, let alone one with over half a billion dollars in assets under management (in fact, the Fund's reported minimum investment threshold is only $50,000). Moreover, based on Camshaft's public disclosures, it appears that Camshaft Advisors and Camshaft Management continuously have charged a 3% per annum management fee and 30% performance fee subject to a 12% hurdle rate—significantly higher than many top-tier, established hedge funds—directly from the Debtor's capital account since the purported investment was made. And Morton, despite having no apparent compliance background, appointed himself as Camshaft's Chief Compliance Officer with the U.S. Securities and Exchange Commission.

5. All told, the Debtor apparently exchanged cash for a highly illiquid and uncertain asset: a limited partnership interest in a fly-by-night hedge fund that is not registered under the U.S. federal securities laws and, upon information and belief, has extensive restrictions on investors' governance, transfer, pledge, and redemption or withdrawal rights, together with few limited partner protections. That interest would likely trade at a substantial discount to $533 million, ignoring the effect of potentially substantial fees and expenses, and is accordingly not reasonably equivalent in value.

6. That is just the first set of the fraudulent transfers. There is more that absolutely cements the conclusion that the transfers were fraudulent and voidable. In the first couple of

months of 2023, tensions between the Debtor, its corporate affiliates, and its Lenders were rising. There were four outstanding Events of Default, and business negotiations were at an impasse. The Lenders began telling the Debtor that, unless near-term progress towards a resolution was made, the Lenders intended to exercise remedies as soon as the parties' forbearance agreement expired on February 10, 2023. The reasonable inference from admissions that have trickled out in prepetition litigations is that, around that time, the Debtor—under its former management—apparently moved, *again*, that same $533 million (or the resulting limited partnership interest in Camshaft Fund attributable to the apparent investment) to an undisclosed affiliate, so that the money would be outside of the Lenders' reach when the Lenders exercised remedies.

7. The admitted purpose of this second transfer was to conceal the $533 million from the Debtor and, derivatively, the Lenders. The Debtor's common stock had been pledged as loan collateral, and BYJU's knew that the Lenders could exercise remedies, taking control of the Debtor then having possession of its cash.

8. The Lenders exercised remedies in March 2023. The Lenders' agent, GLAS Trust Company LLC (or "GLAS," for short), accelerated the loans based on the four acknowledged Events of Default, causing over $1.2 billion to become immediately due and payable, and took control of the pledged equity in the Debtor, appointing Timothy R. Pohl, an experienced restructuring professional, as the Debtor's sole director and officer. When GLAS took those actions, the Lenders were unaware of the Camshaft transfers and believed that the Debtor had over $500 million in its cash and accounts. In fact, BYJU's Alpha had repeatedly disclosed in quarterly financial statements that the Debtor had well over $[redacted] million in "Cash and Bank," a gross mischaracterization of where the money actually sat.

9. The Debtor's former management and affiliates refused to recognize GLAS's exercise of control. In May 2023, GLAS commenced litigation in the Delaware Court of Chancery to affirm Pohl's appointment. *See GLAS Tr. Co. v. Ravindran*¸ No. 2023-0488-MTZ (Del. Ch. 2023). Five days later, BYJU's eponymous founder, Byju Raveendran, reeling from the lawsuit, mocked the Lenders' exercise of remedies. In essence conceding an actual fraudulent transfer, he quipped: "**the money is someplace the Lenders will never find it**." That is how the Lenders came to learn that over $500 million in loan proceeds was no longer at the Debtor. Days later, at a hearing in that same Delaware lawsuit regarding Pohl's appointment, counsel for the Debtor's former management, Riju Ravindran, admitted in open court that the Debtor had "moved the funds" to an undisclosed third-party entity "based on fear of lenders acting expeditiously." These are blatant admissions of actual fraudulent transfers. The Delaware court was not persuaded by counsel's comments. The court issued a *Status Quo* Order on May 18, 2023, allowing Pohl to remain in charge of the Debtor on an interim basis (with certain restrictions, including on Pohl's authority to file for bankruptcy) and ultimately issued a thoughtful ruling on November 2, 2023 (with the final order granted on November 13, 2023), upholding Pohl's appointment as director and officer, as a valid Event of Default had occurred.

10. Upon learning of the transfers, the Debtor, now acting through Pohl, undertook an investigation to find the Debtor's money. But Pohl had almost no records because former management, who facilitated the fraudulent transfers, was recalcitrant. It took until July 2023 before Pohl was able to obtain complete bank statements for five of the Debtor's bank accounts. Relatively soon thereafter, Pohl preliminarily determined that $533 million had gone to Camshaft Fund, and he informed the Lenders and GLAS of that finding.

11. GLAS acted quickly and, on September 5, 2023, sued Camshaft in Florida state court, seeking to avoid the $533 million in transfers, among other relief. *See GLAS Tr. Co. LLC v. Camshaft Cap. Fund, LP*, No. 2023-022640-CA-01 (Fla. 11th Cir. Ct. 2023). At the time, the Debtor lacked the standing and the financing to pursue those claims. And, under the Delaware court's interim order, Pohl could not have filed the Debtor for bankruptcy; the Delaware court did not dissolve that restriction until it issued its final decision on November 13, 2023. No material progress on the merits has been made in GLAS's lawsuit against Camshaft, as Camshaft made blanket objections to all of GLAS's discovery requests, refusing to even confirm if it still had the $533 million. It is now the Debtor that has the power to pursue avoidance and recovery of fraudulent transfers, and GLAS's Florida lawsuit is now subject to the automatic stay.

12. Today, the Debtor believes that bankruptcy provides the best vehicle for maximizing the value of the estate. Among other benefits, bankruptcy provides the tools to precisely locate the $533 million and provides for a centralized forum to house the litigation arising from the potentially extensive prepetition misconduct, while simultaneously staying value-destructive litigation, including Camshaft's separate prepetition lawsuit against the Debtor. *See Camshaft Cap. Fund, LP v. BYJU's Alpha, Inc.*, No. 2023-027523-CA-01 (Fla. 11th Cir. Ct. 2023).

13. With those considerations in mind, the Debtor brings this action to locate, secure, and obtain the return of the $533 million—perhaps the most valuable asset of its bankruptcy estate. Among other relief, the Debtor seeks to avoid the actually and constructively fraudulent transfers of $533 million to Defendant Camshaft Fund and to avoid any and all above-market management and performance fees, and any other expenses, paid by or on account of the Debtor to the Fund's sole investment manager and general partner, Defendants Camshaft Advisors and Camshaft Management, respectively.

Case 24-50013-BLS Doc 5 Filed 02/02/24 Page 9 of 18

14. Additionally, if the $533 million in fraudulently-transferred funds (or any limited partnership interest held in Camshaft Fund as the proceeds of those funds) in fact was further transferred or redeemed in early 2023 or thereafter, the Debtor intends to amend this Complaint to name any subsequent transferees or recipients of redemption proceeds as defendants. To be certain, even in that scenario, Camshaft Fund (and any immediate or mediate transferees) will remain independently liable for the actual and constructive fraudulent transfers as the initial recipient and beneficiary of the fraudulently-transferred money.

15. Finally, during the course of discovery, either in this action or as part of the Debtor's main chapter 11 case, the Debtor may learn of additional transfers or redemptions made, or obligations incurred, to Camshaft or to others that are avoidable under the Bankruptcy Code. Indeed, because the Debtor's current management does not possess the entity's complete books and records (even assuming former management maintained complete and accurate books and records), the Debtor could discover additional avoidable transfers, as well as potentially other claims. The Debtor expressly reserves the right to amend this Complaint and/or file additional actions against Camshaft and others, as appropriate, to protect and preserve the interests of the Debtor's bankruptcy estate.

## JURISDICTION AND VENUE

16. On February 1, 2024 (the "Petition Date"), the Debtor, a corporation organized and existing under the laws of the State of Delaware, filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

17. This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334(b). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

18. This Court has personal jurisdiction over each of the Defendants under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7004(f). This Court also has personal jurisdiction over Camshaft Fund because it is a limited partnership organized and existing under the laws of the State of Delaware. Camshaft Advisors and Camshaft Management also have a substantial relationship to the underlying claims and the State of Delaware, as Camshaft Advisors is the sole investment manager of Camshaft Fund and Camshaft Management is the sole general partner of Camshaft Fund.

19. In the alternative, this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334(b). The Debtor's fraudulent transfer claims are related to its bankruptcy case, and this lawsuit may constitute the Debtor's estate's most valuable asset.

20. Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

21. This adversary proceeding is initiated under, at a minimum, Bankruptcy Rules 7001(1) and (9) and 28 U.S.C. § 2201.

22. Pursuant to Rule 7008-1 of the Local Rules of the U.S. Bankruptcy Court for the District of Delaware, the Debtor consents to the entry of final orders and judgments by the Court on these claims to the extent it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**THE PARTIES**

23. The Debtor, BYJU's Alpha, is a Delaware corporation with its principal place of business in the State of Illinois. The Debtor was formed on September 27, 2021 as a special purpose financing vehicle of its Indian ultimate corporate parent, Think and Learn Pvt. Ltd. ("T&L"). The Debtor has never had any active business operations. From formation until March 3, 2023, upon information and belief, the Debtor's sole director and officer was Riju Ravindran, the younger brother of T&L's founder, Byju Raveendran. As discussed above, Pohl became the

Case 24-50013-JTD Doc 8 Filed 03/28/24 Page 9 of 134

Debtor's sole director and sole officer on March 3, 2023, and has remained in that role through and including the Petition Date.

24. The hedge fund at the center of this lawsuit, Camshaft Fund, is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business at 16850 Collins Avenue, #112408, Sunny Isles Beach, Florida 33160.

25. As noted, Camshaft Advisors is the sole investment manager of Camshaft Fund, while Camshaft Management is the sole general partner for Camshaft Fund. Camshaft Advisors and Camshaft Management are affiliates of one another through Morton's common ownership and control, and are both Florida limited lability companies with their principal places of business both at 16850 Collins Avenue, #112408, Sunny Isles Beach, Florida 33160.

## FACTUAL BACKGROUND

### A. The Debtor's Underlying Term Loan Arrangement.

26. This dispute traces back to a November 2021 term loan arrangement. On November 24, 2021, GLAS, as Administrative and Collateral Agent, the Lenders, the Debtor, and certain other BYJU's entities as guarantors closed on a $1.2 billion term loan facility that would mature in five years. The definitive terms of the term loans are memorialized in several agreements, including a Credit and Guaranty Agreement (the "Credit Agreement"), Ex. 1 (filed under seal), and various security and collateral assignment agreements.

27. The Credit Agreement contains legal promises from the Debtor, which motivated the fraudulent transfers at issue here. In exchange for $1.2 billion, the Debtor and its affiliated guarantors undertook various covenants so that GLAS and the Lenders could carefully monitor and protect the term loans. Each relevant covenant is clear and unambiguous; they are the result of extensive negotiations by sophisticated parties, with advice of experienced counsel and

investment bankers. Most relevant here are the financial reporting and guarantee covenants. As of November 24, 2021, the Debtor, T&L, and the other BYJU's guarantors owed the following obligations to GLAS and the Lenders under the Credit Agreement:

28. **Audited Financial Disclosures:** Under Section 5.1(a) of the Credit Agreement, by the 180th day after the end of T&L's fiscal year on March 31, T&L had to provide its annual audited financials to GLAS, accompanied by an audit report from an auditing firm of recognized national standing. Ex. 1 at 89.

29. **Unaudited Financial Disclosures:** Under Section 5.1(b) of the Credit Agreement, by the 75th day following the end of Q1, Q2, and Q3 of T&L's fiscal year, T&L was required to furnish to GLAS unaudited consolidated financial statements for that fiscal quarter and the then-elapsed portion of the then-current fiscal year, together with comparative financials for the corresponding periods of the prior fiscal year. *Id.* at 90.

30. **Whitehat Guarantee:** Under Section 5.9(c) of the Credit Agreement, one of T&L's Indian subsidiaries, Whitehat Education Technology Private Ltd. ("Whitehat India"), was obligated to sign onto an Onshore Guarantee Deed by no later than April 1, 2022, to guarantee the full amount of the Debtor's term loans. *Id.* at 94. This April 1, 2022 deadline was specifically negotiated. During negotiations, counsel for the lead lenders, known as the "Arrangers," had pressed for Whitehat India to issue a guarantee at the outset. When BYJU's resisted, the Arrangers offered a compromise: "OK to live without guarantee from Whitehat on day 1 provided it accedes after [Reserve Bank of India] approval is granted or if such approval is not obtained, on 1 April 2022." BYJU's agreed to that revised structure, as is reflected in the ultimate Credit Agreement.

31. The Debtor and its former management apparently understood soon after signing the Credit Agreement—and well before April 28, 2022, when it made the first of the fraudulent

transfers to Camshaft Fund—that there were going to be multiple defaults on the Credit Agreement's financial reporting and guarantee covenants. Those defaults ultimately entitled GLAS to exercise remedies, as they rightfully did in March 2023. As discussed below, in November 2023, the Delaware Chancery Court held that the "Whitehat [G]uarantee default gives rise to an event of default," pursuant to which "GLAS was entitled to deliver the default notice" then "seat[]" Pohl.

**B. The Debtor's Fraudulent Transfers to Camshaft Fund in April and July 2022.**

32. In a series of six wire transfers in April and July 2022, the Debtor transferred a total of $533,000,100.00 to Camshaft Fund with the purported purpose of subscribing for a limited partnership interest. The Debtor made each one of those transfers without notice to or consent of the Lenders or GLAS.

33. Specifically, on April 27-28, 2022, the Debtor made three transfers in the total amount of $318,000,000.00 from one of its checking accounts to "Camshaft Capital Fund, Lp" and "Apex Fund Camshaft Capital Lp." Ex. 2 at 16. Fewer than three months later, on July 12-13, 2022, the Debtor made three more transfers in the total amount of $215,000,100.00 from another checking account of Debtor to "CAMSHAFT CAPITAL FUND LP." Ex. 3 at 15, 17.

34. Once the last of these transfers was completed, the Debtor had around $100 million in available funds across its known bank and brokerage accounts. It had no other known assets. Among other uses, the Debtor used these remaining funds to make interest payments to the Lenders, while there also were multiple transfers to and from related entities. As of the Petition Date, aside from a DIP loan and the loans the Debtor obtained from certain Lenders in late January 2024 to pursue its legal rights (including this fraudulent transfer action) and maximize its estate value, the Debtor had less than $20,000 in cash on hand with no other known assets, liquid or illiquid. As a result, and setting aside that the term loans had been validly accelerated as of March

3, 2023, the Debtor was financially unable to make scheduled interest and amortization payments on the term loans, including tens of millions of dollars of interest and amortization payments that would have come due in the ordinary course in May and September 2023 had the term loans not been accelerated.

**C. The Debtor's Insolvency as of April 2022 and Acknowledged Events of Default.**

35. Before the April and July 2022 transfers to Camshaft Fund, the Debtor had defaulted on the Credit Agreement twice, and already had entered into one waiver agreement with its Lenders. In the coming months, there would be at least two more Defaults. Those four Defaults eventually matured into four separate Events of Defaults, and they were the basis upon which, on March 3, 2023, GLAS accelerated the term loans, which at the time had over $1.2 billion outstanding. As of the Petition Date, over $1.4 billion in premium, interest, and fees is due and owing.

36. To begin, when the Q3 FY 2021-22 unaudited financial statements were due on March 16, 2022, T&L only provided financials for the then-elapsed portion of its fiscal year. T&L did not furnish any information for only the quarter itself or comparative financials for the corresponding period of the prior fiscal year.

37. Then, on April 1, 2022, Whitehat India failed to provide a Guarantee as of that date. Nevertheless, on April 5, 2022, the Lenders agreed to defer Whitehat India's obligation to obtain that Guarantee until October 8, 2022. Whitehat India failed to meet that extended deadline.

38. Shortly thereafter, there would be two more Defaults. As for its third Default, on September 13, 2023, T&L failed to provide comparative figures for the Q1 FY 2022-23 quarterly period. Therefore, T&L failed to furnish a material amount of required information across this and the earlier quarterly period. What T&L did furnish on that date showed that the Debtor had

an amount of Indian Rupees in "Cash and Bank" that was equivalent to well over $[redacted] million (based on prevailing exchange rates) at the time.[2]

39. As for its fourth Default, T&L failed to deliver audited annual financial statements for its 2021-22 fiscal year, as of the September 27, 2022 deadline. T&L's failure to provide audited annual financials was so significant that, in June 2023, its auditor Deloitte publicly resigned, citing T&L's failure to provide financial information necessary to complete the audit.[3] T&L's audited financial statements for its 2021-22 fiscal year, which ended March 31, 2022, did not become public until January 2024, at which point the financial results in those statements were nearly two years outdated.

**D. The Lenders' Patient, Yet Unsuccessful, Negotiations with BYJU's.**

40. In summer and fall 2022, around the same time as the third and fourth Defaults, an *ad hoc* group of Lenders engaged legal and financial advisors, and contacted the Debtor's representatives and its legal and financial advisors in an effort to resolve the outstanding Defaults and restructure the term loans. Over the next eight months, the Lenders and their advisors spent countless hours and incurred significant expense, negotiating and implementing nine separate Amendments to the Credit Agreement, all in a good faith, yet unsuccessful, effort to reach a negotiated solution. As part of that process and so that the negotiations did not prejudice the

---

[2] The transfer had to have been made with the prior consent of Camshaft Management, as the sole general partner of Camshaft Fund, and/or Camshaft Advisors, as the Fund's sole investment manager and an affiliate of Camshaft Management. As Camshaft Advisors disclosed in its registered investment advisor brochure (the "Camshaft Brochure")—a document that is publicly filed with the SEC in its investment adviser public disclosure database, which is intended to be distributed to prospective investors, and which outlines Camshaft Fund's commercial terms, investment strategy, and risks, among other information—"[a]lthough amounts may be redeemed/withdrawn from the Camshaft Funds on a periodic basis according to the terms set forth in the applicable agreement, *shares/interests may not be assigned, pledged or otherwise transferred without the prior written consent of the Firm*[,]" *i.e.*, Camshaft Advisors. Ex. 4 at 10 (emphasis added). Moreover, there is "no market for the shares/interests, and none is expected to develop." *Id.*

[3] *See* Alex G. Simon and Anto Antony, *Deloitte Quits as Byju's Auditor Piling Pressure on Tech Startup*, BLOOMBERG (Jun. 22, 2023, 9:35 AM), https://www.bloomberg.com/news/articles/2023-06-22/deloitte-resigns-as-auditor-for-byju-s-on-filings-delay.

Lenders' rights to exercise remedies, the Debtor and its guarantors acknowledged the four Defaults, which matured into Events of Default, in numerous Amendments to the Credit Agreement, and further memorialized the Lenders' entitlement to exercise remedies as a result of those Events of Default.

41. Specifically, the Lenders, through counsel, first wrote to BYJU's on August 29, 2022. In their letter, the Lenders expressed their concern about the "inadequate amount of information being shared," and BYJU's repeated failures to "strictly adhere to the terms of the Credit Agreement." So they could evaluate BYJU's overall financial condition and "establish a constructive dialogue," the Lenders requested various categories of financial information. Among other information, the Lenders sought "[c]ash balances by entity & region, as of August 26, 2022, including a list of all bank accounts, current balances, location and name of account holding entity with respect to the Parent Guarantor and any of its Subsidiaries[.]" Understanding BYJU's overall cash position was critical, the Lenders plainly stated that they "fully expect . . . that cash sitting at the Borrower or any Guarantor under the Credit Agreement remain with such entities in the accounts where the cash currently resides[,]" and not be transferred abroad. If BYJU's made "intercompany transactions," the Lenders previewed that they would view such moves as "aggressive and unnecessary[.]"

42. The Lenders continued to send correspondences in September and October 2022, expressing their growing frustration with BYJU's failure to meaningfully engage on a constructive resolution. On October 3, 2022, the Lenders sent BYJU's a five-page term sheet to resolve the outstanding defaults under the Credit Agreement, either through a complete paydown of the term loans or a partial paydown coupled with a permanent amendment to the Credit Agreement.

43. To preserve the Lenders' rights during the pendency of negotiations, T&L, on behalf of itself and the Debtor, among others, and the Lenders, also began entering into a series of forbearance agreements. On October 4, 2022, the parties entered into Amendment No. 1, which provided for an extension of the Applicable Premium periods in the Credit Agreement to extend call protections for the Lenders so they would not be financially disadvantaged by continuing negotiations. The following week, on October 12th, the parties entered into Amendment No. 2. Ex. 5 (filed under seal). In it, the parties agreed to add to the Credit Agreement the defined term "Specified Defaults," memorializing that BYJU's' four reporting and guarantee breaches constituted Defaults. *Id.* at 1–2. The parties also amended Section 8.1(e) of the Credit Agreement—the contractual provision governing "Events of Default"—to provide that the 45-day cure period for the Specified Defaults would begin on October 10, 2022 and expire on November 24, 2022, at which point the Specified Defaults would mature into Events of Default. *Id.* at 2.

44. As of November 24, 2022, none of the Specified Defaults had been cured. Therefore, they matured into Events of Default, entitling GLAS and the Lenders to exercise remedies. Also on November 24th, T&L executed Amendment No. 3, Ex. 6 (filed under seal), in which it "acknowledged and agreed" that the cure period had expired without any of the Specified Defaults being cured. *Id.* at 2. Significantly, T&L went one step further: it agreed that the Lenders were "**<u>entitled</u>**" to deliver to the "Loan Parties" (*i.e.*, the Debtor and its guarantors) a "Specified Notice of Default and Acceleration," *Id.* at 2 (emphasis added), meaning "a notice of default and acceleration with respect to the Specified Defaults." *Id.* at 1. T&L agreed:

> 1. <u>Agreements</u>.
>
> (a) It is hereby acknowledged and agreed by the parties hereto that (i) <u>the Cure Period for each of the Specified Defaults</u> referred to in the Amendment No. 2 <u>will expire or has expired on November 24, 2022, without any of the Specified Defaults being cured</u> by the Loan Parties, and (ii) <u>the Required</u>

> Lenders will be or are therefore entitled to, on and from November 25, 2022, request the Administrative Agent to deliver to the Loan Parties the Specified Notice of Default and Acceleration.

*Id.* at 2 (emphasis added).

45. The Lenders nevertheless agreed to forbear through December 1, 2022. *Id.* at 2.

46. When that forbearance expired, T&L (again, on behalf of the Debtor, among others) and the Lenders entered into a final forbearance agreement (*i.e.*, Amendment No. 7) dated as of January 6, 2023. Ex. 7 (filed under seal). Under Amendment No. 7, the Lenders agreed to forbear from exercising remedies, including accelerating the term loans, until February 10, 2023, unless the parties were able to reach an agreement to resolve the outstanding defaults before then. *Id*. at 3.

47. As a condition to the Lenders' forbearance agreement, Amendment No. 7 included several important milestones and promises:

- **Capital raise:** T&L promised that BYJU's would raise at least $150 million of new equity capital.
- **Quality of Earnings Report:** T&L promised to facilitate in good faith GLAS's retention of an auditor, Ernst & Young LLP, which then would be provided with a copy of BYJU's' quality of earnings report.
- **Response to Lenders' Term Sheet:** T&L promised to deliver a response to the Lenders' October 3, 2022 restructuring term sheet.
- **Financial Reporting:** T&L agreed to disclose various important financial information and updates for itself and its subsidiaries, including their "balances of cash, Cash Equivalents and Marketable Securities, and transactions with respect to each Material U.S. Bank Account on a weekly basis[.]" As part of that obligation, T&L further agreed that the Lenders' financial advisor could visit its offices in India to "review and authenticate . . . the accuracy of the balances of cash, Cash Equivalents and Marketable Securities[.]"
- **No Dispositions:** T&L agreed that, during the Forbearance Period, there shall be "no Disposition of . . . any cash, Cash Equivalents, Marketable Securities or any other assets held on deposit in, or maintained with, any Designated Account" (other than certain ordinary course payments).

*Id.* at 12–15.

48. The weekly cash disclosures were critical to enable the Lenders to understand the availability of cash collateral and monitor its current location.

49. However, T&L and its subsidiaries, including the Debtor, defaulted on Amendment No. 7's milestones. Further, on January 23, 2023, T&L furnished to the Lenders incomplete unaudited financial statements for Q2 FY 2022-23 (the period ended September 30, 2022). Those financials had been due over a month earlier, by December 14, 2022. The financials showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" that was equivalent to well over $[redacted] million (based on prevailing exchange rates) as of September 30, 2022.

