# EXHIBIT 5

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BYJU'S ALPHA, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 24-10140 (JTD) |
| BYJU'S ALPHA, INC.,<br>Plaintiff,<br><br>v.<br><br>CAMSHAFT CAPITAL FUND, LP,<br>CAMSHAFT CAPITAL ADVISORS, LLC, and<br>CAMSHAFT CAPITAL MANAGEMENT, LLC,<br>RIJU RAVINDRAN, INSPILEARN LLC, and<br>THINK & LEARN PRIVATE LTD.,<br><br>Defendants. | Adv. Pro. No. 24-50013 (JTD) |

**DEBTOR'S AND GLAS TRUST COMPANY LLC'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT ON**
**COUNTS I, II, IV, VIII, AND X OF THE SECOND AMENDED COMPLAINT**

1. Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7056 of the Federal Rules of Bankruptcy Procedure, Debtor-Plaintiff BYJU's Alpha, Inc. (the "Debtor") and Intervenor-Plaintiff GLAS Trust Company LLC ("GLAS," and with the Debtor, "Plaintiffs"), by their undersigned attorneys, hereby move (the "Motion") for partial summary judgment on six causes of action included in the *Second Amended Complaint for Avoidance and Recovery of Fraudulent Transfers, Breach of Fiduciary Duties, Aiding and Abetting Breach of Fiduciary Duties, Accounting, Declaratory Judgment, Turnover of Property, Conversion, and Violation of*

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is: 16192 Coastal Highway, Lewes, Delaware 19958.

*Automatic Stay* [D.I. 151 (sealed), D.I. 153 (redacted)] filed on April 24, 2024: (i) actual fraudulent transfer against Camshaft Fund (as initial transferee) for the First Fraudulent Transfer (Count I), (ii) actual fraudulent transfer against Inspilearn (as initial transferee) and T&L (as transferee beneficiary) for the Second Fraudulent Transfer (Count I), (iii) constructive fraudulent transfer against Inspilearn (as initial transferee) and T&L (as transferee beneficiary) for the Second Fraudulent Transfer (Count II), (iv) breach of fiduciary duties against Ravindran for authorizing the First and Second Fraudulent Transfers (Count IV), (v) conversion of the Debtor's property against Ravindran and T&L (Count X), and (vi) declaratory judgment that the Second Fraudulent Transfer (and any subsequent transfers of the Alpha Funds) are null and void and also that the Alpha Funds remain property of the Debtor's estate (Count VIII).

2. The reasons for the relief requested herein are set forth in the accompanying (i) *Memorandum of Law in Support of Debtor's and GLAS Trust Company LLC's Motion for Partial Summary Judgment on Counts I, II, IV, VIII, and X of the Second Amended Complaint*; (ii) *Declaration of Timothy R. Pohl in Support of Debtor's and GLAS Trust Company LLC's Motion for Partial Summary Judgment on Counts I, II, IV, VIII, and X of the Second Amended Complaint*; (iii) *Declaration of Stephen Spencer in Support of Debtor's and GLAS Trust Company LLC's Motion for Partial Summary Judgment on Counts I, II, IV, VIII, and X of the Second Amended Complaint*; (iv) *Declaration of Michael Gallo in Support of Debtor's and GLAS Trust Company LLC's Motion for Partial Summary Judgment On Counts I, II, IV, VIII, and X of the Second Amended Complaint*; and (v) *Declaration of Benjamin I. Finestone in Support of Debtor's and GLAS Trust Company LLC's Motion for Partial Summary Judgment on Counts I, II, IV, VIII, and X of the Second Amended Complaint*, which are being filed concurrently herewith and are incorporated herein by reference.

3. Pursuant to Rule 7012-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of a final order or judgment on the Motion by this Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

*[Remainder of page intentionally left blank]*

Case 24-50013-BLS Doc 82 Filed 04/28/24 Page 4 of 15

WHEREFORE, Plaintiffs respectfully requests that the Court enter the proposed order attached hereto as **Exhibit A**, granting the Motion and entering partial summary judgment in favor of Plaintiffs.

Dated: Wilmington, Delaware
July 8, 2024

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani (admitted pro hac vice)
Benjamin Finestone (admitted pro hac vice)
Kate Scherling (admitted pro hac vice)
Jianjian Ye (admitted pro hac vice)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel.: (212) 849 7000
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
katescherling@quinnemanuel.com
jianjianye@quinnemanuel.com

*Counsel for Plaintiff-Debtor, BYJU's Alpha, Inc.*

*/s/ Peter J. Keane*

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Email: ljones@pszjlaw.com
pkeane@pszjlaw.com

**REED SMITH LLP**
David A. Pisciotta (admitted *pro hac vice*)
Nicholas B. Vislocky (admitted *pro hac vice*)
599 Lexington Avenue, 22nd Floor
New York, New York 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
Email: dpisciotta@reedsmith.com
nvislocky@reedsmith.com

**KIRKLAND & ELLIS LLP**

**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
Richard U.S. Howell, P.C. (admitted *pro hac vice*)
Ravi Subramanian Shankar (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: patrick.nash@kirkland.com
rhowell@kirkland.com
ravi.shankar@kirkland.com

-and-

Brian Schartz, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: brian.schartz@kirkland.com

*Counsel to Plaintiff-Intervenor GLAS Trust Company LLC*

**<u>EXHIBIT A</u>**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | |
| BYJU'S ALPHA, INC.,[1] | Chapter 11 |
| Debtor. | Case No. 24-10140 (JTD) |
| BYJU'S ALPHA, INC., Plaintiff, | Adv. Pro. No. 24-50013 (JTD) |
| GLAS TRUST COMPANY, LLC, Intervenor-Plaintiff, | |
| v. | |
| CAMSHAFT CAPITAL FUND, LP, CAMSHAFT CAPITAL ADVISORS, LLC, CAMSHAFT CAPITAL MANAGEMENT, LLC, RIJU RAVINDRAN, INSPILEARN LLC, and THINK AND LEARN PRIVATE LIMITED, Defendants. | |

**ORDER (I) GRANTING DEBTOR'S AND GLAS TRUST COMPANY LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I, II, IV, VIII, AND X OF THE SECOND AMENDED COMPLAINT (II) ISSUING DECLARATORY JUDGMENTS, AND (III) ENTERING JUDGMENT**

Upon consideration of the motion for partial summary judgment (the "Motion")[2] filed by Debtor-Plaintiff BYJU's Alpha, Inc. (the "Debtor") and Intervenor-Plaintiff GLAS Trust Company LLC ("GLAS," and with the Debtor, "Plaintiffs") seeking partial summary judgment for Plaintiffs against defendants, Camshaft Capital Fund, LP, Camshaft Capital Advisors, LLC,

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 case is: 1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

[2] All capitalized terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion or the *Memorandum of Law in Support of Debtor's and GLAS Trust Company LLC's Motion for Partial Summary Judgment on Counts I, II, IV, VIII, and X of the Second Amended Complaint filed contemporaneously herewith.*

Camshaft Capital Management, LLC, Riju Ravindran, Inspilearn LLC, and Think and Learn Private Limited (collectively, the "<u>Defendants</u>"), and upon consideration of the Pohl Declaration, the Spencer Declaration, the Gallo Declaration, and the Finestone Declaration, including the documents attached to the declarations; and any responses filed; and this Court having subject matter jurisdiction to consider and to determine the Motion in accordance with 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2023; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and Plaintiffs having consented to entry of a final order by this Court under Article III of the United States Constitution; and this Court having found that due and sufficient notice was given under the circumstances; and after due deliberation and sufficient cause appearing therefore, it is hereby ORDERED that:

1. Plaintiffs' Motion, pursuant to Federal Rule of Civil Procedure 56 and Bankruptcy Rule 7056, is hereby GRANTED and partial summary judgment is hereby entered in favor of Plaintiffs against Defendants as set forth herein.

2. Judgment is hereby entered in favor of Plaintiffs against the Camshaft Fund as to Count I of the Second Amended Complaint. The Debtor's transfer of the Alpha Funds to Camshaft Fund was an actual fraudulent transfer and is avoided under 11 U.S.C. §§ 544(b), 548(a)(1)(A).

3. Judgment is hereby entered in favor of Plaintiffs against Inspilearn and T&L as to Count I of the Second Amended Complaint. The Debtor's transfer of the Camshaft LP Interest to Inspilearn as initial transferee, for the benefit of T&L, was an actual fraudulent transfer and is avoided under 11 U.S.C. §§ 544(b), 548(a)(1)(A).

4. Judgment is hereby entered in favor of Plaintiffs against Inspilearn and T&L as to Count II of the Second Amended Complaint. The Debtor's transfer of the Camshaft LP interest to

Inspilearn for no consideration was a constructive fraudulent transfer and is avoided under 11 U.S.C. §§ 544(b), 548(a)(1)(B).

5. Judgment is hereby entered in favor of Plaintiffs against Ravindran as to Count IV of the Second Amended Complaint. Ravindran breached his fiduciary duties to the Debtor by authorizing the First and Second Fraudulent Transfers.

6. Judgment is hereby entered in favor of Plaintiffs against Ravindran and T&L as to Count X of the Second Amended Complaint. Ravindran and T&L are each liable for the conversion of the Camshaft LP Interest.

7. Judgment is hereby entered in favor of Plaintiffs as to Count VIII of the Second Amended Complaint. Pursuant to 11 U.S.C. §§ 2201 and 2022, the Court hereby declares as follows: (a) the Second Fraudulent Transfer (and any subsequent transfers of the Alpha Funds) are null and void, without any force and effect; and (b) the Alpha Funds remain property of the Debtor's estate under 11 U.S.C. § 541.

8. Pursuant to 11 U.S.C. § 550(a), Camshaft Fund is liable to Plaintiffs in the amount of $533,000,000.00, plus pre-judgment interest at a rate of 5.04% beginning as of March 3, 2023 through the date hereof, post-judgment interest beginning as of the date hereof in accordance with 28 U.S.C. § 1961(a), and costs pursuant to Bankruptcy Rule 7054(b) and 28 U.S.C. § 1920.

9. With respect to the First Fraudulent Transfer, Ravindran is liable to Plaintiffs in the amount of $533,000,000.00, plus pre-judgment interest at a rate of 5.04% beginning as of March 3, 2023 through the date hereof, post-judgment interest beginning as of the date hereof in accordance with 28 U.S.C. § 1961(a), and costs pursuant to Bankruptcy Rule 7054(b) and 28 U.S.C. § 1920. With respect to the Second Fraudulent Transfer, Ravindran is liable to Plaintiffs in the amount of $540,647,109.20, plus pre-judgment interest at a rate of 4.58% beginning as of

March 31, 2023 through the date hereof, post-judgment interest beginning as of the date hereof in accordance with 28 U.S.C. § 1961(a), and costs pursuant to Bankruptcy Rule 7054(b) and 28 U.S.C. § 1920.

10. Pursuant to 11 U.S.C. § 550(a), Inspilearn and T&L are jointly and severally liable to Plaintiffs in the amount of $540,647,109.20, plus pre-judgment interest at a rate of 4.58% beginning as of March 31, 2023 through the date hereof, post-judgment interest beginning as of the date hereof in accordance with 28 U.S.C. § 1961(a), and costs pursuant to Bankruptcy Rule 7054(b) and 28 U.S.C. § 1920.

11. This Court shall retain exclusive jurisdiction to hear and determine any disputes arising from or relating to the interpretation, implementation, and enforcement of the terms and provisions of this Order.

# EXHIBIT 6

Case 24-50013-JTD Doc 333 Filed 04/28/25 Page 1 of 41

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| BYJU'S ALPHA, INC., | ) | Case No. 24-10140 (JTD) |
| Debtor. | ) | |
| BYJU'S ALPHA, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 24-50013 (JTD) |
| CAMSHAFT CAPITAL FUND, LP, CAMSHAFT CAPITAL ADVISORS, LLC, CAMSHAFT CAPITAL MANAGEMENT, LLC, INSPILEARN LLC, AND RIJU RAVINDRAN, | ) | |
| Defendants. | ) | **Re: Adv. D.I. 275** |

## MEMORANDUM OPINION

BYJU's Alpha, Inc., ("**Debtor**") commenced this action asserting that the defendants fraudulently transferred over $500 million of the Debtor's assets in an attempt to defraud the Debtor's creditors.[1] Debtor has moved for partial summary judgment (the "**Motion**") on Count I (actual fraudulent transfer), Count II (constructive fraudulent transfer), Count IV (breach of fiduciary duty), Count VIII (declaratory judgment), and Count X (conversion) of its Complaint.[2] Defendants Camshaft Capital Fund LP ("**Camshaft Fund**"), Camshaft Capital Advisors LLC ("**Camshaft Advisors**"), and Camshaft Capital Management LLC ("**Camshaft Management**") (together with Camshaft Advisors and Camshaft Management, "**Camshaft**"), Think and Learn

[1] Second Amended Complaint ("**Complaint**"), Adv. D.I. 151.
[2] Debtor's Motion for Partial Summary Judgment, Adv. D.I. 275.

Private Limited ( "**T&L**"), and Riju Ravindran ("**Ravindran**") (together with Camshaft and T&L, the "**Defendants**")[3] oppose the Motion.[4]

For the reasons that follow, the Motion is granted.

## FACTUAL BACKGROUND

The Debtor was incorporated in Delaware on September 27, 2021. It was formed as a special purpose financing vehicle by its parent company, T&L, to raise funds for the overseas expansion of "BYJU's."[5] Ravindran was the Debtor's sole director from September 27, 2021, and officer from September 29, 2021.[6] Ravindran was removed from both positions on March 3, 2023.[7]

Debtor was formed to borrow $1.2 billion in five-year term loans (the "**Term Loan**") from a consortium of lenders (the "**Lenders**"). The Term Loan, governed by a Credit and Guaranty Agreement (the "**Credit Agreement**") was executed on November 24, 2021.[8] Ravindran signed the Credit Agreement on behalf of the Debtors and its affiliates. GLAS Trust Company LLC ("**GLAS**"), the Lenders' administrative and collateral agent, also signed.[9]

Only a few months after executing the Credit Agreement, in March and April of 2022, the Debtor and its affiliates failed to satisfy certain loan covenants, which constituted defaults of

---

[3] One of the defendants in this action, Inspilearn LLC, has not filed an opposition to the Motion. It is therefore not included within the defined term "Defendants" as used herein, though it remains a defendant in this adversary proceeding.
[4] See Camshaft Defendants' Objection to Motion, Adv. D.I. 300 ("**Camshaft Objection**"); T&L's Objection to Motion, Adv. D.I. 333 ("**T&L Objection**"); Riju Ravindran's Objection to Motion, Adv. D.I. 335 ("**Ravindran Objection**").
[5] Ravindran Ans. To Second Am. Compl., Adv. D.I. 179 ("**Ravindran SAC Ans**.") at ¶2; Declaration of Benjamin Finestone ("**Finestone Decl.**"), Adv. D.I. 277, Ex. 2 (Mar. 14 Hr'g Tr.) at 15:16-16:10. BYJU's is the trade name of a corporate conglomerate indirectly owned by T&L, based in India. *Id.* T&L is also the parent company of Inspilearn, a Delaware limited liability Company.
[6] Ravindran SAC Ans ¶¶35, 183.
[7] *Id.* at ¶39.
[8] Finestone Decl. Ex. 3 (Credit Agreement) at 166.
[9] *Id.* at 171-72.

the Term Loan.[10] Within weeks of the defaults, the Debtor began to move funds through a series of four transfers (together, the "**Transfers**").

The first of these occurred between April 2022 and July 2022, when the Debtor made a series of wire transfers to Camshaft Fund (the "**First Transfer**"), a small unknown hedge fund,[11] totaling $533 million (the "**Alpha Funds**").[12] In exchange for the Alpha Funds, Debtor received

---

[10] Specifically, (i) on March 16, 2022, T&L failed to furnish required unaudited consolidated financial statements for Q3 FY 2021-2022 and (ii) the Debtor's then-affiliate Whitehat Education Technology Private Limited failed to guarantee the Term Loans by its deadline of April 1 2,022. Declaration of Timothy Pohl ("**Pohl Decl.**"), Adv. D.I. 279 at ¶¶8-9, 17.

[11] An investigation by GLAS that included regulatory filings, background checks, visits to Camshaft's offices, and interviews with purported personnel and friends of Camshaft founder, William Morton ("**Morton**"), suggest that Camshaft is a sham hedge fund. Declaration of Michael Gallo ("**Gallo Decl.**"), Adv. D.I. 278 at ¶¶4-6; Pohl Decl. ¶¶33, 35.

Camshaft Fund was founded in August 2020 by Morton, and Morton is the lone portfolio manager and "key person." Gallo Decl. ¶¶16-18; *id.* Ex. 2 (Apr. 2023 Investment Adviser Brochure at 10). Morton was a 23-year-old with no formal training, experience, or apparent qualifications in investing or money management. *Id.* ¶¶16-18; Finestone Decl. Ex. 7 (Jun. 27, 2024 Morton Dep.Tr.) 299:24-304:10. Morton also lacked any background in regulatory compliance suitable for his role as Camshaft's Chief Compliance Officer. Gallo Decl. Ex. 1 (Apr. 2023 Form ADV) at 26; *id.* Ex. 5 (Mar. 2024 Form ADV) at 24. In fact, Morton had no experience in the financial sector at all. *Id.* ¶18. The rest of the management team was misrepresented on Camshaft's websites, listing the profiles of individuals who apparently did not work for the company or did not realize they were being held out as holding senior positions. *See* Gallo Decl. ¶¶22-28. On state and federal regulatory filings, Camshaft Fund listed the address to a Miami IHOP. Gallo Decl. ¶7-8; Finestone Decl. Ex. 7 (Jun 27, 2024 Morton Dep. Tr.) 316:4-21, 328:3-14. More recent filings reflected Camshaft's "Current Principal Place of Business" at a single room in a coworking-style space. *Id.* ¶10. Private investigators reported that no employees were ever present during its fourteen separate visits to the office. *Id.* ¶10-14. Based on Camshaft's Form ADV disclosures and the Debtor's bank statements, it appears that approximately 90% of the Fund's assets under management were directly attributable to the Debtor's $533 million transfer. Gallo Decl. Ex. 1 (Apr. 2023 Form ADV) at 7-8, 15, 22; *id.* Ex. 5 (Mar. 2024 Form ADV) at 7-8, 15, 21; Finestone Decl. Ex. 7 (Jun. 27 2024 Morton Dep. Tr.) 337:4-9.

GLAS's investigator concluded that the hedge fund was a sham, and I agree. It is unclear why the Debtor's would choose to invest in Camshaft Fund at all. Camshaft never shared any capital account balances, financial statements, investor statements, or other performance updates or reports with the Debtor. Ravindran stated in sworn testimony that he had never heard of Camshaft Fund prior to April 2022 and did not conduct any due diligence on it. Finestone Decl. Ex. 17 (Mar. 12, 2024) Ravindran Dep. Tr.) 144:2-17, 280:17-283:16. Ravindran and Morton never spoke with one another. T&L directed Ravindran to transfer the Alpha Funds to the high-risk and unproven hedge fund, and Ravindran simply took "instructions" from T&L to "sign[] documents" without question. Finestone Dec. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 20:1-6, 24:7-13, 32:19-23, 49:3-12.

[12] Pohl Decl. ¶30; Finestone Decl Ex. 6 (SVB Account Statements) at 15, 17; Ravindran SAC Ans. ¶49.

a limited partnership interest in the Camshaft Fund (the "**LP Interest**").[13] The First Transfer left the Debtor with approximately $131,542,108.16 in available funds across its bank and brokerage accounts.[14] The Alpha Funds were virtually the Debtor's sole asset, as it had no other known assets, liquid or illiquid.[15]

Upon receiving the Alpha Funds, Camshaft disbursed those funds in the form of "loans" to OCI Limited ("**OCI**"), a British commercial process outsourcing (supply chain) specialist,[16] pursuant to at least three promissory notes.[17] It was the Debtor, not Camshaft, that bore the sole risk of any default by OCI under those promissory notes.[18] Ravindran signed side letters for each promissory note on behalf of the Debtor.[19]

The First Transfer, as well as the concurrent loans and side letters, were made without the Lenders' knowledge or approval.[20] Ravindran and T&L concealed the First Transfer from the Lenders for months. T&L (on whose board Ravindran sat) actively misled the Lenders into believing that the funds remained in the Debtor's bank accounts in cash or cash equivalents. For example, in mid-March 2023, T&L furnished to GLAS, for distribution to the Lenders, unaudited quarterly financial statements for the period ended December 31, 2022, that indicated

---

[13] Finestone Decl. Ex. 8 (April 2022 Subscription Agreement); *id* Ex. 9 (July 2022 Additional Subscription Booklet).
[14] Pohl Decl. ¶30, Ravindran SAC Ans. ¶50 (estimating assets of approximately $100 million after the transfer).
[15] *See* Finestone Decl. Ex. 7 (June 27, 2024 Morton Dep. Tr.) 367:9-368:15.
[16] Finestone Decl. Ex. 10 (screenshot of OCI website)
[17] Finestone Decl. Ex. 11 (April 2022 Promissory Note); *id.* Ex. 14 (July 12, 2022 Promissory Note); *id.* Ex. 15 (July 15, 2022 Promissory Note).
[18] *Id.* Ex. 7 (June 27, 2024 Morton Dep. Tr.) 358:13-359:2 (explaining that if OCI failed to make payments on promissory notes "those losses would be taken" from the Debtor's limited partnership interest in Camshaft Fund).
[19] *Id.* Ex 12 (April 2022 Side Letter); *id.* Ex. 13 (August 2022 Amended Side Letter); *id.* Ex. 15 (July 2022 Side Letter).
[20] *Id.* Ex. 17 (Mar. 12, 2024 Ravindran Dep. Tr.) 145:20-146:1, 146:13-147:15, 152:7-14; Ravindran SAC Ans. ¶49; Pohl Decl. ¶21.

the Debtor had an amount of Rupees equivalent to over $500 million (based on prevailing currency exchange rates) in "Cash and Bank." [21]

After the First Transfer, additional defaults occurred in September 2022.[22] The Debtor and the Lenders continued their attempts to reach a negotiated solution, but by November 24, 2022, none of the defaults had been cured and they matured into Events of Default as defined under the amendment to the Credit Agreement.[23] On January 6, 2023, the parties entered into a final forbearance agreement, in which the Lenders agreed to forbear from exercising remedies until February 10, 2023 and reaffirmed that a failure to cure the specified defaults would entitle the Lenders to exercise remedies.[24]

On February 8, 2023, with the defaults still uncured, counsel for the Lenders notified the parties of their intent to exercise remedies.[25] On March 3, 2023, GLAS accelerated the loan and took control of 100% of the Common Stock as the sole shareholder.[26] Through an Action by Written Consent of the Sole Stockholder, GLAS removed Ravindran and appointed Timothy R. Pohl ("**Pohl**"), an experienced restructuring professional, as the Debtor's sole officer and director.[27]

Despite this change in control, on March 31, 2023, Ravindran transferred the Debtor's LP Interest to Inspilearn for no consideration (the "**Second Transfer**").[28] As with the First Transfer, it was T&L who made the ultimate decision and directed the transfer, with Ravindran merely

