# EXHIBIT 9

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BYJU'S ALPHA, INC.,[1] | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 24-10140 (BLS) |
| | ) | |
| | ) | Adv. Pro. Case No. |
| BYJU'S ALPHA, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OCI LIMITED and RUPIN BANKER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>COMPLAINT</u>**

Plaintiff BYJU's Alpha, Inc. (the "<u>Debtor</u>") alleges as follows:

**<u>PRELIMINARY STATEMENT</u>**[2]

1. The central issue in this bankruptcy has been the theft of $533 million, the "Alpha Funds," from the Debtor. On February 27, 2025, this Court granted the Debtor's motion for partial summary judgment and then, among other things, avoided the Debtor's (i) transfer of the Alpha Funds to Camshaft Fund and (ii) subsequent transfer of the Camshaft LP Interest to Inspilearn for the benefit of Think & Learn as fraudulent transfers under 11 U.S.C. §§ 544 and 548.[3] The Court further held that Riju Ravindran,[4] the Debtor's "incompetent" former director and executive

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is: 1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

[2] Capitalized terms not defined in the Preliminary Statement have the meanings given to them below.

[3] *See generally Memorandum Opinion*, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro No. 24-50013 (Bankr. D. Del. Feb. 27, 2025) [Adv. D.I. 383] (the "<u>MSJ Mem. Op.</u>"); *Judgment Order*, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro No. 24-50013 (Bankr. D. Del. Mar. 14, 2025) [Adv. D.I. 388].

[4] To distinguish between the brothers, Byju Raveendran is referred to herein as "Byju" and Riju Ravindran is referred to herein as "Riju."

officer, breached his fiduciary duties to the Debtor by authorizing the transfers.[5] As of today, the Alpha Funds have not been recovered. However, despite the concerted efforts of bad actors around the globe, five of whom have been held in contempt, including Riju and the sham hedge fund (Camshaft) that first received the Alpha Funds, the Debtor has successfully uncovered significant information about the theft.

2. That information directly implicates OCI Limited and its principal Rupin Banker as the next link in the chain. In receiving the Alpha Funds from Camshaft, Defendants engaged in the same pattern of unlawful conduct and obfuscation as Riju and Camshaft, and they too must be held accountable.

3. It was **incredibly** challenging for the Debtor to even learn about OCI. The very reason Camshaft and its inexperienced governor, William Morton, were held in contempt is because they flat out refused to disclose what happened to the Alpha Funds once in their possession.[6] In the first 100 days of this bankruptcy, Camshaft went to the proverbial "ends of the Earth"—at least eleven motions,[7] three lawsuits,[8] and two appeals[9]—to block or frustrate discovery that would have revealed Camshaft's transfer of the Alpha Funds to OCI. The Debtor only learned of OCI when Camshaft's fund administrator, Apex, undeterred by Camshaft's litigation threats, produced documents in late April 2024. These documents did not disappoint,

---

5 *Id.*; *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, 661 B.R. 109, 125 (Bankr. D. Del. 2024).

6 *See id.* at 114-18.

7 *See In re BYJU's Alpha, Inc.*, 24-10140 (Bankr. D. Del.) [D.I.107]; *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro No. 24-50013 (Bankr. D. Del.) [Adv. D.I. 28, 34, 76, 100, 156, 170]; *See BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, 24-358 (D. Del.) [D.I. 5]; *In re Subpoena Served on Apex Fund Servs.*, Case No. 24-171 (S.D.N.Y.) [D.I. 20]; *Camshaft Cap. Mgmt., LLC v. BYJU's Alpha, Inc.*, Case No. 24-56003 (Bankr. S.D. Ind.) [D.I. 21]; *Camshaft Cap. Fund, LP v. BYJU's Alpha, Inc.*, Case No. 24-733 (S.D. Ind.) [D.I. 2].

8 *See In re Subpoena Served on Apex Fund Servs.*, Case No. 24-171 (S.D.N.Y.); *Camshaft Cap. Mgmt., LLC v. BYJU's Alpha, Inc.*, Case No. 24-56003 (Bankr. S.D. Ind.); *Camshaft Cap. Mgmt., LLC v. Apex Fund Servs. (Ind.), Inc.*, Case No. 24-713 (S.D. Ind.).

9 *See BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Case No. 24-358 (D. Del.); *Camshaft Cap. Fund, LP v. BYJU's Alpha, Inc.*, Case No. 24-733 (S.D. Ind.).

shining a light on Defendants' central roles in the dissipation of the Alpha Funds and subsequent years-long cover-up that continues today.

4. Though much still remains to be learned, the fraud is unmistakable. In mid-2022, on the heels of defaulting on its term loans, the Debtor transferred the Alpha Funds to Camshaft in exchange for a purported "investment" in the fund. Camshaft was not chosen for its investment acumen; rather, it was chosen to facilitate, at a minimum, accounting misrepresentations. Camshaft and Morton then helped the Debtor, acting at the direction of its ultimate corporate parent, T&L, move the Alpha Funds abroad to OCI, an English entity that holds itself out as a commercial process outsourcing (supply chain) specialist, without any of the Debtor, T&L, or OCI disclosing the movement of money on their respective financial statements.

5. The reason for the transfer of the Alpha Funds, at least according to OCI in a sworn statement, was to pay for OCI's procurement of "products and services," such as tablets, for T&L and its subsidiaries (but not the Debtor, a special purpose financing vehicle).[10] That explanation is both incomplete and misleading. If OCI simply needed money to procure "products and services," then the Debtor could have wired the Alpha Funds directly to OCI. The Debtor did not need to first involve Camshaft. After all, involving Camshaft was expensive; it received over $10 million for facilitating the subsequent fraudulent transfers at issue here.

6. The *real* reason for the transfer of the Alpha Funds was an attempt at financial alchemy.[11] The Debtor turned the payment of expenses into an appreciating asset, creating the appearance that it continued to maintain control of the Alpha Funds. Rather than record its payment of a substantial amount of goods and services as an expense paid to OCI, T&L and the

---

10 July 31, 2024 First Witness Statement Rebekah Jean Parker ("Parker Statement") ¶¶ 12-13 (attached as Ex. 1).

11 *See generally* Hr'g Tr. at 4:25-28:17, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro No. 24-50013 (Bankr. D. Del. Oct. 9, 2024).

Debtor deceptively recorded the $533 million "investment" in Camshaft as a liquid asset—"Cash and Bank"—on T&L's consolidated financial statements (reported as 5,220.6 Rupees (₹) crore—₹52,206,000,000, which is over $600 million):

*One Example of T&L's Misleading Financial Statements*

THINK & LEARN PRIVATE LIMITED
Q3FY23- INCOME STATEMENT BREAKDOWN AND CASH & BANK BALANCE

(Rs. Crores)

THINK & LEARN PRIVATE LIMITED
Q3FY23- INCOME STATEMENT BREAKDOWN AND CASH & BANK BALANCE

BYJU'S Alpha Inc

Cash and Bank

| S.No. | Subsidiary | Gross Revenue | Taxes | Net Revenue | Consumption /Direct costs | Payroll | Marketing | Other GA | EBIDTA | PAT | Cash and Bank |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Toppr technologies (P) Ltd | 15.1 | (2.0) | 13.1 | - | (9.0) | 0.2 | (2.9) | 1.5 | (2.1) | 6.8 |
| 2 | Grade Stack Learning (P) Ltd | 39.3 | (5.2) | 34.1 | (0.7) | (19.0) | (4.5) | (2.9) | 7.0 | 7.3 | 0.4 |
| 3 | Byjus K3 Education (P) Ltd | - | - | - | - | - | - | 14.8 | 14.8 | 13.9 | 4.7 |
| 4 | Byjus Pte Ltd. Singapore* | 30.1 | - | 30.1 | 2.7 | (62.5) | (9.5) | (0.1) | (39.3) | (37.6) | 35.7 |
| 5 | BYJU'S Alpha Inc | - | - | - | - | - | (597.3) | (30.2) | (627.5) | (842.7) | 5,220.6 |
| 6 | Tynker Inc | 13.2 | - | 13.2 | (1.3) | (16.3) | (3.3) | (3.3) | (11.0) | (11.7) | 21.9 |
| 7 | Specadel Technologies (P) Ltd | 0.1 | 0.0 | 0.2 | - | (0.2) | - | (0.0) | (0.0) | (0.0) | 0.5 |
| 8 | Span Thoughtworks (P) Ltd | - | - | - | - | - | - | 0.0 | 0.0 | (0.5) | 0.5 |
| 9 | Inspilearn LLC | 5.6 | - | 5.6 | - | - | - | - | 5.6 | (2.7) | 2.7 |
| 10 | Isitops Labs | - | - | - | - | (2.9) | (2.3) | (3.6) | (8.7) | (5.5) | 0.4 |
| | **Combined Total** | **103.4** | **(7.2)** | **96.2** | **0.7** | **(109.7)** | **(616.7)** | **(28.2)** | **(657.6)** | | **294.1** |

** Includes BYJU'S Beta Inc, BYJU'S UK, BYJU'S Future School Mexico, BYJU'S Future School Brazil and Geogebra*
*Q3FY23 - October to December 2022*

5,220.6

7. This was a clear accounting misrepresentation. As the former head of financial services at Ernst & Young India observed, "[t]here is no accounting standard anywhere in the world that would allow you to record a prepaid expense as a cash equivalent."[12]

8. OCI was more than just a passive enabler of the Debtor's accounting misrepresentations—it actively participated in the deception. When Camshaft Fund transferred the $533 million to OCI in mid-2022, it did so pursuant to various "Promissory Notes," that is, OCI borrowed the funds in exchange for a promise to repay the $533 million in three years' time. Those legally-enforceable Notes were an integral part of the arrangement here: the value given to the Debtor's appreciating "investment" in Camshaft was tied to, and assumed, OCI's repayment of its Promissory Notes. OCI, however, was never going to borrow money from a T&L subsidiary only to then use the borrowed funds to purchase products and services for T&L and its other

---

[12] Andrew Scurria, *Byju's Lenders Chase $500 Million Moved Out of U.S.*, WALL STREET JOURNAL (Apr. 11, 2025, 10:18 AM), https://www.wsj.com/articles/byjus-lenders-chase-500-million-moved-out-of-u-s-2c0b7a0e.

subsidiaries. That would leave OCI worse off financially. Instead, OCI and T&L agreed behind the scenes that OCI did not need to actually honor the Promissory Notes. Unsurprisingly therefore, OCI failed to disclose the Notes as debts on its publicly-reported financial statements. OCI's disclosed debts in each of 2022, 2023, and 2024 came nowhere close to $533 million; in fact, *no* long-term debts were recorded in either 2023 or 2024:

*OCI's Publicly-Reported Statement of Financial Position*

| OCI's Debts | Aug. 31, 2022 | Mar. 31, 2023 | Mar. 31, 2024 |
|---|---|---|---|
| Creditors: amount falling due within one year | -£64,382,181 | -£35,645,155 | -£33,005,124 |
| Creditors: amount falling due after one year | -£3,070,515 | £0 | £0 |

9. The truth about OCI and Banker gets far worse, and the findings from an extensive investigation into OCI are as alarming as the prior findings into Camshaft. As with Camshaft, OCI repeatedly misled the market and the general public about its size, leadership team, and expertise. OCI's headquarters are a WeWork-style office space in London. Of its eight purported offices outside of London, investigators were able to visit six, each time finding no one from OCI present. The pictures in ¶¶ 25-34, *infra*, speak louder than words. OCI includes on its marketing materials the names, lofty titles, and biographies of individuals who have denied working there. Former OCI staff and contractors criticized OCI for falsely portraying contractors as permanent employees and, in certain cases, as senior executives. And finally, as for Banker, the allegations against him of fraud and criminal wrongdoing have been so frequent that they can be fairly described as commonplace. In other words, OCI is merely Camshaft 2.0. While the Raveendrans' capacity for fraud and deception knows no limits, their tactics are redundant.

10. It is against this backdrop of scheming and deception that the Debtor brings this lawsuit to recover the Alpha Funds. OCI is the subsequent transferee of the Alpha Funds pursuant to Section 550(a)(2) of the Bankruptcy Code and state law; and Defendants aided and abetted not

just Riju's and T&L's breaches of their fiduciary duties but also Camshaft Management's breaches of its own fiduciary duties, in each case to the Debtor (and in the case of Camshaft Management specifically, through the Debtor's limited partnership interest in Camshaft Fund). In fact, it is readily apparent that OCI and Banker were more than mere participants in those breaches—they actively planned, facilitated, and effectuated the scheme that lies at the heart of this case with full knowledge of the fraud. OCI must be held accountable for the significant damage it has caused the Debtor and its estate.

## JURISDICTION AND VENUE

11. On February 1, 2024 (the "Petition Date"), the Debtor, a corporation organized and existing under the laws of the State of Delaware, filed a voluntary petition for relief under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

12. This Court has jurisdiction over these proceedings under 28 U.S.C. § 1334(b) and 28 U.S.C. § 1332(a). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2). Alternatively, this Court has non-core concurrent jurisdiction over these proceedings under 28 U.S.C. § 1334(b). The Debtor's claims are, at a minimum, related to its bankruptcy case insofar as they seek to recover damages, which would augment the Debtors' bankruptcy estate.

13. This Court has personal jurisdiction over each Defendant under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7004(f).

14. This Court has personal jurisdiction over OCI Limited ("OCI") and Banker based on their systematic and repeated contacts with the United States in effectuating the three Transfers (defined below) at issue in this case:

- The Transfers resulted in the movement of the Alpha Funds from (i) the Debtor, a Delaware corporation, (ii) to Camshaft Capital Fund, LP ("Camshaft Fund"), a Delaware limited partnership with its principal place of business in Miami, and finally (iii) to OCI, a UK entity.

- Banker originally contacted Brett Borgersen, a Florida resident, in early 2022 to locate an intermediary through which the Alpha Funds could be transferred.

- Defendants knew that all of the key players were located in the United States.

- Naturally, OCI also routinely communicated with individuals in the United States to consummate the U.S.-focused transaction. Specifically, Defendants repeatedly initiated, responded to, or otherwise engaged in email correspondence, telephone calls, and video conferences with Morton (understood to be a Florida resident at all relevant times) and E.F. Hutton (another U.S. entity) about the Transfers.

- OCI, specifically Banker, negotiated the documents that governed the transaction, including dictating the size of the Debtor's purported investment in Camshaft Fund.

- OCI obtained possession of the Alpha Funds through multiple wire transfers originating from U.S. banks.

- The brunt of the Debtor's injury was felt in the United States.

15. Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

16. This adversary proceeding is initiated under, at a minimum, Bankruptcy Rules 7001(a)(1).

17. Pursuant to Rule 7008-1 of the Local Rules of the U.S. Bankruptcy Court for the District of Delaware, the Debtor consents to the entry of final orders and judgments by the Court on these claims to the extent it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## THE PARTIES, INCLUDING THE EXTENSIVE INVESTIGATION INTO DEFENDANTS

18. Plaintiff-Debtor BYJU's Alpha is a Delaware corporation with its principal place of business in the State of Illinois. The Debtor was formed on September 27, 2021, as a special purpose financing vehicle of its former ultimate corporate parent, Think & Learn Private Ltd. ("T&L"), an Indian entity. Until March 3, 2023, T&L wholly owned the Debtor through an intermediate subsidiary, BYJU's Pte. Ltd. The Debtor has never had any material active business

operations. On March 3, 2023, Timothy R. Pohl became the Debtor's sole director and sole officer, and he has remained in these roles at all times through the present.

19. Defendant OCI Limited is a private limited company organized and existing under the laws of the United Kingdom with its registered offices at Burton Varley Ltd., Suite 3, 2nd Floor, Didsbury House, 748-754 Wilmslow Road, Manchester, England, M20 2DW. Defendant Rupin Banker is a structuring advisor and member of the senior leadership team of OCI, and, upon information and belief, he is a resident of London, United Kingdom.

* * *

20. The truth about Defendants is alarming. As an extensive investigation uncovered, OCI is yet another sham enterprise in the BYJU's saga, and the parallels to Camshaft are uncanny. OCI trumpets its recognition by the Financial Times as the United Kingdom's "Fastest Growing Company" in 2022, third overall in Europe.[13] But an extensive investigation has uncovered that, much like Camshaft, this is smoke and mirrors, as OCI and its controllers have repeatedly misled the market and the general public about its size, leadership team, expertise, and financial affairs—all in order to portray a level of scale, growth, and standing that simply has no basis in fact.

**A. *OCI's WeWork-Style London Headquarters.***

21. OCI's purported "Head Office" is identified as 33 Cannon Street, London, EC4M 5SB.[14] Rather than a dedicated office, the fourth floor of 33 Cannon Street (where OCI is located) is an open-plan, co-working facility that is home to multiple companies and provides working space for over 100 individuals. According to a brochure from building management, a desk rents for £699-£749 per month.

---

[13] *See, e.g.*, OCI, *Recent Awards*, https://oci-group.co.uk/awards/ (last visited May 1, 2025); *FT 1000: the sixth annual list of Europe's fastest-growing companies*, FINANCIAL TIMES (Feb. 28, 2022), https://www.ft.com/ft1000-2022.

[14] *See, e.g.*, OCI, *Our locations*, https://oci-group.co.uk/locations/ (last visited May 1, 2025).

22. Investigators, with management's permission, visited the co-working facility twice, on January 30 and February 18, 2025. OCI appears to have rented a cluster of five or six desks. A former representative of OCI said it did not hold a long-term lease for the space, at least as of 2023. When investigators first visited the facility, five OCI representatives were present in OCI's cluster of desks. When investigators visited a second time on a Tuesday during business hours, OCI's cluster of desks was vacant—no one was working.[15]

**B. *OCI's Non-Existent Non-London Offices.***

23. Online, OCI holds itself out as the "world's first in commercial process outsourcing" with ten offices globally, eight of which are located outside of London and spread across eight countries, as depicted on OCI's website by the blue dots below.[16] OCI actively markets its international presence as a key strategic business advantage.[17] Furthermore, as discussed *infra*, OCI has sent prospective customers marketing materials touting its international office locations, as far ranging as Denmark and Hong Kong.[18] When shown these marketing materials, a former OCI representative told an investigator that OCI has no international offices; rather, OCI just had contractors residing in different countries.

---

[15] Investigators also visited a second purported London office shown on OCI's website (Octagon Point, 5 Cheapside, City of London, EC2V 6AA) on the same two days. Octagon Point is a six-floor, mixed-use building with private offices and meeting rooms of varying sizes on each floor. A former OCI representative told investigators that Octagon Point was generally used for client meetings because it was a nicer office than Cannon Street.

[16] *See* OCI, *Our locations*, https://oci-group.co.uk/locations/ (last visited May 1, 2025).

[17] *Id.* ("We have offices around the world giving us a global reach to provide localised services."); *see also* Parker Statement ¶ 9 ("OCI is a substantial and highly successful company. As shown on its website, OCI has 10 offices across the globe (in the United Kingdom, EMEA, Asia and Oceania)[.]").

[18] *See, e.g.*, ¶ 36, *infra* (a 2020 marketing presentation sent to a future OCI customer); Ex. 2 at 5, 23 (a 2022 marketing presentation sent to a now-former Camshaft representative).




*OCI's Purported Offices "Across the Globe"*

24. From February to April 2025, investigators visited six of the eight non-London office locations (the exceptions being (i) the purported office in the United Arab Emirates, because online maps do not disclose its precise location; and (ii) the purported address in Australia, which is a P.O. Box, not an actual office). OCI was not found at any of the six locations:

25. <u>Manchester (United Kingdom)</u>. OCI purports to maintain an office at Bank Chambers, 93 Lapwing Lane, Manchester. This is a brick building at the corner of a busy junction with one parking spot in the back. The building's intercom identifies two tenants: one in real estate investment and the other in property management. There is no signage or other outward indication that OCI has a presence at the location.




Building




Door

26. It appears as if OCI falsely represented its accountant’s address as the address of one of its offices; OCI’s Manchester-based accountant (Burton Varley Ltd.) previously disclosed 93 Lapwing Lane as its registered address between 2019 and 2023.

27. <u>Prague (Czech Republic)</u>. OCI purports to maintain an office at Bachmačské náměsti 334, 160-00, Prague, 6-Dejvice. This is a six-floor dual-use residential and commercial building located in a residential area in northwest Prague. There are at least 22 apartments and offices in the building. Each unit is listed on the building’s intercom and has its own mailbox on the first floor. OCI is not listed among the names on either. Again, there was no signage or other outward indication that OCI has a presence at the location.



Building




Intercom



Mailboxes

28. However, OCI's founder, CEO, and namesake, **<u>O</u>**liver **<u>C</u>**hapman, used the same Prague address for one of his prior business ventures unrelated to OCI. Specifically, OCI's Prague address is the registered address of Ethos Fashion, a clothing business. Chapman has held a 60% ownership stake in Ethos Fashion since its incorporation in November 2012 and serves as one of its three directors. Ethos Fashion, however, does not appear to be an active business. The company has disclosed no revenue since at least 2020, and its website (http://www.ethos-fashion.cz/) is inactive. On social media, Ethos Fashion's Facebook page has posted only a couple of times since its last activity on January 21, 2016. Chapman himself only lists Ethos Fashion on his LinkedIn resume for 2012-2014.




*Ethos Fashion's Jan. 2016 Facebook Advertising*

29. Copenhagen (Denmark). OCI purports to maintain an office at Fruebjrgvej 3, 2100 Copenhagen Oe, Denmark. That is a shared office space with a modern interior. There is a digital self-service reception kiosk near the front entrance where visitors are able to look up building tenants. There were no results for OCI when searching under the letter "O" in the reception kiosk; the only hit was a business called "OvaCure," a Danish non-governmental organization. An employee working at the parcel service reception area said he had never heard of OCI.



*Interior*




*Self-Service Reception*



*Searching for OCI*

30. Hong Kong (China). OCI purports to maintain an office at International Finance Center, 8 Finance Street, Central, Hong Kong. That is a modern commercial high-rise in Hong Kong's primary business district. OCI does not disclose a floor or office number on its website. Regardless, OCI is not listed in the business directory posted in the building reception, and building security employees confirmed that OCI is not a tenant.



Outside




Business Directory

31. Jakarta (Indonesia). At the time of the first visit in late February 2025, OCI purported to maintain an office on the 33rd floor of City Center Batavia, Tower One, JI KH Mas Mansyur, Kav 126, Jakarta 10250.[19] This is another modern commercial high-rise, located in central Jakarta. Investigators were not allowed to visit the 33rd floor, but two employees from building management said they had never heard of OCI and that the two companies occupying the 33rd floor were in the agricultural and construction business. Those descriptions do not fit OCI. Building management also observed that OCI had published the wrong postal code on its website, using 10250 instead of the correct code, 10260.

---

19 *See, e.g.*, https://web.archive.org/web/20250322234425/https://oci-group.co.uk/locations/ (archived version of OCI's website as of Mar. 22, 2025). Sometime thereafter, OCI changed its Jakarta address on its webpage, but not its other addresses. *See* OCI, *Our locations*, https://oci-group.co.uk/locations/ (last visited May 1, 2025)



Building




Building Management

32. Sometime in March or April 2025, OCI changed the address on its website of just its purported Jakarta office, to the Habibie Centre, Lantai 3, JL Kemang Sel No 98, Adm. Jakarta Selatan, DKI, Jakarta, 12560. This is a four-floor commercial office space building. Investigators visited the address on April 16, 2025. OCI is not listed in the building directory. Three companies on the 3rd floor (Lantai 3) offer virtual office services and are required to report all their tenants to the building management. The building management and receptionist confirmed that there is no record of OCI ever having been a tenant of a physical or virtual office in the building.



Building




Business Directory

33. Mumbai (India). Finally, OCI purports to maintain an office at #324, A to Z Estate, Ganpatrao Kadam Marg, Lower Parel, Mumbai, 400013. The Mumbai office is in an industrial property in Lower Parel, a business district in southern Mumbai. OCI was not listed in the building directory for the third floor, where office #324 is located. Additionally, a walk through the third floor revealed no signage or any other outward indication that OCI or any representatives have a physical presence at the location.



Outside




Business Directory




Office #324

34. The company inhabiting office #324 is Enarr Group (https://enarr.com/), which provides trade finance, corporate finance, and structured finance services. During the visit, an Enarr employee described OCI as a "UK partner." A prior version of OCI's website identified Padam Singhania, Enarr's Managing Partner, as OCI's "India Head." Singhania does not reference this position or OCI on his LinkedIn profile. Two former OCI representatives told an investigator that Singhania would pitch potential deals to OCI. There is no indication that Enarr operates as OCI's India office.

**C. *OCI's Misrepresentations of Its Senior Leadership Team.***

35. According to interviews of former OCI staff and contractors, OCI has publicly misrepresented its senior leadership team. This included falsely portraying contractors as permanent employees and, in certain cases, as senior executives. Former OCI representatives said they even complained to OCI's senior management, including Chapman himself, about this issue.

Yet, OCI sent prospective customers and partners marketing materials that included profiles of executives with lofty titles who, in reality, were merely contractors or, in some instances, appear to have never actually worked for OCI in any capacity.

36. For example, OCI sent a 25-slide marketing presentation to a prospective customer in 2020. *See* Ex. 3. Ten of the slides are devoted to the biographies of ten purportedly senior members of the OCI team, yet some appear to have never worked for OCI.

37. For instance, OCI held out Paul Baksh as its "Head of Softs" (short for "soft commodities," *e.g.*, agricultural products). When interviewed, Baksh disclosed that he had applied for a trader role that OCI posted in 2019, and in fact did have a background in soft commodities trading. However, Baksh said his negotiations with Chapman never panned out, and he never worked for OCI. Yet OCI included Baksh in its published marketing materials. Rashid Rahgozar, the purported "Head of Metals," also told investigators he was not a permanent employee at OCI. He said he had discussed prospective deals involving polymers, not metals, with OCI, but none materialized. He too is featured in OCI's marketing materials. OCI did the same with Garry West, the purported "Head of Recyclables." Baksh and West told investigators that the photographs OCI used of them in the marketing materials were lifted from the internet.

*OCI's Deceptive Marketing Materials*




*Paul Baksh*




*Rashid Rahgozar*




*Garry West*

Case 25-50281-BLS Doc 6-1 Filed 04/23/25 Page 18 of 59

38. Tellingly, seven of the ten purported members of the leadership team named in the presentation, one of whom is Chapman, do not reference their tenures at OCI on their LinkedIn profiles today, despite having otherwise extensive career histories listed.

**D. *Rupin Banker's Sordid Past.***

39. Two former OCI representatives told investigators that Banker—who modestly describes himself as a "structuring advisor of [] OCI Limited"[20]—is significantly more involved in the business than OCI likes to portray to the outside world. Banker's involvement in OCI, and the arrangement involving the Debtor here, is particularly troubling, as allegations against him of fraud—and even criminal misconduct—have been frequent:

- <u>Fraud (approx. 2013-2017)</u>. In 2015, Indian customs officials issued a show-cause notice to Banker, according to court records. Customs officials accused him of masterminding a scheme to import bogus memory cards to India via certain enterprises of which he or his relatives were directors and which received show-cause notices in 2013. Banker contested these allegations.

