# EXHIBIT 10

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ------------------------------------------------------------X | |
| In re | Chapter 11 |
| BYJU'S ALPHA, INC., | Case No. 24-10140 (BLS) |
| Debtor. | |
| ------------------------------------------------------------X | |
| BYJU'S ALPHA, INC., | Adv. Pro. No. 25-50822 (BLS) |
| Plaintiff, | |
| -against- | |
| OCI LIMITED and RUPIN BANKER, | |
| Defendants. | |
| ------------------------------------------------------------X | |

**DECLARATION OF OLIVER PHILIP CHAPMAN**
**IN SUPPORT OF MOTION TO DISMISS**

OLIVER CHAPMAN, pursuant to 28 U.S.C § 1746 declares:

1. I am the founder and chief executive officer of defendant OCI Ltd. ("OCI").

2. In this declaration I discuss the business of OCI generally and its activities in the United States in particular.

3. I make this declaration based upon my personal knowledge, except as to those matters stated to be upon information and belief, and as to those matters, I believe them to be true.

<u>OCI</u>

4. OCI is a corporation organised under the laws of England and Wales. I established OCI in 2012.

5. OCI's primary focus is assisting other companies in the procurement of goods and services. In brief, we help our customers get better prices and better terms, especially in connection with international procurement.

6. OCI has been successful. In 2022, the *Financial Times* acknowledged OCI as the fastest growing company in the United Kingdom and third fastest growing company in Europe. https://www.ft.com/ft1000-2022 (accessed July 3, 2025).

7. OCI's registered office is Suite 3, 2nd Floor, Didsbury House, 748-754 Wilmslow Road, M20 2DW, in Manchester, England, at the offices of OCI's external accountants, an arrangement which I understand to be commonplace. Two OCI employees live in Manchester and work from Manchester.

8. OCI's trading office is located at 33 Cannon Street, London EC4M 5SB, England. These are shared offices, sometimes referred to as "co-working" offices. In London, OCI also has access to nearby shared conference and meeting room facilities.[1]

9. OCI also has a presence in a number of non-UK locations, as indicated on OCI's website. The nature of OCI's relationships with personnel at these locations varies. Similarly, the nature and volume of OCI's activity conducted at or through these locales varies but generally reflects long standing, mutually beneficial relationships that have facilitated OCI's ability to deal locally with customers and suppliers.

OCI's Contacts with the United States

10. OCI does not have and has not had an office in the United States.

11. OCI does not have and has not had employees in the United States.

[1] I note the debtor's criticism of OCI's use of shared offices, implying that this renders OCI less legitimate than businesses that operate differently. Suffice it to say, OCI finds this arrangement satisfactory, especially in the era of remote working.

12. To the best of my knowledge, only rarely have OCI personnel visited the US on OCI business. For example, I briefly visited New York in 2021 when I delivered a presentation at a conference. I have not otherwise visited the United States since that time[2], nor to the best of my knowledge, has any other OCI personnel except OCI advisor Rupin Banker.[3] I understand that Mr. Banker visited his sons in United States where they attended school and university.

13. Over the last several years, OCI has entered into a handful of transactions with counterparties located in the United States but has done so primarily from the United Kingdom. Upon information and belief, in each of these transactions, the initial contact was made by the U.S. counterparty, not by OCI. Most of the contracts for transactions in which OCI is involved are governed by English law and provide for the consent to jurisdiction in England. Thus, for example, OCI successfully challenged personal jurisdiction when sued by a US customer in Utah. *See Stenn Assets UK Limited v. Alder Holdings, LLC*, Case No. 220400247 (April 29, 2023, Fourth Dist. Ct., Utah Cnty).

The Transaction at Issue

14. Upon information and belief, OCI was introduced to Think & Learn Pvt Ltd ("T&L") and its principal, Byju Raveendran, by Enarr Capital. The initial meeting with a representative of T&L that I attended, in or about 2021, occurred in London. At that time, T&L was widely reported as a fast-growing, highly valued, "Ed Tech" business. Based in India, T&L was generally perceived as a company "doing good" by providing remote learning to underserved populations. Various sources then reported T&L to have a market capitalization upwards of multiple billions of dollars.

---

[2] For the sake of completeness, I note that I transited through the United States on my way to and from Mexico at the end of 2024 and beginning of 2025.

[3] Mr. Banker, while not an employee of OCI, has been much involved in many OCI transactions, including the transaction in dispute.

15. To the best of my recollection, in approximately February – April 2022, T&L agreed to hire OCI to manage an extensive procurement program. As I understand the matter, the agreed arrangement was for OCI to acquire goods and services for the benefit of T&L.

16. Executing this procurement program required a structure that allowed OCI to negotiate discounts from vendors in exchange for immediate payment and to defer T&L's payment obligation. Essential to the structure was assurance that OCI would be either paid in advance or immediately repaid for any payments it advanced to T&L vendors.

17. Attached as Exhibit 1 is the agreement between the debtor and OCI (the "OCI-Byju's Alpha Agreement"). It provides for OCI to intermediate the purchase of goods and services by debtor (the defined "Buyer") for which OCI would receive advance payment of $350 million from "the Buyer or by the Buyers Supply Chain Financier Camshaft Capital LP" ("Camshaft Capital").

18. To my knowledge, OCI did not conduct negotiations of any type with T&L or its affiliates, including the debtor, in the United States.

19. I understand the transaction at issue to have involved Camshaft Capital Management, LLC ("Camshaft") and Camshaft Capital. I further understand both were based in Florida. Other than the transaction at issue, OCI has had no involvement with the Camshaft entities.

20. Attached as Exhibit 2 is a copy of the "April Note" to which the debtor refers in the complaint. The Note contains a consent to jurisdiction in Florida for an "action, suit, or proceeding arising from or relating to" the April Note. It was not my intent to consent to jurisdiction in Florida for matters unrelated to the Note.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 14 July 2025.
LONDON, England

OLIVER PHILIP CHAPMAN

# EXHIBIT 1

**GENERAL TERMS AND CONDITIONS OF SALE ON ADVANCE PAYMENT TERMS** between

OCI Limited a company incorporated under the laws of England and Wales with its registered office at 33 Cannon Street, London, EC4M 5SB and with company number 07983075 (the "**Seller**"); and

BYJU'S Alpha, Inc, a corporation registered in the State of Delaware, with its registered office at 16192 Costal Highway, Lewes, County of Sussex, Delaware 19958 and with company number
C4819138, (the "**Buyer**").

The Seller and Buyer may hereinafter be referred to individually as a "**Party**" and collectively as the "**Parties**".

**WHEREAS**:

From time to time the parties hereto may enter into transactions in which the Seller agrees to buy Product from a supplier on terms and conditions which have been disclosed to the Buyer and sell such Product to the Buyer on an 'as is, where is' basis and on the terms and subject to the conditions set out herein.

**NOW IT IS HEREBY AGREED** as follows:

**1. Definitions**

In these general terms and conditions (the "**General Terms and Conditions**") (except where the context otherwise requires) the following words shall have the following meanings:

"**Affiliate**" of a party means any subsidiary or any holding company from time to time of that party, and any subsidiary from time to time of such a holding company.

"**Bill of Exchange**" means a bill of exchange or any other irrevocable payment undertaking in a form acceptable to the Seller and enforceable in the jurisdiction of issue in the amount of the Sale Price with a maturity date being the agreed Payment Date.

"**Business Days**" means a day (which is not a Saturday, a Sunday or a bank or public holiday) on which commercial banks settle payments and are open for general business in London, New York and New Delhi.

"**Certificate of Receipt**" means a certificate of good receipt of the Product or relevant documentation, signed by the Buyer

"**Default Interest Rate**" means the rate per annum which is five point six five per cent (5.65%)

"**Force Majeure**" means any cause preventing the Seller or the Buyer from performing any or all of its obligations (other than any payment obligation) which arises from or is attributable to acts or events beyond its reasonable control, including, without limitation, strikes, lock-outs or other industrial disputes (whether involving the workforce of the party so prevented or of any other party), act of God, war, riot, civil commotion, malicious damage, compliance with any law or governmental order, rule, regulation or direction, accident, breakdown of plant or machinery, fire, flood, storm or default of suppliers or sub-contractors.

"**Advance Payment**" means the payment sent in advance by the Buyer or the Advance payment sent by Buyers Supply Chain Financier Camshaft Capital LP.

"**International Trade Sanctions**" means the laws, regulations, rules and requirements of the United Nations, the United Kingdom, the United States of America (including but not limited to those outlined by the Office of Foreign Assets Control (OFAC) of the US Department of Treasury and the Export Administration Regulations of the US Department of Commerce), the European Union and any other applicable jurisdiction which relate to foreign trade control, export control, trade embargoes or international boycotts or sanctions.

"**Payment Date**" shall have the meaning given to that term in the relevant Sale Offer or Sale Contract, as appropriate.

"**Product**" means the Product including but not limited to media and marketing products, intellectual property, hardware, advertising, software, or other property of the quantity and description set out in the relevant Sale Offer or Sale Contract, as appropriate.

"**Product Documentation**" means the Purchase Contract and any documentary evidence relating to the Product and to the purchase of the Product by the Seller as may be required by the Seller.

"**Purchase Contract**" means, in respect of the Product which are the subject of a particular Trade Transaction, the contract between the Supplier and the Seller for the purchase of such Product by the Seller.

