MORGAN STANLEY SENIOR FUNDING INC., as Lender

By: ______________________________
Name: Andrew Earls
Title: Managing Director

FILED UNDER SEAL


GLAS TRUST COMPANY LLC, as Administrative Agent

By: [signature]
Name: LISHA JOHN
Title: VICE PRESIDENT

[*Signature Page to Project Bright Credit and Guaranty Agreement*]

GLAS TRUST COMPANY LLC, as Collateral Agent

By: ______________________
Name: LISHA JOHN
Title: VICE PRESIDENT

[*Signature Page to Project Bright Credit and Guaranty Agreement*]

**SCHEDULES**

Reference is hereby made to that certain Credit and Guaranty Agreement, dated as of [_____], 2021 (the "Agreement"), among BYJU's Alpha, Inc. as the Borrower, the Guarantors party thereto, the Lenders party thereto, GLAS Trust Company LLC, as Administrative Agent and as Collateral Agent, to which these Schedules (the "Schedules") are attached and made a part thereof. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement. Section references herein are to sections of the Agreement. The Schedules are provided on the terms and subject to the conditions of the Agreement.

The Schedules have been arranged into separate parts corresponding to subsections of the Agreement. Information set forth in any part of the Schedules shall be deemed to be disclosed for purposes of the corresponding clause, paragraph, section or subsection of the Agreement and no disclosure made in any particular part of the Schedules shall be deemed made in any other part unless (i) expressly made therein (by cross-reference or otherwise) or (ii) it is reasonably apparent on the face of such disclosure that such disclosure applies to such other representation, warranty or covenant, as applicable. No reference to or disclosure of any item or other matter in the Schedules shall be construed as an admission or indication that such item or other matter is material (nor shall it establish a standard of materiality for any purpose whatsoever) or that such item or other matter is required to be referred to or disclosed in the Schedules. The information set forth in the Schedules is disclosed solely for the purposes of the Agreement, and no information set forth herein shall be deemed to be an admission by the Parent Guarantor or any of its Subsidiaries to any third party of any matter whatsoever, including of any violation of applicable law or breach of any contractual or other obligation. Nothing contained in the Schedules is intended to broaden the scope of any representation or warranty contained in the Agreement.

For the avoidance of doubt, all content contained in the Schedules shall be subject to the terms of Section 10.12 of the Agreement.

**Schedule 1.1(a)**
**Core Assets**

**LIST OF APPROVED AND REGISTERED INDIAN TRADEMARKS- THINK AND LEARN PVT LTD**

| S No | Registration no | Trademark | Class |
|---|---|---|---|
| 1 | 3055340 | BYJU'S THE LEARNING APP | 9 |
| 2 | 3660210 | BYJU | 9 |
| 3 | 2621269 | BYJU'S CLASSES | 16 |
| 4 | 3660682 | BYJU'S | 16 |
| 5 | 3055343 | LOVE TO LEARN | 35 |
| 6 | 3055344 | COME FALL IN LOVE WITH LEARNING | 35 |
| 7 | 2302636 | BYJU'S | 41 |
| 8 | 3660211 | BYJU | 41 |
| 9 | 3660684 | BYJU'S THE LEARNING APP | 41 |
| 10 | 3660685 | Device of B | 41 |
| 11 | 3660687 | BYJU'S | 41 |
| 12 | 3055342 | BIJU'S | 42 |
| 13 | 3660686 | BYJU'S | 42 |
| 14 | 3660680 | Device of 'B' (New Logo) | 9 |
| 15 | 3891972 | BYJU'S | 9 |
| 16 | 3891973 | BYJU'S | 41 |
| 17 | 3891974 | BYJU'S | 16 |
| 18 | 3891975 | BYJU'S | 42 |
| 19 | 3055341 | BYJU'S-THE LEARNING APP- | 41 |
| 20 | 3932829 | BYJUS THE LEARNING APP- | 9 |
| 21 | 3932830 | BYJUS THE LEARNING APP- | 16 |
| 22 | 3932831 | BYJUS THE LEARNINGAPP- | 41 |
| 23 | 3932832 | BYJUS THE LEARNING APP | 42 |
| 24 | 3660679 | BYJU'S | 9 |
| 25 | 3660681 | BYJU'S THE LEARNING APP | 9 |
| 26 | 3660209 | BYJU'S | 41 |
| 27 | 3660214 | THE LEARNING APP | 41 |
| 28 | 3660216 | THE LEARNING APP | 9 |
| 29 | 3660683 | BYJU'S | 41 |
| 30 | 3660208 | BYJU'S | 9 |
| 31 | 4392392 | BYJU'S | 24 |
| 32 | 4392391 | BYJU'S | 18 |
| 33 | 4391515 | BYJU'S with Device of B | 25 |
| 34 | 4387134 | BYJU'S | 25 |
| 35 | 4392393 | BYJU'S | 28 |
| 36 | 4392394 | BYJU'S | 35 |
| 37 | 3660213 | LOVE TO LEARN | 41 |
| 38 | 4488799 | BYJU'S Learn Pad | 41 |
| 39 | 4488800 | BYJU'S Learn Station | 41 |

| | | | |
|---|---|---|---|
| 40 | 4717955 | BYJUS Keep Learning | 41 |
| 41 | 4717956 | BYJUS Keep Learning | 41 |
| 42 | 4735792 | BYJU'S LearnPad | 9 |
| 43 | 4757319 | BYJU'S Learn Station | 9 |
| 44 | 4870727 | BYJU'S Magic Workbooks along with device of B | 9 |
| 45 | 4870728 | BYJU'S Magic Workbooks along with device of B | 16 |
| 46 | 4870729 | BYJU'S Magic Workbooks along with device of B | 41 |
| 47 | 4891040 | BYJU'S Classes with device of B | 16 |
| 48 | 4891042 | BYJU'S Classes (Word) | 41 |
| 49 | 4891041 | BYJU'S Classes with device of B | 41 |
| 50 | 4938709 | BYJU'S FUTURE SCHOOL with device of B | 9 |
| 51 | 4938710 | BYJU'S FUTURE SCHOOL with device of B | 16 |
| 52 | 4938706 | BYJU'S FUTURE SCHOOL with device of B | 42 |

**LIST OF APPROVED AND REGISTERED COPYRIGHTS - THINK AND LEARN PVT LTD**

| S No | Diary No. | Copyright |
|---|---|---|
| 1 | 14767/2017-CO-A | BYJU'S-THE LEARNING APP- |
| 2 | A-137500/2021 | B BYJU'S |
| 3 | A-137624/2021 | DEVICE OF B |

**LIST OF APPROVED AND REGISTERED INTERNATIONAL TRADEMARKS - THINK AND LEARN PVT LTD**

| S. No. | Registration no | Trademark | Class | Jurisdiction |
|---|---|---|---|---|
| 1 | 4201761 | BYJU'S | 99 (9 & 41) | INDIA |
| 2 | 4201762 | Device of B BYJU'S The Learning App | 99 (9 & 41) | INDIA |
| 3 | 2019/6340 | BYJU'S | 9 | KUWAIT |
| 4 | 2019/6339 | BYJU'S | 41 | KUWAIT |
| 5 | 2019/6338 | BYJU'S THE LEARNING APP | 9 | KUWAIT |
| 6 | 2019/6337 | BYJU'S THE LEARNING APP | 41 | KUWAIT |
| 7 | 312245 | BYJU'S | 9 | UAE |
| 8 | 312246 | BYJU'S | 41 | UAE |
| 9 | 312247 | BYJU'S THE LEARNING APP | 9 | UAE |
| 10 | 312248 | BYJU'S THE LEARNING APP | 41 | UAE |
| 11 | 133288 | BYJU'S THE LEARNING APP | 9 | QATAR |
| 12 | 133289 | BYJU'S THE LEARNING APP | 41 | QATAR |
| 13 | 133286 | BYJU'S | 9 | QATAR |
| 14 | 133287 | BYJU'S | 41 | QATAR |
| 15 | 312245 | BYJU'S | 9 | QATAR |
| 16 | 312246 | BYJU'S | 41 | QATAR |
| 17 | 312247 | BYJU'S THE LEARNING APP | 9 | QATAR |
| 18 | 312248 | BYJU'S THE LEARNING APP | 41 | QATAR |
| 19 | 198411 | BYJU'S | 9 | SAUDI ARABIA |

| | | | | |
|---|---|---|---|---|
| 20 | 198412 | BYJU’S | 41 | SAUDI ARABIA |
| 21 | 198415 | BYJU’S THE LEARNING APP | 9 | SAUDI ARABIA |
| 22 | 198416 | BYJU’S THE LEARNING APP | 41 | SAUDI ARABIA |
| 23 | 1440031097 | BYJU’S | 9 | SAUDI ARABIA |
| 24 | 1440031099 | BYJU’S | 41 | SAUDI ARABIA |
| 25 | 1440031101 | BYJU’S THE LEARNING APP | 9 | SAUDI ARABIA |
| 26 | 1440031102 | BYJU’S THE LEARNING APP | 41 | SAUDI ARABIA |
| 27 | 2540993 | BYJU’S FUTURE SCHOOL (Logo) | 9 | Mexico |
| 28 | 2541260 | BYJU’S FUTURE SCHOOL (Logo) | 16 | Mexico |
| 29 | 2540991 | BYJU’S FUTURE SCHOOL (Logo) | 41 | Mexico |
| 30 | 2540997 | BYJU’S FUTURE SCHOOL (Logo) | 42 | Mexico |
| 31 | 2574691 | BYJU'S FutureSchool (Word Mark) | 9 | Mexico |
| 32 | 2574687 | BYJU'S FutureSchool (Word Mark) | 41 | Mexico |
| 33 | 2517167 | BYJU’S (Word Mark) | 41 | Mexico |
| 34 | 2517109 | BYJU’S (Word Mark) | 42 | Mexico |
| 35 | 2516999 | B BYJU’S The Learning App (Device) | 9 | Mexico |
| 36 | 2517101 | B BYJU’S The Learning App (Device) | 16 | Mexico |
| 37 | 2517060 | B BYJU’S The Learning App (Device) | 41 | Mexico |
| 38 | 2517010 | B BYJU’S The Learning App (Device) | 42 | Mexico |
| 39 | 2517036 | BYJU’S (Word Mark) | 9 | Mexico |
| 40 | 2517002 | BYJU’S (Word Mark) | 16 | Mexico |
| 41 | 42021509630 | BYJU’S FUTURE SCHOOL (Logo) | 9 | PHILIPPINES |
| 42 | 42021509631 | BYJU’S FUTURE SCHOOL (Logo) | 16 | PHILIPPINES |
| 43 | | BYJU’S FUTURE SCHOOL (Logo) | 41 | PHILIPPINES |
| 44 | 42021509633 | BYJU’S FUTURE SCHOOL (Logo) | 42 | PHILIPPINES |
| 45 | 40202109676V | BYJU’S FUTURE SCHOOL (Logo) | 9 | SINGAPORE |
| 46 | 40202109674T | BYJU’S FUTURE SCHOOL (Logo) | 16 | SINGAPORE |
| 47 | 40202109671U | BYJU’S FUTURE SCHOOL (Logo) | 42 | SINGAPORE |
| 48 | 1177060 | BYJU’S FUTURE SCHOOL (Logo) | 9 | NEW ZEALAND |
| 49 | 1177059 | BYJU’S FUTURE SCHOOL (Logo) | 16 | NEW ZEALAND |
| 50 | 1177058 | BYJU’S FUTURE SCHOOL (Logo) | 41 | NEW ZEALAND |
| 51 | 2042555 | BYJU’S | 9 & 41 | AUSTRALIA |
| 52 | 2038144 | BYJU’S THE LEARNING APP | 9 & 41 | AUSTRALIA |
| 53 | 1491582 | BYJU’S | 9 & 41 | EUROPEAN UNION |
| 54 | 1487239 | BYJU’S THE LEARNING APP | 9 & 41 | EUROPEAN UNION |
| 55 | 18464629 | BYJU’S FUTURE SCHOOL (Logo) | 9 | EUROPEAN UNION |
| 56 | 18464629 | BYJU’S FUTURE SCHOOL (Logo) | 16 | EUROPEAN UNION |

| | | | | |
|---|---|---|---|---|
| 57 | 18464629 | BYJU’S FUTURE SCHOOL (Logo) | 41 | EUROPEAN UNION |
| 58 | 18464629 | BYJU’S FUTURE SCHOOL (Logo) | 42 | EUROPEAN UNION |
| 59 | 1491582 | BYJU’S | 9 & 41 | NEW ZEALAND |
| 60 | 1487239 | BYJU’S THE LEARNING APP | 9 & 41 | NEW ZEALAND |
| 61 | 1491582 | BYJU’S | 9 & 41 | PHILIPPINES |
| 62 | M11487239 | BYJU’S THE LEARNING APP | 9 & 41 | PHILIPPINES |
| 63 | M11491582 | BYJU’S | 9 & 41 | SINGAPORE |
| 64 | 1487239 | BYJU’S THE LEARNING APP | 9 & 41 | SINGAPORE |
| 65 | 1491582 | BYJU’S | 9 & 41 | UNITED KINGDOM |
| 66 | 1487239 | BYJU’S THE LEARNING APP | 9 & 41 | UNITED KINGDOM |
| 67 | UK00003631647 | BYJU’S FUTURE SCHOOL (Logo) | 9 | UNITED KINGDOM |
| 68 | UK00003631644 | BYJU’S FUTURE SCHOOL (Logo) | 16 | UNITED KINGDOM |
| 69 | UK00003631643 | BYJU’S FUTURE SCHOOL (Logo) | 41 | UNITED KINGDOM |
| 70 | UK00003631638 | BYJU’S FUTURE SCHOOL (Logo) | 42 | UNITED KINGDOM |
| 71 | 1491582 | BYJU’S | 9 & 41 | RUSSIA |
| 72 | 1487239 | BYJU’S THE LEARNING APP | 9 & 41 | RUSSIA |
| 73 | 1487239 | BYJU’S THE LEARNING APP | 9 & 41 | JAPAN |
| 74 | 1491582 | BYJU’S | 9 & 41 | JAPAN |
| 75 | 1491582 | BYJU’S | 9 & 41 | OMAN |
| 76 | 1487239 | BYJU’S THE LEARNING APP | 9 & 41 | OMAN |
| 77 | 1491582 | BYJU’S | 9 & 41 | IRELAND |
| 78 | 1487239 | BYJU’S THE LEARNING APP | 9 & 41 | IRELAND |
| 79 | 1491582 | BYJU’S | 9 & 41 | BAHRAIN |
| 80 | 1487239 | BYJU’S THE LEARNING APP | 9 & 41 | BAHRAIN |

**LIST OF APPROVED AND REGISTERED TRADEMARKS- WHITEHAT EDUCATION PRIVATE LTD**

| S No | Reg No. | Mark | Class | Country |
|---|---|---|---|---|
| 1 | 4252284 | Whitehat Jr | 9 | India |
| 2 | 4251271 | Whitehat Jr | 41 | India |
| 3 | 4143790 | Whitehat Jr | 9 | India |
| 4 | 4143802 | Whitehat Jr | 41 | India |
| 5 | 4765358 | Whitehat Jr | 38 | India |
| 6 | 4765361 | Whitehat Jr | 38 | India |
| 7 | 4765363 & 4765364 | Whitehat Jr | 9 & 41 | India |
| 8 | 1583486 | Whitehat Jr | 41 | Philippines |
| 9 | 1583512 | Whitehat Jr | 41 | Philippines |
| 10 | 4834338 | Whitehat Jr | 41 | India |
| 11 | 1589917 | Whitehat Jr | 9 | Belgium |
| 12 | 1589917 | Whitehat Jr | 9 | Netherlands |
| 13 | 1589917 | Whitehat Jr | 9 | Luxembourg |
| 14 | 1592708 | Whitehat Jr | 9 | Belgium |
| 15 | 1592708 | Whitehat Jr | 9 | Netherlands |
| 16 | 1592708 | Whitehat Jr | 9 | Luxembourg |
| 17 | 1583512 | Whitehat Jr | 41 | New Zealand |
| 18 | UK00003576153 | Whitehat Jr | 9 & 41 | United Kingdom |
| 19 | UK00003576159 | Whitehat Jr | 9 & 41 | United Kingdom |
| 20 | 1583512 | Whitehat Jr | 41 | Austria |
| 21 | 1583486 | Whitehat Jr | 41 | Austria |
| 22 | 1583512 | Whitehat Jr | 41 | Singapore |
| 23 | 1583486 | Whitehat Jr | 41 | Singapore |
| 24 | 1583486 | Whitehat Jr | 41 | France |
| 25 | 1589917 | Whitehat Jr | 9 | France |
| 26 | 1583512 | Whitehat Jr | 41 | France |
| 27 | 1583512 | Whitehat Jr | 41 | Germany |
| 28 | 1592708 | Whitehat Jr | 9 | Spain |
| 29 | 1589917 & 1583486 | Whitehat Jr | 9 & 41 | Australia |
| 30 | 1592708 & 1583512 | Whitehat Jr | 9 & 41 | Australia |

**LIST OF APPROVED AND REGISTERED TRADEMARKS- TANGIBLE PLAY INC**

| S No | Registration no | MARK | Class | COUNTRY |
|---|---|---|---|---|
| 1 | 1322418 | AWBIE | 9 | China |
| 2 | 1322418 | AWBIE | 9 | European Union |
| 3 | 1322418 | AWBIE | 9 | International Bureau (WIPO) |
| 4 | UK00801322418 | AWBIE | 9 | United Kingdom |
| 5 | 5370752 | AWBIE | 9 | United States of America |
| 6 | UK00003566811 | ENCHANTED WORLD GAMES | 9 | United Kingdom |
| 7 | UK00003566816 | MATH WIZARD | 9 | United Kingdom |
| 8 | 6175462 | MO | 9 | United States of America |
| 9 | TMA1069044 | OSMO | 9 | Canada |
| 10 | 16417605 | OSMO | 42 | China |
| 11 | 16417606 | OSMO | 41 | China |
| 12 | 16417607 | OSMO | 28 | China |
| 13 | 16417608 | OSMO | 9 | China |
| 14 | 22751047 | OSMO | 9 | China |
| 15 | 27236219 | OSMO | 28 | China |
| 16 | 013272125 | OSMO | 28 | European Union |
| 17 | 1607544 | OSMO | 28 | International Bureau (WIPO) |
| 18 | UK00913272125 | OSMO | 28 | United Kingdom |
| 19 | 4883244 | OSMO | 28 | United States of America |
| 20 | 1478847 | OSMO DETECTIVE AGENCY | 9 | European Union |
| 21 | 1478847 | OSMO DETECTIVE AGENCY | 9 | International Bureau (WIPO) |
| 22 | UK00801478847 | OSMO DETECTIVE AGENCY | 9 | United Kingdom |
| 23 | 6449205 | OSMO DETECTIVE AGENCY | 9 | United States of America |
| 24 | 1511273 | OSMO LITTLE GENIUS | 9 | European Union |
| 25 | 1511273 | OSMO LITTLE GENIUS | 9 | India |
| 26 | 1511273 | OSMO LITTLE GENIUS | 9 | International Bureau (WIPO) |
| 27 | 1511273 | OSMO LITTLE GENIUS | 9 | Japan |
| 28 | UK00801511273 | OSMO LITTLE GENIUS | 9 | United Kingdom |
| 29 | 88484374 | OSMO LITTLE GENIUS | 9 | United States of America |
| 30 | 88953764 | OSMO LIVE | 42 | United States of America |
| 31 | 1431346 | OSMO SUPER STUDIO | 9 | Australia |
| 32 | 1431346 | OSMO SUPER STUDIO | 9 | European Union |
| 33 | 1431346 | OSMO SUPER STUDIO | 9 | International Bureau (WIPO) |
| 34 | UK00801431346 | OSMO SUPER STUDIO | 9 | United Kingdom |
| 35 | 5776886 | OSMO SUPER STUDIO | 9 | United States of America |
| 36 | 1477967 | OSMO TOWN | 9 | European Union |
| 37 | 1477967 | OSMO TOWN | 9 | International Bureau (WIPO) |
| 38 | UK00801477967 | OSMO TOWN | 9 | United Kingdom |
| 39 | 88106559 | OSMO TOWN | 9 | United States of America |

| | | | | |
|---|---|---|---|---|
| 40 | 5770917 | SUPER STUDIO | 9 | United States of America |
| 41 | 16417609 | TANGIBLE PLAY | 42 | China |
| 42 | 16417610 | TANGIBLE PLAY | 41 | China |
| 43 | 16417611 | TANGIBLE PLAY | 28 | China |
| 44 | 16417612 | TANGIBLE PLAY | 9 | China |
| 45 | 013272091 | TANGIBLE PLAY | 28 | European Union |
| 46 | UK00913272091 | TANGIBLE PLAY | 28 | United Kingdom |
| 47 | 87878521 | TANGIBLE PLAY | 28 | United States of America |

**LIST OF APPROVED AND REGISTERED TRADEMARKS- GREAT LEARNING**

| **S No** | **Registration no** | **MARK** | **Class** | **COUNTRY** |
|---|---|---|---|---|
| 1 | 4085995 | GL | 41 | India |

**LIST OF APPS**

| S No | Store | App name | App id |
|---|---|---|---|
| 1 | Google Play store | Aakash App for JEE & NEET | com.byjus.aakash.thelearningapp |
| 2 | Google Play store | BYJU'S FutureSchool Math | com.byjus.bfs |
| 3 | Google Play store | BYJU'S KG, Std.1-3 \| Disney • BYJU'S Early Learn | com.byjus.k3 |
| 4 | Google Play store | BYJU'S – The Learning App | com.byjus.thelearningapp |
| 5 | Apple Store | BYJU'S - The Learning App | 1015059076 |
| 6 | Apple Store | BYJU'S FutureSchool Math | 1579021128 |
| 7 | Apple Store | BYJU'S App - Class 4 & 5 | 1190253184 |
| 8 | Apple Store | Disney • BYJU'S Early Learn | 1470583693 |
| 9 | Apple Store | Aakash App for JEE & NEET | 1558431947 |
| 10 | Google Play store | Great Learning App | com.lms.greatlakes |
| 11 | Apple Store | Great Learning App | 1016344161 |

**LIST OF DOMAINS**

1. www.byjus.com
2. www.byjusclasses.com
3. www.whitehatjr.com
4. www.playosmo.com
5. www.aakash.ac.in
6. www.toppr.com
7. www.byjusexamprep.com
8. www.gradeup.co
9. www.meritnation.com
10. www.greatlearning.in
11. www.mygreatlearning.com
12. www.byjus.net
13. www.thinkandlearn.co.in

**Schedule 2.1**
**Term Commitments**

| **Lender** | **Term Commitment** |
|---|---|
| Morgan Stanley Senior Funding Inc. | 1,200,000,000 |

**Schedule 3.6**
**Disclosed Matters**

None

FILED UNDER SEAL


**Schedule 3.10(a)**
**U.S. Plans**

None

**Schedule 3.12**
**Restricted Subsidiaries**

| Current Entity Owned | Record/Beneficial Owner | Direct or Indirect Percentage of Ownership of the Parent Guarantor | Material Subsidiary (Y/N) |
|---|---|---|---|
| WhiteHat Education Technology Pvt Ltd. | Think & Learn Pvt Ltd | 100% | Y |
| Tangible Play Inc | Think & Learn Pvt Ltd | 100% | Y |
| Great Learning Education Pte. Ltd. | BYJU'S Pte Ltd (56.5%)<br>Think & Learn Pvt Ltd (35.7%) | 92.2% | Y |
| Aakash Educational Services Ltd* | Think & Learn Pvt Ltd | 29.48% | Y |
| BYJU'S Pte Ltd | Think & Learn Pvt Ltd | 100% | N |
| Specadel Technologies Pvt Ltd* | Think & Learn Pvt Ltd | 100% | N |
| Span Thoughtworks Pvt Ltd* | Think & Learn Pvt Ltd | 100% | N |
| BYJU'S K3 Education Pvt Ltd | Think & Learn Pvt Ltd | 100% | N |
| BYJU'S Inc | Think & Learn Pvt Ltd | 100% | N |
| Inspilearn LLC | Think & Learn Pvt Ltd | 100% | N |
| Toppr Technologies Pvt Ltd* | Think & Learn Pvt Ltd | 70% | N |
| Grade Stack Learning Private Ltd* | Think & Learn Pvt Ltd | 29.8% | N |
| Aakash Edutech Pvt Ltd | Aakash Educational Services Ltd (100%) | 29.48% | N |
| Haygot Services Private Limited | Toppr Technologies Pvt Ltd | 70% | N |
| WhiteHat Education Technology LLC | WhiteHat Education Technology Pvt Ltd. | 100% | N |
| Digital Aristotle Pvt Ltd | BYJU'S K3 Education Pvt Ltd | 100% | N |

| Current Entity Owned | Record/Beneficial Owner | Direct or Indirect Percentage of Ownership of the Parent Guarantor | Material Subsidiary (Y/N) |
|---|---|---|---|
| Inspilearn Education Pvt Ltd | BYJU'S K3 Education Pvt Ltd | 100% | N |
| Tangible Play B.V. | Tangible Play Inc | 100% | N |
| BYJUS TECHNOLOGIA EDUCACIONAL LTDA | BYJU'S Pte Ltd | 100% | N |
| Byjus S.A de C.V. | BYJU'S Pte Ltd | 100% | N |
| BYJU'S Alpha, Inc | BYJU'S Pte Ltd | 100% | N |
| BYJU'S Beta, Inc | BYJU'S Pte Ltd | 100% | N |
| BYJU'S UK Ltd | BYJU'S Pte Ltd | 100% | N |
| Codr Inc | Inspilearn LLC | 100% | N |

* Denotes entities which are currently intended to merge with the Parent Guarantor.

**Schedule 5.11**
**Unrestricted Subsidiaries**

None

**None. Schedule 5.13**
**Post-Closing Obligations**

Where this Schedule 5.13 requires any action to be taken or any other requirement to be satisfied, the Borrower shall deliver evidence thereof to the Administrative Agent promptly after such action is taken or such requirement is satisfied.

Singapore

| | DATE | ACTIONS AND OTHER REQUIREMENTS |
|---|---|---|
| **1** | Within 30 days of the Effective Date. | Each of the Singapore Loan Parties shall deliver a notice of charge over each deposit account and securities account owned by it in Singapore as of the Effective Date (which is not an Excluded Account) pursuant to the Singapore Security Agreements. |
| **2** | Within 14 days of the Effective Date. | Each Singapore Loan Party shall pay (or cause to be paid) the stamp duties required by applicable law in connection with the execution of the following documents:<br>(a) this Agreement; and<br>(b) Debenture, dated as of the Effective Date, executed by BYJU's Pte. Ltd. |
| **3** | Within 30 days of the Effective Date. | Each Singapore Loan Party shall register (or cause to be registered) the Collateral Agent's security interest in the Collateral under each Singapore Security Agreement with the Accounting and Corporate Regulatory Authority in Singapore and with each other registry or office where such registration is required for perfection under applicable law (including the filing of an electronic statement containing particulars of charge in respect of each of the Singapore Security Agreements and the U.S. Pledge Agreement, dated as of the Effective Date by and between BYJU's Pte. Ltd. and the Collateral Agent). |
| **4** | Within 45 Business Days of the Effective Date. | Each Singapore Loan Party shall, to the extent applicable, file (or cause to be filed) the necessary filings with respect to Intellectual Property registered in Singapore in the appropriate registry or office in Singapore to satisfy the Collateral and Guarantee Requirement. |

United States

| | DATE | ACTIONS AND OTHER REQUIREMENTS |
|---|---|---|
| **1** | Within 120 days of the Effective Date | The Loan Parties shall cause each Material Real Estate Asset as of the Effective Date to be subject to a Lien pursuant to a mortgage, deed or similar document in favor of the Collateral Agent for the benefit of the |

| | | |
|---|---|---|
| | | Secured Parties and take such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect or record such Lien and to otherwise comply with the requirements of the Collateral and Guarantee Requirement |

India

| | **DATE** | **ACTIONS AND OTHER REQUIREMENTS** |
|---|---|---|
| **2** | On or prior to the date on which Whitehat India accedes as a Guarantor | A copy of the constitutional documents of Whitehat India amended to the satisfaction of the Collateral Agent (including to remove any references to the shareholders agreement dated 5 August 2020 entered into between Whitehat India, the Parent Guarantor, Nexus Ventures V Ltd. Mr. Karan Bajaj, the employment agreement dated 5 August 2020 between Whitehat India and Mr. Karan Bajaj and all other related documents.) |
| **3** | Immediately following completion of the EPIC Merger. | The Parent Guarantor shall intimate the RBI of the EPIC Merger and shall request an updated UIN. |

**Schedule 6.1**
**Existing Indebtedness**

None

**Schedule 6.2(b)**
**Existing Liens**

None

**Schedule 6.5**
**Existing Restrictions**

None

**Schedule 6.6**
**Existing Transactions with Affiliates**

None

**Schedule 6.7**
**Existing Investments**

None

EXHIBIT A-1

**[FORM OF]**
**ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [NAME OF ASSIGNOR] (the "Assignor") and [NAME OF ASSIGNEE] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit and Guaranty Agreement identified below, receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex I attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the facility identified below (including any guarantees included in such facility) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| 1. | Assignor: | ______________________________<br>[Assignor [is] [is not] a Defaulting Lender] |
| 2. | Assignee: | ______________________________<br>[and is an Affiliate/Approved Fund of [identify Lender]] |
| 3. | Borrower: | BYJU's Alpha, Inc. (the "Borrower") |
| 4. | Administrative Agent: | GLAS Trust Company LLC as the administrative agent under the Credit Agreement |
| 5. | Credit Agreement: | Credit and Guaranty Agreement, dated as of [_____], 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent. |

6. Assigned Interest:

| Facility Assigned | Aggregate Amount of Term Loans for all Lenders | Amount of Term Loans Assigned | Percentage Assigned of Term Loans[1] |
|---|---|---|---|
| Term Facility | $ | $ | % |

Effective Date: __, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Administrative Agent a completed Administrative Questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]

By: ______________________________
Name:
Title:

[1] Set forth, to at least 9 decimals, as a percentage of the Term Loans of all Lenders thereunder.

ASSIGNEE

[NAME OF ASSIGNEE]

By: ________________________
Name:
Title:

Consented to and Accepted:

[_____], AS THE ADMINISTRATIVE AGENT

By: ________________________
Name:
Title:

[Consented to:

[Borrower]

By: ________________________
Name:
Title:][2]

[2] To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

Annex I
Exhibit A-1

CREDIT AGREEMENT

Standard Terms and Conditions for
Assignment and Assumption

1. Representations and Warranties.

1.1 Assignor. The Assignor: (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby, and (iv) it is [not] a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of their respective Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, (iv) any requirements under applicable law for the Assignee to become a lender under the Credit Agreement or to charge interest at the rate set forth therein from time to time, or (v) the performance or observance by the Borrower, any of their respective Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2. Assignee. The Assignee: (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement and under applicable law, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received and/or had the opportunity to review a copy of the Credit Agreement to the extent it has in its sole discretion deemed necessary, together with copies of the most recent financial statements delivered pursuant to Sections 5.1(a) and 5.1(b) thereof (or, prior to the first such delivery, the financial statements referred to in Section 3.4(a) thereof), as applicable, and such other documents and information as it has in its sole discretion deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on any Agent, any Arranger, the Assignor or any other Lender or any of their respective Related Parties, and (vi) attached to this Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; (b) agrees that it will, independently and without reliance on the Administrative Agent, the Arranger, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (c) appoints and authorizes each of the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Loan Documents as are delegated to or otherwise conferred upon the Administrative Agent or the Collateral Agent, as the case may be, by the terms thereof, together with such powers as are reasonably incidental thereto; and (d) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind and after the Effective Date to the Assignee.

3. Effect of Assignment. Upon the delivery of a fully executed copy hereof to the Administrative Agent, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent of the Assigned Interest and as provided in this Assignment and Assumption, have the rights and obligations of a Lender thereunder and under the other Loan Documents and (ii) the Assignor shall, to the extent as provided in this Assignment and Assumption, relinquish its rights and be released from its obligations under the Credit Agreement and the other Loan Documents to the extent of the Assigned Interest.

4. General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. This Assignment and Assumption incorporates herein the electronic execution provisions set forth in the Credit Agreement as if such provisions were set forth herein, *mutatis mutandis*. THIS ASSIGNMENT AND ASSUMPTION SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

EXHIBIT A-2

**[FORM OF]**
**AFFILIATED LENDER ASSIGNMENT AND ASSUMPTION**

This Affiliated Lender Assignment and Assumption (the "Affiliated Lender Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [NAME OF ASSIGNOR] (the "Assignor") and [NAME OF ASSIGNEE] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit and Guaranty Agreement identified below, receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex I attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Affiliated Lender Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the facility identified below (including any guarantees included in such facility) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Affiliated Lender Assignment and Assumption, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| 1. | Assignor: | ______________________ <br> [Assignor [is] [is not] a Defaulting Lender] |
| 2. | Assignee: | ______________________ <br> Assignee is an Affiliated Lender [and an Affiliate/Approved Fund of [identify Lender]] |
| 3. | Borrower: | BYJU's Alpha, Inc., (the "Borrower") |
| 4. | Administrative Agent: | GLAS Trust Company LLC, as the administrative agent under the Credit Agreement |
| 5. | Credit Agreement: | Credit and Guaranty Agreement, dated as of [_____], 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent. |
| 6. | Assigned Interest: | |

| Facility Assigned | Aggregate Amount of Term Loans for all Lenders | Amount of Term Loans Assigned | Percentage Assigned of Term Loans[1] |
|---|---|---|---|
| Term Facility | $ | $ | % |

Effective Date:__, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Administrative Agent a completed Administrative Questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities), subject to Section 10.4(f) of the Credit Agreement, will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

The terms set forth in this Affiliated Lender Assignment and Assumption are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]

By: ______________________________
Name:
Title:

ASSIGNEE

[NAME OF ASSIGNEE]

By: ______________________________
Name:
Title:

Consented to and Accepted:

GLAS Trust Company LLC as the Administrative Agent

[1] Set forth, to at least 9 decimals, as a percentage of the Term Loans of all Lenders thereunder. After giving effect to Assignee's purchase and assumption of the Assigned Interest, the aggregate principal amount of Term Loans held together in the aggregate by Affiliated Lenders shall not exceed 5% of the aggregate principal amount of Term Loans then outstanding (calculated as of the date of such purchase).

By: ____________________________
Name:
Title:

[Consented to:

[Borrower]

By: ____________________________
Name:
Title:][2]

2 To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

Annex I

Exhibit A-2

CREDIT AGREEMENT

Standard Terms and Conditions for
Affiliated Lender Assignment and Assumption

1. Representations and Warranties.

1.1 Assignor. The Assignor: (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Affiliated Lender Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is [not] a Defaulting Lender; (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of their respective Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, (iv) any requirements under applicable law for the Assignee to become a lender under the Credit Agreement or to charge interest at the rate set forth therein from time to time, or (v) the performance or observance by the Borrower, any of their respective Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document; and (c) acknowledges that the Assignee is an Affiliated Lender and may possess material non-public information with respect to the Parent Guarantor and its Subsidiaries or the securities of any of them that has not been disclosed to the Lenders.

1.2. Assignee. The Assignee: (a) represents and warrants that (i) it is an Affiliated Lender and it has full power and authority, and has taken all action necessary, to execute and deliver this Affiliated Lender Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement and under applicable law, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender (including as an Affiliated Lender) thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender (including as an Affiliated Lender) thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received and/or had the opportunity to review a copy of the Credit Agreement to the extent it has in its sole discretion deemed necessary, together with copies of the most recent financial statements delivered pursuant to Sections 5.1(a) and 5.1(b) thereof (or, prior to the first such delivery, the financial statements referred to in Section 3.4(a) thereof), as applicable, and such other documents and information as it has in its sole discretion deemed appropriate to make its own credit analysis and decision to enter into this Affiliated Lender Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on any Agent, any Arranger, the Assignor or any other Lender or any of their respective Related Parties, (vi) attached to this Affiliated Lender Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee, and (vii) after giving effect to this Affiliated Lender Assignment and Assumption, the aggregate principal amount of all Term Loans then held by all Affiliated Lenders does not exceed 5% of the aggregate outstanding principal amount of the Term Loans; (b) agrees that it will, independently and without reliance on the Administrative Agent, the Arranger, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (c) appoints and authorizes each of the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Loan Documents as are delegated to or otherwise conferred upon the

Administrative Agent or the Collateral Agent, as the case may be, by the terms thereof, together with such powers as are reasonably incidental thereto; and (d) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind and after the Effective Date to the Assignee. 3. Effect of Assignment. Upon the delivery of a fully executed copy hereof to the Administrative Agent, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent of the Assigned Interest and as provided in this Affiliated Lender Assignment and Assumption, have the rights and obligations of a Lender thereunder and under the other Loan Documents and (ii) the Assignor shall, to the extent as provided in this Affiliated Lender Assignment and Assumption, relinquish its rights and be released from its obligations under the Credit Agreement and the other Loan Documents to the extent of the Assigned Interest.

4. General Provisions. This Affiliated Lender Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Affiliated Lender Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. This Affiliated Lender Assignment and Assumption incorporates herein the electronic execution provisions set forth in the Credit Agreement as if such provisions were set forth herein, *mutatis mutandis*. THIS AFFILIATED LENDER ASSIGNMENT AND ASSUMPTION SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

EXHIBIT B

**[FORM OF]**
**BORROWING REQUEST**

GLAS Trust Company LLC as the Administrative Agent
for the Lenders party to the Credit Agreement referred to below

Address: 3 Second Street, Suite 206, Jersey City, NJ 07311
Attention: Transaction Management
Facsimile: 212-202-6246
Email: clientservices.americas@glas.agency; TMGUS@glas.agency

[Date]

Ladies and Gentlemen:

Reference is hereby made to the Credit and Guaranty Agreement, dated as of [_____], 2021 (as it may be modified, supplemented, extended, amended, restated or amended and restated from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among BYJU's Alpha, Inc. as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC, as the Administrative Agent and the Collateral Agent. The Borrower hereby gives irrevocable notice, pursuant to Section 2.3 of the Credit Agreement, that it requests a Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 2.3 of the Credit Agreement:

(i) The Business Day of the Proposed Borrowing is [●]20__.[1]

(ii) The aggregate principal amount of the Proposed Borrowing is [________________][2].

*(cont'd)*

[1] Shall be a Business Day (a) at least three Business Days in the case of Eurodollar Borrowings (or, in respect of the Initial Term Loans, at least two Business Days) after the date hereof and (b) no later than the date of the proposed Borrowing in the case of ABR Borrowings, *provided* that any such notice shall be deemed to have been given on a certain day only if given not later than 12:00 p.m. (New York City time) in the case of Eurodollar Borrowings and not later than 11:00 a.m. (New York City time) in the case of ABR Borrowings on such day.

[2] Such amount to be stated in Dollars.

(iii) The Proposed Borrowing is to be [an ABR][a Eurodollar] Borrowing.

[(iv) The initial Interest Period for the Proposed Borrowing is [one/three/six/twelve] months and shall end on [_________________].][3]

(v) [The location and number of the account or accounts of the Borrower to which funds are to be disbursed is as follows:

[*Insert location and number of the account(s)*]]

The undersigned hereby certifies that the following statements will be true on the date of the Proposed Borrowing:

(A) the representations and warranties of the Loan Parties set forth in the Credit Agreement and in the other Loan Documents are true and correct in all material respects (other than to the extent qualified by materiality or "Material Adverse Effect", in which case, such representations and warranties are true and correct in all respects) on and as of the date of the Proposed Borrowing, except that (i) for purposes of this Borrowing Request, the representations and warranties contained in Section 3.4(a) of the Credit Agreement shall be deemed to refer (after the first delivery thereof) to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 5.1 of the Credit Agreement and (ii) to the extent that such representations and warranties specifically refer to an earlier date, they were true and correct in all material respects (other than to the extent qualified by materiality or "Material Adverse Effect", in which case, such representations and warranties were true and correct in all respects) as of such earlier date; and

(B) at the time of and immediately after giving effect to the Proposed Borrowing, no Default or Event of Default has occurred and is continuing.

[Signature Page Follows]

[3] To be included for a proposed Eurodollar Borrowing. Interest Periods of twelve months or less than one month only available with the consent of each Lender.

The Borrower has caused this Borrowing Request to be executed and delivered by its duly authorized Responsible Officer as of the date first written above.

Very truly yours,

BYJU's Alpha, Inc.

By: ______________________________
Name:
Title:

EXHIBIT C

**[FORM OF]**
**INTEREST ELECTION REQUEST**

GLAS Trust Company LLC as the Administrative Agent
for the Lenders party to the Credit Agreement referred to below

Address: 3 Second Street, Suite 206, Jersey City, NJ 07311
Attention: Transaction Management
Facsimile: 212-202-6246
Email: clientservices.americas@glas.agency; TMGUS@glas.agency

[Date]

Ladies and Gentlemen:

Reference is hereby made to the Credit and Guaranty Agreement, dated as of [_____], 2021 (as it may be modified, supplemented, extended, amended, restated or amended and restated from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among BYJU's Alpha, Inc. as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent. The Borrower hereby gives irrevocable notice pursuant to Section 2.5 of the Credit Agreement, that it requests to [convert][continue] the Borrowing of Term Loans referred to below, and in that connection sets forth below the information relating to such [conversion][continuation] (the "Proposed [Conversion][Continuation]") as required by Section 2.5 of the Credit Agreement:

(i) The Proposed [Conversion][Continuation] relates to the Borrowing of Term Loans originally made on ___________ ___, 20__ (the "Outstanding Borrowing") in the principal amount of $______ and currently maintained as [an ABR Borrowing][a Eurodollar Borrowing with an Interest Period ending on __, ______].

(ii) The effective date of the Proposed [Conversion] [Continuation] is ________________, ____[1].

(iii) The Outstanding Borrowing shall be [continued as a Eurodollar Borrowing with an Interest Period of [one/three/six/twelve] months ending on [_______]][converted into [an ABR Borrowing][a Eurodollar Borrowing with an Interest Period of [one/three/six/twelve] months ending on [_______]]].[2]

[The undersigned hereby certifies that no Event of Default has occurred and will be continuing on the date of the Proposed [Conversion][Continuation]].[3]

[Signature Page Follows]

---

1 Shall be a Business Day (a) at least three Business Days in the case of Eurodollar Borrowings after the date hereof and (b) no later than the date of the proposed conversion or continuation in the case of ABR Borrowings, *provided* that any such notice shall be deemed to have been given on a certain day only if given not later than 12:00 p.m. (New York City time) in the case of Eurodollar Borrowings and not later than 11:00 a.m. (New York City time) in the case of ABR Borrowings on such day.

2 Interest Period of twelve months or less than one month only available with the consent of each Lender. In the event that either (x) only a portion of the Outstanding Borrowing is to be so converted or continued or (y) the Outstanding Borrowing is to be divided into separate Borrowings with different Interest Periods, the Borrower should make appropriate modifications to this clause to reflect the same .

3 In the case of a Proposed Conversion or Continuation, insert this sentence only in the event that the conversion is from an ABR Borrowing to a Eurodollar Borrowing or in the case of a continuation of a Eurodollar Borrowing.

The Borrower has caused this Interest Election Request to be executed and delivered by its duly authorized Responsible Officer as of the date first written above.

Very truly yours,

BYJU's Alpha, Inc.

By: ______________________________
Name:
Title:

EXHIBIT D

**[FORM OF]**
**TERM LOAN NOTE**

New York, New York

_________________ ___, _____

FOR VALUE RECEIVED, [_____] (the "Borrower"), hereby promises to pay, jointly and severally, to __________________________ or its registered assigns (the "Lender"), in dollars, in immediately available funds, at the office of [_____] (the "Administrative Agent") as designated in writing by the Administrative Agent from time to time on the Term Loan Maturity Date (as defined in the Credit and Guaranty Agreement, dated as of [_____], 2021 (as it may be amended, restated, amended and restated, modified, extended and/or supplemented from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent, the unpaid principal amount of all Term Loans made by the Lender to the Borrower pursuant to the Credit Agreement, payable at such times and in such amounts as are specified in the Credit Agreement.

The Borrower promises also to pay to the Lender interest on the unpaid principal amount of each Term Loan incurred by the Borrower from the Lender in like money at said office from the date such Term Loan is made until paid at the rates and at the times provided in Section 2.10 of the Credit Agreement.

This promissory note (this "Note") is one of the Term Loan Notes referred to in the Credit Agreement, and is entitled to the benefits thereof and of the other Loan Documents. As provided in the Credit Agreement, this Note is subject to voluntary prepayment, in whole or in part, prior to the Term Loan Maturity Date and the Term Loans may be converted from one Type into another Type to the extent provided in the Credit Agreement.

In case an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Credit Agreement.

The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

FILED UNDER SEAL


BYJU's Alpha, Inc.

By: ________________________________
Name:
Title:

Exhibit D

EXHIBIT E

**[FORM OF]**
**COMPLIANCE CERTIFICATE**

This Compliance Certificate is delivered to you pursuant to Section 5.1(c) of the Credit and Guaranty Agreement, dated as of [_____], 2021 (as it may be amended, restated, amended and restated, modified, extended and/or supplemented from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), by and among BYJU's Alpha, Inc as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

1. I am the duly elected, qualified and acting [title of Financial Officer] of the Parent Guarantor].

2. I have reviewed and am familiar with the contents of this Compliance Certificate. I am providing this Compliance Certificate solely in my capacity as an officer of the Parent Guarantor.

3. I have reviewed the terms of the Credit Agreement and the other Loan Documents. The financial statements for the fiscal [quarter][year] of the Parent Guarantor ended [ ] attached hereto as ANNEX 1 or otherwise delivered to the Administrative Agent pursuant to the requirements of Section 5.1 of the Credit Agreement (the "Financial Statements") present fairly in all material respects as of the date of each such statement the financial condition and results of operations of the Parent Guarantor and its consolidated Restricted Subsidiaries on a consolidated basis (and with respect to the Parent Guarantor and its Restricted Subsidiaries, on a consolidating basis, as applicable) in accordance with GAAP consistently applied[, subject to normal year-end audit adjustments and the absence of footnotes][1].

4. No Default has occurred and is continuing as of the date hereof[, except for _____________][2].

5. There has been no change in GAAP or in the application thereof applicable to [the Parent Guarantor] and its consolidated Restricted Subsidiaries since the date of the audited financial statements referred to in Section 3.4 of the Credit Agreement that has had a material impact on the Financial Statements [,except for _____________, the effect of which on the Financial Statements has been [______________]][3].

6. [Attached hereto as ANNEX 2 or otherwise delivered to the Administrative Agent pursuant to the requirements of Section 5.1 of the Credit Agreement is (a) a reasonably detailed reconciliation of the financial statements delivered pursuant to clause (1) of Section 5.1(a) of the Credit Agreement indicating the extent to which any figures set forth therein are not attributable to the Loan Parties and (b) the annual consolidated (and, with respect to the Parent Guarantor and its Restricted Subsidiaries, consolidating) operating budget and projections of [the Parent Guarantor][Holdings] and its Subsidiaries showing the quarterly income statement, balance sheet and cash flow statements in reasonable detail, including for key segments.][4]

7. To my knowledge, all Uniform Commercial Code (or similar) financing statements and all other appropriate filings, recordings or registrations, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction identified in the documents delivered pursuant to clause (ii)(1) of Section 5.1(f) of the Credit Agreement to the extent necessary to effect, protect and perfect the

---

[1] To be included only if the Compliance Certificate is certifying the quarterly financials.

[2] Specify the details of any Default, if any, and any action taken or proposed to be taken with respect thereto.

[3] If and to the extent that any change in GAAP that has occurred since the date of the audited financial statements referred to in Section 3.4 of the Credit Agreement had an impact on such financial statements, specify the effect of such change on the financial statements accompanying this Compliance Certificate.

[4] To be included only if the Compliance Certificate is certifying the annual financials.

security interests under the Collateral Documents[, except for the following and as otherwise expressly permitted or set forth in the Loan Documents:

________________________________________________

________________________________________________ ].][5]

8. [Attached hereto as ANNEX 3 are the computations showing (in reasonable detail) the Consolidated Total Net Leverage Ratio as of, [6].][7]

[5] This certification may be given separately by a Responsible Officer of Parent Guarantor at the time of delivery of annual financial statements.

[6] Insert the last day of the fiscal year corresponding to the annual financial statements relating to this Compliance Certificate.

[7] To be included only if the Compliance Certificate is certifying the annual financials.

Case 26-50021-BLS Doc 2951 Filed 04/08/26 Page 425 of 1972

IN WITNESS WHEREOF, I have executed this Compliance Certificate as of the date first written above.

PARENT GUARANTOR

By: ________________________________
Name:
Title: [title of Financial Officer]

ANNEX 1

[Applicable Financial Statements to be attached if applicable]

ANNEX 2

[Applicable Reconciliation and Budget/Projections to be attached if applicable]

ANNEX 3

The information described herein with respect to the Consolidated Total Net Leverage Ratio is as of the computation date.

**Consolidated Total Net Leverage Ratio**

| | | |
|---|---|---|
| (a) | Consolidated Total Net Debt of the Parent Guarantor and its Restricted Subsidiaries on the computation date | $_____ |
| (b) | Consolidated EBITDA with respect to the Parent Guarantor and its Restricted Subsidiaries for the Reference Period ended on the computation date[1] | $_____ |
| | ***The ratio of line (a) above to line (b) above*** | ***___ to 1.00*** |

[1] If such Consolidated EBITDA would be less than 1, then such amount shall be deemed to be 1 for the purposes of calculating the Consolidated Total Net Leverage Ratio

EXHIBIT F

**[FORM OF]**
**MATURITY DATE EXTENSION REQUEST**

GLAS Trust Company LLC as the Administrative Agent
for the Lenders party to the Credit Agreement referred to below

Address: 3 Second Street, Suite 206, Jersey City, NJ 07311
Attention: Transaction Management
Facsimile: 212-202-6246
Email: clientservices.americas@glas.agency; TMGUS@glas.agency

[Date]

Ladies and Gentlemen:

Reference is hereby made to the Credit and Guaranty Agreement, dated as of [●] (as it may be modified, supplemented, extended, amended, restated or amended and restated from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among BYJU's Alpha, Inc as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent. The Borrower hereby requests, in accordance with Section 2.19 of the Credit Agreement, [(i)] an extension of the Term Loan Maturity Date for [describe Class of Term Loans being extended] (the "Extended Term Loans") from [____________], 20[_] to [____________], 20[_], [(ii) the following changes to the Applicable Rate to be applied in determining the interest payable on the Extended Term Loans of, and fees payable under the Credit Agreement to, Extending Term Lenders in respect of that portion of their applicable Term Loans extended to such new maturity date, which changes shall become effective on [____________], 20[_]] [and] [(iii) the amendments or modifications to the terms of the Credit Agreement to be effected in connection with this Maturity Date Extension Request as set forth below:

[_________________]].

BYJU's Alpha, Inc., as the Borrower

By: ______________________________
Name:
Title:

EXHIBIT G

**[FORM OF]**
**COUNTERPART AGREEMENT**

This Counterpart Agreement, dated [ ] (this "Counterpart Agreement") is delivered pursuant to that certain Credit and Guaranty Agreement, dated as of [_____], 2021 (as it may be amended, restated, amended and restated, modified, extended and/or supplemented from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), by and among BYJU's Alpha, Inc. as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

**Section 1.** Pursuant to Section 5.9 of the Credit Agreement, the undersigned (the "New Guarantor") hereby:

(a) agrees that this Counterpart Agreement may be attached to the Credit Agreement and that by the execution and delivery hereof, the undersigned becomes a Guarantor under the Credit Agreement and agrees to be bound by all of the terms thereof with the same force and effect as if originally named therein as a Guarantor; and

(b) represents and warrants that each of the representations and warranties set forth in the Credit Agreement (other than such representations and warranties that relate solely to facts and conditions as of the Effective Date) and applicable to the undersigned is true and correct in all material respects as of the date hereof; *provided* that in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or "Material Adverse Effect" in the text thereof.

**Section 2.** Neither this Counterpart Agreement nor any term hereof may be changed, waived, discharged or terminated, except by an instrument in writing signed by the party (including, if applicable, any party required to evidence its consent to or acceptance of this Counterpart Agreement) against whom enforcement of such change, waiver, discharge or termination is sought. Any notice or other communication herein required or permitted to be given shall be given to the Borrower in accordance with Section 10.1 of the Credit Agreement. In case any provision in or obligation under this Counterpart Agreement shall be invalid or unenforceable in any jurisdiction, the validity and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK. THE TERMS AND PROVISIONS OF SECTION 10.9(B) OF THE CREDIT AGREEMENT ARE INCORPORATED BY REFERENCE HEREIN AS IF FULLY SET FORTH HEREIN.**

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the undersigned has caused this Counterpart Agreement to be duly executed and delivered by its duly authorized officer as of the date above first written.

**[NAME OF NEW GUARANTOR]**

By: ______________________________
Name:
Title:

ACKNOWLEDGED AND ACCEPTED, as of the date above first written:

GLAS TRUST COMPANY LLC,
as the Administrative Agent

By ______________________________
Name:
Title:

EXHIBIT H

**[FORM OF]**
**SOLVENCY CERTIFICATE**

[_____], 2021

This Solvency Certificate is being executed and delivered pursuant to Section [●] of that certain Credit and Guaranty Agreement dated as of [●] among [__] ("Borrower"), [__], a [__], [__], a [__]] and the lenders from time to time party thereto and [●], as administrative agent (as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used but not defined herein shall have the respective meanings set forth in the Credit Agreement.

I, [●], the [Chief Financial Officer/equivalent officer] of the Parent Guarantor in such capacity and not in an individual capacity, hereby certify as follows:

1. I am generally familiar with the businesses and assets of the Borrower, the Loan Parties and the Restricted Subsidiaries, taken as a whole, and am duly authorized to execute this Solvency Certificate on behalf of the Borrower pursuant to the Credit Agreement; and

2. As of the date hereof and after giving effect to the Transactions and the incurrence of the indebtedness and obligations being incurred in connection with the Credit Agreement and the Transactions, that:

(a) immediately after giving effect to the Transactions: (i) the fair value of the assets of the Parent Guarantor and its Restricted Subsidiaries (on a consolidated basis) will exceed the debts and liabilities, direct, subordinated, contingent or otherwise, of the Parent Guarantor and its Restricted Subsidiaries (on a consolidated basis); (ii) the Parent Guarantor and its Restricted Subsidiaries (on a consolidated basis) will be able to pay their debts and liabilities, direct, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iii) the Parent Guarantor and its Restricted Subsidiaries (on a consolidated basis) will not have unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are now conducted; and

(b) the Parent Guarantor does not intend to, nor does it believe that it or any of its Restricted Subsidiaries will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing and amounts of cash to be received by it or any such Restricted Subsidiary and the timing and amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Restricted Subsidiary.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, I have executed this Solvency Certificate on the date first written above

[_____]

By: ______________________________
Name:
Title: [Chief Financial Officer / equivalent officer]

EXHIBIT I-1

**[FORM OF]**
**PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Lenders That Are Not Partnerships for U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit and Guaranty Agreement, dated as of [_____], 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

Pursuant to the provisions of Section 2.14(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Term Loan(s) (as well as any Term Loan Note(s) evidencing such Term Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By ______________________________
Name:
Title:

Date: __________ __, 20[ ]

EXHIBIT I-2

**[FORM OF]**
**PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Participants That Are Not Partnerships for U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit and Guaranty Agreement, dated as of [_____], 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

Pursuant to the provisions of Section 2.14(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By ______________________________
Name:
Title:

Date: __________ __, 20[ ]

<u>EXHIBIT I-3</u>

**[FORM OF]**
**PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Participants That Are Partnerships for U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit and Guaranty Agreement, dated as of [_____], 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

Pursuant to the provisions of <u>Section 2.14(e)</u> of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By ______________________________
Name:
Title:

Date: __________ __, 20[ ]

EXHIBIT I-4

**[FORM OF]**
**PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Lenders That Are Partnerships for U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit and Guaranty Agreement, dated as of [_____], 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

Pursuant to the provisions of Section 2.14(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Term Loan(s) (as well as any Term Loan Note(s) evidencing such Term Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Term Loan(s) (as well as any Term Loan Note(s) evidencing such Term Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By ______________________________
Name:
Title:

Date: __________ __, 20[ ]

EXHIBIT J

**[FORM OF]**
**CERTIFICATION REGARDING BENEFICIAL OWNERS**
**OF LEGAL ENTITY CUSTOMERS**

## I. GENERAL INSTRUCTIONS

**What is this form?**

To help the U.S. government fight financial crime, federal regulation requires certain financial institutions to obtain, verify, and record information about the beneficial owners of legal entity customers. Legal entities can be abused to disguise involvement in terrorist financing, money laundering, tax evasion, corruption, fraud, and other financial crimes. Requiring the disclosure of key individuals who own or control a legal entity (i.e., the beneficial owners) helps U.S. law enforcement investigate and prosecute these crimes.

**Who has to complete this form?**

This form must be completed by the person opening a new account on behalf of a legal entity with a bank, a broker or dealer in securities, or certain other types of U.S. financial institution, and the form must be completed at the time each new account is opened. For these purposes, opening a new account includes establishing a formal relationship with a broker-dealer or lender to effect transactions in securities or for the extension of credit.

For the purposes of this form, a **legal entity** includes a corporation, limited liability company, or other entity that is created by a filing of a public document with a Secretary of State or similar office, a general partnership, and any similar business entity formed in the United States or any other country. **Legal entity** does not include sole proprietorships, unincorporated associations, or natural persons opening accounts on their own behalf.

**What information do I have to provide?**

This form requires you to provide the name, address, date of birth and Social Security number (or passport number or other similar information, in the case of non-U.S. persons) for the following individuals (i.e., the "beneficial owners"):

(i) A single individual with significant responsibility for managing the legal entity customer (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer); and

(ii) Each individual, if any, who owns, directly or indirectly, 25% or more of the equity interests of the legal entity customer (e.g., each natural person who owns 25% or more of the shares of a corporation).

The number of individuals that satisfy this definition of "beneficial owner" may vary. Under section (i), only one individual needs to be identified. Under section (ii), depending on the factual circumstances, up to four individuals (but as few as zero) may need to be identified. It is possible that in some circumstances the same individual might be identified under both sections (e.g., the President of Acme, Inc. who also holds a 30% equity interest). Thus, a completed form will contain the identifying information of at least one individual (under section (i)), and up to five individuals (i.e., one individual under section (i) and four 25% equity holders under section (ii)).

This form also requires you to provide copies of (1) the legal formation document for each legal entity (i.e., the issuer, borrower, or selling securityholder) listed on this form (e.g., Certificate of Incorporation, LLC

Agreement, Partnership Agreement, etc.), and (2) a driver's license, passport or other identifying document for each beneficial owner listed on this form.

**II. EXCLUSIONS (IF APPLICABLE)**

If you believe the legal entity listed in Section III, paragraph (b) below falls under an express exclusion from the "legal entity customer" definition under 31 C.F.R. §1010.230(e)(2), please check the box below and identify the applicable exclusion:

☐ An exclusion applies to the legal entity identified in paragraph (b) of Section III below.

Applicable exclusion: ______________________________________________

**If the box above is checked, please skip paragraphs (c) and (d) of Section III below.**

### III. IDENTIFICATION OF BENEFICIAL OWNER(S)

**For the benefit of each of the financial institutions involved in the applicable sale of securities or extension of credit for which this certification is provided, the following information is hereby provided on behalf of the Issuer/Borrower/Selling Securityholder legal entity customer listed below:**

(a) ***Individual Opening Account.*** Name and Title of Natural Person Opening Account and Completing Certification on Behalf of Legal Entity Customer:

____________________________________________________________

(b) ***Legal Entity Customer.*** Name, Type, and Principal Business Address of Issuer/Borrower/Selling Securityholder Legal Entity Customer for Which the Account is Being Opened:

____________________________________________________________

***Please attach a copy of the legal formation document for each legal entity listed above (e.g., Certificate of Incorporation, LLC Agreement, Partnership Agreement, etc.).***

(c) ***Control Prong.*** The following information for ***one*** individual with significant responsibility for managing the Issuer/Borrower/Selling Securityholder legal entity customer listed above, such as:

☐ An executive officer or senior manager (e.g., Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, Treasurer); or

☐ Any other individual who regularly performs similar functions.

| Name/Title | Date of Birth | Address (Residential or Business Street Address) | *For U.S. Persons*: Social Security Number | *For Non-U.S. Persons*: Social Security Number, Passport Number and Country of Issuance, or other similar identification number[1] |
|---|---|---|---|---|
| | | | | |
| | | | | |

***Please attach copies of a driver's license, passport or other identifying document for each individual listed above.***

(d) ***Ownership/Equity Prong.*** The following information for ***each*** individual, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25% or more of the equity interests of the Issuer/Borrower/Selling Securityholder legal entity customer listed above:

[1] In lieu of a passport number, non-U.S. persons may also provide a Social Security Number, an alien identification card number, or number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard.

| Name/Title | Date of Birth | Address (Residential or Business Street Address) | *For U.S. Persons*: Social Security Number | *For Non-U.S. Persons*: Social Security Number, Passport Number and Country of Issuance, or other similar identification number[2] |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

(If appropriate, an individual listed under section (c) above may also be listed in this section (d)).

***Please attach copies of a driver's license, passport or other identifying document for each individual listed above.***

☐ Equity Owner Not Applicable (Please check this box if there is no individual who owns 25% or more of the equity interest of the legal entity listed above.)

[2] In lieu of a passport number, non-U.S. persons may also provide a Social Security Number, an alien identification card number, or number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard.

**IV. ACKNOWLEDGMENT; SIGNATURE**

**I, ________________________________, in my capacity as __________________________________ of the Issuer/Borrower/Selling Securityholder listed above and not in my individual capacity, hereby:**

**(a) acknowledge and authorize on behalf of the Issuer/Borrower/Selling Securityholder and each beneficial owner identified in paragraphs (c) and (d) of Section III above that this certification and the attachments hereto may be provided to each of the financial institutions involved in the applicable sale of securities or extension of credit;**

**(b) agree on behalf of the Issuer/Borrower/Selling Securityholder identified above, from the date hereof until the closing of the applicable sale of securities or the termination of the agreement providing for the applicable extension of credit, as the case may be, to notify each of the financial institutions involved in such transaction of any change in the information provided herein that would result in a change to the list of beneficial owners identified in paragraphs (c) and (d) of Section III above;**

**(c) agree on behalf of the Issuer/Borrower/Selling Securityholder identified above, upon request by or on behalf of the financial institutions involved in the applicable sale of securities or extension of credit, to provide documentation supporting any applicable exclusion identified in Section II above; and**

**(d) certify, to the best of my knowledge, that the information provided above is complete and correct.**

Signature: ______________________________ Date: _________________________________

Legal Entity Identifier ____________(Optional)

EXHIBIT K

**[FORM OF]**
**PREPAYMENT NOTICE**

GLAS Trust Company LLC as the Administrative Agent
for the Lenders party to the Credit Agreement referred to below

Address: 3 Second Street, Suite 206, Jersey City, NJ 07311
Attention: Transaction Management
Facsimile: 212-202-6246
Email: clientservices.americas@glas.agency; TMGUS@glas.agency

[Date]

Ladies and Gentlemen:

Reference is hereby made to the Credit and Guaranty Agreement, dated as of [_____], 2021 (as it may be modified, supplemented, extended, amended, restated or amended and restated from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent. The Borrower hereby gives irrevocable notice[1], in accordance with Section [2.7][2][2.8][3] of the Credit Agreement and subject to the requirements of Section 2.8(e) of the Credit Agreement, that it intends to prepay a Borrowing under the Credit Agreement, and set forth below is the information relating to such prepayment (the "Proposed Prepayment") as required by Section [2.7][2.8] of the Credit Agreement:

(i) The Business Day of the Proposed Prepayment is [___________].[4]

(ii) The Class of Term Loans being prepaid is as follows: [_______][5].

(iii) The principal amount of each Borrowing or portion thereof to be prepaid is as follows: [_______][6].

(iv) [Attached hereto as Exhibit A is a reasonably detailed calculation of the amount of the Proposed Prepayment.][7]

[Signature Page Follows]

---

1 A notice of voluntary prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities or another transaction, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

2 For voluntary prepayments.

3 For mandatory prepayments pursuant to Section 2.8(a), 2.8(b), 2.8(c) or 2.8(d) of the Credit Agreement.

4 In the case of optional prepayments, this shall be a Business Day (a) at least three Business Days in the case of Eurodollar Borrowings after the date hereof and (b) no later than the date of the proposed prepayment in the case of ABR Borrowings, *provided* that any such notice shall be deemed to have been given on a certain day only if given not later than 12:00 p.m. (New York City time) in the case of Eurodollar Borrowings and not later than 11:00 a.m. (New York City time) in the case of ABR Borrowings, on such day.

In the case of mandatory prepayments, this shall be a Business Day at least three Business Days after the date hereof (or such shorter period of time as may be acceptable to the Administrative Agent in its sole discretion).

5 Applicable for prepayments pursuant to Section 2.7(a) and 2.8(b) of the Credit Agreement.

6 Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.2 of the Credit Agreement, except as necessary to apply fully the required amount of a mandatory prepayment.

7 For mandatory prepayments pursuant to Section 2.8(a), 2.8(b), 2.8(c) or 2.8(d) of the Credit Agreement.

The Borrower has caused this Prepayment Notice to be executed and delivered by its duly authorized Responsible Officer as of the date first written above.

Very truly yours,

[______]

By: ________________________________
Name:
Title:

# Exhibit 28

# Subscription Agreement

*for*

## Camshaft Capital Fund, LP
## A Delaware Limited Partnership

**Camshaft Capital Fund, LP**
175 SW 7th Street
Miami, FL 33130

Ladies and Gentlemen:

The undersigned (the "**Purchaser**" or the "**Subscriber**" as the context requires) understands that Camshaft Capital Fund, LP, a limited partnership organized under the laws of the state of Delaware Fund Administrated by Apex Fund Services (Canada) Ltd, (the "Partnership"), is offering for purchase to the undersigned certain Limited Partnership Interests of the Partnership (the "**Securities**") in this private placement offering with a minimum amount of $500,000.00 (the "**Offering**"). ***The Partnership reserves the right to increase or decrease the total amount sought under this offering or to terminate this Offering at any time and without notice.*** The undersigned further understands that this offering is being made without registration of the Securities under the Securities Act of 1933, as amended (the "**Securities Act**"), or any securities law of any state of the United States or of any other jurisdiction and is being offered pursuant to an exemption thereof. The Partnership also reserves the right to hold one or more subsequent offerings following this Offering.

1. Subscription; Investor Suitability Questionnaire. Subject to the terms and conditions hereof and under this Offering the undersigned hereby irrevocably subscribes to and for the specific Securities set forth on the Signature Page hereto for the aggregate purchase price set forth on the Signature Page hereto, which is payable as described in **Section** 4 hereof (the "**Subscription**"). The undersigned acknowledges that the Securities will be subject to restrictions on transfer as set forth in this subscription agreement (the "**Subscription Agreement**"), the Partnership's Limited Partnership Agreement, as the same may be amended from time to time (the "**Partnership Agreement**") , and under applicable law. Further, the undersigned hereby agrees and acknowledges that it must complete the attached "**Investor Suitability Questionnaire**" in order for Partnership to accept the subscription hereunder.

2. Acceptance of Subscription and Issuance of Securities. It is understood and agreed that the Partnership shall have the sole right, at its complete discretion, to accept or reject this subscription, in whole or in part, for any reason and that the same shall be deemed to be acceptable by the Partnership ***only if***: 1) it is signed by the undersigned (or a duly authorized representative of the undersigned) and delivered to the Partnership at or before the Closing (defined below); 2) the same is counter-signatured by the General Partner; and 3) the undersigned pays the subscription price

indicated. Upon satisfaction of the foregoing conditions, the undersigned shall become a Limited Partner of the Partnership and agrees to be bound by all of the terms and conditions of the Partnership Agreement.

3. <u>The Closing</u>. Beginning as of the Effective Date herein and continuing perpetually, the Partnership may accept subscriptions hereunder. The closing of the purchase and sale of the Securities (each a "**Closing**") under this Offering shall take place remotely, coordinated by the General Partner on the date upon which a Subscription is accepted by Partnership (the "**Closing Date**") pursuant to the terms of Section 2 above, or at such other time and place as the Partnership may designate by notice to the undersigned. Subsequent Closings shall continue to occur throughout the life of the Partnership. In accordance with Section 4 below, on or before the Closing the undersigned shall deliver its requisite subscriber funds to the Partnership to be held in an account controlled by the Partnership and the General Partner.

4. <u>Payment for Securities</u>. Payment for the Securities shall be received by the Partnership from the undersigned by wire transfer of immediately available funds or other means approved by the Partnership in the amount as set forth on the Signature Page hereto simultaneously with the delivery of this Agreement to the Partnership by the Subscriber. The Partnership may, but is not obligated to, deliver certificates representing the Securities to the undersigned at the Closing bearing an appropriate legend referring to the fact that the Securities were sold in reliance upon an exemption from registration under the Securities Act. In lieu of certificates, this completed Subscription Agreement shall be sufficient evidence of the undersigned's admission to the Partnership. Receipt of the payment for the Securities must be received by the Partnership on or before the Closing.

5. <u>Representations and Warranties of the Partnership</u>. As of each Closing Date hereunder, the Partnership represents and warrants that:

(a) The Partnership is duly formed and validly existing under the laws of Delaware, with full power and authority to conduct its business as it is currently being conducted and to own its assets.

(b) The Securities have been duly authorized and, when issued, delivered, and paid for in the manner set forth in this Subscription Agreement, will be validly issued, fully paid, and nonassessable.

6. <u>Representations and Warranties of the Undersigned</u>. The undersigned hereby represents and warrants to and covenants with the Partnership that:

(a) **General**.

(i) The undersigned has all requisite authority (and in the case of an individual, the capacity) to purchase the Securities, enter into this Subscription Agreement, and to perform all the obligations required to be performed by the undersigned hereunder, and such

purchase will not contravene any law, rule, or regulation binding on the undersigned or any investment guideline or restriction applicable to the undersigned.

(ii) The undersigned is not acquiring the Securities as a nominee or agent or otherwise for any other person.

(iii) The undersigned will comply with all applicable laws and regulations in effect in any jurisdiction in which the undersigned purchases or sells Securities and obtain any consent, approval or permission required for such purchases or sales under the laws and regulations of any jurisdiction to which the undersigned is subject or in which the undersigned makes such purchases or sales, and the Partnership shall have no responsibility therefor.

(b) **Information Concerning the Partnership**.

(i) The undersigned acknowledges and verifies that it has received an Offering Memorandum in connection with these securities and that it understands the disclosures contained therein, that it has had full opportunity to request any additional information regarding the Partnership, its business, and its projected plans that it so reasonably requests, that the undersigned is familiar with the principals of the issuer, and acknowledges that it has consulted with his or her own advisors and consultants prior to entering into this Subscription Agreement. The Offering Memorandum, together with this Agreement, constitute the "**Offering Documents**". THE UNDERSIGNED REPRESENTS THAT IT HAS SOUGHT THE ADVICE OF ITS OWN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH THIS AGREEMENT AND THE SECURITIES HEREUNDER.

(ii) The undersigned understands that the Partnership is not currently required to register and will not register as an Investment Partnership under the Investment Partnership Act of 1940 by way of exemption from definition provided under Section 3(c)1 and/or 3(c)5 of the Investment Partnership Act.

(iii) The undersigned understands and accepts that the purchase of the Securities involves various risks, including the risks that there may be no open market for the Securities, or that Subscribers entire investment may be lost. The undersigned represents that it is able to bear any loss associated with an investment in the Securities.

(iv) The undersigned confirms that it is not relying on any communication (written or oral) of the Partnership or any of its affiliates, as investment advice or as a recommendation to purchase the Securities. It is understood that information and explanations related to the terms and conditions of the Securities provided in the Offering Documents or otherwise by the Partnership or any of its affiliates shall not be considered investment advice or a recommendation to purchase the Securities, and that neither the Partnership nor any of its affiliates is acting or has acted as an advisor to the undersigned in deciding to invest in the Securities. The undersigned acknowledges that neither the Partnership nor any of its affiliates has made any representation regarding the proper characterization of the Securities for purposes of determining

the undersigned's authority to invest in the Securities. The undersigned is entering into this Agreement of its own volition, and after its own proper due diligence.

(v) The undersigned is familiar with the business and financial conditions, projections, and operations of the Partnership. The undersigned has had access to such information concerning the Partnership and the Securities as it deems necessary to enable it to make an informed investment decision concerning the purchase of the Securities.

(vi) The undersigned understands that, unless the undersigned notifies the Partnership in writing to the contrary at or before the Closing, each of the undersigned's representations and warranties contained in this Subscription Agreement will be deemed to have been reaffirmed and confirmed as of the Closing, taking into account all information received by the undersigned.

(vii) The undersigned acknowledges that the Partnership has the right in its sole and absolute discretion to abandon this private placement or to alter the terms of offering at any time prior to the completion of the offering. If the Partnership should abandon this private placement, this Subscription Agreement shall thereafter have no force or effect and the Partnership shall return the previously paid subscription price of the Securities, without interest thereon, to the undersigned.

(viii) The undersigned understands that no federal or state agency has passed upon the merits or risks of an investment in the Securities or made any finding or determination concerning the fairness or advisability of this investment.

(c) **Non-reliance**.

(i) The undersigned represents that it is **not** relying on (and will not at any time rely on) any communication (written or oral) of the Partnership, as investment advice or as a recommendation to purchase the Securities, it being understood that information and explanations related to the terms and conditions of the Securities, the Offering Documents, and the other transaction documents that may have been provided to the undersigned shall **not** be considered investment advice or a recommendation to purchase the Securities and is provided "as is" without any warranties. The undersigned is providing this investment after conducting its own due diligence.

(ii) The undersigned confirms that the Partnership has **not** (A) given any guarantee or representation as to the potential success, return, effect or benefit (either legal, regulatory, tax, financial, accounting or otherwise) of an investment in the Securities or (B) made any representation to the undersigned regarding the legality of an investment in the Securities under applicable legal investment or similar laws or regulations. In deciding to purchase the Securities, the undersigned is not relying on the advice or recommendations of the Partnership and the undersigned has made its own independent decision that the investment in the Securities is suitable and appropriate for the undersigned.

(d) **Status of Undersigned**.

(i) The undersigned has such knowledge, skill and experience in business, financial and investment matters that the undersigned is capable of evaluating the merits and risks of an investment in the Securities. With the assistance of the undersigned's own professional advisors, to the extent that the undersigned has deemed appropriate, the undersigned has made its own legal, tax, accounting, and financial evaluation of the merits and risks of an investment in the Securities and the consequences of this Subscription Agreement. The undersigned has considered the suitability of the Securities as an investment in light of its own circumstances and financial condition and the undersigned is able to bear the risks associated with an investment in the Securities and its authority to invest in the Securities.

(ii) The undersigned is an "**accredited investor**" as that term is defined under the Securities Act. The undersigned agrees to furnish any additional information requested by the Partnership or any of its affiliates to assure compliance with applicable U.S. federal and state securities laws in connection with the purchase and sale of the Securities. Any information that has been furnished or that will be furnished by the undersigned to evidence its status as an accredited investor is accurate and complete, and does not contain any misrepresentation or material omission.

(e) **Restrictions on Transfer or Sale of Securities**. As applies to the undersigned Subscriber:

(i) The undersigned is acquiring the Securities solely for the undersigned's own beneficial account, for investment purposes, and not with a view to, or for resale in connection with, any distribution of the Securities. The undersigned understands that the Securities have not been registered under the Securities Act or any State Securities Laws by reason of specific exemptions under the provisions thereof which depend in part upon the investment intent of the undersigned and of the other representations made by the undersigned in this Subscription Agreement. The undersigned understands that the Partnership is relying upon the representations and agreements contained in this Subscription Agreement (and any supplemental information) for the purpose of determining whether this transaction meets the requirements for such exemptions.

(ii) The undersigned understands that the Securities are "restricted securities" under applicable federal securities laws and that the Securities Act and the rules of the U.S. Securities and Exchange Commission (the "**Commission**") provide in substance that the undersigned may dispose of the Securities ***only*** pursuant to an effective registration statement under the Securities Act or an exemption therefrom (and in any case not before one (1) year from the date of subscription hereof), and the undersigned understands that the Partnership, at this time, has no obligation or intention to register any of the Securities, or to take action so as to permit sales pursuant to the Securities Act (including Rule 144 thereunder). Accordingly, the undersigned understands that under the Commission's rules, the undersigned may dispose of the Securities principally only in "private placements" which are exempt from registration under the Securities Act, in which event the transferee will acquire "restricted securities" subject to the same limitations

as in the hands of the undersigned. Consequently, the undersigned understands that the undersigned must bear the economic risks of the investment in the Securities for an indefinite period of time.

(iii) The undersigned agrees: (A) that the undersigned will not sell, assign, pledge, give, transfer, or otherwise dispose of the Securities or any interest therein, or make any offer or attempt to do any of the foregoing, except pursuant to a registration of the Securities under the Securities Act and all applicable State Securities Laws, or in a transaction which is exempt from the registration provisions of the Securities Act and all applicable State Securities Laws; (B) that the certificates representing the Securities will bear a legend making reference to the foregoing restrictions; and (C) that the Partnership and its affiliates shall not be required to give effect to any purported transfer of such Securities except upon compliance with the foregoing restrictions.

(f) **Further Rights of Redemption and Repurchase of Securities.** The undersigned understands and agrees that the Securities sold hereunder may also be subject to certain rights or redemption or repurchase as maybe provided for in the Partnership Agreement of the Partnership, and the undersigned understands that it must agree to such terms in subscribing to the Partnership hereunder.

7. Conditions to Obligations of the Undersigned and the Partnership. The obligations of the undersigned to purchase and pay for the Securities as specified on the Signature Page hereto and of the Partnership to sell the Securities are subject to the satisfaction at or prior to the Closing of the following conditions precedent: the representations and warranties of the Partnership contained in **Section** 5 hereof and of the undersigned contained in **Section** 6 hereof shall be true and correct as of the Closing in all respects with the same effect as though such representations and warranties had been made as of the Closing.

8. Electronic Delivery of Disclosures and Schedule K-1.

(a) The undersigned understands that the Fund and the General Partner expect to deliver tax return information, including Schedule K-1s (each, a "**K-1**") to the undersigned by either electronic mail, or some other form of electronic delivery. Pursuant to IRS Rev. Proc. 2012-17 (Feb. 13, 2012), the Undersigned hereby expressly understands, consents to, and acknowledges such electronic delivery of tax returns and related information. Federal law prohibits the Fund, the General Partner, or their affiliates and designees from disclosing, without consent, undersigned's tax return information to third parties or use of that information for purposes other than the preparation of the Subscriber's tax return. As part of subscription to this offering, the Fund, the General Partner, or their designees may disclose undersigned's income tax return information to certain other affiliated entities or third-party service providers including, but not limited to the Accountant for tax return preparation and data aggregation purposes. The Fund, the General Partner, and their designees covenant they will keep and maintain undersigned's information in strict confidence, using such degree of care as is appropriate to avoid unauthorized access, use or disclosure, and will not use such information in violation of law. In executing this Agreement, the undersigned authorizes the Fund, the General Partner, and/or the Accountant to disclose tax return information to certain Accountant entities, their respective successors, affiliates and, or such other

third-party service providers as the undersigned may request or as may be required by the Fund or the General Partner for purposes of completing tax return preparation and K-1 delivery pursuant to this agreement.

(b) The Subscriber's consent to electronic delivery will apply to all future K–1s unless such consent is withdrawn by the Subscriber.

**(c)** If for any reason the Subscriber would like a paper copy of the K-1 after the Subscriber has consented to electronic delivery, the Subscriber may submit a request via email to the Accountant and the General Partner or send a written request to the same. Requesting a paper copy of the Subscriber's K-1 will not be treated as a withdrawal of consent

(d) If the Subscriber in the future determines that it no longer consents to electronic delivery, the Subscriber will need to notify the Fund and the Accountant so that it can arrange for a paper K-1 to be delivered to the address that the Fund then currently has on file. The Subscriber may submit notice via email to the Accountant or send a written request to the same. The Subscriber's consent is considered withdrawn on the date the Fund receives the written request to withdraw consent. The Fund will confirm the withdrawal and its effective date in writing. A withdrawal of consent does not apply to a K-1 that was emailed to the Subscriber before the effective date of the withdrawal of consent.

(e) The Fund (or the General Partner) will cease providing statements to the Subscriber electronically if the Subscriber provides notice to withdraw consent, if the Subscriber ceases to be a Member of the Fund, or if regulations change to prohibit the form of delivery.

(f) If the Subscriber needs to update the Subscriber's contact information that is on file, please email the update to the General Partner. The Subscriber will be notified if there are any changes to the contact information of the Fund.

(g) The Subscriber's K-1 may be required to be printed and attached to a federal, state, or local income tax return.

9. Obligations Irrevocable. The obligations of the undersigned shall be irrevocable.

10. Legend. The certificates representing the Securities sold pursuant to this Subscription Agreement will be imprinted with a legend in substantially the following form:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. THE SECURITIES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (1) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OR (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE STATE SECURITIES LAWS AND THE SECURITIES LAWS OF OTHER

JURISDICTIONS, AND IN THE CASE OF A TRANSACTION EXEMPT FROM REGISTRATION, UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH TRANSACTION DOES NOT REQUIRE REGISTRATION UNDER THE SECURITIES ACT AND SUCH OTHER APPLICABLE LAWS."

11. Waiver, Amendment. Neither this Subscription Agreement nor any provisions hereof shall be modified, changed, discharged or terminated except by an instrument in writing, signed by the party against whom any waiver, change, discharge or termination is sought.

12. Assignability. Neither this Subscription Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by either the Partnership or the undersigned without the prior written consent of the other party.

13. Waiver of Jury Trial; Dispute Resolution.

(a) THE UNDERSIGNED IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF THE TRANSACTIONS CONTEMPLATED BY THIS SUBSCRIPTION AGREEMENT.

(b) Any dispute, claim, or controversy arising out of or relating to this Agreement, including the negotiation, breach, validity or performance of the Agreement, the rights and obligations contemplated by the Agreement, any claims of fraud or fraud in the inducement, and any claims related to the scope or applicability of this agreement to arbitrate, shall be resolved at the request of any party to this Agreement through a two-step dispute resolution process administered by JAMS, first as mediation, then followed if necessary, by final and binding arbitration administered by a single arbitrator (the "**Arbitrator**")

14. Submission to Jurisdiction. With respect to any suit, action or proceeding relating to any offers, purchases or sales of the Securities by the undersigned ("**Proceedings**"), the undersigned irrevocably submits to the jurisdiction of the federal or state courts located in Miami County, Florida, which submission shall be exclusive unless none of such courts has lawful jurisdiction over such Proceedings.

15. Governing Law. This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

16. Section and Other Headings. The section and other headings contained in this Subscription Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Subscription Agreement.

17. Counterparts; Electronic Signature. This Subscription Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of Electronic Transmission

Case 25-50621-BLS Doc 285-1 Filed 04/08/26 Page 75 of 292

shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. This Agreement, and all other matters before the Limited Partners, the General Partner, or the Partnership, may be executed by electronic signature methods, including DocuSign and related methods and each Limited Partner hereby accepts such method of execution as legally binding.

18. Notices. All notices and other communications provided for herein shall be in writing and shall be deemed to have been duly given if delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid to the following addresses (or such other address as either party shall have specified by notice in writing to the other):

| | |
|---|---|
| **If to the Partnership:** | **Camshaft Capital Fund, LP**<br>175 SW 7th St.<br>Miami, FL 33130<br>Attention: Camshaft Capital |
| **With a copy to:** | **Apex Fund Services**<br>535 Anton Blvd. Suite 830<br>Costa Mesa, CA 92626<br>Attention: Gregory Bartz |
| **If to the Purchaser:** | **Subscriber's Address set forth on Signature Page hereto** |

19. Binding Effect. The provisions of this Subscription Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

20. Survival. All representations, warranties and covenants contained in this Subscription Agreement shall survive (i) the acceptance of the subscription by the Partnership and the Closing, (ii) changes in the transactions, documents and instruments described in the Offering Documents which are not material or which are to the benefit of the undersigned and (iii) the death or disability of the undersigned.

21. Notification of Changes. The undersigned hereby covenants and agrees to notify the Partnership upon the occurrence of any event prior to the closing of the purchase of the Securities pursuant to this Subscription Agreement which would cause any representation, warranty, or covenant of the undersigned contained in this Subscription Agreement to be false or incorrect.

22. Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

*This space intentionally left blank. Signature page and ISQ follow.*

**IN WITNESS WHEREOF**, the undersigned has executed this Subscription Agreement as of the Date written below:

_Byjus Alpha, Inc.
**(Legal Name of Limited Partner)**

**Type of Investor:** __Individual __IRA __Trust X Entity __ Other

**By:** DocuSigned by: [signature] C54896B5666C4E2...

**Total Capital Contribution:** 318,000,000

Riju Ravindran Director
**Printed Name and Authority (if entity) of Signatory**

4/28/2022
**Date Signed**

**Spousal Signature (*if required*)**

**By**: ____________________________

____________________________
**Printed Name of Spouse**

______________
**Date Signed**

The offer to purchase Securities as set forth above is **confirmed and accepted by the Partnership:**

**By: Camshaft Capital Management, LLC,**
General Partner of Camshaft Capital Fund, LP

**By**: DocuSigned by: William Morton 100E0A38ED8D4CB...
William Morton, its Authorized Representative

**DATE ACCEPTED:** 4/28/2022

**INVESTOR SUITABILITY QUESTIONNAIRE**
**IN CONNECTION WITH THE**
**SUBSCRIPTION AGREEMENT OF**
**CAMSHAFT CAPITAL FUND, LP**

This Questionnaire is being distributed to certain individuals and entities, by way of direct distribution, which may be offered the opportunity to subscribe to Limited Partnership Interests or the equivalent thereof (the "***Securities***") of **CAMSHAFT CAPITAL FUND, LP.**, a Delaware limited partnership (the "***Partnership***"). The purpose of this Questionnaire is to assure the Partnership that all such individuals and entities being offered the Securities will meet the standards required by the Securities Act of 1933, as amended (the *"**Act**"*), and applicable U.S. state securities laws.

All answers will be kept confidential. However, by signing this Questionnaire, the undersigned agrees that this information may be provided by the Partnership to its legal and financial advisors, and the Partnership and such advisors may rely on the information set forth in this Questionnaire for purposes of complying with all applicable securities laws and may present this Questionnaire to such parties as it reasonably deems appropriate if called upon to establish its compliance with such securities laws. **The undersigned represents that the information contained herein is complete and accurate to the best knowledge of the undersigned and will notify the Partnership of any material change in any of such information prior to the undersigned's investment in the Partnership. VERIFICATION DOCUMENTATION MUST BE SUBMITTED SIMULTANEOUSLY WITH THIS DOCUMENT.**

**<u>Instructions:</u>** Please complete this questionnaire as thoroughly as possible. **All questions must be answered.**

- If the appropriate answer is "none" or "not applicable," so state.
- If you have any questions, please contact the Administrator (Apex) of the Fund directly.
- ALL SUBSCRIBERS MUST PROVIDE A COMPLETED W9 (W8 if INT) AND A COPY OF A VALID GOVERNMENTAL PHOTO ID/PASSPORT.

| | |
|---|---|
| Jurisdiction of Entity or homestead domicile of individual (U.S. State if U.S.): | Byjus Alpha, Inc. |
| Email for notice purposes: | anita@byjus.com |
| Address for notice purposes: | 3160 DE LA CRUZ BLVD STE 204, SANTA CLARA CA 95054 |
| SSN or EIN/US Taxpayer No. | 4819131 |
| Do you consent to electronic notice for all disclosures, tax returns, reports, and all other communications from the Partnership? | Yes ☒ No ☐ |
| Citizenship of the principals of the investor: | |

***Financial Status Questionnaire begins on the following page.***

**FOR INDIVIDUAL INVESTORS***

**Investors must qualify as Accredited*

**Accredited Investor Certification.** The undersigned makes one of the following representations regarding its income or net worth and certain related matters ***and has checked the applicable representation*:**

[__] The undersigned's income[1] during each of the last two years exceeded $200,000 or, if the undersigned is married, the joint income of the undersigned and the undersigned's spouse during each of the last two years exceed $300,000, and the undersigned reasonably expects the undersigned's income, from all sources during this year, will exceed $200,000 or, if the undersigned is married, the joint income of undersigned and the undersigned's spouse from all sources during this year will exceed $300,000.

***OR***

[__] The undersigned's net worth,[2] including the net worth of the undersigned's spouse (or spousal equivalent), is in excess of $1,000,000 (excluding the value of the undersigned's primary residence).

***OR***

[__] The undersigned is an individual who holds, in good standing, a FINRA Series 7, 65, or 82 License

***OR***

[__] The undersigned is a "knowledgeable employee" of the Partnership as that term is defined in Rule 3c-5(a)(4) of the Investment Partnership Act.

***OR***

[__] The undersigned cannot make any of the representations set forth above.

**FOR ENTITY INVESTORS***

**Investors must qualify as Accredited*

**Accredited Investor Certification.** The undersigned makes one of the following representations regarding its entity and certain related matters ***and has checked the applicable representation*:**

[X] The undersigned is an entity, including an LLC, in which **all** of the equity owners (in the case of a revocable living trust, its grantor(s)) qualify as accredited investors.

[__] The undersigned is a "family office" as defined by the "family office rule" set forth in Rule 202(a)(11)(g)-1 of the Investment Advisors Act ***and*** a) has at least $5 million in assets under management; b) is not formed for the specific purpose of acquiring the securities offered; and c) its prospective investment is directed by a person capable of evaluating the risks and merits of the investment.

[__] The undersigned is a trust with total assets in excess of $5,000,000 whose purchase is directed by a person with such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the prospective investment.

[__] The undersigned is a bank, insurance company, investment company registered under the United States Investment Partnership Act of 1940, as amended (the "Companies Act"), a broker or dealer registered pursuant to Section 15 of the United States Securities Exchange Act of 1934, as amended, a business development company, a Small Business Investment Partnership licensed by the United States Small Business Administration, a plan with total assets in excess of $5,000,000 established and maintained by a state for the benefit of its employees, or a private business development company as defined in Section 202(a)(22) of the United States Investment Advisers Act of 1940, as amended.

[__] The undersigned is an employee benefit plan and *either* all investment decisions are made by a bank, savings and loan association, insurance company, or registered investment advisor, *or* the undersigned has total assets in excess of $5,000,000 *or*, if such plan is a self-directed plan, investment decisions are made solely by persons who are accredited investors.

[__] The undersigned is a corporation, limited liability company, partnership, business trust, not formed for the purpose of acquiring the Securities, or an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), in each case with total assets in excess of $5,000,000.

***OR***

[__] The undersigned cannot make any of the representations set forth above.

## ERISA REPRESENTATIONS

**1.** Subscriber is not acting on behalf of an entity which is deemed to hold the assets of an "Employee Benefit Plan"[1] (which is subject to the fiduciary rules of ERISA) or a "Plan"[2] (e.g., an entity of which 25% or more of any class of equity securities is held by Employee Benefit Plans or Plans, or an insurance company separate account holding "plan assets," etc.) (each, a "Benefit Plan Investor").

**2.** Subscriber is not a life insurance company using the assets of its general account.

[1] Any plan, fund or program established or maintained by an employer or employee organization for the purpose of providing pension, welfare or similar benefits (*i.e.*, deferred compensation arrangements) to employees, which is subject to the fiduciary rules of the U.S. Employee Retirement Income Security Act of 1974, as amended ("***ERISA***").

[2] An individual retirement account ("***IRA***"), a Keogh plan or any other plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "***Code***").

## USA PATRIOT ACT COMPLIANCE

1. Bank from which the Subscriber's payment to the Partnership is being wired (the "***Wiring Bank***"):

JPMorgan Chase Bank N.A.

Name of Bank

270 Park Avenue, 43rd floor New York, NY 10017

Address of Bank

021000021

ABA Number

(Swift Number for INT)

778593837

Account Number

Byju's Alpha, Inc.

Name Under Which Account Is Held

2. Is the Wiring Bank located in the United States or another "FATF Country"[3]?

☒ Yes
☐ No

3. If the Subscriber answered "Yes," is the Subscriber a customer of the Wiring Bank?

☒ Yes
☐ No

If the Subscriber answered "No" to questions 2 or 3 above, the Subscriber may be required, if the Subscriber is an individual, to produce a copy of a passport or identification card, together with any evidence of the Subscriber's address, such as a utility bill or bank statement, and date of birth. If the Subscriber is an entity, the Subscriber may be required to produce a certified copy of the Subscriber's certificate of incorporation, articles of association (or the equivalent) or certificate of formation or limited partnership (or the equivalent), and the names, occupations, dates of birth and residential and business addresses of all directors.

[3] The current list of countries that are members of the Financial Action Task Force on Money Laundering (each an "***FATF Country***") are: Argentina, Australia, Austria, Belgium, Brazil, Canada, China, Denmark, Finland, France, Germany, Greece, Hong Kong, Iceland, India, Ireland, Italy, Japan, Korea, Luxembourg, Malaysia, Mexico, Kingdom of the Netherlands, New Zealand, Norway, Portugal, Russian Federation, Singapore, South Africa, Spain, Sweden, Switzerland, Turkey, United Kingdom, and the United States. The list of FATF Countries may be expanded to include future FATF members and FATF compliant countries, as appropriate.

# PRIVACY NOTICE

The General Partner is committed to protecting your privacy and maintaining the confidentiality and security of your personal information, and in connection therewith, this Privacy Policy is observed by the General Partner. This Privacy Policy explains the manner in which the General Partner collects, utilizes and maintains nonpublic personal information about its investors ("***Investors***"), as required under Federal Law. In addition to the General Partner, the information collected may also be shared with, and utilized by, the Accountant, who is Sterling Mayfair. More information about the Administrator is available upon request to the General Partner.

## Collection of Investor Information

The General Partner and the Administrator may collect personal information about its Investors from the following sources:

1. Subscription forms, investor questionnaires, account forms, and other information provided by the Investor in writing, in person, by telephone, electronically or by any other means. This information includes name, address, employment information, and financial and investment qualifications;

2. Transactions within the Fund, including account balances, investments, distributions and fees;

3. Other interactions with the General Partner's affiliates (for example, discussions with our staff and affiliated broker-dealer); and

4. Verification services and consumer reporting agencies, including an Investor's creditworthiness or credit history.

## Disclosure of Nonpublic Personal Information

The General Partner and the Administrator may share nonpublic personal information about investors or potential investors in the Fund with affiliates, as permitted by law. The General Partner does not disclose nonpublic personal information about investors or potential investors in the Fund to nonaffiliated third parties, except as permitted by law (for example, to service providers who provide services to the Investor or the Investor's account).

The General Partner and the Administrator may share nonpublic personal information, without an Investor's consent, with affiliated and nonaffiliated parties in the following situations, among others:

1. To respond to a subpoena or court order, judicial process or regulatory inquiry;

2. In connection with a proposed or actual sale, merger, or transfer of all or a portion of its business;

3. To protect or defend against fraud, unauthorized transactions (such as money laundering), lawsuits, claims or other liabilities;

4. To service providers of the General Partner in connection with the administration and operations of the General Partner, the Fund and other General Partner products and services, which may include brokers, attorneys, accountants, auditors, administrators or other professionals;

5. To assist the General Partner in offering General Partner-affiliated products and services to its Investors;

6. To process or complete transactions requested by an Investor; and

7. For any proper purpose as contemplated by or permitted under the applicable Fund offering, governing or organizing documents.

**Former Customers and Investors**

The same Privacy Policy applies to former Investors.

**Protection of Investor Information**

The General Partner, and to the extent provided by its own internal policies, the Administrator, maintains physical, electronic and procedural safeguards that comply with federal standards to protect customer information. The General Partner restricts access to the personal and account information of Investors to those employees who need to know that information in the course of their job responsibilities.

**Further Information**

The General Partner and the Administrator reserves the right to change this Privacy Policy at any time. The examples contained within this Privacy Policy are illustrations and are not intended to be exclusive. This Privacy Policy complies with Federal Law regarding privacy. You may have additional rights under other foreign or domestic laws that may apply to you. All questions should be directed to the General Partner Email.

**Banking Disclosure**

The General Partner and/or the Administrator shall cause the Partnership to open and maintain a bank account(s) at an FDIC insured banking institution in the United States. However, all Members acknowledge, understand, and agree that the General Partner cannot and will not guarantee the safe deposit and keeping of all funds outside of reasonable due care, which generally entails ensuring correct receipts and deposits into the account(s) of the Partnership. The General Partner, the Sponsor, and the Partnership are not responsible for the actions (or omissions) or events that occur with the banking institutions in which the Partnership's funds are deposited.

***Signature Page Follows.***

The undersigned, in executing this Investor Suitability Questionnaire, hereby affirms and certifies each of the representations and warranties provided for above, as well as understands and agrees to all notices and disclaimers provided herein. Investors may be required to make certain representations and to satisfy that they are an accredited investor as described herein and may be required to make certain additional representations at the request of Partnership. The suitability standards referred to above are minimum requirements; the satisfaction of such standards does not mean that an investment in the company is a suitable investment for an investor. The Partnership, in its sole and absolute discretion, has the authority to accept or reject an investor hereunder. In addition, we may revoke the offer made and refuse to sell any securities to a prospective investor for any other reason whatsoever.

The undersigned has executed this **Investor Suitability Questionnaire** in connection with the Subscription Agreement of Camshaft Capital Fund, LP, as of the date written below.

Byjus Alpha , Inc

Name of Investor

DocuSigned by:

C54896B5666C4E2...

(Signature)

Riju Ravindran

Name of Signing Party (Please Print)

Director

Title of Signing Party (Please Print)

4/28/2022

Date Signed

[1] For purposes of this Questionnaire, "***income***" means adjusted gross income, as reported for federal income tax purposes, increased by the following amounts: (a) the amount of any tax exempt interest income received, (b) the amount of losses claimed as a limited partner in a limited partnership, (c) any deduction claimed for depletion, (d) amounts contributed to an IRA or Keogh

retirement plan, (e) alimony paid, and (f) any amounts by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code.

[2] For purposes of this Questionnaire, "***net worth***" means the excess of total assets, excluding your primary residence, at fair market value over total liabilities, including your mortgage or any other liability secured by your primary residence only if and to the extent that it exceeds the value of your primary residence. Net worth should include the value of any other shares of stock or options held by you and your spouse and any personal property owned by you or your spouse (*e.g.* furniture, jewelry, other valuables, etc.).

# Exhibit 29

# PROMISSORY NOTE

$300,000,000.00 April 26, 2022

FOR VALUE RECEIVED, **OCI LIMITED** (the "**Borrower**") hereby unconditionally promises to pay to the order of Camshaft Capital Fund, LP, a Delaware limited partnership (the "**Noteholder**"), on April 26, 2025, the principal amount of $318,000,000.00 (Three Hundred Eighteen Million Dollars) (the "**Loan**"), together with all accrued interest thereon, as provided in this Promissory Note (this "**Note**").

1. Payment Dates.

(a) Prepayment of Interest. Borrower shall make interest payments on the Loan as follows:

(i) On the date hereof, Borrower shall pre-pay the first three years' interest on the Loan ($18,000,000). For convenience, the foregoing first three years' interest amount will be deducted from the Loan proceeds payable by Noteholder to Borrower.

Prepaid interest shall not be refunded in any circumstance, including in the event of any prepayment by the Borrower under Section 1(b) of this Note.

(b) Prepayment of Principal. The Borrower may, upon six months' prior written notice, prepay the Loan in whole or in part at any time after October 26, 2023 if a Prepayment Event (as defined below) has occurred before such date or occurs on or after such date. As used in this Note, a Prepayment Event means any of the following:

(i) filing by Byjus Alpha, Inc. ("Byjus") or any affiliate with the Securities and Exchange Commission or any comparable foreign regulatory agency for an initial public offering of securities;

(ii) execution and delivery by Byju of an agreement for the sale of Byju, including, without limitation, any transaction or series of related transactions by which a material interest in Byju or a material amount of its assets is transferred by means of a sale or exchange of capital stock or assets, a merger or consolidation, business combination or special purpose acquisition or other transaction; or

(iii) the adoption of any law, rule or regulation in any jurisdiction making the Loan invalid or illegal or imposing on Byju or the Borrower obligations or requirements materially impacting the business of either Byju or the Borrower related to maintaining the Loan.

(c) Business Day. In the event that any date set forth herein shall fall on a day that is not a Business Day (defined below), the date shall be deemed to be extended to the next following Business Day.

2. Unsecured. The Borrower's performance of its obligations hereunder is unsecured.

3. Interest Rate.

(a) Interest Rate. Principal amounts outstanding under this Note shall bear interest at a rate per annum (the "**Interest Rate**") equal to 1.88679%.

(b) Default Interest. If any amount payable hereunder is not paid when due, whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Interest Rate plus two percentage points (2%).

(c) Computation of Interest. All computations of interest hereunder shall be made on the basis of a year of 365/366 days, as the case may be, and the actual number of days elapsed. Interest shall begin to accrue on the Loan on the date of this Note. On any portion of the Loan that is repaid, interest shall not accrue on and after the date on which such payment is made.

(d) Interest Rate Limitation. All agreements between the Borrower and Noteholder, now existing or hereafter arising, are hereby expressly limited so that in no event whatsoever shall the amount paid or agreed to be paid to Noteholder hereof for the use, forbearance or detention of money to be loaned hereunder or otherwise, or for the performance or payment of any covenant or obligation contained herein, exceed the maximum amount permissible under applicable law. If from any circumstance whatsoever fulfillment of any provision hereof exceeds the limit of validity prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstance Noteholder hereof shall ever receive as interest under this Note or otherwise an amount that would exceed the highest lawful rate, such amount that would be excessive interest shall be applied to the reduction of the principal amount owing hereunder (without charge for prepayment) and not to the payment of interest, or such excess shall be refunded to Borrower.

4. Payment Mechanics.

(a) Manner of Payment. All payments of principal and interest shall be made in US dollars no later than 5:00 PM Eastern Time on the date on which such payment is due. Such payments shall be made by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

(b) Application of Payments. All payments shall be applied, *first*, to fees or charges outstanding under this Note, *second*, to accrued interest, and, *third*, to principal outstanding under this Note.

(c) Business Day. Whenever any payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and interest shall be calculated to include such extension. "**Business Day**" means a day other than Saturday, Sunday, or other day on which commercial banks in Miami, FL are authorized or required by law to close.

(d) Representations and Warranties. The Borrower represents and warrants to the Noteholder as follows:

(e) Compliance with Law. The Borrower is in compliance with all laws, statutes, ordinances, rules, and regulations applicable to or binding on the Borrower except where the failure to be in compliance would not have a material adverse effect on the Borrower.

(f) Power and Authority. The Borrower has the requisite capacity, power and authority to execute, deliver, and perform its obligations under the this Note.

(g) Authorization; Execution and Delivery. The Borrower has duly executed and delivered this Note.

(h) No Approvals. No consent or authorization of, filing with, notice to, or other act by, or in respect of, any Governmental Authority or any other Person is required in order for the Borrower to execute, deliver, or perform any of its obligations under this Note except where the failure to obtain such consent or authorization or to make such filing will not have a material adverse effect on the Borrower.

(i) No Violations. The execution and delivery of this Note and the consummation by the Borrower of the transactions contemplated hereby and thereby do not and will not (a) violate any Law applicable to the Borrower or by which any of Borrower's properties or assets may be bound; or (b) constitute a default under any material agreement or contract by which the Borrower may be bound.

(j) Enforceability. This Note is a valid, legal, and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

(k) No Litigation. No action, suit, litigation, investigation, or proceeding of, or before, any arbitrator or Governmental Authority is pending or, to the Borrower's knowledge, threatened by or against the Borrower or any of Borrower's property or assets (a) with respect to this Note or any of the transactions contemplated hereby or (b) that could be expected to materially adversely affect the Borrower's financial condition or the ability of the Borrower to perform its obligations under this Note.

(l) PATRIOT Act; Anti-Money Laundering. The Borrower is, in compliance in all material respects with the PATRIOT Act, and any other applicable terrorism and money laundering laws, rules, regulations, and orders.

(m) Anti-Corruption Laws and Sanctions.

(i) "**Sanctioned Country**" means, at any time, a country or territory which is itself the subject or target of any comprehensive or country-wide Sanctions.

(ii) "**Sanctioned Person**" means, at any time, (a) any person listed in any Sanctions-related list of designated persons maintained by a Sanctions Authority; (b) any person operating, organized, or resident in a Sanctioned Country, (c) any person owned or controlled by any such person or persons described in the foregoing clauses (a) or (b), or (d) any person that is the subject or target of any Sanctions.

(iii) "**Sanctions**" mean all economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by a Sanctions Authority.

(iv) "**Sanctions Authority**" means OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, Canada, or other relevant sanctions authority.

(v) The Borrower is in compliance with all laws, rules, and regulations of any jurisdiction applicable to the Borrower from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 ("**Anti-Corruption Laws**").

(vi) The Borrower is not and no agent of the Borrower that will act in any capacity in connection with or benefit from the Loan, is a Sanctioned Person.

(vii) No use of proceeds of the Loan or other transaction contemplated by this Note will violate any Anti-Corruption Law or applicable Sanctions.

5. Events of Default. The occurrence and continuance of any of the following shall constitute an "**Event of Default**" hereunder:

(a) Failure to Pay. The Borrower fails to pay (i) any principal amount of the Loan when due; (ii) any interest on the Loan within five (5) days after the date such amount is due; or (iii) any other amount due hereunder within ten (10) days after such amount is due.

(b) Breach of Representations and Warranties. Any representation or warranty made by the Borrower to the Noteholder herein contains an untrue or misleading statement of a material fact as of the date made.

(c) Cross-Defaults. The Borrower fails to pay when due any of its material debt (other than debt arising under this Note), or any interest or premium thereon, when due and such failure continues after the applicable grace period, if any, specified in the agreement or instrument relating to such debt.

(d) Bankruptcy; Insolvency.

(i) The Borrower institutes a voluntary case seeking relief under any law relating to bankruptcy, insolvency, reorganization, or other relief for debtors.

(ii) An involuntary case is commenced under any law relating to bankruptcy or insolvency and is not stayed or dismissed within ninety (90) days.

(iii) The Borrower makes a general assignment for the benefit of creditors.

(iv) The Borrower is unable, or admits in writing its inability, to pay Borrower's debts as they become due.

(v) A case is commenced against the Borrower or Borrower's assets seeking attachment, execution, or similar process against all or a substantial part of Borrower's assets and is not stayed or dismissed within ninety (90) days.

(e) Failure to Give Notice. The Borrower fails to give the notice of Event of Default specified in Section 6.

6. Notice of Event of Default. As soon as possible after it becomes aware that an Event of Default has occurred, and in any event within two (2) Business Days, the Borrower shall notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

7. Remedies. Upon the occurrence and during the continuance of an Event of Default, the Noteholder may, at its option, by written notice to the Borrower declare the outstanding principal amount of the Loan, accrued and unpaid interest thereon, and all other amounts payable hereunder immediately due and payable; *provided*, *however*, if an Event of Default described in

Sections 5(d)(iii) or 5(d)(iv) shall occur, the outstanding principal amount, accrued and unpaid interest, and all other amounts payable hereunder shall become immediately due and payable without notice, declaration, or other act on the part of the Noteholder.

8. Reinstatement. If any payment received by Noteholder hereunder is determined to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation, satisfaction and/or return of the payment and/or this Note, and shall not be discharged or satisfied with any prior payment or cancellation of this Note, but shall remain a valid and binding obligation enforceable, and such payment shall be immediately due and payable upon demand.

9. Expenses. If not defaulting, the Borrower shall pay no fees on this Note, other than interest.

10. Attorneys' Fees. If any party defaults under the terms of this Note, and another party employs an attorney to enforce this Note, whether or not legal proceedings are commenced, then such other party shall be entitled to recover from the defaulting party all reasonable attorneys' fees and other costs and expenses incurred in connection with such enforcement. If any party commences or is made a party to a lawsuit, arbitration or other proceeding to enforce or interpret this Note, the prevailing party in such proceeding shall be entitled to recover from the other party all reasonable attorneys' fees and other costs (whether otherwise taxable or recoverable) incurred in connection with such proceeding, including without limitation any appeal or enforcement of any judgment or decision rendered in such proceeding.

11. Full Payment. All amounts payable under this Note shall be paid in full without setoff, deduction or counterclaim. All amounts payable under this Note shall be free and clear of and without any deduction or withholding for or on account of any taxes, levies, penalties, duties, charges, fees, restrictions or conditions of any nature now or hereafter imposed by any federal, state, country or local government or any political subdivision or taxing authority thereof or therein. Borrower shall indemnify Noteholder against any such taxes, levies, imposts, duties, charges and fees (other than taxes on the income of Noteholder imposed by any taxing authority) which may be assessed against Noteholder or claimed or demanded from Noteholder in respect of any amount payable by Borrower hereunder, and against any costs, charges, expenses or liability arising out of or in respect of such assessment, claim or demand, to the fullest extent permitted by law.

12. Notices. All notices and other communications relating to this Note shall be in writing and shall be deemed given upon the first to occur of (x) deposit with the United States Postal Service or overnight courier service, properly addressed and postage prepaid; (y) transmittal by facsimile or e-mail properly addressed (with written acknowledgment from the intended recipient such as "return receipt requested" function, return e-mail, or other written acknowledgment); or (z) actual receipt by an employee or agent of the other party. Notices hereunder shall be sent to the following addresses, or to such other address as such party shall specify in writing:

(a) If to the Borrower:

OCI Limited
33 Cannon St
London EC4M 5SB
United Kingdom
Attn: Oliver Chapman, CEO
E-mail: oc@oci-group.co.uk

If to the Noteholder:

Camshaft Capital Fund, LP
175 SW 7th Street
Miami, FL 33130
E-mail: William Morton william@camshaftcapital.com

13. Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based on, arising out of, or relating to this Note and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of Florida.

14. Disputes.

(a) Submission to Jurisdiction.

(i) The Borrower irrevocably and unconditionally (A) agrees that any action, suit, or proceeding arising from or relating to this Note may be brought in the courts of the State of Florida sitting in Miami County, and in the United States District Court for the Southern District of Florida, and (B) submits to the exclusive jurisdiction of such courts in any such action, suit, or proceeding. Final judgment against the Borrower in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(ii) Nothing in this Section 14(a) shall affect the right of the Noteholder to bring any action, suit, or proceeding relating to this Note against the Borrower or its properties in the courts of any other jurisdiction.

(iii) Nothing in this Section 14(a) shall affect the right of the Noteholder to serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

(b) Venue. The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying of venue in any action, suit, or proceeding relating to this Note in any court referred to in Section 14(a), and (ii) the defense of inconvenient forum to the maintenance of such action, suit, or proceeding in any such court.

(c) Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

15. Successors and Assigns. Upon notice to the Borrower, this Note may be assigned or transferred by the Noteholder to any individual, corporation, company, limited liability company, trust, joint venture, association, partnership, unincorporated organization, governmental authority, or other entity.

16. Integration. This Note constitutes the entire contract between the Borrower and the Noteholder with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto.

17. Amendments and Waivers. No term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Borrower and the Noteholder. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

18. No Waiver; Cumulative Remedies. No failure by the Noteholder to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The rights, remedies, and powers herein provided are cumulative and not exclusive of any other rights, remedies, or powers provided by law.

19. Severability. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or render such term or provision invalid or unenforceable in any other jurisdiction.

20. Counterparts. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic ("pdf" or "tif") format shall be as effective as delivery of a manually executed counterpart of this Note.

21. Electronic Execution. The words "execution," "signed," "signature," and words of similar import in this Note shall be deemed to include electronic and digital signatures and the keeping of records in electronic form, each of which shall be of the same effect, validity, and enforceability as manually executed signatures and paper-based recordkeeping systems, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. § 7001 *et seq.*), the Electronic Signatures and Records Act of 1999 (N.Y. State Tech. Law §§ 301-309), and any other similar state laws based on the Uniform Electronic Transactions Act.

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date set forth on the first page.

OCI LIMITED

DocuSigned by:

By: Oliver Chapman
4706C6F87E83459...

Name: Oliver Chapman

Title: Director







ATTORNEYS' EYES ONLY - CONFIDENTIAL

Case 25-50261-BLS Doc 29-18 Filed 04/22/26 Page 274 of 297

# Exhibit 30

**FINDERS AGREEMENT**

THIS FIINDERS AGREEMENT (this "**Agreement**") is effective as of April 26, 2022 (the "**Effective Date**") by and between EF Hutton, division of Benchmark Investments, LLC a Nevada limited liability company ("**EF Hutton**"), on one hand, and Camshaft Capital Fund, LP ("**CCF**"), a Delaware limited partnership and Camshaft Capital Management, LLC ("**CCM**" and together with CCF "**Camshaft**"), a Florida limited liability company, on the other hand. EF Hutton, CCM and CCF each a "**Party**" and collectively the "**Parties**".

WITNESSETH:

**WHEREAS**, EF Hutton is (i) a member in good standing of FINRA, (ii) is registered as a broker/dealer under the Exchange Act, (iii) is licensed as a broker/dealer under the laws of the States applicable to the offers and sales of the Securities by such Placement Agent, (iv) is and will be a corporate entity validly existing under the laws of its place of organization, and (v) has full power and authority to enter into and perform its obligations under this Agreement;

**WHEREAS**, CCM is the general partner of CCF, a hedge fund which deploys its capital in various types of investments;

**WHEREAS**, EF Hutton believes that it has the ability to refer potential investors and business opportunities to Camshaft, and Camshaft believes it has the ability to refer potential clients and business opportunities to EF Hutton;

**WHEREAS**, EF Hutton has made a referral of a business opportunity involving OCI Limited ("**OCI**"), concerning a potential transaction in which CCF will loan three hundred eighteen million dollars ($318,000,0000) to OCI (the "**OCI Transaction**"), and EF Hutton shall be compensated by CCM for the Referral of the OCI Transaction pursuant to the terms of this Agreement.

**WHEREAS**, the Parties wish to set forth herein, the terms and conditions upon which they would make such mutual referrals and introductions, including, but not limited to the OCI Transaction.

**NOW**, **THEREFORE**, in consideration of the mutual promises, covenants and agreements set forth herein, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1. <u>Referrals/Provision of Services</u>. Upon the terms and conditions of this Agreement and during the Term, the Parties agree to, from time to time, on a non-exclusive basis, refer to the other Party potential clients and business opportunities (such opportunities each a "**Referral**" and together the "**Referrals**"). The term "Referral" shall mean any introduction of potential client or business opportunities between the Parties, which occurred prior to the Effective Date or which occur thereafter, where the Party being introduced did not have any previous relationship with such potential client or business opportunity, as evidenced by the written acknowledgement of the Party being introduced. For the avoidance of doubt, EF introduced Camshaft to OCI and Camshaft did not have a previous relationship with OCI (or any OCI related person or entity) prior to the Referral by EF Hutton, and solely in connection with the OCI and the OCI Transaction, Camshaft waives the requirement of a written acknowledgement that OCI did not have any previous relationship with Camshaft. The Parties acknowledge and understand that neither Party is under any obligation, contractual or otherwise, to make any specific Referral or to ensure that any Referral materializes into a business arrangement for any other Party, and each Party expressly acknowledges that the other Parties are providing no guarantee that any such business arrangements or Referrals will

occur. Each Party acknowledges and agrees that, in the event these business relationships do not occur, such Party would not be entitled to damages or remedy of any kind, whether in law or equity, against any other Party. Each Party further agrees not to attempt to hold any other Party liable in any manner whatsoever therefore. Each Party acknowledges and agrees that the relationship contemplated by this Agreement is not exclusive.

2. Term/Termination. This Agreement shall be effective as of the date hereof and shall continue in effect for a period of two (2) years (the "**Initial Term**") and thereafter shall renew for successive one (1) year terms (each a "**Renewal Term**" and together with the Initial Term, the "**Term**") unless either Party provides the other with written notice of its desire not to renew this Agreement within thirty (30) days of the end of the Initial Term or any Renewal Term. In addition, any Party may terminate this Agreement (i) for convenience upon thirty (30) days written notice to other Parties or (ii) immediately, upon written notice to the other Parties, in the event any such other Party breaches its obligations under this Agreement. Notwithstanding termination of this Agreement, regardless of reason, each Party shall continue to pay the Fees for any Referral made by any other Party prior to the termination date, so long as a product or service is sold to the Referral within 6 months of the date of termination, and shall take no action to circumvent the payment of such Fee.

3. Fee. Subject to the terms of this Agreement, except as the Parties may mutually agree, in exchange for the Referrals, each Party agrees to pay to the Party who makes such Referral, three percent (3%) of all proceeds actually received by such Party as a result of each such Referral, net of direct third-party expenses incurred related to the Referral (the "**Fees**"). In determining the Fees, internal costs (e.g. salaries of employees) of a Party shall not be deemed to be "third party expenses". Clawbacks shall not apply to any Fees paid. Unless otherwise agreed, Fees shall be paid within two (2) business days of the actual receipt of the applicable transaction proceeds by the Party obligated to make the payment and in accordance with the payment instructions provided by the recipient of the Fee. In the event that the transaction proceeds are other than cash, the Parties will negotiate in good faith regarding the form and timing of the payment of the Fees.

4. OCI Fee. For the avoidance of doubt, and notwithstanding Section 3, upon the closing of the OCI Transaction, Camshaft agrees to pay EF Hutton a referral fee (the "**OCI Fee**") equal to 70.666667% of the result of (a) $9,000,000, minus (b) any direct third-party expenses incurred in relation to the OCI Transaction. The OCI Fee shall be made by wire transfer to the following account:

*Domestic Wire Instructions*

| | |
|---|---|
| Bank Name: | Ameris Bank |
| Bank Address: | 24 Second Avenue<br>Moultrie, GA 31768 |
| Bank Phone: | (770) 474-7829 |
| Account Name: | Benchmark Investments C/O EF Hutton 1871 |
| ABA Routing #: | 061201754 |
| Account Number: | 2049371871 |
| Swift Code: | WFBIUS6S |

5. Licensure Obligations of Parties. As a condition to any Party's obligation to pay the Fees, including, the OCI Fee, the Party that is receiving the Fee shall, during the Term hereof, (i) maintain, in good standing, all license which are required by applicable laws in order to make the payment of the Fees in compliance therewith including, but not limited to, insurance and securities licenses,(ii) not engage in fraud against any person or entity who is the source of a Referral, (iii) maintain an active telephone number for its business, (iv) maintain at least one (1) physical location for its business and (v) not breach any of the material terms of this Agreement. Upon request of the Party who owes the Fees, the Party who would be entitled to receive the Fees shall provide evidence of the foregoing items.

6. Compliance with Applicable Law. Each Party represents and warrants to the other Parties that it has policies and procedures reasonably designed to comply with any and all applicable state and federal laws, rules, regulation and policies that govern its activities under this Agreement including, but not limited to unfair trade practices, advertising, lead generation, insurance licensing, securities licenses, consumer privacy, product suitability, product disclosure requirements impartial conduct standards and any fiduciary responsibilities. Furthermore, each Party shall comply with all applicable laws pertaining to the research, request, handling, dissemination and destruction of confidential medical, financial and personal information for each applicant in accordance to HIPAA mandated guidelines, to the extend applicable.

7. Confidentiality/Non-Circumvent. The Parties have entered into a Non-Disclosure Agreement dated April 26, 2022 (the "**Nondisclosure Agreement**") all information exchanged between the Parties pursuant to this Agreement, including information relating to any Referral, shall be Confidential Information (as defined in the Nondisclosure Agreement). During the Term hereof and for a period of one (1) year thereafter, each Party covenants and agrees not interfere with, circumvent or attempt to avoid or bypass the other Parties with respect to Referrals made by such Party including by formation of new entities for such purposes. Each Party acknowledges and agrees that any breach or threatened breach of this Section 7 would cause the other Party or Parties and its Affiliates serious and irreparable harm for which it would have no adequate remedy at law and that the Confidential Information is being furnished by each Party in reliance upon the covenants and agreements made by the other Parties herein. Each Party further acknowledges that in the event of a breach or threatened breach of this Section 7, the non-breaching Party shall be entitled to equitable relief therefrom, including without limitation the remedies of specific performance and/or an injunction without the posting of a bond. Such remedies shall be in addition to any other rights or remedies, whether at law or in equity, which may be available to the non-breaching Party and its Affiliates.

8. Indemnity. Each Party acknowledges and agrees that, with respect to the product and services offered by the other Parties, the Party making the Referral is providing no substantive advice or services and is acting solely as a referral source. Therefore, the Party or Parties receiving the Referral covenants and agrees to indemnify, defend and hold harmless the Party making the Referral and its Affiliates, employees, agents, officers, directors, members, partners and shareholders from and against any and all claims, actions, damages, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees) (collectively "**Losses**") arising from any third party claim asserted against the party making the Referral arising from: (a) any grossly negligent, or allegedly grossly negligent, act or omission of the Party receiving the Referral and/or its/their employees, agents or representatives, and (b) any violation or alleged violation of

any statute, law, rule or regulation by such Party receiving the Referral or any of its employees, agents or representatives.

9. Limitation of Liability. In no event shall either Party, or any of its affiliates, directors, officers, employees and controlling persons (within the meaning of Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934) be liable to the other Parties for any incidental, indirect, special or consequential damages (i.e., lost profits) arising out of, or in connection with, this Agreement, whether or not such Party was advised of the possibility of such damage. Each Party further agrees that the liability limit of each other Party, together with such other Party's affiliates, directors, officers, employees and controlling persons, shall in no event be greater than the aggregate dollar amount received by such other Party in connection with the Referral giving rise to the applicable claim.

10. Independent Contractors. The Parties shall be independent contractors of one another. Nothing in this Agreement is intended to nor shall it create a joint venture, fiduciary or agency relationship between the Parties, and no Party shall have the right to legally bind any other. Each Party agrees to discharge all obligations imposed upon it as an independent contractor by all applicable federal, state or local laws, regulations or orders now or hereafter in force, including, without limitation, those relating to federal, state and local income taxes and including the filing of all returns and reports, and the payment of all assessments, taxes and other sums required. For avoidance of doubt, no Party shall have the authority, without the prior written consent of the other Party (which shall be within the absolute discretion of such), (i) to make any representation, warranty or covenant on behalf of such Party, (ii) to bind or commit such Party to any business arrangement, contract or agreement, or (iii) except as necessary to perform its obligations under this Agreement, to make statements to third parties regarding another Party, its business or its products.

11. Counterparts/Electronic Signature. This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall have the force and effect of an original, but all of which shall collectively constitute one and the same instrument. This Agreement may be executed electronically, and such execution shall have the same effect as a handwritten signature.

12. Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect any other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

13. Waivers and Amendment. This Agreement may be amended, modified or supplemented only by a written instrument executed by each of the Parties hereto. The waiver by any Party hereto of a breach of any provisions of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

14. Assignment/Binding Effect. Neither this Agreement nor any rights and responsibilities of any Party hereunder may be assigned without the prior written consent of all Parties. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, personal representatives, successors and permitted assigns. As used herein, the term "**Affiliate**" shall mean the officers, directors, managers, members, partners, shareholders, employees, attorneys, agents, professional advisors and independent contractors of a Party and any person, corporation,

partnership or other entity which, directly or indirectly, controls, is controlled by, or is under common control with a Party. "Affiliates" are intended third-party beneficiaries of Sections 6 and 7 of this Agreement.

15. Entire Agreement. This Agreement and the Nondisclosure Agreement shall constitute the entire agreement among the Parties and supersede all prior understandings and agreements between the Parties with respect to the subject matter hereof.

16. Captions. The captions or headings contained herein are for the convenience of the Parties only and does not form a part hereof and in no way modify, interpret or construe the meaning and intentions of the Parties.

17. Choice of Law/Jurisdiction and Attorney's Fees. This Agreement shall be governed by and construed under the laws of the State of New York, United States of American without regards to the conflicts of law provisions of any jurisdiction. Further, each of the Parties hereby irrevocably consent to the exclusive jurisdiction and venue of the state and federal courts located in the County of New York, New York for the adjudication of any dispute relating, directly or indirectly, to this Agreement and/or any transaction or relationship contemplated hereby. In the event of litigation relating to this Agreement, the substantially prevailing Party in such matter shall be entitled to recover reasonable attorney's fees and costs from the other Party or Parties.

18. Further Actions. The Parties shall deliver any further instruments and take any further action that may be reasonably requested by each other in order to carry out the provisions and purposes of this Agreement.

19. Information/Audit Rights. Each Party shall maintain all documents and records necessary to substantiate the Fees paid to the other Party or Parties. Upon ten (10) days advance written notice to a Party, each Party agrees, subject to section 6 hereof, to provide the requesting Party with any and all such records and information reasonably related to the Fees paid or alleged to be owed and/or make such items available for such Party's inspection during normal business hours upon reasonably advanced notice.

20. Notices. Unless otherwise provided, all notices or other communications required or permitted under this Agreement must be in writing, and must be: (i) personally delivered; (ii) sent by registered or certified mail, postage prepaid, return receipt requested; (iii) sent by email, provided that the recipient has acknowledged receipt; or (iv) sent by facsimile, provided that the fax cover sheet or facsimile machine report contains a notation of the date and time of transmission and that the transmission was successful. Notices are presumed received: (i) if personally delivered, upon the date of delivery to the address of the intended recipient; (ii) if mailed in accordance with the provisions of this Paragraph, three business days after the date placed in the United States mail;(iii) if mailed other than in accordance with the provisions of this Paragraph or mailed from outside the United States, when actually received; or (iv) if given by facsimile or email, meeting the requirements above, when sent. For the presumption of receipt to apply, notices must be given to the following addresses:

If to CCF:

Camshaft Capital Fund, LP

175 SW 7th Street
Miami, FL 33130
E-mail: William Morton william@camshaftcapital.com

If to CCM:

Camshaft Capital Management, LLC
175 SW 7th Street
Miami, FL 33130
E-mail: William Morton william@camshaftcapital.com

If to EF Hutton, division of Benchmark Investments, LLC:
Ryan J. Whalen, Esq.
Deputy General Counsel – Head of Litigation
590 Madison Avenue, 39th Floor
New York, NY 1022
rwhalen@efhuttongroup.com

A Party may change the address for notices by written notice to the other Party.

[**SIGNATURES ON FOLLOWING PAGE**]

**SIGNATURE PAGE TO FINDERS AGREEMENT**

IN WITNESS WHEREOF, this Agreement has been executed on the date first written above.

**CAMSHAFT:**

CAMSHAFT CAPITAL FUND, LP

By: Camshaft Capital Management, LLC, its general partner

DocuSigned by:
By: William Morton
100E0A38ED8D4CB...
Name: William C. Morton
Title: Fund Manager

CAMSHAFT CAPITAL MANAGEMENT, LLC

DocuSigned by:
By: William Morton
100E0A38ED8D4CB...
Name: William C. Morton
Title: Fund Manager

**EF HUTTON, division of BENCHMARK INVESTMENTS, LLC**

DocuSigned by:
By: Sam Fleischman
75AFA00C0EE547E...
Name: Sam Fleischman
Title: Supervisory Principal

# Exhibit 31

# FINDER AGREEMENT

THIS FINDER AGREEMENT (this "**Agreement**") is effective as of May 20, 2022 (the "**Effective Date**") by and between Coastal Equities Inc. ("**Finder**"), with an address at 1201 N. Orange St., Suite 729, Wilmington, DE 19801, and Camshaft Capital Fund, LP ("**CCF**"), a Delaware limited partnership and Camshaft Capital Management, LLC ("**CCM**" and together with CCF "**Camshaft**"), a Florida limited liability company. Camshaft and Finder each a "**Party**" and collectively the "**Parties**".

WITNESSETH:

**WHEREAS**, CCM is the general partner of CCF, a hedge fund which deploys its capital in various types of investments;

**WHEREAS**, Finder has made a referral, to Camshaft, of the party identified below in Paragraph 1; and

**WHEREAS**, the Parties wish to set forth herein, the terms and conditions related to such referral.

**NOW**, **THEREFORE**, in consideration of the mutual promises, covenants and agreements set forth herein, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1. <u>Referrals/Provision of Services</u>. Upon the terms and conditions of this Agreement and during the Term, the Parties agree that Finder has made a referral to Camshaft. The term "**Referral**" shall mean Finder's introduction to Camshaft of EF Hutton Group ("**EF Hutton**"), with a business address of 590 Madison Ave 39th Floor New York, NY1022. The Referral has been made prior to the Effective Date or thereafter, whereby EF Hutton did not have any previous relationship with Camshaft.

2. <u>Term/Termination</u>. This Agreement shall be effective from the Effective Date until the fee (defined below) from Camshaft to Finder has been paid, as is evidenced in writing.

3. <u>Fee</u>. Camshaft agrees to pay Finder a fee for the Referral in the amount of $1,155,000.00 (the "**Fee**"). Unless otherwise agreed upon in writing by the Parties, the Fee shall be paid within five (5) days of the Effective Date. The Fee shall be made by wire transfer to the following account:

   *Domestic Wire Instructions*
   Bank Name: Fifth Third Bank
   Bank Address: (Northern Kentucky)
   P.O. Box 630900
   Cincinnati, OH 45263-0900

   Bank Phone: (866) 475-0729

   Account Name: Coastal Equities, Inc.

ABA Routing #: 042000314
Account Number 7480627707:

4. Licensure Obligations of Parties. As a condition to Camshaft's obligation to pay the Fee, including, Finder represents and warrants that Finder (i) maintains, in good standing, all license(s) which are required by applicable laws in order to make the payment of the Fee in compliance therewith including, but not limited to, insurance and securities licenses, (ii) is not engaged in fraud whatsoever in violation of any applicable law, (iii) is not breach any of the material terms of this Agreement. Upon request of Camshaft, Finder shall provide evidence of the foregoing items.

5. Compliance with Applicable Law. Finder represents and warrants to Camshaft that Finder is in compliance with any and all applicable state and federal laws, rules, regulation and policies that govern its activities under this Agreement including, but not limited to unfair trade practices, advertising, lead generation, insurance licensing, securities licenses, consumer privacy, product suitability, product disclosure requirements impartial conduct standards and any fiduciary responsibilities.

6. Confidentiality/Non-Circumvent. If the Parties have entered into a Non-Disclosure Agreement related to the Referral (the "**Nondisclosure Agreement**"), all terms of that Nondisclosure Agreement are incorporated by reference into this Agreement.

7. No Substantive Advice. Each Party acknowledges and agrees that, with respect to the product and services offered by the other Parties, the Party making the Referral is providing no substantive advice or services and is acting solely as a referral source.

8. Limitation of Liability. In no event shall either Party, or any of its Affiliates, members, managers, directors, officers, employees and controlling persons (within the meaning of Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934) be liable to the other Parties for any incidental, indirect, special or consequential damages (i.e., lost profits) arising out of, or in connection with, this Agreement, whether or not such Party was advised of the possibility of such damage. Except in the case of indemnification obligations, each Party further agrees that the liability limit of each other Party, together with such other Party's affiliates, directors, officers, employees and controlling persons, shall in no event be greater than the aggregate dollar amount received by such other Party in connection with the Referral giving rise to the applicable claim.

9. Independent Contractors. The Parties shall be independent contractors of one another. Nothing in this Agreement is intended to nor shall it create a joint venture, fiduciary or agency relationship between the Parties, and no Party shall have the right to legally bind any other. Each Party agrees to discharge all obligations imposed upon it as an independent

contractor by all applicable federal, state or local laws, regulations or orders now or hereafter in force, including, without limitation, those relating to federal, state and local income taxes and including the filing of all returns and reports, and the payment of all assessments, taxes and other sums required. For avoidance of doubt, no Party shall have the authority, without the prior written consent of the other Party (which shall be within the absolute discretion of such), (i) to make any representation, warranty or covenant on behalf of such Party, (ii) to bind or commit such Party to any business arrangement, contract or agreement, or (iii) except as necessary to perform its obligations under this Agreement, to make statements to third parties regarding another Party, its business or its products.

10. Counterparts/Electronic Signature. This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall have the force and effect of an original, but all of which shall collectively constitute one and the same instrument. This Agreement may be executed electronically, and such execution shall have the same effect as a handwritten signature.

11. Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect any other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

12. Waivers and Amendment. This Agreement may be amended, modified or supplemented only by a written instrument executed by each of the Parties hereto. The waiver by any Party hereto of a breach of any provisions of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

13. Assignment/Binding Effect. Neither this Agreement nor any rights and responsibilities of any Party hereunder may be assigned without the prior written consent of all Parties. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, personal representatives, successors and permitted assigns. As used herein, the term "**Affiliate**" shall mean the officers, directors, managers, members, partners, shareholders, employees, attorneys, agents, professional advisors and independent contractors of a Party and any person, corporation, partnership or other entity which, directly or indirectly, controls, is controlled by, or is under common control with a Party.

14. Entire Agreement. This Agreement and (if applicable) the Nondisclosure Agreement shall constitute the entire agreement among the Parties and supersede all prior understandings and agreements between the Parties with respect to the subject matter hereof.

15. Captions. The captions or headings contained herein are for the convenience of the Parties only and does not form a part hereof and in no way modify, interpret or construe the meaning and intentions of the Parties.

16. Choice of Law/Jurisdiction and Attorney's Fees. This Agreement shall be governed by and construed under the laws of the State of Florida without regards to the conflicts of law provisions of any jurisdiction. In the event of litigation relating to this Agreement, the substantially prevailing Party in such matter shall be entitled to recover reasonable attorney's fees and costs from the other Party or Parties.

17. Further Actions. The Parties shall deliver any further instruments and take any further action that may be reasonably requested by each other in order to carry out the provisions and purposes of this Agreement.

18. Information/Audit Rights. Each Party shall maintain all documents and records necessary to substantiate the Fees paid to the other Party or Parties. Upon ten (10) days advance written notice to a Party, each Party agrees to provide the requesting Party with any and all such records and information reasonably related to the Fees paid or alleged to be owed and/or make such items available for such Party's inspection during normal business hours upon reasonably advanced notice.

19. Notices. Unless otherwise provided, all notices or other communications required or permitted under this Agreement must be in writing, and must be: (i) personally delivered; (ii) sent by registered or certified mail, postage prepaid, return receipt requested; (iii) sent by email, provided that the recipient has acknowledged receipt; or (iv) sent by facsimile, provided that the fax cover sheet or facsimile machine report contains a notation of the date and time of transmission and that the transmission was successful. Notices are presumed received: (i) if personally delivered, upon the date of delivery to the address of the intended recipient; (ii) if mailed in accordance with the provisions of this Paragraph, three business days after the date placed in the United States mail;(iii) if mailed other than in accordance with the provisions of this Paragraph or mailed from outside the United States, when actually received; or (iv) if given by facsimile or email, meeting the requirements above, when sent. For the presumption of receipt to apply, notices must be given to the following addresses:

If to CCF:

Camshaft Capital Fund, LP
936 SW 1st Ave #1086
Miami, FL 33130
E-mail: William Morton william@camshaftcapital.com

If to CCM:

Camshaft Capital Management, LLC
936 SW 1st Ave #1086
Miami, FL 33130
E-mail: William Morton william@camshaftcapital.com

If to Finder:
Coastal Equities, Inc.
1201 N. Orange St.
Suite 729
Wilmington, DE 19801
Attn: Legal

A Party may change the address for notices by written notice to the other Party.

[**SIGNATURES ON FOLLOWING PAGE**]

## SIGNATURE PAGE TO FINDERS AGREEMENT

IN WITNESS WHEREOF, this Agreement has been executed on the date first written above.

**CAMSHAFT:**

CAMSHAFT CAPITAL FUND, LP

By: Camshaft Capital Management, LLC, its general partner

DocuSigned by:
By: William Morton 5/21/2022
100E0A38ED8D4CB...
Name: William C. Morton
Title: Fund Manager

CAMSHAFT CAPITAL MANAGEMENT, LLC

DocuSigned by:
By: William Morton 5/21/2022
100E0A38ED8D4CB...
Name: William C. Morton
Title: Fund Manager

Coastal Equities, Inc.

DocuSigned by:
By: Charles Reiling 5/21/2022
86AB33807E72475...
Name: Charles Reiling
Title: CEO

# Exhibit 32

**FORM NO. MGT – 1**
**REGISTER OF MEMBERS**

[Pursuant to Section 88(1)(a) of the Companies Act, 2013 and Rule 3(1) of the Companies (Management and Administration) Rules, 2014]
**(TO BE MAINTAINED SEPARATELY FOR EACH CLASS OF SHARES)**

Name of the Company : **THINK & LEARN PRIVATE LIMITED**
Registered Office Address : **IBC KNOWLEDGE PARK, 4/1, 2ND FLOOR, TOWER D, BANNERGHATTA – MAIN ROAD, BANGALORE – 560029, KARNATAKA INDIA**
CIN : **U80903KA2011PTC061427**

Class of Shares: **SERIES F CCCPS** Nominal Value Per Share (in Rs.): **RS. 10/-** Total Shares held: ______ Folio No. **F-123**

**Personal Details:**

Name of the Member: **BYJUS INVESTMENTS PTE. LTD.**

Name of Joint Holders/s, if any: **NOT APPLICABLE**

Address / Registered Address (in case of body corporate): **30 CECIL STREET, #19-08, PRUDENTIAL TOWER SINGAPORE 049712**

e-Mail ID: **byjuraveendran@gmail.com**

CIN/Regn. No.: **202216074E**

Unique Identification No.: **NOT APPLICABLE**

Father's/Mother's/Spouse's Name: **NOT APPLICABLE**

Status: **PRIVATE COMPANY**

Occupation: **BUSINESS**

PAN No.: **AAKCB9678E**

Nationality: **SINGAPORE**

Date of becoming Member: **01/07/2022**

**In case Member is a Minor,**

Name of Guardian: **NOT APPLICABLE**

Date of Birth of Minor: **NOT APPLICABLE**

**Details of Membership:**
Date of Declaration under Section 89, if applicable: ______
Name and Address of Beneficial Owner : ______
Date of receipt of nomination, if applicable : ______
Name and Address of Nominee: ______
No. of Shares kept in abeyance, if applicable : ______
Record of lien on shares, if applicable : ______
Date of cessation of Membership: ______

**Instructions:**
Particulars of dividend mandates, power of attorney and other instructions, if any: ______
Instruction for sending notices etc., if any: ______

**DETAILS OF SHARE HOLDING**

| Allotment No. / Transfer No. | Date of Allotment / Transfer | No. of Shares allotted or transferred | Distinctive No. of Shares | | Folio of Transferor, if applicable | Name of the Transferor, if applicable | Date of Issue or Endorsement of Share Certificate | Certificate No. | Amount (Rs.) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | From | To | | | | | Payable | Paid / Deemed to be Paid | Due |
| | 01/07/22 | 27,701 | 1542096 | 1569796 | -- | -- | 14/07/22 | F-183 | -- | 986,84,81,250 | -- |
| | 05/07/22 | 25,470 | 1569797 | 1595266 | -- | -- | 14/07/22 | F-184 | -- | 907,36,87,500 | -- |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

**DETAILS OF SHARE HOLDING**

| Lock in Period if any | If shares are issued for consideration other than Cash, brief particulars thereof | Date of Transfer / Transmission / Forfeiture / Redemption, etc | Distinctive No. of Shares | | No. of Shares Transferred/ Transmitted/ Forfeited / Redeemed, etc | Folio of Transferee | Name of Transferee | Balance Shares (after Transfer / Transmission/ Forfeiture / Redemption etc) | Remarks | Authentication / Signature |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | From | To | | | | | | |
| -- | -- | -- | -- | -- | -- | -- | -- | 27,701 | | |
| -- | -- | -- | -- | -- | -- | -- | -- | 53,171 | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

# Exhibit 33

**IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE (6TH EDITION, 1 AUGUST 2016)**

SIAC ARB NO. ARB093/24/RHM

Between

**QATAR HOLDING LLC**

*… Claimant*

And

1. **BYJU'S INVESTMENTS PTE LTD**
2. **BYJU RAVEENDRAN**

*… Respondents*

---

**AFFIDAVIT OF BYJU RAVEENDRAN**

---

I, **BYJU RAVEENDRAN** (Indian Passport No. Z3922404), care of Byju's Investments Pte. Ltd, 30 Cecil Street, #19-08 Prudential Tower, Singapore 049712, do solemnly and sincerely affirm and say as follows:

1. I am the above-named Second Respondent. I am also the director of First Respondent, Byju's Investments Pte Ltd ("**BIPL**") and am authorised to make this Affidavit on behalf of the First Respondent in SIAC ARB No. 93 of 2024 ("**Arbitration**").

2. Insofar as the matters deposed to herein are within my personal knowledge, they are true. Where the matters deposed to herein are not within my personal knowledge, they are true to the best of my knowledge, information or belief.

3. I have been assisted by my counsel, Providence Law Asia LLC and Dr. Rishab Gupta, in the preparation of this Affidavit.

4. I have been shown (i) the Interim Award dated 28 March 2024 issued by Mr. Stuart Isaacs KC (acting as an emergency arbitrator (**EA Award**), as well as (ii) the Interim Order dated 28 March 2024 issued by Mr. Stuart Isaacs KC (**EA Order**). I make this affidavit in compliance with the EA Award and EA Order which provides, amongst others, the following:

> "[…] *the Respondents shall disclose, under a sworn affidavit, to the Claimant, full and accurate details of all their assets, whether in their own name or not and whether solely or jointly owned and whether the Respondents are interested in them legally, beneficially or otherwise, within 21 days from the date of this Award*."

## I. MY ASSETS

5. I set out below a detailed list of my assets:

   a. Bank Accounts:

      i. ICICI Bank Account No. 035701509176;

      ii. Emirates NBD Bank Account No. 1015497457901; and

      iii. LIV (Emirates NBD) Bank Account No. 0959085023401;

   b. Fixed Property: 43 Yoganarasimha, 14th Main, 15th Cross HSR Layout Sector 4, Bangalore (jointly owned by me and my brother, Mr Riju Raveendran).

   c. Shares:

      i. 1,000 ordinary shares (fully paid up) in Byju's Holdings 1 Pte Ltd;

      ii. 1,000 ordinary shares (fully paid up) in Byju's Global Pte Ltd;

iii. 1,000 ordinary shares (fully paid up) in Beeaar Investco Pte Ltd;

iv. 716,370 equity shares (fully paid up) and 7,018 Series F CCCPS in Think & Learn Pvt Ltd; and

v. 99,990,000 ordinary shares (fully paid up) in Byjus Investments Pvt Ltd.

## II. BIPL'S ASSETS

6. A detailed list of BIPL's assets is set out below:

a. Bank Accounts:

i. HSBC Bank Account No. 260288030179; and

ii. HSBC Bank Account No. 260288030180;

b. Shares:

i. 53,171 Series F CCCP shares in Think & Learn Pvt Ltd; and

ii. 17,891,289 ordinary shares (fully paid up) in Aakash Educational Services Limited.

**AFFIRMED** by the abovenamed )
Byju Raveendran )
In Dubai, United Arab Emirates )
On this day of April 2024 )

Byju

I, Atif Ali, Ali said advocate and commissioner for oaths hereby witness that BYJU RAVEENDRAN signed this document in my presence

Juris Prime Legal Consultancy and Law Firm FZ LLC
License No : 18647/2023 P.O.Box 4422 Fujairah - UAE
Email info@juris-prime-legal.com
Mob : +971-55-4805419 www.juris-prime-legal.com
Signature
Date 29/04/2024

Before me

A Notary Public

License No. 18647/2023
P.O.Box : 4422 - U.A.E.
Juris Prime Legal Consultant & Law Firm FZ LLC

# Exhibit 34

---

**IN THE MATTER OF ARBITRATION UNDER**

**THE SIAC ARBITRATION RULES 2016**

---

**BETWEEN**

**QATAR HOLDING LLC**

**THE CLAIMANT**

**—AND—**

**(1) BYJU'S INVESTMENTS PTE. LTD**

**(2) MR BYJU RAVEENDRAN**

**THE RESPONDENTS**

---

# SECOND WITNESS STATEMENT OF SCOTT CRAMER SENECAL

---

22 March 2024

Cleary Gottlieb Steen & Hamilton LLP
2 London Wall Place
London EC2Y 5AU

*Submitted by and on behalf of the Claimant*:

## TABLE OF CONTENTS

I. QH'S KNOWLEDGE OF THE DK TRANSACTION ..... 3

II. PRIOR ACQUISITION BY BIPL OF T&L SHARES AND NEGOTIATION OF THE CONVERSION EVENT OF DEFAULT PROVISION ..... 7

III. CONVERSION EVENT OF DEFAULT AND ALLEGED WAIVER ..... 10

IV. MR RAVEENDRAN'S TRANSPARENCY / QH'S INFORMATION REQUESTS ..... 13

V. LEGITIMACY OF MR RAVEENDRAN'S BUSINESSES / DISSIPATION OF ASSETS IN US PROCEEDINGS ..... 15

VI. THE T&L RIGHTS ISSUE & RISK OF DILUTION/DISSIPATION ..... 18

VII. URGENCY OF THE APPLICATION ..... 19

VIII. CONCLUSIONS ..... 19

I, Scott Cramer Senecal of Qatar Investment Authority ("**QIA**") having my business address at Ooredoo Tower (Building 14), Dafna Street (Street 801), Al Dafna (Zone 61), P.O. Box 23224 Doha, Qatar, will say as follows:

1. I am the Scott Cramer Senecal who previously provided a witness statement in this arbitration, dated 6 March 2024 ("**Senecal 1**"). I make this statement in further support of QH's application for Emergency Arbitration ("**Application**") and in response to Mr Raveendran's witness statement dated 15 March 2024 ("**Raveendran 1**"). Capitalised terms not defined in this statement have the same meaning as in Senecal 1.

2. Save as expressly stated, the facts and matters set out in this witness statement are within my own knowledge and are true to the best of my knowledge and belief. Where I refer to information supplied by others, the source of such information is identified. Where I refer to documents in this witness statement, those documents are exhibited to QH's Application as "**Exhibit C-001**" to "**Exhibit C-057**".

3. As I describe below, Mr Raveendran's statement contains numerous errors and misrepresentations about his interactions with QH and other matters. These only heighten QH's concerns that the Respondents are not reliable counterparties who will meet their obligations in the event of an award against them. QH therefore continues to believe that emergency relief is essential in order to protect its submissions.

## I. QH'S KNOWLEDGE OF THE DK TRANSACTION

4. Mr Raveendran makes much of the fact that QIA is a shareholder in T&L through its subsidiary, INQ Holdings. INQ Holdings currently holds 26,722 Series A CCPs and 31,763 Series F CCPs in T&L. According to the latest cap table circulated by Mr Raveendran on 10 February 2024 (the accuracy of which we are not in a position to confirm), INQ therefore holds only approximately 1.2% of the shares in T&L (which will be diluted by 90% following the planned rights issue).[1] A shareholding of this level gives INQ minimal

---

[1] E-mail Second Respondent to Claimant and enclosures – Aakash capitalization table and list of shareholders (**Exhibit C-020**), p. 3.

information rights; by virtue of that small stake QIA did not gain meaningful insight into the actions taken by Mr Raveendran or T&L (much less somehow waive any of its rights under a contract with another party).

5. Mr Raveendran claims in particular that QH was aware of the DK Transaction at the time it took place. It is correct that INQ received notice of an Extraordinary General Meeting of T&L which was held on 25 April 2023, at which resolutions were passed in respect of the issuance of Debentures, which were ultimately issued in connection with the DK Transaction.[2] However:

    a. The EGM was held on extremely short notice: the official notice was distributed on 24 April 2023, for a meeting to be held the following day.[3] Together with the notice was a form to accept short notice. QIA did not sign that form because as a matter of policy it does not view shareholder meetings called on extremely short notice as representing good corporate governance. No representative from QIA attended the EGM and QIA did not vote on the resolutions.

    b. As Mr Raveendran acknowledges, the resolutions gave him (as well as his wife and brother) a sweeping authority to negotiate and finalise the terms of a certain transaction. What the resolutions did not do was to provide any clarity over what those terms would be. The draft resolutions circulated to shareholders (which were then passed) include a resolution related to the issuance of "*Non-Convertible Debentures*" by Aakash, but gives no further meaningful details of the debentures to be issued or the other terms of the transaction. There is no mention of Davidson Kempner, nor DKCM, nor any other information linking the resolution to the DK Transaction. There is also no disclosure of, or reference to the prospect that, the ultimate holder of the debentures may have any rights in respect of the equity in Aakash, and there is no disclosure of any pledge being granted over the shares in Aakash (or, for that matter, the party that would ultimately grant the pledge, *i.e.*,

---

2 Resolutions passed at the Extraordinary General Meeting dated 25 April 2023 (**Exhibit R-014**).

3 Notice of extraordinary general meeting of T&L and consent to short notice sent to Claimant (**Exhibit C-052**).

Beeaar). Similarly, there was no disclosure made that the shares in Aakash that would ultimately be pledged were the very same shares then held by BIPL, acquired using QH's funding.

c. None of the documents underlying the DK Transaction were provided to INQ (let alone QIA or QH) then or subsequently. As such, QH simply did not know that the Aakash Shares had been transferred by BIPL (routed through BGPL and with no consideration received) to Beeaar as part of the DK Transaction. Glossing over the intermediate sale of the Aakash Shares by BIPL to BGPL, Mr Raveendran suggests that the sale to Beeaar was "*at DK's request and the recommendation of BIPL's lawyers*".[4] This, however, does not inherently justify the transfer of the Aakash Shares or their subsequent pledge in breach of the contractual undertakings of BIPL.

6. In light of the above, the EGM and associated documents plainly did not make full disclosure of the DK Transaction (and thus no consent to it was given, either expressly or by implication). Mr Raveendran then claims that he directly informed Mr Al-Hardan and Mr Al-Mahmoud that the Aakash Shares would be pledged to DK as part of the DK Transaction. This is simply not correct.[5] The contemporaneous notes of the meeting with Mr Al-Hardan and others on 30 April 2023 are at **Exhibit C-050**. They conspicuously do not record Mr Raveendran having revealed that the Aakash Shares had been transferred to first to BGPL and second to Beeaar or pledged. Had this information been revealed, it would have been of significant concern to QH – as evidenced by the fact that when QH finally learned of the transfer to Beeaar and pledge in December 2023, it was indeed immediately alarmed and concerned. Such news would have been recorded in the contemporaneous notes of the meeting. QH would have never known about the intermediate transfer of the Aakash Shares to BGPL had this not come to light in the Respondents' submissions.

---

4 Raveendran 1, ¶28.

5 Reply Witness Statement of Mohammed Al-Hardan ("**Al-Hardan 1**"), ¶10.

7. I have raised the points made by Mr Raveeendran regarding the DK Transaction with QIA's CEO, Mr Al-Mahmoud. Mr Al-Mahmoud has informed me that he never discussed the DK Transaction with Mr Raveendran. Mr Al-Mahmoud has also confirmed that he was never told by the Second Respondent that as part of the DK Transaction the Aakash Shares had been transferred to another entity and subsequently pledged.

8. Mr Raveendran suggests in his Response that QH could have known about Beeaar's ownership through public filings.[6] That is incorrect: the beneficial ownership forms filed by Aakash with the Ministry of Corporate Affairs do not disclose the disposing entity, nor has Aakash published a list of its shareholders (and when QH requested the list of Aakash shareholders from Aakash (and from Mr Raveendran) it received no response).[7]

9. As I explained in Senecal 1,[8] while QH knew of the existence of the DK Transaction in April 2023, QH only became alert to the possibility that the DK Transaction involved a transfer of the Aakash Shares from BIPL to (ultimately) Beeaar and a pledge over those shares by Beeaar in favour of DK on 24 December 2023. Suspicions arose when certain details about the Manipal Transaction were disseminated to individuals on QH's TMT team.[9] Even then, however, the full terms of the Manipal Transaction were not disclosed and the relevant deck inaccurately stated that BIPL was the holder of the shares.[10] It was only following extensive efforts undertaken by QH to uncover the true position that this became apparent.

---

6 Response to the Emergency Arbitration Application (the "**Response**"), ¶106.

7 Beneficial ownership forms (BEN-2) filed by Aakash (**Exhibit C-009**).

8 Senecal 1, ¶13(a).

9 E-mail Respondents (Mr Golani) to Claimant: Manipal Transaction (**Exhibit C-053**).

10 "Manipal Deal Note" slide presentation (**Exhibit C-013**), slide 6.

## II. PRIOR ACQUISITION BY BIPL OF T&L SHARES AND NEGOTIATION OF THE CONVERSION EVENT OF DEFAULT PROVISION

10. Mr Raveendran is wrong to deny that a Conversion EoD has occurred and is wrong to assert that QH consented to BIPL not acquiring additional T&L shares or otherwise waived its rights.

11. Mr Raveendran contends that he had already "*cured*" his eventual Conversion EoD by acquiring T&L shares directly through BIPL, and that this served as a form of safety net in compliance with the terms of the Confirmation.[11] Mr Raveendran therefore seems to suggest that no prejudice was – or is – being suffered by QH because the required number of shares were already held by BIPL prior to the transaction with QH.[12] That is wrong, and demonstrates a complete disregard for the original purpose and express terms of the Transaction Documents, which was ultimately to purchase additional T&L shares. This new story is also flatly inconsistent with another new (and false) story of Mr Raveendran – that he offered in April 2023 to "*cure*" the default by acquiring additional T&L shares – to which I return below.

12. Around July 2022, three months <u>before</u> QH entered into the swap with BIPL, BIPL acquired approximately 53,000 shares in T&L.[13] I understand that the acquisition was partly or fully funded out of the proceeds of a facility between BIPL (as borrower) and Revere Master SPV LLC (a Delaware registered company) (as lender), the sole purpose of which was to fund the purchase of T&L shares (the "**Existing Facility**", as defined in the Confirmation). QH was aware of the Existing Facility and BIPL's shareholding when negotiations began with Mr Raveendran in around August 2022. QH had been provided with a copy of the Existing Facility and a T&L cap table showing T&L shareholding as

11 Raveendran 1, ¶70.

12 Raveendran 1, ¶29(d).

13 BIPL's Share Certificates in T&L (**Exhibit R-039**).

part of the due diligence process. That table stated that as at 23 August 2022, BIPL held 55,402 shares in T&L.[14]

13. QH took into account this previous shareholding and the terms of the Existing Facility in negotiating the various provisions of the Confirmation including the Conversion EoD:

a. As stated above, the original purpose of the proposed transaction was to purchase additional T&L shares. An early draft term sheet that was circulated by QH's solicitors on 20 August 2022 noted that the Initial Exchange Amount would be used to purchase ordinary shares in T&L (*i.e.,* not Aakash).[15]

b. Several days later, it was then proposed that the Initial Exchange Amount would be put towards the purchase of Aakash shares, which would in turn be converted to T&L shares. Given that Aakash shares would be purchased, it was also discussed whether security could be taken over the Aakash Shares, but that was not possible due to restrictions under Indian law. In return for that change in structure, the Conversion EoD provision was included to protect QH's investment if the shares were never converted.[16]

c. The language adopted in the final version of Confirmation was that a Conversion EoD would occur if BIPL failed to acquire an *additional* 50,561 T&L shares.[17] It is therefore clearly the case that BIPL's pre-existing shareholding could not be used in satisfaction of BIPL's failure to convert and QH would never have accepted otherwise.

d. For the same reason, the non-disposal undertaking in the final version of the Confirmation was that disposal of Aakash shares was only permitted "*provided that at a time* ***substantially contemporaneously*** *as such ... disposal, [BIPL] acquires T&L Shares* ***intended to be funded by the Initial Exchange Amount***" (emphasis

14 T&L capitalization table as at 23 August 2022 (**Exhibit C-049**).

15 Claimant's draft of the Transaction term sheet (**Exhibit C-054**).

16 Claimant's second draft of the Transaction term sheet (**Exhibit C-055**).

17 Confirmation (**Exhibit C-001**), p. 16.

added). BIPL's existing shareholding was not "*substantially contemporaneous*", nor had it been "*intended to be funded by the Initial Exchange Amount*".[18]

14. QH also understood at the time that, according to the commercial agreement between BIPL and the original lender under the Existing Facility, the T&L shares it acquired with proceeds of the facility were effectively earmarked to satisfy BIPL's obligations *vis a vis* the lender under the Existing Facility (in other words, they could only be sold in order to pay down that facility, which is also consistent with the exemption to the disposal undertaking in the Confirmation[19]). As such, those shares could not have been used in the manner in which Mr Raveendran now suggests (*i.e.,* to "*cure*" any possible Conversion EoD under the Confirmation). Where the Existing Facility remained unpaid, neither could those shares "*safeguard the Claimant's position where necessary*".[20] It was therefore essential to QH that BIPL was required to acquire *additional* shares in T&L if the merger failed to occur. That Mr Raveendran now purports to use earmarked shares (that have been earmarked to satisfy obligations to other parties) to stave off a claim by QH is consistent with his pattern of diverting assets meant for particular creditors to pay claims considered more pressing.

15. It is also notable that, based on Mr Raveendran's recent shareholding information for T&L sent to QH on 10 February 2024, BIPL apparently only holds 53,171 Series F CCPS shares as of that date. As such, not only has BIPL failed to acquire any additional shares in T&L, but given that the cap table provided on 23 August 2022 stated that 55,402 shares were held, it appears that BIPL has in fact *disposed* of shares since 2022. That disposal would constitute an independent breach of Mr Raveendran's undertaking in the Guarantee, which prohibits Mr Raveendran from disposing of any T&L shares following a Conversion EoD.[21]

---

18 Confirmation, clause 5(o)(ii)(E) (**Exhibit C-001**), p. 30.

19 Confirmation, clause 5(o)(ii) (**Exhibit C-001**), p. 30.

20 Response, ¶104.

21 Deed of personal guarantee by Second Respondent, clause 4.12 (**Exhibit C-002**), p. 12.

## III. CONVERSION EVENT OF DEFAULT AND ALLEGED WAIVER

16. Mr Raveendran claims that "*QIA was supportive of T&L's recommendation not to proceed with the merger, and to run Aakash as a separate entity*" and that "*[QH] had agreed with T&L's decision not to proceed with the merger in Aakash*".[22] All of that is incorrect.[23]

17. QH understood from as early as December 2022 that the merger was not likely to go ahead. QH did not immediately object to Mr Raveendran's proposed course of action to forego the merger because of representations made by Mr Raveendran concerning the value in Aakash, and the possibility of an Aakash IPO, as well as other investments that were allegedly being negotiated for the business. For example, on a call between QH (represented by, among others, Vishal Nayyar, with whom I have consulted in preparing this statement), Mr Raveendran, and their respective legal advisors on 4 January 2023, Mr Raveendran represented that:

    a. he was exploring a potential IPO on a standalone basis and that given Aakash's business profile, he expected a standalone listing to fetch premium value;

    b. the Aakash IPO was an attractive option as it would create sufficient liquidity for BIPL to repay QH at the scheduled maturity date;

    c. QH was no worse off as it would still have the option to convert its shares in Aakash at a future point if the Aakash IPO did not proceed as planned; and

    d. for the proposed transaction to go ahead, QH would need to amend the Confirmation.

18. QH was not "*supportive*" of the failure to proceed with the merger as Mr Raveendran has misconstrued. Instead, QIA was exploring alternatives in an effort to protect its investment in light of the changed circumstances and to put QH into a position akin to what it would have been had the expected conversion of the Aakash Shares into T&L Shares taken place.

---

22 Raveendran 1, ¶20.

23 *See also* Senecal 1, ¶¶9-10.

In doing so, QH was clear that it was not waiving its rights under the Transaction Documents and,[24] on 30 April 2023, QH wrote to Mr Raveendran formally to notify him that the Conversion EoD (and certain other defaults) had occurred, and to expressly reserve QH's rights.

19. Mr Raveendran states that he "*immediately reached out to QH after the 30 April 2023 letter, and offered to cure the alleged default raised in that letter by acquiring the 50,561 T&L Shares*".[25] I first note that the Conversion EoD was not capable of being cured once the deadline passed.

20. More importantly, however, Mr Raveendran never offered to "*cure*" the Conversion EoD, whether on 30 April 2023 as alleged, or at all. A contemporaneous note of the 30 April 2023 call clearly minuted the following matters: [26]

   a. In respect of the Indian Enforcement Directorate investigations into Mr Raveendran's FEMA violations, Mr Raveendran promised he would share a "*legal confirmation*" from his Indian lawyers that T&L was "*fully compliant*" with FEMA rules (in the event, never shared);

   b. various fundraising was being considered within the Byju's group of companies (the "**Group**"), in particular the promised Aakash IPO, as to which Mr Raveendran stated he was hiring bankers "*soon*";

   c. an update on the start of another new Chief Financial Officer of T&L; and

   d. QH's expressly preserving its rights per the Reservation of Rights Letter it had already delivered,[27] saying this was "*essential to protect QH's interest*", and raising

---

24 As to this, in preparing my Second Witness Statement I have noticed an error in Senecal 1, at paragraph 10. I referred there to the concept in the Standstill Agreement that the Upside Premium would be calculated with reference to Aakash rather than T&L. This should have read "Aakash…rather than only T&L" – QH wanted to have this addition to help protect its investment and ensure payout in the event there was an Aakash rather than a T&L liquidity event (including an Aakash IPO or potential sale, which seemed more likely in the circumstances at the time).

25 Raveendran 1, ¶26.

26 Attendance note of call with Second Respondent on 30 April 2023 (**Exhibit C-050**).

27 Letter from Claimant to First Respondent (incl. copy to Second Respondent) (**Exhibit C-008**).

the Standstill Agreement, as to which Mr Raveendran requested a "*couple of weeks*" before "*engaging*".

21. The minutes reflect neither Mr Raveendran's purported offer to "*cure*" his breach nor any waiver by QH of BIPL's default. Rather, Mr Raveendran acknowledged the Standstill Agreement on the call, and stated that he would "*engage*" with it in a further few weeks pending "*ongoing fundraising*". QH never waived BIPL's default nor released BIPL from acquiring the additional T&L shares contemplated under the Confirmation. QH would otherwise not have insisted on the terms of the Standstill Agreement which had been tabled at this time, and which QH persisted for months to have signed by Mr Raveendran. Under that agreement, directly to the contrary, QH expressly did not waive any rights and BIPL covenanted to acquire the additional T&L shares.

22. Mr Raveendran claims, in relation to the Standstill Agreement, that he was in "*close communication*" with QH senior management, including CEO Mr Al-Mahmoud, to address QH's concerns and that the parties agreed they would "*honour the terms of the Standstill Agreement*".[28] This too is inaccurate:

    a. *First,* I understand that the majority of the communications between Mr Al-Hardan and Mr Raveendran in relation to the Standstill Agreement were messages to chase following Mr Raveendran's silence. [29]

    b. *Second*, the terms of the Standstill Agreement included an obligation to purchase *additional* T&L shares. [30] While Mr Raveendran might have agreed to the terms of the Standstill Agreement (as he now claims he did), it is clear that he never really intended to honour its terms. Had he so intended, he would have simply made the purchase of additional shares prescribed by it, but he never did.

---

28 Raveendran 1, ¶51.

29 Al-Hardan 1, ¶8, *see also* e-mails Claimant (Mr Al-Hardan) to Second Respondent: Standstill Agreement and follow-ups (**Exhibit C-028**, **Exhibit C-043**, **Exhibit C-044** and **Exhibit C-045**).

30 Standstill Agreement, clause 4.11 (**Exhibit C-028**).

23. Mr Raveendran's claim that he had promised QH that he would honour the terms of the Standstill Agreement is thoroughly disingenuous. The pledge over the Aakash Shares was already in place before the draft Standstill Agreement was sent to Mr Raveendran on 30 April 2023. The terms of the Standstill Agreement, including terms to the effect that the Aakash Shares would be used for the calculation of the Option Cash Settlement Amount due to QH, were based on the premise that the Aakash Shares were unencumbered (and thus could be sold to third parties so as to generate the Option Cash Settlement Amount). However, Mr Raveendran concealed from QH the critical facts that the Aakash Shares had already been pledged and that he could therefore not honour the terms of the Standstill Agreement.

## IV. MR RAVEENDRAN'S TRANSPARENCY / QH'S INFORMATION REQUESTS

24. Mr Raveendran asserts that he has been open and forthcoming in his communications with QH and other individuals at QIA in relation to QH's information requests. I disagree. I believe that the relevant correspondence speaks for itself, for the reasons set out in Senecal 1. However, it is notable that of the 14 sub-paragraphs listed at paragraph 49 of his statement, not one actually evidences the openness Mr Raveendran suggests:

a. Sub-paragraphs (a)-(d) are irrelevant to the facts that are at issue in the present Application: this correspondence goes to the financial condition and operating performance of the Group and no inference can drawn from it about the Aakash Shares or the condition or state of assets held by BIPL.

b. Sub-paragraph (f) refers to Mr Al-Hardan's request for a meeting with Nitin Golani, CFO of the Group, which culminated in a video call on 22 January 2024. Based on my team's internal note of the call, the presentation Mr Golani gave was anything but transparent: confusingly, Mr Golani interchangeably described Beeaar and BIPL as owning the Aakash Shares, and expressed his own personal surprise that we had not previously been told about Beeaar's existence, describing this as

something for us to "*sort out with Byjus*".[31] Despite his role as CFO, Mr Golani also stated that he had "*no visibility*" on the use of funds advanced by Manipal to the Group. [32]

c. Sub-paragraphs (i), (k) and (m) concern Mr Raveendran's requests to postpone meetings with QH and only bear out Mr Raveendran's delaying tactics.

d. Sub-paragraphs (e), (h) and (j) refer to requests for information sent by Mr Al-Hardan and Cleary Gottlieb to Mr Raveendran, to which no substantive responses were received.[33]

e. Sub-paragraphs (g) and (l) refer to calls held with Mr Raveendran at QH's insistence, and on which Mr Raveendran failed to provide the requested information.

f. Sub-paragraph (n) concerns an NDU that he had promised to provide on 9 February 2024. Mr Raveendran first claimed to have provided a signed version of the NDU in respect of the T&L Shares on 15 February 2024.[34] When I pointed out that the version he attached was not in fact signed or witnessed, Mr Raveendran sent a further signed, amended copy on 17 February 2024. However, he failed to complete the full details of the shares required to register the NDU with the depositary (and has never remedied this, despite being immediately asked to rectify his mistake on several occasions, a point which he omits from his witness statement).[35] With respect to the Aakash Shares, Mr Raveendran now claims that he "*was unable to*

31 Attendance note of briefing call of 22 January 2024 between Mr Golani (CFO of T&L) and T&L shareholders (**Exhibit C-030**), p. 3.

32 Attendance note of briefing call of 22 January 2024 between Mr Golani (CFO of T&L) and T&L shareholders (**Exhibit C-030**), p. 5.

33 E-mail Mr Al-Hardan (for Claimant) to Respondents: information requests (**Exhibit C-014)**, Letter Cleary Gottlieb Steen & Hamilton LLP to First Respondent (incl. copy to Second Respondent) and enclosure – non-disposal undertaking (**Exhibit C-019**) and Letter Cleary Gottlieb Steen & Hamilton LLP to First Respondent (incl. copy to Second Respondent) (**Exhibit C-021**).

34 E-mail Claimant (Mr Senecal) to Second Respondent: second follow up request on unsigned non-disposal undertaking and information requests (**Exhibit C-033**).

35 E-mail Second Respondent to Claimant and enclosure – modified non-disposal undertaking (**Exhibit C-022**).

*execute the NDU in respect of the Aakash Shares held by Beeaar… given that these shares were subject to a pledge pursuant to the Manipal Transaction*". This is not an explanation he gave at the time. The whole story is one more illustration of Mr Raveendran's modus operandi of playing for time and misleading QH.

## V. LEGITIMACY OF MR RAVEENDRAN'S BUSINESSES / DISSIPATION OF ASSETS IN US PROCEEDINGS

25. Mr Raveendran makes a number of assertions in his witness statement concerning the legitimacy of his businesses, including by downplaying the many serious claims made against him in the United States.[36] QH is however concerned that there is serious cause for concern in relation to Mr Raveendran's business practices, including a history of default and bankruptcy.

26. There are currently two sets of proceedings that have arisen in relation to the transfer of USD 533 million from Byju's Alpha, Inc ("**Byju's Alpha**") to Camshaft following Byju's Alpha's default of the USD 1.2 billion Term Loan B. The proceedings, in Florida and Delaware, involve allegations of fraudulent conveyance arising from this transfer.

27. Mr Raveendran attempts to distance himself from the various US-based actions, in particular the Florida and Delaware proceedings:[37]

    a. In relation to the Florida proceedings against Camshaft, Mr Raveendran states that those proceedings "*are not against me and/or any entities within the Group*".[38] He however fails to acknowledge that these proceedings directly implicate Byju's Alpha and the transfer by it of substantial sums to Camshaft. By Mr Raveendran's own admission, Byju's Alpha served an important role within the Group by receiving funds which "*would be directed to various businesses within the* [Group]".[39] As for the involvement of the Group, remarkably in 2023 T&L itself

---

36 **Raveendran 1**, ¶57-64.

37 **Raveendran 1**, ¶58, 61.

38 **Raveendran 1**, ¶58(a).

39 **Raveendran 1**, ¶59.

issued an announcement asserting, "*it has significant cash reserves, and is open to discussions with the TLB lenders and 'ready, willing and able to continue making payments under the TLB if the lenders withdraw their ... actions and honor the terms of the agreement*'".[40] It is also notable from public filings in that case that the CEO of Camshaft, a 23-year-old with no prior investment experience, operated his business out of a Florida outlet of the International House of Pancakes ("**IHOP**"), a chain of pancake and waffle restaurants in America.[41] This does not suggest the air of a legitimate commercial business.

b. Further, Riju Ravindran, Mr Raveendran's brother and the former sole director of Byju's Alpha, and Inspilearn LLC, a wholly-owned subsidiary of the Group, are the defendants in the Delaware-based Chapter 11 bankruptcy and fraudulent transfer proceedings (the "**Delaware Proceedings**").[42] In the Delaware Proceedings, Mr Raveendran (together with his wife and brother) is now subject to an injunction issued by the Delaware bankruptcy judge.

c. In a 14 March 2024 hearing in the Delaware Proceedings, Riju Raveendran testified that he acted at the direction of Byju Raveendran.[43] Per a contemporaneous press report, "*Riju Ravindran testified that he did not know the current location of the funds…. Riju Ravindran said he had attempted to fulfill a promise to locate the funds made at his deposition, but had been rebuffed by Byju Raveendran and T&L's treasurer.*"[44]

---

40 Reorg Article – "UPDATE 2: Byju's Lenders Hold Call to Consider Options as Company Misses Interest Payment" (**Exhibit C-056**), p. 2.

41 Plaintiff's combined opposition, verified return of service, emergency motion, and notice of filing, GLAS Trust Company LLC v. Camshaft Capital Fund, LP et al (Florida) (**Exhibit C-038**), pp. 165, 269.

42 Complaint for Avoidance and Recovery of Fraudulent Transfer, Byju's Alpha Inc. v Camshaft Capital Fund, LP, et al. (**Exhibit C-046**). Similar allegations of fraudulent conveyance are raised in the Florida-based proceedings, *see* **Exhibit C-037**, Exhibit **C-038**.

43 Reorg article – "Byju's Alpha Asset Recovery Efforts Heat Up; Court Issues Injunction Freezing$533M Missing Loan Proceeds; Camshaft Founder Found in Contempt, Court Issues Warrant for His Arrest" (the "**14 March Hearing Report**") (**Exhibit C-051**), p. 2.

44 14 March Hearing Report, (**Exhibit C-051**), p. 2.

d. The judge's order issued on 14 March 2024 found Byju Raveendran (as well as his wife) was acting "*in concert*" with his brother Riju Raveendran.[45]

28. Mr Raveendran also claims that his brother Riju Raveendran has been "*fully cooperative"* in the US-based proceedings.[46] To the contrary: the judge in the Delaware Proceedings stated on the record that Riju Raveendran "*feigned ignorance*" and failed to comply with his discovery obligations, and that "*'any trier of fact' would either conclude Riju Ravindran was "not credible" or the 'most incompetent director in history'*". [47]

29. Further, Mr Raveendran's assertion that there is "*nothing nefarious*" about the transfer of the sum of US$533 million[48] is preposterous:

a. In the 14 March 2024 hearing in the Delaware Proceedings, the judge preliminarily established that the plaintiff was capable of succeeding in its fraudulent transfer action on the merits.[49]

b. The parties involved have been so grudging to give disclosure that a contempt of court order was made against Camshaft's CEO (and Mr Raveendran's former business associate)[50] for his failure to appear, followed by the issue of a warrant for his arrest. [51]

c. The judge was sufficiently convinced that the Second Respondent may dissipate the USD 533 million that he issued an injunction against the Second Respondent (as well as his wife and his brother) to stop that from happening.[52]

---

45 14 March Hearing Report (**Exhibit C-051**), p. 2.

46 Response, ¶88.

47 14 March Hearing Report (**Exhibit C-051**), p. 2.

48 Raveendran 1, ¶58(c).

49 14 March Hearing Report (**Exhibit C-051**), p. 2.

50 Byju's Alpha being a former limited partner of Camshaft, *see* **Exhibit C-037**

51 14 March Hearing Report (**Exhibit C-051**), p. 1.

52 Order granting Debtor's Motion for a Preliminary Injunction made by the United States Bankruptcy Court in Case No. 24-10140 (JTD) (**Exhibit R-049**).

d. It has also been made public in the 14 March 2024 hearing in the Delaware Proceedings that the further transfer of the USD 533 million from Camshaft to Inspilearn LLC was made after an insolvency professional was appointed as the sole director of Byju's Alpha,[53] contradicting Mr Raveendran's claim that the transfer of funds predated "*any events of default under the loan facility agreement, or any disputes with the lenders*".[54]

30. Finally, Mr Raveendran's claim that he has "*contributed nearly US$1 billion of [his] personal wealth into T&L*"[55] is misleading and selective. A significant portion of that investment took place prior to entry into the Transaction Documents. As to the remainder, QH expressly requested evidence of these contributions from Mr Raveendran, which was never provided.

## VI. THE T&L RIGHTS ISSUE & RISK OF DILUTION/DISSIPATION

31. Mr Raveendran argues that there is no risk of dissipation or dilution of his or BIPL's shareholding in T&L as a result of the rights issue, provided that shareholders subscribe up to their pro-rata level of shareholding. I note that QH has seen no evidence as to whether shareholders have done so, or even as to whether Mr Raveendran or BIPL have subscribed up to their pro-rata shareholding.

32. In any event, QH's legitimate concerns about the risk of dissipation are much broader than this. As I have explained above and in Senecal 1, Mr Raveendran has exhibited a pattern of deceptive behaviour, as now only further evidenced by his response to this Application. He is at the heart of numerous fraud and insolvency proceedings. His business is in straits.

33. In respect of the Aakash Shares in particular, Mr Raveendran has also conspicuously failed to explain in his Response why the transfer of the Aakash Shares to Beeaar took place via a third party (Byju's Global, *i.e.,* BGPL). There is no obvious justification for that and I

---

53 14 March Hearing Report (**Exhibit C-051**), p. 2.

54 Raveendran 1, ¶62(a).

55 Raveendran 1, ¶66.

can only infer that the interposition of Byju's Global was designed to further conceal the real source of the Aakash Shares.

34. Moreover, Beeaar's interest in the Aakash Shares has or will imminently be diluted when the Manipal Transaction is approved by the CCI. At the same time, any foreclosure of the pledge over these shares would put them out of QH's reach. Even if the current pledge over Beeaar's holding in Aakash is released, it would only mean that Beeaar would be free to dispose of the Aakash Shares, equally out of QH's reach. In all the circumstances, I believe that there is a real risk that QH will be unable to enforce an award against the Respondents.

## VII. URGENCY OF THE APPLICATION

35. The Respondents suggest that the application has been filed too late because QH "*reasonably had knowledge of the events complained of as early as May 2023*"[56] and that QH provided no justification for this delay. This is wrong: for the reasons explained above and in Senecal 1, the circumstances giving rise to the present Application were not made apparent to QH until the last days of 2023 because of Mr Raveendran's acts of concealment. In the first two months of this year, QH has made every effort to give Mr Raveendran an opportunity to explain his position and to provide the information necessary to give QH comfort that it would not be necessary to initiate this arbitration. As recently as 17 February 2024, Mr Raveendran was purporting to be willing to execute a non-disposal undertaking in favour of QH. However, he never properly completed the document. Once it became clear that Mr Raveendran simply could not be trusted to deliver on his promises, QH moved with all expedition to commence this arbitration on 7 March 2024.

## VIII. CONCLUSIONS

36. For all of the above reasons, the evidence put forward in response to the Application by Mr Raveendran makes me doubly concerned that the relief sought by QH is necessary so as to prevent the real possibility that QH obtains an award against the Respondents which

56 Response, ¶11.

cannot be enforced. I confirm that QH is willing to provide a cross-undertaking in damages in respect of any interim award made.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true.

Scott Cramer Seneeal

Date: 22 March 2024

# Exhibit 35

Exhibit C-01

*Execution Version*

Qatar Holding LLC
Ooredoo Tower (Building 14)
Al Dafna Street (Street 801)
Al Dafna (Zone 61)
Doha, Qatar

__7__ September 2022

Byju's Investments Pte. Ltd.
30 Cecil Street,
#19-08 Prudential Tower,
Singapore 049712
Attention: Mr Byju Raveendran

Dear Sir/Madam,

**CASH-SETTLED OPTION TRANSACTION - Reference Number: ______________________**

1. The purpose of this letter agreement (a "**Confirmation**") is to confirm the terms and conditions of the above-referenced Cash-Settled Option Transaction entered into between Qatar Holding LLC ("**QIA**" or "**Party A**") and Byju's Investments Pte. Ltd. (the "**Counterparty**" or "**Party B**") on the Trade Date specified below (the "**Transaction**"). This Confirmation constitutes a "Confirmation" as referred to in the Agreement below and shall supersede and replace any prior communication in connection with this Transaction. Notwithstanding any provision of the Agreement to the contrary, unless otherwise agreed between the parties in writing by specific reference to this Confirmation, this Transaction shall be the only Transaction entered into under the Agreement.

The definitions and provisions contained in (i) the 2006 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**") (the "**Swap Definitions**")) and (ii) the 2002 ISDA Equity Derivatives Definitions (as published by ISDA) (the "**2002 Equity Definitions**" and, together with the Swap Definitions, the "**Definitions**"), are incorporated by reference into this Confirmation. In the event of any inconsistency between the Definitions or the ISDA Form (as defined below) and the terms of this Confirmation, this Confirmation will govern for the purposes of this Transaction. In the event of any inconsistency between the Swap Definitions and the 2002 Equity Definitions, the 2002 Equity Definitions will govern for the purposes of this Transaction. In the event of any inconsistency between the Definitions and the ISDA Form (as defined below), the ISDA Form (as defined below) will prevail for the purpose of this Transaction. Capitalised terms used in this Confirmation and not defined in this Confirmation or the Definitions shall have the respective meanings assigned in the ISDA Form (as defined below).

This Confirmation evidences a complete and binding agreement between QIA and Counterparty as to the terms of the Transaction to which this Confirmation relates. This Confirmation shall supplement, form a part of, and be subject to, an agreement (the "**Agreement**") in the form of the 2002 ISDA Master Agreement as published by ISDA (the "**ISDA Form**") as if, on the Trade Date specified below, QIA and Counterparty had executed the Agreement in such form with QIA as "Party A" and Counterparty as "Party B", but without any Schedule, except for the following elections and the amendments set out in this Confirmation:

(a) "Specified Entities"
   (i) with respect to Party A, none; and
   (ii) with respect to Party B, the Founder.

(b) "Specified Transaction" will have the meaning specified in Section 14 of the Agreement;

(c) the "Events of Default" provisions of Section 5(a) of the Agreement, including the "Cross-Default" provision of Section 5(a)(vi) of the Agreement will apply to Party B only (with the elections specified in (f) and (g) below) and will not apply to Party A;

(d) the provisions of 5(a)(i) shall be amended to delete references to "first Local Business Day" and "first Local Delivery Day" and replacing them with "second Local Business Day" and "second Local Delivery Day";

(e) the provisions of Section 5(a)(vii) shall be deleted in its entirety and replaced with the following:

"(vii) ***Bankruptcy.*** The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (including any individual, such that any reference to "it" or "its" in the foregoing shall be a reference to "he or she", "him or her", "his or hers" and "himself or herself" where appropriate):—

(l) is dissolved (other than pursuant to a consolidation, amalgamation or merger provided that such consolidation, amalgamation or merger is (A) not mala fide, (B) not aimed at evading liability and (C) approved in writing by Party A); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due (including through failure to comply with a statutory demand); (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4)(A) institutes or has instituted against it by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation or bankruptcy, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (I) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or bankruptcy or (II) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian, official assignee or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (l) to (7) above (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts, in

each case provided that no Event of Default will occur under this Section 5(a)(vii) due to an Ipso Facto Event, regardless of the applicability of section 440(1) of the IRDA; or";

(f) "Specified Indebtedness" shall be deleted in its entirety and replaced with the following:

"***"Specified Indebtedness"*** means any indebtedness for or in respect of:

(a) moneys borrowed;

(b) any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c) any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d) the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with IFRS, be treated as a balance sheet liability;

(e) receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f) any amount raised under any other transaction (including any forward sale or purchase agreement) of a type not referred to in any other paragraph of this definition having the commercial effect of a borrowing;

(g) any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that derivative transaction, that amount) shall be taken into account);

(h) any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(i) the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (h) above.";

(g) "Threshold Amount" means, with respect to Party B, USD 10 million;

(h) as applicable to the "Force Majeure" provisions of Section 5 (b)(ii), the definition of "Waiting Period" in Section 14 shall be amended to delete the words "eight Local Business Days" and replace them with "fifteen Local Business Days";

(i) the "Tax Event" provisions of Section 5(b)(iii) will not apply to Party A, Party B or any Credit Support Provider of Party B;

(j) the "Tax Event Upon Merger" provisions of Section 5(b)(iv) will not apply to Party A, Party B or any Credit Support Provider of Party B;

(k) the "Credit Event Upon Merger" provisions of Section 5(b)(v) will not apply to Party A, Party B or any Credit Support Provider of Party B;

(l) the "Automatic Early Termination" provisions of Section 6(a) will not apply to Party A or Party B;

(m) ***Payer Representations.*** For the purposes of Section 3(e) of the Agreement, Party A does not make representations and Party B shall make the following representation:

"It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of the Agreement) to be made by it to the other party under the Agreement. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of the Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of the Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of the Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of the Agreement, except that it will not be a breach of this representation where reliance is placed on clause (ii) above and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.";

(n) ***Payee Representations.*** For the purposes of Section 3(f) of the Agreement, Party A and Party B do not make any representations;

(o) **Agreement to Deliver Documents.** For the purpose of Sections 4(a)(i) and 4(a)(ii) of the Agreement, each party agrees to deliver the following documents, as applicable:

(i) Tax forms, documents or certificates to be delivered are: none;

(ii) Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Each of the forms, documents and certificates listed in Paragraph 3 of this Confirmation | Upon execution of the Agreement | Yes in respect of those set out in (a) to (g), (i), (j), (n) and (o) of Paragraph 3 of this Confirmation. |
| Party B | The documents, information and notification listed in Paragraph 6 of this Confirmation | The dates specified in Paragraph 6 of this Confirmation | Yes in respect of those set out in (f) to (k) of Paragraph 6 of the Confirmation. |
| Party B | The documents and confirmations listed in Annex I of this Confirmation | Upon execution of the Agreement | Yes |

(p) "Termination Currency" will mean USD;

(q) the "Set-Off" provisions of Section 6(f) will not apply to Party A or Party B;

(r) the provisions of Section 10(a) will not apply to the Agreement;

(s) for the purpose of Section 10(b) of the Agreement:

(i) Party A is not a Multibranch Party and may act through its Qatar office only;
(ii) Party B is not a Multibranch Party and may act through its Singapore office only;

(t) ***Calculation Agent.*** The Calculation Agent is Party A. Any determination by the Calculation Agent shall be made in good faith and a commercially reasonable manner and, subject to 'Calculation Agent dispute resolution' below, will be binding on both Party A and Party B, absent of manifest error;

(u) ***Calculation Agent dispute resolution.*** Notwithstanding the foregoing, any objections raised by Party B in relation to the calculations and determinations shall be promptly notified to Party A. If the parties are unable to in good faith agree on the appropriate calculations or determinations within no more than ten Local Business Days of Party B raising the dispute, each of the parties will appoint an independent, internationally reputed investment bank that is not an Affiliate of either party (the "**Substitute Calculation Agents**") to make the relevant calculation or determination. If the two relevant calculations or determinations are within a 10 per cent. range from each other, then the final calculation or determination shall be deemed the mid-point of such range and the parties agree to be bound by that calculation or determination. If the two calculations or determination are not within a 10 per cent. range of each other, then each of the parties will appoint an independent, internationally reputed investment bank that is not an Affiliate of either party and such independent, internationally reputed investment bank that is not an Affiliate of either party will agree expeditiously upon an independent, internationally reputed investment bank that is not an Affiliate of either party who shall be deemed the Substitute Calculation Agent and their determination shall be deemed final and binding. Both parties will use all reasonable efforts to assist the Substitute Calculation Agent in delivering promptly the final calculations and determinations. Neither the Calculation Agent nor the Substitute Calculation Agent shall have any liability or responsibility for good faith errors or omissions in relation to any of the appropriate calculations and determinations;

(v) ***Credit Support Document*** means: (i) the Share Charge; (ii) the Blocked Account Security Agreement; and (iii) the Personal Guarantee;

(w) ***Credit Support Provider***
(i) in relation to Party B: the Founder and Midco, provided that Sections 5(a)(v) and (vi) of the Agreement shall not apply to Midco as Credit Support Provider;
(ii) in relation to Party A: none;

(x) the election of English law as the governing law (which shall also apply to any non-contractual obligations arising out of or in connection with the Agreement);

(y) Section 13(b) of the Agreement shall be deleted in its entirety and replaced with the following:

"(b) **Dispute Resolution**

(i) Subject to sub-paragraph (viii) below, any dispute arising out of or in connection with this Agreement, including in connection with the validity, interpretation, implementation or alleged breach of any

provision of this Agreement (including breach of warranties provided herein) ("**Dispute**"), shall be referred to and shall be finally resolved by arbitration in accordance with the Singapore International Arbitration Centre Rules ("**SIAC Rules**") in force when the notice of arbitration is submitted in accordance with the SIAC Rules, which rules shall be deemed to be incorporated by reference in this Section 13(b). The parties to the Dispute shall share the costs equally or in the proportion as decided by the arbitral tribunal.

(ii) The venue and seat for such arbitration shall be in Singapore and all proceedings shall be conducted in the English language.

(iii) The arbitral tribunal shall consist of 3 (three) arbitrators. Within 21 (twenty one) days of the receipt of the Arbitration Notice, the respondent shall nominate 1 (one) arbitrator and the claimant shall nominate 1 (one) arbitrator. The 2 (two) arbitrators thus appointed shall nominate the 3rd (third) arbitrator who shall be the presiding arbitrator. If within 21 (twenty one) days from the date of receipt of the Arbitration Notice, a party fails to nominate an arbitrator, or if the 2 (two) arbitrators fail to nominate the 3rd (third) arbitrator within 14 (fourteen) days after appointment of the second arbitrator, the appointment shall be made, upon request of a Party, by the President of the Court of Arbitration of SIAC in accordance with the SIAC Rules.

(iv) All claims and counterclaims (including non-monetary and declaratory claims) arising out of or in connection with this Agreement shall, to the extent such claims or counterclaims are known at the time any arbitration is commenced, be consolidated and determined in the same arbitration proceeding. The arbitral tribunal shall, inter alia, have the authority to award declaratory relief and consider and award specific enforcement of this Agreement.

(v) The award rendered by the arbitral tribunal shall, in addition to dealing with the merits of the case, fix the costs of the arbitration and decide which of the parties thereto shall bear such costs or in what proportions such costs shall be borne by such parties.

(vi) The award rendered by the arbitral tribunal shall be final and binding on all parties.

(vii) Each Party shall co-operate in good faith to expedite (to the maximum extent practicable) the conduct of any arbitral proceedings commenced under this Agreement.

(viii) The Parties agree that they are entitled to bring any claim for interim relief in respect of proceedings commenced pursuant to this Section 13(b) before the courts in India and/or Singapore. For the avoidance of doubt, nothing in this Section 13(b) shall preclude the application of Rule 30 of the SIAC Rules.

(2) Section 13(d) of the Agreement is hereby amended by adding:

(i) after the words "jurisdiction of any court" in the third line thereof, the words "or arbitral tribunal";

(ii) after the word "judgment" in sub-Sections (iv) and (v) in the fifth line thereof, the words "or arbitral award"; and

(iii) after the words "in the courts of any jurisdiction" in sub-Section (v) thereof, the words "or before any arbitral tribunal".

(3) Section 8(b) shall be amended so that each reference in it to "judgment or order" shall be changed to refer to "judgment, arbitral award or order" and the words "or arbitral tribunal" shall be added after the words "another court".

(4) Section 8(c) shall be amended by adding the words "or arbitral award" after the word "judgment".

(5) Section 9(h) shall be amended by adding the words "or arbitral award" after the words "before as well as after judgment" each time they appear;

(z) Section 7 of the Agreement shall be deleted in its entirety and replaced with the following:

"**7. Transfer**

(a) To the extent permitted by applicable law, none of the Transaction Documents nor any interest or obligation in or under the Transaction Documents may be transferred (whether by way of security or otherwise) by Party B, without the prior written consent of Party A.

(b) To the extent permitted by applicable law, none of the Transaction Documents nor any interest or obligation in or under the Transaction Documents may be transferred (whether by way of security or otherwise) by Party A, without the prior written consent of Party B (such consent not to be unreasonably withheld or delayed), except that, Party A may:

(i) make such transfer of a Transaction Document pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement);

(ii) make such transfer of a Transaction Document to any (I) Affiliates, (II) bank, financial institutional or institutional investor; or (III) trust fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets; and

(iii) make such transfer of all or any part of its interest in an Early Termination Amount payable to it by Party B, together with any amounts payable on or with respect to that interest and any other rights associated with that interest pursuant to Sections 8, 9(h) and 11;

in each case without the consent of Party B.

(c) Notwithstanding the foregoing, no Transaction Document nor any interest or obligation in or under any Transaction Document may be transferred (whether by way of security or otherwise) to a Distressed Fund or any T&L Competitor.

(d) Any purported transfer that is not in compliance with this Section 7 will be void.

(e) For the purposes of this Section 7:

(i) "**Distressed Fund**" means any fund or other entity whose primary business is acquiring loans or other financial products where the underlying obligor is subject to (or near to) financial or operational distress, default, or insolvency in order to acquire ownership or control of such obligor or to materially influence the terms of a restructuring of such loan or financial product or to take legal action against the underlying obligor for payment of such loan or under such financial product in order to make a large monetary gain.

(ii) "**T&L Competitor**" means any person or entity that is a competitor of T&L or any of its subsidiaries in the education or education technology sector or any direct or indirect majority or controlling equity holder in such competitor or otherwise any person who has significant influence over the board of directors of any such competitor.

(aa) "Multiple Transaction Payment Netting" will not apply for the purpose of Section 2(c) of this Agreement;

(bb) **"*Affiliate*"** means a Person that directly or indirectly Controls, is Controlled by, or is under common Control with, such Person, provided that, in relation to Party A, "Affiliate" shall mean its parent, the Qatar Investment Authority ("**QIA**"), and its majority owned subsidiaries that are managed on a day-to-day basis by employees of QIA;

(cc) the provisions of Section 3(g) of the Agreement will apply to Party A and to Party B;

(dd) ***Additional Representation*** will apply. For the purpose of Section 3 of the Agreement, the following will constitute an Additional Representation:

(i) *Non-reliance:* It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether this Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) from the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii) *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

(iii) *Status of Parties*. The other party is not acting as a fiduciary for or as an adviser to it in respect of this Transaction.

(ee) ***Recording Conversations.*** Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement, (ii) agrees to obtain any necessary consent of, and give any necessary notice of such recording to, its relevant personnel and (iii) agrees, to the extent permitted by applicable law, that recordings may be submitted in evidence in any Proceedings.

2. The terms of the particular Transaction to which this Confirmation relates are as follows:

<u>General Terms</u>

| | |
|---|---|
| Seller: | Counterparty |
| Buyer: | QIA |
| Transaction Type: | Cash-Settled Option Transaction |
| Trade Date: | __7__ September 2022 |
| Effective Date: | The date on which the Buyer has received all of the Conditions Precedent (or, if not received, has waived the requirement for receipt thereof) in form and substance satisfactory to the Buyer (acting reasonably). The Buyer shall notify the Seller promptly upon receiving all of the Conditions Precedent in form and substance satisfactory to it. |
| Expiration Time: | 5:00pm (London time) |
| Expiration Date: | The earlier of:<br>(i) 31 March 2025 (the "**Scheduled Expiration Date**"); and<br>(ii) the date of occurrence of a Liquidity Event. |
| Number of Options: | One |
| Option Style: | European |
| Option Type: | Call |
| Automatic Exercise: | Applicable |
| Local Business Days: | Singapore, for the purposes of paragraph (a) of the definition of Local Business Day in Section 14 of the Agreement. |
| Business Days: | New York and Mumbai |
| T&L Shares: | Equity shares, Series F CCCPS and other series of equity securities ranking pari passu with and having substantially the same rights as the Series F CCCPS shares in Think & Learn Private Limited ("**T&L**"), and shall also include the shares of any transferee pursuant to an Excluded Transfer. |

| | |
|---|---|
| Series F CCCPS Shares: | Series F fully and compulsorily convertible cumulative preference shares in the share capital of T&L having a face value of INR 10 (Indian Rupees Ten) each. |
| Initial Reference Price: | INR 237,337 (which may be subject to adjustment if a Dilution Event occurs). |
| Aakash Shares: | Equity shares with face value of INR 5 bearing ISIN number INE763PO1039 in Aakash Educational Services Limited, a public limited company, bearing corporate identification number U80300KA2007PLC150057 and having its registered office at No.111, 8th Cross, Paramount Gardens, Thalaghattapura, Kanakapura Main Road, Bangalore, Karnataka, India 560062 ("**Aakash**"). |

<u>Initial Exchange</u>

| | |
|---|---|
| Initial Exchange: | On the Initial Exchange Date, the Initial Exchange Payer shall pay the Initial Exchange Receiver the Initial Exchange Amount. |
| Initial Exchange Amount: | US$150,000,000 (the "**Original Principal Amount**", and the Original Principal Amount as reduced from time to time, the "**Outstanding Principal Amount**") |
| Initial Exchange Date: | Effective Date |
| Initial Exchange Payer: | Buyer |
| Initial Exchange Receiver: | Seller |
| Founder: | Mr Byju Raveendran |
| Purpose: | Party B shall apply the Initial Exchange Amount towards the acquisition of Aakash Shares (or otherwise directly acquire T&L Shares) and not for any other purpose. If Party B does not apply any part of the Original Principal Amount towards any such acquisition within 14 days of the Effective Date, then Party B shall immediately return the amount not so applied to Party A and the Outstanding Principal Amount shall thereafter be deemed reduced accordingly. For the purposes of this provision 'Purpose' only, 'Aakash Shares' shall mean the Aakash Shares that, following the merger of Aakash into T&L, would in aggregate convert into T&L Shares at 50,561 Series F CCCPS of T&L, each fully paid up. |

<u>Mandatory Exchange Event</u>

| | |
|---|---|
| Mandatory Exchange: | On the Mandatory Exchange Date, the Mandatory Exchange Payer shall pay the Mandatory Exchange Receiver the Mandatory Exchange Amount. |
| Mandatory Exchange Date: | The date falling 10 Business Days following the later of: (i) the occurrence of the Sell Down Event; and (ii) the date on which the Calculation Agent has notified the Seller of the Mandatory Exchange Amount. |

| | |
|---|---|
| Mandatory Exchange Payer: | Seller |
| Mandatory Exchange Receiver: | Buyer |
| Mandatory Exchange Amount: | The greater of:<br><br>(i) the sum of the Outstanding Principal Amount and the SDEUP; and<br>(ii) the Outstanding Principal Amount multiplied by two. |
| Sell Down Equity Upside Premium (“**SDEUP**”): | $SDEUP = PA * [\frac{2}{3} * \left(\frac{B}{C} - 1\right)]$ |

**PA** = Outstanding Principal Amount

**B** = Price per T&L Share (in INR, and if the price is not INR, such price shall be converted into INR using the Spot Rate of Exchange applicable at such date as determined by the Calculation Agent) at which the Sell Down Event is consummated (provided that if the Sell Down Event has resulted from more than one Sale Event and/or Security Event, the highest price determined pursuant to (i) and (ii) shall be taken), provided that:

(i) if the Sell Down Event comprises a Sale Event, then the price per T&L Share (in INR, and if the price is not INR, such price shall be converted into INR using the Spot Rate of Exchange applicable at such date as determined by the Calculation Agent) shall be the aggregate sale proceeds (net of all applicable taxes) received by a Founder Entity from the relevant Sale Event divided by the total number of T&L Shares transferred pursuant to the relevant Sale Event, **provided that** if the Sale Event was not conducted on an arms’ length basis, then the price per T&L Share (in INR) shall be the higher of the volume weighted average price per T&L Share sold or issued in the most recently completed offering of T&L Shares and the most recently completed T&L Share sale (excluding any sales by Party A), in each case completed on or prior to the Sell Down Event to third party investors on arms’-length terms, **provided further that** if the relevant Founder Entity does not provide the relevant pricing information to the Calculation Agent which sets out the relevant sale price in reasonable detail accompanied by evidence in form and substance reasonably satisfactory to the Calculation Agent, then the price per T&L Share will be determined pursuant to a Valuation; and

(ii) if the Sell Down Event comprises a Security Event, then the price per T&L Share (in INR, and if the price is not INR, such price shall be converted into INR using the Spot Rate of Exchange applicable at such date as determined by the Calculation Agent) shall be the higher of the volume weighted average price per T&L Share sold or issued in the most recently completed offering of T&L Shares and the most recently

completed T&L Share sale (excluding any sales by Party A), in each case to completed on or prior to the Sell Down Event to third party investors on arms'-length terms, **provided that** if the relevant Founder Entity does not provide the relevant pricing information to the Calculation Agent which sets out the relevant sale price in reasonable detail accompanied by evidence in form and substance reasonably satisfactory to the Calculation Agent, then the price per T&L Share will be determined pursuant to a Valuation.

**C** = the Initial Reference Price.

"**Valuation**" means a valuation conducted by an independent investment bank or accounting firm of international repute that is not an Affiliate of either party (selected by the Calculation Agent on the basis of a methodology consistent with generally accepted valuation practices).

Notwithstanding the foregoing, both parties agree that the SDEUP may not be negative and shall be floored at zero.

Sell Down Event:

"**Sell Down Event**" means one or more Sale Events and/or Security Events that results in the number of Unencumbered Founder Shares falling below 126,284 (the "**Sell Down Trigger Amount**"), provided that the Sell Down Trigger Amount may be adjusted (by the Calculation Agent from time to time) in proportion to any increase or decrease in the volume weighted average price per T&L Share issued or sold in a Qualifying Fundraising as against the Sell Down Event Reference Price as follows:

(i) if the volume weighted average price per T&L Share issued or sold in any offering of T&L Shares to third party investors on arms' length terms is such that the value of the aggregate number of T&L Shares represented by the Sell Down Trigger Amount at the time of such Qualifying Fundraising is less than three times the Outstanding Principal Amount, then the Sell Down Trigger Amount shall be increased to such number of T&L Shares (rounded up to the nearest whole share) as the Calculation Agent shall determine that would be valued at three times the Outstanding Principal Amount; and

(ii) if the volume weighted average price per T&L Share issued or sold in a Qualifying Fundraising is such that the value of the aggregate number of T&L Shares represented by the Sell Down Trigger Amount is more than three times the Outstanding Principal Amount, then the Sell Down Trigger Amount shall be decreased to such number of T&L Shares (rounded up to the nearest whole share) as the Calculation Agent shall determine that would be valued at three times the Outstanding Principal Amount provided that the Sell Down Trigger Amount shall not in any circumstance fall below 101,053 T&L Shares.

"**Sell Down Event Reference Price**" means INR 285,072 per T&L Share (which may be subject to adjustment if a Dilution Event occurs).

"**Sale Event**" means the sale, disposal or any other transfer of Founder Shares (other than any Excluded Transfers, provided that in the case of an Excluded Transfer to a holding company not already listed, all or substantially all of the T&L Shares are intended to be transferred to such holding company and an IPO completes within the period stipulated by the Calculation Agent acting reasonably and provided further that the relevant Founder Entity receives shares in the relevant transferee entity in connection with such Excluded Transfer corresponding to the Founder Shares subject to the Excluded Transfer and contemporaneously therewith).

"**Security Event**" means the incurrence of Specified Indebtedness pursuant to which Security is created over any amount of Founder Shares.

"**Qualifying Fundraising**" means any primary or secondary issuance or offering of T&L Shares with the aggregate amount of proceeds of the primary part of the offering not less than USD 500 million to third party investors on arms' length terms.

"**Founder Entity**" means the Founder, Party B or any entities (including trust) through which the Founder or Party B holds T&L Shares or which is controlled by the Founder or Party B.

"**Founder Shares**" means any T&L Shares owned, held or controlled by a Founder Entity.

<u>Settlement Terms</u>

Cash Settlement: Applicable

Cash Settlement Payment Date: The earlier of:

(i) the Scheduled Expiration Date; and
(ii) 10 Business Days after the earliest of: (a) the date of the actual receipt by the Seller of the proceeds of any Liquidity Event; (b) the date that the proceeds of any Liquidity Event are or would have been distributed to the relevant shareholders of T&L generally; and (c) the date when any lock up period applicable to the Founder Entity following a Liquidity Event expires.

Settlement Currency: United States Dollars

Option Cash Settlement Amount: The greater of:

(i) the sum of the Outstanding Principal Amount and the EUP; and
(ii) the Outstanding Principal Amount multiplied by two.

Equity Upside Premium ("**EUP**"): An EUP shall be calculated in accordance with the formula set out below:

$$EUP = Outstanding\ Principal\ Amount * [\frac{2}{3} * \left(\frac{A}{B} - 1\right)]$$

Where:

**A** = Price per T&L Share (in INR, and if the price is not INR, such price shall be converted into INR using the Spot Rate of Exchange applicable at such date as determined by the Calculation Agent) at which the Liquidity Event is consummated or, if higher, the volume weighted average price per T&L Share for the 15 consecutive trading days on any relevant exchange on which T&L Shares are listed immediately prior to the Cash Settlement Payment Date, as determined by the Calculation Agent,

**provided that** if the relevant Liquidity Event is effected by way of an Asset Sale as described in paragraph (a) of the definition of "Asset Sale", then the price per T&L Share (in INR, and if the price is not INR, such price shall be converted into INR using the Spot Rate of Exchange applicable at such date as determined by the Calculation Agent) shall be the aggregate sale proceeds (net of applicable taxes, if such Asset Sale involves any sale, transfer or disposal of Founder Shares by a Founder Entity or any distribution linked to the Founder Shares) received by the relevant shareholders from such sale divided by the total number of T&L Shares (on a fully diluted basis) as at the date of such Liquidity Event, **provided further that** (x) if the relevant Founder Entity does not provide the relevant pricing information to the Calculation Agent which sets out the relevant sale price in reasonable detail accompanied by evidence in form and substance reasonably satisfactory to the Calculation Agent or (y) if the relevant pricing information is otherwise not available to the Calculation Agent and the parties have not agreed such price in good faith within ten days of the relevant Liquidity Event, then the price per T&L Share will be determined pursuant to a Valuation.

**B** = the Initial Reference Price.

Notwithstanding the foregoing, both parties agree that the EUP may not be negative and shall be floored at zero.

Liquidity Event: An IPO or an Asset Sale.

"**IPO**" means:

(a) an initial public offering, direct listing, admission to trading, listing or quotation of the equity securities or other equity-linked securities (including depository receipts) in T&L or

any successor entity or parent entity of T&L (whether in the form of a primary issuance, secondary sale or a combination thereof) on a bona fide nationally-recognised or internationally-recognised securities exchange;

(b) a business combination transaction involving (i) an entity established to hold the business of T&L, the T&L Shares / securities of which shall be held by then shareholders of T&L and (ii) any listed entity, publicly traded special purpose acquisition company or targeted acquisition company or any entity similar to the foregoing; or

(c) any listing of shares in a relevant transferee entity in connection with any Excluded Transfer.

"**Asset Sale**" means, apart from Excluded Transfers:

(a) the sale, lease, licence or other transfer of all or substantially all of the businesses, properties and/or assets (including, without limitation, tangible and intangible assets, and intellectual property rights) of T&L;

(b) the sale, lease, licence or other transfer of all or substantially all of the equity interests of T&L if after such event the holders of a majority of T&L's voting securities immediately prior to the transaction do not hold a majority of the voting securities of T&L or the successor entity; or

(c) any consolidation, merger, demerger, amalgamation, restructuring, scheme of arrangement or similar transaction in relation to T&L if after such event the holders of a majority of T&L's voting securities immediately prior to the transaction do not hold a majority of the voting securities of T&L or the successor entity,

in each case, either in a single transaction or a series of related transactions.

"**Excluded Transfer**" means any transfer of all or substantially all of the T&L Shares to a holding company, publicly traded special purpose acquisition company or targeted acquisition company (or any entity similar to the foregoing) for the purposes of listing T&L equity securities or, to the extent not already listed, such transferee entity's equity securities (whether in the form of a primary issuance, secondary sale or a combination thereof) on a securities exchange, provided that such listing is completed within a timeline acceptable to Party A (acting reasonably).

Extraordinary Events: Not applicable

Additional Disruption Events: Not applicable

Dilution Events: If the Buyer determines that an adjustment should be made to the economic terms of the Transaction as a result of one or more Dilution Events, the Calculation Agent shall determine as soon as practicable what adjustment (if any) to the definition of T&L Shares, the Initial Reference Price, the Sell Down Event Reference Price, "B" and "C" in the definition of SDEUP, "A" and "B" in the definition of EUP, the Sell Down Trigger Amount

(and any floor applicable thereto) and the Funded Shares and the date on which such adjustment should take effect in a manner that is fair and reasonable (and does not result in a more favourable position for Party A) to take account of diluting or concentrative effect of the relevant Dilution Event(s) (provided that no adjustments shall be made solely to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the T&L Shares).

"**Dilution Events**" means any (a) consolidation or sub-division or splitting up of shares; (b) issue of rights or bonus shares; and (c) reclassification of shares or variation of rights into other kinds of shares.

Additional Termination Event: The following Additional Termination Event shall apply with respect to Party B as the Affected Party only and not to Party A (with this Transaction being an Affected Transaction):

T&L has not by 30 June 2023: (a) appointed a person with appropriate qualifications and credentials as its chief financial officer; and (b) adequately implemented measures to address the internal control issues highlighted by Deloitte in its report dated in respect of the T&L financial statements for the financial year ended 31 March 2021, in each case, as determined by Party A acting in good faith and a commercially reasonable manner (the "**Internal Controls Event**").

Additional Events of Default: The following Additional Events of Default shall apply with respect to Party B as the Defaulting Party only and not to Party A:

(a) **Conversion EoD**

Failure by Party B to acquire additional unencumbered 50,561 T&L Shares within 4 months of the Effective Date (the "**Conversion EoD**").

(b) **Material Adverse Effect**

Any event or circumstance or a series of events or circumstances occurs which Party A reasonably believes has or could reasonably be expected to have a Material Adverse Effect.

(c) **Cessation of business of Party B or T&L**

Party B or T&L suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business, save where the same would also constitute a Liquidity Event or give rise to a Mandatory Exchange Date.

(d) **Expropriation of Party B or T&L**

The authority or ability of Party B or T&L to conducts its business is limited or wholly or substantially curtailed by

any seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to Party B or T&L or any of their respective assets.

(e) **Audit qualification**

Party B's auditors qualify the audited annual consolidated financial statements of Party B.

(f) **Auditor's adverse opinion for T&L**

T&L's auditors issue an adverse opinion with respect to the audited annual consolidated financial statements of T&L.

(g) **Litigation**

Any litigation, arbitration, administrative, governmental, regulatory or other investigations, proceedings or disputes are commenced or threatened, or any judgment or order of a court, arbitral tribunal or other tribunal or any order or sanction of any governmental or other regulatory body is made, in relation to the Transaction Documents or the transactions contemplated in the Transaction Documents or against its assets.

(h) **Bankruptcy of T&L insolvency and related proceedings**

A Bankruptcy Event of Default under Section 5(a)(vii) occurs in respect of T&L (which shall be deemed to be a Specified Entity solely for the purpose thereof).

(i) **Declared company**

Party B is declared by the Minister of Finance of Singapore to be a company to which Part 9 of the Singapore Companies Act 1967 applies.

Early Termination Amount: Notwithstanding any provision of the Agreement to the contrary including without limitation Sections 6(c)(ii) and 6(e), but without prejudice to Sections 8 and 11 of the Agreement, the Early Termination Amount shall be determined as if it were:

(i) in the case of an Event of Default under Section 5(a)(i), arising from a failure to return to Party A any amount of the Initial Exchange Amount not applied in accordance with the section entitled "Purpose", such part of the Initial Exchange Amount that has not been so applied plus any amount payable under Section 9(h) of the Agreement in respect thereof;

(ii) in the case of an Event of Default under Section 5(a)(i), arising from a failure to pay the Option Cash Settlement

Amount, the Option Cash Settlement Amount plus any amount payable under Section 9(h) of the Agreement in respect thereof;

(iii) in the case of an Event of Default under Section 5(a)(i) arising from a failure to pay the Mandatory Exchange Amount, the Mandatory Exchange Amount (as the case may be), plus any amount payable under Section 9(h) of the Agreement in respect of the relevant amount;

(iv) in the case of a Conversion EoD, an amount equal to the product of 1.25 and the Original Principal Amount;

(v) in the case of an Internal Controls Event, an amount equal to the product of 1.10 and the Original Principal Amount;

(vi) in the case of an Illegality or Force Majeure Termination Event, an amount equal to the Outstanding Principal Amount (and for the avoidance of doubt, no EUP or SDEUP shall be payable); and

(vii) in each other case where an Early Termination Date is designated as a result of an Event of Default, an amount equal to the Original Principal Amount plus the amount calculated as a percentage of the Original Principal Amount equal to the percentage of the period between the Effective Date and the Scheduled Expiration Date that has elapsed as at the date such Event of Default occurred (and for the avoidance of doubt, no EUP or SDEUP shall be payable).

| | |
|---|---|
| Payment Date for Early Termination Amount: | Notwithstanding, Section 6(d)(ii), the Early Termination Amount shall be payable two Local Business Days following the Early Termination Date. |
| Default Interest: | The definition of "Default Rate" in Section 14 of the Agreement shall be amended to "4 per cent. per annum". |

## 3. Conditions Precedent

Party A's obligations under this Confirmation are subject to the satisfaction or waiver (such waiver to be in writing) by Party A of the requirements for Party B to deliver the following:

(a) A copy of the Constitutional Documents of each of Party B, Midco, T&L and Aakash.

(b) A copy of the resolution of the board of directors of each of Party B and Midco:

(i) approving the terms of, and the transactions contemplated by, the Transaction Documents to which it is a party and resolving that it execute the Transaction Documents to which it is a party (in each case other than the Blocked Account Security Agreement);

(ii) authorising a specified person or persons to execute the Transaction Documents to which it is a party on its behalf (other than the Blocked Account Security Agreement); and

(iii) authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices to be signed and/or despatched by it under or in connection with the Transaction Documents (other than the Blocked Account Security Agreement)to which it is a party.

(c) A copy of a resolution signed by all holders of the issued shares in Party B, amending Party B's constitution in connection with the Share Charge.

(d) A copy of a resolution signed by all holders of the issued shares in the Midco, approving the terms of, and the transactions contemplated by, the Transaction Documents to which it is a party.

(e) A certificate of each of Party B and Midco (in each case, signed by a director):

(i) confirming that any limit binding on it will not be exceeded by entry into the Transaction Documents (other than the Blocked Account Security Agreement) than the to which it is a party or any of the transactions contemplated thereunder;

(ii) certifying that each copy document relating to it delivered to Party A as Conditions Precedent is correct, complete and in full force and effect in all material respects as at a date no earlier than the date of the Agreement; and

(iii) certifying specimens of the signature of each person authorised by the resolution referred to in paragraph (b) above.

(f) A duly executed copy of the Personal Guarantee.

(g) A duly executed copy of the Share Charge.

(h) A legal opinion of WongPartnership LLP, legal advisers to Party A in Singapore, in a form satisfactory to Party A.

(i) All share certificates, transfers and stock transfer forms or equivalent duly executed by Midco in blank in relation to the assets subject to or expressed to be subject to the Share Charge and such other documents which may be required or necessary in order to perfect the Transaction Security created under the Share Charge;

(j) A copy of any other Authorisation or other document, opinion or assurance which Party A considers to be necessary or desirable (if it has notified Party B accordingly) in connection with the entry into and performance of the transactions contemplated by any Transaction Document or for the validity and enforceability of any Transaction Document (other than in each case the Blocked Account Security Agreement).

(k) The audited annual financial statements of T&L for the financial year ending 31 March 2021, accompanied by an auditor's certificate in the form distributed to Party A prior to the date of this Confirmation.

(l) The unaudited annual financial statements of T&L for the financial year ending 31 March 2022.

(m) Evidence of confirmation, satisfactory to Party A, that Party B and the Personal Guarantor have obtained such consents and approvals, and have entered into, or procured that such agreements are entered into, resolutions passed or undertakings provided as are set out in Annex I of this Confirmation.

(n) A funding notice in relation to the Initial Exchange Amount signed by Party B in form and substance satisfactory to Party A, setting out the proposed Effective Date and the bank account details and transfer instructions for receipt of the Initial Exchange Amount.

(o) Evidence, satisfactory to Party A, that Party B will have sufficient funds to purchase the Aakash Shares immediately following receipt by it of the Initial Exchange Amount (which evidence may be in the form of a signed funding document for sufficient funds and a corresponding CP satisfaction letter).

**4. Counterparty Representations, Warranties and Agreements**

The "Representations" provisions of Section 3, will be made by Party B only and not Party A, and will be made on the date of this Confirmation and will be deemed to be made by Party B on the first day of each calendar month. In addition, Party B represents and warrants to Party A, on the date of this Confirmation and (other than in respect of paragraphs (d), (h) and (i) below) on the first day of each calendar month, the following "Additional Representations":

(a) **Indian laws and regulations**

Party B's ownership of T&L Shares is in compliance with Indian laws, and Party B has not breached any Indian laws and regulations, or undertaken any action that would breach any Indian laws and rights and titles to which in either case has impaired or is reasonably likely to impair its ownership of T&L Shares owned by it; and the entry into, and performance of, the Transaction Documents by Party B, will not result in a breach of any applicable Indian laws and regulations.

(b) **Validity and admissibility in evidence**

Subject to the Legal Reservations, all Authorisations required:

(i) to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Transaction Documents; and

(ii) to make the Transaction Documents admissible in evidence in its jurisdiction of incorporation,

have been obtained or effected and are in full force and effect save for (i) the making of appropriate registrations of the Transaction Security Documents with the Accounting and Corporate Regulatory Authority of Singapore and the payment of fees associated to such registrations and (ii) the payment of stamp duty to the Inland Revenue Authority of Singapore.

(c) **Governing law and enforcement**

Subject to the Legal Reservations:

(i) the choice of the law stated to be the governing law of the Transaction Documents will be recognised and enforced in its jurisdiction of incorporation.

(ii) any arbitral award obtained in relation to the Transaction Documents in the seat of that arbitral tribunal as specified in the Transaction Documents will be recognised and enforced in its jurisdiction of incorporation.

(d) **No deduction of tax**

It is not required to make any Tax Deduction from any payment it may make under the Transaction Documents.

(e) **No filing or stamp taxes**

Subject to any qualifications specifically referred to in any legal opinion delivered to Party A as a Condition Precedent, under the laws of its jurisdiction of incorporation, it is not necessary that the Transaction Documents be filed, recorded or enrolled with any court or other authority in any jurisdiction or that any stamp, registration or similar tax be paid on or in relation to the Transaction Documents or the transactions contemplated by the Transaction Documents, other than (i) the making of appropriate registrations of the Transaction Security Documents with the Accounting and Corporate Regulatory Authority of Singapore and the payment of fees associated to such registrations and (ii) payment of stamp duty of up to a maximum of S$500 imposed by the Inland Revenue Authority of Singapore in connection with the execution and delivery of the Share Charge.

(f) **Taxation**

(i) Neither it nor T&L is materially overdue in the filing of any Tax returns and it is not, and T&L is not, overdue in the payment of any amount in respect of Tax.

(ii) No claims or investigations are being, or are reasonably likely to be, made or conducted against it or T&L with respect to Taxes, other than any claims or investigations comprising routine tax audits arising in the ordinary course of business.

(iii) It and T&L have duly filed their annual accounts with all relevant authorities.

(iv) It and T&L are and have at all times been a resident for Tax purposes only in their jurisdiction of incorporation. Neither it nor T&L is subject to Tax in any country other than its jurisdiction of incorporation by virtue of having a permanent establishment or other place of business in that country or otherwise.

(v) Neither it nor T&L is liable, nor could it or T&L be liable, to pay any amount or make reimbursement or indemnity to any person in respect of any Tax liability of another person.

(vi) It and T&L have correctly claimed and are entitled to carry forward all Tax losses as disclosed in their Tax returns.

(g) **No misleading information**

Save as disclosed in writing to Party A prior to the date of the Agreement:

(i) any written factual information provided to Party A by (or on behalf of) Party B was true and accurate in all material respects as at the date the relevant information was given;

(ii) any projections or forecasts as at their date were prepared on the basis of recent historical information and on the basis of assumptions believed by Party B to be reasonable and were fair (as at the date of the relevant document containing the projection or forecast) and arrive at after careful consideration;

(iii) no event or circumstance has occurred or arisen and no information has been omitted and no information has been given or withheld that results in the information, or forecasts or projections provided being untrue or misleading in any material respect.

(iv) all other written information provided by Party B (including through its advisers or the Founder or his advisers) to Party A was true, complete and accurate in all material respects as at the date it was provided and is not misleading in any material respect.

(h) **No insolvency proceedings**

No corporate action, legal proceeding or other procedure or step described in Section 5(a)(vii) of the Agreement has been taken or, to its knowledge, threatened in writing in relation to Party B.

(i) **Financial statements**

(i) There has been no material adverse change in the assets, business or consolidated financial condition of Party B since the date of the Agreement.

(ii) The most recent financial statements delivered pursuant to sub-paragraphs 3(k) and (l) and sub-paragraphs 6(b)-(e) of this Confirmation:

(A) have been prepared in accordance with all applicable laws and the Accounting Principles consistently applied in India and in a manner consistent with the preparation of T&L's audited financial statements for the year ending 31 March 2021;

(B) in respect of audited financial statements, give true and fair view of; and

(C) in respect of unaudited financial statements, fairly represent,

T&L's consolidated financial condition as at the end of, and consolidated results of operations for, the period to which they relate, and do not contain any misleading statements.

(iii) Since the date the financial statements have been delivered pursuant to Paragraph 6(b) or 6(c) of this Confirmation, there has been no material adverse change in the assets, business or consolidated financial condition of Party B or T&L, as the case may be.

(j) **No proceedings**

(i) No litigation, arbitration or administrative proceedings or investigations of or before any court, arbitral body or agency have been started or threatened against it (in writing) in respect of an amount exceeding (in aggregate) USD 10 million (each a "**Material Proceeding**"), provided that no Material Proceeding shall occur where the relevant litigation, arbitration, administrative proceeding or investigation is frivolous, vexatious or being contested in good faith or is discharged, restrained, stayed or dismissed within 45 days of commencement.

(ii) No judgment or order of a court, arbitral tribunal, arbitral body, other tribunal or agency or any order or sanction of any governmental or other regulatory body has been made against it for an amount exceeding (in aggregate) USD 10 million (each a "**Material Judgment**"), provided that there shall be no Material Judgment if such relevant judgment or order of a court, arbitral tribunal, arbitral body, other tribunal or agency or any order or sanction of any governmental or other regulatory body is being contested in good faith or is discharged, stayed or dismissed within 45 days of being made.

(k) **No breach of laws**

It has not breached in any material respect any law or regulation to which it is subject.

(l) **Pari passu ranking**

Its payment obligations under the Transaction Documents rank at least pari passu with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

(m) **Good title to assets**

It has a good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently conducted.

(n) **Transaction security and guarantee**

Subject to the Legal Reservations and the Perfection Requirements:

(i) each of the Transaction Security Documents validly creates the Security which is expressed to be created by that Transaction Security Document and evidences the Security it is expressed to evidence; and

(ii) the Security Assets are fully capable of being made subject to that Transaction Security without restriction and no consent of any person is required for the creation of the relevant Transaction Security.

(o) **Existing Facility Agreement**

No Security or other credit support, including any guarantee, has been granted by Party B, the Founder or any other person pursuant to or in connection with the Existing Facility Agreement.

(p) **Anti-corruption laws**

(i) Party B has conducted its business in compliance with all applicable anti-corruption laws and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

(ii) Party B has not obtained or induced directly or indirectly through any person the procurement of the Transaction Documents or any contract, consent, approval, right, interest, privilege or other obligation or benefit related to the Transaction Documents or a favourable relationship with Party A through any corrupt or illegal business practice.

(iii) Party B has not given or agreed to give to any person, either directly or indirectly, any placement fee, introductory fee, arrangement fee, finder's fee or any other fee, compensation, monetary benefit or any other benefit, gift, commission, gratuity, bribe or kickback, whether described as a consultation fee or otherwise ("**Fees**"), with the object of obtaining or inducing the procurement of this Agreement or any contract, right, interest, privilege or other obligation or benefit related to the Transaction Documents. For the avoidance of doubt, the following shall not be deemed to be "Fees" within the meaning of this paragraph: (x) any payments that are legitimate in the normal course of business between each party hereto pursuant to the Transaction Documents; (y) items, including refreshments, of an inconsequential or immaterial cost or value; and (z) the regular and customary compensation and benefits received by either party's employees in the ordinary course of business and consistent with past practice.

(q) **Sanctions**

(i) It is not a Designated Person.

(ii) It is not subject to any claim, proceeding, formal notice or (to the best of Party B's knowledge and belief having made due and careful inquiries) investigation with respect to Sanctions which could reasonably be expected to result in it, T&L or Midco or Party A or any of its Affiliates being in breach of any Sanctions or becoming a Designated Person.

(iii) No Designated Person has been involved in the negotiation or execution of the Transaction Documents on behalf of Party B or in the performance by Party B of its obligations under the Transaction Documents or in the use by Party B of the Initial Exchange Amount.

(r) **No other business**

(i) Party B has not traded or carried on any business since the date of its incorporation nor has entered into any agreement, in each case other than:

(A) in connection with the acquisition and ownership of T&L Shares and Aakash Shares and the opening, ownership and operation of, and incurring liabilities under any custody accounts which hold such shares;

(B) entering into and incurring liabilities and obligations (including the entry into a transaction) as contemplated under the Transaction Documents, the Existing Facility Agreement, each Parallel Transaction and any documents required to

be entered into in connection with any Parallel Transaction, in each case, in accordance with the terms thereof;

(C) holding cash or cash equivalent investments and the opening, ownership and operation of, and incurring liabilities under any accounts which hold such cash or cash equivalent investments;

(D) undertaking activities customarily carried on in the normal course of business by an investment or non-trading holding company including incurring any professional and administration costs in the ordinary course of business as an investment or non-trading holding company; and

(E) taking any steps in preparation for or consummation of a Liquidity Event.

(ii) As at the date of this Confirmation, Party B does not have any Subsidiaries.

(s) **No immunity**

In any proceedings taken in its jurisdiction of incorporation in relation to the Transaction Documents to which it is a party, it will not be entitled to claim for itself or any of its assets immunity from suit, execution, attachment or other legal process.

**5. General Undertakings**

The "Agreements" under Section 4 of the Agreement shall be undertaken by Party B only and not Party A. In addition, the undertakings in this Paragraph 5 apply with respect to Party B only and not Party A and remain in force from the date of this Confirmation until the Expiration Date.

(a) **Authorisations**

Party B shall promptly obtain, comply with and do all that is necessary to maintain in full force and effect any Authorisation required under any applicable law or regulation to:

(i) enable it to perform its obligations under the Transaction Documents to which it is a party;

(ii) (subject to the Perfection Requirements) ensure the legality, validity, enforceability or admissibility in evidence of the Transaction Documents; and

(iii) carry on its business where failure to do so has or is reasonably likely to have a Material Adverse Effect.

(b) **Compliance with laws**

Party B shall comply in all material respects with all laws, regulations or Authorisations to which it is subject.

(c) **Bribery Legislation and anti-money laundering laws**

(i) Party B shall not directly or indirectly use all or any part of the Initial Exchange Amount for any purpose, which would breach any Bribery Legislation or any applicable anti-money laundering laws.

(ii) Party B shall not attempt to obtain or induce directly or indirectly through any person the procurement of any contract, consent, approval, right, interest, privilege or other obligation or benefit related to the Transaction Documents or a favourable relationship with Party A through any corrupt or illegal business practice, which would breach any Bribery Legislation or any applicable anti-money laundering laws.

(iii) Party B shall not give or agree to give to any person, either directly or indirectly, any Fees with the object of obtaining or inducing any contract, right, interest, privilege or other obligation or benefit related to the Transaction Documents, which would breach any Bribery Legislation or any applicable anti-money laundering laws.

(iv) Party B shall:

(A) conduct its businesses in compliance with Bribery Legislation and applicable anti-money laundering laws; and

(B) maintain policies and procedures designed to promote and achieve compliance with such laws.

(d) **Sanctions**

Party B shall:

(i) comply in all respects with any Sanctions applicable to it;

(ii) not, directly or indirectly, use the Initial Exchange Amount, or lend, contribute or otherwise make available such proceeds to any person:

(A) to fund any activities or business of or with any person, or in any country or territory that, at the time of such funding is a Designated Person, or a Sanctioned Country; or

(B) in any other manner that could reasonably be expected to result in a breach of Sanctions by Party B or Party A or any of their respective Affiliates or Party B or Party A or any of their respective Affiliates becoming a Designated Person;

(iii) not fund all or part of any payment under a Transaction Document out of proceeds directly or indirectly derived from business or transactions:

(A) with any Sanctioned Country; or

(B) from any action or any dealing with a Designated Person, which would be prohibited by applicable Sanctions or would, or could reasonably be expected to, otherwise cause Party B or Party A or any of their respective Affiliates to be in breach of applicable Sanctions or to become a Designated Person;

(iv) not do business, enter into transactions with, purchase or receive money from or give money to or for the benefit of, a Designated Person to the extent it would be prohibited from doing so by Sanctions (excluding, for the avoidance of doubt, ordinary course of trading services or supplies provided or made to consumers of a

regulated business on an anonymised basis or pursuant to a public agreement, which Party B may not refuse entry into by applicable laws and regulations) or would, or could reasonably be expected to, cause Party A or any of its Affiliates to be in breach of Sanctions or to become a Designated Person.

(e) **Taxation**

(i) Party B and T&L shall pay and discharge all Taxes imposed upon them or their assets within the time period allowed without incurring penalties or contesting them in good faith.

(ii) Party B and T&L may not change their residence for Tax purposes.

(f) **Restriction on merger**

(i) Party B shall do and cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

(ii) Party B shall not enter into any amalgamation, demerger, merger, consolidation or corporate reorganisation or reconstruction.

(g) **No change of business**

(i) Party B shall procure that no substantial change is made to the general nature of the business of Party B at the date of this Confirmation.

(ii) Party B undertakes that it conducts its business in a prudent and reasonable manner having regard to the rights and interests of its creditors generally.

(h) **Ranking**

Party B shall ensure that at all times any unsecured and unsubordinated claims of Party A against Party B under the Transaction Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

(i) **Arm's length basis**

Party B shall not enter into any transaction with any person except those that are no less favourable than arm's length terms. For the avoidance of doubt, the foregoing shall not apply to any acquisition of T&L Shares or any Excluded Transfer (provided that in the case of an Excluded Transfer to a holding company not already listed, all or substantially all of the T&L Shares are intended to be transferred to such holding company and an IPO completes within the period stipulated by the Calculation Agent acting reasonably and provided further that Party B receives shares in the relevant transferee entity in connection with such Excluded Transfer corresponding to the T&L Shares subject to the Excluded Transfer and contemporaneously therewith).

(j) **Distributions and share redemption**

Party B shall not:

(i) declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital);

(ii) repay or distribute any dividend or share premium reserve;

(iii) pay any management, advisory or other fee to or to the order of any of the shareholders of Party B; or

(iv) redeem, repurchase, defease, retire or repay any of its share capital or resolve to do so,

in each case, without the prior written consent of Party A.

(k) **Constitutional documents**

Party B shall not amend, supplement or otherwise modify its Constitutional Documents, without the prior written consent of Party A other than as contemplated in or required to give effect to the Transaction Documents.

(l) **No other business activities**

Party B shall not trade, carry on any business, own any assets or incur any liabilities except for:

(i) in connection with the acquisition and ownership of the Aakash Shares, T&L Shares and any other Subsidiaries and the opening, ownership and operation of, and incurring liabilities under any custody accounts which hold such shares;

(ii) entering into and incurring liabilities and obligations and conducting the transactions contemplated under the Transaction Documents, the Existing Facility Agreement, each Parallel Transaction and any documents required to be entered into in connection with any Parallel Transaction, in each case, in accordance with the terms thereof;

(iii) holding cash or cash equivalent investments and the opening, ownership and operation of, and incurring liabilities under any accounts which hold such cash or cash equivalent investments;

(iv) undertaking activities customarily carried on in the normal course of business by a non-trading holding company including incurring any professional and administration costs in the ordinary course of business as an investment or non-trading holding company; and

(v) taking any steps in preparation for or the consummation of a Liquidity Event.

(m) **Specified Indebtedness**

(i) Party B shall not incur or allow to remain outstanding any Specified Indebtedness or guarantee the obligations of any person.

(ii) Paragraph (i) above does not apply to any Specified Indebtedness outstanding under (A) the Existing Facility Agreement in the aggregate principal amount outstanding

as of the Effective Date, (B) the Transaction Documents, or (C) any Parallel Transaction.

(n) **Negative pledge**

In this Paragraph 5(n), "**Quasi-Security**" means an arrangement or transaction described in paragraph (ii) below.

(i) Party B shall not create or permit to subsist any Security over any of its assets.

(ii) Party B shall not:

(A) sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by Party B;

(B) sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(C) enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(D) enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Specified Indebtedness or of financing the acquisition of an asset.

(iii) Paragraphs (i) and (ii) above do not apply to any Security or (as the case may be) Quasi-Security, listed below:

(A) any Security or Quasi-Security arising by operation of law and in the ordinary course of day-to-day administration or operations of a non-trading holding company;

(B) any netting or set-off arrangement entered into by Party B in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances of Party B;

(C) any Security or Quasi-Security over bank accounts granted as part of that bank's standard terms and conditions or any Security or Quasi-Security granted pursuant to custody arrangements;

(D) any Security or Quasi-Security entered into pursuant to any Transaction Document; or

(E) any Security or Quasi-Security on substantially similar and no more favourable terms to the Transaction Security granted pursuant to any Parallel Transaction and provided further that such Security or Quasi-Security shall not in any way affect the Transaction Security and shall not be on a prior ranking basis.

(o) **Disposals**

(i) Party B shall not enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset.

(ii) Paragraph (i) above does not apply to:

(A) any sale, lease, transfer or other disposal of T&L Shares for the purpose of funding the payment of the Mandatory Exchange Amount, the Option Cash Settlement Amount or any other amount due to Party A under or in connection with any Transaction Document;

(B) the conversion and/or exchange of the Aakash Shares into T&L Shares pursuant to the Framework Agreement;

(C) any Excluded Transfer (provided that in the case of an Excluded Transfer to a holding company not already listed, all or substantially all of the T&L Shares are intended to be transferred to such holding company and an IPO completes within the period stipulated by the Calculation Agent acting reasonably and provided further that Party B receives shares in the relevant transferee entity in connection with such Excluded Transfer corresponding to the T&L Shares subject to the Excluded Transfer and contemporaneously therewith);

(D) any sale, lease, transfer or other disposal of any assets other than Security Assets or Funded Shares provided that the proceeds of such sale, lease, transfer or other disposal are applied by Party B towards the repayment of its Specified Indebtedness; or

(E) any sale, lease, transfer or other disposal of Aakash Shares provided that at a time substantially contemporaneously as such sale, lease transfer or other disposal, Party B acquires T&L Shares intended to be funded by the Initial Exchange Amount or the proceeds of a Parallel Transaction.

(p) **Acquisitions**

Other than (i) the acquisition of Aakash Shares (or the direct acquisition of T&L Shares) using the Initial Exchange Amount or the proceeds of a Parallel Transaction, (ii) the conversion and/or exchange of those Aakash Shares into T&L Shares, (iii) provided that no Specified Indebtedness has been incurred by Party B in connection with such acquisition, any acquisition of the T&L Shares intended to be funded by the Initial Exchange Amount or the proceeds of a Parallel Transaction, and (iv) any acquisition of the T&L Shares funded by way of equity contribution to Party B by its shareholder(s), Party B shall not acquire a company or any shares or securities or a business or undertaking (or in each case, any interest in any of them), or incorporate a company .

(q) **Loans or credit**

Party B shall not be a creditor in respect of any Specified Indebtedness.

(r) **Dividends and voting rights**

(i) Party B shall immediately upon receipt transfer in full any distributions (cash or non-cash) from the Funded Shares into the Blocked Account.

(ii) Party B shall maintain the Blocked Account at all times from the CS Deadline until all amounts due under the Transaction Documents have been paid in full.

(iii) Party B shall not be entitled to make any withdrawals from the Blocked Account without the prior written consent of Party A other than to pay amounts due from Party B to Party A under the Transaction Documents.

(iv) If an Event of Default (including a Conversion EoD) or Termination Event has occurred and is continuing, Party B must promptly exercise all voting rights in respect of the Funded Shares in accordance with the instructions of Party A.

(s) **Promoter lock-up**

Party B shall (and shall procure that all Founder Entities shall) use best efforts, which shall include doing all such acts, making all such applications, filings and appeals as may be necessary or desirable, as well as any structuring of the use of proceeds raised through an IPO of T&L, to ensure that its ownership of T&L Shares are not subject to any lock-up restrictions under applicable laws lasting longer than the minimum lock-up restrictions applicable under law at the relevant time.

(t) **Aakash merger and conversion process**

(i) If the Aakash Shares have not been exchanged pursuant to the merger of Aakash and T&L as contemplated under the Framework Agreement by 3 October 2022, then Party B shall as soon as practicable and taking into account the time required to avoid the occurrence of a Conversion EoD:

(A) provide notice to T&L pursuant to the Fallback Swap Agreement; and

(B) take all actions necessary or desirable, including the receipt of approval from the shareholders of T&L, in accordance with applicable law, to procure, the issuance of T&L Series F CCCPS Shares to Party B in exchange for the Aakash Shares held by Party B (on the basis of an exchange ratio of 100 T&L Series F CCCPS Shares for every 23,932 Aakash Shares,

in each case, subject to such adjustment as may be required in relation to any consolidation, sub-division, bonus issuance, or other change to the capital structure of T&L or Aakash), in accordance with the Fallback Agreement.

(ii) Party B shall exercise all rights and take all such action as is available to it under, pursuant to or in connection with the Framework Agreement and the Fallback Agreement (and any documents related thereto that Party B is a party to) in order to give effect to the transactions contemplated under the Transaction Documents.

(iii) Party B shall procure that the affidavit referred to in Paragraph 2 of Annex I hereto, in the form agreed with Party A, be filed by T&L with the National Company Law Tribunal immediately following the purchase of Aakash Shares by Party B using the Initial Exchange Amount.

(u) **Most favoured nation**

(i) Party B shall promptly deliver to Party A details of any loans, financial indebtedness or alternative financial arrangements it intends to enter into with any third parties in order to fund the acquisition of T&L Shares and/or Aakash Shares by Party B.

(ii) If Party A determines that the terms of any financial arrangements referred to in sub-paragraph (i) above, are better than the terms set out in the Transaction Documents, then at Party A's sole and absolute discretion the Transaction Documents shall be amended to reflect such better terms and Party B agrees to make any such amendments (and procure that any Credit Support Provider agrees to such amendments) to the Transaction Documents.

(v) **Further assurance**

(i) Party B shall promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as Party A may reasonably specify (and in such form as Party A may reasonably require in favour of Party A or its nominee(s)):

(A) to perfect the Security created or intended to be created under or evidenced by the Transaction Security Documents or for the exercise of any rights, powers and remedies of Party A provided by or pursuant to the Transaction Documents or by law; and/or

(B) following the designation of an Early Termination Date, to facilitate the realisation of the assets which are, or are intended to be, the subject to the Transaction Security.

(ii) Party B shall take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on Party A by or pursuant to the Transaction Documents.

(w) **Conditions Subsequent**

No later than the CS Deadline:

(i) Party B shall provide to Party A a copy of the resolution of the board of directors of Party B:

(A) approving the terms of, and the transactions contemplated by, the Blocked Account Security Agreement and resolving that it execute the Blocked Account Security Agreement;

(B) authorising a specified person or persons to execute the Blocked Account Security Agreement) on its behalf; and

(C) authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices to be signed and/or despatched by it under or in connection with the Blocked Account Security Agreement;

(ii) Party B shall provide to Party A certificate of Party B (signed by a director):

(A) confirming that any limit binding on it will not be exceeded by entry into the Blocked Account Security Agreement or any of the transactions contemplated thereunder;

(B) certifying that each copy document relating to it delivered to Party A in connection with the Blocked Account Security Agreement is correct, complete and in full force and effect in all material respects as at a date no earlier than the date of the Blocked Account Security Agreement; and

(C) certifying specimens of the signature of each person authorised by the resolution referred to in paragraph (i) above;

(iii) Party B shall provide to Party A a copy of any other Authorisation or other document, opinion or assurance which Party A considers to be necessary or desirable (if it has notified Party B accordingly) in connection with the entry into and performance of the transactions contemplated the Blocked Account Security Agreement or for the validity and enforceability of the Blocked Account Security Agreement;

(iv) Party B shall open the Blocked Account and enter into the Blocked Account Security Agreement;

(v) Party B shall use reasonable efforts to ensure that an acknowledgement of notice of the Security created pursuant to the Blocked Account Security Agreement, in form and substance satisfactory to Party A, is delivered to Party A by the CS Deadline;

(vi) Party B shall provide to Party A: (A) evidence that the details of the Transaction Security created by the Blocked Account Security Agreement is duly registered with the Accounting and Corporate Regulatory Authority of Singapore; and (B) evidence that any stamp duty payable in Singapore on the Blocked Account Security Agreement has been paid; and

(vii) Party A shall have received a legal opinion satisfactory to it (acting reasonably) as to matters of Singapore law concerning the enforceability of the Blocked Account Security Agreement and the capacity of Party B to enter into the Blocked Account Security Agreement.

## 6. Information Undertakings

Party B shall:

(a) provide Party A, promptly upon request, all information Party A deems necessary or desirable toc comply with "know your customer" or other similar checks under all applicable laws and regulations;

(b) provide Party A, as soon as they become available, but in any event within 180 days of the end of the relevant financial years, its audited consolidated financial statements;

(c) provide Party A, as soon as they become available, but in any event within 180 days of the end of the relevant financial years, T&L's audited consolidated financial statements;

(d) provide Party A, as soon as they become available but in any event within 75 days of the end of the relevant financial half years its consolidated financial statements;

(e) provide Party A, as soon as they become available but in any event within 75 days of the end of the relevant financial half years T&L's consolidated financial statements;

(f) provide Party A, at the same time as they are dispatched, copies of all documents dispatched by Party B to its shareholders generally (or any class of them) or dispatched by Party B to its creditors generally (or any class of them);

(g) notify Party A as soon as reasonably practicable upon the occurrence of any Sell Down Event or Liquidity Event and upon becoming aware of any Event of Default (including a Conversion EoD) or Termination Event;

(h) promptly provide the Calculation Agent or any valuer conducting a Valuation upon their request, all relevant pricing information to enable the Calculation Agent to determine the price per T&L Share and/or the valuer to conduct the relevant Valuation, subject to any restrictions imposed by law, regulation or confidentiality obligations;

(i) notify Party A promptly upon becoming aware of them, the details of any material litigation, arbitration or administrative proceedings which are current, threatened or pending against Party B or T&L or any material judgment relating to Party B or T&L;

(j) promptly upon request, provide Party A such further information regarding the Party B's and T&L's financial condition, assets and operations, any requested amplification or explanation of any item in the financial statements or other material provided by Party B under this Confirmation, any changes to Party B's and T&L's management and an up to date copy of the Party B's and T&L's shareholders' register, as well as any information or documentation reasonably requested by Party A; and

(k) procure that the Founder and senior management of T&L give a presentation to Party A in each financial year (or at a more frequent interval as the parties may agree if an Event of Default has occurred in respect of which Party B is the Defaulting Party) about the ongoing business and financial performance of T&L and Party B.

## 7. Specific performance

Without prejudice to any other rights or remedies that the parties may have, each party acknowledges and agrees that damages alone may not be an adequate remedy for breach of the terms of the Transaction Documents and the parties shall be entitled to the remedies of injunction, specific performance or other equitable relief for any threatened or actual breach of the Transaction Documents.

## 8. Transaction expenses

Without prejudice to Section 11 of the Agreement, Party B shall promptly pay within 10 Business Days of demand all costs and expenses (including legal fees) reasonably incurred by Party A in connection with the preparation, negotiation, printing and execution of the Agreement and other Transaction Documents, subject to a total cap of USD 600,000, provided that Party A shall not be permitted to make a demand prior to the occurrence of the Effective Date.

**9. Confidential Information**

(a) Each party shall (and shall procure all Connected Persons) keep confidential and not use for the purpose of its own business all Confidential Information save to the extent permitted under paragraph (b) below.

(b) Paragraph (a) above shall not prohibit the disclosure of any information if and to the extent that:

(i) the disclosure is made with the written consent of the party to which such information relates;

(ii) the information is in or enters into the public domain other than by a breach of the Transaction Documents;

(iii) the disclosure is required to be made by law or by the regulations of a Governmental Entity;

(iv) the disclosure is made in response to a request by the auditor of a party or its Affiliates, provided that such auditor shall be bound to observe the restrictions in this Paragraph 9;

(v) the disclosure is made on a confidential basis by: (x) Party A to its Affiliates or its or their actual or prospective lenders, underwriters, directors, employees, agents or professional advisers, or the professional advisers of such persons, provided that any actual or prospective lender or underwriter has agreed in writing to be bound to observe restrictions equivalent to those under this Paragraph 9; or (y) a party to a Tax Governmental Entity to the extent reasonably required for the purposes of the Tax affairs of the party or any of its Affiliates;

(vi) the disclosure is reasonably required to be made in order to perform or enforce the provisions of the Transaction Documents;

(vii) the disclosure is reasonably required by Party A to be made to a potential transferee or assignee as may be necessary to effect a transfer or assignment in accordance with the terms of the Agreement, provided that any potential transferee has agreed in writing to be bound to observe the restrictions equivalent to those under this Paragraph 9; and

(viii) the disclosure is required in connection with any Valuation or any dispute (whether in accordance with Section 13(b) or the Calculation Agent dispute resolution provisions of this Confirmation).

(c) Notwithstanding any provision of the Agreement otherwise requiring to provide or disclose any information or documents pertaining to Party A, Party A shall be entitled to withhold, edit, redact and/or otherwise limit disclosure of any Confidential Information on the grounds of national security and/or financial or economic sensitivity and Party A shall have no liability whatsoever and shall be free and harmless from any claims whatsoever for exercising its rights pursuant to this clause.

(d) This Paragraph 9 constitutes the entire agreement between the parties in relation to the obligations of Party A under the Transaction Documents regarding Confidential

Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

(e) Party A acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and Party A undertakes not to use any Confidential Information for any unlawful purpose.

(f) Each of the parties agrees (to the extent permitted by law and regulation) to inform the other Party:

(i) of the circumstances of any disclosure of Confidential Information made to any governmental, banking, taxation or other regulatory authority or to a similar body except where such disclosure is made to such body during the ordinary course of their supervisory or regulatory function; and

(ii) upon becoming aware that Confidential Information has been disclosed in breach of this Paragraph 9.

(g) The obligations in this Paragraph 9 are continuing and, in particular, shall survive and remain binding on each party for a period of twelve months from the Expiration Date.

**10. Notices**

(a) For notices to Party A:

Qatar Holding LLC
Ooredoo Tower (Building 14)
Al Dafna Street (Street 801)
Al Dafna (Zone 61)
Doha, Qatar
Attention: Office of the Legal Department Director
Email: notices.legal@qia.qa
With a copy (which shall not constitute notice) to:
CapitalMarkets@qia.qa

(b) For notices to Counterparty:

Byju's Investments Pte. Ltd.
30 Cecil Street,
#19-08 Prudential Tower,
Singapore 049712

Attention: Mr Byju
Raveendran Phone: +65 6812 1611
Email: byju@byjus.com

11. **Electronic Signatures**

Where a party electronically signs this Confirmation or any amendment of the same, such electronic signature confirms the relevant party's consent to the use of electronic signatures in

respect thereof and to the use by the parties of the electronic signature provider used to effect such signature (if any). The parties further agree that a printed copy of a digital or electronically signed copy of this Confirmation shall be admissible in any legal proceeding and hereby waive any right to object to its introduction in any such proceedings in any capacity.

**12. Electronic Communication**

(a) Any communication to be made between under or in connection with the Transaction Documents may be made by electronic mail or other electronic means (including, without limitation, by way of positing to a secure website) and:

(i) with respect to Party A, the parties must direct any communication to notices.legal@qia.qa;

(ii) with respect to Party B, the parties must direct any communication to byju@byjus.com; and

(iii) subject to the above, the parties shall notify each other in writing of their electronic mail address and/or any other information required to enable the transmission of information by that means and of any change to their address or any other such information supplied by them by not less than five Local Business Days' notice.

(b) Any electronic communication as specified in paragraph (a) above to be made between the parties may only be made in that way to the extent that the parties agree that, unless and until notified to the contrary, this is to be an accepted form of communication.

(c) Any electronic communication as specified in paragraph (a) above made between the parties will be effective only when actually received (or made available) in readable form.

(d) Any electronic communication which becomes effective, in accordance with paragraph (c) above, after 3:00 p.m. in the place in which the party to whom the relevant communication is sent or made available at its address for the purpose of the Transaction Documents shall be deemed only to become effective on the following day.

(e) Any reference in a Transaction Document to a communication being sent or received shall be construed in accordance with this Paragraph 12.

**13. Counterparts**

This Confirmation may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Confirmation.

**14. Definitions**

In this Confirmation, the following definitions shall apply:

(a) "**Acceptable Bank**" means: (i) a bank or financial institution which has a rating for its long term unsecured and non-credit enhanced debt obligations of A or higher by Standard & Poor's Rating Services or Fitch Ratings Ltd or A3 or higher by Moody's Investors Service Limited or a comparable rating from an internationally recognised credit rating agency; or (ii) any other bank or financial institution approved by Party A.

(b) "**Accounting Principles**" means IFRS or generally accepted accounting principles in Party B's or T&L's (as relevant) jurisdiction of incorporation.

(c) "**Authorisations**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

(d) "**Authorised Recipient**" means in relation to each party: (i) such party's Connected Persons for whom it would be useful to have access to the Confidential Information for the Permitted Purpose; and (b) such party's providers of debt and equity finance, if any, and their respective directors, officers, partners, employees, advisers, agents, representatives and consultants for whom it would be useful to have access to the Confidential Information for the purposes of the Transaction Documents.

(e) "**Blocked Account**" means a bank account opened and maintained by Party B with an Acceptable Bank outside of India and secured in favour of Party A.

(f) "**Blocked Account Security Agreement**" means the security agreement providing security over the Blocked Account in favour of Party A (in form and substance satisfactory to Party A) to be dated on or before the CS Deadline between Party B as security provider and Party A as secured party.

(g) "**Bribery Legislation**" means the United States Foreign Corrupt Practices Act of 1977, the U.K. Bribery Act, the (Indian) Prevention of Corruption Act, 1988, the (Indian) Prevention of Money Laundering Act, 2002, the Prevention of Corruption Act 1960 of Singapore and any other anti-corruption, anti-bribery, anti-money laundering, anti-slavery, sanctions or campaign finance Law, as applicable.

(h) "**Confidential Information**" means:

(i) with respect to Party A, information at any time and from time to time supplied by Party A, or by any of its Connected Persons (in written, oral, visual or electronic form) to Party B or Authorised Recipients in connection with the Transaction Documents;

(ii) with respect to Party B, information at any time and from time to time supplied by Party B, or by any of its Connected Persons (in written, oral, visual or electronic form) to Party A or Authorised Recipients in connection with the Transaction Documents; and

(iii) with respect to both parties, any information which relates to:

(A) the affairs or business of any party or its Affiliates;

(B) its assets; or

(C) the subject matter or provisions of, or transactions or matters contemplated by, or negotiations leading to, the Transaction Documents.

(i) "**Connected Persons**" means, in relation to each party, and in each case to the extent that they are involved in any of the transactions contemplated under the Transaction Documents: (i) such person's Affiliates; (ii) the advisers, agents, representatives and consultants of such party and its Affiliates; and (iii) the directors, officers, partners and employees of such party, its Affiliates and of its and their advisers, agents, representatives and consultants.

(j) "**Constitutional Documents**" means in respect of a Singapore incorporated company, the certificate of incorporation and constitution of that company.

(k) "**Control**" of a specified Person means the direct or indirect power of a Person to direct, or cause the direction of, the management or policies of that specified Person, through the ownership of shares, by contract or otherwise. A Person will be deemed to Control a specified Person if *inter alia*:

(i) that Person possesses or is entitled to acquire more than fifty percent (50%) of the voting rights in respect of the specified Person; or

(ii) that Person has the direct or indirect power:

(A) to exercise or cause the exercise of more than fifty per cent (50%) of the voting rights in respect of the specified Person; or

(B) to appoint or cause the appointment of more than half of the board of directors or similar governing body of the specified Person,

and the terms "**Controlled by**", "**Controlling**" and "**under common Control with**" shall be construed accordingly.

(l) "**CS Deadline**" means 31 October 2022.

(m) "**Designated Person**" means a person: (i) that is on a Sanctions List; (ii) that is located in or organized under the laws of, or is a citizen of, a Sanctioned Country; (iii) that is owned or controlled, directly or indirectly (where such ownership or control makes such person a target of Sanctions), or acting or purporting to act on behalf of, any of the persons listed in paragraphs (i) and (ii) above; or (iv) with which Party A or any of its Affiliates is generally prohibited from dealing or otherwise engaging in any transaction similar to the transactions contemplated by the Transaction Documents pursuant to any Sanctions.

(n) "**Existing Facility Agreement**" means the up to USD 400 million facility agreement dated 27 June 2022 between Counterparty, as borrower, and Revere Master SPV LLC, Series VII (BYJU), as lender.

(o) "**Fallback Agreement**" shall have the meaning ascribed to it in Annex I hereto.

(p) "**Framework Agreement**" means the framework agreement dated 3 April 2021 executed between, amongst others, Aakash, T&L, Mr. J.C. Chaudhry, Mr. Aakash Chaudhry, Singapore VII Topco I Pte. Ltd. and BCP Asia Athena ESC (Cayman) Ltd.

(q) "**Funded Shares**" means:

(i) the number of Aakash Shares which are purchased using the Initial Exchange Amount; or

(ii) on conversion or exchange of Aakash Shares into T&L Shares, the number of T&L Shares resulting from such conversion or exchange of the Aakash Shares described in paragraph (i) above.

(r) "**Governmental Entity**" means any public international, supra-national, national, state, municipal or local government (including any sub-division, court, administrative agency, commission or other authority thereof) or private body lawfully exercising or entitled to exercise any regulatory, Tax, importing, central banking, executive, legislative, licensing,

competition or other governmental or quasi-governmental authority or function (and including, for the avoidance of doubt, stock exchanges).

(s) “**IFRS**” means the International Financial Reporting Standards adopted by the International Accounting Standards Board.

(t) “**Ipso Facto Event**” means the Counterparty or Midco is the subject of:

(i) any proceedings as defined under section 440(6) of the IRDA; or

(ii) any process which under any law with a similar purpose may give rise to a stay on, or prevention of, the exercise of contractual rights.

(u) “**IRDA**” means the Insolvency, Restructuring and Dissolution Act 2018 of Singapore.

(v) “**Legal Reservations**” means:

(i) the principle that equitable remedies may be granted or refused at the discretion of a court, the principle of reasonableness and fairness where implied by law and the limitation of enforcement by laws relating to bankruptcy, insolvency, reorganisation, court schemes, administration, moratoria and other laws generally affecting the rights of creditors;

(ii) the time barring of claims under applicable statutes of limitation (or equivalent legislation), the possibility that an undertaking to assume liability for or indemnify a person against non-payment of stamp duty may be void and defences of set-off or counterclaim;

(iii) the principle that additional or default interest imposed pursuant to any relevant agreement may be held to be unenforceable on the grounds that it is a penalty;

(iv) the principle that in certain circumstances Security granted by way of a fixed charge may be recharacterised as a floating charge or that Security purporting to be an assignment may be recharacterised as a charge;

(v) the principle that a court may not give effect to an indemnity for legal costs incurred by a litigant; and

(vi) similar principles, limitations, rights and defences to those in paragraphs (i) to (v) above under the laws of applicable jurisdiction.

(w) “**Material Adverse Effect**” means a material adverse effect on: (i) the business, operations, assets, prospects or financial condition of Party B; (ii) the ability of Party B or its Credit Support Provider to perform or comply with any of its obligations under any Transaction Document to which it is a party; or (iii) the validity or enforceability of, or the effective or ranking of any Security granted or purporting to be granted pursuant to any of the Transaction Documents or the rights or remedies of Party A under any of the Transaction Documents.

(x) “**Midco**” means Byju's Global Pte. Ltd., an exempt private company limited by shares with registered office at 30 Cecil Street, #19-08, Prudential Tower, Singapore (049712).

(y) “**Parallel Transaction**” means any cash-settled option transaction (other than the Transaction) entered or to be entered into on or after the date of the Agreement by the Counterparty for the purposes of financing the acquisition of Aakash Shares or T&L Shares

(as applicable) with the 'initial exchange amounts' (or any equivalent term representing a funding payment to Party B) thereunder (excluding the Transaction) not exceeding in aggregate USD 250 million.

(z) "**Permitted Purpose**" means considering, evaluating and negotiating the Transaction Documents, entry into the Agreement and any transactions contemplated hereby and for the benefit of Party A, potential transfer or assignment of its rights and obligations in accordance with the Transaction Documents.

(aa) "**Person**" means any individual, firm, corporation, company or other body corporate, Governmental Entity or any joint venture, association, partnership, trust or any other entity or organisation (whether or not incorporated or having separate legal personality).

(bb) "**Perfection Requirements**" means the making of the appropriate registrations (including registration of charges, mortgages or pledges), filings, endorsements, notarisations, stamping, notifications or other actions or steps to be made in any jurisdiction in order to perfect any Security created by a Transaction Security Document and/or in order to achieve the relevant priority for the Security created thereunder.

(cc) "**Personal Guarantee**" means the deed of guarantee dated on or around the date of this Confirmation entered into by the Founder as guarantor in favour of Party A.

(dd) "**Sanctioned Country**" means a jurisdiction that is, or whose government is, targeted by country or territory-wide Sanctions (as at the date of this Confirmation, Iran, Syria, Cuba, North Korea, Russia, or the Crimea, Donetsk, and Luhansk Regions of Ukraine).

(ee) "**Sanctions**" means the economic or financial sanctions law, regulations, trade embargoes or other restrictive measures enacted, administered, implemented and/or enforced from time to time by a Sanctions Authority.

(ff) "**Sanctions Authority**" means:

(i) the Security Council of the United Nations;

(ii) the U.S. government or any U.S. government agency (including OFAC, the U.S. State Department, the U.S. Department of Commerce of the U.S. Department of the Treasury);

(iii) the UK government (including, without limitation, any of Her Majesty's Treasury, the Foreign and Commonwealth Office and the UK Department for Business Innovation & Skills);

(iv) the Singapore government;

(v) Qatar; and

(vi) the governments and official institutions, authorities or agencies of any of paragraphs (i) to (v) above.

(gg) "**Sanctions List**" means the Specially Designated Nationals and Blocked Persons list, the Sectoral Sanctions Identifications list and the List of Foreign Sanctions Evaders maintained by OFAC, the Consolidated List of Financial Sanctions Targets and the Investment Ban List maintained by Her Majesty's Treasury, or any similar list maintained by, or public announcement of a Sanctions designation made by, a Sanctions Authority, each as amended, supplemented or substituted from time to time.

(hh) "**Security**" means a mortgage, charge, pledge, lien, hypothecation or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

(ii) "**Security Assets**" means all of the assets of Party B and Midco which from time to time are, or are expressed to be, the subject of the Transaction Security.

(jj) "**Share Charge**" means the share security agreement dated on or around the date hereof between Midco as security giver and Party A as secured party.

(kk) "**Tax Deduction**" means any deduction or withholding for or on account of Tax from a payment under a Transaction Document.

(ll) "**Transaction Documents**" means: (i) the Agreement, including this Confirmation; (ii) the Personal Guarantee; and (iii) the Transaction Security Documents.

(mm) "**Transaction Security**" means the Security created or expressed to be created in favour of Party A pursuant to the Transaction Security Documents.

(nn) "**Transaction Security Documents**" means: (i) the Share Charge; and (ii) the Blocked Account Security Agreement.

(oo) "**Unencumbered Founder Shares**" means T&L Shares that any Founder Entity has the unrestricted right and power to transfer, convey and deliver full ownership of without the consent or agreement of any other person and that are free and clear of any Security (other than any liens customarily imposed by clearing systems), claims, charges, options, and rights of first refusal, encumbrances or other restrictions.

**ANNEX I**

1. Consent from T&L, JC Chaudhry and Aakash Chaudhry (together with JC Chaudhry, the "**Aakash Founders**") to the assignment by Singapore VII Topco I Pte Ltd and BCP Asia Athena ESC (Cayman) Ltd (together, "**Blackstone**") of their rights under the Framework Agreement to BIPL with effect from completion of the sale of shares of Aakash by Blackstone to BIPL under the Option Agreement dated 30 July 2022 between Blackstone, T&L and BIPL (the "**Option Sale**").

2. Consent from T&L, Aakash, the Aakash Founders and Blackstone under the Framework Agreement to the affidavit to be filed by T&L with the National Company Law Tribunal in connection with the Merger (as defined in the Framework Agreement) notifying the NCLT that following completion of the Option Sale, BIPL is the holder of  equity shares in Aakash ("**Option Shares**"), and all Option Shares will be exchanged for Series F CCPS in T&L upon completion of the Merger in the ratio of 100 Series F CCPS of T&L for every 23,932 equity shares of Aakash, subject to such adjustment as may be required in relation to any consolidation, sub-division, bonus issuance or other change to the capital structure of T&L or Aakash.

3. Entry into of an agreement between T&L, Aakash and BIPL (the "**Fallback Agreement**"), in terms satisfactory to Party A, to provide that if the Option Shares held by BIPL have not been exchanged for Series F CCPS in T&L pursuant to the Merger by 3 October 2022, then the Option Shares shall be transferred by BIPL to T&L in consideration for the issue by T&L to BIPL of 74,759 Series F CCPS in T&L (the "**T&L Swap Shares**" and the "**Swap**") promptly following 3 October 2022.

4. Confirmation from BIPL and T&L that they shall procure that each of the conditions specified in the Fallback Agreement for the completion of the Swap are satisfied promptly, and without prejudice to the foregoing, in the event such conditions are not promptly satisfied, they shall waive such conditions and complete the Swap promptly following 3 October 2022.

5. Confirmation by T&L that in accordance with the shareholders' agreement dated 28 February 2019 in relation to T&L (as amended or restated), it shall comply with clause 5 relating to the pre-emptive rights of the shareholders of T&L in connection with the issuance of the T&L Swap Shares to BIPL pursuant to the Swap.

Yours faithfully,

Confirmed as of the date first written above:

| **QATAR HOLDING LLC** | **BYJU'S INVESTMENTS PTE. LTD.** |
|---|---|
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

Name: MANSOOR EBRAHIM AL-MAHMOUD
Title: CEO
Date: 7/9/22

*[Signature page to the Confirmation between Byju's Investments Pte. Ltd. and Qatar Holding LLC - 7th September 2022]*

Yours faithfully,

Confirmed as of the date first written above:

**QATAR HOLDING LLC**

Name:
Title:
Date:

Name:
Title:
Date:

**BYJU'S INVESTMENTS PTE. LTD.**

DocuSigned by:
Byju
F7F0B417823E40F...

Name:
Title:
Date:

# Exhibit 36

# Camshaft Capital Fund, LP

Additional Subscription Booklet

Camshaft Capital Management, LLC
950 Brickell Bay Dr. #5107 Miami, Florida 33131

## APPENDIX B – ADDITIONAL SUBSCRIPTION REQUEST

Camshaft Capital Fund, LP
c/o Camshaft Capital Management, LLC
Attn: William Morton
950 Brickell Bay Dr. #5107
Miami, Florida 33131

**Re: Camshaft Capital Fund, LP, Request for Additional Subscription**

William Morton, Investment Manager:

Reference is made to the Second Amended and Restated Limited Partnership Agreement dated as of July 01, 2021 (as the same may be amended, supplemented or revised from time to time, the "***Partnership Agreement***") of Camshaft Capital Fund, LP, a Delaware limited partnership (the "***Partnership***"). All capitalized terms used but not defined herein shall have the meanings given to them in the Partnership Agreement.

The undersigned is a Partner in the Partnership and, pursuant to *Section 2.03* of the Partnership Agreement, hereby requests to make an additional capital contribution to the Partnership. The undersigned acknowledges that (i) subscription amounts will be credited to the Partnership on the first business day of the next calendar month, except as provided by the General Partner.

The undersigned submits the following subscription amount:

$ 215000000

Payment is tendered in accordance with the following wire instructions:

WIRING INSTRUCTIONS PROVIDED UPON REQUEST

1. Please have your bank identify your name on the wire transfer.
2. The General Partner of the Partnership recommends that your bank charge its wiring fee separately so that the full amount you have elected to invest may be invested in the Partnership.

Furthermore, the undersigned reaffirms as of the date hereof all of the representations, warranties and acknowledgments previously made in the Subscription Agreement executed by the undersigned.

Byju's Alpha, Inc.

Print full legal name of Limited Partner




7/12/2022

Signature Date

Riju Ravindran

Print name of Authorized Signatory

Director

Title of Authorized Signatory

# Exhibit 37

**PROMISSORY NOTE**

$190,812,500.00 July 12, 2022

FOR VALUE RECEIVED, **OCI LIMITED** (the "**Borrower**") hereby unconditionally promises to pay to the order of Camshaft Capital Fund, LP, a Delaware limited partnership (the "**Noteholder**"), on July 12, 2025, the principal amount of $215,000,000.00 (Two Hundred Fifteen Million Dollars) (the "**Loan**"), together with all accrued interest thereon, as provided in this Promissory Note (this "**Note**").

1. Payment Dates.

(a) Prepayment of Interest. Borrower shall make interest payments on the Loan as follows:

(i) On the date hereof, Borrower shall pre-pay the first three years' interest on the Loan ($24,187,500.00). For convenience, the foregoing first three years' interest amount will be deducted from the Loan proceeds payable by Noteholder to Borrower.

Prepaid interest shall not be refunded in any circumstance, including in the event of any prepayment by the Borrower under Section 1(b) of this Note.

(b) Prepayment of Principal. The Borrower may, upon six months' prior written notice, prepay the Loan in whole or in part at any time after January 12, 2024 if a Prepayment Event (as defined below) has occurred before such date or occurs on or after such date. As used in this Note, a Prepayment Event means any of the following:

(i) filing by **Byju's Alpha, Inc.** ("**Byju**") or any affiliate with the Securities and Exchange Commission or any comparable foreign regulatory agency for an initial public offering of securities;

(ii) execution and delivery by Byju of an agreement for the sale of Byju, including, without limitation, any transaction or series of related transactions by which a material interest in Byju or a material amount of its assets is transferred by means of a sale or exchange of capital stock or assets, a merger or consolidation, business combination or special purpose acquisition or other transaction; or

(iii) the adoption of any law, rule or regulation in any jurisdiction making the Loan invalid or illegal or imposing on Byju or the Borrower obligations or requirements materially impacting the business of either Byju or the Borrower related to maintaining the Loan.

(c) Business Day. In the event that any date set forth herein shall fall on a day that is not a Business Day (defined below), the date shall be deemed to be extended to the next following Business Day.

2. Unsecured. The Borrower's performance of its obligations hereunder is unsecured.

3. Interest Rate.

DocuSign Envelope ID: CBB16BFD-8604-4E9F-94D5-BB6BD2D5E200

(a) Interest Rate. Principal amounts outstanding under this Note shall bear interest at a rate per annum (the "**Interest Rate**") equal to 3.75%.

(b) Default Interest. If any amount payable hereunder is not paid when due, whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Interest Rate plus two percentage points (2%).

(c) Computation of Interest. All computations of interest hereunder shall be made on the basis of a year of 365/366 days, as the case may be, and the actual number of days elapsed. Interest shall begin to accrue on the Loan on the date of this Note. On any portion of the Loan that is repaid, interest shall not accrue on and after the date on which such payment is made.

(d) Interest Rate Limitation. All agreements between the Borrower and Noteholder, now existing or hereafter arising, are hereby expressly limited so that in no event whatsoever shall the amount paid or agreed to be paid to Noteholder hereof for the use, forbearance or detention of money to be loaned hereunder or otherwise, or for the performance or payment of any covenant or obligation contained herein, exceed the maximum amount permissible under applicable law. If from any circumstance whatsoever fulfillment of any provision hereof exceeds the limit of validity prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstance Noteholder hereof shall ever receive as interest under this Note or otherwise an amount that would exceed the highest lawful rate, such amount that would be excessive interest shall be applied to the reduction of the principal amount owing hereunder (without charge for prepayment) and not to the payment of interest, or such excess shall be refunded to Borrower.

4. Payment Mechanics.

(a) Manner of Payment. All payments of principal and interest shall be made in US dollars no later than 5:00 PM Eastern Time on the date on which such payment is due. Such payments shall be made by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

(b) Application of Payments. All payments shall be applied, *first*, to fees or charges outstanding under this Note, *second*, to accrued interest, and, *third*, to principal outstanding under this Note.

(c) Business Day. Whenever any payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and interest shall be calculated to include such extension. "**Business Day**" means a day other than Saturday, Sunday, or other day on which commercial banks in Miami, FL are authorized or required by law to close.

(d) Representations and Warranties. The Borrower represents and warrants to the Noteholder as follows:

(e) Compliance with Law. The Borrower is in compliance with all laws, statutes, ordinances, rules, and regulations applicable to or binding on the Borrower except where the failure to be in compliance would not have a material adverse effect on the Borrower.

(f) Power and Authority. The Borrower has the requisite capacity, power and authority to execute, deliver, and perform its obligations under the this Note.

DocuSign Envelope ID: CBB16BFD-8604-4E9F-94D5-BB6BD2D5E200

(g) Authorization; Execution and Delivery. The Borrower has duly executed and delivered this Note.

(h) No Approvals. No consent or authorization of, filing with, notice to, or other act by, or in respect of, any Governmental Authority or any other Person is required in order for the Borrower to execute, deliver, or perform any of its obligations under this Note except where the failure to obtain such consent or authorization or to make such filing will not have a material adverse effect on the Borrower.

(i) No Violations. The execution and delivery of this Note and the consummation by the Borrower of the transactions contemplated hereby and thereby do not and will not (a) violate any Law applicable to the Borrower or by which any of Borrower's properties or assets may be bound; or (b) constitute a default under any material agreement or contract by which the Borrower may be bound.

(j) Enforceability. This Note is a valid, legal, and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

(k) No Litigation. No action, suit, litigation, investigation, or proceeding of, or before, any arbitrator or Governmental Authority is pending or, to the Borrower's knowledge, threatened by or against the Borrower or any of Borrower's property or assets (a) with respect to this Note or any of the transactions contemplated hereby or (b) that could be expected to materially adversely affect the Borrower's financial condition or the ability of the Borrower to perform its obligations under this Note.

(l) PATRIOT Act; Anti-Money Laundering. The Borrower is, in compliance in all material respects with the PATRIOT Act, and any other applicable terrorism and money laundering laws, rules, regulations, and orders.

(m) Anti-Corruption Laws and Sanctions.

(i) "**Sanctioned Country**" means, at any time, a country or territory which is itself the subject or target of any comprehensive or country-wide Sanctions.

(ii) "**Sanctioned Person**" means, at any time, (a) any person listed in any Sanctions-related list of designated persons maintained by a Sanctions Authority; (b) any person operating, organized, or resident in a Sanctioned Country, (c) any person owned or controlled by any such person or persons described in the foregoing clauses (a) or (b), or (d) any person that is the subject or target of any Sanctions.

(iii) "**Sanctions**" mean all economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by a Sanctions Authority.

(iv) "**Sanctions Authority**" means OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, Canada, or other relevant sanctions authority.

(v) The Borrower is in compliance with all laws, rules, and regulations of any jurisdiction applicable to the Borrower from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 ("**Anti-Corruption Laws**").

DocuSign Envelope ID: CBB16BFD-8604-4E9F-94D5-BB6BD2D5E200

(vi) The Borrower is not and no agent of the Borrower that will act in any capacity in connection with or benefit from the Loan, is a Sanctioned Person.

(vii) No use of proceeds of the Loan or other transaction contemplated by this Note will violate any Anti-Corruption Law or applicable Sanctions.

5. Events of Default. The occurrence and continuance of any of the following shall constitute an "**Event of Default**" hereunder:

(a) Failure to Pay. The Borrower fails to pay (i) any principal amount of the Loan when due; (ii) any interest on the Loan within five (5) days after the date such amount is due; or (iii) any other amount due hereunder within ten (10) days after such amount is due.

(b) Breach of Representations and Warranties. Any representation or warranty made by the Borrower to the Noteholder herein contains an untrue or misleading statement of a material fact as of the date made.

(c) Cross-Defaults. The Borrower fails to pay when due any of its material debt (other than debt arising under this Note), or any interest or premium thereon, when due and such failure continues after the applicable grace period, if any, specified in the agreement or instrument relating to such debt.

(d) Bankruptcy; Insolvency.

(i) The Borrower institutes a voluntary case seeking relief under any law relating to bankruptcy, insolvency, reorganization, or other relief for debtors.

(ii) An involuntary case is commenced under any law relating to bankruptcy or insolvency and is not stayed or dismissed within ninety (90) days.

(iii) The Borrower makes a general assignment for the benefit of creditors.

(iv) The Borrower is unable, or admits in writing its inability, to pay Borrower's debts as they become due.

(v) A case is commenced against the Borrower or Borrower's assets seeking attachment, execution, or similar process against all or a substantial part of Borrower's assets and is not stayed or dismissed within ninety (90) days.

(e) Failure to Give Notice. The Borrower fails to give the notice of Event of Default specified in Section 6.

6. Notice of Event of Default. As soon as possible after it becomes aware that an Event of Default has occurred, and in any event within two (2) Business Days, the Borrower shall notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

7. Remedies. Upon the occurrence and during the continuance of an Event of Default, the Noteholder may, at its option, by written notice to the Borrower declare the outstanding principal amount of the Loan, accrued and unpaid interest thereon, and all other amounts payable hereunder immediately due and payable; *provided*, *however*, if an Event of Default described in

Sections 5(d)(iii) or 5(d)(iv) shall occur, the outstanding principal amount, accrued and unpaid interest, and all other amounts payable hereunder shall become immediately due and payable without notice, declaration, or other act on the part of the Noteholder.

8. Reinstatement. If any payment received by Noteholder hereunder is determined to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation, satisfaction and/or return of the payment and/or this Note, and shall not be discharged or satisfied with any prior payment or cancellation of this Note, but shall remain a valid and binding obligation enforceable, and such payment shall be immediately due and payable upon demand.

9. Expenses. If not defaulting, the Borrower shall pay no fees on this Note, other than interest.

10. Attorneys' Fees. If any party defaults under the terms of this Note, and another party employs an attorney to enforce this Note, whether or not legal proceedings are commenced, then such other party shall be entitled to recover from the defaulting party all reasonable attorneys' fees and other costs and expenses incurred in connection with such enforcement. If any party commences or is made a party to a lawsuit, arbitration or other proceeding to enforce or interpret this Note, the prevailing party in such proceeding shall be entitled to recover from the other party all reasonable attorneys' fees and other costs (whether otherwise taxable or recoverable) incurred in connection with such proceeding, including without limitation any appeal or enforcement of any judgment or decision rendered in such proceeding.

11. Full Payment. All amounts payable under this Note shall be paid in full without setoff, deduction or counterclaim. All amounts payable under this Note shall be free and clear of and without any deduction or withholding for or on account of any taxes, levies, penalties, duties, charges, fees, restrictions or conditions of any nature now or hereafter imposed by any federal, state, country or local government or any political subdivision or taxing authority thereof or therein. Borrower shall indemnify Noteholder against any such taxes, levies, imposts, duties, charges and fees (other than taxes on the income of Noteholder imposed by any taxing authority) which may be assessed against Noteholder or claimed or demanded from Noteholder in respect of any amount payable by Borrower hereunder, and against any costs, charges, expenses or liability arising out of or in respect of such assessment, claim or demand, to the fullest extent permitted by law.

12. Notices. All notices and other communications relating to this Note shall be in writing and shall be deemed given upon the first to occur of (x) deposit with the United States Postal Service or overnight courier service, properly addressed and postage prepaid; (y) transmittal by facsimile or e-mail properly addressed (with written acknowledgment from the intended recipient such as "return receipt requested" function, return e-mail, or other written acknowledgment); or (z) actual receipt by an employee or agent of the other party. Notices hereunder shall be sent to the following addresses, or to such other address as such party shall specify in writing:

DocuSign Envelope ID: CBB16BFD-8604-4E9F-94D5-BB6BD2D5E200

(a) If to the Borrower:

OCI Limited
33 Cannon St
London EC4M 5SB
United Kingdom
Attn: Oliver Chapman, CEO
E-mail: oc@oci-group.co.uk

If to the Noteholder:

Camshaft Capital Fund, LP
950 Brickell Bay Dr. #5107
Miami, FL 33131
E-mail: William Morton william@camshaftcapital.com

13. Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based on, arising out of, or relating to this Note and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of Florida.

14. Disputes.

(a) Submission to Jurisdiction.

(i) The Borrower irrevocably and unconditionally (A) agrees that any action, suit, or proceeding arising from or relating to this Note may be brought in the courts of the State of Florida sitting in Miami County, and in the United States District Court for the Southern District of Florida, and (B) submits to the exclusive jurisdiction of such courts in any such action, suit, or proceeding. Final judgment against the Borrower in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(ii) Nothing in this Section 14(a) shall affect the right of the Noteholder to bring any action, suit, or proceeding relating to this Note against the Borrower or its properties in the courts of any other jurisdiction.

(iii) Nothing in this Section 14(a) shall affect the right of the Noteholder to serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

(b) Venue. The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying of venue in any action, suit, or proceeding relating to this Note in any court referred to in Section 14(a), and (ii) the defense of inconvenient forum to the maintenance of such action, suit, or proceeding in any such court.

(c) Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

15. Successors and Assigns. Upon notice to the Borrower, this Note may be assigned or transferred by the Noteholder to any individual, corporation, company, limited liability company, trust, joint venture, association, partnership, unincorporated organization, governmental authority, or other entity.

16. Integration. This Note constitutes the entire contract between the Borrower and the Noteholder with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto.

17. Amendments and Waivers. No term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Borrower and the Noteholder. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

18. No Waiver; Cumulative Remedies. No failure by the Noteholder to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The rights, remedies, and powers herein provided are cumulative and not exclusive of any other rights, remedies, or powers provided by law.

19. Severability. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or render such term or provision invalid or unenforceable in any other jurisdiction.

20. Counterparts. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic ("pdf" or "tif") format shall be as effective as delivery of a manually executed counterpart of this Note.

21. Electronic Execution. The words "execution," "signed," "signature," and words of similar import in this Note shall be deemed to include electronic and digital signatures and the keeping of records in electronic form, each of which shall be of the same effect, validity, and enforceability as manually executed signatures and paper-based recordkeeping systems, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. § 7001 *et seq.*), the Electronic Signatures and Records Act of 1999 (N.Y. State Tech. Law §§ 301-309), and any other similar state laws based on the Uniform Electronic Transactions Act.

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date set forth on the first page

OCI LIMITED

DocuSigned by:

By: Oliver Chapman

Name: Oliver Chapman

Title: Ceo

# Exhibit 38

**AMENDED AND RESTATED**

**FINDERS AGREEMENT**

THIS FINDERS AGREEMENT (this "**Agreement**") is effective as of July 13, 2022 (the "**Effective Date**") by and between EF Hutton, division of Benchmark Investments, LLC a Nevada limited liability company ("**EF Hutton**"), and Camshaft Capital Management, LLC ("**CCM**" or "**Camshaft**"), a Florida limited liability company. EF Hutton, and CCM is each a "**Party**" and collectively the "**Parties**".

WITNESSETH:

**WHEREAS**, EF Hutton is (i) a member in good standing of FINRA, (ii) is registered as a broker/dealer under the Exchange Act, (iii) is licensed as a broker/dealer under the laws of the States applicable to the offers and sales of the Securities by such Placement Agent, (iv) is and will be a corporate entity validly existing under the laws of its place of organization, and (v) has full power and authority to enter into and perform its obligations under this Agreement;

**WHEREAS**, CCM is the general partner of Camshaft Capital Fund, LP ("**CCF**"), a Delaware limited partnership, which deploys its capital in various types of investments;

**WHEREAS**, EF Hutton believes that it has the ability to refer potential investors and business opportunities to Camshaft, and Camshaft believes it has the ability to refer potential clients and business opportunities to EF Hutton;

**WHEREAS**, EF Hutton has made a referral of a business opportunity involving OCI Limited ("**OCI**"), concerning a potential transaction in which CCF will loan two hundred fifteen million dollars ($215,000,0000) to OCI (the "**OCI Transaction II**"), and EF Hutton shall be compensated by CCM for the Referral of the OCI Transaction II pursuant to the terms of this Agreement.

**WHEREAS**, the Parties have entered into that certain Finders Agreement dated June 23, 2022 (the "**Original Agreement**"); and separately April 26, 2022.

**WHEREAS**, the Parties now wish to amend and restate the Original Agreement in its entirety.

**NOW, THEREFORE,** in consideration of the mutual promises and agreements herein set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree to amend and restate the Original Agreement in its entirety to read as follows:

1. Referrals/Provision of Services. Upon the terms and conditions of this Agreement and during the Term, the Parties agree to, from time to time, on a non-exclusive basis, refer to the other Party potential clients and business opportunities (such opportunities each a "**Referral**" and together the "**Referrals**"). The term "Referral" shall mean any introduction of potential client or business opportunities between the Parties, which occurred prior to the Effective Date or which occur thereafter, where the Party being introduced did not have any previous relationship with such potential client or business opportunity, as evidenced by the written acknowledgement of the Party being introduced. For the avoidance of doubt, EF introduced Camshaft to OCI and Camshaft did not have a previous relationship with OCI (or any OCI related person or entity) prior to the Referral by EF Hutton. The Parties acknowledge and understand that neither Party is under any obligation, contractual or otherwise, to make any specific Referral or to ensure that any Referral materializes into a business arrangement for any other Party, and each Party expressly acknowledges that the other Parties are providing no guarantee that any such business arrangements or Referrals will

occur. Each Party acknowledges and agrees that, in the event these business relationships do not occur, such Party would not be entitled to damages or remedy of any kind, whether in law or equity, against any other Party. Each Party further agrees not to attempt to hold any other Party liable in any manner whatsoever therefore. Each Party acknowledges and agrees that the relationship contemplated by this Agreement is not exclusive.

2. Term/Termination. This Agreement, and the prior agreement on April 26, 2022 shall be concluded as of this date hereof, and both parties mutually agree that all mutual referral obligations have ended, and that the prior April 26, 2022 agreement termination language "Notwithstanding termination of this Agreement, regardless of reason, each Party shall continue to pay the Fees for any Referral made by any other Party prior to the termination date, so long as a product or service is sold to the Referral within 6 months of the date of termination, and shall take no action to circumvent the payment of such Fee" is nullified/non applicable. Any future referral payments are subject to a new agreement on a case-by-case basis.

2. Fee. Subject to the terms of this Agreement, except as the Parties may mutually agree, In determining the Fees, internal costs (e.g. salaries of employees and consultant or third party finder's fees) of a Party shall not be deemed to be "third party expenses". Clawbacks shall not apply to any Fees paid. Unless otherwise agreed, Fees shall be paid within two (2) business days of the actual receipt of the applicable transaction proceeds by the Party obligated to make the payment and in accordance with the payment instructions provided by the recipient of the Fee. In the event that the transaction proceeds are other than cash, the Parties will negotiate in good faith regarding the form and timing of the payment of the Fees.

   OCI Fee. In connection with the OCI II Transaction, Camshaft agrees to pay EF Hutton a referral fee (the "**OCI Fee**") equal to 40% of the result of (a) $1,667,500.00, minus (b) $20,000.00 towards third party expenses. The OCI Fee shall be made by wire transfer to the following account:

   *Domestic Wire Instructions*

| | |
|---|---|
| Bank Name: | Ameris Bank |
| Bank Address: | 24 Second Avenue<br>Moultrie, GA 31768 |
| Bank Phone: | (770) 474-7829 |
| Account Name: | Benchmark Investments C/O EF Hutton 1871 |
| ABA Routing #: | 061201754 |
| Account Number: | 2049371871 |

3. Licensure Obligations of Parties. As a condition to any Party's obligation to pay the Fees, including, the OCI Fee, the Party that is receiving the Fee shall, during the Term hereof, (i) maintain, in good standing, all license which are required by applicable laws in order to make the payment of the Fees in compliance therewith including, but not limited to, insurance and securities licenses,(ii) not engage in fraud against any person or entity who is the source of a Referral, (iii) maintain an active telephone number for its business, (iv) maintain at least one (1) physical location for its business and (v) not breach any of the material terms of this Agreement. Upon request of

the Party who owes the Fees, the Party who would be entitled to receive the Fees shall provide evidence of the foregoing items.

4. Compliance with Applicable Law. Each Party represents and warrants to the other Parties that it has policies and procedures reasonably designed to comply with any and all applicable state and federal laws, rules, regulation and policies that govern its activities under this Agreement including, but not limited to unfair trade practices, advertising, lead generation, insurance licensing, securities licenses, consumer privacy, product suitability, product disclosure requirements impartial conduct standards and any fiduciary responsibilities. Furthermore, each Party shall comply with all applicable laws pertaining to the research, request, handling, dissemination and destruction of confidential medical, financial and personal information for each applicant in accordance to HIPAA mandated guidelines, to the extend applicable.

5. Confidentiality/Non-Circumvent. The Parties have entered into a Non-Disclosure Agreement dated April 26, 2022 (the "**Nondisclosure Agreement**") all information exchanged between the Parties pursuant to this Agreement, including information relating to any Referral, shall be Confidential Information (as defined in the Nondisclosure Agreement). During the Term hereof and for a period of one (1) year thereafter, each Party covenants and agrees not interfere with, circumvent or attempt to avoid or bypass the other Parties with respect to Referrals made by such Party including by formation of new entities for such purposes. Each Party acknowledges and agrees that any breach or threatened breach of this Section 7 would cause the other Party or Parties and its Affiliates serious and irreparable harm for which it would have no adequate remedy at law and that the Confidential Information is being furnished by each Party in reliance upon the covenants and agreements made by the other Parties herein. Each Party further acknowledges that in the event of a breach or threatened breach of this Section 7, the non-breaching Party shall be entitled to equitable relief therefrom, including without limitation the remedies of specific performance and/or an injunction without the posting of a bond. Such remedies shall be in addition to any other rights or remedies, whether at law or in equity, which may be available to the non-breaching Party and its Affiliates.

6. Indemnity. Each Party acknowledges and agrees that, with respect to the product and services offered by the other Parties, the Party making the Referral is providing no substantive advice or services and is acting solely as a referral source. Therefore, the Party or Parties receiving the Referral covenants and agrees to indemnify, defend and hold harmless the Party making the Referral and its Affiliates, employees, agents, officers, directors, members, partners and shareholders from and against any and all claims, actions, damages, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees) (collectively "**Losses**") arising from any third party claim asserted against the party making the Referral arising from: (a) any grossly negligent, or allegedly grossly negligent, act or omission of the Party receiving the Referral and/or its/their employees, agents or representatives, and (b) any violation or alleged violation of any statute, law, rule or regulation by such Party receiving the Referral or any of its employees, agents or representatives. Each Party agrees that CCF and its limited partners shall not be liable to any Party in relation to this Agreement, in damages or otherwise, including, without limitation, Losses. Each Party agrees to indemnify CCF from any loss resulting from the indemnifying Party's acts or omissions related to this Agreement, but EF Hutton's duty to indemnify CCF is only the extent that any losses, claims, damages, expenses or liabilities (or actions in respect thereof) are found in a final judgment (not subject to appeal) by a court of law to have resulted primarily and directly from EF Hutton's willful misconduct or gross negligence.

7. Limitation of Liability. In no event shall either Party, or any of its affiliates, directors, officers, employees and controlling persons (within the meaning of Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934) be liable to the other Parties for any incidental, indirect, special or consequential damages (i.e., lost profits) arising out of, or in connection with, this Agreement, whether or not such Party was advised of the possibility of such damage. Each Party further agrees that the liability limit of each other Party, together with such other Party's affiliates, directors, officers, employees and controlling persons, shall in no event be greater than the aggregate dollar amount received by such other Party in connection with the Referral giving rise to the applicable claim.

8. Independent Contractors. The Parties shall be independent contractors of one another. Nothing in this Agreement is intended to nor shall it create a joint venture, fiduciary or agency relationship between the Parties, and no Party shall have the right to legally bind any other. Each Party agrees to discharge all obligations imposed upon it as an independent contractor by all applicable federal, state or local laws, regulations or orders now or hereafter in force, including, without limitation, those relating to federal, state and local income taxes and including the filing of all returns and reports, and the payment of all assessments, taxes and other sums required. For avoidance of doubt, no Party shall have the authority, without the prior written consent of the other Party (which shall be within the absolute discretion of such), (i) to make any representation, warranty or covenant on behalf of such Party, (ii) to bind or commit such Party to any business arrangement, contract or agreement, or (iii) except as necessary to perform its obligations under this Agreement, to make statements to third parties regarding another Party, its business or its products.

9. Counterparts/Electronic Signature. This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall have the force and effect of an original, but all of which shall collectively constitute one and the same instrument. This Agreement may be executed electronically, and such execution shall have the same effect as a handwritten signature.

10. Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect any other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

11. Waivers and Amendment. This Agreement may be amended, modified or supplemented only by a written instrument executed by each of the Parties hereto. The waiver by any Party hereto of a breach of any provisions of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

12. Assignment/Binding Effect. Neither this Agreement nor any rights and responsibilities of any Party hereunder may be assigned without the prior written consent of all Parties. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, personal representatives, successors and permitted assigns. As used herein, the term "**Affiliate**" shall mean the officers, directors, managers, members, partners, shareholders, employees, attorneys, agents, professional advisors and independent contractors of a Party and any person, corporation, partnership or other entity which, directly or indirectly, controls, is controlled by, or is under common control with a Party. "Affiliates" are intended third-party beneficiaries of Sections 6 and 7 of this Agreement.

13. Entire Agreement. This Agreement and the Nondisclosure Agreement shall constitute the entire agreement among the Parties and supersede all prior understandings and agreements between the Parties with respect to the subject matter hereof, including that certain Finders Agreement between the parties dated April 26. 2022.

14. Captions. The captions or headings contained herein are for the convenience of the Parties only and does not form a part hereof and in no way modify, interpret or construe the meaning and intentions of the Parties.

15. Arbitration, Choice of Law/Jurisdiction and Attorney's Fees. This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law. Any controversy between the parties to this Agreement, or arising out of the Agreement, shall be resolved by arbitration before the American Arbitration Association ("AAA") in New York, New York. The following arbitration agreement should be read in conjunction with these disclosures:

(a) ARBITRATION IS FINAL AND BINDING ON THE PARTIES;

(b) THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL;

(c) PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDING; AND

(d) THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDING OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.

(e) ARBITRATION AGREEMENT. ANY AND ALL CONTROVERSIES, DISPUTES OR CLAIMS BETWEEN BROKER-DEALER AND YOU OR YOUR AGENTS, REPRESENTATIVES, EMPLOYEES, DIRECTORS, OFFICERS OR CONTROL PERSONS, ARISING OUT OF, IN CONNECTION WITH, OR WITH RESPECT TO (i) ANY PROVISIONS OF OR THE VALIDITY OF THIS AGREEMENT OR ANY RELATED AGREEMENTS, (ii) THE RELATIONSHIP OF THE PARTIES HERETO, OR (iii) ANY CONTROVERSY ARISING OUT OF YOUR BUSINESS SHALL BE CONDUCTED BY THE AMERICAN ARBITRATION ASSOCIATION UNDER ITS COMMERCIAL ARBITRATION RULES. ARBITRATION MUST BE COMMENCED BY SERVICE OF A WRITTEN DEMAND FOR ARBITRATION OR A WRITTEN NOTICE OF INTENTION TO ARBITRATE. IF YOU ARE A PARTY TO SUCH ARBITRATION, TO THE EXTENT PERMITTED BY THE RULES OF THE APPLICABLE ARBITRATION TRIBUNAL, THE ARBITRATION SHALL BE CONDUCTED IN NEW YORK, NEW YORK. THE DECISION AND AWARD OF THE ARBITRATORS(S) SHALL BE CONCLUSIVE AND BINDING UPON ALL PARTIES, AND ANY JUDGMENT UPON ANY AWARD RENDERED MAY BE ENTERED IN THE STATE OR FEDERAL COURTS LOCATED IN NEW YORK, NEW YORK, OR ANY OTHER COURT HAVING JURISDICTION THEREOF, AND NEITHER PARTY SHALL OPPOSE SUCH ENTRY.

16. Further Actions. The Parties shall deliver any further instruments and take any further action that may be reasonably requested by each other in order to carry out the provisions and purposes of this Agreement.

17. Information/Audit Rights. Each Party shall maintain all documents and records necessary to substantiate the Fees paid to the other Party or Parties. Upon ten (10) days advance written notice to a Party, each Party agrees, subject to section 6 hereof, to provide the requesting Party with any and all such records and information reasonably related to the Fees paid or alleged to be owed and/or make such items available for such Party's inspection during normal business hours upon reasonably advanced notice.

18. Notices. Unless otherwise provided, all notices or other communications required or permitted under this Agreement must be in writing, and must be: (i) personally delivered; (ii) sent by registered or certified mail, postage prepaid, return receipt requested; (iii) sent by email, provided that the recipient has acknowledged receipt; or (iv) sent by facsimile, provided that the fax cover sheet or facsimile machine report contains a notation of the date and time of transmission and that the transmission was successful. Notices are presumed received: (i) if personally delivered, upon the date of delivery to the address of the intended recipient; (ii) if mailed in accordance with the provisions of this Paragraph, three business days after the date placed in the United States mail;(iii) if mailed other than in accordance with the provisions of this Paragraph or mailed from outside the United States, when actually received; or (iv) if given by facsimile or email, meeting the requirements above, when sent. For the presumption of receipt to apply, notices must be given to the following addresses:

If to CCM:

Camshaft Capital Management, LLC
936 SW 1st Ave #1086
Miami, FL 33130
E-mail: William Morton william@camshaftcapital.com

If to EF Hutton, division of Benchmark Investments, LLC:
Ryan J. Whalen, Esq.
Deputy General Counsel – Head of Litigation
590 Madison Avenue, 39th Floor
New York, NY 1022
rwhalen@efhuttongroup.com

A Party may change the address for notices by written notice to the other Party.

[**SIGNATURES ON FOLLOWING PAGE**]

**SIGNATURE PAGE TO AMENDED AND RESTATED FINDERS AGREEMENT**

IN WITNESS WHEREOF, this Agreement has been executed on the date first written above.

**CAMSHAFT CAPITAL MANAGEMENT, LLC**

DocuSigned by:
By: Camshaft Capital Management LLC
100E0A38ED8D4CB...
Name: William C. Morton
Title: Fund Manager

**EF HUTTON, division of BENCHMARK INVESTMENTS, LLC**

DocuSigned by:
By: Sam Fleischman
89119574BB4A4E4...
Name: Sam Fleischman
Title: Supervisory Principal

# Exhibit 39

DocuSign Envelope ID: 39FB2D43-B7CD-4B77-9B99-C5183E40087A

**AMENDED AND RESTATED LOAN ORIGINATION AGREEMENT**

BETWEEN CAMSHAFT CAPITAL MANAGEMENT LLC AND HARRY MAX CONSULTANTS LLC.

**THIS AMENDED AND RESTATED LOAN ORIGINATION AGREEMENT** (this "Agreement") is entered into as of July [13], 2022 (the "Effective Date"), by and between Camshaft Capital Management LLC, a Florida Limited Liability Company located at 950 Brickell Bay Dr. #5107 Miami, FL 33131 ("Camshaft" or "Company"), and Harrymax Consultants LLC, a Florida limited liability company located at 255 Evernia St, West Palm Beach, FL 33401 ("Harrymax" or "Consultant"). Camshaft and Harrymax may be individually referred to as a "Party" and collectively referred to as the "Parties."

**RECITALS:**

**WHEREAS,** Camshaft is the general partner of Camshaft Capital Fund, LP, a Delaware limited partnership (the "Fund");

**WHEREAS,** Harrymax is a consulting agency for all types of businesses, providing professional services, expertise, and specialized labor;

**WHEREAS**, OCI Group, located at 33 Cannon Street, London, EC4M 5SB, United Kingdom, assists businesses with tailored commercial management solutions by leveraging its global network and expertise to develop business growth ("OCI");

**WHEREAS**, the Fund is contemplating originating a loan to OCI (the "Transaction");

**WHEREAS**, Camshaft and Harrymax desire to enter into this Agreement to set forth certain rights and obligations between the parties regarding the origination and servicing of the Transaction; and

**WHEREAS**, Harrymax has performed certain services for Camshaft, including but not limited to: introductions, consulting, compiling and presenting information, statistical analysis, as well as assisting with the Transaction;

**WHEREAS**, the Parties have entered into that certain Loan Origination Agreement dated June 28, 2022 (the "Original Agreement");

**WHEREAS**, the Parties now wish to amend and restate the Original Agreement in its entirety.

**NOW, THEREFORE,** in consideration of the mutual promises and agreements herein set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree to amend and restate the Original Agreement in its entirety to read as follows:

1. DUTIES AND RESPONSIBILITIES.

Camshaft and Harrymax hereby agree that Harrymax shall, when requested by OCI or

Camshaft, assist in facilitating the Transaction.

For the avoidance of doubt, any reference to an individual Party shall also mean such Party's Affiliates. "Affiliate" shall mean, as to any person, any other person that, directly or indirectly, controls, or is controlled by, or is under common control with, such person. For this purpose, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise.

2. TERM.

This Agreement shall be effective as of the Effective Date and its initial term shall expire on the one-year anniversary of the Effective Date unless any party gives written notice of termination to the other party at least 90 days prior to the scheduled date of expiration. This Agreement shall also be terminated once the entire amount of the contemplated Transaction is completed.

Time is of the essence in the performance of the obligations under this Agreement.

3. CONSULTANT PAYMENT TERMS.

Pursuant to the Transaction and loan dispersals from the Fund to OCI, Harrymax will be compensated by Camshaft for professional services as indicated in this Agreement in accordance with the following terms and conditions:

3(a). For the two-hundred fifteen million dollars ($215,000,000.00) loan disbursal by the Fund to OCI, Camshaft shall pay Harrymax of the equal to 35 % of (a) Camshaft's gross fee of $1,667,500.00 ("**Camshaft Fee**") from the OCI Transaction, minus (b) any direct third-party expenses incurred by Camshaft in relation to the OCI Transaction (the "Harrymax Fee")

4. CONDITIONS PRECEDENT.

Prior to, and as a condition precedent to, the Camshaft's payment of the Harrymax Fee to Harrymax, the contemplated Transaction between the Fund and OCI must be completed and executed, including the funds being received and accessible for OCI at OCI's bank account, and Camshaft must have received its Camshaft Fee. All payments to Harrymax discussed above shall be wired within three business days after this condition is met.

5. PAYMENT INSTRUCTIONS.

Camshaft shall pay the Harrymax Fee to Harrymax by wire transfer as follows:

- Name: Harrymax Consultants, LLC
- Address: 255 Evernia Street #506, West Palm Beach, FL 33401
- Bank: Bank of America
- ABA #: 026009593

DocuSign Envelope ID: 39FB2D43-B7CD-4B77-9B99-C5183E40087A

- Account Number: 008983831631

6. COMPLIANCE AND LIABILIY.

The Fund is not a party to this agreement and, the Fund shall not be liable, in damages or otherwise, to Harrymax in connection with this Agreement, including, but not limited to, Camshaft's breach of the terms this Agreement.

The Parties confirm that, at the time of the submission of said Transaction, neither party is aware of any events that will prevent the satisfaction of the conditions specified throughout this Agreement.

The Parties will comply with all applicable federal, state and local laws and regulations with respect to its business activities and all loans.

7. REPRESENTATIONS AND WARRANTIES.

The Parties' execution and delivery of this Agreement, and performance hereunder, does not and will not violate any law, rule or regulation (federal, state or local); any order, writ, judgment, injunction, decree, determination or award; or any other agreement or instrument to which either party may be bound or affected.

Each Party represents and warrants that it is a duly organized and validly existing entity that is in good standing under the applicable laws and regulations of its state of organization, all jurisdictions in which it conducts business and the United States of America. Each Party has the requisite power, authority and capacity, corporate or otherwise, to execute and deliver this Agreement and perform its obligations hereunder.

8. RELATIONSHIP BETWEEN THE PARTIES.

Harrymax provides services as an independent contractor and nothing in this Agreement shall create any other relationship such as agency, partnership, joint venture, and neither Party shall represent that any such relationship exists other than an independent contractor relationship. Harrymax provides all its services on a non-exclusive basis and Harrymax agrees that it shall not be or be considered Camshaft's exclusive provider of Services.

9. REASONABLE EFFORTS AND CONFIDENTIALITY.

9(a). Reasonable Efforts. The Parties shall use reasonable good faith efforts in assisting with the Transaction and shall devote the time the parties deem necessary to complete the obligations set forth throughout this Agreement.

9(b). Non-Disclosure. The Parties shall not, at any time during the term of this Agreement or at any time thereafter, disclose to any person any proprietary information or trade secrets of either party or the Transaction, except as may be required by court order or law, or in accordance with that certain non-disclosure agreement that has been executed between the Parties.

DocuSign Envelope ID: 39FB2D43-B7CD-4B77-9B99-C5183E40087A

10. INDEMNIFICATION.

Each Party, at its own expense, shall indemnify, defend and hold the other Party, including Party's partners, members, shareholders, directors, officers, employees and agents harmless from and against any and all third-party suits, actions, investigations and proceedings, and related costs and expenses (including, reasonable attorney's fees), resulting solely and directly from the indemnifying party's gross negligence, willful misconduct or material breach of this Agreement. Neither Party shall be required hereunder to defend, indemnify or hold harmless the other or its partners, shareholders, directors, officers, employees and agents, or any of them, from any liability resulting from the gross negligence, willful misconduct or material breach of this Agreement by the party seeking indemnification or by any third party. Each Party agrees to give the other prompt written notice of any claim or other matter as to which it believes this indemnification provision is applicable.

Each Party agrees to indemnify the Fund from any loss resulting from the indemnifying Party's acts or omissions related to this Agreement.

11. GENERAL PROVISIONS.

11(a). Further Assurances. Each Party hereto agrees to perform any further acts and to execute and deliver any further documents that may be reasonably necessary to carry out the provisions of this Agreement.

11(b). Severability. In the event that any of the provisions, or portions thereof of this Agreement are held to be illegal, unenforceable, or invalid by any court of competent jurisdiction, the legality, enforceability, and validity of the remaining provisions, or portions thereof shall not be affected thereby, and, in lieu of the illegal, unenforceable, or invalid provision, or portion thereof there shall be added a new legal, enforceable, and valid provision as similar in scope and effect as is necessary to effectuate the results intended by the deleted provision or portion.

11(c). Headings. The headings contained in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning of any of the provisions contained herein.

11(d). Waivers. No waiver of any provision or condition of this Agreement shall be valid unless executed in writing and signed by the party to be bound thereby, and then only to the extent specified in such waiver. No waiver of any provision or condition of this Agreement shall be construed as a waiver of any other provision or condition of this Agreement, and no present waiver of any provision or condition of this Agreement shall be construed as a future waiver of such provision or condition.

11(e). Amendment. This Agreement may be amended only by the written consent of the parties hereto.

11(f). No Pending Suits. Unless otherwise disclosed to either Party in writing,

there is not pending or threatened any suit, action, arbitration or legal, administrative or other proceeding or governmental investigation (including any allegation of fraud) against either Party or its current or former owners, agents, or employees that could have a material adverse effect on either Party's business, assets, financial condition, or reputation.

11(g). Assignment and Delegation. No party shall voluntarily assign or delegate this Agreement or any rights, duties or obligations hereunder to any other person or entity without prior express written approval of the other party, provided that, notwithstanding the foregoing, a party may assign this Agreement by operation of law to any successor to such party by merger or consolidation without the prior consent of the other parties.

11(h). Entire Agreement. This Agreement contains the entire understanding between the parties hereto concerning the subject matter contained herein. There are no representations, agreements, arrangements, or understandings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement that are not fully expressed herein.

11(i). Execution. Each party to this Agreement hereby represents and warrants to the other party hereto that such party has full power and capacity to execute, deliver, and perform this Agreement, which has been duly executed and delivered by, and which evidences the valid and binding obligation of; such party enforceable in accordance with its terms subject to applicable liquidation, conservatorship, bankruptcy, insolvency, reorganization moratorium, or similar laws affecting the enforcement of creditor's right's from time to time in effect and to general principles of equity.

11(j). Notices. Any notice required or permitted to be given under this Agreement shall be in writing, sent via commercial overnight courier, registered or certified U.S. Mail or by the email address as provided below:

Harrymax Email Address: vip732@aol.com

Camshaft Email Address: william@camshaftcapital.com

12. GOVERNING LAW.

This Agreement shall be governed by and constructed in accordance with the Laws of the State of Florida, without giving effect to the conflict of laws rules thereof or of any State. Venue for any action brought hereunder shall be proper in Miami-Dade Country, Florida.

DocuSign Envelope ID: 39FB2D43-B7CD-4B77-9B99-C5183E40087A

IN WITNESS WHEREOF, the parties, by their duly authorized representatives, have caused this Agreement to be executed as of the date first written above.

CAMSHAFT CAPITAL MANAGEMENT LLC

Name: William Morton
Title: President
Signature: DocuSigned by: Camshaft Capital Management LLC 100E0A38ED8D4CB...
Date: 7/13/2022

HARRYMAX CONSULTANTS LLC

Name: Brett Borgensen
Title: President
Signature: DocuSigned by: 45F0FDA3AC454CB...
Date: 7/13/2022

# Exhibit 40

**usbank**

P.O. Box 1800
Saint Paul, Minnesota 55101-0800

3030 IMG S Y ST01

**Private Wealth Management**
**Business Statement**

Account Number:
1 575 2368 6176
Statement Period:
Apr 1, 2022
through
Apr 30, 2022

ADDFTTFFFFAFFTTDDFADFDAFFFFATFTFTAAFAAFTTTDATDDFDTDFTADATFDTDDFFT



000295320 01 SP 000638174565081 E
CAMSHAFT CAPITAL FUND LP
950 BRICKELL BAY DR APT 5107
MIAMI FL 33131-3964

Contact a Private Wealth Management Client Services Representative at 888.265.7962, 24 hours a day, 7 days a week for questions about your account(s). Visit privatewealth.usbank.com to view your statement online.

## INFORMATION YOU SHOULD KNOW

Effective May 26, 2022 the "Your Deposit Account Agreement" disclosure will include update(s) and may affect your rights.

Primary update:

- Updates to Unauthorized Transactions and Lost or Stolen Cards section

Beginning May 26, 2022, a copy of the "Your Deposit Account Agreement" disclosure will be available at your local U.S. Bank branch, online at **usbank.com**, or by calling 800-673-3555.

If you have any questions, you can call us at 800-673-3555. Our business bankers are here to help 8 a.m. to 8 p.m. CT Monday through Friday and 8 a.m. to 6:30 p.m. CT on Saturday. We accept relay calls. Our bankers are also available to help at your local branch via appointment.

## U.S. BANK SILVER - BUSINESS CHECKING

***Member FDIC***

U.S. Bank National Association

**Account Number 1-575-2368-6176**

### Account Summary

| | # Items | | |
|---|---|---|---|
| Beginning Balance on Apr 1 | | $ | 852,654.01 |
| Other Deposits | 11 | | 322,979,854.84 |
| Other Withdrawals | 8 | | 5,192,576.00- |
| **Ending Balance on Apr 30, 2022** | | **$** | **318,639,932.85** |

Number of Days in Statement Period: 30

### Other Deposits

| *Date* | *Description of Transaction* | | *Ref Number* | *Amount* |
|---|---|---|---|---|
| Apr 4 | Mobile Banking Transfer | From Account 157504967702 | | $ 240,000.00 |
| Apr 11 | Reversed Charge | Miscellaneous | | 96.00 |
| Apr 11 | Reversed Charge | Miscellaneous | | 98.00 |
| Apr 11 | Reversed Charge | Miscellaneous | | 272.00 |
| Apr 19 | Wire Credit REF005820<br>ORG=BRAZITALIA LIFESTYLE | TD BANK NA GLASTON 220419052333<br>LLC 2412 SW 16TH AVE | | 50,000.00 |
| Apr 20 | Wire Credit REF000441<br>ORG=STONEX FINANCIAL INC | CADENCE BANK NA OF 220420039032<br>2 PERIMETER PARK SOUTH | | 2,139,388.84 |
| Apr 25 | Wire Credit REF018528<br>ORG=JUAN C GARCIA PO BOX | JPMCHASE NYC 220425045548<br>2647 | | 550,000.00 |
| Apr 27 | Wire Credit REF001418<br>ORG=BYJU'S ALPHA, INC. | JPMCHASE NYC 220427003827<br>3160 DE LA CRUZ | | 100.00 |
| Apr 28 | Wire Credit REF004804<br>ORG=BYJU'S ALPHA, INC. | JPMCHASE NYC 220428015904<br>3160 DE LA CRUZ | | 100.00 |
| Apr 28 | Wire Credit REF007875<br>ORG=BYJU'S ALPHA, INC. | JPMCHASE NYC 220428031079<br>3160 DE LA CRUZ | | 317,999,800.00 |
| Apr 29 | Wire Credit REF009948<br>ORG=STONEX FINANCIAL INC | BMO HARRIS BANK NA 220429173827<br>CUSTOMERS SEGREGATED F | | 2,000,000.00 |
| | | | **Total Other Deposits** | **$ 322,979,854.84** |

usbank

## BALANCE YOUR ACCOUNT

To keep track of all your transactions, you should balance your account every month. Please examine this statement immediately. We will assume that the balance and transactions shown are correct unless you notify us of an error.

Outstanding Deposits

| DATE | AMOUNT |
|---|---|
| | |
| | |
| | |
| TOTAL | $ |

Outstanding Withdrawals

| DATE | AMOUNT |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL | $ |

1. List any deposits that do not appear on your statement in the Outstanding Deposits section at the left. Record the total.
2. Check off in your checkbook register all checks, withdrawals (including Debit Card and ATM) and automatic payments that appear on your statement. Withdrawals that are NOT checked off should be recorded in the Outstanding Withdrawals section at the left. Record the total.
3. Enter the ending balance shown on this statement. $______________
4. Enter the total deposits recorded in the Outstanding Deposits section. $______________
5. Total lines 3 and 4. $______________
6. Enter the total withdrawals recorded in the Outstanding Withdrawals section. $______________
7. Subtract line 6 from line 5. This is your balance. $______________
8. Enter in your register and subtract from your register balance any checks, withdrawals or other debits (including fees, if any) that appear on your statement but have not been recorded in your register.
9. Enter in your register and add to your register balance any deposits or other credits (including interest, if any) that appear in your statement but have not been recorded in your register.
10. The balance in your register should be the same as the balance shown in #7. If it does not match, review and check all figures used, and check the addition and subtraction in your register. If necessary, review and balance your statement from the previous month.

## IMPORTANT DISCLOSURES TO OUR CONSUMER CUSTOMERS

**In Case of Errors or Questions About Your Checking, Savings, ATM, Debit Card, ACH, Bill Pay and Other Electronic Transfers**

If you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt, we must hear from you no later than 60 days* after we sent you the FIRST statement on which the error or problem appeared. Telephone us at the number listed on the front of this statement or write to us at U.S. Bank, EP-MN-WS5D, 60 Livingston Ave., St. Paul, MN 55107.

- Tell us your name and account number.
- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, we may take up to 45 days to investigate your complaint. For errors involving new accounts, point-of-sale, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint. If we decide to do this, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

*Please note: Paper draft and paper check claims must be disputed within 30 days per Your Deposit Account Agreement.

## IMPORTANT DISCLOSURES TO OUR BUSINESS CUSTOMERS

Errors related to any transaction on a business account will be governed by any agreement between us and/or all applicable rules and regulations governing such transactions, including the rules of the National Automated Clearing House Association (NACHA Rules) as may be amended from time to time. If you think this statement is wrong, please telephone us at the number listed on the front of this statement immediately.

## CONSUMER BILLING RIGHTS SUMMARY REGARDING YOUR RESERVE LINE

***What To Do If You Think You Find A Mistake on Your Statement***

If you think there is an error on your statement, write to us at:
U.S. Bank, P.O. Box 3528, Oshkosh, WI 54903-3528.
In your letter, give us the following information:

- ***Account information:*** Your name and account number.
- ***Dollar Amount:*** The dollar amount of the suspected error.
- ***Description of problem:*** If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.
You must notify us of any potential errors *in writing*. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.
While we investigate whether or not there has been an error, the following are true:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**Reserve Line Balance Computation Method:** To determine your **Balance Subject to Interest Rate**, use the dates and balances provided in the Reserve Line Balance Summary section. The date next to the first Balance Subject to Interest is day one for that balance and is applicable up to (but not including) the date of the next balance (if there is one). We multiply the Balance Subject to Interest by the number of days it is applicable and add them up to get the same number of days in the billing cycle. We then divide the result by the number of billing days in the cycle. This is your **Balance Subject to Interest Rate**. Any unpaid interest charges and unpaid fees are not included in the Balance Subject to Interest. The ***INTEREST CHARGE*** begins from the date of each advance.

## REPORTS TO AND FROM CREDIT BUREAUS FOR RESERVE LINES

We may report information about your account to credit bureaus. Late payments, missed payments or other defaults on your account may be reflected in your credit report.

## CONSUMER REPORT DISPUTES

We may report information about account activity on consumer and small business deposit accounts and consumer reserve lines to Consumer Reporting Agencies (CRA). As a result, this may prevent you from obtaining services at other financial institutions. If you believe we have inaccurately reported information to a CRA, you may submit a dispute by calling 844.624.8230 or by writing to: U.S. Bank Attn: Consumer Bureau Dispute Handling (CBDH), P.O. Box 3447, Oshkosh, WI 54903-3447. In order for us to assist you with your dispute, you must provide: your name, address and phone number; the account number; the specific information you are disputing; the explanation of why it is incorrect; and any supporting documentation (e.g., affidavit of identity theft), if applicable.

EQUAL HOUSING LENDER

Member FDIC

usbank

CAMSHAFT CAPITAL FUND LP
950 BRICKELL BAY DR APT 5107
MIAMI FL 33131-3964

**Private Wealth Management**
**Business Statement**
Account Number:
1 575 2368 6176
Statement Period:
Apr 1, 2022
through
Apr 30, 2022



## U.S. BANK SILVER - BUSINESS CHECKING (CONTINUED)

U.S. Bank National Association
**Account Number 1-575-2368-6176**

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Apr 1 | Transfer | To Account 157523709440 | 0100000779 | $ 2,080.00- |
| Apr 1 | Wire Debit REF005247 BNF=INTL FCSTONE | BMO HARRIS BANK NA 220401061842 FINANCIAL INC CUSTOMER SEG ACC | | 600,000.00- |
| Apr 7 | Wire Debit REF000442 BNF=HAOCHENG WANG | WELLS SF 220407007094 | | 10,000.00- |
| Apr 8 | Wire Debit REF002908 BNF=AGAINST ALL ODDS | HUNT COL 220408029269 RESEARCH LLC | | 157,300.00- |
| Apr 14 | Analysis Service Charge | | 1400000000 | 196.00- |
| Apr 22 | Wire Debit REF004840 BNF=INTERACTIVE BROKERS | CITIBANK OF NEW YO 220422043999 LLC | | 2,400,000.00- |
| Apr 26 | Wire Debit REF002212 BNF=APEX FUND AND | CIBC BANK USA CHIC 220426023330 CUSTODY SERVICES LLC | | 23,000.00- |
| Apr 29 | Wire Debit REF007979 BNF=INTERACTIVE BROKERS | CITIBANK OF NEW YO 220429235684 LLC ONE PICKWICK PLAZA | | 2,000,000.00- |
| | | **Total Other Withdrawals** | | **$ 5,192,576.00-** |

### Balance Summary

| Date | Ending Balance | Date | Ending Balance | Date | Ending Balance |
|---|---|---|---|---|---|
| Apr 1 | 250,574.01 | Apr 14 | 323,544.01 | Apr 26 | 639,932.85 |
| Apr 4 | 490,574.01 | Apr 19 | 373,544.01 | Apr 27 | 640,032.85 |
| Apr 7 | 480,574.01 | Apr 20 | 2,512,932.85 | Apr 28 | 318,639,932.85 |
| Apr 8 | 323,274.01 | Apr 22 | 112,932.85 | Apr 29 | 318,639,932.85 |
| Apr 11 | 323,740.01 | Apr 25 | 662,932.85 | | |

Balances only appear for days reflecting change.

## ANALYSIS SERVICE CHARGE DETAIL

Account Analysis Activity for: March 2022

| | | |
|---|---|---|
| Account Number: | 1-575-2368-6176 | $ 196.00 |
| Analysis Service Charge assessed to | 1-575-2368-6176 | $ 196.00 |

1 Financial institutions are required by the State of Iowa to charge sales taxes on certain service charges related to checking accounts. Any assessed tax has been itemized on your statement.

**Service Activity Detail for Account Number 1-575-2368-6176**

| Service | Volume | Avg Unit Price | Total Charge |
|---|---|---|---|
| **Depository Services** | | | |
| Combined Transactions/Items | 13 | | No Charge |
| Subtotal: Depository Services | | | 0.00 |
| **Wire Transfers** | | | |
| Incoming Fedwire | 3 | 14.00000 | 42.00 |
| Bank- Fedwire Non-Repetitive | 2 | 40.00000 | 80.00 |
| Incoming Fedwire Ctp | 1 | 14.00000 | 14.00 |
| Wire Advice Mail | 6 | 10.00000 | 60.00 |
| Subtotal: Wire Transfers | | | 196.00 |
| **ACH Services** | | | |
| ACH Received Addenda Item | 2 | | No Charge |
| Subtotal: ACH Services | | | 0.00 |
| Fee Based Service Charges for Account Number 1-575-2368-6176 | | | $ 196.00 |

This page intentionally left blank

# Exhibit 41

InteractiveBrokers

# Activity Summary

May 2, 2022 - May 31, 2022

Help

## Account Summary

| Account | Account Alias | Name | Prior NAV | Current NAV | TWR |
|---|---|---|---|---|---|
| USD | | | | | |
| U8240608 | | Camshaft Capital Fund LP | 1,000,000.00 | 5,653,395.29 | 1.15% |
| U9415436 | | Camshaft Capital Fund LP | 3,400,000.00 | 8,135,491.86 | 0.51% |
| Total | | | 4,400,000.00 | 13,788,887.15 | |

InteractiveBrokers

# Activity Statement

May 2, 2022 - May 31, 2022

Help

Interactive Brokers LLC, Two Pickwick Plaza, Greenwich, CT 06830

## Account Information

| | |
|---|---|
| Name | Camshaft Capital Fund LP |
| Account | U8240608 |
| Master Name | Camshaft Capital Advisors LLC |
| Account Type | Institution Master |
| Customer Type | Partnership |
| Account Capabilities | Portfolio Margin |
| Base Currency | USD |

## Net Asset Value

| | April 29, 2022 | May 31, 2022 | | | |
|---|---|---|---|---|---|
| | Total | Long | Short | Total | Change |
| Cash | 1,000,000.00 | 5,516,541.35 | 0.00 | 5,516,541.35 | 4,516,541.35 |
| Stock | 0.00 | 117,076.00 | 0.00 | 117,076.00 | 117,076.00 |
| Options | 0.00 | 70,500.00 | -51,750.00 | 18,750.00 | 18,750.00 |
| Interest Accruals | 0.00 | 2,453.07 | -1,425.13 | 1,027.94 | 1,027.94 |
| Total | 1,000,000.00 | 5,706,570.41 | -53,175.13 | 5,653,395.29 | 4,653,395.29 |
| Time Weighted Rate of Return | | | | | 1.15% |

| Change in NAV | Total |
|---|---|
| Starting Value | 1,000,000.00 |
| Mark-to-Market | 53,761.75 |
| Deposits & Withdrawals | 4,600,000.00 |
| Change in Interest Accruals | 1,028.48 |
| Other Fees | -264.50 |
| Commissions | -1,129.90 |
| Other FX Translations | -0.54 |
| Ending Value | 5,653,395.29 |

## Mark-to-Market Performance Summary

| | Quantity | | Price | | Mark-to-Market P/L | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Symbol | Prior | Current | Prior | Current | Position | Transaction | Commissions | Other | Total | Code |
| Stocks | | | | | | | | | | |
| LULU | 0 | 400 | -- | 292.6900 | 2,084.00 | 340.00 | -2.00 | 0.00 | 2,422.00 | |
| Total Stocks | | | | | 2,084.00 | 340.00 | -2.00 | 0.00 | 2,422.00 | |
| Equity and Index Options | | | | | | | | | | |
| VIX 18MAY22 50.0 C | 0 | 0 | -- | -- | 3,374.50 | -124.50 | -47.46 | 0.00 | 3,202.54 | |
| VIX 15JUN22 29.0 C | 0 | 150 | -- | 1.2500 | -26,781.00 | -9,969.00 | -172.37 | 0.00 | -36,922.37 | |
| VIX 15JUN22 37.5 C | 0 | -300 | -- | 0.3750 | 27,750.00 | 6,000.00 | -329.74 | 0.00 | 33,420.26 | |
| VIX 20JUL22 28.0 C | 0 | 150 | -- | 3.4500 | -21,724.50 | -8,575.50 | -172.37 | 0.00 | -30,472.37 | |
| VIX 20JUL22 40.0 C | 0 | -300 | -- | 1.3500 | 23,250.00 | 6,750.00 | -344.74 | 0.00 | 29,655.26 | |

## Mark-to-Market Performance Summary

| Symbol | Quantity Prior | Quantity Current | Price Prior | Price Current | Mark-to-Market P/L Position | Transaction | Commissions | Other | Total | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Equity and Index Options | | | | | 5,869.00 | -5,919.00 | -1,066.69 | 0.00 | -1,116.69 | |
| Futures | | | | | | | | | | |
| NQM2 | 0 | -1 | -- | 12,646.5000 | -9,055.00 | 7,055.00 | -2.15 | 0.00 | -2,002.15 | |
| RTYM2 | 0 | -1 | -- | 1,861.9000 | -5,075.00 | 2,275.00 | -6.45 | 0.00 | -2,806.45 | |
| VXM2 | 0 | -10 | -- | 26.4123 | 27,732.00 | 11,645.00 | -23.80 | 0.00 | 39,353.20 | |
| VXN2 | 0 | -10 | -- | 27.7908 | 20,610.00 | 8,482.00 | -23.80 | 0.00 | 29,068.20 | |
| ZB JUN 22 | 0 | -3 | -- | 140.4375 | -10,500.00 | -1,781.25 | -5.01 | 0.00 | -12,286.26 | |
| Total Futures | | | | | 23,712.00 | 27,675.75 | -61.21 | 0.00 | 51,326.54 | |
| Forex | | | | | | | | | | |
| USD | 1,000,000.00 | 5,516,541.35 | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Total Forex | | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Total (All Assets) | | | | | 31,665.00 | 22,096.75 | -1,129.90 | 0.00 | 52,631.85 | |
| Other Fees | | | | | | | | | -264.50 | |
| Total P/L for Statement Period | | | | | | | | | 52,367.35 | |

## Realized & Unrealized Performance Summary

| Symbol | Cost Adj. | Realized S/T Profit | S/T Loss | L/T Profit | L/T Loss | Total | Unrealized S/T Profit | S/T Loss | L/T Profit | L/T Loss | Total | Total | Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stocks | | | | | | | | | | | | | |
| LULU | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,422.00 | 0.00 | 0.00 | 0.00 | 2,422.00 | 2,422.00 | |
| Total Stocks | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,422.00 | 0.00 | 0.00 | 0.00 | 2,422.00 | 2,422.00 | |
| Equity and Index Options | | | | | | | | | | | | | |
| VIX 18MAY22 50.0 C | 0.00 | 3,202.54 | 0.00 | 0.00 | 0.00 | 3,202.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,202.54 | |
| VIX 15JUN22 29.0 C | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -36,922.37 | 0.00 | 0.00 | -36,922.37 | -36,922.37 | |
| VIX 15JUN22 37.5 C | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,420.26 | 0.00 | 0.00 | 0.00 | 33,420.26 | 33,420.26 | |
| VIX 20JUL22 28.0 C | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -30,472.37 | 0.00 | 0.00 | -30,472.37 | -30,472.37 | |
| VIX 20JUL22 40.0 C | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 29,655.26 | 0.00 | 0.00 | 0.00 | 29,655.26 | 29,655.26 | |
| Total Equity and Index Options | 0.00 | 3,202.54 | 0.00 | 0.00 | 0.00 | 3,202.54 | 63,075.51 | -67,394.74 | 0.00 | 0.00 | -4,319.24 | -1,116.69 | |
| Futures | | | | | | | | | | | | | |
| NQM2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2,002.15 | 0.00 | 0.00 | -2,002.15 | -2,002.15 | |
| RTYM2 | 0.00 | 0.00 | -194.30 | 0.00 | 0.00 | -194.30 | 0.00 | -2,612.15 | 0.00 | 0.00 | -2,612.15 | -2,806.45 | |
| VXM2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 39,353.20 | 0.00 | 0.00 | 0.00 | 39,353.20 | 39,353.20 | |
| VXN2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 29,068.20 | 0.00 | 0.00 | 0.00 | 29,068.20 | 29,068.20 | |
| ZB JUN 22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -12,286.26 | 0.00 | 0.00 | -12,286.26 | -12,286.26 | |
| Total Futures | 0.00 | 0.00 | -194.30 | 0.00 | 0.00 | -194.30 | 68,421.40 | -16,900.56 | 0.00 | 0.00 | 51,520.84 | 51,326.54 | |
| Total (All Assets) | 0.00 | 3,202.54 | -194.30 | 0.00 | 0.00 | 3,008.24 | 133,918.91 | -84,295.30 | 0.00 | 0.00 | 49,623.60 | 52,631.85 | |

Notes

1. This statement uses wash sales P/L for realized and unrealized P/L calculations.

## Month & Year to Date Performance Summary

| Symbol | Description | Mark-to-Market MTD | Mark-to-Market YTD | Realized S/T MTD | Realized S/T YTD | Realized L/T MTD | Realized L/T YTD |
|---|---|---|---|---|---|---|---|
| Stocks | | | | | | | |
| LULU | LULULEMON ATHLETICA INC | 2,422.00 | 2,422.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Stocks | | 2,422.00 | 2,422.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equity and Index Options | | | | | | | |
| VIX 220518C00050000 | VIX 18MAY22 50.0 C | 3,202.54 | 3,202.54 | 3,202.54 | 3,202.54 | 0.00 | 0.00 |
| VIX 220615C00029000 | VIX 15JUN22 29.0 C | -36,922.37 | -36,922.37 | 0.00 | 0.00 | 0.00 | 0.00 |
| VIX 220615C00037500 | VIX 15JUN22 37.5 C | 33,420.26 | 33,420.26 | 0.00 | 0.00 | 0.00 | 0.00 |
| VIX 220720C00028000 | VIX 20JUL22 28.0 C | -30,472.37 | -30,472.37 | 0.00 | 0.00 | 0.00 | 0.00 |
| VIX 220720C00040000 | VIX 20JUL22 40.0 C | 29,655.26 | 29,655.26 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Equity and Index Options | | -1,116.69 | -1,116.69 | 3,202.54 | 3,202.54 | 0.00 | 0.00 |
| Futures | | | | | | | |
| NQM2 | NQ 17JUN22 | -2,002.15 | -2,002.15 | 0.00 | 0.00 | 0.00 | 0.00 |
| RTYM2 | RTY 17JUN22 | -2,806.45 | -2,806.45 | -194.30 | -194.30 | 0.00 | 0.00 |
| VXM2 | VIX 15JUN22 | 39,353.20 | 39,353.20 | 0.00 | 0.00 | 0.00 | 0.00 |
| VXN2 | VIX 20JUL22 | 29,068.20 | 29,068.20 | 0.00 | 0.00 | 0.00 | 0.00 |
| ZB JUN 22 | ZB 21JUN22 | -12,286.26 | -12,286.26 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Futures | | 51,326.54 | 51,326.54 | -194.30 | -194.30 | 0.00 | 0.00 |
| Total (All Assets) | | 52,631.85 | 52,631.85 | 3,008.24 | 3,008.24 | 0.00 | 0.00 |

## Cash Report

| | Total | Securities | Futures | Month to Date | Year to Date |
|---|---|---|---|---|---|
| Base Currency Summary | | | | | |
| Cash Detail | | | | | |
| Starting Cash | 1,000,000.00 | 1,000,000.00 | 0.00 | | |
| Commissions | -1,129.90 | -1,068.69 | -61.21 | -1,129.90 | -1,129.90 |
| Deposits | 9,200,000.00 | 9,200,000.00 | 0.00 | 9,200,000.00 | 13,600,000.00 |
| Account Transfers | -4,600,000.00 | -4,600,000.00 | 0.00 | -4,600,000.00 | -8,000,000.00 |
| Internal Transfers | 0.00 | -369,864.88 | 369,864.88 | 0.00 | 0.00 |
| Cash Settling MTM | 51,387.75 | 0.00 | 51,387.75 | 51,387.75 | 51,387.75 |
| Trades (Sales) | 118,750.00 | 118,750.00 | 0.00 | 118,750.00 | 118,750.00 |
| Trades (Purchase) | -252,202.00 | -252,202.00 | 0.00 | -252,202.00 | -252,202.00 |
| Other Fees | -264.50 | -264.50 | 0.00 | -264.50 | -264.50 |
| Ending Cash | 5,516,541.35 | 5,095,349.93 | 421,191.42 | | |
| Ending Settled Cash | 5,501,834.35 | 5,095,349.93 | 406,484.42 | | |

## Open Positions

| Symbol | Quantity | Mult | Cost Price | Cost Basis | Close Price | Value | Unrealized P/L | Code |
|---|---|---|---|---|---|---|---|---|
| Stocks | | | | | | | | |
| USD | | | | | | | | |
| LULU | 400 | 1 | 286.6350 | 114,654.00 | 292.6900 | 117,076.00 | 2,422.00 | |
| Total | | | | 114,654.00 | | 117,076.00 | 2,422.00 | |

## Open Positions

| Symbol | Quantity | Mult | Cost Price | Cost Basis | Close Price | Value | Unrealized P/L | Code |
|---|---|---|---|---|---|---|---|---|
| Equity and Index Options | | | | | | | | |
| USD | | | | | | | | |
| VIX 15JUN22 29.0 C | 150 | 100 | 3.7114915 | 55,672.37 | 1.2500 | 18,750.00 | -36,922.37 | |
| VIX 15JUN22 37.5 C | -300 | 100 | 1.4890085 | -44,670.26 | 0.3750 | -11,250.00 | 33,420.26 | |
| VIX 20JUL22 28.0 C | 150 | 100 | 5.4814915 | 82,222.37 | 3.4500 | 51,750.00 | -30,472.37 | |
| VIX 20JUL22 40.0 C | -300 | 100 | 2.3385085 | -70,155.26 | 1.3500 | -40,500.00 | 29,655.26 | |
| Total | | | | 23,069.23 | | 18,750.00 | -4,319.24 | |

| Symbol | Quantity | Mult | Cost Price | Cost Basis | Close Price | Value | Unrealized P/L | Code |
|---|---|---|---|---|---|---|---|---|
| Futures | | | | | | | | |
| USD | | | | | | | | |
| NQM2 | -1 | 20 | 12,546.3925 | -250,927.85 | 12,646.5000 | -252,930.00 | -2,002.15 | |
| RTYM2 | -1 | 50 | 1,809.6570 | -90,482.85 | 1,861.9000 | -93,095.00 | -2,612.15 | |
| VXM2 | -10 | 1,000 | 30.34762 | -303,476.20 | 26.4123 | -264,123.00 | 39,353.20 | |
| VXN2 | -10 | 1,000 | 30.69762 | -306,976.20 | 27.7908 | -277,908.00 | 29,068.20 | |
| ZB JUN 22 | -3 | 1,000 | 136.34208 | -409,026.24 | 140.4375 | -421,312.50 | -12,286.26 | |
| Total | | | | -1,360,889.34 | | -1,309,368.50 | 51,520.84 | |

## Net Stock Position Summary

| Symbol | Description | Shares at IB | Shares Borrowed | Shares Lent | Net Shares |
|---|---|---|---|---|---|
| Stocks | | | | | |
| USD | | | | | |
| LULU | LULULEMON ATHLETICA INC | 400 | 0 | 0 | 400 |

## Trades

| Symbol | Date/Time | Quantity | T. Price | C. Price | Proceeds | Comm/Fee | Basis | Realized P/L | MTM P/L | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Stocks | | | | | | | | | | |
| USD | | | | | | | | | | |
| LULU | 2022-05-26, 16:22:49 | 200 | 286.6000 | 287.4800 | -57,320.00 | -1.00 | 57,321.00 | 0.00 | 176.00 | O |
| LULU | 2022-05-26, 16:22:52 | 200 | 286.6600 | 287.4800 | -57,332.00 | -1.00 | 57,333.00 | 0.00 | 164.00 | O |
| Total LULU | | 400 | | | -114,652.00 | -2.00 | 114,654.00 | 0.00 | 340.00 | |
| Total | | | | | -114,652.00 | -2.00 | 114,654.00 | 0.00 | 340.00 | |

| Symbol | Date/Time | Quantity | T. Price | C. Price | Proceeds | Comm/Fee | Basis | Realized P/L | MTM P/L | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Equity and Index Options | | | | | | | | | | |
| USD | | | | | | | | | | |
| VIX 18MAY22 50.0 C | 2022-05-09, 10:51:30 | -50 | 0.6500 | 0.6750 | 3,250.00 | -47.46 | -3,202.54 | 0.00 | -125.00 | O |
| VIX 18MAY22 50.0 C | 2022-05-18, 16:20:00 | 50 | 0.0000 | 0.0001 | 0.00 | 0.00 | 3,202.54 | 3,202.54 | 0.50 | C;Ep |
| Total VIX 18MAY22 50.0 C | | 0 | | | 3,250.00 | -47.46 | 0.00 | 3,202.54 | -124.50 | |
| VIX 15JUN22 29.0 C | 2022-05-24, 11:08:18 | 150 | 3.7000 | 3.0354 | -55,500.00 | -172.37 | 55,672.37 | 0.00 | -9,969.00 | O |
| Total VIX 15JUN22 29.0 C | | 150 | | | -55,500.00 | -172.37 | 55,672.37 | 0.00 | -9,969.00 | |

## Trades

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| VIX 15JUN22 37.5 C | 2022-05-24, 11:05:55 | -300 | 1.5000 | 1.3000 | 45,000.00 | -329.74 | -44,670.26 | 0.00 | 6,000.00 | O;P |
| Total VIX 15JUN22 37.5 C | | -300 | | | 45,000.00 | -329.74 | -44,670.26 | 0.00 | 6,000.00 | |
| VIX 20JUL22 28.0 C | 2022-05-24, 11:14:09 | 150 | 5.4700 | 4.8983 | -82,050.00 | -172.37 | 82,222.37 | 0.00 | -8,575.50 | O |
| Total VIX 20JUL22 28.0 C | | 150 | | | -82,050.00 | -172.37 | 82,222.37 | 0.00 | -8,575.50 | |
| VIX 20JUL22 40.0 C | 2022-05-24, 11:15:01 | -300 | 2.3500 | 2.1250 | 70,500.00 | -344.75 | -70,155.26 | 0.00 | 6,750.00 | O;P |
| Total VIX 20JUL22 40.0 C | | -300 | | | 70,500.00 | -344.75 | -70,155.26 | 0.00 | 6,750.00 | |
| Total | | | | | -18,800.00 | -1,066.69 | 23,069.23 | 3,202.54 | -5,919.00 | |

| Symbol | Date/Time | Quantity | T. Price | C. Price | Notional Value | Comm/Fee | Basis | Realized P/L | MTM P/L | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Futures | | | | | | | | | | |
| USD | | | | | | | | | | |
| NQM2 | 2022-05-08, 22:28:47 | -1 | 12,546.5000 | 12,193.7500 | 250,930.00 | -2.15 | -250,927.85 | 0.00 | 7,055.00 | O |
| Total NQM2 | | -1 | | | 250,930.00 | -2.15 | -250,927.85 | 0.00 | 7,055.00 | |
| RTYM2 | 2022-05-08, 22:28:19 | -2 | 1,809.7000 | 1,760.4000 | 180,970.00 | -4.30 | -180,965.70 | 0.00 | 4,930.00 | O |
| RTYM2 | 2022-05-09, 08:42:32 | 1 | 1,813.5000 | 1,760.4000 | -90,675.00 | -2.15 | 90,482.85 | -194.30 | -2,655.00 | C |
| Total RTYM2 | | -1 | | | 90,295.00 | -6.45 | -90,482.85 | -194.30 | 2,275.00 | |
| VXM2 | 2022-05-24, 11:09:32 | -10 | 30.3500 | 29.1855 | 303,500.00 | -23.80 | -303,476.20 | 0.00 | 11,645.00 | O;P |
| Total VXM2 | | -10 | | | 303,500.00 | -23.80 | -303,476.20 | 0.00 | 11,645.00 | |
| VXN2 | 2022-05-24, 11:15:41 | -10 | 30.7000 | 29.8518 | 307,000.00 | -23.80 | -306,976.20 | 0.00 | 8,482.00 | O;P |
| Total VXN2 | | -10 | | | 307,000.00 | -23.80 | -306,976.20 | 0.00 | 8,482.00 | |
| ZB JUN 22 | 2022-05-08, 22:27:30 | -3 | 136.34375 | 136.9375 | 409,031.25 | -5.01 | -409,026.24 | 0.00 | -1,781.25 | O |
| Total ZB JUN 22 | | -3 | | | 409,031.25 | -5.01 | -409,026.24 | 0.00 | -1,781.25 | |
| Total | | | | | 1,360,756.25 | -61.21 | -1,360,889.34 | -194.30 | 27,675.75 | |

## Interest Accruals

| Base Currency Summary | |
|---|---|
| Starting Accrual Balance | 0.00 |
| Interest Accrued | 1,028.48 |
| Accrual Reversal | 0.00 |
| FX Translation | -0.54 |
| Ending Accrual Balance | 1,027.94 |
| CAD | |
| Starting Accrual Balance | 0.00 |
| Interest Accrued | -50.56 |
| Accrual Reversal | 0.00 |
| Ending Accrual Balance | -50.56 |
| Ending Accrual Balance in USD | -39.97 |
| USD | |
| Starting Accrual Balance | 0.00 |
| Interest Accrued | 1,067.91 |
| Accrual Reversal | 0.00 |
| Ending Accrual Balance | 1,067.91 |

## Deposits & Withdrawals

| Date | Description | Amount |
|---|---|---|
| USD | | |
| 2022-05-06 | Internal Transfer Out To Account U9415436 | -350,000.00 |
| 2022-05-09 | Internal Transfer Out To Account U9415436 | -250,000.00 |
| 2022-05-11 | Electronic Fund Transfer | 9,200,000.00 |
| 2022-05-12 | Internal Transfer Out To Account U9415436 | -4,000,000.00 |
| Total | | 4,600,000.00 |

## Fees

| Date | Description | Amount |
|---|---|---|
| Other Fees | | |
| USD | | |
| 2022-05-10 | w******15:CBOT (GLOBEX) Professional for May 2022[1] | -123.00 |
| 2022-05-10 | W******15:CFE ENHANCED P L2 FOR MAY 2022[1] | -18.50 |
| 2022-05-10 | w******15:CME (GLOBEX) Professional for May 2022[1] | -123.00 |
| Total | | -264.50 |

Notes

1. Market data is provided by Global Financial Information Services (GmbH). Your local broker collects amounts owed for fees and tax for such data on behalf of Global Financial Information Services (GmbH). Note, you are responsible for any applicable taxes relating to the provision of these services.

## Commissions Charged in Service Accounts

| Account | Date/Time | Description | Revenue | Expense | Net | Net In Base |
|---|---|---|---|---|---|---|
| Commissions | | | | | | |

## Financial Instrument Information

| Symbol | Description | Conid | Security ID | Listing Exch | Multiplier | Type | Code |
|---|---|---|---|---|---|---|---|
| Stocks | | | | | | | |
| LULU | LULULEMON ATHLETICA INC | 45157951 | US5500211090 | NASDAQ | 1 | COMMON | |

| Symbol | Description | Conid | Listing Exch | Multiplier | Expiry | Delivery Month | Type | Strike | Code |
|---|---|---|---|---|---|---|---|---|---|
| Equity and Index Options | | | | | | | | | |
| VIX 220518C00050000 | VIX 18MAY22 50.0 C | 511143259 | CBOE | 100 | 2022-05-18 | 2022-05 | C | 50 | |
| VIX 220615C00029000 | VIX 15JUN22 29.0 C | 516990346 | CBOE | 100 | 2022-06-15 | 2022-06 | C | 29 | |
| VIX 220615C00037500 | VIX 15JUN22 37.5 C | 516990435 | CBOE | 100 | 2022-06-15 | 2022-06 | C | 37.5 | |
| VIX 220720C00028000 | VIX 20JUL22 28.0 C | 523592055 | CBOE | 100 | 2022-07-20 | 2022-07 | C | 28 | |
| VIX 220720C00040000 | VIX 20JUL22 40.0 C | 523592151 | CBOE | 100 | 2022-07-20 | 2022-07 | C | 40 | |



Confidential

## Financial Instrument Information

| Symbol | Description | Conid | Listing Exch | Multiplier | Expiry | Delivery Month | Code |
|---|---|---|---|---|---|---|---|
| Futures | | | | | | | |
| NQM2 | NQ 17JUN22 | 477836974 | GLOBEX | 20 | 2022-06-17 | 2022-06 | |
| RTYM2 | RTY 17JUN22 | 477836951 | GLOBEX | 50 | 2022-06-17 | 2022-06 | |
| VXM2 | VIX 15JUN22 | 515658560 | CFE | 1,000 | 2022-06-15 | 2022-06 | |
| VXN2 | VIX 20JUL22 | 522806237 | CFE | 1,000 | 2022-07-20 | 2022-07 | |
| ZB JUN 22 | ZB 21JUN22 | 516099534 | ECBOT | 1,000 | 2022-06-21 | 2022-06 | |

## Codes

| Code | Meaning | Code (Cont.) | Meaning (Cont.) |
|---|---|---|---|
| A | Assignment | LD | Adjusted by Loss Disallowed from Wash Sale |
| ADR | ADR Fee Accrual | LI | Last In, First Out (LIFO) tax basis election |
| AEx | Automatic exercise for dividend-related recommendation. | LT | Long Term P/L |
| Adj | Adjustment | Lo | Direct Loan |
| Al | Allocation | M | Entered manually by IB |
| Aw | Away Trade | MEx | Manual exercise for dividend-related recommendation. |
| B | Automatic Buy-in | ML | Maximize Losses tax basis election |
| Bo | Direct Borrow | MLG | Maximize Long Term Gain tax basis election |
| C | Closing Trade | MLL | Maximize Long Term Loss tax basis election |
| CD | Cash Delivery | MSG | Maximize Short Term Gain tax basis election |
| CP | Complex Position | MSL | Maximize Short Term Loss tax basis election |
| Ca | Cancelled | O | Opening Trade |
| Co | Corrected Trade | P | Partial Execution |
| Cx | Part or all of this transaction was a Crossing executed as dual agent by IB for two IB customers | PI | Price Improvement |
| ETF | ETF Creation/Redemption | Po | Interest or Dividend Accrual Posting |
| Ep | Resulted from an Expired Position | Pr | Part or all of this transaction was executed by the Exchange as a Crossing by IB against an IB affiliate and is therefore classified as a Principal and not an agency trade |
| Ex | Exercise | R | Dividend Reinvestment |
| FP | IB acted as agent for the fractional share portion of this trade, which was executed by an IB affiliate as principal. | RED | Redemption to Investor |
| FPA | IB acted as agent for both the fractional share portion and the whole share portion of this trade; the fractional share portion was executed by an IB Affiliate as principal. | RP | IB acted as agent for the fractional share portion of this trade, which was executed by an IB affiliate as riskless principal. |
| G | Trade in Guaranteed Account Segment | RPA | IB acted as agent for both the fractional share portion and the whole share portion of this trade; the fractional share portion was executed by an IB Affiliate as riskless principal. |
| GEA | Exercise or Assignment resulting from offsetting positions | Re | Interest or Dividend Accrual Reversal |
| HC | Highest Cost tax basis election | Ri | Reimbursement |
| HFI | Investment Transferred to Hedge Fund | SI | This order was solicited by Interactive Brokers |
| HFR | Redemption from Hedge Fund | SL | Specific Lot tax basis election |
| I | Internal Transfer | SO | This order was marked as solicited by your Introducing Broker |
| IA | This transaction was executed against an IB affiliate | SS | Customer designated this trade for shortened settlement and so is subject to execution at prices above the prevailing market |
| INV | Investment Transfer from Investor | ST | Short Term P/L |
| IPO | This transaction was executed as part of an IPO in which IB was a member of the selling group and is classified as a Principal trade. | T | Transfer |
| L | Ordered by IB (Margin Violation) | Un | Unvested shares from stock grant |

## Notes/Legal Notes

Notes

1. Most stock exchange transactions settle on the trade date plus two business days. Options, futures and US open-end mutual fund transactions settle on trade date plus one business day. (Some exchanges and other transaction types may have longer or shorter settlement periods.) Ending settled cash reflects the cash that has actually settled.
2. Initial and maintenance margin requirements are available within the Account Window of the Trader Workstation.
3. Interactive Brokers LLC receives compensation from fund companies in connection with the purchase and holding of fund shares by customers of Interactive Brokers LLC. Such compensation includes, but is not limited to, Rule 12b-1 fees that are paid out of the funds assets. The source and amount of any remuneration received by Interactive Brokers LLC in connection with a transaction will be furnished upon written request of the customer. IB may share a portion of the compensation received from fund companies with your financial advisor or introducing broker.
4. Quantities preceded by a "-" sign indicate sell transactions. Other transactions are purchases.
5. IB acts as agent in executing the fractional share portion of your order. In certain circumstances, IB routes the fractional portion of your order to an affiliate, which may execute the fractional portion of the order as principal. In such circumstances, this is indicated by the codes associated with the trade. If an IB affiliate acts as principal in executing any fractional share portion of your order, the order will be executed at the price displayed for the opposite side of the NBBO from your order (the offer if you are buying and the bid if you are selling) at the time of execution. If an IB affiliate is acting as riskless principal in connection with filling the fractional share portion of your order, the affiliate will execute the fractional share portion of your order at the price it receives for the execution of the whole share.
6. In case of partial executions, commissions are charged on the total quantity executed on the original order. The commission is displayed on the first partial execution only.
7. Each closed lot indicated above with a reference to note (6) was chosen by the end of the trading day to be sold versus the specific opening purchase identified in that row.
8. Trade execution times are displayed in Eastern Time.
9. Applicable commodity Regulatory Fees for your transactions are available on the IB website at www.interactivebrokers.com/en/accounts/fees/exchangeAndRegulatoryFees.php.
10. Borrow Fee Rate represents the cost to borrow stock expressed in percent per annum. It is applied to the cash collateral amount on the stock borrow contract and is separate from any interest earned on credit cash balances. Similarly, Loan Fee Rate represents the benefit to lend stock. A positive rate indicates a cost to the borrower/benefit to the lender and a negative rate indicates a benefit to the borrower/cost to the lender. In general, the fee rates for hard-to-borrow stocks are higher than for normal availability stocks.
11. Interest Rate on Customer Collateral represents the interest paid on the collateral posted to the customer's account and received from lending stock. A positive rate indicates a benefit to the lender.
12. The closing prices on this Activity Statement are indicative and may come from third-party sources. Interactive Brokers does not warrant the accuracy of the prices provided by third-party sources. Due to time zone differences, certain non-US mutual funds may deliver closing prices after the Activity Statement has been produced and the closing prices for such funds will reflect the previous day's price.
13. All Market Data and Research services are provided through Global Financial Information Services (GmbH).
14. Market data is provided by Global Financial Information Services (GmbH). Your local broker collects amounts owed for fees and tax for such data on behalf of Global Financial Information Services (GmbH). Note, you are responsible for any applicable taxes relating to the provision of these services.

Fixed Income Notes

1. Call features for bonds or preferred stocks may affect the yield. For zero coupon, compound interest and multiplier securities, there are no periodic payments and securities may be callable below maturity value without notice to holder unless registered. For asset-backed securities, the actual yield may vary depending on the speed at which the underlying note is pre-paid. For additional information regarding bond yield, please contact the IB Help Desk at: help@interactivebrokers.com. If this debt security is unrated by a nationally recognized statistical rating organization, it may pose a high risk of default. You should consult a financial advisor to determine whether unrated bonds are appropriate for your portfolio in light of your goals and your financial circumstances. Fees charged by bond trading centers are included in the cost of bond transactions.

Legal Notes

1. Please promptly report any inaccuracy or discrepancy in this statement, or in your account. Contact the IB Customer Service Department in writing using the form available on the IB website. You may also contact IB by phone, but if you report an error by phone, you should re-confirm such oral communication in writing in order to protect your rights, including rights under the Securities Investor Protection Act (SIPA).

   Interactive Brokers LLC, www.interactivebrokers.com, 877-442-2757 (U.S.)

   Interactive Brokers (UK) (Ltd), www.interactivebrokers.co.uk, 00800-42-276537 (Intl)

   Interactive Brokers Canada Inc., www.interactivebrokers.ca, 877-745-4222 (Can.)

2. Unless otherwise noted, Interactive Brokers acted as agent in the execution of the above transactions. For those exchanges where IB is not a direct clearing member or custodian, IB may use one of the following clearing agents or sub-custodians: Interactive Brokers Australia Pty Limited; Interactive Brokers Canada Inc.; Interactive Brokers Hong Kong Limited; Interactive Brokers Securities Japan, Inc.; Interactive Brokers (U.K.) Limited; IBKR Financial Services AG; ABN Amro Clearing Singapore Pte. Ltd.; BBVA Bancomer, S.A.; BNP Securities Services, Milan Branch; BMO Harris Bank N.A.; Citibank Europe plc; Euroclear Bank S.A./N.V.; Skandinaviska Enskilda Banken AB (including select branches).
3. IB acts as agent or riskless principal in foreign currency exchange transactions and as riskless principal in spot precious metals transactions. Such transactions are executed against an IB affiliate or a third party, which acts as principal in such transactions and may have a long or short position and may have profited or lost in connection with the transaction. Foreign currency exchange and spot precious metals transactions executed by Customer through IB are not regulated or overseen by the SEC or the CFTC.
4. Trades marked with the exchange indicator of TMBR were effected by IB as agent through a market making affiliate, which acted as principal in the transaction and may have a long or short position in the security and may have profited or lost in connection with the transaction.
5. All VWAP trades are effected pursuant to an average price formula based on a reference price provided by a third-party data provider. Additional information and reference prices are available upon request. IB, as agent, effects VWAP transactions through a market making affiliate, which acts as principal in such transactions and may have a long or short position in the security and may have profited or lost in connection with the transaction.
6. IB accepts liquidity rebates or other order flow payments from Alternative Trading Systems, market makers and exchanges for certain orders in stocks. IB receives payment for some option orders pursuant to exchange-mandated marketing fee programs or other arrangements. The source and nature of any compensation received by IB in connection with any transaction is available upon written request of the customer. For further information, check the IB website and the Order Routing and Payment for Order Flow Disclosure provided when you opened your account and annually or email help@interactivebrokers.com.
7. For security futures trades, if not already indicated on this statement, information about the time of any transaction, the identity of the counterparty to the transaction, and whether IB is acting as agent or principal, as agent for the counterparty, as agent for both parties to the contract, or as principal, and if acting as principal, whether the transaction was a block transaction or an exchange for physicals transaction, will be available upon written request of the customer.
8. Customer is requested to promptly advise Interactive Brokers of any material change in Customer's investment objectives or financial situation.

## Notes/Legal Notes

9. A financial statement of Interactive Brokers LLC is available for your personal inspection at www.interactivebrokers.com or at its offices, or a copy of it will be mailed upon your written request.

10. For trades executed on either the Australian Stock Exchange Ltd ("ASX") or Chi-X Australia Pty Ltd ("Chi-X"), this confirmation is issued subject to: (i) the directions, decisions and requirements of the Market Operator, the relevant Market Integrity Rules, the relevant Market Operating Rules, the Clearing Rules and where relevant, the Settlement Rules; (ii) the customs and usages of the relevant Market; and (iii) the correction of errors and omissions. Interactive Brokers LLC (ARBN: 091191141, AFSL: 245574, Participant on Chi-X Australia)("IB") is not a participant on the ASX, and will route orders to the ASX through its affiliate, Timber Hill Australia Pty Ltd (ABN 25079993534, AFSL: 244380, Participant on the ASX)("THA") who executes such orders. Your ASX and Chi-x Australia trades will be cleared through ABN Amro Clearing Sydney Pty Ltd, an ACH participant. If your transaction was a crossing transaction, IB may have either acted on behalf of (i) both the buyer and seller of this transaction, or (ii) on behalf of the buyer or seller on one side of the transaction and act as Principal on the other side. Under the Corporations Act 2001, where IB enters into an exchange traded derivatives on a customer's behalf, IB is regarded as having issued the derivative to the customer.

11. For All Options Trades Executed on the Stock Exchange of Hong Kong ("SEHK"): (a) Options can involve a high degree of risk and may not be suitable for every investor. Investors should ensure they understand those risks before participating in the options market. (b) All options contracts executed on the SEHK were executed by Timber Hill Securities Hong Kong on behalf of Interactive Brokers LLC. (c) In the event of a default committed by Interactive Brokers LLC resulting in the client suffering any pecuniary loss, the client shall have a right to claim under the Investor Compensation Fund established under the Hong Kong Securities and Futures Ordinance, subject to the terms of the Investor Compensation Fund from time to time. (d) All Exchange Traded Options Business made for or on behalf of a client shall be subject to the relevant provisions of the constitution, Rules of The Stock Exchange of Hong Kong Limited ("SEHK Rules"), regulations, the Articles, customs and usages of SEHK, the Options Trading Rules, the Clearing Rules of SEOCH, the CCASS Rules and the laws of Hong Kong, which shall be binding on both Interactive Brokers LLC and the client.

12. Deposits held away from Interactive Brokers LLC may not qualify under SIPC protection. Also, futures and options on futures are not covered by SIPC.

SIPC Member

InteractiveBrokers

# Activity Statement

May 2, 2022 - May 31, 2022

Help

Interactive Brokers LLC, Two Pickwick Plaza, Greenwich, CT 06830

## Account Information

| | |
|---|---|
| Name | Camshaft Capital Fund LP |
| Account | U9415436 |
| Master Name | Camshaft Capital Fund LP |
| Account Type | Institution Client |
| Customer Type | Partnership |
| Account Capabilities | Portfolio Margin |
| Base Currency | USD |

## Net Asset Value

| | April 29, 2022 | May 31, 2022 | | | |
|---|---|---|---|---|---|
| | Total | Long | Short | Total | Change |
| Cash | 3,400,000.00 | 8,171,594.62 | -37,471.34 | 8,134,123.28 | 4,734,123.28 |
| Interest Accruals | 0.00 | 1,376.87 | -8.29 | 1,368.58 | 1,368.58 |
| Total | 3,400,000.00 | 8,172,971.49 | -37,479.63 | 8,135,491.86 | 4,735,491.86 |

| | |
|---|---|
| Time Weighted Rate of Return | 0.51% |

| Change in NAV | Total |
|---|---|
| Starting Value | 3,400,000.00 |
| Mark-to-Market | 136,844.62 |
| Deposits & Withdrawals | 4,600,000.00 |
| Change in Interest Accruals | 1,368.68 |
| Other Fees | -1,178.50 |
| Commissions | -1,542.84 |
| Other FX Translations | -0.10 |
| Ending Value | 8,135,491.86 |

## Mark-to-Market Performance Summary

| | Quantity | | Price | | Mark-to-Market P/L | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Symbol | Prior | Current | Prior | Current | Position | Transaction | Commissions | Other | Total | Code |
| Futures | | | | | | | | | | |
| 6AU2 | 0 | 20 | -- | 0.7185 | 16,300.00 | 7,075.00 | -49.40 | 0.00 | 23,325.60 | |
| 6CM2 | 0 | 0 | -- | -- | -3,840.00 | 1,120.00 | -39.52 | 0.00 | -2,759.52 | |
| 6CU2 | 0 | 20 | -- | 0.79045 | 20,200.00 | 3,900.00 | -49.40 | 0.00 | 24,050.60 | |
| 6MM2 | 0 | 40 | -- | 0.05068 | 33,450.00 | -850.00 | -98.80 | 0.00 | 32,501.20 | |
| CTH3 | 0 | 12 | -- | 1.1817 | -17,270.00 | 20,840.00 | -35.64 | 0.00 | 3,534.36 | |
| GCZ2 | 0 | 5 | -- | 1,865.0000 | -9,750.00 | -6,420.00 | -50.82 | 0.00 | -16,220.82 | |
| HEQ2 | 0 | 0 | -- | -- | 0.00 | -8,600.00 | -40.60 | 0.00 | -8,640.60 | |
| HEZ2 | 0 | 15 | -- | 0.86775 | -1,080.00 | -17,020.00 | -217.50 | 0.00 | -18,317.50 | |

## Mark-to-Market Performance Summary

| | Quantity | | Price | | Mark-to-Market P/L | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Symbol | Prior | Current | Prior | Current | Position | Transaction | Commissions | Other | Total | Code |
| HGU2 | 0 | 5 | -- | 4.3045 | -5,837.50 | -11,412.50 | -50.82 | 0.00 | -17,300.82 | |
| HOQ2 | 0 | 0 | -- | -- | -3,578.40 | -11,655.00 | -14.22 | 0.00 | -15,247.62 | |
| HOU2 | 0 | 4 | -- | 3.7780 | 44,805.60 | 28,324.80 | -9.48 | 0.00 | 73,120.92 | |
| KCH3 | 0 | 7 | -- | 2.2900 | 34,200.00 | 375.00 | -20.79 | 0.00 | 34,554.21 | |
| KE DEC 22 | 0 | 13 | -- | 11.8100 | -2,712.50 | 14,275.00 | -37.96 | 0.00 | 11,524.54 | |
| LEZ2 | 0 | 10 | -- | 1.4230 | -22,290.00 | 100.00 | -133.40 | 0.00 | -22,323.40 | |
| MMEM2 | 0 | 0 | -- | -- | -7,140.00 | -1,750.00 | -28.98 | 0.00 | -8,918.98 | |
| NGQ2 | 0 | 0 | -- | -- | -6,000.00 | -30,150.00 | -23.70 | 0.00 | -36,173.70 | |
| NGZ2 | 0 | 7 | -- | 8.1840 | 35,210.00 | 27,510.00 | -16.59 | 0.00 | 62,703.41 | |
| PAM2 | 0 | 0 | -- | -- | -19,280.00 | 2,180.00 | -4.84 | 0.00 | -17,104.84 | |
| PAU2 | 0 | 2 | -- | 2,006.3000 | 13,080.00 | -12,020.00 | -4.84 | 0.00 | 1,055.16 | |
| PLV2 | 0 | 0 | -- | -- | -8,775.00 | -5,500.00 | -24.20 | 0.00 | -14,299.20 | |
| RSX2 | 0 | 20 | -- | 1,073.5000 | 1,156.43 | -6,224.26 | -37.15 | 0.00 | -5,104.98 | |
| SBH3 | 0 | 30 | -- | 0.1987 | 12,152.00 | 3,024.00 | -89.10 | 0.00 | 15,086.90 | |
| SIN2 | 0 | 0 | -- | -- | 0.00 | -5,925.00 | -14.52 | 0.00 | -5,939.52 | |
| SIU2 | 0 | 5 | -- | 21.7810 | 1,715.00 | 910.00 | -12.10 | 0.00 | 2,612.90 | |
| SIZ2 | 0 | 0 | -- | -- | -10,635.00 | 2,235.00 | -14.52 | 0.00 | -8,414.52 | |
| XAEM2 | 0 | 7 | -- | 906.7000 | 74,300.00 | 9,070.00 | -15.05 | 0.00 | 83,354.95 | |
| XAFM2 | 0 | 5 | -- | 435.9000 | -950.00 | -18,300.00 | -70.95 | 0.00 | -19,320.95 | |
| XAIM2 | 0 | 5 | -- | 951.4000 | -6,820.00 | -1,330.00 | -27.95 | 0.00 | -8,177.95 | |
| ZB JUN 22 | 0 | 0 | -- | -- | -29,312.50 | -1,750.00 | -40.08 | 0.00 | -31,102.58 | |
| ZB SEP 22 | 0 | -20 | -- | 139.4375 | 28,750.00 | 625.00 | -33.40 | 0.00 | 29,341.60 | |
| ZC MAR 23 | 0 | 20 | -- | 7.1650 | -27,312.50 | 3,062.50 | -146.00 | 0.00 | -24,396.00 | |
| ZL JAN 23 | 0 | 13 | -- | 0.7437 | 7,884.00 | 564.00 | -37.96 | 0.00 | 8,410.04 | |
| ZS JAN 23 | 0 | 0 | -- | -- | -10,687.50 | -1,800.00 | -29.20 | 0.00 | -12,516.70 | |
| ZS MAR 23 | 0 | 8 | -- | 15.0775 | 21,950.00 | 625.00 | -23.36 | 0.00 | 22,551.64 | |
| Total Futures | | | | | 151,882.13 | -14,891.46 | -1,542.84 | 0.00 | 135,447.83 | |
| Forex | | | | | | | | | | |
| CAD | 0.00 | -6,642.00 | -- | 0.79058 | -146.06 | 0.00 | 0.00 | 0.00 | -146.06 | |
| USD | 3,400,000.00 | 8,139,374.31 | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Total Forex | | | | | -146.06 | 0.00 | 0.00 | 0.00 | -146.06 | |
| Total (All Assets) | | | | | 151,736.07 | -14,891.46 | -1,542.84 | 0.00 | 135,301.78 | |
| Other Fees | | | | | | | | | -1,178.50 | |
| Total P/L for Statement Period | | | | | | | | | 134,123.28 | |

## Realized & Unrealized Performance Summary

| | | Realized | | | | | Unrealized | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Symbol | Cost Adj. | S/T Profit | S/T Loss | L/T Profit | L/T Loss | Total | S/T Profit | S/T Loss | L/T Profit | L/T Loss | Total | Total | Code |
| Futures | | | | | | | | | | | | | |
| 6AU2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 23,325.60 | 0.00 | 0.00 | 0.00 | 23,325.60 | 23,325.60 | |
| 6CM2 | 0.00 | 0.00 | -2,759.52 | 0.00 | 0.00 | -2,759.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2,759.52 | |
| 6CU2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 24,050.60 | 0.00 | 0.00 | 0.00 | 24,050.60 | 24,050.60 | |
| 6MM2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32,501.20 | 0.00 | 0.00 | 0.00 | 32,501.20 | 32,501.20 | |

## Realized & Unrealized Performance Summary

| Symbol | Cost Adj. | Realized S/T Profit | Realized S/T Loss | Realized L/T Profit | Realized L/T Loss | Realized Total | Unrealized S/T Profit | Unrealized S/T Loss | Unrealized L/T Profit | Unrealized L/T Loss | Unrealized Total | Total | Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CTH3 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,534.36 | 0.00 | 0.00 | 0.00 | 3,534.36 | 3,534.36 | |
| GCZ2 | 0.00 | 0.00 | -30,508.72 | 0.00 | 0.00 | -30,508.72 | 14,287.90 | 0.00 | 0.00 | 0.00 | 14,287.90 | -16,220.82 | |
| HEQ2 | 0.00 | 0.00 | -8,640.60 | 0.00 | 0.00 | -8,640.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -8,640.60 | |
| HEZ2 | 0.00 | 0.00 | -28,474.00 | 0.00 | 0.00 | -28,474.00 | 10,156.50 | 0.00 | 0.00 | 0.00 | 10,156.50 | -18,317.50 | |
| HGU2 | 0.00 | 0.00 | -24,576.22 | 0.00 | 0.00 | -24,576.22 | 7,275.40 | 0.00 | 0.00 | 0.00 | 7,275.40 | -17,300.82 | |
| HOQ2 | 0.00 | 0.00 | -15,247.62 | 0.00 | 0.00 | -15,247.62 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -15,247.62 | |
| HOU2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 73,120.92 | 0.00 | 0.00 | 0.00 | 73,120.92 | 73,120.92 | |
| KCH3 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,554.21 | 0.00 | 0.00 | 0.00 | 34,554.21 | 34,554.21 | |
| KE DEC 22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 21,047.90 | -9,523.36 | 0.00 | 0.00 | 11,524.54 | 11,524.54 | |
| LEZ2 | 0.00 | 0.00 | -15,394.40 | 0.00 | 0.00 | -15,394.40 | 0.00 | -6,929.00 | 0.00 | 0.00 | -6,929.00 | -22,323.40 | |
| MMEM2 | 0.00 | 0.00 | -8,918.98 | 0.00 | 0.00 | -8,918.98 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -8,918.98 | |
| NGQ2 | 0.00 | 0.00 | -36,173.70 | 0.00 | 0.00 | -36,173.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -36,173.70 | |
| NGZ2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 62,703.41 | 0.00 | 0.00 | 0.00 | 62,703.41 | 62,703.41 | |
| PAM2 | 0.00 | 0.00 | -17,104.84 | 0.00 | 0.00 | -17,104.84 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -17,104.84 | |
| PAU2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,055.16 | 0.00 | 0.00 | 0.00 | 1,055.16 | 1,055.16 | |
| PLV2 | 0.00 | 0.00 | -14,299.20 | 0.00 | 0.00 | -14,299.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14,299.20 | |
| RSX2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -5,251.03 | 0.00 | 0.00 | -5,251.03 | -5,251.03 | |
| SBH3 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16,796.60 | -1,709.70 | 0.00 | 0.00 | 15,086.90 | 15,086.90 | |
| SIN2 | 0.00 | 0.00 | -5,939.52 | 0.00 | 0.00 | -5,939.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -5,939.52 | |
| SIU2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,710.32 | -1,097.42 | 0.00 | 0.00 | 2,612.90 | 2,612.90 | |
| SIZ2 | 0.00 | 0.00 | -8,414.52 | 0.00 | 0.00 | -8,414.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -8,414.52 | |
| XAEM2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 83,354.95 | 0.00 | 0.00 | 0.00 | 83,354.95 | 83,354.95 | |
| XAFM2 | 0.00 | 0.00 | -40,685.20 | 0.00 | 0.00 | -40,685.20 | 21,364.25 | 0.00 | 0.00 | 0.00 | 21,364.25 | -19,320.95 | |
| XAIM2 | 0.00 | 0.00 | -17,617.20 | 0.00 | 0.00 | -17,617.20 | 9,439.25 | 0.00 | 0.00 | 0.00 | 9,439.25 | -8,177.95 | |
| ZB JUN 22 | 0.00 | 0.00 | -31,102.58 | 0.00 | 0.00 | -31,102.58 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -31,102.58 | |
| ZB SEP 22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 29,341.60 | 0.00 | 0.00 | 0.00 | 29,341.60 | 29,341.60 | |
| ZC MAR 23 | 0.00 | 0.00 | -20,337.60 | 0.00 | 0.00 | -20,337.60 | 0.00 | -4,058.40 | 0.00 | 0.00 | -4,058.40 | -24,396.00 | |
| ZL JAN 23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,410.04 | 0.00 | 0.00 | 0.00 | 8,410.04 | 8,410.04 | |
| ZS JAN 23 | 0.00 | 0.00 | -12,516.70 | 0.00 | 0.00 | -12,516.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -12,516.70 | |
| ZS MAR 23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 22,551.64 | 0.00 | 0.00 | 0.00 | 22,551.64 | 22,551.64 | |
| Total Futures | 0.00 | 0.00 | -338,711.12 | 0.00 | 0.00 | -338,711.12 | 502,581.81 | -28,568.91 | 0.00 | 0.00 | 474,012.90 | 135,301.78 | |
| Forex | | | | | | | | | | | | | |
| CAD | 0.00 | 93.76 | -87.34 | 0.00 | 0.00 | 6.43 | 498.71 | -651.19 | 0.00 | 0.00 | -152.48 | -146.06 | |
| Total Forex | 0.00 | 93.76 | -87.34 | 0.00 | 0.00 | 6.43 | 498.71 | -651.19 | 0.00 | 0.00 | -152.48 | -146.06 | |
| Total (All Assets) | 0.00 | 93.76 | -338,798.46 | 0.00 | 0.00 | -338,704.69 | 503,080.52 | -29,220.10 | 0.00 | 0.00 | 473,860.42 | 135,155.72 | |

## Month & Year to Date Performance Summary

| Symbol | Description | Mark-to-Market MTD | Mark-to-Market YTD | Realized S/T MTD | Realized S/T YTD | Realized L/T MTD | Realized L/T YTD |
|---|---|---|---|---|---|---|---|
| Futures | | | | | | | |
| 6AU2 | AUD 19SEP22 | 23,325.60 | 23,325.60 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6CM2 | CAD 14JUN22 | -2,759.52 | -2,759.52 | -2,759.52 | -2,759.52 | 0.00 | 0.00 |
| 6CU2 | CAD 20SEP22 | 24,050.60 | 24,050.60 | 0.00 | 0.00 | 0.00 | 0.00 |

## Month & Year to Date Performance Summary

| Symbol | Description | Mark-to-Market MTD | Mark-to-Market YTD | Realized S/T MTD | Realized S/T YTD | Realized L/T MTD | Realized L/T YTD |
|---|---|---|---|---|---|---|---|
| 6MM2 | MXP 13JUN22 | 32,501.20 | 32,501.20 | 0.00 | 0.00 | 0.00 | 0.00 |
| CTH3 | CT 16MAR23 | 3,534.36 | 3,534.36 | 0.00 | 0.00 | 0.00 | 0.00 |
| GCZ2 | GC 28DEC22 | -16,220.82 | -16,220.82 | -30,508.72 | -30,508.72 | 0.00 | 0.00 |
| HEQ2 | HE 16AUG22 | -8,640.60 | -8,640.60 | -8,640.60 | -8,640.60 | 0.00 | 0.00 |
| HEZ2 | HE 16DEC22 | -18,317.50 | -18,317.50 | -28,474.00 | -28,474.00 | 0.00 | 0.00 |
| HGU2 | HG 28SEP22 | -17,300.82 | -17,300.82 | -24,576.22 | -24,576.22 | 0.00 | 0.00 |
| HOQ2 | HO AUG22 | -15,247.62 | -15,247.62 | -15,247.62 | -15,247.62 | 0.00 | 0.00 |
| HOU2 | HO SEP22 | 73,120.92 | 73,120.92 | 0.00 | 0.00 | 0.00 | 0.00 |
| KCH3 | KC 22MAR23 | 34,554.21 | 34,554.21 | 0.00 | 0.00 | 0.00 | 0.00 |
| KE DEC 22 | KE 14DEC22 | 11,524.54 | 11,524.54 | 0.00 | 0.00 | 0.00 | 0.00 |
| LEZ2 | LE 30DEC22 | -22,323.40 | -22,323.40 | -15,394.40 | -15,394.40 | 0.00 | 0.00 |
| MMEM2 | MXEF 17JUN22 | -8,918.98 | -8,918.98 | -8,918.98 | -8,918.98 | 0.00 | 0.00 |
| NGQ2 | NG AUG22 | -36,173.70 | -36,173.70 | -36,173.70 | -36,173.70 | 0.00 | 0.00 |
| NGZ2 | NG DEC22 | 62,703.41 | 62,703.41 | 0.00 | 0.00 | 0.00 | 0.00 |
| PAM2 | PA 28JUN22 | -17,104.84 | -17,104.84 | -17,104.84 | -17,104.84 | 0.00 | 0.00 |
| PAU2 | PA 28SEP22 | 1,055.16 | 1,055.16 | 0.00 | 0.00 | 0.00 | 0.00 |
| PLV2 | PL 27OCT22 | -14,299.20 | -14,299.20 | -14,299.20 | -14,299.20 | 0.00 | 0.00 |
| RSX2 | RS 14NOV22 | -5,104.98 | -5,104.98 | 0.00 | 0.00 | 0.00 | 0.00 |
| SBH3 | SB MAR23 | 15,086.90 | 15,086.90 | 0.00 | 0.00 | 0.00 | 0.00 |
| SIN2 | SI 27JUL22 | -5,939.52 | -5,939.52 | -5,939.52 | -5,939.52 | 0.00 | 0.00 |
| SIU2 | SI 28SEP22 | 2,612.90 | 2,612.90 | 0.00 | 0.00 | 0.00 | 0.00 |
| SIZ2 | SI 28DEC22 | -8,414.52 | -8,414.52 | -8,414.52 | -8,414.52 | 0.00 | 0.00 |
| XAEM2 | IXE 17JUN22 | 83,354.95 | 83,354.95 | 0.00 | 0.00 | 0.00 | 0.00 |
| XAFM2 | IXM 17JUN22 | -19,320.95 | -19,320.95 | -40,685.20 | -40,685.20 | 0.00 | 0.00 |
| XAIM2 | IXI 17JUN22 | -8,177.95 | -8,177.95 | -17,617.20 | -17,617.20 | 0.00 | 0.00 |
| ZB JUN 22 | ZB 21JUN22 | -31,102.58 | -31,102.58 | -31,102.58 | -31,102.58 | 0.00 | 0.00 |
| ZB SEP 22 | ZB 21SEP22 | 29,341.60 | 29,341.60 | 0.00 | 0.00 | 0.00 | 0.00 |
| ZC MAR 23 | ZC 14MAR23 | -24,396.00 | -24,396.00 | -20,337.60 | -20,337.60 | 0.00 | 0.00 |
| ZL JAN 23 | ZL 13JAN23 | 8,410.04 | 8,410.04 | 0.00 | 0.00 | 0.00 | 0.00 |
| ZS JAN 23 | ZS 13JAN23 | -12,516.70 | -12,516.70 | -12,516.70 | -12,516.70 | 0.00 | 0.00 |
| ZS MAR 23 | ZS 14MAR23 | 22,551.64 | 22,551.64 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Futures | | 135,447.83 | 135,447.83 | -338,711.12 | -338,711.12 | 0.00 | 0.00 |
| Total (All Assets) | | 135,447.83 | 135,447.83 | -338,711.12 | -338,711.12 | 0.00 | 0.00 |

## Cash Report

| | Total | Securities | Futures | Month to Date | Year to Date |
|---|---|---|---|---|---|
| Base Currency Summary | | | | | |
| Starting Cash | 3,400,000.00 | 3,400,000.00 | 0.00 | | |
| Commissions | -1,542.84 | 0.00 | -1,542.84 | -1,542.84 | -1,542.84 |
| Account Transfers | 4,600,000.00 | 4,600,000.00 | 0.00 | 4,600,000.00 | 8,000,000.00 |
| Internal Transfers | 0.00 | -1,397,434.79 | 1,397,434.79 | 0.00 | 0.00 |
| Cash Settling MTM | 136,990.67 | 0.00 | 136,990.67 | 136,990.67 | 136,990.67 |
| Other Fees | -1,178.50 | 0.00 | -1,178.50 | -1,178.50 | -1,178.50 |


Confidential
CAMSHAFT0001810

## Cash Report

| | Total | Securities | Futures | Month to Date | Year to Date |
|---|---|---|---|---|---|
| Cash FX Translation Gain/Loss | -146.06 | -651.19 | 505.13 | | |
| Ending Cash | 8,134,123.28 | 6,601,914.03 | 1,532,209.25 | | |
| Ending Settled Cash | 8,257,586.95 | 6,601,914.03 | 1,655,672.93 | | |
| CAD | | | | | |
| Starting Cash | 0.00 | 0.00 | 0.00 | | |
| Commissions | -48.00 | 0.00 | -48.00 | -48.00 | -48.00 |
| Internal Transfers | 0.00 | -47,397.28 | 47,397.28 | 0.00 | 0.00 |
| Cash Settling MTM | -6,594.00 | 0.00 | -6,594.00 | -6,594.00 | -6,594.00 |
| Ending Cash | -6,642.00 | -47,397.28 | 40,755.28 | | |
| Ending Settled Cash | -6,682.00 | -47,397.28 | 40,715.28 | | |
| USD | | | | | |
| Starting Cash | 3,400,000.00 | 3,400,000.00 | 0.00 | | |
| Commissions | -1,505.69 | 0.00 | -1,505.69 | -1,505.69 | -1,505.69 |
| Account Transfers | 4,600,000.00 | 4,600,000.00 | 0.00 | 4,600,000.00 | 8,000,000.00 |
| Internal Transfers | 0.00 | -1,360,614.63 | 1,360,614.63 | 0.00 | 0.00 |
| Cash Settling MTM | 142,058.50 | 0.00 | 142,058.50 | 142,058.50 | 142,058.50 |
| Other Fees | -1,178.50 | 0.00 | -1,178.50 | -1,178.50 | -1,178.50 |
| Ending Cash | 8,139,374.31 | 6,639,385.37 | 1,499,988.94 | | |
| Ending Settled Cash | 8,262,869.61 | 6,639,385.37 | 1,623,484.24 | | |

## Open Positions

| Symbol | Quantity | Mult | Cost Price | Cost Basis | Close Price | Value | Unrealized P/L | Code |
|---|---|---|---|---|---|---|---|---|
| Futures | | | | | | | | |
| CAD | | | | | | | | |
| RSX2 | 20 | 20 | 1,090.1050 | 436,042.00 | 1,073.5000 | 429,400.00 | -6,642.00 | |
| Total | | | | 436,042.00 | | 429,400.00 | -6,642.00 | |
| Total in USD | | | | 344,726.08 | | 339,475.05 | -5,251.03 | |
| USD | | | | | | | | |
| 6AU2 | 20 | 100,000 | 0.7068372 | 1,413,674.40 | 0.7185 | 1,437,000.00 | 23,325.60 | |
| 6CU2 | 20 | 100,000 | 0.7784247 | 1,556,849.40 | 0.79045 | 1,580,900.00 | 24,050.60 | |
| 6MM2 | 40 | 500,000 | 0.04905494 | 981,098.80 | 0.05068 | 1,013,600.00 | 32,501.20 | |
| CTH3 | 12 | 50,000 | 1.1758094 | 705,485.64 | 1.1817 | 709,020.00 | 3,534.36 | |
| GCZ2 | 5 | 100 | 1,836.4242 | 918,212.10 | 1,865.0000 | 932,500.00 | 14,287.90 | |
| HEZ2 | 15 | 40,000 | 0.8508225 | 510,493.50 | 0.86775 | 520,650.00 | 10,156.50 | |
| HGU2 | 5 | 25,000 | 4.2462968 | 530,787.10 | 4.3045 | 538,062.50 | 7,275.40 | |
| HOU2 | 4 | 42,000 | 3.34275643 | 561,583.08 | 3.7780 | 634,704.00 | 73,120.92 | |
| KCH3 | 7 | 37,500 | 2.15836491 | 566,570.79 | 2.2900 | 601,125.00 | 34,554.21 | |
| KE DEC 22 | 13 | 5,000 | 11.63269938 | 756,125.46 | 11.8100 | 767,650.00 | 11,524.54 | |
| LEZ2 | 10 | 40,000 | 1.4403225 | 576,129.00 | 1.4230 | 569,200.00 | -6,929.00 | |
| NGZ2 | 7 | 10,000 | 7.288237 | 510,176.59 | 8.1840 | 572,880.00 | 62,703.41 | |
| PAU2 | 2 | 100 | 2,001.0242 | 400,204.84 | 2,006.3000 | 401,260.00 | 1,055.16 | |
| SBH3 | 30 | 112,000 | 0.19420985 | 652,545.10 | 0.1987 | 667,632.00 | 15,086.90 | |
| SIU2 | 5 | 5,000 | 21.676484 | 541,912.10 | 21.7810 | 544,525.00 | 2,612.90 | |



Confidential

CAMSHAFT0001811

## Open Positions

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| XAEM2 | 7 | 100 | 787.6215 | 551,335.05 | 906.7000 | 634,690.00 | 83,354.95 | |
| XAFM2 | 5 | 250 | 418.8086 | 523,510.75 | 435.9000 | 544,875.00 | 21,364.25 | |
| XAIM2 | 5 | 100 | 932.5215 | 466,260.75 | 951.4000 | 475,700.00 | 9,439.25 | |
| ZB SEP 22 | -20 | 1,000 | 140.90458 | -2,818,091.60 | 139.4375 | -2,788,750.00 | 29,341.60 | |
| ZC MAR 23 | 20 | 5,000 | 7.205584 | 720,558.40 | 7.1650 | 716,500.00 | -4,058.40 | |
| ZL JAN 23 | 13 | 60,000 | 0.7329179 | 571,675.96 | 0.7437 | 580,086.00 | 8,410.04 | |
| ZS MAR 23 | 8 | 5,000 | 14.513709 | 580,548.36 | 15.0775 | 603,100.00 | 22,551.64 | |
| Total | | | | 11,777,645.57 | | 12,256,909.50 | 479,263.93 | |
| Total Futures in USD | | | | 12,122,371.65 | | 12,596,384.55 | 474,012.90 | |

## Forex Balances

| Description | Quantity | Cost Price | Cost Basis in USD | Close Price | Value in USD | Unrealized P/L in USD | Code |
|---|---|---|---|---|---|---|---|
| Forex | | | | | | | |
| USD | | | | | | | |
| CAD | -6,642.00 | 0.76762288 | 5,098.55 | 0.79058 | -5,251.03 | -152.48 | |
| USD | 8,139,374.31 | 1.0000 | -8,139,374.31 | 1.0000 | 8,139,374.31 | 0.00 | |
| Total | | | -8,134,275.76 | | 8,134,123.28 | -152.48 | |

## Trades

| Symbol | Date/Time | Quantity | T. Price | C. Price | Notional Value | Comm/Fee | Basis | Realized P/L | MTM P/L | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Futures | | | | | | | | | | |
| CAD | | | | | | | | | | |
| RSX2 | 2022-05-01, 22:07:59 | 1 | 1,090.9000 | 1,064.0000 | -21,818.00 | -2.40 | 21,820.40 | 0.00 | -538.00 | O |
| RSX2 | 2022-05-02, 04:04:01 | 14 | 1,094.2000 | 1,064.0000 | -306,376.00 | -33.60 | 306,409.60 | 0.00 | -8,456.00 | O;P |
| RSX2 | 2022-05-12, 10:52:01 | 5 | 1,078.0000 | 1,087.9000 | -107,800.00 | -12.00 | 107,812.00 | 0.00 | 990.00 | O |
| Total RSX2 | | 20 | | | -435,994.00 | -48.00 | 436,042.00 | 0.00 | -8,004.00 | |
| Total | | | | | -435,994.00 | -48.00 | 436,042.00 | 0.00 | -8,004.00 | |
| Total in USD | | | | | -337,448.32 | -37.15 | 337,485.47 | 0.00 | -6,224.26 | |
| USD | | | | | | | | | | |
| 6AU2 | 2022-05-25, 08:47:52 | 15 | 0.70585 | 0.71035 | -1,058,775.00 | -37.05 | 1,058,812.05 | 0.00 | 6,750.00 | O;P |
| 6AU2 | 2022-05-25, 16:25:11 | 5 | 0.7097 | 0.71035 | -354,850.00 | -12.35 | 354,862.35 | 0.00 | 325.00 | O;P |
| Total 6AU2 | | 20 | | | -1,413,625.00 | -49.40 | 1,413,674.40 | 0.00 | 7,075.00 | |
| 6CM2 | 2022-05-02, 16:04:24 | 8 | 0.7763 | 0.7746 | -621,040.00 | -19.76 | 621,059.76 | 0.00 | -1,360.00 | O |
| 6CM2 | 2022-05-08, 20:52:03 | -8 | 0.7729 | 0.7698 | 618,320.00 | -19.76 | -621,059.76 | -2,759.52 | 2,480.00 | C |
| Total 6CM2 | | 0 | | | -2,720.00 | -39.52 | 0.00 | -2,759.52 | 1,120.00 | |
| 6CU2 | 2022-05-25, 09:40:48 | 20 | 0.7784 | 0.78035 | -1,556,800.00 | -49.40 | 1,556,849.40 | 0.00 | 3,900.00 | O;P |
| Total 6CU2 | | 20 | | | -1,556,800.00 | -49.40 | 1,556,849.40 | 0.00 | 3,900.00 | |

## Trades

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6MM2 | 2022-05-02, 09:03:17 | | 20 | 0.04864 | 0.0484 | -486,400.00 | -49.40 | 486,449.40 | 0.00 | -2,400.00 | O |
| 6MM2 | 2022-05-12, 10:43:13 | | 10 | 0.04887 | 0.0489 | -244,350.00 | -24.70 | 244,374.70 | 0.00 | 150.00 | O;P |
| 6MM2 | 2022-05-25, 08:46:16 | | 10 | 0.05005 | 0.05033 | -250,250.00 | -24.70 | 250,274.70 | 0.00 | 1,400.00 | O |
| Total 6MM2 | | | 40 | | | -981,000.00 | -98.80 | 981,098.80 | 0.00 | -850.00 | |
| CTH3 | 2022-05-02, 03:41:20 | | 10 | 1.1750 | 1.2135 | -587,500.00 | -29.70 | 587,529.70 | 0.00 | 19,250.00 | O;P |
| CTH3 | 2022-05-26, 07:51:03 | | 2 | 1.1795 | 1.1954 | -117,950.00 | -5.94 | 117,955.94 | 0.00 | 1,590.00 | O;P |
| Total CTH3 | | | 12 | | | -705,450.00 | -35.64 | 705,485.64 | 0.00 | 20,840.00 | |
| GCZ2 | 2022-05-01, 22:04:25 | | 3 | 1,914.0000 | 1,886.7000 | -574,200.00 | -7.26 | 574,207.26 | 0.00 | -8,190.00 | O;P |
| GCZ2 | 2022-05-10, 10:46:37 | | -3 | 1,872.0000 | 1,863.8000 | 561,600.00 | -7.26 | -574,207.26 | -12,614.52 | 2,460.00 | C |
| GCZ2 | 2022-05-11, 09:30:15 | | 3 | 1,871.5000 | 1,876.9000 | -561,450.00 | -7.26 | 561,457.26 | 0.00 | 1,620.00 | O;P |
| GCZ2 | 2022-05-12, 10:27:48 | | 2 | 1,861.5000 | 1,847.8000 | -372,300.00 | -4.84 | 372,304.84 | 0.00 | -2,740.00 | O |
| GCZ2 | 2022-05-13, 08:26:49 | | -5 | 1,831.7600 | 1,831.1000 | 915,880.00 | -12.10 | -933,762.10 | -17,894.20 | 330.00 | C;P |
| GCZ2 | 2022-05-16, 10:40:31 | | 5 | 1,836.4000 | 1,836.6000 | -918,200.00 | -12.10 | 918,212.10 | 0.00 | 100.00 | O;P |
| Total GCZ2 | | | 5 | | | -948,670.00 | -50.82 | 918,212.10 | -30,508.72 | -6,420.00 | |
| HEQ2 | 2022-05-02, 09:46:40 | | 7 | 1.08475 | 1.06875 | -303,730.00 | -20.30 | 303,750.30 | 0.00 | -4,480.00 | O |
| HEQ2 | 2022-05-04, 09:41:57 | | -7 | 1.05403571 | 1.06875 | 295,130.00 | -20.30 | -303,750.30 | -8,640.60 | -4,120.00 | C;P |
| Total HEQ2 | | | 0 | | | -8,600.00 | -40.60 | 0.00 | -8,640.60 | -8,600.00 | |
| HEZ2 | 2022-05-04, 09:39:42 | | 9 | 0.8350 | 0.8555 | -300,600.00 | -26.10 | 300,626.10 | 0.00 | 7,380.00 | O;P |
| HEZ2 | 2022-05-12, 10:24:53 | | 3 | 0.82925 | 0.81875 | -99,510.00 | -8.70 | 99,518.70 | 0.00 | -1,260.00 | O;P |
| HEZ2 | 2022-05-12, 11:35:25 | | 3 | 0.8245 | 0.81875 | -98,940.00 | -8.70 | 98,948.70 | 0.00 | -690.00 | O |
| HEZ2 | 2022-05-13, 10:09:50 | | -15 | 0.81221667 | 0.8215 | 487,330.00 | -43.50 | -499,093.50 | -11,807.00 | -5,570.00 | C;P |
| HEZ2 | 2022-05-17, 10:28:03 | | 4 | 0.8355 | 0.83275 | -133,680.00 | -11.60 | 133,691.60 | 0.00 | -440.00 | O |
| HEZ2 | 2022-05-17, 10:28:09 | | 11 | 0.83575 | 0.83275 | -367,730.00 | -31.90 | 367,761.90 | 0.00 | -1,320.00 | O;P |
| HEZ2 | 2022-05-18, 09:50:14 | | -15 | 0.80805 | 0.8345 | 484,830.00 | -43.50 | -501,453.50 | -16,667.00 | -15,870.00 | C;P |
| HEZ2 | 2022-05-25, 13:41:43 | | 15 | 0.85075 | 0.8520 | -510,450.00 | -43.50 | 510,493.50 | 0.00 | 750.00 | O;P |
| Total HEZ2 | | | 15 | | | -538,750.00 | -217.50 | 510,493.50 | -28,474.00 | -17,020.00 | |
| HGU2 | 2022-05-02, 15:54:47 | | 4 | 4.2905 | 4.2710 | -429,050.00 | -9.68 | 429,059.68 | 0.00 | -1,950.00 | O |
| HGU2 | 2022-05-09, 03:28:02 | | -4 | 4.1785 | 4.2015 | 417,850.00 | -9.68 | -429,059.68 | -11,219.36 | -2,300.00 | C;P |
| HGU2 | 2022-05-09, 22:48:11 | | 4 | 4.223875 | 4.1635 | -422,387.50 | -9.68 | 422,397.18 | 0.00 | -6,037.50 | O;P |
| HGU2 | 2022-05-12, 03:22:41 | | -4 | 4.0905 | 4.1060 | 409,050.00 | -9.68 | -422,397.18 | -13,356.86 | -1,550.00 | C;P |

## Trades

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HGU2 | 2022-05-17, 16:51:50 | | 3 | 4.2355 | 4.2410 | -317,662.50 | -7.26 | 317,669.76 | 0.00 | 412.50 | O |
| HGU2 | 2022-05-17, 16:58:24 | | 1 | 4.2345 | 4.2410 | -105,862.50 | -2.42 | 105,864.92 | 0.00 | 162.50 | O |
| HGU2 | 2022-05-19, 15:16:23 | | 1 | 4.2900 | 4.2840 | -107,250.00 | -2.42 | 107,252.42 | 0.00 | -150.00 | O |
| Total HGU2 | | | 5 | | | -555,312.50 | -50.82 | 530,787.10 | -24,576.22 | -11,412.50 | |
| HOQ2 | 2022-05-01, 22:13:48 | | 3 | 3.4950 | 3.6099 | -440,370.00 | -7.11 | 440,377.11 | 0.00 | 14,477.40 | O;P |
| HOQ2 | 2022-05-19, 08:54:33 | | -3 | 3.3741 | 3.5815 | 425,136.60 | -7.11 | -440,377.11 | -15,247.62 | -26,132.40 | C;P |
| Total HOQ2 | | | 0 | | | -15,233.40 | -14.22 | 0.00 | -15,247.62 | -11,655.00 | |
| HOU2 | 2022-05-19, 09:12:26 | | 4 | 3.3427 | 3.5113 | -561,573.60 | -9.48 | 561,583.08 | 0.00 | 28,324.80 | O;P |
| Total HOU2 | | | 4 | | | -561,573.60 | -9.48 | 561,583.08 | 0.00 | 28,324.80 | |
| KCH3 | 2022-05-02, 08:58:25 | | 5 | 2.1610 | 2.1455 | -405,187.50 | -14.85 | 405,202.35 | 0.00 | -2,906.25 | O |
| KCH3 | 2022-05-12, 10:42:24 | | 1 | 2.1310 | 2.1430 | -79,912.50 | -2.97 | 79,915.47 | 0.00 | 450.00 | O |
| KCH3 | 2022-05-26, 06:26:31 | | 1 | 2.1720 | 2.2475 | -81,450.00 | -2.97 | 81,452.97 | 0.00 | 2,831.25 | O |
| Total KCH3 | | | 7 | | | -566,550.00 | -20.79 | 566,570.79 | 0.00 | 375.00 | |
| KE DEC 22 | 2022-05-02, 07:48:51 | | 5 | 10.9675 | 11.0475 | -274,187.50 | -14.60 | 274,202.10 | 0.00 | 2,000.00 | O;P |
| KE DEC 22 | 2022-05-09, 09:35:17 | | 3 | 11.9650 | 11.7200 | -179,475.00 | -8.76 | 179,483.76 | 0.00 | -3,675.00 | O |
| KE DEC 22 | 2022-05-12, 10:25:22 | | 2 | 12.1000 | 12.7350 | -121,000.00 | -5.84 | 121,005.84 | 0.00 | 6,350.00 | O |
| KE DEC 22 | 2022-05-12, 10:30:16 | | 3 | 12.0950 | 12.7350 | -181,425.00 | -8.76 | 181,433.76 | 0.00 | 9,600.00 | O;P |
| Total KE DEC 22 | | | 13 | | | -756,087.50 | -37.96 | 756,125.46 | 0.00 | 14,275.00 | |
| LEZ2 | 2022-05-02, 09:34:47 | | 5 | 1.48525 | 1.5005 | -297,050.00 | -14.50 | 297,064.50 | 0.00 | 3,050.00 | O;P |
| LEZ2 | 2022-05-12, 10:29:09 | | 3 | 1.4700 | 1.45975 | -176,400.00 | -8.70 | 176,408.70 | 0.00 | -1,230.00 | O;P |
| LEZ2 | 2022-05-13, 09:39:40 | | -8 | 1.45578125 | 1.45525 | 465,850.00 | -23.20 | -473,473.20 | -7,646.40 | 170.00 | C;P |
| LEZ2 | 2022-05-17, 10:28:48 | | 10 | 1.45925 | 1.4535 | -583,700.00 | -29.00 | 583,729.00 | 0.00 | -2,300.00 | O;P |
| LEZ2 | 2022-05-18, 09:44:38 | | -10 | 1.440025 | 1.4380 | 576,010.00 | -29.00 | -583,729.00 | -7,748.00 | 810.00 | C;P |
| LEZ2 | 2022-05-25, 13:58:34 | | 10 | 1.44025 | 1.43925 | -576,100.00 | -29.00 | 576,129.00 | 0.00 | -400.00 | O;P |
| Total LEZ2 | | | 10 | | | -591,390.00 | -133.40 | 576,129.00 | -15,394.40 | 100.00 | |
| MMEM2 | 2022-05-02, 10:06:39 | | 7 | 1,054.6000 | 1,055.1000 | -369,110.00 | -14.49 | 369,124.49 | 0.00 | 175.00 | O;P |
| MMEM2 | 2022-05-05, 11:25:07 | | -7 | 1,029.2000 | 1,034.7000 | 360,220.00 | -14.49 | -369,124.49 | -8,918.98 | -1,925.00 | C;P |
| Total MMEM2 | | | 0 | | | -8,890.00 | -28.98 | 0.00 | -8,918.98 | -1,750.00 | |
| NGQ2 | 2022-05-01, 22:12:01 | | 5 | 7.5730 | 7.5660 | -378,650.00 | -11.85 | 378,661.85 | 0.00 | -350.00 | O |
| NGQ2 | 2022-05-10, 06:44:55 | | -5 | 6.8500 | 7.4460 | 342,500.00 | -11.85 | -378,661.85 | -36,173.70 | -29,800.00 | C |
| Total NGQ2 | | | 0 | | | -36,150.00 | -23.70 | 0.00 | -36,173.70 | -30,150.00 | |
| NGZ2 | 2022-05-10, 09:30:28 | | 5 | 7.0240 | 7.5710 | -351,200.00 | -11.85 | 351,211.85 | 0.00 | 27,350.00 | O;P |



Confidential

CAMSHAFT0001814

## Trades

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NGZ2 | 2022-05-12, 10:36:39 | | 2 | 7.9480 | 7.9560 | -158,960.00 | -4.74 | 158,964.74 | 0.00 | 160.00 | O |
| Total NGZ2 | | | 7 | | | -510,160.00 | -16.59 | 510,176.59 | 0.00 | 27,510.00 | |
| PAM2 | 2022-05-02, 01:46:41 | | 1 | 2,239.0000 | 2,216.0000 | -223,900.00 | -2.42 | 223,902.42 | 0.00 | -2,300.00 | O |
| PAM2 | 2022-05-06, 09:31:02 | | -1 | 2,068.0000 | 2,023.2000 | 206,800.00 | -2.42 | -223,902.42 | -17,104.84 | 4,480.00 | C |
| Total PAM2 | | | 0 | | | -17,100.00 | -4.84 | 0.00 | -17,104.84 | 2,180.00 | |
| PAU2 | 2022-05-20, 09:08:05 | | 2 | 2,001.0000 | 1,940.9000 | -400,200.00 | -4.84 | 400,204.84 | 0.00 | -12,020.00 | O |
| Total PAU2 | | | 2 | | | -400,200.00 | -4.84 | 400,204.84 | 0.00 | -12,020.00 | |
| PLV2 | 2022-05-11, 09:34:14 | | 5 | 968.7000 | 988.6000 | -242,175.00 | -12.10 | 242,187.10 | 0.00 | 4,975.00 | O |
| PLV2 | 2022-05-18, 19:47:44 | | -5 | 911.6000 | 953.5000 | 227,900.00 | -12.10 | -242,187.10 | -14,299.20 | -10,475.00 | C;P |
| Total PLV2 | | | 0 | | | -14,275.00 | -24.20 | 0.00 | -14,299.20 | -5,500.00 | |
| SBH3 | 2022-05-02, 09:04:50 | | 15 | 0.1922 | 0.1929 | -322,896.00 | -44.55 | 322,940.55 | 0.00 | 1,176.00 | O |
| SBH3 | 2022-05-12, 10:41:59 | | 5 | 0.1881 | 0.1902 | -105,336.00 | -14.85 | 105,350.85 | 0.00 | 1,176.00 | O |
| SBH3 | 2022-05-25, 08:31:14 | | 10 | 0.2002 | 0.2008 | -224,224.00 | -29.70 | 224,253.70 | 0.00 | 672.00 | O |
| Total SBH3 | | | 30 | | | -652,456.00 | -89.10 | 652,545.10 | 0.00 | 3,024.00 | |
| SIN2 | 2022-05-09, 22:47:44 | | 3 | 21.9650 | 21.4240 | -329,475.00 | -7.26 | 329,482.26 | 0.00 | -8,115.00 | O |
| SIN2 | 2022-05-10, 10:48:46 | | -3 | 21.5700 | 21.4240 | 323,550.00 | -7.26 | -329,482.26 | -5,939.52 | 2,190.00 | C |
| Total SIN2 | | | 0 | | | -5,925.00 | -14.52 | 0.00 | -5,939.52 | -5,925.00 | |
| SIU2 | 2022-05-16, 10:42:18 | | 4 | 21.5950 | 21.6400 | -431,900.00 | -9.68 | 431,909.68 | 0.00 | 900.00 | O;P |
| SIU2 | 2022-05-19, 11:32:08 | | 1 | 22.0000 | 22.0020 | -110,000.00 | -2.42 | 110,002.42 | 0.00 | 10.00 | O |
| Total SIU2 | | | 5 | | | -541,900.00 | -12.10 | 541,912.10 | 0.00 | 910.00 | |
| SIZ2 | 2022-05-01, 21:58:25 | | 3 | 22.8750 | 22.7980 | -343,125.00 | -7.26 | 343,132.26 | 0.00 | -1,155.00 | O |
| SIZ2 | 2022-05-09, 05:28:17 | | -3 | 22.3150 | 22.0890 | 334,725.00 | -7.26 | -343,132.26 | -8,414.52 | 3,390.00 | C;P |
| Total SIZ2 | | | 0 | | | -8,400.00 | -14.52 | 0.00 | -8,414.52 | 2,235.00 | |
| XAEM2 | 2022-05-02, 09:44:15 | | 5 | 784.4000 | 795.7000 | -392,200.00 | -10.75 | 392,210.75 | 0.00 | 5,650.00 | O |
| XAEM2 | 2022-05-12, 10:33:21 | | 2 | 795.6000 | 812.7000 | -159,120.00 | -4.30 | 159,124.30 | 0.00 | 3,420.00 | O |
| Total XAEM2 | | | 7 | | | -551,320.00 | -15.05 | 551,335.05 | 0.00 | 9,070.00 | |
| XAFM2 | 2022-05-02, 09:55:41 | | 3 | 425.6500 | 424.7500 | -319,237.50 | -6.45 | 319,243.95 | 0.00 | -675.00 | O;P |
| XAFM2 | 2022-05-02, 14:15:55 | | -3 | 417.3500 | 424.7500 | 313,012.50 | -6.45 | -319,243.95 | -6,237.90 | -5,550.00 | C |
| XAFM2 | 2022-05-03, 10:21:25 | | 4 | 428.2375 | 430.1000 | -428,237.50 | -8.60 | 428,246.10 | 0.00 | 1,862.50 | O;P |
| XAFM2 | 2022-05-09, 15:51:26 | | -4 | 415.2000 | 416.6500 | 415,200.00 | -8.60 | -428,246.10 | -13,054.70 | -1,450.00 | C |
| XAFM2 | 2022-05-10, 09:32:54 | | 3 | 423.0000 | 413.5000 | -317,250.00 | -6.45 | 317,256.45 | 0.00 | -7,125.00 | O |
| XAFM2 | 2022-05-10, 10:47:56 | | -3 | 412.8500 | 413.5000 | 309,637.50 | -6.45 | -317,256.45 | -7,625.40 | -487.50 | C |

## Trades

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| XAFM2 | 2022-05-13, 09:58:07 | 4 | 412.1000 | 411.9500 | -412,100.00 | -8.60 | 412,108.60 | 0.00 | -150.00 | O |
| XAFM2 | 2022-05-20, 12:44:26 | -4 | 398.3500 | 404.7000 | 398,350.00 | -8.60 | -412,108.60 | -13,767.20 | -6,350.00 | C |
| XAFM2 | 2022-05-25, 14:17:51 | 5 | 418.8000 | 420.1000 | -523,500.00 | -10.75 | 523,510.75 | 0.00 | 1,625.00 | O;P |
| Total XAFM2 | | 5 | | | -564,125.00 | -70.95 | 523,510.75 | -40,685.20 | -18,300.00 | |
| XAIM2 | 2022-05-02, 15:53:59 | 3 | 958.6000 | 958.7000 | -287,580.00 | -6.45 | 287,586.45 | 0.00 | 30.00 | O |
| XAIM2 | 2022-05-03, 10:22:01 | 1 | 961.8000 | 965.1000 | -96,180.00 | -2.15 | 96,182.15 | 0.00 | 330.00 | O |
| XAIM2 | 2022-05-12, 09:41:58 | -4 | 915.4000 | 923.5000 | 366,160.00 | -8.60 | -383,768.60 | -17,617.20 | -3,240.00 | C |
| XAIM2 | 2022-05-13, 09:47:35 | 5 | 932.5000 | 935.6000 | -466,250.00 | -10.75 | 466,260.75 | 0.00 | 1,550.00 | O |
| Total XAIM2 | | 5 | | | -483,850.00 | -27.95 | 466,260.75 | -17,617.20 | -1,330.00 | |
| ZB JUN 22 | 2022-05-01, 22:40:03 | -10 | 140.0000 | 139.09375 | 1,400,000.00 | -16.70 | -1,399,983.30 | 0.00 | 9,062.50 | O |
| ZB JUN 22 | 2022-05-12, 10:27:58 | -2 | 140.03125 | 140.9375 | 280,062.50 | -3.34 | -280,059.16 | 0.00 | -1,812.50 | O |
| ZB JUN 22 | 2022-05-25, 08:32:03 | 12 | 142.59375 | 141.84375 | -1,711,125.00 | -20.04 | 1,680,042.46 | -31,102.58 | -9,000.00 | C |
| Total ZB JUN 22 | | 0 | | | -31,062.50 | -40.08 | 0.00 | -31,102.58 | -1,750.00 | |
| ZB SEP 22 | 2022-05-25, 09:54:59 | -20 | 140.90625 | 140.8750 | 2,818,125.00 | -33.40 | -2,818,091.60 | 0.00 | 625.00 | O |
| Total ZB SEP 22 | | -20 | | | 2,818,125.00 | -33.40 | -2,818,091.60 | 0.00 | 625.00 | |
| ZC MAR 23 | 2022-05-01, 22:03:21 | 10 | 7.44275 | 7.4600 | -372,137.50 | -29.20 | 372,166.70 | 0.00 | 862.50 | O;P |
| ZC MAR 23 | 2022-05-12, 10:23:14 | 5 | 7.4275 | 7.5625 | -185,687.50 | -14.60 | 185,702.10 | 0.00 | 3,375.00 | O;P |
| ZC MAR 23 | 2022-05-25, 03:53:08 | -15 | 7.16766667 | 7.2700 | 537,575.00 | -43.80 | -557,868.80 | -20,337.60 | -7,675.00 | C;P |
| ZC MAR 23 | 2022-05-25, 11:51:28 | 20 | 7.2050 | 7.2700 | -720,500.00 | -58.40 | 720,558.40 | 0.00 | 6,500.00 | O;P |
| Total ZC MAR 23 | | 20 | | | -740,750.00 | -146.00 | 720,558.40 | -20,337.60 | 3,062.50 | |
| ZL JAN 23 | 2022-05-01, 22:10:29 | 5 | 0.7290 | 0.7226 | -218,700.00 | -14.60 | 218,714.60 | 0.00 | -1,920.00 | O;P |
| ZL JAN 23 | 2022-05-12, 10:23:13 | 5 | 0.7348 | 0.7429 | -220,440.00 | -14.60 | 220,454.60 | 0.00 | 2,430.00 | O;P |
| ZL JAN 23 | 2022-05-24, 22:33:25 | 3 | 0.7361 | 0.7364 | -132,498.00 | -8.76 | 132,506.76 | 0.00 | 54.00 | O;P |
| Total ZL JAN 23 | | 13 | | | -571,638.00 | -37.96 | 571,675.96 | 0.00 | 564.00 | |
| ZS JAN 23 | 2022-05-01, 22:04:07 | 5 | 15.0450 | 14.9300 | -376,125.00 | -14.60 | 376,139.60 | 0.00 | -2,875.00 | O;P |
| ZS JAN 23 | 2022-05-09, 09:45:45 | -5 | 14.5455 | 14.5025 | 363,637.50 | -14.60 | -376,139.60 | -12,516.70 | 1,075.00 | C;P |
| Total ZS JAN 23 | | 0 | | | -12,487.50 | -29.20 | 0.00 | -12,516.70 | -1,800.00 | |
| ZS MAR 23 | 2022-05-09, 23:12:20 | 6 | 14.5025 | 14.4775 | -435,075.00 | -17.52 | 435,092.52 | 0.00 | -750.00 | O;P |
| ZS MAR 23 | 2022-05-12, 10:38:13 | 2 | 14.5450 | 14.6825 | -145,450.00 | -5.84 | 145,455.84 | 0.00 | 1,375.00 | O;P |
| Total ZS MAR 23 | | 8 | | | -580,525.00 | -23.36 | 580,548.36 | 0.00 | 625.00 | |
| Total | | | | | -12,114,851.00 | -1,505.69 | 11,777,645.57 | -338,711.12 | -8,667.20 | |


Confidential
CAMSHAFT0001816

## Interest Accruals

| Base Currency Summary | |
|---|---|
| Starting Accrual Balance | 0.00 |
| Interest Accrued | 1,368.68 |
| Accrual Reversal | 0.00 |
| FX Translation | -0.10 |
| Ending Accrual Balance | 1,368.58 |
| CAD | |
| Starting Accrual Balance | 0.00 |
| Interest Accrued | -10.48 |
| Accrual Reversal | 0.00 |
| Ending Accrual Balance | -10.48 |
| Ending Accrual Balance in USD | -8.29 |
| USD | |
| Starting Accrual Balance | 0.00 |
| Interest Accrued | 1,376.87 |
| Accrual Reversal | 0.00 |
| Ending Accrual Balance | 1,376.87 |

## Fees

| Date | Description | Amount |
|---|---|---|
| Other Fees | | |
| USD | | |
| 2022-05-02 | c*****38:CBOT (GLOBEX) Professional for Apr 2022[1] | -123.00 |
| 2022-05-02 | c*****38:COMEX (GLOBEX) Professional for Apr 2022[1] | -123.00 |
| 2022-05-02 | C*****38:ICE FUTURES U.S. FOR APR 2022[1] | -120.75 |
| 2022-05-02 | C*****38:ICEFUTUSCANOLA FOR APR 2022[1] | -38.00 |
| 2022-05-02 | c*****38:NYMEX (GLOBEX) Professional for Apr 2022[1] | -123.00 |
| 2022-05-03 | c*****38:CBOT (GLOBEX) Professional for May 2022[1] | -123.00 |
| 2022-05-03 | c*****38:CME (GLOBEX) Professional for May 2022[1] | -123.00 |
| 2022-05-03 | c*****38:COMEX (GLOBEX) Professional for May 2022[1] | -123.00 |
| 2022-05-03 | C*****38:ICE FUTURES U.S. FOR MAY 2022[1] | -120.75 |
| 2022-05-03 | C*****38:ICEFUTUSCANOLA FOR MAY 2022[1] | -38.00 |
| 2022-05-03 | c*****38:NYMEX (GLOBEX) Professional for May 2022[1] | -123.00 |
| Total | | -1,178.50 |

Notes

1. Market data is provided by Global Financial Information Services (GmbH). Your local broker collects amounts owed for fees and tax for such data on behalf of Global Financial Information Services (GmbH). Note, you are responsible for any applicable taxes relating to the provision of these services.

## Deposits & Withdrawals

| Date | Description | Amount |
|---|---|---|
| USD | | |
| 2022-05-06 | Internal Transfer In From Account U8240608 | 350,000.00 |
| 2022-05-09 | Internal Transfer In From Account U8240608 | 250,000.00 |
| 2022-05-12 | Internal Transfer In From Account U8240608 | 4,000,000.00 |
| Total | | 4,600,000.00 |

## Financial Instrument Information

| Symbol | Description | Conid | Listing Exch | Multiplier | Expiry | Delivery Month | Code |
|---|---|---|---|---|---|---|---|
| Futures | | | | | | | |
| 6AU2 | AUD 19SEP22 | 289230167 | GLOBEX | 100,000 | 2022-09-19 | 2022-09 | |
| 6CM2 | CAD 14JUN22 | 280208698 | GLOBEX | 100,000 | 2022-06-14 | 2022-06 | |
| 6CU2 | CAD 20SEP22 | 289956656 | GLOBEX | 100,000 | 2022-09-20 | 2022-09 | |
| 6MM2 | MXP 13JUN22 | 455429130 | GLOBEX | 500,000 | 2022-06-13 | 2022-06 | |
| CTH3 | CT 16MAR23 | 415492838 | NYBOT | 50,000 | 2023-03-16 | 2023-03 | |
| GCZ2 | GC 28DEC22 | 260862601 | NYMEX | 100 | 2022-12-28 | 2022-12 | |
| HEQ2 | HE 16AUG22 | 482017187 | GLOBEX | 40,000 | 2022-08-16 | 2022-08 | |
| HEZ2 | HE 16DEC22 | 496647135 | GLOBEX | 40,000 | 2022-12-16 | 2022-12 | |
| HGU2 | HG 28SEP22 | 290701262 | NYMEX | 25,000 | 2022-09-28 | 2022-09 | |
| HOQ2 | HO AUG22 | 344035103 | NYMEX | 42,000 | 2022-07-29 | 2022-08 | |
| HOU2 | HO SEP22 | 344035107 | NYMEX | 42,000 | 2022-08-31 | 2022-09 | |
| KCH3 | KC 22MAR23 | 415492841 | NYBOT | 37,500 | 2023-03-22 | 2023-03 | |
| KE DEC 22 | KE 14DEC22 | 434140052 | ECBOT | 5,000 | 2022-12-14 | 2022-12 | |
| LEZ2 | LE 30DEC22 | 500092608 | GLOBEX | 40,000 | 2022-12-30 | 2022-12 | |
| MMEM2 | MXEF 17JUN22 | 372558097 | NYSELIFFE | 50 | 2022-06-17 | 2022-06 | |
| NGQ2 | NG AUG22 | 139214019 | NYMEX | 10,000 | 2022-07-27 | 2022-08 | |
| NGZ2 | NG DEC22 | 139213989 | NYMEX | 10,000 | 2022-11-28 | 2022-12 | |
| PAM2 | PA 28JUN22 | 479432132 | NYMEX | 100 | 2022-06-28 | 2022-06 | |
| PAU2 | PA 28SEP22 | 499640751 | NYMEX | 100 | 2022-09-28 | 2022-09 | |
| PLV2 | PL 27OCT22 | 505256601 | NYMEX | 50 | 2022-10-27 | 2022-10 | |
| RSX2 | RS 14NOV22 | 434623768 | NYBOT | 20 | 2022-11-14 | 2022-11 | |
| SBH3 | SB MAR23 | 415492855 | NYBOT | 112,000 | 2023-02-28 | 2023-03 | |
| SIN2 | SI 27JUL22 | 284354343 | NYMEX | 5,000 | 2022-07-27 | 2022-07 | |
| SIU2 | SI 28SEP22 | 452392398 | NYMEX | 5,000 | 2022-09-28 | 2022-09 | |
| SIZ2 | SI 28DEC22 | 301051116 | NYMEX | 5,000 | 2022-12-28 | 2022-12 | |
| XAEM2 | IXE 17JUN22 | 477837029 | GLOBEX | 100 | 2022-06-17 | 2022-06 | |
| XAFM2 | IXM 17JUN22 | 477837014 | GLOBEX | 250 | 2022-06-17 | 2022-06 | |
| XAIM2 | IXI 17JUN22 | 477837041 | GLOBEX | 100 | 2022-06-17 | 2022-06 | |
| ZB JUN 22 | ZB 21JUN22 | 516099534 | ECBOT | 1,000 | 2022-06-21 | 2022-06 | |
| ZB SEP 22 | ZB 21SEP22 | 534281178 | ECBOT | 1,000 | 2022-09-21 | 2022-09 | |
| ZC MAR 23 | ZC 14MAR23 | 460126199 | ECBOT | 5,000 | 2023-03-14 | 2023-03 | |
| ZL JAN 23 | ZL 13JAN23 | 460126236 | ECBOT | 60,000 | 2023-01-13 | 2023-01 | |
| ZS JAN 23 | ZS 13JAN23 | 455229208 | ECBOT | 5,000 | 2023-01-13 | 2023-01 | |
| ZS MAR 23 | ZS 14MAR23 | 455229196 | ECBOT | 5,000 | 2023-03-14 | 2023-03 | |

## Codes

| Code | Meaning | Code (Cont.) | Meaning (Cont.) |
|---|---|---|---|
| A | Assignment | LD | Adjusted by Loss Disallowed from Wash Sale |
| ADR | ADR Fee Accrual | LI | Last In, First Out (LIFO) tax basis election |
| AEx | Automatic exercise for dividend-related recommendation. | LT | Long Term P/L |
| Adj | Adjustment | Lo | Direct Loan |
| Al | Allocation | M | Entered manually by IB |
| Aw | Away Trade | MEx | Manual exercise for dividend-related recommendation. |

## Codes

| Code | Meaning | Code (Cont.) | Meaning (Cont.) |
|---|---|---|---|
| B | Automatic Buy-in | ML | Maximize Losses tax basis election |
| Bo | Direct Borrow | MLG | Maximize Long Term Gain tax basis election |
| C | Closing Trade | MLL | Maximize Long Term Loss tax basis election |
| CD | Cash Delivery | MSG | Maximize Short Term Gain tax basis election |
| CP | Complex Position | MSL | Maximize Short Term Loss tax basis election |
| Ca | Cancelled | O | Opening Trade |
| Co | Corrected Trade | P | Partial Execution |
| Cx | Part or all of this transaction was a Crossing executed as dual agent by IB for two IB customers | PI | Price Improvement |
| ETF | ETF Creation/Redemption | Po | Interest or Dividend Accrual Posting |
| Ep | Resulted from an Expired Position | Pr | Part or all of this transaction was executed by the Exchange as a Crossing by IB against an IB affiliate and is therefore classified as a Principal and not an agency trade |
| Ex | Exercise | R | Dividend Reinvestment |
| FP | IB acted as agent for the fractional share portion of this trade, which was executed by an IB affiliate as principal. | RED | Redemption to Investor |
| FPA | IB acted as agent for both the fractional share portion and the whole share portion of this trade; the fractional share portion was executed by an IB Affiliate as principal. | RP | IB acted as agent for the fractional share portion of this trade, which was executed by an IB affiliate as riskless principal. |
| G | Trade in Guaranteed Account Segment | RPA | IB acted as agent for both the fractional share portion and the whole share portion of this trade; the fractional share portion was executed by an IB Affiliate as riskless principal. |
| GEA | Exercise or Assignment resulting from offsetting positions | Re | Interest or Dividend Accrual Reversal |
| HC | Highest Cost tax basis election | Ri | Reimbursement |
| HFI | Investment Transferred to Hedge Fund | SI | This order was solicited by Interactive Brokers |
| HFR | Redemption from Hedge Fund | SL | Specific Lot tax basis election |
| I | Internal Transfer | SO | This order was marked as solicited by your Introducing Broker |
| IA | This transaction was executed against an IB affiliate | SS | Customer designated this trade for shortened settlement and so is subject to execution at prices above the prevailing market |
| INV | Investment Transfer from Investor | ST | Short Term P/L |
| IPO | This transaction was executed as part of an IPO in which IB was a member of the selling group and is classified as a Principal trade. | T | Transfer |
| L | Ordered by IB (Margin Violation) | Un | Unvested shares from stock grant |

## Notes/Legal Notes

Notes

1. Most stock exchange transactions settle on the trade date plus two business days. Options, futures and US open-end mutual fund transactions settle on trade date plus one business day. (Some exchanges and other transaction types may have longer or shorter settlement periods.) Ending settled cash reflects the cash that has actually settled.
2. Initial and maintenance margin requirements are available within the Account Window of the Trader Workstation.
3. Interactive Brokers LLC receives compensation from fund companies in connection with the purchase and holding of fund shares by customers of Interactive Brokers LLC. Such compensation includes, but is not limited to, Rule 12b-1 fees that are paid out of the funds assets. The source and amount of any remuneration received by Interactive Brokers LLC in connection with a transaction will be furnished upon written request of the customer. IB may share a portion of the compensation received from fund companies with your financial advisor or introducing broker.
4. Quantities preceded by a "-" sign indicate sell transactions. Other transactions are purchases.
5. IB acts as agent in executing the fractional share portion of your order. In certain circumstances, IB routes the fractional portion of your order to an affiliate, which may execute the fractional portion of the order as principal. In such circumstances, this is indicated by the codes associated with the trade. If an IB affiliate acts as principal in executing any fractional share portion of your order, the order will be executed at the price displayed for the opposite side of the NBBO from your order (the offer if you are buying and the bid if you are selling) at the time of execution. If an IB affiliate is acting as riskless principal in connection with filling the fractional share portion of your order, the affiliate will execute the fractional share portion of your order at the price it receives for the execution of the whole share.
6. In case of partial executions, commissions are charged on the total quantity executed on the original order. The commission is displayed on the first partial execution only.
7. Each closed lot indicated above with a reference to note (6) was chosen by the end of the trading day to be sold versus the specific opening purchase identified in that row.
8. Trade execution times are displayed in Eastern Time.
9. Applicable commodity Regulatory Fees for your transactions are available on the IB website at www.interactivebrokers.com/en/accounts/fees/exchangeAndRegulatoryFees.php.



Confidential

CAMSHAFT0001819

## Notes/Legal Notes

10. Borrow Fee Rate represents the cost to borrow stock expressed in percent per annum. It is applied to the cash collateral amount on the stock borrow contract and is separate from any interest earned on credit cash balances. Similarly, Loan Fee Rate represents the benefit to lend stock. A positive rate indicates a cost to the borrower/benefit to the lender and a negative rate indicates a benefit to the borrower/cost to the lender. In general, the fee rates for hard-to-borrow stocks are higher than for normal availability stocks.
11. Interest Rate on Customer Collateral represents the interest paid on the collateral posted to the customer's account and received from lending stock. A positive rate indicates a benefit to the lender.
12. The closing prices on this Activity Statement are indicative and may come from third-party sources. Interactive Brokers does not warrant the accuracy of the prices provided by third-party sources. Due to time zone differences, certain non-US mutual funds may deliver closing prices after the Activity Statement has been produced and the closing prices for such funds will reflect the previous day's price.
13. All Market Data and Research services are provided through Global Financial Information Services (GmbH).
14. Market data is provided by Global Financial Information Services (GmbH). Your local broker collects amounts owed for fees and tax for such data on behalf of Global Financial Information Services (GmbH). Note, you are responsible for any applicable taxes relating to the provision of these services.

Fixed Income Notes

1. Call features for bonds or preferred stocks may affect the yield. For zero coupon, compound interest and multiplier securities, there are no periodic payments and securities may be callable below maturity value without notice to holder unless registered. For asset-backed securities, the actual yield may vary depending on the speed at which the underlying note is pre-paid. For additional information regarding bond yield, please contact the IB Help Desk at: help@interactivebrokers.com. If this debt security is unrated by a nationally recognized statistical rating organization, it may pose a high risk of default. You should consult a financial advisor to determine whether unrated bonds are appropriate for your portfolio in light of your goals and your financial circumstances. Fees charged by bond trading centers are included in the cost of bond transactions.

Legal Notes

1. Please promptly report any inaccuracy or discrepancy in this statement, or in your account. Contact the IB Customer Service Department in writing using the form available on the IB website. You may also contact IB by phone, but if you report an error by phone, you should re-confirm such oral communication in writing in order to protect your rights, including rights under the Securities Investor Protection Act (SIPA).

   Interactive Brokers LLC, www.interactivebrokers.com, 877-442-2757 (U.S.)

   Interactive Brokers (UK) (Ltd), www.interactivebrokers.co.uk, 00800-42-276537 (Intl)

   Interactive Brokers Canada Inc., www.interactivebrokers.ca, 877-745-4222 (Can.)

2. Unless otherwise noted, Interactive Brokers acted as agent in the execution of the above transactions. For those exchanges where IB is not a direct clearing member or custodian, IB may use one of the following clearing agents or sub-custodians: Interactive Brokers Australia Pty Limited; Interactive Brokers Canada Inc.; Interactive Brokers Hong Kong Limited; Interactive Brokers Securities Japan, Inc.; Interactive Brokers (U.K.) Limited; IBKR Financial Services AG; ABN Amro Clearing Singapore Pte. Ltd.; BBVA Bancomer, S.A.; BNP Securities Services, Milan Branch; BMO Harris Bank N.A.; Citibank Europe plc; Euroclear Bank S.A./N.V.; Skandinaviska Enskilda Banken AB (including select branches).
3. IB acts as agent or riskless principal in foreign currency exchange transactions and as riskless principal in spot precious metals transactions. Such transactions are executed against an IB affiliate or a third party, which acts as principal in such transactions and may have a long or short position and may have profited or lost in connection with the transaction. Foreign currency exchange and spot precious metals transactions executed by Customer through IB are not regulated or overseen by the SEC or the CFTC.
4. Trades marked with the exchange indicator of TMBR were effected by IB as agent through a market making affiliate, which acted as principal in the transaction and may have a long or short position in the security and may have profited or lost in connection with the transaction.
5. All VWAP trades are effected pursuant to an average price formula based on a reference price provided by a third-party data provider. Additional information and reference prices are available upon request. IB, as agent, effects VWAP transactions through a market making affiliate, which acts as principal in such transactions and may have a long or short position in the security and may have profited or lost in connection with the transaction.
6. IB accepts liquidity rebates or other order flow payments from Alternative Trading Systems, market makers and exchanges for certain orders in stocks. IB receives payment for some option orders pursuant to exchange-mandated marketing fee programs or other arrangements. The source and nature of any compensation received by IB in connection with any transaction is available upon written request of the customer. For further information, check the IB website and the Order Routing and Payment for Order Flow Disclosure provided when you opened your account and annually or email help@interactivebrokers.com.
7. For security futures trades, if not already indicated on this statement, information about the time of any transaction, the identity of the counterparty to the transaction, and whether IB is acting as agent or principal, as agent for the counterparty, as agent for both parties to the contract, or as principal, and if acting as principal, whether the transaction was a block transaction or an exchange for physicals transaction, will be available upon written request of the customer.
8. Customer is requested to promptly advise Interactive Brokers of any material change in Customer's investment objectives or financial situation.
9. A financial statement of Interactive Brokers LLC is available for your personal inspection at www.interactivebrokers.com or at its offices, or a copy of it will be mailed upon your written request.
10. For trades executed on either the Australian Stock Exchange Ltd ("ASX") or Chi-X Australia Pty Ltd ("Chi-X"), this confirmation is issued subject to: (i) the directions, decisions and requirements of the Market Operator, the relevant Market Integrity Rules, the relevant Market Operating Rules, the Clearing Rules and where relevant, the Settlement Rules; (ii) the customs and usages of the relevant Market; and (iii) the correction of errors and omissions. Interactive Brokers LLC (ARBN: 091191141, AFSL: 245574, Participant on Chi-X Australia)("IB") is not a participant on the ASX, and will route orders to the ASX through its affiliate, Timber Hill Australia Pty Ltd (ABN 25079993534, AFSL: 244380, Participant on the ASX)("THA") who executes such orders. Your ASX and Chi-x Australia trades will be cleared through ABN Amro Clearing Sydney Pty Ltd, an ACH participant. If your transaction was a crossing transaction, IB may have either acted on behalf of (i) both the buyer and seller of this transaction, or (ii) on behalf of the buyer or seller on one side of the transaction and act as Principal on the other side. Under the Corporations Act 2001, where IB enters into an exchange traded derivatives on a customer's behalf, IB is regarded as having issued the derivative to the customer.
11. For All Options Trades Executed on the Stock Exchange of Hong Kong ("SEHK"): (a) Options can involve a high degree of risk and may not be suitable for every investor. Investors should ensure they understand those risks before participating in the options market. (b) All options contracts executed on the SEHK were executed by Timber Hill Securities Hong Kong on behalf of Interactive Brokers LLC. (c) In the event of a default committed by Interactive Brokers LLC resulting in the client suffering any pecuniary loss, the client shall have a right to claim under the Investor Compensation Fund established under the Hong Kong Securities and Futures Ordinance, subject to the terms of the Investor Compensation Fund from time to time. (d) All Exchange Traded Options Business made for or on behalf of a client shall be subject to the relevant provisions of the constitution, Rules of The Stock Exchange of Hong Kong Limited ("SEHK Rules"), regulations, the Articles, customs and usages of SEHK, the Options Trading Rules, the Clearing Rules of SEOCH, the CCASS Rules and the laws of Hong Kong, which shall be binding on both Interactive Brokers LLC and the client.
12. Deposits held away from Interactive Brokers LLC may not qualify under SIPC protection. Also, futures and options on futures are not covered by SIPC.

SIPC Member

# Exhibit 42

usbank

P.O. Box 1800
Saint Paul, Minnesota 55101-0800
3030 IMG S Y ST01

Private Wealth Management
Business Statement
Account Number:
1 575 2370 9457
Statement Period:
May 2, 2022
through
May 31, 2022

DTTDTDDAADTATFATTAFTTAFDDTATDFTTDTADDADDFDTADADTTAFDDTDTDDFDTFFAT



000275338 01 SP 000638205152649 E
CAMSHAFT CAPITAL MANAGEMENT LLC
950 BRICKELL BAY DR APT 5107
MIAMFL 33131-3964

Contact a Private Wealth Management Client Services Representative at 888.265.7962, Monday through Saturday 6:00 a.m. - 8:00 p.m. Central Time and Sunday 8:00 a.m. - 8:00 p.m. Central Time, for questions about your account(s). Visit privatewealth.usbank.com to view your statement online.

U.S. BANK SILVER - BUSINESS CHECKING — Member FDIC
U.S. Bank National Association — Account Number 1-575-2370-9457

Account Summary

| | # Items | | |
|---|---|---|---|
| Beginning Balance on May 2 | | $ | 51.00 |
| Other Deposits | 4 | | 9,070,975.00 |
| Other Withdrawals | 9 | | 7,169,458.36- |
| Ending Balance on May 31, 2022 | | $ | 1,901,567.64 |

Number of Days in Statement Period 31

Other Deposits

| Date | Description of Transaction | | Ref Number | | Amount |
|---|---|---|---|---|---|
| May 9 | Branch Telephone Transfer | From Account 157523686176 | | $ | 30,000.00 |
| May 10 | Branch Telephone Transfer | From Account 157523686176 | | | 9,000,000.00 |
| May 18 | Mobile Banking Transfer | From Account 157523686176 | | | 31,375.00 |
| May 24 | Wire Credit REF000654<br>ORG=RICHARD A WEINTRAUB | ZIONS BANCORP, NA 220524041417<br>PC 10085 CARROLL CANYON | | | 9,600.00 |
| | | | Total Other Deposits | $ | 9,070,975.00 |

Other Withdrawals

| Date | Description of Transaction | | Ref Number | | Amount |
|---|---|---|---|---|---|
| May 10 | Zelle Instant<br>On 05/10/22 | PMT To JIMMY MIAMI LIFE<br>PMT ID=USBzy9d9KSTH | | $ | 5,000.00- |
| May 10 | Mobile Banking Transfer | To Account 157504967702 | | | 30,000.00- |
| May 10 | Wire Debit REF003935<br>BNF=BENCHMARK | AMERIS BK MOULTRIE 220510038590<br>INVESTMENTS C/O EF HUTTON 1871 | | | 5,865,333.36- |
| May 11 | Wire Debit REF003911<br>BNF=MARGARET PHILEN | BK AMER NYC 220511041663 | | | 8,000.00- |
| May 11 | Wire Debit REF003015<br>BNF=INCEPTIV LAW, INC. | WELLS SF 220511032315 | | | 38,000.00- |
| May 16 | Zelle Instant<br>On 05/15/22 | PMT To JIMMY MIAMI LIFE<br>PMT ID=USBr5io9MhjH | | | 5,000.00- |
| May 18 | Mobile Banking Transfer | To Account 157523686176 | | | 31,375.00- |
| May 18 | Mobile Banking Transfer | To Account 157523709440 | | | 31,750.00- |
| May 23 | Wire Debit REF003169<br>BNF=COASTAL EQUITIES, | FIFTH CINCINNATI 220523034042<br>INC. | | | 1,155,000.00- |
| | | | Total Other Withdrawals | $ | 7,169,458.36- |

Balance Summary

| Date | Ending Balance | Date | Ending Balance | Date | Ending Balance |
|---|---|---|---|---|---|
| May 9 | 30,051.00 | May 16 | 3,078,717.64 | May 23 | 1,891,967.64 |
| May 10 | 3,129,717.64 | May 18 | 3,046,967.64 | May 24 | 1,901,567.64 |
| May 11 | 3,083,717.64 | | | | |

Balances only appear for days reflecting change.

ANALYSIS SERVICE CHARGE DETAIL
Account Analysis Activity for: April 2022

usbank

BALANCE YOUR ACCOUNT
To keep track of all your transactions, you should balance your account every month. Please examine this statement immediately. We will assume that the balance and transactions show correct unless you notify us of an error.

Outstanding Deposits

| DATE | AMOUNT |
|---|---|
| | |
| | |
| | |
| TOTAL | $ |

Outstanding Withdrawals

| DATE | AMOUNT |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL | $ |

1. List any deposits that do not appear on your statement in the Outstanding Deposits sectio the left. Record the total.
2. Check off in your checkbook register all checks, withdrawals (including Debit Card and AT and automatic payments that appear on your statement. Withdrawals that are NOT chec should be recorded in the Outstanding Withdrawals section at the left. Record the total.
3. Enter the ending balance shown on this statement. $____________
4. Enter the total deposits recorded in the Outstanding Deposits section. $____________
5. Total lines 3 and 4. $____________
6. Enter the total withdrawals recorded in the Outstanding Withdrawals section. $____________
7. Subtract line 6 from line 5. This is your balance. $____________
8. Enter in your register and subtract from your register balance any checks, withdrawals or debits (including fees, if any) that appear on your statement but have not been recorded register.
9. Enter in your register and add to your register balance any deposits or other credits (inclu interest, if any) that appear in your statement but have not been recorded in your registe
10. The balance in your register should be the same as the balance shown in #7. If it does no match, review and check all figures used, and check the addition and subtraction in your r If necessary, review and balance your statement from the previous month.

IMPORTANT DISCLOSURES TO OUR CONSUMER CUSTOMERS
In Case of Errors or Questions About Your Checking, Savings, ATM, Debit Card, ACH, Bill Pay and Other Electronic Transfers
If you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt, we must hear from yo the FIRST statement on which the error or problem appeared. Telephone us at the number listed on the front of this statement or write to us at U.S Ave., St. Paul, MN 55107.
· Tell us your name and account number.
· Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more
· Tell us the dollar amount of the suspected error.
We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more investigate your complaint. For errors involving new accounts, point-of-sale, or foreign-initiated transactions, we may take up to 90 days to investig we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.
*Please note: Paper draft and paper check claims must be disputed within 30 days per Your Deposit Account Agreement.

IMPORTANT DISCLOSURES TO OUR BUSINESS CUSTOMERS
Errors related to any transaction on a business account will be governed by any agreement between us and/or all applicable rules and regulations g rules of the National Automated Clearing House Association (NACHA Rules) as may be amended from time to time. If you think this statement is w listed on the front of this statement immediately.

CONSUMER BILLING RIGHTS SUMMARY REGARDING YOUR RESERVE LINE
What To Do If You Think You Find A Mistake on Your Statement
If you think there is an error on your statement, write to us at:
U.S. Bank, P.O. Box 3528, Oshkosh, WI 54903-3528.
In your letter, give us the following information:
· Account information: Your name and account number.
· Dollar Amount: The dollar amount of the suspected error.
· Description of problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.
You must contact us within 60 days after the error appeared on your statement.
You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to p
While we investigate whether or not there has been an error, the following are true:
· We cannot try to collect the amount in question, or report you as delinquent on that amount.
· The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we pay the amount in question or any interest or other fees related to that amount.
· While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
· We can apply any unpaid amount against your credit limit.

Reserve Line Balance Computation Method: To determine your Balance Subject to Interest Rate, use the dates and balances provided in the Reserve Line Balance Sur The date next to the first Balance Subject to Interest is day one for that balance and is applicable up to (but not including) the date of the next balar Balance Subject to Interest by the number of days it is applicable and add them up to get the same number of days in the billing cycle. We then divi days in the cycle. This is your Balance Subject to Interest Rate. Any unpaid interest charges and unpaid fees are not included in the Balance Subject to Interest. CHARGE*** begins from the date of each advance.

REPORTS TO AND FROM CREDIT BUREAUS FOR RESERVE LINES
We may report information about your account to credit bureaus. Late payments, missed payments or other defaults on your account may be refle

CONSUMER REPORT DISPUTES
We may report information about account activity on consumer and small business deposit accounts and consumer reserve lines to Consumer Repo may prevent you from obtaining services at other financial institutions. If you believe we have inaccurately reported information to a CRA, you may or by writing to: U.S. Bank Attn: Consumer Bureau Dispute Handling (CBDH), P.O. Box 3447, Oshkosh, WI 54903-3447. In order for us to assist you w your name, address and phone number; the account number; the specific information you are disputing; the explanation of why it is incorrect; and affidavit of identity theft), if applicable.

EQUAL HOUSING LENDER

Member FDIC

CAMSHAFT CAPITAL MANAGEMENT LLC
950 BRICKELL BAY DR APT 5107
MIAMFL 33131-3964

Private Wealth Management
Business Statement
Account Number:
1 575 2370 9457
Statement Period:
May 2, 2022
through
May 31, 2022



ANALYSIS SERVICE CHARGE DETAIL (CONTINUED)

| | | | |
|---|---|---|---|
| Account Number: | 1-575-2370-9457 | $ | 0.00 |
| Analysis Service Charge assessed to | 1-575-2370-9457 | $ | 0.00 |

1Financial institutions are required by the State of Iowa to charge sales taxes on certain service charges related to checking accounts. Any assess has been itemized on your statement.

This page intentionally left blank

# Exhibit 43

JPMorgan Chase Bank, N.A.
P O Box 6076
Newark, DE 19714 - 6076

Primary Account: 000000741806811
For the Period 7/6/22 to 7/29/22

00003215 DPB 021 162 21122 NNNNNNNNNNN T 1 000000000 D1 0000
CAMSHAFT CAPITAL MANAGEMENT, LLC
950 BRICKELL BAY DR APT 5107
MIAMI FL 33131-3964

## J.P. Morgan Team

| | |
|---|---|
| Craig Williams | (800) 634-3763 |
| Addie P Pongpinsir | |
| For assistance after business hours, 7 days a week | (800) 576-6209 |
| Deaf and Hard of Hearing | (800) 242-7383 |
| Online access: **www.jpmorganonline.com** | |

# Commercial Checking

| Checking Account Summary | Instances | Amount |
|---|---|---|
| Beginning Balance | | 0.00 |
| Deposits & Credits | 2 | 3,092,350.00 |
| Payments & Transfers | 2 | (1,230,625.00) |
| **Ending Balance** | **4** | **$1,861,725.00** |

J.P. Morgan

000000741806811
CAMSHAFT CAPITAL MANAGEMENT, LLC

Primary Account: 000000741806811
For the Period 7/6/22 to 7/29/22

## Deposits & Credits

| Date | Description | Amount |
|---|---|---|
| 07/15 | Online Transfer From Chk 6894 Transaction#: 14815002685 | 1,667,500.00 |
| 07/15 | Online Transfer From Chk 6894 Transaction#: 1481829150 | 1,424,850.00 |
| Total Deposits & Credits | | $3,092,350.00 |

## Payments & Transfers

| Date | Description | Amount |
|---|---|---|
| 07/15 | 07/15 Chips Debit Via: Bank of America, N.A./0959 A/C: Harrymax Consultants LLC West Palm Beach FL 33401 Ssn: 0480536 Trn: 1297800196Es | 583,625.00 |
| 07/15 | 07/15 Fedwire Debit Via: Ameris Bank/061201754 A/C: Benchmark Investments C O Ef Hutton1871 Imad: 0715B1Qgc03C006869 Trn: 1297900196Fs | 647,000.00 |
| Total Payments & Transfers | | ($1,230,625.00) |

## Daily Ending Balance

| Date | Amount |
|---|---|
| 07/15 | 1,861,725.00 |

*Your service charges, fees and earnings credit have been calculated through account analysis.*

Primary Account: 000000741806811
For the Period 7/6/22 to 7/29/22

# Important Information About Your Statement

## In Case of Errors or Questions About Your Electronic Funds Transfers

Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-consumers, use your J.P. Morgan Team contact information) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:

- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

## In Case of Errors or Questions About Non-Electronic Transactions:

Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC.

Bank products and services are offered by JPMorgan Chase Bank, N.A. and its affiliates. Securities are offered by J.P. Morgan Securities LLC, member FINRA and SIPC.

1018215020200000062

Investment Products: Not FDIC insured • No bank guarantee • May lose value

Primary Account: 000000741806811

For the Period 7/6/22 to 7/29/22

This Page Intentionally Left Blank

# Exhibit 44

InteractiveBrokers

# Activity Summary

September 1, 2022 - September 30, 2022

Help

## Account Summary

| Account | Account Alias | Name | Prior NAV | Current NAV | TWR |
|---|---|---|---|---|---|
| USD | | | | | |
| U8240608 | | Camshaft Capital Fund LP | 3,286,902.98 | 11,714,412.52 | -0.87% |
| U9415436 | | Camshaft Capital Fund LP | 11,341,412.61 | 10,827,129.75 | -4.53% |
| Total | | | 14,628,315.59 | 22,541,542.27 | |

InteractiveBrokers

# Activity Statement

September 1, 2022 - September 30, 2022

Help

Interactive Brokers LLC, Two Pickwick Plaza, Greenwich, CT 06830

## Account Information

| | |
|---|---|
| Name | Camshaft Capital Fund LP |
| Account | U8240608 |
| Master Name | Camshaft Capital Advisors LLC |
| Account Type | Institution Master |
| Customer Type | Partnership |
| Account Capabilities | Portfolio Margin |
| Base Currency | USD |

## Net Asset Value

| | August 31, 2022 | September 30, 2022 | | | |
|---|---|---|---|---|---|
| | Total | Long | Short | Total | Change |
| Cash | 3,282,267.69 | 11,709,842.46 | -38.73 | 11,709,803.73 | 8,427,536.03 |
| Interest Accruals | 4,635.28 | 20,784.27 | -16,175.48 | 4,608.79 | -26.49 |
| Total | 3,286,902.98 | 11,730,626.72 | -16,214.20 | 11,714,412.52 | 8,427,509.54 |

| | |
|---|---|
| Time Weighted Rate of Return | -0.87% |

| Change in NAV | Total |
|---|---|
| Starting Value | 3,286,902.98 |
| Mark-to-Market | -76,740.44 |
| Deposits & Withdrawals | 8,500,000.00 |
| Interest | 4,778.97 |
| Change in Interest Accruals | -26.50 |
| Other Fees | -264.50 |
| Commissions | -238.00 |
| Other FX Translations | 0.00 |
| Ending Value | 11,714,412.52 |

## Mark-to-Market Performance Summary

| | Quantity | | Price | | Mark-to-Market P/L | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Symbol | Prior | Current | Prior | Current | Position | Transaction | Commissions | Other | Total | Code |
| Futures | | | | | | | | | | |
| VXV2 | 0 | -75 | -- | 31.5160 | -43,927.50 | -14,772.50 | -178.50 | 0.00 | -58,878.50 | |
| VXX2 | 0 | -25 | -- | 31.0717 | 0.00 | -18,042.50 | -59.50 | 0.00 | -18,102.00 | |
| Total Futures | | | | | -43,927.50 | -32,815.00 | -238.00 | 0.00 | -76,980.50 | |
| Forex | | | | | | | | | | |
| CAD | -53.38 | -53.56 | 0.76155 | 0.72306 | 2.06 | 0.00 | 0.00 | 0.00 | 2.06 | |
| USD | 3,282,308.35 | 11,709,842.46 | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Total Forex | | | | | 2.06 | 0.00 | 0.00 | 0.00 | 2.06 | |

## Mark-to-Market Performance Summary

| Symbol | Quantity Prior | Quantity Current | Price Prior | Price Current | Mark-to-Market P/L Position | Mark-to-Market P/L Transaction | Mark-to-Market P/L Commissions | Mark-to-Market P/L Other | Mark-to-Market P/L Total | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Total (All Assets) | | | | | -43,925.44 | -32,815.00 | -238.00 | 0.00 | -76,978.44 | |
| Broker Interest Paid and Received | | | | | | | | | 4,778.97 | |
| Other Fees | | | | | | | | | -264.50 | |
| Total P/L for Statement Period | | | | | | | | | -72,463.97 | |

## Realized & Unrealized Performance Summary

| Symbol | Cost Adj. | Realized S/T Profit | Realized S/T Loss | Realized L/T Profit | Realized L/T Loss | Realized Total | Unrealized S/T Profit | Unrealized S/T Loss | Unrealized L/T Profit | Unrealized L/T Loss | Unrealized Total | Total | Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Futures | | | | | | | | | | | | | |
| VXV2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -58,878.50 | 0.00 | 0.00 | -58,878.50 | -58,878.50 | |
| VXX2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -18,102.00 | 0.00 | 0.00 | -18,102.00 | -18,102.00 | |
| Total Futures | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -76,980.50 | 0.00 | 0.00 | -76,980.50 | -76,980.50 | |
| Forex | | | | | | | | | | | | | |
| CAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.74 | 0.00 | 0.00 | 0.00 | 3.74 | 3.74 | |
| Total Forex | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.74 | 0.00 | 0.00 | 0.00 | 3.74 | 3.74 | |
| Total (All Assets) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.74 | -76,980.50 | 0.00 | 0.00 | -76,976.76 | -76,976.76 | |

Notes

1. This statement uses wash sales P/L for realized and unrealized P/L calculations.

## Month & Year to Date Performance Summary

| Symbol | Description | Mark-to-Market MTD | Mark-to-Market YTD | Realized S/T MTD | Realized S/T YTD | Realized L/T MTD | Realized L/T YTD |
|---|---|---|---|---|---|---|---|
| Stocks | | | | | | | |
| LULU | LULULEMON ATHLETICA INC | 0.00 | 3,461.49 | 0.00 | 3,461.49 | 0.00 | 0.00 |
| Total Stocks | | 0.00 | 3,461.49 | 0.00 | 3,461.49 | 0.00 | 0.00 |
| Equity and Index Options | | | | | | | |
| VIX 220518C00050000 | VIX 18MAY22 50.0 C | 0.00 | 3,202.54 | 0.00 | 3,202.54 | 0.00 | 0.00 |
| VIX 220615C00029000 | VIX 15JUN22 29 C | 0.00 | -2,877.51 | 0.00 | -2,877.51 | 0.00 | 0.00 |
| VIX 220615C00037500 | VIX 15JUN22 37.5 C | 0.00 | 38,118.48 | 0.00 | 38,118.48 | 0.00 | 0.00 |
| VIX 220720C00028000 | VIX 20JUL22 28 C | 0.00 | -71,429.81 | 0.00 | -71,429.81 | 0.00 | 0.00 |
| VIX 220720C00040000 | VIX 20JUL22 40 C | 0.00 | 66,262.88 | 0.00 | 66,262.88 | 0.00 | 0.00 |
| Total Equity and Index Options | | 0.00 | 33,276.59 | 0.00 | 33,276.59 | 0.00 | 0.00 |
| Futures | | | | | | | |
| NQM2 | NQ 17JUN22 | 0.00 | 19,910.70 | 0.00 | 19,910.70 | 0.00 | 0.00 |
| RTYM2 | RTY 17JUN22 | 0.00 | 3,436.40 | 0.00 | 3,436.40 | 0.00 | 0.00 |
| VXM2 | VIX 15JUN22 | 0.00 | 29,802.40 | 0.00 | 29,802.40 | 0.00 | 0.00 |
| VXN2 | VIX 20JUL22 | 0.00 | 24,052.40 | 0.00 | 24,052.40 | 0.00 | 0.00 |
| VXV2 | VIX 19OCT22 | -58,878.50 | -58,878.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| VXX2 | VIX 16NOV22 | -18,102.00 | -18,102.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ZB JUN 22 | ZB 21JUN22 | 0.00 | 8,708.73 | 0.00 | 8,708.73 | 0.00 | 0.00 |
| Total Futures | | -76,980.50 | 8,930.13 | 0.00 | 85,910.63 | 0.00 | 0.00 |



Confidential

CAMSHAFT0001947

## Month & Year to Date Performance Summary

| Symbol | Description | Mark-to-Market MTD | Mark-to-Market YTD | Realized S/T MTD | Realized S/T YTD | Realized L/T MTD | Realized L/T YTD |
|---|---|---|---|---|---|---|---|
| Total (All Assets) | | -76,980.50 | 45,668.22 | 0.00 | 122,648.72 | 0.00 | 0.00 |

## Cash Report

| | Total | Securities | Futures | Month to Date | Year to Date |
|---|---|---|---|---|---|
| Base Currency Summary | | | | | |
| Cash Detail | | | | | |
| Starting Cash | 3,282,267.69 | 2,826,492.18 | 455,775.51 | | |
| Commissions | -238.00 | 0.00 | -238.00 | -238.00 | -2,062.28 |
| Deposits | 8,500,000.00 | 8,500,000.00 | 0.00 | 8,500,000.00 | 23,600,000.00 |
| Account Transfers | 0.00 | 0.00 | 0.00 | 0.00 | -11,950,000.00 |
| Internal Transfers | 0.00 | -1,084,627.84 | 1,084,627.84 | 0.00 | 0.00 |
| Broker Interest Paid and Received | 4,778.97 | 4,778.97 | 0.00 | 4,778.97 | 15,454.27 |
| Cash Settling MTM | -76,742.50 | 0.00 | -76,742.50 | -76,742.50 | 12,286.25 |
| Trades (Sales) | 0.00 | 0.00 | 0.00 | 0.00 | 297,696.25 |
| Trades (Purchase) | 0.00 | 0.00 | 0.00 | 0.00 | -262,252.00 |
| Other Fees | -264.50 | -264.50 | 0.00 | -264.50 | -1,322.50 |
| Cash FX Translation Gain/Loss | 2.06 | 2.06 | 0.00 | | |
| Ending Cash | 11,709,803.73 | 10,246,380.88 | 1,463,422.85 | | |
| Ending Settled Cash | 11,770,636.23 | 10,246,380.88 | 1,524,255.35 | | |
| CAD | | | | | |
| Cash Detail | | | | | |
| Starting Cash | -53.38 | -53.38 | 0.00 | | |
| Broker Interest Paid and Received | -0.18 | -0.18 | 0.00 | -0.18 | -53.56 |
| Ending Cash | -53.56 | -53.56 | 0.00 | | |
| Ending Settled Cash | -53.56 | -53.56 | 0.00 | | |
| USD | | | | | |
| Cash Detail | | | | | |
| Starting Cash | 3,282,308.35 | 2,826,532.84 | 455,775.51 | | |
| Commissions | -238.00 | 0.00 | -238.00 | -238.00 | -2,062.28 |
| Deposits | 8,500,000.00 | 8,500,000.00 | 0.00 | 8,500,000.00 | 23,600,000.00 |
| Account Transfers | 0.00 | 0.00 | 0.00 | 0.00 | -11,950,000.00 |
| Internal Transfers | 0.00 | -1,084,627.84 | 1,084,627.84 | 0.00 | 0.00 |
| Broker Interest Paid and Received | 4,779.11 | 4,779.11 | 0.00 | 4,779.11 | 15,496.74 |
| Cash Settling MTM | -76,742.50 | 0.00 | -76,742.50 | -76,742.50 | 12,286.25 |
| Trades (Sales) | 0.00 | 0.00 | 0.00 | 0.00 | 297,696.25 |
| Trades (Purchase) | 0.00 | 0.00 | 0.00 | 0.00 | -262,252.00 |
| Other Fees | -264.50 | -264.50 | 0.00 | -264.50 | -1,322.50 |
| Ending Cash | 11,709,842.46 | 10,246,419.61 | 1,463,422.85 | | |
| Ending Settled Cash | 11,770,674.96 | 10,246,419.61 | 1,524,255.35 | | |

## Open Positions

| Symbol | Quantity | Mult | Cost Price | Cost Basis | Close Price | Value | Unrealized P/L | Code |
|---|---|---|---|---|---|---|---|---|
| Futures | | | | | | | | |
| USD | | | | | | | | |
| VXV2 | -75 | 1,000 | 30.73095333 | -2,304,821.50 | 31.5160 | -2,363,700.00 | -58,878.50 | |
| VXX2 | -25 | 1,000 | 30.34762 | -758,690.50 | 31.0717 | -776,792.50 | -18,102.00 | |
| Total | | | | -3,063,512.00 | | -3,140,492.50 | -76,980.50 | |

## Forex Balances

| Description | Quantity | Cost Price | Cost Basis in USD | Close Price | Value in USD | Unrealized P/L in USD | Code |
|---|---|---|---|---|---|---|---|
| Forex | | | | | | | |
| USD | | | | | | | |
| CAD | -53.56 | 0.79285835 | 42.47 | 0.72306 | -38.73 | 3.74 | |
| USD | 11,709,842.46 | 1.0000 | -11,709,842.46 | 1.0000 | 11,709,842.46 | 0.00 | |
| Total | | | -11,709,799.99 | | 11,709,803.73 | 3.74 | |

## Trades

| Symbol | Date/Time | Quantity | T. Price | C. Price | Notional Value | Comm/Fee | Basis | Realized P/L | MTM P/L | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Futures | | | | | | | | | | |
| USD | | | | | | | | | | |
| VXV2 | 2022-09-27, 15:50:38 | -25 | 31.3500 | 31.3830 | 783,750.00 | -59.50 | -783,690.50 | 0.00 | -825.00 | O;P |
| VXV2 | 2022-09-28, 16:58:17 | -25 | 29.9000 | 29.8919 | 747,500.00 | -59.50 | -747,440.50 | 0.00 | 202.50 | O |
| VXV2 | 2022-09-29, 18:39:31 | -25 | 30.9500 | 31.5160 | 773,750.00 | -59.50 | -773,690.50 | 0.00 | -14,150.00 | O;P |
| Total VXV2 | | -75 | | | 2,305,000.00 | -178.50 | -2,304,821.50 | 0.00 | -14,772.50 | |
| VXX2 | 2022-09-29, 18:46:02 | -25 | 30.3500 | 31.0717 | 758,750.00 | -59.50 | -758,690.50 | 0.00 | -18,042.50 | O;P |
| Total VXX2 | | -25 | | | 758,750.00 | -59.50 | -758,690.50 | 0.00 | -18,042.50 | |
| Total | | | | | 3,063,750.00 | -238.00 | -3,063,512.00 | 0.00 | -32,815.00 | |



Confidential

CAMSHAFT0001949

## Interest Accruals

| Base Currency Summary | |
|---|---|
| Starting Accrual Balance | 4,635.28 |
| Interest Accrued | 4,752.47 |
| Accrual Reversal | -4,778.97 |
| FX Translation | 0.00 |
| Ending Accrual Balance | 4,608.79 |
| CAD | |
| Starting Accrual Balance | -0.18 |
| Interest Accrued | -0.26 |
| Accrual Reversal | 0.18 |
| Ending Accrual Balance | -0.26 |
| Ending Accrual Balance in USD | -0.19 |
| USD | |
| Starting Accrual Balance | 4,635.42 |
| Interest Accrued | 4,752.67 |
| Accrual Reversal | -4,779.11 |
| Ending Accrual Balance | 4,608.98 |

## Interest

| Date | Description | Amount |
|---|---|---|
| CAD | | |
| 2022-09-06 | CAD Debit Interest for Aug-2022 | -83.70 |
| 2022-09-06 | CAD Debit Interest for Aug-2022 to U9415436 | 83.52 |
| Total | | -0.18 |
| Total in USD | | -0.14 |
| USD | | |
| 2022-09-06 | USD Credit Interest for Aug-2022 | 19,905.35 |
| 2022-09-06 | USD Credit Interest for Aug-2022 to U9415436 | -15,126.24 |
| Total | | 4,779.11 |
| Total Interest in USD | | 4,778.97 |

## Fees

| Date | Description | Amount |
|---|---|---|
| Other Fees | | |
| USD | | |
| 2022-09-05 | w******15:CBOT Professional for Sep 2022[1] | -123.00 |
| 2022-09-05 | W******15:CFE ENHANCED P L2 FOR SEP 2022[1] | -18.50 |
| 2022-09-05 | w******15:CME Professional for Sep 2022[1] | -123.00 |
| Total | | -264.50 |

Notes

1. Market data is provided by Global Financial Information Services (GmbH). Your local broker collects amounts owed for fees and tax for such data on behalf of Global Financial Information Services (GmbH). Note, you are responsible for any applicable taxes relating to the provision of these services.

## Deposits & Withdrawals

| Date | Description | Amount |
|---|---|---|
| USD | | |
| 2022-09-30 | Electronic Fund Transfer | 8,500,000.00 |
| Total | | 8,500,000.00 |

## Financial Instrument Information

| Symbol | Description | Conid | Listing Exch | Multiplier | Expiry | Delivery Month | Code |
|---|---|---|---|---|---|---|---|
| Futures | | | | | | | |
| VXV2 | VIX 19OCT22 | 540342682 | CFE | 1,000 | 2022-10-19 | 2022-10 | |
| VXX2 | VIX 16NOV22 | 545798747 | CFE | 1,000 | 2022-11-16 | 2022-11 | |

## Codes

| Code | Meaning | Code (Cont.) | Meaning (Cont.) |
|---|---|---|---|
| A | Assignment | LI | Last In, First Out (LIFO) tax basis election |
| ADR | ADR Fee Accrual | LT | Long Term P/L |
| AEx | Automatic exercise for dividend-related recommendation. | Lo | Direct Loan |
| Adj | Adjustment | M | Entered manually by IB |
| Al | Allocation | MEx | Manual exercise for dividend-related recommendation. |
| Aw | Away Trade | ML | Maximize Losses tax basis election |
| B | Automatic Buy-in | MLG | Maximize Long Term Gain tax basis election |
| Bo | Direct Borrow | MLL | Maximize Long Term Loss tax basis election |
| C | Closing Trade | MSG | Maximize Short Term Gain tax basis election |
| CD | Cash Delivery | MSL | Maximize Short Term Loss tax basis election |
| CP | Complex Position | O | Opening Trade |
| Ca | Cancelled | P | Partial Execution |
| Co | Corrected Trade | PI | Price Improvement |
| Cx | Part or all of this transaction was a Crossing executed as dual agent by IB for two IB customers | Po | Interest or Dividend Accrual Posting |
| ETF | ETF Creation/Redemption | Pr | Part or all of this transaction was executed by the Exchange as a Crossing by IB against an IB affiliate and is therefore classified as a Principal and not an agency trade |
| Ep | Resulted from an Expired Position | R | Dividend Reinvestment |
| Ex | Exercise | RED | Redemption to Investor |
| FP | IB acted as agent for the fractional share portion of this trade, which was executed by an IB affiliate as principal. | RI | Recurring Investment |
| FPA | IB acted as agent for both the fractional share portion and the whole share portion of this trade; the fractional share portion was executed by an IB Affiliate as principal. | RP | IB acted as agent for the fractional share portion of this trade, which was executed by an IB affiliate as riskless principal. |
| G | Trade in Guaranteed Account Segment | RPA | IB acted as agent for both the fractional share portion and the whole share portion of this trade; the fractional share portion was executed by an IB Affiliate as riskless principal. |
| GEA | Exercise or Assignment resulting from offsetting positions | Re | Interest or Dividend Accrual Reversal |
| HC | Highest Cost tax basis election | Ri | Reimbursement |
| HFI | Investment Transferred to Hedge Fund | SI | This order was solicited by Interactive Brokers |
| HFR | Redemption from Hedge Fund | SL | Specific Lot tax basis election |
| I | Internal Transfer | SO | This order was marked as solicited by your Introducing Broker |
| IA | This transaction was executed against an IB affiliate | SS | Customer designated this trade for shortened settlement and so is subject to execution at prices above the prevailing market |
| INV | Investment Transfer from Investor | ST | Short Term P/L |
| IPO | This transaction was executed as part of an IPO in which IB was a member of the selling group and is classified as a Principal trade. | T | Transfer |
| L | Ordered by IB (Margin Violation) | Un | Unvested shares from stock grant |
| LD | Adjusted by Loss Disallowed from Wash Sale | | |

## Notes/Legal Notes

Notes

1. Most stock exchange transactions settle on the trade date plus two business days. Options, futures and US open-end mutual fund transactions settle on trade date plus one business day. (Some exchanges and other transaction types may have longer or shorter settlement periods.) Ending settled cash reflects the cash that has actually settled.
2. Initial and maintenance margin requirements are available within the Account Window of the Trader Workstation.
3. Interactive Brokers LLC receives compensation from fund companies in connection with the purchase and holding of fund shares by customers of Interactive Brokers LLC. Such compensation includes, but is not limited to, Rule 12b-1 fees that are paid out of the funds assets. The source and amount of any remuneration received by Interactive Brokers LLC in connection with a transaction will be furnished upon written request of the customer. IB may share a portion of the compensation received from fund companies with your financial advisor or introducing broker.
4. Quantities preceded by a "-" sign indicate sell transactions. Other transactions are purchases.

## Notes/Legal Notes

5. IB acts as agent in executing the fractional share portion of your order. In certain circumstances, IB routes the fractional portion of your order to an affiliate, which may execute the fractional portion of the order as principal. In such circumstances, this is indicated by the codes associated with the trade. If an IB affiliate acts as principal in executing any fractional share portion of your order, the order will be executed at the price displayed for the opposite side of the NBBO from your order (the offer if you are buying and the bid if you are selling) at the time of execution. If an IB affiliate is acting as riskless principal in connection with filling the fractional share portion of your order, the affiliate will execute the fractional share portion of your order at the price it receives for the execution of the whole share.
6. In case of partial executions, commissions are charged on the total quantity executed on the original order. The commission is displayed on the first partial execution only.
7. Each closed lot indicated above with a reference to note (6) was chosen by the end of the trading day to be sold versus the specific opening purchase identified in that row.
8. Trade execution times are displayed in Eastern Time.
9. Applicable commodity Regulatory Fees for your transactions are available on the IB website at www.interactivebrokers.com/en/accounts/fees/exchangeAndRegulatoryFees.php.
10. Borrow Fee Rate represents the cost to borrow stock expressed in percent per annum. It is applied to the cash collateral amount on the stock borrow contract and is separate from any interest earned on credit cash balances. Similarly, Loan Fee Rate represents the benefit to lend stock. A positive rate indicates a cost to the borrower/benefit to the lender and a negative rate indicates a benefit to the borrower/cost to the lender. In general, the fee rates for hard-to-borrow stocks are higher than for normal availability stocks.
11. Interest Rate on Customer Collateral represents the interest paid on the collateral posted to the customer's account and received from lending stock. A positive rate indicates a benefit to the lender.
12. The closing prices on this Activity Statement are indicative and may come from third-party sources. Interactive Brokers does not warrant the accuracy of the prices provided by third-party sources. Due to time zone differences, certain non-US mutual funds may deliver closing prices after the Activity Statement has been produced and the closing prices for such funds will reflect the previous day's price.
13. All Market Data and Research services are provided through Global Financial Information Services (GmbH).
14. Market data is provided by Global Financial Information Services (GmbH). Your local broker collects amounts owed for fees and tax for such data on behalf of Global Financial Information Services (GmbH). Note, you are responsible for any applicable taxes relating to the provision of these services.

Fixed Income Notes

1. Call features for bonds or preferred stocks may affect the yield. For zero coupon, compound interest and multiplier securities, there are no periodic payments and securities may be callable below maturity value without notice to holder unless registered. For asset-backed securities, the actual yield may vary depending on the speed at which the underlying note is pre-paid. For additional information regarding bond yield, please contact the IB Help Desk at: help@interactivebrokers.com. If this debt security is unrated by a nationally recognized statistical rating organization, it may pose a high risk of default. You should consult a financial advisor to determine whether unrated bonds are appropriate for your portfolio in light of your goals and your financial circumstances. Fees charged by bond trading centers are included in the cost of bond transactions.

Legal Notes

1. Please promptly report any inaccuracy or discrepancy in this statement, or in your account. Contact the IB Customer Service Department in writing using the form available on the IB website. You may also contact IB by phone, but if you report an error by phone, you should re-confirm such oral communication in writing in order to protect your rights, including rights under the Securities Investor Protection Act (SIPA).

   Interactive Brokers LLC, www.interactivebrokers.com, 877-442-2757 (U.S.)

   Interactive Brokers (UK) (Ltd), www.interactivebrokers.co.uk, 00800-42-276537 (Intl)

   Interactive Brokers Canada Inc., www.interactivebrokers.ca, 877-745-4222 (Can.)

2. Unless otherwise noted, Interactive Brokers acted as agent in the execution of the above transactions. For those exchanges where IB is not a direct clearing member or custodian, IB may use one of the following clearing agents or sub-custodians: Interactive Brokers Australia Pty Limited; Interactive Brokers Canada Inc.; Interactive Brokers Central Europe Zrt.; Interactive Brokers Hong Kong Limited; Interactive Brokers Securities Japan, Inc.; Interactive Brokers (U.K.) Limited; IBKR Financial Services AG; ABN Amro Clearing Singapore Pte. Ltd.; BBVA Bancomer, S.A.; BNP Securities Services, Milan Branch; BMO Harris Bank N.A.; Citibank Europe plc; Skandinaviska Enskilda Banken AB (including select branches).
3. IB acts as agent or riskless principal in foreign currency exchange transactions and as riskless principal in spot precious metals transactions. Such transactions are executed against an IB affiliate or a third party, which acts as principal in such transactions and may have a long or short position and may have profited or lost in connection with the transaction. Foreign currency exchange and spot precious metals transactions executed by Customer through IB are not regulated or overseen by the SEC or the CFTC.
4. Trades marked with the exchange indicator of TMBR were effected by IB as agent through a market making affiliate, which acted as principal in the transaction and may have a long or short position in the security and may have profited or lost in connection with the transaction.
5. All VWAP trades are effected pursuant to an average price formula based on a reference price provided by a third-party data provider. Additional information and reference prices are available upon request. IB, as agent, effects VWAP transactions through a market making affiliate, which acts as principal in such transactions and may have a long or short position in the security and may have profited or lost in connection with the transaction.
6. IB accepts liquidity rebates or other order flow payments from Alternative Trading Systems, market makers and exchanges for certain orders in stocks. IB receives payment for some option orders pursuant to exchange-mandated marketing fee programs or other arrangements. The source and nature of any compensation received by IB in connection with any transaction is available upon written request of the customer. For further information, check the IB website and the Order Routing and Payment for Order Flow Disclosure provided when you opened your account and annually or email help@interactivebrokers.com.
7. For security futures trades, if not already indicated on this statement, information about the time of any transaction, the identity of the counterparty to the transaction, and whether IB is acting as agent or principal, as agent for the counterparty, as agent for both parties to the contract, or as principal, and if acting as principal, whether the transaction was a block transaction or an exchange for physicals transaction, will be available upon written request of the customer.
8. Customer is requested to promptly advise Interactive Brokers of any material change in Customer's investment objectives or financial situation.
9. A financial statement of Interactive Brokers LLC is available for your personal inspection at www.interactivebrokers.com or at its offices, or a copy of it will be mailed upon your written request.
10. For trades executed on either the Australian Stock Exchange Ltd ("ASX") or Chi-X Australia Pty Ltd ("Chi-X"), this confirmation is issued subject to: (i) the directions, decisions and requirements of the Market Operator, the relevant Market Integrity Rules, the relevant Market Operating Rules, the Clearing Rules and where relevant, the Settlement Rules; (ii) the customs and usages of the relevant Market; and (iii) the correction of errors and omissions. Interactive Brokers LLC (ARBN: 091191141, AFSL: 245574, Participant on Chi-X Australia)("IB") is not a participant on the ASX, and will route orders to the ASX through its affiliate, Timber Hill Australia Pty Ltd (ABN 25079993534, AFSL: 244380, Participant on the ASX)("THA") who executes such orders. Your ASX and Chi-x Australia trades will be cleared through ABN Amro Clearing Sydney Pty Ltd, an ACH participant. If your transaction was a crossing transaction, IB may have either acted on behalf of (i) both the buyer and seller of this transaction, or (ii) on behalf of the buyer or seller on one side of the transaction and act as Principal on the other side. Under the Corporations Act 2001, where IB enters into an exchange traded derivatives on a customer's behalf, IB is regarded as having issued the derivative to the customer.

## Notes/Legal Notes

11. For All Options Trades Executed on the Stock Exchange of Hong Kong ("SEHK"): (a) Options can involve a high degree of risk and may not be suitable for every investor. Investors should ensure they understand those risks before participating in the options market. (b) All options contracts executed on the SEHK were executed by Timber Hill Securities Hong Kong on behalf of Interactive Brokers LLC. (c) In the event of a default committed by Interactive Brokers LLC resulting in the client suffering any pecuniary loss, the client shall have a right to claim under the Investor Compensation Fund established under the Hong Kong Securities and Futures Ordinance, subject to the terms of the Investor Compensation Fund from time to time. (d) All Exchange Traded Options Business made for or on behalf of a client shall be subject to the relevant provisions of the constitution, Rules of The Stock Exchange of Hong Kong Limited ("SEHK Rules"), regulations, the Articles, customs and usages of SEHK, the Options Trading Rules, the Clearing Rules of SEOCH, the CCASS Rules and the laws of Hong Kong, which shall be binding on both Interactive Brokers LLC and the client.
12. Deposits held away from Interactive Brokers LLC may not qualify under SIPC protection. Also, futures and options on futures are not covered by SIPC.

SIPC Member

InteractiveBrokers

# Activity Statement

September 1, 2022 - September 30, 2022

Help

Interactive Brokers LLC, Two Pickwick Plaza, Greenwich, CT 06830

## Account Information

| | |
|---|---|
| Name | Camshaft Capital Fund LP |
| Account | U9415436 |
| Master Name | Camshaft Capital Fund LP |
| Account Type | Institution Client |
| Customer Type | Partnership |
| Account Capabilities | Portfolio Margin |
| Base Currency | USD |

## Net Asset Value

| | August 31, 2022 | September 30, 2022 | | | |
|---|---|---|---|---|---|
| | Total | Long | Short | Total | Change |
| Cash | 11,326,846.38 | 10,845,517.12 | -34,432.78 | 10,811,084.34 | -515,762.04 |
| Interest Accruals | 14,566.23 | 16,110.35 | -64.94 | 16,045.41 | 1,479.18 |
| Total | 11,341,412.61 | 10,861,627.47 | -34,497.72 | 10,827,129.75 | -514,282.86 |
| Time Weighted Rate of Return | | | | | -4.53% |

| Change in NAV | Total |
|---|---|
| Starting Value | 11,341,412.61 |
| Mark-to-Market | -527,641.82 |
| Interest | 15,062.73 |
| Change in Interest Accruals | 1,476.65 |
| Other Fees | -650.75 |
| Commissions | -2,532.20 |
| Other FX Translations | 2.53 |
| Ending Value | 10,827,129.75 |

## Mark-to-Market Performance Summary

| | Quantity | | Price | | Mark-to-Market P/L | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Symbol | Prior | Current | Prior | Current | Position | Transaction | Commissions | Other | Total | Code |
| Futures | | | | | | | | | | |
| 6MZ2 | 0 | 0 | -- | -- | -20,500.00 | 3,570.00 | -494.00 | 0.00 | -17,424.00 | |
| CLF3 | 0 | 0 | -- | -- | -27,010.00 | 2,480.00 | -75.84 | 0.00 | -24,605.84 | |
| CLZ2 | 0 | -8 | -- | 78.7200 | 13,600.00 | 4,650.00 | -42.66 | 0.00 | 18,207.34 | |
| CTH3 | 0 | 0 | -- | -- | -26,500.00 | 7,010.00 | -59.40 | 0.00 | -19,549.40 | |
| CTZ2 | 12 | 0 | 1.1321 | -- | -80,000.00 | 14,100.00 | -95.04 | 0.00 | -65,995.04 | |
| ESZ2 | 0 | -6 | -- | 3,601.5000 | 22,862.50 | -3,987.50 | -12.90 | 0.00 | 18,862.10 | |
| ETHU2 | 5 | 0 | 1,560.0000 | -- | -16,375.00 | -6,325.00 | -35.10 | 0.00 | -22,735.10 | |
| GCZ2 | 0 | 0 | -- | -- | -5,200.00 | -5,550.00 | -24.20 | 0.00 | -10,774.20 | |



Confidential

CAMSHAFT0001954

A2886

## Mark-to-Market Performance Summary

| | Quantity | | Price | | Mark-to-Market P/L | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Symbol | Prior | Current | Prior | Current | Position | Transaction | Commissions | Other | Total | Code |
| HEZ2 | 2 | -20 | 0.83875 | 0.76225 | 17,300.00 | -1,490.00 | -110.20 | 0.00 | 15,699.80 | |
| HGH3 | 0 | 0 | -- | -- | 0.00 | -4,462.50 | -33.88 | 0.00 | -4,496.38 | |
| HGZ2 | 0 | -8 | -- | 3.4125 | -47,150.00 | -14,100.00 | -188.76 | 0.00 | -61,438.76 | |
| HOF3 | 0 | 0 | -- | -- | -24,477.60 | 7,681.80 | -18.96 | 0.00 | -16,814.76 | |
| HOZ2 | 0 | -5 | -- | 3.1270 | -77,044.80 | 31,521.00 | -68.73 | 0.00 | -45,592.53 | |
| KCH3 | 7 | 0 | 2.2860 | -- | -13,762.50 | -15,262.50 | -86.13 | 0.00 | -29,111.13 | |
| KE MAR 23 | 10 | 12 | 9.1125 | 9.8525 | 39,575.00 | 3,300.00 | -5.84 | 0.00 | 42,869.16 | |
| LBSX2 | 0 | 0 | -- | -- | -41,690.00 | 11,022.00 | -29.00 | 0.00 | -30,697.00 | |
| LEZ2 | 10 | 0 | 1.48475 | -- | -4,500.00 | -160.00 | -29.00 | 0.00 | -4,689.00 | |
| NGV2 | 6 | 0 | 9.1270 | -- | -58,920.00 | 26,160.00 | -14.22 | 0.00 | -32,774.22 | |
| NGZ2 | 0 | -5 | -- | 7.0650 | -27,430.00 | -12,200.00 | -120.87 | 0.00 | -39,750.87 | |
| NKDU2 | 9 | 0 | 27,855.0000 | -- | -3,150.00 | -7,875.00 | -27.18 | 0.00 | -11,052.18 | |
| NKDZ2 | 0 | 0 | -- | -- | -3,200.00 | -8,850.00 | -48.32 | 0.00 | -12,098.32 | |
| NQZ2 | 4 | 0 | 12,359.5000 | -- | 540.00 | -8,250.00 | -8.60 | 0.00 | -7,718.60 | |
| PLF3 | 0 | 0 | -- | -- | -19,060.00 | 780.00 | -58.08 | 0.00 | -18,338.08 | |
| RTYZ2 | 0 | -12 | -- | 1,669.8000 | 4,400.00 | -5,860.00 | -25.80 | 0.00 | -1,485.80 | |
| SBH3 | 25 | -40 | 0.1777 | 0.1768 | -9,912.00 | 4,737.60 | -193.05 | 0.00 | -5,367.45 | |
| SIZ2 | 0 | 0 | -- | -- | 19,190.00 | -16,440.00 | -53.24 | 0.00 | 2,696.76 | |
| XAEU2 | 8 | 0 | 838.3000 | -- | -12,460.00 | -6,840.00 | -64.50 | 0.00 | -19,364.50 | |
| XAEZ2 | 0 | 0 | -- | -- | -58,270.00 | 17,260.00 | -60.20 | 0.00 | -41,070.20 | |
| XAFU2 | 6 | 0 | 406.2000 | -- | 25,125.00 | -9,200.00 | -38.70 | 0.00 | 15,886.30 | |
| XAFZ2 | 0 | 0 | -- | -- | -14,775.00 | 300.00 | -25.80 | 0.00 | -14,500.80 | |
| XAIU2 | 0 | 0 | -- | -- | 0.00 | 60.00 | -25.80 | 0.00 | 34.20 | |
| XAIZ2 | 0 | 0 | -- | -- | -12,180.00 | -1,320.00 | -25.80 | 0.00 | -13,525.80 | |
| YM SEP 22 | 0 | 0 | -- | -- | -14,910.00 | 570.00 | -25.80 | 0.00 | -14,365.80 | |
| ZC MAR 23 | 17 | 20 | 6.7650 | 6.8400 | 5,587.50 | 1,687.50 | -8.76 | 0.00 | 7,266.24 | |
| ZL DEC 22 | 12 | 0 | 0.6748 | -- | -30,600.00 | -11,376.00 | -35.04 | 0.00 | -42,011.04 | |
| ZL MAR 23 | 0 | 0 | -- | -- | -15,444.00 | -1,764.00 | -105.12 | 0.00 | -17,313.12 | |
| ZM MAR 23 | 0 | 0 | -- | -- | 8,400.00 | 4,660.00 | -87.60 | 0.00 | 12,972.40 | |
| ZS JAN 23 | 8 | 0 | 14.2775 | -- | -11,200.00 | 1,400.00 | -23.36 | 0.00 | -9,823.36 | |
| ZS MAR 23 | 0 | 0 | -- | -- | -13,900.00 | 2,800.00 | -46.72 | 0.00 | -11,146.72 | |
| Total Futures | | | | | -533,040.90 | 4,437.40 | -2,532.20 | 0.00 | -531,135.70 | |
| Forex | | | | | | | | | | |
| CAD | -24,904.12 | -24,987.64 | 0.76155 | 0.72306 | 961.68 | 0.00 | 0.00 | 0.00 | 961.68 | |
| USD | 11,345,812.11 | 10,829,151.90 | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Total Forex | | | | | 961.68 | 0.00 | 0.00 | 0.00 | 961.68 | |
| Total (All Assets) | | | | | -532,079.22 | 4,437.40 | -2,532.20 | 0.00 | -530,174.02 | |
| Broker Interest Paid and Received | | | | | | | | | 15,062.73 | |
| Other Fees | | | | | | | | | -650.75 | |
| Total P/L for Statement Period | | | | | | | | | -515,762.04 | |

## Realized & Unrealized Performance Summary

| | | Realized | | | | | Unrealized | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Symbol | Cost Adj. | S/T Profit | S/T Loss | L/T Profit | L/T Loss | Total | S/T Profit | S/T Loss | L/T Profit | L/T Loss | Total | Total | Code |
| Futures | | | | | | | | | | | | | |
| 6MZ2 | 0.00 | 0.00 | -17,424.00 | 0.00 | 0.00 | -17,424.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -17,424.00 | |
| CLF3 | 0.00 | 0.00 | -24,605.84 | 0.00 | 0.00 | -24,605.84 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -24,605.84 | |
| CLZ2 | 0.00 | 0.00 | -1,513.70 | 0.00 | 0.00 | -1,513.70 | 19,721.04 | 0.00 | 0.00 | 0.00 | 19,721.04 | 18,207.34 | |
| CTH3 | 0.00 | 0.00 | -19,549.40 | 0.00 | 0.00 | -19,549.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -19,549.40 | |
| CTZ2 | 0.00 | 84,928.72 | -16,339.40 | 0.00 | 0.00 | 68,589.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68,589.32 | |
| ESZ2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 18,862.10 | 0.00 | 0.00 | 0.00 | 18,862.10 | 18,862.10 | |
| ETHU2 | 0.00 | 0.00 | -2,270.20 | 0.00 | 0.00 | -2,270.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2,270.20 | |
| GCZ2 | 0.00 | 0.00 | -10,774.20 | 0.00 | 0.00 | -10,774.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10,774.20 | |
| HEZ2 | 0.00 | 0.00 | -6,688.00 | 0.00 | 0.00 | -6,688.00 | 21,142.00 | 0.00 | 0.00 | 0.00 | 21,142.00 | 14,454.00 | |
| HGH3 | 0.00 | 0.00 | -4,496.38 | 0.00 | 0.00 | -4,496.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -4,496.38 | |
| HGZ2 | 0.00 | 2,563.30 | -61,082.70 | 0.00 | 0.00 | -58,519.40 | 0.00 | -2,919.36 | 0.00 | 0.00 | -2,919.36 | -61,438.76 | |
| HOF3 | 0.00 | 0.00 | -16,814.76 | 0.00 | 0.00 | -16,814.76 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -16,814.76 | |
| HOZ2 | 0.00 | 0.00 | -66,769.68 | 0.00 | 0.00 | -66,769.68 | 21,177.15 | 0.00 | 0.00 | 0.00 | 21,177.15 | -45,592.53 | |
| KCH3 | 0.00 | 47,491.53 | -9,873.45 | 0.00 | 0.00 | 37,618.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 37,618.08 | |
| KE MAR 23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 87,089.96 | 0.00 | 0.00 | 0.00 | 87,089.96 | 87,089.96 | |
| LBSX2 | 0.00 | 0.00 | -30,697.00 | 0.00 | 0.00 | -30,697.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -30,697.00 | |
| LEZ2 | 0.00 | 13,082.00 | 0.00 | 0.00 | 0.00 | 13,082.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13,082.00 | |
| NGV2 | 0.00 | 176,821.56 | 0.00 | 0.00 | 0.00 | 176,821.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 176,821.56 | |
| NGZ2 | 0.00 | 6,426.30 | -50,115.32 | 0.00 | 0.00 | -43,689.02 | 3,938.15 | 0.00 | 0.00 | 0.00 | 3,938.15 | -39,750.87 | |
| NKDU2 | 0.00 | 0.00 | -10,404.36 | 0.00 | 0.00 | -10,404.36 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10,404.36 | |
| NKDZ2 | 0.00 | 0.00 | -12,098.32 | 0.00 | 0.00 | -12,098.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -12,098.32 | |
| NQZ2 | 0.00 | 0.00 | -11,587.20 | 0.00 | 0.00 | -11,587.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -11,587.20 | |
| PLF3 | 0.00 | 0.00 | -18,338.08 | 0.00 | 0.00 | -18,338.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -18,338.08 | |
| RTYZ2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 135.70 | -1,621.50 | 0.00 | 0.00 | -1,485.80 | -1,485.80 | |
| SBH3 | 0.00 | 0.00 | -6,554.90 | 0.00 | 0.00 | -6,554.90 | 0.00 | -1,686.80 | 0.00 | 0.00 | -1,686.80 | -8,241.70 | |
| SIZ2 | 0.00 | 17,970.96 | -15,274.20 | 0.00 | 0.00 | 2,696.76 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,696.76 | |
| XAEU2 | 0.00 | 60,355.50 | -777.20 | 0.00 | 0.00 | 59,578.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 59,578.30 | |
| XAEZ2 | 0.00 | 0.00 | -41,070.20 | 0.00 | 0.00 | -41,070.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -41,070.20 | |
| XAFU2 | 0.00 | 19,261.70 | -6,650.80 | 0.00 | 0.00 | 12,610.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12,610.90 | |
| XAFZ2 | 0.00 | 0.00 | -14,500.80 | 0.00 | 0.00 | -14,500.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14,500.80 | |
| XAIU2 | 0.00 | 34.20 | 0.00 | 0.00 | 0.00 | 34.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34.20 | |
| XAIZ2 | 0.00 | 0.00 | -13,525.80 | 0.00 | 0.00 | -13,525.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -13,525.80 | |
| YM SEP 22 | 0.00 | 0.00 | -14,365.80 | 0.00 | 0.00 | -14,365.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14,365.80 | |
| ZC MAR 23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 60,979.10 | 0.00 | 0.00 | 0.00 | 60,979.10 | 60,979.10 | |
| ZL DEC 22 | 0.00 | 37,549.92 | 0.00 | 0.00 | 0.00 | 37,549.92 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 37,549.92 | |
| ZL MAR 23 | 0.00 | 0.00 | -17,313.12 | 0.00 | 0.00 | -17,313.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -17,313.12 | |
| ZM MAR 23 | 0.00 | 12,972.40 | 0.00 | 0.00 | 0.00 | 12,972.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12,972.40 | |
| ZS JAN 23 | 0.00 | 0.00 | -10,546.72 | 0.00 | 0.00 | -10,546.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10,546.72 | |
| ZS MAR 23 | 0.00 | 0.00 | -11,146.72 | 0.00 | 0.00 | -11,146.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -11,146.72 | |
| Total Futures | 0.00 | 479,458.09 | -543,168.25 | 0.00 | 0.00 | -63,710.16 | 233,045.20 | -6,227.66 | 0.00 | 0.00 | 226,817.54 | 163,107.38 | |
| Forex | | | | | | | | | | | | | |
| CAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,559.53 | -1,311.46 | 0.00 | 0.00 | 1,248.08 | 1,248.08 | |
| Total Forex | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,559.53 | -1,311.46 | 0.00 | 0.00 | 1,248.08 | 1,248.08 | |
| Total (All Assets) | 0.00 | 479,458.09 | -543,168.25 | 0.00 | 0.00 | -63,710.16 | 235,604.73 | -7,539.12 | 0.00 | 0.00 | 228,065.62 | 164,355.46 | |

## Month & Year to Date Performance Summary

| Symbol | Description | Mark-to-Market MTD | Mark-to-Market YTD | Realized S/T MTD | Realized S/T YTD | Realized L/T MTD | Realized L/T YTD |
|---|---|---|---|---|---|---|---|
| Futures | | | | | | | |
| 6AU2 | AUD 19SEP22 | 0.00 | -38,512.00 | 0.00 | -38,512.00 | 0.00 | 0.00 |
| 6BU2 | GBP 19SEP22 | 0.00 | -1,300.41 | 0.00 | -1,300.41 | 0.00 | 0.00 |
| 6CM2 | CAD 14JUN22 | 0.00 | -2,759.52 | 0.00 | -2,759.52 | 0.00 | 0.00 |
| 6CU2 | CAD 20SEP22 | 0.00 | -13,398.80 | 0.00 | -13,398.80 | 0.00 | 0.00 |
| 6EU2 | EUR 19SEP22 | 0.00 | 14,956.85 | 0.00 | 14,956.85 | 0.00 | 0.00 |
| 6MM2 | MXP 13JUN22 | 0.00 | 38,402.40 | 0.00 | 38,402.40 | 0.00 | 0.00 |
| 6MU2 | MXP 19SEP22 | 0.00 | -35,872.80 | 0.00 | -35,872.80 | 0.00 | 0.00 |
| 6MZ2 | MXP 19DEC22 | -17,424.00 | -17,424.00 | -17,424.00 | -17,424.00 | 0.00 | 0.00 |
| 6SU2 | CHF 19SEP22 | 0.00 | -18,278.33 | 0.00 | -18,278.33 | 0.00 | 0.00 |
| CCZ2 | CC 15DEC22 | 0.00 | -8,318.80 | 0.00 | -8,318.80 | 0.00 | 0.00 |
| CLF3 | CL JAN23 | -24,605.84 | -24,605.84 | -24,605.84 | -24,605.84 | 0.00 | 0.00 |
| CLV2 | CL OCT22 | 0.00 | -7,777.40 | 0.00 | -7,777.40 | 0.00 | 0.00 |
| CLZ2 | CL DEC22 | 18,207.34 | 7,989.94 | -1,513.70 | -11,731.10 | 0.00 | 0.00 |
| CTH3 | CT 16MAR23 | -19,549.40 | -89,649.48 | -19,549.40 | -89,649.48 | 0.00 | 0.00 |
| CTZ2 | CT 14DEC22 | -65,995.04 | 56,034.92 | 68,589.32 | 56,034.92 | 0.00 | 0.00 |
| ESU2 | ES 16SEP22 | 0.00 | -1,771.50 | 0.00 | -1,771.50 | 0.00 | 0.00 |
| ESZ2 | ES 16DEC22 | 18,862.10 | 18,862.10 | 0.00 | 0.00 | 0.00 | 0.00 |
| ETHN2 | ETHUSDRR JUL22 | 0.00 | -27,045.20 | 0.00 | -27,045.20 | 0.00 | 0.00 |
| ETHQ2 | ETHUSDRR 29AUG22 | 0.00 | 65,161.32 | 0.00 | 65,161.32 | 0.00 | 0.00 |
| ETHU2 | ETHUSDRR SEP22 | -22,735.10 | -45,965.40 | -2,270.20 | -45,965.40 | 0.00 | 0.00 |
| GCZ2 | GC 28DEC22 | -10,774.20 | -87,665.52 | -10,774.20 | -87,665.52 | 0.00 | 0.00 |
| HEQ2 | HE 16AUG22 | 0.00 | -8,640.60 | 0.00 | -8,640.60 | 0.00 | 0.00 |
| HEZ2 | HE 16DEC22 | 15,699.80 | -27,247.00 | -6,688.00 | -48,389.00 | 0.00 | 0.00 |
| HGH3 | HG 29MAR23 | -4,496.38 | -4,496.38 | -4,496.38 | -4,496.38 | 0.00 | 0.00 |
| HGU2 | HG 28SEP22 | 0.00 | -13,757.70 | 0.00 | -13,757.70 | 0.00 | 0.00 |
| HGZ2 | HG 28DEC22 | -61,438.76 | -98,779.50 | -58,519.40 | -95,860.14 | 0.00 | 0.00 |
| HOF3 | HO JAN23 | -16,814.76 | -16,814.76 | -16,814.76 | -16,814.76 | 0.00 | 0.00 |
| HOQ2 | HO AUG22 | 0.00 | -15,247.62 | 0.00 | -15,247.62 | 0.00 | 0.00 |
| HOU2 | HO SEP22 | 0.00 | 102,307.68 | 0.00 | 102,307.68 | 0.00 | 0.00 |
| HOV2 | HO OCT22 | 0.00 | -58,163.34 | 0.00 | -58,163.34 | 0.00 | 0.00 |
| HOX2 | HO NOV22 | 0.00 | 25,054.92 | 0.00 | 25,054.92 | 0.00 | 0.00 |
| HOZ2 | HO DEC22 | -45,592.53 | -70,910.25 | -66,769.68 | -92,087.40 | 0.00 | 0.00 |
| KCH3 | KC 22MAR23 | -29,111.13 | 19,592.10 | 37,618.08 | 19,592.10 | 0.00 | 0.00 |
| KCZ2 | KC 20DEC22 | 0.00 | -5,416.89 | 0.00 | -5,416.89 | 0.00 | 0.00 |
| KE DEC 22 | KE 14DEC22 | 0.00 | -12,810.14 | 0.00 | -12,810.14 | 0.00 | 0.00 |
| KE MAR 23 | KE 14MAR23 | 42,869.16 | -2,835.24 | 0.00 | -89,925.20 | 0.00 | 0.00 |
| LBSU2 | LB 15SEP22 | 0.00 | -64,935.40 | 0.00 | -64,935.40 | 0.00 | 0.00 |
| LBSX2 | LB 15NOV22 | -30,697.00 | -30,697.00 | -30,697.00 | -30,697.00 | 0.00 | 0.00 |
| LEZ2 | LE 30DEC22 | -4,689.00 | -2,312.40 | 13,082.00 | -2,312.40 | 0.00 | 0.00 |
| MMEM2 | MXEF 17JUN22 | 0.00 | -8,918.98 | 0.00 | -8,918.98 | 0.00 | 0.00 |
| MMEU2 | MXEF 16SEP22 | 0.00 | -47,531.30 | 0.00 | -47,531.30 | 0.00 | 0.00 |
| NGJ3 | NG APR23 | 0.00 | -26,755.32 | 0.00 | -26,755.32 | 0.00 | 0.00 |
| NGQ2 | NG AUG22 | 0.00 | -36,173.70 | 0.00 | -36,173.70 | 0.00 | 0.00 |
| NGU2 | NG SEP22 | 0.00 | -22,963.18 | 0.00 | -22,963.18 | 0.00 | 0.00 |



Confidential

CAMSHAFT0001957

## Month & Year to Date Performance Summary

| Symbol | Description | Mark-to-Market MTD | Mark-to-Market YTD | Realized S/T MTD | Realized S/T YTD | Realized L/T MTD | Realized L/T YTD |
|---|---|---|---|---|---|---|---|
| NGV2 | NG OCT22 | -32,774.22 | 176,821.56 | 176,821.56 | 176,821.56 | 0.00 | 0.00 |
| NGZ2 | NG DEC22 | -39,750.87 | -12,330.93 | -43,689.02 | -16,269.08 | 0.00 | 0.00 |
| NKDU2 | NKD 09SEP22 | -11,052.18 | 16,063.60 | -10,404.36 | 16,063.60 | 0.00 | 0.00 |
| NKDZ2 | NKD 09DEC22 | -12,098.32 | -12,098.32 | -12,098.32 | -12,098.32 | 0.00 | 0.00 |
| NQU2 | NQ 16SEP22 | 0.00 | 36,898.40 | 0.00 | 36,898.40 | 0.00 | 0.00 |
| NQZ2 | NQ 16DEC22 | -7,718.60 | -38,609.40 | -11,587.20 | -38,609.40 | 0.00 | 0.00 |
| PAM2 | PA 28JUN22 | 0.00 | -17,104.84 | 0.00 | -17,104.84 | 0.00 | 0.00 |
| PAU2 | PA 28SEP22 | 0.00 | -14,943.56 | 0.00 | -14,943.56 | 0.00 | 0.00 |
| PLF3 | PL 27JAN23 | -18,338.08 | -18,338.08 | -18,338.08 | -18,338.08 | 0.00 | 0.00 |
| PLV2 | PL 27OCT22 | 0.00 | -25,772.60 | 0.00 | -25,772.60 | 0.00 | 0.00 |
| RBV2 | RB OCT22 | 0.00 | -54,632.76 | 0.00 | -54,632.76 | 0.00 | 0.00 |
| RBZ2 | RB DEC22 | 0.00 | -20,582.16 | 0.00 | -20,582.16 | 0.00 | 0.00 |
| RSX2 | RS 14NOV22 | 0.00 | -19,480.73 | 0.00 | -19,700.50 | 0.00 | 0.00 |
| RTYU2 | RTY 16SEP22 | 0.00 | 42,938.90 | 0.00 | 42,938.90 | 0.00 | 0.00 |
| RTYZ2 | RTY 16DEC22 | -1,485.80 | -1,485.80 | 0.00 | 0.00 | 0.00 | 0.00 |
| RX SEP 22 | DJUSRE 16SEP22 | 0.00 | -15,411.60 | 0.00 | -15,411.60 | 0.00 | 0.00 |
| SBH3 | SB MAR23 | -5,367.45 | -60,312.40 | -6,554.90 | -58,625.60 | 0.00 | 0.00 |
| SIN2 | SI 27JUL22 | 0.00 | -5,939.52 | 0.00 | -5,939.52 | 0.00 | 0.00 |
| SIU2 | SI 28SEP22 | 0.00 | -42,299.20 | 0.00 | -42,299.20 | 0.00 | 0.00 |
| SIZ2 | SI 28DEC22 | 2,696.76 | -41,831.48 | 2,696.76 | -41,831.48 | 0.00 | 0.00 |
| XABU2 | IXB 16SEP22 | 0.00 | -22,261.50 | 0.00 | -22,261.50 | 0.00 | 0.00 |
| XAEM2 | IXE 17JUN22 | 0.00 | 71,649.90 | 0.00 | 71,649.90 | 0.00 | 0.00 |
| XAEU2 | IXE 16SEP22 | -19,364.50 | -85,840.70 | 59,578.30 | -85,840.70 | 0.00 | 0.00 |
| XAEZ2 | IXE 16DEC22 | -41,070.20 | -41,070.20 | -41,070.20 | -41,070.20 | 0.00 | 0.00 |
| XAFM2 | IXM 17JUN22 | 0.00 | -62,106.70 | 0.00 | -62,106.70 | 0.00 | 0.00 |
| XAFU2 | IXM 16SEP22 | 15,886.30 | 17,092.90 | 12,610.90 | 17,092.90 | 0.00 | 0.00 |
| XAFZ2 | IXM 16DEC22 | -14,500.80 | -14,500.80 | -14,500.80 | -14,500.80 | 0.00 | 0.00 |
| XAIM2 | IXI 17JUN22 | 0.00 | -42,738.70 | 0.00 | -42,738.70 | 0.00 | 0.00 |
| XAIU2 | IXI 16SEP22 | 34.20 | -18,037.30 | 34.20 | -18,037.30 | 0.00 | 0.00 |
| XAIZ2 | IXI 16DEC22 | -13,525.80 | -13,525.80 | -13,525.80 | -13,525.80 | 0.00 | 0.00 |
| XAPU2 | IXR 16SEP22 | 0.00 | -3,805.80 | 0.00 | -3,805.80 | 0.00 | 0.00 |
| XAUU2 | IXU 16SEP22 | 0.00 | -520.10 | 0.00 | -520.10 | 0.00 | 0.00 |
| YM SEP 22 | YM 16SEP22 | -14,365.80 | -14,365.80 | -14,365.80 | -14,365.80 | 0.00 | 0.00 |
| ZB JUN 22 | ZB 21JUN22 | 0.00 | -31,102.58 | 0.00 | -31,102.58 | 0.00 | 0.00 |
| ZB SEP 22 | ZB 21SEP22 | 0.00 | 34,214.68 | 0.00 | 34,214.68 | 0.00 | 0.00 |
| ZC MAR 23 | ZC 14MAR23 | 7,266.24 | -47,430.72 | 0.00 | -108,409.82 | 0.00 | 0.00 |
| ZL DEC 22 | ZL 14DEC22 | -42,011.04 | 37,549.92 | 37,549.92 | 37,549.92 | 0.00 | 0.00 |
| ZL JAN 23 | ZL 13JAN23 | 0.00 | -16,431.92 | 0.00 | -16,431.92 | 0.00 | 0.00 |
| ZL MAR 23 | ZL 14MAR23 | -17,313.12 | -17,313.12 | -17,313.12 | -17,313.12 | 0.00 | 0.00 |
| ZM MAR 23 | ZM 14MAR23 | 12,972.40 | 12,972.40 | 12,972.40 | 12,972.40 | 0.00 | 0.00 |
| ZN SEP 22 | ZN 21SEP22 | 0.00 | -6,314.80 | 0.00 | -6,314.80 | 0.00 | 0.00 |
| ZS JAN 23 | ZS 13JAN23 | -9,823.36 | -51,081.86 | -10,546.72 | -51,081.86 | 0.00 | 0.00 |
| ZS MAR 23 | ZS 14MAR23 | -11,146.72 | -29,134.32 | -11,146.72 | -29,134.32 | 0.00 | 0.00 |
| ZS NOV 22 | ZS 14NOV22 | 0.00 | -2,841.70 | 0.00 | -2,841.70 | 0.00 | 0.00 |
| ZW DEC 22 | ZW 14DEC22 | 0.00 | -24,670.08 | 0.00 | -24,670.08 | 0.00 | 0.00 |

## Month & Year to Date Performance Summary

| Symbol | Description | Mark-to-Market | | Realized S/T | | Realized L/T | |
|---|---|---|---|---|---|---|---|
| | | MTD | YTD | MTD | YTD | MTD | YTD |
| ZW MAR 23 | ZW 14MAR23 | 0.00 | -16,733.40 | 0.00 | -16,733.40 | 0.00 | 0.00 |
| Total Futures | | -531,135.70 | -1,164,188.49 | -63,710.16 | -1,391,225.80 | 0.00 | 0.00 |
| Total (All Assets) | | -531,135.70 | -1,164,188.49 | -63,710.16 | -1,391,225.80 | 0.00 | 0.00 |

## Cash Report

| | Total | Securities | Futures | Month to Date | Year to Date |
|---|---|---|---|---|---|
| Base Currency Summary | | | | | |
| Starting Cash | 11,326,846.38 | 9,779,638.39 | 1,547,207.98 | | |
| Commissions | -2,532.20 | 0.00 | -2,532.20 | -2,532.20 | -9,782.49 |
| Account Transfers | 0.00 | 0.00 | 0.00 | 0.00 | 11,950,000.00 |
| Internal Transfers | 0.00 | -55,058.81 | 55,058.81 | 0.00 | 0.00 |
| Broker Interest Paid and Received | 15,062.73 | 15,062.73 | 0.00 | 15,062.73 | 27,469.00 |
| Cash Settling MTM | -528,603.50 | 0.00 | -528,603.50 | -528,603.50 | -1,154,406.00 |
| Other Fees | -650.75 | 0.00 | -650.75 | -650.75 | -3,781.50 |
| Cash FX Translation Gain/Loss | 961.68 | 1,832.84 | -871.15 | | |
| Ending Cash | 10,811,084.34 | 9,741,475.15 | 1,069,609.19 | | |
| Ending Settled Cash | 10,750,635.34 | 9,741,475.15 | 1,009,160.19 | | |
| CAD | | | | | |
| Starting Cash | -24,904.12 | -47,537.40 | 22,633.28 | | |
| Commissions | 0.00 | 0.00 | 0.00 | 0.00 | -96.00 |
| Broker Interest Paid and Received | -83.52 | -83.52 | 0.00 | -83.52 | -223.64 |
| Cash Settling MTM | 0.00 | 0.00 | 0.00 | 0.00 | -24,668.00 |
| Ending Cash | -24,987.64 | -47,620.92 | 22,633.28 | | |
| Ending Settled Cash | -24,987.64 | -47,620.92 | 22,633.28 | | |
| USD | | | | | |
| Starting Cash | 11,345,812.11 | 9,815,840.50 | 1,529,971.61 | | |
| Commissions | -2,532.20 | 0.00 | -2,532.20 | -2,532.20 | -9,707.16 |
| Account Transfers | 0.00 | 0.00 | 0.00 | 0.00 | 11,950,000.00 |
| Internal Transfers | 0.00 | -55,058.81 | 55,058.81 | 0.00 | 0.00 |
| Broker Interest Paid and Received | 15,126.24 | 15,126.24 | 0.00 | 15,126.24 | 27,641.16 |
| Cash Settling MTM | -528,603.50 | 0.00 | -528,603.50 | -528,603.50 | -1,135,000.60 |
| Other Fees | -650.75 | 0.00 | -650.75 | -650.75 | -3,781.50 |
| Ending Cash | 10,829,151.90 | 9,775,907.93 | 1,053,243.97 | | |
| Ending Settled Cash | 10,768,702.90 | 9,775,907.93 | 992,794.97 | | |

## Open Positions

| Symbol | Quantity | Mult | Cost Price | Cost Basis | Close Price | Value | Unrealized P/L | Code |
|---|---|---|---|---|---|---|---|---|
| Futures | | | | | | | | |
| USD | | | | | | | | |
| CLZ2 | -8 | 1,000 | 81.18513 | -649,481.04 | 78.7200 | -629,760.00 | 19,721.04 | |
| ESZ2 | -6 | 50 | 3,664.37366667 | -1,099,312.10 | 3,601.5000 | -1,080,450.00 | 18,862.10 | |

## Open Positions

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| HEZ2 | -20 | 40,000 | 0.7886775 | -630,942.00 | 0.76225 | -609,800.00 | 21,142.00 | |
| HGZ2 | -8 | 25,000 | 3.3979032 | -679,580.64 | 3.4125 | -682,500.00 | -2,919.36 | |
| HOZ2 | -5 | 42,000 | 3.22784357 | -677,847.15 | 3.1270 | -656,670.00 | 21,177.15 | |
| KE MAR 23 | 12 | 5,000 | 8.40100067 | 504,060.04 | 9.8525 | 591,150.00 | 87,089.96 | |
| NGZ2 | -5 | 10,000 | 7.143763 | -357,188.15 | 7.0650 | -353,250.00 | 3,938.15 | |
| RTYZ2 | -12 | 50 | 1,667.32366667 | -1,000,394.20 | 1,669.8000 | -1,001,880.00 | -1,485.80 | |
| SBH3 | -40 | 112,000 | 0.17642348 | -790,377.20 | 0.1768 | -792,064.00 | -1,686.80 | |
| ZC MAR 23 | 20 | 5,000 | 6.230209 | 623,020.90 | 6.8400 | 684,000.00 | 60,979.10 | |
| Total | | | | -4,758,041.54 | | -4,531,224.00 | 226,817.54 | |

## Forex Balances

| Description | Quantity | Cost Price | Cost Basis in USD | Close Price | Value in USD | Unrealized P/L in USD | Code |
|---|---|---|---|---|---|---|---|
| Forex | | | | | | | |
| USD | | | | | | | |
| CAD | -24,987.64 | 0.77300778 | 19,315.64 | 0.72306 | -18,067.56 | 1,248.08 | |
| USD | 10,829,151.90 | 1.0000 | -10,829,151.90 | 1.0000 | 10,829,151.90 | 0.00 | |
| Total | | | -10,809,836.26 | | 10,811,084.34 | 1,248.08 | |

## Trades

| Symbol | Date/Time | Quantity | T. Price | C. Price | Notional Value | Comm/Fee | Basis | Realized P/L | MTM P/L | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Futures | | | | | | | | | | |
| USD | | | | | | | | | | |
| 6MZ2 | 2022-09-26, 12:46:55 | -45 | 0.04822 | 0.04821 | 1,084,950.00 | -111.15 | -1,084,838.85 | 0.00 | 225.00 | O;P |
| 6MZ2 | 2022-09-27, 19:35:38 | -5 | 0.04832 | 0.04891 | 120,800.00 | -12.35 | -120,787.65 | 0.00 | -1,475.00 | O;P |
| 6MZ2 | 2022-09-28, 12:50:11 | 50 | 0.04874 | 0.04891 | -1,218,500.00 | -123.50 | 1,205,626.50 | -12,997.00 | 4,250.00 | C |
| 6MZ2 | 2022-09-29, 14:09:42 | -50 | 0.0489 | 0.04882 | 1,222,500.00 | -123.50 | -1,222,376.50 | 0.00 | 2,000.00 | O;P |
| 6MZ2 | 2022-09-30, 04:24:19 | 50 | 0.0490672 | 0.04901 | -1,226,680.00 | -123.50 | 1,222,376.50 | -4,427.00 | -1,430.00 | C;P |
| Total 6MZ2 | | 0 | | | -16,930.00 | -494.00 | 0.00 | -17,424.00 | 3,570.00 | |
| CLF3 | 2022-09-25, 18:10:36 | -7 | 78.1100 | 75.4500 | 546,770.00 | -16.59 | -546,753.41 | 0.00 | 18,620.00 | O |
| CLF3 | 2022-09-27, 19:24:07 | -1 | 76.7000 | 80.2000 | 76,700.00 | -2.37 | -76,697.63 | 0.00 | -3,500.00 | O |
| CLF3 | 2022-09-28, 14:29:42 | 8 | 80.2600 | 80.2000 | -642,080.00 | -18.96 | 623,451.04 | -18,647.92 | -480.00 | C;P |
| CLF3 | 2022-09-28, 15:56:07 | -8 | 80.0100 | 80.2000 | 640,080.00 | -18.96 | -640,061.04 | 0.00 | -1,520.00 | O;P |
| CLF3 | 2022-09-29, 06:23:08 | 8 | 80.7500 | 79.4200 | -646,000.00 | -18.96 | 640,061.04 | -5,957.92 | -10,640.00 | C;P |
| Total CLF3 | | 0 | | | -24,530.00 | -75.84 | 0.00 | -24,605.84 | 2,480.00 | |
| CLZ2 | 2022-09-19, 08:40:04 | -5 | 81.2000 | 84.6100 | 406,000.00 | -11.85 | -405,988.15 | 0.00 | -17,050.00 | O;P |

## Trades

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CLZ2 | 2022-09-19, 08:46:03 | | 5 | 81.4980 | 84.6100 | -407,490.00 | -11.85 | 405,988.15 | -1,513.70 | 15,560.00 | C;P |
| CLZ2 | 2022-09-29, 08:11:31 | | -7 | 81.3000 | 80.4200 | 569,100.00 | -16.59 | -569,083.41 | 0.00 | 6,160.00 | O;P |
| CLZ2 | 2022-09-29, 14:55:54 | | -1 | 80.4000 | 80.4200 | 80,400.00 | -2.37 | -80,397.63 | 0.00 | -20.00 | O |
| Total CLZ2 | | | -8 | | | 648,010.00 | -42.66 | -649,481.04 | -1,513.70 | 4,650.00 | |
| CTH3 | 2022-09-08, 21:14:53 | | 10 | 1.0141 | 1.0145 | -507,050.00 | -29.70 | 507,079.70 | 0.00 | 200.00 | O;P |
| CTH3 | 2022-09-16, 04:00:31 | | -10 | 0.97512 | 0.9615 | 487,560.00 | -29.70 | -507,079.70 | -19,549.40 | 6,810.00 | C;P |
| Total CTH3 | | | 0 | | | -19,490.00 | -59.40 | 0.00 | -19,549.40 | 7,010.00 | |
| CTZ2 | 2022-09-02, 12:20:46 | | -12 | 1.0494 | 1.0321 | 629,640.00 | -35.64 | -544,675.64 | 84,928.72 | 10,380.00 | C;P |
| CTZ2 | 2022-09-21, 23:13:42 | | 10 | 0.9694 | 0.9654 | -484,700.00 | -29.70 | 484,729.70 | 0.00 | -2,000.00 | O;P |
| CTZ2 | 2022-09-23, 04:59:55 | | -10 | 0.93684 | 0.9254 | 468,420.00 | -29.70 | -484,729.70 | -16,339.40 | 5,720.00 | C;P |
| Total CTZ2 | | | -12 | | | 613,360.00 | -95.04 | -544,675.64 | 68,589.32 | 14,100.00 | |
| ESZ2 | 2022-09-26, 12:44:53 | | -4 | 3,668.5000 | 3,670.0000 | 733,700.00 | -8.60 | -733,691.40 | 0.00 | -300.00 | O |
| ESZ2 | 2022-09-27, 19:13:08 | | -1 | 3,669.0000 | 3,732.0000 | 183,450.00 | -2.15 | -183,447.85 | 0.00 | -3,150.00 | O |
| ESZ2 | 2022-09-29, 10:41:32 | | -1 | 3,643.5000 | 3,654.2500 | 182,175.00 | -2.15 | -182,172.85 | 0.00 | -537.50 | O |
| Total ESZ2 | | | -6 | | | 1,099,325.00 | -12.90 | -1,099,312.10 | 0.00 | -3,987.50 | |
| ETHU2 | 2022-09-15, 11:13:08 | | -5 | 1,469.2000 | 1,494.5000 | 367,300.00 | -35.10 | -369,535.10 | -2,270.20 | -6,325.00 | C;P |
| Total ETHU2 | | | -5 | | | 367,300.00 | -35.10 | -369,535.10 | -2,270.20 | -6,325.00 | |
| GCZ2 | 2022-09-07, 13:45:58 | | 5 | 1,729.8000 | 1,727.8000 | -864,900.00 | -12.10 | 864,912.10 | 0.00 | -1,000.00 | O;P |
| GCZ2 | 2022-09-13, 09:16:06 | | -5 | 1,708.3000 | 1,717.4000 | 854,150.00 | -12.10 | -864,912.10 | -10,774.20 | -4,550.00 | C |
| Total GCZ2 | | | 0 | | | -10,750.00 | -24.20 | 0.00 | -10,774.20 | -5,550.00 | |
| HEZ2 | 2022-09-06, 09:37:53 | | 8 | 0.82975 | 0.8350 | -265,520.00 | -23.20 | 265,543.20 | 0.00 | 1,680.00 | O;P |
| HEZ2 | 2022-09-09, 09:30:10 | | -10 | 0.818075 | 0.83125 | 327,230.00 | -29.00 | -333,889.00 | -6,688.00 | -5,270.00 | C;P |
| HEZ2 | 2022-09-26, 12:39:36 | | -15 | 0.79375 | 0.7940 | 476,250.00 | -43.50 | -476,206.50 | 0.00 | -150.00 | O;P |
| HEZ2 | 2022-09-27, 11:53:20 | | -5 | 0.77375 | 0.7625 | 154,750.00 | -14.50 | -154,735.50 | 0.00 | 2,250.00 | O;P |
| Total HEZ2 | | | -22 | | | 692,710.00 | -110.20 | -699,287.80 | -6,688.00 | -1,490.00 | |
| HGH3 | 2022-09-21, 15:25:38 | | 7 | 3.4610 | 3.4585 | -605,675.00 | -16.94 | 605,691.94 | 0.00 | -437.50 | O;P |
| HGH3 | 2022-09-21, 16:01:07 | | -7 | 3.4355 | 3.4585 | 601,212.50 | -16.94 | -605,691.94 | -4,496.38 | -4,025.00 | C;P |
| Total HGH3 | | | 0 | | | -4,462.50 | -33.88 | 0.00 | -4,496.38 | -4,462.50 | |
| HGZ2 | 2022-09-05, 20:29:49 | | 2 | 3.4645 | 3.4620 | -173,225.00 | -4.84 | 173,229.84 | 0.00 | -125.00 | O |
| HGZ2 | 2022-09-05, 20:46:18 | | 3 | 3.4700 | 3.4620 | -260,250.00 | -7.26 | 260,257.26 | 0.00 | -600.00 | O |
| HGZ2 | 2022-09-15, 06:39:29 | | -5 | 3.4885 | 3.4900 | 436,062.50 | -12.10 | -433,487.10 | 2,563.30 | -187.50 | C |
| HGZ2 | 2022-09-18, 20:20:16 | | 6 | 3.5520 | 3.5125 | -532,800.00 | -14.52 | 532,814.52 | 0.00 | -5,925.00 | O;P |

## Trades

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HGZ2 | 2022-09-18, 20:24:01 | | 1 | 3.5535 | 3.5125 | -88,837.50 | -2.42 | 88,839.92 | 0.00 | -1,025.00 | O |
| HGZ2 | 2022-09-21, 11:18:31 | | -7 | 3.4570 | 3.4670 | 604,975.00 | -16.94 | -621,654.44 | -16,696.38 | -1,750.00 | C;P |
| HGZ2 | 2022-09-21, 22:55:43 | | 6 | 3.4650 | 3.4710 | -519,750.00 | -14.52 | 519,764.52 | 0.00 | 900.00 | O;P |
| HGZ2 | 2022-09-23, 03:30:02 | | -6 | 3.4090 | 3.3430 | 511,350.00 | -14.52 | -519,764.52 | -8,429.04 | 9,900.00 | C |
| HGZ2 | 2022-09-25, 18:10:42 | | -7 | 3.3365 | 3.2945 | 583,887.50 | -16.94 | -583,870.56 | 0.00 | 7,350.00 | O;P |
| HGZ2 | 2022-09-27, 19:27:28 | | -2 | 3.2905 | 3.3585 | 164,525.00 | -4.84 | -164,520.16 | 0.00 | -3,400.00 | O |
| HGZ2 | 2022-09-29, 06:05:35 | | 9 | 3.4035 | 3.4180 | -765,787.50 | -21.78 | 748,390.72 | -17,418.56 | 3,262.50 | C;P |
| HGZ2 | 2022-09-29, 10:39:29 | | -8 | 3.3685 | 3.4180 | 673,700.00 | -19.36 | -673,680.64 | 0.00 | -9,900.00 | O |
| HGZ2 | 2022-09-30, 04:05:01 | | 8 | 3.4610 | 3.4125 | -692,200.00 | -19.36 | 673,680.64 | -18,538.72 | -9,700.00 | C;P |
| HGZ2 | 2022-09-30, 14:04:42 | | -8 | 3.3980 | 3.4125 | 679,600.00 | -19.36 | -679,580.64 | 0.00 | -2,900.00 | O |
| Total HGZ2 | | | -8 | | | 621,250.00 | -188.76 | -679,580.64 | -58,519.40 | -14,100.00 | |
| HOF3 | 2022-09-14, 08:30:17 | | 4 | 3.236575 | 3.2509 | -543,744.60 | -9.48 | 543,754.08 | 0.00 | 2,406.60 | O;P |
| HOF3 | 2022-09-15, 09:22:04 | | -4 | 3.1366 | 3.1052 | 526,948.80 | -9.48 | -543,754.08 | -16,814.76 | 5,275.20 | C;P |
| Total HOF3 | | | 0 | | | -16,795.80 | -18.96 | 0.00 | -16,814.76 | 7,681.80 | |
| HOZ2 | 2022-09-01, 10:22:29 | | 4 | 3.4102 | 3.4342 | -572,913.60 | -9.48 | 572,923.08 | 0.00 | 4,032.00 | O;P |
| HOZ2 | 2022-09-14, 03:06:02 | | -4 | 3.30425 | 3.2928 | 555,114.00 | -9.48 | -572,923.08 | -17,818.56 | 1,923.60 | C;P |
| HOZ2 | 2022-09-22, 08:46:32 | | 3 | 3.2660 | 3.2517 | -411,516.00 | -7.11 | 411,523.11 | 0.00 | -1,801.80 | O;P |
| HOZ2 | 2022-09-23, 06:46:02 | | -3 | 3.1537 | 3.0949 | 397,366.20 | -7.11 | -411,523.11 | -14,164.02 | 7,408.80 | C;P |
| HOZ2 | 2022-09-26, 08:23:24 | | -4 | 3.05205 | 2.9830 | 512,744.40 | -9.48 | -512,734.92 | 0.00 | 11,600.40 | O;P |
| HOZ2 | 2022-09-27, 12:31:57 | | -1 | 3.0535 | 3.0871 | 128,247.00 | -2.37 | -128,244.63 | 0.00 | -1,411.20 | O |
| HOZ2 | 2022-09-28, 11:45:27 | | 5 | 3.21788 | 3.2437 | -675,754.80 | -11.85 | 640,979.55 | -34,787.10 | 5,422.20 | C;P |
| HOZ2 | 2022-09-28, 20:05:12 | | -4 | 3.2350 | 3.2072 | 543,480.00 | -9.48 | -543,470.52 | 0.00 | 4,670.40 | O |
| HOZ2 | 2022-09-29, 14:52:04 | | -1 | 3.1995 | 3.2072 | 134,379.00 | -2.37 | -134,376.63 | 0.00 | -323.40 | O |
| Total HOZ2 | | | -5 | | | 611,146.20 | -68.73 | -677,847.15 | -66,769.68 | 31,521.00 | |
| KCH3 | 2022-09-06, 07:16:36 | | -6 | 2.2140 | 2.2365 | 498,150.00 | -17.82 | -455,980.32 | 42,151.86 | -5,062.50 | C;P |
| KCH3 | 2022-09-12, 08:33:10 | | 5 | 2.2120 | 2.1920 | -414,750.00 | -14.85 | 414,764.85 | 0.00 | -3,750.00 | O;P |
| KCH3 | 2022-09-13, 09:01:24 | | -6 | 2.1595 | 2.1545 | 485,887.50 | -17.82 | -492,130.32 | -6,260.64 | 1,125.00 | C;P |
| KCH3 | 2022-09-19, 11:15:30 | | 6 | 2.1195 | 2.1545 | -476,887.50 | -17.82 | 476,905.32 | 0.00 | 7,875.00 | O;P |
| KCH3 | 2022-09-28, 08:00:00 | | -6 | 2.12733333 | 2.1960 | 478,650.00 | -17.82 | -476,905.32 | 1,726.86 | -15,450.00 | C;P |
| Total KCH3 | | | -7 | | | 571,050.00 | -86.13 | -533,345.79 | 37,618.08 | -15,262.50 | |



**Confidential**

## Trades

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| KE MAR 23 | 2022-09-20, 09:54:31 | | 2 | 9.2650 | 9.5950 | -92,650.00 | -5.84 | 92,655.84 | 0.00 | 3,300.00 | O;P |
| Total KE MAR 23 | | | 2 | | | -92,650.00 | -5.84 | 92,655.84 | 0.00 | 3,300.00 | |
| LBSX2 | 2022-09-09, 15:57:36 | | 5 | 505.9000 | 510.8000 | -278,245.00 | -14.50 | 278,259.50 | 0.00 | 2,695.00 | O;P |
| LBSX2 | 2022-09-23, 10:00:00 | | -5 | 450.1400 | 435.0000 | 247,577.00 | -14.50 | -278,259.50 | -30,697.00 | 8,327.00 | C;P |
| Total LBSX2 | | | 0 | | | -30,668.00 | -29.00 | 0.00 | -30,697.00 | 11,022.00 | |
| LEZ2 | 2022-09-26, 12:33:44 | | -10 | 1.4731 | 1.4735 | 589,240.00 | -29.00 | -576,129.00 | 13,082.00 | -160.00 | C;P |
| Total LEZ2 | | | -10 | | | 589,240.00 | -29.00 | -576,129.00 | 13,082.00 | -160.00 | |
| NGV2 | 2022-09-06, 06:32:38 | | -6 | 8.5810 | 8.1450 | 514,860.00 | -14.22 | -338,024.22 | 176,821.56 | 26,160.00 | C;P |
| Total NGV2 | | | -6 | | | 514,860.00 | -14.22 | -338,024.22 | 176,821.56 | 26,160.00 | |
| NGZ2 | 2022-09-06, 11:47:00 | | 5 | 8.7002 | 8.3670 | -435,010.00 | -11.85 | 435,021.85 | 0.00 | -16,660.00 | O;P |
| NGZ2 | 2022-09-06, 14:03:31 | | -5 | 8.3360 | 8.3670 | 416,800.00 | -11.85 | -435,021.85 | -18,233.70 | -1,550.00 | C;P |
| NGZ2 | 2022-09-08, 09:27:30 | | 5 | 8.1720 | 8.1020 | -408,600.00 | -11.85 | 408,611.85 | 0.00 | -3,500.00 | O;P |
| NGZ2 | 2022-09-16, 04:14:12 | | -5 | 8.3010 | 7.9660 | 415,050.00 | -11.85 | -408,611.85 | 6,426.30 | 16,750.00 | C;P |
| NGZ2 | 2022-09-21, 15:03:17 | | 4 | 8.0200 | 7.9900 | -320,800.00 | -9.48 | 320,809.48 | 0.00 | -1,200.00 | O;P |
| NGZ2 | 2022-09-22, 10:31:01 | | -4 | 7.7110 | 7.3780 | 308,440.00 | -9.48 | -320,809.48 | -12,378.96 | 13,320.00 | C;P |
| NGZ2 | 2022-09-25, 21:10:05 | | 5 | 7.3250 | 7.2350 | -366,250.00 | -11.85 | 366,261.85 | 0.00 | -4,500.00 | O;P |
| NGZ2 | 2022-09-26, 07:15:38 | | -5 | 7.0550 | 7.2350 | 352,750.00 | -11.85 | -366,261.85 | -13,523.70 | -9,000.00 | C;P |
| NGZ2 | 2022-09-27, 23:08:01 | | -4 | 7.1000 | 7.2000 | 284,000.00 | -9.48 | -283,990.52 | 0.00 | -4,000.00 | O;P |
| NGZ2 | 2022-09-28, 15:19:17 | | 4 | 7.2490 | 7.2000 | -289,960.00 | -9.48 | 283,990.52 | -5,978.96 | -1,960.00 | C |
| NGZ2 | 2022-09-29, 14:53:25 | | -5 | 7.1440 | 7.1420 | 357,200.00 | -11.85 | -357,188.15 | 0.00 | 100.00 | O;P |
| Total NGZ2 | | | -5 | | | 313,620.00 | -120.87 | -357,188.15 | -43,689.02 | -12,200.00 | |
| NKDU2 | 2022-08-31, 21:38:00 | | -9 | 27,610.0000 | 27,785.0000 | 1,242,450.00 | -27.18 | -1,252,827.18 | -10,404.36 | -7,875.00 | C;P |
| Total NKDU2 | | | -9 | | | 1,242,450.00 | -27.18 | -1,252,827.18 | -10,404.36 | -7,875.00 | |
| NKDZ2 | 2022-09-01, 14:33:10 | | 8 | 27,535.0000 | 27,615.0000 | -1,101,400.00 | -24.16 | 1,101,424.16 | 0.00 | 3,200.00 | O |
| NKDZ2 | 2022-09-06, 20:18:54 | | -8 | 27,233.7500 | 27,535.0000 | 1,089,350.00 | -24.16 | -1,101,424.16 | -12,098.32 | -12,050.00 | C;P |
| Total NKDZ2 | | | 0 | | | -12,050.00 | -48.32 | 0.00 | -12,098.32 | -8,850.00 | |
| NQZ2 | 2022-08-31, 19:19:21 | | -4 | 12,263.1250 | 12,366.2500 | 981,050.00 | -8.60 | -992,628.60 | -11,587.20 | -8,250.00 | C;P |
| Total NQZ2 | | | -4 | | | 981,050.00 | -8.60 | -992,628.60 | -11,587.20 | -8,250.00 | |
| PLF3 | 2022-09-13, 09:29:19 | | 10 | 898.4000 | 883.4000 | -449,200.00 | -24.20 | 449,224.20 | 0.00 | -7,500.00 | O;P |
| PLF3 | 2022-09-18, 20:32:21 | | 2 | 902.6000 | 912.6000 | -90,260.00 | -4.84 | 90,264.84 | 0.00 | 1,000.00 | O |
| PLF3 | 2022-09-23, 06:48:49 | | -10 | 871.0600 | 856.5000 | 435,530.00 | -24.20 | -449,224.20 | -13,718.40 | 7,280.00 | C;P |
| PLF3 | 2022-09-23, 12:47:55 | | -2 | 856.5000 | 856.5000 | 85,650.00 | -4.84 | -90,264.84 | -4,619.68 | 0.00 | C |

## Trades

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total PLF3 | | 0 | | | -18,280.00 | -58.08 | 0.00 | -18,338.08 | 780.00 | |
| RTYZ2 | 2022-09-27, 12:08:16 | -10 | 1,666.6000 | 1,668.4000 | 833,300.00 | -21.50 | -833,278.50 | 0.00 | -900.00 | O |
| RTYZ2 | 2022-09-27, 19:25:42 | -2 | 1,671.2000 | 1,720.8000 | 167,120.00 | -4.30 | -167,115.70 | 0.00 | -4,960.00 | O |
| Total RTYZ2 | | -12 | | | 1,000,420.00 | -25.80 | -1,000,394.20 | 0.00 | -5,860.00 | |
| SBH3 | 2022-09-16, 08:55:56 | -25 | 0.176412 | 0.1756 | 493,953.60 | -74.25 | -500,434.25 | -6,554.90 | 2,273.60 | C;P |
| SBH3 | 2022-09-27, 11:41:47 | -30 | 0.1765 | 0.1759 | 593,040.00 | -89.10 | -592,950.90 | 0.00 | 2,016.00 | O;P |
| SBH3 | 2022-09-27, 12:16:50 | -10 | 0.1763 | 0.1759 | 197,456.00 | -29.70 | -197,426.30 | 0.00 | 448.00 | O;P |
| Total SBH3 | | -65 | | | 1,284,449.60 | -193.05 | -1,290,811.45 | -6,554.90 | 4,737.60 | |
| SIZ2 | 2022-09-05, 20:29:49 | 6 | 18.1900 | 17.9080 | -545,700.00 | -14.52 | 545,714.52 | 0.00 | -8,460.00 | O;P |
| SIZ2 | 2022-09-16, 04:16:32 | -6 | 18.7900 | 19.3810 | 563,700.00 | -14.52 | -545,714.52 | 17,970.96 | -17,730.00 | C;P |
| SIZ2 | 2022-09-20, 22:33:10 | 5 | 19.3150 | 19.4800 | -482,875.00 | -12.10 | 482,887.10 | 0.00 | 4,125.00 | O |
| SIZ2 | 2022-09-25, 18:07:10 | -5 | 18.7050 | 18.4800 | 467,625.00 | -12.10 | -482,887.10 | -15,274.20 | 5,625.00 | C |
| Total SIZ2 | | 0 | | | 2,750.00 | -53.24 | 0.00 | 2,696.76 | -16,440.00 | |
| XAEU2 | 2022-09-01, 09:59:30 | -6 | 811.01666667 | 817.8000 | 486,610.00 | -12.90 | -439,072.90 | 47,524.20 | -4,070.00 | C;P |
| XAEU2 | 2022-09-06, 14:00:44 | 4 | 824.3000 | 824.2000 | -329,720.00 | -8.60 | 329,728.60 | 0.00 | -40.00 | O |
| XAEU2 | 2022-09-06, 15:56:01 | -6 | 822.36666667 | 824.2000 | 493,420.00 | -12.90 | -482,352.90 | 11,054.20 | -1,100.00 | C;P |
| XAEU2 | 2022-09-07, 10:43:44 | 7 | 814.92857143 | 814.7000 | -570,450.00 | -15.05 | 570,465.05 | 0.00 | -160.00 | O;P |
| XAEU2 | 2022-09-08, 15:46:46 | -7 | 816.4000 | 818.5000 | 571,480.00 | -15.05 | -570,465.05 | 999.90 | -1,470.00 | C;P |
| Total XAEU2 | | -8 | | | 651,340.00 | -64.50 | -591,697.20 | 59,578.30 | -6,840.00 | |
| XAEZ2 | 2022-09-08, 15:42:27 | 7 | 814.9000 | 817.1000 | -570,430.00 | -15.05 | 570,445.05 | 0.00 | 1,540.00 | O;P |
| XAEZ2 | 2022-09-12, 08:40:59 | 1 | 845.5000 | 852.1000 | -84,550.00 | -2.15 | 84,552.15 | 0.00 | 660.00 | O |
| XAEZ2 | 2022-09-16, 09:44:50 | -7 | 810.5000 | 813.3000 | 567,350.00 | -15.05 | -570,445.05 | -3,110.10 | -1,960.00 | C |
| XAEZ2 | 2022-09-19, 09:35:25 | 6 | 800.1000 | 813.3000 | -480,060.00 | -12.90 | 480,072.90 | 0.00 | 7,920.00 | O;P |
| XAEZ2 | 2022-09-23, 09:40:00 | -7 | 752.4000 | 739.4000 | 526,680.00 | -15.05 | -564,625.05 | -37,960.10 | 9,100.00 | C |
| Total XAEZ2 | | 0 | | | -41,010.00 | -60.20 | 0.00 | -41,070.20 | 17,260.00 | |
| XAFU2 | 2022-09-01, 09:30:34 | -6 | 403.95833333 | 407.7000 | 605,937.50 | -12.90 | -612,575.40 | -6,650.80 | -5,612.50 | C;P |
| XAFU2 | 2022-09-06, 11:49:21 | 6 | 404.24166667 | 403.1500 | -606,362.50 | -12.90 | 606,375.40 | 0.00 | -1,637.50 | O;P |
| XAFU2 | 2022-09-08, 15:50:56 | -6 | 417.1000 | 418.4000 | 625,650.00 | -12.90 | -606,375.40 | 19,261.70 | -1,950.00 | C;P |
| Total XAFU2 | | -6 | | | 625,225.00 | -38.70 | -612,575.40 | 12,610.90 | -9,200.00 | |
| XAFZ2 | 2022-09-08, 15:44:43 | 6 | 418.0000 | 420.0500 | -627,000.00 | -12.90 | 627,012.90 | 0.00 | 3,075.00 | O;P |
| XAFZ2 | 2022-09-14, 10:23:24 | -6 | 408.3500 | 410.2000 | 612,525.00 | -12.90 | -627,012.90 | -14,500.80 | -2,775.00 | C |
| Total XAFZ2 | | 0 | | | -14,475.00 | -25.80 | 0.00 | -14,500.80 | 300.00 | |

## Trades

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| XAIU2 | 2022-09-08, 13:56:41 | 6 | 941.4000 | 944.9000 | -564,840.00 | -12.90 | 564,852.90 | 0.00 | 2,100.00 | O;P |
| XAIU2 | 2022-09-08, 15:49:51 | -6 | 941.5000 | 944.9000 | 564,900.00 | -12.90 | -564,852.90 | 34.20 | -2,040.00 | C;P |
| Total XAIU2 | | 0 | | | 60.00 | -25.80 | 0.00 | 34.20 | 60.00 | |
| XAIZ2 | 2022-09-08, 15:45:39 | 6 | 945.0000 | 949.0000 | -567,000.00 | -12.90 | 567,012.90 | 0.00 | 2,400.00 | O |
| XAIZ2 | 2022-09-14, 10:04:19 | -6 | 922.5000 | 928.7000 | 553,500.00 | -12.90 | -567,012.90 | -13,525.80 | -3,720.00 | C |
| Total XAIZ2 | | 0 | | | -13,500.00 | -25.80 | 0.00 | -13,525.80 | -1,320.00 | |
| YM SEP 22 | 2022-09-01, 14:29:35 | 6 | 31,535.0000 | 31,663.0000 | -946,050.00 | -12.90 | 946,062.90 | 0.00 | 3,840.00 | O |
| YM SEP 22 | 2022-09-06, 10:12:48 | -6 | 31,057.0000 | 31,166.0000 | 931,710.00 | -12.90 | -946,062.90 | -14,365.80 | -3,270.00 | C;P |
| Total YM SEP 22 | | 0 | | | -14,340.00 | -25.80 | 0.00 | -14,365.80 | 570.00 | |
| ZC MAR 23 | 2022-09-09, 08:38:27 | 3 | 6.7800 | 6.8925 | -101,700.00 | -8.76 | 101,708.76 | 0.00 | 1,687.50 | O |
| Total ZC MAR 23 | | 3 | | | -101,700.00 | -8.76 | 101,708.76 | 0.00 | 1,687.50 | |
| ZL DEC 22 | 2022-09-08, 05:07:21 | -12 | 0.6165 | 0.6323 | 443,880.00 | -35.04 | -406,295.04 | 37,549.92 | -11,376.00 | C;P |
| Total ZL DEC 22 | | -12 | | | 443,880.00 | -35.04 | -406,295.04 | 37,549.92 | -11,376.00 | |
| ZL MAR 23 | 2022-09-26, 22:44:58 | -6 | 0.6080 | 0.6081 | 218,880.00 | -17.52 | -218,862.48 | 0.00 | -36.00 | O;P |
| ZL MAR 23 | 2022-09-26, 22:52:15 | -12 | 0.6078 | 0.6081 | 437,616.00 | -35.04 | -437,580.96 | 0.00 | -216.00 | O;P |
| ZL MAR 23 | 2022-09-29, 12:54:37 | 18 | 0.6238 | 0.6224 | -673,704.00 | -52.56 | 656,443.44 | -17,313.12 | -1,512.00 | C;P |
| Total ZL MAR 23 | | 0 | | | -17,208.00 | -105.12 | 0.00 | -17,313.12 | -1,764.00 | |
| ZM MAR 23 | 2022-09-08, 20:27:18 | 15 | 400.9000 | 403.3000 | -601,350.00 | -43.80 | 601,393.80 | 0.00 | 3,600.00 | O;P |
| ZM MAR 23 | 2022-09-16, 10:18:18 | -15 | 409.60666667 | 408.9000 | 614,410.00 | -43.80 | -601,393.80 | 12,972.40 | 1,060.00 | C;P |
| Total ZM MAR 23 | | 0 | | | 13,060.00 | -87.60 | 0.00 | 12,972.40 | 4,660.00 | |
| ZS JAN 23 | 2022-09-01, 11:52:29 | -8 | 14.0325 | 13.9975 | 561,300.00 | -23.36 | -571,823.36 | -10,546.72 | 1,400.00 | C;P |
| Total ZS JAN 23 | | -8 | | | 561,300.00 | -23.36 | -571,823.36 | -10,546.72 | 1,400.00 | |
| ZS MAR 23 | 2022-09-18, 20:40:31 | 8 | 14.5925 | 14.6925 | -583,700.00 | -23.36 | 583,723.36 | 0.00 | 4,000.00 | O;P |
| ZS MAR 23 | 2022-09-23, 09:45:08 | -8 | 14.3150 | 14.3450 | 572,600.00 | -23.36 | -583,723.36 | -11,146.72 | -1,200.00 | C;P |
| Total ZS MAR 23 | | 0 | | | -11,100.00 | -46.72 | 0.00 | -11,146.72 | 2,800.00 | |
| Total | | | | | 12,987,916.50 | -2,532.20 | -13,049,094.46 | -63,710.16 | 4,437.40 | |

## Interest Accruals

| Base Currency Summary | |
|---|---|
| Starting Accrual Balance | 14,566.23 |
| Interest Accrued | 16,539.38 |
| Accrual Reversal | -15,062.73 |
| FX Translation | 2.53 |
| Ending Accrual Balance | 16,045.41 |
| CAD | |
| Starting Accrual Balance | -80.82 |
| Interest Accrued | -92.51 |
| Accrual Reversal | 83.52 |
| Ending Accrual Balance | -89.81 |
| Ending Accrual Balance in USD | -64.94 |
| USD | |
| Starting Accrual Balance | 14,627.78 |
| Interest Accrued | 16,608.81 |
| Accrual Reversal | -15,126.24 |
| Ending Accrual Balance | 16,110.35 |

## Fees

| Date | Description | Amount |
|---|---|---|
| Other Fees | | |
| USD | | |
| 2022-09-05 | c*****38:CBOT Professional for Sep 2022[1] | -123.00 |
| 2022-09-05 | c*****38:CME Professional for Sep 2022[1] | -123.00 |
| 2022-09-05 | c*****38:COMEX Professional for Sep 2022[1] | -123.00 |
| 2022-09-05 | C*****38:ICE FUTURES U.S. FOR SEP 2022[1] | -120.75 |
| 2022-09-05 | C*****38:ICEFUTUSCANOLA FOR SEP 2022[1] | -38.00 |
| 2022-09-05 | c*****38:NYMEX Professional for Sep 2022[1] | -123.00 |
| Total | | -650.75 |

Notes

1. Market data is provided by Global Financial Information Services (GmbH). Your local broker collects amounts owed for fees and tax for such data on behalf of Global Financial Information Services (GmbH). Note, you are responsible for any applicable taxes relating to the provision of these services.

## Interest

| Date | Description | Amount |
|---|---|---|
| CAD | | |
| 2022-09-06 | CAD Debit Interest for Aug-2022 from U8240608 | -83.52 |
| Total | | -83.52 |
| Total in USD | | -63.51 |
| USD | | |
| 2022-09-06 | USD Credit Interest for Aug-2022 from U8240608 | 15,126.24 |
| Total | | 15,126.24 |
| Total Interest in USD | | 15,062.73 |

## Financial Instrument Information

| Symbol | Description | Conid | Listing Exch | Multiplier | Expiry | Delivery Month | Code |
|---|---|---|---|---|---|---|---|
| Futures | | | | | | | |
| 6MZ2 | MXP 19DEC22 | 491421951 | GLOBEX | 500,000 | 2022-12-19 | 2022-12 | |
| CLF3 | CL JAN23 | 296574742 | NYMEX | 1,000 | 2022-12-20 | 2023-01 | |
| CLZ2 | CL DEC22 | 138979238 | NYMEX | 1,000 | 2022-11-21 | 2022-12 | |
| CTH3 | CT 16MAR23 | 415492838 | NYBOT | 50,000 | 2023-03-16 | 2023-03 | |
| CTZ2 | CT 14DEC22 | 397994196 | NYBOT | 50,000 | 2022-12-14 | 2022-12 | |
| ESZ2 | ES 16DEC22 | 495512551 | GLOBEX | 50 | 2022-12-16 | 2022-12 | |
| ETHU2 | ETHUSDRR SEP22 | 553045282 | CMECRYPTO | 50 | 2022-10-03 | 2022-09 | |
| GCZ2 | GC 28DEC22 | 260862601 | NYMEX | 100 | 2022-12-28 | 2022-12 | |
| HEZ2 | HE 16DEC22 | 496647135 | GLOBEX | 40,000 | 2022-12-16 | 2022-12 | |
| HGH3 | HG 29MAR23 | 312294459 | NYMEX | 25,000 | 2023-03-29 | 2023-03 | |
| HGZ2 | HG 28DEC22 | 301051088 | NYMEX | 25,000 | 2022-12-28 | 2022-12 | |
| HOF3 | HO JAN23 | 344035127 | NYMEX | 42,000 | 2022-12-30 | 2023-01 | |
| HOZ2 | HO DEC22 | 344035122 | NYMEX | 42,000 | 2022-11-30 | 2022-12 | |
| KCH3 | KC 22MAR23 | 415492841 | NYBOT | 37,500 | 2023-03-22 | 2023-03 | |
| KE MAR 23 | KE 14MAR23 | 434140049 | ECBOT | 5,000 | 2023-03-14 | 2023-03 | |
| LBSX2 | LB 15NOV22 | 514487508 | GLOBEX | 110 | 2022-11-15 | 2022-11 | |
| LEZ2 | LE 30DEC22 | 500092608 | GLOBEX | 40,000 | 2022-12-30 | 2022-12 | |
| NGV2 | NG OCT22 | 139214028 | NYMEX | 10,000 | 2022-09-28 | 2022-10 | |
| NGZ2 | NG DEC22 | 139213989 | NYMEX | 10,000 | 2022-11-28 | 2022-12 | |
| NKDU2 | NKD 09SEP22 | 382852174 | GLOBEX | 5 | 2022-09-09 | 2022-09 | |
| NKDZ2 | NKD 09DEC22 | 353749265 | GLOBEX | 5 | 2022-12-09 | 2022-12 | |
| NQZ2 | NQ 16DEC22 | 515416660 | GLOBEX | 20 | 2022-12-16 | 2022-12 | |
| PLF3 | PL 27JAN23 | 523243752 | NYMEX | 50 | 2023-01-27 | 2023-01 | |
| RTYZ2 | RTY 16DEC22 | 515416587 | GLOBEX | 50 | 2022-12-16 | 2022-12 | |
| SBH3 | SB MAR23 | 415492855 | NYBOT | 112,000 | 2023-02-28 | 2023-03 | |
| SIZ2 | SI 28DEC22 | 301051116 | NYMEX | 5,000 | 2022-12-28 | 2022-12 | |
| XAEU2 | IXE 16SEP22 | 497954600 | GLOBEX | 100 | 2022-09-16 | 2022-09 | |
| XAEZ2 | IXE 16DEC22 | 515416617 | GLOBEX | 100 | 2022-12-16 | 2022-12 | |
| XAFU2 | IXM 16SEP22 | 497954524 | GLOBEX | 250 | 2022-09-16 | 2022-09 | |
| XAFZ2 | IXM 16DEC22 | 515416611 | GLOBEX | 250 | 2022-12-16 | 2022-12 | |
| XAIU2 | IXI 16SEP22 | 497954560 | GLOBEX | 100 | 2022-09-16 | 2022-09 | |
| XAIZ2 | IXI 16DEC22 | 515416592 | GLOBEX | 100 | 2022-12-16 | 2022-12 | |
| YM SEP 22 | YM 16SEP22 | 515416550 | ECBOT | 5 | 2022-09-16 | 2022-09 | |
| ZC MAR 23 | ZC 14MAR23 | 460126199 | ECBOT | 5,000 | 2023-03-14 | 2023-03 | |
| ZL DEC 22 | ZL 14DEC22 | 345852237 | ECBOT | 60,000 | 2022-12-14 | 2022-12 | |
| ZL MAR 23 | ZL 14MAR23 | 460126255 | ECBOT | 60,000 | 2023-03-14 | 2023-03 | |
| ZM MAR 23 | ZM 14MAR23 | 460126182 | ECBOT | 100 | 2023-03-14 | 2023-03 | |
| ZS JAN 23 | ZS 13JAN23 | 455229208 | ECBOT | 5,000 | 2023-01-13 | 2023-01 | |
| ZS MAR 23 | ZS 14MAR23 | 455229196 | ECBOT | 5,000 | 2023-03-14 | 2023-03 | |

## Codes

| Code | Meaning | Code (Cont.) | Meaning (Cont.) |
|---|---|---|---|
| A | Assignment | LI | Last In, First Out (LIFO) tax basis election |

## Codes

| Code | Meaning | Code (Cont.) | Meaning (Cont.) |
|---|---|---|---|
| ADR | ADR Fee Accrual | LT | Long Term P/L |
| AEx | Automatic exercise for dividend-related recommendation. | Lo | Direct Loan |
| Adj | Adjustment | M | Entered manually by IB |
| Al | Allocation | MEx | Manual exercise for dividend-related recommendation. |
| Aw | Away Trade | ML | Maximize Losses tax basis election |
| B | Automatic Buy-in | MLG | Maximize Long Term Gain tax basis election |
| Bo | Direct Borrow | MLL | Maximize Long Term Loss tax basis election |
| C | Closing Trade | MSG | Maximize Short Term Gain tax basis election |
| CD | Cash Delivery | MSL | Maximize Short Term Loss tax basis election |
| CP | Complex Position | O | Opening Trade |
| Ca | Cancelled | P | Partial Execution |
| Co | Corrected Trade | PI | Price Improvement |
| Cx | Part or all of this transaction was a Crossing executed as dual agent by IB for two IB customers | Po | Interest or Dividend Accrual Posting |
| ETF | ETF Creation/Redemption | Pr | Part or all of this transaction was executed by the Exchange as a Crossing by IB against an IB affiliate and is therefore classified as a Principal and not an agency trade |
| Ep | Resulted from an Expired Position | R | Dividend Reinvestment |
| Ex | Exercise | RED | Redemption to Investor |
| FP | IB acted as agent for the fractional share portion of this trade, which was executed by an IB affiliate as principal. | RI | Recurring Investment |
| FPA | IB acted as agent for both the fractional share portion and the whole share portion of this trade; the fractional share portion was executed by an IB Affiliate as principal. | RP | IB acted as agent for the fractional share portion of this trade, which was executed by an IB affiliate as riskless principal. |
| G | Trade in Guaranteed Account Segment | RPA | IB acted as agent for both the fractional share portion and the whole share portion of this trade; the fractional share portion was executed by an IB Affiliate as riskless principal. |
| GEA | Exercise or Assignment resulting from offsetting positions | Re | Interest or Dividend Accrual Reversal |
| HC | Highest Cost tax basis election | Ri | Reimbursement |
| HFI | Investment Transferred to Hedge Fund | SI | This order was solicited by Interactive Brokers |
| HFR | Redemption from Hedge Fund | SL | Specific Lot tax basis election |
| I | Internal Transfer | SO | This order was marked as solicited by your Introducing Broker |
| IA | This transaction was executed against an IB affiliate | SS | Customer designated this trade for shortened settlement and so is subject to execution at prices above the prevailing market |
| INV | Investment Transfer from Investor | ST | Short Term P/L |
| IPO | This transaction was executed as part of an IPO in which IB was a member of the selling group and is classified as a Principal trade. | T | Transfer |
| L | Ordered by IB (Margin Violation) | Un | Unvested shares from stock grant |
| LD | Adjusted by Loss Disallowed from Wash Sale | | |

## Notes/Legal Notes

Notes

1. Most stock exchange transactions settle on the trade date plus two business days. Options, futures and US open-end mutual fund transactions settle on trade date plus one business day. (Some exchanges and other transaction types may have longer or shorter settlement periods.) Ending settled cash reflects the cash that has actually settled.
2. Initial and maintenance margin requirements are available within the Account Window of the Trader Workstation.
3. Interactive Brokers LLC receives compensation from fund companies in connection with the purchase and holding of fund shares by customers of Interactive Brokers LLC. Such compensation includes, but is not limited to, Rule 12b-1 fees that are paid out of the funds assets. The source and amount of any remuneration received by Interactive Brokers LLC in connection with a transaction will be furnished upon written request of the customer. IB may share a portion of the compensation received from fund companies with your financial advisor or introducing broker.
4. Quantities preceded by a "-" sign indicate sell transactions. Other transactions are purchases.



Confidential

CAMSHAFT0001968

## Notes/Legal Notes

5. IB acts as agent in executing the fractional share portion of your order. In certain circumstances, IB routes the fractional portion of your order to an affiliate, which may execute the fractional portion of the order as principal. In such circumstances, this is indicated by the codes associated with the trade. If an IB affiliate acts as principal in executing any fractional share portion of your order, the order will be executed at the price displayed for the opposite side of the NBBO from your order (the offer if you are buying and the bid if you are selling) at the time of execution. If an IB affiliate is acting as riskless principal in connection with filling the fractional share portion of your order, the affiliate will execute the fractional share portion of your order at the price it receives for the execution of the whole share.
6. In case of partial executions, commissions are charged on the total quantity executed on the original order. The commission is displayed on the first partial execution only.
7. Each closed lot indicated above with a reference to note (6) was chosen by the end of the trading day to be sold versus the specific opening purchase identified in that row.
8. Trade execution times are displayed in Eastern Time.
9. Applicable commodity Regulatory Fees for your transactions are available on the IB website at www.interactivebrokers.com/en/accounts/fees/exchangeAndRegulatoryFees.php.
10. Borrow Fee Rate represents the cost to borrow stock expressed in percent per annum. It is applied to the cash collateral amount on the stock borrow contract and is separate from any interest earned on credit cash balances. Similarly, Loan Fee Rate represents the benefit to lend stock. A positive rate indicates a cost to the borrower/benefit to the lender and a negative rate indicates a benefit to the borrower/cost to the lender. In general, the fee rates for hard-to-borrow stocks are higher than for normal availability stocks.
11. Interest Rate on Customer Collateral represents the interest paid on the collateral posted to the customer's account and received from lending stock. A positive rate indicates a benefit to the lender.
12. The closing prices on this Activity Statement are indicative and may come from third-party sources. Interactive Brokers does not warrant the accuracy of the prices provided by third-party sources. Due to time zone differences, certain non-US mutual funds may deliver closing prices after the Activity Statement has been produced and the closing prices for such funds will reflect the previous day's price.
13. All Market Data and Research services are provided through Global Financial Information Services (GmbH).
14. Market data is provided by Global Financial Information Services (GmbH). Your local broker collects amounts owed for fees and tax for such data on behalf of Global Financial Information Services (GmbH). Note, you are responsible for any applicable taxes relating to the provision of these services.

Fixed Income Notes

1. Call features for bonds or preferred stocks may affect the yield. For zero coupon, compound interest and multiplier securities, there are no periodic payments and securities may be callable below maturity value without notice to holder unless registered. For asset-backed securities, the actual yield may vary depending on the speed at which the underlying note is pre-paid. For additional information regarding bond yield, please contact the IB Help Desk at: help@interactivebrokers.com. If this debt security is unrated by a nationally recognized statistical rating organization, it may pose a high risk of default. You should consult a financial advisor to determine whether unrated bonds are appropriate for your portfolio in light of your goals and your financial circumstances. Fees charged by bond trading centers are included in the cost of bond transactions.

Legal Notes

1. Please promptly report any inaccuracy or discrepancy in this statement, or in your account. Contact the IB Customer Service Department in writing using the form available on the IB website. You may also contact IB by phone, but if you report an error by phone, you should re-confirm such oral communication in writing in order to protect your rights, including rights under the Securities Investor Protection Act (SIPA).

   Interactive Brokers LLC, www.interactivebrokers.com, 877-442-2757 (U.S.)

   Interactive Brokers (UK) (Ltd), www.interactivebrokers.co.uk, 00800-42-276537 (Intl)

   Interactive Brokers Canada Inc., www.interactivebrokers.ca, 877-745-4222 (Can.)

2. Unless otherwise noted, Interactive Brokers acted as agent in the execution of the above transactions. For those exchanges where IB is not a direct clearing member or custodian, IB may use one of the following clearing agents or sub-custodians: Interactive Brokers Australia Pty Limited; Interactive Brokers Canada Inc.; Interactive Brokers Central Europe Zrt.; Interactive Brokers Hong Kong Limited; Interactive Brokers Securities Japan, Inc.; Interactive Brokers (U.K.) Limited; IBKR Financial Services AG; ABN Amro Clearing Singapore Pte. Ltd.; BBVA Bancomer, S.A.; BNP Securities Services, Milan Branch; BMO Harris Bank N.A.; Citibank Europe plc; Skandinaviska Enskilda Banken AB (including select branches).
3. IB acts as agent or riskless principal in foreign currency exchange transactions and as riskless principal in spot precious metals transactions. Such transactions are executed against an IB affiliate or a third party, which acts as principal in such transactions and may have a long or short position and may have profited or lost in connection with the transaction. Foreign currency exchange and spot precious metals transactions executed by Customer through IB are not regulated or overseen by the SEC or the CFTC.
4. Trades marked with the exchange indicator of TMBR were effected by IB as agent through a market making affiliate, which acted as principal in the transaction and may have a long or short position in the security and may have profited or lost in connection with the transaction.
5. All VWAP trades are effected pursuant to an average price formula based on a reference price provided by a third-party data provider. Additional information and reference prices are available upon request. IB, as agent, effects VWAP transactions through a market making affiliate, which acts as principal in such transactions and may have a long or short position in the security and may have profited or lost in connection with the transaction.
6. IB accepts liquidity rebates or other order flow payments from Alternative Trading Systems, market makers and exchanges for certain orders in stocks. IB receives payment for some option orders pursuant to exchange-mandated marketing fee programs or other arrangements. The source and nature of any compensation received by IB in connection with any transaction is available upon written request of the customer. For further information, check the IB website and the Order Routing and Payment for Order Flow Disclosure provided when you opened your account and annually or email help@interactivebrokers.com.
7. For security futures trades, if not already indicated on this statement, information about the time of any transaction, the identity of the counterparty to the transaction, and whether IB is acting as agent or principal, as agent for the counterparty, as agent for both parties to the contract, or as principal, and if acting as principal, whether the transaction was a block transaction or an exchange for physicals transaction, will be available upon written request of the customer.
8. Customer is requested to promptly advise Interactive Brokers of any material change in Customer's investment objectives or financial situation.
9. A financial statement of Interactive Brokers LLC is available for your personal inspection at www.interactivebrokers.com or at its offices, or a copy of it will be mailed upon your written request.
10. For trades executed on either the Australian Stock Exchange Ltd ("ASX") or Chi-X Australia Pty Ltd ("Chi-X"), this confirmation is issued subject to: (i) the directions, decisions and requirements of the Market Operator, the relevant Market Integrity Rules, the relevant Market Operating Rules, the Clearing Rules and where relevant, the Settlement Rules; (ii) the customs and usages of the relevant Market; and (iii) the correction of errors and omissions. Interactive Brokers LLC (ARBN: 091191141, AFSL: 245574, Participant on Chi-X Australia)("IB") is not a participant on the ASX, and will route orders to the ASX through its affiliate, Timber Hill Australia Pty Ltd (ABN 25079993534, AFSL: 244380, Participant on the ASX)("THA") who executes such orders. Your ASX and Chi-x Australia trades will be cleared through ABN Amro Clearing Sydney Pty Ltd, an ACH participant. If your transaction was a crossing transaction, IB may have either acted on behalf of (i) both the buyer and seller of this transaction, or (ii) on behalf of the buyer or seller on one side of the transaction and act as Principal on the other side. Under the Corporations Act 2001, where IB enters into an exchange traded derivatives on a customer's behalf, IB is regarded as having issued the derivative to the customer.

## Notes/Legal Notes

11. For All Options Trades Executed on the Stock Exchange of Hong Kong ("SEHK"): (a) Options can involve a high degree of risk and may not be suitable for every investor. Investors should ensure they understand those risks before participating in the options market. (b) All options contracts executed on the SEHK were executed by Timber Hill Securities Hong Kong on behalf of Interactive Brokers LLC. (c) In the event of a default committed by Interactive Brokers LLC resulting in the client suffering any pecuniary loss, the client shall have a right to claim under the Investor Compensation Fund established under the Hong Kong Securities and Futures Ordinance, subject to the terms of the Investor Compensation Fund from time to time. (d) All Exchange Traded Options Business made for or on behalf of a client shall be subject to the relevant provisions of the constitution, Rules of The Stock Exchange of Hong Kong Limited ("SEHK Rules"), regulations, the Articles, customs and usages of SEHK, the Options Trading Rules, the Clearing Rules of SEOCH, the CCASS Rules and the laws of Hong Kong, which shall be binding on both Interactive Brokers LLC and the client.
12. Deposits held away from Interactive Brokers LLC may not qualify under SIPC protection. Also, futures and options on futures are not covered by SIPC.

SIPC Member

# Exhibit 45

**EXECUTION COPY**

**MORGAN STANLEY SENIOR FUNDING, INC.**
1585 Broadway
New York, NY 1003613

**JPMORGAN CHASE BANK, N.A.**
383 Madison Avenue, 6th Floor,
New York, NY 10179

**CONFIDENTIAL**

November 24, 2021

BYJU's Alpha, Inc.
6th Floor, Tower D, IBC Knowledge Park,
Bannerghatta Main Road, Bangalore,
Karnataka India- 560 029
Attention: Anita Kishore

<u>Project Bright</u>
<u>$1,200,000,000 Term Loan Facility</u>
<u>Fee Letter</u>

Ladies and Gentlemen:

We refer to the $1,200,000,000 Term Loan Credit Agreement, dated as of the date hereof between, among others, BYJU's Alpha, Inc., as borrower (the "**Borrower**" or "**you**"), Think & Learn Private Limited as the Parent Guarantor (the "**Parent Guarantor**"), certain subsidiaries of the Parent Guarantor party thereto as Guarantors, the Lenders party thereto (the "**Lenders**") and GLAS Trust Company LLC, as administrative agent (in such capacity, the "**Administrative Agent**") (the "**Credit Agreement**"). Capitalized terms used but not otherwise defined in this letter agreement (this "**Fee Letter**") shall have the meanings assigned to them in the Credit Agreement. This Fee Letter is a "Fee Letter", and therefore a "Loan Document", as defined in the Credit Agreement.

In connection with the initial term loan facility (the "**Initial Term Loan Facility**"), established pursuant to the Credit Agreement, you agree to pay (or cause to be paid) to Morgan Stanley Senior Funding Inc. and JPMorgan Chase Bank, N.A. (the "**Arrangers**"), an arrangement fee (the "**Arrangement Fee**") in an aggregate amount equal to $12,000,000 (being an amount equal to 1.00% of the aggregate principal amount of the Initial Term Loan Facility) which shall be payable by the Borrower in cash in full to the bank account of the relevant Arranger set out below not later than the date falling three Business Days after the Effective Date in the following proportions:

(a) $7,000,000 for the account of Morgan Stanley Senior Funding Inc. to be paid into the following bank account:

| | |
|---|---|
| **To:** | CITIBANK, N.A. NEW YORK, NY 10043 |

| | |
|---|---|
| **Via:** | ABA # 021-000-089 |
| **Account Name:** | MORGAN STANLEY SENIOR FUNDING, INC. |
| **Account Number:** | 406-99-776 |
| **Ref:** | Project Bright |
| **Attention:** | Loan Servicing |

and

(b) $5,000,000 for the account of JPMorgan Chase Bank, N.A to be paid into the following bank account:

| | |
|---|---|
| **To:** | JPMORGAN CHASE BANK, N.A. |
| **Via:** | ABA # 021 000 021 |
| **Account Name:** | JPMORGAN CHASE BANK, N.A. |
| **Account Number:** | 9008113381H5212 |
| **Ref:** | BYJU’S ALPHA INC. |

As further consideration for the Arrangers arranging the Initial Term Loan Facility, you agree that the Initial Term Loans made available to you on the Effective Date will be net funded with an original issue discount of 1.50% of the aggregate principal amount thereof.

You agree that, once paid, the fees or any part thereof payable hereunder shall not be refundable under any circumstances. All fees payable hereunder shall be paid in immediately available funds, shall not be subject to reduction by way of set-off or counterclaim and shall be in addition to reimbursement of each Arrangers' reasonable, documented and invoiced out-of-pocket expenses (to the extent required to be reimbursed under the terms of the Credit Agreement).

This Fee Letter shall not be assignable by any party hereto without the prior written consent of each other party hereto (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. Notwithstanding the foregoing, the Arrangers reserve the right to allocate, in whole or in part, to its affiliates or branches the Arrangement Fee in such manner as the Arrangers and their affiliates or branches may agree in their sole discretion and, to the extent so employed, such affiliates and branches shall be entitled to the benefits and protections afforded to, and subject to the provisions governing the conduct of, the Arrangers hereunder, provided that such allocation does not result in the Borrower having to pay an amount more than the Arrangement Fee. This Fee Letter may not be amended or waived except by an instrument in writing signed by you and the Arrangers. This Fee Letter may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Fee Letter by facsimile or other electronic means, including by

email with a "pdf" copy thereof attached, shall constitute an original for purposes hereof. The words "execution," "signed," "signature," and words of like import in this letter agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any similar state laws based on the Uniform Electronic Transmission Act.

The provisions of Section 10.3 (*Expenses; Limitation of Liability, Indemnity, Etc*), 10.7 (*Severability*), 10.9 (*Governing Law; Jurisdiction; Consent to Service of Process*), 10.10 (*Waiver of Jury Trial*) and 10.12 (*Confidentiality*) of the Credit Agreement are hereby incorporated in this Fee Letter by reference, *mutatis mutandis*, as if fully set out in this Fee Letter and any reference to "this Agreement" in such Sections of the Credit Agreement shall be deemed to refer to this Fee Letter.

*[The remainder of this page intentionally left blank]*

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this Fee Letter.

Very truly yours,

MORGAN STANLEY SENIOR FUNDING INC., as Arranger

By: [signature]
Name: Andrew Earls
Title: Managing Director

JPMORGAN CHASE BANK, N.A., as Arranger

By: ______________________
Name:
Title:

*Signature Page to Bright Arrangement Fee Letter*

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this Fee Letter.

Very truly yours,

MORGAN STANLEY SENIOR FUNDING INC., as Arranger

By: ________________________

Name:
Title:

JPMORGAN CHASE BANK, N.A., as Arranger

By: ________________________

Name: Peter B. Thauer
Title: Managing Director

*Signature Page to Bright Arrangement Fee Letter*

Accepted and agreed to as of
the date first above written:

**BYJU'S ALPHA, INC.**

By: [signature]

Name: RIJU RAVINDRAN
Title: DIRECTOR.

*Signature Page to Bright Arrangement Fee Letter*

# Exhibit 46

# PROMISSORY NOTE

$15,095,150.00 July 15, 2022

FOR VALUE RECEIVED, **OCI LIMITED** (the "**Borrower**") hereby unconditionally promises to pay to the order of Camshaft Capital Fund, LP, a Delaware limited partnership (the "**Noteholder**"), on July 15, 2025, the principal amount of $16,520,000.00 (Sixteen Million Five Hundred Twenty Thousand Dollars) (the "**Loan**"), together with all accrued interest thereon, as provided in this Promissory Note (this "**Note**").

1. Payment Dates.

(a) Prepayment of Interest. Borrower shall make interest payments on the Loan as follows:

(i) On the date hereof, Borrower shall pre-pay the first 1.5 years' interest on the Loan ($1,424,850.00). For convenience, the foregoing first 1.5 years' interest amount will be deducted from the Loan proceeds payable by Noteholder to Borrower.

Prepaid interest shall not be refunded in any circumstance, including in the event of any prepayment by the Borrower under Section 1(b) of this Note.

(b) Prepayment of Principal. The Borrower may, upon six months' prior written notice, prepay the Loan in whole or in part at any time after January 15, 2024 if a Prepayment Event (as defined below) has occurred before such date or occurs on or after such date. As used in this Note, a Prepayment Event means any of the following:

(i) filing by **Byjus Alpha Inc.** ("**Byju**") or any affiliate with the Securities and Exchange Commission or any comparable foreign regulatory agency for an initial public offering of securities;

(ii) execution and delivery by Byju of an agreement for the sale of Byju, including, without limitation, any transaction or series of related transactions by which a material interest in Byju or a material amount of its assets is transferred by means of a sale or exchange of capital stock or assets, a merger or consolidation, business combination or special purpose acquisition or other transaction; or

(iii) the adoption of any law, rule or regulation in any jurisdiction making the Loan invalid or illegal or imposing on Byju or the Borrower obligations or requirements materially impacting the business of either Byju or the Borrower related to maintaining the Loan.

(c) Business Day. In the event that any date set forth herein shall fall on a day that is not a Business Day (defined below), the date shall be deemed to be extended to the next following Business Day.

2. Unsecured. The Borrower's performance of its obligations hereunder is unsecured.

3. Interest Rate.

(a) Interest Rate. Principal amounts outstanding under this Note shall bear interest at a rate per annum (the "**Interest Rate**") equal to 5.75%.

(b) Default Interest. If any amount payable hereunder is not paid when due, whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Interest Rate plus two percentage points (2%).

(c) Computation of Interest. All computations of interest hereunder shall be made on the basis of a year of 365/366 days, as the case may be, and the actual number of days elapsed. Interest shall begin to accrue on the Loan on the date of this Note. On any portion of the Loan that is repaid, interest shall not accrue on and after the date on which such payment is made.

(d) Interest Rate Limitation. All agreements between the Borrower and Noteholder, now existing or hereafter arising, are hereby expressly limited so that in no event whatsoever shall the amount paid or agreed to be paid to Noteholder hereof for the use, forbearance or detention of money to be loaned hereunder or otherwise, or for the performance or payment of any covenant or obligation contained herein, exceed the maximum amount permissible under applicable law. If from any circumstance whatsoever fulfillment of any provision hereof exceeds the limit of validity prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstance Noteholder hereof shall ever receive as interest under this Note or otherwise an amount that would exceed the highest lawful rate, such amount that would be excessive interest shall be applied to the reduction of the principal amount owing hereunder (without charge for prepayment) and not to the payment of interest, or such excess shall be refunded to Borrower.

4. Payment Mechanics.

(a) Manner of Payment. All payments of principal and interest shall be made in US dollars no later 30 days before the due date, by 5:00 PM Eastern Time on the date on which such payment is due. The next payment for 1.5 years of $1,424,850.00 is due January 15, 2024. Such payments shall be made by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

(b) Application of Payments. All payments shall be applied, *first*, to fees or charges outstanding under this Note, *second*, to accrued interest, and, *third*, to principal outstanding under this Note.

(c) Business Day. Whenever any payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and interest shall be calculated to include such extension. "**Business Day**" means a day other than Saturday, Sunday, or other day on which commercial banks in Miami, FL are authorized or required by law to close.

(d) Representations and Warranties. The Borrower represents and warrants to the Noteholder as follows:

(e) Compliance with Law. The Borrower is in compliance with all laws, statutes, ordinances, rules, and regulations applicable to or binding on the Borrower except where the failure to be in compliance would not have a material adverse effect on the Borrower.

(f) Power and Authority. The Borrower has the requisite capacity, power and authority to execute, deliver, and perform its obligations under the this Note.

(g) Authorization; Execution and Delivery. The Borrower has duly executed and delivered this Note.

(h) No Approvals. No consent or authorization of, filing with, notice to, or other act by, or in respect of, any Governmental Authority or any other Person is required in order for the Borrower to execute, deliver, or perform any of its obligations under this Note except where the failure to obtain such consent or authorization or to make such filing will not have a material adverse effect on the Borrower.

(i) No Violations. The execution and delivery of this Note and the consummation by the Borrower of the transactions contemplated hereby and thereby do not and will not (a) violate any Law applicable to the Borrower or by which any of Borrower's properties or assets may be bound; or (b) constitute a default under any material agreement or contract by which the Borrower may be bound.

(j) Enforceability. This Note is a valid, legal, and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

(k) No Litigation. No action, suit, litigation, investigation, or proceeding of, or before, any arbitrator or Governmental Authority is pending or, to the Borrower's knowledge, threatened by or against the Borrower or any of Borrower's property or assets (a) with respect to this Note or any of the transactions contemplated hereby or (b) that could be expected to materially adversely affect the Borrower's financial condition or the ability of the Borrower to perform its obligations under this Note.

(l) PATRIOT Act; Anti-Money Laundering. The Borrower is, in compliance in all material respects with the PATRIOT Act, and any other applicable terrorism and money laundering laws, rules, regulations, and orders.

(m) Anti-Corruption Laws and Sanctions.

(i) "**Sanctioned Country**" means, at any time, a country or territory which is itself the subject or target of any comprehensive or country-wide Sanctions.

(ii) "**Sanctioned Person**" means, at any time, (a) any person listed in any Sanctions-related list of designated persons maintained by a Sanctions Authority; (b) any person operating, organized, or resident in a Sanctioned Country, (c) any person owned or controlled by any such person or persons described in the foregoing clauses (a) or (b), or (d) any person that is the subject or target of any Sanctions.

(iii) "**Sanctions**" mean all economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by a Sanctions Authority.

(iv) "**Sanctions Authority**" means OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, Canada, or other relevant sanctions authority.

(v) The Borrower is in compliance with all laws, rules, and regulations of any jurisdiction applicable to the Borrower from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 ("**Anti-Corruption Laws**").

(vi) The Borrower is not and no agent of the Borrower that will act in any capacity in connection with or benefit from the Loan, is a Sanctioned Person.

(vii) No use of proceeds of the Loan or other transaction contemplated by this Note will violate any Anti-Corruption Law or applicable Sanctions.

5. Events of Default. The occurrence and continuance of any of the following shall constitute an "**Event of Default**" hereunder:

(a) Failure to Pay. The Borrower fails to pay (i) any principal amount of the Loan when due; (ii) any interest on the Loan within five (5) days after the date such amount is due; or (iii) any other amount due hereunder within ten (10) days after such amount is due.

(b) Breach of Representations and Warranties. Any representation or warranty made by the Borrower to the Noteholder herein contains an untrue or misleading statement of a material fact as of the date made.

(c) Cross-Defaults. The Borrower fails to pay when due any of its material debt (other than debt arising under this Note), or any interest or premium thereon, when due and such failure continues after the applicable grace period, if any, specified in the agreement or instrument relating to such debt.

(d) Bankruptcy; Insolvency.

(i) The Borrower institutes a voluntary case seeking relief under any law relating to bankruptcy, insolvency, reorganization, or other relief for debtors.

(ii) An involuntary case is commenced under any law relating to bankruptcy or insolvency and is not stayed or dismissed within ninety (90) days.

(iii) The Borrower makes a general assignment for the benefit of creditors.

(iv) The Borrower is unable, or admits in writing its inability, to pay Borrower's debts as they become due.

(v) A case is commenced against the Borrower or Borrower's assets seeking attachment, execution, or similar process against all or a substantial part of Borrower's assets and is not stayed or dismissed within ninety (90) days.

(e) Failure to Give Notice. The Borrower fails to give the notice of Event of Default specified in Section 6.

6. Notice of Event of Default. As soon as possible after it becomes aware that an Event of Default has occurred, and in any event within two (2) Business Days, the Borrower shall notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

7. Remedies. Upon the occurrence and during the continuance of an Event of Default, the Noteholder may, at its option, by written notice to the Borrower declare the outstanding principal amount of the Loan, accrued and unpaid interest thereon, and all other amounts payable hereunder immediately due and payable; *provided*, *however*, if an Event of Default described in

Sections 5(d)(iii) or 5(d)(iv) shall occur, the outstanding principal amount, accrued and unpaid interest, and all other amounts payable hereunder shall become immediately due and payable without notice, declaration, or other act on the part of the Noteholder.

8. Reinstatement. If any payment received by Noteholder hereunder is determined to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation, satisfaction and/or return of the payment and/or this Note, and shall not be discharged or satisfied with any prior payment or cancellation of this Note, but shall remain a valid and binding obligation enforceable, and such payment shall be immediately due and payable upon demand.

9. Expenses. If not defaulting, the Borrower shall pay no fees on this Note, other than interest.

10. Attorneys' Fees. If any party defaults under the terms of this Note, and another party employs an attorney to enforce this Note, whether or not legal proceedings are commenced, then such other party shall be entitled to recover from the defaulting party all reasonable attorneys' fees and other costs and expenses incurred in connection with such enforcement. If any party commences or is made a party to a lawsuit, arbitration or other proceeding to enforce or interpret this Note, the prevailing party in such proceeding shall be entitled to recover from the other party all reasonable attorneys' fees and other costs (whether otherwise taxable or recoverable) incurred in connection with such proceeding, including without limitation any appeal or enforcement of any judgment or decision rendered in such proceeding.

11. Full Payment. All amounts payable under this Note shall be paid in full without setoff, deduction or counterclaim. All amounts payable under this Note shall be free and clear of and without any deduction or withholding for or on account of any taxes, levies, penalties, duties, charges, fees, restrictions or conditions of any nature now or hereafter imposed by any federal, state, country or local government or any political subdivision or taxing authority thereof or therein. Borrower shall indemnify Noteholder against any such taxes, levies, imposts, duties, charges and fees (other than taxes on the income of Noteholder imposed by any taxing authority) which may be assessed against Noteholder or claimed or demanded from Noteholder in respect of any amount payable by Borrower hereunder, and against any costs, charges, expenses or liability arising out of or in respect of such assessment, claim or demand, to the fullest extent permitted by law.

12. Notices. All notices and other communications relating to this Note shall be in writing and shall be deemed given upon the first to occur of (x) deposit with the United States Postal Service or overnight courier service, properly addressed and postage prepaid; (y) transmittal by facsimile or e-mail properly addressed (with written acknowledgment from the intended recipient such as "return receipt requested" function, return e-mail, or other written acknowledgment); or (z) actual receipt by an employee or agent of the other party. Notices hereunder shall be sent to the following addresses, or to such other address as such party shall specify in writing:

(a) If to the Borrower:

OCI Limited
33 Cannon St
London EC4M 5SB
United Kingdom
Attn: Oliver Chapman, CEO
E-mail: oc@oci-group.co.uk

If to the Noteholder:

Camshaft Capital Fund, LP
950 Brickell Bay Dr. #5107
Miami, FL 33131
E-mail: William Morton william@camshaftcapital.com

13. Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based on, arising out of, or relating to this Note and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of Florida.

14. Disputes.

(a) Submission to Jurisdiction.

(i) The Borrower irrevocably and unconditionally (A) agrees that any action, suit, or proceeding arising from or relating to this Note may be brought in the courts of the State of Florida sitting in Miami County, and in the United States District Court for the Southern District of Florida, and (B) submits to the exclusive jurisdiction of such courts in any such action, suit, or proceeding. Final judgment against the Borrower in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(ii) Nothing in this Section 14(a) shall affect the right of the Noteholder to bring any action, suit, or proceeding relating to this Note against the Borrower or its properties in the courts of any other jurisdiction.

(iii) Nothing in this Section 14(a) shall affect the right of the Noteholder to serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

(b) Venue. The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying of venue in any action, suit, or proceeding relating to this Note in any court referred to in Section 14(a), and (ii) the defense of inconvenient forum to the maintenance of such action, suit, or proceeding in any such court.

(c) Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

15. Successors and Assigns. Upon notice to the Borrower, this Note may be assigned or transferred by the Noteholder to any individual, corporation, company, limited liability company, trust, joint venture, association, partnership, unincorporated organization, governmental authority, or other entity.

16. Integration. This Note constitutes the entire contract between the Borrower and the Noteholder with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto.

17. Amendments and Waivers. No term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Borrower and the Noteholder. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

18. No Waiver; Cumulative Remedies. No failure by the Noteholder to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The rights, remedies, and powers herein provided are cumulative and not exclusive of any other rights, remedies, or powers provided by law.

19. Severability. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or render such term or provision invalid or unenforceable in any other jurisdiction.

20. Counterparts. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic ("pdf" or "tif") format shall be as effective as delivery of a manually executed counterpart of this Note.

21. Electronic Execution. The words "execution," "signed," "signature," and words of similar import in this Note shall be deemed to include electronic and digital signatures and the keeping of records in electronic form, each of which shall be of the same effect, validity, and enforceability as manually executed signatures and paper-based recordkeeping systems, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. § 7001 *et seq.*), the Electronic Signatures and Records Act of 1999 (N.Y. State Tech. Law §§ 301-309), and any other similar state laws based on the Uniform Electronic Transactions Act.

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date set forth on the first page.

OCI LIMITED

By: DocuSigned by: Oliver Chapman 4796C6F67E83459

Name: Oliver Chapman

Title: CEO

# Exhibit 47

**FORM NO. MGT – 1**
**REGISTER OF MEMBERS**
[Pursuant to Section 88(1)(a) of the Companies Act, 2013 and Rule 3(1) of the Companies (Management and Administration) Rules, 2014]
**(TO BE MAINTAINED SEPARATELY FOR EACH CLASS OF SHARES)**

Name of the Company : **THINK & LEARN PRIVATE LIMITED**
Registered Office Address : **IBC KNOWLEDGE PARK, 4/1, 2ND FLOOR, TOWER D, BANNERGHATTA – MAIN ROAD, BANGALORE – 560029, KARNATAKA INDIA**
CIN : **U80903KA2011PTC061427**

Class of Shares: **SERIES F CCCPS** Nominal Value Per Share (in Rs.): **RS. 10/-** Total Shares held: ____________ Folio No. **F-124**

**Personal Details:**

Name of the Member: **BYJU'S HOLDINGS 1 PTE. LTD.**

Name of Joint Holders/s, if any: **NOT APPLICABLE**

Address / Registered Address (in case of body corporate): **30 CECIL STREET, #19-08, PRUDENTIAL TOWER SINGAPORE 049712**

e-Mail ID: **byjuraveendran@gmail.com**

CIN/Regn. No.: **202230727N**

Unique Identification No.: **NOT APPLICABLE**

Father's/Mother's/Spouse's Name: **NOT APPLICABLE**

Status: **PRIVATE COMPANY**

Occupation: **BUSINESS**

PAN No.: **AALCB4406D**

Nationality: **SINGAPORE**

Date of becoming Member: **29/09/2022**

**In case Member is a Minor,**

Name of Guardian: **NOT APPLICABLE**

Date of Birth of Minor: **NOT APPLICABLE**

**Details of Membership:**
Date of Declaration under Section 89, if applicable: ____________
Name and Address of Beneficial Owner : ____________
Date of receipt of nomination, if applicable : ____________
Name and Address of Nominee: ____________
No. of Shares kept in abeyance, if applicable : ____________
Record of lien on shares, if applicable : ____________
Date of cessation of Membership: ____________

**Instructions:**
Particulars of dividend mandates, power of attorney and other instructions, if any: ____________
Instruction for sending notices etc., if any: ____________

**DETAILS OF SHARE HOLDING**

| Allotment No. / Transfer No. | Date of Allotment / Transfer | No. of Shares allotted or transferred | Distinctive No. of Shares | | Folio of Transferor, if applicable | Name of the Transferor, if applicable | Date of Issue or Endorsement of Share Certificate | Certificate No. | Amount (Rs.) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | From | To | | | | | Payable | Paid / Deemed to be Paid | Due |
| | 29/09/22 | 11,335 | 1595267 | 1606601 | -- | -- | 18/10/22 | F-185 | -- | 403,80,93,750 | -- |
| | 21/10/22 | 11,334 | 1606602 | 1617935 | -- | -- | 03/11/22 | F-186 | -- | 403,77,37,500 | -- |
| | 04/11/22 | 11,548 | 1617936 | 1629483 | -- | -- | 15/11/22 | F-187 | -- | 411,39,75,000 | -- |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

**DETAILS OF SHARE HOLDING**

| Lock in Period if any | If shares are issued for consideration other than Cash, brief particulars thereof | Date of Transfer / Transmission / Forfeiture / Redemption, etc | Distinctive No. of Shares | | No. of Shares Transferred/ Transmitted/ Forfeited / Redeemed, etc | Folio of Transferee | Name of Transferee | Balance Shares (after Transfer / Transmission/ Forfeiture / Redemption etc) | Remarks | Authentication / Signature |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | From | To | | | | | | |
| -- | -- | -- | -- | -- | -- | -- | -- | 11,335 | | |
| -- | -- | -- | -- | -- | -- | -- | -- | 22,669 | | |
| -- | -- | -- | -- | -- | -- | -- | -- | 34,217 | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

# Exhibit 48

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| BYJU'S ALPHA, INC. | ) | Case No. 24-10140 (JTD) |
| Debtor. | ) | |
| BYJU'S ALPHA, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 24-50013 (JTD) |
| CAMSHAFT CAPITAL FUND, LP, CAMSHAFT CAPITAL ADVISORS, LLC, CAMSHAFT CAPITAL MANAGEMENT, LLC, RIJU RAVINDRAN, INSPILEARN LLC, AND THINK AND LEARN PRIVATE LIMITED | ) | |
| Defendants. | ) | **Re: Adv. D.I. 180 and 210** |

**MEMORANDUM OPINION AND ORDER**

BYJU's Alpha ("**Debtor**") commenced this action asserting that the Defendants fraudulently transferred over $500 million of the Debtor's assets in an attempt to defraud the Debtor's creditors.[1] Defendants Camshaft Capital Fund LP ("**Camshaft Fund**"), Camshaft Capital Advisors LLC ("**Camshaft Advisors**"), and Camshaft Capital Management LLC ("**Camshaft Management**") (together with Camshaft Advisors and Camshaft Management, "**Camshaft**") moved to dismiss the Second Amended Complaint ("**Complaint**") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012.[2] Defendant Think and Learn Private

[1] Second Amended Complaint, Adv. D.I. 151.
[2] Camshaft's Motion to Dismiss Second Amended Complaint, Adv. D.I. 180 ("**Camshaft Motion**").

Limited ( "**T&L**") also moved to dismiss pursuant to Rules 12(b)(2) and 12(b)(5) claiming lack of personal jurisdiction and insufficient service of process.[3] For the reasons that follow, the Motions are denied.

## FACTS ALLEGED IN THE COMPLAINT

Debtor is a Delaware corporation formed on September 27, 2021, by its parent company, T&L. Debtor was formed as a special purpose financing vehicle and has never had any active business operations.

Debtor's ultimate parent, T&L, is a private, limited purpose, foreign company existing under the laws of India. T&L is also the parent company of Inspilearn LLC ("**Inspilearn**"), a Delaware limited liability company.

All three companies do business under the tradename "BYJU's," the self-proclaimed world's largest education technology conglomerate. The companies were founded by Byju Ravindreen, who served as the Chief Executive Officer of T&L. Byju Ravindreen's younger brother, Riju Ravindran, served as the sole officer and director of the Debtor until March 3, 2023, and the sole manager of Inspilearn until February 14, 2024. Riju Ravindran is also a shareholder and director of T&L.

Debtor was formed to borrow $1.2 billion in five-year term loans in November 2021 (the "**Term Loan**") from certain lenders (the "**Lenders**") under a Credit and Guaranty Agreement (the "**Credit Agreement**"), with GLAS Trust Company LLC ("**GLAS**") serving as the Lenders' agent.

[3] T&L's Motion to Dismiss, Adv. D.I. 210 ("**T&L Motion**") (together with the Camshaft Motion, the "**Motions**").

Shortly after funding, the Debtor began defaulting on its loan obligations. From March to October 2022, the Debtor and its affiliates failed to satisfy three covenants at least four times.[4] The Lenders entered into a temporary waiver and several forbearance agreements to allow the Debtor time to cure the defaults.[5] At the same time that the Debtor was negotiating with its Lenders to cure its defaults, it was transferring its largest asset to Camshaft, an apparent sham hedge fund.[6]

On April 27-28, 2022—just weeks after the first two defaults occurred, and after entering into the first forbearance agreement with the Lenders—the Debtor made three wire transfers totaling $318,000,000.00 to Camshaft.[7] The Debtor made three more wire transfers totaling $215,000,100.00 to Camshaft between July 12 and13, 2022.[8] The total, $533 million (the "**Alpha Funds**"), was exchanged for a subscription to a limited partnership interest in Camshaft Fund (the "**First Transfer**"). This left the Debtor with approximately $100 million in available funds across its known bank and brokerage accounts, and approximately $1.194 billion in

[4] The first default occurred on March 16, 2022, when T&L failed to provide required financial statements. Complaint ¶45. A second default occurred on April 1, 2022, when Whitehat failed to provide a guarantee. *Id.* at ¶46. A third default occurred on September 13, 2023, when T&L failed to provide comparative figures for the Q1 FY 2022-23 period. *Id.*, at ¶47. The fourth default came when T&L again failed to deliver an audited annual financial statement before its September 27, 2022, deadline. *Id.* at ¶48.
[5] *See id.* at ¶88.
[6] The Complaint provides a lengthy and detailed description of the "sham" characteristics of Camshaft. Camshaft Fund was founded in August 2020 by William Morton ("**Morton**"). Morton was a 23-year-old with no formal training, experience, or apparent qualifications in investing and money management. *Id.* at ¶¶5, 65. On state and federal regulatory filings, Camshaft Fund listed the address to a Miami IHOP and a non-working telephone number. *Id.* at ¶¶55-64. Based on Camshaft's Form ADV disclosures and the Debtor's bank statements, it appears that approximately 90% of the Fund's assets under management were directly attributable to the Debtor's $533 million transfer. *Id.*, Ex. 4, at 4 and Ex. 5 at 4.

The Complaint further alleges Debtor failed to undertake even basic due diligence prior to investing with Camshaft. Camshaft never shared any capital account balances, financial statements, investor statements, or other performance updates or reports with the Debtor. *Id.*, ¶71. Riju Ravindran stated that he had never heard of Camshaft Fund prior to April 2022 and did not conduct any due diligence on it. *Id.* Riju Ravindran and Morton never spoke with one another. *Id.* Yet T&L directed Riju Ravindran to transfer the Alpha Funds to the high-risk and unproven hedge fund.
[7] Complaint ¶49.
[8] *Id.*