consider include: (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtor; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control, or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction. *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).[51] "The presence or absence of any single badge of fraud is not conclusive," and "[t]he proper inquiry is whether the badges of fraud are present, not whether some factors are absent." *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) (internal citations omitted). Moreover, while the existence of a single badge of fraud "may cast suspicion of the transferor's intent," *In re Fedders* 11 *N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009), "a confluence of several badges of fraud in one transaction [ ] generally provides conclusive evidence of an actual intent to defraud." *Merrill Lynch Business Fin. Srvs., Inc. v. Kupperman*, 441 F. App'x 938, 941 (3d Cir. 2011) (citations omitted).

Here, Debtor asserts that it has pled fraudulent intent through both circumstantial and direct evidence. As direct evidence of intent, Debtor points to its allegations that the Debtor's founder, Byju Raveendran, informed counsel for the Lenders that "the money is someplace the lenders will never find it."[52] As circumstantial evidence of intent, Debtor asserts it has pled facts sufficient to support the conclusion that at least six badges of fraud were present. Specifically, Debtor has alleged that:

---

[51] States that have enacted the Uniform Fraudulent Transfers Act, including Delaware and Florida, have codified the badges of fraud. *See* 6 *Del. C.* § 1304(b) (codifying the "badges of fraud"); Fla. Stat. § 726.105(2) (same).
[52] *Id.* ¶¶10, 115.

- The transfers to Camshaft Fund were concealed from the Lenders;
- The transfers were of substantially all of the Debtor's assets—over 80% of its liquid assets;
- The assets were (and continue to be) concealed;
- The Debtor received less than reasonably equivalent value – having received only an interest in a sham hedge fund in exchange for $533 million cash and then nothing in exchange for that interest with respect to the later transfers;
- The Debtor became insolvent as a result of the Transfers --having over $1.2 billion in liabilities against less than a tenth of that amount in assets;
- The Debtor made the Transfers shortly after incurring substantial debt – the First Transfer was made a mere six months after the Debtor incurred the $1.2 billion term loan. Then, after conceding that four Events of Default had occurred and within three weeks of the forbearance agreement expiring—at which point their loan would be called and GLAS would take control—the Debtor carried out the Second Transfer to Inspilearn;
- Ravindran and T&L continue to control the Alpha Funds through T&L's unidentified non-U.S. based subsidiary;
- The Defendants have gone to extreme and prolonged lengths to conceal and misrepresent critical details about the transfers, even finding themselves in contempt of court for refusing to disclose the location of the funds.[53]

Camshaft nevertheless argues that the Debtor cannot establish fraudulent intent as a matter of law for two reasons: (1) the Transfers were not prohibited under the Credit Agreement; and (2) the "undisputed facts" in the record negate any inference of improper intent. Camshaft is wrong on both points.

Camshaft first argues that the Debtor's allegations of fraudulent intent are insufficient as a matter of law because the initial transfer was completely consistent with the corporate purpose of the Debtor and the terms of the Credit Agreement. Specifically, Camshaft argues that the Credit Agreement expressly contemplates the use of the Loan proceeds for investment purposes

[53] Complaint ¶ 158.

and does not include any restriction on investment vehicles such as hedge funds like Camshaft, even though it does forbid other types of investments. Because the Transfers aligned with the parties' expectations, Camshaft asserts, the circumstances surrounding the Transfers cannot be used to establish fraudulent intent. I disagree.

As a threshold matter, the issue Camshaft raises – whether the Transfers were of the kind contemplated by the Credit Agreement – is one of fact. Much of the Complaint includes allegations that directly contradict Camshaft's assertion that the Transfers made were of the type contemplated by the parties when they entered into the Loan. *See, e.g.*, Complaint ¶¶ 52-71, 78-81 (alleging that the Debtor transferred virtually all of its assets to a "sham hedge fund" without conducting any due diligence); *id.* ¶¶ 80-81 (alleging the partnership interests received were illiquid and not the type of investment (cash equivalent or marketable securities) contemplated under the Credit Agreement). At this stage of the case, I must accept these well-pled allegations as true.

But even assuming that was not the case, Camshaft is also incorrect about the law. "A transfer may be fraudulent even if it is made in accordance with the terms of a contract between the parties." *In re EBC I Inc.*, 356 B.R. 631, 640 (Bankr. D. Del. 2006). The fact that the Credit Agreement contemplates investments does not preclude a claim for fraudulent transfer. *See In re Pinto*, 89 B.R. 486, 497-98 (Bankr. E.D. Pa. 1988) ("Any *otherwise legal* transfer may be avoided under § 548 if the requirements of that section are otherwise met[.]"). Consequently, even if it could be determined from the face of the Credit Agreement that the Transfers were consistent with its terms, that would not preclude the Debtor from asserting this claim.

Camshaft next argues that the "undisputed facts" negate Debtor's allegations of fraudulent intent, pointing to various ambiguities, contradictions, or discrepancies in the record

with respect to specific allegations. *See, e.g.*, Camshaft's Brief at 4 (arguing that it is "obvious" that Mr. Raveendran's statements about the location of the money, "if they were in fact made," referred to the Second Transfer, not the First Transfer). But despite Camshaft's characterization to the contrary, these facts have not yet been fully developed and are, in this nascent form, subject to multiple interpretations. Such facts cannot be resolved on a motion to dismiss. *See Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022) ("On a motion to dismiss, a court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff.") (quoting *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008)).

For these reasons Camshaft's Motion is denied with respect to Count I.

**C. Constructive Fraudulent Transfer (Counts II and III)**

In Counts II and III of the Complaint, the Debtor asserts claims for constructive fraudulent transfer pursuant to Sections 544(b) and 548 (a)(1)(B) of the Bankruptcy Code and applicable state law (*e.g.*, Fla. Stat. §§726,105(1)(b) and 726.106(1), 6 Del. C. §§ 1304(a)(2) and 1305(a)). Count II addresses the four Transfers and Count III addresses the fees collected by Camshaft Management and Camshaft Advisors (the "**Fees**").

"This Court evaluates claims of constructive fraud under the notice pleading standard of Fed. R. Civ. Pro. 8(a)(2)." *Beskrone v. Opengate Capital Grp., LLC (In re Pennysaver USA Publ'g, LLC)*, 602 B.R. 256, 266 (Bankr. D. Del. 2019). "At the motion to dismiss stage, to plead adequately a constructive fraud claim all that is needed is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent." *Id.* (alterations omitted).

1. *Exculpation and Indemnification*

Camshaft first moves to dismiss both counts on the grounds that exculpation and indemnification provisions in the parties' Second Amended and Restated Limited Partnership Agreement ("**LPA**") act as a bar to all claims against Camshaft that do not involve bad faith, intentional misconduct, or gross negligence. As constructive fraudulent transfer claims have no scienter element, Camshaft argues, they do not constitute the kind of misconduct that would vitiate an exculpation provision.

While I am not convinced that it would be appropriate to consider the LPA at all at this stage of the case,[54] even if I were to do so, it would not help Camshaft. As the Debtor notes, a pre-petition debtor does not have the capacity to waive fraudulent transfer claims asserted by a trustee or debtor in possession under the Bankruptcy Code. As this Court has explained in *PAH Litig. Tr. v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*,

> Post-petition avoidance actions "can only be brought by the trustee after the petition is filed . . . and the [pre-petition debtor] does not own the right to pursue a fraudulent transfer claim in bankruptcy." *Official Comm. of Unsecured Creditors v. UMB Bank (In re Residential Capital, LLC)*, 497 B.R. 403, 414 (Bankr. S.D.N.Y. 2013). It follows that the pre-petition debtor may not waive such claims either. The avoidance powers under the Code are within the unique purview of the trustee, and courts have noted that "prior to bankruptcy a debtor may not waive bankruptcy rights that inure to the benefit of unsecured creditors not a party to that waiver." *Minnesota Corn Processors, Inc. v. American Sweeteners, Inc. (In re American Sweeteners Inc.)*, 248 B.R. 271, 276 (Bankr. E.D. Pa. 2000).

2016 Bankr. LEXIS 2810, at *53-54 (Bankr. D. Del. June 20, 2016). Accordingly, even assuming, *arguendo*, that the exculpation provision did operate as a bar to a constructive fraudulent transfer

[54] Debtor argues that the LPA should not be considered because it is outside the scope of the Complaint. Debtor further argues that Camshaft should be precluded from relying on the LPA now because it refused to produce it in discovery. While I am inclined to agree with the Debtor, particularly on the latter issue, I need not decide the issue because, as noted above, the LPA is irrelevant.

claim in another context, it does not serve as a bar to the claim asserted here. The case cited by Camshaft in support of its argument does not alter this conclusion. *See O'Toole v. McTaggart (In re Trinsum Grp., Inc.)*, 466 B.R. 596, 618 (Bankr. S.D.N.Y. 2012) (noting, with respect to a breach of fiduciary duty claim, that allegations that a director authorized a constructive fraudulent transfer would not be enough to avoid an otherwise valid exculpation provision because "with respect to misconduct or violations of the law, it is only when there has been 'intentional misconduct or a knowing violation of law' that the exculpation provision does not protect a director from personal liability.").

2. _Reasonably equivalent value_

Camshaft next moves to dismiss the constructive fraudulent transfer claims on the basis that the Debtor has not adequately alleged a lack of reasonably equivalent value.

"[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly what it gave.'" *VFB LLC v. Campbell Soup. Co.*, 482 F.3d 624, 631 (3d Cir. 2008); *Walker v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89 (Bankr. D. Del. 2010). To sufficiently plead a lack of reasonably equivalent value, a plaintiff must present some information about the value the debtor received in exchange for the transfer. Courts conduct a two-part inquiry to evaluate whether the debtor received reasonably equivalent value: (i) "whether the debtor received any value [for the transfer] at all," and (ii) if so, whether that value was "reasonably equivalent" to the value of the transfer. *Mellon Bank N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149, 152 (3d. Cir. 1996); *Kirschner v. J.P. Morgan Chase, N.A. (In re Millennium Lab Holdings II, LLC)* 2019 Bankr. LEXIS 646, at *13 (Bankr. D. Del. Feb. 28, 2019).

With respect to the transfers at issue in Count II, Debtor has alleged that it did not receive reasonably equivalent value because in exchange for $533 million in cash, the Debtor received limited partnership interests in Camshaft Fund, which it alleges is a sham hedge fund run by an unqualified portfolio manager that, at the time, had its principal place of business listed as a Miami IHOP with no working telephone number. Debtor further alleges that the limited partnership interests it received were not registered under the securities laws, were illiquid securities subject to significant restrictions on resale and transferability and required Debtor to pay to Camshaft exorbitant fees and expenses that were well above market.[55]

Camshaft argues that Debtor's allegations are insufficient to establish a lack of reasonably equivalent value as a matter of law because (1) the investment services purchased had objective value; and (2) Camshaft's interrogatory responses demonstrate that the investment had positive return. I disagree.

While Camshaft attempts to frame its argument as one of law, Camshaft has only raised issues of fact. Even if it were proper to consider the evidence cited by Camshaft on a motion to dismiss,[56] the evidence would, at best, establish that the Debtor received something (as opposed to nothing), which would only satisfy the first part of the Third Circuit's test. It does nothing to satisfy the balance of the inquiry, which is whether that value is reasonably equivalent to the value of what was given by the debtor. See *Mellon Bank N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149, 152 (3d. Cir. 1996) ("[B]efore determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court

---

[55] Complaint ¶¶ 55-79, 168.

[56] Interrogatory responses are generally considered beyond the scope of the record on a motion to dismiss. *See, e.g.*, *Intercept Pharms., Inc. v. Fiorucci*, Civil Action No. 1:14-cv-1313-RGA, 2017 U.S. Dist. LEXIS 8026, at *4 (D. Del. Jan. 20, 2017) ("Defendant points to nothing in his pleading that provides support for his 'bald assertions.' Instead, Defendant points to his interrogatory responses, which constitute extraneous information that I will not consider for the purposes of this 12(b)(6) motion.").

must make an express factual determination as to whether the debtor received any value at all.”). *See also Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212 (3d Cir. 2006) (“If a court determines that the debtor gained at least some value as a result of the transfer, what follows is a comparison: whether the debtor got roughly the value it gave.”). The latter inquiry is one that is almost always a question of fact and therefore not amenable to resolution on a motion to dismiss. *See EPLG I, LLC v. Citibank, N.A. and U.S. Bank, N.A. (In re Qimonda Richmond, LLC)*, 467 B.R. 318, 327 (Bankr. D. Del. 2012) (noting that the Third Circuit requires application of a “totality of the circumstances” test and holding that the issue of reasonably equivalent value required a factual determination “that cannot be made on a motion to dismiss”).

3. Failure to Plead

With respect to the transfers at issue in Count III (the Fees), Camshaft argues that the claim should be dismissed because the Debtor has not alleged the date or amount of fees charged with the necessary specificity. I disagree.

As noted above, constructive fraudulent transfer claims are subject to the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure which only require a short and plain statement of the claim, as compared to Rule 9, which requires that claims be stated with particularity. *See Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*, 427 B.R. 301, 310 (Bankr. D. Del. 2010) (Unlike a claim for actual fraudulent transfer, a claim for constructive fraudulent transfer need only be pled pursuant to requirements of Rule 8(a).); Fed. R. Civ. Proc. 8. *See also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (“The Rules demand only a short and plain statement of the claim showing that the pleader is entitled to

relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.") (internal citations and quotations omitted).

While the averments set forth in the section of the Complaint entitled "Count III" (beginning with paragraph 177) reference the Fees in general terms, paragraph 76 of the Complaint includes a chart of estimated Fees broken down by month and amount.[57] Although the Fees claimed by the Debtor are estimates, the estimates were based on Camshaft's disclosure that the management fee is paid monthly and equal to 3% per annum of the beginning capital account balance for each month, calculated using the quarterly account statements that Camshaft produced.[58] Camshaft fails to explain the exact manner in which it believes Debtor's estimates are insufficient, and I find that they are not. Given that the precise details about the Fees charged by Camshaft should already be in Camshaft's possession, I find that the allegations with respect to Count III are more than sufficient to provide Camshaft with fair notice of the charges against it. *See McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 268 (3d Cir. 2016) (where information is exclusively within defendant's control, a plaintiff "may plead allegations based upon information and belief, so long as he does not rely on boilerplate and conclusory allegations, and he accompanies his legal theory with allegations that make his theoretically viable claim plausible").

For these reasons, Camshaft's Motion is denied with respect to Count III of the Complaint.

**D. Declaratory Judgment**

Camshaft next moves to dismiss Count VIII of the complaint. In Count VIII, Debtor seeks declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, that (i) the Second Transfer,

[57] Complaint ¶76.
[58] *Id.*

as well as any subsequent transfer or disposition of the Alpha Funds, were ultra vires, void ab initio, and/or otherwise without force and effect, and that (ii) the Alpha Funds are property of the estate under section 541 of the Bankruptcy Code.[59]

Camshaft argues that the basis of the Debtor's claim in Count VIII is that Inspilearn and Riju Ravindran acted without proper authority, not that Camshaft acted without proper authority. Thus, Camshaft, it contends, has no interest in the outcome. Further, Camshaft argues that because it has not asserted any rights or interest in the Alpha Funds, as against the Camshaft Defendants, there is no actual controversy or need to adjudicate adverse legal interests. Debtor responds that the Second Transfer involves the Debtor's transfer of the Camshaft limited partnership interest, the disposition of which Camshaft is inherently interested.

I am satisfied that Camshaft is an appropriate party to this claim. Camshaft clearly has a legal interest in the matters at issue in Count VIII of the Complaint, even if it chooses not to take action with respect to that interest at this time. At this early stage of the litigation, the extent of Camshaft's participation in the events that form the basis of this claim remain unclear. Accordingly, its Motion with respect to Count VIII is denied.

**E. Willful Violation of the Automatic Stay**

In Count XI of the Complaint, Debtor asserts a claim for willful violation of the automatic stay with respect to the two transfers that it alleges occurred post-petition. Specifically, Debtor alleges that on the same day Debtor filed its chapter 11 petition, "Ravindran, T&L, and Inspilearn, with Camshaft's assistance, caused Inspilearn to transfer the Debtor's property to an offshore trust. Upon information and belief, they executed the transfer after learning of the

[59] Complaint ¶ 229.

Debtor's bankruptcy filing, in violation of the bankruptcy stay" imposed by Section 362(a)(3) of the Code.[60]

Camshaft has moved to dismiss this claim on the grounds that (1) the Debtor's pleading is conclusory and improperly based on information and belief; and (2) Debtor's allegations conflict with "undisputed evidence" that the transfer at issue was made before the petition was filed. I am not persuaded on either point.

First, allegations based upon information and belief are permissible where the facts at issue are peculiarly within defendants' possession. *See McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267-68 (3d. Cir. 2016). Second, much like the evidence cited by Camshaft in support of its other arguments, the evidence offered here only raises questions of fact that cannot be resolved at this stage of the case. Accordingly, Camshaft's Motion with respect to Count XI is denied.

**CONCLUSION**

For the reasons set forth above, the Motions are DENIED.

It is SO ORDERED.

Dated: February 27, 2025

JOHN T. DORSEY, U.S.B.J.

[60] Complaint ¶ 248.

# Exhibit 49

# Trade and Supply Chain Agreement

**GENERAL TERMS AND CONDITIONS between**

OCI Limited a company incorporated under the laws of England and Wales with its registered office at Bank Chambers, 93 Lapwing Lane, Manchester, England, M20 6UR and trading office at 33 Cannon Street, London, EC4M 5SB and with company number 07983075 (the "**Seller**"); and

Think & Learn Private Limited, a corporation registered in India, with its registered office at 2nd Floor Tower D 4/1, Bannerghatta Main Road, Bengaluru, KA 560029 India (the "**Buyer**").

The Seller and Buyer may hereinafter be referred to individually as a "**Party**" and collectively as the "**Parties**".

Date of this General Terms and Conditions: November 25, 2021

**WHEREAS**:

From time to time the parties hereto may enter into transactions in which the Seller agrees to buy Product from a supplier on terms and conditions which have been disclosed to the Buyer and sell such Product to the Buyer on an 'as is, where is' basis and on the terms and subject to the conditions set out herein.

**NOW IT IS HEREBY AGREED** as follows:

1. **Definitions**

In these general terms and conditions (the "**General Terms and Conditions**") (except where the context otherwise requires) the following words shall have the following meanings:

"**Affiliate**" of a party means any subsidiary or any holding company from time to time of that party, and any subsidiary from time to time of such a holding company.

"**Bill of Exchange**" means a bill of exchange or any other irrevocable payment undertaking substantially in a form set out in Schedule I and acceptable to the Parties (executed after the invoice is raised by the Seller under the respective Purchase Order) and enforceable in the jurisdiction of issue in the amount of the Sale Price with a maturity date being the agreed Payment Date.

"**Business Days**" means a day (which is not a Saturday, a Sunday or a bank or public holiday) on which commercial banks settle payments and are open for general business in London, New York and New Delhi.

"**Certificate of Receipt**" means a certificate of good receipt of the Product or relevant documentation, signed by the Buyer

"**Default Interest Rate**" means the rate per annum which is 6.00%

"**Force Majeure**" means any cause preventing the Seller or the Buyer from performing any or all of its obligations (other than any payment obligation) which arises from or is attributable to acts or events beyond its reasonable control, including, without limitation, strikes, lock-outs or other industrial disputes (whether involving the workforce of the party so prevented or of any other party), act of God, war, riot, civil commotion, malicious damage, compliance with any law or governmental order, rule, regulation or direction, accident, breakdown of plant or machinery, fire, flood, storm or default of suppliers or sub-contractors.

"**International Trade Sanctions**" means the laws, regulations, rules and requirements of the United Nations, the United Kingdom, the United States of America (including but not limited to those outlined by the Office of Foreign Assets Control (OFAC) of the US Department of Treasury and the Export Administration Regulations of the US Department of Commerce), the European Union and any other applicable jurisdiction which relate to foreign trade control, export control, trade embargoes or international boycotts or sanctions.

"**Payment Date**" shall have the meaning given to that term in the relevant Purchase Order.

"**Product**" means the Requested Product mentioned in the respective Purchase Order.

"**Product Documentation**" means the Purchase Order and any documentary evidence relating to the Product and to the purchase of the Product by the Seller as may be required by the Buyer including but not limited to proforma invoice, commercial invoice, packing list and any other document detailed in Schedule II.

"**Purchase Contract**" means, in respect of the Product which are the subject of a particular Trade Transaction, the purchase order issued by the Seller read with acceptance of the Supplier with a Proforma invoice annexed.

"**Purchase Date**" means the date on which the Seller acquires the legal and beneficial title to the Product pursuant to a Purchase Contract.

"**Purchase Order**" means (pursuant to a Sale Offer duly accepted by the Buyer) a purchase order or any other request which has been duly executed by both the Buyer and the Seller in accordance with Clause 2.1 in the format set forth in Schedule IV.

"**Requested Products**" means such goods, tangibles, including but not limited to hardware, software, or other property of the quantity and description as more particularly identified in the Request, that the Buyer is desirous of purchasing or executing a Purchase Order with the Seller for.

"**Sale Price**" means the Total Amount mentioned in the Purchase Order.

"**Seller's Representatives**" means the Seller's agents and representatives and the Seller's and its agents' and representatives' directors, officers and employees.

"**Supplier**" shall mean the supplier (as mutually acceptable to the Parties) of the relevant Product to the Seller pursuant to a Purchase Contract.

"**Trade Transaction**" means a trade transaction entered into pursuant to these General Terms and Conditions.

**2. Transaction**

2.1 Pursuant to this General Terms and Conditions, the Buyer may address a written request on the Seller setting out such details more specifically mentioned in Schedule III for such Requested Products (the written request shall be referred to as the "**Request**"). Upon the receipt of the Request from the Buyer, the Seller shall, in the event such Requested Product(s) are in stock (with the Supplier) and/or can be delivered (by the Supplier) within the timelines stipulated by the Buyer in the Request, offer to sell such Requested Products to the Buyer in writing ("**Sale Offer**"). Upon the Buyer accepting the Sale Offer in writing, the Buyer and the Seller shall execute a purchase order for the purchase and supply of Products ("**Purchase Order**"). The Parties agree that a) the Seller shall issue a proforma invoice in connection with the relevant portion of the Sale Price (basis the delivery timelines set out in the Purchase Order) to the Buyer basis which the commercial invoice will be raised by the Seller on the Buyer at the time of delivery of the relevant Product(s) b) the Bill of Exchange shall be executed in the format agreed between the Parties and c) payments for the relevant Products shall be made by Buyer to the Seller, in accordance with the relevant pro forma invoice executed between the Parties. Further the Seller shall and shall cause the Supplier to share the Product Documentations pertaining to the relevant Product(s) with the Buyer, once the relevant Product(s) have been shipped.

2.2 The Parties acknowledge and agree that the Seller shall transfer the title (to such extent and in such manner as the Seller receives from the relevant Supplier) of the Products, to the Buyer at the time of delivery of the Products, provided that the Seller agrees that it will not itself create any encumbrance over the Products.

2.3 Notwithstanding the provisions of this General Terms and Conditions and the Purchase Order, the transfer of legal and beneficial title of the Product, from the Seller to the Buyer in full, shall take place in the manner as set forth below:

| S.N. | Manner in which Product(s) are transported | Transfer of Title of Product(s) to the Buyer |
|---|---|---|
| 1. | CIF: When the Product(s) are delivered on destination port by Supplier. | When the Product(s) are delivered to the Buyer at the destination port. |
| 2. | FOB: When Buyer transports from origin port | When the Product(s) are picked up by the Buyer at the Supplier port. |
| 3. | Ex-works: When Buyer picks up Product(s) from Supplier warehouse. | When the Product(s) are picked up by the Buyer from the Supplier warehouse. |

Note: The Parties shall undertake to incorporate the respective incoterms in the relevant Purchase Order. If there are any other modes/manner in which the Product(s) are proposed to be transported, in addition to the modes provided in the above- mentioned table, the transfer of title of Product(s) for such additional mode of transportation shall be mutually agreed between the Parties over an email and/or in the relevant Purchase Order.

3. **Payment**

3.1 The Buyer shall pay the amount set out in the relevant undisputed pro forma invoice to the Seller (as set out in the invoice raised and delivered by the Seller to the Buyer in connection with the relevant Product(s) which references the (a) delivery timelines of the Products ordered by the Buyer and (b) relevant invoiced portion of the Sale Price in full on the Payment Date by transfer of an amount equal to the relevant undisputed pro form invoice to the account of the Seller, within the timelines (which will be based on the timelines set forth in the Purchase Order) set forth in the relevant invoice (raised and delivered by the Seller to the Buyer in connection with the relevant Product(s)).

3.2 Any price adjustments or deductions being made by the Seller shall be made only after the mutual discussion and agreement (in writing) between the Parties.

3.3 In addition to the aforementioned, all transaction specific instructions related to payment for the Products will be detailed in the Purchase Order.

3.4 Subject to applicable Indian laws, in consideration of the services provided by the Seller to the Buyer under the General Terms and Conditions, the Buyer agrees to pay a facilitation fee to the Seller which will be based on the Purchase Order, as invoiced in the pro forma invoice for the relevant Product by the Seller.

