# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                            .  Chapter 11
                                 .  Case No. 24-11161 (BLS)
EPIC! CREATIONS, INC.,           .
*et al.,*                        .  (Jointly Administered)
                                 .
          Debtor.                .
. . . . . . . . . . . . . . . .  .
                                 .
CLAUDIA Z. SPRINGER,             .
CHAPTER 11 TRUSTEE,              .
                                 .
          Plaintiff,             .  Adv. Pro. No. 24-50233 (BLS)
                                 .
     v.                          .
                                 .
GOOGLE LLC, VOIZZIT              .
TECHNOLOGY PRIVATE LTD.,         .
VOIZZIT INFORMATION             .
TECHNOLOGY LLC, VINAY           .  Courtroom No. 1
RAVINDRA, RAJENDRAN             .  824 North Market Street
VELLAPALATH,                    .  Wilmington, Delaware 19801
                                 .
          Defendants.            .  Wednesday, January 29, 2025
. . . . . . . . . . . . . . . .  .  1:00 p.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE


(APPEARANCES CONTINUED)


Audio Operator:          Dana L. Moore, ECRO

Transcription Company:   Reliable
                         The Nemours Building
                         1007 N. Orange Street, Suite 110
                         Wilmington, Delaware 19801
                         Telephone: (302)654-8080
                         Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:

For the Trustee:             Joseph Barsalona, Esquire
PASHMAN STEIN WALDER HAYDEN, P.C.
824 North Market Street
Suite 800
Wilmington, Delaware 19801

Catherine Steege, Esquire
Melissa Root, Esquire
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654

For GLAS Trust
Company:               Ravi Shankar, Esquire
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654

For the Defendants:      Maureen Scorese, Esquire
CHUGH, LLP
295 Pierson Avenue
Suite 101
Edison, New Jersey 08837

INDEX

MOTIONS:                                                    PAGE

Agenda
Item 2: GLAS Trust Company LLC's Motion to               7
        Intervene [Adv. D.I. 65, filed
        01/24/2025]

        Court's Ruling:                                 17

Agenda
Item 1: Chapter 11 Trustee's Emergency                  22
        Motion to Hold the Voizzit
        Defendants in Contempt of Court for
        their Failure to Comply with the
        Court's November 19 Order [Adv. D.I.
        18, filed 11/26/2024]


WITNESSES CALLED
BY THE DEBTORS:                                          PAGE


    CLAUDIA SPRINGER

        Direct examination by Ms. Root              42

        Cross-examination by Ms. Scorese            49

        Redirect examination by Ms. Root            59

        Recross-examination by Ms. Scorese          62


    JACOB GRALL

        Direct examination by Ms. Root              63

        Cross-examination by Ms. Scorese            65

(Proceedings commenced at 1:06 p.m.)

THE COURTROOM OFFICER:  All rise.

THE COURT:  Please be seated.  Good afternoon.

MR. BARSALONA:  Good afternoon, Your Honor.  For the record Joe Barsalona from Pashman Stein Walder Hayden on behalf of the Trustee.

THE COURT:  Good to see you.  Welcome.

MR. BARSALONA:  Thank you, Your Honor.  So, we are going off of the second amended agenda, Docket No. 88.  And if we could, Your Honor, we would like to go in reverse order with the motion to shorten GLAS's request to intervene and proceed from there.

THE COURT:  Counsel, any objection?  Welcome, its good to see you.

MS. SCORESE:  So, we did meet and confer.  I would prefer to go in order because this has been scheduled but, again, we can agree to it.

THE COURT:  I appreciate your point but I think we will go in reverse order because if we conduct the hearing one of the first questions GLAS is going to say is can I get up, can my papers be heard and can I argue.  So, I think it would be appropriate to proceed first with that.  And I would note we are going to deal with the motion.  So, as for a motion to shorten time to have it heard today in connection with this, I am prepared to grant that motion just because

this is where we are.

As to the merits of the motion, that is a different question and I will take argument from the parties but I don't want any uncertainty about whether the Court will hear the motion now. I recognize that it was filed on shortened notice and expedited but from my lights, while I acknowledge the burden on counsel to oppose it in a shortened time, the application itself was certainly not a surprise. So, let's turn to the merits of the motion.

MR. BARSALONA:  Thank you, Your Honor.  I will turn the lectern over to GLAS's counsel.

THE COURT:  Mr. Shankar, welcome.  Good to see you.

MS. SCORESE:  Your Honor, if I may.  I would like to strike the reply to the extent that counsel wants to argue anything in reply.  A lot of the information that GLAS's counsel included in that reply was inappropriate information that really should have been in the opening brief but we could address in our responsive brief.  So, on that basis it seems prejudicial to my clients because we didn't have a fair opportunity to really address it in our response.

THE COURT:  Here is what I am going to do, rather then strike the reply I did not -- when I reviewed the reply, I did not necessarily anticipate that issue but I confess I would not necessarily have read it with that kind of prism.

What I would like to do, and this is a bit unorthodox, I assume that this is not an evidentiary discussion on your intervention motion, is that correct?

MR. SHANKAR:  Correct, Your Honor.

THE COURT:  You are not calling a witness?

MR. SHANKAR:  Correct, Your Honor.

THE COURT:  Okay, I am taking argument. It is not typical for the Court to permit an objection or response during an argument but I would be prepared to do that if you believe that Mr. Shankar is straying into areas that were raised exclusively in the reply as to which you are unfairly prejudiced. I think that is an easier way for me to deal with it then to simply strike the reply.

Additionally, having read the reply when it came in and then again this morning in preparation, there are parts of the reply that I think are clearly appropriate and parts that, as I think about it, may be new information that is not appropriate for a reply.  I think that is the easiest way to do it.  I am not prepared to strike the reply. I directed the filing of the reply, I understand the timeline upon which I  put it.  The replies came in late yesterday.  I am cognizant of the burden, frankly, on all parties of the scheduling of this matter but I did so deliberately.

So, I am going to ask counsel on both sides to play it a little bit differently.  Again, I have seen plenty

of lawyers object during other lawyers arguments, I have seen plenty of that and its generally not encouraged.  I would ask that you be mindful of the objection and if counsel has an issue then I would want to have that issue heard. I think that is probably the fairest way to deal with it but at this time I would not be prepared to strike the reply and I recognize that the filing time did not leave you an opportunity for either a motion in limine or a formal motion to strike.  That is where we will go.

Mr. Shankar.

MR. SHANKAR:  Thank you, Your Honor.  Your Honor, GLAS Trust Company, as the principle stakeholder of these debtors, move to intervene at Docket 65 and filed its reply brief, as the Court mentioned, at Docket 83.  Your Honor, we do not reflexively intervene in cases in these bankruptcies. We moved to intervene in the timeline we did with two specific considerations in mind.  We did so to participate in today's hearing, as the Court has recognized, and we did so because the sales process, which has been docketed and which is public, has kicked off in the context of these bankruptcy proceedings and we want to safeguard that process from Voizzit's disruption which has already set back the timelines of this case which the Court can recognize from the milestones in the initial DIP order to where we are today.

The Voizzit issues are important to GLAS and the

lenders and we request the opportunity to be heard on those issues.  We believe we can add value to the Court's consideration of the issues which has relevant factors that this Court can consider at a minimum with respect to its permissive authority to allow us to intervene.  And I say that, Your Honor, because if allowed the opportunity to argue, and we previewed some of this, Your Honor, in our reply introduction yesterday so as not to hide the ball with what our intentions are today, we believe that we can add value relative to the factual investigation that GLAS has conducted with respect to Voizzit's claims.  We also believe we can add perspective and value as the only party here today who has been here since the commencement of these involuntary cases back in June and who can juxtapose some of the conduct that this Court and Your Honor in particular has seen from the earlier happenings of this case versus today.

Your Honor, I even brought slides with me and I think Your Honor will like those slides that I have brought.

THE COURT:  I have said a Kirkland lawyer can't order appetizers without a PowerPoint.

(Laughter)

MR. SHANKAR:  This time, Your Honor, though I went the extra mile.  So, this has the extra elbow grease on the sides.

THE COURT:  Do you have a hard copy for me? I

think it was sent over but if you have got a hard copy handy that would be helpful.  I left it -- I think that was what was sent over earlier, is that correct?

MR. SHANKAR:  Correct, Your Honor.  I do have a hard copy and I have copies for all parties.

THE COURT:  Great.  Thank you.  Do you need privileges to share on the screen or I'm happy to work from the papers.

MR. SHANKAR:  I should say, Your Honor, those slides are for purposes of the substantive merits, not for purposes of the intervention.

THE COURT:  Okay.

MR. SHANKAR:  With the intervention I'm going to do something atypical for a Kirkland lawyer and just argue.

THE COURT:  Gutsy.

(Laughter)

MR. SHANKAR:  Your Honor, I began with our statutory right to intervene.  There are three independent bases to intervene.  The statutory right exists under Section 1109(b) as a party of interest.  Its memorialized in Third Circuit law including Marin Motor Oil.  We also believe we have a right to intervene under Federal Rule 24(a)(2) as well as permissively intervene under 24(b).  The Trustee, Your Honor, has no objection.

Now, what I think counsel has referenced with

respect to "new evidence" is the question of whether or not GLAS is a party in interest, whether or not GLAS is a creditor as that term is defined under 1109(b), as well as whether or not GLAS has standing alternatively as an indenture trustee on behalf of these loans.

I will make a legal point, Your Honor, and then I'll make a point that the Court can consider as a matter of judicial notice in which I don't even think should really be in dispute among anyone.  As a legal matter, a creditor doesn't necessarily need to have a non-contingent claim or even a non-disputed claim to be a creditor.  That comes from the definitions of creditor under 101 of the Bankruptcy Code. As a matter though, Your Honor, and this is an argument that we were rebutting that was the first time made within Voizzit's paper the question of is our claim contingent. It appeared to me that Voizzit's counsel was making an argument that was made against us in connection with the involuntary petitions.

THE COURT:  I recall.

MR. SHANKAR:  Your Honor, since that time not just the Delaware Court of Chancery but also the Delaware Supreme Court has ruled in our favor on the question of the occurrence of an event of default meaning that GLAS properly exercised remedies confirming a number of actions we have taken in this Court including what resulted in the filing of

BYJU's Alpha for its own bankruptcy, as well as the commencement of the involuntary petitions.  I don't think that the Court's taking notice of published opinions from the Delaware Supreme Court or the Court of Chancery would constitute impermissible evidence.

There are other points I made, Your Honor, but in respect to the Court's initial comments I will not make those points with respect to why our claims are not contingent in order to stray far away from the line of what may or may not be new facts introduced for purposes of this argument.  So, I will simply say that our claim is not contingent and that issue is also legally irrelevant.

Voizzit says that the Trustee can adequately represent our interest.  This is not a response to why we have a statutory right to intervene.  That stands on its own two feet.  This is an argument with respect to --

THE COURT:  Rule 24.