50. The next day, on January 24, 2023, counsel for the Lenders sent a letter to the board of each of the Debtor and its immediate and ultimate corporate parents. The Lenders raised their concern with BYJU's "level of engagement . . . over the past five months." There had been no engagement on the October 3, 2022 term sheet, and, "perhaps most troublingly," T&L's ongoing financing reporting failures "frustrated" the Lenders' "efforts to monitor one of its most significant categories of collateral—cash and liquid investments." Rather than provide "the account information required under the terms of the Forbearance Agreement[,]" all T&L had provided was a "two-line summary of cash residing in accounts inside and outside of India." The Lenders stated their expectation that "cash residing within [BYJU's] account(s) in the United States will remain there[.]" While the Lenders still wanted to find a "commercial resolution," counsel ended the letter by signaling that, if progress was not made, "the Lenders are united in their willingness to take adversarial action against the Loan Parties[.]"

51. Three days later, on January 27, 2023, counsel for the Lenders followed up with an email to the board members. The Lenders' frustration was apparent. They stated that, absent progress, "the Lenders will have no choice but to re-evaluate the current course of action and

determine whether their interests are better served by terminating the forbearance . . . and exercising rights and remedies against [BYJU's]."

52. Nothing changed. T&L continued to fail to meaningfully respond to the Lenders' term sheet. On February 8, 2023, counsel for the Lenders followed up on its earlier email, ratcheting up the tone of its communication. As a result of BYJU's "utter disregard of [its] obligations under the Credit Agreement and Forbearance Agreement," "the Lenders are now in the process of preparing to pursue alternative options, including exercise of their rights and remedies under the Credit Agreement[.]"

53. Two days later, on February 10, 2023, the forbearance period expired by its own terms. Less than a month later, the Lenders directed their agent, GLAS, to exercise remedies, as discussed below.

### E. The Debtor's Apparent Transfer or Redemption of Its Limited Partnership Interest in Camshaft Fund to a Third-Party Entity.

54. As of February 2023, the parties had entered into nine formal waivers and amendments to their Credit Agreement to address the outstanding Defaults, which then had matured into Events of Default (after the Defaults were not cured).

55. At that time, the Debtor had misled the Lenders to believe that it had well over $500 million in liquid assets. As disclosed on January 23, 2022, T&L's unaudited financial statements for the period ended September 30, 2022 showed that the Debtor had well over $[redacted] million in "Cash and Bank" balances at that time. Consistent with earlier financial disclosures, T&L's unaudited financial statements for the period ended December 31, 2022, which were disclosed in mid-March 2023, similarly showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" that was equivalent to well over $[redacted] million (based on prevailing exchange rates). To state the obvious, both of these financial statements showed that the Debtor—the borrower on a

defaulted loan—had [redacted] of dollars in liquid cash or cash equivalents available to it to service its debt.

56. Unbeknownst to the Lenders and GLAS, the bulk of that money was not held by the Debtor in cash or in one of its bank or brokerage accounts, as the "Cash and Bank" label suggested. Instead, those funds already had been transferred to Camshaft Fund. Further, whatever interest in Camshaft Fund that the Debtor held or received on account of its $533 million in transfers was itself apparently soon to be transferred or redeemed, again unbeknownst to the Lenders and GLAS.

57. After the final forbearance expired on February 10, 2023, GLAS, at the Lenders' direction, began exercising remedies. On March 3, 2023, GLAS accelerated all amounts outstanding—over $1.2 billion in principal and outstanding interest and fees—under the term loans to become due and payable immediately. That same day, GLAS also exercised control of the pledged equity in the Debtor and, as the now-sole shareholder of the Debtor, appointed Pohl as the Debtor's sole director. At the direction of GLAS, the sole shareholder of the Debtor, Pohl then appointed himself as the Debtor's sole officer.

58. As laid out in this Complaint, the Debtor, through Pohl, understands that, sometime between December 31, 2022 and Pohl's appointment on March 3, 2023, the Debtor apparently transferred or redeemed, *again*, the $533 million—or the limited partnership interests (or their equivalent) in Camshaft Fund that had been received on account of the April and July 2022 transfers—to an undisclosed BYJU affiliate in the United States. As the Debtor's former sole director and officer, Riju Ravindran, admitted in a declaration under oath filed in the earlier Delaware state court litigation, "[p]rior to the commencement of the present action [*i.e.*, May 3, 2023], **the amount to the credit of Alpha with the Investment Fund was moved to another**

**<u>BYJU's-affiliated entity within the United States</u>**." Ex. 8, June 25, 2023 R. Ravindran Decl. ¶ 10 (emphasis added). Based on a detailed review of the Debtor's bank statements, the referenced "Investment Fund" is Camshaft Fund.

59. Additionally, in a lawsuit that Camshaft filed prepetition against the Debtor in Florida, Camshaft alleged that the Debtor had transferred its entire limited partnership interest in Camshaft Fund (what Riju Ravindran called "the amount to the credit of Alpha with the Investment Fund") "[i]n the first quarter of 2023, and prior to Mr. Pohl's appointment as a director of BYJU's [Alpha]." Those allegations are consistent with T&L's financial disclosures as of September 30 and December 31, 2022, and Ravindran's sworn statements. If true, Camshaft's allegations place the date of this transfer at sometime between December 31, 2022 and March 3, 2023.

60. What is abundantly clear is the Debtor's former management's motivation for transferring or redeeming the Debtor's interest in Camshaft Fund: to conceal the assets from the Lenders and GLAS. The Debtor made the transfer with the express intention of frustrating GLAS's and the Lenders' contractual rights under the term loan agreements. Again, as of December 31, 2022, there were four conceded Events of Default, each one entitling the Lenders and GLAS to accelerate the over-$1.2 billion outstanding on the term loans. Further, the parties had just entered into a forbearance agreement expiring on February 10, 2023, at which point GLAS, acting at the Lenders' direction, could exercise those remedies. Commercial discussions were breaking down and reaching an impasse, and the Lenders had clearly signaled their intention to begin exercising remedies. The logical inference, if the sworn statement of Riju Ravindran and allegations of Camshaft are to be believed, is that the Debtor made the transfer on or about February 10, 2023, before the Lenders could exercise remedies. The Debtor's former representatives knew they had no defense to the Lenders exercising remedies. Amendment No. 7 reaffirmed that the Debtor's

failure to cure the Specified Defaults "**entitles**" the Lenders to exercise remedies, and *three times* acknowledged that "*none* of the Specified Defaults can be cured or remedied." Ex. 7 at 6, 11–12 (emphasis added). This is a classic fraudulent transfer fact pattern: a borrower concealing virtually all of its assets just as a forbearance agreement is about to expire or has expired.

61. Riju Ravindran's own counsel later admitted to such a fraudulent motive in a public hearing in a Delaware court, with numerous Lenders listening in:

> [GLAS and Pohl] raised this issue of the $500 million transfer as a reason to rule against defendants, and obviously this is -- you know, when first hearing about it, it raises [*sic*] antenna. I understand that, Your Honor.
>
> . . . **Byju's moved the funds, and Byju's moved the funds to an entity that it controls in the United States**. The money is in the United States. I don't know exactly when it was done.
>
> **To be candid, these were based on fear of lenders acting expeditiously** with these unconscionable tactics to assets without a proper determination and due process under the credit agreement. **Byju's felt the need to protect the cash**.

62. Regardless of where and when the money was moved, the Debtor's currently-available bank statements record no transfer of funds or redemption of interests back to the Debtor from any Camshaft entity. Nor has Riju Ravindran or any other current or former representative of T&L or the Debtor ever shared with Pohl any record of the Debtor receiving consideration for any purported transfer or redemption of the Debtor's limited partnership interest in Camshaft Fund.

### F. The Debtor's Concealment of the Transfers or Redemptions from the Lenders and GLAS.

63. At the beginning of 2023, the Lenders continued to work towards a negotiated resolution, if one could be had. But those efforts were exhausted without success and with only more concerns, including regarding the BYJU's enterprise's overall financial condition and the predicted risk that the Debtor would move the vast majority of the money it held to frustrate the Lenders' remedies. In light of the lack of meaningful progress and responsiveness by their

borrower and its affiliates, the Lenders exercised their contractual remedies to address the acknowledged Events of Default and to protect their collateral.

64. As mentioned, on March 3, 2023, GLAS, at the Lenders' direction, declared Events of Default and began exercising remedies. Immediately, T&L's founder and CEO Byju Raveendran reached out to the Lenders, requesting that the parties reengage on a potential resolution. The Lenders were willing to engage, which then prompted several weeks of negotiation. During those negotiations, an area of focus for the Lenders was on cash verification.

65. On March 16, 2023, T&L posted with GLAS, for distribution to the Lenders, its Q3 FY 2022-23 financial statements, which included the above-referenced representation that the Debtor had the equivalent of well over $[redacted] million in "Cash and Bank" balances as of December 31, 2022.

66. Also in March 2023, in support of broader negotiations among the parties, the Lenders' counsel requested that BYJU's confirm the funds available to the Debtor. In response to this cash verification request, BYJU's representatives agreed to a roundabout cash verification process with the Lenders. To that end, on or about March 27, 2023, BYJU's outside counsel informed one of the Lenders' advisors that, on a recent Zoom call, he watched his client virtually log into a bank portal and saw a cash statement showing that the account held a substantial amount of cash, which counsel said was in the United States. Counsel disclosed the exact amount of funds he saw, an amount that is consistent with the aggregate amount of the April and July 2022 transfers. Counsel did not disclose the account holder's identity, and he did not disclose which bank held the account.

67. The Lenders sought comfort as part of broader negotiations that substantial liquid assets in the United States were available for debt service, and BYJU's statements naturally—and

very likely intentionally—led the Lenders to believe that the Debtor continued to hold or have access to this cash. It now appears that BYJU's counsel may have shown the Lenders' advisor a bank account belonging to a BYJU's entity other than BYJU's Alpha, without disclosing that critical fact.

68. The Lenders' hopes for a negotiated resolution turned out to be misplaced, however. BYJU's would frequently go incommunicado during the negotiations and ultimately appeared insincere about trying to enter into a completed amendment.

69. Then, on May 3, 2023, GLAS and Pohl filed a lawsuit in the Delaware Court of Chancery, seeking confirmation that, pursuant to the Delaware statutory code, 8 *Del. C.* § 225, their exercise of remedies had effectuated a proper change of control of the Debtor. *See GLAS Tr. Co. LLC v. Ravindran*, C.A. No. 2023-0488-MTZ (Del. Ch. 2023). Upon commencing that action, the Lenders had every reason to believe that the Debtor had in its possession a significant sum of money:




70. Five days later, during a May 8, 2023 call, Byju Raveendran, with his General Counsel on the line, told one of the Lenders' advisors that the Debtor no longer had the money. Rather, "**<u>the mon[ey] is someplace the Lenders will never find it</u>**."

71. Byju Raveendran's comments were so shocking that the Lenders' advisor wrote them down on a piece of scratch paper:




72. On May 18, 2023, the Chancery Court issued a *Status Quo* Order—an interim order similar to a temporary injunction—authorizing Pohl to remain in control of the Debtor as sole director and officer pending a final case decision and requiring the BYJU's defendants in that lawsuit to provide Pohl with access to and control of the Debtor's open bank and other accounts. Other than the Debtor's bank statements reflecting the Camshaft Fund transfers, BYJU's never shared and, in fact, flatly refused to disclose, any information about the transfers to Camshaft with the Debtor's current director and officer, Pohl.

73. On August 4, 2023, the Chancery Court held a bench trial. On November 2, 2023, it found that "the Whitehat [G]uarantee default gives rise to an event of default," pursuant to which "GLAS was entitled to deliver the default notice" then "seat[]" Pohl.

74. On November 13, 2023, the Chancery Court issued its Final Order and Judgment declaring that GLAS's enforcement steps on March 3, 2023 were valid and effective as to the removal of Riju Ravindran as the preexisting director and officer of the Debtor, and the appointment of Pohl to serve as the Debtor's sole replacement director and officer.

**G. The Debtor's Reasons for Transferring $533 Million to Camshaft Fund.**

75. There is no readily apparent legitimate reason for why the Debtor would "invest" over half a billion dollars in Camshaft Fund, particularly after multiple loan defaults had occurred. Camshaft Fund is an unknown and unproven hedge fund founded in August 2020 by Morton—then a 23-year old with no formal training in investing and money management, and no apparent qualification to manage a hedge fund—and which previously listed on federal and state regulatory filings the address of an International House of Pancakes in Miami as its principal place on business.

76. Specifically, Camshaft Fund was formed on August 13, 2020, as a Delaware limited partnership. Its sole general partner is Camshaft Management, which had been formed two weeks earlier, on July 28, 2020. Its investment manager, Camshaft Advisors, also was formed on July 28, 2020.

77. All three Camshaft entities have disclosed an affiliation with Morton. Morton controls Camshaft. According to public filings, Morton is the managing member and sole owner of both the Camshaft general partner and the investment manager. Moreover, Camshaft Advisors' brochure states that Camshaft relies upon Morton as a "[k]ey [p]erson." Ex. 4 at 10.

78. Hedge funds file a so-called "Form D" with the SEC in connection with an exempt offering of securities under the federal securities laws. In its Form D filed on September 11, 2020, when it launched, Camshaft Fund disclosed an address at 285 NW 42nd Avenue in Miami. Camshaft Fund disclosed the same address for Morton. Camshaft Advisors' Form ADV, filed on October 26, 2023, identified Morton as the Chief Executive Officer and Chief Compliance Officer.


2. Principal Place of Business and Contact Information

| Name of Issuer | | | |
|---|---|---|---|
| Camshaft Capital Fund, LP | | | |
| Street Address 1 | | Street Address 2 | |
| 285 NW 42ND AVENUE | | | |
| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
| MIAMI | FLORIDA | 33126 | 4065523828 |

79. Likewise, Camshaft Management, as General Partner, and Camshaft Advisors, as Investment Manager, disclosed their offices as being located at the same address in their 2020 and 2021 filings with the Florida Secretary of State.

80. Since at least the 1990s, that address—285 NW 42nd Avenue—has been home to an IHOP. IHOP's distinctive blue awning can be seen from this satellite image of the address:




81. This is a ground-level picture of the location taken a few months ago:



82. This IHOP was the principal place of business of the Fund, General Partner, and Investment Manager, to which the Debtor transferred over half a billion dollars.

83. More recently, Camshaft Advisors publicly disclosed that, as of April 2023, it had $595,845,395 in regulatory assets under management in Camshaft Fund, the only investment advisory client it had under management. Ex. 4 at 4. Camshaft Advisors publicly reported this same amount in regulatory assets under management again in its Form ADV on October 26, 2023. Based on the Debtor's bank statements, it appears that almost 90% of this amount is attributable to the Debtor's April and July 2022 fraudulent transfers.

84. There is no disclosed evidence of the Debtor having received *any* return accruing from its enormous investment in the Camshaft Fund, and no capital account balances, financial statements, investor updates, or other reports or information from Camshaft have been shared with the Debtor or GLAS. Instead, it appears that the Debtor's former management chose to "invest" half a billion dollars in an unproven, high-risk hedge fund managed by a young and unknown portfolio manager with no reputation in the industry, at a time when the Debtor was in default on billion-dollar secured loans.

85. Alarmingly, there are no material restrictions on Camshaft Fund's investment activities. As disclosed in the Camshaft Brochure, Camshaft Fund relies upon numerous high-risk and uncertain trading strategies, including those that rely on leverage and short selling, distressed and illiquid securities, derivative instruments, and emerging markets investments. Ex. 4 at 8–9, 17. Not surprisingly, one of Camshaft's self-disclosed risks is that investors must be "prepared to lose their entire investment" and for this reason, an investment in the Camshaft Fund "is not a complete investment program" (*id.* at 10):

> ***Potential Loss of Investment***. An investment in the Camshaft Funds involves a high degree of risk. There can be no assurance that the Camshaft Funds' investment objective will be achieved. There is a risk that an investment in the Camshaft Funds will be lost entirely or in part. The Camshaft Funds is not a complete investment program and should represent only a portion of an investor's portfolio. Investors must be prepared to lose their entire investment in the Camshaft Funds.

86. While the Debtor and its stakeholders have hundreds of millions of dollars at risk, Camshaft does not. It is profiting at its client's expense with an above-market fee structure. Upon information and belief based on Camshaft's disclosures, Camshaft has charged a 3% per annum management fee—substantially higher than many top-tier, established hedge funds[4]—directly from the Debtor's (or the new holder's) capital account continuously since the investment was first made. *Id.* at 4, 6. Based on the Debtor's investment activity, a 3% annual fee would result in **over $20 million** in aggregate management fees to date having been paid out of the Debtor's capital account (assuming no profits, losses or distributions), a direct diminution in the value of its investment in Camshaft. Additionally, upon information and belief, Camshaft charges an above-market performance fee: 30% subject to a 12% hurdle (*i.e.*, 30% of the net returns achieved by a capital account in excess of 12%). Camshaft charges these high fees even though, in Morton's own view, trading is "a lot more simple than people make it out to be," in fact, "it's really simple."[5]

[4] *See e.g.*, Jacob Wolinsky, *Institutionsare Dumping Their Hedge Fund Allocations on a Massive Scale*, FORBES (Nov. 28, 2022, 03:54 PM), https://www.forbes.com/sites/jacobwolinsky/2022/11/28/institutions-are-dumping-their-hedge-fund-allocations-on-a-massive-scale/?sh=3bbf343836f2 ("According to HFR data, the average management fee was 1.5%[.]"); *Hedge Fund Launches Surge Through Mid-Year, Dominated by Multi Strategy inflation Trading*, Hedge Fund Rsch. (Oct. 4, 2023), https://www.hfr.com/news/hedge-fund-launches-surge-through-mid-year-dominated-by-multi-strategy-inflation-trading ("The average industry-wide management fee was unchanged from the prior quarter at 1.36 percent[.]").

[5] *See* Uptown Creation, *William C. Morton "Lessons From a 24 yo Hedge Fund Manager" on Social Seller w Conor Paulsen Ep 29.1*, YOUTUBE (Aug. 31, 2021), https://www.youtube.com/watch?v=S6Z3u8Ka_TA.

87. With these fees extracted from the Camshaft Fund, Morton appears to have dramatically upgraded his own personal living standard. Morton appears to have recently purchased three luxury cars for himself: a 2023 Ferrari Roma, a 2020 Lamborghini Huracán EVO, and a 2014 Rolls-Royce Wraith. Additionally, upon information and belief, another Florida-domiciled entity Morton controls, Camshaft, LLC, lists its principal place of business at 18555 Collins Avenue, Suite #5405, Sunny Isles Beach, Florida 33160—a multi-million dollar, residential condominium overlooking the ocean and commonly known as the Porsche Design Tower. The Lenders are owed over $1.2 billion, and Morton is extravagantly spending their money on himself.

**H. Camshaft's Refusal to Provide Discovery about the $533 million.**

88. As noted above, upon learning that the $533 million had been invested in Camshaft Fund, on September 5, 2023, GLAS sued Camshaft in Florida state court. Concurrently, GLAS served targeted document requests and interrogatories on Camshaft, and also filed an *ex parte* emergency motion seeking to expedite Camshaft's response deadlines.

89. GLAS focused on the factual issues central to its fraudulent transfer claims. GLAS's six interrogatories and twelve document requests were aimed at understanding the reasons for and circumstances behind the Debtor's original transfers to Camshaft Fund, along with what happened to those funds, including whether Camshaft Fund still held all or a portion of the original $533 million investment. In particular, GLAS sought, with key portions highlighted:

> Interrogatory No. 1. Identify the details of each transfer of money from BYJU's Alpha or BYJU's to Camshaft, including but not limited to: (i) the date of the transfer, (ii) the transferor and transferee, (iii) the exact amount of funds transferred, (iv) the Person that authorized the transfer, (v) the purpose of the transfer, (vi) where those funds currently are located, and (vii) in whose name those funds are currently held.

> Request for Production No. 3. All account records—including but not limited to (i) capital account statements, (ii) custodial statements, (iii) financial statements, and (iv) statements of management fees, transaction fees, placement fees, expenses, and other compensation charged (including performance-based compensation)—associated with any of BYJU's Alpha, BYJU's, or any Money Transfer.
>
> Request for Production No. 6. All agreements entered into between Camshaft, on the one hand, and BYJU's Alpha, BYJU's, or their representatives, on the other hand, including limited partnership agreements, subscription agreements, side letters, and due diligence confirmations.

90. On September 11, 2023, the Florida court granted GLAS's expedition motion.

91. On September 12, 2023, GLAS served Camshaft Fund. Service on Camshaft Advisors and Camshaft Management trailed until September 20 and 22, 2023, respectively, as those two entities had originally improperly designated a P.O. Box as their registered agent.

92. Then, the gamesmanship by Camshaft began. Over the next four months, Camshaft used every trick in the book to stall having to provide basic discovery:

- On September 18th, Camshaft Fund claimed it had not been served six days earlier. Though GLAS had served the Fund's registered agent, Legalinc Corporate Services—the registered agent disclosed in Camshaft Fund's filings with the Delaware Secretary of State—the Fund nonetheless claimed that it had not actually engaged Legalinc "due to an oversight by the [formation] law firm."
- On September 21st, the three Camshaft Defendants moved to have the Court vacate its expedition order, then set GLAS's discovery requests on a regular, 45-day schedule.
- On October 8th, the Florida court reset the discovery deadlines on a regular schedule. As a result, the first of Camshaft's responses were due on October 26, 2023.
- On October 10th, Camshaft moved to transfer and to dismiss. Camshaft made numerous misstatements of law, claiming that GLAS "lacks standing to assert its claims because it itself does not stand in the position of a creditor" of the transferee Camshaft (as opposed to the transferor, the Debtor), GLAS lacks a "claim" under Florida's fraudulent transfer statutes because it is "not pursuing such a claim against BYJU's in any litigation" (even though the Delaware Chancery Court found that a valid Event of Default occurred, empowering GLAS to take control of the Debtor), and that the Credit Agreement somehow preempted GLAS's claim for fraudulent transfer.

- On October 25th, Camshaft moved to stay discovery.
- Camshaft did not serve any discovery responses on the October 26th due date, but instead waited until November 6th, which was the separate deadline for Camshaft Advisors and Camshaft Management. On that date, Camshaft served three pages of boilerplate objections. Ex. 9. Camshaft generically claimed that GLAS's requests were objectionable for twelve reasons, but only identified one interrogatory specifically as being objectionable. *Id.* at 2.

93. For its part, GLAS filed two motions to compel, making every effort to locate the $533 million. However, during the initial case management conference on December 14, 2023, the Florida court declined to entertain argument on the pending discovery motions, instead deciding that it would resolve Camshaft's motions to dismiss and transfer first. With agreement of the parties, the Florida court set argument on those motions for February 2, 2024, a date subject to the automatic stay resulting from the Debtor's bankruptcy filing.

**I. The Debtor's Information Demands to Camshaft Fund.**

94. Following the Delaware Chancery's November 13, 2023 final judgment that Pohl is the "valid" sole director and officer of the Debtor, Pohl—on behalf of the Debtor—promptly requested Camshaft Fund to provide information concerning to the Debtor's fraudulent transfers. Ex. 10. Pohl explained that "former management of [Borrower] . . . failed to provide to [Pohl] information regarding the [Camshaft] Transfers and Documents," thus "[Pohl] lack[s] this information." *Id.* at 1. Pohl then requested "any and all information in the possession or control of Camshaft regarding the Investment, the Transfers, and Documents," and listed specific categories of requests, including (i) all account records associated with the Debtor and (ii) copies of Camshaft Fund's limited partnership agreement and any related agreements between the Debtor and Camshaft Fund. *Id.* at 1–3.

95. On December 4, 2023, Camshaft responded, flatly rejecting Pohl's information demand on the purported grounds that the Debtor was no longer a limited partner in Camshaft

Fund. Ex. 11. Specifically, Camshaft acknowledged for the first time that "BYJU's Alpha is a former limited partner of Camshaft Capital Fund," and that the Debtor currently has a "zero-balance capital account," without specifying why that was the case, *i.e.*, as a result of a transfer or a redemption. *Id*. at 1. Accordingly, Camshaft provided Pohl with none of the requested information regarding the Debtor's once held interest in Camshaft Fund.

96. On the very same day, Camshaft sued the Debtor without notice, seeking a declaratory judgment that it would not have to provide any such documents or information. *See Camshaft Cap. Fund, LP v. BYJU's Alpha, Inc.*, Case No. 2023-027523-CA-01 (Fla. 11th Cir. Ct. 2023). In its Complaint, Camshaft claimed for first time that, sometime in the first quarter of 2023, "BYJU's [Alpha] transferred all of its investment interest as a limited partner in Camshaft Capital Fund to a third party." Camshaft conspicuously failed to identify that third party by name, or any other details about that transfer. Pohl does not have any record of the transfer, let alone the Debtor receiving any consideration for it.