---

[21] Finestone Decl. Ex. 18 (T&L Unaudited Quarterly Financial Statement for Period Ended December 31, 2022).
[22] Pohl Decl. ¶¶10-11.
[23] Pohl Decl. ¶ 13.
[24] Pohl Decl. ¶14; Ravindran SAC Ans. ¶¶ 92, 103; Finestone Decl. Ex. 23 (Amendment No. 7) §§ 1,6(a).
[25] Finestone Decl. Ex 24 (Feb.8 , 2023 Lenders' Email); Ravindran SAC Ans. ¶¶97-98.
[26] Pohl Decl. ¶¶18-19.
[27] *Id.* ¶¶2-4, 20.
[28] Finestone Decl. Ex. 25 (Mar. 31, 2023 Transfer Agreement) §1; *id.* Ex. 7 (June 27, 2024 Morton Dep. Tr.) 78:21-79:5, 85:1-11, 126:22-127:20.

signing documents without asking questions.[29] The Debtor received no consideration for this transfer, which was valued at that time at $540,647,109.29.[30] The transfer was consummated and finalized on March 31, 2023 when the Debtor, Inspilearn, and Camshaft executed a Transfer Agreement and a Subscription Agreement.[31] Following the Second Transfer, the Debtor was left with $439,905.47 in its bank accounts.[32]

On May 3, 2023, GLAS and Pohl filed suit in the Delaware Court of Chancery, seeking among other things, a declaration that Pohl had been validly appointed as the Debtor's director and officer pursuant to Delaware General Corporate Law, 8 *Del. C.* § 225.[33] In a hearing before that Court, Ravindran's counsel acknowledged that Debtor transferred the Alpha Funds because "BYJU's felt the need to protect the cash."[34]

The Delaware Action ultimately concluded with the Court entering an order affirming that, *inter alia*, the March 3, 2023 removal of the Debtor's then officer and director (*e.g.* Ravindran) was valid, and Pohl's appointment as sole director, CEO, and Secretary was valid.[35] Five days later, during a May 8, 2023 call, Byju Raveendran (the Debtor's founder, and self-appointed CEO, T&L's CEO, and Riju Ravindran's older brother told the Lenders' senior

---

[29] "The direction came from Think and Learn, but [Ravindran] signed the document." Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 52:4-6.
[30] Finestone Decl. Ex. 28 (Apex Statement for the Period Ended Mar. 31, 2023); Finestone Decl. Ex. 20 (Camshaft's Second Am. Interrog. Ans.) at 5, Answer to Interrog. No. 2; Finestone Decl. Ex. 7 (Jun 27, 2024 Morton Dep. Tr.) 83:13-84:18, 135:14-21.
[31] Finestone Decl. Ex. 25 (Transfer Agreement); Finestone Decl. Ex. 27 (Mar. 31, 2023 Subscription Agreement).
[32] Pohl Decl. ¶30. According to Ravindran, after the Second Fraudulent Transfer, the Debtor "didn't have anything left." Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 54:23-35.
[33] Pohl Decl. ¶ 23; *see GLAS Tr. Co. LLC v. Ravindran*, C.A. No. 2023-0488-MTZ (Del. Ch. 023) (the "**Delaware Action**").
[34] Finestone Decl. Ex. 30 (May 18, 2023 Delaware Action Hr'g Tr.) 34:2-35:4.
[35] Finestone Decl. Ex. 29 (Order) at 1-2; Pohl Decl. ¶¶ 36-37.

financial advisor, Stephen Spencer, in reference to the Alpha Funds, that the Debtor "doesn't have the money[.]"[36] Rather, "the money is someplace the Lenders will never find it." [37]

On May 22, 2023, the *Status Quo* Order entered by the Delaware Court of Chancery required Ravindran to "immediately" provide Pohl with "access to and exclusive control over the accounts[,] . . . documents, and information of the Company," as "necessary" for Pohl to perform [his] role as sole director and officer."[38] After a thorough review and examination of the Debtor's bank accounts, Pohl finally determined, in July 2023, that $533 million of the Term Loan proceeds had been transferred to Camshaft Fund in April and July 2022.[39]

Soon thereafter, on September 5, 2023, GLAS sued Camshaft in state court in Miami, Florida, seeking to avoid the transfer of the Alpha Funds, among other relief.[40]

On February 1, 2024, the Debtor filed for bankruptcy (the "**Petition Date**"). That same day, Camshaft and Ravindran facilitated the further transfer of the LP Interest from Inspilearn to a "non-U.S. trust" of Inspilearn (the "**Third Transfer**").[41]

On March 5, 2024, Ravindran submitted a declaration stating that he had resigned as the manager of Inspilearn on February 14, 2024, and revealing the Alpha Funds had been transferred again to a "non-U.S. based subsidiary of BYJU's" (the "**Fourth Transfer**").[42] Ravindran refused to identify the subsidiary.

---

[36] *Id.* ¶¶ 13-14.
[37] Ravindran SAC Ans. ¶ 35; *See* Declaration of Stephen Spencer ("**Spencer Decl.**"), Adv. D.I. 280, ¶¶ 11-15.
[38] Pohl Decl. ¶ 27.
[39] Pohl Decl. ¶ 32.
[40] *Id.* ¶ 35; *GLAS Tr. Co. LLC v. Camshaft Cap. Fund, LP*, Case No. 2023-022640-CA-01 (Fla. 11th Cir. Ct. 2023).
[41] Finestone Decl. Ex. 20 (Camshaft's Second Am. Interrog. Ans.) at 4-5.
[42] Ravindran Decl. ¶¶6, 11.

Case 24-50013-BLS Doc 323 Filed 04/28/25 Page 8 of 43

On March 18, 2024, a preliminary injunction order was entered, enjoining Defendants, along with Raveendran and Divya Gokulnath (Raveendran's spouse and T&L director) "from taking any steps to spend, transfer, exchange, convert, dissipate, liquidate, or otherwise move or modify any rights" related to the Alpha Funds.[43]

On May 28, 2024, Ravindran was held in contempt for failing to comply with the Preliminary Injunction Order, which required him to "take all necessary steps to determine the location, amount, and composition of the Alpha Funds[.]"[44] To date, Ravindran has failed to respond to discovery requests and Debtor has been unable to identify which T&L subsidiary holds the funds.[45]

## JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## LEGAL STANDARD

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056; *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A genuine dispute of material fact exists only if a reasonable trier of fact could enter a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A disputed

---

[43] Order Granting Debtor's Motion for a Preliminary Injunction, Adv. D.I. 84, (the "**Preliminary Injunction Order**").
[44] Preliminary Injunction Order at ¶2; Order on Finding of Contempt ("**Contempt Order**"), Adv. D.I. 204, at ¶1.
[45] Pohl Decl. ¶47; Finestone Decl. Ex. 37 (June 6, 2024 Email).

fact is 'material' if it would affect the outcome of the suit as determined by the substantive law." *Doe v. Luzerne County*, 660 F.3d 169, 175 (3d Cir. 2011) (quoting *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d. Cir. 1986). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.'" *Celotex*, 477 U.S. 317, 323 (1986). When a movant's evidence demonstrates the lack of a genuine issue of material fact, the burden shifts to the opposing party to demonstrate the existence of a genuine issue for trial. *Id.*, at 327. In order to prevail, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (*citing DeLuca v. Atlantic Refining Co.*, 176 F.2d 421, 423 (CA2 1949)). The Court's sole role is to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## DISCUSSION

### I. Ripeness

#### A. Request to Stay

Defendants T&L and Ravindran raise the threshold argument that the Motion is premature and that a ruling should be deferred pending the outcome of several related actions. In large part, this argument is moot, now that rulings have been issued in all but one of the other

actions since the time the parties submitted their briefing.[46] The only action that remains pending is the New York Action, in which a group of entities affiliated with the BYJU's enterprise seeks, among other things, a declaration that they had not defaulted under the Loan Agreement and damages for alleged breaches of the Loan Agreement.[47] But Defendants' request to stay this Motion pending the outcome of other proceedings has already been denied once,[48] and Defendants do not cite to any change in circumstances since that ruling. Accordingly, their renewed request to defer a ruling on this Motion is denied.

B. <u>Rule 56(d) Challenge</u>

All Defendants also oppose the Motion pursuant to Federal Rule of Civil Procedure 56(d), arguing they have not had the opportunity to take any meaningful discovery of the Debtor. Rule 56 provides that:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

---

[46] Since briefing was completed, Ravindran lost his appeal in the Delaware Action. *See Ravindran v. GLAS Trust Company LLC*, C.A. No. 2024-0488 (Del. Sup. Ct. Sept. 23, 2024) (*affm'g* the Delaware Chancery Court's ruling that GLAS had the authority to assume control over the Debtor). Ravindran's appeals of this Court's Preliminary Injunction and Contempt Orders were also dismissed with prejudice by the District Court for failure to prosecute on December 5, 2024. *See Camshaft Capital Fund, LP v. BYJU's Alpha, Inc.*, Ca. No. 24-358-MN (consolidated) (D. Del. Dec. 5, 2024) (finding that Ravindran failed to timely file an opening brief in support of his appeals and failed to oppose the Motion to Dismiss his appeals and dismissing the appeals with prejudice). The challenged orders of the Chancery Court and this Court are thus in full effect, and Defendants' arguments about the pendency of their appeals are therefore moot.

[47] *Byju's Pte. Ltd. v. GLAS Tr. Co. LLC*, No. 652717 (N.Y. Sup. Ct. June 5, 2023) ("**<u>New York Action</u>**").

[48] In July of 2024, Ravindran and T&L filed an Emergency Motion to Stay Proceedings on Debtor's Motion for Partial Summary Judgment, citing both the Delaware appeals and the New York action as reason to stay the summary judgment proceedings. Adv. D.I. 290. That motion was denied. Adv. D.I. 327.

A motion pursuant to Rule 56(d) "must identify *with specificity*" three things: "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *Lunderstadt v. Colafella*, 885 F.2d 66, 71 (3d Cir. 1989) (emphasis added) (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 139-40 (3d Cir. 1988)); *see also Radich v. Goode*, 886 F.2d 1391, 1393-94 (3d Cir. 1989). None of the declarations submitted in support of the Defendants' respective 56(d) motions satisfy these requirements.

Ravindran argues that he has not been afforded the opportunity to conduct affirmative discovery because the Court's Contempt Order has effectively ensured that, regardless of the facts, Ravindran will be found liable on all claims related to the First and Second Transfers. Ravindran cites to the provision of the Contempt Order that states he "is precluded from asserting in this Adversary Proceeding that the Alpha Funds . . . were transferred from the Debtor to Camshaft Capital Fund LP and, subsequently, from Camshaft Capital Fund LP to Inspilearn LLC, for a proper purpose."[49] In other words, Ravindran argues, the sanction imposed in the Contempt Order made discovery futile.

As a preliminary point, I reject Ravindran's suggestion that the sanctions imposed on him because of his own conduct in this case can now be used to his advantage. But even were that not the case, Ravindran's argument that he did not previously obtain the discovery needed because doing so would be futile directly contradicts the remainder of his argument: that there is specific discovery he requires to oppose the Motion. If the discovery identified by Ravindran would, in fact, preclude summary judgment (as it must to be successful under Rule 56(d)), then

[49] Contempt Order ¶ 5.

engaging in that discovery could not be futile (thereby invalidating Ravindran's explanation for why it has not been previously obtained). Simply put, Ravindran's argument makes no sense.

T&L also seeks additional time to conduct discovery pursuant to Rule 56(d). At oral argument, T&L suggested that it could not engage in discovery because doing so would cause it to "risk…waiv[ing] [its] objection to personal jurisdiction."[50] But T&L never requested to take discovery without waiving its objection.[51] Additionally, even assuming T&L's declaration identified what evidence it hoped to gain from the Lenders and their agents with sufficient specificity, which it does not, the evidence T&L purportedly seeks to elicit would not preclude summary judgment. T&L says it intends to seek discovery concerning the restrictions on the Term Loan funds and the allowed uses of those funds so that it can establish that the Debtor's transfer of the Alpha Funds to Camshaft was permitted under the Credit Agreement. But this evidence would not preclude summary judgment because contractual compliance is not a defense to fraudulent transfer. *See, e.g.*, *In re EBC I Inc.*, 356 B.r. 631, 640 (Bankr. D. Del. 2006) ("A transfer may be fraudulent even if it is made in accordance with the terms of a contract between the parties.").

Camshaft's Rule 56(d) argument is likewise unpersuasive. The declaration submitted in support of its Rule 56(d) challenge offered only vague statements about what discovery was needed and did not explain with specificity how the information sought would preclude summary judgment.[52] Further, the only explanation Camshaft offered for its failure to take the discovery it

[50] Oral argument transcript, Adv. D.I. 377, at 142:13-17.
[51] *Id.* at 142:18-23; 143:1-18.
[52] Declaration of Pieter Van Tol, Adv. D.I. 302.

now claims is vital is that its motion to dismiss was pending. As I noted at oral argument, Camshaft's arguments on this point are simply not convincing.[53]

## II. Personal Jurisdiction (T&L)

Defendant T&L also objects to the Motion on the basis that it is not subject to this Court's jurisdiction.

Under Bankruptcy Rule 7004, a court has personal jurisdiction over a defendant if three requirements are met:

> (1) service of process has been made in accordance with Bankruptcy Rule 7004 or Civil Rule 4; (2) the court has subject matter jurisdiction under section 1334 of the [Judicial] Code [28 U.S.C. § 1334]; and (3) exercise of jurisdiction is consistent with the Constitution and the laws of the United States.

*Tribune Media Servs. v. Beatty (In re Tribune Co.)*, 418 B.R. 116, 121 (Bankr. D. Del. 2009) (internal citations omitted). T&L argues that the first and third requirements of this test have not been met.

First, T&L argues that service of process has not been made in accordance with the applicable rules. Debtor served T&L by serving T&L's subsidiary, Inspilearn on the grounds that the two entities are so closely related that Inspilearn is effectively T&L's alter ego.[54] Debtor effectuated service in four ways: (1) personal service; (2) first-class mail; (3) email directed to T&L's current counsel and board members; and (4) mail to T&L's registered address in India.[55]

---

[53] The Court rejected counsel's argument that the pending motion to dismiss is a valid excuse for failing to conduct discovery. Oral Argument Transcript, Adv. 377 at 30:8-12. Counsel also argued that it was "in good faith" satisfying the Debtor's discovery, which was "a massive undertaking" that prevented Camshaft from taking their own offensive discovery. The Court dismissed this as well, noting that Mr. Morton fled the country to avoid doing discovery and the court held him in contempt.

[54] *See* Summons and Notice of Pretrial Conference ("**Summons**"), Adv. D.I. 152; *see also* Affidavit of Corporate Service, Adv. D.I. 160.

[55] *See id.*; Complaint, Ex. 1, at § 10.1.

T&L does not contest that this service occurred. Rather, it disputes that any of these methods of service is sufficient to satisfy both the 1965 Hauge Convention on Service Abroad (the "**Hague Convention**") and Federal Rule of Civil Procedure 4(h).[56] Specifically, T&L argues that under the Hague Convention, the Debtor was required to serve T&L in India, and that domestic service upon T&L's Delaware subsidiary Inspilearn was insufficient "substitute service" to satisfy Rule 4(h)(1) because Inspilearn is not a general agent of T&L.

As I explained in my ruling on T&L's motion to dismiss (Adv. D.I. 382), the Hague Convention does not apply where service on a domestic subsidiary is valid and complete under both state law and the Due Process Clause of the Fourteenth Amendment. *See also Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 697, 707 (1988) (affirming lower court ruling that under state law service on a foreign defendant could be effectuated through its domestic subsidiary where the parent and the subsidiary are "so closely related that [the subsidiary] is [the parent]'s agent for service of process as a matter of law"). Under Delaware law, service on a subsidiary will confer jurisdiction over the parent if the subsidiary is found to be either the alter ego or the agent of the parent. *See Akzona, Inc. v. E. I. Du Pont de Nemours & Co.*, 607 F. Supp. 227, 237 (D. Del. 1984) ("Service on a subsidiary does not confer jurisdiction over the parent where separate corporate identities are maintained, unless the subsidiary is found to be either the alter ego or the agent of the parent."). Here, there is sufficient evidence for me to conclude that Inspilearn is T&L's alter ego.

"In order to find that a subsidiary is the alter ego or instrumentality of the parent, the Plaintiff must prove control by the parent to such a degree that the subsidiary has become its mere instrumentality." *Id.* (internal quotation and citation omitted). "Whether a subsidiary is the

---

[56] In a bankruptcy adversary proceeding, service of process is governed by Bankruptcy Rule 7004, which incorporates the methods authorized by FRCP 4(e)-(j). *See* Fed. R. Bankr. P. 7004(a).

agent of the parent involves a determination that the separate corporate identities of the subsidiary and parent are a fiction and that the subsidiary is, in fact, being operated as a department of the parent." *Id.* "The parent must have actual, participatory and total control of the subsidiary." *Id.*[57] T&L argues that the Debtor has not put forth sufficient evidence to satisfy this standard here. I disagree.

Debtor has offered an abundance of evidence that T&L has "actual, participatory, and total control" over Inspilearn, including that:

- T&L employed only a single person -- Riju Ravindran, the brother of T&L founder Byju Raveendran – at both Debtor and Inspilearn, which were both non-operating companies with no business and no other advisors[58]

- T&L controlled all corporate functions of Debtor and Inspilearn and neither subsidiary maintained its own books and records[59]

- T&L made all decisions on behalf of the Debtor and Inspilearn, as evidenced by Riju Ravindran's testimony that as sole officer of the

[57] Courts have acknowledged in subsequent opinions that the standard applied by the *Akzona* court is more akin to that applicable for determining alter ego status than for determining the existence of an agency relationship. See *British Telcoms. PLC v. IAC/InteractiveCorp*, 356 F. Supp. 3d 405, 412 (D. Del. 2019) ("The analysis conducted in Akzona has been recognized by subsequent courts in this district (either explicitly or implicitly) as being more akin to an alter ego analysis than to a conventional agency analysis. *See Upjohn Co. v. Syntro Corp.*, No. CIV. A. 89-107, 1990 U.S. Dist. LEXIS 11512, 1990 WL 79232, at *4 (D. Del. Mar. 9, 1990) (stating that the court in *Akzona* "concluded that the record was insufficient to support a finding that the subsidiary was the alter ago of the parent"); *Sears, Roebuck & Co. v. Sears*, 744 F. Supp. 1297, 1305-06 (D. Del. 1990) (finding that "[t]he Court in *Akzona* . . . did not distinguish the agency and alter-ego theories[;] [h]owever, it did find that absent *total* control of the subsidiary . . . the presence of the subsidiary could not be imputed to the parent for jurisdictional purposes")). However, because (1) the parties both relied on *Akzona*; (2) the parties here made no attempt to discuss what is required under Delaware law to establish an agency, instead relying on either cases discussing the agency law of other states or Delaware alter ego law, and (3) because I find the evidence satisfies the higher burden of establishing alter ego, I find *Akzona* to be instructive here.

[58] Ravindran SAC Ans., at ¶¶35-36. Ravindran was the "sole governor" of Inspilearn until he resigned in February 2024. Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 32:24-33:1.

[59] Finestone Decl. Ex. 17 (Ravindran Dep. Tr.) 246:17-247:4; Finestone Decl. Ex. 32 (First Day Hr'g Tr.) 37:8-11 ("We do note that the debtor's declaration indicates that they do not have access presently to the books and records and, accordingly, they don't know who their creditors are."). *See also* First Day Declaration at ¶7 (noting that T&L had possession of books and records for the Debtor).

Debtor and Inspilearn he did not "ever make a decision for [himself] over BYJU's Alpha" – "[i]t was always with the parent"[60]

- T&L directed Riju Ravindran to transfer funds from Debtor to Inspilearn and then to its non-US offshore trust [61]
- T&L's founder, CEO, and director, Byju Raveendran, admitted to directing the movement of money from the Debtor to "protect the money" from the Lenders, stating that he hid the money "someplace the Lenders will never find it"[62]

T&L has not introduced any evidence that might call these facts into question or otherwise contradict the conclusion that T&L exercised total control over Inspilearn. Accordingly, I find the Debtor has established that Inspilearn is T&L's alter ego as a matter of law. As such, service on Inspilearn is sufficient under Delaware law to effectuate service on T&L.

T&L next argues that the personal jurisdiction is not appropriate here because the constitutional requirements for jurisdiction have not been met. To satisfy constitutional due process, a defendant must have "purposefully established 'minimum contacts' in the forum," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985), such that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice,'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007). The minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation, *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977), such that the defendant has fair warning it may be subject to suit in that forum. *Marten*, 499 F.3d at 296. A foreign corporation is entitled to due process-based personal jurisdiction protections to the same extent

---

[60] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 20:1-6, 42:7-13, 39:19-23, 49:3-12; Finestone Decl. Ex. 17 (Mar. 12, 2024 Ravindran Dep. Tr.) 48L 15-49:11 (Ravindran viewed the transfers as "all within the BYJU's enterprise.").
[61] Finestone Decl. Ex. 35 (Mar. 5, 2024 Ravindran Decl.) ¶6; Finestone Decl. Ex. 2 (Mar. 14 Hr'g Tr.) at 51:8-52:6 ("Q. The direction [to sign documents approving the transfer from the Debtor to Inspilearn] came from Think and Learn, but you signed the documents, correct? A. Correct, sir.").
[62] Spencer Decl. ¶13-14.

as a United States citizen. *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F. 4th 226, 223 (5th Cir. 2022).

A federal court must have one of two forms of personal jurisdiction to comport with these principles: either general jurisdiction or specific jurisdiction. *See D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) (citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-15 (1984)).[63] Specific jurisdiction exists when the cause of action arises from the defendant's forum related activities. *Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016). "In contrast, general jurisdiction does not require [the d]efendant's connections be related to the particular cause of action, but that [d]efendants have continuous or systematic contacts with the forum state." *Gurmessa v. Genocide Prevention in Eth., Inc.*, Civ. Action No. 21-869-RGA, 2023 U.S. Dist. LEXIS 54563, at *4-5 (D. Del. Mar. 29, 2023). In bankruptcy cases, the relevant forum for purposes of personal jurisdiction is the United States in general, not the state in which the bankruptcy court sits. See *Zazzali v. Swenson (In re DBSI, Inc.)*, 451 B.R. 373, 376 (Bankr. D. Del. 2011) ("'Where Congress has spoken by authorizing nationwide service of process, . . . the jurisdiction of a federal court need not be confined by the defendant's contact with the state in which the federal court sits.'") (quoting *Pinker,* 292 F.3d at 369) (alteration in original); Fed. R. Bankr. P. 7004(d).

T&L raises three arguments related to personal jurisdiction: (1) that the Court lacks general personal jurisdiction over T&L because it is a foreign entity with no business operations in the United States; (2) that the Court lacks specific jurisdiction over T&L because the contacts relied upon by Debtor are not T&L's contacts, but are contacts of Inspilearn and Ravindran; and

---

[63] Because the bankruptcy rules provide the statutory basis for personal jurisdiction, "the Court need not look to the Delaware long arm-statute, or the case law interpreting it, to determine whether it has personal jurisdiction." *In re AstroPower Liquidating Tr.*, 335 B.R. 309, 317 (Bankr. D. Del. 2005).