- <u>Extortion (approx. 2018-2019)</u>. In a 2019 criminal complaint in India, a real estate investor, Khailash Aggarwal, accused Banker and his father of instructing a notorious Mumbai gangster (Vijay Shetty) to threaten him to, among other things, drop his claim for the return of money he had lent Banker.[21] The police investigation into the Bankers was quashed for lack of *prima facie* evidence.[22]

- <u>Criminal conviction (approx. 2018-2019)</u>. According to Indian court filings, Banker and his wife were criminally convicted in the United Arab Emirates on charges of using forged documents to fraudulently withdraw ₹35 crore (over $4 million) from the bank account of the same Khailash Aggarwal referenced above.[23]

- <u>Fraud (approx. 2019-2023)</u>. In 2019, Banker was accused of conspiracy and fraud in a civil U.K. lawsuit. Sri Ram Tumuluri, a former business partner,

---

[20] Declaration of Rupin Banker ¶ 2, *Stenn Assets UK Ltd. v. Alder Holdings, LLC*, Civ. No. 220400247 (Utah Dist. Ct. Jan. 13, 2023).

[21] *See generally* Judgment, *Banker v. State of Maharashtra*, Criminal Application No. 488 (High Court of Judicature at Bombay) (the "<u>Banker Judgment</u>") (attached as Ex. 4).

[22] Swati Deshpande, *Bombay HC quashes MCOCA case against Mumbai businessman in absence of prima facie evidence*, THE TIMES OF INDIA (June 25, 2023).

[23] *See* Banker Judgment ¶¶ 4, 10; *see also id.* ¶ 21 ("it is not in dispute that criminal court at Dubai has already found Rupin Banker and [his wife] Meenakshi Banker guilty and imposed appropriate punishment").

alleged that Banker had attempted to commit supply chain financing fraud by asking him to sign documents under false pretenses. The parties settled the lawsuit confidentially in 2023.

- Criminal charges (approx. 2020-2021). Upon information and belief,[24] Banker and his company Libra Middle East Trading FZ-LLC were defendants in a criminal case in Dubai opened on the basis of a police report filed in 2020. The Dubai Public Prosecution website states the defendants were charged on counts involving fraud, forgery, and the unauthorized use of government seals, stamps, or marks. A judgment was issued in March 2021. There was an appeal against the original court judgment in the case, registered on April 5, 2021 (for which the Dubai Public Prosecution database does not provide further details).

- Money laundering (2025). As recently as March 2025, the Indian Directorate of Enforcement brought a case under the Prevention of Money Laundering Act against Banker and various of his companies, among others, in a Mumbai court. On April 4, 2025, the Indian court found a "clear, *prima-facie* case which demonstrate generation of proceeds of crime," and thus "sufficient ground to issue process" against Banker and his co-accused.

40. Additional allegations have surfaced in local press. As The Times of India reported, when legal issues delayed the construction of a residential flat he had purchased, Banker allegedly paid ₹1.5 crore (approx. $175,000) to hire three henchmen to extort from the builder ₹11 crore (approx. $1.25 million) as damages.[25]

41. These are the credentials of a man who has described himself as a "distinguished global financier" with an "impeccable reputation in the eyes of the public the world-over."

42. As the foregoing facts reveal, OCI was far from a legitimate business with a good faith reason to receive over a half of billion dollars of the Debtor's money. On the contrary, and as explained herein, OCI is merely the next link in a chain of fraudulent transfers.

---

[24] The docket for Criminal Case No. 21902/2020 is publicly available on the Dubai Public Prosecution website (https://www.dxbpp.gov.ae/default.aspx?lang=en). It lists only Banker's initials ("R.H.," for Rupin Hemant) and those of his company Libra Middle East Trading FZ-LLC ("L.C.," for Libra company).

[25] *Three try to extort Rs 1.5 crore from builder over Rs 8.5 crore flat row*, THE TIMES OF INDIA (Apr. 5, 2018).

# FACTUAL BACKGROUND

## THE DEBTOR'S TERM LOAN ARRANGEMENT

**A.** ***The Debtor's Obligations Under Its $1.2 Billion Term Loan Arrangement.***

43. On November 24, 2021, GLAS Trust Company LLC ("GLAS"), as Administrative and Collateral Agent, the Lenders, the Debtor, T&L, and certain other T&L subsidiaries as guarantors, closed on a $1.2 billion term loan facility that would mature in five years, absent acceleration. The definitive terms of that facility are memorialized in several agreements, including a Credit and Guaranty Agreement (the "Credit Agreement").

44. The Credit Agreement contains the Debtor's legal rights, duties, and obligations with respect to the term loans. In consideration for the $1.2 billion in loan proceeds, the Debtor and its affiliated guarantors accepted various covenants so that the Lenders could carefully and continuously monitor and protect their interests. Each relevant covenant is clear on its face, the result of extensive negotiations by sophisticated parties, advised by experienced counsel and financial advisors. Most relevant here are the financial reporting and guarantee covenants.

45. **Audited Financial Disclosures:** By the 180th day after the end of T&L's fiscal year on March 31, T&L was required to provide its annual audited financials to GLAS.

46. **Unaudited Financial Disclosures:** By the 75th day following the end of Q1, Q2, and Q3 of T&L's fiscal year, which ended March 31, T&L was required to provide to GLAS unaudited consolidated financial statements for that fiscal quarter and the then-elapsed portion of the then-current fiscal year, together with comparative financials for the corresponding periods of the prior fiscal year.

47. **Whitehat Guarantee:** One of T&L's subsidiaries, Whitehat Education Technology Private Ltd. ("Whitehat India"), was obligated to sign on to an Onshore Guarantee Deed by no later than April 1, 2022 to guarantee the Debtor's term loans.

48. T&L and the Debtor understood soon after signing the Credit Agreement, and well before the first transfer of the Alpha Funds to OCI via Camshaft Fund, that there were multiple defaults of the Credit Agreement's covenants. Those defaults ultimately entitled GLAS to certain remedies, which it properly exercised in March 2023.

**B. *The Debtor's Defaults Beginning as of March 2022.***

49. From March to September 2022, the Debtor and its affiliates failed to satisfy the aforementioned covenants at least four times, each of which, on its own, empowered the Lenders to accelerate the term loans and exercise control of the Debtor, among other remedies. While this Court is familiar with the defaults and remedies taken (said remedies having been determined to be appropriate by both the Delaware Chancery Court and the Delaware Supreme Court),[26] a brief recitation nonetheless is provided for context.

50. To begin, when the Q3 FY 2021-22 unaudited financial statements were due on March 16, 2022, T&L provided financials only for the then-elapsed portion of its fiscal year. T&L did not furnish any information for the quarter itself or comparative financials for the corresponding period of the prior fiscal year.

51. Shortly thereafter, Whitehat India failed to provide the Guarantee due as of April 1, 2022. Nonetheless, on April 5, 2022, the Lenders agreed to defer Whitehat India's obligation to obtain that guarantee until October 8, 2022, which Whitehat India also failed to meet.

52. A third Default occurred on September 13, 2022, when T&L failed to provide comparative figures for the Q1 FY 2022-23 quarterly period. What T&L did furnish on that date, however, showed that the Debtor had an amount of Indian Rupees in "Cash and Bank" that was equivalent to well over $500 million (based on prevailing exchange rates) at the time.

---

[26] *See, e.g.*, *Ravindran v. GLAS Tr. Co. LLC*, 327 A.3d 1061 (Del. 2024).

53. As for its fourth Default, T&L failed to deliver audited annual financial statements for its 2021-22 fiscal year by the September 27, 2022 deadline. T&L's failure was so significant that its auditor Deloitte publicly resigned in June 2023.

**BYJU'S INCURS HUNDREDS OF MILLIONS OF DOLLARS IN DEBT THROUGH THE PROCUREMENT OF GOODS AND SERVICES FROM OCI**

54. If OCI and Byju are to be believed, from November 2021—when the Credit Agreement was being executed—until March 2023, T&L and its subsidiaries (which collectively do business under the name, "BYJU's") began procuring goods and services from OCI.[27] As OCI has described the arrangement, it provided "outsourced procurement services," including procuring IT equipment (*e.g.*, tablets) and advertising for BYJU's.[28] Of course, the Debtor had no material business operations, so it was not the beneficiary of OCI's services, and the Debtor's records (to the extent Pohl has them) do not reflect the Debtor's receipt of any such services.

55. According to Byju, OCI executed purchase orders directly with, and paid, vendors on behalf of BYJU's.[29] BYJU's then became obligated to reimburse OCI and pay a fee, for which OCI required collateral to secure BYJU's' payment obligations.[30] Early on, BYJU's provided bank guarantees as collateral.[31] However, the guarantees eventually proved to be inadequate.[32] As BYJU's began to grow through corporate acquisitions, it increased the volume of goods and services it procured from OCI,[33] and ended up owing OCI hundreds of millions of dollars, which,

---

27 *See, e.g.*, Parker Statement ¶ 12; Decl. of B. Raveendran ("Byju Decl.") ¶ 38, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Oct. 9, 2024) [Adv. D.I. 371-1].

28 Parker Statement ¶ 12.

29 Byju Decl. ¶ 36.

30 *See id.*

31 *See id.*

32 *See id.* ¶ 37.

33 *Id.* ¶ 38.

according to Morton (who knew that "OCI was owed . . . several hundred million dollars from Think and Learn" *before* he transferred the Alpha Funds to OCI), led to the Transfers here.

**OCI FRAUDULENTLY RECEIVED THE DEBTOR'S ALPHA FUNDS**

56. There are three transfers (collectively, the "Transfers") at issue in this litigation:

**A. *The First Transfer: The Debtor's April and May 2022 Transfer of $318 Million to OCI via Camshaft Fund.***

57. In late March 2022, with the Debtor in default, T&L and OCI began taking concrete steps to structure, document, and execute a $318 million fraudulent transfer to OCI via Camshaft Fund—the "First Transfer." OCI, primarily through Banker, played a pivotal role in structuring and effectuating this First Transfer (and also the later Transfers).

1. Rupin Banker's Introduction to Camshaft.

58. As recounted in later litigation,[34] on or about February or March 2022, Banker contacted Brett Borgersen—a Florida resident, "finder of parties for various transactions," and someone with whom Banker had a prior professional relationship—and set into motion a search for a financial institution or other intermediary that could facilitate moving the Debtor's funds to OCI. What followed was a game of telephone to locate a facilitator for Banker: (i) Borgersen enlisted the help of a business contact at the U.S.-based E.F. Hutton Group (which had revived the name of a once illustrious stock brokerage firm), (ii) who, in turn, enlisted the help of one of his business contacts, James Milliron, and (iii) who finally contacted Morton, the founder of Camshaft Fund[35]—who Milliron had met at a strip club a few months earlier—on or about March 31, 2022.[36]

---

[34] *See* Complaint, *HarryMax Consultants, LLC v. Benchmark Invs., LLC*, Case No. 50-2022-CA-009285-XXXX-MB (Fla. Cir. Ct., 15th Cir. Sept. 20, 2022) (the "HarryMax Compl.").

[35] Camshaft Fund acted through its Florida-incorporated and Florida-based sole general partner, Camshaft Capital Management, LLC ("Camshaft Management," and together with Camshaft Fund's Florida-incorporated and Florida-based investment adviser, Camshaft Capital Advisors, LLC, "Camshaft")).

[36] *See, e.g.*, HarryMax Compl. ¶¶ 16-18; Decl. of W. Morton ("Morton Decl.") ¶ 3, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. July 29, 2024) [Adv. D.I. 301].

59. For Morton, a nine-figure deal for Camshaft Fund was too good to be true. As of early 2022, Morton was 25 years old, and his nascent hedge fund had less than $10 million in assets under management, minimal staff, and had recently moved its principal place of business away from an IHOP in Miami. But with the potential to earn millions of dollars in fees, Morton set aside any reservations he had, and agreed to help implement the First Transfer.

2. <u>Rupin Banker's Negotiation of the First Transfer</u>.

60. Once connected, Banker and Morton documented the transfer in mere weeks. On April 5, 2022, an E.F. Hutton representative started an email chain, including Morton and Banker to use "as the working group to discuss/intro [C]amshaft to Rupin [Banker]." That same day, Morton circulated various documents, including a slide capturing the "intent of the deal," and initial drafts of the definitive agreements. Morton understood OCI's contemplated "deal" to be one in which (i) the Debtor would "invest" $200 million into Camshaft Fund, (ii) Camshaft Fund would loan $180 million back to the Debtor, and (iii) then the Debtor would, importantly, use the loaned funds to "distribute capital to OCI without booking an expense":

*William Morton's Initial Outline of the BYJU's-Camshaft-OCI Deal*



61. Over the next couple of weeks, Banker clarified and modified the deal structure, exchanging emails and calls with Morton. For example, in emails including OCI and Camshaft, but not BYJU's or the Debtor, it was decided to double the size of BYJU's' contemplated investment in Camshaft Fund, from $200 million to $400 million, of which $380 million would be loaned. It was further decided that the Debtor's funds would be "lent to OCI from Camshaft," not to BYJU's as first contemplated.

62. By mid-April 2022, OCI's New York-based transactional counsel at Sullivan & Worcester LLP began reviewing and turning Camshaft Fund's draft definitive agreements. OCI's counsel's immediate comments were focused on mitigating the risks caused by Camshaft Fund initially receiving the Debtor's funds before they were promptly transferred to OCI. Counsel, for instance, wanted to ensure a "simultaneous closing of the investment by Byju and the loan to OCI, with the $380 million sent directly by Byju to OCI," bypassing Camshaft Fund altogether. But that would have undercut the entire rationale for the arrangement—financial alchemy. As Morton responded, the "400M must be deposited into the Admin (Apex) control Camshaft LP US Bank account," otherwise, "Apex (and further Deloitte) will not give a statement/credit [of] a 400M capital account[.]"

63. By April 21-22, 2022, the terms of the First Transfer were largely finalized, but the size of the transaction was changed to $318 million, with $18 million in prepaid interest. The arrangement was executed about a week later.

3. <u>The Parties' Execution of the Documentation for the First Transfer</u>.

64. On April 28, 2022, the Debtor, Camshaft, and OCI executed four related agreements to effectuate the First Transfer, all of which Banker (and also T&L) received. The four agreements are: (i) a *Subscription Agreement for Camshaft Capital Fund, LP* (the "<u>April</u>

Subscription Agreement")[37] between the Debtor and Camshaft Management; (ii) a *Side Letter Agreement* (as amended on August 9, 2022,[38] the "April Side Letter") between the Debtor and Camshaft Fund (signed by Camshaft Management); (iii) a Delaware-governed *Second Amended and Restated Limited Partnership Agreement (Revised) of Camshaft Capital Fund, LP* (the "Camshaft LP Agreement")[39] by Camshaft Management; and (iv) an unsecured, three-year *Promissory Note* (the "April Promissory Note") by OCI. Riju, Morton, and Chapman were the respective signatories for the Debtor, Camshaft, and OCI.

65. Of the four agreements, the April Side Letter generally outlined the overall arrangement. *First*, the Debtor became a limited partner of Camshaft Fund with a $318 million "investment," which would be allocated in a side pocket account away from Camshaft Fund's other LPs. *Second*, upon receiving the Debtor's $318 million, Camshaft Fund would "loan" the same amount of money to OCI via the April Promissory Note, but only transfer $300 million, with $18 million withheld as prepaid interest. *Third*, the $18 million would be allocated evenly between the Debtor and Camshaft Management. *Lastly*, as Morton testified, the value of the Debtor's "investment" depended upon OCI's repayment (or not) of the April Promissory Note.

66. To protect Camshaft, the April Side Letter (and similarly the later July Side Letter) stated that it was allocating "[a]ll losses" relating to the Debtor's purported investment "entirely to" the Debtor. This language, according to Morton, moved all risk from the OCI loan to the Debtor. As he testified, there was "express clarity" from the Side Letters that, if OCI failed to

---

[37] The April Subscription Agreement was filed publicly at *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Apr. 10, 2025) [Adv. D.I. 403-1].

[38] The amendment was filed publicly at *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Apr. 10, 2025) [Adv. D.I. 403-3].

[39] The Camshaft LP Agreement was filed publicly at *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Apr. 10, 2025) [Adv. D.I. 405-2].

honor the Promissory Notes, "those losses would be taken" from the Debtor's LP interest in Camshaft Fund. They would not be borne by Camshaft Fund.

67. Finally, consistent with this being a U.S.-centered transaction, the April Promissory Note: (1) was governed by Florida law; (2) required OCI to consent to jurisdiction in the courts sitting in Miami; (3) required payments to be made in U.S. dollars to a U.S. bank account by the U.S. close of business on the specified dates; (4) required compliance with U.S. anti-money laundering and anti-corruption laws; (5) dictated that U.S. laws would govern the enforceability of electronic signatures; and (6) defined "Business Day" to exclude U.S. bank holidays.

* * *

68. Also upon executing the April Subscription Letter, the Debtor became a limited partner of Camshaft Fund, a Delaware limited partnership. As a result, Camshaft Management, as the general partner of Camshaft Fund, came to owe certain fiduciary duties to the Debtor in respect of its interest in Camshaft Fund. The Camshaft LP Agreement did <u>not</u> disclaim Camshaft Management's fiduciary duties to Camshaft Fund or the limited partners thereof, including the Debtor; indeed, the Private Placement Memorandum for Camshaft Fund confirmed that Camshaft Management is "a fiduciary with respect to the Fund" and has "fiduciary obligations to deal fairly and honestly in its relationship with the Fund and the Limited Partners."

69. Accordingly, the Debtor, Camshaft, and OCI chose to structure the First Transfer (and also the Second Transfer) as creating not just a contractual relationship but also, significantly, a fiduciary relationship. As such, Camshaft Management owed fiduciary duties to exercise the utmost good faith, fairness, and loyalty to Camshaft Fund and its limited partners, including the

Debtor.[40] Camshaft Management was also contractually obligated, in connection with the Transfers, to devote such time and attention to Camshaft Fund to ensure it was properly conducting its business, not helping perpetuate financial alchemy.

4. <u>The Movement of the $318 Million from the Debtor to Camshaft Fund to OCI</u>.

70. When the transaction documents were executed, BYJU's, Camshaft, and OCI turned their attention to moving the $318 million. Moving the money from the Debtor to Camshaft Fund was quick. The Debtor transferred the full $318 million to Camshaft Fund via three wire transfers on April 27-28, 2022. The Debtor made the wire transfers out of its JPMorgan Chase commercial checking account in California to Camshaft Fund's U.S. Bank account in California.

71. Moving the $300 million from Camshaft Fund to OCI was far more cumbersome and not completed until May 10, 2022. On April 28, Banker sent OCI's wiring instructions to Morton, among others, directing that the money be wired to a U.S. Dollar-denominated account. However, before any money could be transferred, Camshaft Fund's bank (U.S. Bank) had to complete "know your customer" ("<u>KYC</u>") and anti-money laundering ("<u>AML</u>") verification.

72. The ensuing delays frustrated OCI. Chapman, OCI's CEO, founder, and sole shareholder, became personally involved. He pushed Morton to "close the trade," telling him on Friday, April 29, 2022 to "ensure the transfer is with OCI absolute latest Monday," May 2, which Chapman said was "essential." That same day, Chapman also pleaded with U.S. Bank to expedite the wire transfer. Morton even offered to personally fly a "cashiers [*sic*] check for 300M" to OCI in London. When told that was not feasible, Morton offered to cover U.S. Bank's legal costs.

---

[40] *See Exit Strategy, LLC v. Festival Retail Fund BH, L.P.*, 2023 WL 4571932, at *8 (Del. Ch. July 17, 2023) ("A general partner owes fiduciary duties to the partnership and its limited partners and is liable for breaching the partnership agreement."), *aff'd*, 326 A.3d 356 (Del. 2024).

73. On May 3, 2022, Morton memorialized a "plan of action," which he had arrived at after "working with Rupin for some time on this matter," to close the transaction so they could "all win." To reassure everyone, Morton claimed that "this is a by the book clean transaction."

74. On May 4, 2022, Banker introduced Morton to Byju and Kishore. Morton then confirmed that he had forwarded their contact information to U.S. Bank in order to enlist their help to speed up the transfer.

75. The wire transfer still had not been completed as of May 9, 2022. Banker became angry. Over the course of multiple emails, he told E.F Hutton and Morton that "Byju and OCI [were] becoming increasingly concerned about the delay in OCI's receipt of the loan proceeds." Banker disclosed that OCI had "payments of $300 Million that were committed to vendors last week" and was at risk of losing negotiated discounts, insisting that "[s]omeone needs to be liable for the losses we are incurring." Shortly thereafter, Banker contacted Morton by email, text, and phone.

76. Finally, on May 10, 2022, U.S. Bank made the $300 million wire transfer in dollars out of the United States to OCI's Lloyds Bank account in London.

### B. ***The Second Transfer: The Debtor's July 2022 Transfer of $215 Million to OCI via Camshaft Fund.***

77. By early June 2022, OCI started planning to runback the same trade—the "Second Transfer." This process was relatively straightforward.

1. Rupin Banker's Negotiation of the Second Transfer.

78. On June 3, 2022, Banker told Morton that the trade would be "the exact same transaction as the previous one," but the dollar amounts would be different. Less than a week later, Banker and Morton discussed the economics of the Second Transfer on a call. After a brief delay, on July 7, 2022, Banker reached back out to Morton to notify him that OCI was "ready for the next

tranche of $150-$200[M]." Four days later, Morton sent Banker revised drafts of the "deal docs," this time contemplating a $215 million transaction.

2. <u>The Parties' Execution of the Documentation for the Second Transfer</u>.

79. The next day, July 12, 2022, the Debtor, Camshaft, and OCI executed three related agreements to effectuate the Second Transfer, all of which Banker received. The three related agreements are: (i) an *Additional Subscription Booklet* (the "<u>July Subscription Agreement</u>") by the Debtor; (ii) a *Side Letter Agreement* (the "<u>July Side Letter</u>")[41] between the Debtor and Camshaft Fund (signed by Camshaft Management); and (iii) an unsecured, three-year *Promissory Note* (the "<u>July 12 Promissory Note</u>") by OCI. Riju, Morton, and Chapman were the signatories.

80. As before, the July Side Letter outlined the overall arrangement, which primarily involved the same four overarching components, but with different dollar amounts. This time, the Debtor made a $215 million subscription, which Camshaft Fund then "loaned" to OCI, except for $24,187,500 in prepaid interest. Per the July Side Letter, (i) $22,520,000 of the prepaid interest would be allocated to the Debtor, out of which $16,520,000 would remain in an "Investment Side Pocket" and $6,000,000 would be loaned to Camshaft Management, and (ii) the remaining $1,667,500 would be allocated to Camshaft Management. The July Side Letter also included indemnification/exculpation provisions for Camshaft's benefit.

81. Also as before, the July 12 Promissory Note reflected the U.S.-centric nature of the transactions.

---

41 The July Side Letter was filed publicly at *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Apr. 10, 2025) [Adv. D.I. 403-2].

3. The Movement of the $215 Million from the Debtor to Camshaft Fund to OCI Limited.

82. The money moved quickly the second time around. On July 12-13, 2022, the Debtor transferred $215 million via three wire transfers out of its Silicon Valley Bank checking account in California to Camshaft Fund's Northern Trust demand deposit account in New Jersey. Then, on July 14, 2022, Camshaft Fund, transferred $190,812,300 (out of a separate JPMorgan account) to OCI's Barclays account (after making a small test wire two days earlier).

**C. *The Third Transfer: Camshaft Fund's July 2022 Transfer of $16.52 Million to OCI Limited.***

83. On July 15, 2022, Camshaft Fund made yet another loan to OCI, this time in the amount of $16,520,000—the "Third Transfer." $16,520,000 represented most of the prepaid interest that the Debtor had "earned" under the July Side Letter, and it was "loaned" to OCI via a third unsecured, three-year *Promissory Note* (and together with the April and the July 12 Promissory Notes, the "Promissory Notes") executed by Chapman on behalf of OCI. On July 15, 2022, Camshaft Fund transferred $15,095,150 from its aforementioned JPMorgan account to OCI's Barclays account.

**THE AFTERMATH OF THE FIRST, SECOND, AND THIRD TRANSFERS**

84. As a result of the First, Second, and Third Transfers, the Debtor was out of pocket $533,000,000, Camshaft Management received at least approximately $10,667,500 in fees through "prepaid interest," and OCI received the Alpha Funds, which it never has repaid pursuant to the three Promissory Notes.

85. The Debtor was the clear loser in this scheme. It was left insolvent, if not already so, having defaulted on the Credit Agreement and transferred over 80% of its cash on hand to Camshaft Fund. After the Second Transfer, the Debtor had approximately $131 million in available funds across its known bank and brokerage accounts, with no other material liquid assets.

86. Thus, it was no surprise that the three Transfers, and the concurrent Side Letters and Promissory Notes, were made without GLAS's and the Lenders' knowledge or approval. The Transfers instead were aggressively concealed. T&L misled the Lenders into believing that the $533 million remained in the Debtor's bank accounts in cash or cash equivalents, which a limited partnership interest in a hedge fund unequivocally is not. Nonetheless, as illustrated in the Preliminary Statement, *supra*, T&L furnished to GLAS, for distribution to the Lenders, unaudited financial statements for the quarters ended June 30, September 30, and December 31, 2022, each reporting that the Debtor had an amount of Rupees equivalent to over $500 million in "Cash and Bank."

87. The Debtor's sole director, Riju, approved these misrepresentations. He signed a March 2023 Compliance Certificate, as a T&L Financial Officer, attesting that the December 31, 2022 quarterly financial statements "present *fairly* in *all material respects* . . . the financial condition and results of operations of the Parent Guarantor and its consolidated Restricted Subsidiaries" (emphasis added). They certainly did not.

88. It was not until the summer of 2023 that Pohl discovered, following an investigation into the Debtor's bank statements, that the Debtor had, over a year earlier, transferred $533 million to Camshaft Fund. And it was not until this bankruptcy that Pohl learned, notwithstanding Camshaft's stonewalling, that the same funds were then moved to OCI.

**RIJU RAVINDRAN'S AND T&L'S BREACH OF THEIR FIDUCIARY DUTIES TO THE DEBTOR**

89. Though it was the Debtor's money being transferred, the terms of the three Transfers appear to have been mostly negotiated by OCI and Camshaft, with the Debtor (and even T&L) frequently absent. Notably, the Debtor did not have legal counsel or other advisors reviewing the draft legal agreements and commenting on the contemplated deal.