"**Purchase Date**" means the date on which the Seller acquires the legal and beneficial title to the Product pursuant to a Purchase Contract.

"**Sale Contract**" means a duly completed Sale Offer which has been duly executed by both the Buyer and the Seller in accordance with Clause 2.1.

"**Sale Offer**" means any offer for sale, proforma invoice or contract proposal.

"**Sale Price**" shall have the meaning given to that term in a Sale Offer or Sale Contract, as appropriate.

"**Seller's Representatives**" means the Seller's agents and representatives and the Seller's and its agents' and representatives' directors, officers and employees.

"**Supplier**" shall mean the supplier of the relevant Product to the Seller pursuant to a Purchase Contract.

"**Trade Transaction**" means a trade transaction entered into pursuant to these General Terms and Conditions.

**2. Sale Contract**

2.1 From time to time the Seller may issue a Sale Offer by which it offers to sell Product to the Buyer. If the Buyer is willing to buy such Product, the Buyer may sign and deliver the Sale Offer to the Seller and, upon satisfaction of all of the conditions set out in Clause 2.2 on or prior to the Payment Date, a binding Sale Contract shall be formed for the sale of the Product by the Seller to the Buyer on an 'as is, where is' basis and on the terms set out in the Sale Contract and in these General Terms and Conditions.

2.2 The Buyer shall ensure the receipt by the Seller on or before the Payment Date of the following:

2.2.1 a binding Sale Contract duly executed by the Buyer in respect of the relevant Trade Transaction;

2.2.2 all the applicable Product Documentation;

2.2.3 the Certificate of Receipt in respect of the relevant Product and evidence satisfactory to the Seller that the Product have been insured in accordance with Condition 4 (*Demurrage and Insurance*) on or prior to the date of the Sale Contract; and

2.2.4 advice acceptable to the Seller that any Bills of Exchange in respect of the Sale Contract have been accepted for an aggregate amount equal to the Sale Price and the signatures thereto have been verified as per terms of Sale Offer.

2.3 For the avoidance of doubt, the Seller may withdraw any Sale Offer by written notice to the Buyer at any time before the conditions set out in clause 2.2 above have been satisfied.

2.4 The Buyer acknowledges that the Seller shall transfer only such title to such Product, and subject to such encumbrances (provided that the Seller agrees that it will not itself create any encumbrance over the Product) and delivered (or not delivered) to such extent and in such manner as the Seller receives from the Supplier.

**3. Payment**

The Buyer shall pay the Sale Price to the Seller an Advance of USD 350,000,000 (United States Dollars Three Hundred and Fifty Million) within 60 days of signing this contract. The advance payment may be paid directly by the Buyer or by the Buyers Supply Chain Financier Camshaft Capital LP, to the Seller.

**4. Demurrage and Insurance**

4.1 Unless otherwise agreed in writing by the Seller on a case by case basis with the Buyer, the Buyer undertakes to make or obtain (as the case may be), and agrees that it shall be solely liable for all obligations in respect of, transport and insurance, including but not limited to dispatch / demurrage calculations and payments and the importation, discharge and clearance of the Product.

4.2 Unless otherwise agreed in writing by the Seller on a case by case basis with the Buyer, the Buyer shall, unless so insured by the Supplier, procure that the Product, are insured on a "All Risks Covered Basis" with an underwriter acceptable to the Seller and shall promptly following the request of the Seller note the Seller's interest as sole loss payee in relation to such policy and shall provide a copy of any such policy and evidence of payment of the premium to the Seller.

## 5. Representations and Warranties

The Buyer represents and warrants to the Seller with respect to itself upon execution of these General Terms and Conditions, on the date of each Sale Contract and on each date on which any amounts are outstanding to the Seller under any Sale Contract, that:

5.1 it is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, is in good standing;

5.2 it has the power to execute these General Terms and Conditions and any other documentation relating to these General Terms and Conditions to which it is a party, to deliver these General Terms and Conditions and any other documentation relating to these General Terms and Conditions that it is required by these General Terms and Conditions to deliver and to perform its obligations under these General Terms and Conditions and any obligations it has under any ancillary documents (including without limitation any Sale Contract, and Bill of Exchange) to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

5.3 such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgement of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

5.4 all authorisations, consents, approvals, resolutions, licences, exemptions, filings, notarisations, registrations or governmental and other consents that are required to have been obtained by it with respect to these General Terms and Conditions and any ancillary document (including without limitation any Sale Contract or Bill of Exchange) to which it is a party have been obtained and are in full force and effect and all conditions of any such have been complied with;

5.5 all information provided or to be provided by the Buyer to the Seller is true, complete and accurate in all material respects as at the date it was provided and is not misleading in any respect;

5.6 its obligations under these General Terms and Conditions and any ancillary document (including without limitation any Sale Contract and Bill of Exchange) to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms;

5.7 it has not acted and is not in violation of and will not act in violation of any International Trade Sanction;

5.8 it is not insolvent or subject to any moratorium or any insolvency related proceeding in any jurisdiction;

5.9 it is not subject to any litigation or regulatory investigation or other similar proceeding which could adversely affect its ability to honour its obligations under these General Terms and Conditions or any ancillary document (including without limitation any Sale Contract and Bill of Exchange);

5.10 it is not involved in any dispute or litigation with any relevant Supplier and is not aware of any reason why any such Supplier would not deliver the Product in accordance with

a Purchase Contract or why any such Supplier may make any claim under a Purchase Contract; and

5.11 the Product subject to the relevant Sale Contract will for all purposes have been received by it in good condition and otherwise in all respects in accordance with the relevant Product Documentation. (it being acknowledged that this clause 5.11 will not prevent the Buyer from asserting any claim against the Supplier, and the Seller will pass on the economic claim or benefit that it receives from any debit or credit note received from the Supplier or the Buyer, in respect to those Product, to the Buyer or the Supplier as applicable);

## 6. Information

The Buyer shall, until these General Terms and Conditions are terminated and all monies owed to the Seller under it are paid in full promptly upon becoming aware of them, provide to the Seller the details of any litigation, arbitration, administrative or insolvency proceedings which are current, (to the knowledge of the Buyer) threatened in writing, or pending against the Buyer which have a material impact on performance of Buyer's obligations under this Agreement of under any Sale Contract.

## 7. Events of Default

7.1 If any of the following (each an "**Event of Default**") occurs and remains uncured for a period of 15 (fifteen) days:

7.1.1 the Buyer fails to pay any sum due from it under a Sale Contract or these General Terms and Conditions on the due date and in the manner specified; or

7.1.2 any representation or warranty made or repeated by the Buyer in these General Terms and Conditions, any Sale Contract proves to have been incorrect or misleading in any material respect when made or repeated; or

7.1.3 the Buyer disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, these General Terms and Conditions, a Certificate of Receipt, any Sale Contract or any transaction evidenced by such a Sale Contract (or such action is taken by any person or entity appointed or empowered to operate or act on its behalf); or

7.1.4 the Buyer suspends, ceases or threatens to suspend or cease to carry on all or a substantial part of its business or suspends or threatens to suspend payment of all or a substantial part of its debts or is, or is deemed for the purposes of any applicable law to be, unable to pay its debts or admits inability to pay its debts as they fall due, or any financial indebtedness of the Buyer is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described); or

7.1.5 any corporate action, legal proceedings or other procedure or step is taken in relation to (i) the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation of

the Buyer, (ii) a composition, compromise, assignment or arrangement with any creditor of the Buyer, (iii) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Buyer or (iv) enforcement of any security over any assets of the Buyer or any analogous procedure or step is taken in any jurisdiction; or

7.1.6 the Buyer fails to comply with any material term or condition of these General Terms and Conditions, any Sale Contract; or

7.1.7 it becomes unlawful or impossible for the Buyer to perform or to continue to perform any of its obligations under these General Terms and Conditions, any Sale Contract, or any other documents referred to herein; or

7.1.8 the performance of any part of these General Terms and Conditions, or any Sale Contract requires any party to act in any manner that is inconsistent with any International Trade Sanctions,

the Seller may declare that an Event of Default has occurred.

7.2 If the Seller declares that an Event of Default has occurred:

7.2.1 all amounts due under these General Terms and Conditions, under any Sale Contract and under any other agreements with the Seller, will become immediately due and payable notwithstanding their maturity dates;

7.2.2 the Seller shall be at liberty, without notice to the Buyer, at the Buyer's risk and cost, to sell, dispose of, deal with or refuse to deal with the Product or any Bills of Exchange without prejudice to its rights to bring proceedings against the Buyer; and

7.2.3 these General Terms and Conditions will be unavailable for further sales and cancelled for all purposes once all payments under Clause 7.2.1 above have been received or otherwise satisfied in full.

## 8. Inspection

If any inspection of Product is required it shall be arranged for and paid for by the Buyer. The Seller shall not be liable or responsible for any inspection requirement and the Buyer shall indemnify the Seller on first demand against any costs or expenses that the Seller may incur in such respect.

## 9. Taxes

If one of the Parties is obliged by law to make any withholding or deduction for, or on account of, any present or future taxes, levies, imposts, duties, deductions, withholdings or other charges, it will pay to the other such additional amounts as may be necessary in order to ensure that the other party receives a net amount equal to the full amount due under these General Terms and Conditions or Sale Contract, as appropriate.