4. **Demurrage and Insurance**

4.1 Unless otherwise agreed in writing by the Seller on a case-by-case basis with the Buyer in the Purchase Order, the Buyer undertakes to make or obtain (as the case may be), and agrees that it shall be solely liable for all obligations in respect of, transport and insurance, including but not limited to dispatch / demurrage calculations and payments and the importation, discharge and clearance of the Product.

4.2 The Buyer confirms that its existing marine floater insurance policy shall be applicable to the Products from the place where the title of the Product(s) is transferred to the Buyer. However, in the event the incoterms specify that the sale is basis CIF (cost, insurance, freight), the Parties acknowledge and accept that the Supplier shall provide the insurance cover to the satisfaction of the Parties. The Buyer further represents that its insurance policy is a valid, subsisting and operative by complying with the terms of issue of such insurance policy/ies including the timely payment of the premium for such policy/ies, and agrees to produce a copy of such insurance policy/ies whenever required and requested by the Seller in writing.

5. **Representations and Warranties**

5.1 The Parties represents and warrants to each other with respect to itself upon execution of these General Terms and Conditions, and on the date of each Purchase Order and on each Payment Date, that:

5.1.1 it is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, is in good standing;

5.1.2 it has the power to execute these General Terms and Conditions and any other

documentation relating to these General Terms and Conditions to which it is a party, to deliver these General Terms and Conditions and any other documentation relating to these General Terms and Conditions that it is required by these General Terms and Conditions to deliver and to perform its obligations under these General Terms and Conditions and any obligations it has under any ancillary documents (including without limitation any Purchase Order, and Bill of Exchange) to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

5.1.3 such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgement of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

5.1.4 all authorisations, consents, approvals, resolutions, licences, exemptions, filings, notarisations, registrations or governmental and other consents that are required to have been obtained by it with respect to these General Terms and Conditions and any ancillary document (including without limitation any Purchase Order or Bill of Exchange) to which it is a party have been obtained and are in full force and effect and all conditions of any such have been complied with;

5.1.5 all information provided or to be provided by a Party to the other Party is true, complete and accurate in all material respects as at the date it was provided and is not misleading in any respect;

5.1.6 its obligations under these General Terms and Conditions and any ancillary document (including without limitation any Purchase Order and Bill of Exchange) to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms;

5.1.7 it has not acted and is not in violation of and will not act in violation of any International Trade Sanction;

5.1.8 it is not insolvent;

5.1.9 it is not subject to any litigation or regulatory investigation or other similar proceeding which could adversely affect its ability to honour its obligations under these General Terms and Conditions or any ancillary document (including without limitation any Purchase Order and Bill of Exchange);

5.1.10 it is not involved in any dispute or litigation with any relevant Supplier

**6. Information**

6.1 Either Party shall, until these General Terms and Conditions are terminated provide to other Party the details of such insolvency proceedings which (a) have not been disposed off within a period of 30 days from the date of admission and (b) exceed the value of USD 10,000,000 or its equivalent in any other currency or currencies) due and payable prior to its specified maturity.

6.2 The Seller may, until the expiry of these General Terms and Conditions, request the provision of audited accounts of the Buyer for that financial year (or, if any such accounts are not audited, the management accounts) as applicable.

**7. Events of Default**

7.1 If any of the following (each an "**Event of Default**") occurs and remains uncured for a period of 30 (thirty) days ("**Grace Period**") after a written notice is provided by the Seller

to the Buyer :

7.1.1 the Buyer fails to pay any sum due from it under a Purchase Order or these General Terms and Conditions, and in the manner specified; or

7.1.2 any representation or warranty made by the Buyer in these General Terms and Conditions, any Purchase Order proves to have been incorrect or misleading in any material respect when made or repeated; or

7.1.3 the Buyer disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, these General Terms and Conditions, a Certificate of Receipt, any Purchase Order, or any transaction evidenced by such a Purchase Order (or such action is taken by any person or entity appointed or empowered to operate or act on its behalf); or

7.1.4 the Buyer suspends or ceases to make the payment of all or a substantial part of its debts to the Seller or is, or is deemed for the purposes of any applicable law to be, unable to pay its debts or admits inability to pay its debts to the Seller as they fall due,; or

7.1.5 any corporate action, legal proceedings or other procedure or step is taken in relation to (i) , voluntary winding-up and voluntary dissolution of the Buyer, (ii) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Buyer; or

7.1.6 the Buyer fails to comply with any material term or condition of these General Terms and Conditions, any Purchase Order; or

7.1.7 it becomes unlawful for the Buyer to perform or to continue to perform any of its obligations under these General Terms and Conditions, any Purchase Order, or any other documents referred to herein; or

7.1.8 the performance of any part of these General Terms and Conditions, or any Purchase Order requires any party to act in any manner that is inconsistent with any International Trade Sanctions, it may be declared that an Event of Default has occurred.

7.2 If an Event of Default has occurred, without prejudice to any rights or remedies that may be available to a Party under the transaction or otherwise, on the occurrence of an Event of Default, Parties may, exercise the following rights:

7.2.1 Terminate this General Terms and Conditions, and /or declare all of the amounts for which the Products have been delivered, as due and payable to the Seller, within 15(fifteen) days from the expiry of the Grace Period;

7.2.2 these General Terms and Conditions will be unavailable for further sales and stands suspended for all purposes until all payments under Clause 7.2.1 above have been received or otherwise satisfied in full.

7.2.3 At its sole cost, exercise any right, power or remedy permitted to it by law, including by suit, in equity, or by action at law, or both, or otherwise, whether for specific performance of any covenant, condition or term contained in this General Terms and Conditions or for an injunction against a violation of any of the terms and conditions of this General Terms and Conditions, or in aid of the exercise of any power or right granted in this General Terms and Conditions and/or as a creditor.

## 8. Inspection

8.1 The Parties agree that Buyer shall carry out the inspection of the Products delivered in accordance with the Purchase Order and the Seller shall not be liable or responsible for any inspection requirement.

8.2 In case any delivered Products are a) damaged and/or; b) rejected due to any deficiencies and/or; c) incorrect and/or d) do not match the specifications or the quantity set out in the relevant Purchase Order, the Buyer shall report the same to the Seller and/or Supplier in accordance with the terms set out in the relevant Purchase Order ("Deficiency Report"). Upon the notification of the Deficiency Report by the Buyer to the Seller and/or the Supplier and return of the delivered Products where it may be required or may be applicable, the Seller shall upon receiving a credit note from the Supplier, issue a credit note to the Buyer for the relevant deficient Products along with the copy of the credit note issued by the Supplier to the Seller and, upon receipt of monies from the Supplier, shall refund the monies pertaining to the deficient Product(s) to the Buyer along with the requisite supporting documents within 30 days from the date of issuance of the credit note by the Seller.

9. **Taxes**

If one of the Parties is obliged by law to make any withholding or deduction for, or on account of, any present or future taxes, levies, imposts, duties, deductions, withholdings or other charges, which may be required as per applicable law, it will pay to the other such additional amounts as may be necessary in order to ensure that the other party receives a net amount equal to the full amount due under these General Terms and Conditions or Purchase Order, as appropriate.

10. **Hold Harmless and Indemnities**

10.1 The Buyer shall not hold the Seller or the Seller's Representatives responsible in any eventuality at any time for any losses of any nature which the Buyer may incur, now or in the future, in relation to the Purchase Order or the Trade Transactions.

10.2 The Buyer shall indemnify the Seller and the Seller's Representatives on first demand against any direct and actual losses, claims, demands, proceedings, costs, charges, expenses and liabilities and any financial obligations (including but not limited to legal costs on a full indemnity basis) which the Seller or the Seller's Representatives may incur or sustain arising out of a material breach of these General Terms and Conditions, the Purchase Order, any Trade Transactions, committed by the Buyer. *Provided, however,* that (i) the Buyer shall not be liable for any incidental, consequential, indirect, special or punitive damages or losses; and (ii) the aggregate liability of the Buyer towards the Seller and Seller Representatives shall be limited to the Sale Price of the relevant Purchase Order under which the concerned indemnity event arises.

11. **Acknowledgements and undertakings in respect of the Product**

The Buyer and the Seller agrees and acknowledges that the warranties, covenants as to title, quality or otherwise regarding the Product as may be given by the Supplier to the Seller, shall be given to the Buyer by the Seller;

12. **Acts or Omissions of the Supplier, the Carrier and other Third Parties**

In the event any loss borne by the Buyer caused by or contributed to by the Supplier, by any carrier, any owner or operator of any vessel or any other party having any responsibility direct or indirect for the carriage or storage of the Product (collectively the "Carriers"), the Seller shall on the instruction and at the Buyer's cost initiate legal proceedings or take such action(s) available under the applicable law, against the relevant Carrier for the costs, losses or expenses incurred by the Buyer as a result of the default on the part of the relevant Carrier, any deviation from the voyage or any delay in the carriage of the Product.

**13 Import and Export Permits**

As specified in the Product Documentation, the respective Parties shall respectively obtain all approvals and consents required for the import and export of the Product, including all import and export permits, permissions and other documents required for the exit from and the entry of the Product into any relevant country or territory and the Buyer shall bear all costs, fees and expenses associated with obtaining such import permits and other documents.

**14 Force majeure**

14.1 If either Party is prevented or delayed in the performance of any of its obligations under these General Terms and Conditions by Force Majeure, such Party shall serve notice in writing on the other Party specifying the nature and extent of the circumstances giving rise to Force Majeure and shall promptly serve notice in writing to the Party informing it of the ending of the Force Majeure. The Parties shall have no liability in respect of the performance of such of its obligations as are prevented by Force Majeure during the continuation of the Force Majeure, using reasonable endeavours, to recommence its affected operations in order for it to perform its obligations.

**15** If the Seller is prevented from performance of its obligations for a continuous period in excess of two months, the Seller may, at any time thereafter, terminate these General Terms and Conditions forthwith on service of written notice of thirty days to the Buyer, in which case neither party shall have any liability to the other except that a) the Buyer shall within fifteen days from the date of termination pay to the Seller all amounts owing to it for the Products already delivered by the Supplier, b) the Seller shall within thirty days from the date of termination, refund any amount due under credit note issued to the Buyer by the Seller. All rights and liabilities that may have accrued prior to the termination shall continue to subsist.

**16 Assignment**

16.1 The terms and conditions of these General Terms and Conditions and any related Purchase Order shall be binding upon the parties hereto, their successors and assignees.

16.2 Neither Party shall be entitled to assign these General Terms and Conditions, any Purchase Order or any of its rights or obligations under any of them without the prior written consent of the other Party.

16.3 The Buyer acknowledges and agrees that the Seller may, subject to applicable law(s) (including Indian Foreign Exchange Laws and Indian customs laws), assign any or all its rights under these General Terms and Conditions or any Trade Transaction to any person or persons to whom the Seller sells any receivable (each a Transferee), provided however that, irrespective of any assignment of any or all rights to a Transferee by the Seller, the Buyer shall only make payments due, under these General Terms and Conditions and the Bills of Exchange, to the Seller.

**17 Amendment**

Any variation of these General Terms and Conditions must be in writing and signed by the parties hereto.

**18 Third Parties**

The Parties do not intend that any term of these General Terms and Conditions or any Purchase Order will be enforceable by virtue of the Contracts (Rights of Third Parties) Act 1999 by any person that is not a party to them except that the indemnities and agreements

to hold harmless shall be enforceable by the Seller's Representatives.

**19 Severability and entire agreement**

19.1 If at any time any provision of these General Terms and Conditions or any Purchase Order is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, it shall not affect or impair the legality, validity or enforceability in that jurisdiction of any other provision of these General Terms and Conditions; or the legality, validity or enforceability under the law of any other jurisdiction of that or any other provision of these General Terms and Conditions or any Purchase Order.

19.2 These General Terms and Conditions together with each Purchase order issued under its terms constitutes the full and complete agreement of the Parties and supersedes all prior proposals, agreements, discussions and representations (either oral or written) between the Parties. The Parties acknowledges that it has not relied on any representations or warranties except those set out in these General Terms and Conditions.

**20 Payments and Default Interest**

20.1 All payments to the Seller shall be effected in the currency of the Sale Price, in immediately available funds without set-off, counterclaim or deduction.

20.2 Any sum due from the Buyer to the Seller pursuant to these General Terms and Conditions that remains unpaid even after seven (7) days from the day it falls due shall bear interest from the first day on which the default arises, thereafter up to the date on which the Seller receives payment (both before and after judgment) at the Default Interest Rate.

**21 Confidentiality**

21.1 Each Party undertakes that (unless the prior written consent of the other Party shall first have been obtained) it shall, and shall procure that its officers, employees, advisers and agents shall, at any time whether during the term of these General Terms and Conditions or thereafter, keep confidential and not by failure to exercise due care or otherwise by any act or omission disclose to any person whosoever any of the confidential information of the other party. For the purposes of this Clause, "**confidential information**" shall include:

(i) the contents of these General Terms and Conditions, of any Purchase Order and any other agreement or arrangement contemplated by these General Terms and Conditions;

(ii) information of whatever nature concerning the current or future business, finances, assets, liabilities, dealings, transactions, know-how, customers, suppliers, pricing, processes or affairs of the other party (and, in the case of the Seller, any such information relating to its Affiliates);

(iii) any information which is expressly indicated to be confidential or is imparted by one party to another in circumstances importing an obligation of confidence and which any party may from time to time receive or obtain as a result of entering into, or performing its obligations pursuant to, these General Terms and Conditions or otherwise.

21.2 The restrictions imposed by Clause 20.1 shall not apply to the disclosure of any information by a party (the "**disclosing party**"):

(i) which now or hereafter comes into the public domain otherwise than as a result of a breach of such undertaking of confidentiality;

(ii) which is required by law or regulation, only to the extent required;

(iii) to a court, arbitrator or administrative tribunal in the course of proceedings before

it to which the disclosing party is a party in a case where such disclosure is required by such proceedings;

(iv) to any advisers, financiers or insurers to the disclosing party or to a potential financier or potential acquirer of the disclosing party or of any of its assets which are bound to the disclosing party by a written obligation of confidence which applies to any information disclosed.

**22 Termination**

22.1 This General Terms and Conditions shall remain in full force and effect, for a period of 1 years from the date of this General Terms and Conditions (the "Initial Term"). Thirty (30) days prior to the expiration of the Initial Term, the General Terms and Conditions shall deemed to be automatically renewed for a further 12 months period ("**Renewed Term**"). Upon the expiration of the Renewed Term, only upon the receipt of a written notice of extension from the Buyer to the Seller the General Terms and Conditions shall deemed to be automatically renewed for a further 12 months period. Notwithstanding any other provision of this General Terms and Conditions, the Parties may terminate this General Terms and Conditions at any time by giving thirty days prior written notice to the other Party.

22.2 These General Terms and Conditions may be terminated by either Party upon thirty (30) days' prior written notice delivered to the other Party. The obligations of each Party arising under any Purchase Order concluded prior to the date of termination (and any payment obligations pursuant to Clause 20 above) will remain valid and binding until fully performed or discharged.

22.3 Upon termination of:

(i) a Purchase Order, the Seller may terminate the consignment subject thereto in accordance with the terms of that Purchase Order; and

(ii) a Purchase Contract, the Seller may terminate the Sale Contract forthwith in relation to the consignment subject thereto.

**23 No Waiver**

No delay or omission of any of the parties in exercising any rights, powers or privileges hereunder shall operate to impair such rights, powers or privileges or be construed as a waiver thereof and any single or partial exercise of any such rights, powers or privileges shall not preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided in these General Terms and Conditions are cumulative and non-exclusive of any rights or remedies provided by law.

**24 Notices**

24.1 Any notice to be given by one Party to any other Party under, or in connection with, these General Terms and Conditions or any transaction hereunder shall be in writing, in English and signed by or on behalf of the party giving it.

24.2 Any such notice shall be served either by sending the physical copy of the notice to the address set out below or by sending it by e-mail to each of the relevant e-mail addresses set out below and in each case marked for the attention of the relevant party or parties (or as otherwise notified from time to time in accordance with the provisions of this Clause). Any notice served physically or by email shall be deemed to have been duly given, in the case of physical delivery, at the date of delivery and, in the case of e-mail, when actually received in readable form, provided that in each case where delivery by hand or email occurs after 6.00 pm in the place where it is received on a Business Day or on a day which is not a Business Day, service shall be deemed to occur at 9.00 am in the place where it is received on the next following Business Day.

24.3 References to time in this clause are to local time in the country of the addressee.

| For the Buyer: | For the Seller |
|---|---|
| Address: 2nd Floor Tower D 4/1, Bannerghatta Main Road, Bengaluru, KA 560029 India | Address: 33 Cannon Street, London, EC4M 5SB, United Kingdom |
| For raising a Request to place orders for procurement of Product(s):<br>1. Mohnish Jaiswal (mohnish@byjus.com)<br>2. Chandan Sharma (sharma.chandan@byjus.com) | For operational communications:<br>1. Department Inbox: operations@oci-group.co.uk<br>2. Dominic Keogh (dk@oci-group.co.uk)<br>3. Kate Stanley (ks@oci- group.co.uk) |
| For approval of payments<br>1. Mohnish Jaiswal (mohnish@byjus.com) | For issuance of Offer:<br>1. Department Inbox: operations@oci-group.co.uk<br>2. Dominic Keogh (dk@oci- group.co.uk)<br>3. Kate Stanley (ks@oci-group.co.uk) |
| For operational communications –<br>1. Akshay Kulkarni (kulkarni.akshay@byjus.com) | |
| For issuance of Purchase Order:<br>1. Niranjan Kumar (niranjankumar.v@byjus.com)<br>2. Akshay Kulkarni (kulkarni.akshay@byjus.com) | |

**25. Electronic Communication**

In respect of any request, instruction. notice or other communication sent by means of e- mail ("**Electronic Communication**") to a Party in relation to these General Terms and Conditions, any Purchase Order or any transaction carried out hereunder, the other Party confirms and agrees that: (a) the receiving Party is authorised to act upon an Electronic Communication which, in its sole discretion, it believes to have been issued by or to originate from the sending Party; (b) the receiving Party may refuse to act upon or reject any Electronic Communication in its sole discretion; (c) receiving Party is neither in a position to nor is required to ascertain the veracity or correctness of any Electronic Communication or attachment thereto or to determine whether any part of the same has been altered, intercepted or otherwise misused and sending Party undertakes to be fully liable for any untrue, forged, incorrect or misleading Electronic Communication and the consequences thereof; (d) it will unconditionally and irrevocably indemnify receiving Party and the receiving Party's Representatives against any loss, cost, damage, expense, liability, claim or proceedings which it or they incur or suffer as a result of acting on or refraining from acting on any Electronic Communication or as a result of any payment made on the instruction therein or as a result of any errors, delays, alterations, interference or lack of authenticity of any Electronic Communication or attachment thereto and the sending Party acknowledges that the receiving Party shall not have any liability for the same, unless the same arises as a result of the receiving Party's gross negligence, wilful misconduct or fraud.

Notwithstanding anything to the contrary provided under this General Terms and Conditions, any Electronic Communications can only be sent by authorised representatives of the Parties, as listed hereunder:

| For the Buyer: | For the Seller |
|---|---|
| For raising a Request to place orders for procurement of Product(s):<br>1. Mohnish Jaiswal (mohnish@byjus.com)<br>2. Chandan Sharma (sharma.chandan@byjus.com)<br><br>For approval of payments<br>1. Mohnish Jaiswal (mohnish@byjus.com)<br><br>For operational communications –<br>1. Akshay Kulkarni (kulkarni.akshay@byjus.com)<br><br>For issuance of Purchase Order:<br>1. Niranjan Kumar (niranjankumar.v@byjus.com)<br>2. Akshay Kulkarni (kulkarni.akshay@byjus.com) | For operational communications:<br>1. Department Inbox: operations@oci-group.co.uk<br>2. Dominic Keogh (dk@oci-group.co.uk)<br>3. Kate Stanley (ks@oci-group.co.uk)<br><br>For issuance of Offer:<br>1. Department Inbox: operations@oci-group.co.uk<br>2. Dominic Keogh (dk@oci-group.co.uk)<br>3. Kate Stanley (ks@oci-group.co.uk) |

Parties hereby agree that any request, instruction, notice, or Electronic Communications initiated between the Parties for the purpose of this General Terms and Conditions, by any person other than the authorised representatives mentioned above, shall not stand valid or binding between the Parties.

**26. Governing Law**

These General Terms and Conditions and their construction, validity and performance and any non-contractual obligations arising from or connected with them shall be governed by English law to the exclusion of any other law.

**27. Dispute Resolution**

The Parties agree that:

27.1 any dispute or claim (whether contractual or non-contractual) arising out of or in connection with these General Terms and Conditions, including but not limited to any question regarding its existence, validity, breach or termination (a "**Dispute**") shall, subject to Clause 26.1.5 below, be referred to and finally resolved by arbitration with its seat or legal place in London, under the LCIA Rules in force at the time of the referral to arbitration, which LCIA Rules are deemed to be incorporated by reference into these General Terms and Conditions;

27.2 the number of arbitrators shall be 1 (one); the appointed arbitrator shall be a barrister or solicitor practicing in England and Wales, the language of the arbitration shall be English. The arbitrator shall be mutually appointed by the Buyer and the Seller.

27.3 prior to a party referring any Dispute to arbitration, that party shall serve upon the other party a notice in writing giving 10 (ten) clear Business Days' notice of its intention to refer a

Dispute to arbitration,

27.4 notwithstanding Clause 27.1. to 27.1.3 above, either Party may, by giving written notice to the other Party, elect to have a Dispute determined by the Commercial Court of the High Court of England and Wales. A written notice shall be given to the Party to elect to refer a Dispute commenced a Party to the Commercial Court of the High Court of England and Wales on or before the 10th (tenth) Business Day following the date of receipt of the a Party's notice given pursuant to Clause 27.4.

27.5 Each Party agrees that, solely in connection with any claims arising out of or related to this General Terms and Conditions and any Trade Transaction hereunder, it irrevocably appoints Byju's UK Limited, Devonshire House 60, Goswell Road London (in the case of the Buyer) as its agent for service of process in England & Wales and that failure by such agent to notify it of the process will not invalidate the proceedings concerned.

27.6 Nothing in this Clause 27 shall prevent either party from seeking interim, provisional or conservatory measures from any court or other judicial authority of competent jurisdiction at any time whether before or after the formation of an arbitral tribunal or the commencement of proceedings in the Commercial Court of the High Court of England and Wales.

**AS WITNESS the hands of the parties or their duly authorised representatives the day and the year first above written**

For and on behalf of Think & Learn Private Limited

By............................................
Name: Riju Ravindran
Date: November 26, 2021

For and on behalf of OCI Limited

By............................................
Name: Oliver Chapman
Date: November 26, 2021

# Exhibit 51

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

FOR THE District of DELAWARE

In re BYJU'S ALPHA, INC.
Debtor

Case No. 24-10140 (JTD)

Chapter 11

*(Complete if issued in an adversary proceeding)*

BYJU'S ALPHA, INC.,
Plaintiff
v.
CAMSHAFT CAPITAL FUND, LP, et al.
Defendant

Adv. Proc. No. 24-50013 (JTD)

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: HSBC Bank USA, N.A.
*(Name of person to whom the subpoena is directed)*

■ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| PLACE | DATE AND TIME |
|---|---|
| Quinn Emanuel Urquhart & Sullivan, LLP 295 Fifth Avenue, New York, NY 10016 | 4/21/2025 5:30 p.m. |

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 3/21/2025

CLERK OF COURT

OR

____________________
*Signature of Clerk or Deputy Clerk*

/s/ Jianjian Ye
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* BYJU'S ALPHA, INC. , who issues or requests this subpoena, are:

Jianjian Ye, 295 Fifth Ave., New York, NY 10016, jianjianye@quinnemanuel.com, 212-849-7573, Jordan Nakdimon 212-849-7368

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE

**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: ______________________________________________
on *(date)* __________ .

☐ I served the subpoena by delivering a copy to the named person as follows: ____________________________________
______________________________________________________________________________________________
__________________________________ on (*date*) ___________________ ; or

☐ I returned the subpoena unexecuted because: ____________________________________________________________
______________________________________________________________________________________________

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _______________________ .

My fees are $ _________ for travel and $_________ for services, for a total of $_________ .

I declare under penalty of perjury that this information is true and correct.

Date: _______________

______________________________________________
*Server's signature*

______________________________________________
*Printed name and title*

______________________________________________
*Server's address*

Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections*. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

## SCHEDULE A

## DEFINITIONS

As used herein, the following terms have the meanings indicated below:

1. "**Action**" means the above-captioned adversary proceeding.

2. "**Communication**" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

3. "**SWIFT**" means the Society for World Interbank Financial Telecommunication.

4. "**MT**" ("message text") means the traditional message type for use on the SWIFT network.

5. "**MX**" means the XML message type for use on the SWIFT network.

6. "**Electronically Stored Information**" ("ESI") means, without limitation, the following:

   a. information that is generated, received, processed, and recorded, and/or maintained by or in computers, databases, systems, network drives, shared spaces, external and removable media, and other electronic devices and sources, including, without limitation, voicemail, email, Instant Messaging systems, and transaction processing, and ledger systems;

   b. internal or external websites and other shared spaces;

   c. output resulting from the use of any software program, database, or other system, including, without limitation, word processing Documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, SWIFT portal, SWIFT database, AOL Instant MessengerTM (or similar programs) or bulletin board programs, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, a deleted file, or file fragment;

   d. activity listings of electronic mail receipts and/or transmittals; and any and all items stored on computer memories, hard disks, floppy disks, CD-ROM, magnetic tape, microfiche, flash memory, thumb drives, memory sticks, and related media used to move and store data, such as, but not limited to, a personal digital assistant, e.g., Palm Pilot, Blackberry, or similar device, and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all Documents requested herein; and

e. archived data, legacy data, and back-up tapes.