MR. SHANKAR:  -- Rule 24. So, this I the backup argument.  Your Honor, I will be the first one to thank Ms. Springer and her team for their robust efforts in the context of these cases.  So, I am not here to argue that there is a specific identifiable conflict in the context of today's hearing that puts us at loggerheads.  We have worked cooperatively with the Trustee to make sure that doesn't happen.

What I am here to say though is that we offer a perspective and we represent a constituent which is a slightly different perspective and I would say meaningfully different perspective then the Trustee.  Given GLAS's role as administrative agent across what is a morass of cases that span multiple different continents, there are issues, factual issues, that crisscross jurisdictions.  There's also a lot of fact development we have done, Your Honor, which is unique to GLAS and the efforts of GLAS and its advisors which I believe will help the Court get to the right decision in the context of the hearings today.

There is also a practical matter, Your Honor, which is, as in addition to a creditor and an indenture trustee, we are also under the final DIP order and we have consultation advisement rights with respect to the Trustee. So, being under the tent and being able to participate in discovery, especially here, I come to you, Your Honor not just as a bankruptcy attorney but as a litigator, being able to see the evidence, develop the evidence, and participate in the formulation of the evidence. When I get asked questions by GLAS and the lender group with respect to what recommendations I would make, having that firsthand knowledge is valuable.

The last point I will make, Your Honor, is about permissive intervention.  GLAS has worked and will continue

to work cooperatively with the Trustee to minimize burden among all parties.  I mentioned the point at the outset.  We did not reflexively intervene.  We identify when we feel that it is appropriate to intervene given the context and the evolvement of the cases, and in particular today that the sales process has kicked off.

All we have done over the course of the last week is we served joinder notices to depositions that did not occur. We have not sought to file separate briefs.  We have worked cooperatively with the Trustee and her counsel in order to minimize any burden. I am the last person here, Your Honor, who wants to make work for anyone.  That make work comes at the expense of my client constituency and we are not going to do that.

Voizzit spent the last week arguing at a thematic level that they would like the right to be heard, that these proceedings were moving too quickly, which undermined their right to be heard.  Your Honor, GLAS requests the right to be heard and for those reasons we would request the right to intervene.

THE COURT:  Very good.  Ms. Scorese.  Welcome, its good to see you in person. I want to make sure I am pronouncing your name correctly, Scorese.

MS. SCORESE:  Yes, Your Honor.

THE COURT:  Very well.  You may proceed.

MS. SCORESE:  Thank you, Your Honor.  Good afternoon.

So, I do want to take a few points to say that there were certainly no exigent circumstances for the shortening of time and it is a serial pattern in this case. Albeit you did rule on that, Your Honor, but it's a serial pattern that prejudices my clients, the Voizzit defendants.

THE COURT:  So noted.

MS. SCORESE:  So, Section 1109 provision for intervention here is permissive. It is not absolute.  So, I would like to point that out.  Again, I would like to go on the record that there was no basis --

THE COURT:  I mean its an interesting topic and I saw the parties submissions on it and I certainly dealt with Section 1109 but -- and I am familiar with Marin Oil, we don't necessarily need to debate it.  And this is kind of a softball or its an open door for you, but it's not intuitive to me that any creditor is entitled to intervene in an adversary proceeding. I am aware of what the case law says. I am certainly not breaking from it but just almost as a philosophical matter, an adversary proceeding is a standalone lawsuit with claims, complaints filed, etc., and the argument that, you know, any creditor that wants to be involved in a lawsuit between a debtor and its landlord is arguably not intuitive.

I understand the 1109 argument but it is -- I think the practical implications of it that we don't see play out very often.  You don't see people on a frolic and detour looking to jump into a lawsuit but I view these questions less under 1109 and I know that that is their lead argument but more under the intervention provision of the rules.

MS. SCORESE:  Thank you, Your Honor.

THE COURT:  Sure.

MS. SCORESE:  Maybe to follow up, in all honesty, the Trustee could simply call GLAS as a witness if, in fact, we did not GLAS to be present here to provide any evidence or testimony and including them as another intervenor in this particular scenario will just drive-up costs for everyone including the service of duplicative discovery which, in fact, did happen on Friday evening.  After I received the motion to intervene, I also got additional cross motions for deposition by GLAS.

So, to that point, Your Honor, the Trustee will swing into Rule 24 and the requirements there.  So -- well, prior to that GLAS's interests are adequately represented by the Trustee in this adversary proceeding.  They have been up until now from the commencement through last Friday the Trustee was handling this just fine. There was no need for the intervener.  So, that weighs against granting this motion.

Again, the facts that GLAS points to as in their reply brief is not a basis to bring them in.  Their basis, the Trustee can adequately protect in her role here as the plaintiff for the adversary proceeding.  We also want to say that the interest is just not -- as counsel said, he didn't go into -- there is no other interest here to worry about. We want to focus on the TRO in this proceeding.  We want to represent and state that Voizzit defendants want to work with the Trustee to resolve what the Trustee needs in this situation and quite honestly there is nothing that GLAS needs to comment on with respect to that.

The burden is on the applicant here and to overcome it they need to show adversity of interest, collusion, and non (indiscernible) party to suit.  And so GLAS's intervention appears really calculated to overwhelm the Voizzit defendants as a strategic litigation maneuver in this case where there were already litigation heavy deadlines in play.  It forces -- it forced -- it provided duplicative discovery that we had to review and assess over the weekend prior to this hearing while trying to get ready for the hearing.  It created conflicts between preparation requirements for the various proceedings that are here before you today.

So, we would prefer to not have artificial time pressure on dealing with this kind of last minute

intervention.  As I said, the prejudicial impact extends beyond the immediate procedural burdens. It prevents development of a complete factual record as well when we have to handle these types of motions.  And the tactical timing combined with the motion to shorten time and immediate discovery deadlines simply demonstrates a coordinated strategy to disadvantage the Voizzit defendants rather than a genuine need for participation in these proceedings.

So, the circumstances create the type of prejudice that courts have recognized as grounds for denying interventions and particularly when considered in view that the intervenors interests are already adequately protected by the Trustee in this adversary proceeding.  So, Your Honor, I would close with that unless you have additional questions. We do really feel that this would just drive up the cost and create duplicity where it's not necessary and hinder the ability of Voizzit defendants to work closely with the Trustee to try to resolve the outstanding bullet points of the TRO.

THE COURT:  I understand.

MS. SCORESE:  Thank you.

THE COURT:  Thank you.  I am going to grant the motion to intervene. I note that counsel observed the concerns with respect to the timing of the motion and motion to shorten time. I have ruled on that. I am cognizant of the

potential burden on parties but I think it is appropriate, first, to conduct today's hearing in order to have a full record on the motion, the substantive motions that are in front of me, and then to afford GLAS the opportunity to be heard today on their request to intervene and to protect their interest in this proceeding.

Counsel argued and briefed the issues under Section 1109 as a threshold matter and Rule 24.  I am going to duck the 1109 question. Its an interesting one to me and it may be the end of the inquiry but I think it's a little bit more nuance then that and I actually think that the record here developed today before me gives me more of a measure of comfort that I'm not making broad rulings or interpretations of the code where I can apply the rule under what I think are facts that permit intervention under either mandatory intervention or permissive.

In so ruling I have had the opportunity over, obviously, many months of dealing with this in conjunction with Judge Dorsey but, obviously, recently with a full focus on it, I am satisfied that GLAS actually has recognizable interests that need to be represented here today.  Their capacity as indenture trustee makes them, I believe, the largest stakeholder in these proceedings. I don't believe that issues or potential challenges to their claims in this case either as themselves or as indenture trustee provide a

predicate to deny their request for intervention.

I am satisfied that the request is not untimely. This litigation is hardly typical.  It was commenced by Judge Dorsey in December seeking content for failure to comply with various orders scheduled for early January. The matter was carried over to me just a few weeks ago and I would not presume to second guess the thought process of GLAS in determining whether and when to seek to intervene.

I also don't believe there is a material burden on the parties given the procedural steps that have gotten us to this hearing. I don't believe that permitting GLAS to intervene today will impose a significant burden.  We had a lengthy colloquy at our prior hearing scheduling today's hearing with respect to issues of discovery.  Ms. Steege actually raised the question of whether or not discovery could be demanded or heard. I think I responded that I wanted to fight about the merits.  This is a contested matter, there is an entitlement to discovery, etc., but I was not going to conflate the contempt issue that is in front of me today with discovery contempt sanctions.  That is not giving anyone a pass but I didn't want to, sort of, create the kind of piling on possibility that counsel observed.

So, obviously, the discovery that was issued and whether it was complied with or not will have consequences in the context of the substantive motion that is in front of me

but it's not going to be an independent basis for performance or not. I don't know if that helps the challenge or burden counsel observed over the weekend when receiving allegedly duplicative discovery requests but it is what it is.

So, there are a number of factors that case law has laid out very effectively by the parties in their submissions on this and I don't believe under the circumstances that its necessary to walk through the multi factor test that are laid out. I find as a threshold matter that GLAS has carried its burden under Rule 24(a). I do believe that they have a right to intervene as of right here. As to intervention permissibly, again, the primary concern is duplication, burden, and whether or not the interests of a stakeholder are adequately represented in the proceeding.

Case law teaches that courts are obliged to liberally construe intervention and part of the reason for that is because courts have the ability to manage the litigation itself to address the risk of duplication or burdensome piling on which, again, I have confidence that I would have the ability to address if need be.

So, when I look at it, I do think that GLAS has its own peculiar interests here as a very large stakeholder. The trustee has been appointed, she has fiduciary duties and obligations that may not necessarily square in all respects and circumstances with GLAS. And Mr. Shankar's comment at

the outset I thought was actually -- I think a valuable point, which is that this is an unusual case that started as -- or at least portions of this case started as an involuntary.  The trustee was not a party to any of those proceedings until she was appointed by the Office of the United States Trustee following the entry of my order.

And so the opportunity for GLAS to be a participant in this proceeding and to bring to the Court and to the other litigants the context with -- that it is familiar with is, frankly, valuable and weighs into the intervention analysis.

I would make one final comment.  Rule 24(c), as a general proposition, requires that a party that intervenes is obliged to file a complaint in intervention.  The Court can waive that, where circumstances warrant, and I would waive that here, primarily because I think the filing of a complaint in intervention would in fact probably impose a meaningful burden on the other side.  I believe that the issues are joined and raised, but requiring the defendant here to respond to a brand new complaint, deal with a summons and all of those steps, I don't believe is necessary or warranted, and, therefore, I would waive that requirement and obligation, but the motion to intervene is granted and that order will issue in due course.

That brings us to the balance of the calendar; is

that correct?

MS. STEEGE:  Yes, Your Honor.

THE COURT:  Ms. Steege, good afternoon.  It is good to see you.