**J. Camshaft's Misrepresentation of Who Owns the $533 million.**

97. It is not clear that Camshaft and its recent allegations should be believed. Camshaft has opportunistically flipped between the Debtor still owning the $533 million—*and not*—depending on which position allows it to avoid having to disclose what happened to the money. Weeks before Pohl requested the Debtor's account records related to Camshaft Fund, Camshaft represented to the Florida court that the Debtor "owned" the $533 million. Camshaft used that purported fact to argue that GLAS's lawsuit had to be dismissed, because the Debtor was an indispensable missing party to the Florida litigation.

98. As laid out below, it is impossible to square this with Camshaft's inconsistent representations about the current ownership of the $533 million. If the Debtor did not still own

the $533 million, then Camshaft misrepresented the salient facts to the Florida court when it characterized the Debtor as an indispensable party. Whoever else owned the money would have an interest in the litigation, but Camshaft did not argue that party was indispensable in an apparent effort to hide that third party's identity.

| What Camshaft claimed then: | What Camshaft claims now: |
|---|---|
| **(1)** GLAS's specious Complaint purports to ask the Court to seize $533 million in assets owned by BYJU's Alpha Inc. ("BYJU's") a non-party to this litigation invested into Camshaft Fund, based on statutory fraudulent transfer claims that require Plaintiff to prove, among other things, that BYJU's [Alpha] is "liable" to GLAS. Camshaft MTD at 1.<br>**(2)** It is clear on the face of GLAS's Complaint that BYJU's [Alpha] is "materially interested, either legally or beneficially, in the subject-matter of the suit" so as to be an indispensable party. After all, it is BYJU's [Alpha]'s funds that GLAS is seeking to obtain. Camshaft MTD at 11.<br>**(3)** And third, Plaintiff's position further illustrates that the thrust of this action is not a [sic] set a trial, or sue BYJU's [Alpha] for breach of contract to obtain a judgment establishing Plaintiff's entitlement to the funds, but instead to obtain discovery that Plaintiff otherwise would not be entitled to in the prior pending litigations, in other fora, between Plaintiff and BYJU's [Alpha]—the actual party in interest and beneficial owner of the more than $500M in investments that Plaintiff seeks to seize in this litigation. Case Management Rep. at 9.<br>**(4)** The borrower BYJU's [Alpha] is an indispensable party because Plaintiff is requesting that the Court seize BYJU's[] [Alpha's] approximately $500 million investment in Camshaft, and it is impossible to adjudicate that relief without affecting BYJU's[] [Alpha's] material interests in that property. Plaintiff's Response completely fails to address the straightforward issue that BYJU's [Alpha] has an interest in the investment property and has clear due process rights under Florida law to defend that interest. Camshaft MTD Reply at 10. | **(5)** More specifically, Camshaft is in doubt as to the absence of an statutory obligations it may have to disclose books and records information to BYJU's [Alpha], a former limited partner of Camshaft Capital Fund, because BYJU's [Alpha] has transferred all of its investment interest to another entity, resulting in BYJU's [Alpha] having a zero-balance capital account in Camshaft Capital Fund, thereby terminating its relationship with Camshaft. Camshaft Compl. ¶ 3.<br>**(6)** In the first quarter of 2023, and prior to Mr. Pohl's appointment as a director of BYJU's [Alpha], BYJU's [Alpha] transferred one hundred percent of its interest in Camshaft to a third party pursuant to the terms of the LPA. As of the date of the transfer, BYJU's [Alpha] has a zero-balance capital account, thus terminating its Investment and making it a ***former*** limited partner of Camshaft Capital Fund. Camshaft Compl. ¶¶ 25–26 (emphasis in original). |

### K. BYJU's' Ongoing Obfuscation of What Happened to the $533 million.

99. On information and belief, as with Camshaft, BYJU's also refused to come clean with what happened to the $533 million. As noted, GLAS had filed the Florida Action on September 5, 2023. Eight days later, T&L was obligated to furnish unaudited quarterly financial



A0081

information for the Q1 FY 2023-24 (*i.e.*, the fiscal quarter ended June 30, 2023). However, as relayed to BYJU's Alpha by the Lenders, T&L refused to furnish that financial information on that date, and still has not furnished it. This marked the first time that T&L failed to furnish any unaudited financial information for a fiscal quarter. Presumably, the reason for T&L's decision not to share unaudited financials is because those financials would reveal what had happened to the $533 million Camshaft investment. As compared to the December 31, 2022 unaudited financial statements, some other BYJU's entity presumably should be reporting an additional $533 million in "Cash and Bank" as of June 30, 2023—if Camshaft's allegations are to be believed.

100. After months of saying nothing, BYJU's finally released an opaque and abstract statement on September 13, 2023, that only confirmed an insider was somehow the beneficiary of the fraudulent transfers and the money was, as threatened, outside the reach of BYJU's creditors.

101. On November 21, 2023, GLAS, acting at the Lenders' direction, noticed a default for T&L's failure to furnish the Q1 FY 2023-24 unaudited financial statements. On the same day, GLAS also formally invoked its inspection rights under the Credit Agreement and demanded an investor call (which T&L had contractually agreed to hold each quarter). Pursuant to its right to request "such other information regarding the financial condition, business and operations of [T&L] or any of its subsidiaries as the Lenders may reasonably request," Ex. 1 at 91, GLAS further requested "a detailed written explanation of the business reasons for and purposes" of the $533 million in transfers to Camshaft Fund" and "a detailed written explanation of the current status of the funds wired to the Camshaft Fund," among other information about the Camshaft transfers.

102. On information and belief, BYJU's never directly responded to those default notices and information requests. Instead, in an amended complaint filed with a New York state

court on December 11, 2023, BYJU's claimed that "the above notices have been issued in complete bad-faith," but made no effort to explain how. BYJU's has no reasonable explanation.

103. On information and belief, most recently, on Sunday, January 14, 2024, Byju Raveendran and his Chief Strategy Officer, Anita Kishore, requested a call with three of the Lenders, after GLAS, at the Lenders' direction, had sent a letter to T&L's shareholders informing them of the Lenders' imminent filing of the Indian equivalent to an involuntary bankruptcy petition against T&L in India (which ultimately was commenced on January 22, 2024). That call occurred the next day, and, among other topics, the Lenders directly asked about the $533 million in transfers of their loan proceeds to Camshaft Fund—the questions that were at the top of their minds. As the Lenders have relayed about the call:

104. When asked if the $533 million still "exist[s]," Raveendran and Kishore both went silent. Raveendran eventually asked Kishore to answer, but she continued to remain silent. As the silence dragged on, Raveendran stepped in: "We have not touched that money." Raveendran later doubled down on that representation. When asked "[h]ow much cash is still in [BYJU's] that is attributable to [the Lenders'] $1.2 billion term loan," Raveendran answered "more than $500 million," which he promptly confirmed was "in cash and cash equivalents." Yet when Ms. Kishore was asked if she agreed, she caveated her response: the "only source of information" she had about the $533 million was "the audit," later clarifying that she was referencing information received "as of October [2023] end" showing that the money was there.

105. When asked why BYJU's had not provided the Lenders with verification of the cash's existence (which the Lenders had repeatedly requested, including in fall of 2023), Raveendran again went silent. Later in the call, Raveendran disclosed that BYJU's' auditor—presumably the same source of information that Ms. Kishore had relied upon for her own

knowledge about the purported existence of the $533 million—would not agree to providing a cash verification certificate.

106. When asked for the first time why the $533 million, if it in fact existed, was not being applied to paydown the term loans, Raveendran did not answer the question. He instead pivoted to describing his efforts to sell certain of BYJU's' assets to pay down the loans. When asked the same question for a second time, Raveendran again did not answer. When asked the same question for a third time, he blamed the Lenders: "because of all your actions, we lost all the value." If the Lenders continued to take "further action," Raveendran threatened that they would not get "max answer". Near the end of the call, Raveendran finally offered that, after 1-2 asset sales to raise cash, he would be willing to negotiate with the Lenders about the application of the $533 million to their term loans.

107. When asked why the $533 million was sent to Camshaft in the first place, Raveendran said it was to "protect" the money. In Raveendran's own words, "I am not siphoning money." Later, Raveendran alluded to there being an explanation for the Camshaft transfers, but he simply was not going to reveal it: "I can tell you that it was done for a reason and I don't want to tell you what that reason was."

108. When asked to arrange a call with Morton, Raveendran could not do it. He said: "I don't know William Morton, for me to arrange a call."

109. Ultimately, Raveendran chastised the Lenders for acting "like only [Byju's] did anything incorrect." It was Raveendran who had "suffered the most."

110. This lawsuit now ensues.

* * *

# CAUSES OF ACTION

## COUNT ONE
## ACTUAL FRAUDULENT TRANSFERS
## (AGAINST CAMSHAFT FUND)

111. The Debtor reincorporates and realleges each of the allegations in paragraphs 1 through 110 as if fully set forth herein.

112. Over the course of April and July 2022, the Debtor transferred approximately $533 million to Camshaft Fund, with the intent to hinder, delay, and/or defraud present or future creditors. Those transfers constituted a transfer of property of the Debtor.

113. There is direct evidence of the Debtor's actual fraudulent intent. Byju Raveendran admitted that money had been moved to "someplace the Lenders will never find it" and that the transfers were made to "protect" the funds, and his brother Riju Ravindran's own counsel publicly acknowledged his clients' intent in moving the money was to frustrate the Lenders' remedies.

114. Additionally, through the "badges of fraud" recognized by bankruptcy law and state fraudulent transfer law, including the Florida Uniform Fraudulent Transfer Act, there is significant circumstantial evidence of actual fraudulent intent:

- The transfers were concealed. The Debtor's former representatives never disclosed the transfers to the Lenders, and, in fact, concealed the transfers in quarterly financial reports by disclosing that the Debtor purported to have over $[redacted] million in "Cash and Bank." The transfers to Camshaft Fund were neither "cash" nor "bank."
- The transfers were of substantially all of the Debtor's assets.
- The Debtor received less than reasonably equivalent value in return. Pohl has no record of the Debtor receiving any consideration from Camshaft; even if there was consideration in the form of an illiquid limited partnership interest, it was inadequate, as summarized in Count Two.
- The Debtor immediately became insolvent post-transfers, if it was not already insolvent. Post-transfers, the Debtor had over $1.2 billion in liabilities against less than a tenth of that amount in assets (and no ability to generate ongoing revenue). It was plainly insolvent.

- <u>The Debtor made the transfers shortly after incurring substantial debt</u>. The Debtor began making the fraudulent Camshaft transfers within six months of entering into the Credit Agreement, on the heels of defaulting multiple times and entering into a temporary waiver agreement.

115. The fact that the Debtor's former representatives and Camshaft have gone to such extreme lengths to conceal and confuse critical details about the transfers and what happened to the $533 million corroborates the actual fraudulent intent.

116. Should the Debtor have subsequently transferred or redeemed the approximately $533 million invested—or, alternatively, the limited partnership interest held—in Camshaft Fund, such that the interest is now held by a third party, Camshaft Fund is still liable as the initial recipient and beneficiary of the investment.

117. In light of the foregoing, the transfers should be avoided as fraudulent pursuant to Sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code and applicable state law (*e.g.*, Fla. Stat. § 726.105(1)(a)), and the Debtor should recover from Camshaft Fund pursuant to Section 550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtor's bankruptcy estate.

**COUNT TWO**
**CONSTRUCTIVE FRAUDULENT TRANSFERS**
**(AGAINST CAMSHAFT FUND)**

118. The Debtor reincorporates and realleges each of the allegations in paragraphs 1 through 110 as if fully set forth herein.

119. Over the course of April and July 2022, the Debtor transferred approximately $533 million to Camshaft Fund. Those transfers were a transfer of property of the Debtor.

120. At the time of those transfers, the Debtor, under applicable law, was insolvent or became insolvent as a direct result of making the transfers, was inadequately capitalized, and/or was unable to pay its debts as they came due, and remained so at all times thereafter through the

Petition Date. Specifically, the Debtor (a) was a special purpose financing vehicle with no active operations; (b) had defaulted on the term loans as early as March 2022, before the first transfer was made, and could foresee further defaults; (c) had no ability to comply with its obligations under the Credit Agreement, subsequent forbearance agreements, and other loan documents; and (d) owed the Lenders an amount of money, which would soon be accelerated, exceeding $1.2 billion, for which the remaining assets of the Debtor were unreasonably small in relation to the outstanding debt.

121. The Debtor did not receive reasonably equivalent value in exchange for the April and July 2022 transfers to Camshaft Fund, an unproven high-risk hedge fund run by a young and unknown portfolio manager. Any limited partnership interest that the Debtor received in Camshaft Fund—which is not registered under the securities laws and subject to strict restrictions on resale and transferability, along with well above-market fees and expenses—was not reasonably equivalent to the approximately $533 million that the Debtor invested. Simply, the Debtor exchanged the most liquid asset on its balance sheet—cash sitting in checking and brokerage accounts—for a highly *illiquid* asset—a limited partnership interest in a no-name hedge fund, which has a thin market and accordingly would be expected to trade at a substantial discount. Indeed, the purpose of the Debtor's purported "investment" in Camshaft was to conceal assets, not to generate investment returns while minimizing risk of loss.

122. Should that limited partnership interest and/or the approximately $533 million now be held by a third-party entity, Camshaft Fund remains liable because it is the initial recipient and beneficiary of the investment.

123. In light of the foregoing, the Camshaft Fund transfers should be avoided as fraudulent pursuant to Sections 544(b)[6] and 548(a)(1)(B) of the Bankruptcy Code and applicable state law (*e.g.*, Fla. Stat. §§ 726.105(1)(b) and 726.106(1)), and the Debtor may recover from Camshaft Fund pursuant to Section 550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtor's bankruptcy estate.

**COUNT THREE**
**CONSTRUCTIVE FRAUDULENT TRANSFERS**
**(AGAINST CAMSHAFT ADVISORS AND CAMSHAFT MANAGEMENT)**

124. The Debtor reincorporates and realleges each of the allegations in paragraphs 1 through 110 as if fully set forth herein.

125. Over the course of April and July 2022, the Debtor transferred $533 million to Camshaft Fund. Since the Debtor transferred approximately $533 million to Camshaft Fund in April and July 2022, upon information and belief based on Camshaft's public disclosures, Camshaft Advisors and Camshaft Management have been charging an above-market 3% annual management fee directly from the Debtor's capital account (or any third-party's capital account holding some or all of the Debtor's approximately $533 million) on a monthly basis, along with an above-market performance fee of 30% subject to a 12% hurdle and potentially other expenses. Based on the Debtor's investments, a 3% annual fee would result in **over $20 million** in fees to date having been paid out of the Debtor's capital account (assuming no profits and losses or distributions). Those transfers constituted a transfer of property of the Debtor.

---

6 Section 544(b) of the Bankruptcy Code authorizes the Debtor to avoid any transfer of an interest in its property that is voidable under applicable law by any creditor holding an allowable unsecured claim. Accordingly, fraudulent transfers are avoidable pursuant to Section 544(b) of the Bankruptcy Code and other applicable law, including the Florida Uniform Fraudulent Transfer Act, Fla. Stat. § 726.101 *et seq*.

126. At the time that it paid the fees in question, the Debtor, under applicable law, was insolvent or became insolvent as a result of initiating the transfers to Camshaft that resulted in these fee payments, was inadequately capitalized, and/or was unable to pay its debts as they came due, and remained so at all times thereafter through the Petition Date. Specifically, the Debtor (a) was a special purpose financing vehicle with no active operations; (b) had defaulted on the Term Loans before the first transfer was made and could foresee further defaults; (c) had no ability to comply with its obligations under the Credit Agreement, the subsequent forbearance agreements, and the other loan documents; and (d) owed the Lenders an amount of money, which would soon be accelerated, exceeding $1.2 billion, for which the remaining assets of the Debtor were unreasonably small in relation to the outstanding debt.

127. The Debtor did not receive reasonably equivalent value in exchange for the payment of the alleged management or performance fees, particularly where the fees being charged are so substantial, including in relation to prevailing market fees and particularly in light of the information uncovered about Camshaft, its operations, and its Chief Executive Officer and Chief Compliance Officer Morton, as set forth above. Camshaft Fund is simply an unproven, high-risk hedge fund run by a young and unknown portfolio manager that apparently was chosen by the Debtor's prior management specifically for its anonymity. As a result, the Debtor has suffered millions of dollars in damages, with the exact amount to be determined at trial.

128. In light of the foregoing, the transfers should be avoided as fraudulent pursuant to Sections 544(b) and 548(a)(1)(B) of the Bankruptcy Code and applicable state law (*e.g.*, Fla. Stat. §§ 726.105(1)(b) and 726.106(1)), and the Debtor should recover from Camshaft Advisors and Camshaft Management pursuant to Section 550 of the Bankruptcy Code the full amount of such

transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtor's bankruptcy estate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff BYJU's Alpha, Inc. requests that this Court enter judgment and granting the following relief:

a. Avoidance of the actual and constructive fraudulent transfers under 11 U.S.C. §§ 544, 548, and 550 and the Florida Uniform Fraudulent Transfer Act (or any other applicable state law);

b. Award of (a) the return of property to the Debtor's estate that is the subject of the avoidable fraudulent transfers alleged herein; or (b) monetary damages under 11 U.S.C. § 550 reflecting the value of the avoidable transfers alleged herein (plus the value of any additional avoidable transfers the Debtor learns, through discovery or otherwise, were made to one or more of the Camshaft Defendants);

c. Attorneys' fees, costs, and expenses incurred in this adversary proceeding;

d. Pre- and post-judgment interest up to the statutory maximum; and

e. Any other relief that this Court may deem just, proper, or equitable under the circumstances.

Dated: February 2, 2024
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*<u>/s/ Robert S. Brady</u>*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani (pro hac vice forthcoming)
Benjamin Finestone (pro hac vice forthcoming)
Daniel Holzman (pro hac vice forthcoming)
Jianjian Ye (pro hac vice forthcoming)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel.: (212) 849 7000
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholzman@quinnemanuel.com
jianjianye@quinnemanuel.com

Proposed Counsel for Debtor, BYJU's Alpha, Inc.

# EXHIBIT 1

## DOCUMENT FILED UNDER SEAL

# EXHIBIT 2

## DOCUMENT FILED UNDER SEAL

# EXHIBIT 3

## DOCUMENT FILED UNDER SEAL

# EXHIBIT 4

CAMSHAFT CAPITAL

CAMSHAFT CAPITAL ADVISORS, LLC
18555 COLLINS AVE SUITE #5405
SUNNY ISLES BEACH, FL 33160
TELEPHONE: 305-619-1383

WWW.CAMSHAFTCAPITAL.COM

**April 2023**

**This brochure provides information about the qualifications and business practices of Camshaft Capital Advisors. LLC ("Camshaft" or the "Firm"). If you have any questions about the contents of this brochure, please contact us at (305) 619-1383 and/or email: william@camshaftcapital.com The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission ("SEC") or by any state securities authority.**

**Additional information about Camshaft also is available on the SEC's website at www.adviserinfo.sec.gov.**

**Camshaft is registered as an investment adviser with the SEC. Registration with the SEC does not imply a certain level of skill or training.**

**<u>Item 2.</u>** Material Changes

This is the initial Brochure filing for Camshaft Capital Advisors, LLC. Going forward this Item will be updated with each annual amendment.

*The information set forth in this Brochure is qualified in its entirety by reference to a Client's Governing Documents (as defined herein) and/or offering documents. In the event of a conflict between the information set forth in this Brochure and the information set forth in a Client's Governing Documents and/or offering documents, the Client's Governing Documents and/or offering documents shall take precedence.*

**Item 3.** Table of Contents

**Topic:** **Page**

**Item 2.** **Material Changes** ........ **2**

**Item 3.** **Table of Contents** ........ **3**

**Item 4.** **Advisory Business** ........ **4**

**Item 5.** **Fees and Compensation** ........ **4**

**Item 6.** **Performance-Based Fees and Side-By-Side Management** ........ **6**

**Item 7.** **Types of Clients** ........ **7**

**Item 8.** **Methods of Analysis, Investment Strategies and Risk of Loss** ........ **8**

**Item 9.** **Disciplinary Information** ........ **38**

**Item 10.** **Other Financial Industry Activities and Affiliations** ........ **38**

**Item 11.** **Code of Ethics, Participation or Interest in Client Transactions and Personal Trading** ........ **39**

**Item 12.** **Brokerage Practices** ........ **40**

**Item 13.** **Review of Accounts** ........ **42**

**Item 14.** **Client Referrals and Other Compensation** ........ **42**

**Item 15.** **Custody** ........ **42**

**Item 16.** **Investment Discretion** ........ **43**

**Item 17.** **Voting Client Securities** ........ **43**

**Item 18.** **Financial Information** ........ **44**

**Item 4.** Advisory Business

For the purposes of this Brochure, the "**Adviser**", "Camshaft: or the "**Investment Manager"** means Camshaft Capital Advisors, LLC. The Investment Manager, owned by William Morton, is a limited liability company organized under the laws of the State of Florida and has been providing investment advisory services since 2020. Camshaft Capital Management, LLC is the General Partner of Camshaft Capital Fund LP. Mr. Morton acts as the managing member of Camshaft Capital Management, LLC.

Currently, Camshaft manages and provides discretionary investment advisory services to the Camshaft Capital Fund, LP (as defined below in this Item 4 under "**Funds**"). In addition, Camshaft may serve as a discretionary investment adviser to invest the assets of a privately offered pooled investment vehicle managed by an unaffiliated third-party pursuant to a trading advisory agreement (the "**Third-Party Fund**" and, together with the Camshaft Funds, the "**Funds**"). Camshaft may also provide investment advisory services to entities or pooled investment vehicles on a managed account basis (each such arrangement, a "**Managed Account**," and the entity(ies) funding a Managed Account, a "**Managed Account Client**"). For the purposes of this brochure, a "**Client**" refers to a Fund (but not the investors in a Fund) and/or a Managed Account Client, as the context requires.

As of December 31, 2022, Camshaft had $595,845,395 in regulatory assets under management. Camshaft does not currently manage any Client assets on a non-discretionary basis. Camshaft does not participate in any wrap fee programs.

Managed Account Arrangements

As of the date of this brochure, Camshaft has no Managed Account arrangements. However, in the event that Camshaft were to enter into a Managed Account arrangement in the future, then Camshaft would develop investment guidelines based upon the Managed Account Client's specific investment objectives. Managed Account advisory services would be governed by a written agreement ("**Managed Account Agreement**") between Camshaft and the Managed Account Client. Camshaft would manage any such Managed Accounts under a broad range of potential mandates. Managed Account Clients would be permitted to amend their investment guidelines as their needs change or impose restrictions or limitations on investing in certain securities or types of securities.

**Item 5.** Fees and Compensation

A management fee is paid monthly in advance to the General Partner. The management fee is equal to three percent (3%) per annum of the beginning capital account balance of each Limited Partner for such month. The General Partner may, in its sole discretion, enter into arrangements with Limited Partners under which the management fee is reduced, waived or calculated differently with respect to such Limited Partners, including, without limitation, Limited Partners that are members, affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, or Limited Partners that make substantial investment or otherwise are determined by the General Partner in its sole discretion to represent a strategic relationship.

To the extent that there is a shared expense among any of the Camshaft Funds, on the one hand, and Camshaft, on the other hand, Camshaft will allocate the expense among such Camshaft Fund(s) and itself in a manner that it determines is fair and equitable under the circumstances to all parties.

See Item 6 below for more information concerning performance-based fees.

<u>Managed Accounts</u>

Camshaft presently does not have, and thus receives no fees from, any Managed Account Clients. In the event that Camshaft were to advise a Managed Account in the future, it may be paid a management fee and/or a performance fee by such Managed Account in accordance with the terms of the applicable Managed Account Agreement.