(3) that even if minimum contacts were established, an exercise of personal jurisdiction over T&L would be unreasonable.

Debtor responds that this Court could exercise either general or specific jurisdiction over T&L. General jurisdiction exists, Debtor argues, because the Court has jurisdiction over T&L's subsidiary Inspilearn, which is T&L's alter ego. Specific jurisdiction exists, according to Debtor, because T&L's creation of U.S. entities for the purpose of engaging in business in the U.S., which business is now the subject of this litigation, amounts to conduct purposefully directed at this forum.

With respect to general jurisdiction, as noted in my ruling on T&L's motion to dismiss (Adv. D.I. 382), at least one court has observed that a finding of general jurisdiction based on an alter ego theory is perhaps at odds with the Supreme Court's admonition that general jurisdiction over a corporation only comports with the constitutional limits of due process when the forum is one in which the corporation is "fairly regarded as at home." *Daimler AG v. Bauman*, 571 U.S. 117, 136-37 (2014). However, I need not rule on that issue because Debtor has put forth sufficient evidence to establish specific jurisdiction over T&L.

Specific jurisdiction exists where the defendant has (1) purposefully directed its activities at the forum; (2) the litigation arises out of or relates to at least one of those activities; and (3) the exercise of jurisdiction otherwise comports with fair play and substantial justice. *Weiser Law Firm, P.C. v. Hartleib*, No. 23-1889, 2024 U.S. App. LEXIS 32691, at *6-7 (3d Cir. Dec. 26, 2024). Here, Debtor has submitted the following evidence regarding T&L's activities directed at the forum:

- T&L created the Debtor, a Delaware corporation with its principal place of business in the State of Illinois.[64]

---

[64] Finestone Decl. Ex. 1 (Certificate of Incorporation).

- T&L created Inspilearn, a wholly owned subsidiary which is a Delaware limited liability company.[65]

- T&L used the Debtor, a special purpose financing vehicle, as the borrower under a Credit and Guaranty Agreement for the Term Loan.[66]

- T&L served as a guarantor for the Term Loan.[67]

- T&L offered three of its Delaware subsidiaries as guarantors for the Term Loan.[68]

- T&L engaged two U.S. banks as Joint Lead Arrangers and Joint Bookrunners for its efforts of borrowing money primarily from the U.S. capital market.[69]

- T&L submitted itself to the jurisdiction of the U.S. District Court for the Southern District of New York in "any action or proceeding arising out of or relating to" the Credit Agreement.[70]

- T&L instructed the Debtor, through Ravindran as sole director, to transfer over $533 million of the loan proceeds to Camshaft Fund in exchange for the LP Interest.[71]

- T&L instructed Ravindran to transfer the LP Interest to Inspilearn after Ravindran had been removed as director and officer of the Debtor.[72] T&L also communicated directly with Camshaft Fund about the transfer and provided AML materials to Camshaft's then-fund administrator.[73]

---

[65] Ravindran SAC Ans. at ¶ 36.
[66] Finestone Decl. Ex. 3 (Credit and Guaranty Agreement); Ravindran SAC Ans. at ¶2; Finestone Decl. Ex. 2 (Mar. 14 Hr'g Tr.) at 15:16-16:10.
[67] Finestone Decl. Ex. 3 (Credit and Guaranty Agreement) at 37.
[68] *Id.*, at 37.
[69] *Id.* at 1.
[70] *Id.*, at 148.
[71] Finestone Decl. Ex. 2 (Mar. 14 Hr'g Tr.) 43:2-5 ("Q. You signed the documents for BYJU's Alpha to make the investment into Camshaft, did you not? A. Yes. From the instructions from the parent company, sir."), 49:3-12 ("Q. You were just taking direction from the parent though, correct? A. Yes, sir.").
[72] Finestone Decl. Ex. 2 (Mar. 14 Hr'g Tr.) at 51:8-52:6 ("Q. The direction [to sign documents approving the transfer from the Debtor to Inspilearn] came from Think and Learn, but you signed the documents, correct? A. Correct, sir."); Finestone Decl. Ex. 27 (Mar. 31, 2023 Subscription Agreement); Finestone Decl. 25 (Transfer Agreement).
[73] Finestone Decl. Ex. 26 (Mar. 6, 2024 Kishore Email) (email from BYJU's Chief Strategy Officer to William Morton requesting to resume the process of transferring Byju's Alpha Inc.'s account to Inspilearn; *id.* (additional emails in Exhibit 26 between Kishore, Morton, Raveendran, and employees at Apex discuss exchanging AML and KYC documents).

- The transfer agreement and subscription agreement were governed by U.S. law.[74]

T&L does not dispute that these actions demonstrate that it purposefully directed its activities at the forum or that the litigation "arises out of" or "relates to" these activities. Instead, T&L simply reiterates its objection to Debtor's reliance on actions taken by Inspilearn or Ravindran, asserting that T&L did not appoint either as its agent. But no finding regarding agency is needed. As discussed above, Debtor has submitted sufficient evidence to establish that Inspilearn was T&L's alter ego and exercised total control over both Inspilearn and Ravindran. This, in addition to the fact that the activities relied on closely relate to the claims asserted, leads me to conclude that the minimum contacts necessary to support the exercise of specific jurisdiction over T&L are present here. Nevertheless, for jurisdiction to be proper, I must also determine whether the exercise of jurisdiction over T&L would otherwise comport with fair play and substantial justice. T&L disputes that this final requirement for jurisdiction is satisfied, arguing that the Court should refrain from exercising specific jurisdiction here because doing so would be unreasonable. *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (exercise of personal jurisdiction must be "reasonable under the circumstances of the particular case") (citing *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).

Where the plaintiff makes a *prima facie* showing of minimum contacts, the burden then shifts to defendants to "'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *AstroPower Liquidating Tr. v. Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.)*, 335 B.R. 309, 321 (Bankr. D. Del. 2005) (quoting *Grand Entm't Group v. Star Media Sales*, 988 F.2d 476, 483 (3d Cir. 1993)). "The burden on a defendant who

[74] Finestone Decl. Ex. 27 (Mar. 31, 2023 Subscription Agreement); Finestone Decl. 25 (Transfer Agreement).

wishes to show an absence of fairness or lack of substantial justice is heavy." *Id.* In deciding whether a defendant has met this burden, courts consider the following factors: (1) the burden on defendants of litigating in the United States; (2) the interest of the United States in adjudicating the dispute; (3) the plaintiff's interest in obtaining the relief sought; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Id.*

T&L contends that requiring it to defend this action in Delaware would impose an exorbitant and unreasonable financial burden on it because all of its witnesses are located in India or Dubai and it is already being forced to expend millions of dollars litigating with the Debtor in state court in Delaware and New York, as well as litigating with GLAS in the action it commenced against T&L in India. I am not persuaded.

While T&L has perhaps established that litigating in the United States is inconvenient, it has not demonstrated that the exercise of jurisdiction over it would be unreasonable. "When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114, 107 S. Ct. 1026, 1033 (1987). Considering the extensive evidence suggesting T&L's creation of a U.S. subsidiary which was then used to perpetrate a fraud, I find that under the circumstances of this case, the exercise of jurisdiction over T&L is reasonable.

Having disposed of the Defendants' threshold arguments, I will now consider the substance of Debtor's Motion.

**III. Actual Fraudulent Transfer (Count I) against Camshaft**

Debtor first moves for summary judgment against Camshaft on its claim in Count I for actual fraudulent transfer with respect to the First Transfer.

A. Section 550

Camshaft first argues that Debtor cannot recover from Camshaft because it is not an initial transferee or other qualifying entity under Section 550 of the Code but is instead a "mere conduit."

Section 550 provides that a trustee or debtor in possession may recover property from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee or such initial transferee." 11 U.S.C. § 550(a). The term "initial transferee" is not defined in the Bankruptcy Code, but courts in the Third Circuit have adopted the "dominion and control" or "conduit" test as a "defense to avoidance . . . for those entities which are 'mere conduits' of the avoided transfers." *In re Parcel Consultants*, 287 B.R. 41, 46-47 (Bankr. D.N.J. 1992). To be a 'mere conduit,' a defendant must establish that it lacked dominion and control over the transfer because the payment simply passed through its hands and it had no power to redirect the funds to its own use." *In re Lenox Healthcare, Inc.*, 343 B.R. 96, 103 (Bankr. D. Del. 2006) (internal quotation and citations omitted).

In support of its "mere conduit" defense, Camshaft makes the conclusory argument that the Debtor did not give Camshaft dominion and control over the Alpha Funds. However, it cites to nothing in support of this position. Instead, it simply contends that Debtor's proposed interpretation of the documents that govern the Loan (suggesting that Camshaft did have control over the funds) is incorrect, and that additional discovery is needed. As discussed above, the time for Camshaft to take discovery has passed. The "mere conduit" defense is an affirmative

defense for which Camshaft has the burden of proof. *Dembsky v. Frommer, Lawrence & Haug, LLP (In re Lambertson Truex, LLC)*, 458 B.R. 155, 160 (Bankr. D. Del. 2011). It has not met this burden here.

B. Good Faith

Camshaft next argues that it accepted the Alpha Funds in good faith consistent with Section 548(c) of the Code, thereby precluding Debtor from establishing the transfer was fraudulent as against Camshaft. *See* 11 U.S.C. § 548(c) (providing that a party that receives a fraudulent conveyance "that takes for value and in good faith has a lien on ... any interest transferred ... to the extent that such transferee ... gave value to the debtor in exchange for such transfer or obligation").

Camshaft argues that it satisfies the requirements for this defense because the evidence shows that Camshaft (1) was unaware of the Credit Agreement (or any alleged default) at the time of the transfers; (2) had no actual knowledge of any fraudulent purpose for the transfers; and (3) performed extensive due diligence on the Debtor and the BYJU's group prior to the transfers.[75]

Debtor responds that Camshaft cannot establish its good faith because even if one accepted Camshaft's assertion that it lacked actual knowledge of a fraudulent purpose, the evidence conclusively demonstrates that Camshaft was on inquiry notice regarding the Debtor's fraudulent intent. I agree.

As Camshaft acknowledges in its objection,

> In analyzing the issue of good faith, a court must consider whether the transferee had actual knowledge of the debtor's fraudulent purpose in making the transfers or had knowledge of facts or circumstances that would have induced an ordinarily prudent person to make inquiry and if the inquiry, if made with reasonable

[75] Morton Decl., Adv. D.I. 301.

diligence, would have led to the discovery of the debtor's fraudulent purpose.

> Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a diligent investigation requirement. A transferee cannot meet its burden of a diligent inquiry by intentionally remaining willfully ignorant of facts that would cause it to be on notice. The willful blindness inquiry focuses on whether an individual took deliberate action to avoid learning of a fact after there was a high probability that the fact was true. A transferee may not put on "blinders" prior to entering into transactions with the debtor where circumstances would place the transferee on inquiry notice of the debtor's fraudulent purpose or insolvency.

*Maxus Liquidating Tr. v. YPF S.A. (In re Maxus Energy Corp.)*, 641 B.R. 467, 511 (Bankr. D. Del. 2022) (citation omitted).

Here, there were numerous red flags that should have led Camshaft to discover the Debtor's fraudulent purpose. These include that: 1) the transaction was exponentially larger than that which a fund as small and new as Camshaft would typically handle;[76] (2) Camshaft had virtually no downside exposure;[77] (3) Camshaft received excessive fees upfront;[78] and (4) the terms of the deal did not line up with its economic substance.[79] In the face of this evidence

---

[76] *See* Gallo Decl. Ex. 1 (Apr. 2023 Form ADV) at 7-8, 15, 22 (disclosing approximately $595,845,395 in AUM); Gallo Decl. Ex. 5 (Mar. 2024 Form ADV) at 7-8, 15, 21 (disclosing approximately $581,052,119 in AUM); Finestone Decl. Ex. 7 (Jun. 27, 2024 Morton Dep. Tr.) 337:4-9 (conceding that other limited partners comprised less than $10 million of Camshaft's NAV at the time the Debtor made its initial subscription in Camshaft Fund).

[77] *See* Finestone Decl. Ex. 7 (Morton Dep. Tr.) 358:13-359:20.

[78] *See* Finestone Decl. Ex. 11 (April 2022 Promissory Note) at 1; *id.* Ex. 7 (Jun. 27, 2024 Morton Dep. Tr.) 354:24-355:19; *id.* Ex. 12 (April 2022 Side Letter) at 1. Of the $18 million of prepaid interest on the April 2022 Promissory Note, Camshaft Fund would immediately receive $9 million. Finestone Decl. Ex. 15 (July 2022 Side Letter) at 2. Of the $24.1875 million of prepaid interest on the July 12, 2022 Promissory Note, Camshaft Fund would immediately receive $1.6675 million. On July 15, 2022, OCI executed yet another promissory note to Camshaft Fund in a principal amount of $16.52 million, of which $1.42485 million was prepaid interest. Finestone Decl. Ex. 16 (July 15, 2022 Promissory Note) at 1.

[79] *See* Finestone Decl., Ex. 7 (Morton Dep. Tr.) 179:24-180:17, 242:23-243:3; *id.* at 181:11-15 (admitting that OCI "crossed out what they were going to repay with money they['d] spent on liabilities related to BYJU's," which is "consistent with the investment structure"); *id.* at 181:16-182:5 (explaining that OCI offsetting amounts it spent on good and services for the "BYJU's enterprise" with the money lent was "why the investments in us happened"); Declaration of William Morton ("**Morton Decl.**"), Adv. D.I. 301, ¶ 5 and Ex. C (explaining purpose of transaction); Finestone Decl. Ex. 7 (Morton Dep. Tr.) 358:13-359:21.

suggesting an improper purpose, Camshaft's evidence – even when viewed in the light most favorable to it – does not create a genuine issue of material fact as it would not be sufficient to enable a jury to find in its favor. *Clark v. Modern Group Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) ("Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (non-moving party must come forward with "specific facts" showing a genuine issue for trial; evidence that merely raises some "metaphysical doubt as to the material facts" is insufficient to satisfy the non-moving party's burden).

Like the mere conduit defense, the burden with respect to the good faith defense rests solely on Camshaft. *Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 391 (E.D. Pa. 2013) ("'Good faith' is an affirmative defense for which the transferee bears the burden of proof."). Camshaft has failed to meet that burden here.

C. <u>Merits of Actual Fraudulent Transfer Claim against Camshaft</u>

In Count I of the Complaint, Debtor seeks to recover the funds transferred as actual fraudulent transfers pursuant to both state and federal law. To prevail, Debtor "must prove that the debtor made these transfers with actual intent to hinder, delay, or defraud its creditors." *Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litig. Inc.)*, 2023 Bankr. LEXIS 2584, at *22 (Bankr. D. Del. Oct. 19, 2023). "These requirements are in the disjunctive, such that 'any one of the three requisite states of mind . . is sufficient to establish the intent element.'" *Id.* (alterations in original).

A plaintiff may establish intent in an actual fraudulent transfer case in one of two ways: (1) through direct evidence; or (2) through circumstantial evidence. *Opioid Master Disbursement Tr. II v. Covidien Unlimited Co. (In re Mallinckrodt PLC)*, 2024 Bankr. LEXIS 104, at *123 (Bankr. D. Del. Jan. 18, 2024). To demonstrate fraudulent intent in the absence of direct evidence, claimants typically rely on "'badges of fraud,' *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Kirschner v. Large S'holders (In re Tribune Co. Fraudulent Conveyance Litig.)*, 10 F.4th 147, 160 (2d Cir. 2021).

The badges of fraud that courts often consider include: (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtor; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control, or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction. *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).[80] "The presence or absence of any single badge of fraud is not conclusive," and "[t]he proper inquiry is whether the badges of fraud are present, not whether some factors are absent." *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) (internal citations omitted). Moreover, while the existence of a single badge of fraud "may cast suspicion of the transferor's intent," *In re Fedders* 11 *N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009), "a confluence of several badges of fraud in one transaction [ ] generally provides

[80] States that have enacted the Uniform Fraudulent Transfers Act, including Delaware and Florida, have codified the badges of fraud. *See* 6 *Del. C.* § 1304(b) (codifying the "badges of fraud"); Fla. Stat. § 726.105(2) (same).

conclusive evidence of an actual intent to defraud." *Merrill Lynch Business Fin. Srvs., Inc. v. Kupperman*, 441 F. App'x 938, 941 (3d Cir. 2011) (citations omitted).

Here, Debtor asserts that the evidence demonstrates that five badges of fraud were present with respect to the First Transfer, thereby establishing the requisite intent to hinder, delay, or defraud Debtor's creditors (namely, the Lenders). Specifically, Debtor points to the following:

> • **The fact of the transfer itself was concealed.** Until the Debtor's current management uncovered, through the Debtor's bank account records in July 2023, the transfers of the Alpha Funds to Camshaft Fund, the fact those transfers had been made was hidden for nearly 16 months.[81]
>
> • **The Debtor transferred "substantially all" of its assets.** Debtor transferred $533 million—more than 80% of its assets to Camshaft Fund.[82]
>
> • **The Alpha Funds were concealed.** The Debtor's former management actively concealed the Camshaft Fund transfer, disclosing post-transfer that the Debtor still possessed over $500 million in "Cash and Bank."[83] Camshaft has concealed the location of the Alpha Funds in several ways, including by disregarding this Court's discovery orders, even in the face of contempt sanctions and a warrant for civil confinement.
>
> • **The Debtor was insolvent post-transfer.** The Debtor had over $1 billion in liabilities against approximately $131 million in total assets after the Camshaft Fund "investments," with no ability to generate revenue.[84]
>
> • **The Debtor made the transfer shortly after incurring substantial debt.** The Debtor began making the Camshaft Fund transfers within six months of entering into the Credit Agreement, on the heels of two defaults and one limited waiver arrangement.[85]

---

[81] Debtor's Opening Brief, ¶ 53.
[82] *Id.* ¶¶ 13-14; Pohl Decl. ¶ 30
[83] *See id.* ¶¶ 15-19; *Merrill Lynch*, 441 F. App'x at 941 (as here, the transferor had been "repeatedly submitting false statements to cover up fraudulent conduct").
[84] *See id.* ¶¶ 11, 13.
[85] *See id.* ¶¶ 11, 13; Pohl Decl. ¶ 9.

Camshaft responds by offering alternative explanations for the facts that the Debtor suggests evince a fraudulent intent. For example, in response to Debtor's assertion that the First Transfer was concealed, Camshaft argues that Debtor has not been able to point to anything that would give rise to an obligation by Debtor to notify the Lenders of the transfer or otherwise disclose it. With respect to the fact that Debtor transferred substantially all of its assets and that the transfer occurred shortly after the Debtor incurred substantial debt, Camshaft argues this does not suggest fraud because, consistent with the terms of the Credit Agreement, facilitating the movement of funds to BYJU's entities was the entire purpose of the Loan. But Camshaft points to no evidence in support of these theories. Argument alone is insufficient to defeat summary judgment.

With respect to the remaining badges of fraud, Camshaft disputes the Debtor's interpretation of the evidence it put forth, but it again offers no contrary evidence of its own. For example, on the issue of the concealment of the funds, Camshaft argues that Debtor's suggestion that one can infer an improper motive from the fact that the financial statements produced by T&L include an entry reflecting the Debtor as having over $500 million in "Cash and Bank" should not be given any weight because there is no evidence in the record regarding how either the Lenders or T&L interpreted that entry. Camshaft argues that the "Cash and Bank" entry could actually mean that T&L believed that Debtor had continuing access to the Alpha Funds even after they were transferred; an interpretation that would contradict Debtor's claim of insolvency as a result of the transfer. But it was Camshaft's obligation to obtain this evidence, not the Debtor's. Camshaft could have deposed T&L and gotten its explanation for this entry, but it did not. Its failure to do so does not create an issue of fact.

Camshaft does cite to the testimony of Morton, which it suggests offers "several, legitimate corporate purposes" for the First Transfer. Specifically, Camshaft argues that its evidence establishes that the First Transfer was unrelated to the defaults because it shows that (1) Debtor was discussing a deal with the financial markets well before the first default occurred; and (2) that in those negotiations there was no discussion of any defaults under the Credit Agreement. But, as discussed above in connection with Camshaft's good faith defense, even viewing this testimony in the light most favorable to Camshaft, this evidence does not create a genuine issue of material fact. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986) (emphasis in original).

Considering all the evidence before me, I find there to be no genuine issue of material fact as to the Debtor's claim that the First Transfer is an actual fraudulent transfer as to Camshaft.

For these reasons, the Motion with respect to Count I (as to Camshaft) is granted.

## IV. Actual Fraudulent Transfer (Count I) against Inspilearn and T&L

Debtor next moves for summary judgment against Inspilearn and T&L, jointly and severally, on Count I with respect to the Second Transfer (the transfer of the LP Interest to Inspilearn). Debtor seeks to hold both Inspilearn and T&L liable for this transfer on the theory that Inspilearn was under the common control of T&L and Ravindran at the time of the transfer, in March 2023.

Defendant Inspilearn has neither entered an appearance in this case nor filed an opposition to the Motion. Accordingly, summary judgment against Inspilearn is granted by default.

T&L opposes the Motion with respect to Count I only on the basis that T&L is not a proper party under Section 550 of the Code because it did not make or receive any of the transfers at issue. Debtor does not dispute that T&L was neither a transferee nor a transferor of any transfer but argues that its claim against T&L is nevertheless proper because T&L is the entity for whose benefit the Second Transfer was made. In other words, it was a "transfer beneficiary." *See* 11 U.S.C. § 550(a)(1) (allowing plaintiff to recover from an initial transferee as well as any "entity for whose benefit such transfer was made").

In response, T&L argues that it cannot be the beneficiary of the Second Transfer because it is the subsequent transferee of the First Transfer. In support of this position, T&L cites *Sklar v. Susquehanna Bank (In re Glob. Prot. USA, Inc.)*, 546 B.R. 586, 621 (Bankr. D.N.J. 2016) (holding that "a subsequent transferee cannot also be an entity for whose benefit the transfer was made.").

Debtor replies that it is not seeking to hold T&L liable as both subsequent transferee of the First Transfer and transfer beneficiary with respect to the Second Transfer. Rather, it is not seeking to recover from T&L as to the First Transfer at all; only the Second Transfer.[86] Debtor contends that since T&L makes no argument as to why it should not be considered the transfer beneficiary of the Second Transfer, its argument pursuant to Section 550 should be rejected. I agree.

[86] Debtor's Omnibus Reply to T&L's and Ravindran's Objections to Motion, Adv. D.I. 346 at 14.