90. Even when Camshaft required KYC/AML of the Debtor, OCI primarily handled the requests. Banker, not Riju, sent Morton and Apex various diligence materials on April 28, 2022: (i) the Debtor's completed W-9 tax form, which reported the Debtor's Delaware location and included Riju's signature under the line, "Signature of U.S. person," (ii) the Debtor's Certificate of Incorporation and Bylaws, the latter of which was certified by Riju as "CEO, Director, President and Secretary" and stated that the Debtor was a Delaware corporation, (iii) the Debtor's Employer Identification Number, and (iv) a copy of Riju's passport (who Banker explicitly identified as the Debtor's "Director" in one of his cover emails). Moreover, Banker confirmed that Riju would be the "only" authorized signer on behalf of the Debtor.

91. Consistent with this record, Riju later admitted that there was no one looking out for the Debtor's interests as part of the Transfers. While the Debtor's sole director, Riju did not "ever make a decision for [himself] over BYJU's Alpha"—"[i]t was always the parent company."[42] It was at least T&L's Board—Byju and his wife and co-founder Divya Gokulnath—that directed Riju to transfer the Alpha Funds. Indeed, at the time of the transfer, Riju had (incredibly) not even heard of Camshaft, much less investigated or conducted due diligence on it.

**OCI'S CONCEALMENT OF THE TRANSFERS, ACCOUNTING MISREPRESENTATIONS, AND FALSITIES**

92. As with Camshaft, Morton, and Riju, OCI too has concealed the truth behind what happened to the $533 million. Among other steps, OCI enabled *more* fraudulent transfers to occur in 2023, immediately following GLAS's exercise of remedies; for years has inexplicably failed to disclose any of the Promissory Notes on its financial statements; and cannot square its sworn disclosures about the Alpha Funds with BYJU's', nor explain why it sent $11.25 million to one of

---

[42] Hr'g Tr. at 32:19-23, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024).

Case 25-50282-BLS Doc 1 Filed 04/28/25 Page 34 of 57

Byju's business associates to fraudulently acquire the term loans. OCI's actions speak louder than words, consistent with Defendants' longstanding history of deception.

**A. *OCI's Facilitation of the March 2023 Fraudulent Transfer to Inspilearn.***

93. On Friday, March 3, 2023, GLAS became the Debtor's sole shareholder and removed the Debtor's existing directors, appointing Pohl in their place. The following Monday, Byju and his co-conspirators began taking concrete steps to move the Camshaft LP Interest out of the reach of the Debtor (now under Pohl's control) and to Inspilearn, another T&L subsidiary. This transfer was finalized on March 31, 2023. OCI facilitated this fraudulent transfer.

94. As noted, OCI's public position is that it received the Alpha Funds in 2022 to provide "outsourced procurement services" to T&L and its subsidiaries. And according to OCI, it provided these services until March 2023, when the $533 million was "spent" and no further services were provided. As OCI told a U.K. court in a sworn statement from counsel:

> *Between November 2021 and March 2023, OCI provided outsourced procurement services to T&L* and its subsidiaries in relation to the procurement of IT equipment; namely, electronic tablets and advertising, including promotion via various media. The purchase price of such tablets and media services was funded by monies advanced to OCI by Camshaft Capital Fund, LP (a Delaware limited partnership) ('Camshaft Fund') under promissory notes.
>
> OCI has delivered the services that it was contracted to provide, and *the monies advanced to OCI by Camshaft Fund have been spent*: (i) on these products and services, which were procured and delivered or provided to T&L and its subsidiaries; and (ii) in satisfaction of OCI's fees.[43]

95. Those admissions are significant. They reveal OCI's duplicity as part of the March 31, 2023 fraudulent transfer to Inspilearn.

[43] Parker Statement ¶¶ 12-13 (internal citations omitted, emphasis added).

96. Specifically, on March 31, 2023, Riju, on behalf of Inspilearn, executed two Side Letters with Camshaft Fund (the "March 2023 Side Letters"), amending and restating the April and July Side Letters. In the March 2023 Side Letters, Inspilearn and Camshaft Fund recorded that "OCI Limited has indicated that it intends to repay the Loan described in the Amended Side Letter (the 'Original OCI Loan') in multiple payments (each, a 'Partial Repayment') over a subsequent period following the Effective Date, until the entire Original OCI Loan is paid off." Upon the "Partial Repayments" being made, Camshaft Fund would, on paper, take three sequential steps: (i) purchase various certificates of deposit ("CDs") from a U.S. bank held in a Camshaft Fund-Inspilearn joint account, (ii) take out three-year loans of 95% or more of the value of the CDs at an interest rate equal or lower than the yield on the CDs (the "Partnership Loans"), and (iii) originate (new) loans to OCI (the "OCI Loans") in the amount of 100% of the net proceeds of, and with the same duration as, the Partnership Loans.

97. This convoluted arrangement provided OCI with no practical benefit. In effect, OCI was agreeing to voluntarily repay its 2022 Promissory Notes two years ahead of maturity only to immediately borrow, again, nearly the same amount of money on similar terms. Also significantly, according to OCI, there was nothing outstanding on the original Promissory Notes as of March 31, 2023; the money had been "spent." Thus, the complexity of the March 2023 Side Letters was entirely unnecessary. Unsurprisingly, OCI never sent money to Camshaft Fund to repay the original Notes, and no replacement "OCI Loans" were issued.

98. There is simply no legitimate explanation for OCI making the representations memorialized in the March 2023 Side Letters. These Side Letters were all a ruse, presumably intended to give the March 31, 2023 transactions the facial appearance of legitimacy in case anyone ever asked questions.

**B. *OCI's Failure to Disclose the Promissory Notes in Its Financial Statements.***

99. Pursuant to the three mid-2022 Promissory Notes, OCI promised to repay $533 million in three years' time. These were *bona fide* legal obligations. However, OCI's publicly-filed—*and audited*—financial statements do not record any of the Notes. As depicted in Paragraph 8, *supra*, in each of 2022, 2023, and 2024, OCI disclosed in its Statement of Financial Position its short-term and long-term debts. However, at no time did OCI disclose debts approaching anywhere near $533 million. Rather, in its financial statements as of March 31, 2023, *i.e.*, the very same day that the March 2023 Side Letters memorialized OCI's intention to repay the Promissory Notes and obtain new "OCI Loans," OCI reported having no long-term debts and approximately £35 million (about $44 million under prevailing exchange rates) in short-term debts. It appears that OCI instead recorded the $500-plus million it received from Camshaft Fund as revenue, as OCI reported over £1.6 billion in revenue for the 17-month period from March 31, 2021 to August 31, 2022.

100. Simply put, no one reviewing OCI's audited financial statements would ever have known that OCI had borrowed the Alpha Funds. And, given that $550 million was more than five times greater than OCI's reported net assets for every fiscal year through and including FY 2021-22, it is hard to overstate the materiality of this omission.[44]

**C. *The Tension and then Sudden Harmony between OCI's and BYJU's' Public Positions about the Alpha Funds.***

101. For a long time, BYJU's was adamant that the Alpha Funds had not been spent and were under in its control. BYJU's repeated that position like a mantra:

[44] Unsurprisingly, there are also serious questions about OCI's auditor. Under U.K. accounting regulations, only auditors listed on the U.K.'s Register of Statutory Auditors (https://www.auditregister.org.uk/) are permitted to carry out a statutory audit of a U.K.-registered company, such as OCI. Failure to comply subjects the company to various penalties, including fines, sanctions, and prosecution. OCI's auditor, Kamran Asghar, cannot be found on the U.K.'s Register of Statutory Auditors, either by name or registration number (#1025776).

- In a September 13, 2023 statement to investors, BYJU's "categorically denie[d] media reports insinuating that BYJU's was no longer a beneficiary owner of the [Alpha Funds]." According to BYJU's, the money had not been spent—far from it, "an offshore subsidiary remains the beneficiary of the money invested in high security fixed income instruments invested with a multi-hundred billion dollar fund in the U.S."

- In a January 14, 2024 call, Byju told the Lenders: "[w]e have not touched that money." When then asked "[h]ow much cash" remains, he said "more than $500 million," which was "in cash and cash equivalents."

- In a March 5, 2024 Official Statement, BYJU's said the Alpha Funds were "currently in a 100% non US subsidiary of BYJU's."[45]

- On March 14, 2024, Riju testified that the "[m]oney was at Inspilearn."[46]

- On March 15, 2024, the very next day after the Court issued its P.I. Order, BYJU's issued yet another statement, representing that "the [] funds are safely parked in one of our subsidiaries and, as per the order, it will rightfully remain there."[47]

102. So when OCI claimed, in a July 2024 statement to an English court responding to the Debtor's discovery application, that the Alpha Funds had been "spent," that was unexpected.[48] This uncorroborated statement contradicted BYJU's' longstanding position to investors, and it was all too convenient for OCI to take in the context of litigation where OCI was seeking to avoid having to give evidence and testimony.

103. From every indication, in the summer of 2024, Byju and Banker had coordinated a change in their story about what happened to the Alpha Funds. The two men already had been

[45] Official Statement, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 5, 2024) [Adv. D.I. 59-2].

[46] Hr'g Tr. at 36:15-16, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Mar. 14, 2024).

[47] *See Order maintains status quo: Byju's after US bankruptcy court orders hedge fund manager arrest*, BUSINESS TODAY (Mar. 15, 2024, 8:50 PM), https://www.businesstoday.in/entrepreneurship/start-up/story/order-maintains-status-quo-byjus-after-us-bankruptcy-court-orders-hedge-fund-manager-arrest-421681-2024-03-15.

[48] Parker Statement ¶ 13.

asserting a common legal interest in response to the Debtor's claims.[49] And, in his declaration filed on the eve of the summary judgment hearing against his brother, Byju nearly word for word recycled a lot of OCI's description of how the Alpha Funds were used, as italicized below:

| **OCI's Sworn Statement[50]**<br>**July 31, 2024** | **Byju Raveendran's Sworn Statement[51]**<br>**Oct. 8, 2024** |
|---|---|
| Between November 2021 and March 2023, OCI provided outsourced procurement services to T&L and its subsidiaries in relation to the procurement of IT equipment; namely, electronic tablets and advertising, including promotion via various media. The purchase price of such tablets and media services was funded by monies advanced to OCI by Camshaft Capital Fund, LP (a Delaware limited partnership) ('Camshaft Fund') under promissory notes. | *Between November 2021* (i.e., after the Credit Agreement was entered into) *and March 2023, OCI provided outsourced procurement services to T&L and its subsidiaries in relation to the procurement of IT equipment*, such as *electronic tablets, and advertising (including* marketing via *various media*). Akin to the structure described above, Camshaft made credit available *to OCI under promissory notes* pursuant to agreements between Camshaft and OCI. |

104. Byju and Banker had gotten their stories straight.

**D. *OCI's Unexplained Transfers to William Hailer.***

105. Finally, OCI has never reconciled its sworn statement with the testimony of Byju's former business associate William Hailer, whose live testimony the Court found "very credible."[52] Hailer's testimony (and the accompanying declaration he submitted to the Court) show that his advisory firm received millions of dollars from OCI in summer of 2024 as part of Byju's deceptive scheme to clandestinely repurchase the term loans from the Lenders.

106. Specifically, Hailer, the CEO of Rose Lake, Inc. ("Rose Lake"), testified that, from the summer of 2024 onwards, he had frequent conversations with Byju about acquiring the

---

[49] In the earlier litigation, Camshaft withheld from production multiple emails from March, April, and May 2024 among it, Byju, and Banker, claiming on its privilege log that a common legal interest existed among them about the litigation and the parties' joint defense "strategy."

[50] Parker Statement ¶ 12.

[51] Byju Decl. ¶ 38 (emphasis added).

[52] Hr'g Tr. at 72:7-10, *In re Epic! Creations, Inc.*, Case No. 24-11161 (Bankr. D. Del. Dec. 3, 2024).

Lenders' term loans.[53] The "goal," as described by Hailer, was to "bring investors along from BYJU's network to be able to look at an acquisition of term loan B[.]"[54] In connection with that goal, Byju introduced Hailer to an individual purportedly representing one such investor.[55] To pay Rose Lake's fees and serve as proof of funds in case requested by the Lenders during negotiations, the investor caused two wire transfers to be sent from OCI to Rose Lake in June and July 2024; the transfers were in the aggregate amount of $11,250,000.[56] At the time, Hailer thought the investor was independent of Byju—a view that Hailer would soon change, as he learned that Rose Lake had been misled by Byju about the investor's true identity.[57] In actuality, Rose Lake was "working in partnership with 'the company' meaning Byju."[58]

107. In a March 11, 2025 statement published on its webpage, OCI asserts that it "terminated its relationship with T&L and all its subsidiaries long ago."[59] These transfers to Rose Lake did not occur "long ago." From the looks of it, OCI has been helping finance Byju's secretive attempts to repurchase the term loans, perhaps with the same Alpha Funds taken from the Debtor.

**THE DECEPTION INHERENT IN**
**THE BYJU'S-CAMSHAFT-OCI ARRANGEMENT**

108. Upon information and belief, in mid-2022, T&L, while raising capital and contemplating a potential SPAC transaction to go public,[60] wanted to artificially bolster its

---

[53] Hr'g Tr. at 34:8-15, 37:7-38:2, 43:14-23, *In re Epic! Creations, Inc.*, Case No. 24-11161 (Bankr. D. Del. Nov. 21, 2024).

[54] *Id.* at 37:17-22.

[55] *Declaration of William R. Hailer* at 4, *In re Epic Creations, Inc.*, Case No. 24-11161 (Bankr. D. Del. Nov. 20, 2024) [D.I. 314].

[56] *Id.* at 4-5.

[57] *Id.* at 5-6.

[58] *Id.* at 5.

[59] OCI, *Public Statement on OCI's Commercial Relationship with Think & Learn Pvt Ltd.*, https://oci-group.co.uk/legal/ (last visited May 1, 2025).

[60] *See, e.g.*, *Byju's aims for SPAC merger agreement within a month*, MINT (Jan. 31, 2022, 04:58 PM), https://www.livemint.com/companies/news/byjus-aims-for-spac-merger-agreement-within-a-month-11643627919317.html (describing BYJU's as pursuing a SPAC listing in "mid-2022"); *Byju's clears payment to*

financial performance by concealing its heavy cash burn. T&L needed a way to use its subsidiaries' funds to pay for expenses without recording a corresponding decline in assets. The solution was to manipulate T&L's and its subsidiaries' books and records.

109. Enter Camshaft and its pliable controller Morton. First, the Debtor, at T&L's direction, made a $533 million "investment" in Camshaft Fund, so that it could record an "appreciating asset," *i.e.*, the Camshaft LP Interest.[61] To that end, Camshaft's administrator issued statements to the Debtor disclosing a purportedly appreciating investment asset valued in excess of $533 million. And second, Camshaft Fund transferred the $533 million to OCI (via purported notes) to pay for OCI's procurement of goods and services for BYJU's without any corresponding accounting liability for the Debtor.[62]

110. However, for OCI, receiving the $533 million in the form of "loans" posed a significant problem. OCI wanted collateral to secure its ongoing procurement of goods and services, as discussed. OCI borrowing money from Camshaft Fund, which funds originated from the Debtor, was not collateral. Or said another way: a vendor borrowing money from its customer is <u>not</u> collateral for the customer's obligations to the vendor.

111. So, as part of the overall scheme, OCI secretly agreed—with someone at T&L, whose identity has yet to be disclosed, pursuant to an agreement that never has been produced (and may not exist in writing)[63]—that OCI would offset its loan obligations to Camshaft Fund against

*Aakash, completes fund raise of $800-million*, THE ECONOMIC TIMES (Jul. 4, 2022, 05:49 PM), https://economictimes.indiatimes.com/tech/funding/byjus-clears-payment-to-aakash-completes-800-million-fund-raise (describing BYJU's' receipt of "the majority of the $800-million fund announced in March" 2022).

61 Morton Decl. ¶ 5.

62 *Id.*; *Camshaft Defendants' Objection to Debtor's and GLAS Trust Company LLC's Motion for Partial Summary Judgment* ("<u>Camshaft MSJ Obj.</u>") at 4, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Oct. 9, 2024) [Adv. D.I. 300 (sealed)].

63 Camshaft's counsel confirmed that, "to the extent there is an [offset] agreement in writing, Camshaft does not have a copy."

payments made by OCI for the BYJU's enterprise.[64] In that way, OCI currently claims that the Alpha Funds were "spent," and presumably justifies its failure to disclose the Promissory Notes as debts on its financial statements (*see* ¶¶ 8, 99-100, *supra*).

112. However, one critical problem for OCI is that Camshaft Fund never agreed to forgive OCI's loan obligations. Camshaft Fund was the lender, and its general partner Camshaft Management, on account of its fiduciary duties, could not lawfully authorize the extinguishment of the Notes. As the Promissory Notes explicitly state, "[n]o term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Borrower [OCI] and the Noteholder [Camshaft Fund]." T&L, in contrast, had no legal authority to modify OCI's loan obligations due to T&L's lack of privity with those transactions.

113. Ultimately, the BYJU's-Camshaft-OCI arrangement was inherently deceptive and fraudulent, as confirmed by its unnecessary complexity. The information uncovered so far suggests the Promissory Notes may never have been intended to be repaid, and that the Debtor's purported "investment" in Camshaft Fund may never have been intended to be redeemed for cash. Seemingly for that reason (among potentially others), as soon as Pohl took control of the Debtor, T&L and Camshaft, with OCI's active facilitation, repeatedly (and fraudulently) transferred the Camshaft LP Interest. This explains the parties' blatant misconduct over the past three years. T&L, Camshaft, and OCI could not risk Pohl, as an independent fiduciary of the Debtor, demanding that OCI actually honor its *bona fide* loan obligations under the Promissory Notes.

---

[64] *See, e.g.*, June 27, 2024 Morton Dep. Tr. at 181:16-182:5, 183:23-184:6 (agreeing that, "if OCI paid certain of BYJU's debts, it's going to offset the amount that it owes on the promissory notes," which was "the structure of the investment," and further testifying that "there is a[n] offset agreement between money they use – spent on the goods and services credit they've [OCI] extended the BYJU's enterprise and the money we [Camshaft Fund] lent them, which is consistent with our investment structure and why the investments in us happened"); Camshaft MSJ Obj. at 5 ("Consistent with the investment structure, OCI used the monies loaned from the Camshaft Fund to offset debts that BYJU's owed to OCI.").

## CAUSES OF ACTION

### COUNT ONE
### RECOVERY OF A SUBSEQUENT TRANSFER
### (AGAINST OCI LIMITED)

114. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

115. Between April and July 2022, Riju and T&L caused the Debtor to transfer the Alpha Funds to Camshaft Fund as the initial transferee (*i.e.*, the First, Second, and Third Transfers). The full amount of the Alpha Funds were nearly-simultaneously "loaned" by Camshaft Fund to OCI pursuant to three Promissory Notes (the "Subsequent Transfers").

116. In the initial adversary proceeding filed against Camshaft Fund, among others, *see BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro No. 24-50013 (Bankr. D. Del.), the Debtor asserted a claim (Count I) to avoid the First and Second Transfers as actual fraudulent transfers under Sections 544(b) and 548(a)(1)(B) of the Bankruptcy Code. The Court granted summary judgment on Count I (*see* MSJ Mem. Op. at 29).

117. In coordination with T&L and Camshaft Fund, OCI orchestrated the Subsequent Transfers of the Alpha Funds to it. Given OCI's involvement in devising and structuring the BYJU's-Camshaft-OCI arrangement, OCI knew that the original Transfers were avoidable fraudulent transfers. That is because, much like Camshaft, OCI, another sham enterprise, was aware of numerous red flags, and that the parties were papering a deal that was needlessly complex and inherently deceptive. There were far simpler ways to transfer $533 million from the Debtor to OCI, including without having to pay Camshaft Fund an eight-figure "tip." The terms of the Side Letters and Promissory Notes did not line up with their economic substance. Both the Debtor

and OCI misrepresented the arrangement on their financial statements. And OCI's role in the cover-up since at least 2023 corroborates its knowledge of the Debtor's actual fraudulent intent.

118. To date, OCI has made no payments under the Promissory Notes. Instead, OCI has retained and/or used the Alpha Funds to its own benefit.

119. The Debtor did not receive any value from the three Transfers. That was the apparent point: OCI's promises to repay the Promissory Notes and to allocate prepaid interest to the Debtor was likely purely illusory.

120. In light of the foregoing, OCI is liable to the Debtor under Sections 544(b)(1)[65] and 550(a)(2) of the Bankruptcy Code and applicable state law (*e.g.*, 6 *Del. C.* §§ 1304(a)(2) and 1305) as a subsequent transferee for the full amount of the Alpha Funds, plus interest from the relevant dates and costs and fees to the extent available, for the benefit of the Debtor's bankruptcy estate.

**COUNT TWO**
**AIDING AND ABETTING**
**RIJU RAVINDRAN'S BREACH OF FIDUCIARY DUTIES**
**(AGAINST OCI LIMITED AND RUPIN BANKER)**

121. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

**A. *Riju Ravindran's Breach of His Fiduciary Duties.***

122. Riju was the sole director of the Debtor from its incorporation on September 27, 2021, and was an officer from September 29, 2021 through at least the time of the three Transfers and the Subsequent Transfers. As such, he owed non-waivable fiduciary duties to the Debtor.

---

65 Section 544(b) of the Bankruptcy Code authorizes the Debtor to avoid any transfer of an interest in its property that is voidable under applicable law by any creditor holding an allowable unsecured claim. Accordingly, fraudulent transfers are avoidable pursuant to Section 544(b) of the Bankruptcy Code and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301 *et seq.*

123. At the time of the Transfers and the Subsequent Transfers, the Debtor, under applicable law, was insolvent or became insolvent as a direct result of its making the transfers, was inadequately capitalized, and/or was unable to pay its debts as they came due, and remained so at all times thereafter through the Petition Date. Specifically, the Debtor: (a) was a special purpose financing vehicle with no meaningful active operations; (b) had defaulted on the term loans as early as March 2022, before the First Transfer was made, had entered into a forbearance agreement, and could foresee further defaults occurring; (c) had no ability to comply with its financial obligations and other covenants under the Credit Agreement, subsequent forbearance agreements, and other loan documents due to a lack of funds; and (d) owed the Lenders an amount of money exceeding $1.2 billion, which would soon be accelerated, and with respect to which the remaining assets of the Debtor were unreasonably small in relation to the outstanding debt.

124. Even if the Debtor was not insolvent at the time of the First, Second, and Third Transfers, Riju's actions to transfer the Alpha Funds would have rendered the Debtor unable to meet its contractual obligations under the Credit Agreement. The Alpha Funds were the Debtor's largest known liquid asset, and even prior to their transfer were of lower size than the Debtor's obligations under the term loans. Moving the funds away from the Debtor, leaving the Debtor with only (i) approximately $419 million in available funds after the First Transfer completed on May 10, 2022 and (ii) approximately $131 million in available funds after the Second Transfer (which itself would soon be transferred out of the Debtor), rendered the Debtor unable to make any interest payments or to pay down the outstanding balance of the accelerated term loans, as required under the Credit Agreement. The Court itself has found that the Debtor was insolvent immediately following the Second Transfer.[66]

---

[66] MSJ Mem. Op. at 37.

125. Because the Debtor either was insolvent at the time of the First, Second, and Third Transfers, or was rendered unable to meet its contractual obligations by Riju's action, Riju owed to the Debtor, for the benefit of the Debtor and its creditors, fiduciary duties to: (i) act with the care that an ordinarily prudent director and officer of a Delaware corporation would in a similar position, (ii) serve in the best interests of the Debtor, for the benefit of the Debtor and its creditors; and (iii) refrain from intentionally acting with a purpose other than to advance the best interests of the Debtor, for the benefit of the Debtor and its creditors.

126. As the sole director and officer of the Debtor at the time, Riju caused the Debtor to transfer the Alpha Funds to Camshaft Fund without conducting any due diligence or investigation. He admitted in sworn testimony that he had never heard of Camshaft or its inexperienced founder prior to transferring the Debtor's Alpha Funds to them, much less conducted any diligence into them, nor did Riju speak to any advisors or counsel when approving this "investment." Riju also never read Camshaft's offering materials or other legal documents, nor did he have any skill related to investment management, despite signing an agreement claiming that he did. Additionally, Riju never spoke to Morton before or after authorizing the investment in Camshaft, nor inquired as to why T&L instructed him to approve this half-billion dollar investment. Worse still, he admitted to never having monitored, or hiring someone to monitor, the investment on the Debtor's behalf to ensure that Camshaft Fund did not completely dissipate the Alpha Funds.

127. There is no legitimate reason for the three Transfers and the Subsequent Transfers other than to frustrate the Lenders' ability to exercise remedies under the Credit Agreement. Riju's conduct grossly deviated from the standard of care that an ordinarily prudent director or officer of a Delaware corporation would have exercised in a similar situation. Not only did Riju remove the Debtor's largest known liquid asset when the Debtor had monetary obligations to fulfill under the

Credit Agreement, he transferred that asset to a sham hedge fund, whose principal place of business was once the address for an IHOP in Miami and which is run by a man in his twenties with no formal training in money management or experience in regulatory compliance. Riju did so with no apparent benefit to the Debtor, while knowing that the Debtor was already insolvent or would become insolvent as a result of the First, Second, and Third Transfers, that the Debtor already was in default at the time of the aforementioned Transfers, and that the Debtor lacked any meaningful revenue-generating capabilities. By transferring away the Alpha Funds, Riju secretly and deliberately removed the principal source of available cash that the Debtor could have used to satisfy its obligations under the Credit Agreement. Riju thus actively concealed the money from the Debtor, which needed the money in order to meet its legal and financial obligations to the creditors. As such, Riju was grossly negligent, and acted in bad faith, willfully failing to exercise the care of an ordinarily prudent director of a Delaware corporation. This actively harmed the Debtor, causing it to default on its obligations under the Credit Agreement. Riju, who signed the Credit Agreement on behalf of the Debtor, knew or should have known what his obligations were thereunder, and he deliberately and willfully disregarded them notwithstanding the consequences.

128. For the foregoing reasons, and as held by the Court in the MSJ Memorandum Opinion, Riju breached his fiduciary duties to the Debtor through his dereliction and conscious disregard of his fiduciary duties to the Debtor, including with respect to the First, Second, and Third Transfers and the Subsequent Transfers.

### B. *OCI's and Rupin Banker's Aiding and Abetting of Riju Ravindran's Breach of His Fiduciary Duties to the Debtor.*

129. OCI and Banker knowingly participated in Riju's fiduciary breaches, with specific knowledge that Riju was the sole director of the Debtor and of the Debtor's corporate and ownership structure.