10. **Hold Harmless and Indemnities**

10.1 The Buyer shall not hold the Seller or the Seller's Representatives responsible in any eventuality at any time for any losses of any nature which the Buyer may incur, now or in the future, in relation to the Sale Contracts or the Trade Transactions.

10.2 The Buyer shall indemnify the Seller and the Seller's Representatives on first demand against any direct and actual losses, claims, demands, proceedings, costs, charges, expenses and liabilities and any financial obligations (including but not limited to legal costs on a full indemnity basis) which the Seller or the Seller's Representatives may incur or sustain as a consequence of the submission of any claim or demand in relation to or arising in any way whatsoever out of these General Terms and Conditions, the Sale Contract, any Trade Transactions done under them or the Product. *Provided, however,* that (i) the Buyer shall not be liable for any incidental, consequential, indirect, special or punitive damages or losses; and (ii) the aggregate liability of the Buyer towards the Seller and Seller Representatives shall be limited to the Sale Price of the relevant Sale Contract under which the concerned indemnity event arises.

**11 Acknowledgements and undertakings in respect of the Product and the Product Documentation**

By signing a Sale Contract, the Buyer:

11.1 agrees and acknowledges that the Product are sold to it without any express or implied representations, warranties or covenants as to title, quality or otherwise;

11.2 irrevocably and unconditionally waives any and all right as against the Seller to reject the Product (or any part thereof) or to assert any claim as against the Seller in relation to the Product or the Bill(s) of Exchange (it being acknowledged that this clause 11.2 will not prevent the Buyer from asserting any claim against the Supplier, and the Seller will pass on the economic claim or benefit that it receives from any debit or credit note received from the Supplier or the Buyer, in respect to those Product, to the Buyer or the Supplier as applicable);

11.3 agrees that it shall ensure that on and from the Purchase Date until full payment of the Sale Price has been received by the Seller, the Product shall remain at all times under its exclusive control and risk; and

11.4 agrees that the Seller shall not be responsible for the failure of the Supplier (or any other party) to perform any obligations, including but not limited to any obligations under the Purchase Contract such as those relating to delivery, including documentation and acknowledges that any such obligations are the sole responsibility of the Supplier (or other third party expressed to be responsible for them).

**12 Exclusion of Liability for Acts or Omissions of the Supplier, the Carrier and other Third Parties**

The Buyer hereby waives any liability of the Seller for any matters caused by or contributed to by the Supplier, by any carrier, any owner or operator of any vessel or any other party having any responsibility direct or indirect for the carriage or storage of the Product (collectively the "**Carriers**") and, in particular, but without prejudice to the generality of the foregoing, the

Seller shall not be liable for any costs, losses or expenses incurred by the Buyer as a result of any default on the part of any Carrier, any deviation from the voyage or any delay in the carriage of the Product.

## 13 Title

Transfer of legal and beneficial ownership of the Product to the Buyer shall take place on the date on which the conditions set out in clause 2.2 above have been satisfied.

## 14 Import and Export Permits

If the Product requires any permits in the country of import, the Buyer shall obtain all approvals and consents required for the import and export of the Product, including all import and export permits, permissions and other documents required for the exit from and the entry of the Product into any relevant country or territory and the Buyer shall bear all costs, fees and expenses associated with obtaining such import permits and other documents.

## 15 Force majeure

15.1 If the Seller is prevented or delayed in the performance of any of its obligations under these General Terms and Conditions by Force Majeure, the Seller shall serve notice in writing on the Buyer specifying the nature and extent of the circumstances giving rise to Force Majeure and shall promptly serve notice in writing on the Buyer informing it of the ending of the Force Majeure. The Seller shall have no liability in respect of the performance of such of its obligations as are prevented by Force Majeure during the continuation of the Force Majeure and for such time after it ceases as is necessary for the Seller, using reasonable endeavours, to recommence its affected operations in order for it to perform its obligations.

15.2 If the Seller is prevented from performance of its obligations for a continuous period in excess of two months, the Seller may, at any time thereafter, terminate these General Terms and Conditions forthwith on service of written notice on the Buyer, in which case neither party shall have any liability to the other except that the Buyer shall immediately on termination pay to the Seller all amounts owing to it (whether due or not) and all rights and liabilities under the indemnities shall continue to subsist.

## 16 Assignment

16.1 The terms and conditions of these General Terms and Conditions and any related Sale Contract shall be binding upon the parties hereto, their successors and assignees.

16.2 The Buyer shall not be entitled to assign these General Terms and Conditions, any Sale Contract or any of its rights or obligations under any of them without the prior written consent of the Seller.

16.3 The Seller may assign any of these General Terms and Conditions or any Sale Contract or any of its rights or obligations under any of them to any person.

## 17 Amendment

Any variation of these General Terms and Conditions must be in writing and signed by the parties hereto.

**18 Third Parties**

The Parties do not intend that any term of these General Terms and Conditions or any Sale Contract will be enforceable by virtue of the Contracts (Rights of Third Parties) Act 1999 by any person that is not a party to them except that the indemnities and agreements to hold harmless shall be enforceable by the Seller's Representatives.

**19 Severability and entire agreement**

19.1 If at any time any provision of these General Terms and Conditions or any Sale Contract is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, it shall not affect or impair the legality, validity or enforceability in that jurisdiction of any other provision of these General Terms and Conditions; or the legality, validity or enforceability under the law of any other jurisdiction of that or any other provision of these General Terms and Conditions or any Sale Contract.

19.2 These General Terms and Conditions together with each Sale Contract issued under its terms constitutes the full and complete agreement of the parties and supersedes all prior proposals, agreements, discussions and representations (either oral or written) between the parties. The Buyer acknowledges that it has not relied on any representations or warranties except those set out in these General Terms and Conditions.

**20 Payments and Default Interest**

20.1 All payments to the Seller shall be effected in the currency of the Sale Price, in immediately available funds without set-off, counterclaim or deduction.

20.2 The Seller may set off against amounts owed by it any amounts owed to the Seller by the Buyer unless it is unlawful in India to do so.

20.3 Any sum due from the Buyer to the Seller pursuant to these General Terms and Conditions that remains unpaid even after seven (7) days from the day it falls due shall bear interest from the first day thereafter up to the date on which the Seller receives payment (both before and after judgment) at the Default Interest Rate.

**21 Confidentiality**

21.1 Each Party undertakes that (unless the prior written consent of the other Party shall first have been obtained) it shall, and shall procure that its officers, employees, advisers and agents shall, at any time whether during the term of these General Terms and Conditions or thereafter, keep confidential and not by failure to exercise due care or otherwise by any act or omission disclose to any person whatever, or use or exploit commercially for its or their own purposes, any of the confidential information of the other party. For the purposes of this Clause, **"confidential information"** shall include:

(i) the contents of these General Terms and Conditions, of any Sale Contract and any other agreement or arrangement contemplated by these General Terms and Conditions;

(ii) information of whatever nature concerning the current or future business, finances, assets, liabilities, dealings, transactions, know-how, customers, suppliers, pricing, processes or affairs of the other party (and, in the case of the Seller, any such information relating to its Affiliates);

(iii) any information which is expressly indicated to be confidential or is imparted by one party to another in circumstances importing an obligation of confidence;

and which any party may from time to time receive or obtain as a result of entering into, or performing its obligations pursuant to, these General Terms and Conditions or otherwise.

21.2 The restrictions imposed by Clause 21.1 shall not apply to the disclosure of any information by a party (the **"disclosing party"**):

(i) which now or hereafter comes into the public domain otherwise than as a result of a breach of such undertaking of confidentiality;

(ii) which is required by law or regulation, only to the extent required;

(iii) which is required to be disclosed by the regulations of any recognised exchange upon which the share capital of the disclosing party is or is proposed to be from time to time listed or dealt in, only to the extent required;

(iv) to a court, arbitrator or administrative tribunal in the course of proceedings before it to which the disclosing party is a party in a case where such disclosure is required by such proceedings;

(v) to any advisers, financiers or insurers or potential advisers, financiers or insurers to the disclosing party or to a potential acquirer of the disclosing party or of any of its assets which are bound to the disclosing party by a duty of confidence which applies to any information disclosed.

## 22 Termination

This Agreement shall remain in full force and effect, for a period of 1 years from the date of this Agreement (the "Initial Term"). Thirty (30) days prior to the expiration of the Initial Term, the Agreement shall deemed to be automatically renewed for a further 12 months. Thirty days prior to the expiration of the renewed Term, the Agreement shall deemed to be automatically renewed for a further 12 months and repeated every year thereafter until it is not renewed, unless otherwise terminated hereunder. Notwithstanding any other provision of this Agreement, the Parties may terminate this Agreement at any time by giving thirty days prior written notice to the other Party.

## 23 No Waiver

No delay or omission of any of the parties in exercising any rights, powers or privileges hereunder shall operate to impair such rights, powers or privileges or be construed as a waiver thereof and any single or partial exercise of any such rights, powers or privileges shall not preclude any other or further exercise thereof or the exercise of any other right, power or

privilege. The rights and remedies provided in these General Terms and Conditions are cumulative and non-exclusive of any rights or remedies provided by law.

**24 Notices**

Any notice to be given by one Party to any other Party under, or in connection with, these General Terms and Conditions or any transaction hereunder shall be in writing, in English and signed by or on behalf of the party giving it.