7. "**Document**" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure ("**FRCP**") 34(a)(1)(A), made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 7034. A draft or non-identical copy is a separate document within the meaning of this term per FRCP 34(a)(1)(A) made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 7034.

8. When referring to documents, "**to identify**" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s). In the alternative, the responding party may produce the documents, together with identifying information sufficient to satisfy Fed. R. Civ. P. 33(d).

9. The words "**include**" and "**including**" mean "including but not limited to." The use of the term "include" in any request shall not be used to limit the generality or scope of any request. Nor shall the generality of any request be limited by the fact that another request touches on the same topic with a greater or lesser degree of specificity.

10. The words "**relating to**" means regarding, relating to, involving, concerning, referring to, describing, evidencing, constituting, relevant to, or in connection with, either directly or indirectly.

11. "**Byju's Alpha**" means the entity named as Plaintiff in the Action and in whose favor a judgment was entered against Defendants on March 14, 2025, including any agents, predecessors, successors, parents, subsidiaries, departments, divisions, joint ventures, partnerships, and other branches or affiliates, together with all officers, directors, employees, subsidiaries, affiliates, agents, or other person acting (or purporting to act) on behalf of the foregoing.

Case 25-50526-BLS Doc 89-4 Filed 01/28/26 Page 27 of 144

12. "**You**" and "**Your**" means the recipient of this subpoena and its officers, directors, employees, subsidiaries, affiliates, agents, or other persons acting (or purporting to act) on its behalf.

13. "**Person**" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

14. "**Concerning**" means relating to, referring to, describing, evidencing or constituting.

15. The terms defined above and the individual requests for production and inspection are to be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the FRCP or any applicable laws.

16. All words not defined in these Definitions shall be construed using their plain and ordinary meaning. If more than one meaning can be ascribed to a word, the meaning (or combination of meanings) that would make a Document be covered by the requests for production should be used, unless You provide written notice of the specific ambiguity and state the definition of the word used to exclude the Document from the scope of the request.

17. These Definitions are provided only for purposes of discovery, in conformance with FRCP 34(a) and Federal Rules of Bankruptcy Procedure 7034, and are not intended to be used for any purpose other than discovery. Byju's Alpha reserves the right to modify these Definitions or utilize different Definitions for any other purpose.

## RULES OF CONSTRUCTION

The following rules of construction apply to this discovery request:

1. The terms "**all**," "**any**," and "**each**" shall each be construed as encompassing any and all.

2. The connectives "**and**" and "**or**" shall be construed either disjunctively or

conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

3. The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

1. You are requested to produce all non-privileged Documents and other things described below that are within Your possession, custody or control, or in the possession, custody or control of Your attorneys, directors, officers, agents, employees, representatives, associates, division affiliates, partnerships, parents, or subsidiaries, and persons under their control.

2. A Document or other thing is deemed to be in Your actual or constructive possession, custody or control if it is in Your physical custody or if it is in the physical custody of any other Person and You (a) have a right, by control, contract, statute, order or otherwise, to use inspect, examine or copy such Documents on any terms; (b) have an understanding, express or implied, that You may use, inspect, examine or copy such Documents upon any terms; or (c) have, as a practical matter, been able to use, inspect, examine or copy such Document when You sought to do so. Such other Persons include record retention vendors, and technology, data, or other 3rd party IT, cloud or other service providers.

3. Unless otherwise indicated, these requests seek Documents and Communications concerning the time period from April 1, 2021 through present. If any Document, Communication, or other information is dated outside of the Relevant Time Period but is necessary for a complete understanding of a Document or Communication covered by the requests, such Document outside of the Relevant Time Period shall be produced. If any Document or Communication is undated and the date of its preparation cannot be determined, the Document or Communication shall be produced if otherwise responsive to the requests.

4. Each Document or other thing requested shall be produced in its entirety along

Case 25-50526-BLS Doc 30-10 Filed 04/30/26 Page 34 of 149

with all non-identical versions thereof and without abbreviation or redaction. Further, all attachments, enclosures, cover letters, memoranda, and appendices shall also be produced. If a Document or other thing responsive to any request cannot be produced in full, it shall be produced to the extent possible, with an explanation stating why production of the remainder is not possible. Any alteration of a responsive Document or other thing, including notes, underlining, stamps, drafts, revisions, modifications, and other versions, is a separate Document or other thing and is to be produced as a separate Document or other thing. For all Documents and other things, any family relationship should be captured and reflected in the production. Further, if any portion of any Document is responsive to any request in this subpoena, the entire Document is to be produced. A Document with handwritten, typewritten or other recorded notes, editing marks, etc., is not and shall not be deemed to be identical to one without such modifications, additions, or deletions.

5. Documents and other things not otherwise responsive to a request shall be produced if such materials mention, discuss, refer to, or explain the materials called for by a request, or if such materials are attached to materials called for by a request (*e.g.*, routing slips, transmittal emails, transmittal memoranda, letters, cover letters, comments, evaluations, or similar materials).

6. Each request shall be answered on the basis of Your entire knowledge, from all sources, after a reasonable and good faith inquiry has been made and a search has been conducted.

7. All Documents produced pursuant to this subpoena are to be produced as they are kept in the usual course. All responsive ESI that is maintained in the usual course in electronic format shall be produced in its native format along with the software necessary to interpret such files if such software is not readily available, with the metadata normally contained within such Documents, and the necessary load files. If such metadata is not available, each Document shall

be accompanied by a listing of all file properties concerning such Document, including, but not limited to, all information concerning the date(s) the Document was last accessed, created, modified, or distributed, and the author(s) and recipient(s) of the Document. If production in native format is impossible or impracticable, ESI may be produced in non-proprietary format, such as such as .xls, .csv, .jpg, .tif, or .pdf, or other agreed upon format, at the highest resolution available along with the metadata normally contained within such Documents.

8. Documents in large or complex formats, such as large Excel-format spreadsheets or accounting databases, for which non-proprietary format imaging would alter the presentation of the data, should be produced in their native format.

9. For each data file provided, You should separately provide a control file reflecting the search protocol utilized to obtain such data file.

10. ESI should not be produced in a form that removes or significantly degrades the ability to search the ESI by electronic means where the ESI is ordinarily maintained in a way that makes it searchable by electronic means.

11. File folders with tabs or labels or directories of files identifying documents shall be produced intact with such documents.

12. Documents attached to each other shall not be separated. All documents that respond, in whole or in part, to any portion of any request shall be produced in their entirety, including all addenda, appendices, attachments and enclosures.

13. If there are no Documents or other things responsive to any particular request, Your response shall state so in writing.

14. In the event that any Document or other thing called for by these requests is withheld on the basis of a claim or privilege or immunity:

a. The person asserting the privilege shall identify the nature of the privilege

(including work product) which is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked; and

b. The following information shall be provided in the objection unless divulgence of such information would cause disclosure of the allegedly privileged information: (i) the type of document, e.g., letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) the author of the document, the addressees of the document, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other;

15. Any purportedly privileged Document or other thing containing non-privileged material must be produced, redacting only the portion purportedly privileged.

16. If You have any good faith objections to any request or any part thereof, the specific nature of the objection and whether it applies to the entire request or to a part of the request shall be stated in accordance with FRCP 34, made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 7034. If there is an objection to any part of a request, then the part objected to should be identified and Documents and other things responsive to the remaining unobjectionable part should be timely produced. Further, if You object to part of a request, You must state the basis of Your objections in accordance with FRCP 34.

17. In the event that any Document or other thing responsive to these requests has been lost, discarded, or destroyed, that Document or other thing is to be identified by stating as completely as possible: (a) the authors or creators of the material, (b) all persons who received copies of the material, including any indicated and blind copy recipients, (c) the present custodian of the material, (d) the date of the material, (e) the material's date of destruction or discard, manner of destruction or discard, and the reason for destruction or discard, and (f) the persons

Case 26-50201-BLS Doc 85-4 Filed 04/20/26 Page 12 of 124

authorizing and carrying out such destruction or discard.

18. Each production shall be submitted with a transmittal letter or email that includes the case caption, production volume name, encryption method/software used if applicable, and passwords for any password protected files if applicable.

19. Upon request, counsel for Byju's Alpha will provide to You an electronic copy of this subpoena in Microsoft Word document file format to facilitate Your answering the request below.

## REQUEST FOR PRODUCTION

1. All Documents concerning SWIFT messages received or transmitted during the Relevant Time Period through Your SWIFT portal or stored in Your SWIFT database and satisfying the following SWIFT message search criteria:

SWIFT Message Search Criteria:

1) Transaction date = April 1, 2021 through the date of the search;

2) SWIFT Message Standard:

   a. MT Message Type = 101, 102, 102+, 103, 103+, 104, 110, 111, 121, 195, 196, 198, 199, 200, 201, 202, 202 COV, 203, 205, 207, 210, 295, 296, 298, 299, 304, 307, 320, 321, 400, 410, 416, 420, 495, 496, 498, 499, 500, 502, 509, 515, 600, 601, 604, 605, 606, 607, 608, 609, 620, 700, 701, 707, 710, 756, 760, 767, 795, 796, 798, 799; 900, 910, 940, 941, 942, 950, or 986; and/or

   b. MX Equivalent Type = pain.001, pacs.008, pacs.009cov, pacs.003, pain.008, camt.026, camt.027, camt.033, camt.034, camt.028, camt.031, camt.029, pacs.009, camt.050, camt.057, tsrv.001, tsrv.005, camt.054, camt.053, or camt.052;

3) Where numerical values are present, MT Message Field 32*n* or 33*n* (where *n* is an optional letter), or MX Equivalent Type Element <IntrBkSttlmAmt>, <IntrBkSttlmDt>, or <InstdAmt>, or any currency amount field = greater than or equal to **1,000**; and

4) MT Message Field 50*n*, 59*n*, 70*n*, 72, 82*n*, 87*n*, or 95*n* (where *n* is an optional letter), or MX Equivalent Type Element <InstdAmt>, <Dbtr>, <Cdtr>, <RmtInf>, <Ustrd>, <Strd>, <ChrgsInf>, <PrvsInstgAgt1>, <PrvsInstgAgt2>, <PrvsInstgAgt3>, <RltdRmtInf>, or any beneficiary, originator, or instruction field, contain any of the SWIFT Search Terms listed in **Table A**, including the variations of the SWIFT Search Terms separated by semicolons in **Table A**, regardless of whether the relevant field contains other text.

**TABLE A**
**SWIFT SEARCH TERMS TO BE SEARCHED**

| Term | Variations |
|---|---|
| Aakash Edutech Pvt Ltd | "Aakash Edutech";<br>"Aakash" and "EDU" |
| Accuvise Administrators Limited | "Accuvise" |
| Ackees Mobile Tech Pvt Ltd | "Ackees Mobile Tech" |
| Adar Poonawalla | |
| AE550200000023491640100 | |
| Airretailer Technology LLC | |
| Aiyo International Limited | "Aiyo International" |
| Ajin Purushothaman | "Ajin Purushothaman" |
| Alexandra Tanya Morton | "Alexandra Morton"; "Alexandra T. Morton" |
| Ananya Srivastava | "Ananya Shree" |
| Andrew Simon | "Andrew Simon" AND "DC Legal" |
| Andrew Wagner | |
| Anisree Vellapalath | |
| Anita Kishore | |
| anita.k27@gmail.com | |
| anita@thinkandlearn.in | |
| anitak27@gmail.com | |
| Anticee Solutions Ltd | "Anticee Solutions" |
| Anubhav Sinha | |
| Apex Fund | "Apex Fund" AND "Godolphin" |
| Arun Kant | "Arun Kant" |
| Astra Management Services | "Astra Management" |
| Aswani Nambarambath | |
| Aswani Valsaraj | |
| Banker Corporation | |
| Beeaar Investco Pte Ltd | "Beeaar" |
| Benchmark Investments LLC | "Benchmark Investments" |
| Bisy Philip Rajendran | |
| Black Hills Solutions | |
| Blaise Pascal Barrelet | "Blaise Barrelet" |
| Bluebell Capital Investments Ltd | "Bluebell Capital Investments" |
| Brett Borgensen | "Brett Borgensen" |
| Brikram Trading | |
| Burton Varley Ltd | "Burton Varley" |
| Byju Raveendran | "Byju R*"; "Byju Raveendran";<br>"Byju Ravindran" |

**TABLE A**
**SWIFT SEARCH TERMS TO BE SEARCHED**

| | |
|---|---|
| BYJU's Alpha, Inc | "Byjus Alpha"; "Byju's Alpha"; "Byju Alpha"; "Byjus"; "Byju's" |
| Byju's Global Pte Ltd | "Byju's Global"; "Byjus Global" |
| Byju's Holdings 1 Pte Ltd | "Byju's Holdings"; "Byjus Holdings" |
| Byju's Holdings 2 Pte Ltd | "Byju's Holdings"; "Byjus Holdings" |
| Byju's Investments Pte Ltd | "Byju's Investments" |
| Byju's Pte Ltd | "Byju's Private"; "Byju's Pte" |
| BYJU's UK Ltd | "Byju's UK" |
| byjuraveendran@gmail.com | |
| byjuraveendran@icloud.com | |
| Byjus Investments Pvt Ltd | "Byjus Investments" |
| Byju's K3 Education Pvt Ltd | "Byju's K3"; "Byjus K3" |
| Byjus Learning Company FZCO | "Byjus Learning Company"; "Byju's Learning Company" |
| BYJU's S.A. de C.V. | "BYJU's S.A."; "BYJUs S.A." |
| BYJU's Tecnologia Educacional LTDA | "BYJU's Tecnologia Educational"; "BYJUs Technologia Educational" |
| Camelback Financial Corp. | |
| cameron.morton96@gmail.com | |
| cameronmorton96@gmail.com | |

**TABLE A**
**SWIFT SEARCH TERMS TO BE SEARCHED**

| | |
|---|---|
| Camshaft Capital Advisors LLC | "Camshaft" |
| Camshaft Capital Credit LP | "Camshaft" |
| Camshaft Capital Fund LP | "Camshaft" |
| Camshaft Capital Fund, LP | "Camshaft" |
| Camshaft Capital Management, LLC | "Camshaft Capital" |
| Camshaft Capital Advisors, LLC | "Camshaft" |
| Camshaft Consulting LLC | "Camshaft Consulting" |
| Camshaft CRE 1 LLC | "Camshaft CRE" |
| Camshaft Credit LP | "Camshaft Credit" |
| Camshaft Credit LP SPV 1 | "Camshaft" |
| Camshaft Credit Management LLC | "Camshaft" |
| Camshaft Fund, LP | "Camshaft Fund" |
| Camshaft LLC | “Camshaft” |
| Camshaft LP -- Activist I | “Camshaft” |
| Camshaft LP Short Term Liquid Assets 1 | "Camshaft LP" |
| Camshaft LP SPV 1 | "Camshaft" |
| Camshaft Management , LLC | "Camshaft Management" |

**TABLE A**
**SWIFT SEARCH TERMS TO BE SEARCHED**

| | |
|---|---|
| Camshaft Management LLC | "Camshaft" |
| Cema Language Solutions Corp | "Cema Language Solutions" |
| Charlotte Mason | "Charlotte Mason" w/10 ("OCI" OR "Aiyo") |
| Chris Rigby | "Chris Rigby" AND "Stenn" |
| cman9625@yahoo.com | |
| Cutting Edge Sports FZ-LLC | "Cutting Edge Sports" |
| Davin Goldsztajn | |
| DC Legal FZ LLC | "DC Legal |
| Deeptha AR | "Deeptha Akhila Raghavan"; "Deeptha Ravindran" |
| Delta Management Services | "Delta Management" |
| Dheeraj Guliani | |
| Digital Aristotle Pvt Ltd | "Digital Aristotle" |
| Divya Gokulnath | "Divya G*"; "Divya Gokulnath" |
| divya@byjus.com | |
| divya@thinkandlaern.in | |
| divya@thinkandlearn.in | |
| Donald J. Morton | "Donald Morton" |
| Dynaveo Ltd | "Dynaveo" |
| E44840008 | |
| E44951003 | |
| EF Hutton | "EF Hutton" |
| Enso Group | |
| E-Outlets Limited | "E-Outlets" |
| Epic! Creations Inc | "Epic! Creations"; "Epic Creations" |
| Epsilon, Villa B12, Yemlur village, Varthur hobli, Bangalore, Kartnataka, India, 560037 | Epsilon w/10 (Bengaluru OR Bangalore) |
| Epsilon, Villa B13, Yemlur village, Varthur hobli, Bangalore, Kartnataka, India, 560037 | Epsilon w/10 (Bengaluru OR Bangalore) |
| EST Capital AG | "EST Capital" |
| Ethos Fashion Sro | "Ethos Fashion Sro" |

**TABLE A**
**SWIFT SEARCH TERMS TO BE SEARCHED**

| | |
|---|---|
| Future Ideas Trading LLC | "Future Ideas Trading" |
| GeoGebra GmbH | "GeoGebra" |
| GL Pte Singapore | |
| Global Lingo (S) Pte Ltd | "Global Lingo" |
| Godolphin Fund | "Godolphin Fund" |
| Gokulnath Kuppuswamy Naidu | "Gokulnath Naidu"; "Gokulnath Kuppuswamy" |
| Golden Mile 3, Palm Jumeriah, Dubai | |
| Gorillahouse Tech Ltd | "Gorillahouse" |
| Great Lakes E-Learning Services Pvt Limited | "Great Lakes Learning"; "Great Lakes E-Learning" |
| Great Learning Education Services Pvt Ltd | “Great Learning Education Services” |
| Greengage Investments Ltd | "Greengage Investments" |
| H Motion Ltd | "H Motion" |
| Harrymax Consultants LLC | "Harrymax Consultants" |
| Haygot Services Pvt Ltd | "Haygot" |
| HDFC Bank Limited | |
| HSBC Singapore | |
| Hydra Enforcement, LP | “Hydra Enforcement” |
| Hydra Global LLC | “Hydra Global” |
| ICC Business Corporation FZ LLC | "ICC Business Corporation" |
| ICICI Bank Limited | |
| IIFL Finance Limited | |
| Incred Financial Services | "Incred Financial" |
| Infiken Internet Labs Pvt Ltd | “Infiken” |
| Innovagro Foods LLP | "Innovagro" |
| Inspilearn Education Pvt Ltd | “Inspilearn” |
| Inspilearn LLC | "Inspilearn" |
| Intap Labs Pvt Ltd | “Intap Labs” |
| Itria Venture S | Itria Venture |
| Jamey Jacob | "Jamey Jacob"; "J Jacob" |
| Jason Perz | "Jason Perz"; "J Perz" |
| Jed Trail, Sevierville, TN 37862 | |
| Jino Joseph | "Jino Joseph"; "Jion Joseph"; "J Joseph"; (in conjunction with "Byju's") |

**TABLE A**
**SWIFT SEARCH TERMS TO BE SEARCHED**

| | |
|---|---|
| Jon Naseath | Jonathan Naseath |
| Kamran Asghar | "K Asghar" |
| kiran.a@sureshandco.com | |
| Kishore Srinivasan | "Srinivasan Kishore" |
| Kranti Growth Catalysts | "Kranti Growth" |
| Krypton Fund Services | |
| Kunnaruvath Raveendran | "Kunnaruvath Ravindran" |
| Kush Banker | "Kush Rupin Banker" |
| L 33 Lailak 2 Street | ("Emirates Hills" OR "Dubai") AND "L33" AND "LAILAK" |
| Leonie Hill Capital Private Limited | "Leonie Hill Capital" |
| Libra Trading | |
| Madison Properties | |
| Madoc Plantation | |
| Magnela Properties | |
| Malav Banker | |
| Maplewood Trading | |
| Marinemast | |
| Marquise International | |
| Mavrus Properties | |
| Meenakshi Banker | "Banker Meenakshi Rupin"; "Minakshi Banker" |
| melonie19@gmail.com | |
| melonie19@okdhfcbank | |
| Memphis Global | |
| Merill Tradecom | |
| Michael Lipman | "Michael Lipman"; "M Lipman"; "Mike Lipman" (in conjunction with "Camshaft") |
| Miramac Properties | |
| Mohammad Iqbal Puri | |
| Monique Morley | |
| Montiago General Trading LLC | |
| More Ideas Books Trading LLC | "More Ideas" |
| More Ideas General Trading LLC | "More Ideas"; "BYJUs" AND "MIGT" |
| Morris Properties | |
| Nerissa Infra Projects | |
| Neuron Fuel Inc | "Neuron Fuel" |

**TABLE A**
**SWIFT SEARCH TERMS TO BE SEARCHED**

| | |
|---|---|
| No. 206; Green Glen Layout;Bellandur; Bangalore - Ground Floor, Bengaluru, Karnataka, India, 560103 | “Green Glen Layout”<br>“no. 206” W/10 (Bengaluru OR Bangalore) |
| No. 43, Yoganarasimha 14th Main, 15th Cross, HSR Layout, Sector 4, Bengaluru, Karnataka, India, 560102 | “Yoganarasimha 14th Main”<br><br>(“No 43” w/10 (Bengaluru OR Bangalore)) |
| Northwest Education Pte Ltd | "Northwest Education" |
| OCI Group Ltd | "OCI Group" |
| OCI Limited | "OCI Ltd" |
| OCI Logistics Ltd | "OCI Logistics" |
| OCI Office Ltd | "OCI Office" |
| OCI RESI Ltd | "OCI RESI" |
| Oliver Chapman | ("O Chapman" w/10 "OCI"); "Oliver Philip Chapman" |
| Om Pandey | "Om P Pandey"; "Om Pandey" |
| Orin OCI RB Ltd | "Orin OCI RB" |
| Padam Singhania | |
| Pankaj Srivastava | "Pankaj Srivastava" |
| PP Holdings | |
| Praseeth Pareparambil Sankaramveettil | "Praseeth Sankaramveettil"; "Praseeth Pareparambil Sankaramveettil" |
| Preethi Srivastava | |
| Purplemint Fintech | |
| R Motion Ltd | "R Motion" |
| Rahul Rajendran Vellapalath | |
| Rainbow Ridge Way, Sevierville, TN 37862 | |
| Rajendran Vellapalath | |
| rajendran@keralapravasiassociation.com | |
| raju.1971@hotmail.com | |
| Ranjan Pai | |
| Ready Merchantlinks Private Limited | "Ready Merchantlinks"; "Ready Merchantlinks Pvt Ltd"; "Ready Merchantlinks Private Ltd"; "Ready Merchantlinks Pvt Limited" |

**TABLE A**
**SWIFT SEARCH TERMS TO BE SEARCHED**

| | |
|---|---|
| ReadyFunds | |
| Red Vinyard Endeavors LLC | Red Vinyard |
| Riju Ravindran | “Riju R*”; "Riju Raveendran"; “Riju Ravindran”; Riju (W/10) Ravindran |
| rijuravindran@gmail.com | |
| Rise International | |
| Rizwana Shaheen Ameer Meea | ("Rizwana Meea" OR "Rizwana Ameer Meea") AND Godolphin |
| Robert Forte | |
| Roisin Chapman | "Roisin Chapman"; "R Chapman" w/10 "OCI") |
| Rose Lake | |
| Royal Fort Infracom General Trading | "Royal Fort Infracom" |
| Rupin Banker | ("R Banker" w/10 "OCI"); "Rupin Hemant Banker"; "Rupin Banker Hemant" ("Rupin Bankar"w/10 "OCI"); ("R Bankar" w/10 "OCI") ("Rupin Hemant Bankar" W/10 "OCI") |
| Sairaj Unnikrishnan | |
| Sandeep Krishnan Narayanaswamy | "Sandeep Krishnan"; "Sandeep Krishna" |
| Sandeep Vellapalath | |
| sandykris@gmail.com | |
| sandykris_82@yahoo.com | |
| Sean Teeling | "Sean Teeling"; "S Teeling" |
| Secure Capital | |
| Serena Vista LLC | "Serena Vista" |
| Serum Institute | |
| Shaji Puthalath | "Shaji Divakar" |
| Shaman Commodities | |
| Shantanu Prakash | |
| Sharath Kumar | |
| Shenka Ltd | "Shenka" |
| Shobhana Valli Mundani | "Shobhana Raveendran"; "Shobhana Ravindran" |