MS. STEEGE:  Good to see you, Your Honor.

As a preliminary matter, at the start of the hearing, you raised discovery, and we do have one discovery issue we want to raise with you.

THE COURT:  Okay.

MS. STEEGE:  Mindful of the fact that you had indicated at last week's hearing that you didn't want to have contempt motions on contempt motions, and that you would deal with any failure to answer the discovery as appropriate in the hearing, we do think that there is one way where it would be very appropriate to address it at this hearing and that is with regard to the request for admissions that we issued.  We issued nine requests for admission, which were all directed at the issue of whether or not the Voizzit defendants have complied with the TRO, which we think is the key and central issue of this hearing.

The fact that we're asking you now today to deem their failure to answer those requests for admission as admissions should be no surprise to counsel or the parties because Rule 37(a)(3) specifically provides that if you don't answer a request for admission or provide an appropriate

objection to a request for admission, it's deemed admitted and it's deemed admitted conclusively, that matter, for purposes of the hearing and the proceeding in which it's admitted.

There are nine requests, and if Ms. Gambale can have the screen, she can pull them up so Your Honor can see them.

THE COURT:  Sure.

MS. STEEGE:  And I'll say, Your Honor, they're also -- these requests for admission are attached to the protective order motion that was filed at 75-1, it's page 12 of that document --

THE COURT:  Okay.

MS. STEEGE:  -- where they appear.

And so if you look at these requests for admission, each of them go to the specific things that we are saying are violative of the TRO.

Request number 1, ask them to admit that they have not returned the Apple funds to the trustee.  That's the 1.63 -- $1,063,752 that they took.  That's the violation of paragraph 5 of the TRO.  Admit that you have not dismissed the India lawsuit; that goes to paragraph 4, not exercising control over property of the estate.  Admit that you did not provide the trustee with the information required by paragraph 3 by November 22nd; that goes to the violation of

paragraph 3 of the TRO, so does paragraph 4, admit that you did not facilitate the transfer of the email extensions, projects, entity names, and other credentials as mandated by paragraph 3 of the TRO.

Paragraph 5 goes to -- paragraph 5 of the TRO, admit that you did not take any actions to return the source code repositories that were taken from the debtors' GitHub site, because paragraph 5 goes beyond the Google accounts, it says return everything you have taken from this estate, they did not do that.

Paragraph 6 of our requests to admit, admit that the EduNest website is designed and developed by Voizzit Information Technologies LLC.  That's the website that took the GitHub repositories.  It goes again to paragraph 5 of the TRO.

Admit that you never took any actions to return to the trustee the Playosmo.com domain transferred from Tangible Play's Cloudflare account.  That again goes to paragraph 5, they took that, did not return it.

Admit that you have not delivered to the trustee data relating to the amount of time customers spent viewing specific content within the applications for the time period that you controlled the Google accounts.  That goes to paragraph 5 of the TRO and is something that's quite important to the trustee because we're not going to be able

to figure out what we owe publishers for the fourth quarter and part of the third quarter because we don't have the data to know how many people looked at what content for what time period.

Paragraph 9 of the requests to admit, admit that you never complied with paragraph 5 of the TRO by transferring to the trustee the debtors' applications data, project funds, or any other information or property of the debtors.  It's a summary request for admission, it goes to paragraph 5.

THE COURT:  Ms. Steege, when were the RFAs propounded?

MS. STEEGE:  They were propounded the day after the hearing last week on Thursday.  And we asked for them to be answered by Monday when we had noticed up the deposition for Mr. Vellapalath and the two Voizzit entities.  We had a conversation with counsel on Friday evening at about 7:30 Central time, last Friday, to dismiss the discovery.  We had requested that of them.  The conversation was about the deposition and the fact that they did not intend to appear at the deposition, but they would confirm that over the weekend.  There was no discussion really about the written discovery other than that they were going to respond to it.

On Sunday -- and this is marked as an exhibit, 35, I believe it is -- Exhibit 35 is an email exchange about all

of these discovery conferences.  Sunday morning we were told by counsel that they would be serving responses to the written discovery, and then later, Sunday evening, we were told that they would not be doing that.  And they had on Saturday told us they weren't going to participate in any deposition.

So, basically, we got no answers to any discovery. What we did get and what I don't think cures any of the problems with the requests for admission is we got the motion for the protective order.  And that motion really isn't directed at the RFAs other than with respect to one sentence in that document, it's just a general complaint about the fact that discovery has been served, and that is not sufficient to satisfy Rule 36 and the objection requirements.

And there's a case I could point Your Honor to, Janko v. Fresh Market, and you can find it at 2015 WL 4714928, and at page 2 of that particular decision.  A party is arguing that general objections that they served to discovery satisfied the objection requirement of Rule 36 and that, therefore, you don't have to answer because you've given an objection, and the court says, "General objections to requests for admission that are not addressed as specific requests to admissions are insufficient."

In other words, they had to go through and they had to say why a particular admission wasn't appropriate

under the rule and under the scope of discovery allowed by Rule 26. And I would submit they couldn't have done that, Your Honor, because the scope of discovery under Rule 26(b) is anything that's relevant to the action and is proportional to the needs of the case. Here, the issue is did they or did they not do these things, did they comply with the TRO or did they not. That is the issue, that's the reason why we're here at a contempt hearing.

So it's obviously relevant, and doing it this way in a request for admission is obviously a proportional way to do it because it saves the Court time if they admit and, if they deny, they would have been required to explain why they were denying what it is they did. And they didn't do either of those things; instead, they just filed this protective order motion, which just generally says Your Honor shouldn't have allowed expedited discovery, so it seeks to reargue that, it talks about some mistakes that were made in the agenda of last week's hearing and in the witness -- in the exhibit list that was filed for last week's hearing where we apparently referred to Docket 18. Docket 18 is the motion for contempt, 14 is the TRO. And then they say that the definition confused them about the preliminary injunction.

I have to say on that, without sounding flip, Your Honor, my response is, really, how does that affect anything? If you look at the admissions, they all talk about the TRO,

and that clearly is identified as Docket 14.  So, while there was a typographical error there and that's a mistake, it wouldn't have confused anybody here.  And we're not in a case where there have been five or ten or 15 preliminary injunctions entered, there's been one.  The docket is not all that long and, if there was any confusion, they could have asked us and said what is this preliminary injunction.

Finally, Your Honor, with respect to the one request for admission that they did reference in their objection, it's request number 6, which asked them to admit that the EduNest website is designed and developed by Voizzit Information Technologies.  And they say that that's inappropriate because we're trying to get into the software development and business affairs of Voizzit.

I don't see how that request for admission gets into how they developed their software.  It doesn't ask and it doesn't seek affirmative information other than an admission, it doesn't ask for their finances or anything else, it just says this is something that's part of Voizzit. And in point of fact, if you go to that website, edunest.uae, you'll see it says at the bottom, developed by Voizzit LLC. So we just wanted that admitted so we didn't have to go through the proof that we went through at the November 21st hearing to show that that GitHub site where they took the GitHub materials is actually owned by them.

Finally, I'd say, Your Honor, that you did order them not only to respond, but to respond by the deadlines set forth in the discovery.  Had they asked us for an extra day, we would have said yes.  They didn't do that.  They never even had really a meet-and-confer over this.  We did have a meet-and-confer over the depositions where they told us they weren't going to produce Mr. Vellapalath for a deposition.

So with that, Your Honor, I think that it's appropriate to deem these requests for admission admitted. It will certainly streamline the hearing.  It's consistent with what Your Honor indicated last week, which is that, if they didn't answer, it may impact how the hearing is conducted.  We served requests for admission, expecting that they would respond and that it would streamline things, and they didn't answer and so now Your Honor should streamline things for them by deeming these admitted in accordance with the rules.

THE COURT:  Very good.  Ms. Scorese.

MS. SCORESE:  Thank you, Your Honor.

So I would like to back up a little bit, Your Honor, and let's start with the beginning.  So, at the outset, with respect to deeming the RFAs admitted, I guess I'm going to start back there, under Rule 47.

So, when filing a motion for a protective order, we would say that that would suspend the deadline to respond.

We took your deadline very seriously last week, but I do want to back up, again, that the discovery we received was for three depositions with subject matter that we had to review and analyze, as well as the RFAs to review, and it was served on the three parties.  So we had to consider those RFAs individually for those three parties, as well as interrogatories, as well as requests for documents.  And so to receive them at 4:14 in the afternoon on Thursday with a response deadline of 9:00 a.m. on Monday is somewhat of a Herculean task for anyone in any litigation.

And then on top of that, to look at the other motions that GLAS filed, two of them, to respond to, in addition to preparing the response for the order to show cause, and it is quite impossible to have the time to work with the client to get those answers so that they would be meaningful.

Furthermore, I did not know my client's schedule for this week or for last week when we had our hearing on Wednesday.  I found out on Friday that my client had to travel to India, and he's there until February 5th for a political rally, which he is leading, Your Honor.  So he is involved every day in a political rally and has a full agenda, and is not home easily accessible.

THE COURT:  Here's what we're going to do.  The primary purpose of requests for admission and in particular

Ms. Steege, as counsel for the trustee, is looking to streamline the proceedings that we're going to have today. The approach I'm going to do -- I'm going to take is going to kind of frustrate that goal, but I'm going to take the trustee's request that I deem them admitted under advisement, and I think we're going to move forward with the hearing today.

MS. SCORESE:  I do -- I'm sorry -- I do need to go on the record about the meet-and-confer, Your Honor, because it was not accurate, I would like to correct that.

THE COURT:  And I'm fine, I'm happy to have you make your record, but I want everybody to know what we're doing right now.

A couple things.  I think I need to hear from everybody about the relief that's being sought today substantively by the trustee.  Some of that is informed by what has happened in the months and weeks and days leading up to this hearing.  This is a contempt proceeding, so the performance or behavior of the proposed contemnor is material.  I'm not saying that the trustee's request to have these deemed admitted is the kind of piling on that I was worried about, but I think I would like to take the opportunity to develop the record, which I assume the parties are prepared to do today in the time that we have, because it would seem to me that if I were to deem these admitted, it

would not only streamline our hearing, it would be pretty close to ending it.  And that may be appropriate, but I think I actually need more of a record.

And I would make one observation that I think is consistent with counsel's concern about -- the deeming of requests for admission admitted is an issue that I have dealt with many times and I have actually written on it.  I stand by the schedule that I have imposed and I stand by the admonitions that I gave parties at our hearing leading up to today.  I heard you loud and clear requesting a substantially longer extension and I respectfully demurred.  It may be at the conclusion of our hearing that I do find that the record warrants deeming admitted the requests for admission, but I'd rather deal with that, frankly, on a more developed record than with counsel's argument.

So I think we will move forward with the hearing on the merits.  The Court is taking under advisement the request.  Yes, does that frustrate the purpose of streamlining the hearing?  I think that's correct, but it's a risk that I'm willing to take.