<u>Additional Expenses</u>

In addition to the management fees and the performance-based fees described above, the Camshaft Funds (and, indirectly, the investors therein) will pay such additional expenses as are disclosed in the Camshaft Funds' applicable offering documents. The expenses to be paid by each Camshaft Fund vary and may include, among others, the following: transaction costs and investment-related expenses incurred in connection with the Funds' trading activities, including securities and futures brokerage, clearing, margin interest (if any), custodial expenses, and any non-U.S. mutual fund expenses; all U.S. and non-U.S. legal, regulatory and compliance fees and expenses (including, but not limited to, blue sky compliance, compliance with the Alternative Investment Fund Managers Directive, MIFID, the EEA and FATCA), accounting, auditing, tax preparation, expenses relating to the offering and sale of the Shares, and registration fees and expenses as well as related fees and expenses (including, but not limited to, legal fees or other fees and expenses related to: the preparation and filing of Form PF, CFTC and NFA Form CPO-PQR, NFA Form CTA-PR and NFA Form PR, the applicable portion of Camshaft's fees and expenses incurred in connection with preparing and filing Form ADV that are allocable to a Camshaft Fund, and any other SEC, CFTC and/or NFA filings and registrations or other filings that are made with respect to the Funds or assets of the Funds; related requirements under the Dodd-Frank Act, and U.S. Department of the Treasury and U.S. Department of Commerce regulations; and registrations and related requirements of foreign regulators); expenses associated with the continued offering of shares, which include, but are not limited to, marketing, travel and other solicitation expenses; operational expenses such as the administrator's charges, fees and expenses, trade support systems, the directors' charges and expenses, photocopying, facsimile, postage, and telephone expenses; research and research-related costs, consulting fees, fees and charges (such as data feeds, news, Fund reports, brokerage reports, software licenses, ongoing development, implementation, updating and support of software licenses, bank service fees, third-party trading and/or portfolio-related services and support, including software costs such as order management, risk management and similar systems, software costs relating to order management, and Bloomberg terminals and services); legal fees and due diligence expenses, related to the analysis purchase or sale of investments, whether or not the investment is consummated; Camshaft Fund related insurance costs (including a portion of D&O and E&O insurance for Camshaft, if applicable), extraordinary expenses (such as, litigation costs and indemnification obligations), if any; the Performance Fee and the Management Fee (defined below) paid to Camshaft; Cayman Islands government fees and director registration fees and other equivalent expenses; and interest in connection with

investment-related borrowings. In addition, each Fund will bear its *pro rata* share of all expenses related to any pooled investment vehicle(s) (including, but not limited to, the Master Fund) in which such Fund invests; such charges may include management fees, performance fees, ordinary operating expenses (such as administration, legal, accounting and other operational costs) and extraordinary expenses (such as litigation costs and indemnification obligations), provided that such Fund will not bear a double-layering of asset-based fees or performance-based compensation in connection with its investment in another Camshaft Fund. Therefore, it is possible that a Fund may bear a portion of any such expense even though it may not directly benefit therefrom. Funds also pay the fees and expenses of their prime brokers, futures commission merchants and administrators.

As described further in the respective offering documents for the Camshaft Funds, generally, Camshaft will bear certain overhead expenses of operating the Camshaft Funds which otherwise would be allocable to the Camshaft Funds.

Although Camshaft presently does not have any Managed Account Clients, any future Managed Account Clients of Camshaft may be expected to pay additional expenses similar to those described above, to the extent applicable, subject to the specific terms of the applicable Managed Account Agreement.

Please see Item 12 below for a discussion of Camshaft's brokerage practices.

<u>Additional Information About Fees and Expenses</u>

The specific manner in which Camshaft charges management fees, performance-based fees, and expenses is established in each Client's written agreement with Camshaft. Camshaft investors may consult the applicable Fund's offering memorandum and governing documents for a description of these charges. Generally, pursuant to the applicable governing documents for each Fund, management fees and performance-based fees are deducted directly from each investor's account with the relevant Fund. Management fees, if any, are generally paid monthly in arrears. Performance fees, if any, are paid at the end of the fiscal year to which the fee pertains or upon a redemption from a Fund or a termination of a Managed Account.

The foregoing fees and expenses may be negotiable, reduced, rebated or waived in certain circumstances, including with respect to Clients or Fund investors that are employees of Camshaft and other persons that are affiliated with Camshaft or its affiliates.

**<u>Item 6.</u>** Performance-Based Fees and Side-By-Side Management

Currently, Camshaft's Clients are generally charged both a management fee and a performance fee. The performance fees are structured to comply with Section 205 of the Investment Advisers Act of 1940, as amended (the "**Advisers Act**").

Performance-based compensation arrangements may create an incentive for Camshaft to make investments that are riskier or more speculative than would be the case in the absence of a financial incentive based on the performance of a Client's account. Performance-based compensation arrangements may also create an incentive for Camshaft to favor higher fee paying accounts over other accounts in the allocation of investment opportunities. When Camshaft

transacts securities for more than one Client account, the investment opportunities and trades must be allocated in a manner consistent with Camshaft's fiduciary duties. Camshaft will not necessarily purchase or sell the same securities at the same time or in the same proportionate amounts for all eligible portfolios, particularly if different portfolios have materially different amounts of capital under management by Camshaft or different amounts of investable cash available or different investment guidelines, financing arrangements and/or dealer relationships. As a result, although Camshaft manages portfolios with similar or identical investment objectives, or may manage accounts with different objectives that trade in the same securities, the portfolio decisions relating to these accounts, and the performance resulting from such decisions, may differ from portfolio to portfolio.

Camshaft presently does not have, and thus receives no fees from, any Managed Account Clients. If in the future Camshaft were to advise a Managed Account alongside the Camshaft Funds, it is possible that Camshaft may take different positions in the same or related securities for such Clients, such as selling certain securities short for a Camshaft Fund while a Managed Account simultaneously holds the same or related securities long. In such case, Camshaft will adopt and execute side-by-side management procedures in an effort to mitigate these potential conflicts.

**Item 7.** Types of Clients

Camshaft currently provides investment advice only to the Camshaft Funds. However, Camshaft may advise additional or different types of entities in the future.

Each Camshaft Fund is not registered under the Investment Company Act of 1940, as amended (the "**1940 Act**"), in reliance on the exemption provided by Section 3(c)(7) of the 1940 Act. In addition, each Camshaft Fund's interests or shares (as applicable) are not registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or any state "blue-sky" laws; rather, they are privately offered only to qualified purchasers and accredited investors pursuant to an exemption from registration under Regulation D under the Securities Act. Each investor in the Fund must be (1) an "accredited investor" as defined in Regulation D under the Securities Act, (2) a "qualified purchaser" as defined in the 1940 Act and the regulations under the 1940 Act, and (3) a "United States person" as defined under the Internal Revenue Code of 1986, as amended (the "Code"). Each investor in the Fund that is a "United States person" (as defined in the Code) must be (1) an "accredited investor," as defined in Regulation D under the Securities Act, (2) a "qualified purchaser" or "knowledgeable employee" as defined in the 1940 Act and the rules under the 1940 Act (and thus a "qualified client" within the meaning of the Advisers Act), and (3) exempt from U.S. federal income tax under Section 501 of the Code or otherwise. Each other investor in the Fund must not be a "U.S. person," as defined in Regulation S under the Securities Act, or a "United States person" as defined in the Code, and must be a "Non-United States person" as defined in Regulation 4.7 under the U.S. Commodity Exchange Act, as amended. The minimum investment in each Fund, subject to waiver, is $2,500,000.

If a Client or potential Client would like to open a Managed Account, the conditions for starting and maintaining a Managed Account will vary with the circumstances of each Managed Account and be negotiated and set forth on an individual basis in the relevant Managed Account Agreement.

**Item 8.** Methods of Analysis, Investment Strategies and Risk of Loss

The methods of analysis and investment strategies used by Camshaft in managing Camshaft Fund assets are summarized below. The methods of analysis and investment strategies that Camshaft would use to manage assets of any Managed Account Clients would vary depending on the needs of each Managed Account Client, but are expected to be comparable to those summarized below for the Camshaft Funds. In addition, the material risks involved with each significant investment strategy and method of analysis is explained below.

Methods of Analysis and Investment Strategies

The methods of analysis and investment strategies used by Camshaft in managing assets are summarized below. Investors and prospective investors in a Camshaft Fund should review the offering memorandum Fund in which they are invested (or are seeking to invest) for additional information about the strategies and risks associated with an investment in such Fund. For information concerning the sub-strategies identified below, please refer to the confidential offering memorandum of the applicable Camshaft Fund.

- *Leverage and Short Selling*. The Fund may from time to time engage in short selling. Selling securities short runs the risk of losing an amount greater than the amount invested. Short selling is subject to theoretically unlimited risk of loss because there is no limit on how much the price of the stock may appreciate before the short position is closed out. A short sale may result in a sudden and substantial loss if, for example, an acquisition proposal is made for the subject company at a substantial premium over market price. Furthermore, the Fund at times will trade securities on a leveraged basis, i.e., where the security can be purchased by putting up only a portion of the instrument's face value and borrowing the remainder (margin). As a result, a relatively small price movement in a security may result in immediate and substantial losses to the Fund. In addition, trading on margin will result in interest charges to the Fund which may be substantial. Leveraged investments, including any purchase or sale of securities on margin, may result in losses in excess of the amount invested.

- *Trading in Distressed Securities and Highly Leveraged Companies*. The strategies of the General Partner and the Investment Advisers may entail investments in distressed securities and highly leveraged companies. An investment in these types of securities and companies, by the nature of their leveraged capital structure, will involve a high degree of financial risk. Such risks include, but are not limited to, the following: (a) difficulty in identifying attractive investment opportunities; (b) subordination to substantial amounts of senior indebtedness, all or a signification portion of which may be secured; (c) the possibility of substantial changes in rights and covenants which could result in less protection for the Fund with respect to securities purchased in proceedings under Chapter 11 of the US Bankruptcy Code; and (d) the lack of regulation of the OTC Market (in which distressed securities often are traded) by any exchange, and the lack of any established market-making, margin or other requirements that would help to insure a viable trading market exists for a particular security.

- *Illiquidity of Markets*. At various times, the markets for securities interests purchased or sold by the Fund may be "thing" or illiquid, making purchase or sale of securities at desired prices or in desired quantities difficult or impossible. For example, securities exchanges and the

SEC have authority to suspend trading in a particular security without notice. In addition, the Fund may invest in private placements of securities that are not registered under the Act and may have little to no trading market.

- *Investing in Illiquid Securities*. The Fund may from time to time invest in unregistered securities of public companies and at times in the securities of private companies, including without limitation, limited partnerships, the securities of which may be, and often are, illiquid. While no more that 10% of the Fund's portfolio may be invested in illiquid securities, the Fund may be forced to hold a larger cash reserve than normal as a precaution in the event of a large number of withdrawal requests by Limited Partners within a short period of time.

- *Other Investment Strategies*. Camshaft may also pursue other investment strategies as it deems appropriate, including, but not limited to: long/short equity investing, investing and trading in futures, foreign currency instruments, options, total-return swaps, stock indices and exchange-traded funds or other derivative financial instruments.

Material Risks

***An investment in the Camshaft Funds involves substantial risks, including, but not limited to, those described below. The following information is not intended to be an exhaustive listing of all potential risks associated with an investment in the Camshaft Funds. There can be no assurance that the Camshaft Funds will realize their investment objective or return any capital. Shares/interests are a potentially suitable investment only for sophisticated investors for whom an investment in the Camshaft Funds does not represent a complete investment program and who, in consultation with their own investment and tax advisors, fully understand and are capable of assuming the risks of an investment in the shares/interests.***

***Note that, while this section may refer to risks of trading by the Camshaft Funds, all of the Camshaft Funds' trading activities occur at the level of the Master Fund. In addition, references in this section to possible actions undertaken by the Camshaft Funds and the risks related to the operation of the Camshaft Funds should be read to include references to possible actions undertaken by the Master Fund and the risks related to the operation of the Master Fund.***

***Prospective investors should give careful consideration to the following factors in evaluating the merits and suitability of an investment in the Camshaft Funds:***

**Risks Relating to the Camshaft Funds and the Offering of Shares/Interests**

***Limitations on Past Performance***. Camshaft Funds' past performance is by no means necessarily representative of how the Camshaft Funds will perform. While certain individuals of the Firm have substantial experience investing in certain types of opportunities that the Camshaft Funds pursues, there can be no assurance that the Camshaft Funds or the Master Fund will generate performance results equivalent to the past results generated by the Firm or that the Camshaft Funds will avoid losses. Market conditions and trading approaches are continually changing, and the fact that certain individuals of the Firm may have achieved certain positive performance in the past may be largely irrelevant to the Camshaft Funds' prospects for profitability. The Camshaft Funds'

past performance has been, and is expected to continue to be, highly volatile. PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS. NO ASSURANCE CAN BE MADE THAT PROFITS WILL BE ACHIEVED OR THAT SUBSTANTIAL LOSSES WILL NOT BE INCURRED.

***Potential Loss of Investment***. An investment in the Camshaft Funds involves a high degree of risk. There can be no assurance that the Camshaft Funds' investment objective will be achieved. There is a risk that an investment in the Camshaft Funds will be lost entirely or in part. The Camshaft Funds is not a complete investment program and should represent only a portion of an investor's portfolio. Investors must be prepared to lose their entire investment in the Camshaft Funds.

***No Market for Shares/Interests***. Although amounts may be redeemed/withdrawn from the Camshaft Funds on a periodic basis according to the terms set forth in the applicable agreement, shares/interests may not be assigned, pledged or otherwise transferred without the prior written consent of the Firm. There is no market for the shares/interests, and none is expected to develop. Shares/interests will not be registered under the securities laws of any jurisdiction and will be subject to strict restrictions on resale and transferability. Therefore, investors must be prepared to bear the risk of their investment in the Camshaft Funds for a substantial period of time.

***Reliance on Key Person***. The Camshaft Funds is substantially dependent on the services of Camshaft. In the event of the death, disability, departure or insolvency of Mr. Morton, the business of the Camshaft Funds may be adversely affected. Mr. Morton will devote such time and effort as he deems necessary for the management and administration of the Camshaft Funds' business. However, Mr. Morton may engage in various other business activities in addition to managing the Camshaft Funds, and consequently Mr. Morton may not devote his complete time to the business of the Camshaft Funds.

***Effect of Substantial Redemptions/Withdrawals***. A number of events could result in substantial redemptions/withdrawals from the Camshaft Funds. Actions taken to meet such redemptions/withdrawals requests could result in a decrease in the prices of equities (listed and unlisted, private and public, common and preferred), fixed income securities, sovereign debt, futures (including commodity futures), over-the-counter physical commodities, foreign exchange forward and spot contracts, digital assets and digital asset derivatives, American Depositary Receipts ("ADRs"), foreign exchange currencies, and other derivative contracts and transactions such as swaps (including interest rate swaps, credit default swaps, index credit default swaps, equity total return swaps, volatility or variance swaps, correlation swaps and commodity swaps), options, warrants, convertible securities, and cash or cash equivalents (such as treasury notes and bills, certificates of deposit, commercial paper, broker balances, bankers acceptances or repurchase agreements) (collectively, "Financial Instruments") held by the Camshaft Funds and an increase in expenses (*e.g.*, transaction costs and the costs of terminating agreements). The overall value of the Camshaft Funds may also decrease because the liquidation value of certain assets may be materially less than their mark-to-market value. The Camshaft Funds may be forced to sell its more liquid positions, may need to maintain greater amounts of cash and cash-equivalent investments than it would otherwise maintain and may also be restricted in its ability to obtain financing or derivatives counterparty relationships needed for certain investment and trading strategies, any of which could affect the Camshaft Funds adversely.

***Performance-Based Compensation.*** In addition to sharing in profits on the basis of its capital, the Firm will be entitled to receive from each investor's account (paid by the Master Fund) a performance fee based on a percentage of the new net income, if any, in respect of such investor's account during a performance period. The performance fee can be characterized as creating an incentive to the Firm to make speculative investments and thus a potential conflict with the investments of the investors. Since the performance fee will be based upon portfolio gains, both realized and unrealized (net of realized and unrealized losses), it is possible that the Firm may receive a performance fee based upon unrealized appreciation in particular positions which is not in fact achieved upon eventual disposition of such positions. The fact that the performance fee is based on capital appreciation of the Camshaft Funds may create an incentive for the Firm to make investments that are more speculative than would be the case in the absence of such performance-based advisory compensation.

***Share Value Calculation.*** The value of the dollar class shares will be calculated in U.S. Dollars.

***Limited Regulatory Oversight***. The Camshaft Funds is not registered as an "investment company" under the U.S. Investment Company Act of 1940, as amended (the "**Company Act"**) or any comparable regulatory requirements and does not intend to do so. Accordingly, the provisions of such regulations, which among other things generally require investment companies to have a majority of disinterested directors, require securities held in custody at all times to be maintained in segregated accounts and regulate the relationship between the investment company and its asset manager, are not applicable to an investment in the Camshaft Funds. Notwithstanding the foregoing, the U.S. Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**") imposes burdensome reporting and recordkeeping requirements on the Camshaft Funds. The Camshaft Funds intends to trade with dealers who will be required by regulation or will undertake to fulfill the Camshaft Funds' Dodd-Frank mandated reporting requirements. The costs associated with such compliance may result in certain investment strategies in which the Camshaft Funds engages, or may have otherwise engaged, becoming non-viable or non-economic to implement.

***Investors Do Not Participate in Management***. Except as outlined in the applicable offering documents investors, in their capacity as such, do not have the right to participate in the management of the Camshaft Funds or in the conduct of its business, whether by voting or otherwise. In general, the Firm is solely responsible for managing the Camshaft Funds and for the investment, sale and reinvestment of the Camshaft Funds' assets.

***Risk of Litigation***. In the ordinary course of business, the Camshaft Funds may be subject to litigation from time to time. In addition, as a result of certain investments, the Camshaft Funds could be named as a defendant in a lawsuit or regulatory action. The outcome of such proceedings, which may materially adversely affect the value of the Camshaft Funds, may be impossible to anticipate, and such proceedings may continue without resolution for long periods of time. Any litigation may consume substantial amounts of the Firm's time and attention, and that time and the devotion of these resources to litigation may, at times, be disproportionate to the amounts at stake in the litigation.

***Service Provider Risks***. The Camshaft Funds and the Firm are also reliant upon the proper performance of duties and obligations of their respective service providers. The Camshaft Funds may be adversely impacted in a material manner if one or more of the service providers to the Camshaft Funds or the Firm fail to adequately perform their functions. In addition, key activities undertaken in connection with the Firm's and the Camshaft Funds' operations may be concentrated in one or more service providers, which may expose the Camshaft Funds to risks if one or more of such service providers does not provide, or becomes incapable of providing services, in the normal course of business.

***Institutional and Counterparty Risk***. Institutions, such as brokerage firms, banks and broker dealers, generally have custody of the Camshaft Funds' portfolio assets and may hold such assets in "street name." The Camshaft Funds is subject to the risk that these firms and other brokers, counterparties or clearinghouses with which the Camshaft Funds deals may default on their obligations to the Camshaft Funds. Any default by any of such parties could result in material losses to the Camshaft Funds. Bankruptcy or fraud at one of these institutions could also impair the operational capabilities or the capital position of the Camshaft Funds. In addition, securities and other assets deposited with custodians or brokers may not be clearly identified as being assets of the Camshaft Funds, causing the Camshaft Funds to be exposed to a credit risk with regard to such parties. The Camshaft Funds generally will only be an unsecured creditor of its trading counterparties in the event of bankruptcy or administration of such counterparties. In some jurisdictions, the Camshaft Funds may also only be an unsecured creditor of its brokers in the event of bankruptcy or administration of such brokers. The Camshaft Funds will attempt to limit its brokerage and custody transactions to well capitalized and established banks and brokerage firms in an effort to mitigate such risks, but the collapse of the seemingly well capitalized and established Bear Stearns and Lehman Brothers demonstrates the limits on the effectiveness of this approach in avoiding counterparty losses.

The Camshaft Funds may effect transactions in over-the-counter ("**OTC**") and "interdealer" markets. The participants in such markets are typically not subject to the same level of credit evaluation and regulatory oversight as are members of "exchange based" markets. This exposes the Camshaft Funds to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not bona fide) or because of a credit or liquidity problem, thus causing the Camshaft Funds to suffer a loss. Such counterparty risk is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or in instances where the Camshaft Funds has concentrated its transactions with a single or small group of counterparties. The inability to make complete and "foolproof" evaluations of the financial capabilities of the Camshaft Funds' counterparties and the absence of a regulated market to facilitate settlement increases the risk to the Camshaft Funds.

The Camshaft Funds are likely to have exposure to trading counterparties other than its prime brokers. If the Camshaft Funds deliver collateral to its trading counterparties under the terms of its ISDA Master Agreements and any other trading agreements, either by posting initial margin or on a daily mark-to-market basis, circumstances may arise where a counterparty may be over-collateralized and/or the Camshaft Funds may from time to time have uncollateralized mark-to-market exposure to a counterparty in relation to its rights to receive securities and cash. In both circumstances the Camshaft Funds will be exposed to the creditworthiness of any such

counterparty and, in the event of the insolvency of a trading counterparty, the Camshaft Funds will rank as an unsecured creditor in relation to amounts equivalent to any such over-collateralization and any uncollateralized exposure to such trading counterparty. In such circumstances it is likely that the Camshaft Funds will be unable to recover any debt in full, or at all.

The Camshaft Funds' contractual arrangements with its trading counterparties will typically contain termination provisions in the event of, among other things, a significant decline in the net asset value of the Camshaft Funds, calculated on a periodic basis, and/or a decline in the net asset value of the Camshaft Funds to an absolute floor. Termination of any such contractual arrangements could seriously impair the ability of the Camshaft Funds to carry on its investment activities.

In addition to the foregoing risks associated with a counterparty or prime broker defaulting or entering into a dispute, there is also the risk that major institutional investors in the Camshaft Funds may be compelled to withdraw or redeem or that the Camshaft Funds' counterparties or brokers will be required to restrict the amount of credit previously granted to the Camshaft Funds due to their own financial difficulties, resulting in forced liquidation of substantial portions of the Camshaft Funds' investments.

The Camshaft Funds' brokers and other counterparties may hold the Camshaft Funds' assets, including assets held as collateral for margin loans or other financing provided to the Camshaft Funds. Under the terms of such arrangements and under applicable law, a secured party may be permitted to rehypothecate such assets in connection with securities lending or other transactions entered into by the secured party. Depending upon the types of instruments traded, the Camshaft Funds may be subject to risk of loss of its assets on deposit with a counterparty in the event of the bankruptcy or insolvency of such counterparty, any clearing broker through which such counterparty executes and clears transactions (whether on behalf of the Camshaft Funds or on behalf of other customers of such counterparty), any affiliate of such counterparty or any clearinghouse or exchange on which such counterparty trades (whether on behalf of the Camshaft Funds or on behalf of other customers of such counterparty).

The Camshaft Funds are not restricted from dealing with any particular counterparty or from concentrating any or all transactions with one counterparty. The ability of the Firm to transact business with any one or number of counterparties, the lack of any meaningful or independent evaluation of such counterparties' financial capabilities and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Camshaft Funds.

***Illiquid Financial Instruments***. Financial Instruments purchased by the Camshaft Funds may lack a liquid trading market, which may result in the inability of the Camshaft Funds to sell any such security or portfolio investment or to close out a transaction or to cover the short sale of a position, thereby forcing the Camshaft Funds to incur potentially unlimited losses in such instruments. This lack of liquidity and depth could be a disadvantage to the Camshaft Funds both in the realization of the prices that are quoted and the execution of orders at desired prices. In addition, Financial Instruments that are at one time marketable could become unmarketable (or more difficult to market) for a number of reasons. For example, in the case of securities traded on the NASDAQ National Market System, Inc., if the price of the securities falls below the minimum price required for continued trading, their marketability is likely to be adversely affected or

effectively eliminated altogether. In addition, most U.S. futures exchanges have established "daily price fluctuation limits" which preclude the execution of trades at prices outside of the limit, and, from time to time, the CFTC or the exchanges may suspend trading in market disruption circumstances. The daily limits establish the maximum amount that the price of a futures contract may vary either up or down from the previous day's settlement price. Once the daily limit has been reached in a particular futures contract, no trades may be made at a price beyond the limit. In these cases, it is possible that the Camshaft Funds could be required to maintain a losing position that it otherwise would close and incur significant losses or be unable to establish a position and miss a profit opportunity. Illiquid Financial Instruments may also be more difficult to value. Liquidity risk arises in the general funding of the Camshaft Funds' trading activities. It includes the risk of the Camshaft Funds not being able to fund trading activities at settlement dates, or liquidate Financial Instrument positions in a timely manner at a reasonable price. The sale of illiquid Financial Instruments often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the OTC markets. The Camshaft Funds may not be able to readily dispose of such illiquid investments and, in some cases, may be contractually prohibited from disposing of such investments for a specified period of time. Finally, if a substantial number of investors were to redeem/withdraw from the Camshaft Funds and the Camshaft Funds did not have a sufficient amount of cash and liquid securities to satisfy in cash such requests, the Camshaft Funds might have to meet such redemption/withdrawal requests through distributions of illiquid Financial Instruments.

Certain positions are typically liquidated on or shortly before the effective redemption/withdrawal date. If there is a market dislocation, including a daily price fluctuation limit, affecting such position(s) on such date, the price of the position(s) used to determine the net asset value of the investor account may be substantially different than the amount for which the position(s) can ultimately be sold by the Master Fund (or the price that would have been in effect without such market dislocation). Shorter notice for a redemption/withdrawal may exacerbate this result. If a market dislocation exists on a date on which the Camshaft Funds attempts to liquidate positions to satisfy redemptions/withdrawals, the non- redeeming/withdrawing investors (and new subscribers, if any) would be adversely affected if the relevant portfolio positions are subsequently sold for less than the price assigned to the positions as of the redemption/withdrawal date. Alternatively, if the relevant portfolio positions are subsequently sold for greater value, then the redeeming/withdrawing investor would be adversely affected. These effects are exacerbated in the case of redemptions/withdrawals representing a significant percentage of the net asset value of the Camshaft Funds.