A plaintiff may recover from a "transfer beneficiary" if it (i) actually received a benefit, (ii) that is quantifiable, and (iii) is accessible to the beneficiary. *See In re McCook Metals, L.L.C.*, 319 B.R. 570, 590 (N.D. Ill. 2005) (holding majority owner, manager, and chairman of limited liability company liable for transfers to the limited liability company); *see also In re Samson Resources Corp.*, 2022 WL 3135288, at *7-8 (Bankr. D. Del. Aug. 4, 2022) (adopting the *McCook Metals* test). Debtor argues that T&L satisfies the *McCook* test as the transfer beneficiary of the Second Transfer, pointing first to the fact that T&L owns 100% of the membership interests in Inspilearn.[87] Thus, although Inspilearn formally received the LP Interest, T&L received the entire economic benefit of the transfer because of the increase in its equity interest in Inspilearn. *See In re Worcester Quality Foods, Inc.*, 152 B.R. 394, 404 (Bankr. D. Mass. 1993) (finding 100% equity owners to be real beneficiaries of fraudulent transfers). Debtor next argues that the value of this benefit to T&L is quantifiable—it is the value of the transferred LP Interest, which Defendants state is $540,647,109.29.[88] Finally, Debtor argues that T&L's access to, and actual control over, the LP Interest was evinced by its (fulfilled) direction to Ravindran to transfer the LP Interest *from* Inspilearn to a "non-US trust" of Inspilearn.[89]

T&L has offered no evidence to contradict the evidence on which Debtor relies. Nor has it made any substantive argument as to why T&L should not be considered the entity for whose benefit the Second Transfer was made. Accordingly, I reject T&L's argument that it is not a proper party under Section 550(a) of the Code.

---

[87] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 22:3-7; *id.* Ex. 38 (Amended & Restated LLC Operating Agreement of Inspilearn) at 7 (listing T&L's "Percentage Interest" in Inspilearn as "100%" and T&L as the sole member in Inspilearn).

[88] Finestone Decl. Ex 28 (Apex Statement); Finestone Decl. Ex. 20 (Camshaft Interrogatory Answers) at 5; Ravindran Answer ¶ 104; Finestone Decl. Ex. 7 (Morton Deposition) at 83, 135 (LP interest recorded in Camshaft's books at $538 million).

[89] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 59:18-21 (Ravindran "just took direction from the parent company," T&L, with respect to the Third Fraudulent Transfer).

T&L makes no argument regarding the merits of Debtor's claim in Count I that the Second Transfer constitutes an actual fraudulent transfer. The Debtor has put forth both direct and circumstantial evidence of fraudulent intent with respect to the Second Transfer.

As direct evidence that the Second Transfer was made with fraudulent intent the Debtor points to (1) the statement made by Riju Ravindran's counsel that the transfer was "based on fear of lenders acting expeditiously" and that "Byju's felt the need to protect the cash;"[90] and (2) the admission of T&L founder and CEO, Byju Raveendran, that "the money is someplace the Lenders will never find it."[91] In support, Debtor cites to *Kirschner v. Citigroup Glob. Mkts., Inc. (In re Tribune Co. Fraudulent Conveyance Litig.)*, 10 F.4th 147, 161 (2d Cir. 2021) ("[F]or an intentional fraudulent transfer claim, which requires actual intent, a company's intent may be established only through the actual intent of the individuals in a position to control the disposition of [the transferor's] property.") (citations omitted) and *Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litig. Inc.)*, 2023 Bankr. LEXIS 2584, at *26 (Bankr. D. Del. Oct. 19, 2023) ("[I]n the fraudulent conveyance context, so long as a corporation's agent had the requisite fraudulent intent when it caused the corporation to carry out the transaction, that intent is imputed to the corporation.").

As circumstantial evidence of fraudulent intent, Debtor points to the presence of eight badges of fraud:

- **The Second Transfer was made to an insider.** The Debtor (a T&L subsidiary) transferred the LP Interest to Inspilearn (another T&L subsidiary).[92] *See Mallinckrodt*, 2024 WL 206682, at *27 ("[T]ransfers to an affiliate are deemed

[90] Finestone Decl. Ex. 30 (May 18 Transcript in Delaware Action) at 34-35.
[91] Spencer Declaration ¶¶ 11-15.
[92] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) at 22; Ex 7 (Morton Deposition) at 88-90, 97, 25 (Transfer Agreement).

transfers to insiders.”). Ravindran himself viewed the transfers as “all within the BYJU’s enterprise.”[93]

- **Ravindran and T&L retained control of the LP Interest.** Ravindran was the “sole governor” of Inspilearn.[94] Thus, post-transfer he (and, in turn, T&L) retained control of the LP Interest. *See Dealer Comput. Servs., Inc. v. Trebour*, 2013 WL 6047508, at *3 (D.N.J. Nov. 12, 2013) (debtor-transferor’s president stood on both sides of transfer, so “the debtor retained control of the property after the transfer”); *MarketXT*, 376 B.R. at 412 (that funds were transferred between entities controlled by the debtor’s owner and operator was a badge of fraud).

- **The fact of the Second Transfer was concealed.** After concealing the First Transfer, Defendants then proceeded to conceal the details of the Second Transfer for almost a year.[95]

- **The Debtor made the Second Transfer directly after the Debtor’s creditors exercised remedies.[96]**

- **The Debtor transferred “substantially all” of its assets.** On March 31, 2023, the Debtor ended the day with approximately $493,905 in cash in its accounts, with no other assets or sources of revenue.[97]

- **The transferred assets were concealed.** Defendants concealed the whereabouts of the Alpha Funds on multiple occasions. They (i) failed to furnish financial statements that would have revealed where the Alpha Funds were transferred, (ii) refused GLAS’s and the Lenders’ basic information requests, (iii) made additional transfers when Plaintiffs came close to finding the Alpha Funds, (iv) orchestrated the sham resignation of Ravindran to facilitate the Fourth Transfer, and (v) repeatedly violated the Court’s discovery orders, all to keep the Alpha Funds away from the Debtor and its creditors.[98]

- **The Debtor made the transfer shortly after incurring substantial debt.** The Debtor’s former management began preparations to move the LP Interest as soon as they agreed that four “Specified Defaults” had occurred (*i.e.*, October 2022), *then* conceded the maturation of four Events of Default, *and finally* moved the LP

---

[93] Finestone Decl. Ex. 17 (Mar. 12, 2024 Ravindran Dep. Tr.) 48:15-49:11.
[94] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr’g Tr.) 32:24-33:1.
[95] Pohl Decl. ¶¶ 11,38, 39, 40; Ravindran SAC Answer ¶ 130-33; Finestone Decl. Ex. 18 (T&L Quarterly Financial Statement) and Ex. 31.
[96] Pohl Decl.; Finestone Decl. Ex 25 (Transfer Agreement), Ex. 7 (Morton Deposition); Ex. 26 (Mar. 6 Email).
[97] Pohl Decl. ¶ 30; Finestone Decl. Ex. 2 (Mar. 14, 2024 Hearing Tr.) at 54.
[98] See generally Pohl Decl., Finestone Decl.

> Interest to Inspilearn on March 31, 2023, after the Lenders exercised remedies, including directing GLAS to take control of the Debtor and its assets.[99]

Lastly, Debtor argues that in addition to the overwhelming direct and circumstantial evidence of "badges of fraud," the Court may infer actual fraudulent intent where the "natural consequence" of a debtor's action is to "hinder, delay, or defraud" creditors. *See In re Tronox Inc.,* 503 B.R. 239, 279-80 (Bankr. S.D.N.Y. 2013) (observing that "actual intent" is satisfied when the consequences of an act are substantially certain to result from it); *SB Liquidation Tr. v. Preferred Bank (In re Syntax-Brillian Corp.)*, 2016 Bankr. LEXIS 988, at *19 (Bankr. D. Del. Feb. 8, 2016) (transferors are "presumed to intend the natural consequences of their acts"). Here, Debtor argues, transferring the LP Interest to Inspilearn— which was not a guarantor or pledgor under the Credit Agreement—had the natural consequence of hindering, delaying, or defrauding the Lenders, who no longer had recourse to that value, thus undermining their economic and contractual rights.

Having considered the evidence presented by Debtor, and the lack of any opposing evidence from T&L, I am satisfied that Debtor has established that the Second Transfer was made with fraudulent intent. T&L has not pointed to any evidence that would support the conclusion that the Second Transfer was made for a proper purpose and the totality of the circumstances suggest that it was not. Accordingly, the Motion with respect to Count I and the Second Transfer, as against T&L, is granted.[100]

---

[99] *See* Debtor's Opening Brief ¶¶ 34-39.

[100] Debtor also moves for summary judgment on its constructive fraud claims against Inspilearn and T&L. Since I find in Debtor's favor on the actual fraudulent transfer claim, there is no need to rule on the constructive fraud claim.

## V. Fiduciary Duty (Count IV)

Debtor next moves for summary judgment on Count IV of the Complaint, which asserts a claim for breach of fiduciary duty against Ravindran arising out of his abdication of all decision-making to the Debtor's parent, T&L. Debtor argues that this dereliction of duty by Ravindran constitutes both a breach of the duty of care and the duty of good faith. To succeed on a claim for breach of fiduciary duty, a plaintiff must demonstrate that: (1) a fiduciary duty exists; and (2) that the fiduciary breached that duty. *In re Tropicana Ent., LLC*, 520 B.R. 455, 470 (Bankr. D. Del. 2014) (quoting *York Linings v. Roach*, No. 16622, 1999 Del. Ch. LEXIS 160, 1999 WL 608850, *2 (Del. Ch. July 28, 1999)).

Fiduciary duties include the duties of care, loyalty, and good faith. *In re USA Detergents, Inc.*, 418 B.R. 533, 543 (Bankr. D. Del. 2009) (citing *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998)). "Under Delaware law, the duty of care is the duty to act on an informed basis." *Buchwald Cap. Advisors LLC v. Schoen (In re OPP Liquidating Co.)*, Nos. 19-10729 (MFW), 21-50431 (MFW), 2022 Bankr. LEXIS 651, at *18-19 (Bankr. D. Del. Mar. 14, 2022). "The duty of loyalty mandates that a corporate fiduciary act with 'undivided and unselfish loyalty to the corporation' and that 'there shall be no conflict between duty and self-interest.'" *Official Comm. of Unsecured Creditors of Midway Games Inc. v. Nat'l Amusements Inc. (In re Midway Games Inc.)*, 428 B.R. 303, 318 (Bankr. D. Del. 2010) (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983)). "As a subsidiary element of the duty of loyalty, a successful claim for the breach of the duty of good faith requires a plaintiff to demonstrate one of three actions: '1) where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation; 2) where the fiduciary acts with the intent to violate applicable positive law; or 3) where the fiduciary intentionally fails to act in the face of a known duty to act,

demonstrating a conscious disregard for his duties.'" *Id.* (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006)).

In support of its claim that Ravindran breached his fiduciary duties with respect to the First Transfer, Debtor points to Ravindran's testimony that he conducted no diligence of either Camshaft or Mr. Morton and asked no questions about the Debtor's transfer of more than $500 million to Camshaft.[101] With respect to the Second Transfer, Debtor points to Ravindran's facilitation of the Debtor's transfer of the LP Interest – then valued by the Defendants at $540 million -- to Inspilearn, solely because T&L directed it.[102] Although he sat on T&L's board, Ravindran "didn't know the reason why [he was] signing documents to move assets from BYJU's Alpha to Inspilearn[,]"[103] and did not ask why the LP Interest was being transferred or about the impact it would have on the Debtor's finances or solvency.[104] Instead, once he got an "instruction" from T&L, Ravindran just "signed and mov[ed] on[.]"[105]

Ravindran does not oppose the merits of Debtor's claim but instead argues that the claim is technically improper for two reasons, both of which turn on the Debtor's ability to establish its insolvency at the time of the Transfers.[106]

---

[101] Finestone Decl. Ex 2 (March 14, 2024 Hearing Transcript) at 20, 42, 49 (testifying that T&L made the decision to transfer funds to Camshaft and he simply took instruction and signed documents without question), Ex. 17 (Ravindran Deposition Transcript) at 144, 280-84. Finestone Decl. Ex. 17 (Mar. 12, 2024 Ravindran Dep. Tr.) 112:14-19. He had "no idea" how Camshaft was selected, and "no idea" why T&L "made that direction to [him] to invest the money in Camshaft[.]" Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 20:18-22, 43:6-10, 43:19-44:4.

[102] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 25:1-3, 51:8-52:6.

[103] *Id.* 52:7-16, 53:16-19.

[104] *Id.* 25:4-14. He did not "wonder why we were doing this," and "[didn't] think too much about this one." Finestone Decl. Ex. 17 (Mar. 12, 2024 Ravindran Dep. Tr.) 161:6-14.

[105] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 25:4-14.

[106] Ravindran also opposes the Motion as premature because he believes discovery is needed and because several orders were on appeal at the time briefing on this Motion was filed. As I have disposed of both issues above, I need not address them here.

First, Ravindran argues that unless Debtor establishes that it was insolvent – a fact Ravindran asserts is in dispute – he only owed fiduciary duties to the Debtor's parent company. In support, Ravindran cites to *Scher v. Essar Glob. Fund Ltd. (In re Essar Steel Minn. LLC & Esml Holdings, Inc.)*, 602 B.R. 600, 607- 08 (Bankr. D. Del. 2019) ("In general, directors of a wholly-owned subsidiary owe fiduciary duties only to the parent corporation. As the company enters the zone of insolvency, however, those directors also owe fiduciary duties to creditors of the subsidiary.") (internal citation omitted). Ravindran argues that there are genuine issues of material fact on the question of Debtor's insolvency at the time of the First Transfer, pointing to the Debtor's acknowledgement of the fact that the LP Interest obtained in exchange for the Alpha Funds was valued by Camshaft's advisors at $540 million as of March 31, 2023.[107] I disagree.

The evidence on which Ravindran relies values the LP Interest as of March 2023. This does nothing to establish the value of the LP Interest at the time of the First Transfer, which was in mid-2022. But even assuming the LP Interest did have a value of $540 million at the time of the First Transfer, the Debtor's balance sheet would still have reflected only about $671 million in assets against approximately $1.2 billion in debt.[108] At the time of the Second Transfer, the Debtor's balance sheet would have shown only $540.5 million in assets (assuming the LP Interest was valued at $540 million) against the same $1.2 billion in debt.[109] Thus, at either point in time, this meets the definition for insolvency under the Code. *See* 11 U.S.C. § 101(32)(A) (defining "insolvent" as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation"). *See also Mellon Bank, N.A. v.*

---

[107] Ravindran Objection at 18; Debtor's Opening Brief at ¶¶ 14 and 46.
[108] Pohl Decl. at ¶ 30 (stating the Debtor had approximately $131 million in its bank accounts on July 13, 2022).
[109] *Id.* (stating the Debtor had $493,905.47 in its bank accounts as of March 31, 2023).

*Official Comm. Of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*), 92 F.3d 139, 154-55 (3d Cir. 1996) ("This is known as the balance sheet test: assets and liabilities are tallied *at fair valuation* to determine whether the corporation's debts exceed its assets.) (citations omitted). Ravindran has not demonstrated a genuine issue of material fact with respect to the Debtor's insolvency.

Ravindran's second argument fares no better. Ravindran argues that Debtor cannot hold him liable for breach of fiduciary duty because the Debtor's certificate of incorporation contains an exculpatory provision that provides "[t]he personal liability of the directors to this corporation or its stockholders for monetary damages for any breach of a fiduciary duty as a director shall be eliminated to the fullest extent permitted under applicable law."[110] But Ravindran's only argument on this point is that "Ravindran did not breach his duty of good faith when following the direction of [T&L] unless the Debtor was insolvent – which is a disputed issue of fact[.][111] As I have just explained, the Debtor's insolvency is not a disputed issue of fact.

Ravindran does not argue that the conduct at issue is conduct covered by the exculpation clause and I find that it is not. *See McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) (holding that "the intentional dereliction of duty or the conscious disregard for one's responsibilities" is a "non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith"). Having considered the evidence in the record regarding Ravindran's total abdication of his duties to the Debtor,[112] as well as the absence of any evidence to the contrary, I find that Debtor has established as a matter of law that Ravindran breached his duty of good

[110] Finestone Decl., Ex. 1 (Certificate of Incorporation) at Art. VI.A.
[111] Ravindran Objection at 20.
[112] *See, e.g.,* Finestone Decl. Ex. 17 (Ravindran Deposition) at 112, 144, 280-284; *id.* Ex. 2 (Mar. 14, 2024 Hr'g Tr.) at 20, 24-25, 32-33, 42-43, 49, 51-52.

faith. *Official Comm. of Unsecured Creditors of Midway Games Inc. v. Nat'l Amusements Inc. (In re Midway Games Inc.)*, 428 B.R. 303, 318 (Bankr. D. Del. 2010) ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge their fiduciary obligations in good faith.").

The Motion is therefore granted with respect to Count IV of the Complaint.

## VI. Declaratory Judgment (Count VIII)

Debtor next moves for summary judgment on Count VIII of the Complaint, in which it seeks declaratory judgment that the Second Transfer—and all subsequent transfers or dispositions of the Alpha Funds—were *ultra vires*, void *ab initio*, and/or otherwise without force and effect, and that the Alpha Funds are property of the estate under Section 541 of the Code.[113]

Section 541 provides that, upon a bankruptcy filing, an estate is created comprising, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Under Section 541(a)(6), the Debtor's estate includes the proceeds or profits of or from the property of the estate. 11 U.S.C. § 541(a)(6); *see also In re Michener*, 342 B.R. 428, 432 (Bankr. D. Del. 2006) (noting that the broad scope of "proceeds" in Section 546(a)(6), which "encompass[es] any conversion in the form of property of the estate, and anything of value generated by property of the estate") (internal citation and quotation marks omitted).

[113] The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration[.]" Whether a declaratory judgment action is ripe is guided by three main considerations: (i) adversity of the parties' interest, (ii) conclusiveness of the judgement; and (iii) the practical utility of the judgment. *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643 646 (3d Cir. 1990); *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995); *Wayne Land and Mineral Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 522 (3d Cir. 2018).

The basis for Debtor's claim is that the transfer of the LP Interest is void because it was done by unauthorized individuals for no consideration. *See Solomon v. Armstrong*, 747 A.2d 1098, 1114 & n.45 (Del. Ch. 1999); *Linkerhof v. Delaware Soc. For Prevention of Cruelty to Animals*, 2012 WL 769603, at *4 (D. Del. Mar. 9, 2012) (acts taken by board fraudulently and/or in bad faith are void); *Adams v. Calvarese Farms Maintenance Corp., Inc.*, 2010 WL 3944961, at *8 (Del. Ch. Sept. 17, 2010) (noting that void acts include those that are *ultra vires*, fraudulent, or corporate waste). In support of its claim, Debtor points to the fact that the individuals who directed the Second Transfer – Byju Raveendran and Ravindran – had no authority to act on behalf of the Debtor. Raveendran, the CEO and founder of T&L, was not employed by the Debtor in any capacity, and Ravindran, the Debtor's former director and officer, had been removed from his positions with the Debtor several weeks before the transfer was made.[114] Further, Debtor points to evidence that establishes that the Debtor received nothing in exchange for the transfer of the LP Interest.[115]

None of the moving Defendants cite to any evidence that would contradict these facts. T&L and Ravindran merely argue that the Court should defer issuing a ruling until all appeals in this and related actions have been resolved, an argument that I dispose of above. Judgment against T&L and Ravindran is therefore appropriate.

Camshaft reiterates the argument made in its motion to dismiss that it is not a proper party to this claim because it has not asserted any interest in the LP Interest that was the subject

[114] On March 3, 2023, GLAS, on behalf of the Lenders, exercised remedies under the Term Loans and took control of the Debtor. Pohl Declaration ¶¶ 18-19. On that same date, GLAS removed Ravindran as director and appointed Pohl in his place. *Id.* ¶¶ 2-4, 20. Pohl then executed a written consent removing Ravindran as officer and appointing himself CEO. *Id.* On March 31, 2023, T&L directed Ravindran to transfer the LP Interest to Inspilearn. Finestone Decl. Ex 25 (March 31, 2023 Transfer Agreement) and Ex. 7 (Morton Deposition Tr.) and Ex. 2 (Mar. 14, 2024 Hearing Tr.) 24-25, 31, 51-52 (Ravindran testifying).

[115] Finestone Decl. Ex. 7 (Morton Deposition Tr.) at 78-79, 85, 126-27.

of the Second Transfer and therefore there is no "controversy" between Camshaft and the Debtor that warrants a declaratory judgment. Camshaft cites to no facts in the record and no caselaw to support its position. The Debtor responds that Camshaft plainly has an interest in the disposition of limited partnership interests in the Camshaft Fund, and that Camshaft was a "necessary and indispensable party" that affirmatively consented to the transfer, citing the Transfer Agreement and Subscription Agreement to support this contention.

I agree with the Debtor. That Camshaft is not asserting an interest at this time does not change the fact that Camshaft does have a legal interest in both the LP Interest itself and the transaction pursuant to which the LP Interest was transferred. The Transfer Agreement was counter-signed by Camshaft Management, affirmatively consenting to the Debtor's transfer of the LP Interest to Inspilearn. The subscription agreement by its plain terms requires the prior written consent of Camshaft Advisors for any transfer or assignment of the limited partnership interests. Camshaft Management allowed Inspilearn to become a substitute limited partner in the Camshaft Fund with capital contribution equal to "100% of Byju's Alpha Inc.'s LP Interests." This interest is sufficient to make Camshaft a proper party against whom declaratory judgment may be entered.

For these reasons, Debtor's Motion with respect to Count VIII is granted.

## VII. <u>Conversion (Count X)</u>

Lastly, the Debtor moves for summary judgment on Count X of the Complaint, in which it asserts a claim for conversion against Ravindran and T&L arising out of the Debtor's transfer of the LP Interest without corporate authority.

Conversion is generally defined as "any distinct act of dominion wrongfully asserted over the property of another, in denial of his right, or inconsistent with it." *Malca v. Rappi, Inc.*, 2021

WL 2044268, at *5 (Del. Ch. May 20, 2021) (quoting *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)). The elements of conversion under Delaware law are: (i) the plaintiff had a property interest in the property; (ii) the plaintiff had a right to possess the property; and (iii) the defendants wrongfully possessed or disposed of the property as if it were their own. *Id.* at *5.

In support of its claim, Debtor points to the same evidence on which it relied for its declaratory judgment claim in Count VIII, showing that Ravindran, at T&L's direction, transferred the LP Interest to Inspilearn even though he had been removed from his positions as Debtor's director and officer several weeks earlier and therefore lacked legal authority to do so.[116] *See Gulf Aviation Services Group WLL v. Wilmington Trust Company*, 2023 WL 9118772, at *11 (Del. Super. 2023) (when a defendant held title to property solely in its capacity as owner trustee, its legal authority to sell that property terminated when it resigned as trustee).

Defendants do not dispute these facts, but instead simply repeat their argument that the Motion is premature. As discussed above, I reject those arguments.

The evidence makes clear that as of March 3, 2023, Pohl was the only party with corporate authority to direct the use, possession, transfer, or disposition of the property of the Debtor. Because T&L and Ravindran lacked corporate authority to exercise control over the Debtor's property on March 31 the transfer of the LP Interest was a wrongful disposition of the Debtor's property. This constitutes conversion under applicable law. *See Gulf Aviation Servs. Grp. WLL v. Wilmington Tr. Co.*, No. N20C-05-128 AML CCLD, 2023 Del. Super. LEXIS 966, at *34 (Super. Ct. Dec. 29, 2023) ("Property is converted when the defendant wrongfully exerts dominion or control over it in a manner that denies or is inconsistent with the plaintiff's right.").

Accordingly, the Motion with respect to Count X is granted.

---

[116] *See supra*, Section VI.