Case 25-50282-BLS Doc 1 Filed 04/28/25 Page 47 of 59

130. Defendants led, and even at times dominated, the negotiation and structuring of the BYJU's-Camshaft-OCI arrangement, shaping the amount and terms of the Debtor's transfers without the Debtor's or its representatives' apparent knowledge. Defendants did this while knowing that the arrangement is inherently deceptive and intended to mislead. They specifically were aware that the terms of the Side Letters and the Promissory Notes did not match their economic substance, the latter of which was highly unfavorable to the Debtor, as the value of the Debtor's "investment" in Camshaft Fund turned on OCI honoring the Promissory Notes, which OCI apparently had no intention of repaying. Defendants, as the ones purportedly procuring goods and services for T&L and its subsidiaries (but not the Debtor), also knew that the Debtor would not benefit from OCI's use of the Alpha Funds. Furthermore, Defendants chose Camshaft Fund, a sham hedge fund, to facilitate the transfers of the Alpha Funds. Accordingly, Defendants had constructive, if not actual, notice that the Debtor, which had no independent representation, would be harmed by the First, Second, and Third Transfers, and that no reasonable corporate fiduciary would authorize such a damaging transaction.

131. Defendants' knowledge is confirmed by the fact that they regularly acted on the Debtor's behalf during negotiations, including by reviewing and commenting on documents to which the Debtor, but not OCI, was a counterparty, and by facilitating the provision of the Debtor's identifying information for KYC/AML purposes.

132. Apart from their role in orchestrating the Transfers and the Subsequent Transfers, and despite their knowledge of Riju's abdication of his fiduciary duties, Defendants eagerly pressed forward with the fraudulent transfers at issue. Banker personally ensured that Camshaft Fund's custodian and fund administrator had all of the Debtor's identifying information necessary to complete the AML/KYC processes for the Subsequent Transfers, and pressured Camshaft Fund

and its custodian to effectuate the Subsequent Transfers. In sum, Defendants were closely and actively involved in executing the three Transfers and the Subsequent Transfers for their benefit.

133. OCI's and Banker's knowing participation in Riju's fiduciary breaches caused direct and proximate harm to the Debtor. Given OCI's and Banker's extensive involvement and participation in the negotiation, execution, and consummation of the Transfers and the Subsequent Transfers, it was foreseeable that Defendants' knowing participation in Riju's fiduciary breaches would cause financial injury to the Debtor.

134. In light of the foregoing, the Debtor is entitled to damages on account of OCI's and Banker's aiding and abetting Riju's breach of his non-waivable fiduciary duties, including compensatory damages for the damages and harm caused to the Debtor, attorneys' fees and expenses, and prejudgment interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtor's bankruptcy estate.

**COUNT THREE**
**AIDING AND ABETTING**
**T&L'S BREACH OF FIDUCIARY DUTIES**
**(AGAINST OCI LIMITED AND RUPIN BANKER)**

135. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

**A. *T&L's Breach of Its Fiduciary Duties.***

136. T&L was the Debtor's ultimate parent company from its incorporation on September 27, 2021 until March 3, 2023.

137. During the time that T&L was the Debtor's ultimate parent company, T&L had ultimate and exclusive control and authority over the Debtor. As Riju testified, every single decision with respect to the Alpha Funds came from T&L.

138. With its authority as the Debtor's ultimate parent company, in April 2022 and July 2022, T&L caused the Debtor to transfer the Alpha Funds to Camshaft Fund, by ordering Riju to sign the necessary subscription agreements, with the intent to hinder, delay, and/or defraud present or future creditors.

139. At the time of those transfers and the associated subscriptions, the Debtor, under applicable law, was insolvent or became insolvent as a direct result of making the transfers, was inadequately capitalized, and/or was unable to pay its debts as they came due and remained so at all times thereafter through the Petition Date. Specifically, the Debtor: (a) was a special purpose financing vehicle with no meaningful active operations; (b) had defaulted on the term loans as early as March 2022, before the First Transfer was made, had entered into a forbearance agreement, and could foresee further defaults occurring; (c) had no meaningful ability to comply with its financial obligations and other covenants under the Credit Agreement, subsequent forbearance agreements, and other loan documents due to a lack of funds; and (d) owed the Lenders an amount of money exceeding $1.2 billion, which would soon be accelerated, and with respect to which the remaining assets of the Debtor were unreasonably small in relation to the outstanding debt.

140. Even if the Debtor were not insolvent at the time of the First, Second, and Third Transfers, T&L's actions to transfer the funds would have rendered the Debtor unable to meet its contractual obligations under the Credit Agreement. The Alpha Funds were the Debtor's largest known liquid asset, and even prior to their transfer were of lower size than the Debtor's obligations under the term loans. Moving the funds away from the Debtor, leaving the Debtor with only inadequate funds after the First and Second Transfers (which funds would soon be transferred out of the Debtor), rendered the Debtor unable to make any interest payments or to pay down the

outstanding balance of the accelerated term loans. As noted, the Court has found that the Debtor was insolvent immediately following the Second Transfer.

141. Because the Debtor either was insolvent at the time of the First, Second, and Third Transfers, or was rendered insolvent by T&L's actions, and because T&L used the parent-subsidiary relationship to conduct business dealings that perpetuated fraud, T&L, as the Debtor's parent company, owed to the Debtor, for the Debtor's own benefit or the benefit of the Debtor's creditors, fiduciary duties to: (i) act with the care that an ordinarily prudent director and officer of a Delaware corporation would in a similar position, (ii) serve in the best interests of the Debtor, for the benefit of its creditors; and (iii) refrain from intentionally acting with a purpose other than to the advance the best interests of the Debtor, for the benefit of its creditors.

142. As the Debtor's then-ultimate parent company, T&L is believed to have caused the Debtor to transfer the Alpha Funds to Camshaft Fund without conducting any due diligence or investigation. As Riju stated under oath, as director of T&L, he personally did not conduct any due diligence or investigation with respect to Camshaft, and, to his knowledge, no other T&L board member conducted any due diligence either. Riju, as director of T&L, had never heard of Camshaft Fund or its inexperienced founder prior to investing, nor did he ever speak with Morton, investigate his background, or review Camshaft Fund's offering materials or other legal documents. Neither is any other director or officer at T&L known to have conducted any diligence into Camshaft. There is no legitimate reason for this transfer other than to frustrate the Lenders' exercise of remedies. T&L's conduct grossly deviated from the standard of care that an ordinarily prudent parent company would have exercised in a similar situation. Not only did T&L remove the Debtor's largest liquid asset when the Debtor had significant monetary obligations to fulfill under the Credit Agreement, T&L transferred that asset to a sham hedge fund, whose principal

place of business was once the address for an IHOP in Miami and which is run by a man in his twenties with no formal training in investing or experience in regulatory compliance. T&L did so with no apparent benefit to the Debtor, while knowing that the Debtor was already insolvent or would become insolvent as a result of the Transfers, that the Debtor already was in default at the time of the aforementioned Transfers, and that the Debtor lacked any meaningful revenue-generating capabilities. By transferring away the Alpha Funds, T&L secretly removed the principal source of available cash that the Debtor could have used to satisfy its obligations under the Credit Agreement. T&L thus actively concealed the money from the Debtor, which needed the money in order to meet its legal and financial obligations to the creditors. As such, T&L acted in bad faith and was grossly negligent, willfully failing to exercise the care of an ordinarily prudent parent company, which actively harmed the Debtor and caused it to default on its obligations under the Credit Agreement.

143. Two of the directors of T&L, either personally or through their respective counsel, have admitted to moving the Alpha Funds in order to thwart the Debtor's ability to meet its financial obligations under the Credit Agreement. Counsel for Riju, a director of T&L, admitted in open court that the Alpha Funds were transferred to Camshaft "based on fear of lenders acting expeditiously" in exercising remedies. Byju, the founder, CEO, and a director of T&L, admitted on multiple occasions that he is hiding the money from the Lenders in a place they will never find it. In fact, on May 8, 2023, he stated that he hid the Debtor's Alpha Funds "someplace the Lenders will never find it." Then on January 14, 2024, Byju stated that he transferred the Debtor's Alpha Funds to Camshaft, at the time that T&L was the Debtor's ultimate parent company, to "protect" the money. T&L thus actively siphoned and concealed the Alpha Funds from the Debtor, which needed the money in order to meet its legal and financial obligations to the creditors.

144. As a result of T&L's egregious conduct, the Debtor has been unable to meet its legal obligations to pay interest and amortization under the Credit Agreement, nor could it pay the accelerated amount of the term loans on and after March 3, 2023. This caused material injury to the Debtor, which had to pay premium, interest, and expenses on the late payments and defaulted term loans. This, in turn, caused injury to the Debtor's creditors, which have not been paid under the Credit Agreement as a result of T&L's actions.

**B. *OCI's and Rupin Banker's Aiding and Abetting of T&L's Breach of Its Fiduciary Duties to the Debtor.***

145. OCI and Banker knowingly participated in T&L's fiduciary breaches, with specific knowledge that, though the Debtor was the source of the $533 million Alpha Funds, T&L was the decisionmaker on its behalf.

146. Defendants led, and even at times dominated, the negotiation and structuring of the BYJU's-Camshaft-OCI arrangement, shaping the amount and the terms of the Debtor's transfers without the Debtor's or its representatives' apparent knowledge. Defendants did this while knowing that the arrangement is inherently deceptive and intended to mislead. They specifically were aware that the terms of the Side Letters and the Promissory Notes did not match their economic substance, the latter of which was highly unfavorable to the Debtor, as the value of the Debtor's "investment" in Camshaft Fund turned on OCI honoring the Promissory Notes, which OCI apparently had no intention of repaying. Defendants, as the ones purportedly procuring goods and services for T&L and its subsidiaries (but not the Debtor), also knew that the Debtor would not benefit from OCI's use of the Alpha Funds. Furthermore, Defendants chose Camshaft Fund, a sham hedge fund, to facilitate the transfers of the Alpha Funds. Accordingly, Defendants had constructive, if not actual, notice that the Debtor, which had no independent representation, would

be harmed by the First, Second, and Third Transfers, and that no reasonable corporate fiduciary would authorize such a damaging transaction.

147. Defendants' knowledge is confirmed by the fact that they regularly acted on the Debtor's behalf during negotiations, including by reviewing and commenting on documents to which the Debtor, but not OCI, was a counterparty, and by facilitating the provision of the Debtor's identifying information for KYC/AML purposes.

148. As noted, despite their knowledge of T&L's complete abdication of its fiduciary duties, Defendants eagerly pressed forward with the fraudulent transfers at issue. In short, Defendants were closely and actively involved in executing the three Transfers and the Subsequent Transfers for their benefit.

149. OCI's and Banker's knowing participation in T&L's fiduciary breaches caused direct and proximate harm to the Debtor. Given OCI's and Banker's extensive involvement and participation in the negotiation, execution, and consummation of the Transfers and the Subsequent Transfers, it was foreseeable that Defendants' knowing participation in T&L's fiduciary breaches would case financial injury to the Debtor.

150. In light of the foregoing, the Debtor is entitled to damages on account of OCI's and Banker's aiding and abetting T&L's breach of its fiduciary duties, including compensatory damages for the damages and harm caused to the Debtor, attorneys' fees and expenses, and prejudgment interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtor's bankruptcy estate.

**COUNT FOUR**
**AIDING AND ABETTING**
**CAMSHAFT MANAGEMENT'S BREACH OF FIDUCIARY DUTIES**
**(AGAINST OCI AND BANKER)**

151. The Debtor incorporates and realleges all preceding paragraphs as if fully set forth herein.

**A. *Camshaft Management's Breach of Its Fiduciary Duties.***

152. Camshaft Management, as the sole general partner of Camshaft Fund, owed certain fiduciary duties to Camshaft fund and its limited partners, including the Debtor. Specifically, Camshaft Management owed the Debtor as a result of its limited partnership interest in Camshaft Fund: (i) a duty of loyalty to refrain from dealing with Camshaft Fund in an adverse manner, and (ii) a duty of care to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law.

153. Camshaft Management negotiated, executed, and consummated the First, Second, and Third Transfers, and the Subsequent Transfers at issue. Throughout that process, Camshaft Management actively negotiated for an arrangement that was off-market and harmful to the Debtor. Specifically, Camshaft Management, through the actual knowledge of its controller Morton, consummated the Side Letters and the Promissory Notes, knowing that the arrangement was too good to be true and deceptive. The definitive "deal docs" that Camshaft negotiated, without the involvement of independent representatives or advisors of the Debtor, allocated all of the economic risk of loss of the Debtor's "investment" to the Debtor through a segregated "investment side pocket" account. Camshaft Management espoused terms that left the Debtor's "investment" wholly unsecured in this account, and further understood that OCI was not intending to repay the Promissory Notes, which supported the value of that "investment." Yet Camshaft facilitated the provision of investor account statements showing an appreciating financial asset

while taking no known steps to enforce the Promissory Notes. For its role in the scheme, Camshaft Management received over $10 million in risk-free cash payments from the Alpha Funds.

154. By permitting the Alpha Funds to be "loaned" to OCI without any principal protection or assurance of repayment and on terms that did not reflect the economic substance and true purpose of the arrangement, which was financial alchemy, Camshaft Management acted adversely to Camshaft Fund and its investment side pocket account limited partner, the Debtor. Therefore, Camshaft Management's conduct materially breached its fiduciary duties to Camshaft Fund in respect of the Debtor's limited partnership interest therein. These breaches directly and materially harmed the Debtor. Indeed, it was solely the Debtor's investment that was "loaned" to OCI on highly unfavorable terms without any principal protection or assurance of repayment. Furthermore, Camshaft Management extracted significant value for its own benefit directly from the Debtor's Alpha Funds that were "loaned" to OCI.

**B. *OCI's and Rupin Banker's Aiding and Abetting of Camshaft Management's Breach of Its Fiduciary Duties.***

155. OCI and Banker knowingly aided and abetted Camshaft Management's fiduciary breaches, including by identifying and enlisting Camshaft Management to serve as an intermediary for the First, Second, and Third Transfers and the Subsequent Transfers. Given their integral role in the scheme, including their input into the structuring and the preparation of side letters and various other legal agreements, Defendants were aware of, and acceded to, Camshaft Management's insistence on deal terms that were off-market and harmful to the Debtor. OCI, Banker, and Camshaft Management were also aware that the arrangement was contemplated to result in a loss to the Debtor—Camshaft Management would extract more than $10 million in value risk free as a "tip," while the rest of the funds would be used to pay the expenses of affiliates of the Debtor and for other potential uses. Defendants were aware that the terms of arrangement

left the Debtor's "investment" unprotected, which was particularly harmful given OCI had no known intention of repaying its loans.

156. Defendants' knowing participation in Camshaft Management's fiduciary breaches caused direct and proximate harm to the Debtor through the Debtor's side pocket "investment" in Camshaft Fund. By design, this harm uniquely affected the Debtor, as opposed to the Camshaft Fund and its other investors generally. Given OCI's and Banker's extensive involvement and participation in this scheme, it was foreseeable that OCI's and Banker's knowing participation in Camshaft Management's fiduciary breaches would directly and proximately cause injury to the Debtor through its limited partnership interest in Camshaft Fund.

**C. *Futility of Any Demand on Camshaft Management.***

157. To the extent that a demand is required to be made of Camshaft Management, it would be futile. At all relevant times, Camshaft Management, through its controller Morton, has acted in concert with OCI and Banker in effectuating and consummating each and every aspect of the First, Second, and Third Transfers and the Subsequent Transfers. Indeed, Camshaft Management itself negotiated for terms that were off-market and harmful to the Debtor, extracting significant value from the Debtor to its own pecuniary benefit. Moreover, Morton founded, owns, controls, and manages Camshaft. Accordingly, a demand on Camshaft Management to pursue claims against itself, arising from actions taken for Camshaft Management's own benefit at the Debtor's expense, which were directed by Morton, would be futile. For these reasons, the Debtor has not made a demand on Camshaft Management to pursue the above claims against OCI and Banker.

158. In light of the foregoing, the Debtor is entitled to damages on account of OCI's and Banker's aiding and abetting of Camshaft Management's breach of Camshaft Management's fiduciary duties, including compensatory damages for the damages and harm caused to the Debtor,

attorneys' fees and expenses, and prejudgment interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtor's bankruptcy estate.

[*Rest of Page Intentionally Left Blank*]

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff BYJU's Alpha, Inc. requests that this Court enter judgment and grant the following relief:

a. Avoidance of the actual and constructive fraudulent transfers under 11 U.S.C. §§ 544, 548, and 550 and the Delaware Uniform Fraudulent Transfer Act (or any other applicable state law);

b. Award of (a) the return of property to the Debtor's estate that is the subject of the avoidable fraudulent transfer alleged herein; or (b) monetary damages under 11 U.S.C. § 550 reflecting the value of the avoidable transfer alleged herein (plus the value of any additional avoidable transfers the Debtor learns, through discovery or otherwise, were made to one or more of the Defendants);

c. Award of damages for aiding and abetting the breach of fiduciary duties by Riju Ravindran, including compensatory damages for the damages and harm caused to the Debtor and/or the disgorgement of the Alpha Funds (or the proceeds thereof);

d. Award of damages for aiding and abetting the breach of fiduciary duties by T&L, including compensatory damages for the damages and harm caused to the Debtor and/or the disgorgement of the Alpha Funds (or the proceeds thereof);

e. Award of damages for aiding and abetting of breach of fiduciary duties by Camshaft Management, including compensatory damages for the damages and harm caused to the Debtor through its limited partnership interest in Camshaft Fund and/or the disgorgement of the Alpha Funds (or the proceeds thereof);

f. Attorneys' fees, costs, and expenses incurred in this adversary proceeding;

g. Pre- and post-judgment interest up to the statutory maximum; and

h. Any other relief that this Court may deem just, proper, or equitable under the circumstances.

Case 25-50282-BLS Doc 6-1 Filed 04/28/25 Page 59 of 97

Dated: May 5, 2025
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin Finestone (admitted *pro hac vice*)
Kate Scherling (admitted *pro hac vice*)
295 Fifth Avenue
New York, New York 10016
Tel.: (212) 849 7000
benjaminfinestone@quinnemanuel.com
katescherling@quinnemanuel.com

*Counsel for Debtor, BYJU's Alpha, Inc.*

# EXHIBIT 1

**Respondents**
**R J Parker**
**First Witness Statement**
**Exhibit RJP1**
**31 July 2024**

**IN THE HIGH COURT OF JUSTICE** **KF-2024-003996**

**KING'S BENCH DIVISION**

**IN THE MATTER OF AN APPLICATION UNDER CPR 34.17 FOR ORDERS UNDER THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975**

**AND IN THE MATTER OF THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

**AND IN THE MATTER OF A CIVIL PROCEEDING NOW PENDING BEFORE THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

**BETWEEN:**

**BYJU'S ALPHA, INC.**

**Applicant**

-and-

**(1) OCI LIMITED**
**(2) OLIVER CHAPMAN**
**(3) RUBIN BANKER**

**Respondents**

---

**FIRST WITNESS STATEMENT**

**OF REBEKAH JEAN PARKER**

---

I, **REBEKAH JEAN PARKER**, of Laytons LLP, Yarnwicke, 119-121 Cannon Street, London EC4N 5AT, **WILL SAY AS FOLLOWS**:

## A. INTRODUCTION

1. I am a Partner of Laytons LLP ("**Laytons**"), the law firm which acts on behalf of the Respondents in these proceedings ("**OCI**", "**Mr. Chapman**" and "**Mr. Banker**"

respectively). I have conduct of these proceedings on behalf of the Respondents. I am duly authorised by the Respondents to make this witness statement.

2. I make this witness statement in support of the Respondents' application to set aside the Order of Senior Master Cook dated 11 July 2024 (the "**Set Aside Application**" and the "**11 July Order**" respectively).

3. There is now produced and shown to me a bundle of documents marked "**Exhibit RJP1**". I refer to Exhibit RJP1 below in the format [**RJP1/page**]. In making this witness statement, I have reviewed the First Witness Statement of Matthew Bunting dated 10 July 2024 ("**Bunting 1**") and Exhibit MJB1, which were filed in support of the Ex Parte Application (as defined below). I refer to Bunting 1 below. I also refer to Exhibit MJB1 below in the format [**MJB1/Page**].

4. The 11 July Order was made pursuant to an *ex parte* application issued by the Applicant in these proceedings ("**BYJU**") on 10 July 2024 (the "**Ex Parte Application**") and gives effect to a letter of request dated 26 June 2024 (the "**Letter of Request**") issued by the Honorable John T. Dorsey, United States Bankruptcy Court Judge ("**Judge Dorsey**") in proceedings in the United States Bankruptcy Court for the District of Delaware, namely, *In re; BYJU's Alpha, Inc., Case No. 20-10140 (JTD)* and *BYJU's Alpha, Inc. v. Camshaft Capital Fund, LP, et al., Adversary Proceeding No. 24-50013 (JTD)* (the "**US Proceedings**") [**RJP1/3-29**]. In giving effect to the Letter of Request, the 11 July Order: (i) requires the Respondents to produce various documents listed in Schedule A to the 11 July Order to BYJU's solicitors, insofar as those documents are within the Respondents' possession and control; and (ii) requires Mr. Chapman and Mr. Banker to attend an examination on oath at BYJU's solicitors' offices, with the examination to be conducted by the legal representatives of the parties to the US Proceedings.

5. Paragraph 10 of the 11 July Order provides that the Respondents have liberty to apply to set aside or vary the 11 July Order within 7 business days of service (despite the Letter of Request providing for the Respondents to apply within 14 calendar days). The Ex Parte Application and its supporting documents were served on the Respondents on 17 July 2024. On that date, Laytons wrote to BYJU's solicitors, Quinn Emanuel Urquhart

& Sullivan UK LLP ("**Quinn Emanuel**") requesting a 21-day extension to the deadline for an application to set aside or vary the 11 July Order [**RJP1/30-32**]. Quinn Emanuel responded on 18 July 2024 and offered an extension of 14 calendar days from 17 July 2024, i.e., until 31 July 2024 [**RJP1/33-34**]. On 19 July 2024, a consent order was filed extending the deadline by agreement of BYJU and the Respondents until 31 July 2024, which was subsequently approved by the Order of Senior Master Cook dated 24 July 2024 [**RJP1/35-37**]. The Set Aside Application is made by the Respondents pursuant to the liberty to apply provision contained at paragraph 10 of the 11 July Order. The Respondents believe that the 11 July Order should be set aside in its present form and I set out below what appear to be the relevant shortcomings in the process by which the Letter of Request was obtained and nature and scope of the requests made.

6. Unless otherwise stated, the facts referred to in this witness statement are within my own knowledge and are true. Where the facts are not within my own knowledge, they are true to the best of my knowledge and belief and I have stated the source of my knowledge and belief. Nothing said in this witness statement is intended to constitute a waiver of privilege.

7. The remainder of this witness statement is structured as follows:

   (1) Section B sets out the background to the Set Aside Application.

   (2) Section C sets out the Respondents' position on the Set Aside Application.

## <u>B. BACKGROUND</u>

### <u>B1. The Respondents</u>

8. OCI is a private company that was incorporated under the laws of England and Wales on 9 March 2012 [**RJP1/38-39**]. OCI carries on business as a supply chain procurement partner. That role involves assisting businesses across a variety of sectors with product / material sourcing, logistics, commercial supply and sales contract negotiations.

9. OCI is a substantial and highly successful company. As shown on its website, OCI has 10 offices across the globe (in the United Kingdom, EMEA, Asia and Oceania) [**RJP1/40-48**]. OCI was ranked by the *Financial Times* and Statista, the global data and business intelligence platform, as the fastest growing company in terms of revenue in the United Kingdom and the third fastest in Europe, out of a list of 1000 companies [**RJP1/49-55**]. OCI showed a compound annual growth rate CAGR of 409.59%. As shown in its audited accounts published on Companies House [**RJP1/56-105**], OCI's revenue, net profit and net assets for the past three years were as follows:

| | **Revenue for year** | **Net profit for year** | **Net assets as at YE** |
|---|---|---|---|
| **YE 30 March 2021 (12 months)** | £509,304,539 | £8,839,328 | £49,066,625 |
| **YE 31 August 2022 (17 months)** | £1,614,419,267 | £28,252,358 | £65,739,075 |
| **YE 31 March 2023 (7 months)** | £458,931,885 | £9,473,205 | £75,212,280 |

10. Mr. Chapman is the founder, CEO, sole director and sole shareholder of OCI [**RJP1/106-107**].

11. Mr. Banker has been an advisor to OCI for the past few years. Mr. Banker holds the title of Investor & Structuring Advisor. His role is to provide structuring advice to enable OCI to offer contractual terms to buyers and suppliers that meet their requirements whilst reducing risk to OCI.

## **B2. Dealings between OCI and T&L / subsidiaries of T&L**

12. OCI was introduced to BYJU and its ultimate parent company, Think and Learn Private, Ltd ("**T&L**") in early 2021. Between November 2021 and March 2023, OCI provided outsourced procurement services to T&L and its subsidiaries in relation to the

procurement of IT equipment; namely, electronic tablets and advertising, including promotion via various media. For example, OCI procured tablets from suppliers and arranged for delivery to T&L and its subsidiaries. The purchase price of such tablets and media services was funded by monies advanced to OCI by Camshaft Capital Fund, LP (a Delaware limited partnership) ("**Camshaft Fund**") under promissory notes [**RJP1/108-136**].

13. OCI has delivered the services that it was contracted to provide, and the monies advanced to OCI by Camshaft Fund have been spent: (i) on these products and services, which were procured and delivered or provided to T&L and its subsidiaries; and (ii) in satisfaction of OCI's fees.

## <u>B3. The US Proceedings</u>

14. None of the Respondents are parties to the US Proceedings. The Respondents have limited information regarding the US Proceedings and their knowledge in this regard is primarily based upon the information contained in Bunting 1 and Exhibit MJB1, as well as certain court documents from the US Proceedings which the Respondents have been able to obtain. However, I set out at paragraphs 15-20 below the Respondents' understanding of the US Proceedings based on the information available to them.

### B3.1. The parties to the US Proceedings

15. The parties to the US Proceedings are as follows:

(1) BYJU (a Delaware corporation) is the Plaintiff / Debtor.

(2) GLAS Trust Company LLC (a New Jersey limited liability company) ("**GLAS**") is the Interventor-Plaintiff.

(3) The Defendants to the US Proceedings (the "**US Defendants**") are:

(a) Camshaft Fund.

(b) Camshaft Capital Advisors, LLC (a Florida limited liability company) ("**Camshaft Advisors**").

(c) Camshaft Capital Management, LLC (a Florida limited liability company) ("**Camshaft Management**").

(d) Riju Ravindran ("**R Ravindran**").

(e) Inspilearn LLC (a Delaware limited liability company) ("**Inspilearn**").

(f) T&L (an Indian company).