Any such notice shall be served either by sending it by fax to the number set out below or by sending it by e-mail to each of the relevant e-mail addresses set out below and in each case marked for the attention of the relevant party or parties (or as otherwise notified from time to time in accordance with the provisions of this Clause). Any notice served by fax or email shall be deemed to have been duly given, in the case of fax, at the time of transmission and, in the case of e-mail, when actually received in readable form, provided that in each case where delivery by hand or email occurs after 6.00 pm in the place where it is received on a Business Day or on a day which is not a Business Day, service shall be deemed to occur at 9.00 am in the place where it is received on the next following Business Day.

References to time in this clause are to local time in the country of the addressee.

In the case of the Seller, to it c/o OCI Limited:

Address: 33 Cannon Street, London, EC4M 5SB, United Kingdom

Email: [EMAIL ADDRESS]

In the case of the Buyer, to:

Address: 16192 Costal Highway, Lewes, County of Sussex, Delaware 19958

Email: legal@byjus.com

or any other address in respect of which written notice has been given to the relevant party.

**25 Electronic Communication**

In respect of any request, instruction, notice or other communication sent by means of facsimile transmission, e-mail or other means of electronic transmission ("**Electronic Communication**") to the Seller in relation to these General Terms and Conditions, any Sale Offer or Sale Contract or any transaction carried out hereunder, the Buyer confirms and agrees that: (a) the Seller is authorised to act upon an Electronic Communication which, in its sole discretion, it believes to have been issued by or to originate from the Buyer; (b) the Seller may refuse to act upon or reject any Electronic Communication in its sole discretion; (c) the Seller is neither in a position to nor is required to ascertain the veracity or correctness of any Electronic Communication or attachment thereto or to determine whether any part of the same has been altered, intercepted or otherwise misused and the Buyer undertakes to be fully liable for any untrue, forged, incorrect or misleading Electronic Communication and the consequences thereof; (d) it will unconditionally and irrevocably indemnify the Seller and the Seller's Representatives against any loss, cost, damage, expense, liability, claim or proceedings which it or they incur or suffer as a result of acting on or refraining from acting on any Electronic Communication or as a result of any payment made on the instruction therein

(whether to the Seller or to any other person) or as a result of any errors, delays, alterations, interference or lack of authenticity of any Electronic Communication or attachment thereto and the Buyer acknowledges that the Seller shall not have any liability for the same, unless the same arises as a result of the Seller's gross negligence, wilful misconduct or fraud.

**26 Governing Law**

These General Terms and Conditions and their construction, validity and performance and any non-contractual obligations arising from or connected with them shall be governed by English law to the exclusion of any other law.

**27 Dispute Resolution**

The Parties agree that:

27.1 any dispute or claim (whether contractual or non-contractual) arising out of or in connection with these General Terms and Conditions, including but not limited to any question regarding its existence, validity, breach or termination (a "**Dispute**") shall, subject to Clause 27.1.5 below, be referred to and finally resolved by arbitration with its seat or legal place in London, under the LCIA Rules in force at the time of the referral to arbitration, which LCIA Rules are deemed to be incorporated by reference into these General Terms and Conditions;

27.2 the number of arbitrators shall be 1 (one); the appointed arbitrator shall be a barrister or solicitor practicing in England and Wales, the language of the arbitration shall be English

27.3 prior to a party referring any Dispute to arbitration, that party shall serve upon the other party a notice in writing giving 10 (ten) clear Business Days' notice of its intention to refer a Dispute to arbitration;

27.4 notwithstanding Clause 27.1.1 to 27.1.4 above, the Seller may (if the Seller believes that the Buyer has failed to make a payment when due hereunder), by giving written notice to the Buyer, elect to have a Dispute determined by the Commercial Court of the High Court of England and Wales. If the Buyer is the claiming party in a Dispute, then the Seller shall give written notice to the Buyer to elect to refer a Dispute commenced by the Buyer to the Commercial Court of the High Court of England and Wales on or before the 10th (tenth) Business Day following the date of receipt of the Buyer's notice given pursuant to Clause 27.1.4. If the Seller makes such an election, each Party shall appoint a solicitor admitted and located in England and Wales to accept service of proceedings relating to the Dispute on or before the 10th (tenth) Business Day following receipt of a written request to do so;

27.5 where the Seller elects to have a Dispute determined by the Commercial Court of the High Court of England and Wales in accordance with Clause 27.1.5, the Parties shall take any and all steps necessary to discontinue any arbitration proceedings commenced and any costs incurred in relation to such arbitration proceedings shall become costs incurred in relation to the proceedings before the Commercial Court of the High Court of England and Wales; and

27.6 nothing in this Clause 27 shall prevent either party from seeking interim, provisional

or conservatory measures from any court or other judicial authority of competent jurisdiction at any time whether before or after the formation of an arbitral tribunal or the commencement of proceedings in the Commercial Court of the High Court of England and Wales.

**AS WITNESS the hands of the parties or their duly authorised representatives the day and the year first above written**

For and on behalf of BYJU'S Alpha Inc

DocuSigned by:
C54896B5666C4E2...

By…………………………………………

Name: Riju Ravindran

Date: April 4, 2022

For and on behalf of OCI Limited

OCI LIMITED OCI Reg No. 7953075 Great Britain

By…………………………………………

Name: Oliver Chapman

Date: 04.04.22

# EXHIBIT 2

# PROMISSORY NOTE

$300,000,000.00 April 26, 2022

FOR VALUE RECEIVED, **OCI LIMITED** (the "**Borrower**") hereby unconditionally promises to pay to the order of Camshaft Capital Fund, LP, a Delaware limited partnership (the "**Noteholder**"), on April 26, 2025, the principal amount of $318,000,000.00 (Three Hundred Eighteen Million Dollars) (the "**Loan**"), together with all accrued interest thereon, as provided in this Promissory Note (this "**Note**").

1. Payment Dates.

(a) Prepayment of Interest. Borrower shall make interest payments on the Loan as follows:

(i) On the date hereof, Borrower shall pre-pay the first three years' interest on the Loan ($18,000,000). For convenience, the foregoing first three years' interest amount will be deducted from the Loan proceeds payable by Noteholder to Borrower.

Prepaid interest shall not be refunded in any circumstance, including in the event of any prepayment by the Borrower under Section 1(b) of this Note.

(b) Prepayment of Principal. The Borrower may, upon six months' prior written notice, prepay the Loan in whole or in part at any time after October 26, 2023 if a Prepayment Event (as defined below) has occurred before such date or occurs on or after such date. As used in this Note, a Prepayment Event means any of the following:

(i) filing by Byjus Alpha, Inc. ("Byjus") or any affiliate with the Securities and Exchange Commission or any comparable foreign regulatory agency for an initial public offering of securities;

(ii) execution and delivery by Byju of an agreement for the sale of Byju, including, without limitation, any transaction or series of related transactions by which a material interest in Byju or a material amount of its assets is transferred by means of a sale or exchange of capital stock or assets, a merger or consolidation, business combination or special purpose acquisition or other transaction; or

(iii) the adoption of any law, rule or regulation in any jurisdiction making the Loan invalid or illegal or imposing on Byju or the Borrower obligations or requirements materially impacting the business of either Byju or the Borrower related to maintaining the Loan.

(c) Business Day. In the event that any date set forth herein shall fall on a day that is not a Business Day (defined below), the date shall be deemed to be extended to the next following Business Day.

2. Unsecured. The Borrower's performance of its obligations hereunder is unsecured.

3. Interest Rate.

(a) Interest Rate. Principal amounts outstanding under this Note shall bear interest at a rate per annum (the "**Interest Rate**") equal to 1.88679%.

(b) Default Interest. If any amount payable hereunder is not paid when due, whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Interest Rate plus two percentage points (2%).

(c) Computation of Interest. All computations of interest hereunder shall be made on the basis of a year of 365/366 days, as the case may be, and the actual number of days elapsed. Interest shall begin to accrue on the Loan on the date of this Note. On any portion of the Loan that is repaid, interest shall not accrue on and after the date on which such payment is made.

(d) Interest Rate Limitation. All agreements between the Borrower and Noteholder, now existing or hereafter arising, are hereby expressly limited so that in no event whatsoever shall the amount paid or agreed to be paid to Noteholder hereof for the use, forbearance or detention of money to be loaned hereunder or otherwise, or for the performance or payment of any covenant or obligation contained herein, exceed the maximum amount permissible under applicable law. If from any circumstance whatsoever fulfillment of any provision hereof exceeds the limit of validity prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstance Noteholder hereof shall ever receive as interest under this Note or otherwise an amount that would exceed the highest lawful rate, such amount that would be excessive interest shall be applied to the reduction of the principal amount owing hereunder (without charge for prepayment) and not to the payment of interest, or such excess shall be refunded to Borrower.

4. Payment Mechanics.

(a) Manner of Payment. All payments of principal and interest shall be made in US dollars no later than 5:00 PM Eastern Time on the date on which such payment is due. Such payments shall be made by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

(b) Application of Payments. All payments shall be applied, *first*, to fees or charges outstanding under this Note, *second*, to accrued interest, and, *third*, to principal outstanding under this Note.

(c) Business Day. Whenever any payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and interest shall be calculated to include such extension. "**Business Day**" means a day other than Saturday, Sunday, or other day on which commercial banks in Miami, FL are authorized or required by law to close.