**TABLE A**
**SWIFT SEARCH TERMS TO BE SEARCHED**

| | |
|---|---|
| Sindhu Ratna Kul Bhaskar | "Sindhu Bhaskar"; "Dr Sindhu Bhaskar" |
| Skyconsult General Trading LLC | "Skyconsult General Trading" |
| Skywest Trading | |
| Snake River Trust | |
| Sola Fide | |
| Span Thoughtworks Pvt Ltd | "Span Thoughtworks" |
| Specadel Technologies Pvt Ltd | "Specadel" |
| Sreejith Narayanan Kunniyur | |
| Sriharu Marri Sreepathy | "Sriharu Marri Sreepathi" |
| Srisolve IBS Enterprises Private Limited | "Srisolve"; "Innovmania Enterprises" |
| Stallions Investment Management | |
| Stenn Assets UK Limited | "Stenn Assets" |
| Tangible Play Inc | "Tangible Play" |
| Think and Learn | T&L; "Think & Learn"; "Think and Learn" |
| Toppr Technologies Pvt Ltd | "Toppr Technologies" |
| U8240608 | |
| U9415436 | |
| UAB Capitulus | |
| Venice Land | |
| Vinay Raveendra | |
| Vinay Ravindra | "Vinay Ravindra"; "Vinay Raveendra"; "Vinay Ravindranath" |
| Vinay Ravindranath | |
| Voizzit | |
| Weblength Infonet Pvt Ltd | "Weblength Infonet" |
| Whitehat Education Technology Private Limited | "Whitehat Education Technology" |
| William Cameron Morton | "William Cameron Morton"; "William C Morton"; "William Morton"; "Will Morton"; |

**TABLE A**
**SWIFT SEARCH TERMS TO BE SEARCHED**

| | |
|---|---|
| | "W Cameron Morton"; "Cameron Morton" |
| William Hailer | "Will Hailer"; "W Hailer" |
| william@camshaftadvisors.com | |
| william@hydra-enforcement.com | |
| Wirturbo | "Wirturbo" AND "Andrew Simon"; "Wirturbo" AND "DC Legal" |
| Wondersearch Ltd | "Wondersearch" |
| Yuv Banker | "Yuv Rupin Banker" |
| YWE Business Solutions | |
| (305) 619-1383 | |
| (406) 552-3828 | |
| +91 9741029559 | |
| +91 97693 61921 | |
| +91 99014 67788 | |
| +971 502 717 805 | |
| +971 56 395 2280 | |
| +971 56 3952 280 | |
| 000201618599 | |
| 004701081930 | |
| 00531000135994 | |
| 035701509176 | |
| 035701510898 | |
| 035701510900 | |
| 0959085023401 | |
| 101201502312 | |
| 1015497457901 | |
| 1025855157002 | |
| 1109 Windmill Properties LLC | “1109 Windmill Properties” |
| 1200 Brickell Avenue, Suite 310 | "1200 Brickell Avenue" w/7 Miami |
| 1211099286 | |
| 1304****7695 | 1304 w/1 76958 |
| 1-575-0496-7702 | "157504967702" |
| 1-575-2368-6176 | "157523686176" |
| 15752370944 | |
| 1-575-2370-9440 | "157523709440" |

**TABLE A**
**SWIFT SEARCH TERMS TO BE SEARCHED**

| | |
|---|---|
| 1-575-2370-9457 | "157523709457" |
| 15752370957 | |
| 16850 Collins Avenue,#112408, Sunny Isles Beach, Florida 33160 | "16850 Collins Avenue" w/7 Florida |
| 175 SW 7th Street, Miami, FL 33130 | "175 SW 7th Street" W/5 Miami |
| 18555 Collins Ave Ste 5405, Sunny Isles Beach, FL 33160 | |
| 260288030179 | |
| 260288030180 | |
| 269100-20010 | "26910020010" |
| 26912820083147407006 | |
| 285 NW 42nd Avenue | |
| 29330337 | |
| 3251 3412 6959 | |
| 32848409 | |
| 3301019993 | |
| 3303534635 | |
| 3303535876 | |
| 3499923869778960 | |
| 3499926431790960 | |
| 3499927924582530 | |
| 36280504 | |
| 4/1, 2nd Floor, Tower D, IBC Knowledge Park, Bannerghatta Main Road, Bangalore, Karnataka, India, 560 029 | ("IBC Knowledge Park" and Byju or Byju's) |
| 414740020282 | |
| 42181841029913640007 | |
| 447043111567 | |
| 50100110273397 | |
| 50100110273638 | |
| 50100168803838 | |
| 50100270296161 | |
| 5022869 | |
| 5152201433706 | |
| 5188112317576905000 | |
| 600304003452 | |
| 619090183 | |

Case 25-50621-BLS Doc 285-1 Filed 04/20/26 Page 52 of 124

**TABLE A**
**SWIFT SEARCH TERMS TO BE SEARCHED**

| | |
|---|---|
| 6683805700264559000 | |
| 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 | |
| 6813646268179415000 | |
| 741806159 | |
| 741806811 | |
| 741806894 | |
| 777 Brickell Ave, Floor 5, Miami, FL 33131 | "777 Brickell" w/7 Miami |
| 7777051000013969 | |
| 778593837 | |
| 805-3297616498 | |
| 805-5170928917 | |
| 80783 | "80783" (w/5 Gokulnath) |
| 80795 | "80795" (w/5 Raveendran) |
| 80796 | "80796" (w/5 "Ravindran)" |
| 853-30818 | |
| 853-30819 | |
| 87-2924260 | |
| 8990-1821 | "8990-1821" |
| 9049602879517622000 | |
| 914028111 | |
| 936 SW 1st Avenue, #1086, Miami, FL 33130 | "936 SW 1st Avenue" W/5 Miami |
| 950 Brickell Bay Drive, #5107, Miami, FL 33130 | "950 Brickell Bay Drive" w/7 Miami |

# Exhibit 52

# UNITED STATES BANKRUPTCY COURT

FOR THE District of DELAWARE

In re BYJU'S ALPHA, INC.
Debtor

(Complete if issued in an adversary proceeding)

BYJU'S ALPHA, INC.,
Plaintiff
v.
CAMSHAFT CAPITAL FUND, LP, et al.
Defendant

Case No. 24-10140 (BLS)

Chapter 11

Adv. Proc. No. 24-50013 (BLS)

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: HSBC Bank USA, N.A.
*(Name of person to whom the subpoena is directed)*

■ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| PLACE | DATE AND TIME |
|---|---|
| Quinn Emanuel Urquhart & Sullivan, LLP 295 Fifth Avenue, New York, NY 10016 | 5/2/2025 5:30 p.m. |

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 4/2/2025

CLERK OF COURT

OR

________________________
*Signature of Clerk or Deputy Clerk*

/s/ *Kate Scherling*
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* BYJU'S ALPHA, INC. , who issues or requests this subpoena, are:
Kate Scherling, 295 Fifth Ave., New York, NY 10016, katescherling@quinnemanuel.com, 212-849-7178, Jordan Nakdimon 212-849-7368

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE

**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: ______________________________________________
on *(date)* __________ .

☐ I served the subpoena by delivering a copy to the named person as follows: ____________________________________
____________________________________________________________________________________________________
__________________________________ on (*date*) ___________________ ; or

☐ I returned the subpoena unexecuted because: ____________________________________________________________
____________________________________________________________________________________________________

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _______________________ .

My fees are $ _________ for travel and $_________ for services, for a total of $_________ .

I declare under penalty of perjury that this information is true and correct.

Date: _______________

________________________________________
*Server's signature*

________________________________________
*Printed name and title*

________________________________________
*Server's address*

Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections*. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

Case 25-50021-BLS Doc 285-1 Filed 04/08/26 Page 30 of 124

**ATTACHMENT A**

**DEFINITIONS**

As used herein, the following terms have the meanings indicated below:

1. "**Action**" means the above-captioned case.

2. **"Account"** means any instrument of any nature whereby You accepted and held financial assets on behalf of a depositor or for the benefit of another.

3. "**Communication**" or "**Communications**" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

4. "**Concerning**" means relating to, referring to, describing, evidencing, or constituting.

5. "**Document**" or "**Documents**" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A), as made applicable herein by Federal Rules of Bankruptcy Procedure 7034, 7069, and 9016. A draft or non-identical copy is a separate document within the meaning of this term.

6. "**Electronically Stored Information**" ("**ESI**") means, without limitation, the following:

a. information that is generated, received, processed, and recorded, and/or maintained by or in computers, databases, systems, network drives, shared spaces, external and removable media, and other electronic devices and sources, including, without limitation, voicemail, email, Instant Messaging systems, and transaction processing, and ledger systems;

b. internal or external websites and other shared spaces;

c. output resulting from the use of any software program, database, or other system, including, without limitation, word processing Documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, SWIFT portal, SWIFT database, AOL Instant MessengerTM (or similar programs), or bulletin board programs, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and

all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, a deleted file, or file fragment;

d. activity listings of electronic mail receipts and/or transmittals; and any and all items stored on clouds, hosting services, computer memories, hard disks, floppy disks, CD-ROM, magnetic tape, microfiche, flash memory, thumb drives, memory sticks, online platforms, and related media used to move and store data, such as, but not limited to, a personal digital assistant, *e.g.*, iPhone, or similar device, and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all Documents requested herein; and

e. archived data, legacy data, and back-up tapes.

7. The words "**include**" and "**including**" mean "including but not limited to." The use of the term "include" in any request shall not be used to limit the generality or scope of any request. Nor shall the generality of any request be limited by the fact that another request touches on the same topic with a greater or lesser degree of specificity.

8. "**Judgment Creditor**" means the entity named as Debtor-Plaintiff in the Action.

9. "**Judgment Debtors**" means Camshaft Capital Fund LP, Camshaft Capital Management LLC, and Camshaft Capital Advisors LLC, Riju Ravindran, Inspilearn LLC, and Think and Learn Private Limited, including their agents or other persons acting (or purporting to act) on their behalf, any entity in which they are a partner, and any organization or entity that a Judgment Debtor manages or controls, or an affiliate thereof, and any of their predecessors, successors, parents, subsidiaries, departments, divisions, joint ventures, partnerships, branches, or affiliates.

10. "**Byju**" means the individual known as Byju Raveendran, Byju Ravindran, or any other name or alias.

11. "**Morton**" means the individual known as William Cameron Morton, William C. Morton, William Morton, Will Morton, W, Cameron Morton, Cameron Morton or any other name or alias, last known to reside at 950 Brickell Bay Drive, Apartment 5107. Miami, FL 33131.

12. “**Person**” or “**Persons**” means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

13. **Relevant Time Period**” means the time period between April 1, 2021, and the date that you respond to these Requests.

14. “**You**” and “**Your**” means HSBC Bank USA, N.A., and your officers, directors, employees, subsidiaries, affiliates, agents, or other persons acting (or purporting to act) on your behalf.

15. The terms defined above and each individual request for production are to be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, or any other applicable laws.

16. All words not defined in these Definitions shall be construed using their plain and ordinary meaning. If more than one meaning can be ascribed to a word, the meaning (or combination of meanings) that would make a Document be covered by the request for production should be used, unless You provide written notice of the specific ambiguity and state the definition of the word used to exclude the Document from the scope of the request.

## RULES OF CONSTRUCTION

The following rules of construction apply to these discovery requests:

1. The terms “**all**,” “**any**,” and “**each**” shall each be construed as encompassing any and all.

2. The connectives “**and**” and “**or**” shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

3. The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

1. You are requested to produce all non-privileged Documents and other things described below that are within Your possession, custody or control, or in the possession, custody or control of Your attorneys, directors, officers, agents, employees, representatives, associates, division affiliates, partnerships, parents, or subsidiaries, and persons under their control.

2. A Document or other thing is deemed to be in Your actual or constructive possession, custody, or control if it is in Your physical custody or if it is in the physical custody of any other Person and You (a) have a right, by control, contract, statute, order, or otherwise, to use inspect, examine or copy such Documents on any terms; (b) have an understanding, express or implied, that You may use, inspect, examine, or copy such Documents upon any terms; (c) have, as a practical matter, been able to use, inspect, examine, or copy such Document when You sought to do so. Such other Persons include record retention vendors, and technology, data, or other third-party IT, cloud, hosting, or other service providers.

3. Each Document or other thing requested shall be produced in its entirety along with all non-identical versions thereof and without abbreviation or redaction. Further, all attachments, enclosures, cover letters, memoranda, and appendices shall also be produced. If a Document or other thing responsive to any request cannot be produced in full, it shall be produced to the extent possible, with an explanation stating why production of the remainder is not possible. Any alteration of a responsive Document or other thing, including notes, underlining, stamps, drafts, revisions, modifications, and other versions, is a separate Document or other thing and is to be produced as a separate Document or other thing. For all Documents and other things, any family relationship should be captured and reflected in the production. Further, if any portion of any Document is responsive to any request in this subpoena, the entire Document is to be produced. A Document with handwritten, typewritten, or other recorded notes, editing marks,

deletions, modifications, additions, or annotations, is not and shall not be deemed to be identical to one without such recorded notes, editing marks, deletions, modifications, additions, or annotations.

4. Documents and other things not otherwise responsive to a request shall be produced if such materials mention, discuss, refer to, or explain the materials called for by a request, or if such materials are attached to materials called for by a request (*e.g.*, routing slips, transmittal emails, transmittal memoranda, letters, cover letters, comments, evaluations, or similar materials).

5. Each request shall be answered on the basis of Your entire knowledge, from all sources, after a reasonable and good faith inquiry has been made and a search has been conducted.

6. All Documents produced pursuant to this subpoena are to be produced as they are kept in the usual course. All responsive ESI that is maintained in the usual course in electronic format shall be produced in its native format along with the software necessary to interpret such files if such software is not readily available, with the metadata normally contained within such Documents, and the necessary load files. If such metadata is not available, each Document shall be accompanied by a listing of all file properties concerning such Document, including, but not limited to, all information concerning the date(s) the Document was last accessed, created, modified, or distributed, and the author(s) and recipient(s) of the Document. If production in native format is impossible or impracticable, ESI may be produced in non-proprietary format, such as .xls, .csv, .jpg, .tif, or .pdf, or other agreed upon format, at the highest resolution available along with the metadata normally contained within such Documents.

7. Documents in large or complex formats, such as large Excel-format spreadsheets or accounting databases, for which non-proprietary format imaging would alter the presentation of the data, should be produced in their native format.

8. For each data file provided, You should separately provide a control file reflecting the search protocol utilized to obtain such data file.

9. ESI should not be produced in a form that removes or significantly degrades or alters the ability to search the ESI by electronic means where the ESI is ordinarily maintained in a way that makes it searchable by electronic means.

10. File folders with tabs or labels or directories of files identifying documents shall be produced intact with such documents.

11. Documents attached to each other shall not be separated. All documents that respond, in whole or in part, to any portion of any request shall be produced in their entirety, including all addenda, appendices, attachments, exhibits, and enclosures.

12. If there are no Documents or other things responsive to the request, Your response shall state so in writing.

13. In the event that any Document or other thing called for by the request is withheld on the basis of a claim or privilege or immunity:

a. The person asserting the privilege shall identify the nature of the privilege (including work product) which is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked; and

b. The following information shall be provided in the objection unless divulgence of such information would cause disclosure of the purportedly privileged information: (i) the type of document, *e.g.*, letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) the author of the document, the addressees of the document, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other;

14. Any purportedly privileged Document or other thing containing non-privileged material must be produced, redacting only the portion purportedly privileged.

15. If You have any good faith objections to any request or any part thereof, the specific nature of the objection and whether it applies to the entire request or to a part of the request shall be stated in accordance with Federal Rule of Civil Procedure 45, as made applicable by Federal Rules of Bankruptcy Procedure 7069 and 9016. If there is an objection to any part of the request, then the part objected to should be identified and Documents and other things responsive to the remaining unobjectionable part should be timely produced. Further, if You object to part of the request, You must state the basis of Your objections in accordance with Federal Rule of Civil Procedure 45.

16. In the event that any Document or other thing responsive to a request has been lost, discarded, or destroyed, that Document or other thing is to be identified by stating as completely as possible: (a) the authors or creators of the material, (b) all persons who received copies of the material, including any indicated and blind copy recipients, (c) the present custodian of the material, (d) the date of the material, (e) the material's date of destruction or discard, manner of destruction or discard, and the reason for destruction or discard, and (f) the persons authorizing and carrying out such destruction or discard.

17. Each production shall be submitted with a transmittal letter or email that includes the case caption, production volume name, encryption method/software used if applicable, and passwords for any password protected files if applicable.

18. All Documents produced pursuant to this subpoena may be used in the Action, or any related actions regarding the enforcement of the judgment entered in the Action.

19. In the event that any Document responsive to these requests is deemed confidential, it may be produced subject to the terms of the Stipulated Confidentiality Agreement

and Protective Order entered in the Action, Case 24-50013, Doc 134.

20. Upon request, counsel for Judgment Creditor will provide to You an electronic copy of this subpoena in Microsoft Word document file format to facilitate Your answering the request below.

## REQUESTS FOR PRODUCTION

1. Any Communications between You and any of the Judgment Debtors, Byju, or Morton during the Relevant Time Period.

2. All Documents Concerning all Accounts at Your institution including but not limited to those accounts listed on Appendix 1 that are held by or for the benefit of any of the Judgment Debtors, Byju, or Morton. For each such Account, provide the following:

   a) All Account-opening Documents and all signature cards associated with the Account;

   b) All Documents generated in the course of compliance with "know your customer" ("KYC") obligations; and

   c) All transaction history and monthly account statements for all Accounts identified.

3. Documents sufficient to show the current balance of all active Accounts.

4. All Account-closure Documents for all closed accounts, including but not limited to:

   a) All Documents evidencing the date the Account closure was initiated;

   b) All Documents evidencing the identity of all Persons responsible for initiating and carrying out the Account closure;

   c) All Documents evidencing the balance of the Account at the time of the closure; and

   d) All Documents related to the transfer of the Account's balance at the time of the closure.

5. All Currency Transactions Reports (CTR Form 4789) and Reports of International Transportation of Currency or Monetary Instruments (Form 4790) filed by You with the

Department of Treasury, Internal Revenue Service, or the United States Customs Service, relating to any transactions conducted by or on behalf of any of the Judgment Debtors, Byju, or Morton.

6. Any Documents concerning the assets, liabilities, or expenses of any of the Judgment Debtors, Byju, or Morton.

7. Any Documents indicating the use of aliases, nominees, trustees, or any other Persons holding any assets on behalf of or for the benefit or use of any of the Judgment Debtors, Byju, or Morton.

8. Documents sufficient to identify any purchases of cryptocurrency or transfers of assets to a cryptocurrency exchange by any of the Judgment Debtors, Byju, or Morton.

Case 25-50621-BLS Doc 295-1 Filed 04/28/26 Page 40 of 124

**APPENDIX 1**

| Account Number |
| --- |
| [redacted]8111 |
| [redacted]0100 (HSBC Bank – Middle East) |
| [redacted]0179 |
| [redacted]0180 |

# Exhibit 53

BDO

Tel: +91 80 6811 1600
www.bdo.in

SV Tower, No. 27, Floor 4
80 Feet Road, Koramangala
Bengaluru 560095, INDIA

**INDEPENDENT AUDITORS' REPORT**

**To the Board of Directors of BYJU'S Alpha, Inc.**

**Report on the Audit of the Special Purpose Financial Statements**

**Opinion**

We have audited the Special Purpose financial statements of BYJU'S Alpha, Inc. ('the Company'), which comprise the Balance Sheet as at March 31, 2022, and the related Statement of Income (including other Comprehensive Income), Statement of Changes in Stockholders' Equity and Statement of Cash Flows for the year then ended, and notes to the financial statements, including a Summary of Significant Accounting Policies. In our opinion, the accompanying special purpose financial statements present fairly, in all material respects, the financial position of the Company as at March 31, 2022, and the results of its operations and its cash flows for the period then ended in accordance with the accounting principles generally accepted in the United States of America ("US GAAP").

**Basis for Opinion**

We conducted our audit in accordance with International Standards on Auditing ("ISAs"). Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the special purpose financial statements section of our report. We are independent of the Company in accordance with the relevant ethical requirements relating to our audits, which include the International Ethics Standards Board for Accountants' Code of Ethics for Professional Accountants (IESBA Code), and we have fulfilled our other ethical responsibilities in accordance with these requirements and the IESBA Code. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Emphasis of Matter - Basis of Accounting and Restriction on Distribution and Use**

We draw attention to Note 1 to the special purpose financial statements, which describes the basis of accounting. The special purpose financial statements are prepared to assist the Company in complying with the financial reporting in accordance with U.S. generally accepted accounting principles ("U.S. GAAP"). As a result, the special purpose financial statements may not be suitable for another purpose.

Our report is intended solely for the use of Management and should not be distributed to or used by any other parties. BDO India LLP shall not be liable to the Company or to any other concerned for any claims, liabilities or expenses relating to this assignment. Accordingly, we do not accept or assume any liability or any duty of care for any other purpose or to any other person to whom this report is shown or into whose hands it may come without our prior consent in writing.

Our opinion is not modified in respect of this matter.

BDO

**Material Uncertainty related to Going Concern**

As at March 31, 2022, the accumulated losses of the Company exceeds the stockholder's equity by USD 32,204,198. Further, the Company has an outstanding loan of USD 1,204,291,667 (including interest amounting to USD 7,291,667) as at March 31, 2022. These factors are indicative of the existence of a uncertainty that may cast significant doubt on the Company's ability to continue as a going concern, which is dependent on establishing profitable operations and obtaining continuing financial support from its shareholders. The Company has received a support letter from Ultimate Parent Company to meet any shortfall in its fund requirement to meet its liabilities in future. These mitigating factors have been more fully discussed in note 1 to the accompanying special purpose financial statements, in view of which the accompanying special purpose financial statements have been prepared under the going concern assumption, and consequently, no adjustments have been made to the carrying values or classification of balance sheet accounts.

Our opinion is not qualified in respect of above matter.

**Responsibilities of the Management and Those Charged with Governance for the Special Purpose Financial Statements**

Management is responsible for the preparation and fair presentation of the special purpose financial statements in accordance with US GAAP and the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of special purpose financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the special purpose financial statements, management is responsible for assessing the Company's ability to continue as a going concern, disclosing as applicable, matters related to going concern and using the going concern basis of accounting unless management either intends to liquidate the Company or to cease operations, or has no realistic alternative but to do so.

Management is responsible for overseeing the Company's financial reporting process.

**Auditors' Responsibilities for the Audit of the Special Purpose Financial Statements**

Our objectives are to obtain reasonable assurance about whether the special purpose financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with ISAs will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

BDO India LLP, an Indian limited liability partnership firm, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.

Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the special purpose financial statements.

We give in “Annexure A” a detailed description of Auditor’s responsibilities for Audit of the special purpose financial statements.

BDO India LLP

**BDO India LLP**
**Mumbai, India**

**November 22, 2022**

BDO India LLP, an Indian limited liability partnership firm, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.

BDO

**ANNEXURE A TO THE INDEPENDENT AUDITOR'S REPORT ON EVEN DATE ON THE SPCIAL PURPOSE FINANCIAL STATEMENTS OF BYJU'S ALPHA, INC.**

**Auditor's Responsibilities for the Audit of the Special Purpose Financial Statements**

As part of an audit in accordance with ISAs, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.
- Identify and assess the risks of material misstatement of the special purpose financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the special purpose financial statements.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Company's internal controls. Accordingly, no such opinion is expressed.
- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the special purpose financial statements.
- Conclude on the appropriateness of management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Company's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the special purpose financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause the Company to cease to continue as a going concern.
- Evaluate the overall presentation, structure and content of the special purpose financial statements, including the disclosures, and whether the special purpose financial statements represent the underlying transactions and events in a manner that achieves fair presentation.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide those charged with governance with a statement that we have complied with relevant ethical requirements regarding independence, and to communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, related safeguards.

BDO India LLP

**BDO India LLP**
**Mumbai, India**

**November 22, 2022**

BDO India LLP, an Indian limited liability partnership firm, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.

# FINANCIAL STATEMENTS

BYJU'S Alpha, Inc.
Period ended March 31, 2022

With Independent Auditor's Report

BYJU'S Alpha, Inc.

Balance sheet

| | Note | | As of March 31, 2022 |
|---|---|---|---|
| Assets | | | |
| *Current assets* | | | |
| Cash and cash equivalents | 4 | $ | 10,49,87,487 |
| Current investments | 5 | $ | 76,00,00,000 |
| Accounts receivable | | | 16,09,085 |
| Other current assets | 6 | | 2,22,16,144 |
| *Total current assets* | | $ | 88,88,12,716 |
| Investment in associate | 7 | | 1,27,07,236 |
| Loans and advances | 8 | | 24,34,04,300 |
| *Total assets* | | $ | 1,14,49,24,253 |
| Liabilities and stockholders' equity | | | |
| *Current liabilities* | | | |
| Accounts payable | | | 3,08,880 |
| Current portion of long-term debt | | | 1,20,00,000 |
| Accrued liabilities | 10 | | 80,07,529 |
| *Total current liabilities* | | $ | 2,03,16,409 |
| Long-term debt, net of current portion | 9 | | 1,15,68,12,042 |
| *Total liabilities* | | $ | 1,17,71,28,450 |
| *Stockholders' equity* | | | |
| Common stock | 11 | | 1,00,000 |
| Retained earnings | | | (3,23,04,198) |
| Total stockholders' equity | | | (3,22,04,198) |
| *Total liabilities & stockholders' equity* | | $ | 1,14,49,24,253 |

*See accompanying notes.*

BYJU'S Alpha, Inc.

Statement of Income

| | Note | For the period ended March 31, 2022 |
|---|---|---|
| Revenues | 12 | $ 2,67,053 |
| Cost of revenues | | 2,00,290 |
| Gross margin | | 66,763 |
| Legal and professional charges | | 47,05,362 |
| Income/(Loss) from operations | | 46,38,599 |
| Other income, net | 13 | 1,37,775 |
| Guarantee fee | | 1,05,890 |
| Interest income | 15 | 13,42,032 |
| Interest expenses, net | 14 | 2,90,22,686 |
| Income/(Loss) before provision for income taxes | | (3,22,87,369) |
| Income tax expense | | - |
| Share of loss of associate company | | 16,829 |
| Net Income/(Loss) | | $ (3,23,04,198) |

*See accompanying notes .*



A3016

BYJU'S Alpha, Inc.