And, again, the issue about streamlining is often considered in the pretrial process, we are the trial today.  If you were weeks -- if we had a different scenario and we were weeks before, and Ms. Steege came in and said we propounded these months ago, every deadline has passed, deem

them admitted so we know that we don't need to bring 14 witnesses, we bring three, I have granted that request on many occasions.  Your point, we're moving very quickly, requests were filed, we've got a lot going on, the client has other obligations, clients can determine what their priorities are; that's a separate issue.

So I think that's where we'll leave the discovery issue, but, Counsel, I think you wanted to make an additional point before we move forward.

MS. SCORESE:  Yes, Your Honor, thank you, I do.

So, in the meet-and-confer, we did also talk about written discovery.  I did raise concerns with it being overly broad and burdensome in the way it was presented and almost harassing for my client.  If the most important were the RFAs, then let's streamline expedited discovery rather than serve everything under the sun and see what happens, Your Honor.

I truly believe that in this situation counsel could have done much better to enable us to provide the focused discovery that would have been more appropriate, clearly that would be the RFAs in this situation.

Secondly -- so we did have that meet-and-confer on Friday evening and I did raise that.  I did suggest Tuesday as a possibility for serving them.  I said Monday was very difficult with the response deadline and everything else.

And counsel responded with they're traveling that day and that wouldn't work and it would be useless.  So that was somewhat -- with both the deposition and with the written discovery, it would have been helpful to have that information.  But we did suggest Tuesday as a possibility for the discovery and to extend that deadline to Tuesday, Your Honor.

So, unfortunately, in this situation we do feel that there is severe prejudice to our clients.  I do understand you have a history, but I do want to go on the record that the clients, our understanding of this matter is that they want to comply and we want to -- I have drafts of all of the discovery, but I need that additional time to meet and talk with my clients.  Your Honor, this is not easy to jump into a case at this stage.  I'm sure you can appreciate it, as do --

THE COURT:  I do.

MS. SCORESE:  -- everyone else in this courtroom. And I do -- I repeatedly asked for the time to be able to sit with my client to go through that discovery, which would have taken more than a day, quite honestly, to be able to fully vet their responses and provide meaningful responses to that discovery.

So, Your Honor, this is not something -- and, for that reason, we felt that it would have been an injustice to

our client to put them in that situation, and then found that the motion for a protective order was the only way to get that relief since we offered to counsel, opposing counsel, to provide responses later, but we couldn't meet this deadline with so much.  And I think in that meet-and-confer, even in that timeline, if it was Sunday night, we did a follow-up, and then on Tuesday or Monday I did clarify, hey, we'll give you responses, but we just -- we can't do it on the 9:00 a.m. deadline, that that shows good faith, we want to work and provide this information, our clients are with us on this, but, unfortunately, it was too burdensome.  And it would have really helped the client if opposing counsel had said just give us the answer for the RFAs.  If we can focus in and pare down the burden of documents that we -- demands that we put on you, let's just get this so we can have that for the hearing, and that didn't happen, Your Honor.  I think that that would have been very helpful.

So you know my briefing, I don't want to take more of the Court's time, but my briefing does also express the concerns and the improper purpose in serving so much discovery on our clients.

So, thank you.

THE COURT:  Very good.

Ms. Steege.

MS. STEEGE:  Your Honor, and I don't want to

belabor the point, we understand Your Honor's ruling.  I will just say that Exhibit 35 does record what was discussed and the discussion about Tuesday was about the depositions, and we indicated that because we were going to have to travel to Delaware sometime Tuesday afternoon and we had our reply brief due on 24-hours notice, we really wanted to do the depositions on Monday, that Tuesday wasn't really an appropriate time.

I would also note, Your Honor, because I think it's being done for purposes of creating a record and it's creating a false impression, this notion that counsel has just come into this case.  We asked her specifically when she was retained, she was retained on December 30th; you'll see that in Exhibit 35, she tells us that.  That's three weeks before last week's hearing, four weeks before this hearing.

This record is not that complicated, it's not that hard, and I would just point that out because I think this constant discussion about how unfair the time frame is for counsel is really inappropriate and really ought to stop.

THE COURT:  All right.

MS. SCORESE:  May I respond to that, Your Honor --

THE COURT:  No --

MS. SCORESE:  -- very briefly?

THE COURT:  -- no, I've heard enough sparring.

Here's what we're going to do.  I think I've been

clear, I'm going to take -- there's been a request by the trustee to have certain requests for admission deemed admitted, I've taken that under advisement, but I believe we need to turn to the substance of the proceeding.

I think we should take just a five-minute break. We have figured out intervention, we have figured out whether or not -- the status of the discovery issue, and we'll take a five-minute break, we'll reconvene at 2 o'clock.

I have to be done at 5:00. I am hopeful that we are done by then; if not, then we're going to need to talk a little bit about scheduling. We'll take a break at counsel's pleasure at some point between the 2 o'clock and 5 o'clock time and if it looks like we're going to get done, then great, and, if not, then I would be guided by the parties about scheduling and mechanics.

Ms. Steege?

MS. STEEGE: Yes, Your Honor. I think one thing that could move things along, in light of the briefing that Your Honor has, is perhaps we dispense with any opening statements.

THE COURT: I do not need openings and --

MS. STEEGE: Right.

THE COURT: -- I was going to lead the hearing with that.

MS. STEEGE: Great.

THE COURT:  I do not need openings.  I have the parties' submissions, which were helpful, and I may ask for the benefit of closing arguments, but I believe that we should move to the substance of the proceedings.

So I want to give the parties five minutes to get themselves organized, and then we will reconvene for the substance of Agenda Item, I think it's Number 1.

We'll stand in recess.

(Recess taken at 1:54 p.m.)

(Proceedings resume at 2:04 p.m.)

THE COURT:  Please be seated.  Good to see you.

MS. ROOT:  Good afternoon, Your Honor.  Melissa Root, Chapter 11 Trustee.  Your Honor, given your directions before the recess, we are going to move into the Trustee's evidence.  We had a meeting this morning with counsel for the Voizzit Defendants counsel.  And with respect to Trustee's exhibits that are 1 through 37, I understand that there's no objection by the Voizzit counsel to those being admitted into evidence.

The one clarification I would make, Your Honor, is with respect to Exhibit 37, that's the India complaint.  The Trustee does not seek to have that admitted for the truth of the matter asserted.

THE COURT:  Just for that it's of record.

MS. ROOT:  And with respect to the December 3rd

transcript, Exhibit 14, the portions of that that are the statements of Mr. Vellapalath are also not being offered for the truth, but just for the record.

THE COURT:  So noted.  So those are admitted without opposition; is that correct?

MS. SCORESE:  Yes, Your Honor.

THE COURT:  Very good.  They're admitted, as I think counsel knows, I appreciate the engagement of counsel, and they're all admitted.  As a practical matter, though, the Court is not absorbing all of these documents.  I will be guided by counsel on the relevant information in your various exhibits.  And so we'll leave it at that.  But those documents are exhibit.  Are admitted.

Ms. Root, I do note that I have a binder of proposed exhibits from the Voizzit Defendants.  Has there been a discussion about those exhibits?

MS. ROOT:  There has been a discussion about those exhibits, Your Honor.  And the Trustee objects to the admissibility of the Voizzit exhibits.  They are newspaper articles and a complaint.  And the Trustee's objection is both to the relevance of those documents.  And they're also hearsay.

THE COURT:  Right.  I will deal with any objection to the omission of a document throughout the proceeding.  I don't think we're going to deal with sparring over that right

now.  If there's an attempt to introduce one of these documents and there's an objection, I will rule upon that objection.  Okay.

MS. ROOT:  All right.  Thank you.  Your Honor, with respect to witness testimony, the Trustee has filed three declarations for Ms. Springer, Mr. Grall.  And my declaration is on the record.  All of us are obviously here in the courtroom today.

Again, this morning, based on our conversations with Voizzit Defendants' counsel, we understand that they have no objection to the declarations going in as their direct testimony, subject, of course, to their right to --

THE COURT:  To the opportunity to cross.

MS. ROOT:  Yes.

THE COURT:  Very well.  Again, confirming those declarations can be admitted, and you'll have the opportunity to cross the declarants and witnesses.

MS. SCORESE:  Yes, Your Honor.

THE COURT:  Actually, I need you to make sure that you're closer to the microphone.  Just because it's a recording, so we need to make sure that we pick you up. Sorry about that.

MS. SCORESE:  Can you hear me now, Your Honor.

THE COURT:  I can.  I can hear you just fine. It's both the system and folks on Zoom can't necessarily pick

you up.

MS. SCORESE:  Understood.  Right.  So, Your Honor, I did look through those declarations.  I am concerned with some of the statements in those declarations not having support from evidentiary documents, but we'll do cross on some of those.

THE COURT:  That -- every word of the declaration is subject to the opportunity to cross examine, if you're okay with them being admitted as a substitute for adducing the direct testimony.  And I would give you, certainly, ample latitude in terms of cross examination.  Does that work for you?

MS. SCORESE:  Yes, Your Honor.

THE COURT:  Very well.  With that, then, the declarations, which are -- I want to make sure -- they're Ms. Steege.  They're you, Ms. Root, for the documents.  And the third one I have, the --

MS. ROOT:  The declarations are the declaration of Ms. Springer, which is at Docket No. 76.

THE COURT:  Oh, right.  Ms. Springer.

MS. ROOT:  The declaration of Mr. Jacob Grall, who's here in the courtroom at Docket No. 18-4.  These are all adversary dockets.  And then my declaration at Docket No. 77.

With respect, Your Honor, to Ms. Springer, as

often the case, in this case, things develop even after the declarations have been filed with the Court.  So I do have a short supplemental examination for Ms. Springer.  And the Trustee would call herself to the stand.

THE COURT:  I would permit that.  Ms. Springer. Good afternoon and welcome.

MS. SPRINGER:  Good afternoon, Your Honor.

THE COURT:  Please remain standing.  The court reporter will swear the witness.

THE CLERK:  Please raise your right hand.  Do you solemnly swear to tell the truth, the whole truth, and nothing but the truth, so help you God?

MS. SPRINGER:  I do.

THE COURT REPORTER:  Please state and spell your last name for the record.

MS. SPRINGER:  My name is Claudia Springer.  Last name is spelled S-P-R-I-N-G-E-R.

THE COURT:  Very good.  You may proceed.

DIRECT EXAMINATION

BY MS. ROOT:

Q     Good morning -- or good afternoon, Ms. Springer.

A     Good afternoon.

Q     Who is your employer?

A     Novo Advisors.

Q     And what does Novo Advisors do, Ms. Springer?

A       Novo advisors is a financial consulting and restructuring and bankruptcy advisory firm.

Q       What is your title at Novo Advisors?