Where appropriate, certain positions in the Camshaft Funds' investment portfolio that are illiquid and do not actively trade are marked to market by the Firm, taking into account actual market prices, market prices of comparable investments and/or such other factors (*e.g.*, the tenor of the respective instrument) as the Firm deems appropriate. To the extent that marking an illiquid investment to market is not practicable, an investment will be carried at fair value, as reasonably determined by the Firm. There is no guarantee that fair value will represent the value that will be realized by the Camshaft Funds on the eventual disposition of the investment or that would, in fact, be realized upon an immediate disposition of the investment. As a result, an investor redeeming/withdrawing its investment from the Camshaft Funds prior to realization of such an investment may not participate in gains or losses therefrom.

***Cybersecurity Breaches.*** The Camshaft Funds and the Firm are subject to risks associated with a breach in their cybersecurity. Cybersecurity is a generic term used to describe the technology, processes and practices designed to protect networks, systems, computers, programs and data from "hacking" by other computer users, other unauthorized access and the resulting damage and disruption of hardware and software systems, loss or corruption of data, as well as misappropriation of confidential information. If a cybersecurity breach occurs, the Camshaft Funds may incur substantial costs, including those associated with: forensic analysis of the origin and scope of the breach; investment losses from sabotaged trading systems; identity theft; unauthorized use of proprietary information; litigation; adverse investor reaction; the dissemination of confidential and proprietary information; reputational damage; and increased and upgraded cybersecurity. Any such breach could expose the Firm and/or the Camshaft Funds to civil liability, as well as regulatory inquiry and/or action. In addition, any such breach could cause substantial redemptions/withdrawals from the Camshaft Funds. In addition, investors could be exposed to additional losses as a result of unauthorized use of their personal information.

***Evolving Privacy Laws.*** In the ordinary course of business, the Firm collects, processes, receives, shares and maintains personal information, including data relating to personnel and investors. As a result, the Firm is subject to various U.S. federal and state privacy and information security laws regulating personal information and creating potential liability for the mishandling, misuse or compromise of that personal information. These laws are evolving, and new legislation may be enacted over time. New privacy laws add additional complexity to compliance programs and alternative data use that may require additional investment in resources, and could impact trading strategies.

***Limits of Disclosure.*** The descriptions in the Camshaft Funds' offering documents of the Firm's investment strategies, the markets and Financial Instruments in which the Camshaft Funds trades, the risk factors and conflicts of interest involved in doing so and other aspects of the Camshaft Funds' operations are subject to material inherent limitations and do not purport to be either complete or comprehensive. In investing in the Camshaft Funds, investors are entrusting their capital to the subjective, discretionary market judgment of the Firm, trading in changing, volatile and uncertain markets. No prospective investor should invest in the Camshaft Funds if such investor is not capable of understanding and evaluating the risks of such investment.

**<u>Risks Associated with the Camshaft Funds' Investment Strategies</u>**

***Global Macro Strategies***. The success of the Camshaft Funds' global macro investment strategy depends upon the Firm's ability to identify and exploit perceived fundamental, economic, financial and political imbalances that may exist in and between global markets across a variety of Financial Instruments and asset classes. The identification and exploitation of such imbalances and the prediction of price movements in these instruments involves significant uncertainties due to their reliance on various factors, including political, economic, international and environmental trends and events. There can be no assurance that the Firm will be able to identify investment opportunities or exploit such imbalances. The Camshaft Funds may incur substantial losses if the investment theses underlying the investment strategies or positions fail to develop as expected by the Firm.

***Relative Value Strategy Risks***. The success of the Camshaft Funds' relative value trading is dependent on the Firm's ability to exploit relative mispricing's among interrelated instruments. Although relative value positions may be considered to have a lower risk profile than directional trades as the former attempt to exploit price differentials not overall price movements, relative value investment strategies are by no means without risk. Mispricing's, even if correctly identified, may not converge within the time frame within which the Camshaft Funds maintains its positions. Even pure "riskless" arbitrage—which is rare—can result in significant losses if the arbitrage cannot be sustained (due, for example, to margin calls). International securities and markets may not move in correlation with each other or in directions anticipated by the Firm, so that hedging and arbitrage activities may not be successful. The Camshaft Funds' relative value investment strategies are subject to the risks of disruptions in historical price relationships, the restricted availability of credit and the obsolescence or inaccuracy of its algorithms. Market disruptions may also force the Camshaft Funds to close out one or more positions. Such disruptions have in the past resulted in substantial losses for funds employing relative value investment strategies.

The profitability of relative value trading has been materially reduced in certain asset classes in the past decade— in part due to the number of market participants seeking to exploit the same mispricings.

***Long/Short Strategies***. The success of the Camshaft Funds' long/short investment strategy depends upon the Firm's ability to identify and purchase securities that are undervalued and identify and sell short securities that are overvalued. The identification of investment opportunities in the implementation of the Camshaft Funds' long/short investment strategies is a difficult task, and there are no assurances that such opportunities will be successfully recognized or acquired. In the event that the perceived opportunities underlying the Camshaft Funds' positions were to fail to converge toward, or were to diverge further from, values expected by the Firm, the Camshaft Funds may incur losses. In the event of market disruptions, significant losses can be incurred which may force the Camshaft Funds to close out one or more positions. Furthermore, any valuation models used by the Firm, if applicable, to determine whether a position presents an attractive opportunity consistent with the Firm's long/short investment strategies may become outdated and inaccurate as market conditions change.

***Currency Risk – FX Hedging***. The Camshaft Funds intends to trade currencies for speculative or hedging purposes and may (but is not required to) use forward contracts and other Financial Instruments to seek to hedge against fluctuations in the relative value of the Fund's investments in respect of the Euro class shares and the GBP class shares. Hedging does not eliminate fluctuations in the value of the U.S. Dollar relative to the Euro or British Pounds Sterling or vice versa, or prevent losses if their relative values change, but rather establishes other positions designed to gain from those same developments, and such hedging transactions may also limit the opportunity for gain if the value of the U.S. Dollar should increase in relation to the Euro or British Pounds Sterling. As with other hedging transactions, currency hedging may result in a poorer overall performance and increased (rather than reduced) risk for the Camshaft Funds, the Euro class shares and the GBP class shares. There can be no guarantee that the Firm will be able to enter into suitable currency hedging transactions at a price and terms sufficient to protect the Camshaft Funds from a decline in the value of a particular currency and that such hedging transactions will be able to be executed at a time when the Camshaft Funds wishes to do so.

The Camshaft Funds may also invest a portion of its assets in equity securities, fixed income securities and other investments denominated in currencies other than the U.S. Dollar and in other Financial Instruments, the prices of which are determined with reference to currencies other than the U.S. Dollar. Currency markets are highly volatile, and currency trading is highly leveraged. For example, governments from time to time intervene, directly and by regulation, in the currency markets, with the specific intention of influencing the exchange rates. Currency markets are also, in general, highly interest rate sensitive, and may also be affected by trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. The Camshaft Funds may invest in currencies of Emerging Markets (as defined below), which may be less liquid than currencies of developed countries. There can be no guarantee that instruments suitable for hedging currency exchange rate changes will be available at the time when the Camshaft Funds wishes to use them or will be able to be liquidated when the Fund wishes to do so. Some currency risks are difficult or impossible to hedge, including for example the impact of exchange rate fluctuations on portfolio companies' businesses and macroeconomies. In some countries, the markets for certain of these hedging instruments are not highly developed or do not exist. To the extent certain currency exposure is not part of the Camshaft Funds' investment strategy as described above, the Firm may hedge against currency fluctuations, but there can be no assurance that such hedging transactions will be effective.

***Opportunistic Investing***. The Camshaft Funds will build a portfolio of both long and short equity investments where the investment team has identified potential for value from misunderstood or mispriced opportunities. Although the investment team conducts rigorous analysis of these opportunities, even if such an opportunity is correctly identified, such opportunity may not materialize within the time frame of which the Camshaft Funds maintains its positions, may take considerable time to occur or may result in an alternative strategic action that will result in closing the investment at a lower value than entry. Market liquidity constraints, borrowing availability and short squeezes can all have a material impact on the Camshaft Funds' investments and can require action to liquidate or exit positions at less than optimal levels.

General market disruptions may force the Camshaft Funds to close out one or more positions before the Camshaft Funds can capture gains or when the Camshaft Funds' trades would result in losses. Such disruptions have in the past resulted in substantial losses for investment funds.

Any long investments in financially troubled issuers carry a potential risk of loss by the Camshaft Funds. Among the problems involved in assessing and making investments in troubled issuers is the fact that it frequently may be difficult to obtain information as to the condition of such issuer. The market prices of the securities of such issuers are also subject to abrupt and erratic market movements and above average price volatility, and the spread between the bid and asked prices of such securities may be greater than normally expected. It may take a number of years for the market prices of such securities to reflect their intrinsic values. It is anticipated that some of such securities in the portfolio of the Camshaft Funds may not be widely traded, and that the Camshaft Funds' position in such securities may be substantial in relation to the market for such securities.

These types of investing requires active monitoring and may, in rare instances, require participation in bankruptcy or reorganization proceedings by the Firm. To the extent that the Firm becomes involved in such proceedings, the Camshaft Funds may have a more active participation in the affairs of the issuer than that assumed generally by an investor. In addition, the Firm's participation in such proceedings may restrict or limit the Camshaft Funds' ability to trade securities of the subject company. The Camshaft Funds may have limited ability to influence the management of the issuer or to elect a representative to the issuer's board of directors or other governing body, potentially increasing the risk of such investments. In addition, the management of the issuer or its shareholders may have economic or business interests which are inconsistent with those of the Camshaft Funds, and they may be in a position to take action contrary to the Camshaft Funds' objectives.

***Special Situations***. The Camshaft Funds may have investments in issuers involved in (or the target of) acquisition attempts or tender offers or issuers involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions. In any investment opportunity involving any such type of business enterprise, there exists the risk that the transaction in which such business enterprise is involved will be unsuccessful, will take considerable time or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Camshaft Funds of the security or other Financial Instruments in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the Camshaft Funds may be required to sell its investment at a loss. Because there is substantial uncertainty concerning the outcome of transactions involving financially troubled issuers in which the Camshaft Funds may invest, there is a potential risk of loss by the Camshaft Funds of its entire investment in such issuers.

***Short Selling***. Short selling involves selling securities which are not owned by the short seller and borrowing them for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date. Short selling allows the seller to profit from declines in market prices of the sold securities to the extent such decline exceeds the transaction costs and the costs of borrowing the securities. A short sale creates the risk of a theoretically unlimited loss, in that the price of the underlying security could theoretically increase without limit, thus increasing the cost to the Camshaft Funds of buying those securities to cover the short position. There can be no assurance that the Camshaft Funds will be able to maintain the ability to borrow securities sold short. In particular, (i) a tender offer or similar transaction with respect to a company whose securities the Camshaft Funds has sold short or (ii) an unexpected shortage in an underlying commodity with respect to commodity futures that the Camshaft Funds has sold short, could cause the value of such Financial Instruments to rise dramatically, resulting in substantial losses to the Camshaft Funds. Regulators have, and may in the future, suspend short sales in Financial Instruments traded by the Camshaft Funds, which may cause the price of such securities to rise, resulting in a loss to the Camshaft Funds. Brokers may also require the Camshaft Funds to "cover" a short position at an inopportune time thereby forcing the Camshaft Funds to purchase the security at the then-prevailing market price which may be higher than the price at which such security was originally sold short by the Camshaft Funds.

***Market Data.*** The Firm's and the Camshaft Funds' investment strategies depend on a wide variety and large quantity of market data obtained from numerous hosts of different suppliers, including multiple exchanges. Notwithstanding the Firm's reliance on large quantities of market

data, sources of market data may decline over time, which could adversely impact the investment program of the Camshaft Funds. In addition, market data contract pricing and terms are complex and subject to change without prior notice in many cases; increases in market data contract pricing could make the acquisition of certain data cost-prohibitive for the Firm which would negatively impact the Camshaft Funds' net performance. If data that the Camshaft Funds relies on is corrupted, compromised or discontinued in any material manner, the Camshaft Funds may suffer material losses or be exposed to the risk of loss of investment opportunities.

***Credit Ratings.*** Credit ratings of structured finance products, other fixed-income instruments and investments represent the rating agencies' opinions regarding their credit quality and are not a guarantee of future credit performance of such securities. Rating agencies attempt to evaluate the safety of principal and interest payments and do not evaluate the risks of fluctuations in market value. Therefore, the ratings assigned to securities by rating agencies may not fully reflect the true risks of an investment. Further, in recent years many highly rated structured securities have been subject to substantial losses.

***Discretionary Aspects of the Firm's Investment Approach.*** The Firm's strategies and research methodologies retain certain discretionary aspects. In particular, the discretion of the Firm is expected to be used throughout the research and creation of models, in interpreting data, choosing signals and ranking their importance. In addition, from time to time, the Firm may determine to make investment decisions or reallocate the Camshaft Funds' capital in respect of a particular asset class or investment strategy in anticipation of, or in reaction to, what the Firm deems to be certain "material events" in the global economy. Such "material events" include, but are not limited to, economic turning points, market regime changes, central bank announcements, geopolitical shifts and other material economic and market or risk events underlying the Camshaft Funds' investment strategies and in the Firm's view represent opportunities to enhance returns, reduce volatility or protect against potential drawdowns. There can be no assurances that such interventions will be successful or not increase the Camshaft Funds' losses attributable to such external events.

***Use of Leverage***. The investment strategies utilized on behalf of the Camshaft Funds generally involve the use of borrowed funds and otherwise obtaining leveraged exposures to Financial Instruments. Leverage in respect of certain investment strategies employed on behalf of the Camshaft Funds may be significant. Such leverage may be employed at the strategy level or the portfolio level. Use of leverage for investment purposes entails significant risks. Use of leverage tends to magnify the gains or losses from investment activities and the overall volatility of the Camshaft Funds. In addition, leverage results in interest expense and other costs and premiums. If gains earned by the Camshaft Funds' portfolio fail to cover such costs, the net asset value of the Camshaft Funds may decrease faster than if there had been no borrowings.

If securities pledged to brokers or other financial institutions to secure the Camshaft Funds' margin accounts decline in value, the Camshaft Funds could be subject to a "margin call," pursuant to which the Camshaft Funds must either deposit additional funds with the broker, or suffer mandatory liquidation of the pledged securities to compensate for the decline in value. The prime brokers and dealers that provide financing to the Camshaft Funds will determine the margin, haircut and collateral valuation policies that will apply to the Camshaft Funds from time to time.

Changes by prime brokers and dealers in margin, haircut, financing and valuation policies may result in margin calls, loss of financing and forced liquidations of positions at disadvantageous prices. There can be no assurance that the Camshaft Funds will be able to maintain any financing, and at times, especially during distressed market conditions, brokers and dealers have substantially reduced the availability of credit. If the Camshaft Funds is unable to obtain financing on terms acceptable to the Firm, the Camshaft Funds could be forced to liquidate portfolio investments on a schedule that the Firm would not otherwise follow and incur significant losses.

***Hedging***. Hedging techniques involve one or more of the following risks: (i) imperfect correlation between the performance and value of the instrument and the value of the Camshaft Funds securities or other objective of the Firm; (ii) possible lack of a secondary market for closing out a position in such instrument; (iii) losses resulting from interest rate, spread or other market movements not anticipated by the Firm; (iv) the possible obligation to meet additional margin or other payment requirements, all of which could worsen the Camshaft Funds' position; and (v) default or refusal to perform on the part of the counterparty with which the Camshaft Funds trade. Furthermore, to the extent that any hedging strategy involves the use of OTC derivatives transactions, such a strategy would be affected by implementation of various regulations, including those adopted pursuant to Dodd-Frank.

The Firm will not, in general, attempt to hedge all market or other risks inherent in the Camshaft Funds' positions, and hedges certain risks, if at all, only partially. Specifically, the Firm may choose not, or may determine that it is economically unattractive, to hedge certain risks—either in respect of particular positions or in respect of the Camshaft Funds' overall portfolio. The Camshaft Funds' portfolio composition will commonly result in various directional market risks remaining unhedged. The Firm may rely on diversification to control such risks to the extent that the Firm believes it is desirable to do so; however, the Camshaft Funds is not subject to formal diversification policies.

The ability of the Camshaft Funds to hedge successfully will depend on the ability of the Firm to predict pertinent price movements or the underlying causes of such price movements, which cannot be assured. The Firm is not required to hedge and there can be no assurance that hedging transactions will be available or, even if undertaken, will be effective. In addition, it is not possible to hedge fully or perfectly against currency fluctuations affecting the value of securities denominated in non-U.S. currencies because the value of those securities is likely to fluctuate as a result of independent factors not related to currency fluctuations. Moreover, it should be noted that the portfolio will always be exposed to certain risks that cannot be hedged, such as counterparty credit risk. Furthermore, by hedging a particular position, any potential gain from an increase in the value of such position may be limited.

***Emerging Market Investing***. The Camshaft Funds may invest a portion of its assets in the securities of, or instruments providing exposure to, less developed countries or countries with new or developing capital markets ("Emerging Markets"), as well as trade the currencies of such countries to hedge currency exposure. The value of Emerging Markets currencies and securities may be drastically affected by political developments in the country of issuance. In addition, the existing governments in the relevant countries could take actions that could have a negative impact on the Camshaft Funds, including nationalization, expropriation, sudden imposition of capital

controls, imposition of confiscatory taxation or regulatory or imposition of withholding or other taxes on interest payments.

Some of the countries in which the Camshaft Funds may invest have experienced political, economic and/or social instability. Many such countries have also experienced dramatic swings in the value of their national currency. There can be no assurance that such instability or such fluctuations will not occur in the future and, if they do occur, that they will not have a substantial adverse effect on the performance of the Camshaft Funds.

The economies of many of the Emerging Markets countries are still in the early stages of modern development and are subject to abrupt and unexpected change. In many cases, governments retain a high degree of direct control over the economy and may take actions having sudden and widespread effects. Also, many Emerging Markets country economies have a high dependence on a small group of markets or even a single market. Emerging Markets countries also tend to have periods of high inflation and high interest rates, as well as substantial volatility in interest rates, which could affect the Camshaft Funds adversely.

Foreign investment in the Emerging Markets countries is in some cases restricted. Many of these countries have non-convertible currencies and the value of investments may be affected by fluctuation in available currency rates and exchange control regulations. The remittance of profits may therefore be restricted, and the Camshaft Funds may utilize swaps and other forms of indirect investment to access such markets. Moreover, the banking systems in these countries are not fully developed and considerable delays may occur in the transfer of funds within, and the remittance of monies out of, Emerging Markets countries.

Certain Emerging Markets countries are particularly likely to require identifying information about entities and persons who have direct, or even indirect, exposure to the securities of issuers in those countries. This may result in the Camshaft Funds being asked to provide information about investors to Emerging Markets regulators or to the brokers who are providing services to the Camshaft Funds in connection with trading activities. Such information may include, but may not be limited to, the identities, addresses and countries of origin of the investors.

***Volatility***. The market value of certain investments held by the Camshaft Funds may be volatile, and will generally fluctuate due to a variety of factors that are inherently difficult to predict, including, among other things, the macro business and economic environment, specific developments or trends in respect of a company or in any particular industry, the market's overall perception of risk, general economic conditions, the condition of certain financial markets, domestic and international economic and political events, prevailing credit spreads, changes in prevailing interest rates and the financial condition of counterparties.

***Interest Rate Risk***. The Camshaft Funds is subject to interest rate risk. Generally, the value of fixed income securities will change inversely with changes in interest rates. As interest rates rise, the market value of fixed income securities tends to decrease. Conversely, as interest rates fall, the market value of fixed income securities tends to increase. This risk will be greater for long-term securities than for short-term securities. The Firm may attempt to minimize the exposure of its portfolio to interest rate changes through the use of interest rate swaps, interest rate futures

and/or interest rate options. However, there can be no guarantee that the Firm will be successful in mitigating the impact of interest rate changes on its portfolio.

***Potential Inability to Trade or Report Due to Systems Failure***. The Firm's investment strategies rely extensively on a wide range of information technology systems, including computer hardware and software systems and will be dependent to a significant degree on the proper functioning of such internal and external computer systems. Information technology systems are subject to a number of inherent and unpredictable risks. Accordingly, systems failures, whether due to third-party failures upon which such systems are dependent or the failure of the Firm's hardware or software, could disrupt trading or make trading impossible until such failure is remedied. Any such failure, and consequential inability to trade (even for a short time), could, in certain market conditions, cause the Camshaft Funds to experience significant trading losses or to miss opportunities for profitable trading. Any such failures also could cause a temporary delay in reports to investors.

***Availability of Investment Opportunities***. There can be no assurance that the Firm will be able to find suitable opportunities consistent with its investment approach or that it believes will likely to provide the desired returns. Market conditions may limit the availability of investment opportunities. Such limitations may cause delays in deploying the Camshaft Funds' capital, concentration of the Camshaft Funds' investments and may negatively impact the Camshaft Funds' returns.

***No Material Restrictions***. The Firm will opportunistically implement whatever investment strategies it believes from time to time may be best suited to prevailing market conditions and to the Firm's investment approach, without material restrictions. Such investment strategies may involve higher levels of risk than the ones discussed herein. There can be no assurance that the Firm will be successful in applying any strategy to the Camshaft Funds' investing.

**Risks Relating to Financial Instruments Traded**

***Futures***. The rapid fluctuations in the market prices of futures interests make an investment in the Camshaft Funds volatile. Volatility is caused by changes in supply and demand relationships; weather; agricultural, trade, fiscal, monetary and exchange control programs; U.S. and non-U.S. political and economic events and policies; and changes in interest rates. If the Firm incorrectly predicts the direction of the price in a futures interest, large losses may occur and the Camshaft Funds could lose all or substantially all of its assets.

Futures prices are highly volatile and are affected by a wide variety of complex and hard to predict factors; consequently, a primary risk in trading these instruments is rapid fluctuations in market prices in a short time period. Price fluctuations may affect the Firm's ability to earn investment returns for the Camshaft Funds. Market volatility may also depart significantly from historical averages, which could affect performance. Volatility could create adverse results for the performance of the Camshaft Funds in several ways. A period of substantial volatility shortly after an investor's initial investment, or additional investments thereafter, could adversely affect performance and cause a significant reduction in such investor's equity, making it more difficult to achieve profitability. Substantial volatility prior to the time of a planned redemption/withdrawal

adversely affect performance, and could reduce the amount of proceeds actually received when the redemption/withdrawal has been completed.

Futures exchanges may impose position accountability limits (the "Position Accountability Limits") with respect to certain futures contracts traded on each particular futures exchange. Position Accountability Limits are triggers that would bring the Camshaft Funds' position(s) to the attention of the exchange. Through the application of Position Accountability Limits, exchanges can prohibit an investor from holding a position of more than a specific number of futures contracts. Under the rules of a futures exchange, if the Camshaft Funds holds a certain number of futures contracts approaching the Position Accountability Limit, the Camshaft Funds may be required by the futures exchange to limit or decrease its holdings of such futures contracts pursuant to the futures exchange's Position Accountability Limits. If the Camshaft Funds is required to either limit or decrease its holdings of such futures contracts, or if an exchange lowers its Position Accountability Limits, the Camshaft Funds may be adversely affected and may not be able to achieve its investment objective.

***Non-U.S. Futures***. Foreign futures transactions involve executing and clearing trades on non-U.S. futures exchanges. This is the case even if the foreign exchange is formally "linked" to a U.S. futures exchange, whereby a trade executed on one exchange liquidates or establishes a position on the other exchange. No U.S. organization regulates the activities of a foreign exchange, including the execution, delivery and clearing of transactions on such an exchange, and no domestic regulator has the power to compel enforcement of the rules of the foreign exchange or the laws of the foreign country. Moreover, such laws or regulations will vary depending on the foreign country in which the transaction occurs. For these reasons, the Camshaft Funds may not be afforded certain of the protections which apply to domestic transactions, including the right to use domestic alternative dispute resolution procedures. In particular, funds received from customers to margin foreign futures transactions may not be provided the same protections as funds received to margin futures transactions on domestic exchanges. In addition, the price of any foreign futures or option contract and, therefore, the potential profit and loss resulting therefrom, may be affected by any fluctuation in the foreign exchange rate between the time the order is placed and the time the foreign futures contract is liquidated or the foreign option contract is liquidated or exercised.

***Credit Default Swaps***. The Camshaft Funds may invest in credit default swaps ("**CDS**"). A credit default swap is a contract between two parties which transfers the risk of loss if a company fails to pay principal or interest on time or files for bankruptcy. Credit default swaps can be used to hedge a portion of the default risk on a single corporate bond or a portfolio of bonds. In addition, credit default swaps can be used to implement the Firm's view that a particular credit, or group of credits, will experience credit improvement or credit impairment. Swap transactions dependent upon credit events are priced incorporating many variables including the pricing and volatility of the common stock, and potential loss upon default, among other factors. As such, there are many factors upon which market participants may have divergent views.