## CONCLUSION

For the reasons set forth above, the Motion is GRANTED and summary judgment will therefore be entered on Count I (with respect to the First Transfer) against Camshaft, Count I (with respect to the Second Transfer) against Inspilearn and T&L, Count IV against Ravindran, Count VIII against all defendants, and Count X against Ravindran and T&L.

The parties should submit a joint proposed order under certification of counsel. If unable to agree on the amount of the judgment, the parties should meet and confer regarding a briefing schedule and dates for an evidentiary hearing on the issue of damages.

Dated: February 27, 2025

JOHN T. DORSEY, U.S.B.J.

# EXHIBIT 7

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| BYJU'S ALPHA, INC.,[1] | ) | Chapter 11 |
| Debtor. | ) | Case No. 24-10140 (BLS) |
| BYJU'S ALPHA, INC., Plaintiff, | ) | Adv. Pro. No. 24-50013 (BLS) |
| GLAS TRUST COMPANY, LLC, Intervenor-Plaintiff, | ) | |
| v. | ) | |
| CAMSHAFT CAPITAL FUND, LP, CAMSHAFT CAPITAL ADVISORS, LLC, CAMSHAFT CAPITAL MANAGEMENT, LLC, RIJU RAVINDRAN, INSPILEARN LLC, and THINK AND LEARN PRIVATE LIMITED, | ) | |
| Defendants. | ) | |

**JUDGMENT ORDER**

Upon consideration of the motion for partial summary judgment (the "Motion")[2] filed by Debtor-Plaintiff BYJU's Alpha, Inc. (the "Debtor") and Intervenor-Plaintiff GLAS Trust Company LLC ("GLAS," and with the Debtor, "Plaintiffs") seeking partial summary judgment for Plaintiffs against Camshaft Capital Fund, LP ("Camshaft Fund"), Camshaft Capital Advisors, LLC, Camshaft Capital Management, LLC, Riju Ravindran, Inspilearn LLC ("Inspilearn"), and

---

1 The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 case is: 1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

2 All capitalized terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion or the *Memorandum of Law in Support of Debtor's and GLAS Trust Company LLC's Motion for Partial Summary Judgment on Counts I, II, IV, VIII, and X of the Second Amended Complaint* [Adv. D.I. 276].

Think and Learn Private Ltd. ("T&L") (collectively, the "Defendants"), and upon consideration of the Pohl Declaration, the Spencer Declaration, the Gallo Declaration, and the Finestone Declaration, including the documents attached to the declarations, the responses filed, and the oral argument heard on October 9, 2024; and for the reasons set forth in this Court's *Memorandum Opinion and Order*, dated February 27, 2025 [Adv. D.I. 382] and *Memorandum Opinion*, dated February 27, 2025 [Adv. D.I. 383] (the "MSJ Opinion"); and this Court having subject matter jurisdiction to consider and to determine the Motion in accordance with 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2023; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409 and this Court having found that due and sufficient notice was given under the circumstances; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1. Plaintiffs' Motion, pursuant to Federal Rule of Civil Procedure 56 and Bankruptcy Rule 7056, is GRANTED for the reasons set forth in the MSJ Opinion, and partial summary judgment is hereby entered in favor of Plaintiffs against Defendants as set forth herein.

2. Judgment is hereby entered in favor of Plaintiffs against Camshaft Fund as to Count I of the Second Amended Complaint. The Debtor's transfer of the Alpha Funds to Camshaft Fund was an actual fraudulent transfer and is avoided under 11 U.S.C. §§ 544(b), 548(a)(1)(A). Accordingly, pursuant to 11 U.S.C. § 550(a), Camshaft Fund is liable to Plaintiffs in the amount of $533,000,000.00, plus pre-judgment interest at a rate of 5.04% (compounded quarterly) beginning as of March 3, 2023 through the date hereof, post-judgment interest beginning as of the date hereof in accordance with 28 U.S.C. § 1961(a), and costs pursuant to Bankruptcy Rule 7054(b) and 28 U.S.C. § 1920.

3. Judgment is hereby entered in favor of Plaintiffs against Inspilearn and T&L as to Count I of the Second Amended Complaint. The Debtor's transfer of the Camshaft LP Interest to Inspilearn as initial transferee, for the benefit of T&L, was an actual fraudulent transfer and is avoided under 11 U.S.C. §§ 544(b), 548(a)(1)(A). Accordingly, pursuant to 11 U.S.C. § 550(a), Inspilearn and T&L are jointly and severally liable to Plaintiffs in the amount of $540,647,109.20, plus pre-judgment interest at a rate of 4.58% (compounded quarterly) beginning as of March 31, 2023 through the date hereof, post-judgment interest beginning as of the date hereof in accordance with 28 U.S.C. § 1961(a), and costs pursuant to Bankruptcy Rule 7054(b) and 28 U.S.C. § 1920.

4. Judgment is hereby entered in favor of Plaintiffs against Ravindran as to Count IV of the Second Amended Complaint. Ravindran breached his fiduciary duties to the Debtor by authorizing the First and Second Fraudulent Transfers. Accordingly, Ravindran is liable to Plaintiffs in the amount of $540,647,109.20, plus pre-judgment interest at a rate of 10.00% (compounded quarterly) beginning as of March 31, 2023 through the date hereof, post-judgment interest beginning as of the date hereof in accordance with 28 U.S.C. § 1961(a), and costs pursuant to Bankruptcy Rule 7054(b) and 28 U.S.C. § 1920.

5. Judgment is hereby entered in favor of Plaintiffs as to Count VIII of the Second Amended Complaint. Pursuant to 11 U.S.C. §§ 2201 and 2022, the Court hereby declares as follows: (a) the Second Fraudulent Transfer (and any subsequent transfers of the Alpha Funds) are null and void, without any force and effect; and (b) the Alpha Funds remain property of the Debtor's estate under 11 U.S.C. § 541.

6. Judgment is hereby entered in favor of Plaintiffs against Ravindran and T&L as to Count X of the Second Amended Complaint. Ravindran and T&L are each liable for the conversion of the Camshaft LP Interest. Accordingly, Ravindran is liable to Plaintiffs in the

amount of $540,647,109.20, plus pre-judgment interest at a rate of 10.00% (compounded quarterly) beginning as of March 31, 2023 through the date hereof, post-judgment interest beginning as of the date hereof in accordance with 28 U.S.C. § 1961(a), and costs pursuant to Bankruptcy Rule 7054(b) and 28 U.S.C. § 1920.

7. The terms and conditions of this Judgment Order shall be immediately effective and enforceable upon its entry, notwithstanding any provision in the Bankruptcy Rules or the Local Rules to the contrary, and the Debtor may, in its discretion and without further delay, take any action and perform any act authorized under this Judgment Order.

8. This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Judgment Order.

Dated: March 14, 2025

**Judge Brendan Linehan Shannon**

# EXHIBIT 8

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BYJU'S ALPHA, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 24-10140 (BLS) |
| BYJU'S ALPHA, INC.,<br>Plaintiff,<br><br>v.<br><br>BYJU RAVEENDRAN, DIVYA GOKULNATH, and ANITA KISHORE,<br><br>Defendants. | Adv. Pro. Case No. ________ |

## COMPLAINT

Plaintiff-Debtor BYJU's Alpha, Inc. (the "Debtor") alleges as follows:

## PRELIMINARY STATEMENT[2]

1. This is an action to hold three powerful BYJU's executives accountable for having purposefully caused the Debtor to fraudulently transfer an asset valued at ***over half a billion dollars*** for ***no consideration***. The Debtor's former CEO, Byju Raveendran,[3] took these actions—with the support and assistance of, and in coordination with, his co-founder and wife Divya Gokulnath and consigliere Anita Kishore, among others—in complete disregard of his duties as

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is: 1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

[2] Capitalized terms not defined in the Preliminary Statement have the meanings given to them below.

[3] To distinguish between the Raveendran brothers, Byju Raveendran is referred to herein as "Byju" and Riju Ravindran is referred to herein as "Riju."

an officer to, and a fiduciary of, a Delaware corporation and while knowing that what he was doing was nothing short of corporate theft.

2. Specifically, as has been well documented, Byju and his cohorts, including his nuclear family and former student (Kishore), orchestrated an ongoing illegal scheme to take and then conceal from the Debtor $533 million ***of the Debtor's own funds*** (the "Alpha Funds") and the proceeds thereof. *See generally BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del.).[4] *First*, in mid-2022, the Debtor, acting at the direction of at least Byju, Riju, and Gokulnath, transferred the Alpha Funds to Camshaft Fund, a sham hedge fund, ostensibly in exchange for receiving a limited partnership interest in such fund (the "Camshaft LP Interest"). *Second*, on March 31, 2023, Defendants, among others, caused the Debtor's purported transfer of that Camshaft LP Interest, which Camshaft Fund (through its then-administrator, Apex Fund Services) contemporaneously valued at $540,647,109.29, to a non-guarantor BYJU's affiliate, Inspilearn LLC, for no consideration whatsoever. To be certain, Defendants (and also Riju) did not secure any replacement or substitute asset whatsoever—not even an intercompany receivable or promissory note, as purportedly had been the case with certain prior advances of loan proceeds, indeed, not even $1 of value was conveyed. *Third*, on the February 1, 2024 Petition Date, Inspilearn, acting at the direction of the ultimate corporate parent of the BYJU's enterprise—Think & Learn Pvt. Ltd. ("T&L"), in which Byju, Gokulnath, and Kishore played key roles in managing—transferred the entire Camshaft LP Interest to an offshore trust, which then purportedly fully redeemed it.[5] *Lastly*, according to T&L, after the Petition Date, Inspilearn moved the

---

[4] On February 27, 2025, this Court issued its *Memorandum Opinion* entering summary judgment in favor of the Debtor and GLAS on various claims associated with the unlawful scheme to transfer the Alpha Funds, including claims of actual fraudulent transfer against Camshaft, Inspilearn, and T&L, breach of fiduciary duty against Riju, and conversion against Riju and T&L. Memorandum Opinion, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Feb. 27, 2025) [Adv. D.I. 383] (the "MSJ Mem. Op.").

[5] As this Court found, "Inspilearn is T&L's alter ego as a matter of law." *Id.* at 16.

resulting funds to an unidentified, non-U.S. T&L subsidiary. It remains unknown at this time whether additional transfers since have been made.

3. Though critical details about the Alpha Funds and their current whereabouts remain concealed, the Debtor has learned that Byju was acting as the Debtor's "***self-appointed CEO***" when he surreptitiously directed the second fraudulent transfer of the Debtor's Camshaft LP Interest on March 31, 2023.[6] The timing of the transfer on March 31 is significant; it was Defendants' way to retaliate against the Lenders' exercise of remedies. Twenty-eight days earlier, on March 3, the Debtor's Lenders (acting through their agent) had, based on the occurrence of multiple conceded Events of Default and the plain terms of the Debtor's Credit Agreement, accelerated the term loans and assumed control of the Debtor, becoming its sole shareholder. Immediately thereafter, the Lenders' agent removed the Debtor's existing directors and officers, *i.e.*, the Raveendran brothers, and replaced them with Timothy R. Pohl, an experienced restructuring professional, as the Debtor's sole director.

4. Byju's blatant disregard for his non-waivable fiduciary duties to the Debtor, with Gokulnath's and Kishore's assistance, is evident from the timeline of events surrounding the second fraudulent transfer. As of October 2022, there were at least four defaults outstanding under the Debtor's Credit Agreement. An *ad hoc* group of Lenders had formed, and, in October 2022, the Lenders, T&L, and the Debtor, among others, executed the first of a series of amendments to the Credit Agreement, three of which memorialized the occurrence and/or the consequences of the four prior defaults. Byju signed the first of those three notable amendments on behalf of, among others, T&L and the Debtor; Riju (the Debtor's then-sole director) signed the other two. Also in

---

[6] *Id.* at 6 (emphasis added).

October 2022, the Debtor "started the process of transferring its limited partnership interest in Camshaft Fund to Inspilearn," as Riju himself admitted in the instant bankruptcy proceeding.[7]

5. Three months later, on January 6, 2023, the Debtor executed the third of the referenced amendments. In exchange for a forbearance through February 10, 2023, T&L and the Debtor, among others, reaffirmed that the failure to cure the four defaults "entitles" the Lenders to exercise remedies. Underscoring that point, they further agreed that the outstanding Specified Defaults could no longer be cured. This point was so important that it was memorialized four times in an 18-page amendment.

6. But there was no consensual resolution. As noted, on Friday, March 3, 2023, the Lenders directed their agent to exercise remedies. In turn, their agent, GLAS, sent the BYJU's organization numerous notices of the Debtor's default and the agent's exercise of remedies. Kishore in particular received the notice by three mediums—email (anita@byjus.com), courier, and certified mail.

**GLAS Trust Company LLC**
**3 Second Street, Suite 206**
**Jersey City, NJ 07311**

March 3, 2023

<u>Via E-Mail (riju@byjus.com; anita@byjus.com; roshan.thomas@byjus.com), Hand Delivery & Certified Mail, Return Receipt Requested to the Borrower and Loan Parties:</u>

| | | |
|---|---|---|
| BYJU'S, 4/1,<br>6th Floor, Tower D,<br>IBC Knowledge Park,<br>Bannerghatta Main Road,<br>Bangalore, Karnataka, India 560029<br>Attn: Riju Ravindran, with copies to: Anita Kishore and Roshan Thomas | BYJU's Alpha, Inc.<br>3160 De La Cruz Blvd, Suite 204<br>Santa Clara, CA, USA, 95054<br>Attn: Riju Ravindran, with copies to: Anita Kishore and Roshan Thomas | Harvard Business Services, Inc.<br>16192 Coastal Highway<br>Lewes, Delaware, USA 19958 |

*GLAS's Notice of Default and Acceleration Letter*

[7] Ravindran Ans. to First Am. Compl. ¶ 6, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Apr. 8, 2024) [Adv. D.I. 124 (sealed); Adv. D.I. 129 (redacted)].

From: Irena Goldstein [Irena.Goldstein@glas.agency]
Sent: 3/3/2023 10:56:32 AM
To: anita@byjus.com
CC: Katie Fischer [Katie.Fischer@glas.agency]
Subject: BYJU Notice of Default and Acceleration [GLAS-ACTIVE.FID26862]
Attachments: Notice of Default and Acceleration (Executed).pdf

To whom it may concern,

Please see the attached Notice of Default and Acceleration.

GLAS Trust Company LLC, as Administrative Agent and Collateral Agent

*GLAS's email to Anita Kishore enclosing Notice of Default and Acceleration Letter*

7. The very next business day—before Pohl, the Debtor's newly-appointed corporate governor, was able to secure actual control of the Debtor's assets—Byju, Kishore, and their confederates commenced the final steps of transferring the Camshaft LP Interest. To this end, Kishore, having just received GLAS's notice of default—and with Byju copied but without Pohl's knowledge—expressly directed Camshaft's founder to "resume the process" of transferring the Camshaft LP Interest to Inspilearn, where Riju was the sole manager. With the subject line of "Account transfer," Kishore's motivation in sending this email was clear: hide the money.

**From:** Anita Kishore <anita@byjus.com>
**Sent:** Monday, March 6, 2023 7:17:32 PM
**To:** William Morton <william@camshaftcapital.com>
**Cc:** Byju Sir <byju@byjus.com>
**Subject:** Account transfer

Hi William,

Can we resume the process of transferring Byju's Alpha Inc.'s account to Inspilearn LLC.

Warm regards,
Anita

*Anita Kishore's Transfer Instruction to Camshaft Fund*

8. Another 25 days later and once again unbeknownst to Pohl, the transfer of the Camshaft LP Interest to Inspilearn was purportedly completed via a Transfer Agreement (and a separate Subscription Agreement executed contemporaneously). The Transfer Agreement, dated March 31, 2023, provided that, "upon execution and delivery of [the Transfer Agreement] by the parties thereto, Transferor shall assign, transfer, and convey the Transferred Interest to

Case 25-50212-BLS Doc 8-2 Filed 04/28/25 Page 6 of 51

Transferee[.]" This Transfer Agreement was signed by Byju, ***holding himself out as the Debtor's CEO***; and Riju, the Debtor's then-former sole director and the then-sole manager of the transferee Inspilearn, on Inspilearn's behalf (Camshaft also executed the Agreement). Byju, on behalf of the transferor Debtor, falsely and fraudulently represented and warranted that he, on the Debtor's behalf, had "all requisite power and authority to execute, deliver and perform this Agreement."

9. It was not until 2024, upon receiving discovery in this bankruptcy proceeding, that the Debtor (under Pohl's control) learned about and obtained a copy of this Transfer Agreement.

10. Following Byju's execution of the Transfer Agreement, the Debtor's accounts were largely depleted. The Debtor had under $500,000 in cash in its bank accounts compared to at least approximately $1.2 billion in liabilities, which had been accelerated, and now no longer held the Camshaft LP Interest. Defendants, at a time when they no longer had legal control of the Debtor, intentionally and maliciously stripped the Debtor barren to keep the Alpha Funds (or the proceeds of such funds) beyond the reach of the Debtor's creditors.

11. Accordingly, the Debtor brings this action, comprised of six separate claims, to hold Defendants accountable for the material damage they have caused, and continue to cause, to the Debtor and its estate. *First*, the Debtor asserts an aiding and abetting claim against Byju and Gokulnath for deliberately directing one or more of Riju's fraudulent transfers of the $533 million Alpha Funds (or the proceeds thereof) in complete disregard of Riju's fiduciary duties to the Debtor. *Second*, the Debtor asserts a breach of fiduciary duties claim against Byju as the Debtor's former chief executive officer for his role in directing and causing the transfer of the Camshaft LP Interest on account of the Alpha Funds for no consideration, stripping the Debtor of an asset valued at over $540 million. *Third*, the Debtor asserts an aiding and abetting breach of fiduciary duties claim against Kishore for her role in deliberately assisting Byju so he could transfer the Camshaft

LP Interest, knowing this action amounted to a breach of Byju's fiduciary duties as it was theft. *Fourth*, the Debtor asserts an accounting claim against all Defendants, given the extensive deficiencies and mischaracterizations in the Debtor's books and records, particularly with respect to the Alpha Funds and the proceeds thereof. *Fifth*, the Debtor asserts a conversion claim against all Defendants. The second fraudulent transfer was not purportedly consummated until March 31, 2023, by which time Byju had already been removed as the Debtor's officer and T&L no longer indirectly owned the Debtor. As this Court already has found, "as of March 3, 2023, Pohl was the only party with corporate authority to direct the use, possession, transfer, or disposition of the property of the Debtor."[8] *See also Ravindran v. GLAS Tr. Co. LLC*, 237 A.3d 1061 (Del. 2024) (upholding the change of control of the Debtor and Pohl's appointment). This meant that Defendants lacked the legal authority to exercise control over the Debtor's property (whether on behalf of the Debtor or its former corporate parent T&L) on March 31, 2023, including causing the transfer of the Debtor's Camshaft LP Interest. As with the Debtor's prior conversion claims against Riju and T&L, the Debtor's conversion claim against Byju, Gokulnath, and Kishore is being asserted as their actions amounted to a denial of the Debtor's rights as the proper owner of the Camshaft LP Interest. *Sixth and finally*, the Debtor asserts a civil conspiracy claim against all Defendants for acting in concert along with Riju, among others, to deprive the Debtor of its Camshaft LP Interest, knowing they had no lawful authority to direct the Debtor's affairs or take possession of its assets.

[8] MSJ Mem. Op. at 42.

**JURISDICTION AND VENUE**

12. On February 1, 2024 (the "Petition Date"), the Debtor, a corporation organized and existing under the laws of the State of Delaware, filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

13. This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334(b). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2). In the alternative, this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334(b). The Debtor's claims are related to its bankruptcy case, and this lawsuit concerns an important asset of the Debtor's estate.

14. This Court has personal jurisdiction over the three Defendants under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7004(f). Importantly, with respect to Byju, under 10 *Del. C.* § 3114(b), by serving as the CEO of a Delaware corporation, as reflected in the Transfer Agreement,[9] Byju irrevocably consented to the acceptance of service of process through the Debtor's registered agent in any action against him for breach of fiduciary duties in his capacity as CEO.[10] And, as a result of the Debtor's incorporation in the State of Delaware and Byju becoming an officer of that corporation, Byju purposefully availed himself of certain rights,

[9] Additionally, on August 3, 2023, Byju, acting improperly on behalf of the Debtor, executed a so-called "Merchant Agreement" and related "Security Agreement and Guaranty" as part of another lending arrangement.

[10] 10 *Del. C.* § 3114(b) provides a statutory basis for not just serving non-resident directors of Delaware corporations, but also asserting personal jurisdiction in "any action or proceeding against such officer for violation of a duty in such capacity[.]" 10 *Del. C.* § 3114(b); *see also Hazout v. Tsang Mun Ting*, 134 A.3d 274, 293 (Del. 2016) (finding that Section 3114 authorized the Delaware lower court to exercise personal jurisdiction over the Canadian defendant, because he was acting in his capacity as the Delaware corporation's President and Chief Executive Officer). Moreover, the exercise of personal jurisdiction pursuant to Section 3114 is consistent with due process. *See, e.g.*, *id.* at 292-94 (exercising personal jurisdiction did not offend traditional notions of fair play and substantial justice where, as here: (1) the Canadian defendant purposefully availed himself of Delaware duties and protections by becoming a director and officer of a Delaware corporation; (2) the claims against the Canadian defendant involved actions in his official capacity, namely, negotiating contracts that involved the change of control of a Delaware public corporation; and (3) such agreements reflected the parties' express choice to use the law of Delaware as their common language of commerce, and their understanding that litigation over later contractual differences could ensue in Delaware).

privileges, and protections under Delaware law, while accepting certain attendant non-waivable duties and obligations, including fiduciary duties. Accordingly, Byju was on notice that he could be haled into the Delaware courts at any time to answer for the breaches of those duties to which he is subject.

15. Nor should the Court's jurisdiction over Byju be in dispute. On October 9, 2024, Byju, in the separate adversary proceeding against Riju, voluntarily submitted to this Court a *Declaration of Byju Raveendran* in support of his brother's opposition to the Debtor's pending motion for summary judgment and volunteered to sit for a deposition. *See* Decl. of B. Raveendran ("Byju Decl."), *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Oct. 9, 2024) [Adv. D.I. 371-1]. Accordingly, Byju has waived any possible objection to the jurisdiction or purported inconvenience of this Court.

16. Furthermore, this Court also has personal jurisdiction over Byju for purposefully directing his activities towards the United States and the State of Delaware, in particular. Specifically, Byju directed his tortious conduct towards the Debtor, a *Delaware* corporation, and brother Riju, in his capacity as a *Delaware* director, by aiding and abetting his breach his fiduciary duties by transferring the Alpha Funds to Camshaft Fund, a *Delaware* limited partnership. This Complaint directly arises out of, or relates to, those activities. The intentional acts complained of took place in the United States, and the Debtor bore the brunt of those action in the United States, making the United States the focal point of that harm. With all of that knowledge, including the knowledge he gained as a T&L director, Byju expressly directed his tortious conduct at this forum.