**B3.2. The allegations made by BYJU in the US Proceedings**

16. As set out above, the Respondents have limited information regarding the US Proceedings. According to the Second Amended Complaint filed by BYJU in the US Proceedings on 24 April 2024 (which has been partially redacted in the publicly available version) (the "**SAC**") [**RJP1/137-217**], the central allegations made by BYJU in the US Proceedings appear to be as follows:[1]

(1) BYJU was formed on 27 September 2021 as a special purpose financing vehicle of its then ultimate parent company, T&L. From its formation until 3 March 2023, BYJU's sole director and officer was R Ravindran, the younger brother of T&L's founder, Byju Ravindran ("**B Ravindran**") (SAC, paragraph 32 [**RJP1/150**]).

(2) On 24 November 2021, BYJU borrowed $1.2 billion from a syndicate of lenders under a 5-year term loan facility (the "**Facility**"). GLAS acted as the Administrative and Collateral Agent for the purposes of the Facility (SAC, paragraph 38 [**RJP1/152**]).

---

1 For the avoidance of doubt, paragraph 16 of this witness statement is intended to constitute a summary of the allegations made by BYJU in the US Proceedings. Neither I nor the Respondents make any comment as to whether those allegations are true and/or accurate.

(3) After the Facility was concluded, BYJU defaulted on certain covenants under the Facility. As a result, on 3 March 2023, GLAS (on behalf of the lenders) accelerated the sums owed under the Facility and appointed an insolvency practitioner, Timothy R. Pohl, as the new sole director of BYJU (SAC, paragraph 103 [**RJP1/173**]). On 1 February 2024, BYJU filed for Chapter 11 bankruptcy (SAC, paragraph 141 [**RJP1/186**]).

(4) By its claims (which are described below), BYJU seeks to recover sums totalling approximately $533 million (the "**Alpha Funds**") which it alleges formed part of the sums borrowed under the Facility and were misappropriated from it by a series of four fraudulent transfers (the "**Alleged Fraudulent Transfers**"):

(a) First, the transfer of the Alpha Funds by BYJU to Camshaft Fund in April and July 2022 in return for a limited partnership interest in Camshaft Fund (the "**First Transfer**") (SAC, paragraphs 2, 49 and 51 [**RJP1/138,155-156**]).

(b) Second, the transfer of BYJU's interest in Camshaft Fund to Inspilearn in March 2023 (the "**Second Transfer**") (SAC, paragraphs 7 and 104 [**RJP1/140-141,174-175**]).

(c) Third, the transfer of Inspilearn's interest in Camshaft Fund to an (anonymous) *"non-US trust on behalf of Inspilearn"* on 1 February 2024 (the "**Third Transfer**") (SAC, paragraphs 14 and 143-144 [**RJP1/143-144,186**]).

(d) Fourth, the transfer of the interest in the Camshaft Fund from the *"non-US trust on behalf of Inspilearn"* to an (anonymous) *"non-US based 100% subsidiary of BYJU's"* at some point between 14 February 2024 and 5 March 2024 (the "**Fourth Transfer**") (SAC, paragraphs 15 and 149 [**RJP1/144,188**]).

(5) As a result of the Fourth Transfer, the Alpha Funds are now held by T&L through the *"non-US based 100% subsidiary of BYJU's"*, the identity of which is unknown

to BYJU (SAC, paragraphs 151, 158, 192, 216 and 233 [**RJP1/188,190-192, 201, 208-209, 211**]).

(6) BYJU advances 10 separate claims in the US Proceedings:

(a) Actual fraudulent transfers: A claim against all the US Defendants that: (i) the Alleged Fraudulent Transfers constituted actual fraudulent transfers; (ii) the Alleged Fraudulent Transfers should be avoided; and (iii) BYJU is entitled to recover the full amount of such transfers from Camshaft Fund, R Ravindran, T&L and Inspilearn (SAC, paragraphs 155-164 [**RJP1/189-193**]).

(b) Constructive fraudulent transfers: A claim against all the US Defendants that: (i) the Alleged Fraudulent Transfers constituted constructive fraudulent transfers; (ii) the Alleged Fraudulent Transfers should be avoided; and (iii) BYJU is entitled to recover the full amount of such transfers from Camshaft Fund, R Ravindran, T&L and Inspilearn (SAC, paragraphs 165-176 [**RJP1/193-195**]).

(c) Constructive fraudulent transfers: A claim against Camshaft Advisors and Camshaft Management that: (i) BYJU's payment of certain fees charged by Camshaft Advisors and Camshaft Management constituted constructive fraudulent transfers; (ii) such transfers should be avoided; and (iii) BYJU is entitled to recover the full amount of such transfers from Camshaft Advisors and Camshaft Management (SAC, paragraphs 177-181 [**RJP1/196-197**]).

(d) Breach of fiduciary duties: A claim against R Ravindran that he breached fiduciary duties owed to BYJU by causing BYJU to enter into the First Transfer and the Second Transfer, in respect of which BYJU is entitled to damages and/or disgorgement of the Alpha Funds and/or profits and fees received by R Ravindran (SAC, paragraphs 182-193 [**RJP1/197-202**]).

(e) Breach of fiduciary duties: A claim against T&L that it breached fiduciary duties owed to BYJU by causing BYJU to enter into the First Transfer and the Second Transfer, in respect of which BYJU is entitled to damages and/or disgorgement of the Alpha Funds and/or profits received by T&L (SAC, paragraphs 194-207 [**RJP1/202-206**).

(f) Aiding and abetting breach of fiduciary duties: A claim against T&L that it knowingly participated in R Ravindran's breach of fiduciary duties, in respect of which BYJU is entitled to damages (SAC, paragraphs 208-212 [**RJP1/206-208**]).

(g) Accounting: A claim against R Ravindran and T&L for an account in respect of the Alpha Funds by the production and examination of all books and records associated with the Alpha Funds or interest (SAC, paragraphs 213-223 [**RJP1/208-210**]).

(h) Declaratory judgment: A claim against all the US Defendants for a declaration that: (i) the Second Transfer and any subsequent transfer or disposition of the Alpha Funds was *ultra vires*, void *ab initio* and/or otherwise without force and effect; and (ii) the Alpha Funds are the property of BYJU's estate (SAC, paragraphs 224-229 [**RJP1/210-211**]).

(i) Turnover of property of the estate: A claim against T&L for the turn over of the Alpha Funds to BYJU's estate and for disclosure of all recorded information, in the form of books, documents, records and papers associated with the Alpha Funds (SAC, paragraphs 230-236 [**RJP1/211-212**]).

(j) Conversion: A claim against R Ravindran and T&L for conversion of BYJU's limited partnership interest in Camshaft Fund, in respect of which BYJU is entitled to damages (SAC, paragraphs 237-242 [**RJP1/212-213**]).

(k) Violation of automatic stay: A claim against all the US Defendants for violation of the automatic stay imposed by reason of BYJU filing for

Chapter 11 bankruptcy on 1 February 2024, in respect of which BYJU claims actual and punitive damages (SAC, paragraphs 243-256 [**RJP1/213-215**]).

### B3.3. The Letter of Request

17. The Letter of Request was issued by Judge Dorsey on 26 June 2024 pursuant to a Motion filed by BYJU in the US Proceedings on 5 June 2024 (the "**Motion**") [**MJB1/284**].

18. Based on the evidence available to the Respondents, it appears that Judge Dorsey did not, when granting the Motion, consider whether the evidence sought by BYJU by the Letter of Request was relevant to the issues that arise for trial in the US Proceedings, rather than being merely sought for the purposes of discovery in the US Proceedings. I say this for the following reasons.

19. As the English courts have noted in various cases, letters of request are often issued by United States courts *"without any real scrutiny"*, *"without any (or any significant) amendment"* being made to the form of the letter of request sought and *"without the judge being informed of the significant differences between US federal procedure and those of [the English] courts"*: see, for example, Gredd v Busson [2003] EWHC 3001 (QB) at [27(8)]. This appears to have happened in the present case when the Motion was granted by Judge Dorsey. As to this:

(1) The Motion does not explain in any place the differences in procedure between the United States courts and the English courts; namely, that the English courts will only give effect to a foreign letter of request insofar as it is confined to eliciting evidence which is relevant to the issues which arise for trial in the foreign proceedings. To the contrary, the Motion suggests that the purpose of obtaining the evidence sought by the Letter of Request is for discovery in the US Proceedings (rather than to obtain evidence relevant to the issues for trial in the US Proceedings). In particular:

(a) Paragraph 4 of the Motion summarises its purpose as being *"to obtain discovery from OCI...and OCI's senior leadership team"* (rather than to

obtain evidence relevant to the issues for trial in the US Proceedings) [**MJB1/287**].

(b) The Motion states at paragraph 22 that *"the discovery requested by the Debtor is relevant to the claims at issue in this litigation"* because *"OCI…played an integral (if not prominent) role in an artifice, perpetrated by Camshaft and other defendants to the Adversary Proceedings, to conceal and obfuscate the location and composition of the Alpha Funds"* [**MJB1/291**]. However, this does not identify any specific issues for trial to which the evidence sought by the Letter of Request would relate. Rather it constitutes a general reference to discovery in the context of a high-level description of the alleged fraud.

(c) The Motion states at paragraph 23 that *"The discovery sought in the Letter of Request is targeted to seek information about the whereabouts of the Alpha Funds and the transactions involving those funds that are the subject of this Adversary Proceeding along with information concerning the contemplation and negotiation preceding those transactions"* [**MJB1/292**]. This does not identify any specific issues for trial to which the evidence sought would relate and instead is simply aimed at discovery.

(d) The Motion states at paragraph 24 that BYJU seeks to depose Mr. Chapman *"to inquire as to, among other things, (i) any legitimate purpose the Debtor, Camshaft, and OCI could possibly have had in "lending" the Alpha Funds to OCI immediately after Ravindran transferred such funds to Camshaft, (ii) whether OCI has subsequently transferred any of the Alpha Funds to other parties, (iii) whether OCI intends on repaying the Alpha Funds to the Debtor, and (iv) whether OCI can point to any consideration that the Debtor may be left with in replacement for the Alpha Funds"*, and that it seeks to depose Mr. Banker *"to inquire about the genesis of the OCI-Debtor-Camshaft relationships, in addition to the areas of inquiry listed above"* [**MJB1/292**]. This does not identify any

specific issues for trial to which the evidence sought would relate and, again, is instead simply aimed at discovery.

(2) The Letter of Request itself also suggests that the evidence sought is for the purposes of US-style discovery, rather than to prove issues at trial in the US Proceedings. In particular:

(a) The Letter of Request states at page 3 that OCI *"likely has significant relevant information"* regarding the Alpha Funds [**RJP1/15**]. However, this does not identify any specific issues for trial to which the evidence sought would relate.

(b) The Letter of Request states at page 7 that *"without limitation on its other uses, discovery from OCI, Mr. Chapman, and Mr. Banker will provide key information regarding the various fraudulent transfers of the Alpha Funds and the Defendants' reasons for so transferring, including whether there was any legitimate and lawful business reason for doing so"* [**RJP1/19**]. This is couched in vague and non-exhaustive terms and does not identify any specific issues for trial to which the evidence sought would relate.

(c) The Letter of Request also states at page 7 that *"The requests and examination topics, as detailed in Sections 10 and 11 below, relate specifically to OCI's (acting at the direction of Mr. Chapman and/or Mr. Banker) acceptance and receipt of the Alpha Funds as putative loans that, as Plaintiffs currently understand, OCI has not yet paid back, and which do not appear as liabilities in its accounts (and which further do not appear to mature until 2025)."* [**RJP1/19**]. This does not identify any specific issues for trial to which the evidence sought would relate.

(d) The Letter of Request states at page 8 that *"the evidence sought...will be highly relevant to and either probative or disprobative of material facts relevant to the Second Amended Complaint"* [**RJP1/20**]. However, again,

this does not identify the material facts in dispute in the US Proceedings which the evidence sought will be probative or disprobative of.

(e) The Letter of Request states at page 9 that the Respondents *"can be expected to have relevant evidence to provide in connection with the disposal of the US proceedings"* [**RJP1/21**]. Again, this does not identify any specific issues for trial to which the evidence sought would relate.

(3) Based on recent correspondence from Quinn Emanuel [**RJP1/218-223**], it appears that: (i) the Motion was not the subject of any written submissions by the parties to the US Proceedings (beyond those made by BYJU in the Motion itself); (ii) the Motion was not the subject of any oral argument at a hearing; and (iii) Judge Dorsey did not give any judgment (either *ex tempore* or in writing) when granting the Motion and issuing the Letter of Request. Accordingly, it seems that the fundamental question of whether the evidence requested was specifically relevant to the issues for trial in the US Proceedings was not drawn to Judge Dorsey's attention. That question was not the subject of amplification, argument or scrutiny as part of a reasoned decision as to relevance.

(4) The draft of the Letter of Request enclosed with the Motion is identical to the issued Letter of Request.

20. OCI's US counsel have confirmed that the US Proceedings remain live for present purposes and that the parties thereto have issued various motions and counter-motions in relation to partial summary disposal. I understand that no trial date has been set but am not presently aware of any further matters of direct relevance to the Set Aside Application in its current form.

## C. SET ASIDE APPLICATION

21. The legal arguments underpinning the Set Aside Application will be a matter for written and oral submissions by counsel for the Hearing. In order that the Court and BYJU have notice of the arguments advanced by the Respondents on the Set Aside Application, I

summarise below the Respondents' position. I address the requests for documents set out in Schedule A to the 11 July Order first, before addressing the order for the examination of Mr. Chapman and Mr. Banker.

## C1. Requests for documents

22. Schedule A to the 11 July Order lists various documents which OCI, Mr. Chapman and Mr. Banker are requested to produce [**RJP1/9**]. The Respondents' position is that the requests for documents: (i) are impermissibly broad and/or vague; and/or (ii) are not relevant to the issues that arise for trial in the US Proceedings (and instead are aimed at seeking discovery). I address each paragraph of Schedule A to the 11 July Order in turn below.

### C1.1. Schedule A, paragraph 1

23. The documents requested by Schedule A, paragraph 1 are:

> *"1. All communications with the Debtor and/or Defendants relating to the Alpha Funds."*

24. This request for documents is impermissibly broad and/or vague. It is not possible to identify the particular documents that are sought because:

(1) The request is not limited by any date range and thus relates to any *"communications"* from any date in time.

(2) There is no definition of *"communications"*. The request therefore relates to any *"communications"*, whether by letter, email, fax, instant messaging or otherwise.

(3) The request relates to communications between the Respondents (three separate parties) and BYJU and/or the US Defendants (seven separate parties).

(4) It is unclear what is meant by the words *"relating to the Alpha Funds"*. Whether an individual *"communication"* would *"relate to the Alpha Funds"* is subjective, making the parameters of the request uncertain.

25. In any event, the documents are not relevant to a specific issue that arises for trial in the US Proceedings. Instead, they are documents sought for the purposes of discovery, as demonstrated by the broad and wide-ranging way in which the documents are described.

**C1.2. Schedule A, paragraph 2**

26. The documents requested by Schedule A, paragraph 2 are:

> *"2. All documents and communications relating to the contemplation, negotiation, and execution of the transactions relating to the promissory notes issued by OCI Limited to Camshaft Fund LP, including but not limited to*
>
> > *a. The April 26, 2022 promissory note by and between OCI Limited and Camshaft Capital Fund, LP, with a principal amount of $318 million.*
> >
> > *b. The April 30, 2022 promissory note by and between Camshaft Capital Management, LLC and Camshaft Capital Fund, LP, with a principal amount of $9 million.*
> >
> > *c. The July 12, 2022 promissory note by and between OCI Limited and Camshaft Capital Fund, LP, with a principal amount of $215 million.*
> >
> > *d. The July 14, 2022 promissory note by and between Camshaft Capital Management, LLC and Camshaft Capital Fund, LP, with a principal amount of $6 million.*
> >
> > *e. The July 15, 2022 promissory note by and between OCI Limited and Camshaft Capital Fund, LP, with a principal amount of $16.52 million.*
> >
> > *f. Any other promissory notes relating to the Alpha Funds or the proceeds thereof, including as referenced in the March 31, 2023 First Amended and Restated Side Agreements among Camshaft Capital Fund, LP, Camshaft Capital Advisors, LLC, and Inspilearn LLC."*

27. The substance of this request for documents is in the chapeau: it refers to documents/communications that *"relate to"* the promissory notes referred to (*"All documents and communications relating to the contemplation, negotiation, and execution of the transactions <u>relating to the promissory notes</u>…"*).

28. This request for documents is impermissibly broad and/or vague. It is not possible to identify the particular documents that are sought because:

(1) The request is not limited by any date range and thus relates to any *"documents and communications"* from any date in time.

(2) There is no definition of *"documents"*. The request therefore relates to any type of document whatsoever.

(3) There is no definition of *"communications"*. The request therefore relates to any *"communications"*, whether by letter, email, fax, instant messaging or otherwise. Further, there is no limit imposed on the parties to such communications.

(4) It is unclear what is meant by the words *"relating to the contemplation, negotiation, and execution of the transactions relating to the promissory notes issued by OCI Limited to Camshaft Fund LP"*. Whether an individual *"document"* or *"communication"* would relate to such (unspecified) *"transactions"* is subjective, as is whether such *"transactions"* would relate to the *"promissory notes"*, making the parameters of the request uncertain.

(5) The request is drafted in non-exhaustive terms (see the wording *"including but not limited to"* and *"Any other promissory notes relating to the Alpha Funds or the proceeds thereof"*).

29. In any event, the documents are not relevant to a specific issue that arises for trial in the US Proceedings. Instead, they are documents sought for the purposes of discovery. As to this:

(1) As set out at paragraph 16(4) above, BYJU's pleaded case in the US Proceedings is that the Alpha Funds were misappropriated by the Alleged Fraudulent Transfers and, following the Fourth Transfer, are now held by T&L through the *"non-US based 100% subsidiary of BYJU's"*. On its own pleaded case, BYJU has identified the entity that holds the relevant Alpha Funds. The promissory notes entered into by OCI and Camshaft Fund do not form part of BYJU's pleaded case in the US Proceedings as to how the Alpha Funds were allegedly misappropriated. It is therefore not clear how this broadly drafted request could possibly be relevant to the issues which arise for trial in the US Proceedings.

(2) The fact that the documents are sought for discovery is demonstrated by the broad and wide-ranging way in which the documents are described.

**C1.3. Schedule A, paragraph 3**

30. The documents requested by Schedule A, paragraph 3 are:

> *"3. All documents and communications relating to transfer, disposition, and location of the Alpha Funds."*

31. This request for documents is impermissibly broad and/or vague. It is not possible to identify the particular documents that are sought because:

(1) The request is not limited by any date range and thus relates to any *"documents and communications"* from any date in time.

(2) There is no definition of *"documents"*. The request therefore relates to any type of document whatsoever.

(3) There is no definition of *"communications"*. The request therefore relates to any *"communications"*, whether by letter, email, fax, instant messaging or otherwise. Further, there is no limit imposed on the parties to such communications.

(4) It is unclear what is meant by the words *"relating to transfer, disposition, and location of the Alpha Funds"*. Whether an individual *"document"* or

*"communication"* would relate to such matters is subjective, making the parameters of the request uncertain.

32. In any event, the documents are not relevant to a specific issue that arises for trial in the US Proceedings. Instead, they are documents sought for the purposes of discovery. As to this:

(1) As set out at paragraph 16(4) above, BYJU's pleaded case in the US Proceedings is that the Alpha Funds were misappropriated by the Alleged Fraudulent Transfers and, following the Fourth Transfer, are now held by T&L through the *"non-US based 100% subsidiary of BYJU's"*. On its own pleaded case, BYJU has identified the entity that holds the relevant Alpha Funds. In those circumstances, the documents sought are not relevant to the issues which arise for trial in the US Proceedings.

(2) The fact that the documents are sought for discovery is demonstrated by the broad and wide-ranging way in which the documents are described.

**C1.4. Schedule A, paragraph 4**

33. The documents requested by Schedule A, paragraph 4 are:

> *"4. All documents and communications relating to the repayment, if any, of the promissory notes referenced above."*

34. This request for documents is impermissibly broad and/or vague. It is not possible to identify the particular documents that are sought because:

(1) The request is not limited by any date range and thus relates to any *"documents and communications"* from any date in time.

(2) There is no definition of *"documents"*. The request therefore relates to any type of document whatsoever.

(3) There is no definition of *"communications"*. The request therefore relates to any *"communications"*, whether by letter, email, fax, instant messaging or otherwise. Further, there is no limit imposed on the parties to such communications.

(4) It is unclear what is meant by the words *"relating to the repayment, if any, of the promissory notes referenced above"*. Whether an individual *"document"* or *"communication"* would relate to such matters is subjective, making the parameters of the request uncertain.

(5) The cross-reference to *"the promissory notes referenced above"* means that the request is non-exhaustive, since the promissory notes include, at Schedule A, paragraph 2(f): *"Any other promissory notes relating to the Alpha Funds or the proceeds thereof…"*.

35. In any event, the documents are not relevant to a specific issue that arises for trial in the US Proceedings. Instead, they are documents sought for the purposes of discovery. As to this:

(1) As set out at paragraph 16(4) above, BYJU's pleaded case in the US Proceedings is that the Alpha Funds were misappropriated by the Alleged Fraudulent Transfers and, following the Fourth Transfer, are now held by T&L through the *"non-US based 100% subsidiary of BYJU's"*. In those circumstances, the documents sought are not relevant to the issues which arise for trial in the US Proceedings. On its own pleaded case, BYJU has identified the entity that holds the relevant Alpha Funds. The promissory notes entered into by OCI and Camshaft Fund (including whether or not such promissory notes were repaid by OCI) do not form part of BYJU's pleaded case in the US Proceedings as to how the Alpha Funds were allegedly misappropriated.

(2) The fact that the documents are sought for discovery is demonstrated by the broad and wide-ranging way in which the documents are described.

### C1.5. Schedule A, paragraph 5

36. The documents requested by Schedule A, paragraph 5 are:

> *"5. All documents and communications relating to the contemplation, negotiation, and execution of the transactions relating to the side letters between the Debtor or Inspilearn, on the one hand, and Camshaft Capital Fund, LP, Camshaft Capital Management, LLC, or Camshaft Capital Advisors, LLC, on the other hand."*

37. This request for documents is impermissibly broad and/or vague. It is not possible to identify the particular documents that are sought. As to this:

(1) The request is not limited by any date range and thus relates to any *"documents and communications"* from any date in time.

(2) There is no definition of *"documents"*. The request therefore relates to any type of document whatsoever.

(3) There is no definition of *"communications"*. The request therefore relates to any *"communications"*, whether by letter, email, fax, instant messaging or otherwise. Further, there is no limit imposed on the parties to such communications.

(4) The *"side letters"* referred to are not defined by dates or the parties thereto.

(5) It is unclear what is meant by the words *"relating to the contemplation, negotiation, and execution of the transactions relating to the side letters"*. Whether an individual *"document"* or *"communication"* would relate to such (unspecified) *"transactions"* is subjective, as is whether such *"transactions"* would relate to the (unspecified) *"side letters"*, making the parameters of the request uncertain.

(6) The request does not refer to documents or communications that involve or to which OCI was party. There is no basis for contending that OCI would have, or would likely have, possession of or access to the same.

38. In any event, the documents are not relevant to a specific issue that arises for trial in the US Proceedings. Instead, they are documents sought for the purposes of discovery. As to this:

(1) As set out at paragraph 16(4) above, BYJU's pleaded case in the US Proceedings is that the Alpha Funds were misappropriated by the Alleged Fraudulent Transfers and, following the Fourth Transfer, are now held by T&L through the *"non-US based 100% subsidiary of BYJU's"*. In those circumstances, the documents sought are not relevant to the issues which arise for trial in the US Proceedings. On its own pleaded case, BYJU has identified the entity that holds the relevant Alpha Funds. The side letters entered into by BYJU / Inspirlearn and the Camshaft entities do not form part of BYJU's pleaded case in the US Proceedings as to how the Alpha Funds were allegedly misappropriated.

(2) The fact that the documents are sought for discovery is demonstrated by the broad and wide-ranging way in which the documents are described.

**C1.6. Schedule A, paragraph 6**

39. The documents requested by Schedule A, paragraph 6 are:

> *"6. All documents and communications relating to OCI Limited's business relationship with Defendants, DC Legal LLC, and any of their principals, representatives, or affiliates."*

40. This request for documents is impermissibly broad and/or vague. It is not possible to identify the particular documents that are sought because:

(1) The request is not limited by any date range and thus relates to any *"documents and communications"* from any date in time.

(2) There is no definition of *"documents"*. The request therefore relates to any type of document whatsoever.

(3) There is no definition of *"communications"*. The request therefore relates to any *"communications"*, whether by letter, email, fax, instant messaging or otherwise. Further, there is no limit imposed on the parties to such communications.

(4) There is no definition of *"business relationship"* or *"principals, representatives, or affiliates"*, which terms are unduly vague.

(5) It is unclear what is meant by the words *"relating to OCI Limited's business relationship with Defendants, DC Legal LLC, and any of their principals, representatives, or affiliates"*. Whether an individual *"document"* or *"communication"* would relate to OCI's *"business relationship"* with such parties is subjective, making the parameters of the request uncertain.

41. In any event, the documents are not relevant to a specific issue that arises for trial in the US Proceedings. Instead, they are documents sought for the purposes of discovery. As to this:

(1) As set out at paragraph 16(4) above, BYJU's pleaded case in the US Proceedings is that the Alpha Funds were misappropriated by the Alleged Fraudulent Transfers and, following the Fourth Transfer, are now held by T&L through the *"non-US based 100% subsidiary of BYJU's"*. In those circumstances, the documents sought are not relevant to the issues which arise for trial in the US Proceedings.

(2) Similarly, any business relationship between OCI and the US Defendants, DC Legal LLC FZ and any of their principals, representatives or affiliates is not an issue to be determined at trial in the US Proceedings.

(3) The fact that the documents are sought for discovery is demonstrated by the broad and wide-ranging way in which the documents are described.

**C1.7. Schedule A, paragraph 7**

42. The documents requested by Schedule A, paragraph 7 are:

*"7. All documents and communications relating to OCI Limited's business relationship with HarryMax Consultants, LLC, Benchmark Investments, LLC, E.F. Hutton, DC Legal LLC FZ, Michael Lipman, and any of their principals, representatives, or affiliates."*

43. This request for documents is impermissibly broad and/or vague. It is not possible to identify the particular documents that are sought because:

(1) The request is not limited by any date range and thus relates to any *"documents and communications"* from any date in time.

(2) There is no definition of *"documents"*. The request therefore relates to any type of document whatsoever.

(3) There is no definition of *"communications"*. The request therefore relates to any *"communications"*, whether by letter, email, fax, instant messaging or otherwise. Further, there is no limit imposed on the parties to such communications.

(4) There is no definition of *"business relationship"* or *"principals, representatives, or affiliates"*, which terms are unduly vague.