(d) Representations and Warranties. The Borrower represents and warrants to the Noteholder as follows:

(e) Compliance with Law. The Borrower is in compliance with all laws, statutes, ordinances, rules, and regulations applicable to or binding on the Borrower except where the failure to be in compliance would not have a material adverse effect on the Borrower.

(f) Power and Authority. The Borrower has the requisite capacity, power and authority to execute, deliver, and perform its obligations under the this Note.

(g) Authorization; Execution and Delivery. The Borrower has duly executed and delivered this Note.

(h) No Approvals. No consent or authorization of, filing with, notice to, or other act by, or in respect of, any Governmental Authority or any other Person is required in order for the Borrower to execute, deliver, or perform any of its obligations under this Note except where the failure to obtain such consent or authorization or to make such filing will not have a material adverse effect on the Borrower.

(i) No Violations. The execution and delivery of this Note and the consummation by the Borrower of the transactions contemplated hereby and thereby do not and will not (a) violate any Law applicable to the Borrower or by which any of Borrower's properties or assets may be bound; or (b) constitute a default under any material agreement or contract by which the Borrower may be bound.

(j) Enforceability. This Note is a valid, legal, and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

(k) No Litigation. No action, suit, litigation, investigation, or proceeding of, or before, any arbitrator or Governmental Authority is pending or, to the Borrower's knowledge, threatened by or against the Borrower or any of Borrower's property or assets (a) with respect to this Note or any of the transactions contemplated hereby or (b) that could be expected to materially adversely affect the Borrower's financial condition or the ability of the Borrower to perform its obligations under this Note.

(l) PATRIOT Act; Anti-Money Laundering. The Borrower is, in compliance in all material respects with the PATRIOT Act, and any other applicable terrorism and money laundering laws, rules, regulations, and orders.

(m) Anti-Corruption Laws and Sanctions.

(i) "**Sanctioned Country**" means, at any time, a country or territory which is itself the subject or target of any comprehensive or country-wide Sanctions.

(ii) "**Sanctioned Person**" means, at any time, (a) any person listed in any Sanctions-related list of designated persons maintained by a Sanctions Authority; (b) any person operating, organized, or resident in a Sanctioned Country, (c) any person owned or controlled by any such person or persons described in the foregoing clauses (a) or (b), or (d) any person that is the subject or target of any Sanctions.

(iii) "**Sanctions**" mean all economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by a Sanctions Authority.

(iv) "**Sanctions Authority**" means OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, Canada, or other relevant sanctions authority.

(v) The Borrower is in compliance with all laws, rules, and regulations of any jurisdiction applicable to the Borrower from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 ("**Anti-Corruption Laws**").

(vi) The Borrower is not and no agent of the Borrower that will act in any capacity in connection with or benefit from the Loan, is a Sanctioned Person.

(vii) No use of proceeds of the Loan or other transaction contemplated by this Note will violate any Anti-Corruption Law or applicable Sanctions.

5. Events of Default. The occurrence and continuance of any of the following shall constitute an "**Event of Default**" hereunder:

(a) Failure to Pay. The Borrower fails to pay (i) any principal amount of the Loan when due; (ii) any interest on the Loan within five (5) days after the date such amount is due; or (iii) any other amount due hereunder within ten (10) days after such amount is due.

(b) Breach of Representations and Warranties. Any representation or warranty made by the Borrower to the Noteholder herein contains an untrue or misleading statement of a material fact as of the date made.

(c) Cross-Defaults. The Borrower fails to pay when due any of its material debt (other than debt arising under this Note), or any interest or premium thereon, when due and such failure continues after the applicable grace period, if any, specified in the agreement or instrument relating to such debt.

(d) Bankruptcy; Insolvency.

(i) The Borrower institutes a voluntary case seeking relief under any law relating to bankruptcy, insolvency, reorganization, or other relief for debtors.

(ii) An involuntary case is commenced under any law relating to bankruptcy or insolvency and is not stayed or dismissed within ninety (90) days.

(iii) The Borrower makes a general assignment for the benefit of creditors.

(iv) The Borrower is unable, or admits in writing its inability, to pay Borrower's debts as they become due.

(v) A case is commenced against the Borrower or Borrower's assets seeking attachment, execution, or similar process against all or a substantial part of Borrower's assets and is not stayed or dismissed within ninety (90) days.

(e) Failure to Give Notice. The Borrower fails to give the notice of Event of Default specified in Section 6.

6. Notice of Event of Default. As soon as possible after it becomes aware that an Event of Default has occurred, and in any event within two (2) Business Days, the Borrower shall notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

7. Remedies. Upon the occurrence and during the continuance of an Event of Default, the Noteholder may, at its option, by written notice to the Borrower declare the outstanding principal amount of the Loan, accrued and unpaid interest thereon, and all other amounts payable hereunder immediately due and payable; *provided*, *however*, if an Event of Default described in

Sections 5(d)(iii) or 5(d)(iv) shall occur, the outstanding principal amount, accrued and unpaid interest, and all other amounts payable hereunder shall become immediately due and payable without notice, declaration, or other act on the part of the Noteholder.

8. Reinstatement. If any payment received by Noteholder hereunder is determined to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation, satisfaction and/or return of the payment and/or this Note, and shall not be discharged or satisfied with any prior payment or cancellation of this Note, but shall remain a valid and binding obligation enforceable, and such payment shall be immediately due and payable upon demand.

9. Expenses. If not defaulting, the Borrower shall pay no fees on this Note, other than interest.

10. Attorneys' Fees. If any party defaults under the terms of this Note, and another party employs an attorney to enforce this Note, whether or not legal proceedings are commenced, then such other party shall be entitled to recover from the defaulting party all reasonable attorneys' fees and other costs and expenses incurred in connection with such enforcement. If any party commences or is made a party to a lawsuit, arbitration or other proceeding to enforce or interpret this Note, the prevailing party in such proceeding shall be entitled to recover from the other party all reasonable attorneys' fees and other costs (whether otherwise taxable or recoverable) incurred in connection with such proceeding, including without limitation any appeal or enforcement of any judgment or decision rendered in such proceeding.

11. Full Payment. All amounts payable under this Note shall be paid in full without setoff, deduction or counterclaim. All amounts payable under this Note shall be free and clear of and without any deduction or withholding for or on account of any taxes, levies, penalties, duties, charges, fees, restrictions or conditions of any nature now or hereafter imposed by any federal, state, country or local government or any political subdivision or taxing authority thereof or therein. Borrower shall indemnify Noteholder against any such taxes, levies, imposts, duties, charges and fees (other than taxes on the income of Noteholder imposed by any taxing authority) which may be assessed against Noteholder or claimed or demanded from Noteholder in respect of any amount payable by Borrower hereunder, and against any costs, charges, expenses or liability arising out of or in respect of such assessment, claim or demand, to the fullest extent permitted by law.

12. Notices. All notices and other communications relating to this Note shall be in writing and shall be deemed given upon the first to occur of (x) deposit with the United States Postal Service or overnight courier service, properly addressed and postage prepaid; (y) transmittal by facsimile or e-mail properly addressed (with written acknowledgment from the intended recipient such as "return receipt requested" function, return e-mail, or other written acknowledgment); or (z) actual receipt by an employee or agent of the other party. Notices hereunder shall be sent to the following addresses, or to such other address as such party shall specify in writing:

(a) If to the Borrower:

OCI Limited
33 Cannon St
London EC4M 5SB
United Kingdom
Attn: Oliver Chapman, CEO
E-mail: oc@oci-group.co.uk

If to the Noteholder:

Camshaft Capital Fund, LP
175 SW 7th Street
Miami, FL 33130
E-mail: William Morton william@camshaftcapital.com

13. Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based on, arising out of, or relating to this Note and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of Florida.

14. Disputes.

(a) Submission to Jurisdiction.

(i) The Borrower irrevocably and unconditionally (A) agrees that any action, suit, or proceeding arising from or relating to this Note may be brought in the courts of the State of Florida sitting in Miami County, and in the United States District Court for the Southern District of Florida, and (B) submits to the exclusive jurisdiction of such courts in any such action, suit, or proceeding. Final judgment against the Borrower in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(ii) Nothing in this Section 14(a) shall affect the right of the Noteholder to bring any action, suit, or proceeding relating to this Note against the Borrower or its properties in the courts of any other jurisdiction.

(iii) Nothing in this Section 14(a) shall affect the right of the Noteholder to serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

(b) Venue. The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying of venue in any action, suit, or proceeding relating to this Note in any court referred to in Section 14(a), and (ii) the defense of inconvenient forum to the maintenance of such action, suit, or proceeding in any such court.

(c) Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

DocuSign Envelope ID: 16208E18-1E84-413B-B88D-A037147B439E

15. Successors and Assigns. Upon notice to the Borrower, this Note may be assigned or transferred by the Noteholder to any individual, corporation, company, limited liability company, trust, joint venture, association, partnership, unincorporated organization, governmental authority, or other entity.

16. Integration. This Note constitutes the entire contract between the Borrower and the Noteholder with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto.

17. Amendments and Waivers. No term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Borrower and the Noteholder. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

18. No Waiver; Cumulative Remedies. No failure by the Noteholder to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The rights, remedies, and powers herein provided are cumulative and not exclusive of any other rights, remedies, or powers provided by law.

19. Severability. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or render such term or provision invalid or unenforceable in any other jurisdiction.

20. Counterparts. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic ("pdf" or "tif") format shall be as effective as delivery of a manually executed counterpart of this Note.