Statements of Stockholders' Equity

| | Common Stock | | Retained Earnings | | Total |
|---|---|---|---|---|---|
| | Shares | $ | | | |
| Capital infused on issue of common stock | 1,000 | 1,00,000 | | | 1,00,000 |
| Net Income for the period | | | (3,23,04,198) | | (3,23,04,198) |
| Other comprehensive income / (loss), net | | | - | | - |
| Balance as of March 31, 2022 | 1,000 | 1,00,000 | (3,23,04,198) | - | (3,22,04,198) |

*See accompanying notes .*

Case 26-50021-BLS Doc 29-14 Filed 04/07/26 Page 50 of 124

BYJU'S Alpha, Inc.

Statements of Cash Flows

| | | Period ended March 31, 2022 |
|---|---|---|
| Cash flows from operating activities | | |
| Net income | | (3,23,04,198) |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Non-cash adjustments | | |
| Share of loss of associate company | | 16,829 |
| Interest income | | (13,42,032) |
| | $ | (3,36,29,401) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | | (2,67,053) |
| Other assets | | (2,22,16,144) |
| Accounts payable and accrued liabilities | | 1,01,64,900 |
| Net cash provided by operating activities | $ | (4,59,47,697) |
| Cash flows from investing activities | | |
| Loan given to fellow subsidiaries | | (24,34,04,300) |
| Payment made for investment in associate | | (1,27,24,065) |
| Interest received | | |
| Payment for investment in MMF | | (1,01,00,00,000) |
| Proceeds from sale of MMF | | 25,00,00,000 |
| Proceeds from sale of short term investments | | |
| Net cash (used in)/provided by investing activities | $ | (1,01,61,28,365) |
| Cash flows from financing activities | | |
| Issue of common stock | | 1,00,000 |
| Repayment of long term debt | | (30,00,000) |
| Proceeds from long term debt | | 1,20,00,00,000 |
| Debt cost incurred on facilitating Loan | | (3,00,36,450) |
| Net cash used in financing activities | $ | 1,16,70,63,550 |
| Effect of exchange rate changes on cash | | |
| Net increase in cash and cash equivalents and restricted cash during the year | | 10,49,87,487 |
| Cash, cash equivalents and restricted cash at the beginning of the year | | 0 |
| Cash, cash equivalents and restricted cash at the end of the year | $ | 10,49,87,487 |

Supplementary information

| | | |
|---|---|---|
| Cash paid for interest expense | $ | 1,91,66,667 |
| Cash paid for income taxes, net | $ | - |

*See accompanying notes.*

Case 25-50026-BLS Doc 285-10 Filed 04/02/26 Page 61 of 124

BYJU'S Alpha, Inc.

Notes to Financial Statements
March 31, 2022

1. Company Overview and Summary of Significant Accounting Policies

Company Overview

Byjus Alpha Inc. (the "Company") was incorporated on September 27, 2021 under the laws of the State of Delaware. The company act as a repository of all international brands/Trademarks and in turn license it out to all other associate companies. The company raise funds and provide support to other associate companies. The Company is headquartered in the U.S.

Basis of Presentation of Financial Statements

The accompanying financial data has been prepared in accordance with U.S. generally accepted accounting principles

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. The Company bases its estimates and judgments on historical experience and on various other assumptions that it believes are reasonable under the circumstances. The amount of assets and liabilities reported on the Company's balance sheets and the amounts of revenue and expenses reported for each of its periods presented are affected by estimates and assumptions, which are used for, but not limited to, stock-based compensation, allowance for doubtful debts, determination of impairment of long-lived assets, income taxes, hedge accounting for derivatives and other contingencies and commitments. Management believes that the estimates used in the preparation of the financial statements are prudent and reasonable. Although these estimates are based upon management's best knowledge of current events and actions, actual results could differ from those estimates.

The Company has evaluated subsequent events through November 22, 2022 the date the financial statements were available to be issued.

As at March 31, 2022, the accumulated losses of the Company exceeds the stockholder's equity by USD 32,204,198. Further, the Company has an outstanding loan of USD 1,204,291,667 (including interest amounting to USD 7,291,667) as at March 31, 2022. These factors are indicative of the existence of a uncertainty that may cast significant doubt on the Company's ability to continue as a going concern, which is dependent on establishing profitable operations and obtaining continuing financial support from its shareholders. The Company has a liquid assets of USD 868,496,308 as at March 31, 2022 and the Company has received a support letter from Ultimate Parent Company to meet any shortfall in its fund requirement to meet its liabilities in future. Accordingly, no adjustments have been made to the carrying values or classification of balance sheet accounts.

BYJU'S Alpha, Inc.

Notes to Financial Statements
March 31, 2022

Functional Currency and Exchange Rate Translation

The financial statements are reported in U.S. Dollars, which is the Company's functional currency.

Foreign currency transactions are translated into the functional currency at the rates of exchange prevailing on the date of the respective transactions. Monetary assets and liabilities denominated in currencies other than the functional currency are translated into the respective functional currency at the rates of exchange prevailing at the balance sheet date. The gains or losses resulting from foreign currency transactions are included in the statements of income within other income/(expense), net.

Short Term Investments

The Company has classified short term investments in Government Money Market funds as available-for-sale. financial assets and are within level 1 in the fair value hierarchy, these investments are measured at fair value, with unrealized gains or losses, net of tax, reported as a component of accumulated other comprehensive income/(loss) in the Statement Of Equity. securities are included in the statement of income within other income/ (expense), net. The Realized gains or losses and decline in value judged to be other than temporary on available-for sale cost of securities sold or disposed is determined on First-in-First-out (FIFO) method.

Revenue Recognition

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09, Revenue from Contracts with Customers ("Topic 606"). Topic 606 applies to Company's license income and generally requires recognition of revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration the entity expects to be entitled to in exchange for those goods or services. Pursuant to Topic 606, revenues are recognised upon the application of the foillowing five steps.

- Identification of the contract, or contracts, with a customer
- Identification of the performance obligations in the contract
- Determination of the transaction price
- Allocation of the transaction price to the performance obligations in the contract
- Recognition of revenue when, or as performance obligations are satisfied.

License revenue is recognised at 2% of the sub-licensee's aggregate revenues of their business derived from products or services that bear any of the Licensed Trademarks of the Company, minus any applicable taxes on those revenues but before any refunds or credits are given to their customers and without any other deductions.

Revenue is measured as the amount of consideration the Company expects to receive in exchange for providing the above services. The Company estimates different forms of variable consideration based on current conditions and contractual obligations. Revenue is recorded net of volume discounts, work credits, cash discounts, rebates and similar charges. Sales and other tax amounts collected from customers for remittance to governmental authorities are excluded from revenue.

Other income

*Interest Income*

Interest income is recognized on a time proportion basis taking into account the amount outstanding and the

*Dividend income*

Dividend income is recognized when the right to receive dividend is established

A3020

Case 25-50021-BLS Doc 285-1 Filed 04/28/26 Page 78 of 144

BYJU'S Alpha, Inc.

Notes to Financial Statements
March 31, 2022

Accounts Receivable

The Company extends credit to clients based upon management's assessment of their creditworthiness. Accounts receivable are recorded at the invoiced amount, net of allowances for bad and doubtful debts, and do not bear interest.

The Company follows ASU 2016-13, Financial Instruments - Credit Losses, which requires the Company to make an estimate of current expected credit losses ('CECL') for allowance for doubtful accounts and unbilled receivables based upon assessment of various factors, including historical experience, the age of the accounts receivable balances, credit quality of customers, current economic conditions, reasonable and supportable forecasts of future economic conditions, and other factors that may affect the ability to collect from customers.

The Company also makes specific provision where there are evidences that indicate that a particular receivable balance might turn bad. The creation of this provision is based on appraising the accounts receivable on individual basis.

As a practical expedient, the Company uses a provision matrix to determine CECL allowance on portfolio of its accounts receivable. The provision matrix is based on its historically observed default rates over the expected life of the accounts receivable and is adjusted for forward-looking estimates. At every reporting date, the historical observed default rates are updated and changes in the forward-looking estimates are analysed.

The CECL allowance is a valuation account that is to be deducted from the amortized cost basis of the financial asset to present the net carrying value at the amount expected to be collected on the financial asset. The CECL allowance is recorded as selling, general and administrative expenses on the Company's statements of income. Account balances are charged off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote.

Financial Instruments

Recognition

All financial instruments are initially measured at their fair value and are subsequently classified either at amortized cost, at fair value through statement of profit and loss (FVTPL) or at fair value through other comprehensive income (FVOCI). Financial assets are classified based on the Company's management model of such instruments and their contractual cash flows they generate. Financial liabilities are classified and measured at amortized cost, unless they are held for trading and classified as FVTPL.

The Company has made the following classifications:

BYJU'S Alpha, Inc.

Notes to Financial Statements
March 31, 2022

Financial assets carried at amortized cost
Cash and cash equivalents, short-term investments and accounts receivable are measured at amortized cost.

Financial liabilities carried at amortized cost
Accounts payable and interest accrued within accrued liabilities are measured at amortized cost.Long-term debt are measured at amortized cost using effective interest method.

Transaction costs related to financial instruments other than FVTPL are included in the initial recognition of the corresponding asset or liability and are amortized using effective interest method.

De-recognition of financial instruments
Financial instruments are derecognized if the contractual rights to the cash flows from the financial asset expire or the asset is transferred and the transfer qualifies for derecognition as substantially all the risks and rewards of ownership of the financial asset have been transferred

Fair Value Measurements

The carrying value reported in the balance sheets of cash and cash equivalents, restricted cash, short-term investments, accounts and unbilled receivables, other current assets, debt, accounts payable, accrued expenses and accrued liabilities approximate fair value because of their short term nature, and the variable interest rate on the debt.

Fair value is the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities, which are required to be recorded at fair value, the Company considers the principal or most advantageous market in which it would transact and the market-based risk measurements or assumptions that market participants would use in pricing the asset or liability, such as inherent risk, transfer restrictions, and credit risk.

The fair value hierarchy prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy requires that the Company maximize the use of observable inputs and minimize the use of unobservable inputs. The levels of the fair value hierarchy are described below:

Level 1 - Quoted prices for identical instruments traded in active markets.
Level 2 - Quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that are not active, and model-based valuation techniques for which all significant assumptions are observable in the market.
Level 3 - Unobservable inputs that cannot be supported by market activity and that are significant to the fair value of the asset or liability, such as the use of certain pricing models, discounted cash flow models and similar techniques that use significant assumptions. These unobservable inputs reflect our own estimates of assumptions that market participants would use in pricing the asset or liability.

Refer to Note 27, “Fair Value Measurements,” for additional information on determination of fair value of the assets and

BYJU'S Alpha, Inc.

Notes to Financial Statements
March 31, 2022

Interests in equity-accounted investees:

The Company's interests in equity-accounted investees comprise interests in associates.
Associates are those entities in which the Company has significant influence, but not control or joint control, over the financial and operating policies. Interests in associates are accounted for using the equity method. They are initially recognised at cost, which includes transaction costs, if any.

Subsequent to initial recognition, the financial statements include the Company's share of the profit or loss and OCI of equity accounted investees, until the date on which significant influence ceases.

Commitment and Contingencies

A provision is recognized if, as a result of a past event, the Company has a present legal obligation that is reasonably estimable and it is probable that an outflow of economic benefits will be required to settle the obligation. Provisions are determined by the best estimate of the outflow of economic benefits required to settle the obligation at the reporting date. Where no reliable estimate can be made, a disclosure is made as contingent liability. A disclosure for a contingent liability is also made when there is a possible obligation or a present obligation that may, but probably will not, require an outflow of resources. Where there is a possible obligation or a present obligation in respect of which the likelihood of outflow of resources is remote, no provision or disclosure is made.

Liabilities for loss contingencies arising from claims, tax assessments, litigations, fines and penalties, and other sources are recorded when it is probable that a liability has been incurred and the amount of the assessment and/or remediation can be reasonably estimated. Legal costs incurred in connection with the same are expensed as incurred.

2. Recent accounting pronouncements

In December 2019, the FASB issued ASU 2019-12, to simplify the accounting for income taxes. The new guidance changes various subtopics of accounting for income taxes including, but not limited to, accounting for "hybrid" tax regimes, tax basis step-up in goodwill obtained in a transaction that is not a business combination, intraperiod tax allocation exception to incremental approach, ownership changes in investments, interim-period accounting for enacted changes in tax law, and year-to-date loss limitation in interim-period tax accounting. For entities other than public business entities, the guidance is effective for fiscal years beginning after December 15, 2021 and interim periods within fiscal years beginning after December 15, 2022. Early adoption is permitted, including adoption in an interim period. The Company is currently evaluating the new guidance to determine the impact it may have on our financial position, results of operations or cash flows.

Case 25-50026-BLS Doc 195-1 Filed 04/07/26 Page 56 of 124

BYJU'S Alpha, Inc.

Notes to Financial Statements (Continued)
March 31, 2022

4. Cash and cash equivalents

Cash and cash equivalents consist primarily of cash on hand, balance in current accounts.

Cash and cash equivalents consist of the following:

| | | As of March 31, 2022 |
|---|---|---|
| - in current accounts | | 10,49,87,487 |
| Total cash and cash equivalents | $ | 10,49,87,487 |

5. Short-term investments

Short-term investments comprise of

| | | Carrying Value | | Fair Value |
|---|---|---|---|---|
| - JPM MMF investment | $ | 76,00,00,000 | $ | 76,00,00,000 |
| | $ | 76,00,00,000 | $ | 76,00,00,000 |

6. Other current assets

Other current assets consist of the following:

| | | As of March 31, 2022 |
|---|---|---|
| Advance to suppliers | | 2,21,27,500 |
| Dividend income receivable | | 88,644 |
| Total current assets | $ | 2,22,16,144 |

7. Investment in associate

Investment in associate consist of the following:

| | | As of March 31, 2022 |
|---|---|---|
| Investment in associate (Geogebra GMBH) | | 1,27,07,236 |
| Total investment in associate | $ | 1,27,07,236 |

On March 21, 2022, the company's acquired 50% equity interest in Geogebra GMBH ('Geogebra') and Geogebra became its associate from that date. Geogrebra is an strategic investment engaged in edtech business.

A3024

BYJU'S Alpha, Inc.

Notes to Financial Statements (Continued)
March 31, 2022

The following table summarises the financial information of Geogebra as included in the financial statements, adjusted for fair value adjustments at acquisition. The table also reconciles the summarised financial information to the carrying amount of the Company's interest in Geogebra.

| | As of March 31, 2022 |
|---|---|
| Investment in associate at cost (50% ownership) | 1,27,24,065 |
| Revenue | 34,135 |
| Profit from continuing operations (100%) | (33,658) |
| Other comprehensive income (100%) | - |
| Total comprehensive income (100%) | (33,658) |
| Share of loss of associate company (50%) | (16,829) |
| Carrying amount of investment in associate | 1,27,07,236 |

8. Loans and advances

Loans and advances consist of the following:

| | As of March 31, 2022 |
|---|---|
| Loan to related parties (fellow subsidiaries) | 24,34,04,300 |
| Total loans | $ 24,34,04,300 |

9. Long-term Debt

On November 24, 2021 ("Effective Date"), the Company entered into a credit agreement with Morgan Stanley Senior Funding LLC providing a $1,200,000,000 secured term loan facility. A gaurantee of 115% of the total underlying loan has been given by Think and Learn Private Limited ("Parent Gaurantor"). The repayment of the credit facility in quarterly principal instalments, commencing on the last day of the first full fiscal quarter of the Parent Gaurantor following the effective date, in an amount equal to 0.25% of the aggregate principal amount of the Term Loan Facility made on the Effective Date, which amount shall be due and payable on the last day of each fiscal quarter of the Parent Gaurantor . An amount of USD 1,140 million shall be paid at the end of the term loan maturity date, the outstanding amount of the facility shall be paid in full in Dollars by the Company.

Security given under the Credit Agreement: The Term Loan Facility will be secured by:

(a) all assets granted by -

- (i) the Borrower,
- (ii) Whitehat Education Technology LLC,
- (iii) Tangible Play Inc.,
- (iv) BYJU's Pte. Ltd. and
- (v) Great Learning Education Pte Ltd; and

(b) Shares pledged by -

- (i) The Borrower (100% of it's own share) and
- (ii) BYJU's Pte Ltd (Shares held in Great Learning Education Pte Ltd).

10. Accrued liabilities

Accrued liabilities consist of the following:

| | As of March 31, 2022 |
|---|---|
| Interest accrued | $ 80,07,529 |
| Total accrued liabilities | $ 80,07,529 |

A3025

Case 26-50021-BLS Doc 85-4 Filed 04/07/26 Page 58 of 124

BYJU'S Alpha, Inc.

Notes to Financial Statements (Continued)
March 31, 2022

**11. Stockholders' equity**

Stockholders' equity consists of common stock which are described in detail below. Each class of stock has voting rights, with one vote for each share of stock.

As per the Byjus Alpha Inc., Certificate of Incorporation, the total number of shares that the Company is authorized to issue is 10,000 shares, which shall be Common Stock. The Common stock shall each have a par value of $100 per share.

Classes of Stock

*Common Stock:*

The common stock of the Company consists of 1,000 shares of authorized voting common units with a par value of $100. As of March 31, 2022, 1,000 shares issued and outstanding, respectively.

BYJU'S Alpha, Inc.
Notes to Financial Statements (Continued)
March 31, 2022

12. Revenue from operations

| | Period ended March 31, 2022 |
|---|---|
| License fee | 2,67,053 |
| | $ 2,67,053 |

13. Other income, net

| | Period ended March 31, 2022 |
|---|---|
| Dividend income | $ 1,37,775 |
| | $ 1,37,775 |

14. Interest expenses

| | Period ended March 31, 2022 |
|---|---|
| Interest expense on secured loan | 2,90,22,686 |
| | $ 2,90,22,686 |

Case 25-50021-BLS Doc 295-10 Filed 04/28/26 Page 85 of 149

Notes to Financial Statements (Continued)
BYJU'S Alpha, Inc.

## 15. Related party transactions

The Company had transactions carried out with the related parties during the period ended March 31, 2022 and had balances due to/from the related parties as on March 31, 2022 as follows:

Transactions carried out with the related parties during the period ended March 31, 2022

| | Period ended March 31, 2022 |
|---|---|
| Interest income | |
| Byjus Brazil | 5,675 |
| Byjus Mexico | 5,741 |
| Byjus Beta | 35,921 |
| WhiteHat Education Technology LLC | 57,289 |
| Tangible play Inc | 8,16,831 |
| Inspilearn LLC | 4,20,575 |
| | 13,42,032 |
| License fee | |
| Byjus Brazil | 29,762 |
| Byjus Mexico | 27,276 |
| WhiteHat Education Technology LLC | 2,10,015 |
| | 2,67,053 |
| Royalty expense | |
| Think and learn private limited | 2,00,290 |
| | 2,00,290 |
| Guarantee fee | |
| Think and learn private limited | 1,05,890 |
| | 1,05,890 |
| Investment in associate | |
| Geogebra GMBH | 1,27,07,236 |
| | 1,27,07,236 |

A3028

Case 25-50021-BLS Doc 295-11 Filed 04/28/26 Page 86 of 124

Notes to Financial Statements (Continued)
BYJU'S Alpha, Inc.

Balance to/from the related parties as on March 31, 2022:

| | As at March 31, 2022 |
|---|---|
| Loans given to fellow subsidiaries | |
| Byju's Brazil | 33,01,000 |
| Byju's Mexico | 31,01,000 |
| Byju's Beta Inc | 1,40,01,000 |
| Inspilearn LLC | 4,30,00,000 |
| Tangible Play Inc | 16,40,01,000 |
| Whitehat Education Technology LLC | 1,60,00,300 |
| | 24,34,04,300 |
| Interest accrued | |
| Byjus Brazil | 5,675 |
| Byjus Mexico | 5,741 |
| Byjus Beta | 35,921 |
| WhiteHat Education Technology LLC | 57,289 |
| Tangible play Inc | 8,16,831 |
| Inspilearn LLC | 4,20,575 |
| | 13,42,032 |
| Accounts payable | |
| Think and learn private limited | 3,06,180 |
| | 3,06,180 |
| Investment in associate | |
| Geogebra GMBH | 1,27,07,236 |
| | 1,27,07,236 |

BYJU'S Alpha, Inc.

Notes to Financial Statements (Continued)
March 31, 2022

## 16. Subsequent events

BYJU'S Alpha Inc has evaluated subsequent events through November 22, 2022, the date on which the financial statements were issued. The financial statements include all events or transactions, including estimates, required to be recognized in accordance with the accounting principles generally accepted in the United States of America.

# Exhibit 54

# EXHIBIT 5

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Annual Statement

January 1, 2021 - December 31, 2021



BYJU'S ALPHA INC
3160 DE LA CRUZ BLVD STE 204
SANTA CLARA CA 95054-2408

## Account Details

**Account Owner** BYJU'S ALPHA INC

**Account Number** 5022869

**Dealer Information** JP MORGAN INSTITUTIONAL INVESTMENTS
GLOBAL LIQUIDITY- DE
500 STANTON CHRISTIANA RD # 3-3750
NEWARK DE 19713-2105

97500/100
GLOBAL LIQUIDITY

## Contact Us

**Investor Services** 1.800.766.7722

**Online Access** www.jpmgloballiquidity.com

**Email Address**
Liquidity.client.services.americas@jpmorgan.com

**JPMorgan Funds News**

Simplify your audit confirmation process. A balance audit confirmation can now be requested for Global Liquidity accounts through www.confirmation.com.

Call 1-800-766-7722 for a fund prospectus. You can also visit us online at www.jpmgloballiquidity.com. Investors should carefully consider the investment objectives and risk as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.

# Portfolio Overview

**Portfolio Value** as of 12/31/2021 **$1,010,000,000.00**

| | 12/01/2021 - 12/31/2021 | Year-to-Date |
|---|---|---|
| **Beginning Market Value** | **$0.00** | **$0.00** |
| + Purchases | $1,010,000,000.00 | $1,010,000,000.00 |
| + Reinvested Dividends | $0.00 | $0.00 |
| + Reinvested Capital Gains | $0.00 | $0.00 |
| - Redemptions | $0.00 | $0.00 |
| +/- Change in Investment Value | $0.00 | $0.00 |
| **Ending Market Value** | **$1,010,000,000.00** | **$1,010,000,000.00** |
| Distributed Dividends | $8,651.82 | $8,651.82 |
| Distributed Capital Gains | $0.00 | $0.00 |

## Portfolio Fund Values

| Fund Name | Market Value 12/01/2021 | Change in Account Value | Market Value 12/31/2021 |
|---|---|---|---|
| U.S. Govt Mmkt Fund - Capital | $0.00 | $1,010,000,000.00 | $1,010,000,000.00 |
| **Total** | **$0.00** | **$1,010,000,000.00** | **$1,010,000,000.00** |



JPM..*54100*.0761821004.55115.55115.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Annual Statement

January 1, 2021 - December 31, 2021



# Transaction History

## U.S. Govt Mmkt Fund - Capital

**Fund Number** 3164
**Account Number** 5022869

The 7-day SEC yield on December 31, 2021 for the U.S. Govt Mmkt Fund - Capital Shares was 0.03%.

| Confirm Date | Trade Date | Transaction Description | Share Price | Shares this Transaction | Transaction Dollar Amount |
|---|---|---|---|---|---|
| | | **Beginning Balance** | **$1.00** | **0.000** | **$0.00** |
| 12/17 | 12/17 | SHARES PURCHASED BY WIRE | $1.00 | 10,000,000.000 | $10,000,000.00 |
| 12/20 | 12/20 | SHARES PURCHASED BY WIRE | $1.00 | 1,000,000,000.000 | $1,000,000,000.00 |
| 12/31 | 12/31 | INCOME DIV CASH | $0.00 | 0.000 | $8,651.82 |
| | | **Total Shares Owned as of 12/31/2021** | | **1,010,000,000.000** | |
| | | **Ending Balance as of 12/31/2021** | **$1.00** | | **$1,010,000,000.00** |

### Account Earnings Summary

| | |
|---|---|
| YTD Income Dividends | $8,651.82 |
| YTD Capital Gains | $0.00 |
| **Total YTD Earnings** | **$8,651.82** |

### Estimated Operating Expenses

Your investment in the Fund is subject to certain fees and expenses, as set forth in the Fund's prospectus in the table entitled "annual operating expenses." The operating expenses charged to your investment for the period is estimated to be $151,500.00. The amount was calculated by taking your last day's balance during the period, multiplying it by the Fund's annual operating expenses and dividing by twelve.