A       I am a principal at Novo.

Q       Ms. Springer, what was your occupation before joining Novo Advisors?

A       So I was a bankruptcy and insolvency attorney for many years.  I was most recently, before Novo, at a firm called Reed Smith and for almost 20 years.  And before that, I was at Duane Morris for close to 18 years.

Q       Ms. Springer, are you familiar with the amended declaration of Claudia Z. Springer in support of an order of contempt against Defendants Voizzit Technology Private Limited, Voizzit Information Technology, LLC, Vinay Ravindra, and Rajendran Vellapalath, which was filed on January 27th at Adversary Docket No. 76 and I believe is Exhibit 1 in the book that's in front of you of exhibits?

A       I am familiar with that document.

Q       Did you sign your declaration under penalty of perjury, Ms. Springer?

A       I did.

Q       And as you sit here today, is your declaration true and correct to the best of your knowledge?

A       Yes, it is.

Q       Ms. Springer, if you could go to Exhibit 1, Trustee's

Exhibit 1, which is your declaration.  And I would direct your attention to page 10 and specifically to paragraph 16G. Let me know when you're there.

A      Yes, I am there.

Q      Ms. Springer, does this paragraph contain your testimony regarding the India lawsuit that the Voizzit Defendants commenced against you and certain other Defendants in India?

A      Yes, it does.

Q      Ms. Springer, were you, as Trustee, sued in that lawsuit?

A      Yes, I was.

Q      Do you, as Trustee, have counsel in India for that lawsuit?

A      Yes, I do.

Q      And do you direct your India counsel as Trustee?

A      Yes, I do.

Q      How is your India counsel paid?

A      From the estate.  From the Epic! estate.

Q      Have you filed a motion to retain that Indian counsel in this case?

A      Yes.

Q      And has that motion been approved?

A      Yes, it has.

Q      Ms. Springer, do you keep yourself informed and aware

of the developments in the India lawsuits?

A     Yes, we have weekly and sometimes more frequently calls with our India counsel.

Q     And Ms. Springer, since the time at which you signed this declaration, which was Eastern Time in the afternoon of January 27, 2025, have there been any developments in the India lawsuit?

A     Yes.  There was a hearing on Monday, I believe, of this week, at which time I understand from speaking with my India counsel, the Voizzit Plaintiffs were present, and there was nothing stated on the record by them regarding the order of this this court to discontinue that litigation.

Q     Ms. Springer, to your knowledge at that hearing that occurred on Monday, would there have been an opportunity for the Voizzit Defendants to ask the Indian court to dismiss their lawsuit?

A     Yes, there would have been.

Q     And did they do so?

A     No.

Q     Do you know when the next hearing is in the India case?

A     I believe it's on February 18th.

Q     And will you, as Trustee of the estates here, direct your Indian counsel to appear for you and represent you at those hearings?

A     Yes.

Q     And will you, as Trustee, direct your Indian counsel, to file whatever papers are necessary and make whatever arguments are necessary to oppose the relief the Voizzit Defendants seek in the Indian lawsuit?

A     Yes.

Q     And why is that important to you as the Chapter 11 Trustee?

A     Because it's an infringement on these estates.  It's causing tremendous amount of confusion among the -- in connection with the sale process that we are currently engaged in, and it's a violation of the automatic stay, and it should be discontinued.

Q     And every time, Ms. Springer, that you ask your India counsel to take action in the India lawsuit, will that result in extra legal expense and fees in this case?

A     Sure.

Q     Ms. Springer, switching topics for a moment, did Voizzit Information Technology, LLC, ever return to the estates the $1,063,752, the Apple funds of Apple funds to the Trustee?

A     No, they did not.

Q     Ms. Springer, did the Voizzit Defendants ever dismiss the India lawsuit?

A     No, they did not.

Q     Ms. Springer, did the Voizzit Defendants ever provide

the Trustee with the information mandated by paragraph 3 of the TRO by November 22, 2024?

A      No, they did not.

Q      Ms. Springer, did the Voizzit Defendants at any time facilitate the transfer of the email extensions, projects, entity names, or other credentials to the Trustee mandated by paragraph 3 of the TRO?

A      No, they did not.

Q      Ms. Springer, did the Voizzit Defendants ever take any actions to return to the Trustee the source code repositories transferred from the Debtor's GitHub accounts to the EduNest TP and EduNest TP accounts?

A      No, they did not.

Q      Ms. Springer, do you know whether the EduNest website is designed and developed by Voizzit Information Technology, LLC?

A      I don't know.  I don't have knowledge of that, no.

Q      Ms. Springer, did the Voizzit Defendants ever take any actions to return to the Trustee the playosmo.com domain that was transferred from Tangible Play's CloudFlare account?

A      No.

Q      Ms. Springer, did the Voizzit Defendants ever deliver to the Trustee data relating to the amount of time customers spent viewing specific content within the applications for the time period when they control the Google accounts?

A    No, they did not.

Q    And how, if it does, does their failure to do so harm the estates?

A    That harms the estates because we've been asked by many of the publishers about payments that they believe are due to them for certain parts of the fourth quarter of 2024 and parts of the third quarter of 2024.  Without that information, it's virtually impossible for us to have accurate knowledge of what those amounts should be.

Q    Ms. Springer, did Voizzit Information Technology, LLC, ever comply with paragraph 5 of the TRO by transferring to the Trustee the Debtor's applications, data, projects, funds, or any other information or property of the Debtor?

A    No.

Q    And does that cause harm to the estates?

A    Sure.  Because we have spent many, many hours going to other sources from which these applications derived in order to get some of that information, as much as we've been able to get back, and that has involved many, many hours of lawyers' time as well as persons at Novo Advisers, as well as other people who have done so, and they've charged the estate for their time.  So it's costing a lot of money.

Q    And Ms. Springer, in your declaration that's been admitted, does that contain the fees and expenses that the estates have incurred through the date on which your

declaration was filed?

A      The amended declaration?  Yes.

Q      And, Ms. Springer, if every day that this matter is not resolved, does that create additional expense and fees to the estate?

A      Yes, every day.  We have -- we're witness to it right now.  We have a courtroom full of attorneys and other professionals, and it's costing the estate thousands of dollars.  So, yes, the answer to that is, yes, it is continuing to cost the estate money.

Q      Thank you.

A      As long as this lasts.

Q      Thank you, Ms. Springer.

            MS. ROOT:  No further questions.

            THE COURT:  Before we turn to cross, the Court has permitted GLAS to intervene, and I would ask whether or not GLAS has any questions on direct for the witness, Mr. Shankar.

            MR. SHANKAR:  No, Your Honor.

            THE COURT:  Very good.  Ms. Scorese.

                        CROSS-EXAMINATION

BY MS. SCORESE:

Q      Good afternoon, Ms. Springer.

A      Good afternoon.

            THE COURT:  Ms. Scorese, similar -- this is

actually different.  I have learned over the years that I can hear you fine and a witness will be able to hear you fine. The mics, you need to pick one and stick with it.  Otherwise, it is an issue for the court reporter, but it is very much an issue that I've heard for folks that are on Zoom.  So you're welcome to take either the left or the right microphone and just try to use that one.  Okay.  If you're in the middle, it doesn't work.  I don't know why.  It's your tax dollar at work.

MS. SCORESE:  Okay.  Thank you.  Thank you very much.

BY MS. SCORESE:

Q     So, Ms. Springer, I wanted to start up back with the India lawsuit.  Did you know that the Voizzit Defendants offered last week to stay the case in view of your request for a dismissal?

A     No, I did not know that they offered to stay the case, but I know that they didn't dismiss the case.

Q     So did you know that that offer was declined by your counsel when we made it?

A     It should have been declined, but I didn't know at the time that it was declined because that's not what the Court ordered the Voizzit Defendants to do.  They ordered the Voizzit -- rather the Voizzit Plaintiffs in that case to dismiss the case, not to just stay it.

Q     If it were dismissed, would it have saved you on expenses on Monday for that court appearance?

A     It may have -- may have saved some money.  When did they offer to -- I don't even know that they -- I don't have knowledge of when they offered to stay the case, but I -- I would answer your question to say, no, it wouldn't have, because my lawyers were directed to appear at that hearing unless that hearing and the case was terminated.  And it was not.

Q     Well, isn't it true that when a case is stayed, the hearing would have been suspended?

A     Well, that doesn't matter whether it would have been suspended or not.  And I don't know that it would have been suspended.  The fact is that the Voizzit Plaintiffs in that case did not follow the order of this court by terminating that lawsuit, which is what they should have done.

Q     So just to be clear, you did not know that Voizzit Defendants offered to postpone that hearing to address -- to the Trustee.

          MS. ROOT:  Objection.

          THE COURT:  Hang on.  Those are two different things.  One was whether or not the case would be stayed, which was the premise of your first question.  And now what you've described is an agreement or an offer to adjourn the hearing, those are two different things.

I think I'd like a little bit of clarity and confirm whether or not Ms. Springer was informed of either an offer to adjourn or to stay the proceeding.  So I just want to make sure we're all talking about the same thing.  You may ask your question again.

BY MS. SCORESE:

Q      Did you know that the Voizzit Defendants offered to postpone the hearing?

A      I did not know that they offered to postpone the hearing.

Q      Getting back to the order you mentioned, was this a written order to dismiss the case against the Court?  Let me rephrase.  Was there a written order to the Voizzit Defendants to dismiss the India lawsuit?

A      The Court entered an order, a TRO, and in it there was language to the effect that the -- that the Voizzit persons/litigants should not take certain actions.  And that action in pursuing that case violates that order.

Q      But if you were to read the order, does it expressly state to not -- to dismiss the India lawsuit?

A      To me it does, because it covers a whole panoply of things.  And that's one of them.  And by the way, we were told by former counsel that that was going to be dismissed, and that never happened.

Q      So that gets back to communication.  Isn't that right,

Ms. Springer?

A    I don't know what you're talking about.

Q    Well, the former counsel was no longer representing the Voizzit Defendants sometime in the end of November, December 2024; isn't that right?

A    I don't know the exact date, frankly, when they stopped representing.  I believe they stopped representing the Voizzit parties after the hearing that preceded these hearing -- this hearing.  But I don't know the exact date that they stopped representing.  I think that's a matter of public record, though.

Q    So with these concerns, was there any effort by you to work with the Voizzit Defendants to have -- to have the case dismissed?

A    Sure.  We asked them to dismiss it.  The Court ordered them to dismiss it.  That's why we're here today.

Q    Did you --

A    Because they failed to do it.  Among other things.

Q    Did you speak with the Voizzit Defendants at any time?

A    Why would I have an opportunity to speak with the Voizzit Defendants?  No.  I spoke to their counsel.

Q    Did you speak with the Voizzit Defendants after they -- counsel withdrew?