The Camshaft Funds may also purchase or sell CDS on a basket of reference entities or an index. In circumstances in which the Camshaft Funds is the credit default swap buyer and does not own the debt securities that are deliverable under a CDS, the Camshaft Funds is exposed to the risk that deliverable securities will not be available in the market, or will be available only at

unfavorable prices, as would be the case in a so-called "short squeeze." While the credit default swap market auction protocols reduce this risk, it is still possible that an auction will not be organized or will not be successful. As a seller of CDS, the Camshaft Funds incurs leveraged exposure to the credit of the reference entity and is subject to many of the same risks it would incur if it were holding debt securities issued by the reference entity. However, the Camshaft Funds will not have any legal recourse against the reference entity and will not benefit from any collateral securing the reference entity's debt obligations. In addition, in the event that a cash settlement auction to identify the relevant deliverable securities, is not established the credit default swap buyer will have broad discretion to select which of the reference entity's debt obligations to deliver to the Camshaft Funds following a credit event and will likely choose the obligations with the lowest market value in order to maximize the payment obligations of the Camshaft Funds.

***Equity Investments***. The Camshaft Funds intends to invest in equity markets, which may involve substantial risks. Investments in equity markets are highly volatile and may be subject to wide and sudden fluctuations, with a resulting fluctuation in the Camshaft Funds' performance. Equity markets may decline due to factors affecting equity securities markets generally or particular industries represented in those markets. Factors affecting the equity markets include, without limitation, real or perceived adverse economic conditions, changes in the general outlook for corporate earnings, changes in interest or currency rates, political events or adverse investor sentiment generally. They may also decline due to factors that affect a particular industry or industries, such as labor shortages or increased production costs and competitive conditions within an industry. Equity markets tend to be cyclical and may experience periods of turbulence. For the foregoing reasons, investments in equity markets can be highly speculative and carry a substantial risk of loss of principal.

The Camshaft Funds' single name equity investments may involve substantial risks and may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses. There are no absolute restrictions in regard to the size or operating experience of the companies in which the Camshaft Funds may invest. Relatively small companies may lack management depth or the ability to generate internally, or obtain externally, the funds necessary for growth. Companies with new products or services could sustain significant losses if projected markets do not materialize. Equity prices are directly affected by issuer specific events, as well as general market conditions. In addition, in many countries investing in common stocks is subject to heightened regulatory and self-regulatory scrutiny as compared to investing in debt or other Financial Instruments. Changes in the structure of the equity markets or new market participants may materially impede the Camshaft Funds' investment strategy.

***Fixed Income Investments***. The Camshaft Funds intends to invest in bonds and other fixed income securities of U.S. and non-U.S. issuers. The value of the fixed income securities in which the Camshaft Funds may invest changes both as general market conditions change and as the general levels of interest rates fluctuate. When interest rates decline, the value of the Camshaft Funds' fixed income securities can be expected to rise. Conversely, when interest rates rise, the value of such securities is generally expected to decline. Investments in lower rated or unrated fixed income securities in which the Camshaft Funds may invest, while generally providing greater opportunity for gain and income than investments in higher rated securities, usually entail greater risk (including the possibility of default or bankruptcy of the issuers of such securities). Fixed

income securities are generally not exchange traded and therefore, usually carry a higher level of liquidity and mark-to-market risk potential than most exchange-traded equity securities.

The Camshaft Funds may take positions in debt securities which rank junior to other outstanding securities and obligations of the issuer, all or a significant portion of which may be secured on substantially all of that issuer's assets. The Camshaft Funds may take positions in debt securities which are not protected by financial covenants or limitations on additional indebtedness. The Camshaft Funds may invest in securities which are moral obligations of issuers or subject to appropriations. The Camshaft Funds will therefore be subject to credit and liquidity risks. In addition, evaluating credit risk for debt securities of issuers in some jurisdictions involves uncertainty because credit rating agencies throughout the world have different standards, making comparison across countries difficult.

*Prepayment Risk*. The frequency at which prepayments (including voluntary prepayments by the obligors and accelerations due to defaults) occur on debt instruments will be affected by a variety of factors including the prevailing level of interest rates and spreads as well as economic, demographic, tax, social, legal and other factors. Generally, obligors tend to prepay their fixed rate obligations when prevailing interest rates fall below the coupon rates on their obligations. Similarly, floating rate issuers and borrowers tend to prepay their obligations when spreads narrow.

In general, "premium" securities (securities whose market values exceed their principal or par amounts) are adversely affected by faster than anticipated prepayments, and "discount" securities (securities whose principal or par amounts exceed their market values) are adversely affected by slower than anticipated prepayments. Since many fixed rate obligations will be discount instruments when interest rates and/or spreads are high, and will be premium instruments when interest rates and/or spreads are low, such debt instruments may be adversely affected by changes in prepayments in any interest rate environment.

The adverse effects of prepayments may impact the Camshaft Funds' portfolio in two ways. First, particular investments may experience outright losses, as in the case of an interest-only instrument in an environment of faster actual or anticipated prepayments. Second, particular investments may underperform relative to hedges that the Firm may have constructed for these investments, resulting in a loss to the Camshaft Funds' overall portfolio. In particular, prepayments (at par) may limit the potential upside of many instruments to their principal or par amounts, whereas their corresponding hedges often have the potential for unlimited loss.

*High-Yield Securities*. The Camshaft Funds may invest in high yield securities. High-yield securities face ongoing uncertainties and exposure to adverse business, financial or economic conditions which could lead to the issuer's inability to meet timely interest and principal payments. The market values of certain of these lower-rated and unrated debt securities tend to reflect individual corporate developments to a greater extent than do higher-rated securities which react primarily to fluctuations in the general level of interest rates, and tend to be more sensitive to economic conditions than are higher-rated securities. Companies that issue such securities are often highly leveraged and may not have available

to them more traditional methods of financing. It is possible that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities. In addition, it is possible that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default of such securities.

*Corporate Debt*. Bonds, notes and debentures issued by corporations may pay fixed, variable or floating rates of interest, and may include zero-coupon obligations. Corporate debt instruments may be subject to credit ratings downgrades. Other instruments may have the lowest quality ratings or may be unrated. In addition, the Camshaft Funds may be paid interest in kind in connection with its investments in corporate debt and related Financial Instruments (*e.g.*, the principal owed to the Camshaft Funds in connection with a debt investment may be increased by the amount of interest due on such debt investment). Such investments may experience greater market value volatility than debt obligations that provide for regular payments of interest in cash and, in the event of a default, the Camshaft Funds may experience substantial losses.

*Mezzanine Debt*. Mezzanine debt is typically junior to the obligations of a company to senior creditors, trade creditors and employees. The ability of the Master Fund to influence a company's affairs, especially during periods of financial distress or following an insolvency, will be substantially less than that of senior creditors. Mezzanine debt instruments are often issued in connection with leveraged acquisitions or recapitalizations in which the issuers incur a substantially higher amount of indebtedness than the level at which they had previously operated. Default rates for mezzanine debt instruments have historically been higher than for investment-grade instruments. In the event of the insolvency of a portfolio company of the Master Fund or similar event, the Master Fund's debt investment therein will be subject to fraudulent conveyance, subordination and preference laws.

*Non-Performing Nature of Debt*. Certain debt instruments may be non-performing or in default. Furthermore, the obligor or relevant guarantor may also be in bankruptcy or liquidation. There can be no assurance as to the amount and timing of payments, if any, with respect to such debt instruments.

*Troubled Origination*. When financial institutions or other entities that are insolvent or in serious financial difficulty originate debt, the standards by which such instruments were originated, the recourse to the selling institution, or the standards by which such instruments are being serviced or operated may be adversely affected.

***Obligations of Governments, their Agencies and Instrumentalities.*** The Camshaft Funds intends to invest in government securities. Government securities are obligations of, or are guaranteed by, governments, their agencies or instrumentalities. These instruments include bills, certificates of indebtedness and notes and bonds issued by governments, states, municipalities or by government agencies or instrumentalities. Some government securities, such as U.S. Treasury bills and bonds, are supported by the full faith and credit of the government treasury; others are supported by the right of the issuer to borrow from the government treasury; others are supported by the discretionary authority of the government to purchase the agency's obligations; still others

are supported only by the credit of the instrumentality. Certain events, including bankruptcy filings by certain municipalities, have highlighted the risks inherent in investing in government securities. It is difficult, if not impossible, to determine the extent to which such filings will become more common. Bankruptcy laws applicable to governments are relatively untested and may not provide the same protections to creditors as those contained in bankruptcy laws applicable to non-government debtors. It is impossible to predict whether the Partnership will be able to successfully avoid losses relating to defaults by issuers of governmental securities.

Various factors may adversely affect the value and yield of municipal securities. These factors include imbalances in demand, potential legislative changes, as well as uncertainties related to the tax status of municipal bonds or the rights of others holding these securities. Returns will depend on a positively sloped yield curve and the relationship between the tax-exempt and taxable yield curves. Adverse changes in the slope of the municipal bond yield curve as well as its relationship to the taxable yield curve, among other things, could have a material adverse effect on performance. Investments in municipal securities may be subject to liquidity risk because of the fragmentation of the municipal bond market and the unique effect that political, legislative and/or regulatory actions can have on the municipal bond market, compared to the taxable markets.

The Camshaft Funds intends to invest in sovereign debt issued or guaranteed by U.S. and non-U.S. governments, their agencies and instrumentalities either in the currency of their domicile or in a foreign currency. Investors in sovereign debt may be asked to participate in debt restructuring, including the deferral of interest and principal payments, and may also be requested by the issuer to extend additional loans. Investments in sovereign debt are subject to varying degrees of credit risk depending on the level of government support. Certain sovereign debt securities are supported by the full faith and credit of the national government or political subdivision or agency, while others lack such support. Investments in sovereign debt are also subject to varying degrees of credit risk as a result of financial or political instability in the relevant countries. Certain events, such as the political and economic instability in various European Union (the "EU") countries, have highlighted the risks inherent in investing in sovereign debt, including an EU member choosing to leave the Eurozone and redenominating its debt. The unwillingness of one or more EU countries to provide assistance to distressed sovereigns within the EU underlines the unexpected political dynamics that may arise to undermine investor expectations regarding the safety of sovereign debt.

Additionally, the financial markets are roiled from time to time by evolving developments relating to possible sovereign defaults or moratoriums. A sovereign's financial condition is subject to numerous factors—social programs, political pressure, supra-national economic actions—all or many of which may be exogenous to the Firm's analysis and research and may from time to time dominate market pricing (even if contrary to fundamental/trading dynamic pricing correctly identified by the Firm). It is impossible to predict whether the Camshaft Funds will be able to successfully avoid losses relating to sovereign default. There is no current means of collecting on defaulted sovereign debt as part of bankruptcy or other proceedings.

In addition to general default risk relating to sovereign debt, if the Camshaft Funds invests in sovereign debt denominated in a currency other than U.S. Dollars (or in respect of which payments of principal or interest are paid in a currency other than U.S. Dollars), the Camshaft Funds will be exposed to the risk that one or more jurisdictions may impose currency controls that

would limit the Camshaft Funds' ability to convert such payments of principal or interest to U.S. Dollars. It is impossible to predict whether any such currency controls will be imposed.

Countries or territories (including Venezuela, Russia, Argentina, Puerto Rico, Turkey and Lebanon) have encountered, or are currently encountering, difficulties in servicing their external national or government debt obligations, which led to defaults on government obligations and the restructuring of certain indebtedness. One sovereign default may have an adverse effect on the markets of both the defaulting country or territory and non-defaulting countries and/or territories.

***Repurchase and Reverse Repurchase Agreements.*** The Camshaft Funds may enter into repurchase and reverse repurchase agreements. When the Camshaft Funds enters into a repurchase agreement, it "sells" securities to a broker-dealer or financial institution, and agrees to repurchase such securities on a mutually agreed date for the price paid by the broker-dealer or financial institution, plus interest at a negotiated rate. In a reverse repurchase transaction, the Camshaft Funds "buys" securities from a broker-dealer or financial institution, subject to the obligation of the broker-dealer or financial institution to repurchase such securities at the price paid by the Camshaft Funds, plus interest at a negotiated rate. The use of repurchase and reverse repurchase agreements by the Camshaft Funds involves certain risks. For example, if the seller of securities to the Camshaft Funds under a reverse repurchase agreement defaults on its obligation to repurchase the underlying securities, as a result of its bankruptcy or otherwise, the Camshaft Funds will seek to dispose of such securities, which action could involve costs or delays. If the seller becomes insolvent and subject to liquidation or reorganization under applicable bankruptcy or other laws, the Camshaft Funds' ability to dispose of the underlying securities may be restricted. It is possible, in a bankruptcy or liquidation scenario, that the Camshaft Funds may not be able to substantiate its interest in the underlying securities. Finally, if a seller defaults on its obligation to repurchase securities under a reverse repurchase agreement, the Camshaft Funds may suffer a loss to the extent that it is forced to liquidate its position in the market, and proceeds from the sale of the underlying securities are less than the repurchase price agreed to by the defaulting seller.

***Distressed Securities***. The fact that certain of the companies in whose securities the Camshaft Funds may invest are in transition, out of favor, financially leveraged or troubled, or potentially troubled, and may be or have recently been involved in major strategic actions, restructurings, bankruptcy, reorganization or liquidation, means that their securities are likely to be particularly risky investments although they also may offer the potential for correspondingly high returns. Such companies' securities may be considered speculative, and the ability of such companies to pay their debts on schedule could be affected by adverse interest rate movements, changes in the general economic climate, economic factors affecting a particular industry, or specific developments within such companies. In addition, there is no minimum credit standard that is a prerequisite to the Camshaft Funds' investment in any instrument, and a significant portion of the obligations and preferred stock in which the Camshaft Funds invests may be less than investment grade.

Investment in the securities of financially troubled issuers and operationally troubled issuers involves a high degree of credit and market risk. Although the Camshaft Funds invests in select companies that, in the view of the Firm, have the potential over the long-term for capital growth, there can be no assurance that such financially troubled issuers or operationally troubled issuers can be successfully transformed into profitable operating companies. There is a possibility

that the Camshaft Funds may incur substantial or total losses on its investments. During an economic downturn or recession, securities of financially troubled or operationally troubled issuers are more likely to go into default than securities of other issuers. In addition, it may be difficult to obtain information about financially troubled issuers and operationally troubled issuers.

Securities of financially troubled issuers and operationally troubled issuers are less liquid and more volatile than securities of companies not experiencing financial difficulties. The market prices of such securities are subject to erratic and abrupt market movements and the spread between bid and asked prices may be greater than normally expected. In addition, it is anticipated that many of the Camshaft Funds' portfolio investments may not be widely traded and that the Camshaft Funds' investment in such securities may be substantial relative to the market for such securities. As a result, the Camshaft Funds may experience delays and incur losses and other costs in connection with the sale of its portfolio securities.

***Derivative Instruments***. The Camshaft Funds will use various derivative financial instruments for both hedging and synthetic investing. Derivative financial instruments include credit derivatives, interest rate swaps, total return swaps, options, forward currency contracts and futures. In addition, the Camshaft Funds may from time to time use both exchange-traded and OTC futures and options as part of its investment strategy and for hedging purposes. Such derivative instruments may be highly volatile, involve certain special risks and expose investors to a high risk of loss.

The risks relating to OTC derivatives that are not otherwise cleared through a central clearing party include, but are not limited to, the following: (i) credit risk (the exposure to the possibility of loss resulting from a counterparty's failure to meet its financial obligations); (ii) market risk (adverse movements in the price of a financial asset or commodity); (iii) legal risk (the characterization of a transaction or a party's legal capacity to enter into it could render the financial contract unenforceable, and the insolvency or bankruptcy of a counterparty could preempt otherwise enforceable contract rights); (iv) operational risk (inadequate controls, deficient procedures, human error, system failure or fraud); (v) documentation risk (exposure to losses resulting from inadequate documentation); (vi) liquidity risk (exposure to losses created by inability to prematurely terminate the derivative); (vii) systemic risk (the risk that financial difficulties in one institution or a major market disruption will cause uncontrollable financial harm to the financial system); (viii) concentration risk (exposure to losses from the concentration of closely related risks such as exposure to a particular industry or exposure linked to a particular entity); and (ix) settlement risk (the risk faced when one party to a transaction has performed its obligations under a contract but has not yet received value from its counterparty).

Use of derivatives and other techniques such as short sales for hedging purposes involves certain additional risks, including (i) dependence on the ability to predict movements in the price of the Financial Instruments hedged; (ii) imperfect correlation between movements in the Financial Instruments on which the derivative is based and movements in the assets of the underlying portfolio; and (iii) possible impediments to effective portfolio management or the ability to meet short-term obligations because of the percentage of a portfolio's assets segregated to cover its obligations. In addition, by hedging a particular position, any potential gain from an increase in value of such position may be limited. See also "*Short Selling*," "*Options*" and "*Leverage*."

Transactions in OTC derivatives may involve other risks as well. It may be impossible to liquidate an existing position, to assess the value of a position or to assess the exposure to risk. The low initial margin deposits normally required to establish a position in such instruments permit a high degree of leverage. As a result, a relatively small movement in the price of a contract may result in a profit or a loss which is high in proportion to the amount of funds actually placed as initial margin and may result in unquantifiable further losses exceeding any margin deposited. Further, when used for hedging purposes there may be an imperfect correlation between these instruments and the investments or market sectors being hedged. Lastly, regulatory restraints may restrict the notional amount of instruments that the Camshaft Funds may trade.

***Swaps*****.** The Camshaft Funds may enter into swap agreements (including total return and foreign exchange swaps) and other types of OTC transactions with broker-dealers or other financial institutions. Depending on their structures, swap agreements may increase or decrease the Camshaft Funds' exposure to various securities, commodities, indices, currencies or other investments or units of measure. The values of the Camshaft Funds' swap positions would increase or decrease depending on the changes in value of the underlying asset.

Total return swaps typically involve commitments to pay interest in exchange for a market-linked return, both based on notional amounts. Depending on the change in the value or level of the underlying instrument, basket of instruments, or index, the Camshaft Funds will either receive or make a payment based on the amount of the change. To the extent the total return of the instrument, basket of instruments, or index underlying the transaction exceeds or falls short of the offsetting interest rate obligation, the Camshaft Funds will receive a payment from or make a payment to the counterparty, respectively.

The use of swaps involves investment techniques and risks different from and potentially greater than those associated with ordinary securities transactions. Swaps involve the risk that the price of the swap used by the Camshaft Funds to calculate net asset value does not accurately reflect its fair market value, which could have a favorable or unfavorable effect on the net asset value of the Camshaft Funds. Some swaps are complex and, in the case of bilateral (uncleared) swaps, may be valued based on quotations given by the Camshaft Funds' swap counterparty, who has adverse interests to the Camshaft Funds with respect to the value of the swap. In certain cases related to bilateral (uncleared) swaps, the Camshaft Funds' swap counterparty may be the only source of value quotations for a swap, while in other cases, multiple quotes may be available. There are also different methodologies that may be used to determine the value of a credit default swap and credit default swap spreads may be wide. As a result of the foregoing factors, the Camshaft Funds may not be able to close out swaps at the price used by the Camshaft Funds to calculate its net asset value. Also, under certain circumstances related to bilateral (uncleared) swaps, if a swap counterparty undervalues the Camshaft Funds' interest in a swap, it could require the Camshaft Funds to transfer greater amounts of collateral to the counterparty than if the swap was valued at fair market value.

Because the master and credit support agreements for bilateral (uncleared) OTC swap transactions are individually negotiated with a specific counterparty, there exists the risk that the parties may interpret contractual terms (*e.g.*, the definition of default) differently when the Camshaft Funds seeks to enforce its contractual rights. If that occurs, the Camshaft Funds may be

Case 24-50213-BLS Doc 5-1 Filed 04/02/24 Page 136 of 169

forced to seek to enforce its contractual rights through legal proceedings, which may be costly and time consuming.

There is currently little case law characterizing total rate of return swaps and other derivatives, interpreting their provisions and characterizing their tax treatment. There can be no assurance that future decisions construing similar provisions to those in many of the Camshaft Funds' swap agreements or other related documents or additional regulations and laws governing such derivatives will not have a material adverse effect on the Camshaft Funds.

The CFTC requires certain derivative transactions that were previously executed on a bi-lateral basis in the OTC markets to be executed through a regulated futures or swap exchange or execution facility. The SEC is also expected to impose similar requirements on certain security-based derivatives in the near future, though it is not yet clear when these parallel SEC requirements will go into effect. Such requirements may make it more difficult and costly for investment funds, including the Camshaft Funds, to enter into highly tailored or customized transactions. They may also render certain strategies in which the Camshaft Funds might otherwise engage impossible or so costly that they will no longer be economical to implement. If the Camshaft Funds decides to execute derivatives transactions through such exchanges or execution facilities—and especially if it decides to become a direct member of one or more of these exchanges or execution facilities—the Camshaft Funds would be subject to the rules of the exchange or execution facility, which would bring additional risks and liabilities, and potential requirements under applicable regulations and under rules of the relevant exchange or execution facility.

With respect to cleared OTC derivatives, the Camshaft Funds will not face a clearinghouse directly but rather through an OTC derivatives dealer that is registered with the CFTC or SEC to act as a clearing member. The Camshaft Funds may face the indirect risk of the failure of another clearing member customer to meet its obligations to its clearing member. Such scenario could arise due to a default by the clearing member on its obligations to the clearinghouse, triggered by a customer's failure to meet its obligations to the clearing member.

***Options***. The Camshaft Funds may engage in the trading of options. Trading options is highly speculative and may entail risks that are greater than investing in other securities. The value of options will be affected by market volatility and prices of options are generally more volatile than prices of other securities. Furthermore, specific market movements of the securities underlying an option cannot accurately be predicted.

In trading options, the Firm speculates on market fluctuations of securities and securities indices (or other indices, such as credit indices) while investing only a small percentage of the value of the securities underlying such option. A change in the market price of the underlying securities or underlying market index will cause a much greater change in the price of the option contract. In addition, to the extent that the Camshaft Funds purchases options that it does not sell or exercise, the Camshaft Funds will suffer the loss of the premium paid in such purchase. To the extent the Camshaft Funds sells uncovered options and must deliver the underlying securities at the option price, the Camshaft Funds has a theoretically unlimited risk of loss if the price of such underlying securities increases. If the Camshaft Funds must buy those underlying securities, the Camshaft Funds risks the loss of the difference between the market price of the underlying securities and the option price. Any gain or loss derived from the sale or exercise of an option will

be reduced or increased, respectively, by the amount of the premium paid. The expenses of option investing include commissions payable on the purchase and on the exercise or sale of an option.

***Stock Index Options***. The Camshaft Funds may purchase and sell call and put options on stock indices listed on securities exchanges or traded in the over-the-counter market for the purpose of realizing its investment objectives or for the purpose of hedging its portfolio. A stock index fluctuates with changes in the market values of the stocks included in the index. The effectiveness of purchasing or writing stock index options for hedging purposes will depend upon the extent to which price movements in the Camshaft Funds' portfolio correlates with price movements of the stock indices selected. Because the value of an index option depends upon movements in the level of the index rather than the price of a particular stock, whether the Camshaft Funds realizes gains or losses from the purchase or writing of options on indices depends upon movements in the level of prices in the stock market generally or, in the case of certain indices, in an industry or market segment, rather than movements in the price of particular stocks. Accordingly, successful use by the Camshaft Funds of options on stock indices will be subject to the Firm's ability to correctly predict movements in the direction of the stock market generally or of particular industries or market segments.

***Forward Contracts***. The Camshaft Funds may enter into forward contracts, generally for currency hedging purposes. In the absence of exchange trading and the involvement of clearing houses, there are no standardized terms for forward contracts. Accordingly, the parties are free to establish such settlement times and underlying amounts of a security or currency as desirable, which may vary from the standardized provisions available through any futures contract. In addition, as two party obligations for which there is no secondary market, forward contracts involve counterparty risk not present with futures.

***Foreign Securities and Foreign Currencies***. The Camshaft Funds may invest in securities of foreign issuers (including by entering into total return swap and similar Financial Instruments), securities denominated in foreign currencies, and depository receipts, such as ADRs, which are receipts typically issued by a U.S. bank or trust company and which evidence ownership of underlying securities of non-U.S. corporations. Investing in foreign securities, currencies, and/or ADRs may present a greater degree of risk than investing in domestic securities and currencies due to possible exchange rate fluctuations, a change in trade balances, possible exchange controls, less publicly-available information, more volatile markets, less regulation, less favorable tax provisions (including possible withholding taxes), war or expropriation. In particular, the dollar value of portfolio securities of non-U.S. issuers fluctuates with changes in market and economic conditions abroad and with changes in relative currency values. The application of foreign tax laws (e.g., the imposition of withholding taxes on dividend or interest payments) or confiscatory taxation may also affect investment in foreign securities.