17. Similarly, this Court has personal jurisdiction over Gokulnath, who purposefully directed her activities towards the United States and the State of Delaware, in particular. Specifically, Gokulnath directed her tortious conduct towards the Debtor, a *Delaware* corporation,

and Riju, in his capacity as a *Delaware* director, by aiding and abetting his breach his fiduciary duties by transferring the Alpha Funds first to Camshaft Fund, a *Delaware* limited partnership, and then to Inspilearn, a *Delaware* limited liability company. This Complaint directly arises out of, or relates to, those activities. The intentional acts complained of took place in the United States, and the Debtor bore the brunt of those action in the United States, making the United States the focal point of that harm. With all of that knowledge, including the knowledge she gained as a T&L director, Gokulnath expressly directed her tortious conduct at this forum.

18. Lastly, this Court has personal jurisdiction over Kishore, who purposefully directed her activities towards the United States and the State of Delaware, in particular. Kishore directed her tortious conduct towards Camshaft Fund, a *Delaware* limited partnership, and caused the transfer of the Camshaft LP Interest—*i.e.*, an ownership interest in a *Delaware* limited partnership—from the Debtor, a *Delaware* corporation, to Inspilearn, a *Delaware* limited liability company. This Complaint directly arises out of, or relates to, those activities. Kishore, in her senior role at T&L in which she facilitated the Debtor's diligence with Camshaft, knew, or should have known, that the Debtor was incorporated in the United States and held the Camshaft LP Interest in the United States. She also communicated directly with Camshaft to transfer, then conceal, the Camshaft LP Interest. Again, the intentional acts complained of took place in the United States, and the Debtor bore the brunt of those action in the United States, making the United States the focal point of that harm. With all of that knowledge, Kishore expressly directed her tortious conduct at this forum.

19. Additionally, Gokulnath and Kishore voluntarily conspired with at least Byju and Riju—two former fiduciaries of the Delaware Debtor—to defraud and deprive the Debtor of the Alpha Funds and Camshaft LP Interest. Gokulnath and Kishore have been integral members of

this conspiracy and, at all times relevant to the Complaint, had knowledge of their lack of authority to act on behalf of the Debtor. Nevertheless, both of them facilitated the process of transferring the Alpha Funds and/or the Camshaft LP Interest. In a number of respects, Gokulnath's and Kishore's tortious conduct—all of which was directed at Delaware entities—underlies Byju's and Riju's fiduciary breaches when transferring away the Alpha Funds and the proceeds thereof. Stated bluntly and precisely, the Debtor was used to perpetrate a fraud in Delaware, and Gokulnath and Kishore are an integral part of that wrongful scheme.[11] By any reasonable measure, they should have anticipated that their involvement in a concerted plan to strip assets from the Debtor would result in a Delaware court asserting jurisdiction over each of them to account for such unlawful conduct.

20. Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

21. This adversary proceeding is initiated under, at a minimum, Bankruptcy Rules 7001(1) and (7) and 28 U.S.C. § 2201.

22. Pursuant to Rule 7008-1 of the Local Rules of the U.S. Bankruptcy Court for the District of Delaware, the Debtor consents to the entry of final orders and judgments by the Court on these claims to the extent it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## THE PARTIES

23. Plaintiff-Debtor BYJU's Alpha is a Delaware corporation with its principal place of business in the State of Illinois. The Debtor was formed on September 27, 2021, as a special purpose financing vehicle of its former ultimate corporate parent, T&L, an Indian entity. Until

---

[11] MSJ Mem. Op. at 21 ("Considering the extensive evidence suggesting T&L's creation of a U.S. subsidiary which was then used to perpetrate a fraud, I find that under the circumstances of this case, the exercise of jurisdiction over T&L is reasonable.").

March 3, 2023, T&L wholly owned the Debtor through an intermediate subsidiary, BYJU's Pte. Ltd. The Debtor has never had any material active business operations. From its formation until March 3, 2023, the Debtor's officer and sole director was Riju Ravindran. Byju Raveendran also served as the Debtor's officer, namely, CEO, for an indeterminate period of time. On March 3, 2023, Timothy R. Pohl became the Debtor's sole director and sole officer, and he has remained in these roles at all times through the present time.

24. Defendant Byju Raveendran, who currently resides in Dubai, is the eponymous founder of the BYJU's enterprise (the entities that collectively do business under the tradename, "BYJU's," and that previously included the Debtor). He co-founded and is a shareholder of the Debtor's former ultimate corporate parent, T&L, and served as T&L's acting director until July 16, 2024, when T&L was involuntarily placed into an insolvency proceeding in India. As noted, Byju also served as the Debtor's CEO, including in March 2023.

25. Defendant Divya Gokulnath, who also currently resides in Dubai in the same house as Byju (and also Riju), is a co-founder of the BYJU's enterprise. As with her husband, Gokulnath co-founded and is a shareholder of the Debtor's former ultimate corporate parent, T&L, and served as T&L's acting director until July 16, 2024, when T&L was involuntarily placed into an insolvency proceeding in India.

26. Anita Kishore, one of Byju's former students, rose to become T&L's Chief Strategy Officer. Yet, Kishore's role was even more powerful than even her C-suite title suggested, as she has been described by sources as T&L's *de facto* CFO, the only person (other than Byju) who actually understood T&L's financial affairs, and the leader of T&L's investor relations and global expansion.[12] Altogether, Kishore apparently was one of the most powerful people within the

[12] Pradip K. Saha, *Everyone in the Byjuverse is looking for Anita Kishore*, THE MORNING CONTEXT (Aug. 11, 2024), https://themorningcontext.com/internet/everyone-in-the-byjuverse-is-looking-for-anita-kishore.

BYJU's organization outside of Byju and his close family.[13] The Debtor understands that Kishore currently resides in Bengaluru, India.

## FACTUAL BACKGROUND

### A. The Debtor's $1.2 Billion Term Loan Arrangement.

27. On November 24, 2021, GLAS Trust Company LLC ("GLAS"), as Administrative and Collateral Agent, the Lenders, the Debtor, T&L, and certain other BYJU's entities as guarantors closed on a $1.2 billion term loan facility that would mature in five years absent acceleration. The definitive terms of that facility are memorialized in several agreements, including a Credit and Guaranty Agreement (the "Credit Agreement") and various security and collateral assignment agreements.

28. The Credit Agreement contains the Debtor's legal rights, duties, and obligations with respect to the term loans. In consideration for the $1.2 billion in loan proceeds, the Debtor and its affiliated guarantors accepted various covenants so that the Lenders could monitor and protect the term loans on a continuous and ongoing basis. Each relevant covenant is clear on its face; they are the result of extensive negotiations by sophisticated parties, advised by experienced legal and financial advisors. Most relevant here are the financial reporting and guarantee covenants. As of November 24, 2021, the Debtor, T&L, and the other BYJU's guarantors owed—yet subsequently failed to provide—the following deliverables to GLAS and the Lenders pursuant to the Credit Agreement:

29. **Audited Financial Disclosures:** Pursuant to Section 5.1(a) of the Credit Agreement, by the 180th day after the end of T&L's fiscal year on March 31, T&L was required

[13] *See id.*

to provide its annual audited financials to GLAS, accompanied by an audit report from an auditing firm of recognized national standing.

30. **Unaudited Financial Disclosures:** Under Section 5.1(b) of the Credit Agreement, by the 75th day following the end of Q1, Q2, and Q3 of T&L's fiscal year, T&L was required to provide to GLAS unaudited consolidated financial statements for that fiscal quarter and the then-elapsed portion of the then-current fiscal year, together with comparative financials for the corresponding periods of the prior fiscal year.

31. **Whitehat Guarantee:** Under Section 5.9(c) of the Credit Agreement, one of T&L's Indian subsidiaries, Whitehat Education Technology Private Ltd. ("Whitehat India"), was obligated to sign on to an Onshore Guarantee Deed, by no later than April 1, 2022, to guarantee the full amount of the Debtor's term loans.

32. The Debtor and its former management apparently understood soon after signing the Credit Agreement—and well before April 28, 2022, when it made the first of the *at least* four fraudulent transfers of the Alpha Funds (or the proceeds thereof)—that there were multiple material defaults on the Credit Agreement's financial reporting and guarantee covenants. Those defaults ultimately entitled GLAS to certain remedies, which it properly exercised in March 2023, as discussed below.

**B. The Debtor's Insolvency as of April 2022 and Acknowledged Events of Default.**

33. Within months of executing the Credit Agreement, the Debtor defaulted.[14] From March to September 2022, the Debtor and its affiliates failed to satisfy three or more covenants at least four times, each of which, on its own, empowered the Lenders to accelerate the term loans and exercise other available remedies, as they ultimately did.

[14] *See* MSJ Mem. Op. at 2-3.

34. To begin, when the Q3 FY 2021-22 unaudited financial statements were due on March 16, 2022, T&L only provided financials for the then-elapsed portion of its fiscal year. T&L did not furnish any information for the quarter itself or comparative financials for the corresponding period of the prior fiscal year.

35. Shortly after, Whitehat India failed to provide the Guarantee due as of April 1, 2022. Nonetheless, on April 5, 2022, the Lenders agreed to defer Whitehat India's obligation to obtain that guarantee until October 8, 2022. Whitehat India also failed to meet the extended deadline.

36. A third Default occurred on September 13, 2023, when T&L failed to provide comparative figures for the Q1 FY 2022-23 quarterly period. Therefore, T&L failed to furnish a material amount of required information across this and the prior quarterly period. What T&L did furnish on that date showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" that was equivalent to well over $500 million (based on prevailing exchange rates) at the time.[15]

37. As for its fourth Default, T&L failed to deliver audited annual financial statements for its 2021-22 fiscal year by the September 27, 2022 deadline. T&L's failure was so significant that its independent auditor, Deloitte, publicly resigned in June 2023, citing T&L's failure to provide the financial information necessary to complete the audit.[16] T&L's audited financial statements for its 2021-22 fiscal year, which ended March 31, 2022, did not become public until

[15] *See id.* at 4 ("T&L (on whose board [Byju and Riju] sat) actively misled the Lenders into believing that the funds remained in the Debtor's bank accounts in cash or cash equivalents.").

[16] *See* Alex G. Simon & Anto Antony, *Deloitte Quits as Byju's Auditor Piling Pressure on Tech Startup*, BLOOMBERG (June 22, 2023, 9:25 AM), https://www.bloomberg.com/news/articles/2023-06-22/deloitte-resigns-as-auditor-for-byju-s-on-filings-delay. Then, in September 2024, a second T&L independent auditor, BDO, likewise resigned, citing "inordinate" delays in T&L's filing of its FY 2022-23 annual financial statements and expressing concern that T&L's management "lacks transparency with respect to providing full information to the auditor." Aditya Kalra, *Byju's auditor BDO resigns after start of bankruptcy proceedings, company says*, REUTERS (Sept. 9, 2024, 7:13 AM), https://www.reuters.com/technology/byjus-auditor-bdo-resigns-after-start-bankruptcy-proceedings-company-says-2024-09-07/.

January 2024, at which point the financial results in those statements were outdated by nearly two years.

38. Unsurprisingly, T&L's accounting deficiencies extend to the Debtor. While now under Pohl's control, the Debtor lacks reliable accounting records of its assets and liabilities. In fact, the Debtor has no audited financial statements for the fiscal year ended March 31, 2023, no audited or unaudited financial statements reflecting the March 31, 2023 transfer of the Camshaft LP Interest, and no financial statements of any kind, covering any quarter or fiscal year following March 31, 2023.

### C. <u>The First Fraudulent Transfer</u>: The Debtor's Transfer of $533 Million to Camshaft Fund While in Default.

39. Mere weeks after defaulting twice on the Credit Agreement and entering into one forbearance agreement, on April 27-28, 2022, the Debtor (during which time Riju was the Debtor's sole director and taking direction from the T&L Board, as he later conceded during depositions) initiated three wire transfers totaling $318,000,000 to Camshaft Capital Fund, L.P., a Delaware limited partnership ("<u>Camshaft Fund,</u>" and collectively with its affiliates, "<u>Camshaft</u>"), with the purported purpose of subscribing for a limited partnership interest therein. Kishore understood this "investment" required directing the activities of the Debtor, a Delaware corporation. Indeed, Kishore was responsible for facilitating diligence on behalf of the Debtor. The Debtor made each one of those transfers (which were not made pursuant to any known Board investment policy and thus were in direct contravention of the Credit Agreement) without notice to or consent of GLAS or the Lenders. Fewer than three months later, on July 12-13, 2022, the Debtor initiated three additional transfers in the total amount of $215,000,000 from another checking account of the Debtor to Camshaft Fund. In total, the Debtor had transferred $533,000,000 to Camshaft Fund, in

exchange for limited partnership interests in Camshaft Fund pursuant to two sets of subscription agreements and corresponding side letters.

40. Time has shown that, once the Alpha Funds were transferred, they were gone—the Debtor never received any money back from Camshaft Fund, or anyone else, on account of this purported "investment." According to Byju, the money went to pay vendors on behalf of T&L and its subsidiaries (which, again, would be to persons other than the Debtor, which lacked any meaningful operations of its own). Byju Decl. ¶ 36.

41. In the process of making this first fraudulent transfer, Riju had wholly abandoned his fiduciary duties as an officer and the sole director of the Debtor, and instead allowed its ultimate parent, T&L, to make the Debtor's decisions on its behalf. Hr'g Tr. at 20:1-6, 42:7-13, 49:3-12, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024) (conceding that "[i]t was Think and Learn that decided to make that transfer" to Camshaft, with Riju simply taking "instructions" from T&L and "signing [] documents" without question); *see also id.* at 43:19-44:4 (admitting that he "didn't think very much about the decision" to move $533 million into Camshaft Fund, not even asking "one question"). As Riju freely testified, he "didn't even one time make a decision for [himself] over BYJU's Alpha"—"[i]t was always with the parent company." *Id.* at 32:19-23; *see also id.* at 43:19-44:4. Furthermore, [redacted]

42. The transfer of the $533 million to Camshaft Fund is the first of at least four known fraudulent transfers in this case. The first fraudulent transfer was made without the Lenders' knowledge or approval. As a result of the first fraudulent transfer, the Debtor was rendered

insolvent, if not already so. Specifically, the Debtor's liabilities (approximately $1.194 billion in outstanding principal on defaulted loans as of July 12-13, 2022) far exceeded the Debtor's liquid assets (around $131 million in available funds), and the Debtor had no meaningful active operations capable of generating income.

### D. The Illegitimacy of the Debtor's Transfer to Camshaft Fund, a Sham Hedge Fund.

43. There was no legitimate reason for the Debtor to allegedly "invest" over half a billion dollars in Camshaft Fund, which at the time had under $10 million in assets under management, particularly after multiple loan defaults had occurred. It has since become well publicized that Camshaft Fund was an unproven, fly-by-night hedge fund founded in August 2020 by William Morton—then a 23-year old with no formal training in investing or money management, and no apparent qualification to manage a hedge fund—and which previously listed on federal and state regulatory filings the address of an International House of Pancakes in the Little Havana neighborhood of Miami as its principal place of business. Simply put, Camshaft Fund was a complete "sham,"[17] and Morton was an inexperienced and highly unqualified manager.

44. Indeed, there was no reason for the Debtor to purportedly "invest" the $533 million in Camshaft Fund other than to hinder, delay, and/or defraud the Lenders. And in fact, the Debtor did not decide to make that purported investment. Rather, as has come to light, it was the combination of at least T&L, OCI Limited ("OCI") (which received the Alpha Funds from Camshaft Fund), and their respective principals that played a role in developing, orchestrating, and/or directing this fraudulent scheme.

---

[17] *See* MSJ Mem. Op. at 3 n.11 ("GLAS's investigator concluded that the hedge fund was a sham, and I agree. It is unclear why the Debtor[] would choose to invest in Camshaft Fund at all.").

**E. The Lenders' Unsuccessful Negotiations with BYJU's.**

45. In the summer and fall of 2022, around the same time as the third and fourth Defaults, an *ad hoc* group of Lenders engaged legal and financial advisors and contacted the Debtor's representatives, including Byju, Gokulnath, Riju, and Kishore, and T&L's legal and financial advisors, in an effort to resolve the outstanding Defaults and restructure the term loans. Over the following eight or so months, the Lenders and their advisors spent many hours negotiating and implementing nine separate Amendments to the Credit Agreement, all in a good faith, yet ultimately unsuccessful, effort to reach a negotiated resolution. As part of that process and so that the negotiations would not prejudice the Lenders' rights to exercise remedies, the Debtor and its guarantors, including T&L, acknowledged the four Defaults, which matured into Events of Default under the Credit Agreement, in three separate amendments to the Credit Agreement (namely, Amendment Nos. 2, 3, and 7), which further memorialized the Lenders' entitlement to exercise remedies as a result of those Events of Default.

46. To protect the Lenders' rights during the pendency of negotiations, T&L, on behalf of itself and the Debtor (among others), and the Lenders, also began entering into a series of forbearance agreements. On October 4, 2022, the parties entered into Amendment No. 1, which extended call protections for the Lenders so they would not be financially disadvantaged by continuing negotiations. The following week, on October 12, 2022, the parties executed Amendment No. 2, which Byju signed on behalf of T&L and the other BYJU's loan parties. In Amendment No. 2, the parties agreed to memorialize that BYJU's' four reporting and guarantee breaches constituted Defaults (the "Specified Defaults"). The parties also amended Section 8.1(e) of the Credit Agreement—the contractual provision governing "Events of Default"—to provide that the 45-day cure period for the Specified Defaults would begin on October 10, 2022 and expire on November 24, 2022, at which point the Specified Defaults would mature into Events of Default.

Unbeknownst to the Lenders, also in or around October 2022, the Debtor initiated the process that would soon lead to the second fraudulent transfer, *i.e.*, the Debtor's transfer of its Camshaft LP Interest to Inspilearn, a non-guarantor under the Credit Agreement of which Riju was the sole manager and T&L was the controller and sole owner. Indeed, Riju has unequivocally admitted the Debtor "started the process" of transferring the Camshaft LP Interest in October 2022, and Camshaft's correspondence with its then-third-party administrator, Apex Fund Services ("Apex"), concerning the steps required to effectuate this second transfer confirms the same.

47. The timing of these efforts reveals that Byju, Gokulnath, Riju, Kishore, and the T&L organization as a whole understood that the Lenders were contractually authorized to exercise remedies if the Specified Defaults were not cured by November 24, 2022.

48. Indeed, as of November 24, 2022, none of the Specified Defaults had been cured, whereupon they matured into Events of Default, entitling GLAS and the Lenders to exercise remedies. Also on November 24, 2022, T&L and the Debtor, among others, executed Amendment No. 3, in which they "acknowledged and agreed" that the cure period had expired without any of the Specified Defaults being cured. Importantly, they went one step further, agreeing that the Lenders were "entitle[d]" to deliver to the "Loan Parties" (*i.e.*, the Debtor and its guarantors) a "Specified Notice of Default and Acceleration," meaning "a notice of default and acceleration with respect to the Specified Defaults."

49. The Lenders nevertheless agreed to forbear through December 1, 2022. When that forbearance period expired, T&L (again, on behalf of itself and the Debtor, among others) and the Lenders entered into a final forbearance agreement—Amendment No. 7, dated as of January 6, 2023. Under Section 1 of Amendment No. 7, the Lenders agreed to forbear from exercising

remedies, including accelerating the term loans, until February 10, 2023, unless the parties were able to reach an agreement to resolve the outstanding defaults before then.

50. As a condition to the Lenders' forbearance agreement, Amendment No. 7 included several important milestones. However, T&L and its subsidiaries, including the Debtor, defaulted on Amendment No. 7's milestones. Additionally, on January 23, 2023, T&L furnished to the Lenders incomplete unaudited financial statements for Q2 FY 2022-23 (the period ended September 30, 2022). Those financials had been due over a month earlier, by December 14, 2022. The financials showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" equivalent to well over $500 million (based on prevailing exchange rates) as of September 30, 2022.

51. On February 10, 2023, the forbearance period expired by its own terms. Less than a month later, the Lenders directed their agent, GLAS, to exercise remedies, as discussed *infra*.

**F. <u>The Second Fraudulent Transfer</u>: Byju Raveendran's Transfer of the Debtor's Camshaft LP Interest to Inspilearn on Behalf of the Debtor.**

52. Through February 2023, the Lenders and the Loan Parties had entered into nine formal waivers and amendments to the Credit Agreement to address the outstanding Defaults, which by then had matured into Events of Default (after the Defaults were not cured).

53. At that time, BYJU's had misrepresented to the Lenders that it had well over $500 million in liquid assets. As disclosed on January 23, 2022, T&L's unaudited financial statements for the period ended September 30, 2022 showed that the Debtor had well over $500 million in "Cash and Bank" balances at that time. Consistent with earlier financial disclosures, T&L's unaudited financial statements for the period ended December 31, 2022, which were provided in mid-March 2023, similarly showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" equivalent to well over $500 million (based on prevailing exchange

rates). To state the obvious, both financial statements clearly represented that the Debtor—the borrower on a defaulted loan—had hundreds of millions of dollars in liquid cash or cash equivalents available to service its outstanding debts.

54. Unbeknownst to the Lenders and GLAS, the bulk of that money was not held by the Debtor in cash or in its bank or brokerage accounts, as the "Cash and Bank" label suggested. Instead, those funds had already been transferred to Camshaft Fund. Further, whatever interest in Camshaft Fund that the Debtor held or received on account of its $533 million in transfers was itself soon to be transferred to Inspilearn, again unbeknownst to the Lenders and GLAS.

55. After the final forbearance expired on February 10, 2023, GLAS, at the Lenders' direction, began exercising remedies. On March 3, 2023, GLAS accelerated all amounts outstanding under the term loans—over $1.2 billion in principal and outstanding interest and fees—to become due and payable immediately. That same day, GLAS also took control of the pledged equity in the Debtor and, as the now-sole shareholder of the Debtor, appointed Pohl as the Debtor's sole director. Pohl then appointed himself as the Debtor's sole officer.

56. Pohl was appointed on March 3, 2023, a Friday.

57. The very next business day—Monday, March 6, 2023—Kishore emailed Morton, copying Byju, directing Camshaft Fund to "***resume*** the process of transferring Byju's Alpha Inc.'s account to Inspilearn LLC" (emphasis added). In doing so, Kishore was resuming the process that at least Camshaft, Inspilearn, and the Raveendran brothers had first commenced more than four months prior, in the previous October.

58. Over the following weeks, Camshaft and Apex requested information of BYJU's so that they could conduct KYC and AML diligence on the proposed transferee, Inspilearn, and the transfer could be completed.

59. Finally, on March 31, 2023, the Debtor, Inspilearn, and Camshaft executed various agreements that, collectively, purported to consummate the second fraudulent transfer, effective for all purposes as of that same date. The second fraudulent transfer is squarely at issue in this Complaint, and provides the basis for many of the Debtor's claims herein.