(5) It is unclear what is meant by the words *"relating to OCI Limited's business relationship with HarryMax Consultants, LLC, Benchmark Investments, LLC, E.F. Hutton, DC Legal LLC FZ, Michael Lipman, and any of their principals, representatives, or affiliates"*. Whether an individual *"document"* or *"communication"* would relate to OCI's *"business relationship"* with such parties is subjective, making the parameters of the request uncertain.

44. In any event, the documents are not relevant to a specific issue that arises for trial in the US Proceedings. Instead, they are documents sought for the purposes of discovery. As to this:

(1) As set out at paragraph 16(4) above, BYJU's pleaded case in the US Proceedings is that the Alpha Funds were misappropriated by the Alleged Fraudulent

Transfers and, following the Fourth Transfer, are now held by T&L through the *"non-US based 100% subsidiary of BYJU's"*. In those circumstances, the documents sought are not relevant to the issues which arise for trial in the US Proceedings.

(2) Similarly, any business relationship between OCI and HarryMax Consultants, LLC, Benchmark Investments, LLC, E.F. Hutton, DC Legal LLC FZ, Michael Lipman and any of their principals, representatives or affiliates is not an issue to be determined at trial in the US Proceedings.

(3) The fact that the documents are sought for discovery is demonstrated by the broad and wide-ranging way in which the documents are described.

## <u>C2. Examination of Mr. Chapman and Mr. Banker</u>

45. Schedule B to the 11 July Order lists various topics on which Mr. Chapman and Mr. Banker are to be examined [**RJP1/10-11**]. The Respondents' position is that these topics for examination: (i) are impermissibly broad and/or vague; and/or (ii) are not relevant to the issues that arise for trial in the US Proceedings (and instead are aimed at seeking discovery). I address each paragraph of Schedule B to the 11 July Order in turn below.

### C2.1. Schedule B, paragraph 1

46. The topic for examination set out in Schedule B, paragraph 1 is:

> *"1. The witness' educational background, employment history, professional qualifications, and preparation for the deposition (to include any contact he may have had with the parties, their lawyers, insurers, or representatives, but excluding any privileged content of such communications)."*

47. The evidence sought under this topic is not relevant to a specific issue that arises for trial in the US Proceedings. Instead, it is sought for the purposes of discovery. Neither Mr. Chapman's nor Mr. Banker's educational background, employment history,

professional qualifications or preparation for the examination are relevant to an issue for trial in the US Proceedings, not least where none of the Respondents are parties to the US Proceedings.

**C2.2. Schedule B, paragraph 2**

48. The topic for examination set out in Schedule B, paragraph 2 is:

> *"2. OCI Limited's business relationship with Defendants, DC Legal LLC FZ, and any of their principals, representatives, or affiliates."*

49. This topic for examination is impermissibly broad and/or vague. In particular:

(1) The topic is not limited by any date range and thus relates to any date in time.

(2) There is no definition of *"business relationship"* or *"principals, representatives, or affiliates"*, which terms are unduly vague.

50. In any event, the evidence sought under this topic is not relevant to a specific issue that arises for trial in the US Proceedings. Instead, it is sought for the purposes of discovery. As to this:

(1) As set out at paragraph 16(4) above, BYJU's pleaded case in the US Proceedings is that the Alpha Funds were misappropriated by the Alleged Fraudulent Transfers and, following the Fourth Transfer, are now held by T&L through the *"non-US based 100% subsidiary of BYJU's"*. In those circumstances, the evidence sought is not relevant to the issues which arise for trial in the US Proceedings. Any business relationship between OCI and the US Defendants, DC Legal LLC FZ and any of their principals, representatives or affiliates is not an issue to be determined at trial in the US Proceedings.

(2) The fact that the evidence is sought for discovery is demonstrated by the broad and wide-ranging way in which the topic for examination is described.

**C2.3. Schedule B, paragraph 3**

51. The topic for examination set out in Schedule B, paragraph 3 is:

> *"3. OCI Limited's business relationship with HarryMax Consultants, LLC, Benchmark Investments, LLC, E.F. Hutton, DC Legal LLC FZ, Michael Lipman, and any of their principals, representatives, or affiliates."*

52. This topic for examination is impermissibly broad and/or vague. In particular:

(1) The topic is not limited by any date range and thus relates to any date in time.

(2) There is no definition of *"business relationship"* or *"principals, representatives, or affiliates"*, which terms are unduly vague.

53. In any event, the evidence sought under this topic is not relevant to a specific issue that arises for trial in the US Proceedings. Instead, it is sought for the purposes of discovery. As to this:

(1) As set out at paragraph 16(4) above, BYJU's pleaded case in the US Proceedings is that the Alpha Funds were misappropriated by the Alleged Fraudulent Transfers and, following the Fourth Transfer, are now held by T&L through the *"non-US based 100% subsidiary of BYJU's"*. In those circumstances, the evidence sought is not relevant to the issues which arise for trial in the US Proceedings. Any business relationship between OCI and HarryMax Consultants, LLC, Benchmark Investments, LLC, E.F. Hutton, DC Legal LLC FZ, Michael Lipman and any of their principals, representatives or affiliates is not an issue to be determined at trial in the US Proceedings.

(2) The fact that the evidence is sought for discovery is demonstrated by the broad and wide-ranging way in which the topic for examination is described.

**C2.4. Schedule B, paragraph 4**

54. The topic for examination set out in Schedule B, paragraph 4 is:

*"4. The contemplation, negotiation, and execution of the transactions relating to the promissory notes issued by OCI Limited to Camshaft Capital Fund, LP, including but not limited to;*

*a. The April 26, 2022 promissory note by and between OCI Limited and Camshaft Capital Fund, LP, with a principal amount of $318 million.*

*b. The April 30, 2022 promissory note by and between Camshaft Capital Management, LLC and Camshaft Capital Fund, LP, with a principal amount of $9 million.*

*c. The July 12, 2022 promissory note by and between OCI Limited and Camshaft Capital Fund, LP, with a principal amount of $215 million.*

*d. The July 14, 2022 promissory note by and between Camshaft Capital Management, LLC and Camshaft Capital Fund, LP, with a principal amount of $6 million.*

*e. The July 15, 2022 promissory note by and between OCI Limited and Camshaft Capital Fund, LP, with a principal amount of $16.52 million.*

*f. Any other promissory notes relating to the Alpha Funds or the proceeds thereof, including as referenced in the March 31, 2023 First Amended and Restated Side Agreements among Camshaft Capital Fund, LP, Camshaft Capital Advisors, LLC, and Inspilearn LLC."*

55. This topic for examination is impermissibly broad and/or vague. In particular:

(1) The topic is not limited by any date range and thus relates to any date in time.

(2) It is unclear what is meant by the words *"relating to the contemplation, negotiation, and execution of the transactions relating to the promissory notes issued by OCI Limited to Camshaft Fund LP"*. Further, the request is drafted in non-exhaustive terms (see the wording *"including but not limited to"* and *"Any*

*other promissory notes relating to the Alpha Funds or the proceeds thereof*"). The parameters of the topic for examination therefore are not properly defined.

56. In any event, the evidence sought under this topic is not relevant to a specific issue that arises for trial in the US Proceedings. Instead, it is sought for the purposes of discovery. As to this:

(1) As set out at paragraph 16(4) above, BYJU's pleaded case in the US Proceedings is that the Alpha Funds were misappropriated by the Alleged Fraudulent Transfers and, following the Fourth Transfer, are now held by T&L through the "*non-US based 100% subsidiary of BYJU's*". In those circumstances, the evidence sought is not relevant to the issues which arise for trial in the US Proceedings. On its own pleaded case, BYJU has identified the entity that holds the relevant Alpha Funds. The promissory notes entered into by OCI and Camshaft Fund do not form part of BYJU's pleaded case in the US Proceedings as to how the Alpha Funds were allegedly misappropriated.

(2) The fact that the evidence is sought for discovery is demonstrated by the broad and wide-ranging way in which the topic for examination is described.

**C2.5. Schedule B, paragraph 5**

57. The topic for examination set out in Schedule B, paragraph 5 is:

> *"5. The contemplation, negotiation, and execution of the transactions relating to the side letters between the Debtor or Inspilearn, on the one hand, and Camshaft Capital Fund, LP, Camshaft Capital Management, LLC, or Camshaft Capital Advisors, LLC, on the other hand."*

58. This topic for examination is impermissibly broad and/or vague. In particular:

(1) The topic does not relate to any transaction involving OCI and there is no *prima facie* basis for assuming relevant knowledge.

(2) The topic is not limited by any date range and thus relates to any date in time.

(3) The *"side letters"* referred to are not defined by dates or the parties thereto.

(4) It is unclear what is meant by the words *"The contemplation, negotiation, and execution of the transactions relating to the side letters…"*. The parameters of the topic for examination therefore are not properly defined.

59. In any event, the evidence sought under this topic is not relevant to a specific issue that arises for trial in the US Proceedings. Instead, it is sought for the purposes of discovery. As to this:

(1) As set out at paragraph 16(4) above, BYJU's pleaded case in the US Proceedings is that the Alpha Funds were misappropriated by the Alleged Fraudulent Transfers and, following the Fourth Transfer, are now held by T&L through the *"non-US based 100% subsidiary of BYJU's"*. In those circumstances, the evidence sought is not relevant to the issues which arise for trial in the US Proceedings. On its own pleaded case, BYJU has identified the entity that holds the relevant Alpha Funds. The side letters entered into by BYJU / Inspirlearn and the Camshaft entities do not form part of BYJU's pleaded case in the US Proceedings as to how the Alpha Funds were allegedly misappropriated.

(2) The fact that the evidence is sought for discovery is demonstrated by the broad and wide-ranging way in which the topic for examination is described.

**C2.6. Schedule B, paragraph 6**

60. The topic for examination set out in Schedule B, paragraph 6 is:

> *"6. The transfer, disposition, and location of the Alpha Funds."*

61. This topic for examination is impermissibly broad and/or vague. In particular:

(1) The topic is not limited by any date range and thus relates to any date in time.

(2) The topic is extremely broad in its subject matter (for example, it does not identify specific *"transfers"* or *"dispositions"*).

62. In any event, the evidence sought under this topic is not relevant to a specific issue that arises for trial in the US Proceedings. Instead, it is sought for the purposes of discovery. As to this:

(1) As set out at paragraph 16(4) above, BYJU's pleaded case in the US Proceedings is that the Alpha Funds were misappropriated by the Alleged Fraudulent Transfers and, following the Fourth Transfer, are now held by T&L through the *"non-US based 100% subsidiary of BYJU's"*. On its own pleaded case, BYJU has identified the entity that holds the relevant Alpha Funds. In those circumstances, the evidence sought is not relevant to the issues which arise for trial in the US Proceedings.

(2) The fact that the evidence is sought for discovery is demonstrated by the broad and wide-ranging way in which the topic for examination is described.

**C2.7. Schedule B, paragraph 7**

63. The topic for examination set out in Schedule B, paragraph 7 is:

*"7. Repayment, if any, of the promissory notes referenced above."*

64. This topic for examination is impermissibly broad and/or vague. In particular:

(1) The topic is not limited by any date range and thus relates to any date in time.

(2) The topic is extremely broad in its subject matter.

(3) The cross-reference to *"the promissory notes referenced above"* means that the request is non-exhaustive, since the promissory notes include, at Schedule B, paragraph 4(f): *"Any other promissory notes relating to the Alpha Funds or the proceeds thereof..."*.

65. In any event, the evidence sought under this topic is not relevant to a specific issue that arises for trial in the US Proceedings. Instead, it is sought for the purposes of discovery. As to this:

(1) As set out at paragraph 16(4) above, BYJU's pleaded case in the US Proceedings is that the Alpha Funds were misappropriated by the Alleged Fraudulent Transfers and, following the Fourth Transfer, are now held by T&L through the *"non-US based 100% subsidiary of BYJU's"*. In those circumstances, the evidence sought is not relevant to the issues which arise for trial in the US Proceedings. On its own pleaded case, BYJU has identified the entity that holds the relevant Alpha Funds. The promissory notes entered into by OCI and Camshaft Fund (including whether or not such promissory notes were repaid by OCI) do not form part of BYJU's pleaded case in the US Proceedings as to how the Alpha Funds were allegedly misappropriated.

(2) The fact that the evidence is sought for discovery is demonstrated by the broad and wide-ranging way in which the topic for examination is described.

**<u>C3. Other points raised in Bunting 1</u>**

66. Bunting 1 raises various miscellaneous points in relation to the Letter of Request. It is not clear to the Respondents how such points are relevant to whether the requests set out in the Letter of Request are permissible. Save for two points addressed below, I therefore do not respond to the various points set out in Bunting 1 (although for the avoidance of doubt, they are not accepted).

67. <u>First</u>, Bunting 1 appears to suggest at paragraph 12 that *"the reason behind why the document requests and topics for examination have necessarily been framed in the way they are"* is because of *"the unusual and extraordinary nature of the US Proceedings"* and *"the bizarre and obstructive conduct of certain of the Defendants and those associated with them"*. Similarly, Bunting 1 states at paragraph 43 that *"The Applicant has sought to particularise as much as it reasonably can in making these document request [sic.] given the dearth of information it has been able to obtain."* It is not clear in what way the US Proceedings are said to be *"unusual and extraordinary"* or how this, or the conduct of the US Defendants in the US Proceedings, could support the requests for documents and topics for examination set out in the Letter of Request. Further, I

note that Bunting 1 acknowledges that BYJU has received the following oral and documentary evidence from the US Defendants in the US Proceedings:

(1) Oral evidence by way of the cross examination of R Ravindran at a hearing before Judge Dorsey on 14 March 2024 (Bunting 1, paragraph 61; [**MJB1/919-990]**).

(2) Disclosure of documents by Apex Fund Services ("**Apex**") (the administrator of Camshaft Fund) on 29 April 2024 pursuant to a *subpoena* served by BYJU (Bunting 1, paragraphs 20-21).

(3) Disclosure of documents by Camshaft in May / June 2024 pursuant to requests for production of documents served by BYJU (Bunting 1, paragraphs 22-23).

(4) A deposition of Mr. William Morton ("**Mr. Morton**"), the founder of Camshaft, on 27 June 2024 (Bunting 1, footnote 12; [**MJB1/385-876**]).

68. Bunting 1 does not state how many documents were obtained by BYJU from Apex and Camshaft. Based on the information available to the Respondents, it appears to be an overstatement to suggest that that BYJU has only been able to obtain a *"dearth of information"* in the US Proceedings.

69. Second, Bunting 1 quotes at paragraph 47 certain dicta made by Judge Dorsey in an Memorandum Opinion issued on 3 April 2024 on an injunction application made by BYJU in the US Proceedings, that the US Defendants' conduct *"necessitat[ed] a higher degree of intervention"* by the US court.

70. It is not clear how this statement could support the requests for documents and topics for examination which are set out in the Letter of Request in respect of the Respondents. In any event, I note that paragraph 47 of Bunting 1 only quotes part of the relevant dicta of Judge Dorsey. The full dicta state (with the words omitted at paragraph 47 of Bunting 1 emphasised) [**MJB1/254**]:

"***<u>In addition to its probability of success on the merits, it is clear that the Debtor faces irreparable harm without some form of injunctive relief.</u>*** *The missing $533 million is likely the Debtor's only way to pay its creditors. The Defendants have repeatedly demonstrated willful disregard for the Debtor's attempts to locate these missing funds, which implies they do not have the means to satisfy a $533 million judgment, other than the missing funds. Moreover, the Defendants have refused to comply with this Court's orders to disclose the location of the funds, necessitating a higher degree of intervention if the Debtor is to have any hope of recovering its assets."* (Emphasis added.)

71. It therefore appears that the statement Judge Dorsey was making was specifically in considering the relevant legal test, as to whether injunctive relief was warranted in the US Proceedings.

72. Further, I note that the Memorandum Opinion issued by Judge Dorsey on 3 April 2024 pre-dates the disclosure of documents by Apex and Camshaft and Mr. Morton's deposition (described above).

## <u>D. CONCLUSION</u>

73. For the reasons set out above, which will be developed in written and oral submissions, the Respondents invite the Court to set aside the 11 July Order. The Respondents also invite the Court to direct that BYJU pay the Respondents' costs of the Set Aside Application.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Name: Rebekah Jean Parker

Dated: 31 July 2024

Signed

# EXHIBIT 2


OCI
INTRODUCTION TO OCI
October 2022
STRICTLY PRIVATE AND CONFIDENTIAL, NOT FOR DISTRIBUTION




OCI is the world's first in commercial process outsourcing. It redesigns supply chains for large corporates around the world - to drive growth.

Working capital cycles are at their longest ever, restricting businesses' potential for expansion.

OCI harnesses technology, intelligence, and commercial process solutions to free working capital from supply chains.

OCI's unique approach eases financial constraints, making businesses more agile and accelerating their expansion.

SOURCING | LOGISTICS | FLEXIBLE FINANCE

# OCI VALUE ADD

**Why multinational companies rely on OCI**

**E2E**
The world's top corporates rely on OCI as OCI provides end-to-end procurement solutions with flexible credit options.

**INTELLIGENCE**
OCI has some of the most intelligent trade finance experts globally on its team.

**SOURCING, LOGISTICS, FINANCE**
Extensive partnerships for sourcing, logistics, and finance enable OCI to provide benefits of economies of scale to our clients.

**COMPLIANCE**
OCI is very protective of its reputation and ensures that all transactions are uncompromisingly regulatory compliant.

**CREDIT**
Deep access to liquidity enables OCI to offer 90 days to seven-year credit options and the scale to cater for the largest requirements.

**GLOBAL PRESENCE, LOCAL REACH**
OCI's global network of offices enables it to provide clients with on-the-ground expertise and intelligence, whilst incorporating and mitigating global considerations.

OCI

# BUSINESS LINES

## SOURCING

OCI is a leading, independent commercial process outsourcing organisation specialising in the energy, manufacturing, consumables, technology, media, and pharmaceutical sectors.

OCI provides a comprehensive knowledge of commercial markets alongside a local presence and an ability to control supplies.

Trading with the Americas, EMEA, Asia and Africa - with more than 10 years multidisciplinary experience - OCI's position in the market ensures dynamic solutions and smooth transactions.

## LOGISTICS

OCI specialises in collecting, loading, and transporting cargoes from locations that are hard to reach and ensuring on schedule delivery.

OCI's logistics team has a fundamental understanding of what its clients require and keeps their interests at the forefront of operations.

OCI has developed a global network of 56 logistical partnerships across five continents. This means that OCI can coordinate and closely monitor cargo from start to finish, enabling it to offer an enhanced logistical service.

## FINANCE

OCI's diversified procurement strategies allow it to unlock broad funding solutions for all its affiliates.

Its scale and structure protects businesses from industry shocks and operates a judicious approach to risk management, even in the most volatile markets.

Using considered and comprehensive structures, OCI ensures that suppliers and customers are faced with zero risk in their financial transactions, in a format which relieves working capital constraints.

OCI is revolutionising advanced financing capabilities for its clients.

OCI

## PROCUREMENT SOLUTION

# GLOBAL OPERATIONS




OCI

# OPERATIONS

| UK | CZECH REPUBLIC | DENMARK | HONG KONG | UAE | USA | AUSTRALIA | INDONESIA | MALAYSIA |
|---|---|---|---|---|---|---|---|---|
| Global HQ | Eastern European Commercial Operations | Scandinavian Commercial Operations | Far East Asia Commercial Operations | Indian Subcontinent Commercial Operations | North American Operations | Australasia Commercial Operations | Indonesian Commercial Operations | Malaysian Commercial Operations |
| Global Partner Servicing | | European Finance | Logistics | Middle Eastern Commercial Operations | Latin America Operations | Australasia Partner Partnerships | | Malaysian Partner Partnerships |
| Global Treasury | | | Inspection | Africa Focused Project Exports | Finance Control - Americas | | | |
| Global Operations | | | Quality Control | Quality Control | Partner Servicing - Americas | | | |

# SUPPLY CHAIN SOLUTIONS FOR



vivendi

Honeywell

posco DAEWOO

Staples

macy's

DELL

Sysco

OCI

Case 25-50212-BLS Doc 3-2 Filed 04/28/25 Page 9 of 47

# SUPPLY CHAIN SOLUTIONS FOR



resideo

ALARM.COM

Northwell Health

pharma

T · ·Mobile·

TATA

HYUNDAI

OCI




FINANCING PARTNERS

STEIN
Standard Chartered
DEBT FUNDS
HSBC UK
UMTB
Jefferies
BARCLAYS
INSURANCE FUNDS
CHANNEL

LEGAL & COMPLIANCE PARTNERS

LATHAM & WATKINS LLP
STEPHENSON HARWOOD
Sullivan SULLIVAN & WORCESTER
ReedSmith




### FOOD DISTRIBUTION

OCI partnered with a US food distribution conglomerate to finance their inbound inventory. Our client required over 1 billion USD worth of goods to be secured from a number of factories in Asia. OCI financed the advance payments needed to pay their suppliers. Furthermore, OCI implemented a comprehensive, end-to-end and multi-modal logistics strategy in order to deliver the goods to their distribution network across the United States - all whilst keeping the goods on OCI's balance sheet. The products were then ultimately sold to our client in a 'just-in-time' manner with up to 180 days open account credit terms.

### AGRICULTURE

Working with a large agricultural consortium in South America across two years, OCI enabled our client to finance 0.25bn USD worth of agricultural products. OCI facilitated advanced payment to the consortium in order for them to finance their supplies from local markets. This dramatically increased the consortium's available liquidity on their balance sheet, enabling them to cost-effectively restructure their existing debt.

### E-COMMERCE

OCI is partnered with an e-commerce giant headquartered in China. The Chinese entity wanted to sell around 2 billion USD worth of inventory to their USA counterpart and needed to be paid on the shipment date - without providing the USA entity any credit terms. The USA entity however wished to receive the inventory delivered to their warehouse and on 180 days open account credit terms. OCI was able to first facilitate the payment to the Chinese entity upon receipt of shipping documents. Whilst working in tandem with the client's inhouse logistics department, OCI took title and customs cleared the goods as importer of record in the USA, before delivering to the US entities desired warehouses and providing the required extended credit period.

# SELECTED PARTNER SOLUTIONS

Sysco

OCI partnered with Sysco Corporation, USA's largest food distribution conglomerate, for financing their inbound inventory. Sysco required 1.2 billion USD of goods to be secured from factories in Asia. OCI financed the advanced payments needed to pay suppliers. A comprehensive logistics strategy was implemented to accommodate and facilitate the inventory - whilst keeping it off their balance sheet - across 12 warehouses in the USA. Products were sold to Sysco 'just in time' with extended credit of 90-180 days on open account terms.

Embrapa

OCI partnered with a large agri consortium in Brazil, for two years finance of soybean valued at 250 million USD. OCI made advance payments to the soybean consortium so they could finance the supplies inbound from the local market. This created a large availability of liquidity for the consortium's balance sheet and meant they were about to restructure their existing debt at cost efficient pricing.

JD.COM

OCI is a partner with JD.com - headquartered in China- a 135 Billion USD e-commerce giant. JD.com, China wanted to sell 1.6 Billion USD inventory to JD.com, USA. China needed to be paid on shipment date and did not wish to give credit to the USA entity. The USA entity wanted to receive the inventory delivered to their warehouses and required 180 days open account credit. OCI facilitated the payment to JD.com, China upon receipt of shipping documents. OCI then took title of the goods and - whilst working with JD.com logistics department - custom cleared the cargo as importer on record in USA. The products were then delivered to their desired warehouses and JD.com, USA utilised the extended credit period.



A0804

# OCI IN THE MEDIA

FT
FINANCIAL TIMES

**OCI is the 3rd fastest growing company in Europe**
according to the Financial Times and the second largest in revenue.




**EUROPE'S FASTEST GROWING COMPANIES**

| RANK | COMPANY | CAGR | REVENUE 2020 (EUR) |
|---|---|---|---|
| 1 | Swappie | 477,43 | 97,611,814 |
| 2 | Kilo.Health | 450,05 | 57,318,766 |
| **3** | **OCI** | **409,59** | **568,322,073** |
| 4 | OnlyFans | 393,63 | 316,732,986 |
| 5 | Enpal. | 386,88 | 56,109,613 |
| 6 | MR | 343,52 | 13,165,586 |
| 7 | thriva | 321,66 | 18,732,563 |
| 8 | EXOTEC | 306,86 | 47,597,000 |
| 9 | Winelivery | 303,73 | 7,337,290 |
| 10 | instabox | 299,73 | 24,484,879 |

Case 25-50822-BLS Doc 8-13 Filed 05/05/25 Page 10 of 47

# OCI IN THE MEDIA

Oliver Chapman, Chief Executive of OCI Ltd., said the British trading company has seen a 42% increase in inventory requests from six months ago.

A private-healthcare firm approached OCI in April, in the early days of the pandemic, looking to store personal protective equipment without knowing when or where it would need the gear.

OCI bought £100 million ($126 million) worth of PPE, predominantly masks and gloves and mostly from China, and stored the supplies in the U.K.

**Julie Steinberg & Joe Wallace**
Europe Finance Reporters

THE WALL STREET JOURNAL.

OCI

# TIMELINE

**2010**
Trade established under OCI brand

**2012**
OCI Limited formed

**2012-17**
Trade of metals
Trade of recyclables
Trade of alternative fuels
Trade of energy products

**2018**
OCI develops from a trading organisation to a consultative supply chain partner

**2018-19**
Achieved first fully integrated E2E supply chain partnership

**2019-20**
- Recognised as a leader in E2E procurement partnerships by ‘blue chip’ companies.
- OCI establishes and develops CPO space and launches this into the market.

**2021**
UK’s No.1 Fastest Growing Company, Europe’s No.3 Fastest Growing Company - Financial Times 1000

OCI

# INTELLIGENCE

OCI is proud of the talent, expertise, and knowledge it has accumulated from its team of astute individuals



**Oliver Chapman**
CEO

- CEO of OCI Group, globally
- Experience in global supply chain operations
- Well recognised in global commerce and Fortune 500 companies



**Rupin Banker**
Head of Structuring

- Financial Investor and Mentor
- 20+ years experience in international trade and structured finance
- Mentored many organisations into multi-billion-dollar enterprises



**Steve Box**
Strategic Advisor

- Head of Falcon Group, Europe
- CEO, Bibby Financial Services
- Global Head of Receivables Finance, HSBC Bank

OCI

# INTELLIGENCE

OCI is proud of the talent, expertise, and knowledge it has accumulated from its team of astute individuals



**Ishtiaq M. Khan**
Managing Director, OCI Asia

25 years of involvement in private and government related partnerships in Indonesia, Sri Lanka and Malaysia

Started career in Citigroup, managing the supply chain

Structuring FDI funding for Government Link Companies



**Geoff Parry**
Commercial Director

Brings 30 years international banking experience, 20 plus years in trade and supply chain - half based in Asia and half in Europe.