21. Electronic Execution. The words "execution," "signed," "signature," and words of similar import in this Note shall be deemed to include electronic and digital signatures and the keeping of records in electronic form, each of which shall be of the same effect, validity, and enforceability as manually executed signatures and paper-based recordkeeping systems, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. § 7001 *et seq.*), the Electronic Signatures and Records Act of 1999 (N.Y. State Tech. Law §§ 301-309), and any other similar state laws based on the Uniform Electronic Transactions Act.

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date set forth on the first page.

OCI LIMITED

DocuSigned by:

By: Oliver Chapman
4706C6F87E83459...

Name: Oliver Chapman

Title: Director



4861-1196-7260, v.6
4855-0956-8797, v. 5

**CERTIFICATE OF SERVICE**

I, William D. Sullivan, hereby certify that on the 14th day of July 2025, a copy of the foregoing *Declaration of Oliver Philip Chapman in Support of Motion to Dismiss* was electronically filed and served via CM/ECF on all registered users of that system in accordance with Del. Bankr. L.R. 9036-1(b), and a courtesy copy was served via Electronic Mail on the parties listed below.

*Counsel for Byju's Alpha, Inc.*

Susheel Kirpalani, Esq.
Banjamin Finestone, Esq.
Daniel Holzman, Esq.
Jianjian Ye, Esq.
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
sushellkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholtzman@quinnemanuel.com
jianjianye@quinnemnuel.com

Robert S. Brady, Esq.
Kenneth J. Enos, Esq.
Jared W. Kochenash, Esq.
Timothy R. Powell, Esq.
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
100 N. King Stree
Wilmington, DE 19801
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

*Counsel to Glas Trust Company LLC*

Brian Schartz, P.C.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
brian.schartz@kirkland.com

Patrick J. Nash, Jr. , P.C.
Richard U.S. Howell, P.C.
Ravi Subramanian Shankar, Esq.
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
patrick.nash@kirkland.com
rhowell@kirkland.com
ravi.shankar@kirkland.com

Laura Davis Jones, Esq.
Peter J. Keane, Esq.
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
ljones@pszjlaw.com
pkeane@pszjlaw.com

July 14, 2025
Date

*/s/ William D. Sullivan*
William D. Sullivan

# EXHIBIT 11

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ----------------------------------------------------------X | |
| In re | Chapter 11 |
| BYJU'S ALPHA, INC., | Case No. 24-10140 (BLS) |
| Debtor. | |
| ----------------------------------------------------------X | |
| BYJU'S ALPHA, INC., | Adv. Pro. No. 25-50822 (BLS) |
| Plaintiff, | |
| -against- | |
| OCI LIMITED and RUPIN BANKER, | |
| Defendants. | |
| ----------------------------------------------------------X | |

**DEFENDANT OCI LIMITED'S MOTION TO DISMISS**
**OR IN THE ALTERNATIVE, TO STAY THIS CASE IN FAVOR OF ARBITRATION**

Defendant OCI Limited ("OCI"), by and through undersigned counsel, submits this Motion to Dismiss the Complaint filed by Byju's Alpha, Inc. (the "debtor" or "plaintiff") for lack of personal jurisdiction under Federal Rules of Civil Procedure ("Fed. R. Civ. P.) 12(b)(2), made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7012. Alternatively, based a written agreement dated April 4, 2022 (the "Byju's Alpha-OCI Agreement"), OCI seeks an order staying this proceeding in favor of arbitration. In support of this motion (the "Motion to Dismiss"), OCI relies on its *Memorandum of Law in Support of its Motion to Dismiss or in the Alternative, to Stay this Case in Favor of Arbitration* ("Memorandum of Law") filed contemporaneously herewith.

WHEREFORE, for the reasons set forth in the Memorandum of Law, OCI respectfully requests that the Court grant its Motion to Dismiss the Complaint for lack of personal

jurisdiction and without granting the debtor leave to replead or, in the alternative, stay this case in favor of arbitration, and grant such other and further relief as the Court deems just and proper.

Dated: July 14, 2025
Wilmington, Delaware

**SULLIVAN HAZELTINE ALLINSON LLC**

/s/ *William D. Sullivan*
William D. Sullivan (No. 2820)
Elihu E. Allinson (No. 3476)
919 North Market St., Ste. 420
Wilmington, Delaware 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
zallinson@sha-llc.com

and

**SULLIVAN & WORCESTER LLP**

Michael T. Sullivan
Anna Lea McNerney
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 660-3000
msullivan@sullivanlaw.com
amcnerney@sullivanlaw.com

-and-

Patrick P. Dinardo
Ryan Rosenblatt
1 Post Office Square
Boston, MA 02109
Tel.: (617) 338-2800
pdinardo@sullivanlaw.com
rrosenblatt@sullivanlaw.com

*Counsel for OCI Limited*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ------------------------------------------------------------X | |
| In re | Chapter 11 |
| BYJU'S ALPHA, INC., | Case No. 24-10140 (BLS) |
| Debtor. | |
| ------------------------------------------------------------X | |
| BYJU'S ALPHA, INC., | Adv. Pro. No. 25-50822 (BLS) |
| Plaintiff, | |
| -against- | **Related Docket No. ____** |
| OCI LIMITED and RUPIN BANKER, | |
| Defendants. | |
| ------------------------------------------------------------X | |

**ORDER GRANTING DEFENDANT OCI LIMITED'S MOTION TO DISMISS**
**OR IN THE ALTERNATIVE, TO STAY THIS CASE IN FAVOR OF ARBITRATION**

AND NOW, this ____ day of _____, 2028, having considered *Defendant OCI Limited's Motion to Dismiss or in the Alternative, to Stay This Case in Favor of Arbitration* (the "Motion"), Defendant's brief in support of the Motion, and any responses or replies to the Motion; and the Court finding that the Plaintiff lacks personal jurisdiction over Defendant OCI Limited with respect to the allegations contained in the Complaint (the "Complaint"); it is hereby

**ORDERED** that the Motion is granted as set forth herein; and it is further

**ORDERED** that the Complaint shall be, and hereby is, dismissed with prejudice as against OCI pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding pursuant to Rule 7012(b) of the Federal Rules of Bankruptcy Procedure; and it is further

**ORDERED** that Defendant, OCI Limited shall be, and hereby is dismissed from the Adversary Proceeding with prejudice.

_____________________________________
The Honorable Brendan L. Shannon
United States Bankruptcy Court

<u>**CERTIFICATE OF SERVICE**</u>

I, William D. Sullivan, hereby certify that on the 14th day of July 2025, a copy of the foregoing *Defendant OCI Limited's Motion to Dismiss or in the Alternative, to Stay This Case in Favor of Arbitration* was electronically filed and served via CM/ECF on all registered users of that system in accordance with Del. Bankr. L.R. 9036-1(b), and a courtesy copy was served via Electronic Mail on the parties listed below.

*Counsel for Byju's Alpha, Inc.*

Susheel Kirpalani, Esq.
Banjamin Finestone, Esq.
Daniel Holzman, Esq.
Jianjian Ye, Esq.
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
sushellkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholtzman@quinnemanuel.com
jianjianye@quinnemnuel.com

Robert S. Brady, Esq.
Kenneth J. Enos, Esq.
Jared W. Kochenash, Esq.
Timothy R. Powell, Esq.
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
100 N. King Stree
Wilmington, DE 19801
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

*Counsel to Glas Trust Company LLC*

Brian Schartz, P.C.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
brian.schartz@kirkland.com

Patrick J. Nash, Jr. , P.C.
Richard U.S. Howell, P.C.
Ravi Subramanian Shankar, Esq.
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
patrick.nash@kirkland.com
rhowell@kirkland.com
ravi.shankar@kirkland.com

Laura Davis Jones, Esq.
Peter J. Keane, Esq.
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
ljones@pszjlaw.com
pkeane@pszjlaw.com

July 14, 2025
Date

*/s/ William D. Sullivan*
William D. Sullivan

# EXHIBIT 12

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BYJU'S ALPHA, INC.,[1] | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 24-10140 (BLS) |
| | ) | |
| | ) | |
| BYJU'S ALPHA, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| GLAS TRUST COMPANY, LLC, | ) | |
| | ) | |
| Intervenor-Plaintiff, | ) | Adv. Pro. No. 25-50822 (BLS) |
| | ) | |
| v. | ) | |
| | ) | |
| OCI LIMITED and RUPIN BANKER | ) | **Hearing Date: TBD**<br>**Obj. Deadline: TBD** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEBTOR'S MOTION PURSUANT TO BANKRUPTCY RULE 9019**
**FOR ENTRY OF AN ORDER APPROVING COMPROMISE AND AGREEMENT**
**BETWEEN THE DEBTOR, GLAS TRUST COMPANY LLC, AND OCI LIMITED**

The Debtor submits this Motion for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), approving a settlement (the "Settlement") between the Debtor and Defendant OCI Limited ("OCI") in full and final satisfaction of the Debtor's claims against OCI (the "OCI Claims") as set forth in the adversary proceeding captioned, *BYJU's Alpha, Inc. v. OCI Ltd.*, Adv. No. 25-50822 (Bankr. D. Del.) (the "Adversary Proceeding"). A copy of the agreement, which sets forth the Settlement terms, is attached as Exhibit I to the Proposed Order.[2] In support of this Motion, the Debtor respectfully states as follows:

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is: 1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

[2] The parties' agreement has been filed under seal in accordance with the *Debtor's Motion, Pursuant to Section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018, for Entry of an Order Authorizing the Filing Under Seal of Certain Confidential Information Included in Debtor's Motion Pursuant to Bankruptcy Rule 9019 for*

## INTRODUCTION

1. The truth of what happened to the missing $533 million Alpha Funds has been an alarming mystery for a long time. But as part of its Settlement with the Debtor, OCI, a mediate transferee of the vast majority of that money, has agreed to come forward. The truth about what happened to the vast majority of the Alpha Funds is that they were, in effect, roundtripped right back to Byju Raveendran and his affiliates, which is both shocking given Raveendran's untruthful statements described below, and yet—given Raveendran's conduct before this Court to date—unsurprising at the same time.