JPM..*54100*.0761821004.55116.55116.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Annual Statement

January 1, 2021 - December 31, 2021



**Annual Cumulative Expense Examples**

A Fund's annual return is reduced by its fees and expenses for that year. The examples below are intended to help you understand the annual and cumulative impact of the Fund's fees and expenses on your investment through a hypothetical investment of $10,000 held for the next 10 years. The examples assume the following

- On the date exactly one year before the first period end date below, you invest $10,000 in the Fund and you will hold the shares for the entire 10 year period;
- Your investment has a 5% return each year;
- The Fund's operating expenses remain at the levels discussed below and are not affected by increases or decreases in Fund assets over time;
- At the time of purchase, any applicable initial sales charges (loads) are deducted; and
- There is no sales charge (load) on reinvested dividends.
- The annual costs are calculated using the Net Expense Ratios for the period through the expiration of any fee waivers or expense reimbursement memorialized in a written contract between the Funds and JPMIM and/or its affiliates; and the Gross Expense Ratios thereafter.

"Gross Cumulative Return" shows what the cumulative return on your investment at the end of each 12 month period end date (year), shown below, would be if Fund expenses are not deducted. "Net Cumulative Return" shows what the cumulative return on your investment at the end of each year would be assuming Fund expenses are deducted each year in the amount shown under "Annual Costs."
"Net Annual Return" shows what effect the "Annual Costs" will have on the assumed 5% annual return for each year.

**Your actual costs may be higher or lower than those shown.**

| JPMorgan U.S. Government Money Market Fund | Capital Shares | | | |
|---|---|---|---|---|
| Period Ended | Annual Costs | Gross Cumulative Return | Net Cumulative Return | Net Annual Return |
| June 30, 2022 | $ 18 | 5.00% | 4.82% | 4.82% |
| June 30, 2023 | $ 20 | 10.25% | 9.86% | 4.81% |
| June 30, 2024 | $ 21 | 15.76% | 15.15% | 4.81% |
| June 30, 2025 | $ 22 | 21.55% | 20.68% | 4.81% |
| June 30, 2026 | $ 23 | 27.63% | 26.49% | 4.81% |
| June 30, 2027 | $ 25 | 34.01% | 32.57% | 4.81% |
| June 30, 2028 | $ 26 | 40.71% | 38.95% | 4.81% |
| June 30, 2029 | $ 27 | 47.75% | 45.63% | 4.81% |
| June 30, 2030 | $ 28 | 55.13% | 52.64% | 4.81% |
| June 30, 2031 | $ 30 | 62.89% | 59.98% | 4.81% |



JPM..*54200*.0761821004.55117.55117.CNSJPMD1.....CM........GCP.......000025776

# How to Contact J.P. Morgan

**Regular Mail:**
J.P. Morgan Institutional Funds Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

**Overnight Mail:**
J.P. Morgan Institutional Funds Service Center
c/o DST Systems, Inc.
Suite 219265
430 W. 7th St
Kansas City, MO 64105-1407

**Website:**
www.jpmgloballiquidity.com

**Hours of Operation:**
Monday to Friday from
7:30 a.m. (EST) to 6:00 p.m. (EST)

**NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

***Contact J.P. Morgan Funds Distribution Services, Inc. at 1-800-766-7722 for a prospectus. You can also visit us at www.jpmorganfunds.com. Investors should carefully consider the investment objectives and risks as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.***

**Retail Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

**Institutional Money Markets Funds disclosure:**
You could lose money by investing in the Fund. Because the share price of the Fund will fluctuate, when you sell your shares they may be worth more or less than what you originally paid for them. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time. Any gain resulting from the sale or exchange of Fund shares will be taxable as long-term or short-term gain, depending upon how long you have held your shares.

**Government Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

J.P. Morgan Asset Management is the marketing name for the asset management businesses of JPMorgan Chase & Co. Those businesses include, but are not limited to, JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management Inc., Security Capital Research & Management Incorporated, J.P. Morgan Alternative Asset Management, Inc., and J.P. Morgan Asset Management (Canada), Inc.

J.P. Morgan Funds are distributed by JPMorgan Distribution Services, Inc., which is a subsidiary of JPMorgan Chase & Co. Affiliates of JPMorgan Chase & Co. receive fees for providing various services to the funds.



JPM..*54200*.0761821004.55118.55118.CNSJPMD1.....CM........GCP.......000025776

**IMPORTANT INFORMATION ABOUT ADVISORY FEES**

*Summary of Senior Officer Fee Evaluation Available on Website*. As part of the Banc One Investment Advisors Corporation's (subsequently known as JPMorgan Investment Advisors, Inc.) settlement with the New York Attorney General, your Fund has retained a Senior Officer to assist the Board of Trustees in reviewing and determining that management fees are reasonable. (JPMorgan Investment Advisors, Inc. transferred its business to J.P. Morgan Investment Management Inc. effective January 1, 2010.) Stephen M. Ungerman, who also serves as the Chief Compliance Officer for the J.P. Morgan Funds has served as the Fund's Senior Officer since 2005. The Senior Officer provided an independent fee evaluation to the Board at both the 2020 and 2021 August board meetings. The Board considered this information in connection with the 2020 and 2021 annual approval of the investment advisory contract. You can find the two most recent summaries of the Senior Officer's fee evaluation on our website www.jpmorganfunds.com by clicking on "Senior Officer Fee Summary."

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

January 01, 2022 - January 31, 2022



BYJU'S ALPHA INC
3160 DE LA CRUZ BLVD STE 204
SANTA CLARA CA 95054-2408

## Account Details

| | |
|---|---|
| **Account Owner** | BYJU'S ALPHA INC |
| **Account Number** | 5022869 |
| **Dealer Information** | JP MORGAN INSTITUTIONAL INVESTMENTS<br>GLOBAL LIQUIDITY- DE<br>500 STANTON CHRISTIANA RD # 3-3750<br>NEWARK DE 19713-2105<br><br>97500/100<br>GLOBAL LIQUIDITY |

## Contact Us

| | |
|---|---|
| **Investor Services** | 1.800.766.7722 |
| **Online Access** | www.jpmgloballiquidity.com |
| **Email Address** | Liquidity.client.services.americas@jpmorgan.com |

**JPMorgan Funds News**

Simplify your audit confirmation process. A balance audit confirmation can now be requested for Global Liquidity accounts through www.confirmation.com.

Call 1-800-766-7722 for a fund prospectus. You can also visit us online at www.jpmgloballiquidity.com. Investors should carefully consider the investment objectives and risk as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.

# Portfolio Overview

| **Portfolio Value** as of 01/31/2022 | **$1,010,000,000.00** |
|---|---|
| | **01/01/2022 - 01/31/2022** |
| **Beginning Market Value** | **$1,010,000,000.00** |
| + Purchases | $0.00 |
| + Reinvested Dividends | $0.00 |
| + Reinvested Capital Gains | $0.00 |
| - Redemptions | $0.00 |
| +/- Change in Investment Value | $0.00 |
| **Ending Market Value** | **$1,010,000,000.00** |
| Distributed Dividends | $22,297.77 |
| Distributed Capital Gains | $0.00 |

## Portfolio Fund Values

| Fund Name | Market Value 01/01/2022 | Change in Account Value | Market Value 01/31/2022 |
|---|---|---|---|
| U.S. Govt Mmkt Fund - Capital | $1,010,000,000.00 | $0.00 | $1,010,000,000.00 |
| **Total** | **$1,010,000,000.00** | **$0.00** | **$1,010,000,000.00** |



JPM..*33100*.0786636004.39091.39091.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

**J.P. Morgan Institutional Fund Service Center**
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

January 01, 2022 - January 31, 2022



# Transaction History

## U.S. Govt Mmkt Fund - Capital

**Fund Number** 3164
**Account Number** 5022869

The 7-day SEC yield on January 31, 2022 for the U.S. Govt Mmkt Fund - Capital Shares was 0.03%.

| Confirm Date | Trade Date | Transaction Description | Share Price | Shares this Transaction | Transaction Dollar Amount |
|---|---|---|---|---|---|
| | | **Beginning Balance** | **$1.00** | **1,010,000,000.000** | **$1,010,000,000.00** |
| 01/31 | 01/31 | INCOME DIV CASH | $0.00 | 0.000 | $22,297.77 |
| | | **Total Shares Owned as of 01/31/2022** | | **1,010,000,000.000** | |
| | | **Ending Balance as of 01/31/2022** | **$1.00** | | **$1,010,000,000.00** |

### Account Earnings Summary

| | |
|---|---|
| YTD Income Dividends | $22,297.77 |
| YTD Capital Gains | $0.00 |
| **Total YTD Earnings** | **$22,297.77** |

### Estimated Operating Expenses

Your investment in the Fund is subject to certain fees and expenses, as set forth in the Fund's prospectus in the table entitled "annual operating expenses." The operating expenses charged to your investment for the period is estimated to be $151,500.00. The amount was calculated by taking your last day's balance during the period, multiplying it by the Fund's annual operating expenses and dividing by twelve.



JPM..*33100*.0786636004.39092.39092.CNSJPMD1.....CM........GCP.......000025776

Case 25-00201-BLS Doc 205-10 Filed 04/28/26 Page 98 of 149

# How to Contact J.P. Morgan

**Regular Mail:**
J.P. Morgan Institutional Funds Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

**Overnight Mail:**
J.P. Morgan Institutional Funds Service Center
c/o DST Systems, Inc.
Suite 219265
430 W. 7th St
Kansas City, MO 64105-1407

**Website:**
www.jpmgloballiquidity.com

**Hours of Operation:**
Monday to Friday from
7:30 a.m. (EST) to 6:00 p.m. (EST)

**NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

***Contact J.P. Morgan Funds Distribution Services, Inc. at 1-800-766-7722 for a prospectus. You can also visit us at www.jpmorganfunds.com. Investors should carefully consider the investment objectives and risks as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.***

**Retail Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

**Institutional Money Markets Funds disclosure:**
You could lose money by investing in the Fund. Because the share price of the Fund will fluctuate, when you sell your shares they may be worth more or less than what you originally paid for them. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time. Any gain resulting from the sale or exchange of Fund shares will be taxable as long-term or short-term gain, depending upon how long you have held your shares.

**Government Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

J.P. Morgan Asset Management is the marketing name for the asset management businesses of JPMorgan Chase & Co. Those businesses include, but are not limited to, JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management Inc., Security Capital Research & Management Incorporated, J.P. Morgan Alternative Asset Management, Inc., and J.P. Morgan Asset Management (Canada), Inc.

J.P. Morgan Funds are distributed by JPMorgan Distribution Services, Inc., which is a subsidiary of JPMorgan Chase & Co. Affiliates of JPMorgan Chase & Co. receive fees for providing various services to the funds.



JPM..*33200*.0786636004.39093.39093.CNSJPMD1.....CM........GCP.......000025776

**IMPORTANT INFORMATION ABOUT ADVISORY FEES**

*Summary of Senior Officer Fee Evaluation Available on Website*. As part of the Banc One Investment Advisors Corporation's (subsequently known as JPMorgan Investment Advisors, Inc.) settlement with the New York Attorney General, your Fund has retained a Senior Officer to assist the Board of Trustees in reviewing and determining that management fees are reasonable. (JPMorgan Investment Advisors, Inc. transferred its business to J.P. Morgan Investment Management Inc. effective January 1, 2010.) Stephen M. Ungerman, who also serves as the Chief Compliance Officer for the J.P. Morgan Funds has served as the Fund's Senior Officer since 2005. The Senior Officer provided an independent fee evaluation to the Board at both the 2020 and 2021 August board meetings. The Board considered this information in connection with the 2020 and 2021 annual approval of the investment advisory contract. You can find the two most recent summaries of the Senior Officer's fee evaluation on our website www.jpmorganfunds.com by clicking on "Senior Officer Fee Summary."



JPM..*33310*.0786636004.39095.39095.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

February 01, 2022 - February 28, 2022



BYJU'S ALPHA INC
3160 DE LA CRUZ BLVD STE 204
SANTA CLARA CA 95054-2408

## Account Details

**Account Owner** BYJU'S ALPHA INC

**Account Number** 5022869

**Dealer Information** JP MORGAN INSTITUTIONAL INVESTMENTS
GLOBAL LIQUIDITY- DE
500 STANTON CHRISTIANA RD # 3-3750
NEWARK DE 19713-2105

97500/100
GLOBAL LIQUIDITY

## Contact Us

**Investor Services** 1.800.766.7722

**Online Access** www.jpmgloballiquidity.com

**Email Address**
Liquidity.client.services.americas@jpmorgan.com

**JPMorgan Funds News**

Simplify your audit confirmation process. A balance audit confirmation can now be requested for Global Liquidity accounts through www.confirmation.com.

Call 1-800-766-7722 for a fund prospectus. You can also visit us online at www.jpmgloballiquidity.com. Investors should carefully consider the investment objectives and risk as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.

## Portfolio Overview

**Portfolio Value** as of 02/28/2022 **$860,000,000.00**

| | 02/01/2022 - 02/28/2022 | Year-to-Date |
|---|---|---|
| **Beginning Market Value** | **$1,010,000,000.00** | **$1,010,000,000.00** |
| + Purchases | $0.00 | $0.00 |
| + Reinvested Dividends | $0.00 | $0.00 |
| + Reinvested Capital Gains | $0.00 | $0.00 |
| - Redemptions | $150,000,000.00 | $150,000,000.00 |
| +/- Change in Investment Value | $0.00 | $0.00 |
| **Ending Market Value** | **$860,000,000.00** | **$860,000,000.00** |
| Distributed Dividends | $18,181.00 | $40,478.77 |
| Distributed Capital Gains | $0.00 | $0.00 |

## Portfolio Fund Values

| Fund Name | Market Value 02/01/2022 | Change in Account Value | Market Value 02/28/2022 |
|---|---|---|---|
| U.S. Govt Mmkt Fund - Capital | $1,010,000,000.00 | -$150,000,000.00 | $860,000,000.00 |
| **Total** | **$1,010,000,000.00** | **-$150,000,000.00** | **$860,000,000.00** |



JPM..*54100*.0808881004.38639.38639.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan Asset Management

J.P. Morgan Institutional Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

February 01, 2022 - February 28, 2022



# Transaction History

## U.S. Govt Mmkt Fund - Capital

**Fund Number** 3164
**Account Number** 5022869

The 7-day SEC yield on February 28, 2022 for the U.S. Govt Mmkt Fund - Capital Shares was 0.03%.

| Confirm Date | Trade Date | Transaction Description | Share Price | Shares this Transaction | Transaction Dollar Amount |
|---|---|---|---|---|---|
| | | **Beginning Balance** | **$1.00** | **1,010,000,000.000** | **$1,010,000,000.00** |
| 02/02 | 02/02 | SAME DAY WIRE REDEMPTION | $1.00 | -50,000,000.000 | -$50,000,000.00 |
| 02/15 | 02/15 | SAME DAY WIRE REDEMPTION | $1.00 | -100,000,000.000 | -$100,000,000.00 |
| 02/28 | 02/28 | INCOME DIV CASH | $0.00 | 0.000 | $18,181.00 |
| | | **Total Shares Owned as of 02/28/2022** | | **860,000,000.000** | |
| | | **Ending Balance as of 02/28/2022** | **$1.00** | | **$860,000,000.00** |

### Account Earnings Summary

| | |
|---|---|
| YTD Income Dividends | $40,478.77 |
| YTD Capital Gains | $0.00 |
| **Total YTD Earnings** | **$40,478.77** |

### Estimated Operating Expenses

Your investment in the Fund is subject to certain fees and expenses, as set forth in the Fund's prospectus in the table entitled "annual operating expenses." The operating expenses charged to your investment for the period is estimated to be $129,000.00. The amount was calculated by taking your last day's balance during the period, multiplying it by the Fund's annual operating expenses and dividing by twelve.



JPM..*54100*.0808881004.38640.38640.CNSJPMD1.....CM........GCP.......000025776

# How to Contact J.P. Morgan

**Regular Mail:**
J.P. Morgan Institutional Funds Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

**Overnight Mail:**
J.P. Morgan Institutional Funds Service Center
c/o DST Systems, Inc.
Suite 219265
430 W. 7th St
Kansas City, MO 64105-1407

**Website:**
www.jpmgloballiquidity.com

**Hours of Operation:**
Monday to Friday from
7:30 a.m. (EST) to 6:00 p.m. (EST)

**NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

***Contact J.P. Morgan Funds Distribution Services, Inc. at 1-800-766-7722 for a prospectus. You can also visit us at www.jpmorganfunds.com. Investors should carefully consider the investment objectives and risks as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.***

**Retail Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

**Institutional Money Markets Funds disclosure:**
You could lose money by investing in the Fund. Because the share price of the Fund will fluctuate, when you sell your shares they may be worth more or less than what you originally paid for them. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time. Any gain resulting from the sale or exchange of Fund shares will be taxable as long-term or short-term gain, depending upon how long you have held your shares.

**Government Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

J.P. Morgan Asset Management is the marketing name for the asset management businesses of JPMorgan Chase & Co. Those businesses include, but are not limited to, JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management Inc., Security Capital Research & Management Incorporated, J.P. Morgan Alternative Asset Management, Inc., and J.P. Morgan Asset Management (Canada), Inc.

J.P. Morgan Funds are distributed by JPMorgan Distribution Services, Inc., which is a subsidiary of JPMorgan Chase & Co. Affiliates of JPMorgan Chase & Co. receive fees for providing various services to the funds.



JPM..*54200*.0808881004.38641.38641.CNSJPMD1.....CM........GCP.......000025776

**IMPORTANT INFORMATION ABOUT ADVISORY FEES**

*Summary of Senior Officer Fee Evaluation Available on Website*. As part of the Banc One Investment Advisors Corporation's (subsequently known as JPMorgan Investment Advisors, Inc.) settlement with the New York Attorney General, your Fund has retained a Senior Officer to assist the Board of Trustees in reviewing and determining that management fees are reasonable. (JPMorgan Investment Advisors, Inc. transferred its business to J.P. Morgan Investment Management Inc. effective January 1, 2010.) Stephen M. Ungerman, who also serves as the Chief Compliance Officer for the J.P. Morgan Funds has served as the Fund's Senior Officer since 2005. The Senior Officer provided an independent fee evaluation to the Board at both the 2020 and 2021 August board meetings. The Board considered this information in connection with the 2020 and 2021 annual approval of the investment advisory contract. You can find the two most recent summaries of the Senior Officer's fee evaluation on our website www.jpmorganfunds.com by clicking on "Senior Officer Fee Summary."

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

March 01, 2022 - March 31, 2022



## Account Details

**Account Owner** BYJU'S ALPHA INC

**Account Number** 5022869

**Dealer Information** JP MORGAN INSTITUTIONAL INVESTMENTS
GLOBAL LIQUIDITY- DE
500 STANTON CHRISTIANA RD # 3-3750
NEWARK DE 19713-2105

97500/100
GLOBAL LIQUIDITY

BYJU'S ALPHA INC
3160 DE LA CRUZ BLVD STE 204
SANTA CLARA CA 95054-2408

## Contact Us

**Investor Services** 1.800.766.7722

**Online Access** www.jpmgloballiquidity.com

**Email Address**
Liquidity.client.services.americas@jpmorgan.com

## Portfolio Overview

**Portfolio Value** as of 03/31/2022 **$760,000,000.00**

| | 03/01/2022 - 03/31/2022 | Year-to-Date |
|---|---|---|
| **Beginning Market Value** | **$860,000,000.00** | **$1,010,000,000.00** |
| + Purchases | $0.00 | $0.00 |
| + Reinvested Dividends | $0.00 | $0.00 |
| + Reinvested Capital Gains | $0.00 | $0.00 |
| - Redemptions | $100,000,000.00 | $250,000,000.00 |
| +/- Change in Investment Value | $0.00 | $0.00 |
| **Ending Market Value** | **$760,000,000.00** | **$760,000,000.00** |
| Distributed Dividends | $88,643.94 | $129,122.71 |
| Distributed Capital Gains | $0.00 | $0.00 |

**JPMorgan Funds News**

Simplify your audit confirmation process. A balance audit confirmation can now be requested for Global Liquidity accounts through www.confirmation.com.

Call 1-800-766-7722 for a fund prospectus. You can also visit us online at www.jpmgloballiquidity.com. Investors should carefully consider the investment objectives and risk as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.

## Portfolio Fund Values

| Fund Name | Market Value 03/01/2022 | Change in Account Value | Market Value 03/31/2022 |
|---|---|---|---|
| U.S. Govt Mmkt Fund - Capital | $860,000,000.00 | -$100,000,000.00 | $760,000,000.00 |
| **Total** | **$860,000,000.00** | **-$100,000,000.00** | **$760,000,000.00** |



JPM..*76100*.0836083004.38329.38329.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

March 01, 2022 - March 31, 2022



## Transaction History

### U.S. Govt Mmkt Fund - Capital

**Fund Number** 3164
**Account Number** 5022869

The 7-day SEC yield on March 31, 2022 for the U.S. Govt Mmkt Fund - Capital Shares was 0.25%.

| Confirm Date | Trade Date | Transaction Description | Share Price | Shares this Transaction | Transaction Dollar Amount |
|---|---|---|---|---|---|
| | | **Beginning Balance** | **$1.00** | **860,000,000.000** | **$860,000,000.00** |
| 03/24 | 03/24 | SAME DAY WIRE REDEMPTION | $1.00 | -100,000,000.000 | -$100,000,000.00 |
| 03/31 | 03/31 | INCOME DIV CASH | $0.00 | 0.000 | $88,643.94 |
| | | **Total Shares Owned as of 03/31/2022** | | **760,000,000.000** | |
| | | **Ending Balance as of 03/31/2022** | **$1.00** | | **$760,000,000.00** |

### Account Earnings Summary

| | |
|---|---|
| YTD Income Dividends | $129,122.71 |
| YTD Capital Gains | $0.00 |
| **Total YTD Earnings** | **$129,122.71** |

### Estimated Operating Expenses

Your investment in the Fund is subject to certain fees and expenses, as set forth in the Fund's prospectus in the table entitled "annual operating expenses." The operating expenses charged to your investment for the period is estimated to be $114,000.00. The amount was calculated by taking your last day's balance during the period, multiplying it by the Fund's annual operating expenses and dividing by twelve.



JPM..*76100*.0836083004.38330.38330.CNSJPMD1.....CM........GCP.......000025776

Case 25-50521-BLS Doc 8-5 Filed 04/08/25 Page 185 of 194

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

March 01, 2022 - March 31, 2022



**Annual Cumulative Expense Examples**

A Fund's annual return is reduced by its fees and expenses for that year. The examples below are intended to help you understand the annual and cumulative impact of the Fund's fees and expenses on your investment through a hypothetical investment of $10,000 held for the next 10 years. The examples assume the following

- On the date exactly one year before the first period end date below, you invest $10,000 in the Fund and you will hold the shares for the entire 10 year period;
- Your investment has a 5% return each year;
- The Fund's operating expenses remain at the levels discussed below and are not affected by increases or decreases in Fund assets over time;
- At the time of purchase, any applicable initial sales charges (loads) are deducted; and
- There is no sales charge (load) on reinvested dividends.
- The annual costs are calculated using the Net Expense Ratios for the period through the expiration of any fee waivers or expense reimbursement memorialized in a written contract between the Funds and JPMIM and/or its affiliates; and the Gross Expense Ratios thereafter.

"Gross Cumulative Return" shows what the cumulative return on your investment at the end of each 12 month period end date (year), shown below, would be if Fund expenses are not deducted. "Net Cumulative Return" shows what the cumulative return on your investment at the end of each year would be assuming Fund expenses are deducted each year in the amount shown under "Annual Costs."
"Net Annual Return" shows what effect the "Annual Costs" will have on the assumed 5% annual return for each year.

**Your actual costs may be higher or lower than those shown.**

| JPMorgan U.S. Government Money Market Fund | Capital Shares | | | |
|---|---|---|---|---|
| Period Ended | Annual Costs | Gross Cumulative Return | Net Cumulative Return | Net Annual Return |
| June 30, 2022 | $ 18 | 5.00% | 4.82% | 4.82% |
| June 30, 2023 | $ 20 | 10.25% | 9.86% | 4.81% |
| June 30, 2024 | $ 21 | 15.76% | 15.15% | 4.81% |
| June 30, 2025 | $ 22 | 21.55% | 20.68% | 4.81% |
| June 30, 2026 | $ 23 | 27.63% | 26.49% | 4.81% |
| June 30, 2027 | $ 25 | 34.01% | 32.57% | 4.81% |
| June 30, 2028 | $ 26 | 40.71% | 38.95% | 4.81% |
| June 30, 2029 | $ 27 | 47.75% | 45.63% | 4.81% |
| June 30, 2030 | $ 28 | 55.13% | 52.64% | 4.81% |
| June 30, 2031 | $ 30 | 62.89% | 59.98% | 4.81% |



JPM..*76200*.0836083004.38331.38331.CNSJPMD1.....CM........GCP.......000025776

# How to Contact J.P. Morgan

**Regular Mail:**
J.P. Morgan Institutional Funds Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

**Overnight Mail:**
J.P. Morgan Institutional Funds Service Center
c/o DST Systems, Inc.
Suite 219265
430 W. 7th St
Kansas City, MO 64105-1407

**Website:**
www.jpmgloballiquidity.com

**Hours of Operation:**
Monday to Friday from
7:30 a.m. (EST) to 6:00 p.m. (EST)

**NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

***Contact J.P. Morgan Funds Distribution Services, Inc. at 1-800-766-7722 for a prospectus. You can also visit us at www.jpmorganfunds.com. Investors should carefully consider the investment objectives and risks as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.***

**Retail Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

**Institutional Money Markets Funds disclosure:**
You could lose money by investing in the Fund. Because the share price of the Fund will fluctuate, when you sell your shares they may be worth more or less than what you originally paid for them. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time. Any gain resulting from the sale or exchange of Fund shares will be taxable as long-term or short-term gain, depending upon how long you have held your shares.