A    My understanding was they were going to comply with the order, which they failed to do.  They then hired you at some

point.  So, no, I did not speak directly to the Voizzit Defendants.  The Voizzit Defendants should have complied with the order of this court, and they failed to do so.

Q     Thank you for the extra testimony.  However, let's stick to the questions.

MS. SCORESE:  I like to strike the testimony that is beyond the scope of the question.

THE COURT:  No, I'm not going to strike the testimony.  I will give you certainly, as I said, ample latitude on cross examination.  It got a little bit argumentative there momentarily, but I don't believe it rises to the level of striking.  You may proceed.

BY MS. SCORESE:

Q     During the time the Voizzit Defendants did not have counsel, did you try to reach out to them to discuss the require- -- the information that you needed?

A     I don't know what information you're talking about.

Q     During that time, did you -- during the time that they were unrepresented, did you reach out to the Voizzit Defendants to demand what you needed through the TRO for compliance with the TRO?

A     I believe counsel did.  I didn't.

Q     Do you have evidence to prove that the Voizzit Defendants initiated the bank transfer on the Apple account that you raise in your certification?

A    The transfer of the million-plus dollars?

Q    Yes.

A    Yes, there was evidence that that money was sent to one of the Voizzit entities.  That is what Apple told us.  And we saw it on documentation from Apple that it went to a Voizzit entity.  Also, Voizzit did not deny it.  In fact, I believe they admitted it, that they had the money, but they said they weren't returning it to us because they spent it.

Q    But do you have an actual evidence showing that someone from Voizzit went into the Apple account and initiated the transfer?

A    Yeah, we have evidence from Apple that they did.  I don't know what other evidence there would be.

THE COURT:  Ms. Root?

MS. ROOT:  Your Honor, I have two objections.  The first is relevance.  This is relitigating this.  Judge Dorsey found that they took the money.  We have the TRO.  Money's gone.  Judge Dorsey found and concluded that the Voizzit Defendants took it.  The Voizzit Defendants didn't appeal that or do anything.  That's the TRO.  That's the Apple stay ordered.  It was in November, when Voizzit was here, represented by counsel.

And on November 21st, when Mr. Vellapalath, who I believe is listening in today, was listening in on the 21st.  Judge Dorsey found they took -- they stole the Apple money.

These questions to Ms. Springer are entirely inappropriate.

We're here today because they haven't complied with the TRO and it's on civil contempt.  It's not whether Judge Dorsey was right or wrong.  He was right.  But they didn't do anything with respect to that order.  So these questions are completely out of bounds.

We're sitting -- we're trying to allow counsel to represent her case here, but this is just -- it crosses the line.

THE COURT:  Response?

MS. SCORESE:  So I'll move on Your Honor.  I'll withdraw --

THE COURT:  And the objection is sustained.  You may proceed.

MS. SCORESE:  Okay.

BY MS. SCORESE:

Q    Ms. Springer, do you know if Voizzit Defendants were authorized in India to make the decisions that they did on the Debtor's businesses?

A    You're asking me, do I -- I don't really understand your question.

Q    Well, do you know if Voizzit Defendants were authorized in India for any of the decisions that they made?

MS. SCORESE:  Objection.  Authorized by whom?  And how would Ms. Springer --

THE COURT:  Yeah, we need a more clarified -- we need a clearer question.  What decisions were made and whether or not they had either corporate authority, legal authority, personal authority.  I think I need a little bit of clarity on that before the witness can answer.

BY MS. SCORESE:

Q    All right, so with respect to the platforms, do you know -- and the work that Voizzit Defendants did by adding their name to the platforms that have been in evidence and discussed, do you know if Voizzit Defendants were authorized in India to make those decisions?

MS. SCORESE:  Objection.  Again, I can't understand the question.  It's in part because the Voizzit Defendants have taken so many platforms that you're going to have to be specific about which one in your question so Ms. Springer can answer.

THE COURT:  Yeah.  All right, hang on.  I want you to ask your question again because I -- there's a lot of activity that was the subject of discussion.  Your question is whether or not they were authorized.  But I'm not precisely certain what you're asking, so I'm going to ask you to rephrase the question, if you would.

BY MS. SCORESE:

Q    Okay.  Do you know if the Voizzit Defendants were authorized by the Debtors to do the work on the GitHub

account?

A      By the Debtors?

Q      By the management of the Debtors?

A      No, they were not authorized.

Q      Do you know.  Do you know if Voizzit Defendants were authorized prior to the TRO and prior to their knowledge of the bankruptcy, so prior to November 4th, let's say, do you know if the Voizzit Defendants were authorized to make changes to the Debtor's assets in India?  By management, let me say by management.

A      First of all, I don't agree with you, your question, that they only found out about the bankruptcy in November. That's the first thing I don't agree with.

Q      We understand.

A      Secondly, I don't know what they were told in India by whom, but whoever told them anything in India was not authorized to direct them to do anything regarding the Debtors.  I'm the only one who has that authority since I was appointed in September.  And I certainly never directed them to do anything having to do with the Debtors.

            MS. SCORESE:  No further questions, Your Honor.

            THE COURT:  Any redirect?

            MS. ROOT:  Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MS. ROOT:

Q     Ms. Springer, do you still have Exhibit 1 in front of you?

A     Yes, I do.

Q     Could I ask you to turn, please, to Exhibit D to Exhibit 1, which is also on the Trustee's exhibit list?

A     Yep.

Q     Ms. Springer, are you familiar with this document?

A     It looks like an email.  Am I looking at the right thing from --

          MS. ROOT:  If I could ask, Ms. Gambale, could you put up exhibit D, please, to the amended declaration of Claudia Springer?  Thank you.  D.  Thank you.

BY MS. ROOT:

Q     Ms. Springer, and while that's coming up, let's go back to page 11 of your declaration.

A     Okay.

Q     And I would direct your attention to the line that's that six lines down, beginning once those orders were entered, I directed my counsel in India to send the letter attached hereto as Exhibit D to the Voizzit Defendants' counsel in India, asking that their clients withdraw the lawsuit.  Do you see that?

A     Yes, I do.

Q     Okay.  And Ms. Gambale has put up what has been Exhibit D to your declaration.  Do you see that now?

A    Yes, I do.

Q    Ms. Springer, what is that?

A    That is an email from one of our lawyers in India to -- I'm not sure how to pronounce the name of the person of the recipient, so I need a little help there.

Q    Do you understand, Ms. Springer --

THE COURT:  I can read it, but I can't pronounce it.

BY MS. ROOT:

Q    -- that this was directed to Voizzit Defendants' counsel in India that was appearing for --

A    Yes, that's -- that's my understanding.

Q    Okay.  And Ms. Voizzit (sic), I know both you and the Court can read, but can you read for me the subject line of that email, please, or the subject line of the letter?

A    Withdrawal of subject commercial suit and request for service of all supporting documents.

Q    Okay.  In this letter, did your India counsel provide Voizzit Defendants' India counsel with the TRO and with the PI?

A    Yes, he attached it.

Q    And was he explicit in demanding that the India -- that the Voizzit defendants dismiss the India lawsuit?

A    Yes, he was.

Q    And this was sent --

MS. SCORESE:  Your Honor, I'm sorry, I would like to object that Ms. Springer is not copied on this email.  So --

THE COURT:  I'm sorry?

MS. SCORESE:  Ms. Springer is not copied on this email.  So it is not her email here.

THE COURT:  Lay a foundation.

BY MS. ROOT:

Q     Ms. Springer, did you direct your India counsel to prepare and send an email to Voizzit defendants' India counsel?

A     Yes.

Q     And did you review the text of that email that appears here on Exhibit D before it was sent?

A     Yes.

Q     And after your India counsel sent this email, did you, Ms. Springer, receive a copy of this email from your India counsel?

A     I believe I did, yes.

Q     And Ms. Springer, as the Trustee, I believe I already asked you this, but do you direct the actions of your India counsel?

A     Yes, I do.

THE COURT:  Is there a remaining objection following the foundation?

62

MS. SCORESE:  No.  No, Your Honor.

THE COURT:  Very well.

MS. ROOT:  Thank you, Ms. Springer.  I don't have any other questions for you.

MS. SCORESE:  I'd like to do a follow up.

THE COURT:  Of course.

MS. SCORESE:  If we could put that email back up, please.  Thank you.

THE COURT:  Of course.

RECROSS EXAMINATION

BY MS. SCORESE:

Q     Ms. Springer, if you could go down to paragraph number one and read that into the record, please.

A     Number one, meaning temporary restraining order?

Q     Yes.

A     Temporary restraining order dated 11 December 2024 against the Plaintiff, restraining it from continuing to prosecute the above-referred commercial suit.

Q     So with that language, was that -- do you -- does that mean to dismiss the case or to stay the case?

A     To dismiss the case.

Q     But does it say dismiss the case?

A     No, but two does.

Q     Okay, thank you.  No further questions.

A     You're welcome.

THE COURT:  Any redirect?  All right.

Ms. Springer, you may step down.

MS. SPRINGER:  Thank you, Your Honor.

THE COURT:  Ms. Root?

MS. ROOT:  Thank you, Your Honor.  Our next witness is Mr. Grall.  I had admitted or moved his declaration into evidence.  I do have a couple of questions for Mr. Grall, so I call him.

THE COURT:  Very good.  Welcome, sir.  Please remain standing.  We'll swear the witness.

THE COURT REPORTER:  Please raise your right hand.  Do you solemnly swear to tell the truth, the whole truth, and nothing but the truth, so help you God?

MR. GRALL:  Yes.

THE COURT REPORTER:  Please state your full name and your last name for the record, spell it.

MR. GRALL:  Jacob Grall, G-R-A-L-L.

THE COURT:  Very good.  Welcome.

DIRECT EXAMINATION

BY MS. ROOT:

Q    Good afternoon, Mr. Grall.

A    Good afternoon.

Q    Mr. Grall, who is your employer?

A    Novo Advisors.

Q    And Mr. Grall, do you have a role in this case?

A     Yes, I'm the lead financial advisor and operational advisor to Claudia Springer, the Trustee.

Q     And in that role, Mr. Grall, are you familiar with the Debtor's operations and business?

A     Yes.

Q     Mr. Grall, have you ever researched the EduNest site and who operates it?

A     Yes.

Q     And why did you do that?

A     Their name appeared on GitHub when GitHub reported who took the repositories after they left our account.

Q     And who did take those depositories after they left?

A     An entity called EduNest and EduNest Plus.

Q     And what did you do to research EduNest and EduNest plus?

A     I googled the terminology and found a website, EduNest.ae, which was designed and developed by Voizzit Information Technology.

Q     And how do you know, Mr. Grall, that EduNest was designed and developed by Voizzit Technology?

A     It's the footer of the website.

Q     No further questions.

          THE COURT:  I'm sorry?  It's the what of the website?

          MR. GRALL:  The footer.  If you scroll down, it

says --

THE COURT:  Thank you.