The Camshaft Funds may trade on exchanges located outside the United States. Trading on U.S. exchanges is subject to SEC and CFTC regulation and oversight, as applicable, including, for example, minimum capital requirements for commodity brokers, regulation of trading practices on the exchanges, prohibitions against trading ahead of customer orders, prohibitions against filling orders off exchanges, prescribed risk disclosure statements, testing and licensing of industry sales personnel and other industry professionals, and recordkeeping requirements. Trading on foreign exchanges is not regulated by the SEC, CFTC or any other U.S. governmental agency or

instrumentality and may be subject to regulations that are different from those to which U.S. exchange trading is subject, provide less protection to investors than trading on U.S. exchanges, and may be less vigorously enforced than regulations in the United States. Positions on foreign exchanges also are subject to the risk of exchange controls, expropriation, excessive taxation or government disruptions.

***Commodities***. Trading commodities and commodity interests (e.g., futures contracts on commodities, securities indices or currencies) is highly speculative and may entail risks that are greater than the risks associated with investing in equity securities. Prices of commodity interests are generally more volatile than prices of equity securities and such volatility is expected to reoccur in the future. Because of the low margin deposits typically required in commodity contract trading, a relatively small movement in the market price of a commodity contract may result in a disproportionately large profit or loss to the Camshaft Funds. Market movements can be volatile and are difficult to predict. Weather, inflation, trade policies, geopolitical events and other unforeseen events can also have a significant impact upon commodity prices. A variety of possible actions by various government agencies also can inhibit profitability or can result in losses. Such events could result in large market movements and volatile market conditions and create the risk of significant losses for the Camshaft Funds.

**Market-Related and Regulatory Risks**

***Market Disruptions; Governmental Intervention***. The global financial markets have in the past decade undergone pervasive and fundamental disruptions that have led to extensive and unprecedented governmental intervention. Such intervention has in certain cases been implemented on an "emergency" basis, suddenly and substantially eliminating market participants' ability to continue to implement certain strategies or manage the risk of their outstanding positions. In addition—as one would expect given the complexities of the financial markets and the limited time frame within which governments have felt compelled to take action—these interventions have typically been unclear in scope and application, resulting in confusion and uncertainty which in itself has been materially detrimental to the efficient functioning of the markets as well as previously successful investment strategies.

The Camshaft Funds may incur major losses in the event of disrupted markets and other extraordinary events in which historical pricing relationships become materially distorted. The risk of loss from pricing distortions is compounded by the fact that in disrupted markets many positions become illiquid, making it difficult or impossible to close out positions against which the markets are moving. The financing available to the Camshaft Funds from its banks, dealers and other counterparties is typically reduced in disrupted markets. Such a reduction may result in substantial losses to the Camshaft Funds. Market disruptions may from time to time cause dramatic losses for the Camshaft Funds, and such events can result in otherwise historically low-risk strategies performing with unprecedented volatility and risk.

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") seeks to regulate markets, market participants and Financial Instruments that previously have been unregulated and substantially alters the regulation of many other markets, market participants and Financial Instruments. Because the implementation of Dodd-Frank is ongoing, it is difficult to predict the ultimate impact of Dodd-Frank on the Camshaft Funds, the Firm and the markets in

which they trade and invest. Dodd-Frank and regulations adopted pursuant to Dodd-Frank could have a material adverse impact on the profit potential of the Camshaft Funds.

***Effect of Speculative Position Limits***. The CFTC and the United States commodities exchanges impose limits referred to as “speculative position limits” on the maximum net long or net short speculative positions that any person may hold or control in any particular futures or options contracts traded on United States commodities exchanges. For example, the CFTC currently imposes speculative position limits on a number of agricultural commodities (e.g., corn, oats, wheat, soybeans and cotton) and United States commodities exchanges currently impose speculative position limits on many other commodities. Dodd-Frank significantly expands the CFTC’s authority to impose position limits with respect to futures contracts and options on futures contracts, swaps that are economically equivalent to futures or options on futures, and swaps that are traded on a regulated exchange and certain swaps that perform a significant price discovery function. In response to this expansion of its authority, in 2012, the CFTC proposed a series of new speculative position limits with respect to futures and options on futures on so-called “exempt commodities” (which includes most energy and metals contracts) and with respect to agricultural commodities. Those proposed speculative position limits were vacated by a United States District Court, but the CFTC has again proposed a new set of speculative position limit rules which are not yet finalized (or effective). If the CFTC is successful in its second attempt to establish speculative position limits, the size or duration of positions available to the Camshaft Funds may be severely limited. All accounts owned or managed by the Firm are likely to be combined for speculative position limit purposes. Thus, the Camshaft Funds could be required to liquidate positions it holds in order to comply with such limits, or may not be able to fully implement trading instructions in order to comply with such limits. Any such liquidation or limited implementation could result in substantial costs to the Camshaft Funds.

***European Market Infrastructure Regulation***. The European Market Infrastructure Regulation (“EMIR”) introduced certain requirements in respect of derivative contracts, which apply to varying degrees to entities established in the EU, regardless of whether they are transacting with counterparties established in the EU or outside of the EU. As such, where the Camshaft Funds transacts with EU counterparties, they will likely require the transaction to be EMIR-compliant, with the result that the Camshaft Funds becomes subject to additional obligations and/or costs that may not otherwise have applied.

Broadly, EMIR’s requirements in respect of derivative contracts are (i) mandatory clearing of OTC derivative contracts declared subject to the clearing obligation; (ii) risk mitigation techniques in respect of uncleared OTC derivative contracts; and (iii) reporting and record-keeping requirements in respect of all derivative contracts. The application of these requirements is dependent on the classification of the counterparties as financial counterparties (“FCs”), non-financial counterparties above the clearing threshold (“NFC+s”) or non-financial counterparties below the clearing threshold (“NFC-s”).

The EU regulatory framework and legal regime relating to derivatives comprises not only EMIR but also includes a package of legislation, technical standards and related guidance collectively known as MiFID II as described below.

Prospective investors should be aware that there may be ongoing costs (whether direct or indirect) of compliance with EMIR, and that EMIR may adversely affect the Camshaft Funds' ability to engage in certain derivative transactions.

***MiFID II***. The European Union Markets in Financial Instruments Directive ("MiFID") governs the provision of investment services and activities in relation to, as well as the organized trading of, financial instruments such as shares, bonds, units in collective investment schemes and derivatives. MiFID will be comprehensively revised and replaced by a new EU directive and regulation, collectively referred to as "MiFID II", from January 3, 2018. Although the Camshaft Funds is not organized in the EU, and is not authorized or regulated by any EU member state financial services regulator, certain aspects of MiFID II may have an impact on the Camshaft Funds.

MiFID II imposes certain restrictions as to the trading of shares and derivatives, which could apply to transactions made by or with the Camshaft Funds. Subject to certain conditions and exceptions, the Camshaft Funds may be unable to trade shares or derivatives with affected counterparties other than as provided by MiFID II. MiFID II also applies position limits to the size of a net position that a person can hold at all times in commodity derivatives traded on EU trading venues and in "economically equivalent" OTC derivatives.

More generally, EU regulated firms that have trading relationships with the Camshaft Funds may be obliged by MiFID II to impose certain requirements on the Camshaft Funds, or they may seek to do so contractually, with a view to satisfying their own compliance obligations. It is difficult to predict the full impact of MiFID II on the Camshaft Funds. Prospective investors should also be aware that there may be costs (whether direct or indirect) of compliance with MiFID II.

***EU Short Selling Regulation***. On November 1, 2012, the EU Regulation on Short Selling and Certain Aspects of Credit Default Swaps (the "SSR") became directly applicable in all member states of the EU. The SSR applies to short sales of, and short positions relating to, the issued share capital of companies whose shares are admitted to trading on a regulated market or multilateral-trading facility in the EU (unless the principal trading venue for the relevant shares is located in a country outside the EU) ("EU listed shares"), among other types of investments. The SSR imposes certain private and public disclosure obligations in respect of short positions in EU listed shares which apply to all natural or legal persons, irrespective of regulatory status, located inside or outside the EU. The SSR also contains prohibitions on uncovered short sales of EU listed shares in certain circumstances. National regulators, and in certain circumstances, the European Securities and Markets Authority, are able to take certain additional emergency measures (including complete bans on short-selling activities) if certain conditions are met. The SSR may prevent the Firm from fully expressing negative views in relation to EU listed shares. Accordingly, the ability of the Firm to implement the investment approach and fulfill the investment objective of the Camshaft Funds may be constrained.

***International Investing***. Investing outside the United States may involve greater risks than investing in the United States. Investing in emerging and certain non-U.S. markets involves additional risks and special considerations not typically associated with investing in other more established economies or markets. Such risks may include, without limitation: (i) increased risk of nationalization or expropriation of assets or confiscatory taxation; (ii) greater social, economic and

political uncertainty, including civil and ethnic unrest, war, abrupt changes in political and economic power, changes in government institutions and policies or famine; (iii) potentially higher dependence on exports and the corresponding importance of international trade; (iv) greater volatility, less liquidity and smaller capitalization of markets; (v) greater volatility in currency exchange rates; (vi) greater risk of inflation; (vii) capital controls, such as limitations on the ability to exchange local currencies for U.S. Dollars, and trade restrictions, including quotas, tariffs, customs, duties and other assessments, which may lead to significant costs and delays in obtaining licenses, approvals and authorizations; (viii) increased likelihood of governmental involvement in and control over the economy, issuers and financial markets; (ix) governmental decisions to cease support of economic reform programs or to impose centrally planned economies; (x) preferential treatment of local interests over foreign interests by the government, including legislators, regulators and courts; (xi) differences in auditing and financial reporting standards which may result in the unavailability of reliable, current or detailed information about issuers; (xii) less extensive or more extensive regulation of the markets; (xiii) longer settlement periods for transactions and less reliable clearance and custody arrangements; (xiv) greater correlation to commodity price movements; (xv) imposition of withholding or other taxes on dividends, interest, capital gains, gross sales or disposition proceeds or other income; (xvi) higher transaction costs; and (xvii) certain considerations regarding the maintenance of the Camshaft Funds' securities with non-U.S. brokers and securities depositories. Moreover, non-U.S. companies are generally not subject to uniform accounting, auditing and financial reporting standards, practices and requirements comparable to those applicable to United States companies.

Non-U.S. markets may also have different clearance and settlement procedures, and in certain markets there have been times when settlements have failed to keep pace with the volume of securities transactions, making it difficult to conduct such transactions. Delays in settlement could result in periods when assets of the Camshaft Funds are uninvested and no return is earned thereon. The inability of the Camshaft Funds to make intended security purchases due to settlement problems or the risk of intermediary counterparty failures could cause the Camshaft Funds to miss investment opportunities. The inability to dispose of a security due to settlement problems could result either in losses to the Camshaft Funds due to subsequent declines in the value of such security or, if the Camshaft Funds has entered into a contract to sell the security, could result in possible liability to the purchaser. Transaction costs of buying and selling non-U.S. securities, including brokerage, tax and custody costs, may be higher than those involved in U.S. transactions. Furthermore, many non-U.S. financial markets, while generally growing in volume, have, for the most part, substantially less volume than U.S. markets, and securities of many non-U.S. companies are historically less liquid and their prices historically more volatile than securities of comparable U.S. companies.

The economies of individual non-U.S. countries may also differ favorably or unfavorably from the U.S. economy in such respects as growth of gross domestic product, rate of inflation, volatility of currency exchange rates, depreciation, capital reinvestment, interest rates, resources, self-sufficiency and balance of payments position.

***United Kingdom Membership of the European Union***. The United Kingdom ("**UK**") ceased to be a member of the EU on January 31, 2020 ("Brexit"). During a prescribed period (the "**Transition Period**"), certain transitional arrangements were in effect, such that the UK continued to be treated, in most respects, as if it were still a member of the EU, and generally remained

subject to EU law. On December 24, 2020, the EU and the UK reached an agreement in principle on the terms of certain agreements and declarations governing the ongoing relationship between the EU and the UK, including the EU-UK Trade and Cooperation Agreement (the "**Agreement**"), and on December 30, 2020, the Council of the European Union adopted a decision authorizing the signature of the Agreement and its provisional application for a limited period between January 1, 2021 to February 28, 2021, pending ratification of the Agreement by the European Parliament. The Transition Period ended on December 31, 2020. The Agreement is limited in its scope primarily to the trade of goods, transport, energy links and fishing, and uncertainties remain relating to certain aspects of the UK's future economic, trading and legal relationships with the EU and with other countries. The actual or potential consequences of Brexit, and the associated uncertainty, could adversely affect economic and market conditions in the UK, in the EU and its member states and elsewhere, and could contribute to instability in global financial markets.

***Current Political Uncertainty***. Some of the results of recent elections and referenda have been unexpected and resulted in material market changes and increases in market uncertainty. Given recent changes in administrations and applicable law following such recent elections and referenda, the future of current regulations, or the adopting of new regulations, is also uncertain. While these uncertainties may create investments opportunities for the Camshaft Funds, such uncertainties could alternatively have adverse impacts on the Camshaft Funds. Predicting the outcome of political processes and events is inherently difficult and uncertain. If the Firm fails to anticipate political events or predicts them incorrectly, it may cause the Camshaft Funds to miss investment opportunities or incur losses. There may be detrimental implications for the value of certain of the Camshaft Funds' investments in certain markets, its ability to enter into transactions or to value or realize its investments or otherwise to implement its investment program or the Firm's investment strategies.

***Risk of Natural Disasters, Epidemics and Terrorist Attacks.*** Countries and regions in which the Camshaft Funds invests, where the Firm has offices or where the Camshaft Funds or the Firm otherwise do business are susceptible to natural disasters (e.g., fire, flood, earthquake, storm and hurricane) and epidemics, pandemics or other outbreaks of serious contagious diseases. The occurrence of a natural disaster or epidemic could adversely affect and severely disrupt the business operations, economies and financial markets of many countries (even beyond the site of the natural disaster or epidemic) and could adversely affect the Camshaft Funds' investment program or the Firm's ability to do business. In addition, terrorist attacks, or the fear of or the precautions taken in anticipation of such attacks, could, directly or indirectly, materially and adversely affect certain industries in which the Camshaft Funds invests or could affect the countries and regions in which the Camshaft Funds invests, where the Firm has offices or where the Camshaft Funds or the Firm otherwise do business. Other acts of war (e.g., war, invasion, acts of foreign enemies, hostilities and insurrection, regardless of whether war is declared) could also have a material adverse impact on the financial condition of industries or countries in which the Camshaft Funds invests.

***COVID-19.*** The recent global outbreak of the novel coronavirus (COVID-19) is currently creating unprecedented economic and social uncertainty throughout the world. The ultimate impact of the COVID 19 outbreak is difficult to predict, but it is likely that COVID-19 will have a materially adverse impact on global, national and local economies in the immediate future and that such negative impact is likely to persist for some time. In particular, disruptions to commercial

activity across economies due to the imposition of quarantines, remote working policies, "social distancing" practices and travel restrictions, and/or failures to contain the outbreak despite these measures, could materially and adversely impact the Camshaft Funds' investments. Similar disruptions may occur in respect of the Firm's and the Camshaft Funds' service providers and counterparties (including providers of financing), which could also negatively impact the Camshaft Funds. While there are indications of various governmental responses to the potential negative effects of COVID-19, it is unclear how effective these responses will be and what other impacts such responses may have on the overall performance of markets or the Camshaft Funds.

***ERISA Matters***. Most pension and profit sharing plans, individual retirement accounts and other tax-advantaged retirement funds are subject to provisions of the Code, ERISA, or both, which may be relevant to a decision as to whether such an investor should invest in the Camshaft Funds. There may, for example, be issues as to whether such an investment is "prudent." Legal counsel should be consulted by such an investor before investing in the Camshaft Funds.

AN INVESTMENT IN CAMSHAFT AND THE CAMSHAFT FUNDS IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. INVESTMENTS INCLUDING THE RISK THAT THE ENTIRE INVESTMENT MAY BE LOST. NO GUARANTEE OR REPRESENTATION IS MADE THAT THE FUNDS' INVESTMNENT OBJECTIVES WIL BE ACHIEVED.

**Item 9.** Disciplinary Information

This Brochure, as dated on page 1, reflects that there are no material legal or disciplinary events that have occurred with respect to Camshaft or management persons within the past 10 years.

**Item 10.** Other Financial Industry Activities and Affiliations

Camshaft is exempt from registration as a commodity pool operator ("**CPO"**) and a commodity trading advisor ("**CTA**") with the Commodities Future Trading Commission ("CFTCF").

As described above in Items 5 and 6, Camshaft receives asset-based and performance-based compensation from the Funds. The amounts payable to Camshaft are based directly on the net asset value of the Funds. To the extent that valuation of assets is determined based upon information provided by Camshaft, because there is, for example, no public market price available, there may be a conflict of interest. Camshaft will value such assets in accordance with its valuation policies and procedures.

Camshaft, and other professionals of Camshaft (directly or through its affiliates) may make, and in some cases have made, a capital contribution to one or more of the Funds and, therefore, may be viewed as having an incentive to favor such Funds over other Clients, including pooled investment vehicles in which Camshaft or such persons are not invested (which may include other Camshaft Funds). Camshaft routinely waives the applicable management fees and performance fees for Camshaft-affiliated investors.

Certain of the above conflicts may also be generally addressed through adherence with Camshaft's compliance policies and procedures and its Code of Ethics.

**Item 11.** Code of Ethics, Participation or Interest in Client Transactions and Personal Trading

Camshaft has adopted a Code of Ethics pursuant to Rule 204A-1 under the Advisers Act (the "**Code of Ethics**"). All "access persons" (including employees, managers and officers) of Camshaft must comply with the Code of Ethics. The Code of Ethics states that Camshaft personnel must always place the interests of Camshaft's Clients first. The Code of Ethics sets forth standards of conduct expected of Camshaft's personnel, which reflect the fiduciary obligations of Camshaft and its personnel to its Clients, and requires Camshaft's personnel to comply with applicable federal securities laws. The Code of Ethics also requires each employee of Camshaft to report potential violations of the Code of Ethics promptly to Camshaft's Chief Compliance Officer (the "**CCO**"). Camshaft provides each employee with a copy of the Code of Ethics upon commencement of employment and any amendments as required., Employees are required to provide a written acknowledgement that they have received the Code of Ethics, including any amendments no less than annually.

Camshaft's CCO receives copies account statements for all of its access persons who maintain brokerage accounts no less than quarterly. In addition, each access person must submit to the CCO an annual acknowledgement and certification stating that the access person will comply with the Code of Ethics. The Code of Ethics further requires access persons to submit quarterly transaction reports (or duplicate brokerage statements) that detail the access person's securities transactions for each quarter, for the CCO to review. Finally, the Code of Ethics also contains restrictions on the use of insider information and material non-public information regarding Clients.

Camshaft keeps records of reports and other information that access persons are required to submit under the Code of Ethics. The CCO reports on issues that arise under the Code of Ethics to Camshaft's senior management at least annually. Clients and prospective Clients can obtain a copy of the Code of Ethics upon request by contacting Camshaft by telephone at (305) 619-1383 or by email to william@camshaftcapital.com.

As described above in Item 10, Camshaft and certain of its management personnel, employees or affiliates will have a financial interest in investments made by one or more of the Camshaft Funds through their participation in such Funds as a managing member, investment manager, administrative member, director or investor, as applicable. Camshaft and such persons may, therefore, be viewed as having an incentive to favor such Funds over other Clients, including Funds in which such persons are not invested.

In addition, Camshaft may solicit Clients to invest in Camshaft Funds for which Camshaft and certain of its management personnel, employees or affiliates serve as managing member, administrative member, investment manager or director, as applicable, and/or have a financial interest. Additionally, because certain of the Funds for which Camshaft acts as managing member, investment manager or director may invest in other Funds for which Camshaft acts in a similar capacity, Camshaft may be deemed to be recommending to such Funds that they buy securities in which Camshaft and such Camshaft-related persons have a financial interest and/or securities that

Case 24-50213-BLS Doc 8-1 Filed 04/28/2024 Page 145 of 169

Camshaft and such Camshaft-related persons also buys for themselves (*i.e.*, interests in other Funds). To address these potential conflicts, Funds will not bear a double-layering of asset-based fees or performance-based fees in connection with their investment in other Camshaft Funds. Each Fund will, however, be responsible for its *pro rata* share of the expenses of the other Fund in which it invests.

Certain of the above conflicts are generally addressed through adherence to Camshaft's Compliance Manual and its Code of Ethics.

**Item 12.** Brokerage Practices

Camshaft is responsible for determining what securities will be purchased and sold for each Client and selecting the broker-dealer to execute transactions on behalf of Clients. Purchases and sales of securities for a Client must be made in accordance with the investment objectives, strategies and policies of such Client.

It is Camshaft's policy to seek best execution on behalf of its Clients – that is, Camshaft seeks to achieve the best overall qualitative execution for a Client in a particular circumstance. Best execution is not synonymous with the lowest brokerage commission. Camshaft may cause a Client to pay a brokerage commission in excess of that which another broker might have charged for executing the same transaction if it determines that the commission paid was reasonable in relation to the value of the services provided by the broker.

In seeking to achieve best execution, Camshaft considers the full range and quality of services a broker may provide, including ,but not limited to, the experience and skill of the broker's securities traders; the broker's accessibility to primary markets and quotation services; for NASDAQ securities, whether a broker makes a market in that security; a broker's past history of successful, prompt and reliable execution of client trades; the financial strength and stability of the broker; the broker's administrative efficiency; commission rates; the overall net economic result to a client (involving both price paid or received and any commissions and other costs paid); the security price and its volatility; the size of the transaction, including the ability to effect the transaction at all where a large block is involved; the broker's availability to execute possibly difficult transactions in the future; and the receipt of research services. In addition, for purposes of monitoring best execution, Camshaft generally performs comparisons between executed prices and volume-weighted average prices each trading day for each broker.

Camshaft generally does not utilize "soft dollars" or "pay-up" for research. "Soft dollars" refers to Camshaft's receipt of research or other products or services other than execution from brokers. Camshaft may receive, without cost and unrelated to the execution of securities transactions, a broad range of research services from broker-dealers, including information on the economy, industries, groups of securities and individual companies, statistical information, market data, accounting and legal interpretations, political developments, pricing and appraisal services, credit analysis, risk measurement analysis, performance analysis and other information which may affect the economy and/or security prices. Camshaft may also pay broker-dealers and their affiliates for certain specialized data and services, such as benchmark information, that are also unrelated to the execution of securities transactions.

In the event that Camshaft were to receive any "soft dollar" benefits, however, Camshaft expects that they would qualify under the safe harbor provided for under Section 28(e) of the Securities Exchange Act of 1934, as amended. If Camshaft were to use Client brokerage commissions (or markups or markdowns) to obtain "soft dollar" benefits, such as research or other products or services, it would receive a benefit because it does not have to produce or pay for the research, products or services. Consequently, Camshaft would have an incentive to select or recommend a broker-dealer based on its interest in receiving "soft dollar" benefits, rather than on its Clients' interest in receiving most favorable execution.

Camshaft does not consider, in selecting or recommending broker-dealers, any Client referrals it may receive from a broker-dealer or third party. Camshaft does not recommend, request or require that a Client direct the execution of transactions through a specified broker-dealer, nor does it have any arrangement in which it permits a Client to direct transactions to a specific broker-dealer.

Despite the highly customized nature of its advice, Camshaft may on occasion purchase or sell the same securities for more than one Client account at the same time or same day, and in so doing will allocate investment opportunities and trades fairly. "Fair" treatment does not mean identical treatment of all Clients. Rather, it means that Camshaft does not discriminate on an impermissible basis against one Client or group of Clients. When Camshaft transacts securities for more than one Client account, the investment opportunities and trades must be allocated in a manner consistent with Camshaft's fiduciary duties and in accordance with the Firm's investment allocation procedures.

Camshaft may combine or "bunch" orders to obtain best execution, to negotiate more favorable commission rates or to allocate equitably among Camshaft's Clients differences in prices and commissions or other transaction costs that might have been obtained had such orders been placed independently. Camshaft's determination with respect to allocations will be based on what is appropriate under the particular circumstances, and the allocation may be made based upon relevant factors, which may include: (i) cash availability and need; (ii) suitability; (iii) when only a small percentage of the order is executed, shares may be allocated to the account with the smallest order or the smallest position or to an account that is out of line with respect to security or sector weightings relative to other portfolios, with similar mandates; (iv) allocations may be given to one account when one account has limitations in its investment guidelines which prohibit it from purchasing other securities which are expected to produce similar investment results and can be purchased by other accounts; (v) if an account reaches an investment guideline limit and cannot participate in an allocation, shares may be reallocated to other accounts (this may be due to unforeseen changes in an account's assets after an order is placed); (vi) with respect to sale allocations, allocations may be given to accounts low in cash; (vii) in cases when a *pro rata* allocation of a potential execution would result in a *de minimis* allocation in one or more accounts, Camshaft may exclude the account(s) from the allocation and the transactions may be executed on a *pro rata* basis among the remaining accounts; or (viii) in cases where a small proportion of an order is executed in all accounts, shares may be allocated to one or more accounts on a random basis. For equity investments, generally, each Client will receive the same average price as other participants in the bunched transaction.