60. Of particular significance here, the Debtor, Inspilearn, and Camshaft executed a Transfer Agreement "made as of 3/31/2023." The Transfer Agreement, by its terms, effectuated the transfer of the entire Camshaft LP Interest from the transferor Debtor to the transferee Inspilearn. *See, e.g.*, Transfer Agreement § 1 ("[U]pon execution and delivery of this Agreement by the parties hereto, Transferor shall assign, transfer and convey the Transferred Interest[18] to Transferee."). Further, upon execution of the Transfer Agreement the Camshaft Fund's sole general partner and control person, Camshaft Capital Management, LLC ("Camshaft Management") agreed to "record the transfer of the Transferred Interest to Transferee as contemplated by this Agreement." *Id.* §§ 1-2. Following the transfer, the Debtor "shall have zero remaining interest in the Transferred Interest," while Inspilearn would accede to all of the Debtor's existing obligations to Camshaft Fund. *Id.* §§ 3(A)-(B). And, upon execution of an accompanying Subscription Agreement (discussed below) dated as of the same date, Inspilearn "shall be entitled to all rights, under the Partnership Agreement, which arise from and after the date hereof, in respect of the Transferred Interest." *Id.* § 3(B).

61. Riju signed the Transfer Agreement on behalf of Inspilearn. *Id.* at 6. Significantly, Byju signed the Transfer Agreement on behalf of the Debtor, listing his title as "CEO." *Id.* On behalf of the Debtor, Byju represented and warranted (falsely) that the Debtor had "all requisite power and authority to execute, deliver and perform this agreement." *Id.* § 4(A).

---

[18] The "Transferred Interest" was defined in the Transfer Agreement as "100% of the Interest," referring to the Debtor's "total Capital Commitment to [Camshaft Fund] in the amount of $533,000,000.00." *Id.* at 1 (Recitals).

62. Also on March 31, 2023, Inspilearn and Camshaft Management executed the aforementioned Subscription Agreement, by which Inspilearn would, as of such date, subscribe to, and become a substitute limited partner in, Camshaft Fund with an in-kind capital contribution equal to "100% of Byju's Alpha Inc.'s LP Interests in Camshaft Capital Fund, LP." Riju, on behalf of Inspilearn, executed the Subscription Agreement on March 29, 2023, but Camshaft Fund's general partner, Camshaft Management, did not countersign the Subscription Agreement until March 31, 2023, the same day the Transfer Agreement was effective by its terms.

63. According to Riju, the transfer of the Camshaft LP Interest from the Debtor to Inspilearn was the brainchild of T&L, of which Byju and Gokulnath were directors and Kishore was one of the most senior executives. *See, e.g.*, Hr'g Tr. at 32:19-23, 59:18-21, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024) (repeatedly testifying that he "just took direction from the parent company," T&L). When examined at trial and asked why he thought T&L conceived of and directed the transfer to Inspilearn, Riju admittedly did not know "the reason why [he was] signing documents to move assets from BYJU's Alpha to Inspilearn." *Id.* at 25:4-14, 53:16-19. Rather, he followed instructions willfully and blindly—unable to "think of one idea" for the transfer, despite the fact that the Lenders had recently exercised their remedies under the Credit Agreement. *Id.* at 53:25-54:1. Indeed, he did not know whether the Debtor received even $1 of value for the Camshaft LP Interest. *Id.* at 56:8-15. Riju stated that he "just sign[ed]" the documents authorizing the transfer and "mov[ed] on." *Id.* at 25:4-14, 56:3-7. As set forth herein, at least the three Defendants directed this second fraudulent transfer.

64. Defendants' motivation for transferring the Camshaft LP Interest to Inspilearn—a non-obligor under the Credit Agreement—is readily apparent: to conceal that asset from the

Debtor's creditors and to frustrate their rights to exercise remedies under the Credit Agreement and applicable law. Again, as of December 31, 2022, there were four conceded Events of Default, each one entitling the Lenders and GLAS to accelerate the over-$1.2 billion outstanding on the term loans. Further, the parties had recently entered into a forbearance agreement expiring on February 10, 2023, at which point GLAS, acting at the Lenders' direction, could exercise those remedies. Negotiations were reaching an impasse, and the Lenders had clearly signaled their intention to exercise remedies. Defendants knew the Debtor had no defense to the Lenders exercising remedies, because Amendment No. 7 reaffirmed that the Debtor's failure to cure the Specified Defaults "***entitles***" the Lenders to exercise remedies, and *four times* acknowledged that "*none* of the Specified Defaults can be cured or remedied." This is a classic fact pattern of fraud: a borrower concealing virtually all its assets at around the time of a forbearance agreement expiring and, indeed, *after* the creditors had exercised remedies.

65. Consistent with that fraudulent motive, the Debtor was left with virtually no assets following the second fraudulent transfer. As of March 31, 2023, the Camshaft LP Interest had been valued by Camshaft at $540,647,109.29. In exchange for the Camshaft LP Interest, the Debtor received nothing—not even a cent or a promise to pay anything—in consideration. Indeed, to this day, Riju cannot identify "$1 of value that Inspilearn promised it would pay BYJU's Alpha for the Camshaft investment." Hr'g Tr. at 56:10-15, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024). As a result, the Debtor was rendered at least balance sheet insolvent, if not already so. Its liabilities (almost $1.2 billion in outstanding principal on accelerated loans in default) far exceeded its liquid assets, under $500,000 in its bank accounts, and now not even the illiquid Camshaft LP Interest.[19]

[19] *See* MSJ Mem. Op. at 37-38.

**G. Defendants' Concealment of the Second Fraudulent Transfer to Inspilearn from the Lenders and GLAS.**

66. At the beginning of 2023, the Lenders continued to work toward a negotiated resolution, if one could be had. But those efforts were exhausted without success and with only more concerns arising, including regarding the BYJU's enterprise's overall financial condition and the predicted risk that the Debtor would move the vast majority of the money it held to frustrate the Lenders' exercise of remedies. In light of the lack of meaningful progress and responsiveness by the Debtor and its affiliates, the Lenders exercised their contractual and legal remedies to address the acknowledged Events of Default and to protect their collateral.

67. On March 3, 2023, GLAS, at the Lenders' direction, declared Events of Default to initiate the exercise of remedies. Immediately, Byju reached out to the Lenders, requesting that the parties reengage on a potential resolution. The Lenders were open to engage, which then prompted several weeks of negotiation. During those negotiations, an area of focus for the Lenders was on cash verification.

68. Kishore actively participated in efforts to mislead the Lenders regarding the Debtor's cash position. On March 16, 2023, T&L, with Kishore copied, posted with GLAS, for distribution to the Lenders, its Q3 FY 2022-23 financial statements, which included the above-referenced representation that the Debtor had the equivalent of well over $500 million in "Cash and Bank" balances as of December 31, 2022.

69. Also in March 2023, in support of broader negotiations among the parties, the Lenders requested that BYJU's confirm the funds available to the Debtor. In response to this cash verification request, BYJU's representatives agreed to a roundabout cash verification process with the Lenders. To that end, according to what BYJU's outside counsel informed one of the Lenders' advisors on or about March 27, 2023, counsel had, on a recent videoconference call with Kishore

(and also T&L's then-General Counsel Roshan Thomas), watched Kishore virtually log into a purported bank portal. According to counsel, "the login process was smooth, nothing was glitchy." Counsel saw a statement showing that the account held a substantial amount of cash, which counsel said was located "in the U.S." (even though the money actually had been transferred abroad to OCI). Counsel disclosed to the Lenders' advisor the exact amount of funds he had seen, an amount that is consistent with the aggregate amount of the April and July 2022 transfers.

70. Based on the information that has since come to light, it now appears that BYJU's outside counsel had seen the Debtor's capital account at Camshaft Fund, reflecting the ascribed value of the Camshaft LP Interest, without disclosing that critical fact to the Lenders' advisor, let alone disclosing that Defendants were in the midst of transferring that LP Interest to Inspilearn. The deception is apparent.

71. Moreover, the Lenders' hopes for a negotiated resolution once again turned out to be misplaced as BYJU's ultimately appeared insincere about trying to enter into a successful amendment. More likely, the reasonable inference is that Defendants were simply buying time to complete the second fraudulent transfer and to move the Camshaft LP Interest out of the Lenders' reach.

72. On May 3, 2023, GLAS and Pohl filed a lawsuit in the Delaware Court of Chancery against Riju, among others, seeking confirmation that, pursuant to the Delaware statutory code, 8 *Del. C.* § 225, their exercise of remedies had effectuated a proper change of control of the Debtor. *See GLAS Tr. Co. LLC v. Ravindran*, C.A. No. 2023-0488-MTZ (Del. Ch. 2023) (the "<u>225 Action</u>"). Upon commencing that action, Pohl, and the Lenders, had every reason to believe from BYJU's' financial and cash verification disclosures that the Debtor had in its possession a significant sum of money. However, five days later, during a May 8, 2023 call, Byju, with his

General Counsel, Thomas, on the line, told one of the Lenders' advisors that the Debtor no longer had the money. Rather, as Byju's asserted, "***the money is someplace the Lenders will never find it***." Byju's comments were so shocking that the Lenders' advisor immediately wrote them down on a piece of scratch paper.[20]

73. Over a month after the execution of the Transfer Agreement, in May 2023 and following Kishore's request, Camshaft's fund administrator changed the Transfer Agreement's "dealing date" to March 1, 2023. This was an unlawful attempt to backdate the transfer of the Camshaft LP Interest to a time *before* the Lenders exercised remedies on March 3, 2023. The request was made to accomplish a clear objective—to further conceal the Camshaft LP Interest and place it further out of the Lenders' reach.

74. On May 18, 2023, the Chancery Court issued a *Status Quo* Order (an interim order similar in effect to a temporary injunction) authorizing Pohl to remain in control of the Debtor as sole director and officer pending a final case decision and requiring the BYJU's defendants in that lawsuit to provide Pohl with access to and control of the Debtor's open bank and other accounts. Other than the Debtor's bank statements reflecting the Camshaft Fund transfers, BYJU's never shared, and in fact, flatly refused to disclose, any information about the Camshaft Fund transfers with the Debtor's current director and officer, Pohl. To this day, Pohl has not received books and

[20] In a filing made on October 9, 2024, almost 18 months after his infamous May 8 remark, Byju—on the morning of argument on summary judgment against his brother Riju—in a transparent and desperate effort to save face and attempt to forestall a half-billion-dollar judgment against Riju—*for the first time* denied that he ever said those words. Byju Decl. ¶ 3. But Byju had not denied saying what he said to Stephen Spencer (the Lenders' financial advisor) when Spencer confronted him with his remark on a second conference call on May 8, 2023, with the Lenders' and BYJU's' own advisors in attendance. Decl. of Stephen Spencer ¶ 15, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. July 8, 2024) [Adv. D.I. 280]. BYJU's' counsel subsequently acknowledged its founder's remarks during a May 18, 2023 hearing before the Chancery Court. Counsel admitted that Byju's remark "raises [an] antenna," but defended Byju's concealment of the Alpha Funds as being done "based on fears of lenders acting expeditiously." Hr'g Tr. at 34:5, 21-22, *GLAS Tr. Co. LLC v. Ravindran*, Case No. 2023-0488-MTZ (Del. Ch. May 18, 2023). Nor did Byju's deny his remark in prior conversations with the Lenders.

records from the Debtor's former management or its former ultimate corporate parent, T&L. Based on Riju's deposition, Pohl understands that, to the extent the Debtor has books and records, they were maintained by or in the custody of T&L. Though Pohl has been able to piece together certain information through discovery, he has been unable to obtain a complete and accurate picture of the Debtor's finances from its formation through the present.

75. On August 4, 2023, the Chancery Court held a bench trial in the 225 Action. On November 2, 2023, it found that "the Whitehat [G]uarantee default gives rise to an event of default," pursuant to which "GLAS was entitled to deliver the default notice" and to then "seat[]" Pohl. On November 13, 2023, the Chancery Court issued its Final Order and Judgment declaring that GLAS's enforcement steps on March 3, 2023, were valid and effective as to the removal of the Debtor's preexisting director and officer and the appointment of Pohl to serve as the Debtor's sole replacement director and officer. The Delaware Supreme Court affirmed that Judgment on September 23, 2024. *See Ravindran v. GLAS Tr. Co. LLC*, 327 A.3d 1061 (Del. 2024).

**H. Byju Raveendran's Web of Deception.**

76. In the face of his wrongdoings and unlawful conduct, Byju, his family, and his business enterprise repeatedly misrepresented the use and location of the Alpha Funds. The deception has been pervasive and extreme, as demonstrated by each of the following material misrepresentations.

77. (**1**) First, on August 22, 23, and 25, 2023, in the days immediately before Pohl's discovery of the transfers to sham hedge fund Camshaft Fund, Kishore met with some of the Lenders in New York to discuss a potential resolution, including proposals predicated upon BYJU's' ongoing access to the $533 million Alpha Funds.

78. (**2**) Then, following Pohl's discovery and GLAS's subsequent September 5, 2023 suit against Camshaft, on September 13, 2023, BYJU's released an opaque statement. In it, BYJU's "categorically denie[d] media reports which insinuated that BYJU's was no longer a beneficiary owner of the [Alpha Funds]," instead representing that "an offshore subsidiary remains the beneficiary of the money invested in high security fixed income instruments invested with a multi-hundred billion dollar fund in the U.S." Camshaft, however, was not, and never has been, a "multi-hundred billion dollar fund," and no "*high security* fixed income instruments" were ever received on account of the Alpha Funds.

79. (**3**) Then, in a January 14, 2024 call, Byju and Kishore (whom the Lenders only later learned had directed Camshaft to "resume" the transfer of the Debtor's Camshaft LP Interest immediately following Pohl's appointment) answered three of the Lenders' direct questions about the Alpha Funds. When asked if the Alpha Funds still exist, Byju and Kishore first went silent. Byju eventually asked Kishore to answer, but she continued to remain silent. As the silence dragged on, Byju stepped in, adamantly stating, "[w]e have not touched that money," and emphasizing that he was "not siphoning money." When then asked "[h]ow much cash" remains, he said "more than $500 million," which he promptly confirmed in response to the Lenders' questions was "in cash and cash equivalents." For her part, Kishore corroborated Byju, representing that the money still existed at least as of the end of October 2023.

80. (**4**) On February 1, 2024, the Debtor commenced this bankruptcy proceeding. One month later, with the Debtor pursuing expedited discovery into the Alpha Funds, Riju filed with this Court a March 5 Official Statement from BYJU's that the Alpha Funds were "currently in a 100% non US subsidiary of BYJU'S." *See* Official Statement, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 5, 2024) [Adv. D.I. 59-2]. The

Official Statement left no doubt that the BYJU's "group entities remained the beneficiary holders of the money." *Id.*

81. (**5**) On March 14, 2024, Riju testified that the "[m]oney was at Inspilearn." Hr'g Tr. at 36:15-16, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024). That same day, the Court issued a preliminary injunction (memorialized four days later in a corresponding order), freezing the Alpha Funds and ordering Riju to "take all necessary steps" to, *inter alia*, locate the Alpha Funds.[21] *See* Order Granting Debtor's Mot. for Prelim. Inj., *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 18, 2024) [Adv. D.I. 84] (the "P.I. Order"). Notably, the Court also enjoined Byju personally (along with Gokulnath, who sat on the T&L board along with Riju and Byju). *Id.* All of the enjoined parties, including Byju and Gokulnath, were enjoined from taking any steps to spend, transfer, exchange, convert, dissipate, liquidate, or otherwise move or modify any rights related to the Alpha Funds. *Id.*

82. (**6**) The very next day, on March 15, 2024, BYJU's issued yet another statement in response to the Court's Order. With respect to the Alpha Funds, BYJU's represented that "the said funds are safely parked in one of our subsidiaries and, as per the order, it will rightfully remain there."[22]

83. Altogether, in a span of seven months, Byju, Riju, Kishore, or Byju's business enterprise at least *six* times—nearly once per month—represented that the $533 million had not been spent and was safe and secure.

---

[21] Riju violated the P.I. Order by, *inter alia*, failing to take all such necessary steps to find the Alpha Funds, and has been held, and remains, in contempt. *See* Order on Finding of Contempt, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. May 28, 2024) [Adv. D.I. 204].

[22] *See Order maintains status quo: Byju's after US bankruptcy court orders hedge fund manager arrest*, BUSINESS TODAY (Mar. 15, 2024, 8:50 PM), https://www.businesstoday.in/entrepreneurship/start-up/story/order-maintains-status-quo-byjus-after-us-bankruptcy-court-orders-hedge-fund-manager-arrest-421681-2024-03-15.

84. After months of telling this Court and the public that the Alpha Funds were safely within BYJU's' control, and notwithstanding his own brother's sworn corroborating testimony, Byju did a 180-degree pivot the morning of the summary judgment hearing against his brother (Riju) and company (T&L).[23] In his declaration, Byju swore that OCI Limited, a UK-registered company that purportedly made various, unspecified "purchases" for the benefit of the BYJU's enterprise, had "set-off its outstanding dues against the Alpha Funds as a result of BYJU's' inability to reimburse OCI," the lack of mutuality with the Debtor notwithstanding. Byju Decl. ¶ 39.

85. It is impossible to square Byju's current representation with his own, his brother's, Kishore's, and his business enterprise's repeated statements to the Court, investors, Lenders, and the public over the past year. Either they all consistently lied to the world or, having asserted the day after the preliminary injunction hearing that the money was "safely parked" in one of BYJU's' subsidiaries, Byju followed in his brother's footsteps and violated the same P.I. Order. The one truthful statement Byju has made publicly is that his "strategy" of trying to conceal money from creditors "has not gone right."[24]

86. Notwithstanding the contradictory statements made to the public and the Court, Byju's attempts to conceal the Alpha Funds continue to this day.

87. At present, the whereabouts of the Alpha Funds remain unknown, and the apparent mastermind of this scheme, Byju, has largely escaped accountability—***until now***.[25]

---

[23] Likewise, in an interview with the Financial Times, Byju "told FT that his company no longer had access to capital and the entirety of the $1.2 bn term loan at the heart of the sprawling legal battle with its creditors had been spent." Christ Kay & Chloe Cornish, *'Screaming into a hurricane': the fall of India's most valuable start-up Byju's*, THE FINANCIAL TIMES (Oct. 3, 2024), https://www.ft.com/content/8788b2d7-98c1-469b-acbc-fd5fadd97939.

[24] *Id.*

[25] Nor has Byju's misconduct abated. In related bankruptcy proceedings before this Court involving three of the Debtor's guarantors, Byju went so far as to purchase an international plane ticket to prevent a critical witness from testifying. *See* Hr'g Tr. at 46:18-49-17, *In re Epic! Creations, Inc.*, Case No. 24-11161 (Bankr. D. Del.

## CAUSES OF ACTION

### COUNT ONE
### AIDING AND ABETTING RIJU RAVINDRAN'S BREACH OF FIDUCIARY DUTIES (AGAINST BYJU RAVEENDRAN AND DIVYA GOKULNATH)

88. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

**A. Riju Ravindran's Breach of His Fiduciary Duties.**

89. In his capacity as the sole director of the Debtor from its incorporation on September 27, 2021, and an officer from September 29, 2021, Riju owed non-waivable fiduciary duties to the Debtor through at least the time of the first and second fraudulent transfers.

90. At the time of the first fraudulent transfer to Camshaft Fund in mid-2022, the Debtor, under applicable law, was insolvent or became insolvent as a direct result of its making the transfer, was inadequately capitalized, and/or was unable to pay its debts as they came due, and remained so at all times thereafter through the Petition Date. Specifically, the Debtor: (a) was a special purpose financing vehicle with no meaningful active operations; (b) had defaulted on the term loans as early as March 2022, before the first fraudulent transfer was made, had entered into a forbearance agreement, and could foresee further defaults occurring; (c) had no ability to comply with its financial obligations and other covenants under the Credit Agreement, subsequent forbearance agreements, and other loan documents due to a lack of funds; and (d) owed the Lenders an amount of money exceeding $1.2 billion, which would soon be accelerated, and with respect to which the remaining assets of the Debtor were unreasonably small in relation to the outstanding debt.

Nov. 21, 2024). The Court was "gravely disturbed by the testimony that I heard today both, about witness tampering and about actions being taken to take assets from these debtors after I entered my order saying that that should not happen." *Id.* 92:12-16. The concerns here are similar: Byju will seemingly stop at nothing to illegally conceal the Alpha Funds from the Debtor, its creditors, and this Court.

91. Even if the Debtor was not insolvent at the time of the first fraudulent transfer, Riju's actions to transfer the Alpha Funds would have rendered the Debtor unable to meet its contractual obligations under the Credit Agreement. The funds were the Debtor's largest known liquid asset, and even prior to their transfer were of lower size than the Debtor's obligations under the term loans. Moving the Alpha Funds away from the Debtor in mid-2022 left the Debtor with only approximately $131 million in available cash (which itself would soon be transferred out of the Debtor) and rendered the Debtor unable to make any interest payments or to pay down the outstanding balance of the accelerated term loans, as required under the Credit Agreement. The Court itself has found that the Debtor was insolvent immediately following the first fraudulent transfer.[26]

92. Because the Debtor either was insolvent at the time of the first fraudulent transfer, or was rendered unable to meet its contractual obligations by Riju's action, Riju owed to the Debtor, for the benefit of the Debtor and its creditors, fiduciary duties to: (i) act with the care that an ordinarily prudent director and officer would in a similar position, (ii) serve in the best interests of the Debtor, for the benefit of the Debtor and its creditors; and (iii) refrain from intentionally acting with a purpose other than to advance the best interests of the Debtor, for the benefit of the Debtor and its creditors.

93. As the sole director and officer of the Debtor at the time, and without being exhaustive, Riju caused the Debtor to transfer the Alpha Funds to Camshaft Fund without conducting any known due diligence or investigation. He already has admitted in sworn testimony that he had never heard of Camshaft or its inexperienced founder prior to transferring the Debtor's

[26] MSJ Mem. Op. at 37 (finding that "even assuming the LP Interest did have a value of $540 million at the time of the First Transfer, the Debtor's balance sheet would still have reflected only about $671 million in assets against approximately $1.2 billion in debt," which "meets the definition for insolvency under the [Bankruptcy] Code").

Alpha Funds to Camshaft, much less conducted any diligence into Camshaft Fund or its founder, nor did he speak to any advisors or counsel when approving this investment. Riju also never read Camshaft Fund's offering materials or other legal documents, nor did he have any skill related to investment management, despite signing an agreement claiming that he did. Additionally, Riju did not once speak to Morton before or after authorizing the investment in Camshaft, nor did he inquire as to why T&L instructed him to approve this half-billion-dollar investment. Worse still, he admitted to never monitoring the investment or hiring someone to monitor the investment on the Debtor's behalf to ensure that Camshaft Fund did not completely dissipate the Alpha Funds.

94. There is no legitimate reason for the transfer other than to frustrate the Lenders' ability to exercise remedies under the Credit Agreement. Riju's conduct grossly deviated from the standard of care that an ordinarily prudent director or officer would have exercised in a similar situation. Not only did Riju remove the Debtor's largest known liquid asset when the Debtor had substantial monetary obligations to fulfill under the Credit Agreement, he transferred that asset to a sham hedge fund, whose principal place of business was once at the location of an IHOP in Miami and which is run by a man in his twenties with no formal training in money management or experience in regulatory compliance. Riju did so with no apparent benefit to the Debtor, while knowing that the Debtor was already insolvent or would become insolvent as a result of the first fraudulent transfer, that the Debtor already was in default at the time of the aforementioned transfer, and that the Debtor lacked any meaningful revenue-generating capabilities. By transferring away the Alpha Funds, Riju secretly removed the principal source of available cash that the Debtor could have used to satisfy its obligations under the Credit Agreement. Riju thus actively concealed the money from the Debtor, which needed the money in order to meet the Debtor's legal and financial obligations to the creditors. As such, Ravindran was grossly negligent

and acted in bad faith, willfully failing to exercise the care of an ordinarily prudent director of a Delaware corporation. This actively and materially harmed the Debtor. Riju, who signed the Credit Agreement on behalf of the Debtor, knew or should have known what his obligations were thereunder, and he deliberately and willfully disregarded them notwithstanding the consequences.