Previous roles have included Head of Trade Finance at MUFG, UK Head of Global Corporate Trade Finance at Barclays and Global Head of Trade Asset Management at Standard Chartered.



**Neil Edwards**
Trade Director

Experienced trade and supply chain finance professional and coverage banker with 25+ years of knowledge and expertise.

He has managed relationships and led origination efforts with multinationals across a variety of sectors including being a Director of Trade & Supply Chain Finance at NatWest, amongst other roles at Citi, Commerzbank and RBS.

OCI

OCI

# Example Structures

Payables, Inventory, Receivables

# PAYABLES

### Benefits

- Non-debt solution for buyers (trade payables)
- Extended terms for buyers, extending DPOs
- Early payment to suppliers enables possible commercial discounts on purchases for buyers
- Suppliers receive early payment, improving (or moving to zero) DSOs




OCI

# EXISTING INVENTORY 1

## Benefits

- Off-balance sheet solution with extended credit terms possible providing further liquidity
- Balance sheet metrics improved through reduced DIOs




OCI

# EXISTING INVENTORY 2




Benefits

- Non-debt, trade payables solution, providing liquidity

OCI

# NEW INVENTORY

## Benefits

- Suppliers and buyers both minimise DIOs
- Can be a non-debt, trade payables solution, or off-balance sheet




OCI

# RECEIVABLES




## Benefits

- Suppliers achieve a true sale of receivables, minimising DSOs and improving liquidity
- Extended credit terms possible for buyers

OCI

United Kingdom | Australia | Czech Republic | Denmark | Hong Kong | Indonesia | Malaysia | UAE | USA

www.oci-group.co.uk | t: +44 (0) 20 3137 7326 | e: hello@oci-group.co.uk

# EXHIBIT 3

# OCI

# OCI

Overview

Global Operations

Services

Business Lines

Senior Management

OCI



## An Overview

OCI is a specialist supply chain partner trading across a diverse range of markets globally, expanding the business over a decade.

With an ever-increasing, global requirement of liquidity, OCI unlocks further potential for our suppliers and customers by offering a breadth of comprehensive financing solutions, each one uniquely tailored to our stakeholders needs.

This strategy has enabled OCI to nurture a strong, robust and longstanding presence in several commodity markets including recyclables, metals, softs and energy.

Typically, we source our materials from Europe, West Africa and the Middle East and supply to, largely, Indian and Asian economies. As markets around the world adapt, so does our reactive supply chain.

We are able to move materials via air, sea, road and rail freight, utilising our extensive global network across offices in London, Manchester, Denmark, Hong Kong and United Arab Emirates.

OCI specialise in sourcing from suppliers in challenging regions and providing them with bespoke financial solutions to optimise their business.

OCI

# Global Operations




A0821

OCI

# Office Locations



London

Manchester

Denmark

Hong Kong

United Arab Emirates

Switzerland (2020)

OCI

# Office Operations

OCI Group is an international organisation comprising of strategically located entities. Each business operates independently as its own profit centre, enabling OCI to achieve a truly global reach and local presence.

## UK
Group HQ

- European trading operation
- European and global finance

Commodities traded:

- Metals
- Energy
- Recyclables
- Softs

## Denmark

- Scandinavian trading operations
- European finance

Commodities traded:

- Energy
  - Alternative Fuels

## Hong Kong

- Far East Asian trading operations

Commodities traded:

- Energy
- Metals

## UAE

- Indian subcontinent and Middle Eastern trading operations

Commodities traded:

- Recyclables
- Metals

## Switzerland
(2020)

- Financial operations and Energy trading operations.

Commodities traded:

- Energy

A0823

OCI

# Services



## Overview

- A leading independent commodity trading company
- Specialises in metals, softs, energy products and recyclable cargo
- Able to supply across air, sea, road and rail freight
- Comprehensive knowledge across a wide range of sectors
- Strong logistical expertise

## What We Do

- Trained sourcing specialists
- Experts in providing supply chain financing solutions
- Delivery of on-time, on-spec shipments globally
- Strong, long-term strategic partnerships
- Absolute compliance with international trade legislation and environmental regulations

Case 25-50281-BLS Doc 1-3 Filed 04/28/25 Page 29 of 77

OCI

# Services



## Sourcing Materials

OCI uses intelligent investigation to locate materials from challenging locations. This cuts out countless logistical challenges for the customer as we deal directly with the supplier to ensure the timely and uncomplicated transportation of materials. OCI source specific materials and products for clients and actively manage the entire supply chain on their behalf.

## Exceptional Services

OCI prides itself on the highest level of support and provides a unique service before, during and after any transaction is completed.

The support team delivers round-the-clock care to all our clients. The team are highly educated within their field and deliver qualified guidance, technical advice and expertise wherever necessary.

## Supply Chain Solutions

The specialist teams at OCI utilise their worldwide network and global office network to locate the best-suited supply chain solutions for our stakeholders.

Extensive research, tested procedures and focused time are dedicated to fully understanding both the supplier and the end user to ensure the most efficient and resourceful service is always provided.

OCI

# Clients

HYUNDAI

山钢集团
SD STEEL

NNPC STAFF COOPERATIVE MULTIPURPOSE SOCIETY LTD.

posco
DAEWOO

MAERSK

Vitol

中国石化
SINOPEC

Niramax
Total Waste Solutions

TRAFIGURA

GLENCORE

PetroChina

NISHAT

OCI

# SWOT Analysis

## Strengths

- Strong product portfolio
- Comprehensive banking network
- Buyer and seller network
- Market knowledge
- Competitive logistics access
- Extensive team expertise

## Weaknesses

- Ever increasing funding requirement
- Finance pricing

S W
O T

## Opportunities

- New suppliers
- New buyers
- Logistical opportunities

## Threats

- Shipping rate volatility
- Global economy
- Force majeure/global pandemics

OCI

# Statement



OCI has shown excellent growth over the past 10+ years with core business activities within the steel, softs, oil and gas sectors now showing significantly increased turnover.

In addition, OCI is coordinating supplier & buyer financing and purchasing for large international corporations across a breath of sectors.

OCI

# Business Lines



## Trading

OCI is a leading, independent commodity trading company specialising in energy and metals. We can supply materials via air, sea, road and rail freight, utilising our extensive global network across offices in London, Manchester, Denmark, Hong Kong and United Arab Emirates.

OCI provides a winning combination – comprehensive knowledge of the commodities markets and strong logistical expertise; locating, transporting and supplying factories around the world with any commodity they require.

Trading with America, Japan, South Korea, Malaysia, India and China - with more than 10 years multidisciplinary experience - OCI's position in the market ensures competitive prices and smooth transactions every time.

## Logistics

OCI are proud of the unique service we offer our customers; specialising in collecting, loading and transporting commodities and materials from locations which are often hard to reach, delivered to our customers on schedule.

Having handled our own group's shipping for the past ten years, OCI's logistics team has a fundamental understanding of what our clientele require and keeps their interests at the forefront of our operations.

OCI has developed a global network of 56 partnership offices across all five continents. This means OCI can coordinate and closely monitor cargo from start to finish, enabling us to offer the most competitive commodity rates in the market.

## Finance

OCI's diversified funding model allows it to operate effectively in all market conditions. Its scale and structure protects business from industry shocks and its judicious approach to risk management unlocks access in volatile markets. OCI provides flexibility and the ability to capitalise on opportunities as they arise.

OCI systematically hedges price risk and has considered exposure to underlying commodity prices.

Using structured commodity finance, OCI ensures that its suppliers and customers are secure in their financial transactions, in a format which promotes the successful supply of relevant materials.

OCI unlocks advanced financing capabilities for its supply chain partners.

# Financing Requirement:

OCI have entered into agreements and have contracts at various stages with very good counterparties that require financing from $ 20 million-$ 50 million for each contract.

The transactions involve financing of receivables, that are either secured by Documentary Letter of credit that is insured by AA rated insurers or involve financing of advances to large producers Secured by a Standby Letter of Credit that is insured by AA rated insurers.

We also intend to enter into contracts with large corporates, that involve sale on consignment basis to the large corporate backed by performance bond issued by AA rated insurers.

The financing institution can be co-insured/loss payee on the insurance policy offering full security for the finance.

OCI

"International business has transformed over the past two decades -
traditional trade is obsolete.

A trading company must stay ahead to compete effectively...

OCI's supply chain partnering strategy is optimised to provide our stakeholders with significant performance advantages."

**Oliver Chapman**
Chief Executive Officer
OCI

OCI

# Chief Executive Officer



**Oliver Chapman**
CEO

**Career Experience**

- 10+ years as Director of OCI Group, UK.
- Head of OCI's breadth of divisions, including; recyclables, metals, energy and softs.
- Managed the strategic acquisition of various global organisations.
- Negotiated, won and executed supply contracts with international Governments
- Provided purchasing solutions in emerging markets for Government owned corporates.
- Partnered with large multinationals to manage their supply chains for complex markets
- Contracted supply chain solutions to mid and large cap corporates for their sourcing, logistics, inventory and the sales cycle.
- Proven to provide immediate asset, finance and procurement for multinational corporations.
- Developed extended supply chain financing solutions for large and medium corporations on a long term basis.
- Originated new markets for a range of recyclable materials.
- Pioneered new recycling methods of materials destined for landfill whilst consulting on EU Governments' waste-to-energy projects.

OCI

# Trade and Supply Chain Senior Director



**Gary Griffiths**
Trade & Supply Chain Director

**Career Experience**

- Managing Director of Trade Finance at Bibby Financial Services.
- Head of Trade, Receivables & Supplier Finance Origination (Large & Global Corporate Markets) at Lloyds Banking Group.
- Heads of Trade and Working Capital (London) at Barclays.

**Skillsets**

- Specialist in trade, supplier, working capital, invoice & receivables finance as well as FX and international cash management.
- Extensive experience in leadership, deal origination and managing client relationships across SME, large and global corporations.

OCI

# Trade Director



**Richard Jones**
Trade Director

**Career Experience**

- Group Chief Executive Officer of Crown Agents Bank.
- Managing Director and Head of Payments and Cash Management UK for HSBC.
- Co-founder of Cambridge Sustainable Investment Partners.

**Skillsets**

- Creative leader with the skills to problem solve and drive entrepreneurial led growth.
- Key ability to build, manage and coordinate both small and large teams across a breadth of businesses.
- Deploys a truly global perspective calling on senior leadership experience across large multinationals and supporting scale-ups.

OCI

## Strategic Director



**Steve Box**
Strategic Director

### Career Experience

- Chief Executive Officer - Bibby Financial Services, Europe/Asia and North America.
- Global Head of Receivables Finance at HSBC.
- Managing Director of HSBC Invoice Finance (UK) Limited, HSBC Equipment Finance Limited and Trade
- Head of Falcon Group, Europe.

### Skillsets

- Expert in advisory leadership, deal structuring, training and strategic input across a truly – 27 country – global model.
- Responsible for the delivery of international growth strategies.

OCI

# Emerging Markets Director



**Juliano Mattar**
EM Director

**Career Experience**

- Head of Emerging Market (Fixed Income) at Stifel Nicolaus
- Head of Emerging Markets Distribution, Europe – UBS Investment Bank.
- Global Head of Emerging Markets – BNP Paribas
- Emerging Markets Distribution – Europe, Deutsche Bank

**Skillsets**

- Over 25 years experience in investment banking dealing with Global Emerging Markets.
- Highly successful in managing relationships with key, global market players across large multinationals and SMEs.
- Provides a wealth of experience across origination, sales, business development, in-depth knowledge across a breadth of financial products and instruments.

OCI

# Head of Strategy



**Nick Beech**
Head of Strategy

**Career Experience**

- 19 years Investment Banking experience working for; UBS, Citibank, Alfa Bank, Deutsche Bank and EFG Hermes.
- 4 years as Director of Sebia Group providing Financial and Strategic Consultancy to the Oil and Gas sector.

**Skillsets**

- Track record of successful management in Investment Banking
- Commodity based emerging markets expertise
- 19 years broad financial product experience and exposure

OCI

# Head of Energy



**Tom Nicol**
Head of Energy

## Career Experience

- 8 years Managing Director of VSL Engineering Far East based in Hong Kong.
- 8 Years Vice President then President of Unibros Steel Group based in Moscow then New York.
- 5 Years Senior Group Vice President of Chinese Government oil company based in UAE, then China.

## Skillsets

- Qualified Chartered Civil Engineer
- 17 years in Civil construction and project management
- 20 years in commodity trading energy project development

OCI

# Head of Metals



**Rashid Rahgozar**
Head of Metals

### Career Experience

- Senior Trader with 25+ years experience.
- Responsible for global sales and sourcing of a diverse portfolio of products, including non-ferrous metals, oil refined products, chemicals and polymers with annual sales of up to USD 200 Million.

### Skillsets

- Sales strategy and business development
- Excellent financial analytical skills, contract negotiation and administration
- Trade finance, risk management, negotiation and logistics.

OCI

# Head of Recyclables



**Garry West**
Head of Recyclables

**Career Experience**

- 43 years global commodity trading; base & secondary metals and waste paper.
- Held global Senior Management and Directorship positions.
- Successfully built global offices and team management structures, incorporating comprehensive risk management.
- Ex-CEO of West Recycling.

**Skillsets**

- Extensive knowledge in all levels of base and secondary metals trading.
- Expert in source and global logistics management delivering real time results.

OCI

# Head of Softs



**Paul Baksh**
Head of Softs

**Career Experience**

- 25 years in the soft commodity space.
- Expert in the trade of soft commodities, including but not limited to; sugar, rice, urea, ethanol, glucose, starches, wheat, biomass.
- Leading involvement in initiating global sugar-related initiatives for major corporations.
- Previously Head of Physical Sugar Trading at Trading Ltd.

**Skillsets**

- Experienced procurement manager and commodities trade consultant.
- Key markets include Europe, Africa, the Middle East and the Balkans.
- Developing hedging, futures and options strategies and rationales for, mainly, sugar and grain markets.

# OCI

33 Cannon Street
London
EC4M 5SB
United Kingdom

+44 (0) 203 137 7326
hello@oci-group.co.uk
www.oci-group.co.uk

# EXHIBIT 4

# IN THE HIGH COURT OF JUDICATURE AT BOMBAY

## CRIMINAL APPELLATE JURISDICTION

### CRIMINAL APPLICATION NO.488 OF 2020

***ALONG WITH***

### INTERIM APPLICATION NO.1252 OF 2023

Hemant Dhirajlal Banker, ]
Age : 71 years, ]
2801, A-Wing, Raheja Atlantia, ]
Ganapat Rao Kadam Marg, Worli, ]
Delisle Road, Mumbai – 400 013 ] .... **APPLICANT**

***VERSUS***

1) State of Maharashtra, ]
Through Worli Police Station, ]
Ganapatrao Kadam Marg, BDD Chawls, ]
Worli Naka, Worli, Mumbai – 400018 ]
2) Kailash Aggarwal, ]
15th Floor, Nishika Terraces, ]
Khan Abdul Gaffar Khan Road, ]
Worli Sea Face, Worli, Mumbai – 400 030 ] .... **RESPONDENTS**

***ALONG WITH***

### CRIMINAL WRIT PETITION NO.1296 OF 2023

Meenakshi Rupin Banker, ]
Age : 46 years, Occ. : Housewife ]
Currently residing at 6, Reeves House, ]
Trafalgar Gardens, Crawley, RH107SW, U.K. ]
Having permanent address at : ]
2801, A-Wing, Raheja, Ganpatrao Kadam Marg ]
Lower Parel, Mumbai – 400 013. ] .... **PETITIONER**

***VERSUS***

1) The State of Maharashtra, ]
2) The Anti-Extortion Cell, Mumbai ]
Ground Floor, Stone Building, ]





::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

HIGH COURT OF JUDICATURE AT BOMBAY

Near P.N. Office, Picket Cross Road, ]
Kalbadevi, Mumbai – 400 001. ]
3) Kailash Aggarwal, ]
Age : 45 years ]
15th Floor, Nishika Terraces, ]
Khan Abdul Gaffar Khan Road, ]
Worli Sea Face, Worli, Mumbai – 400 030 ] .... **RESPONDENTS**

Mr. Aabad Ponda, Sr. Advocate, with Mr. Parvez Memon, Mr. Zulfiquar Memon, Mr. Waseem Pangarkar, Mr. Ravi Mishra, Ms. Drishti Singh, Mr. Siddhant Dhavale and Mr. Mahesh Ahire, i/by MZM Legal, for the Applicant in APL/488/2020 & IA/1252/2023 and for the Petitioner in WP/1296/2023.

Ms. A.S. Pai, P.P., with Ms. M.H. Mhatre, APP, for Respondent No.1-State.

Mr. Nitin Gaware-Patil for Respondent No.2-Original Complainant.

**CORAM : SUNIL B. SHUKRE AND M.M. SATHAYE, JJ.**

**Date of Reserving the Judgment : 27th April, 2023.**

**Date of Pronouncing the Judgment : 22nd June, 2023.**

**JUDGMENT : ( Per Sunil B. Shukre, J. )**

1. Heard Mr. Ponda, learned Senior Advocate for the applicant-Hemant Banker and the petitioner-Meenakshi Banker, Ms. Pai, learned Public Prosecutor for the respondent no.1-State and Mr. Gaware-Patil for respondent no.2-original complainant.

2. For the sake of convenience, the applicant - Hemant Banker and the petitioner - Meenakshi Banker are hereinafter called as **"the applicants"** and



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

Criminal Application No.488 of 2020 and Criminal Writ Petition No.1296 of 2023 are hereinafter referred to as **"the applications"**.

3. By these applications, the applicant – Hemant Banker, accused no.4 in Crime No.303 of 2020 registered at Worli Police Station, Mumbai and accused no.2 in FIR No.122 of 2020 registered by Anti-Extortion Cell, D.C.B., C.I.D., Mumbai, and other applicant – Meenakshi Banker, accused no.3 in Crime No.303 of 2020 registered at Worli Police Station, Mumbai and Wanted Accused in Crime No.122 of 2020 registered by the Anti-Extortion Cell, D.C.B., C.I.D., Mumbai, have sought quashing of both the FIRs and also quashing of the order dated 22nd September 2021 of the Joint Commissioner of Police (Crime), Mumbai granting approval under Section 23(1)(a) of the Maharashtra Control of Organized Crime Act, 1999 *(for short, **"MCOC Act")***, to initiate proceedings under the MCOC Act against the applicants and other accused persons.

4. It all began with filing of a complaint with Worli Police Station on 27th August 2020 by respondent no.2-Kailash Aggarwal. The respondent no.2 alleged that, through a common acquaintance, one Akash Mehta, he was introduced to Rupin Banker (Accused No.2 in Crime No.303 of 2020 and Wanted Accused in FIR No.122/2020) and family of Rupin Banker in the year 2018. He alleged that he extended some financial assistance to Rupin Banker. He further alleged that Rupin Banker and his wife - Meenakshi submitted forged documents at Bar Dubai Branch of Bank of



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

Baroda and fraudulently withdrew Rs.35 crores from the account of respondent no.2, in respect of which respondent no.2 has filed a complaint against Rupin Banker, Meenakshi Banker and Hemant Banker at Police Station, Dubai. The applicant further alleged that, during that period of time, Rupin Banker and Meenakshi Banker ran away to London, while this applicant continued to stay in Dubai. The respondent no.2 further alleged that on 15th July 2019, he was in Mauritius and on the next day, i.e. 16th July 2019 at 5:30 p.m. Mauritius time, he received on his mobile phone a call from international number "+8244" and the caller disclosed his name as "Vijay". The respondent no.2 further alleged that since he was busy in a meeting, he told the caller to call him back after some time and thereafter again, call from the same number was received by respondent no.2 on his mobile number and at that time, the caller told him that he was Vijay Shetty, a notorious goon, who had committed six murders, including one at Kala Ghoda, Mumbai. The applicant further alleged that the caller asked respondent no.2 to not take any police action against Rupin Banker.

5. The respondent no.2 then stated that he returned to Dubai on 20th July 2019 and while at Dubai, he received call on his mobile number from the same international number on 22nd July 2019. The respondent no.2 further alleged that he recognized the voice of the caller and thought it to be of Vijay Shetty. This time, respondent no.2 has alleged, the caller hurled abuses at him and threatened him to not demand money from Banker family or otherwise, he would have to lose his life. Respondent no.2 stated that the



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

caller knew that he had returned to Dubai from Mauritius and that the caller was in touch with Rupin Banker and his father Hemant Banker and that the caller had issued threat to him at the behest of one of them. Respondent no.2 further alleged that about two days thereafter, he received another call from the same international number and at that time, Vijay Shetty started threatening him on behalf of Rupin Banker, but, as he was scared, he did not utter a single word and cut short the call. He alleged that thereafter, he tried contacting Hemant Banker - the father of Rupin Banker, but to no avail. Respondent no.2 has further alleged that feeling terrorized due to the threat calls being received by him, he returned to India on 27th July 2019 and then on 8th August 2019, when he was at home, he received on his mobile phone a call from Hemant Banker. He stated that Hemant Banker told him that some more time would be required for returning the money. He further alleged that when he asked Hemant Banker as to why did he make Vijay Shetty call him giving threats to him, he answered in the negative.

6. The respondent no.2 then alleged that on 10th August 2019 again, Vijay Shetty called him and asked him to not demand any money from Rupin Banker and that Rupin Banker be given six months' time for repayment. He further alleged that again on 22nd August 2019, Vijay Shetty called him in the afternoon and issued threats to him. On the basis of these allegations, Worli Police Station registered an offence of extortion, punishable under Section 387, r/w. Section 34 of the IPC, vide FIR / Crime


::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

No.303/2020 against Vijay Shetty, Rupin Banker, Meenakshi Banker and Hemant Banker and started investigation. The Anti-Extortion Cell, Crime Branch, Mumbai also made its own investigation while registering Crime No.122/2020 under Sections 387 and 120(B), r/w. Section 34 of the IPC, based on the same complaint filed at Worli Police Station. During the course of the investigation, it found that there was material available for proceeding under the provisions of the MCOC Act against the accused persons. Accordingly, it sought approval of the competent authority under Section 23(1)(a) of the MCOC Act for registration of MCOC offences and investigating them in accordance with the law. The competent authority, the Joint Commissioner of Police (Crime), Mumbai, granted approval under Section 23(1)(a) of the MCOC Act on 22nd September 2021 against these applicants and other accused persons.

7. On the basis of the approval so granted, offences punishable under Sections 3(1)(ii), 3(2) and 3(4) of the MCOC Act, 1999 came to be added and have also been registered in FIR No.122 of 2020 registered against these applicants and other accused persons. The applicants have sought quashing of these FIRs and approval order impugned by these applicants.

8. Mr. Aabad Ponda, learned Senior Advocate for the applicant submits that the basic offence registered against the applicant in the present case is the one under Section 387 of the IPC and it is this offence which, in the opinion of the prosecution, constitutes continuing unlawful activity


::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

undertaken by the applicants and others as members of organized crime syndicate for obtaining pecuniary benefits, thereby justifying registration of offences punishable under Sections Sections 3(1)(ii), 3(2) and 3(4) of the MCOC Act. But, he submits, the basic offence of extortion, as defined under Section 383 of the IPC, is not at all constituted against the present applicants. Mr. Ponda submits that there is neither any allegation of these applicants issuing any threat of injury or death against the respondent no.2 nor is there any allegation about the applicants dishonestly inducing the person so put in fear of injury or death to deliver to any person any property or valuable security. He further submits that there is no material whatsoever collected during the course of investigation which would fulfill the essential ingredients of the offence of extortion, as defined under Section 383 of IPC. He further submits that all the allegations taken as uncontroverted and accepted as they are do not even give a hint of making out the offence of extortion as defined under Section 383 of IPC against the applicants. He also submits that there is no material available on record showing prima facie commission of offences of criminal conspiracy and criminal intimidation in Mumbai. He further submits that when the material available on record, taken as true and at its face value, does not show prima facie commission of any of the said offences, there cannot be found, in any manner, indulging in any continuing unlawful activity within the meaning of Section 2(1)(d) of the MCOC Act by these applicants and so there cannot be any organized crime committed by these applicants within the meaning of Section 2(1)(e)



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

of the MCOC Act, which is punishable under Section 3 of the MCOC Act. He thus submits that both the FIRs registered against these applicants and the impugned approval order passed by the Joint Commissioner (Crime), Mumbai deserve to be quashed and set aside.

9. Ms. Pai, learned P.P. appearing on behalf of the State has strongly opposed the application. She submits that it is well settled law that FIR is not an encyclopedia of the crime committed and, therefore, if something is missing from the FIR, it could not be said that no offence is prima facie made out against the person against whom the FIR is registered. She submits that during the course of the further investigation made by the Anti-Extortion Cell, Crime Branch, Mumbai, more evidence has been disclosed against the applicants and that evidence includes the calls recorded between various accused persons and between accused persons and the applicants. She further submits that there are specific allegations made against Vijay Shetty, who is a gangster and against whom more than one charge sheet involving cognizable offences punishable with imprisonment of three years or more have been filed within the preceding period of ten years and since some connection between Banker family and Vijay Shetty has been prima facie found, all the offences, which are registered against these applicants and other accused persons, are prima facie made out. She further submits that the FIRs disclose that the offences as registered against the applicants and others have also been committed in India and they had international ramifications as the threats were received by respondent no.2-complainant





::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

at Mauritius and Dubai as well. Ms. Pai further submits that these offences have been committed with a view to gain pecuniary benefits. She further submits that so far, charge sheet could not be filed against Vijay Shetty as he is still absconding, but, as held in the case of *Kavitha Lankesh Vs. State of Karnataka and Ors.*[1], it cannot be said that cognizance of the charge sheet filed against the accused who are present before the court cannot be taken in the absence of absconding accused as the cognizance is to be taken of the offence and not of the offender. She also submits that Hemant Banker is the main accused as it was him who had introduced Vijay Shetty to the respondent no.2. Thus, she submits that this is not a fit case for quashing of the FIRs and order impugned herein.

10. Mr. Gaware Patil, learned counsel for respondent no.2-complainant has made his submissions on similar lines as Ms. Pai, learned P.P. In addition, he has invited our attention to Section 22 of the MCOC Act, which raises a presumption against the accused regarding commission of offence of organized crime, unless the contrary is proved. He submits that in this case, there is sufficient material available on record, which, prima facie, indicates commission of offence. He also submits that Hemant Banker is the kingpin of the organized crime syndicate and it was him who had sought the help of Vijay Shetty in committing the offence of extortion. He further submits that two of the accused persons, Rupin Banker and Meenakshi Banker, were tried by a criminal court in UAE and were convicted for forgery under its laws.

1 *2021 SCC OnLine SC 956*


::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

He further submits that even though Meenakshi Banker has been shown to be housewife, she, in fact, has been made Director in several companies and has played active role in commission of the offences. He submits that roles played individually by the members of the organized crime syndicate cannot be viewed in an isolated manner and made a basis for quashing of the crime registered against the accused persons. He submits that these applicants are making every effort to flee away from India and to make themselves unavailable for the trial. On these grounds, he has opposed the applications.