2. For months, BYJU's enterprise, including directly via its eponymous founder, told shareholders,[3] lenders,[4] and the press[5] that the Alpha Funds remained in its possession. But then Raveendran changed the story completely. In an unsolicited, sworn declaration filed with the Court in fall of 2024, Raveendran repeatedly represented that the money actually had been sent to OCI for "legitimate commercial purposes," namely, to procure "services to T&L and its subsidiaries in relation to the procurement of IT equipment, such as electronic tablets, and advertising (including marketing *via* various media)." B. Raveendran Decl. ¶¶ 34, 38, 41.[6] Raveendran even went so far as to end his 10-page declaration by proclaiming his innocence, saying he hoped his explanation would "dispel[] any notion that I or any of the founding members

---

*Entry of an Order Approving Compromise and Agreement Between the Debtor, GLAS Trust Company LLC, and OCI Limited*, filed contemporaneously herewith.

[3] Compl. ¶ 76, *BYJU's Alpha, Inc. v. Raveendran*, Adv. Pro. No. 25-50526 (Bankr. D. Del. Apr. 9, 2025) [D.I. 1] (quoting a BYJU's email to shareholders, which "categorically denie[d] media reports which insinuated that BYJU's was no longer a beneficiary owner of the [Alpha Funds]"—instead representing that "an offshore subsidiary remains the beneficiary of the money").

[4] *Id.* ¶ 77 (memorializing Raveendran telling lenders, "[w]e have not touched that money," rather, "more than $500 million" still remains "in cash and cash equivalents").

[5] *Id.* ¶¶ 80, 82 (quoting two BYJU's press statements asserting that the Alpha Funds were "currently in a 100% non US subsidiary of BYJU's" and "safely parked in one of our subsidiaries").

[6] Declaration of Byju Raveendran ¶¶ 80, 82, *BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP*, Adv. Pro. No. 24-50013 (Bankr. D. Del. Oct. 9, 2024) [D.I. 371-1] (the "B. Raveendran Decl."). Even if true (which it is not), Raveendran's version of the story would still comprise a massive fraudulent transfer in respect of the Debtor.

of BYJU'S siphoned these funds for personal gain." *Id.* ¶ 41. Raveendran's sworn testimony has now been proven to be untrue.

3. **<u>Exhibit B</u>** to this Motion is the sworn declaration of OCI's founder Oliver Chapman, which itemizes down to the cent what happened to the Alpha Funds once OCI received the money. *Significantly, the Debtor has come to understand that a single former OCI representative, Defendant Rupin Banker, in conjunction with Raveendran, among others (not Chapman), abused OCI to facilitate a fraud on the Debtor and its creditors.*

4. The Alpha Funds were not used for "legitimate commercial purposes," as Raveendran swore to the world under penalty of perjury. Nor was the money used by OCI to procure goods and services, such as tablets and advertising, for T&L. The truth is far more sinister, as Chapman has laid bare, based on his own personal knowledge coupled with his review of documents in OCI's possession. In 2022, while the Debtor was in default on its obligations under the Credit Agreement, $533 million was clandestinely removed, with the intention that the vast majority of that money be moved (via a series of opaque transfers) to a corporate vehicle in Singapore—BYJU's Global Pte Ltd.—that Raveendran individually owned. Chapman's credible declaration, in other words, demonstrates that Raveendran's plot was to siphon hundreds of millions of dollars of corporate assets for personal use. This is what Raveendran, his brother Riju, and their cohorts seemingly have been covering up for the past 3+ years, and also apparently why they have been willing to flout one Court order after another rather than tell the truth.

5. OCI, in contrast, chose a different path. The information and other consideration being provided by OCI and Chapman under the Settlement provides important value to the Debtor and its estate, including in unravelling the truth behind what happened to the Alpha Funds and holding wrongdoers accountable, all without further delay and expense. To that point, the Debtor

has determined to discontinue further proceedings against OCI and that it has no basis to pursue a claim against Chapman. Claims against OCI and Chapman will be released.

6. As has been shown, the consideration being provided by OCI easily satisfies the standard under Federal Rule of Bankruptcy Procedure 9019. The Settlement is in the best interests of the Debtor, its estate, and its creditors, and it should be approved.

**JURISDICTION AND VENUE**

7. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "Amended Standing Order"). Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtor consents to a final order with respect to this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of the above-captioned chapter 11 case and this Motion is proper pursuant to 28 U.S.C. §§ 1408-09.

9. The statutory bases for the relief requested herein are section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**BACKGROUND**

**I. General Background**

10. On February 1, 2024 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code (this "Chapter 11 Case") in the Court. The Debtor is authorized to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108

of the Bankruptcy Code. No official committee has been appointed in this Chapter 11 Case, and no request has been made for the appointment of a trustee or an examiner. Additional information regarding the Debtor, its capital structure, and the circumstances leading to the filing of this Chapter 11 Case is set forth in the *Declaration of Timothy R. Pohl, Director, CEO, and Secretary of BYJU's Alpha, Inc., in Support of the Debtor's Chapter 11 Petition* [D.I. 3].

11. On October 29, 2025, the Court entered its Order [D.I. 517] confirming the *Amended Combined Disclosure Statement and Chapter 11 Plan of BYJU's Alpha, Inc.* [D.I. 475] (the "Plan"). The Plan has not yet gone effective.

**II. The Adversary Proceeding**

12. On May 5, 2025, the Debtor initiated the instant Adversary Proceeding against OCI and Banker. As set forth in greater detail in the Complaint [Adv. D.I. 1], the Debtor seeks to recover from OCI under section 550 of the Bankruptcy Code. The Debtor also brought claims against both OCI and Banker for aiding and abetting each of Camshaft Capital Management, Think & Learn Private Ltd., and Riju Ravindran's breaches of their fiduciary duties.

13. GLAS Trust Company LLC (solely in its capacity as Administrative Agent and as Collateral Agent) ("GLAS") filed a motion to intervene as a plaintiff on May 27, 2025, which was granted on July 8, 2025. Adv. D.I. 7, 22

14. OCI filed a motion to dismiss the Complaint on July 14, 2025. Adv. D.I. 23. That motion is fully briefed and is pending decision. *See* Adv. D.I. 24, 28, 34.

**III. The Settlement**

15. The parties have been engaged in discussions and/or settlement communications. After review and analysis of the positions and/or defenses set forth by OCI, and after good-faith, arm's-length negotiations, the Debtor and OCI have agreed to the terms of the Settlement, which

are set forth in the agreement attached as Exhibit I. For the avoidance of doubt, all claims asserted in the Adversary Proceeding against Banker shall remain pending.

**<u>RELIEF REQUESTED</u>**

16. By this Motion, the Debtor seeks entry of the Proposed Order approving the Settlement pursuant to Bankruptcy Rule 9019(a).

**<u>BASIS FOR RELIEF REQUESTED</u>**

17. Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Bankruptcy Rule 9019 further provides that after notice and a hearing, the Court may approve a proposed settlement or compromise. The decision whether to accept or reject a compromise lies within the sound discretion of the Court. *See In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 451 (Bankr. D.N.J. 1990). Approval of a settlement is appropriate if it is "fair, reasonable, and in the interest of the estate." *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997).

18. When analyzing settlements, courts in the Third Circuit generally consider the following factors (the "<u>Martin Factors</u>"):

(i) the probability of success in litigation;
(ii) the likely difficulties in collection;
(iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
(iv) the paramount interest of the creditors.

*See Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159 (3d Cir. 2002); *In re Martin*, 91 F.3d 389, 392 (3d Cir. 1996).

19. In addition to these four requirements, the Court must also consider "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (citing *Protective Comm. for Indep.*

*Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). The "ultimate inquiry" under Rule 9019 is "whether the compromise is fair, reasonable, and in the interest of the estate." *Marvel Entm't*, 222 B.R. at 249 (quoting *In re Louise's, Inc.*, 211 B.R. at 801). Importantly, it is well-established that a settlement proponent need not convince the Court that a settlement is the best possible compromise, but only that the settlement falls "within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 77–78 (Bankr. D. Del. 2012) ("In analyzing the compromise or settlement agreement under the Martin factors, courts should not have a 'mini trial' on the merits, but rather should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.").

20. In the Debtor's business judgment, the Settlement represents a fair compromise considering the circumstances, and it is reasonable and in the best interests of the Debtor, its estate, creditors, and other parties involved in this Chapter 11 Case. The Settlement results from good-faith, arm's-length negotiations between the parties, leading to an agreement that falls within the range of reasonable litigation outcomes. The Settlement offers a fair and practical resolution to the presented issues, which, if brought to litigation, would reduce the Debtor's limited resources and diminish creditor recoveries. The Settlement meets the relevant Martin Factors and, therefore, should be approved.