**Government Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

J.P. Morgan Asset Management is the marketing name for the asset management businesses of JPMorgan Chase & Co. Those businesses include, but are not limited to, JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management Inc., Security Capital Research & Management Incorporated, J.P. Morgan Alternative Asset Management, Inc., and J.P. Morgan Asset Management (Canada), Inc.

J.P. Morgan Funds are distributed by JPMorgan Distribution Services, Inc., which is a subsidiary of JPMorgan Chase & Co. Affiliates of JPMorgan Chase & Co. receive fees for providing various services to the funds.



JPM..*76200*.0836083004.38332.38332.CNSJPMD1.....CM........GCP.......000025776

**IMPORTANT INFORMATION ABOUT ADVISORY FEES**

*Summary of Senior Officer Fee Evaluation Available on Website*. As part of the Banc One Investment Advisors Corporation's (subsequently known as JPMorgan Investment Advisors, Inc.) settlement with the New York Attorney General, your Fund has retained a Senior Officer to assist the Board of Trustees in reviewing and determining that management fees are reasonable. (JPMorgan Investment Advisors, Inc. transferred its business to J.P. Morgan Investment Management Inc. effective January 1, 2010.) Stephen M. Ungerman, who also serves as the Chief Compliance Officer for the J.P. Morgan Funds has served as the Fund's Senior Officer since 2005. The Senior Officer provided an independent fee evaluation to the Board at both the 2020 and 2021 August board meetings. The Board considered this information in connection with the 2020 and 2021 annual approval of the investment advisory contract. You can find the two most recent summaries of the Senior Officer's fee evaluation on our website www.jpmorganfunds.com by clicking on "Senior Officer Fee Summary."



JPM..*76310*.0836083004.38333.38333.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

April 01, 2022 - April 30, 2022



BYJU'S ALPHA INC
3160 DE LA CRUZ BLVD STE 204
SANTA CLARA CA 95054-2408

## Account Details

| | |
|---|---|
| **Account Owner** | BYJU'S ALPHA INC |
| **Account Number** | 5022869 |
| **Dealer Information** | JP MORGAN INSTITUTIONAL INVESTMENTS<br>GLOBAL LIQUIDITY- DE<br>500 STANTON CHRISTIANA RD # 3-3750<br>NEWARK DE 19713-2105<br><br>97500/100<br>GLOBAL LIQUIDITY |

## Contact Us

| | |
|---|---|
| **Investor Services** | 1.800.766.7722 |
| **Online Access** | www.jpmgloballiquidity.com |
| **Email Address** | Liquidity.client.services.americas@jpmorgan.com |

## Portfolio Overview

**Portfolio Value** as of 04/30/2022 **$380,000,000.00**

| | 04/01/2022 - 04/30/2022 | Year-to-Date |
|---|---|---|
| **Beginning Market Value** | **$760,000,000.00** | **$1,010,000,000.00** |
| + Purchases | $0.00 | $0.00 |
| + Reinvested Dividends | $0.00 | $0.00 |
| + Reinvested Capital Gains | $0.00 | $0.00 |
| - Redemptions | $380,000,000.00 | $630,000,000.00 |
| +/- Change in Investment Value | $0.00 | $0.00 |
| **Ending Market Value** | **$380,000,000.00** | **$380,000,000.00** |
| Distributed Dividends | $165,654.76 | $294,777.47 |
| Distributed Capital Gains | $0.00 | $0.00 |

**JPMorgan Funds News**

Simplify your audit confirmation process. A balance audit confirmation can now be requested for Global Liquidity accounts through www.confirmation.com.

Call 1-800-766-7722 for a fund prospectus. You can also visit us online at www.jpmgloballiquidity.com. Investors should carefully consider the investment objectives and risk as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.

## Portfolio Fund Values

| Fund Name | Market Value 04/01/2022 | Change in Account Value | Market Value 04/30/2022 |
|---|---|---|---|
| U.S. Govt Mmkt Fund - Capital | $760,000,000.00 | -$380,000,000.00 | $380,000,000.00 |
| **Total** | **$760,000,000.00** | **-$380,000,000.00** | **$380,000,000.00** |

A3057

JPM..*44100*.0860723004.37439.37439.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

April 01, 2022 - April 30, 2022



# Transaction History

## U.S. Govt Mmkt Fund - Capital

**Fund Number** 3164
**Account Number** 5022869

The 7-day SEC yield on April 30, 2022 for the U.S. Govt Mmkt Fund - Capital Shares was 0.32%.

| Confirm Date | Trade Date | Transaction Description | Share Price | Shares this Transaction | Transaction Dollar Amount |
|---|---|---|---|---|---|
| | | **Beginning Balance** | **$1.00** | **760,000,000.000** | **$760,000,000.00** |
| 04/22 | 04/22 | SAME DAY WIRE REDEMPTION | $1.00 | -60,000,000.000 | -$60,000,000.00 |
| 04/27 | 04/27 | SAME DAY WIRE REDEMPTION | $1.00 | -320,000,000.000 | -$320,000,000.00 |
| 04/29 | 04/29 | INCOME DIV CASH | $0.00 | 0.000 | $165,654.76 |
| | | **Total Shares Owned as of 04/30/2022** | | **380,000,000.000** | |
| | | **Ending Balance as of 04/30/2022** | **$1.00** | | **$380,000,000.00** |

### Account Earnings Summary

| | |
|---|---|
| YTD Income Dividends | $294,777.47 |
| YTD Capital Gains | $0.00 |
| **Total YTD Earnings** | **$294,777.47** |

### Estimated Operating Expenses

Your investment in the Fund is subject to certain fees and expenses, as set forth in the Fund's prospectus in the table entitled "annual operating expenses." The operating expenses charged to your investment for the period is estimated to be $57,000.00. The amount was calculated by taking your last day's balance during the period, multiplying it by the Fund's annual operating expenses and dividing by twelve.



JPM..*44100*.0860723004.37440.37440.CNSJPMD1.....CM........GCP.......000025776

# How to Contact J.P. Morgan

**Regular Mail:**
J.P. Morgan Institutional Funds Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

**Overnight Mail:**
J.P. Morgan Institutional Funds Service Center
c/o DST Systems, Inc.
Suite 219265
430 W. 7th St
Kansas City, MO 64105-1407

**Website:**
www.jpmgloballiquidity.com

**Hours of Operation:**
Monday to Friday from
7:30 a.m. (EST) to 6:00 p.m. (EST)

**NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

***Contact J.P. Morgan Funds Distribution Services, Inc. at 1-800-766-7722 for a prospectus. You can also visit us at www.jpmorganfunds.com. Investors should carefully consider the investment objectives and risks as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.***

**Retail Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

**Institutional Money Markets Funds disclosure:**
You could lose money by investing in the Fund. Because the share price of the Fund will fluctuate, when you sell your shares they may be worth more or less than what you originally paid for them. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time. Any gain resulting from the sale or exchange of Fund shares will be taxable as long-term or short-term gain, depending upon how long you have held your shares.

**Government Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

J.P. Morgan Asset Management is the marketing name for the asset management businesses of JPMorgan Chase & Co. Those businesses include, but are not limited to, JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management Inc., Security Capital Research & Management Incorporated, J.P. Morgan Alternative Asset Management, Inc., and J.P. Morgan Asset Management (Canada), Inc.

J.P. Morgan Funds are distributed by JPMorgan Distribution Services, Inc., which is a subsidiary of JPMorgan Chase & Co. Affiliates of JPMorgan Chase & Co. receive fees for providing various services to the funds.



JPM..*44200*.0860723004.37441.37441.CNSJPMD1.....CM........GCP.......000025776

**IMPORTANT INFORMATION ABOUT ADVISORY FEES**

*Summary of Senior Officer Fee Evaluation Available on Website*. As part of the Banc One Investment Advisors Corporation's (subsequently known as JPMorgan Investment Advisors, Inc.) settlement with the New York Attorney General, your Fund has retained a Senior Officer to assist the Board of Trustees in reviewing and determining that management fees are reasonable. (JPMorgan Investment Advisors, Inc. transferred its business to J.P. Morgan Investment Management Inc. effective January 1, 2010.) Stephen M. Ungerman, who also serves as the Chief Compliance Officer for the J.P. Morgan Funds has served as the Fund's Senior Officer since 2005. The Senior Officer provided an independent fee evaluation to the Board at both the 2020 and 2021 August board meetings. The Board considered this information in connection with the 2020 and 2021 annual approval of the investment advisory contract. You can find the two most recent summaries of the Senior Officer's fee evaluation on our website www.jpmorganfunds.com by clicking on "Senior Officer Fee Summary."



JPM..*44310*.0860723004.37443.37443.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

May 01, 2022 - May 31, 2022



BYJU'S ALPHA INC
3160 DE LA CRUZ BLVD STE 204
SANTA CLARA CA 95054-2408

## Account Details

**Account Owner** BYJU'S ALPHA INC

**Account Number** 5022869

**Dealer Information** JP MORGAN INSTITUTIONAL INVESTMENTS
GLOBAL LIQUIDITY- DE
500 STANTON CHRISTIANA RD # 3-3750
NEWARK DE 19713-2105

97500/100
GLOBAL LIQUIDITY

## Contact Us

**Investor Services** 1.800.766.7722

**Online Access** www.jpmgloballiquidity.com

**Email Address**
Liquidity.client.services.americas@jpmorgan.com

**JPMorgan Funds News**

Simplify your audit confirmation process. A balance audit confirmation can now be requested for Global Liquidity accounts through www.confirmation.com.

Call 1-800-766-7722 for a fund prospectus. You can also visit us online at www.jpmgloballiquidity.com. Investors should carefully consider the investment objectives and risk as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.

# Portfolio Overview

**Portfolio Value** as of 05/31/2022 **$300,000,000.00**

| | 05/01/2022 - 05/31/2022 | Year-to-Date |
|---|---|---|
| **Beginning Market Value** | **$380,000,000.00** | **$1,010,000,000.00** |
| + Purchases | $0.00 | $0.00 |
| + Reinvested Dividends | $0.00 | $0.00 |
| + Reinvested Capital Gains | $0.00 | $0.00 |
| - Redemptions | $80,000,000.00 | $710,000,000.00 |
| +/- Change in Investment Value | $0.00 | $0.00 |
| **Ending Market Value** | **$300,000,000.00** | **$300,000,000.00** |
| Distributed Dividends | $210,012.53 | $504,790.00 |
| Distributed Capital Gains | $0.00 | $0.00 |

## Portfolio Fund Values

| Fund Name | Market Value 05/01/2022 | Change in Account Value | Market Value 05/31/2022 |
|---|---|---|---|
| U.S. Govt Mmkt Fund - Capital | $380,000,000.00 | -$80,000,000.00 | $300,000,000.00 |
| **Total** | **$380,000,000.00** | **-$80,000,000.00** | **$300,000,000.00** |



JPM..*97100*.0883673004.37185.37185.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

May 01, 2022 - May 31, 2022



# Transaction History

## U.S. Govt Mmkt Fund - Capital

**Fund Number** 3164
**Account Number** 5022869

The 7-day SEC yield on May 31, 2022 for the U.S. Govt Mmkt Fund - Capital Shares was 0.76%.

| Confirm Date | Trade Date | Transaction Description | Share Price | Shares this Transaction | Transaction Dollar Amount |
|---|---|---|---|---|---|
| | | **Beginning Balance** | **$1.00** | **380,000,000.000** | **$380,000,000.00** |
| 05/25 | 05/25 | SAME DAY WIRE REDEMPTION | $1.00 | -30,000,000.000 | -$30,000,000.00 |
| 05/27 | 05/27 | SAME DAY WIRE REDEMPTION | $1.00 | -50,000,000.000 | -$50,000,000.00 |
| 05/31 | 05/31 | INCOME DIV CASH | $0.00 | 0.000 | $210,012.53 |
| | | **Total Shares Owned as of 05/31/2022** | | **300,000,000.000** | |
| | | **Ending Balance as of 05/31/2022** | **$1.00** | | **$300,000,000.00** |

### Account Earnings Summary

| | |
|---|---|
| YTD Income Dividends | $504,790.00 |
| YTD Capital Gains | $0.00 |
| **Total YTD Earnings** | **$504,790.00** |

### Estimated Operating Expenses

Your investment in the Fund is subject to certain fees and expenses, as set forth in the Fund's prospectus in the table entitled "annual operating expenses." The operating expenses charged to your investment for the period is estimated to be $45,000.00. The amount was calculated by taking your last day's balance during the period, multiplying it by the Fund's annual operating expenses and dividing by twelve.



JPM..*97100*.0883673004.37186.37186.CNSJPMD1.....CM........GCP.......000025776

Case 25-50526-BLS Doc 14-10 Filed 04/08/26 Page 127 of 149

# How to Contact J.P. Morgan

**Regular Mail:**
J.P. Morgan Institutional Funds Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

**Overnight Mail:**
J.P. Morgan Institutional Funds Service Center
c/o DST Systems, Inc.
Suite 219265
430 W. 7th St
Kansas City, MO 64105-1407

**Website:**
www.jpmgloballiquidity.com

**Hours of Operation:**
Monday to Friday from
7:30 a.m. (EST) to 6:00 p.m. (EST)

**NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

***Contact J.P. Morgan Funds Distribution Services, Inc. at 1-800-766-7722 for a prospectus. You can also visit us at www.jpmorganfunds.com. Investors should carefully consider the investment objectives and risks as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.***

**Retail Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

**Institutional Money Markets Funds disclosure:**
You could lose money by investing in the Fund. Because the share price of the Fund will fluctuate, when you sell your shares they may be worth more or less than what you originally paid for them. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time. Any gain resulting from the sale or exchange of Fund shares will be taxable as long-term or short-term gain, depending upon how long you have held your shares.

**Government Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

J.P. Morgan Asset Management is the marketing name for the asset management businesses of JPMorgan Chase & Co. Those businesses include, but are not limited to, JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management Inc., Security Capital Research & Management Incorporated, J.P. Morgan Alternative Asset Management, Inc., and J.P. Morgan Asset Management (Canada), Inc.

J.P. Morgan Funds are distributed by JPMorgan Distribution Services, Inc., which is a subsidiary of JPMorgan Chase & Co. Affiliates of JPMorgan Chase & Co. receive fees for providing various services to the funds.


JPM..*97200*.0883673004.37187.37187.CNSJPMD1.....CM........GCP.......000025776

**IMPORTANT INFORMATION ABOUT ADVISORY FEES**

*Summary of Senior Officer Fee Evaluation Available on Website*. As part of the Banc One Investment Advisors Corporation's (subsequently known as JPMorgan Investment Advisors, Inc.) settlement with the New York Attorney General, your Fund has retained a Senior Officer to assist the Board of Trustees in reviewing and determining that management fees are reasonable. (JPMorgan Investment Advisors, Inc. transferred its business to J.P. Morgan Investment Management Inc. effective January 1, 2010.) Stephen M. Ungerman, who also serves as the Chief Compliance Officer for the J.P. Morgan Funds has served as the Fund's Senior Officer since 2005. The Senior Officer provided an independent fee evaluation to the Board at both the 2020 and 2021 August board meetings. The Board considered this information in connection with the 2020 and 2021 annual approval of the investment advisory contract. You can find the two most recent summaries of the Senior Officer's fee evaluation on our website www.jpmorganfunds.com by clicking on "Senior Officer Fee Summary."

JPM..*97310*.0883673004.37190.37190.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

June 01, 2022 - June 30, 2022



BYJU'S ALPHA INC
3160 DE LA CRUZ BLVD STE 204
SANTA CLARA CA 95054-2408

## Account Details

| | |
|---|---|
| **Account Owner** | BYJU'S ALPHA INC |
| **Account Number** | 5022869 |
| **Dealer Information** | JP MORGAN INSTITUTIONAL INVESTMENTS<br>GLOBAL LIQUIDITY- DE<br>500 STANTON CHRISTIANA RD # 3-3750<br>NEWARK DE 19713-2105<br>97500/100<br>GLOBAL LIQUIDITY |

## Contact Us

**Investor Services** 1.800.766.7722

**Online Access** www.jpmgloballiquidity.com

**Email Address**
Liquidity.client.services.americas@jpmorgan.com

## Portfolio Overview

**Portfolio Value** as of 06/30/2022 **$250,000,000.00**

| | 06/01/2022 - 06/30/2022 | Year-to-Date |
|---|---|---|
| **Beginning Market Value** | **$300,000,000.00** | **$1,010,000,000.00** |
| + Purchases | $0.00 | $0.00 |
| + Reinvested Dividends | $0.00 | $0.00 |
| + Reinvested Capital Gains | $0.00 | $0.00 |
| - Redemptions | $50,000,000.00 | $760,000,000.00 |
| +/- Change in Investment Value | $0.00 | $0.00 |
| **Ending Market Value** | **$250,000,000.00** | **$250,000,000.00** |
| Distributed Dividends | $242,700.25 | $747,490.25 |
| Distributed Capital Gains | $0.00 | $0.00 |

**JPMorgan Funds News**

Simplify your audit confirmation process. A balance audit confirmation can now be requested for Global Liquidity accounts through www.confirmation.com.

Call 1-800-766-7722 for a fund prospectus. You can also visit us online at www.jpmgloballiquidity.com. Investors should carefully consider the investment objectives and risk as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.

## Portfolio Fund Values

| Fund Name | Market Value 06/01/2022 | Change in Account Value | Market Value 06/30/2022 |
|---|---|---|---|
| U.S. Govt Mmkt Fund - Capital | $300,000,000.00 | -$50,000,000.00 | $250,000,000.00 |
| **Total** | **$300,000,000.00** | **-$50,000,000.00** | **$250,000,000.00** |



JPM..*24100*.0905855004.36869.36869.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

June 01, 2022 - June 30, 2022



# Transaction History

## U.S. Govt Mmkt Fund - Capital

**Fund Number** 3164
**Account Number** 5022869

The 7-day SEC yield on June 30, 2022 for the U.S. Govt Mmkt Fund - Capital Shares was 1.32%.

| Confirm Date | Trade Date | Transaction Description | Share Price | Shares this Transaction | Transaction Dollar Amount |
|---|---|---|---|---|---|
| | | **Beginning Balance** | **$1.00** | **300,000,000.000** | **$300,000,000.00** |
| 06/23 | 06/23 | SAME DAY WIRE REDEMPTION | $1.00 | -50,000,000.000 | -$50,000,000.00 |
| 06/30 | 06/30 | INCOME DIV CASH | $0.00 | 0.000 | $242,700.25 |
| | | **Total Shares Owned as of 06/30/2022** | | **250,000,000.000** | |
| | | **Ending Balance as of 06/30/2022** | **$1.00** | | **$250,000,000.00** |

### Account Earnings Summary

| | |
|---|---|
| YTD Income Dividends | $747,490.25 |
| YTD Capital Gains | $0.00 |
| **Total YTD Earnings** | **$747,490.25** |

### Estimated Operating Expenses

Your investment in the Fund is subject to certain fees and expenses, as set forth in the Fund's prospectus in the table entitled "annual operating expenses." The operating expenses charged to your investment for the period is estimated to be $37,500.00. The amount was calculated by taking your last day's balance during the period, multiplying it by the Fund's annual operating expenses and dividing by twelve.



JPM..*24100*.0905855004.36870.36870.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

June 01, 2022 - June 30, 2022



**Annual Cumulative Expense Examples**

A Fund's annual return is reduced by its fees and expenses for that year. The examples below are intended to help you understand the annual and cumulative impact of the Fund's fees and expenses on your investment through a hypothetical investment of $10,000 held for the next 10 years. The examples assume the following

- On the date exactly one year before the first period end date below, you invest $10,000 in the Fund and you will hold the shares for the entire 10 year period;
- Your investment has a 5% return each year;
- The Fund's operating expenses remain at the levels discussed below and are not affected by increases or decreases in Fund assets over time;
- At the time of purchase, any applicable initial sales charges (loads) are deducted; and
- There is no sales charge (load) on reinvested dividends.
- The annual costs are calculated using the Net Expense Ratios for the period through the expiration of any fee waivers or expense reimbursement memorialized in a written contract between the Funds and JPMIM and/or its affiliates; and the Gross Expense Ratios thereafter.

"Gross Cumulative Return" shows what the cumulative return on your investment at the end of each 12 month period end date (year), shown below, would be if Fund expenses are not deducted. "Net Cumulative Return" shows what the cumulative return on your investment at the end of each year would be assuming Fund expenses are deducted each year in the amount shown under "Annual Costs."
"Net Annual Return" shows what effect the "Annual Costs" will have on the assumed 5% annual return for each year.

**Your actual costs may be higher or lower than those shown.**

| JPMorgan U.S. Government Money Market Fund | Capital Shares | | | |
|---|---|---|---|---|
| Period Ended | Annual Costs | Gross Cumulative Return | Net Cumulative Return | Net Annual Return |
| June 30, 2022 | $ 18 | 5.00% | 4.82% | 4.82% |
| June 30, 2023 | $ 20 | 10.25% | 9.86% | 4.81% |
| June 30, 2024 | $ 21 | 15.76% | 15.15% | 4.81% |
| June 30, 2025 | $ 22 | 21.55% | 20.68% | 4.81% |
| June 30, 2026 | $ 23 | 27.63% | 26.49% | 4.81% |
| June 30, 2027 | $ 25 | 34.01% | 32.57% | 4.81% |
| June 30, 2028 | $ 26 | 40.71% | 38.95% | 4.81% |
| June 30, 2029 | $ 27 | 47.75% | 45.63% | 4.81% |
| June 30, 2030 | $ 28 | 55.13% | 52.64% | 4.81% |
| June 30, 2031 | $ 30 | 62.89% | 59.98% | 4.81% |



JPM..*24200*.0905855004.36871.36871.CNSJPMD1.....CM........GCP.......000025776

# How to Contact J.P. Morgan

**Regular Mail:**
J.P. Morgan Institutional Funds Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

**Overnight Mail:**
J.P. Morgan Institutional Funds Service Center
c/o DST Systems, Inc.
Suite 219265
430 W. 7th St
Kansas City, MO 64105-1407

**Website:**
www.jpmgloballiquidity.com

**Hours of Operation:**
Monday to Friday from
7:30 a.m. (EST) to 6:00 p.m. (EST)

**NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

***Contact J.P. Morgan Funds Distribution Services, Inc. at 1-800-766-7722 for a prospectus. You can also visit us at www.jpmorganfunds.com. Investors should carefully consider the investment objectives and risks as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.***

**Retail Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

**Institutional Money Markets Funds disclosure:**
You could lose money by investing in the Fund. Because the share price of the Fund will fluctuate, when you sell your shares they may be worth more or less than what you originally paid for them. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time. Any gain resulting from the sale or exchange of Fund shares will be taxable as long-term or short-term gain, depending upon how long you have held your shares.

**Government Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

J.P. Morgan Asset Management is the marketing name for the asset management businesses of JPMorgan Chase & Co. Those businesses include, but are not limited to, JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management Inc., Security Capital Research & Management Incorporated, J.P. Morgan Alternative Asset Management, Inc., and J.P. Morgan Asset Management (Canada), Inc.

J.P. Morgan Funds are distributed by JPMorgan Distribution Services, Inc., which is a subsidiary of JPMorgan Chase & Co. Affiliates of JPMorgan Chase & Co. receive fees for providing various services to the funds.



JPM..*24200*.0905855004.36872.36872.CNSJPMD1.....CM........GCP.......000025776

**IMPORTANT INFORMATION ABOUT ADVISORY FEES**

*Summary of Senior Officer Fee Evaluation Available on Website*. As part of the Banc One Investment Advisors Corporation's (subsequently known as JPMorgan Investment Advisors, Inc.) settlement with the New York Attorney General, your Fund has retained a Senior Officer to assist the Board of Trustees in reviewing and determining that management fees are reasonable. (JPMorgan Investment Advisors, Inc. transferred its business to J.P. Morgan Investment Management Inc. effective January 1, 2010.) Stephen M. Ungerman, who also serves as the Chief Compliance Officer for the J.P. Morgan Funds has served as the Fund's Senior Officer since 2005. The Senior Officer provided an independent fee evaluation to the Board at both the 2020 and 2021 August board meetings. The Board considered this information in connection with the 2020 and 2021 annual approval of the investment advisory contract. You can find the two most recent summaries of the Senior Officer's fee evaluation on our website www.jpmorganfunds.com by clicking on "Senior Officer Fee Summary."