MR. GRALL:  -- copyright information.

BY MS. ROOT:

Q    So, Mr. Grall, just to make sure I am clear on this, if I were to go to that website and scroll to the bottom, if I were to go to the EduNest website and scroll to the bottom, what would I see there?

A    Designed and developed by Voizzit Information Technology, LLC.

Q    Thank you, Mr. Grall.  I don't have any other questions.

THE COURT:  Okay.  Mr. Shankar, any questions for Mr. Grohl?

MR. SHANKAR:  No, Your Honor.

THE COURT:  Very good.

Ms. Scorese?

MS. SCORESE:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. SCORESE:

Q    Good afternoon.

A    Good afternoon.

Q    So, just a few questions here.  If you could turn to your declaration, page 6.  Do you have a copy of it up there in one of the binders?

THE COURT:  Which tab of the binder?  I only have four.  If you've got an exhibit binder, I think you're at Exhibit 15.  Exhibit 15 is four pages long.  Are we talking about the same -- no, I'm sorry.  I'm looking at a deck from November.  Declaration from November.  I apologize for the interruption.  Which document are we looking for?

MS. SCORESE:  We're looking at Mr. Grall's declaration that was submitted in support of the motion for entry of the TRO.

THE COURT:  So this is -- I just want to make sure which document.  Is this the document dated the 26th of November, Docket No. 18?

MS. SCORESE:  It's hard to read the top, but let me check on the.  It might -- I believe it is.  Yes, it's the 18th.  No. 18th declaration.

THE COURT:  Mr. Grall, do you have that document, sir?  I think it's at -- if you've got your witness binder, it's at Tab 15.

MS. ROOT:  Your Honor, I think what the confusion here is, our Exhibit 15, the declaration we submitted, 18-4 is where it is in the adversary docket.  That's the declaration he submitted in support of the motion for contempt.  I think she's talking about the declaration he submitted when we got the TRO, and that, we didn't mark because we just didn't mark it.  But --

MS. SCORESE:  So -- all right.

THE COURT:  If you've got his declaration from the TRO motion, you're welcome to examine him on that.

MS. SCORESE:  Okay.

THE COURT:  Do we need a moment to get copies of that?

MS. SCORESE:  I think it would be better if I could have a minute.

MS. ROOT:  Your Honor, we don't have it here (inaudible).

THE COURT:  The easiest thing to do is -- you just email it to Ms. Bello or actually email it to Ms. Walker. She's at her desk right now.  And we'll come out with a half dozen copies.  How long is the document?

MS. SCORESE:  It's just eight pages.

THE COURT:  All right, we'll take a five minute break.  If you folks would be kind enough, you have Ms. Walker's contact information.  We'll be happy to make the copies, and we'll just keep moving forward.

Mr. Grall, I would remind you, you remain under oath, and you're not to discuss your testimony with any party during the break.  Five minutes.  We'll come back with the documents.  Thanks.

MS. SCORESE:  Thank you, Your Honor.

THE COURT:  Stand in recess.

(Off the record at 2:41 p.m.)

(On the record at 2:55 p.m.)

THE DEPUTY:  All rise.

THE COURT:  Please be seated.  Mr. Grall, I remind you, sir, you remain under oath.

MR. GRALL:  Yes, sir.

THE COURT:  Counsel ready to proceed?  You have your documents, right?

MS. SCORESE:  Yes, thank you.

THE COURT:  Great.  Happy to oblige.

MS. SCORESE:  Thanks so much for your -- thank you very much for your help.

THE COURT:  Sure.

MS. SCORESE:  All right.  And we did want to let you know that that document was attached to Docket No. 77 that was filed on Monday.

THE COURT:  Okay.

MS. SCORESE:  So we didn't (inaudible).  Thank you.

BY MS. SCORESE:

Q    So, Mr. Grall, do you have a technology background?

A    I do not.

Q    Okay.  All right, so if you could go to your declaration, do you have that in front of you?

A    Yes, I do.

Q      From November 18th, 2024.

A      Yes.

Q      Would you please go to page 6?

A      I'm there.

Q      You're there.  Okay.  Would you please read paragraph 17?

A      For example, on or around October 8th, 2024, upon obtaining access to Epic's account with Stripe, Inc., which collects and processes payments for orders placed through Epic's website, we discovered that Mr. Ravindra had changed the name of Epic's Stripe account to Voizzit Information Technology LLC on September 27th, 2024.

Q      Do you know if Mr. Ravindra was authorized by the managers to make that change?

        MS. ROOT:  Objection.  Relevance.

        THE COURT:  I'm sorry.

        MS. ROOT:  Objection.  I object to the relevance of the question.

        MS. SCORESE:  So, Your Honor, it is relevant. These are the facts that the Trustee continues to ask questions about in the discovery as well as demanding compliance of confirmation from our clients about all of these --

        THE COURT:  I think the objection is that Judge Dorsey has already ruled on this line of inquiry.  He may be

right, he may have been wrong, but it's built into the ruling.  It may be a subject for an appellate proceeding or otherwise.  But the point about whether this has happened or whether it was proper, I think Judge Dorsey has ruled on. Isn't that -- I want to confirm.  That's the nature of the objection.

MS. ROOT:  Yes, Your Honor.  I was giving counsel an opportunity to respond, but we've cited to Your Honor the case law on this, and the case law is clear.  We've got the Supreme Court's decision in Maggio v. Zeitz for this point. The contempt proceeding doesn't reopen reconsideration of the legal or factual basis for the order that was allegedly was disobeyed.  That's exactly what she's trying to do.  She's introducing or trying to seek testimony --

THE COURT:  All right.  So I want to know -- yeah, I'm going to allow counsel to respond.  So the question -- the witness has testified about conduct by Mr. Ravindra with respect to Stripe and Voizzit.  And your question was, do you know whether Mr. Ravindra was authorized to do this?

MS. SCORESE:  Correct, Your Honor, there's a number of RFAs that are in dispute here.  And this information is lying fully on assumptions of about acts done and pointing the finger to certain people who may very well have been authorized in India to be making those changes.

So perhaps there's somebody else that was the

moving force behind all of these acts which the Voizzit Defendants are being alleged of doing on their own and independently and surreptitiously.

THE COURT:  Ms. Root?

MS. ROOT:  Your Honor, the Voizzit Defendants aren't being alleged of having done these actions.  We had a hearing.  We had multiple hearings.  November 19th, November 21st.  The Voizzit Defendants were represented by counsel. Judge Dorsey found that they had violated the stay.  Judge Dorsey entered our TRO.  Then Judge Dorsey entered the preliminary injunction.  The RFAs don't go to those issues that are decided.  The RFA goes to the Voizzit Defendants' failure to comply with the TRO and with the PI, and today is about that contempt and the damages that Ms. Springer testified to.  None of this is relevant to what is before the Court today.

THE COURT:  I'm going to sustain the objection. You may proceed.

MS. SCORESE:  Okay.  I have no further questions, Your Honor.

THE COURT:  Any redirect?

MS. ROOT:  No, Your Honor.

MS. SCORESE:  Okay.

THE COURT:  Mr. Grall, thank you, sir.  You may step down.

MR. GRALL:  Yes, sir.

THE COURT:  Does the Trustee have any additional witnesses or testimony to educe?

MS. ROOT:  No, Your Honor.  We previously moved for admission of my declaration.  There's no follow-up examination.

THE COURT:  Very good.  Do the Defendants have witnesses or evidence to educe?

MS. SCORESE:  Your Honor --

THE COURT:  Ms. Scorese?

MS. SCORESE:  I did want to do a cross examination of Ms. Root.

THE COURT:  Okay.  Hang on.  Ms. Root's declaration.  I've got a lot of binders up here.  Where's the easiest place to find your declaration, Ms. Root?

MS. ROOT:  At Exhibit 16 in the binder.

THE COURT:  It is hardly typical to have litigation counsel called as a witness.  I know that we have admitted the declaration, which makes her susceptible to that.  I'd like an offer proof as to the areas of the inquiry.

MS. SCORESE:  So, Your Honor, I was going with the declaration that was provided in Document No. 77.  So it is not that (inaudible).

THE COURT:  Right.  Her declaration is Exhibit No.

77.

MS. SCORESE:  So I did want to just ask her about paragraph 10 (inaudible) and just about her knowledge on the technology and crashing of the website.

THE COURT:  Okay.  These are specific factual representations.  I would hear a response on whether Ms. Root should be called to testify here.

MS. ROOT:  Well, maybe I'll make the relevance objection and then the estate can make further objections, Your Honor, if I do give testimony, but this, I would make the same objection that I just made.  This goes to an event that occurred on November 18th.  There was a crashing of the website caused by the Voizzit Defendants.  We raised this issue with the Court on November 21st.  There was extended testimony about it on November 21st.  There were exhibits admitted into evidence on November 21st --

THE COURT:  I've now read paragraph 10.  I think I'd like clarity from counsel.  Again, I have no reluctance of putting Ms. Root on the stand, but I need to -- it is hardly typical, and I just need to make sure that it is warranted.

These are factual allegations in paragraph 10 of Docket No. 77 relating to actions, I think, well before the entry of the orders that were entered by Judge Dorsey leading to the contempt proceeding that is here.  So I would ask Ms.

74

Scorese whether or not this is subject to the same infirmity as the prior exchange of questions.

MS. SCORESE:  Your Honor, I would ask that it just be stricken if opposing counsel says it's not relevant.

THE COURT:  It's an interesting question.  Ms. Steege?

MS. STEEGE:  Your Honor, the reason why this paragraph is in Ms. Root's declaration, her declaration is basically just going through all the notices that were given to counsel and to the Defendants.

The second part of this talks about the fact that there was a conversation where Ms. Root indicated that we were going to be filing and have heard the next day, the TRO related to the theft of the Google accounts.  That's what this relates to, is that notice was given even before formal notice was given to counsel that we were going to go into court and get the TRO.  It just leads up to the fact that they had notice of the TRO.  That's all it does.

THE COURT:  Okay.  I am not prepared to strike this as part of her declaration.  I would typically permit examination of any witness who's offered this, but it's offered primarily to demonstrate, as counsel just observed, that there was a colloquy and a discussion regarding circumstances that were happening on Monday, November 18th.

And I would ask, again, for an offer of proof as

to how this relates to the request for an order of contempt for failure to comply with a temporary restraining order entered and a personal -- and a PI entered, you know, days or weeks later.

MS. SCORESE:  Your Honor, I'll withdraw the request.

THE COURT:  Very well.

MS. SCORESE:  Thank you.  I do not have any witnesses, Your Honor, but I do have some evidence that I would like to move --

THE COURT:  I think what we promised at the outset was that there were objections to those, and if there's an attempt to admit them, then we would deal with them at the appropriate time.  And it sounds like this is the appropriate time.

MS. SCORESE:  Yes, Your Honor.