Clients may pay more when Camshaft does not aggregate trades, as seeking to place separate, non-simultaneous transactions in the same security for multiple Clients may negatively affect market price, transaction commissions and/or trade execution. A Client's non-participation in bunched trades may result in lost opportunities to execute securities transactions for such Client's account that other Clients participating in bunched trades were able to execute.

**Item 13.** Review of Accounts

Camshaft's Managing Director and one or more members of Camshaft's investment team review positions in Camshaft Fund accounts on an ongoing basis to monitor the Camshaft Funds' compliance with the investment objectives and guidelines described in the Funds' offering documents. The accounts of Camshaft Fund investors are valued monthly by the administrator, who forwards an account statement to Fund investors on a monthly basis. Investors in the Funds may receive other periodic and annual written reports as set forth in the applicable Fund's offering documents. Camshaft also conducts meetings with Clients and investors in the Funds upon request. Any Managed Account Clients will receive the written reporting provided for in the Managed Account Agreement governing such accounts, if applicable.

**Item 14.** Client Referrals and Other Compensation

Camshaft does not receive an economic benefit from any person who is not a Client for providing investment advice or other advisory services.

Camshaft may, from time to time, enter into arrangements with third parties for marketing and solicitation activities. If Camshaft pays a cash fee to anyone for soliciting separate account Clients on its behalf, Camshaft will comply with the requirements of the SEC's Marketing Rule (Rule 206(4)-1 under the Advisers Act) to the extent applicable. This rule requires, among other things, a written agreement between the investment adviser and the person soliciting Clients on its behalf, and that the soliciting person provide a disclosure document to the potential Client at the time that the solicitation is made. Camshaft may pay a portion or percentage of the compensation that it receives from Clients for investment advisory services to a third-party, but this will not result in any Client being charged fees at a rate in excess of the rate of fees that Camshaft customarily charges for similar services to comparable accounts, nor will Camshaft charge any Client any other amount for the purpose of offsetting the cost of obtaining an account through a third-party referral.

**Item 15.** Custody

Generally, Camshaft does not have custody of Client assets other than the assets of the Camshaft Funds. Camshaft acts as managing member or investment manager of the Camshaft Funds and is authorized under the Funds' governing documents to deduct fees from each Fund investor's account. Such powers cause Camshaft to be deemed to have custody of the Camshaft Funds' assets for purposes of the SEC's custody rule. Accordingly, to meet the requirements of the custody rule, the Camshaft Funds are subject to an annual audit in accordance with generally accepted accounting principles conducted by an independent public accountant registered with the Public Company Accounting Oversight Board and the audited financial statements are distributed to investors in the Funds within 90 days of the Funds' fiscal year end (in accordance with rules required of registered commodity pool operators).

In the event that Camshaft has any Managed Account Clients in the future, it generally expects that it will not have custody over the assets of such accounts. Managed Account Clients will receive quarterly account statements from the qualified custodian for their accounts and should carefully review those statements. Camshaft generally will not provide statements to Managed Account Clients, except if specifically requested or in certain limited circumstances. Any Managed Account Clients who receive account statements from Camshaft should compare those statements with the account statements received from the qualified custodian.

**Item 16.** Investment Discretion

Camshaft has discretionary authority over the investment activities of its Clients. In the case of the Funds, this discretionary authority is generally granted to Camshaft pursuant to the organizational documents of each Fund and/or pursuant to Camshaft's investment advisory agreement with such Fund. For any Managed Account Clients, discretionary authority is granted to Camshaft pursuant to a Managed Account Agreement, which may impose restrictions on this discretion and specify the types of investments permitted. Camshaft is obligated to exercise its investment discretion in a manner consistent with the stated investment objectives, policies, guidelines and restrictions/limitations for a particular Client account.

**Item 17.** Voting Client Securities

Camshaft has the authority to vote all proxy proposals and corporate actions (collectively, "**proxies**") on behalf of the Funds it advises, and may be delegated the authority to vote proxies held in any Managed Accounts that it may advise in the future. However, depending on the securities in which its Clients are invested, Camshaft may not frequently vote proxies. To the extent that Camshaft invests in a security for a Client for which a proxy vote may arise and Camshaft receives timely notice of such proxy from the Client's prime broker under the terms of the applicable prime broker agreement, Camshaft is guided by general fiduciary principles and will seek to treat proxies in a manner intended to enhance the overall economic value of the applicable Client's assets. Camshaft may (and often does) refrain from voting a Client's proxy under certain circumstances, including, but not limited to, when (i) the economic effect on shareholder's interests or the value of the portfolio holding is indeterminable or insignificant; (ii) voting the proxy would unduly impair the investment management process; or (iii) the cost of voting the proxies outweighs the benefits or is otherwise impractical. In addition, Camshaft may refrain from voting a proxy on behalf of its Clients' accounts due to (1) *de minimis* holdings; (2) *de minimis* impact on the portfolio; (3) items relating to non-U.S. issuers (such as those described below); (4) contractual arrangements with Clients; and/or (5) their authorized delegates or the failure of a proxy to provide sufficient information to allow for informed decision making. For example, Camshaft may refrain from voting a proxy of a non-U.S. issuer due to logistical considerations that may have a detrimental effect on Camshaft's ability to vote the proxy. These issues may include, but are not limited to: (a) proxy statements and ballots being written in a foreign language; (b) untimely notice of a shareholder meeting; (c) requirements to vote proxies in person; (d) restrictions on non-U.S. person's ability to exercise votes; (e) restrictions on the sale of securities for a period of time in proximity to the shareholder meeting (*e.g.*, share blocking); or (f) requirements to provide local agents with power of attorney to facilitate the voting instructions. Any actual or apparent conflict of interest between the interests of Camshaft and its Clients is

resolved in a manner that is consistent with the best interests of Clients and in a manner not affected by such actual or apparent conflict of interest.

Camshaft currently does not permit Clients to direct its vote in a particular solicitation.

**<u>Item 18.</u>** Financial Information

Currently, there is no financial condition that is reasonably likely to impair our ability to meet contractual commitments to Clients.

# EXHIBIT 5

## DOCUMENT FILED UNDER SEAL

# EXHIBIT 6

## DOCUMENT FILED UNDER SEAL

# EXHIBIT 7

## DOCUMENT FILED UNDER SEAL

# EXHIBIT 8

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| GLAS TRUST COMPANY LLC, in its capacity as Administrative Agent and Collateral Agent, and TIMOTHY R. POHL,<br><br>Plaintiffs,<br><br>v.<br><br>RIJU RAVINDRAN, BYJU'S ALPHA, INC., and TANGIBLE PLAY, INC.,<br><br>Defendants. | ) | C.A. No. 2023-0488-MTZ |

**UNSWORN FOREIGN DECLARATION OF RIJU RAVINDRAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE *STATUS QUO* ORDER AND TO COMPEL AN ANSWER TO INTERROGATORY NO. 1**

I, Riju Ravindran, hereby declare as follows pursuant to 10 *Del*. C. § 5356:

1. I am a Defendant in the above-captioned action.

2. I submit this Declaration in support of Defendants' Opposition to Plaintiffs' Motion to Enforce *Status Quo* Order and to Compel an Answer to Interrogatory No. 1 (the "Motion to Enforce").

3. This Declaration is based on my personal knowledge as well as knowledge I have gained as a director and officer of Byju's Alpha, Inc. ("Alpha").

4. Alpha was incorporated on September 27, 2021, and (i) is an indirect, wholly owned subsidiary of Think and Learn Private Limited, and (ii) part of a group of related business entities (collectively, "Byju's").

5. I was appointed as the sole director of Alpha on September 27, 2021 and Chief Executive Officer, President, Chief Financial Officer and Secretary of Alpha on September 29, 2021.

6. Alpha is the borrower under a credit and guarantee agreement, dated as of November 24, 2021 (the "Credit Agreement"), governing a term loan facility with an aggregate principal amount of $1.2 billion (the "Term Loan").

7. At the time of the entry of the *Status Quo* Order in this action, Alpha held three bank accounts. Alpha had bank accounts at JP Morgan Chase ("JPM Account"), Silicon Valley Bank and Bank of America (collectively, "Bank Accounts").

8. In late November 2021, the funds received pursuant to the Term Loan were deposited into the JPM Account. The purpose of the Term Loan was to fund the core overseas business of Byju's. To fund the operations of Byju's, money received pursuant to the Term Loan was dispersed to various Byju's entities at different intervals. Plaintiff GLAS Trust Company LLC and Alpha's lenders understood the purpose of the Term Loan, and that it would not simply rest in the Bank Accounts.

9. Subsequent to the receipt of funds by Alpha, Alpha transferred approximately $500 million from certain of the Bank Accounts to an investment fund (the "Investment Fund"). At the time of the December 2022 compliance

certificate discussed in the Motion to Enforce, approximately USD 500 Million was held in the Investment Fund.

10. Prior to the commencement of the present action, the amount to the credit of Alpha with the Investment Fund was moved to another Byju's-affiliated entity within the United States. There neither was, nor is, any prohibition on movement or investment of funds. At the time this action was filed, the Investment Fund in respect of Alpha was inactive. I do not have paper copies of the Investment Fund account statements in respect of Alpha as I used to access these online.

11. Details of the transfers from certain of the Bank Accounts to the Investment Fund can be accessed via online access to the Bank Accounts and by reviewing contemporaneous bank statements of the Bank Accounts, to which Pohl has access.

12. Prior to the entry of the *Status Quo* Order, I relied upon online access to the Bank Accounts. In order to gain online access, I would be sent a temporary One-Time Password ("OTP"), which was sent to my mobile phone each time I attempted to log in to the Bank Accounts. I was unable to log into the Bank Accounts any other way.

13. The transactions discussed in paragraphs 12 and 15 of the Motion to Enforce were debited due to prior auto debit instructions in respect of Alpha's pre-existing obligations in the ordinary course of business. Because there was not

enough time to cancel these auto debit instructions prior to the Court's oral ruling at the May 18th *status quo* hearing and ultimate entry of the *Status Quo* Order on May 22nd, Byju's funded the SVB Account with the exact amounts to be debited to ensure that the balance of the Alpha funds would not be reduced. The transfers discussed at paragraphs 12 of the Motion to Enforce occurred prior to the entry of the *Status Quo* Order, on the day of the hearing. The transfers discussed at paragraph 15 of the Motion to Enforce occurred on the day the *Status Quo* Order was entered. The instructions to cancel the existing auto debit instructions were subsequently provided and as a result funds should not have been deducted in June and will not be deducted going forward.

I declare under penalty of perjury under the law of Delaware that the foregoing is true and correct and that I am physically located outside of the geographic boundaries of the United States, Puerto Rico the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States.

Executed this 25th day of June, 2023, in Dubai, United Arab Emirates.

______________________________

Riju Ravindran

# EXHIBIT 9

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2023-022640-CA-01 (43)

GLAS TRUST COMPANY LLC, in its capacity as Administrative Agent and Collateral Agent,

Plaintiff,

v.

CAMSHAFT CAPITAL FUND, LP, CAMSHAFT CAPITAL ADVISORS, LLC, CAMSHAFT CAPITAL MANAGEMENT, LLC, and JOHN DOE,

Defendants.
_______________________________________________/

**CAMSHAFT DEFENDANTS' OBJECTIONS TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION AND FIRST SET OF INTERROGATORIES**

Defendants Camshaft Capital Fund, LP ("Camshaft Capital"), Camshaft Capital Advisors, LLC ("Camshaft Advisors"), and Camshaft Capital Management, LLC ("Camshaft Management" and, together with Camshaft Capital and Camshaft Advisors, collectively "Camshaft" or "Defendants"), by and through undersigned counsel and pursuant to Fla. R. Civ. P. 1.340 and 1.350, hereby serve the following objections to the First Set of Request for Production and First Set of Interrogatories (together, the "Discovery Requests") propounded by Plaintiff GLAS Trust Company LLC ("GLAS").

1. Camshaft objects to the Discovery Requests on the basis that it has filed a Motion to Stay Discovery, and incorporates by reference the objections to discovery raised therein.

2. Camshaft objects to the Discovery Requests as premature because it is not apparent that Plaintiff either has standing to bring the claims in its Complaint, or if its Complaint states a cause of action.

3. Camshaft objects to the Discovery Requests because they encompass proprietary and confidential trade-secret materials under Florida law, as argued in Camshaft's Motion to Stay Discovery and supported by the declaration of William C. Morton.

4. Camshaft objects to the Discovery Requests as overbroad, not relevant to the subject matter of the pending action or any claim or defense, and not proportional to the needs of the case to the extent their requests are not reasonably limited either in time or in scope to the particular investments at issue as framed by Plaintiff's Complaint.

5. Camshaft objects to the Discovery Requests as overbroad because they define both "BYJU" and "BYJU's Alpha" to include more than thirty separate distinct entities and each of their respective unnamed and unidentified "consultants, advisors, representatives, agents, attorneys, accountants, employees," requiring Camshaft unreasonably to speculate about which documents might be responsive.

6. Camshaft objects to the Discovery Requests as vague to the extent they unreasonably require Camshaft to speculate about the materials being sought.

7. Camshaft objects to the Discovery Requests insofar as they request Mr. William C. Morton to "[i]dentify every relationship (whether professional or personal)" as vague, undefined, require Camshaft unreasonably to speculate what information is being sought, and contravene Mr. Morton's right to privacy under Article I, Section 23 of the Florida Constitution.

8. Camshaft objects to the Discovery Requests insofar as they request Camshaft to comment on statements by third parties who are not agents or employees of Camshaft or describe the mental state of third parties who are not under Camshaft's control, as such requests are vague, ambiguous, and unreasonably require Camshaft to speculate regarding the information being sought.

9. Camshaft objects to the Discovery Requests to the extent they seek information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, including but not limited to the Discovery Requests' requests for "legal documents." Inadvertent disclosure of any privileged information in response to the Discovery Requests shall not be deemed a waiver of any applicable privilege.

10. Camshaft objects to the Discovery Requests to the extent they seek information not within Camshaft's possession, custody, or control.

11. All objections are based on information presently known to Camshaft based upon reasonable and diligent investigation conducted to date. Objections set forth herein are made without prejudice to Camshaft's right to supplement, amend, or otherwise revise these responses and objections to the extent any of the information provided contains errors or omissions or if more accurate or complete information becomes available, and to raise any additional objections it may have in the future.

12. All objections to the Discovery Requests are provided without waiver of, and with express reservation of (a) all objections as to the competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence in any further proceedings in this action, including trial and/or final hearing, or in any other action; (b) all privileges, including the attorney-client privilege and the work product doctrine and the accountant-client privilege; (c) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests; and (d) the right to move for a protective order to protect the confidentiality of any information disclosed or for any other purpose provided by law.

Dated: November 6, 2023.

Respectfully submitted,

**HOGAN LOVELLS US LLP**
600 Brickell Avenue
Suite 2700
Miami, Florida 33131
Tel: 305-459-6500
Fax: 305-459-6550
By:/s/ David Massey
David Massey
Florida Bar No. 86129
david.massey@hoganlovells.com
Marty Steinberg
Florida Bar No. 187293
marty.steinberg@hoganlovells.com

*Counsel for Defendants Camshaft Capital Fund, LP, Camshaft Capital Advisors, LLC and Camshaft Capital Management, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 6th day of November, 2023, a true and correct copy of the foregoing was served to all counsel of record via email:

LEON COSGROVE JIMENEZ, LLP:
azaron@leoncosgrove.com
dperez@leoncosgrove.com
mjimenez@leoncosgrove.com
lmathews@leoncosgrove.com

KIRKLAND & ELLIS LLP
Ravi.Shankar@kirkland.com
Christine.Shang@kirkland.com
Katie.welch@kirkland.com
Colin.rathe@kirkland.com

By: */s/ David B. Massey*
David B. Massey

# EXHIBIT 10

BYJU's Alpha, Inc.
2045 N. Fremont Street
Chicago, Illinois 60614

November 20, 2023

Via Courier Mail

Camshaft Capital Fund, LP
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801
Attention: William Morton

Re: **Information Demand in Connection with BYJU's Alpha, Inc.'s Transfer of $533 Million to Camshaft Capital Fund, LP and Investment**

Mr. Morton:

As you may be aware, I, Timothy R. Pohl, am the sole director, Chief Executive Officer, and Secretary of BYJU's Alpha, Inc. (the "Company"). Further, on November 2, 2023, the Delaware Court of Chancery in the attached bench ruling held that "Pohl is, indeed, BYJU's Alpha's sole director and officer" since March 3, 2023.

As you are aware, the Company made five transfers in April and July 2022, totaling $533 million (collectively, the "Transfers"), to Camshaft Capital Fund, LP (together with Camshaft Capital Advisors, LLC, Camshaft Capital Management, LLC, and their respective affiliates and direct and indirect managed funds, "Camshaft"). Because former management of the Company caused the Transfers to occur and caused the Company to enter into any agreement, arrangement, instrument, and document with Camshaft (collectively, the "Documents") and failed to provide to me information regarding the Transfers and Documents, I lack this information, despite being the sole director and officer of the Company.

Further, it is my understanding that the Company's funds from the Transfers were invested in Camshaft (the "Investment"), and as a result, the Company is a limited partner in one or more Camshaft funds (the "LP"). In order to better understand the Investment and the Company's rights and risks with respect thereto, as the sole representative of the Company, I demand, under my contractual and legal rights, including Section 17-305 of the Delaware limited partnership act, that Camshaft provide to me within five business days after the date of this letter any and all information in the possession or control of Camshaft regarding the Investment, the Transfers, and Documents, including, without limitation, the following:

1. True and full information regarding the status of the business and financial condition of the LP.

2. A copy of the LP's federal, state and local income tax returns for each year.

3. A current list of the name and last known business, residence or mailing address of each partner in the LP.

4. A copy of any written partnership agreement and certificate of limited partnership with respect to the LP and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the partnership agreement and any certificate and all amendments thereto have been executed.

5. True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each partner in the LP and which each partner in the LP has agreed to contribute in the future, and the date on which each became a partner.

6. All Documents, including, without limitation, subscription agreements, side letters, due diligence confirmations, term sheets, presentations, letters, legal documents, and offering materials with respect to the LP.

7. All information regarding the Transfers, including the uses of each Transfer.

8. All account records-including but not limited to (a) capital account statements, (b) custodial statements, (c) financial statements, and (d) statements of management fees, transaction fees, placement fees, expenses, and other compensation charged (including performance-based compensation) associated with the Company or any Transfer.

9. All records of confirmations, transfers, assignments, re-titlings, subscriptions, contributions, withdrawals, redemptions and other transactions associated the Company or any Transfer.

10. All Information regarding whether there has been any change in ownership of the Company's Investment, and, if there has been any change, all information regarding the identity of any transferee of any portion or all of the Investment.

11. All communications at any time between Camshaft or its representatives, on the one hand, and the Company or any of its former representatives, on the other hand.

12. All documents and communications at any time concerning the relationship between Camshaft or William C. Morton, on the one hand, and the Company or its former representatives, including Byju Raveendran, Divya Gokulnath, and Riju Raveendran, on the other hand.

13. All state, federal, regulatory, and international filings Camshaft has made since its formation.

14. Documents sufficient to show Camshaft's organizational, ownership, and control structure at all times since Camshaft's formation.

15. All documents and communications concerning any direct or indirect (i) investments (whether made through a security, derivative, equity, or debt instrument, a capital contribution, or otherwise) or (ii) dispositions or transfers (whether of cash, cash equivalents, securities, assets, or any other item of value) made by Camshaft or any of its representatives or

affiliates to any of the Company or its representative or its affiliates, including, without limitation, Think & Learn Private Limited.

All of the requested information should be provided to me and the Company's legal counsel, via email or overnight courier, to the following addresses:

Timothy R. Pohl
BYJU's Alpha, Inc.
2045 N. Fremont Street
Chicago, Illinois 60614
Email: timrpohl@gmail.com

With a copy to:

Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Attn: Susheel Kirpalani and Daniel Holzman
Email: susheelkirpalani@quinnemanuel.com; danielholzman@quinnemanuel.com

Finally, I, as the sole director and officer of the Company, am the only party who is entitled to have access to and control over and provide any direction or instruction with respect to any Investment of the Company and any funds you received from the Company in the Transfers.

In the event that Camshaft does not respond or provide the requested information within five business days from the date this letter, I will seek appropriate relief to the fullest extent permitted under law.

Thank you for your prompt attention to this extremely urgent matter.

Sincerely,

Tim Pohl (Nov 20, 2023 14:37 CST)
Timothy R. Pohl

Cc: David Massey at david.massey@hoganlovells.com
Marty Steinberg at marty.steinberg@hoganlovells.com
Susheel Kirpalani at susheelkirpalani@quinnemanuel.com
Daniel Holzman at danielholzman@quinnemanuel.com

# EXHIBIT 11

Hogan Lovells

Hogan Lovells US LLP
600 Brickell Avenue
Suite 2700
Miami, FL 33131
T +1 305 459 6500
F +1 305 459 6550
www.hoganlovells.com

December 4, 2023

**By Electronic Mail**

Susheel Kirpalani and Daniel Holzman
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
susheelkirpalani@quinnemanuel.com; danielholzman@quinnemanuel.com

Mr. Timothy R. Pohl
BYJU's Alpha, Inc.
2045 N. Fremont Street
Chicago, Illinois 60614
timrpohl@gmail.com

**Re: Response to Letter from Timothy Pohl to Camshaft Capital Fund, LP Demanding Information**

Dear Messrs. Pohl, Kirpalani and Holzman:

This letter is in response to the letter from Timothy Pohl to Camshaft Capital Fund, LP, dated November 20, 2023 (the "Letter"), wherein BYJU's Alpha, Inc. ("BYJU's Alpha") demands information as a purported limited partner "in one or more of the Camshaft funds." BJYU's Alpha is a former limited partner of Camshaft Capital Fund, LP, and was never a limited partner of any other Camshaft entity.

Your letter demands information on behalf of BYJU's Alpha pursuant to Section 17-305 of the "Delaware limited partnership act." Section 17-305 of the Delaware Revised Uniform Limited Partnership Act "affords no . . . right to former limited partners to inspect a partnership's books and records." *Greenhouse v. Polychain Fund I LP*, No. 2018-0214-JRS, 2019 WL 2290245, at *5 (Del. Ch. May 29, 2019) (holding that plaintiff had no standing to seek books and records under 6 Del. C. § 17-305 because plaintiff was no longer a limited partner).

As such, BYJU's Alpha's demand for books and records is rejected because BYJU's Alpha has no statutory right or standing to demand books and records from Camshaft Capital Fund, LP (or any other Camshaft entity identified in your Letter). Nor does BYJU's Alpha have any rights under the Limited Partnership Agreement between BYJU's Alpha and Camshaft Capital Fund, LP, as a former limited partner with a zero-balance capital account.

Camshaft Capital Fund, LP (and all other Camshaft entities identified in your Letter) expressly reserve and do not waive all other defenses to your demand under the Delaware Revised Uniform Limited

Hogan Lovells US LLP is a limited liability partnership registered in the state of Delaware. "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in: Alicante Amsterdam Baltimore Beijing Birmingham Boston Brussels Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston Johannesburg London Los Angeles Luxembourg Madrid Mexico City Miami Milan Minneapolis Monterrey Munich New York Northern Virginia Paris Philadelphia Rome San Francisco São Paulo Shanghai Silicon Valley Singapore Sydney Tokyo Warsaw Washington, D.C. Associated Offices: Budapest Jakarta Riyadh Shanghai FTZ Ulaanbaatar. Business Service Centers: Johannesburg Louisville. Legal Services Center: Berlin. For more information see www.hoganlovells.com

Partnership Act, contract law, or any other basis, including but not limited to that the requested documents are confidential, trade secret, and proprietary to Camshaft Capital Fund, LP under the express terms of the aforementioned Limited Partnership Agreement, and disclosure, even if statutorily or contractually permitted (which it is not), would harm the partnership.

Sincerely,

David Massey

Partner
david.massey@hoganlovells.com
D 1 (305) 459-6678

cc: Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Attn: Susheel Kirpalani and Daniel Holzman
Quinn Emanuel Urquhart & Sullivan, LLP
susheelkirpalani@quinnemanuel.com danielholzman@quinnemanuel.com