95. Riju also caused the Debtor to transfer its limited partnership interest in Camshaft Fund to the Debtor's then-affiliate, Inspilearn, and could not articulate any value that the Debtor received in consideration for this transfer. There is no legitimate reason for these transfers other than to frustrate the Lenders' exercise of remedies. Riju's conduct thus grossly deviated from the standard of care that an ordinarily prudent director or officer would have exercised in a similar situation. As such, Riju acted at least with gross negligence and/or willfulness or even bad faith in failing to exercise the care of an ordinarily prudent director of a Delaware corporation by actively harming the Debtor and causing it to transfer its property without receiving any consideration in return.

96. Riju caused the Debtor to transfer its limited partnership interest in Camshaft Fund to the Debtor's then-affiliate, Inspilearn, in order to thwart the Lenders' ability to exercise remedies, thereby violating his duty of loyalty to the Debtor and the Debtor's creditors. Riju acted to keep the money within his family's exclusive control. Riju is (or was) a director for most of T&L's subsidiaries and is a significant stockholder in T&L. The funds also were put outside the reach of the Debtor and its creditors because Inspilearn was neither the borrower nor a guarantor under the Credit Agreement. Riju thus intentionally subordinated the interests of the Debtor to those of himself and his family, thereby breaching his duty of loyalty to the Debtor. As a result of Riju's egregious conduct, the Debtor has been unable to meet its legal and financial obligations to pay interest or amortization under the Credit Agreement, nor could it pay the accelerated amount

of the term loans on and after March 3, 2023. This caused material injury to the Debtor, which had to pay premium, interest, and expenses on the late payments and defaulted term loans. This also caused injury to the Debtor's creditors, which have not been paid under the Credit Agreement as a result of Riju's actions.

97. For the foregoing reasons, and as held by the Court in the MSJ Memorandum Opinion, Riju breached his fiduciary duties to the Debtor through his dereliction and conscious disregard of his fiduciary duties to the Debtor, including with respect to the first fraudulent transfer.[27]

**B. Byju Raveendran's and Divya Gokulnath's Aiding and Abetting of Riju Ravindran's Breach of His Fiduciary Duties to the Debtor.**

98. Byju and Gokulnath each knowingly participated in, and substantially assisted, Riju's fiduciary breach with respect to the first fraudulent transfer in 2022, and Gokulnath also knowingly participated in, and substantially assisted, Riju's fiduciary breach with respect to the second fraudulent transfer in 2023.[28] Byju and Gokulnath, each co-founders and directors of T&L, understood that Riju owed non-waivable fiduciary duties to the Debtor because T&L formed the Debtor as a Delaware corporation (as opposed to an LLC or LP, in which fiduciary duties can be waived) and appointed Riju as its sole director.

99. In an effort to keep the Alpha Funds out of the reach of the Lenders, Byju and Gokulnath directed Riju, as the Debtor's director, to cause or to approve of the Debtor's transfer

---

27 *See, e.g.*, MSJ Mem. Op. at 38-39 ("Having considered the evidence in the record regarding Ravindran's total abdication of his duties to the Debtor, as well as the absence of any evidence to the contrary, I find that Debtor has established as a matter of law that Ravindran breached his duty of good faith."); *see also* Judgment Order, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2025) [Adv. D.I. 388] (entering judgment against Riju for his breach of fiduciaries to the Debtor as to the first fraudulent transfer).

28 As alleged in Count Two, Byju owed his own fiduciary duties to the Debtor at the time of the second fraudulent transfer, and then breached those duties when effectuating that transfer while holding himself out as the Debtor's CEO.

of the Alpha Funds and then the Camshaft LP Interest. Byju and Gokulnath did this when they knew, or should have known as T&L directors, that, *inter alia*, the Debtor was insolvent, would become insolvent as a result of the transfers, or would be unable to meet its legal obligations as a result of the transfers. Moreover, as Riju freely testified, he "didn't even one time make a decision for [himself] over BYJU's Alpha"—"[i]t was always with the parent company." Hr'g Tr. at 32:19-23, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024).

100. Byju and Gokulnath had no legitimate reason to facilitate the transfers, which stripped the Debtor of the Alpha Funds for their own interests, but rather sought to frustrate the Lenders' ability to exercise remedies under the Credit Agreement. Byju and Gokulnath were not acting to further any legitimate interest of the Debtor, or even T&L, by facilitating the unlawful and fraudulent transfer of the Alpha Funds and the Camshaft LP Interest. Like Riju, Byju's and Gokulnath's actions were taken for the purpose of keeping the Alpha Funds out of reach of the Lenders and within their family's own reach, all to the ultimate detriment of the Debtor.

101. Byju's and Gokulnath's knowing and active participation and substantial assistance in Riju's fiduciary breaches caused direct and proximate harm to the Debtor. Specifically, it was foreseeable that Byju's active participation in Riju's fiduciary breaches related to the first fraudulent transfer would cause the Debtor to suffer the loss of the Alpha Funds (or the proceeds thereof) and other harms stemming from those losses. The same is true of Gokulnath's active participation in Riju's fiduciary breaches related to the first and second fraudulent transfers.

102. In light of the foregoing, the Debtor is, at a minimum, entitled to damages for Byju and Gokulnath aiding and abetting Riju's breach of his fiduciary duties (and discovery may reveal that Byju also breached his own fiduciary duties to the Debtor in causing it to make the first

fraudulent transfer), including compensatory damages for the damages caused to the Debtor, attorneys' fees and expenses, and prejudgment interest.

**COUNT TWO**
**BREACH OF FIDUCIARY DUTY**
**(AGAINST BYJU RAVEENDRAN)**

103. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

104. On March 31, 2023, Byju, while holding himself out as the Debtor's CEO, caused the Debtor to transfer the Camshaft LP Interest to a non-guarantor affiliate, Inspilearn, for no consideration. This process for consummating this transfer commenced no later than fall of 2022, well before the Debtor's former directors and offers, including Byju, had been removed. Accordingly, Byju is liable for his March 31, 2023 breach of fiduciary duties as the Debtor's officer, even though he had no authority to continue acting in that role at that time.

105. At the time of this transfer, the Debtor, under applicable law, was insolvent, *i.e.*, its liabilities exceeded its assets and/or was unable to pay its debts as they came due and remained so at all times thereafter through and including the Petition Date. Specifically, the Debtor: (a) was a special purpose financing vehicle with no material active operations; (b) had defaulted on its term loans; (c) had no ability to comply with its obligations under the accelerated Credit Agreement due to a lack of funds, whether directly or directly from its affiliated guarantors (which were unwilling to step-in and honor those obligations); and (d) owed the Lenders principal and interest exceeding $1.2 billion, which had been accelerated.

106. The Camshaft LP Interest was contemporaneously valued at over $540 million. After the transfer to Inspilearn, a non-guarantor affiliate, the Debtor was left without the Camshaft LP Interest and less than $500,000 in its bank accounts. Moreover, it was financially unable to

Case 25-50212-BLS Doc 2 Filed 04/28/25 Page 40 of 50

make any interest payments or pay down the outstanding principal of the accelerated term loans, as required under the Credit Agreement.

107. As the Debtor was insolvent, Byju owed fiduciary duties to the Debtor, as a putative officer, to: (i) act with the care that an ordinarily prudent officer would in a similar position, (ii) serve in the best interests of the Debtor; and (iii) refrain from intentionally acting with a purpose other than to advance the best interests of the Debtor.

108. Byju failed to serve in the best interests of the Debtor when he directed and purportedly effectuated the Inspilearn transfer. The Debtor received no consideration for this transfer. As Riju, the Debtor's former director and officer admitted in sworn testimony, he could not identify what, if anything, Inspilearn had paid or provided in value to the Debtor for acquiring the Camshaft LP Interest, nor did he know whether Inspilearn promised to pay anything or provide any value to the Debtor for the investment in the future. The Debtor's term loans had been accelerated, and Byju knew that the Debtor was insolvent, and indeed lacked any material revenue-generating capabilities. Moreover, Byju actively concealed the Alpha Funds and the Camshaft LP Interest from the Debtor, which needed the money to meet its legal and contractual obligations to its creditors. Byju has offered no legitimate reason for the transfers and asset concealment, rather admitting only weeks after the second fraudulent transfer that the Alpha Funds were someplace the Lenders would "never" find it. As this Court has observed, "[i]t is difficult to imagine a single combination of words to demonstrate actual fraudulent intent more clearly." *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, 661 B.R. 109, 123 (Bankr. D. Del. 2024).

109. Byju's conduct grossly deviated from the standard of care that an ordinarily prudent director and officer of a Delaware corporation would have exercised in a similar situation. He materially harmed the Debtor, causing it to transfer its property without receiving any

consideration in return. His actions were willful and in bad faith. Byju deliberately directed the second fraudulent transfer in order to thwart the Lenders' exercise of their contractual remedies by placing the Debtor's primary remaining assets beyond their reach, while remaining accessible to T&L (and thus, to Byju himself). This violated his duty of loyalty to the Debtor, for the benefit of its creditors, whose interests were paramount in light of the Debtor's ongoing insolvency. In doing so, Byju—the founder, director, and a significant shareholder of T&L—acted in furtherance of his own interests and the interests of T&L's (former) indirect equity in the Debtor, while subordinating the Debtor's interests.

110. By subordinating the Debtor's interests to those of himself and his family through T&L, and by continuing to conceal his self-dealing and misappropriation, Byju breached his overriding fiduciary duties to the Debtor. As a result of this egregious and offensive conduct, the Debtor has been unable to meet its legal obligations to pay interest or amortization under the Credit Agreement, nor could it pay the accelerated amount of the term loans on and after March 3, 2023. This has caused (and continues to cause) material injury to the Debtor and its estate, the creditors of which have not received a single payment under the Credit Agreement since March 2023. Indeed, it is a proximate cause of the Debtor's bankruptcy filing. And exacerbating the injury, Byju has spent his time since the filing doing everything he can to frustrate the discovery of the Alpha Funds and the proceeds thereof.

111. In light of the foregoing, the Debtor is entitled to damages for Byju's breach of his fiduciary duties, including compensatory damages for the damages caused to the Debtor, the disgorgement of the Alpha Funds, the disgorgement of any profits received as a result of the wrongful transfer of the Alpha Funds and/or the Camshaft LP Interest, the disgorgement of any

fees that Byju earned in his capacity as the CEO of Debtor around the time of the second fraudulent transfer, attorneys' fees and expenses, and pre- and post-judgment interest.

**COUNT THREE**
**AIDING AND ABETTING BYJU RAVEENDRAN'S BREACH OF FIDUCIARY DUTIES (AGAINST ANITA KISHORE)**

112. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

113. As discussed more fully in Count Two, Byju, as the former chief executive officer of the Debtor, owed to the Debtor fiduciary duties to, among other things, exercise due care, act loyally, and serve in the best interest of the Debtor for the benefit of its creditors.

114. As discussed more fully in Count Two, Byju breached his fiduciary duties to the Debtor by, among other things, causing the Debtor to transfer the Camshaft LP Interest to Inspilearn for no consideration, on the heels of the Lenders' exercise of remedies, including the Lenders' agent exercising control over the Debtor and appointing Pohl as its sole director.

115. Kishore knowingly and actively participated in, and substantially assisted, Byju's breach of his fiduciary duties. Kishore, acting in concert with Byju, caused the Debtor to transfer the Camshaft LP Interest to Inspilearn (a T&L subsidiary) and facilitated Camshaft Fund's consent to the transfer. Based on the factual record, including the reasonable inferences therefrom, Kishore did all of this with knowledge that, *inter alia*, the Debtor was insolvent following the Lenders' acceleration of the term loans, would become insolvent as a result of the transfers, or would be unable to meet its legal obligations as a result of the transfers. Additionally, Kishore knew that, at the time she was directing the transfer, she and Byju had no lawful authority to direct the Debtor's affairs, following a change of control based on conceded Events of Default, and the Lenders' resulting exercise of remedies. Kishore also took active measures to conceal the unlawful transfer of the Camshaft LP Interest. Furthermore, Byju and Kishore made the fraudulent transfer to

Inspilearn to advance T&L's interests, in knowing disregard of Byju's obligations to the Debtor. Indeed, as discussed above, two of the directors of T&L, either personally or through counsel, have admitted to moving the funds in order to protect T&L's own interests by thwarting the Debtor's ability to meet its legal obligations to the creditors.

116. In light of the foregoing, the Debtor is entitled to damages for Kishore's aiding and abetting Byju's breach of his fiduciary duties, including compensatory damages for the damages caused to the Debtor, attorneys' fees and expenses, and prejudgment interest.

**COUNT FOUR**
**ACCOUNTING**
**(AGAINST ALL DEFENDANTS)**

117. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

118. The Debtor failed to maintain complete and accurate books and records of the Debtor's assets and liabilities. To the extent books and records were maintained, they were maintained by or in the custody of T&L—of which (i) Byju and Gokulnath were co-founders and directors, in addition to being significant shareholders, and (ii) Kishore was a senior officer—or by Byju, Gokulnath, and Kishore personally. *See* Hr'g Tr. at 73:15-24, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024) (Riju testifying that T&L "maintains financial and accounting records with respect to its subsidiaries," including BYJU's Alpha, and that information and records concerning the Alpha Funds "should be" maintained in the books of T&L).

119. The Debtor (under Pohl's direction) has repeatedly requested information from the Debtor's former management and representatives, including, among other things, the location, purported beneficial owners, form, value, and other information regarding the Alpha Funds and the Camshaft LP Interest. For instance, on May 3, 2023, Pohl's counsel sent a letter to Kishore

and BYJU's General Counsel, copying T&L's outside counsel and Pohl personally, demanding that they—"as current officers of Think and Learn Pvt Ltd."—"immediately" disclose "all information you possess or have access to concerning any assets of the Company," among other information.

120. However, neither T&L's senior executives nor anyone else has provided Pohl with complete information about the Debtor's assets. Instead, all of them, including Byju, Gokulnath, and Kishore, have actively concealed and provided misleading information about the Debtor's assets. In fact, based on Riju's in-court testimony on March 14 and May 21, 2024, Byju and Gokulnath—then comprising two thirds of the T&L board—failed to disclose the current location of the Alpha Funds in response to Riju's direct request for this information. There is no doubt that Byju and Gokulnath have, at all times, had the ability to obtain the information the Debtor has long sought concerning the missing Alpha Funds. This is information that Defendants, in their roles at the Debtor and/or T&L and as key participants in the fraudulent transfers scheme, would have to have known. However, the Debtor is unaware whether the Alpha Funds presently exist in cash, cash equivalents, or in other forms—or if those funds still exist at all.

121. Because the Alpha Funds are the Debtor's assets, Byju was acting as a fiduciary with respect to his handling of them, as discussed in Count Two. Byju, therefore, breached his fiduciary duties to the Debtor when he, acting as the Debtor's CEO, effectuated the transfer of the Camshaft LP Interest to a non-guarantor affiliate for no consideration.

122. Moreover, Gokulnath and Kishore, in their fiduciary roles at T&L, were also responsible for maintaining the Debtor's books and records. In fact, as for Kishore, the record confirms that she had access to the Debtor's account at Camshaft Fund.

123. As a result of Defendants' material breaches of their duties, the Debtor has suffered, and will continue to suffer, injury and significant harm as set forth in detail herein.

124. Accordingly, the Debtor requires, and is entitled to, a full and accurate accounting of the Debtor's Alpha Funds, through the production and examination of all books and records associated with those funds and any proceeds thereof, specifically those relating to the second fraudulent transfer to Inspilearn. Accordingly, the Debtor seeks entry of a judgment directing each of the Defendants to perform a full and accurate accounting of the Alpha Funds and any proceeds thereof, such as the Camshaft LP Interest, including each and every subsequent transfer and any proceeds thereof.

**COUNT FIVE**
**CONVERSION**
**(AGAINST ALL DEFENDANTS)**

125. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

126. GLAS, on behalf of the Lenders, exercised remedies and became the Debtor's sole shareholder on March 3, 2023. That same day, GLAS removed the Debtor's existing directors and officers and appointed Pohl in their place. As a result, Byju, Riju, and everyone else acting with them, including Gokulnath and Kishore, were relieved of any authority governing the use, transfer, disposition, or other transaction of the Debtor's property—including the Alpha Funds and the Camshaft LP Interest—on and after March 3, 2023. Instead, on and after March 3, 2023, the Debtor, under Pohl's exclusive control, had the sole authority governing the use, transfer, disposition, or other transaction of the Debtor's property—including the Alpha Funds and the Camshaft LP Interest. Accordingly, the Debtor would have had possession over the entire Camshaft LP Interest through March 31, 2023, when the second fraudulent transfer was

purportedly consummated. And from and after March 3, 2023, the Debtor, at the direction of Pohl, had an immediate right and the sole authority to possession of the Camshaft LP Interest.

127. Because all three Defendants lacked any authority to exercise control over the Debtor's property on and after March 3, 2023, the Debtor's purported transfer of the Camshaft LP Interest on March 31, 2023, which was made without the consent or knowledge of the Debtor (at that time under the control of Pohl, its sole director and officer), constituted a wrongful act of possession and disposition of the Debtor's Camshaft LP Interest. As such, Defendants are joint tortfeasors who unlawfully exerted control over the Camshaft LP Interest as if it remained property under their control when, in fact, it was the Debtor's exclusive property over which they had no control.

128. By transferring away the Camshaft LP Interest for no consideration, Defendants denied and eliminated the Debtor's contractual rights to that property. Because Defendants had continuously concealed the existence of the Camshaft LP Interest, Pohl was unable to specifically demand that the interest be returned to the Debtor before it was transferred to Inspilearn. These actions by Defendants amounted to an unlawful conversion of the Debtor's rights as the legal owner of the Camshaft LP Interest.

129. In light of the foregoing, the Debtor requests damages in an amount to be determined at trial, in addition to attorneys' fees and expenses, and prejudgment interest incurred in this adversary proceeding.

**COUNT SIX**
**CIVIL CONSPIRACY**
**(AGAINST ALL DEFENDANTS)[29]**

130. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

131. GLAS, on behalf of the Lenders, exercised remedies and became the Debtor's sole shareholder on March 3, 2023. That same day, GLAS removed the Debtor's existing directors and officers and appointed Pohl in their place. As a result, Byju and Riju, and everyone else acting with them, including Gokulnath and Kishore, were relieved of any authority governing the use, transfer, disposition, or other transaction of the Debtor's property—including the Alpha Funds and the Camshaft LP Interest—on and after March 3, 2023. Instead, on and after March 3, 2023, the Debtor, under Pohl's exclusive control, had the sole authority governing the use, transfer, disposition, or other transaction of the Debtor's property—including the Alpha Funds and the Camshaft LP Interest. Accordingly, the Debtor would have had possession over the entire Camshaft LP Interest through March 31, 2023, when the second fraudulent transfer was purportedly consummated. And from and after March 3, 2023, the Debtor, at the direction of Pohl, had an immediate right and the sole authority to possession of the Camshaft LP Interest.

132. However, Defendants, acting in concert along with at least Riju and Inspilearn, among others, took a series of unlawful and coordinated steps to defeat the Debtor's ownership of the Alpha Funds and the proceeds thereof, including the Camshaft LP Interest. These unlawful steps included: (i) Kishore, with Byju copied—which was no accident—defrauding the Debtor by directing Camshaft Fund to transfer the Camshaft LP Interest on the first business day following

[29] Though Riju and Inspilearn are among the co-conspirators, the Debtor already obtained judgments against them and, for that reason, among others, has chosen not to name them as defendants at this time in this current lawsuit. *See generally* MSJ Mem. Op.

GLAS's exercise of remedies, at a time when Kishore knew that neither she nor Byju had any lawful authority to direct the Debtor's affairs and assert control over its assets, (ii) Kishore facilitating the unlawful transfers at issue, (iii) Kishore engaging in a sham cash verification exercise to mislead the Lenders about the location and availability of the Alpha Funds, (iv) Byju falsely representing that he had the authority to execute the Transfer Agreement on behalf of the Debtor, and (v) Byju and Riju executing various integrated agreements on March 31, 2023 to purportedly consummate the Debtor's transfer of the Camshaft LP Interest for no consideration. The orchestration of these events from March 3 to 31, 2023, along with the subsequent efforts taken by Byju, Riju, Gokulnath, and Kishore, among others, to transfer the Camshaft LP Interest *again* in May 2023 and February 2024, and then to cover-up the transfer during the course of these bankruptcy proceedings, including in response with the Court's P.I. Order directing Riju to take all "necessary steps" to locate the Alpha Funds,[30] demonstrates a meeting of the minds to move the Camshaft LP Interest away from the control of the Debtor (rightfully under the control of Pohl) and GLAS. The ultimate effect of this conspiracy was to deprive the Debtor of the Alpha Funds and the proceeds thereof, including the Camshaft LP Interest.

133. In light of the foregoing, the Debtor requests damages in an amount to be determined at trial, in addition to attorneys' fees and expenses, and prejudgment interest incurred in this adversary proceeding.

---

[30] Order Granting Debtor's Mot. for Prelim. Inj. ¶ 2, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 18, 2025) [Adv. D.I. 84] (the "P.I. Order"). As came out at the hearing on May 21, 2024, Byju, Riju, and Gokulnath had engaged in a charade to conceal the Alpha Funds while they were all living together.

Case 25-50212-BLS Doc 2 Filed 04/28/25 Page 49 of 50

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Debtor BYJU's Alpha, Inc. requests that this Court enter judgment and grant the following relief against Byju Raveendran, Divya Gokulnath, and Anita Kishore:

a. Award of damages for breach of fiduciary duties and aiding and abetting such breach of fiduciary duties, including compensatory damages for damages caused to the Debtor and disgorgement of the Alpha Funds, the Camshaft LP Interest, and/or the proceeds thereof;

b. An accounting of the Alpha Funds, the Camshaft LP Interest, and/or the proceeds thereof;

c. Award of damages for conversion of, and civil conspiracy to defeat, the Debtor's ownership of the Camshaft LP Interest;

d. Attorneys' fees, costs, and expenses incurred in this adversary proceeding;

e. Pre- and post-judgment interest up to the statutory maximum; and

f. Any other relief that this Court may deem just, proper, or equitable under the circumstances.

Case 25-50212-BLS Doc 2 Filed 04/09/25 Page 50 of 50

Dated: April 9, 2025
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin I. Finestone (*pro hac vice* forthcoming)
Kate Scherling (*pro hac vice* forthcoming)
Jordan M. Nakdimon (*pro hac vice* forthcoming)
295 Fifth Avenue
New York, New York 10016
Tel.: (212) 849 7000
benjaminfinestone@quinnemanuel.com
katescherling@quinnemanuel.com
jordannakdimon@quinnemanuel.com

*Counsel for Plaintiff-Debtor, BYJU's Alpha, Inc.*