11. Accused no.4-Hemant Banker in FIR No.303/2020, who is applicant in the Criminal Application No.488 of 2020, had earlier by this very application sought similar reliefs. This Court, by its judgment dated 14th December 2021, had dismissed the application. The said judgment was challenged by Hemant Banker before the Apex Court in Criminal Appeal No.791 of 2023. The Supreme Court, however, set aside the said judgment and remanded the matter back to the High Court for a fresh consideration on its own merits. The Supreme Court found it necessary to consider the submissions of the applicant – Hemant Banker, which related to prima facie making out of offences punishable under Sections 387 and 506 of the IPC or otherwise. The Supreme Court held that this Court did not bestow serious consideration with regard to the one based on Section 387 of the IPC. It further held that insofar as offence punishable under Section 506 of IPC was concerned, though the question whether it was committed or not was something that could have been gone into only by the trial court, but what



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

would matter for the purpose of the application filed under Section 482 of Cr.P.C. is as to whether or not the allegations would prima facie attract that offence in the light of the notification dated 4th October 1962.

12. Now, if we take a look at the impugned order passed under Section 23(1)(a) of the MCOC Act dated 22nd September 2021, we would find that the offences punishable under Sections 387 and 120(B), read with Section 34 of IPC, registered against the applicants, weighed with the authority while granting its approval for proceeding against these applicants under the provisions of MCOC Act. The fact of registration of FIR against the applicant - Hemant Banker for an offence punishable under Section 387 having been taken into account by the authority granting approval under Section 23(1)(a) of the MCOC Act was noted by the Apex Court and, therefore, it observed that it was necessary to bestow serious consideration in regard to the one based on Section 387 of IPC. This background of facts would make it necessary for us to consider first as to whether or not the allegations as made and the material as available, taken at face value without adding anything to the same and without subtracting anything from the same, are sufficient to constitute the offence punishable under Section 387 of IPC and also offence punishable under Section 120(B) of IPC against the applicants. This is the principle of law which governs exercise of power of this court under Section 482 of the Code of Criminal Procedure. This principle of law is now well embedded in our criminal jurisprudence. A useful reference in this regard may be made to the cases of *R.P. Kapur Vs.*





::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

*State of Punjab*[1], *State of Punjab Vs. Kasturi Lal & Ors.*[2], *Padal Venkata Rama Reddy Vs. Kovvuri Satyanarayana Reddy & Ors.*[3], *Subrata Das Vs. State of Jharkhand*[4] and *State of Haryana Vs. Bhajan Lal*[5].

13. Before we deal with the allegations made against this applicant and the other applicant – Meenakshi Banker, as regards offence of extortion punishable under Section 387 of IPC, it would be appropriate for us to consider the law relating to the extortion, as it would help us in determining as to whether or not the allegations made against both the applicants prima facie constitute the offence of extortion.

14. The section applied against both the applicants is Section 387 of the IPC, which prescribes punishment for the offence of extortion in its aggravated form. It says that, whoever, in order to the committing of extortion, puts or attempts to put any person in fear of death or of grievous hurt to that person or to any other person, shall be punished with imprisonment of either description for a term which may extend to seven years, and shall also be liable to fine. The term "Extortion" is defined in Section 383 and it reads thus :-

> *"383.* ***Extortion*** – *Whoever intentionally puts any person in fear of any injury to that person, or to any other, and thereby dishonestly induces the person so put in fear to*

1 *AIR 1960 SC 866*
2 *(2004) 12 SCC 195*
3 *(2011) 12 SCC 437*
4 *(2010) 10 SCC 798*
5 *1992 Supp. (1) SCC 335*

*deliver to any person any property or valuable security, or anything signed or sealed which may be converted into a valuable security, commits "extortion".*

15. This definition indicates following ingredients of the offence of extortion, which must be present for constituting it.

(i) Intentionally putting any person in fear of injury to that person or any other person;
(ii) Inducing of the person so put in fear dishonestly;
(iii) Delivery to any person any property or valuable security by the person put in fear and subjected to dishonest inducement.

If any of these ingredients is absent, the offence of extortion would not be complete, as held in the case of *Dhananjay alias Dhananjay Kumar Singh Vs. State of Bihar and Anr.*[1]. In an earlier case of *R.S. Nayak Vs. A.R. Antulay and Anr.*[2], similar view was taken by the Apex Court.

16. In the case of *Isaac Isanga Musumba and Ors. Vs. State of Maharashtra and Ors.*[3], the Apex Court has held that, unless property is delivered to the accused person pursuant to the threat, no offence of extortion is made out and the FIR for the offence under Section 384 cannot be registered by the police. Relevant observations of the Apex Court, appearing in paragraph 3 of the judgment, are reproduced thus :-

1 *(2007) 14 SCC 768*
2 *(1986) 2 SCC 716*
3 *(2014) 15 SCC 357*



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

> *"3. We have read the FIR, which has been annexed to the writ petition as Annexure P-7 and we find therefrom that the complainants have alleged that the accused persons have shown copies of international warrants issued against the complainants by the Ugandan Court and letters written by Uganda Ministry of Justice and Constitutional Affairs and the accused have threatened to extort 20 million dollars (equivalent to Rs.110 crores). In the complaint, there is no mention whatsoever that pursuant to the demands made by the accused, any amount was delivered to the accused by the complainants. If that be so, we fail to see as to how an offence of extortion as defined in Section 383 IPC is made out."*

17. In the case of *M/s. GIC Housing Finance Ltd. Vs. The State of Maharashtra and Anr.*[1], a Coordinate Bench of this court has taken a similar view when it held that, the essential ingredients of the offence of extortion are intentionally putting any person in fear of any injury to that person or to any other and thereby dishonestly inducing the person so put in fear to deliver to any person any property or any valuable security.

18. Of course, in the case of *Bhagwan Gajanan Phandat Vs. State of Maharashtra, along with connected matter*[2], a Coordinate Bench of this court, of which one of us was a part, has, while dealing with the offence

1 *2015 SCC OnLine Bom 6231*

2 *2019 SCC OnLine Bom 144*





::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

punishable under Section 387 of the IPC, observed that the section does not say that the threatened person has delivered any property in pursuance to the threat. This observation, in our considered view, cannot be understood as laying down an authoritative proposition of law that even without any delivery of property, offence of extortion can be constituted; the reason being that the statement does not make it clear as to whether or not delivery of any property following the threat given is an essential part of the offence of Section 387. The statement is only about the threatened person delivering any property. Secondly, it has been made in ignorance of the law laid down by the Apex Court in the aforestated cases of *Isaac Isanga Musumba, Dhananjay alias Dhananjay Kumar Singh* and *R.S. Nayak (Supra)*. So, it is clear now that not only putting a person under fear of any injury and dishonestly inducing the person so put in fear to deliver the property but also actual delivery of property are a *sine-qua-non* of the offence of extortion, as defined under Section 383 IPC. With this clarity in mind, let us now proceed to consider the allegations made against both the applicants.

19. Now, in the light of the above referred law, let us consider the nature of the allegations made against both the applicants and find out as to whether or not they, taken at their face value, satisfy the requirements of the offence of extortion and constitute an offence punishable under Section 387 of IPC registered against both the applicants in these crimes.



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

HIGH COURT OF JUDICATURE AT BOMBAY

20. In both the crimes, the FIR No.303 of 2020 dated 27th August 2020 is at the center and is what has set the criminal law in motion and, therefore, consideration of the allegations made in this FIR would be of utmost importance. On a careful perusal of the FIR, we find that there is not a single allegation made against either of these applicants that they or any one of them intentionally put the complainant or any other person in fear of death or of grievous hurt and thereby dishonestly induced the complainant or any other person to make investment in the business of the complainant in January, 2018. We further find that the other allegation, which is about Rupin Banker and Meenakshi Banker submitting forged documents to Bar Dubai Branch of Bank of Baroda and using these documents for fraudulent withdrawal of amount of Rs.35 crores from the account of the complainant also does not show that the essential ingredients of the offence of extortion are fulfilled. This allegation pertains to fraudulent withdrawal of Rs.35 crores from the bank account of the complainant by using forged documents and it is not about withdrawal of the amount by obtaining signature of the complainant on withdrawal slip or any cheque leaf by putting the complainant in fear of death or grievous hurt. As regards such fraudulent withdrawal, it is not in dispute that criminal court at Dubai has already found Rupin Banker and Meenakshi Banker guilty and imposed appropriate punishment as per the law prevailing in that country.

21. In addition to above referred allegations, there are a few more allegations made in the FIR filed against these applicants and other persons.




::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

These allegations relate to issuance of threats to the respondent no.2 by one Vijay Shetty and that is stated to have been done on behalf of Rupin Banker. The first such threat, as has been alleged, is on the life of respondent no.2, which was issued in the evening of 16th July 2019 and it was issued by making a call from international number +8244 to the mobile number of respondent no.2 - 9820297745. This threat was received by respondent no.2 admittedly when he was in Mauritius. The caller, Vijay Shetty, had then called upon respondent no.2 to not initiate any police action against Rupin Banker or otherwise respondent no.2 would be killed on his reaching Mumbai. By this threat, no attempt was made to coerce the respondent no.2 into delivering to any person any property or valuable security. The next threat was received by respondent no.2 again from Vijay Shetty on 22nd July 2019 and it was received by him when he was in Dubai. At that time, it is alleged, the caller abused respondent no.2 and threatened him that if he demanded any money from Banker family, he would have to pay for his life. It is also alleged that this threat was thought by respondent no.2 to have been issued by Vijay Shetty at the behest of Rupin Banker as he believed that the caller was in touch with Rupin Banker and his father Hemant Banker. Here again, the threat given was not for inducing the respondent no.2 to deliver any property, but to refrain from demanding repayment of money.

22. The further allegations made in the FIR No.303 of 2020 show that same caller, Vijay Shetty, again called up respondent no.2 about two days





::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

after 22nd July 2019 and had threatened him but respondent no.2 cut short the call without speaking much to him. Respondent no.2 has then stated that thereafter he returned to India and in the night of 8th August 2019, when he was at home, Hemant Banker, one of the applicants, called him on his mobile no.9820297745 and told him that some time would be required for return of the money. He has further stated that when he asked him as to why did he get Vijay Shetty make a threatening phone call to him, Hemant Banker answered in the negative. Then, respondent no.2 also alleged that in the evening of 10th August 2019, the same caller, Vijay Shetty, made a phone call to him and asked him to not demand repayment of money and that respondent no.2 should give to Rupin Banker six months' time for repayment of money. Similar call was alleged to be received by respondent no.2 from Vijay Shetty on 22nd August 2019.

23. When the above referred allegations regarding the calls made by the Hemant Banker and Vijay Shetty are considered at their face value, without adding anything to them or subtracting anything from them, we would find that none of those calls was of such nature as to induce, much less dishonestly, respondent no.2 to deliver any person any property or valuable security. All of these calls were either about respondent no.2 refraining from demanding repayment of money or giving of time of six months for repayment of money. We have already seen that not only putting a person in fear of death or grievous hurt is necessary for prima facie constituting the


::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

offence of extortion, but also dishonestly inducing the person so put in fear to deliver property or valuable security is equally necessary. Similarly, delivery of property is yet another ingredient which completes the offence of extortion, as defined under Section 383 IPC and as held in the case of *Isaac Isanga Musumba and Ors. Vs. State of Maharashtra and Ors.*[1] It is clear that no offence whatsoever of extortion, punishable under Section 387 IPC, read with Section 383 IPC, is prima facie made out against any of the applicants. It is true that FIR is not an encyclopedia of all facts pertaining to crime, as held in the case of *Farman Imran Shah @ Karu Vs. State of Maharashtra*[2], but, FIR being the first information given to a police station about commission of cognizable offence, which sets the criminal law in motion on the premise that a cognizable offence is prima facie committed, it is necessary that the FIR mentions basic facts from which an inference can be drawn about commission of a cognizable offence. In the case of *State of Andhra Pradesh Vs. Goloconda Linga Swamy*[3], the Supreme Court has held, in paragraph 12 of the judgment, that though the FIR is not meant to be an encyclopedia of the background scenario, yet it must state skeletal features, thereby disclosing the commission of an offence. If the core features of an offence are not stated in the FIR, we would say, it would not be a first information report relating to commission of a cognizable offence, as contemplated under Section 154 of the Code of 1973 and that would mean

1 *(2014) 15 SCC 357*

2 *2014 ALL MR (Cri) 1571*

3 *2004 DGLS (SC) 599; 2004 AIR (SC) 3967*



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

that no investigation can be initiated by the police upon such an information.

24. In the instant case, the FIR, taken at its face value, accepting all the allegations made therein as true, does not disclose that the threats issued were for compelling the respondent no.2 to deliver property and that there was indeed delivery of property or valuable security because of those threats. These ingredients are part of the skeletal features of the offence of extortion and as they are missing here, we find that no offence of extortion, as punishable under Section 387 IPC, which is registered against both the applicants in both the crimes, is prima facie made out. There is also no other material brought to our notice from which we could say that these ingredients are present in both the crimes, thereby prima facie constituting offence of extortion as tried to be made out against both the applicants. This would enable us to hold that insofar as offence of extortion as punishable under Section 387 IPC is concerned, both the applicants have made out their case for quashing of the same.

25. The impugned order dated 22nd September 2021, issued under Section 23(1)(a) of the MCOC Act, apart from making the offence punishable under Section 387 IPC as it's basis, also makes the other offence the offence of criminal conspiracy punishable under Section 120B of the IPC. However, for an offence of criminal conspiracy, as defined under Section 120A IPC, the requirement is that of agreement between two or



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

HIGH COURT OF JUDICATURE BOMBAY

more persons for doing or causing to be done an illegal act or an act, which is not illegal, by illegal means. Now if we carefully consider the allegations made in the FIR, we would find that the respondent no.2 has nowhere alleged that there was any agreement for issuing threats or death threats to respondent no.2 between Vijay Shetty and these two applicants – Hemant Banker and Meenakshi Banker. This is, however, not to say that criminal agreement cannot be ascertained from surrounding facts and circumstances, as such agreement need not always be express and can, most of the times, be tacit. But, in the instant case, there is no other material brought to our notice from which any inference about prima facie existence of criminal agreement can be drawn. Even the call details do not reveal any circumstances indicating, prima facie, presence of such conspiracy. At one place, the respondent no.2 states that the fact of his returning to Dubai from Mauritius was known to Vijay Shetty, that Vijay Shetty was in touch with Rupin Banker and Hemant Banker and then he says that "at his behest", without clarifying as to who amongst son and father duo, Vijay Shetty had threatened him. But, as stated earlier, this threat was not for what is understood as the offence of extortion but for pressurizing respondent no.2 into giving up his demand for repayment of money, which was out of the scope of offence of extortion, as defined under Section 383 IPC. The allegation of criminal conspiracy, in the present case, is primarily in the context of offence of extortion and that very offence having not been prima facie constituted in the present case, in our considered view, even the



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

offence of criminal conspiracy, punishable under Section 120B IPC, cannot be said to be prima facie made out against any of these applicants.

26. If we say that for slapping offence of criminal conspiracy against the applicants, offence of criminal intimidation under Section 506 IPC also provided contextual setting, we would have to examine first, if this offence is prima facie made out against the applicants or not.

27. In order to constitute an offence of criminal intimidation, as defined under Section 503 IPC, the threat must have been issued to cause injury to a person or his reputation or his property with an intent to cause alarm to that person or compel that person to do some act which he is not legally bound to do or to omit to do any act which that person is legally entitled to do. If these ingredients are found to be present in the FIR, it would be an offence of criminal intimidation punishable under Section 506 IPC. These ingredients are prima facie present in the present case, but of course not against these applicants, as there is no allegation that these applicants or any of them had actually made threat calls. If that is so, offence of criminal intimidation would not be prima facie made out against the applicants, thereby making the registration of offence of criminal conspiracy in this context without any basis.

28. Apart from what is stated above, we must say that offence punishable under Section 506 IPC is, in the normal circumstances, as per the First Schedule to the Code of Criminal Procedure, 1973, non-cognizable and



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

bailable and that means no FIR for this offence can be registered in normal course. However, as per the notification dated 4th October 1962 issued by the Government of Maharashtra, this offence is made cognizable and non-bailable when committed in Greater Mumbai. Applicability of this notification to the First Schedule to the Code of 1973, so as to amend the First Schedule accordingly, was one of the issues which was referred to a Full Bench of this court for its answer. The Full Bench, by its judgment dated 5th April 2017, delivered in Criminal Writ Petition No.2841 of 2013 *(Kahera Sayed Vs. The State of Maharashtra & Ors.), together with other connected matters*, answered the issue in the affirmative. It held that this notification of 4th October 1962 has the effect of amending the First Schedule to the Code of 1973 and this notification is applicable to the area of Greater Mumbai even after the Code of 1973 having come into force upon repeal of the Code of 1898. So, the position is clear. Offence punishable under Section 506 IPC would be cognizable and non-bailable only when it is committed in Greater Mumbai. In the instant case, the allegations contained in the FIR, when accepted as they are, do not show that the offence of criminal intimidation has been prima facie committed by the caller, who was different from the applicants, in Greater Mumbai. They show that the threats made firstly on 16th July 2019 in the evening; secondly on 22nd July 2019 and thereafter about two days from 22nd July 2019, were outside the soil of India and, therefore, these threats did not disclose any cognizable and non-bailable offence punishable under Section 506 IPC in





::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

HIGH COURT OF JUDICATURE BOMBAY

Greater Mumbai. There was one more threat made on 10th August 2019, which, according to the respondent no.2, was received by him when he was in India. Although respondent no.2 in his FIR does not state anything about the particular place where he was at the time he received the threat, one can assume that the threat was received by him when he was within the territorial limits of Greater Mumbai. But, about this particular threat, there is no allegation whatsoever made against either of these applicants nor is there any allegation to the effect that this threat was issued at the bidding of these applicants. Thus, we are of the view that the offence of criminal intimidation punishable under Section 506 IPC, as disclosed in the FIR, is prima facie non-cognizable and bailable and, therefore, on the basis of such an offence, no criminal law could have been set in motion without permission of the Magistrate. It would then mean that there could have been no offence of criminal conspiracy in the context of offence of criminal intimidation.

29. Learned P.P. has argued that there is some more material available in the nature of some call details of the accused persons. Copies of the transcriptions of these call details have been placed on record. We have gone through them and we find that there is nothing in these call details records so as to incriminate the applicants or any of them in the offences registered against them. Similarly, an argument has also been made that though Meenakshi Banker has been shown to be housewife, she, in fact, has been made Director in several companies and has played active role in



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

HIGH COURT OF JUDICATURE AT BOMBAY

commission of the offences. We must say that the submission about playing of active role by her is without any basis and that the FIR registered against her and other persons does not contain any skeletal features about her playing any active role in commission of the offences, which is a requirement of law, as we have seen earlier. There is no material shown to us about her playing any active role in commission of the offences alleged against her. It then follows that the conclusions that we have reached so far get only further bolstered up.

30. Once it is found that neither the offence punishable under Section 387 IPC nor the offence punishable under Section 120B IPC nor the offence punishable under Section 506 IPC, read with Section 34 IPC, is prima facie made out against both the applicants, the impugned order dated 22nd September 2021 passed by the Joint Commissioner of Police (Crime), Mumbai, which has made these offences as it's basis, cannot be sustained in the eye of law. It would then follow that even the offences punishable under Sections 3(1)(ii), 3(2) and 3(4) of the MCOC Act could not be said to have been made out against any of the applicants. These sections prescribe punishment for organized crime. Organized crime has been defined under Section 2(e) of the MCOC Act as meaning any continuing unlawful activity by an individual, singly or jointly, either as a member of the organized crime syndicate or on behalf of such syndicate, by taking recourse to violence or threat of violence or intimidation or coercion or other unlawful means, with



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

HIGH COURT OF JUDICATURE AT BOMBAY
सत्यमेव जयते

the objective of gaining pecuniary benefits or some undue economic or other advantage. Of course, as held in the case of *Kavitha Lankesh Vs. State of Karnataka and Ors.*[1], registration of a crime against a person or an offender is not what matters but recording of offence of organized crime is what matters as it is a crime which is primarily made up of continuing unlawful activity by an individual, singly or jointly, either as a member of organized crime syndicate or on behalf of such syndicate. But, without there being any "continuing unlawful activity", as defined in Section 2(1)(d) of the MCOC Act, there would not constitute any offence of organized crime. Even if there is any continuing unlawful activity, it must be shown to be disclosing a cognizable offence punishable with imprisonment of three years or more, it must have been undertaken singly or jointly; it must have been undertaken as a member of organized crime syndicate or on behalf of such syndicate and it must have been the one in respect of which more than one charge sheet have been filed before a competent court within the preceding period of ten years, and that court must have taken cognizance of the offence[2].

31. Such being the requirements of the offence of organized crime, we have to see as to whether or not there is any continuing activity which is

1 *AIR 2021 SC 5113*

2 *(See cases of :*
*Govind Sakharam Ubhe Vs. State of Maharashtra, 2009 ALL MR (Cri) 1903,*
*Mujahid Ibrahim Pathan & Ors. Vs. State of Maharashtra & Ors. 2015 (3) Bom.C.R. (Cri) 704*
*Vikrant Harish Varandani Vs. State of Maharashtra & Ors. (Criminal Writ Petition No.2560 of 2019, decided on 29th April 2021.*



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

prohibited in law and which is a cognizable offence punishable with imprisonment of three years or more, which is attributable to both the applicants or either of the applicants either directly or as member of an organized crime syndicate. The answer to this poser has to be given as in the negative as we have already found that there is no activity attributable to both or any of the applicants, which is a cognizable offence. This has a reference to what we have found in respect of the offence of criminal intimidation punishable under Section 506 IPC registered against the applicants and also to offence of extortion punishable under Section 387 IPC or of criminal conspiracy punishable under Section 120B IPC, which offences have been found by us as not having been prima facie made out against any of these applicants. We have already made a detailed discussion in this regard in the earlier paragraphs. If there is no continuing unlawful activity, as defined under Section 2(1)(d) of the MCOC Act, prima facie committed either individually or jointly and either as a member of an organized crime syndicate or on behalf of such syndicate by any of these applicants, there cannot made out any offence of organized crime under Section 3 of the MCOC Act. That apart, there is also no material showing that these applicants or any of them had any nexus in the context of the offences of extortion, criminal conspiracy and criminal intimidation, with Vijay Shetty against whom more than one charge sheet have been filed. Presence of such nexus is necessary as held in the case of *Kavitha Lankesh Vs. State of Karnataka and Ors.*[1]. This would mean that registration of this

1 *2021 SCC OnLine SC 956*



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

HIGH COURT OF JUDICATURE BOMBAY

crime against the applicants is without any substance and, therefore, all the sections applied against both the applicants in this regard would have to be quashed and set aside. It would also mean that the impugned order of approval passed under Section 23(1)(a) of the MCOC Act by the Joint Commissioner of Police (Crime), Mumbai is illegal and cannot be sustained in the eye of law. However, we clarify here that since quashing of FIR in part is permissible, as held in the case of *Lovely Salhotra & Anr. Vs. State (NCT of Delhi) & Anr.*[1], the final order of quashing of the impugned crimes here would be applicable only to these applicants – Hemant Banker and Meenakshi Banker and it would not affect in any manner investigation being made in both these crimes against the remaining accused persons.

32. There is also an argument made that there is presumption as to an offence under Section 3 of the MCOC Act and this presumption is to be found in Section 22 of the MCOC Act. It is submitted that since the offence of organized crime has been registered against these applicants, this presumption, as provided under Section 22, would go against the applicants. In order to properly understand the nature of the presumption, we find it necessary to reproduce Section 22 of the MCOC Act here and it reads thus :-

> ***"22. Presumption as to offences under Section 3***
>
> *(1) In a prosecution for an offence of organized crime punishable under Section 3, if it is proved -*
>
> *(a) that unlawful arms and other material including documents or papers were*

1 *(2018) 12 SCC 391*





::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

HIGH COURT OF JUDICATURE BOMBAY

*recovered from the possession of the accused and there is reason to believe that such unlawful arms and other material including documents or papers were used in the* ***commission of such offence;*** *or*

*(b) that by the evidence of an expert, the finger prints of the accused were found at the site of the offence or on anything including unlawful arms and other material including documents or papers and vehicle used in connection with the commission of such offence, the Special Court shall presume, unless the contrary is proved, that the accused had committed such offence.*

*(2) In a prosecution for* ***an offence of organized crime*** *punishable under sub-section (2) of section 3, if it is proved that the accused rendered any financial assistance to a person accused of, or reasonably suspected of, "an offence of organised crime," the Special Court shall presume, unless the contrary is proved, that such person has committed the offence under the said sub-section (2)."*

33. It would be clear from the provisions contained in clauses (a) and (b) of sub-sections (1) and (2) of Section 22 of the MCOC Act, that there has to be something like **"commission of such offence"** or commission of **"an offence of organized crime"** and without there being any prima facie commission of an offence, as contemplated under these provisions of law, or without there being any material showing prima facie commission of an





::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

offence, as contemplated by these provisions of law, the presumption arising from recovery of unlawful arms or other materials or documents or papers or fingerprints or discovery of evidence about rendering of financial assistance could not be drawn. These provisions of law enable the Special Court to mandatorily presume that the accused has committed an offence of organized crime if it is proved that the documents, other material, unlawful arms, fingerprints etc. recovered from the possession of the accused had reasonable link to the commission of offence. Of course, this presumption is rebuttable at the instance of the accused. But, in the present case, we have found that there is no basis for us to hold that these applicants have or any of them has prima facie indulged in any continuing unlawful activity prohibited by law, as envisaged in Section 2(1)(d) of the MCOC Act, and that being so, presumption under Section 22 of the MCOC Act would not be attracted here.

34. In the result, we find that both the criminal application and writ petition deserve to be allowed. Accordingly, we pass the following order :-

(i) Criminal Application No.488 of 2020 and Writ Petition No.1296 of 2023 are allowed.

(ii) It is directed that the impugned crimes bearing Crime No.303 of 2020 and Crime No.122 of 2022 registered at Worli Police Station, Mumbai and Anti-Extortion



::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::

Cell, Crime Branch, Mumbai, respectively, are hereby quashed and set aside.

(iii) The impugned order dated 22nd September 2021 passed under Section 23(1)(a) of the MCOC Act by the Joint Commissioner of Police (Crime), Mumbai is also quashed and set aside.

(iv) Interim Application No.1252 of 2023 is disposed of in terms of the above order.

**(M.M. SATHAYE, J.)** **(SUNIL B. SHUKRE J.)**





::: Uploaded on - 23/06/2023 ::: Downloaded on - 23/06/2023 23:30:11 :::