21. First, if the settling parties were unable to reach a consensual resolution, the Debtor would have to litigate the OCI Claims. The Debtor believes that the OCI Claims have merit and that they would be successful in the Adversary Proceeding. However, OCI denies the allegations made in the Complaint, and there are risks and costs associated with pursuing these claims, with no guarantee that the Court would rule in favor of the Debtor (notwithstanding the Debtor's

confidence in the OCI Claims). Moreover, even if the Debtor were successful in the litigation, the collectability of any judgment it might obtain against OCI is questionable. For these reasons and more, the Debtor believes that its business judgment is sound and that the proposed Settlement offers a reasonable and fair resolution of the OCI Claims.

22. Second, resolving the OCI Claims without the Settlement could require costly and time-consuming litigation, possibly requiring lengthy evidentiary proceedings before this Court. In contrast, the Settlement allows the Debtor to avoid the time and expenses associated with litigating the Adversary Proceeding, ultimately diminishing the assets of the Debtor's estate. Therefore, the Debtor believes that the Settlement provides a certain and timely resolution of the OCI Claims, which is in the best interest of all parties involved.

23. Finally, the paramount interest of creditors (and other parties in interest in this Chapter 11 Case) will undoubtedly be best served by approving the Settlement. Continued litigation with OCI regarding the OCI Claims will only increase the administrative costs of the Chapter 11 Case and, as noted, diminish recoveries for stakeholders. Additionally, considering the risk of an unfavorable outcome, reaching a final resolution of the OCI Claims, as outlined in the Settlement, is in the best interests of creditors. Therefore, in light of the delays and risks associated with litigation, the Debtor's decision to enter into the Settlement should be approved.

24. For the foregoing reasons, the Debtor respectfully submits that the terms of the Settlement satisfy the criteria for approval under Bankruptcy Rule 9019.

**NOTICE**

25. The Debtor will provide notice of this motion to: (a) Office of the United States Trustee for the District of Delaware; (b) counsel to GLAS; (c) counsel to OCI; (d) counsel to Banker; and (e) all parties that have filed a notice of appearance and request for service of papers

pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

WHEREFORE, the Debtor respectfully requests entry of the Proposed Order approving the Settlement and such other and further relief as the Court may deem just and proper.

Dated: November 15, 2025
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin Finestone (admitted pro hac vice)
Kate Scherling (admitted pro hac vice)
Jordan M. Nakdimon (admitted pro hac vice)
295 Fifth Avenue
New York, New York 10016
Tel.: (212) 849 7000
benjaminfinestone@quinnemanuel.com
katescherling@quinnemanuel.com
jordannakdimon@quinnemanuel.com

Counsel for Debtor, BYJU's Alpha, Inc.

# <u>Exhibit A</u>

## Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re:<br><br>BYJU'S ALPHA, INC.,[1]<br><br>Debtor. | ) | Chapter 11<br><br>Case No. 24-10140 (BLS) |
| BYJU'S ALPHA, INC.,<br>Plaintiff,<br><br>GLAS TRUST COMPANY LLC,<br><br>Intervenor-Plaintiff,<br><br>v.<br><br>OCI LIMITED and RUPIN BANKER<br><br>Defendants. | ) | Adv. Pro. No. 25-50822 (BLS) |

**ORDER APPROVING COMPROMISE AND AGREEMENT AMONG THE DEBTOR, GLAS TRUST COMPANY LLC, AND OCI LIMITED**

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtor and debtor in possession (the "Debtor") for entry of an order (this "Order"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure approving a settlement (the "Settlement") among the Debtor, GLAS Trust Company LLC (solely in its capacity as Administrative Agent and as Collateral Agent under a Credit and Guaranty Agreement dated as of November 24, 2021 with the Debor and others) ("GLAS"), and OCI Limited ("OCI") in full and final satisfaction of the Debtor's and GLAS's claims against OCI (but, for the avoidance of doubt, not Rupin Banker) as set forth in the adversary proceeding titled *BYJU's Alpha, Inc. v. OCI Ltd. & Rupin Banker*, Adv.

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is: 1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion.

No. 25-50822 (Bankr. D. Del.) (the "Adversary Proceeding"); and the Court finding that the Settlement is fair and reasonable; and the Court finding the Settlement satisfies the standards for approval of a compromise under Rule 9019 of the Federal Rules of Bankruptcy Procedure and applicable decisional case law; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required; and it appearing that this Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested in the Motion and provided for herein is in the best interest of the Debtor, its estate, and its creditors; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. The Motion is **GRANTED** as set forth herein.

2. The Settlement, the terms of which are set forth in the agreement attached hereto as Exhibit I, is hereby **APPROVED** in full and final settlement of the claims asserted against OCI in the Adversary Proceeding.

3. As set forth in this Court's *Findings of Fact, Conclusions of Law, and Order Confirming the Amended Combined Disclosure Statement and Chapter 11 Plan of BYJU's Alpha, Inc.* [D.I. 517], this Court shall have exclusive jurisdiction with respect to any claim, cause of action, proceeding, or motion against OCI or Oliver Chapman arising out of, or relating to, the subject matter of the Adversary Proceeding or the Settlement.

4. Without affecting the finality of this Order, this Court shall retain continuing jurisdiction (a) with respect to any and all matters arising from or related to the implementation of this Order and (b) to construe, enforce, and administer this Order.

# <u>Exhibit I</u>

## Agreement

**[Filed Under Seal]**

# Exhibit B

## Chapman Declaration

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BYJU'S ALPHA, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 24-10140 (BLS) |
| BYJU'S ALPHA, INC.,<br>Plaintiff,<br><br>GLAS TRUST COMPANY, LLC,<br><br>Intervenor-Plaintiff,<br><br>v.<br><br>OCI LIMITED and RUPIN BANKER<br><br>Defendants. | Adv. Pro. No. 25-50822 (BLS) |

**DECLARATION OF OLIVER PHILIP CHAPMAN**

Oliver Philip Chapman, pursuant to 28 U.S.C. § 1746, declares:

1. I am the chief executive officer of OCI Limited ("OCI"), a defendant in this proceeding. The statements set forth in this declaration are based on my personal knowledge or upon a review of OCI business records.

2. In 2022, OCI participated in transactions involving the Debtor, Byju Raveendran, Think & Learn Pvt. Ltd ("T&L"), and others. I was told at the time that the transactions would involve Think & Learn providing funds to OCI which OCI would use for the procurement of goods and services for T&L's benefit. On OCI's part, these transactions were entirely directed and arranged by Rupin

Banker. Moreover, I knew that Rupin Banker and Byju Raveendran were in regular direct contact over the period of these transactions. To the best of my understanding, all of Rupin Banker's dealings relating to the Alpha Funds (defined below) were at Byju Raveendran's direction or otherwise within Byju Raveendran's knowledge.

3. On or about the dates listed immediately below, OCI received the following funds, which derived from the Debtor (the "Alpha Funds"), from Camshaft Capital Fund, LP or its affiliate through Apex Fund Services or one of its affiliates:

a. 10th May 2022 (received 12th May) $300,000,000

b. 12th July 2022 (received 14th July) $190,812,292.89

c. 15th July 2022 $15,095,142.91

**Total: $505,907,436**

4. Of these funds $13,182,215 were transferred to companies that appear to be involved in Think & Learn's procurement activities, including:

a. Google LLC

i. 28th June 2022 $8,856,900.83

ii. 25th June 2022 $1,097,539.96

iii. 29th Nov 2022 $1,885,728.43

b. Sony India *(CULVER MAX ENTERTAINMENT PVT LTD)*

i. 30th June 2022 $1,342,045.83.

**Total: $13,182,215**

5. The lion's share of the funds were, however, transferred from OCI's accounts to a single entity, REVERE MASTER SPV LLC in four transactions:

i. 28th June 2022 $150,000,000 (in three $50m tranches)

ii. 29th June 2022 $103,750,000 (in two tranches of $50,000,000 and $53,750,000)

iii. 7th July 2022 $25,375,000

iv. 15th July 2022 $150,000,000
(in three $50m tranches)

v. 18th July 2022 $50,500,000

**Total: $479,625,000**

6. REVERE MASTER SPV LLC is a special purpose vehicle of Revere Securities LLP, a provider of investment banking and wealth management.

7. Furthermore, related documents in OCI's possession have been reviewed that demonstrate the intention of those controlling these funds was that almost all were to be transferred on from that recipient to a Singapore corporation, Byju's Global Pte Ltd (Byju's Global).

8. The $13,100,220.80 remaining was transferred at the direction of Rupin Banker to him, for his benefit, or at his direction for the benefit of third parties.

9. Accordingly, OCI did ***not*** use the vast majority of the Alpha Funds to provide outsourced procurement services to T&L (or its subsidiaries), as alleged by Byju Raveendran, in relation to the procurement of IT equipment, such as electronic tablets, and media/advertising. Rather, after receiving the Alpha Funds, at the direction of Byju Raveendran and Rupin Banker, OCI was caused to turn around and transfer the funds out as described above.

I declare under penalty of perjury under the laws of the United States of America that foregoing is true and correct.

Executed on 15th November 2025.

By……………………..

Name: Oliver Chapman