JPM..*24310*.0905855004.36873.36873.CNSJPMD1.....CM........GCP.......000025776

Case 25-50261-BLS Doc 185-4 Filed 04/08/26 Page 130 of 144

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

July 01, 2022 - July 31, 2022



BYJU'S ALPHA INC
3160 DE LA CRUZ BLVD STE 204
SANTA CLARA CA 95054-2408

## Account Details

**Account Owner** BYJU'S ALPHA INC

**Account Number** 5022869

**Dealer Information** JP MORGAN INSTITUTIONAL INVESTMENTS
GLOBAL LIQUIDITY- DE
500 STANTON CHRISTIANA RD # 3-3750
NEWARK DE 19713-2105

97500/100
GLOBAL LIQUIDITY

## Contact Us

**Investor Services** 1.800.766.7722

**Online Access** www.jpmgloballiquidity.com

**Email Address**
Liquidity.client.services.americas@jpmorgan.com

## Portfolio Overview

**Portfolio Value** as of 07/31/2022 **$30,000,000.00**

| | 07/01/2022 - 07/31/2022 | Year-to-Date |
|---|---|---|
| **Beginning Market Value** | **$250,000,000.00** | **$1,010,000,000.00** |
| + Purchases | $0.00 | $0.00 |
| + Reinvested Dividends | $0.00 | $0.00 |
| + Reinvested Capital Gains | $0.00 | $0.00 |
| - Redemptions | $220,000,000.00 | $980,000,000.00 |
| +/- Change in Investment Value | $0.00 | $0.00 |
| **Ending Market Value** | **$30,000,000.00** | **$30,000,000.00** |
| Distributed Dividends | $91,900.08 | $839,390.33 |
| Distributed Capital Gains | $0.00 | $0.00 |

**JPMorgan Funds News**

Simplify your audit confirmation process. A balance audit confirmation can now be requested for Global Liquidity accounts through www.confirmation.com.

Call 1-800-766-7722 for a fund prospectus. You can also visit us online at www.jpmgloballiquidity.com. Investors should carefully consider the investment objectives and risk as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.

## Portfolio Fund Values

| Fund Name | Market Value 07/01/2022 | Change in Account Value | Market Value 07/31/2022 |
|---|---|---|---|
| U.S. Govt Mmkt Fund - Capital | $250,000,000.00 | -$220,000,000.00 | $30,000,000.00 |
| **Total** | **$250,000,000.00** | **-$220,000,000.00** | **$30,000,000.00** |

A3075

JPM..*57100*.0926782004.36359.36359.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

July 01, 2022 - July 31, 2022



# Transaction History

## U.S. Govt Mmkt Fund - Capital

**Fund Number** 3164
**Account Number** 5022869

The 7-day SEC yield on July 31, 2022 for the U.S. Govt Mmkt Fund - Capital Shares was 1.78%.

| Confirm Date | Trade Date | Transaction Description | Share Price | Shares this Transaction | Transaction Dollar Amount |
|---|---|---|---|---|---|
| | | **Beginning Balance** | **$1.00** | **250,000,000.000** | **$250,000,000.00** |
| 07/07 | 07/07 | SAME DAY WIRE REDEMPTION | $1.00 | -200,000,000.000 | -$200,000,000.00 |
| 07/14 | 07/14 | SAME DAY WIRE REDEMPTION | $1.00 | -20,000,000.000 | -$20,000,000.00 |
| 07/29 | 07/29 | INCOME DIV CASH | $0.00 | 0.000 | $91,900.08 |
| | | **Total Shares Owned as of 07/31/2022** | | **30,000,000.000** | |
| | | **Ending Balance as of 07/31/2022** | **$1.00** | | **$30,000,000.00** |

### Account Earnings Summary

| | |
|---|---|
| YTD Income Dividends | $839,390.33 |
| YTD Capital Gains | $0.00 |
| **Total YTD Earnings** | **$839,390.33** |

### Estimated Operating Expenses

Your investment in the Fund is subject to certain fees and expenses, as set forth in the Fund's prospectus in the table entitled "annual operating expenses." The operating expenses charged to your investment for the period is estimated to be $4,500.00. The amount was calculated by taking your last day's balance during the period, multiplying it by the Fund's annual operating expenses and dividing by twelve.



JPM..*57100*.0926782004.36360.36360.CNSJPMD1.....CM........GCP.......000025776

# How to Contact J.P. Morgan

**Regular Mail:**
J.P. Morgan Institutional Funds Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

**Overnight Mail:**
J.P. Morgan Institutional Funds Service Center
c/o DST Systems, Inc.
Suite 219265
430 W. 7th St
Kansas City, MO 64105-1407

**Website:**
www.jpmgloballiquidity.com

**Hours of Operation:**
Monday to Friday from
7:30 a.m. (EST) to 6:00 p.m. (EST)

**NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

***Contact J.P. Morgan Funds Distribution Services, Inc. at 1-800-766-7722 for a prospectus. You can also visit us at www.jpmorganfunds.com. Investors should carefully consider the investment objectives and risks as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.***

**Retail Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

**Institutional Money Markets Funds disclosure:**
You could lose money by investing in the Fund. Because the share price of the Fund will fluctuate, when you sell your shares they may be worth more or less than what you originally paid for them. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time. Any gain resulting from the sale or exchange of Fund shares will be taxable as long-term or short-term gain, depending upon how long you have held your shares.

**Government Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

J.P. Morgan Asset Management is the marketing name for the asset management businesses of JPMorgan Chase & Co. Those businesses include, but are not limited to, JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management Inc., Security Capital Research & Management Incorporated, J.P. Morgan Alternative Asset Management, Inc., and J.P. Morgan Asset Management (Canada), Inc.

J.P. Morgan Funds are distributed by JPMorgan Distribution Services, Inc., which is a subsidiary of JPMorgan Chase & Co. Affiliates of JPMorgan Chase & Co. receive fees for providing various services to the funds.



JPM..*57200*.0926782004.36361.36361.CNSJPMD1.....CM........GCP.......000025776

**IMPORTANT INFORMATION ABOUT ADVISORY FEES**

*Summary of Senior Officer Fee Evaluation Available on Website*. As part of the Banc One Investment Advisors Corporation's (subsequently known as JPMorgan Investment Advisors, Inc.) settlement with the New York Attorney General, your Fund has retained a Senior Officer to assist the Board of Trustees in reviewing and determining that management fees are reasonable. (JPMorgan Investment Advisors, Inc. transferred its business to J.P. Morgan Investment Management Inc. effective January 1, 2010.) Stephen M. Ungerman, who also serves as the Chief Compliance Officer for the J.P. Morgan Funds has served as the Fund's Senior Officer since 2005. The Senior Officer provided an independent fee evaluation to the Board at both the 2020 and 2021 August board meetings. The Board considered this information in connection with the 2020 and 2021 annual approval of the investment advisory contract. You can find the two most recent summaries of the Senior Officer's fee evaluation on our website www.jpmorganfunds.com by clicking on "Senior Officer Fee Summary."



JPM..*57310*.0926782004.36363.36363.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

**J.P. Morgan Institutional Fund Service Center**
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

August 01, 2022 - August 31, 2022



BYJU'S ALPHA INC
3160 DE LA CRUZ BLVD STE 204
SANTA CLARA CA 95054-2408

## Account Details

| | |
|---|---|
| **Account Owner** | BYJU'S ALPHA INC |
| **Account Number** | 5022869 |
| **Dealer Information** | JP MORGAN INSTITUTIONAL INVESTMENTS<br>GLOBAL LIQUIDITY- DE<br>500 STANTON CHRISTIANA RD # 3-3750<br>NEWARK DE 19713-2105<br><br>97500/100<br>GLOBAL LIQUIDITY |

## Contact Us

| | |
|---|---|
| **Investor Services** | 1.800.766.7722 |
| **Online Access** | www.jpmgloballiquidity.com |
| **Email Address** | Liquidity.client.services.americas@jpmorgan.com |

**JPMorgan Funds News**

Simplify your audit confirmation process. A balance audit confirmation can now be requested for Global Liquidity accounts through www.confirmation.com.

Call 1-800-766-7722 for a fund prospectus. You can also visit us online at www.jpmgloballiquidity.com. Investors should carefully consider the investment objectives and risk as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.

# Portfolio Overview

**Portfolio Value** as of 08/31/2022 **$0.00**

| | 08/01/2022 - 08/31/2022 | Year-to-Date |
|---|---|---|
| **Beginning Market Value** | **$30,000,000.00** | **$1,010,000,000.00** |
| + Purchases | $0.00 | $0.00 |
| + Reinvested Dividends | $0.00 | $0.00 |
| + Reinvested Capital Gains | $0.00 | $0.00 |
| - Redemptions | $30,000,000.00 | $1,010,000,000.00 |
| +/- Change in Investment Value | $0.00 | $0.00 |
| **Ending Market Value** | **$0.00** | **$0.00** |
| Distributed Dividends | $38,297.12 | $877,687.45 |
| Distributed Capital Gains | $0.00 | $0.00 |

## Portfolio Fund Values

| Fund Name | Market Value 08/01/2022 | Change in Account Value | Market Value 08/31/2022 |
|---|---|---|---|
| U.S. Govt Mmkt Fund - Capital | $30,000,000.00 | -$30,000,000.00 | $0.00 |
| **Total** | **$30,000,000.00** | **-$30,000,000.00** | **$0.00** |



JPM..*76100*.0948757004.35887.35887.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

**J.P. Morgan Institutional**
**Fund Service Center**
P.O. Box 219265
Kansas City, MO 64121-9265

# Monthly Statement

August 01, 2022 - August 31, 2022



# Transaction History

## U.S. Govt Mmkt Fund - Capital

**Fund Number** 3164
**Account Number** 5022869

The 7-day SEC yield on August 31, 2022 for the U.S. Govt Mmkt Fund - Capital Shares was 2.02%.

| Confirm Date | Trade Date | Transaction Description | Share Price | Shares this Transaction | Transaction Dollar Amount |
|---|---|---|---|---|---|
| | | **Beginning Balance** | **$1.00** | **30,000,000.000** | **$30,000,000.00** |
| 08/23 | 08/23 | SAME DAY WIRE REDEMPTION | $1.00 | -25,000,000.000 | -$25,000,000.00 |
| 08/31 | 08/31 | INCOME DIVIDEND CASH | $1.00 | 0.000 | $38,297.12 |
| 08/31 | 08/31 | SAME DAY WIRE REDEMPTION | $1.00 | -5,000,000.000 | -$5,000,000.00 |
| | | **Total Shares Owned as of 08/31/2022** | | **0.000** | |
| | | **Ending Balance as of 08/31/2022** | **$1.00** | | **$0.00** |

### Account Earnings Summary

| | |
|---|---|
| YTD Income Dividends | $877,687.45 |
| YTD Capital Gains | $0.00 |
| **Total YTD Earnings** | **$877,687.45** |

### Estimated Operating Expenses

Your investment in the Fund is subject to certain fees and expenses, as set forth in the Fund's prospectus in the table entitled "annual operating expenses." The operating expenses charged to your investment for the period is estimated to be $0.00. The amount was calculated by taking your last day's balance during the period, multiplying it by the Fund's annual operating expenses and dividing by twelve.



JPM..*76100*.0948757004.35888.35888.CNSJPMD1.....CM........GCP.......000025776

# How to Contact J.P. Morgan

**Regular Mail:**
J.P. Morgan Institutional Funds Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

**Overnight Mail:**
J.P. Morgan Institutional Funds Service Center
c/o DST Systems, Inc.
Suite 219265
430 W. 7th St
Kansas City, MO 64105-1407

**Website:**
www.jpmgloballiquidity.com

**Hours of Operation:**
Monday to Friday from
7:30 a.m. (EST) to 6:00 p.m. (EST)

**NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

***Contact J.P. Morgan Funds Distribution Services, Inc. at 1-800-766-7722 for a prospectus. You can also visit us at www.jpmorganfunds.com. Investors should carefully consider the investment objectives and risks as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.***

**Retail Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

**Institutional Money Markets Funds disclosure:**
You could lose money by investing in the Fund. Because the share price of the Fund will fluctuate, when you sell your shares they may be worth more or less than what you originally paid for them. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time. Any gain resulting from the sale or exchange of Fund shares will be taxable as long-term or short-term gain, depending upon how long you have held your shares.

**Government Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

J.P. Morgan Asset Management is the marketing name for the asset management businesses of JPMorgan Chase & Co. Those businesses include, but are not limited to, JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management Inc., Security Capital Research & Management Incorporated, J.P. Morgan Alternative Asset Management, Inc., and J.P. Morgan Asset Management (Canada), Inc.

J.P. Morgan Funds are distributed by JPMorgan Distribution Services, Inc., which is a subsidiary of JPMorgan Chase & Co. Affiliates of JPMorgan Chase & Co. receive fees for providing various services to the funds.



JPM..*76200*.0948757004.35889.35889.CNSJPMD1.....CM........GCP.......000025776

**IMPORTANT INFORMATION ABOUT ADVISORY FEES**

*Summary of Senior Officer Fee Evaluation Available on Website*. As part of the Banc One Investment Advisors Corporation's (subsequently known as JPMorgan Investment Advisors, Inc.) settlement with the New York Attorney General, your Fund has retained a Senior Officer to assist the Board of Trustees in reviewing and determining that management fees are reasonable. (JPMorgan Investment Advisors, Inc. transferred its business to J.P. Morgan Investment Management Inc. effective January 1, 2010.) Stephen M. Ungerman, who also serves as the Chief Compliance Officer for the J.P. Morgan Funds has served as the Fund's Senior Officer since 2005. The Senior Officer provided an independent fee evaluation to the Board at both the 2020 and 2021 August board meetings. The Board considered this information in connection with the 2020 and 2021 annual approval of the investment advisory contract. You can find the two most recent summaries of the Senior Officer's fee evaluation on our website www.jpmorganfunds.com by clicking on "Senior Officer Fee Summary."



JPM..*76310*.0948757004.35891.35891.CNSJPMD1.....CM........GCP.......000025776

Case 25-50261-BLS Doc 205-10 Filed 04/20/26 Page 143 of 149



JPM..*76310*.0948757004.35892.35892.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

**J.P. Morgan Institutional Fund Service Center**
P.O. Box 219265
Kansas City, MO 64121-9265

# Annual Statement

January 1, 2022 - December 31, 2022



BYJU'S ALPHA INC
3160 DE LA CRUZ BLVD STE 204
SANTA CLARA CA 95054-2408

## Account Details

**Account Owner** BYJU'S ALPHA INC

**Account Number** 5022869

**Dealer Information** JP MORGAN INSTITUTIONAL INVESTMENTS
GLOBAL LIQUIDITY- DE
500 STANTON CHRISTIANA RD # 3-3750
NEWARK DE 19713-2105

97500/100
GLOBAL LIQUIDITY

## Contact Us

**Investor Services** 1.800.766.7722

**Online Access** www.jpmgloballiquidity.com

**Email Address**
Liquidity.client.services.americas@jpmorgan.com

**JPMorgan Funds News**

Simplify your audit confirmation process. A balance audit confirmation can now be requested for Global Liquidity accounts through www.confirmation.com.

Call 1-800-766-7722 for a fund prospectus. You can also visit us online at www.jpmgloballiquidity.com. Investors should carefully consider the investment objectives and risk as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.

# Portfolio Overview

**Portfolio Value** as of 12/31/2022 **$0.00**

| | 12/01/2022 - 12/31/2022 | Year-to-Date |
|---|---|---|
| **Beginning Market Value** | **$0.00** | **$1,010,000,000.00** |
| + Purchases | $0.00 | $0.00 |
| + Reinvested Dividends | $0.00 | $0.00 |
| + Reinvested Capital Gains | $0.00 | $0.00 |
| - Redemptions | $0.00 | $1,010,000,000.00 |
| +/- Change in Investment Value | $0.00 | $0.00 |
| **Ending Market Value** | **$0.00** | **$0.00** |
| Distributed Dividends | $0.00 | $877,687.45 |
| Distributed Capital Gains | $0.00 | $0.00 |

## Portfolio Fund Values

| Fund Name | Market Value 12/01/2022 | Change in Account Value | Market Value 12/31/2022 |
|---|---|---|---|
| U.S. Govt Mmkt Fund - Capital | $0.00 | $0.00 | $0.00 |
| **Total** | **$0.00** | **$0.00** | **$0.00** |

**A3087**

JPM..*52100*.0032210004.45881.45881.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Annual Statement

January 1, 2022 - December 31, 2022



# Transaction History

## U.S. Govt Mmkt Fund - Capital

**Fund Number** 3164
**Account Number** 5022869

The 7-day SEC yield on December 31, 2022 for the U.S. Govt Mmkt Fund - Capital Shares was 4.19%.

| Confirm Date | Trade Date | Transaction Description | Share Price | Shares this Transaction | Transaction Dollar Amount |
|---|---|---|---|---|---|
| | | **Beginning Balance** | **$1.00** | **1,010,000,000.000** | **$1,010,000,000.00** |
| 01/31 | 01/31 | INCOME DIV CASH | $0.00 | 0.000 | $22,297.77 |
| 02/02 | 02/02 | SAME DAY WIRE REDEMPTION | $1.00 | -50,000,000.000 | -$50,000,000.00 |
| 02/15 | 02/15 | SAME DAY WIRE REDEMPTION | $1.00 | -100,000,000.000 | -$100,000,000.00 |
| 02/28 | 02/28 | INCOME DIV CASH | $0.00 | 0.000 | $18,181.00 |
| 03/24 | 03/24 | SAME DAY WIRE REDEMPTION | $1.00 | -100,000,000.000 | -$100,000,000.00 |
| 03/31 | 03/31 | INCOME DIV CASH | $0.00 | 0.000 | $88,643.94 |
| 04/22 | 04/22 | SAME DAY WIRE REDEMPTION | $1.00 | -60,000,000.000 | -$60,000,000.00 |
| 04/27 | 04/27 | SAME DAY WIRE REDEMPTION | $1.00 | -320,000,000.000 | -$320,000,000.00 |
| 04/29 | 04/29 | INCOME DIV CASH | $0.00 | 0.000 | $165,654.76 |
| 05/25 | 05/25 | SAME DAY WIRE REDEMPTION | $1.00 | -30,000,000.000 | -$30,000,000.00 |
| 05/27 | 05/27 | SAME DAY WIRE REDEMPTION | $1.00 | -50,000,000.000 | -$50,000,000.00 |
| 05/31 | 05/31 | INCOME DIV CASH | $0.00 | 0.000 | $210,012.53 |
| 06/23 | 06/23 | SAME DAY WIRE REDEMPTION | $1.00 | -50,000,000.000 | -$50,000,000.00 |
| 06/30 | 06/30 | INCOME DIV CASH | $0.00 | 0.000 | $242,700.25 |
| 07/07 | 07/07 | SAME DAY WIRE REDEMPTION | $1.00 | -200,000,000.000 | -$200,000,000.00 |
| 07/14 | 07/14 | SAME DAY WIRE REDEMPTION | $1.00 | -20,000,000.000 | -$20,000,000.00 |
| 07/29 | 07/29 | INCOME DIV CASH | $0.00 | 0.000 | $91,900.08 |
| 08/23 | 08/23 | SAME DAY WIRE REDEMPTION | $1.00 | -25,000,000.000 | -$25,000,000.00 |
| 08/31 | 08/31 | INCOME DIVIDEND CASH | $1.00 | 0.000 | $38,297.12 |
| 08/31 | 08/31 | SAME DAY WIRE REDEMPTION | $1.00 | -5,000,000.000 | -$5,000,000.00 |
| | | **Total Shares Owned as of 12/31/2022** | | **0.000** | |
| | | **Ending Balance as of 12/31/2022** | **$1.00** | | **$0.00** |

### Account Earnings Summary

| | |
|---|---|
| YTD Income Dividends | $877,687.45 |
| YTD Capital Gains | $0.00 |
| **Total YTD Earnings** | **$877,687.45** |

### Estimated Operating Expenses

Your investment in the Fund is subject to certain fees and expenses, as set forth in the Fund's prospectus in the table entitled "annual operating expenses." The operating expenses charged to your investment for the period is estimated to be $0.00. The amount was calculated by taking your last day's balance during the period, multiplying it by the Fund's annual operating expenses and dividing by twelve.



JPM..*52100*.0032210004.45882.45882.CNSJPMD1.....CM........GCP.......000025776

J.P.Morgan
Asset Management

J.P. Morgan Institutional
Fund Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

# Annual Statement

January 1, 2022 - December 31, 2022



**Annual Cumulative Expense Examples**

A Fund's annual return is reduced by its fees and expenses for that year. The examples below are intended to help you understand the annual and cumulative impact of the Fund's fees and expenses on your investment through a hypothetical investment of $10,000 held for the next 10 years. The examples assume the following
- On the date exactly one year before the first period end date below, you invest $10,000 in the Fund and you will hold the shares for the entire 10 year period;
- Your investment has a 5% return each year;
- The Fund's operating expenses remain at the levels discussed below and are not affected by increases or decreases in Fund assets over time;
- At the time of purchase, any applicable initial sales charges (loads) are deducted; and
- There is no sales charge (load) on reinvested dividends.
- The annual costs are calculated using the Net Expense Ratios for the period through the expiration of any fee waivers or expense reimbursement memorialized in a written contract between the Funds and JPMIM and/or its affiliates; and the Gross Expense Ratios thereafter.

"Gross Cumulative Return" shows what the cumulative return on your investment at the end of each 12 month period end date (year), shown below, would be if Fund expenses are not deducted. "Net Cumulative Return" shows what the cumulative return on your investment at the end of each year would be assuming Fund expenses are deducted each year in the amount shown under "Annual Costs."
"Net Annual Return" shows what effect the "Annual Costs" will have on the assumed 5% annual return for each year.

**Your actual costs may be higher or lower than those shown.**

**JPMorgan U.S. Government Money Market Fund**

| | Capital Shares | | | |
|---|---|---|---|---|
| Period Ended | Annual Costs | Gross Cumulative Return | Net Cumulative Return | Net Annual Return |
| June 30, 2023 | $ 18 | 5.00% | 4.82% | 4.82% |
| June 30, 2024 | $ 19 | 10.25% | 9.87% | 4.82% |
| June 30, 2025 | $ 20 | 15.76% | 15.17% | 4.82% |
| June 30, 2026 | $ 21 | 21.55% | 20.72% | 4.82% |
| June 30, 2027 | $ 22 | 27.63% | 26.54% | 4.82% |
| June 30, 2028 | $ 23 | 34.01% | 32.64% | 4.82% |
| June 30, 2029 | $ 24 | 40.71% | 39.03% | 4.82% |
| June 30, 2030 | $ 26 | 47.75% | 45.73% | 4.82% |
| June 30, 2031 | $ 27 | 55.13% | 52.76% | 4.82% |
| June 30, 2032 | $ 28 | 62.89% | 60.12% | 4.82% |



JPM..*52200*.0032210004.45883.45883.CNSJPMD1.....CM........GCP.......000025776

# How to Contact J.P. Morgan

**Regular Mail:**
J.P. Morgan Institutional Funds Service Center
P.O. Box 219265
Kansas City, MO 64121-9265

**Overnight Mail:**
J.P. Morgan Institutional Funds Service Center
c/o DST Systems, Inc.
Suite 219265
430 W. 7th St
Kansas City, MO 64105-1407

**Website:**
www.jpmgloballiquidity.com

**Hours of Operation:**
Monday to Friday from
7:30 a.m. (EST) to 6:00 p.m. (EST)

**NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

***Contact J.P. Morgan Funds Distribution Services, Inc. at 1-800-766-7722 for a prospectus. You can also visit us at www.jpmorganfunds.com. Investors should carefully consider the investment objectives and risks as well as charges and expenses of the mutual fund before investing. The prospectus contains this and other information about the mutual fund. Read the prospectus carefully before investing.***

**Retail Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

**Institutional Money Markets Funds disclosure:**
You could lose money by investing in the Fund. Because the share price of the Fund will fluctuate, when you sell your shares they may be worth more or less than what you originally paid for them. The Fund may impose a fee upon the sale of your shares or may temporarily suspend your ability to sell shares if the Fund's liquidity falls below required minimums because of market conditions or other factors. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time. Any gain resulting from the sale or exchange of Fund shares will be taxable as long-term or short-term gain, depending upon how long you have held your shares.

**Government Money Market Funds disclosure:**
You could lose money by investing in the Fund. Although the Fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. An investment in the Fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The Fund's sponsor has no legal obligation to provide financial support to the Fund, and you should not expect that the sponsor will provide financial support to the Fund at any time.

J.P. Morgan Asset Management is the marketing name for the asset management businesses of JPMorgan Chase & Co. Those businesses include, but are not limited to, JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management Inc., Security Capital Research & Management Incorporated, J.P. Morgan Alternative Asset Management, Inc., and J.P. Morgan Asset Management (Canada), Inc.

J.P. Morgan Funds are distributed by JPMorgan Distribution Services, Inc., which is a subsidiary of JPMorgan Chase & Co. Affiliates of JPMorgan Chase & Co. receive fees for providing various services to the funds.



JPM..*52200*.0032210004.45884.45884.CNSJPMD1.....CM........GCP.......000025776

**IMPORTANT INFORMATION ABOUT ADVISORY FEES**

*Summary of Senior Officer Fee Evaluation Available on Website*. As part of the Banc One Investment Advisors Corporation's (subsequently known as JPMorgan Investment Advisors, Inc.) settlement with the New York Attorney General, your Fund has retained a Senior Officer to assist the Board of Trustees in reviewing and determining that management fees are reasonable. (JPMorgan Investment Advisors, Inc. transferred its business to J.P. Morgan Investment Management Inc. effective January 1, 2010.) Stephen M. Ungerman, who also serves as the Chief Compliance Officer for the J.P. Morgan Funds has served as the Fund's Senior Officer since 2005. The Senior Officer provides an independent fee evaluation to the Board on an annual basis. You can find the two most recent summaries of the Senior Officer's fee evaluation on our website www.jpmorganfunds.com by clicking on "Senior Officer Fee Summary."



JPM..*52310*.0032210004.45885.45885.CNSJPMD1.....CM........GCP.......000025776