THE COURT:  I have the exhibit binder.  It has a total of eight exhibits.  Do I have the correct document?

MS. SCORESE:  Yes, Your Honor, you do have the correct binder.  And what I'm looking for is.  I didn't want to get into an argument over the press releases.  I would like to just jump to Exhibits 6, 7, and 8.  I would like to request the Court that it take judicial notice of these documents.  They are publicly filed documents.

7 and 8 -- Exhibits 7 and 8 are both complaints

76

that were filed we count that were filed against Bill Hailer, on whom this Court has relied heavily for credibility purposes.  And I don't believe these complaints were previously before the Court.

And it is important for my clients to have this opportunity to present the complaints and take judicial notice because it's evidence of claims and allegations of fraud against Bill Hailer.  That does go to the gist of both all of the allegations that led into the TRO and the TRO itself and the underpinnings of it.

THE COURT:  I am not prepared to travel down that path.  I don't think that that would be appropriate.  And I will give you my reasons.  I start with, there was a proceeding that was conducted.  The witness testified, and I believe was subject to cross examination.  That occurred.  Orders were issued based upon that record.  And that testimony by Judge Dorsey.

It makes no difference whether it was heard in front of me or in front of Judge Dorsey.  I want to be clear about that.

The identification of additional information that might call into question a particular witness' capacity for truth, and I think that's what this is being presented on, this is not the format in which that would be raised.  That would be in the context of either a motion for

reconsideration or some form of an appeal based upon perhaps a deficient record.  But I don't believe that this is an inquiry that can be raised to avoid compliance with a form of order with an order entered by the Court.

I would note one further comment.  And again, I've just skimmed these documents, but I think the principle stands, but I believe it applies with even more force here. The documents that you've identified appear to be offered to demonstrate that Mr. Hailer has, perhaps, a tendency for wrongful conduct or untruthfulness.

To the extent that I would open a record to consider testimony, and I'm not certain that I would in a hearing such as this, that testimony would have to be Mr. Hailer doesn't just have a tendency.  He testified X in front of this court.  And that is affirmatively untrue as a result of, you know, this undisputed testimony or admissions in another proceeding.

Again, I don't know precisely how I would do that, and I would honestly want the opportunity to research that question.  But had you had the opportunity, the opportunity existed to cross examine Mr. Hailer, to present and confront him with this information, assuming it could have gotten into evidence or been used for cross examination, which is a much lower burden, and the opportunity was there to test his veracity and to provide that exchange in front of Judge

Dorsey.

That did not occur.  Orders were issued, and the proceeding today is with respect to the enforcement of those issues.  I am not of those orders.  I am not prepared to admit into evidence or pursue a challenge to the veracity of a witness whose testimony is included in a closed record.

MS. SCORESE:  Thank you, Your Honor.  I was hoping to get them in to help level the playing field for my clients and their veracity as well.  But I --

THE COURT:  Your client, I want to be clear, again, I'm not going to argue about it.  But your client, I believe, has been given repeated opportunities to come to this court and to advise either me or Judge Dorsey about what is happening here and what is appropriate and what is not appropriate.  And that opportunity has not been taken.

I understand there are issues with respect to travel and visas, but as I said at our last hearing, and as I believe Judge Dorsey observed, this proceeding has been pending for months.  And the Court certainly can't leave it open or otherwise hold off on administering the proceeding because a witness either does not wish or is not able to appear and testify.

So I am not prepared -- I understand your wish to level the playing field.  I make no comment on that.  But I am not prepared to admit into evidence at this proceeding

your proposed Exhibits 6, 7, and 8.

MS. SCORESE:  So I have nothing further, Your Honor.

THE COURT:  Very well.

MR. SHANKAR:  Your Honor, may I be heard on one housekeeping item?

THE COURT:  Sure.  Come on up to the microphones, please.  We want to make sure you're on the record.

MR. SHANKAR:  Your Honor, Ravi Shankar from Kirkland & Ellis on behalf of GLAS Trust Company.

In the vein of the evidentiary record, two days ago, counsel for Voizzit submitted an opposition to the order to show cause.  Exhibit 1 of that opposition at Docket 80 was two agreements that purported to be between GLAS Trust Company and William Hailer's firm, Rose Lake.

Those agreements were fabricated, Your Honor.  GLAS's signature on those agreements was forged.  I put that on the record at a December 3rd hearing.  I sent a letter to counsel yesterday laying out the forgery.  And we had a discussion with counsel this morning where it is my understanding that Voizzit will withdraw those two exhibits.  Sorry.  Those two exhibits to the opposition.

Those exhibits to the opposition are not being introduced into evidence today.  But the representation on the docket that there were agreements between GLAS that were

forged and it was a general counsel signature that was forged are extremely serious.

And so I felt compelled, Your Honor, to make those statements on the record such that there is no reliance given by anyone or no suggestion from anyone that GLAS somehow entered into an agreement to sell the term loans when that did not happen.

THE COURT:  So noted.

MS. SCORESE:  Thank you.  I did have that as part of my opening argument.  And with everything getting rearranged, I wanted to say that as well.  So full agreement and did not knowingly do that.

THE COURT:  Okay, thank you.  Here's what we're going to do.  We do not or the Court does not require closing arguments in connection with this matter.  I'm going to grant the Chapter 11 Trustee's motion to hold the Voizzit Defendants in contempt for failure to comply with this court's numerous orders.

And again, I note that we have moved today from a hearing that was originally scheduled last week.  The Court extended it briefly, obviously, albeit not to the extent requested by the adjournment request by counsel for the Defendants.  But we pushed it out better than a week to get to today's hearing.

But I believe that the relief requested in the

Chapter 11 Trustee's emergency motion is appropriate and warranted and will issue today. And I will give you my reasons. Again, I'm not going to burden the record with extensive factual findings. As a practical matter, there's been a bit of conflation between the allegations that led to the temporary restraining order and the preliminary injunction and the request for enforcement.

And the allegations that led to the temporary restraining order and the preliminary injunction, as with many circumstances in this case, are unusual or even extraordinary, but they're really not in front of me today. Orders have been issued as to which compliance is required. Those orders are not stayed. They are not appealed or reversed. And yet the record is undisputed that there has been substantial noncompliance with those orders.

I note that the submissions which the parties provided to the Court were certainly helpful in preparation for the hearing. But much of the Defendants opposition goes to whether or not Judge Dorsey's orders and whether or not the record developed in those proceedings was sufficient or appropriate to warrant the relief that he had provided. That's not an inquiry that this court is obliged to make.

And again, I want to be abundantly clear. There is no issue or no consideration given to the fact that the earlier proceedings were heard by Judge Dorsey and I am

hearing these proceedings.  It is a fact of life that judges move in and out of cases as scheduling requires.  I am, in my own estimation, certainly fully up to speed with respect to the extensive factual record in these proceedings.

So this is not a question of this court reducing or limiting the record and the proceedings today because of a perceived handicapped due to Judge Dorsey's handling of the prior proceedings.  He has entered his orders on appropriate and sufficient records.  Those orders need to be complied with, and they have not been complied with.

We go next to an issue of whether or not notice has been appropriate and sufficient for the entry of contempt orders.  And I am satisfied here that it is not a close call that notice has been provided.  There have been many, many hearings, many, many opportunities to be heard.  The record and the exhibits that have been admitted, particularly the Debtor's exhibits -- I'm sorry, the Trustee's exhibits -- reflect extensive communication with the Defendants when they were represented by counsel, when they were not represented, and now again, when they are represented by counsel.

There is only so much that a Trustee or a litigant can do to show patience when they have obtained relief from the Court and they demand compliance with that relief.  And I believe that the Trustee here has done everything possible to ensure that the notice of proceedings, the opportunity to

engage, and the opportunity to appear and be heard has been adequately and sufficiently provided in order to allow the Court to exercise its jurisdiction to enter the relief that's provided.

So, based upon the record before me, again, I have seen contempt motions over the almost two decades that I have been on the bench.  This case and related proceedings in these matters are not unique, but they are certainly rare in my experience.  But I believe that the extraordinary relief of contempt is appropriate and warranted here.

Case law teaches that there are substantial guardrails and requirements that are imposed on a party seeking an order of contempt.  And I am satisfied, again, without recapping all of the case law which was capably presented to the Court through all of the submissions, I am certainly satisfied that the applicable case law governing the imposition of contempt sanctions has been met here, and I'm prepared to enter the order.

I would also enter an order, as requested by the Trustee, imposing a fine or a sanction of $25,000 a day until there is compliance with the Court's order.  I would ask that that order be uploaded promptly and it will issue.  That order, I don't believe it carries the same sort of timing or significance of a temporary restraining order, but I would note that my order is effective immediately, and it is the

29th of January at 3:18 p.m. Eastern Time.  And the order of contempt will issue, I assume, immediately.

I would ask, if there are any questions.

MS. ROOT:  Your Honor, are you allowing the fees that we incurred?

THE COURT:  I am.  I would ask for the bill of costs to be attached to the proposed form of order.  If that's not convenient, then it can be submitted subsequent under a notice of filing.  I think that's probably where you're going to go because you would need to include today's hearing.

MS. ROOT:  Yes, Your Honor.

THE COURT:  Okay, then you can file it separately, but the Court will order the fees requested.  Are there any other questions?

MS. ROOT:  No, Your Honor.

THE COURT:  Any questions, Ms. Scorese?

MS. SCORESE:  Yes, Your Honor, I did want to request that we make note that this is just relating to the TRO and not the preliminary injunction.  There's been some cross reference to that, and this motion is specifically on the TRO and for damages.  We haven't had any specific information on it, other than what's in the cert.  So we were going to ask for that to be delayed as far as the damages to review that information, but I understand you've already made

85

your decision.

THE COURT:  Well, the damages are the fees, and the fees are what they are.  There'll be a notice of filing, and there will be an opportunity to respond to that.  And I want to be clear about that.  That's not an unusual feature of a request for an award of fees.  An award of fees is certainly warranted here.  It'll be filed under a notice of submission.  But it is true that I believe there needs to be an opportunity to respond to that.

But the record, again, here is clear so that there's not any uncertainty.  There has been significant work and effort expended in connection with essentially vindicating the order and rulings by Judge Dorsey.  And so the fees will be awarded.  If there's an issue with respect to the amounts, then we will have some summary proceeding about that.  But the award is granted.

MS. ROOT:  Thank you, Your Honor.

THE COURT:  Are there any other questions?

MS. ROOT:  No, Your Honor.

THE COURT:  All right, I will look for that order to be submitted under certification.  With that, we stand in recess.  Thank you.

(Proceedings concluded at 3:20 p.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling                    January 30, 2025

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable

/s/ Tracey J. Williams                    January 30, 2025

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable

/s/ Wendy K. Sawyer                       January 30, 2025

Wendy K. Sawyer, CDLT

Certified Court Transcriptionist

For Reliable