# EXHIBIT 1

DATED 06/27/2022

**(1) BYJUS INVESTMENTS PTE LTD.**
as Borrower

**(2) REVERE MASTER SPV LLC, SERIES VII (BYJU)**
as Lender

# UP TO $400 MILLION USD FACILITY AGREEMENT

**CONTENTS**

**Clause** **Page**

1. DEFINITIONS AND INTERPRETATION ....1
2. THE FACILITY ....8
3. PURPOSE ....8
4. CONDITIONS OF UTILISATION ....8
5. UTILISATION ....9
6. REPAYMENT ....9
7. PREPAYMENT AND CANCELLATION ....10
8. INTEREST ....11
9. TAX GROSS UP AND INDEMNITIES ....12
10. INCREASED COSTS ....14
11. OTHER INDEMNITIES ....15
12. MITIGATION BY THE LENDER ....17
13. COSTS AND EXPENSES ....17
14. REPRESENTATIONS ....18
15. INFORMATION UNDERTAKINGS ....22
16. GENERAL UNDERTAKINGS ....24
17. EVENTS OF DEFAULT ....26
18. CHANGES TO THE LENDER ....30
19. CHANGES TO THE BORROWER ....30
20. PAYMENT MECHANICS ....30
21. SET-OFF ....31
22. NOTICES ....32
23. CALCULATIONS AND CERTIFICATES ....33
24. PARTIAL INVALIDITY ....33
25. REMEDIES, WAIVERS AND HARDSHIP ....34
26. AMENDMENTS AND WAIVERS ....34
27. CONFIDENTIALITY ....34
28. COUNTERPARTS ....36
29. ARRANGER ....36
30. GOVERNING LAW ....38
31. ENFORCEMENT ....38

SCHEDULE 1 CONDITIONS PRECEDENT ....39
SCHEDULE 2 UTILISATION REQUEST ....40

**THIS AGREEMENT** is _____________ 2022 and is made between:

(1) **Byjus Investments Pte Ltd.,** a company incorporated and registered in Singapore, with registered number 202216074E, and whose registered office is at 30 Cecil Street, |19-08 Prudential tower, Singapore 049712, Singapore (the "**Borrower**"); and

(2) **Revere Master SPV LLC, Series VII (Byju)**, a company incorporated in Delaware, United States of America (the "**Lender**").

**IT IS AGREED** as follows:

## SECTION 1

## INTERPRETATION

### 1. DEFINITIONS AND INTERPRETATION

### 1.1 Definitions

In this Agreement:

"**Accounting Principles**" means generally accepted accounting principles in Singapore, including the "Accounting Standards" as defined in the Companies Act.

"**Affiliate**" means, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person, or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Availability Period**" means the period from and including the date of this Agreement to and including the date falling [2] Months thereafter.

"**Available Commitment**" means the Lender's Commitment minus:

(a) any outstanding Loans under the Facility; and

(b) in relation to any proposed Utilisation, any other Utilisations under that Facility that are due to be made on or before the proposed Utilisation Date.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in Singapore and Switzerland and on which banks in those jurisdictions are able to transfer Dollars.

"**Change of Control**" means any person or group of persons acting in concert gains direct or indirect control of the Borrower. For the purposes of this definition:

(a) "**control**" of the Borrower means:

(i) the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to:

(A) cast, or control the casting of, more than one-half of the maximum number of votes that might be cast at a general meeting of the Borrower;

(B) appoint or remove all, or the majority, of the directors or other equivalent officers of the Borrower; or

(C) give directions with respect to the operating and financial policies of the Borrower with which the directors or other equivalent officers of the Borrower are obliged to comply; or

(ii) the holding beneficially of more than 50% of the issued share capital of the Borrower (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital);

and

(b) "**acting in concert**" means, a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively co-operate, through the acquisition or ownership directly or indirectly by any of them of shares in the Borrower or otherwise, either directly or indirectly, to obtain or consolidate control of the Borrower.

"**Charged Property**" means all of the assets of the Borrower which from time to time are, or are expressed to be, the subject of the Transaction Security.

"**Commitment**" means up to $400 Million USD, which shall be lent to Borrower in two or more parts, with the first tranche being $250 Million USD.

"**Companies Act**" means the Companies Act, Chapter 50 of Singapore.

"**Confidential Information**" means all information relating to the Borrower, the Finance Documents or the Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party, the Finance Documents or the Facility from any of its advisers in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(a) is or becomes public information other than as a direct or indirect result of any breach by a Finance Party of Clause 27.1 (*Confidential Information*); or

(b) is identified in writing at the time of delivery as non-confidential by the Borrower or any of its advisers; or

(c) is known by a Finance Party before the date the information is disclosed to it in accordance with the above or is lawfully obtained by a Finance Party after that date, from a source which is, as far as a Finance Party is aware, unconnected with the Borrower and which, in either case, as far as a Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

"**Confidentiality Undertaking**" means a confidentiality undertaking substantially in a recommended form of the LMA or in any other form agreed between the Borrower and the Lender.

"**Constitutional Documents**" means, in respect of any person, the memorandum and articles of that person, or any similar constitutional documents in its jurisdiction of incorporation.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 17 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

"**Delegate**" means any delegate, agent, attorney or co-trustee appointed by the Lender.

"**Event of Default**" means any event or circumstance specified as such in Clause 17 (*Events of Default*).

"**Facility**" means the term credit facility made available under this Agreement as described in Clause 2.1 (*The Facility*).

"**Final Repayment Date**" means date falling on the third anniversary of the first Utilisation Date.

"**Finance Document**" means this Agreement, each Transaction Security Document, any Utilisation Request, and any other document designated as a "Finance Document" by the Lender and the Borrower.

"**Finance Lease**" means any lease or hire purchase contract which would, in accordance with the Accounting Principles, be treated as a finance or capital lease.

"**Finance Party**" means the Arranger or the Lender.

"**Financial Indebtedness**" means any indebtedness for or in respect of:

(a) moneys borrowed;

(b) any amount raised by acceptance under any acceptance credit or bill discounting facility (or dematerialised equivalent);

(c) any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d) the amount of any liability in respect of Finance Leases;

(e) receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f) any amount raised under any other transaction (including any forward sale or purchase agreement) of a type not referred to in any other paragraph of this definition having the commercial effect of a borrowing;

(g) any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that derivative transaction, that amount) shall be taken into account);

(h) any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(i) the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (a) to (h) above.

"**Interest Period**" means, in relation to a Loan or any Unpaid Sum, each period determined in accordance with clause 8 (*Interest*).

"**Ipso Facto Event**" means the Borrower is the subject of:

(a) any proceedings as described in section 440 of the Insolvency, Restructuring and Dissolution Act 2018 of Singapore; or

(b) any process which under any law with a similar purpose may give rise to a stay on, or prevention of, the exercise of contractual rights.

"**Loan**" means each loan made or to be made under the Facility or the principal amount outstanding for the time being of that loan.

"**Material Adverse Effect**" means a material adverse effect on:

(a) the business, operations, assets, prospects or financial condition of the Borrower; or

(b) the ability of the Borrower to perform or comply with any of its obligations under any Finance Document; or

(c) the validity or enforceability of, or the effectiveness or ranking of any Security granted or purporting to be granted pursuant to any of, the Finance Documents or the rights or remedies of a Finance Party under any of the Finance Documents.

"**Month**" means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a) if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day; and

(b) if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month.

The above rules will only apply to the last Month of any period.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of Treasury.

"**Party**" means a party to this Agreement.

"**Receiver**" means a receiver or receiver and manager or administrative receiver of the whole or any part of the Charged Property.

"**Repeating Representations**" means each of the representations set out in Clause 14.

"**Representative**" means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian.

"**Restricted Party**" means a person that is, or is owned or controlled by a person, or acting (directly or indirectly) on behalf of a person, that is:

(a) listed on any Sanctions List or otherwise the target of any Sanctions; or

(b) located, organized, incorporated or resident in a country or territory which is, or whose government is, subject to Sanctions.

"**Sanctions**" means any trade, economic or financial sanctions laws, regulations, embargoes or restrictive measures administered, imposed, enacted or enforced by a Sanctions Authority.

"**Sanctions Authority**" means:

(a) the Security Council of the United Nations;

(b) the United States;

(c) the European Union (or any present or future member state thereof);

(d) the United Kingdom;

(e) any country or territory in which the Borrower operates or is located or incorporated; and

(f) the governments and official institutions, authorities or agencies of any of paragraphs (a) through (e) above, including, but not limited to, OFAC, the United States Department of State or Commerce and Her Majesty's Treasury.

"**Sanctions List**" means:

(a) the Specially Designated Nationals and Blocked Persons List, Sectoral Sanctions Identifications List and List of Foreign Sanctions Evaders Sanctioned Pursuant to Executive Order 13608 maintained by OFAC;

(b) "The Consolidated List of Financial Sanctions Targets" maintained by Her Majesty's Treasury; and

(c) any similar list maintained by, or public announcement of a Sanctions designation made by, a Sanctions Authority (without limitation to the generality of the foregoing, such lists as are maintained by (i) the European Union, (ii) the United Nations Security Council Committee or (iii) the United States Department of State),

each as amended, supplemented or substituted from time to time.

"**Secured Parties**" means each Finance Party and any Receiver or Delegate.

"**Security**" means a mortgage, charge, pledge, lien, hypothecation, assignment or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Shares**" means Equity shares*, issued by Think and Learn India Pvt Ltd* .

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Transaction Security**" means the Security created or expressed to be created in favour of the Secured Parties pursuant to the Transaction Security Documents.

"**Transaction Security Documents**" means each of:

(a) the Singapore law security over the shares of BYJU's Investments Pte Ltd granted in favour of the Secured Parties by the Borrower dated on or about the date of this Agreement; and

(b) any other document creating or expressed to create any Security over all or any part of its assets in respect of the obligations of the Borrower under any of the Finance Documents.

"**Unpaid Sum**" means any sum due and payable but unpaid by the Borrower under the Finance Documents.

"**Utilisation**" means a utilisation of the Facility.

"**Utilisation Date**" means the date of a Utilisation, being the date on which the relevant Loan is to be made.

"**Utilisation Request**" means a notice substantially in the relevant form set out in Schedule 2 (*Utilisation Request*).

"**VAT**" means:

(a) any value added tax imposed by the Value Added Tax Act 1994;

(b) any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(c) any other tax of a similar nature, whether imposed in Singapore, Switzerland, the United Kingdom or in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

1.2 **Construction**

(a) Unless a contrary indication appears, a reference in this Agreement to:

(i) the "**Arranger**", any "**Finance Party**", "**Lender**", any "**Party**", any "**Secured Party**", or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Finance Documents;

(ii) a document in "**agreed form**" is a document which is previously agreed in writing by or on behalf of the Borrower and the Lender;

(iii) "**assets**" includes present and future properties, revenues and rights of every description;

(iv) a "**Finance Document**" or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, novated, supplemented, extended or restated;

(v) "**guarantee**" means any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person

where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(vi) the words "**including**" and "**in particular**" shall be construed as being by way of illustration or emphasis only and shall not be construed as, nor shall they take effect as, limiting the generality of any preceding words;

(vii) "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(viii) a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality);

(ix) a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(x) a provision of law is a reference to that provision as amended or re-enacted; and

(xi) a time of day is a reference to London time.

(b) Section, Clause and Schedule headings are for ease of reference only.

(c) Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(d) A Default (other than an Event of Default) is "**continuing**" if it has not been remedied or waived and an Event of Default is "**continuing**" if it has not been waived.

1.3 **Currency symbols and definitions**

"**$**", "**USD**" or "**Dollars**" means the lawful currency of the United States of America.

1.4 **Third party rights**

(a) Unless expressly provided to the contrary in a Finance Document a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Agreement.

(b) Notwithstanding any term of any Finance Document, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

**SECTION 2**

**THE FACILITY**

## 2. THE FACILITY

### 2.1 The Facility

Subject to the terms of this Agreement, the Lender shall make available to the Borrower a dollar term loan facility in an amount equal to the Commitment.

## 3. PURPOSE

### 3.1 Purpose

The Borrower shall apply all amounts borrowed by it under the Facility towards the purchase of the Shares.

### 3.2 Monitoring

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

## 4. CONDITIONS OF UTILISATION

### 4.1 Initial conditions precedent

The Borrower may not deliver a Utilisation Request unless the Lender has received all of the documents and other evidence listed in Schedule 1 (*Conditions Precedent*) in form and substance satisfactory to the Lender. The Lender shall notify the Borrower promptly upon being so satisfied.

### 4.2 Further conditions precedent

Subject to Clause 4.1 (*Initial conditions precedent*), the Lender will only be obliged to comply with Clause 5 (*Utilisation*) if on the date of the Utilisation Request and on the proposed Utilisation Date:

(a) no Default is continuing or would result from the proposed Loan; and

(b) the Repeating Representations to be made by the Borrower are true in all material respects.

### 4.3 Maximum number of Loans

The Borrower may not deliver a Utilisation Request if as a result of the proposed Utilisation 2 or more Loans would be outstanding.

## SECTION 3

## UTILISATION

### 5. UTILISATION

**5.1 Delivery of a Utilisation Request**

The Borrower may utilise the Facility by delivery to the Lender of a duly completed Utilisation Request not later than 12:00 p.m One Business Day before the proposed Utilisation Date (unless otherwise agreed in writing by the Lender).

**5.2 Completion of a Utilisation Request**

(a) Each Utilisation Request is irrevocable and will not be regarded as having been duly completed unless:

(i) the proposed Utilisation Date is a Business Day within the Availability Period; and

(ii) the currency and amount of the Utilisation comply with Clause 5.3 (*Currency and amount*).

(b) Only one Loan may be requested in each Utilisation Request.

**5.3 Currency and amount**

(a) The currency specified in a Utilisation Request must be Dollars.

(b) The amount of the proposed Loan must be an amount which is not more than the Available Commitment and which is a minimum of $250 million USD or, if less, the Available Commitment.

**5.4 Lender's participation**

If the conditions set out in this Agreement have been met, the Lender shall make the relevant Loan available to the Borrower by payment of such amounts to the account specified in the Utilisation Request by the Utilisation Date.

**5.5 Cancellation of Commitment**

The Commitment which, at that time, is unutilised shall be immediately cancelled at the end of the Availability Period.

## SECTION 4

## REPAYMENT, PREPAYMENT AND CANCELLATION

### 6. REPAYMENT

**6.1 Repayment of Loans**

The Borrower shall repay each Loan by paying to the Lender the aggregate amount of that Loan outstanding on the Final Repayment Date.

## 7. PREPAYMENT AND CANCELLATION

### 7.1 Illegality

If, at any time, it is or becomes unlawful in any applicable jurisdiction for the Lender to perform any of its obligations as contemplated by this Agreement or to fund, issue or maintain a Loan or it becomes unlawful for any Affiliate of the Lender to do so:

(a) the Lender shall promptly notify the Borrower upon becoming aware of that event;

(b) the Available Commitment will be immediately cancelled; and

(c) the Borrower shall repay that Loan on the date specified by the Lender in the notice delivered to the Borrower (being no earlier than the last day of any applicable grace period permitted by law) and the Commitment shall be cancelled.

### 7.2 Change of Control

Upon the occurrence of:

(a) a Change of Control; or

(b) the sale of all or substantially all of the assets of the Borrower whether in a single transaction or a series of related transactions,

(i) the Borrower shall promptly notify the Lender upon becoming aware of that event;

(ii) the Lender shall not be obliged to fund a Utilisation;

(iii) if the Lender so requires and notifies the Borrower by not less than three days' notice, the Lender may, cancel the Commitment and declare the outstanding Loan, together with accrued interest, and all other amounts accrued under the Finance Documents immediately due and payable, whereupon the Commitment will be cancelled and all such outstanding amounts will become immediately due and payable.

### 7.3 Voluntary prepayment of Loans

(a) The Borrower may, if it gives the Lender not less than 10 Business Days' notice (or such shorter period as the Lender may agree) prior notice, prepay the whole or any part of any Loan (but, if in part, being an amount that reduces the amount of the Loan by a minimum amount of $10,000,000.

(b) A Loan may only be prepaid after the last day of the Availability Period (or, if earlier, the day on which the Available Commitment is zero).

### 7.4 Restrictions

(a) Any notice of cancellation, prepayment, authorisation or other election given under Clause 7 (*Prepayment and cancellation*) shall (subject to the terms of that Clause) be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

(b) The Borrower may not reborrow any part of the Facility which is prepaid.

(c) Unless a contrary indication appears in this Agreement, any part of the Facility which is prepaid or repaid may be reborrowed in accordance with the terms of this Agreement provided that notwithstanding any term of this Agreement, any part of the Facility may only be re-borrowed on an uncommitted basis, with the consent of the Lender in its sole unfettered discretion.

(d) The Borrower shall not repay or prepay all or any part of any Loans or cancel all or any part of the Commitment except at the times and in the manner expressly provided for in this Agreement.

(e) No amount of the Commitment cancelled under this Agreement may be subsequently reinstated.

**SECTION 5**

**COSTS OF UTILISATION**

## 8. INTEREST

### 8.1 Calculation of interest

The rate of interest on each Loan for each Interest Period shall be 9 per cent. per annum**.**

### 8.2 Payment of interest

The Borrower shall pay accrued interest on each Loan on the last day of each Interest Period for that Loan.

### 8.3 Duration of Interest Periods

(a) The duration of each Interest Period shall be compounded annually and payable at the Final Repayment Date.

(b) An Interest Period for a Loan shall not extend beyond the Final Repayment Date.

(c) Each Interest Period for a Loan shall start on the Utilisation Date or (if the relevant Loan has already been made) on the last day of its preceding Interest Period.

(d) If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

### 8.4 Default Interest

(a) If the Borrower fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the Unpaid Sum from the due date up to the date of actual payment (both before and after judgment) at a rate which is 2 per cent per annum higher than the rate which would have been payable if the Unpaid Sum had, during the period of non-payment, constituted a Loan in the currency of the Unpaid Sum for successive Interest Periods. Any interest accruing under this Clause 8.4 shall be immediately payable by the Borrower on demand by the Lender.

(b) If any Unpaid Sum consists of all or part of a Loan which became due on a day which was not the last day of an Interest Period relating to that Loan:

(i) the first Interest Period for that Unpaid Sum shall have a duration equal to the unexpired portion of the current Interest Period relating to that Loan; and

(ii) the rate of interest applying to the Unpaid Sum during that first Interest Period shall be 2 per cent. per annum higher than the rate which would have applied if the Unpaid Sum had not become due.

(c) Default interest (if unpaid) arising on an Unpaid Sum will be compounded with the overdue amount monthly but will remain immediately due and payable.

## SECTION 6

## ADDITIONAL PAYMENT OBLIGATIONS

### 9. TAX GROSS UP AND INDEMNITIES

### 9.1 Definitions

(a) In this Clause 9:

"**Indirect Tax**" means any goods and services tax, consumption tax, VAT or any tax of a similar nature.

"**Tax Credit**" means a credit against, relief or remission for, or repayment of any Tax.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Finance Document.

"**Tax Payment**" means an increased payment made by the Borrower to a Finance Party under Clause 9.2 (*Tax gross-up*) or a payment under Clause 9.3 (*Tax indemnity*).

(b) Unless a contrary indication appears, in this Clause 9 a reference to "**determines**" or "**determined**" means a determination made in the absolute discretion of the person making the determination (acting reasonably and in good faith).

### 9.2 Tax gross-up

(a) All payments to be made by the Borrower to any Finance Party under the Finance Documents shall be made free and clear of and without any Tax Deduction unless the Borrower is required to make a Tax Deduction, in which case the sum payable by the Borrower (in respect of which such Tax Deduction is required to be made) shall be increased to the extent necessary to ensure that such Finance Party receives a sum net of any deduction or withholding equal to the sum which it would have received had no such Tax Deduction been made or required to be made.

(a) The Borrower shall promptly upon becoming aware that the Borrower must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Finance Parties accordingly. Similarly, a Finance Party shall notify the Borrower on becoming so aware in respect of a payment payable to the Finance Party.

(b) If the Borrower is required to make a Tax Deduction, the Borrower shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(c) Within thirty days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Borrower making that Tax Deduction shall deliver to the Finance Parties evidence reasonably satisfactory to the Finance Parties that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

9.3 **Tax indemnity**

(a) Without prejudice to Clause 9.2 (*Tax gross-up*), if any Finance Party is required to make any payment of or on account of Tax on or in relation to any sum received or receivable under the Finance Documents (including any sum deemed for the purposes of Tax to be received or receivable by such Finance Party whether or not actually received or receivable) or if any liability in respect of any such payment is asserted, imposed, levied or assessed against any Finance Party, the Borrower shall, within three Business Days of demand of the applicable Finance Party, promptly indemnify the Finance Party which suffers a loss or liability as a result against such payment or liability, together with any interest, penalties, costs and expenses payable or incurred in connection therewith, **provided that** this Clause 9.3 shall not apply to:

(i) any Tax imposed on and calculated by reference to the net income actually received or receivable by such Finance Party (but, for the avoidance of doubt, not including any sum deemed for the purposes of Tax to be received or receivable by such Finance Party but not actually receivable) by the jurisdiction in which such Finance Party is incorporated; or

(ii) any Tax imposed on and calculated by reference to the net income of such Finance Party actually received or receivable by such Finance Party (but, for the avoidance of doubt, not including any sum deemed for the purposes of Tax to be received or receivable by such Finance Party but not actually receivable) by the jurisdiction in which Finance Party is located.

(b) A Finance Party intending to make a claim under paragraph (a) above shall notify the Borrower of the event giving rise to the claim.

9.4 **Tax credit**

If the Borrower makes a Tax Payment and the relevant Finance Party determines that:

(a) a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

(b) that Finance Party has obtained and utilised that Tax Credit,

the Finance Party shall pay an amount to the Borrower which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Borrower.

9.5 **Stamp taxes**

The Borrower shall:

(a) pay all stamp duty, registration and other similar Taxes payable in respect of any Finance Document; and

(b) within three Business Days of demand, indemnify each Finance Party against any cost, loss or liability that Finance Party incurs in relation to any stamp duty, registration or other similar Taxes paid or payable in respect of any Finance Document.

9.6 **Indirect tax**

(a) All amounts set out or expressed in a Finance Document to be payable by any Party to a Finance Party shall be deemed to be exclusive of any Indirect Tax. If any Indirect Tax is chargeable on any supply made by any Finance Party to any Party in connection with a Finance Document, that Party shall pay to the Finance Party (in addition to and at the same time as paying the consideration for that supply) an amount equal to the amount of the Indirect Tax.

(b) Where a Finance Document requires any Party to reimburse or indemnify a Finance Party for any costs or expenses, that Party shall also at the same time pay and indemnify the Finance Party against all Indirect Tax incurred by that Finance Party in respect of the costs or expenses to the extent that the Finance Party reasonably determines that it is not entitled to credit or repayment in respect of the Indirect Tax.

10. **INCREASED COSTS**

10.1 **Increased costs**

(a) Subject to Clause 10.3 (*Exceptions*), the Borrower shall, within three Business Days of a demand by a Finance Party, pay for the account of the Finance Party the amount of any Increased Costs incurred by the Finance Party or any of its Affiliates as a result of (i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation or (ii) compliance with any law or regulation made after the date of this Agreement. The terms "law" and "regulation" in this paragraph (a) shall include any law or regulation concerning capital adequacy, prudential limits, liquidity, reserve assets or Tax.

(b) In this Agreement:

"**Increased Costs**" means:

(i) a reduction in the rate of return from the Facility or on the Finance Party's (or its Affiliate's) overall capital (including as a result of any reduction in the rate of return on capital brought about by more capital being required to be allocated by such Finance Party);

(ii) an additional or increased cost; or

(iii) a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to the undertaking, funding or performance by such Finance Party of any of its obligations under any Finance Document or any participation of such Finance Party in any Loan or Unpaid Sum.

10.2 **Increased cost claims**

(a) If a Finance Party intends to make a claim pursuant to Clause 10.1 (*Increased costs*), the Finance Party shall notify the Borrower of the event giving rise to the claim.

(b) The Finance Party shall, as soon as practicable after a demand by the Borrower, provide a certificate giving reasonable details of the circumstances giving rise to such claim.

10.3 **Exceptions**

(a) Clause 10.1 (*Increased costs*) does not apply to the extent any Increased Cost is:

(i) attributable to a Tax Deduction required by law to be made by the Borrower;

(ii) compensated for by Clause 9.3 (*Tax indemnity*) (or would have been compensated for under Clause 9.3 (*Tax indemnity*) but was not so compensated solely because any of the exclusions in paragraph (b) of Clause 9.3 (*Tax indemnity*) applied); or

(iii) attributable to the wilful breach by the Finance Party or its Affiliates of any law or regulation.

(b) In this Clause 10.3, a reference to a "**Tax Deduction**" has the same meaning given to the term in Clause 9.1 (*Definitions*).

11. **OTHER INDEMNITIES**

11.1 **Currency indemnity**

(a) If any sum due from the Borrower under the Finance Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

(i) making or filing a claim or proof against the Borrower; or

(ii) obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

the Borrower shall as an independent obligation, within three Business Days of demand, indemnify the Secured Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b) The Borrower waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

11.2 **Other indemnities**

(a) The Borrower shall within three Business Days of demand, indemnify the Secured Parties against any cost, loss or liability incurred by it as a result of:

(i) the occurrence of any Event of Default;

(ii) its failure by to pay any amount due under a Finance Document on its due date;

(iii) funding, or making arrangements to fund, any Loan requested by the Borrower in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by the Finance Party alone); or

(iv) any Loan (or part of any Loan) not being prepaid in accordance with a notice of prepayment given by the Borrower.

11.3 **Indemnity to the Finance Parties**

(a) The Borrower shall, within three Business Days of demand, indemnify each Finance Party (and in the case of paragraph (ii), each Finance Party, every Receiver and Delegate) against:

(i) any cost, loss or liability incurred by the Finance Party (acting reasonably) as a result of:

(A) investigating any event which it reasonably believes is a Default; and

(B) instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement;

(ii) any cost, loss or liability incurred by any of the Finance Parties, Receiver or Delegate as a result of:

(A) any failure by the Borrower to comply with its obligations under Clause 13 (*Costs and expenses*);

(B) acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

(C) the taking, holding, protection or enforcement of the Transaction Security;

(D) the exercise of any of the rights, powers, discretions, authorities and remedies vested in the Finance Party as security holder and each Receiver and Delegate by the Finance Documents or by law;

(E) any default by the Borrower in the performance of any of the obligations expressed to be assumed by it in the Finance Documents; or

(F) acting as security holder, Receiver or Delegate under the Finance Documents or which otherwise relates to any of the Charged Property (otherwise, in each case, than by reason of the relevant security holder's, Receiver's or as the case may be, Delegate's gross negligence or wilful misconduct).

(b) The Borrower expressly acknowledges and agrees that the continuation of its indemnity obligations under this Clause 11.3 will not be prejudiced by any release of any of the Charged Property pursuant to the enforcement of the Transaction Security.

(c) Each of the Finance Parties (acting as security holder) and every Receiver and Delegate may indemnify itself out of the Charged Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this Clause 11.3 and shall have a lien on the Transaction Security and the proceeds of the enforcement of the Transaction Security for all moneys payable to it.

## 12. MITIGATION BY THE LENDER

### 12.1 Mitigation

(a) Each Finance Party shall, in consultation with the Borrower, take all reasonable steps to mitigate any circumstances which arise and which would result in any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Clause 7.1 (*Illegality*), Clause 9 (*Tax gross-up and indemnities*) or Clause 10 (*Increased Costs*) including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate.

(b) Paragraph (a) above does not in any way limit the obligations of the Borrower under the Finance Documents.

### 12.2 Limitation of liability

(a) The Borrower shall promptly indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under Clause 12.1 (*Mitigation*).

(b) A Finance Party is not obliged to take any steps under Clause 12.1 (*Mitigation*) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

## 13. COSTS AND EXPENSES

### 13.1 Transaction expenses

The Borrower shall, within three Business Days of demand, pay each Finance Party the amount of all costs and expenses (including legal fees) reasonably incurred by any of them (including by any Receiver or Delegate) in connection with the negotiation, preparation, printing, execution and perfection of:

(a) the Transaction Security, this Agreement, the Finance Documents and any other documents referred to in this Agreement; and

(b) any other Finance Documents executed after the date of this Agreement,

provided that the Borrower's maximum liability under this Clause 13.1 shall not exceed $100,000.

### 13.2 Amendment costs

If the Borrower requests an amendment, waiver or consent, the Borrower shall, within five Business Days of demand, reimburse each Finance Party for the amount of all costs and expenses (including legal fees) reasonably incurred by the Finance Parties (including by any Receiver or Delegate) in responding to, evaluating, negotiating or complying with that request or requirement.

13.3 **Enforcement and preservation costs**

The Borrower shall, within three Business Days of demand, pay to each Secured Party the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of or the preservation of any rights under any Finance Document and the Transaction Security and any proceedings instituted by or against the Lender as a consequence of taking or holding the Transaction Security or enforcing these rights.

## SECTION 7

## REPRESENTATIONS, UNDERTAKINGS AND EVENTS OF DEFAULT

### 14. REPRESENTATIONS

14.1 **General**

The Borrower makes the representations and warranties set out in this Clause 14 to the Lender.

14.2 **Status**

(a) It is a limited liability corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation.

(b) It has the power to own its assets and carry on its business as it is being conducted.

14.3 **Binding obligations**

(a) The obligations expressed to be assumed by it in each Finance Document to which it is a party are legal, valid, binding and enforceable obligations.

(b) Without limiting the generality of paragraph (a) above, each Transaction Security Document to which it is a party creates the security interests which that Transaction Security Document purports to create and those security interests are valid and effective.

14.4 **Non-conflict with other obligations**

The entry into and performance by it of, and the transactions contemplated by, the Finance Documents and the granting of the Transaction Security do not and will not conflict with:

(a) any law or regulation applicable to it;

(b) the Constitutional Documents of the Borrower; or

(c) any agreement or instrument binding upon it or any of its assets or constitute a default or termination event (however described) under any such agreement or instrument.

14.5 **Power and authority**

(a) It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Finance Documents to which it is or will be a party and the transactions contemplated by those Finance Documents.

(b) No limit on its powers will be exceeded as a result of the borrowing, grant of security or giving of guarantees or indemnities contemplated by the Finance Documents to which it is a party.

14.6 **Validity and admissibility in evidence**

(a) All Authorisations required or desirable:

(i) to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Finance Documents to which it is a party; and

(ii) to make the Finance Documents to which it is a party admissible in evidence in its jurisdiction of incorporation,

have been obtained or effected and are in full force and effect except any Authorisation referred to in Clause 14.9 (*No filing or stamp taxes*).

(b) All Authorisations necessary for the conduct of the business, trade and ordinary activities of the Borrower have been obtained or effected and are in full force and effect.

14.7 **Governing law and enforcement**

(a) The choice of governing law of the Finance Documents will be recognised and enforced in its jurisdiction of incorporation.

(b) Any judgment obtained in relation to a Finance Document in the jurisdiction of the governing law of that Finance Document will be recognised and enforced in its jurisdiction of incorporation.

14.8 **Insolvency**

No:

(a) corporate action, legal proceeding or other procedure or step described in paragraph (a) of Clause 17.6 (*Insolvency proceedings*); or

(b) creditors' process described in Clause 17.7 (*Creditors' process*),

has been taken or, to the knowledge of the Borrower, threatened in relation to a member of the Borrower; and none of the circumstances described in Clause 17.5 (*Insolvency*) applies to the Borrower.

14.9 **No filing or stamp taxes**

Under the laws of its jurisdiction of incorporation it is not necessary that the Finance Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents except registration of particulars of the Transaction Security Documents at the Accounting and Corporate Regulatory Authority in Singapore in and the payment of associated fees and which registrations and filings will be made and paid promptly after the date of the relevant Transaction Security Document.

14.10 **Deduction of Tax**

It is not required to make any deduction for or on account of Tax from any payment it may make under any Finance Document.

14.11 **No default**

(a) No Event of Default and, on the date of this Agreement, no Default is continuing or is reasonably likely to result from the making of any Utilisation or the entry into, the performance of, or any transaction contemplated by, any Finance Document.

(b) No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on it or to which its assets are subject.

14.12 **No misleading information**

Save as disclosed in writing to the Lender prior to the date of this Agreement:

(a) any factual information provided to the Lender by (or on behalf of) the Borrower was true and accurate in all material respects as at the date of the relevant information was given;

(b) any projections or forecasts as at their date were prepared on the basis of recent historical information and on the basis of assumptions believed by the Borrower to be reasonable and were fair (as at the date of the relevant document containing the projection or forecast) and arrived at after careful consideration;

(c) no event or circumstance has occurred or arisen and no information has been omitted and no information has been given or withheld that results in the information, or forecasts or projections provided being untrue or misleading in any material respect; and

(d) all other written information provided by the Borrower (including its advisers) to the Lender was true, complete and accurate in all material respects as at the date it was provided and is not misleading in any material respect.

14.13 **Financial Statements**

(a) There has been no material adverse change in the assets, business or consolidated financial condition of the Borrower since the date of this Agreement.

(b) The most recent financial statements delivered pursuant to Clause 15.1 (*Financial statements*):

(i) have been prepared in accordance with the Accounting Principles; and

(ii) give a true and fair view of the Borrower’s consolidated financial condition as at the end of, and consolidated results of operations for, the period to which they relate.

(c) The budgets and forecasts supplied under this Agreement were arrived at after careful consideration and have been prepared in good faith on the basis of recent historical information and on the basis of assumptions which were believed by the Borrower to be reasonable as at the date they were prepared and supplied.

(d) Since the date the financial statements have been delivered pursuant to Clause 15.1 *(Financial statements)*, there has been no material adverse change in the assets, business or consolidated financial condition of the Borrower.

14.14 **No proceedings**

(a) No litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency have been started or threatened against it.

(b) No judgment or order of a court, arbitral tribunal or other tribunal or any order or sanction of any governmental or other regulatory body has been made against it.

14.15 **No breach of laws**

(a) It has not breached any law or regulation which breach has or is reasonably likely to have a Material Adverse Effect.

(b) No labour disputes are current or, to the best of its knowledge and belief (having made due and careful enquiry), threatened against the Borrower which have or are reasonably likely to have a Material Adverse Effect.

14.16 **Taxation**

(a) It is not materially overdue in the filing of any Tax returns and it is not overdue in the payment of any amount in respect of Tax.

(b) No claims or investigations are being, or are reasonably likely to be, made or conducted against it with respect to Taxes.

(c) It has duly filed its annual accounts with all relevant authorities.

(d) It is resident for Tax purposes only in its jurisdiction of incorporation.

14.17 **Anti-corruption law**

The Borrower has conducted its businesses in compliance with applicable anti-corruption laws and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

14.18 **Sanctions**

Neither it nor any of its respective directors, officers or employees or, to its knowledge, any of its representatives or agents:

(a) is a Restricted Party; or

(b) has received notice from a Sanctions Authority that it is subject to any claim, action, proceeding or investigation with respect to applicable Sanctions.

14.19 **Ranking**

The Transaction Security has or will have the ranking in priority which it is expressed to have in the Transaction Security Documents.

### 14.20 Good title to assets

It has a good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently conducted.

### 14.21 Legal and beneficial ownership

It is the sole legal and beneficial owner of the respective assets over which it purports to grant Security.

### 14.22 Times when representations made

(a) All the representations and warranties in this Clause 14 are made by the Borrower on the date of this Agreement.

(b) The Repeating Representations are deemed to be made by the Borrower:

(i) on the date of the Utilisation Request;

(ii) on the Utilisation Date; and

(iii) on the last day of each Interest Period.

(c) Each representation or warranty deemed to be made after the date of this Agreement shall be deemed to be made by reference to the facts and circumstances existing at the date the representation or warranty is deemed to be made.

## 15. INFORMATION UNDERTAKINGS

The undertakings in this Clause 15 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

In this Clause 15:

"**Annual Financial Statements**" means the financial statements for a financial year delivered pursuant to paragraph 0 of Clause 15.1 (*Financial statements*).

### 15.1 Financial statements

The Borrower shall supply to the Lender, as soon as they are available, but in any event within 180 days after the end of each of its financial years, its audited consolidated financial statements for that financial year.

### 15.2 Requirements as to financial statements

(a) The Borrower shall procure that each set of Annual Financial Statements includes a balance sheet, profit and loss account and cashflow statement.

(b) Each set of financial statements delivered pursuant to Clause 15.1 (*Financial statements*):

(i) shall be certified by a director of the relevant company as giving a true and fair view of the Borrower's financial condition and operations as at the date as at which those financial statements were drawn up and, in the case of the Annual Financial Statements, shall be accompanied by any letter addressed to the

management of the relevant company by the auditors of those Annual Financial Statements and accompanying those Annual Financial Statements;

(ii) shall be prepared in accordance with the Accounting Principles.

15.3 **Information: miscellaneous**

The Borrower shall supply to the Lender:

(a) at the same time as they are dispatched, copies of all documents dispatched by the Borrower to its shareholders generally (or any class of them) or dispatched by the Borrower to its creditors generally (or any class of them);

(b) promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against the Borrower;

(c) promptly, such information as the Lender may require about the Charged Property and compliance of the Borrower with the terms of any Transaction Security Documents; and

(d) promptly on request, such further information regarding its financial condition, assets and operations, any requested amplification or explanation of any item in the financial statements, budgets or other material provided by the Borrower under this Agreement, any changes to its management and an up to date copy of its shareholders' register, as well as any information or documentation requested by the Lender.

15.4 **Notification of default**

(a) The Borrower shall notify the Lender of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.

(b) Promptly upon a request by the Lender, the Borrower shall supply to the Lender a certificate signed by two of its directors or senior officers on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

15.5 **"Know your customer" checks**

(a) If:

(i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

(ii) any change in the status of the Borrower or the composition of the shareholders of the Borrower after the date of this Agreement; or

(iii) a proposed assignment or transfer by the Lender of any of its rights and/or obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer,

obliges the Lender or in the case of paragraph (iii) above, any prospective new Lender to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Borrower shall promptly upon the request of the Lender supply, or procure the supply

of, such documentation and other evidence as is reasonably requested by the Lender (for itself or, in the case of the event described in paragraph (iii) above, on behalf of any prospective new Lender) in order for the Lender or, in the case of the event described in paragraph (iii) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

## 16. GENERAL UNDERTAKINGS

Unless expressly stated otherwise, the undertakings in this Clause 16 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

### 16.1 Authorisations

The Borrower shall promptly:

(a) obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b) supply certified copies to the Lender of:

any Authorisation required under any applicable law or regulation to:

(i) enable it to perform its obligations under the Finance Documents;

(ii) ensure the legality, validity, enforceability or admissibility in evidence of any Finance Document; and

(iii) carry on its business where failure to do so has or is reasonably likely to have a Material Adverse Effect.

### 16.2 Compliance with laws

The Borrower shall comply in all respects with all laws to which it is subject.

### 16.3 Anti-corruption law

(a) The Borrower shall not directly or indirectly use the proceeds of the Facility for any purpose which would breach the Bribery Act 2010, the United States Foreign Corrupt Practices Act of 1977 or other similar legislation in other jurisdictions.

(b) The Borrower shall:

(i) conduct its businesses in compliance with applicable anti-corruption laws; and

(ii) maintain policies and procedures designed to promote and achieve compliance with such laws.

### 16.4 Sanctions

(a) The Borrower shall not:

(i) use the proceeds of any Loan to, directly or indirectly, finance or make available funds to any Restricted Party or any other person if and to the extent such financing or provision of funds would result in a violation of Sanctions

by the Borrower or, to the knowledge of the Borrower, cause the Lender to be in breach of any Sanctions; or

(ii) knowingly use any funds identified as directly derived from any activity or dealing with a person listed on a Sanctions List in discharging any obligation due or owing to the Lender under the Finance Documents to the extent such use of such funds would cause the Lender to be in breach of any Sanctions.

(b) The Borrower shall:

(i) take reasonable measures to ensure its compliance with Sanctions applicable to it; and

(ii) promptly upon becoming aware of them, supply to the Lender details of any claim, action, suit, proceedings or investigation against it by any Sanctions Authority as notified by that Sanctions Authority to the Borrower with respect to Sanctions applicable to it.

16.5 **Taxation**

(a) The Borrower shall pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring penalties.

(b) The Borrower may not change its residence for Tax purposes.

16.6 **Merger**

The Borrower shall not enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction.

16.7 **Change of business/conduct of business**

(a) The Borrower shall procure that no substantial change is made to the general nature of the business of the Borrower at the date of this Agreement.

(b) The Borrower undertakes that it conducts its business in a prudent and reasonable manner having regard to the rights and interests of its creditors generally.

16.8 **Purpose**

The Borrower shall apply all amounts under the Facility exclusively for the purposes set out in Clause 3.1 (*Purpose*) and shall promptly at the Lender's request provide evidence of such application.

16.9 **Pari passu ranking**

The Borrower shall ensure that at all times any unsecured and unsubordinated claims of the Lender against it under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

16.10 **Arm's length basis**

The Borrower shall not enter into any transaction with any person except on arm's length terms and for full market value.

### 16.11 Dividends and share redemption

The Borrower shall not:

(a) declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital);

(b) repay or distribute any dividend or share premium reserve;

(c) pay any management, advisory or other fee to or to the order of any of the shareholders of the Borrower; or

(d) redeem, repurchase, defease, retire or repay any of its share capital or resolve to do so,

without the prior written consent of the Lender.

### 16.12 Constitutional documents

The Borrower shall not amend, supplement or otherwise modify its Constitutional Documents.

### 16.13 Further assurance

(a) The Borrower shall promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the Lender may reasonably specify (and in such form as the Lender may reasonably require in favour of the Lender or its nominee(s)):

(i) to perfect the Security created or intended to be created under or evidenced by the Transaction Security Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Transaction Security) or for the exercise of any rights, powers and remedies of the Lender provided by or pursuant to the Finance Documents or by law;

(ii) to confer on the Lender Security over any of its property and assets located in any jurisdiction equivalent or similar to the Security intended to be conferred by or pursuant to the Transaction Security Documents; and/or

(iii) to facilitate the realisation of the assets which are, or are intended to be, the subject of the Transaction Security.

(b) The Borrower shall take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Lender by or pursuant to the Finance Documents.

## 17. EVENTS OF DEFAULT

Each of the events or circumstances set out in this Clause 17 is an Event of Default (save for Clause 17.16 (*Acceleration*)).

17.1 **Non-payment**

(a) The Borrower does not pay on the due date any amount payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless:

(i) its failure to pay is caused by administrative or technical error; and

(ii) payment is made within two Business Days of its due date.

17.2 **Other obligations**

(a) The Borrower does not comply with any provision of the Finance Documents (other than those referred to in Clause 17.1 (*Non-payment*).

(b) No Event of Default under paragraph (a) above will occur if the failure to comply is capable of remedy and is remedied within ten Business Days of the earlier of (i) the Lender giving notice to the Borrower and (ii) the Borrower becoming aware of the failure to comply.

17.3 **Misrepresentation**

(a) Any representation or statement made or deemed to be made by the Borrower in the Finance Documents or any other document delivered by or on behalf of the Borrower under or in connection with any Finance Document is or proves to have been incorrect or misleading when made or deemed to be made.

(b) No Event of Default under paragraph (a) above will occur if the failure to comply is capable of remedy and is remedied within ten Business Days of the earlier of (i) the Lender giving notice to the Borrower and (ii) the Borrower becoming aware of the failure to comply.

17.4 **Cross default**

(a) Any Financial Indebtedness of the Borrower is not paid when due nor within any originally applicable grace period.

(b) Any Financial Indebtedness of the Borrower is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(c) Any commitment for any Financial Indebtedness of the Borrower is cancelled or suspended by a creditor of the Borrower as a result of an event of default (however described).

(d) Any creditor of the Borrower becomes entitled to declare any Financial Indebtedness of the Borrower due and payable prior to its specified maturity as a result of an event of default (however described).

17.5 **Insolvency**

(a) The Borrower is or is presumed or deemed to be unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more

of its creditors (excluding any Finance Party in its capacity as such) with a view to rescheduling any of its indebtedness.

(b) The value of the assets of the Borrower is less than its liabilities (taking into account contingent and prospective liabilities).

(c) A moratorium, other than an Ipso Facto Event, is declared in respect of any indebtedness of the Borrower.

17.6 **Insolvency proceedings**

Any corporate action, legal proceedings or other procedure or step is taken in relation to:

(a) the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration, judicial management, provisional supervision or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any the Borrower;

(b) a composition or arrangement with any creditor of the Borrower, or an assignment for the benefit of creditors generally of the Borrower or a class of such creditors;

(c) the appointment of a liquidator, receiver, administrator, judicial manager, administrative receiver, compulsory manager, provisional supervisor or other similar officer in respect of the Borrower or any of its assets; or

(d) enforcement of any Security over any assets of the Borrower,

(e) or any analogous procedure or step is taken in any jurisdiction.

Paragraph (a) above shall not apply to (i) an Ipso Facto Event; or (ii) any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 30 days of commencement.

17.7 **Creditors' process**

Any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of the Borrower.

17.8 **Unlawfulness and invalidity**

(a) It is or becomes unlawful for the Borrower to perform any of its obligations under the Finance Documents or any Transaction Security created or expressed to be created or evidenced by the Transaction Security Documents ceases to be effective.

(b) Any obligation or obligations of the Borrower under any Finance Documents are not or cease to be legal, valid, binding or enforceable.

(c) Any Finance Document ceases to be in full force and effect or any Transaction Security ceases to be legal, valid, binding, enforceable or effective or is alleged by a party to it (other than the Lender) to be ineffective.

17.9 **Cessation of business**

The Borrower suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business.

17.10 **Audit qualification**

The Borrower's auditors qualify the audited annual consolidated financial statements of the Borrower.

17.11 **Expropriation**

The authority or ability of the Borrower to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to the Borrower or any of its assets.

17.12 **Repudiation and rescission of agreements**

The Borrower (or any other relevant party) rescinds or purports to rescind or repudiates or purports to repudiate a Finance Document or any of the Transaction Security or evidences an intention to rescind or repudiate a Finance Document or any Transaction Security.

17.13 **Litigation**

Any litigation, arbitration, administrative, governmental, regulatory or other investigations, proceedings or disputes are commenced or threatened, or any judgment or order of a court, arbitral tribunal or other tribunal or any order or sanction of any governmental or other regulatory body is made, in relation to the Finance Documents or the transactions contemplated in the Finance Documents or against its assets.

17.14 **Material Adverse Effect**

Any event or circumstance or series of events or circumstances occurs which the Lender believes has or could reasonably be expected to have a Material Adverse Effect.

17.15 **Declared company**

The Borrower is declared by the Minister for Finance of Singapore to be a company to which Part IX of the Companies Act applies.

17.16 **Acceleration**

On and at any time after the occurrence of an Event of Default which is continuing the Lender may:

(a) by notice to the Borrower:

  (i) cancel the Commitment at which time it shall immediately be cancelled;

  (ii) declare that all or part of the Utilisations, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, at which time they shall become immediately due and payable;

  (iii) declare that all or part of the Utilisations be payable on demand, at which time they shall immediately become payable on demand by the Lender; and/or

(b) exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

## SECTION 8

## CHANGES TO THE PARTIES

### 18. CHANGES TO THE LENDER

**18.1 Assignments and transfers by the Lender**

(a) Subject to paragraph (a) below, the Lender may not assign any of its rights or transfer by novation any of its rights and obligations under any Finance Document to any person (including without limitation through granting participations or sub-participations) without the prior written consent of the Borrower (not to be unreasonably withheld or delayed).

(b) The consent of the Borrower is not required for an assignment or transfer under paragraph (a) above where the assignment or transfer is made at a time when an Event of Default is continuing.

### 19. CHANGES TO THE BORROWER

**19.1 Assignment and transfers by the Borrower**

The Borrower may not assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

## SECTION 9

## ADMINISTRATION

### 20. PAYMENT MECHANICS

**20.1 Payments to the Lender**

(a) On each date on which the Borrower is required to make a payment under a Finance Document, the Borrower shall make the same available to the Lender (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Lender as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b) Payment shall be made to such account in the principal financial centre of the country of that currency and with such bank as the Lender, in each case, specifies.

**20.2 Distributions to the Borrower**

The Lender may (with the consent of the Borrower or in accordance with Clause 21 (*Set-Off*)) apply any amount received by it for the Borrower in or towards payment (on the date and in the currency and funds of receipt) of any amount due from the Borrower under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

**20.3 Partial payments**

(a) If the Lender receives a payment for application against amounts due in respect of any Finance Documents that is insufficient to discharge all the amounts then due and payable by the Borrower under the Finance Documents, the Lender shall apply that

payment towards the obligations of the Borrower under the Finance Documents in the following order:

(i) **first**, in or towards payment of any unpaid amount owing to the Arranger under the Finance Documents;

(ii) **secondly**, in or towards payment of any accrued interest, fee or commission due but unpaid under the Finance Documents;

(iii) **thirdly**, in or towards payment of any principal due but unpaid under the Finance Documents; and

(iv) **fourthly**, in or towards payment of any other sum due but unpaid under the Finance Documents.

(b) The Lender may vary the order set out in paragraphs (a)(ii) to (iv) above.

(c) Paragraphs (a) and (b) above will override any appropriation made by the Borrower.

### 20.4 Set-off by the Borrower

All payments to be made by the Borrower under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

### 20.5 Business Days

(a) Any payment under the Finance Documents which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b) During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement, interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

### 20.6 Currency of account

(a) Subject to paragraphs (b) and (c) below, Dollars is the currency of account and payment for any sum due from the Borrower under any Finance Document.

(b) Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(c) Any amount expressed to be payable in a currency other than Dollars shall be paid in that other currency.

## 21. SET-OFF

A Finance Party may set off any matured obligation due from the Borrower under the Finance Documents against any matured obligation owed by that Finance Party to the Borrower, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, that Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

22. **NOTICES**

22.1 **Communications in writing**

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax or electronic mail.

22.2 **Addresses**

The address and email address (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

(a) in the case of the Borrower:

Address: 30 Cecil Street, |19-08 Prudential tower, Singapore 049712

Email: byju@byjus.com

Tel: +65 6812 1611

Attention: Mr Byju Raveendran

(b) in the case of the Lender:

Address: 650 5th Avenue, 35th Floor
New York, NY 10019

Email: kwool@reveresecurities.com

Tel:

Attention: Attn: Kyle Wool

or any substitute address, email address or department or officer as a Party may notify to the other Party, by not less than five Business Days' notice, if a change is made.

22.3 **Delivery**

(a) Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(i) if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

(ii) if by way of electronic mail, if received on or before 5:00 p.m. in the place in which the Party to whom the relevant communication is sent or made available has its address for the purpose of this Agreement, on that day, or if received after 5.00 p.m, on the then next day,

and, if a particular department or officer is specified as part of its address details provided under Clause 22.2 (*Addresses*), if addressed to that department or officer.

(b) Any communication or document to be made or delivered to a Finance Party will be effective only when actually received by the Finance Party and then only if it is

expressly marked for the attention of the department or officer identified with the Finance Party's signature below (or any substitute department or officer as a Finance Party shall specify for this purpose).

(c) Any communication or document made or delivered to the Borrower in accordance with this Clause 22.3 will be deemed to have been made or delivered to the Borrower.

(d) Any communication or document which becomes effective, in accordance with paragraphs (a) to (c) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

22.4 **English language**

(a) Any notice given under or in connection with any Finance Document must be in English.

(b) All other documents provided under or in connection with any Finance Document must be:

(i) in English; or

(ii) if not in English, and if so required by the Lender, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

23. **CALCULATIONS AND CERTIFICATES**

23.1 **Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

23.2 **Certificates and determinations**

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

23.3 **Day count convention**

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 365 days.

24. **PARTIAL INVALIDITY**

If, at any time, any provision of a Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 25. REMEDIES, WAIVERS AND HARDSHIP

### 25.1 Remedies and waivers

No failure to exercise, nor any delay in exercising, on the part of any Secured Party, any right or remedy under a Finance Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any Finance Document. No election to affirm any Finance Document on the part of any Secured Party shall be effective unless it is in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in each Finance Document are cumulative and not exclusive of any rights or remedies provided by law.

## 26. AMENDMENTS AND WAIVERS

Any term of the Finance Documents may be amended or waived with the agreement of the Lender and the Borrower.

## 27. CONFIDENTIALITY

### 27.1 Confidential Information

Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by Clause 27.2 (*Disclosure of Confidential Information*), and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

### 27.2 Disclosure of Confidential Information

Any Finance Party may disclose:

(a) to any of its Affiliates and any of its or their officers, directors, employees, professional advisers, auditors, partners and Representatives such Confidential Information as that Finance Party shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this paragraph (a) is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

(b) to any person:

(i) to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Finance Documents and, in each case, to any of that person's Affiliates, Representatives and professional advisers;

(ii) with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or the Borrower and to any of that person's Affiliates, Representatives and professional advisers;

(iii) appointed by that Finance Party or by a person to whom paragraph (b)(i) or (ii) above applies to receive communications, notices, information or documents delivered pursuant to the Finance Documents on its behalf;

(iv) who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in paragraph (b)(i) or (b)(ii) above;

(v) to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(vi) to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes;

(vii) who is a Party; or

(viii) with the consent of the Borrower;

in each case, such Confidential Information as that Finance Party shall consider appropriate if:

(A) in relation to paragraphs (b)(i), (b)(ii) and (b)(iii) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information;

(B) in relation to paragraph (b)(iv) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential Information they receive and is informed that some or all of such Confidential Information may be price-sensitive information;

(C) in relation to paragraphs (b)(v) and (b)(vi), the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of that Finance Party, it is not practicable so to do in the circumstances;

(c) to any person appointed by that Finance Party or by a person to whom paragraph (b)(i) or (b)(ii) above applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this paragraph (c) if the service provider to whom the Confidential Information is to be given has entered into a confidentiality agreement substantially in the form of the LMA Master Confidentiality Undertaking for Use With Administration/Settlement Service Providers or such other form of confidentiality undertaking agreed between the Borrower and the Lender; and

(d) to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Borrower if the rating agency to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information.

27.3 **Continuing obligations**

The obligations in this Clause 27 are continuing and, in particular, shall survive and remain binding on the Finance Parties for a period of twelve months from the earlier of:

(a) the date on which all amounts payable by the Borrower under or in connection with the Finance Documents have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

(b) the date on which a Finance Party otherwise ceases to be a Finance Party for the purposes hereof.

27.4 **Entire agreement**

This Clause 27 constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

28. **COUNTERPARTS**

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

29. **ARRANGER**

29.1 **Role of the Arranger**

Except as specifically provided in the Finance Documents, the Arranger has no obligations of any kind to any other Party under or in connection with any Finance Document.

29.2 **No fiduciary duties**

(a) Nothing in any Finance Document constitutes the Arranger as a trustee or fiduciary of any other person.

(b) The Arranger shall not be bound to account to the Lender for any sum or the profit element of any sum received by it for its own account.

29.3 **Business with the Group**

The Arranger may accept deposits from, lend money to and generally engage in any kind of banking or other business with any other Party.

29.4 **Responsibility for documentation**

The Arranger is not responsible or liable for:

(a) the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Arranger, the Borrower or any other person given in or in connection with any Finance Document or the transactions contemplated in the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; or

(b) the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document.

29.5 **Exclusion of liability**

Nothing in this Agreement shall oblige the Arranger to conduct:

(a) any "know your customer" or other procedures in relation to any person; or

(b) any check on the extent to which any transaction contemplated by this Agreement might be unlawful for the Lender,

on behalf of the Lender and the Lender confirms to the Arranger that it is solely responsible for any such procedures or check it is required to conduct and that it shall not rely on any statement in relation to such procedures or check made by the Arranger.

29.6 **Credit appraisal by the Lenders**

Without affecting the responsibility of the Borrower for information supplied by it or on its behalf in connection with any Finance Document, the Lender confirms to the Arranger that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a) the financial condition, status and nature of the Borrower;

(b) the legality, validity, effectiveness, adequacy or enforceability of any Finance Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(c) whether the Lender has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(d) the adequacy, accuracy and/or completeness of any information provided by any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document.

## SECTION 10

## GOVERNING LAW AND ENFORCEMENT

### 30. GOVERNING LAW

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by Delaware law, United States of America.

### 31. ENFORCEMENT

### 31.1 Jurisdiction of New York Courts

(a) The Parties agrees that all legal proceedings concerning the interpretations, enforcement, and defense of the transactions contemplated by this Agreement (whether brought against a party hereto or its respective Affiliates, directors, officers, stockholders, partners, members, employees, or agents) shall be commenced exclusively in the state and federal courts sitting in Manhattan, New York, United States of America. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the Manhattan, New York, United States of America for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein. If any Party shall commence an action, suit, or proceeding to enforce any provisions of this Agreement, then the prevailing party in such action, suit, or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation, and prosecution of such action or proceeding. (a "**Dispute**").

(b) The Parties agree that the courts of New York, United States of America are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

## SCHEDULE 1
## CONDITIONS PRECEDENT

1. **Borrower**

(a) A copy of the Constitutional Documents of the Borrower.

(b) A copy of a resolution of the board of directors of the Borrower:

(i) approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute, deliver and perform the Finance Documents to which it is a party;

(ii) authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf; and

(iii) authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party.

(c) A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above in relation to the Finance Documents and related documents.

(d) A certificate of the Borrower (signed by a director) confirming that borrowing the Commitment would not cause any borrowing limit binding on the Borrower to be exceeded and certifying that each copy document relating to it specified in this Schedule 1 is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of this Agreement.

2. **Finance Documents**

(a) Each Finance Document, duly executed by the Borrower.

(b) A copy of all notices required to be sent under the Transaction Security Documents, executed by the Borrower, duly acknowledged by the relevant addressee.

3. **Other documents and evidence**

(a) A copy of any other Authorisation or other document, opinion or assurance which the Lender considers to be necessary or desirable in connection with the entry into and performance of the transactions contemplated by any Finance Document or for the validity and enforceability of any Finance Document.

(b) Evidence that the fees, costs and expenses then due the Borrower pursuant to Clause 13 (*Costs and Expenses*) have been paid or will be paid by the Utilisation Date.

**SCHEDULE 2**
**UTILISATION REQUEST**

From: Byjus Investments Pte Ltd.

To: Revere Master SPV LLC, Series VII (Byju)

Dated: 27 July 2022

Dear Sirs

$400 Million **Facility Agreement**
**dated** [●] **(the "Facility Agreement")**

1. We refer to the Facility Agreement. This is a Utilisation Request. Terms defined in the Facility Agreement have the same meaning in this Utilisation Request.

2. We wish to borrow a Loan on the following terms:

   (a) Proposed Utilisation Date: [●] (or, if that is not a Business Day, the next Business Day)

   (b) Amount: [●] US Dollars 400 Million

3. We confirm that each condition specified in Clause 4.2 (*Further conditions precedent*) of the Facility Agreement is satisfied on the date of this Utilisation Request.

4. The proceeds of this Loan should be credited to [*account*]. Byjus Investments Pte Ltd, Account Number 260-288030-178 at HSBC Bank Singapore - SWIFT Code HSBCSGSG

5. This Utilisation Request is irrevocable.

Yours faithfully

Byju Raveendran
......................................

authorised signatory for
**Byjus Investments Pte Ltd.**

DocuSigned by:
F7F0B417823E40F...

6/27/2022

# EXECUTION PAGES

**THE BORROWER**

**Signed for an on behalf of**
**Byjus Investments Pte Ltd**.




Name: Byju Raveendran

Title: Director

**THE LENDER**

**Signed for an on behalf of**
**Revere Master SPV LLC, Series VII (Byju)**

**By its Investment Manager, Revere IM LLC**

DocuSigned by:
Kyle Wool
D7D1A47C7225425...
______________________________

Name: Kyle Wool

Title: Manager of the Manager

# EXHIBIT 2

DATED 07/18/2022

(1) **BYJUS GLOBAL PTE LTD.**
as Borrower

(2) **REVERE MASTER SPV LLC, SERIES VII-A (BYJUS)**
as Lender

# UP TO $250 MILLION USD FACILITY AGREEMENT

# CONTENTS

**Clause** **Page**

1. DEFINITIONS AND INTERPRETATION ....1
2. THE FACILITY ....8
3. PURPOSE ....8
4. CONDITIONS OF UTILISATION ....8
5. UTILISATION ....8
6. REPAYMENT ....9
7. PREPAYMENT AND CANCELLATION ....9
8. INTEREST ....11
9. TAX GROSS UP AND INDEMNITIES ....12
10. INCREASED COSTS ....14
11. OTHER INDEMNITIES ....15
12. MITIGATION BY THE LENDER ....17
13. COSTS AND EXPENSES ....17
14. REPRESENTATIONS ....18
15. INFORMATION UNDERTAKINGS ....22
16. GENERAL UNDERTAKINGS ....24
17. EVENTS OF DEFAULT ....26
18. CHANGES TO THE LENDER ....30
19. CHANGES TO THE BORROWER ....30
20. PAYMENT MECHANICS ....30
21. SET-OFF ....31
22. NOTICES ....32
23. CALCULATIONS AND CERTIFICATES ....33
24. PARTIAL INVALIDITY ....33
25. REMEDIES, WAIVERS AND HARDSHIP ....34
26. AMENDMENTS AND WAIVERS ....34
27. CONFIDENTIALITY ....34
28. COUNTERPARTS ....36
29. ARRANGER ....36
30. GOVERNING LAW ....38
31. ENFORCEMENT ....38

SCHEDULE 1 CONDITIONS PRECEDENT ....39
SCHEDULE 2 UTILISATION REQUEST ....40

**THIS AGREEMENT** is July 18 2022 and is made between:

(1) **Byjus Global Pte Ltd.,** a company incorporated and registered in Singapore, with registered number 202216074E, and whose registered office is at 30 Cecil Street, |19-08 Prudential tower, Singapore 049712, Singapore (the "**Borrower**"); and

(2) **Revere Master SPV LLC, Series VII-A (Byjus)**, a company incorporated in Delaware, United States of America (the "**Lender**").

**IT IS AGREED** as follows:

## SECTION 1

## INTERPRETATION

### 1. DEFINITIONS AND INTERPRETATION

### 1.1 Definitions

In this Agreement:

"**Accounting Principles**" means generally accepted accounting principles in Singapore, including the "Accounting Standards" as defined in the Companies Act.

"**Affiliate**" means, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person, or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Availability Period**" means the period from and including the date of this Agreement to and including the date falling [2] Months thereafter.

"**Available Commitment**" means the Lender's Commitment minus:

(a) any outstanding Loans under the Facility; and

(b) in relation to any proposed Utilisation, any other Utilisations under that Facility that are due to be made on or before the proposed Utilisation Date.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in Singapore and Switzerland and on which banks in those jurisdictions are able to transfer Dollars.

"**Change of Control**" means any person or group of persons acting in concert gains direct or indirect control of the Borrower. For the purposes of this definition:

(a) "**control**" of the Borrower means:

(i) the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to:

(A) cast, or control the casting of, more than one-half of the maximum number of votes that might be cast at a general meeting of the Borrower;

(B) appoint or remove all, or the majority, of the directors or other equivalent officers of the Borrower; or

(C) give directions with respect to the operating and financial policies of the Borrower with which the directors or other equivalent officers of the Borrower are obliged to comply; or

(ii) the holding beneficially of more than 50% of the issued share capital of the Borrower (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital);

and

(b) "**acting in concert**" means, a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively co-operate, through the acquisition or ownership directly or indirectly by any of them of shares in the Borrower or otherwise, either directly or indirectly, to obtain or consolidate control of the Borrower.

"**Charged Property**" means all of the assets of the Borrower which from time to time are, or are expressed to be, the subject of the Transaction Security.

"**Commitment**" means up to $250 Million USD which shall be lent to Borrower in two or more parts, with the first tranche being $200 Million USD being confirmed, and the balance of $50 Million USD in one or more parts, available if the Lender chooses to lend up to $250 Million, at the discretion of the Lender. Lender shall have sole discretion to accept or reject any amounts above the initial $200 Million lent herein.

"**Companies Act**" means the Companies Act, Chapter 50 of Singapore.

"**Confidential Information**" means all information relating to the Borrower, the Finance Documents or the Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party, the Finance Documents or the Facility from any of its advisers in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(a) is or becomes public information other than as a direct or indirect result of any breach by a Finance Party of Clause 27.1 (*Confidential Information*); or

(b) is identified in writing at the time of delivery as non-confidential by the Borrower or any of its advisers; or

(c) is known by a Finance Party before the date the information is disclosed to it in accordance with the above or is lawfully obtained by a Finance Party after that date, from a source which is, as far as a Finance Party is aware, unconnected with the Borrower and which, in either case, as far as a Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

"**Confidentiality Undertaking**" means a confidentiality undertaking substantially in a recommended form of the LMA or in any other form agreed between the Borrower and the Lender.

"**Constitutional Documents**" means, in respect of any person, the memorandum and articles of that person, or any similar constitutional documents in its jurisdiction of incorporation.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 17 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

"**Delegate**" means any delegate, agent, attorney or co-trustee appointed by the Lender.

"**Event of Default**" means any event or circumstance specified as such in Clause 17 (*Events of Default*).

"**Facility**" means the term credit facility made available under this Agreement as described in Clause 2.1 (*The Facility*).

"**Final Repayment Date**" means date falling on the third anniversary of the first Utilisation Date.

"**Finance Document**" means this Agreement, each Transaction Security Document, any Utilisation Request, and any other document designated as a "Finance Document" by the Lender and the Borrower.

"**Finance Lease**" means any lease or hire purchase contract which would, in accordance with the Accounting Principles, be treated as a finance or capital lease.

"**Finance Party**" means the Arranger or the Lender.

"**Financial Indebtedness**" means any indebtedness for or in respect of:

(a) moneys borrowed;

(b) any amount raised by acceptance under any acceptance credit or bill discounting facility (or dematerialised equivalent);

(c) any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d) the amount of any liability in respect of Finance Leases;

(e) receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f) any amount raised under any other transaction (including any forward sale or purchase agreement) of a type not referred to in any other paragraph of this definition having the commercial effect of a borrowing;

(g) any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that derivative transaction, that amount) shall be taken into account);

(h) any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(i) the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (a) to (h) above.

"**Interest Period**" means, in relation to a Loan or any Unpaid Sum, each period determined in accordance with clause 8 (*Interest*).

"**Ipso Facto Event**" means the Borrower is the subject of:

(a) any proceedings as described in section 440 of the Insolvency, Restructuring and Dissolution Act 2018 of Singapore; or

(b) any process which under any law with a similar purpose may give rise to a stay on, or prevention of, the exercise of contractual rights.

"**Loan**" means each loan made or to be made under the Facility or the principal amount outstanding for the time being of that loan.

"**Material Adverse Effect**" means a material adverse effect on:

(a) the business, operations, assets, prospects or financial condition of the Borrower; or

(b) the ability of the Borrower to perform or comply with any of its obligations under any Finance Document; or

(c) the validity or enforceability of, or the effectiveness or ranking of any Security granted or purporting to be granted pursuant to any of, the Finance Documents or the rights or remedies of a Finance Party under any of the Finance Documents.

"**Month**" means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a) if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day; and

(b) if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month.

The above rules will only apply to the last Month of any period.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of Treasury.

"**Party**" means a party to this Agreement.

"**Receiver**" means a receiver or receiver and manager or administrative receiver of the whole or any part of the Charged Property.

"**Repeating Representations**" means each of the representations set out in Clause 14.

"**Representative**" means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian.

"**Restricted Party**" means a person that is, or is owned or controlled by a person, or acting (directly or indirectly) on behalf of a person, that is:

(a) listed on any Sanctions List or otherwise the target of any Sanctions; or

(b) located, organized, incorporated or resident in a country or territory which is, or whose government is, subject to Sanctions.

"**Sanctions**" means any trade, economic or financial sanctions laws, regulations, embargoes or restrictive measures administered, imposed, enacted or enforced by a Sanctions Authority.

"**Sanctions Authority**" means:

(a) the Security Council of the United Nations;

(b) the United States;

(c) the European Union (or any present or future member state thereof);

(d) the United Kingdom;

(e) any country or territory in which the Borrower operates or is located or incorporated; and

(f) the governments and official institutions, authorities or agencies of any of paragraphs (a) through (e) above, including, but not limited to, OFAC, the United States Department of State or Commerce and Her Majesty's Treasury.

"**Sanctions List**" means:

(a) the Specially Designated Nationals and Blocked Persons List, Sectoral Sanctions Identifications List and List of Foreign Sanctions Evaders Sanctioned Pursuant to Executive Order 13608 maintained by OFAC;

(b) "The Consolidated List of Financial Sanctions Targets" maintained by Her Majesty's Treasury; and

(c) any similar list maintained by, or public announcement of a Sanctions designation made by, a Sanctions Authority (without limitation to the generality of the foregoing, such lists as are maintained by (i) the European Union, (ii) the United Nations Security Council Committee or (iii) the United States Department of State),

each as amended, supplemented or substituted from time to time.

"**Secured Parties**" means each Finance Party and any Receiver or Delegate.

"**Security**" means a mortgage, charge, pledge, lien, hypothecation, assignment or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Shares**" means Equity shares, *issued by Think and Learn India Pvt Ltd*.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Transaction Security**" means the Security created or expressed to be created in favour of the Secured Parties pursuant to the Transaction Security Documents.

"**Transaction Security Documents**" means each of:

(a) the Singapore law security over the shares of BYJU's Investments Pte Ltd granted in favour of the Secured Parties by the Borrower dated on or about the date of this Agreement; and

(b) any other document creating or expressed to create any Security over all or any part of its assets in respect of the obligations of the Borrower under any of the Finance Documents.

"**Unpaid Sum**" means any sum due and payable but unpaid by the Borrower under the Finance Documents.

"**Utilisation**" means a utilisation of the Facility.

"**Utilisation Date**" means the date of a Utilisation, being the date on which the relevant Loan is to be made.

"**Utilisation Request**" means a notice substantially in the relevant form set out in Schedule 2 (*Utilisation Request*).

"**VAT**" means:

(a) any value added tax imposed by the Value Added Tax Act 1994;

(b) any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(c) any other tax of a similar nature, whether imposed in Singapore, Switzerland, the United Kingdom or in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

1.2 **Construction**

(a) Unless a contrary indication appears, a reference in this Agreement to:

(i) the "**Arranger**", any "**Finance Party**", "**Lender**", any "**Party**", any "**Secured Party**", or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Finance Documents;

(ii) a document in "**agreed form**" is a document which is previously agreed in writing by or on behalf of the Borrower and the Lender;

(iii) "**assets**" includes present and future properties, revenues and rights of every description;

(iv) a "**Finance Document**" or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, novated, supplemented, extended or restated;

(v) "**guarantee**" means any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or

contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(vi) the words "**including**" and "**in particular**" shall be construed as being by way of illustration or emphasis only and shall not be construed as, nor shall they take effect as, limiting the generality of any preceding words;

(vii) "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(viii) a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality);

(ix) a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(x) a provision of law is a reference to that provision as amended or re-enacted; and

(xi) a time of day is a reference to London time.

(b) Section, Clause and Schedule headings are for ease of reference only.

(c) Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(d) A Default (other than an Event of Default) is "**continuing**" if it has not been remedied or waived and an Event of Default is "**continuing**" if it has not been waived.

**1.3 Currency symbols and definitions**

"**$**", "**USD**" or "**Dollars**" means the lawful currency of the United States of America.

**1.4 Third party rights**

(a) Unless expressly provided to the contrary in a Finance Document a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Agreement.

(b) Notwithstanding any term of any Finance Document, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

## SECTION 2

## THE FACILITY

### 2. THE FACILITY

### 2.1 The Facility

Subject to the terms of this Agreement, the Lender shall make available to the Borrower a dollar term loan facility in an amount equal to the Commitment.

### 3. PURPOSE

### 3.1 Purpose

The Borrower shall apply all amounts borrowed by it under the Facility towards the purchase of the Shares.

### 3.2 Monitoring

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

### 4. CONDITIONS OF UTILISATION

### 4.1 Initial conditions precedent

The Borrower may not deliver a Utilisation Request unless the Lender has received all of the documents and other evidence listed in Schedule 1 (*Conditions Precedent*) in form and substance satisfactory to the Lender. The Lender shall notify the Borrower promptly upon being so satisfied.

### 4.2 Further conditions precedent

Subject to Clause 4.1 (*Initial conditions precedent*), the Lender will only be obliged to comply with Clause 5 (*Utilisation*) if on the date of the Utilisation Request and on the proposed Utilisation Date:

(a) no Default is continuing or would result from the proposed Loan; and

(b) the Repeating Representations to be made by the Borrower are true in all material respects.

### 4.3 Maximum number of Loans

The Borrower may not deliver a Utilisation Request if as a result of the proposed Utilisation 2 or more Loans would be outstanding.

## SECTION 3

## UTILISATION

### 5. UTILISATION

**5.1 Delivery of a Utilisation Request**

The Borrower may utilise the Facility by delivery to the Lender of a duly completed Utilisation Request not later than 12:00 p.m One Business Day before the proposed Utilisation Date (unless otherwise agreed in writing by the Lender).

**5.2 Completion of a Utilisation Request**

(a) Each Utilisation Request is irrevocable and will not be regarded as having been duly completed unless:

(i) the proposed Utilisation Date is a Business Day within the Availability Period; and

(ii) the currency and amount of the Utilisation comply with Clause 5.3 (*Currency and amount*).

(b) Only one Loan may be requested in each Utilisation Request.

**5.3 Currency and amount**

(a) The currency specified in a Utilisation Request must be Dollars.

(b) The amount of the proposed Loan must be an amount which is not more than the Available Commitment and which is a minimum of $200 million USD or, if less, the Available Commitment.

**5.4 Lender's participation**

If the conditions set out in this Agreement have been met, the Lender shall make the relevant Loan available to the Borrower by payment of such amounts to the account specified in the Utilisation Request by the Utilisation Date.

**5.5 Cancellation of Commitment**

The Commitment which, at that time, is unutilised shall be immediately cancelled at the end of the Availability Period.

## SECTION 4

## REPAYMENT, PREPAYMENT AND CANCELLATION

### 6. REPAYMENT

**6.1 Repayment of Loans**

The Borrower shall repay each Loan by paying to the Lender the aggregate amount of that Loan outstanding on the Final Repayment Date.

## 7. PREPAYMENT AND CANCELLATION

### 7.1 Illegality

If, at any time, it is or becomes unlawful in any applicable jurisdiction for the Lender to perform any of its obligations as contemplated by this Agreement or to fund, issue or maintain a Loan or it becomes unlawful for any Affiliate of the Lender to do so:

(a) the Lender shall promptly notify the Borrower upon becoming aware of that event;

(b) the Available Commitment will be immediately cancelled; and

(c) the Borrower shall repay that Loan on the date specified by the Lender in the notice delivered to the Borrower (being no earlier than the last day of any applicable grace period permitted by law) and the Commitment shall be cancelled.

### 7.2 Change of Control

Upon the occurrence of:

(a) a Change of Control; or

(b) the sale of all or substantially all of the assets of the Borrower whether in a single transaction or a series of related transactions,

(i) the Borrower shall promptly notify the Lender upon becoming aware of that event;

(ii) the Lender shall not be obliged to fund a Utilisation;

(iii) if the Lender so requires and notifies the Borrower by not less than three days' notice, the Lender may, cancel the Commitment and declare the outstanding Loan, together with accrued interest, and all other amounts accrued under the Finance Documents immediately due and payable, whereupon the Commitment will be cancelled and all such outstanding amounts will become immediately due and payable.

### 7.3 Voluntary prepayment of Loans

(a) The Borrower may, if it gives the Lender not less than 10 Business Days' notice (or such shorter period as the Lender may agree) prior notice, prepay the whole or any part of any Loan (but, if in part, being an amount that reduces the amount of the Loan by a minimum amount of $10,000,000.

(b) A Loan may only be prepaid after the last day of the Availability Period (or, if earlier, the day on which the Available Commitment is zero).

### 7.4 Restrictions

(a) Any notice of cancellation, prepayment, authorisation or other election given under Clause 7 (*Prepayment and cancellation*) shall (subject to the terms of that Clause) be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

(b) The Borrower may not reborrow any part of the Facility which is prepaid.

(c) Unless a contrary indication appears in this Agreement, any part of the Facility which is prepaid or repaid may be reborrowed in accordance with the terms of this Agreement provided that notwithstanding any term of this Agreement, any part of the Facility may only be re-borrowed on an uncommitted basis, with the consent of the Lender in its sole unfettered discretion.

(d) The Borrower shall not repay or prepay all or any part of any Loans or cancel all or any part of the Commitment except at the times and in the manner expressly provided for in this Agreement.

(e) No amount of the Commitment cancelled under this Agreement may be subsequently reinstated.

## SECTION 5

## COSTS OF UTILISATION

### 8. INTEREST

#### 8.1 Calculation of interest

The rate of interest on each Loan for each Interest Period shall be 9 per cent. per annum**.**

#### 8.2 Payment of interest

The Borrower shall pay accrued interest on each Loan on the last day of each Interest Period for that Loan.

#### 8.3 Duration of Interest Periods

(a) The duration of each Interest Period shall be compounded annually and payable at the Final Repayment Date.

(b) An Interest Period for a Loan shall not extend beyond the Final Repayment Date.

(c) Each Interest Period for a Loan shall start on the Utilisation Date or (if the relevant Loan has already been made) on the last day of its preceding Interest Period.

(d) If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

#### 8.4 Default Interest

(a) If the Borrower fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the Unpaid Sum from the due date up to the date of actual payment (both before and after judgment) at a rate which is 2 per cent per annum higher than the rate which would have been payable if the Unpaid Sum had, during the period of non-payment, constituted a Loan in the currency of the Unpaid Sum for successive Interest Periods. Any interest accruing under this Clause 8.4 shall be immediately payable by the Borrower on demand by the Lender.

(b) If any Unpaid Sum consists of all or part of a Loan which became due on a day which was not the last day of an Interest Period relating to that Loan:

(i) the first Interest Period for that Unpaid Sum shall have a duration equal to the unexpired portion of the current Interest Period relating to that Loan; and

(ii) the rate of interest applying to the Unpaid Sum during that first Interest Period shall be 2 per cent. per annum higher than the rate which would have applied if the Unpaid Sum had not become due.

(c) Default interest (if unpaid) arising on an Unpaid Sum will be compounded with the overdue amount monthly but will remain immediately due and payable.

## SECTION 6

## ADDITIONAL PAYMENT OBLIGATIONS

### 9. TAX GROSS UP AND INDEMNITIES

### 9.1 Definitions

(a) In this Clause 9:

"**Indirect Tax**" means any goods and services tax, consumption tax, VAT or any tax of a similar nature.

"**Tax Credit**" means a credit against, relief or remission for, or repayment of any Tax.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Finance Document.

"**Tax Payment**" means an increased payment made by the Borrower to a Finance Party under Clause 9.2 (*Tax gross-up*) or a payment under Clause 9.3 (*Tax indemnity*).

(b) Unless a contrary indication appears, in this Clause 9 a reference to "**determines**" or "**determined**" means a determination made in the absolute discretion of the person making the determination (acting reasonably and in good faith).

### 9.2 Tax gross-up

(a) All payments to be made by the Borrower to any Finance Party under the Finance Documents shall be made free and clear of and without any Tax Deduction unless the Borrower is required to make a Tax Deduction, in which case the sum payable by the Borrower (in respect of which such Tax Deduction is required to be made) shall be increased to the extent necessary to ensure that such Finance Party receives a sum net of any deduction or withholding equal to the sum which it would have received had no such Tax Deduction been made or required to be made.

(a) The Borrower shall promptly upon becoming aware that the Borrower must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Finance Parties accordingly. Similarly, a Finance Party shall notify the Borrower on becoming so aware in respect of a payment payable to the Finance Party.

(b) If the Borrower is required to make a Tax Deduction, the Borrower shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(c) Within thirty days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Borrower making that Tax Deduction shall deliver to the Finance Parties evidence reasonably satisfactory to the Finance Parties that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

9.3 **Tax indemnity**

(a) Without prejudice to Clause 9.2 (*Tax gross-up*), if any Finance Party is required to make any payment of or on account of Tax on or in relation to any sum received or receivable under the Finance Documents (including any sum deemed for the purposes of Tax to be received or receivable by such Finance Party whether or not actually received or receivable) or if any liability in respect of any such payment is asserted, imposed, levied or assessed against any Finance Party, the Borrower shall, within three Business Days of demand of the applicable Finance Party, promptly indemnify the Finance Party which suffers a loss or liability as a result against such payment or liability, together with any interest, penalties, costs and expenses payable or incurred in connection therewith, **provided that** this Clause 9.3 shall not apply to:

(i) any Tax imposed on and calculated by reference to the net income actually received or receivable by such Finance Party (but, for the avoidance of doubt, not including any sum deemed for the purposes of Tax to be received or receivable by such Finance Party but not actually receivable) by the jurisdiction in which such Finance Party is incorporated; or

(ii) any Tax imposed on and calculated by reference to the net income of such Finance Party actually received or receivable by such Finance Party (but, for the avoidance of doubt, not including any sum deemed for the purposes of Tax to be received or receivable by such Finance Party but not actually receivable) by the jurisdiction in which Finance Party is located.

(b) A Finance Party intending to make a claim under paragraph (a) above shall notify the Borrower of the event giving rise to the claim.

9.4 **Tax credit**

If the Borrower makes a Tax Payment and the relevant Finance Party determines that:

(a) a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

(b) that Finance Party has obtained and utilised that Tax Credit,

the Finance Party shall pay an amount to the Borrower which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Borrower.

9.5 **Stamp taxes**

The Borrower shall:

(a) pay all stamp duty, registration and other similar Taxes payable in respect of any Finance Document; and

(b) within three Business Days of demand, indemnify each Finance Party against any cost, loss or liability that Finance Party incurs in relation to any stamp duty, registration or other similar Taxes paid or payable in respect of any Finance Document.

9.6 **Indirect tax**

(a) All amounts set out or expressed in a Finance Document to be payable by any Party to a Finance Party shall be deemed to be exclusive of any Indirect Tax. If any Indirect Tax is chargeable on any supply made by any Finance Party to any Party in connection with a Finance Document, that Party shall pay to the Finance Party (in addition to and at the same time as paying the consideration for that supply) an amount equal to the amount of the Indirect Tax.

(b) Where a Finance Document requires any Party to reimburse or indemnify a Finance Party for any costs or expenses, that Party shall also at the same time pay and indemnify the Finance Party against all Indirect Tax incurred by that Finance Party in respect of the costs or expenses to the extent that the Finance Party reasonably determines that it is not entitled to credit or repayment in respect of the Indirect Tax.

10. **INCREASED COSTS**

10.1 **Increased costs**

(a) Subject to Clause 10.3 (*Exceptions*), the Borrower shall, within three Business Days of a demand by a Finance Party, pay for the account of the Finance Party the amount of any Increased Costs incurred by the Finance Party or any of its Affiliates as a result of (i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation or (ii) compliance with any law or regulation made after the date of this Agreement. The terms "law" and "regulation" in this paragraph (a) shall include any law or regulation concerning capital adequacy, prudential limits, liquidity, reserve assets or Tax.

(b) In this Agreement:

"**Increased Costs**" means:

(i) a reduction in the rate of return from the Facility or on the Finance Party's (or its Affiliate's) overall capital (including as a result of any reduction in the rate of return on capital brought about by more capital being required to be allocated by such Finance Party);

(ii) an additional or increased cost; or

(iii) a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to the undertaking, funding or performance by such Finance Party of any of its obligations under any Finance Document or any participation of such Finance Party in any Loan or Unpaid Sum.

### 10.2 Increased cost claims

(a) If a Finance Party intends to make a claim pursuant to Clause 10.1 (*Increased costs*), the Finance Party shall notify the Borrower of the event giving rise to the claim.

(b) The Finance Party shall, as soon as practicable after a demand by the Borrower, provide a certificate giving reasonable details of the circumstances giving rise to such claim.

### 10.3 Exceptions

(a) Clause 10.1 (*Increased costs*) does not apply to the extent any Increased Cost is:

(i) attributable to a Tax Deduction required by law to be made by the Borrower;

(ii) compensated for by Clause 9.3 (*Tax indemnity*) (or would have been compensated for under Clause 9.3 (*Tax indemnity*) but was not so compensated solely because any of the exclusions in paragraph (b) of Clause 9.3 (*Tax indemnity*) applied); or

(iii) attributable to the wilful breach by the Finance Party or its Affiliates of any law or regulation.

(b) In this Clause 10.3, a reference to a "**Tax Deduction**" has the same meaning given to the term in Clause 9.1 (*Definitions*).

## 11. OTHER INDEMNITIES

### 11.1 Currency indemnity

(a) If any sum due from the Borrower under the Finance Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

(i) making or filing a claim or proof against the Borrower; or

(ii) obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

the Borrower shall as an independent obligation, within three Business Days of demand, indemnify the Secured Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b) The Borrower waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

### 11.2 Other indemnities

(a) The Borrower shall within three Business Days of demand, indemnify the Secured Parties against any cost, loss or liability incurred by it as a result of:

(i) the occurrence of any Event of Default;

(ii) its failure by to pay any amount due under a Finance Document on its due date;

(iii) funding, or making arrangements to fund, any Loan requested by the Borrower in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by the Finance Party alone); or

(iv) any Loan (or part of any Loan) not being prepaid in accordance with a notice of prepayment given by the Borrower.

11.3 **Indemnity to the Finance Parties**

(a) The Borrower shall, within three Business Days of demand, indemnify each Finance Party (and in the case of paragraph (ii), each Finance Party, every Receiver and Delegate) against:

(i) any cost, loss or liability incurred by the Finance Party (acting reasonably) as a result of:

(A) investigating any event which it reasonably believes is a Default; and

(B) instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement;

(ii) any cost, loss or liability incurred by any of the Finance Parties, Receiver or Delegate as a result of:

(A) any failure by the Borrower to comply with its obligations under Clause 13 (*Costs and expenses*);

(B) acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

(C) the taking, holding, protection or enforcement of the Transaction Security;

(D) the exercise of any of the rights, powers, discretions, authorities and remedies vested in the Finance Party as security holder and each Receiver and Delegate by the Finance Documents or by law;

(E) any default by the Borrower in the performance of any of the obligations expressed to be assumed by it in the Finance Documents; or

(F) acting as security holder, Receiver or Delegate under the Finance Documents or which otherwise relates to any of the Charged Property (otherwise, in each case, than by reason of the relevant security holder's, Receiver's or as the case may be, Delegate's gross negligence or wilful misconduct).

(b) The Borrower expressly acknowledges and agrees that the continuation of its indemnity obligations under this Clause 11.3 will not be prejudiced by any release of any of the Charged Property pursuant to the enforcement of the Transaction Security.

(c) Each of the Finance Parties (acting as security holder) and every Receiver and Delegate may indemnify itself out of the Charged Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this Clause 11.3 and shall have a lien on the Transaction Security and the proceeds of the enforcement of the Transaction Security for all moneys payable to it.

## 12. MITIGATION BY THE LENDER

### 12.1 Mitigation

(a) Each Finance Party shall, in consultation with the Borrower, take all reasonable steps to mitigate any circumstances which arise and which would result in any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Clause 7.1 (*Illegality*), Clause 9 (*Tax gross-up and indemnities*) or Clause 10 (*Increased Costs*) including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate.

(b) Paragraph (a) above does not in any way limit the obligations of the Borrower under the Finance Documents.

### 12.2 Limitation of liability

(a) The Borrower shall promptly indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under Clause 12.1 (*Mitigation*).

(b) A Finance Party is not obliged to take any steps under Clause 12.1 (*Mitigation*) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

## 13. COSTS AND EXPENSES

### 13.1 Transaction expenses

The Borrower shall, within three Business Days of demand, pay each Finance Party the amount of all costs and expenses (including legal fees) reasonably incurred by any of them (including by any Receiver or Delegate) in connection with the negotiation, preparation, printing, execution and perfection of:

(a) the Transaction Security, this Agreement, the Finance Documents and any other documents referred to in this Agreement; and

(b) any other Finance Documents executed after the date of this Agreement,

provided that the Borrower's maximum liability under this Clause 13.1 shall not exceed $100,000.

### 13.2 Amendment costs

If the Borrower requests an amendment, waiver or consent, the Borrower shall, within five Business Days of demand, reimburse each Finance Party for the amount of all costs and expenses (including legal fees) reasonably incurred by the Finance Parties (including by any Receiver or Delegate) in responding to, evaluating, negotiating or complying with that request or requirement.

13.3 **Enforcement and preservation costs**

The Borrower shall, within three Business Days of demand, pay to each Secured Party the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of or the preservation of any rights under any Finance Document and the Transaction Security and any proceedings instituted by or against the Lender as a consequence of taking or holding the Transaction Security or enforcing these rights.

## SECTION 7

## REPRESENTATIONS, UNDERTAKINGS AND EVENTS OF DEFAULT

14. **REPRESENTATIONS**

14.1 **General**

The Borrower makes the representations and warranties set out in this Clause 14 to the Lender.

14.2 **Status**

(a) It is a limited liability corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation.

(b) It has the power to own its assets and carry on its business as it is being conducted.

14.3 **Binding obligations**

(a) The obligations expressed to be assumed by it in each Finance Document to which it is a party are legal, valid, binding and enforceable obligations.

(b) Without limiting the generality of paragraph (a) above, each Transaction Security Document to which it is a party creates the security interests which that Transaction Security Document purports to create and those security interests are valid and effective.

14.4 **Non-conflict with other obligations**

The entry into and performance by it of, and the transactions contemplated by, the Finance Documents and the granting of the Transaction Security do not and will not conflict with:

(a) any law or regulation applicable to it;

(b) the Constitutional Documents of the Borrower; or

(c) any agreement or instrument binding upon it or any of its assets or constitute a default or termination event (however described) under any such agreement or instrument.

14.5 **Power and authority**

(a) It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Finance Documents to which it is or will be a party and the transactions contemplated by those Finance Documents.

(b) No limit on its powers will be exceeded as a result of the borrowing, grant of security or giving of guarantees or indemnities contemplated by the Finance Documents to which it is a party.

14.6 **Validity and admissibility in evidence**

(a) All Authorisations required or desirable:

(i) to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Finance Documents to which it is a party; and

(ii) to make the Finance Documents to which it is a party admissible in evidence in its jurisdiction of incorporation,

have been obtained or effected and are in full force and effect except any Authorisation referred to in Clause 14.9 (*No filing or stamp taxes*).

(b) All Authorisations necessary for the conduct of the business, trade and ordinary activities of the Borrower have been obtained or effected and are in full force and effect.

14.7 **Governing law and enforcement**

(a) The choice of governing law of the Finance Documents will be recognised and enforced in its jurisdiction of incorporation.

(b) Any judgment obtained in relation to a Finance Document in the jurisdiction of the governing law of that Finance Document will be recognised and enforced in its jurisdiction of incorporation.

14.8 **Insolvency**

No:

(a) corporate action, legal proceeding or other procedure or step described in paragraph (a) of Clause 17.6 (*Insolvency proceedings*); or

(b) creditors' process described in Clause 17.7 (*Creditors' process*),

has been taken or, to the knowledge of the Borrower, threatened in relation to a member of the Borrower; and none of the circumstances described in Clause 17.5 (*Insolvency*) applies to the Borrower.

14.9 **No filing or stamp taxes**

Under the laws of its jurisdiction of incorporation it is not necessary that the Finance Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents except registration of particulars of the Transaction Security Documents at the Accounting and Corporate Regulatory Authority in Singapore in and the payment of associated fees and which registrations and filings will be made and paid promptly after the date of the relevant Transaction Security Document.

14.10 **Deduction of Tax**

It is not required to make any deduction for or on account of Tax from any payment it may make under any Finance Document.

14.11 **No default**

(a) No Event of Default and, on the date of this Agreement, no Default is continuing or is reasonably likely to result from the making of any Utilisation or the entry into, the performance of, or any transaction contemplated by, any Finance Document.

(b) No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on it or to which its assets are subject.

14.12 **No misleading information**

Save as disclosed in writing to the Lender prior to the date of this Agreement:

(a) any factual information provided to the Lender by (or on behalf of) the Borrower was true and accurate in all material respects as at the date of the relevant information was given;

(b) any projections or forecasts as at their date were prepared on the basis of recent historical information and on the basis of assumptions believed by the Borrower to be reasonable and were fair (as at the date of the relevant document containing the projection or forecast) and arrived at after careful consideration;

(c) no event or circumstance has occurred or arisen and no information has been omitted and no information has been given or withheld that results in the information, or forecasts or projections provided being untrue or misleading in any material respect; and

(d) all other written information provided by the Borrower (including its advisers) to the Lender was true, complete and accurate in all material respects as at the date it was provided and is not misleading in any material respect.

14.13 **Financial Statements**

(a) There has been no material adverse change in the assets, business or consolidated financial condition of the Borrower since the date of this Agreement.

(b) The most recent financial statements delivered pursuant to Clause 15.1 (*Financial statements*):

(i) have been prepared in accordance with the Accounting Principles; and

(ii) give a true and fair view of the Borrower's consolidated financial condition as at the end of, and consolidated results of operations for, the period to which they relate.

(c) The budgets and forecasts supplied under this Agreement were arrived at after careful consideration and have been prepared in good faith on the basis of recent historical information and on the basis of assumptions which were believed by the Borrower to be reasonable as at the date they were prepared and supplied.

(d) Since the date the financial statements have been delivered pursuant to Clause 15.1 *(Financial statements)*, there has been no material adverse change in the assets, business or consolidated financial condition of the Borrower.

14.14 **No proceedings**

(a) No litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency have been started or threatened against it.

(b) No judgment or order of a court, arbitral tribunal or other tribunal or any order or sanction of any governmental or other regulatory body has been made against it.

14.15 **No breach of laws**

(a) It has not breached any law or regulation which breach has or is reasonably likely to have a Material Adverse Effect.

(b) No labour disputes are current or, to the best of its knowledge and belief (having made due and careful enquiry), threatened against the Borrower which have or are reasonably likely to have a Material Adverse Effect.

14.16 **Taxation**

(a) It is not materially overdue in the filing of any Tax returns and it is not overdue in the payment of any amount in respect of Tax.

(b) No claims or investigations are being, or are reasonably likely to be, made or conducted against it with respect to Taxes.

(c) It has duly filed its annual accounts with all relevant authorities.

(d) It is resident for Tax purposes only in its jurisdiction of incorporation.

14.17 **Anti-corruption law**

The Borrower has conducted its businesses in compliance with applicable anti-corruption laws and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

14.18 **Sanctions**

Neither it nor any of its respective directors, officers or employees or, to its knowledge, any of its representatives or agents:

(a) is a Restricted Party; or

(b) has received notice from a Sanctions Authority that it is subject to any claim, action, proceeding or investigation with respect to applicable Sanctions.

14.19 **Ranking**

The Transaction Security has or will have the ranking in priority which it is expressed to have in the Transaction Security Documents.

### 14.20 Good title to assets

It has a good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently conducted.

### 14.21 Legal and beneficial ownership

It is the sole legal and beneficial owner of the respective assets over which it purports to grant Security.

### 14.22 Times when representations made

(a) All the representations and warranties in this Clause 14 are made by the Borrower on the date of this Agreement.

(b) The Repeating Representations are deemed to be made by the Borrower:

(i) on the date of the Utilisation Request;

(ii) on the Utilisation Date; and

(iii) on the last day of each Interest Period.

(c) Each representation or warranty deemed to be made after the date of this Agreement shall be deemed to be made by reference to the facts and circumstances existing at the date the representation or warranty is deemed to be made.

## 15. INFORMATION UNDERTAKINGS

The undertakings in this Clause 15 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

In this Clause 15:

"**Annual Financial Statements**" means the financial statements for a financial year delivered pursuant to paragraph 0 of Clause 15.1 (*Financial statements*).

### 15.1 Financial statements

The Borrower shall supply to the Lender, as soon as they are available, but in any event within 180 days after the end of each of its financial years, its audited consolidated financial statements for that financial year.

### 15.2 Requirements as to financial statements

(a) The Borrower shall procure that each set of Annual Financial Statements includes a balance sheet, profit and loss account and cashflow statement.

(b) Each set of financial statements delivered pursuant to Clause 15.1 (*Financial statements*):

(i) shall be certified by a director of the relevant company as giving a true and fair view of the Borrower's financial condition and operations as at the date as at which those financial statements were drawn up and, in the case of the Annual Financial Statements, shall be accompanied by any letter addressed to the

management of the relevant company by the auditors of those Annual Financial Statements and accompanying those Annual Financial Statements;

(ii) shall be prepared in accordance with the Accounting Principles.

15.3 **Information: miscellaneous**

The Borrower shall supply to the Lender:

(a) at the same time as they are dispatched, copies of all documents dispatched by the Borrower to its shareholders generally (or any class of them) or dispatched by the Borrower to its creditors generally (or any class of them);

(b) promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against the Borrower;

(c) promptly, such information as the Lender may require about the Charged Property and compliance of the Borrower with the terms of any Transaction Security Documents; and

(d) promptly on request, such further information regarding its financial condition, assets and operations, any requested amplification or explanation of any item in the financial statements, budgets or other material provided by the Borrower under this Agreement, any changes to its management and an up to date copy of its shareholders' register, as well as any information or documentation requested by the Lender.

15.4 **Notification of default**

(a) The Borrower shall notify the Lender of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.

(b) Promptly upon a request by the Lender, the Borrower shall supply to the Lender a certificate signed by two of its directors or senior officers on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

15.5 **"Know your customer" checks**

(a) If:

(i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

(ii) any change in the status of the Borrower or the composition of the shareholders of the Borrower after the date of this Agreement; or

(iii) a proposed assignment or transfer by the Lender of any of its rights and/or obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer,

obliges the Lender or in the case of paragraph (iii) above, any prospective new Lender to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Borrower shall promptly upon the request of the Lender supply, or procure the supply

of, such documentation and other evidence as is reasonably requested by the Lender (for itself or, in the case of the event described in paragraph (iii) above, on behalf of any prospective new Lender) in order for the Lender or, in the case of the event described in paragraph (iii) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

## 16. GENERAL UNDERTAKINGS

Unless expressly stated otherwise, the undertakings in this Clause 16 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

### 16.1 Authorisations

The Borrower shall promptly:

(a) obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b) supply certified copies to the Lender of:

any Authorisation required under any applicable law or regulation to:

(i) enable it to perform its obligations under the Finance Documents;

(ii) ensure the legality, validity, enforceability or admissibility in evidence of any Finance Document; and

(iii) carry on its business where failure to do so has or is reasonably likely to have a Material Adverse Effect.

### 16.2 Compliance with laws

The Borrower shall comply in all respects with all laws to which it is subject.

### 16.3 Anti-corruption law

(a) The Borrower shall not directly or indirectly use the proceeds of the Facility for any purpose which would breach the Bribery Act 2010, the United States Foreign Corrupt Practices Act of 1977 or other similar legislation in other jurisdictions.

(b) The Borrower shall:

(i) conduct its businesses in compliance with applicable anti-corruption laws; and

(ii) maintain policies and procedures designed to promote and achieve compliance with such laws.

### 16.4 Sanctions

(a) The Borrower shall not:

(i) use the proceeds of any Loan to, directly or indirectly, finance or make available funds to any Restricted Party or any other person if and to the extent such financing or provision of funds would result in a violation of Sanctions

by the Borrower or, to the knowledge of the Borrower, cause the Lender to be in breach of any Sanctions; or

(ii) knowingly use any funds identified as directly derived from any activity or dealing with a person listed on a Sanctions List in discharging any obligation due or owing to the Lender under the Finance Documents to the extent such use of such funds would cause the Lender to be in breach of any Sanctions.

(b) The Borrower shall:

(i) take reasonable measures to ensure its compliance with Sanctions applicable to it; and

(ii) promptly upon becoming aware of them, supply to the Lender details of any claim, action, suit, proceedings or investigation against it by any Sanctions Authority as notified by that Sanctions Authority to the Borrower with respect to Sanctions applicable to it.

16.5 **Taxation**

(a) The Borrower shall pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring penalties.

(b) The Borrower may not change its residence for Tax purposes.

16.6 **Merger**

The Borrower shall not enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction.

16.7 **Change of business/conduct of business**

(a) The Borrower shall procure that no substantial change is made to the general nature of the business of the Borrower at the date of this Agreement.

(b) The Borrower undertakes that it conducts its business in a prudent and reasonable manner having regard to the rights and interests of its creditors generally.

16.8 **Purpose**

The Borrower shall apply all amounts under the Facility exclusively for the purposes set out in Clause 3.1 (*Purpose*) and shall promptly at the Lender's request provide evidence of such application.

16.9 **Pari passu ranking**

The Borrower shall ensure that at all times any unsecured and unsubordinated claims of the Lender against it under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

16.10 **Arm's length basis**

The Borrower shall not enter into any transaction with any person except on arm's length terms and for full market value.

16.11 **Dividends and share redemption**

The Borrower shall not:

(a) declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital);

(b) repay or distribute any dividend or share premium reserve;

(c) pay any management, advisory or other fee to or to the order of any of the shareholders of the Borrower; or

(d) redeem, repurchase, defease, retire or repay any of its share capital or resolve to do so,

without the prior written consent of the Lender.

16.12 **Constitutional documents**

The Borrower shall not amend, supplement or otherwise modify its Constitutional Documents.

16.13 **Further assurance**

(a) The Borrower shall promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the Lender may reasonably specify (and in such form as the Lender may reasonably require in favour of the Lender or its nominee(s)):

(i) to perfect the Security created or intended to be created under or evidenced by the Transaction Security Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Transaction Security) or for the exercise of any rights, powers and remedies of the Lender provided by or pursuant to the Finance Documents or by law;

(ii) to confer on the Lender Security over any of its property and assets located in any jurisdiction equivalent or similar to the Security intended to be conferred by or pursuant to the Transaction Security Documents; and/or

(iii) to facilitate the realisation of the assets which are, or are intended to be, the subject of the Transaction Security.

(b) The Borrower shall take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Lender by or pursuant to the Finance Documents.

17. **EVENTS OF DEFAULT**

Each of the events or circumstances set out in this Clause 17 is an Event of Default (save for Clause 17.16 (*Acceleration*)).

17.1 **Non-payment**

(a) The Borrower does not pay on the due date any amount payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless:

(i) its failure to pay is caused by administrative or technical error; and

(ii) payment is made within two Business Days of its due date.

17.2 **Other obligations**

(a) The Borrower does not comply with any provision of the Finance Documents (other than those referred to in Clause 17.1 (*Non-payment*).

(b) No Event of Default under paragraph (a) above will occur if the failure to comply is capable of remedy and is remedied within ten Business Days of the earlier of (i) the Lender giving notice to the Borrower and (ii) the Borrower becoming aware of the failure to comply.

17.3 **Misrepresentation**

(a) Any representation or statement made or deemed to be made by the Borrower in the Finance Documents or any other document delivered by or on behalf of the Borrower under or in connection with any Finance Document is or proves to have been incorrect or misleading when made or deemed to be made.

(b) No Event of Default under paragraph (a) above will occur if the failure to comply is capable of remedy and is remedied within ten Business Days of the earlier of (i) the Lender giving notice to the Borrower and (ii) the Borrower becoming aware of the failure to comply.

17.4 **Cross default**

(a) Any Financial Indebtedness of the Borrower is not paid when due nor within any originally applicable grace period.

(b) Any Financial Indebtedness of the Borrower is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(c) Any commitment for any Financial Indebtedness of the Borrower is cancelled or suspended by a creditor of the Borrower as a result of an event of default (however described).

(d) Any creditor of the Borrower becomes entitled to declare any Financial Indebtedness of the Borrower due and payable prior to its specified maturity as a result of an event of default (however described).

17.5 **Insolvency**

(a) The Borrower is or is presumed or deemed to be unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more

of its creditors (excluding any Finance Party in its capacity as such) with a view to rescheduling any of its indebtedness.

(b) The value of the assets of the Borrower is less than its liabilities (taking into account contingent and prospective liabilities).

(c) A moratorium, other than an Ipso Facto Event, is declared in respect of any indebtedness of the Borrower.

17.6 **Insolvency proceedings**

Any corporate action, legal proceedings or other procedure or step is taken in relation to:

(a) the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration, judicial management, provisional supervision or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any the Borrower;

(b) a composition or arrangement with any creditor of the Borrower, or an assignment for the benefit of creditors generally of the Borrower or a class of such creditors;

(c) the appointment of a liquidator, receiver, administrator, judicial manager, administrative receiver, compulsory manager, provisional supervisor or other similar officer in respect of the Borrower or any of its assets; or

(d) enforcement of any Security over any assets of the Borrower,

(e) or any analogous procedure or step is taken in any jurisdiction.

Paragraph (a) above shall not apply to (i) an Ipso Facto Event; or (ii) any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 30 days of commencement.

17.7 **Creditors' process**

Any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of the Borrower.

17.8 **Unlawfulness and invalidity**

(a) It is or becomes unlawful for the Borrower to perform any of its obligations under the Finance Documents or any Transaction Security created or expressed to be created or evidenced by the Transaction Security Documents ceases to be effective.

(b) Any obligation or obligations of the Borrower under any Finance Documents are not or cease to be legal, valid, binding or enforceable.

(c) Any Finance Document ceases to be in full force and effect or any Transaction Security ceases to be legal, valid, binding, enforceable or effective or is alleged by a party to it (other than the Lender) to be ineffective.

17.9 **Cessation of business**

The Borrower suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business.

17.10 **Audit qualification**

The Borrower's auditors qualify the audited annual consolidated financial statements of the Borrower.

17.11 **Expropriation**

The authority or ability of the Borrower to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to the Borrower or any of its assets.

17.12 **Repudiation and rescission of agreements**

The Borrower (or any other relevant party) rescinds or purports to rescind or repudiates or purports to repudiate a Finance Document or any of the Transaction Security or evidences an intention to rescind or repudiate a Finance Document or any Transaction Security.

17.13 **Litigation**

Any litigation, arbitration, administrative, governmental, regulatory or other investigations, proceedings or disputes are commenced or threatened, or any judgment or order of a court, arbitral tribunal or other tribunal or any order or sanction of any governmental or other regulatory body is made, in relation to the Finance Documents or the transactions contemplated in the Finance Documents or against its assets.

17.14 **Material Adverse Effect**

Any event or circumstance or series of events or circumstances occurs which the Lender believes has or could reasonably be expected to have a Material Adverse Effect.

17.15 **Declared company**

The Borrower is declared by the Minister for Finance of Singapore to be a company to which Part IX of the Companies Act applies.

17.16 **Acceleration**

On and at any time after the occurrence of an Event of Default which is continuing the Lender may:

(a) by notice to the Borrower:

  (i) cancel the Commitment at which time it shall immediately be cancelled;

  (ii) declare that all or part of the Utilisations, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, at which time they shall become immediately due and payable;

  (iii) declare that all or part of the Utilisations be payable on demand, at which time they shall immediately become payable on demand by the Lender; and/or

(b) exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

## SECTION 8

## CHANGES TO THE PARTIES

### 18. CHANGES TO THE LENDER

**18.1 Assignments and transfers by the Lender**

(a) Subject to paragraph (a) below, the Lender may not assign any of its rights or transfer by novation any of its rights and obligations under any Finance Document to any person (including without limitation through granting participations or sub-participations) without the prior written consent of the Borrower (not to be unreasonably withheld or delayed).

(b) The consent of the Borrower is not required for an assignment or transfer under paragraph (a) above where the assignment or transfer is made at a time when an Event of Default is continuing.

### 19. CHANGES TO THE BORROWER

**19.1 Assignment and transfers by the Borrower**

The Borrower may not assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

## SECTION 9

## ADMINISTRATION

### 20. PAYMENT MECHANICS

**20.1 Payments to the Lender**

(a) On each date on which the Borrower is required to make a payment under a Finance Document, the Borrower shall make the same available to the Lender (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Lender as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b) Payment shall be made to such account in the principal financial centre of the country of that currency and with such bank as the Lender, in each case, specifies.

**20.2 Distributions to the Borrower**

The Lender may (with the consent of the Borrower or in accordance with Clause 21 (*Set-Off*)) apply any amount received by it for the Borrower in or towards payment (on the date and in the currency and funds of receipt) of any amount due from the Borrower under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

**20.3 Partial payments**

(a) If the Lender receives a payment for application against amounts due in respect of any Finance Documents that is insufficient to discharge all the amounts then due and payable by the Borrower under the Finance Documents, the Lender shall apply that

payment towards the obligations of the Borrower under the Finance Documents in the following order:

(i) **first**, in or towards payment of any unpaid amount owing to the Arranger under the Finance Documents;

(ii) **secondly**, in or towards payment of any accrued interest, fee or commission due but unpaid under the Finance Documents;

(iii) **thirdly**, in or towards payment of any principal due but unpaid under the Finance Documents; and

(iv) **fourthly**, in or towards payment of any other sum due but unpaid under the Finance Documents.

(b) The Lender may vary the order set out in paragraphs (a)(ii) to (iv) above.

(c) Paragraphs (a) and (b) above will override any appropriation made by the Borrower.

### 20.4 Set-off by the Borrower

All payments to be made by the Borrower under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

### 20.5 Business Days

(a) Any payment under the Finance Documents which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b) During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement, interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

### 20.6 Currency of account

(a) Subject to paragraphs (b) and (c) below, Dollars is the currency of account and payment for any sum due from the Borrower under any Finance Document.

(b) Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(c) Any amount expressed to be payable in a currency other than Dollars shall be paid in that other currency.

## 21. SET-OFF

A Finance Party may set off any matured obligation due from the Borrower under the Finance Documents against any matured obligation owed by that Finance Party to the Borrower, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, that Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

## 22. NOTICES

### 22.1 Communications in writing

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax or electronic mail.

### 22.2 Addresses

The address and email address (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

(a) in the case of the Borrower:

Address: 30 Cecil Street, |19-08 Prudential tower, Singapore 049712

Email: byju@byjus.com

Tel: +65 6812 1611

Attention: Mr Byju Raveendran

(b) in the case of the Lender:

Revere Manager LLC
Attn: Kyle Wool, Manager
650 5th Avenue, 35th Floor
New York, NY 10019
Phone: (212) 688-2350
E-mail: kwool@reveresecurities.com

or any substitute address, email address or department or officer as a Party may notify to the other Party, by not less than five Business Days' notice, if a change is made.

### 22.3 Delivery

(a) Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(i) if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

(ii) if by way of electronic mail, if received on or before 5:00 p.m. in the place in which the Party to whom the relevant communication is sent or made available has its address for the purpose of this Agreement, on that day, or if received after 5.00 p.m, on the then next day,

and, if a particular department or officer is specified as part of its address details provided under Clause 22.2 (*Addresses*), if addressed to that department or officer.

(b) Any communication or document to be made or delivered to a Finance Party will be effective only when actually received by the Finance Party and then only if it is expressly marked for the attention of the department or officer identified with the

Finance Party's signature below (or any substitute department or officer as a Finance Party shall specify for this purpose).

(c) Any communication or document made or delivered to the Borrower in accordance with this Clause 22.3 will be deemed to have been made or delivered to the Borrower.

(d) Any communication or document which becomes effective, in accordance with paragraphs (a) to (c) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

22.4 **English language**

(a) Any notice given under or in connection with any Finance Document must be in English.

(b) All other documents provided under or in connection with any Finance Document must be:

(i) in English; or

(ii) if not in English, and if so required by the Lender, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 23. CALCULATIONS AND CERTIFICATES

23.1 **Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

23.2 **Certificates and determinations**

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

23.3 **Day count convention**

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 365 days.

## 24. PARTIAL INVALIDITY

If, at any time, any provision of a Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 25. REMEDIES, WAIVERS AND HARDSHIP

25.1 **Remedies and waivers**

No failure to exercise, nor any delay in exercising, on the part of any Secured Party, any right or remedy under a Finance Document shall operate as a waiver of any such right or remedy or

constitute an election to affirm any Finance Document. No election to affirm any Finance Document on the part of any Secured Party shall be effective unless it is in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in each Finance Document are cumulative and not exclusive of any rights or remedies provided by law.

## 26. AMENDMENTS AND WAIVERS

Any term of the Finance Documents may be amended or waived with the agreement of the Lender and the Borrower.

## 27. CONFIDENTIALITY

### 27.1 Confidential Information

Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by Clause 27.2 (*Disclosure of Confidential Information*), and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

### 27.2 Disclosure of Confidential Information

Any Finance Party may disclose:

(a) to any of its Affiliates and any of its or their officers, directors, employees, professional advisers, auditors, partners and Representatives such Confidential Information as that Finance Party shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this paragraph (a) is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

(b) to any person:

(i) to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Finance Documents and, in each case, to any of that person's Affiliates, Representatives and professional advisers;

(ii) with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or the Borrower and to any of that person's Affiliates, Representatives and professional advisers;

(iii) appointed by that Finance Party or by a person to whom paragraph (b)(i) or (ii) above applies to receive communications, notices, information or documents delivered pursuant to the Finance Documents on its behalf;

(iv) who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in paragraph (b)(i) or (b)(ii) above;

(v) to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(vi) to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes;

(vii) who is a Party; or

(viii) with the consent of the Borrower;

in each case, such Confidential Information as that Finance Party shall consider appropriate if:

(A) in relation to paragraphs (b)(i), (b)(ii) and (b)(iii) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information;

(B) in relation to paragraph (b)(iv) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential Information they receive and is informed that some or all of such Confidential Information may be price-sensitive information;

(C) in relation to paragraphs (b)(v) and (b)(vi), the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of that Finance Party, it is not practicable so to do in the circumstances;

(c) to any person appointed by that Finance Party or by a person to whom paragraph (b)(i) or (b)(ii) above applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this paragraph (c) if the service provider to whom the Confidential Information is to be given has entered into a confidentiality agreement substantially in the form of the LMA Master Confidentiality Undertaking for Use With Administration/Settlement Service Providers or such other form of confidentiality undertaking agreed between the Borrower and the Lender; and

(d) to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Borrower if the rating agency to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information.

27.3 **Continuing obligations**

The obligations in this Clause 27 are continuing and, in particular, shall survive and remain binding on the Finance Parties for a period of twelve months from the earlier of:

(a) the date on which all amounts payable by the Borrower under or in connection with the Finance Documents have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

(b) the date on which a Finance Party otherwise ceases to be a Finance Party for the purposes hereof.

27.4 **Entire agreement**

This Clause 27 constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

28. **COUNTERPARTS**

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

29. **ARRANGER**

29.1 **Role of the Arranger**

Except as specifically provided in the Finance Documents, the Arranger has no obligations of any kind to any other Party under or in connection with any Finance Document.

29.2 **No fiduciary duties**

(a) Nothing in any Finance Document constitutes the Arranger as a trustee or fiduciary of any other person.

(b) The Arranger shall not be bound to account to the Lender for any sum or the profit element of any sum received by it for its own account.

29.3 **Business with the Group**

The Arranger may accept deposits from, lend money to and generally engage in any kind of banking or other business with any other Party.

29.4 **Responsibility for documentation**

The Arranger is not responsible or liable for:

(a) the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Arranger, the Borrower or any other person given in or in connection with any Finance Document or the transactions contemplated in the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; or

(b) the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document.

29.5 **Exclusion of liability**

Nothing in this Agreement shall oblige the Arranger to conduct:

(a) any "know your customer" or other procedures in relation to any person; or

(b) any check on the extent to which any transaction contemplated by this Agreement might be unlawful for the Lender,

on behalf of the Lender and the Lender confirms to the Arranger that it is solely responsible for any such procedures or check it is required to conduct and that it shall not rely on any statement in relation to such procedures or check made by the Arranger.

29.6 **Credit appraisal by the Lenders**

Without affecting the responsibility of the Borrower for information supplied by it or on its behalf in connection with any Finance Document, the Lender confirms to the Arranger that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a) the financial condition, status and nature of the Borrower;

(b) the legality, validity, effectiveness, adequacy or enforceability of any Finance Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(c) whether the Lender has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(d) the adequacy, accuracy and/or completeness of any information provided by any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document.

## SECTION 10

## GOVERNING LAW AND ENFORCEMENT

## 30. GOVERNING LAW

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by Delaware law, United States of America.

31. **ENFORCEMENT**

31.1 **Jurisdiction of New York Courts**

(a) The Parties agrees that all legal proceedings concerning the interpretations, enforcement, and defense of the transactions contemplated by this Agreement (whether brought against a party hereto or its respective Affiliates, directors, officers, stockholders, partners, members, employees, or agents) shall be commenced exclusively in the state and federal courts sitting in Manhattan, New York, United States of America. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the Manhattan, New York, United States of America for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein. If any Party shall commence an action, suit, or proceeding to enforce any provisions of this Agreement, then the prevailing party in such action, suit, or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation, and prosecution of such action or proceeding. (a "**Dispute**").

(b) The Parties agree that the courts of New York, United States of America are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

# SCHEDULE 1
# CONDITIONS PRECEDENT

1. **Borrower**

(a) A copy of the Constitutional Documents of the Borrower.

(b) A copy of a resolution of the board of directors of the Borrower:

(i) approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute, deliver and perform the Finance Documents to which it is a party;

(ii) authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf; and

(iii) authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party.

(c) A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above in relation to the Finance Documents and related documents.

(d) A certificate of the Borrower (signed by a director) confirming that borrowing the Commitment would not cause any borrowing limit binding on the Borrower to be exceeded and certifying that each copy document relating to it specified in this Schedule 1 is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of this Agreement.

2. **Finance Documents**

(a) Each Finance Document, duly executed by the Borrower.

(b) A copy of all notices required to be sent under the Transaction Security Documents, executed by the Borrower, duly acknowledged by the relevant addressee.

3. **Other documents and evidence**

(a) A copy of any other Authorisation or other document, opinion or assurance which the Lender considers to be necessary or desirable in connection with the entry into and performance of the transactions contemplated by any Finance Document or for the validity and enforceability of any Finance Document.

(b) Evidence that the fees, costs and expenses then due the Borrower pursuant to Clause 13 (*Costs and Expenses*) have been paid or will be paid by the Utilisation Date.

**SCHEDULE 2**
**UTILISATION REQUEST**

From: Byjus Global Pte Ltd.

To: Revere Master SPV LLC, Series VII-A (Byju)

Dated: July 18, 2022

Dear Sirs

**$250 Million Facility Agreement**
**dated July 18, 2022 (the "Facility Agreement")**

1. We refer to the Facility Agreement. This is a Utilisation Request. Terms defined in the Facility Agreement have the same meaning in this Utilisation Request.

2. We wish to borrow a Loan on the following terms:

   (a) Proposed Utilisation Date: [●] (or, if that is not a Business Day, the next Business Day)

   (b) Amount: $200,000,000

3. We confirm that each condition specified in Clause 4.2 (*Further conditions precedent*) of the Facility Agreement is satisfied on the date of this Utilisation Request.

4. The proceeds of this Loan should be credited to [*account*].

5. This Utilisation Request is irrevocable.

Yours faithfully

DocuSigned by:
……………………
F7F0B417823E40F...

7/18/2022

authorised signatory for
**Byjus Global Pte Ltd.**

# EXECUTION PAGES

**THE BORROWER**

**Signed for an on behalf of**
**Byjus Global Pte Ltd**.

DocuSigned by:
F7F0B417823E40F...

Name: Byju Raveendran

Title: FOUNDER CEO

**THE LENDER**

**Signed for an on behalf of**
**Revere Master SPV LLC, Series VII-A (Byjus)**

**By its Investment Manager, Revere IM LLC**

DocuSigned by:
Kyle Wool
D7D1A47C7225425...

Name: Kyle Wool

Title: Manager of the Manager

# EXHIBIT 3

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**Intentional misstatements or omissions of fact constitute federal criminal violations. See 18 U.S.C. 1001.**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

## FORM D

## Notice of Exempt Offering of Securities

### 1. Issuer's Identity

CIK (Filer ID Number): 0001936379

Previous Names: [X] None

Entity Type:
- [ ] Corporation
- [ ] Limited Partnership
- [X] Limited Liability Company
- [ ] General Partnership
- [ ] Business Trust
- [ ] Other (Specify)

Name of Issuer
Revere Master SPV LLC Series VII (Byju)

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization
- [ ] Over Five Years Ago
- [X] Within Last Five Years (Specify Year) 2022
- [ ] Yet to Be Formed

### 2. Principal Place of Business and Contact Information

Name of Issuer
Revere Master SPV LLC Series VII (Byju)

| Street Address 1 | Street Address 2 | | |
|---|---|---|---|
| 650 5TH AVENUE | 35TH FLOOR | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| NEW YORK | NEW YORK | 10019 | 917 848 8320 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Revere Manager LLC | -- | |
| **Street Address 1** | **Street Address 2** | |
| 650 5th Avenue | 35th Floor | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| New York | NEW YORK | 10019 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Manager of the Issuer.

**4. Industry Group**

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [X] Pooled Investment Fund
    - [ ] Hedge Fund
    - [ ] Private Equity Fund
    - [X] Venture Capital Fund
    - [ ] Other Investment Fund
    - Is the issuer registered as an investment company under the Investment Company Act of 1940?
      - [ ] Yes
      - [X] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

**5. Issuer Size**

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [X] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

[X] Investment Company Act Section 3(c)

[ ] Rule 504(b)(1) (not (i), (ii) or (iii))
[ ] Rule 504 (b)(1)(i)
[ ] Rule 504 (b)(1)(ii)
[ ] Rule 504 (b)(1)(iii)
[X] Rule 506(b)
[ ] Rule 506(c)
[ ] Securities Act Section 4(a)(5)

[X] Section 3(c)(1)
[ ] Section 3(c)(2)
[ ] Section 3(c)(3)
[ ] Section 3(c)(4)
[ ] Section 3(c)(5)
[ ] Section 3(c)(6)
[ ] Section 3(c)(7)
[ ] Section 3(c)(9)
[ ] Section 3(c)(10)
[ ] Section 3(c)(11)
[ ] Section 3(c)(12)
[ ] Section 3(c)(13)
[ ] Section 3(c)(14)

## 7. Type of Filing

[X] New Notice Date of First Sale 2022-06-29 [ ] First Sale Yet to Occur
[ ] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? [ ] Yes [X] No

## 9. Type(s) of Securities Offered (select all that apply)

[X] Equity
[ ] Debt
[ ] Option, Warrant or Other Right to Acquire Another Security
[ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
[X] Pooled Investment Fund Interests
[ ] Tenant-in-Common Securities
[ ] Mineral Property Securities
[ ] Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $0 USD

## 12. Sales Compensation

Recipient: Revere Securities LLC

Recipient CRD Number [ ] None: 14178

(Associated) Broker or Dealer [X] None: None

(Associated) Broker or Dealer CRD Number [X] None: None

Street Address 1: 650 5th Avenue

Street Address 2: 35th Floor

City

State/Province/Country

ZIP/Postal Code

| New York | NEW YORK | 10019 |
|---|---|---|

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☒ Foreign/non-US

## 13. Offering and Sales Amounts

| | | |
|---|---|---|
| Total Offering Amount | | USD or ☒ Indefinite |
| Total Amount Sold | $275,000,000 | USD |
| Total Remaining to be Sold | | USD or ☒ Indefinite |

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 1

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☒ Estimate

Finders' Fees $0 USD ☒ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$4,125,000 USD ☒ Estimate

Clarification of Response (if Necessary):

Represents a Management Fee payable to Revere Manager LLC.

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is

filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Revere Master SPV LLC Series VII (Byju) | /s/ Kyle Wool | Kyle Wool | Managing Member of the Manager | 2022-07-13 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

# EXHIBIT 4

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**Intentional misstatements or omissions of fact constitute federal criminal violations. See 18 U.S.C. 1001.**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

# FORM D

## Notice of Exempt Offering of Securities

### 1. Issuer's Identity

CIK (Filer ID Number)
0001939882

Previous Names
[X] None

Name of Issuer
REVERE MASTER SPV LLC - SERIES VII - A (BYJUS)

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2022
[ ] Yet to Be Formed

Entity Type
[ ] Corporation
[ ] Limited Partnership
[X] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer
REVERE MASTER SPV LLC - SERIES VII - A (BYJUS)

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 650 FIFTH AVENUE | | 35TH FLOOR | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| NEW YORK | NEW YORK | 10019 | (917) 848-8320 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Revere Manager LLC | -- | |
| **Street Address 1** | **Street Address 2** | |
| 650 Fifth Avenue | 35th Floor | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| New York | NEW YORK | 10019 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Manager of the Issuer.

**4. Industry Group**

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [X] Pooled Investment Fund
    - [ ] Hedge Fund
    - [ ] Private Equity Fund
    - [X] Venture Capital Fund
    - [ ] Other Investment Fund
    - Is the issuer registered as an investment company under the Investment Company Act of 1940?
      - [ ] Yes
      - [X] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

**5. Issuer Size**

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [X] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

[X] Investment Company Act Section 3(c)

[ ] Rule 504(b)(1) (not (i), (ii) or (iii))
[ ] Rule 504 (b)(1)(i)
[ ] Rule 504 (b)(1)(ii)
[ ] Rule 504 (b)(1)(iii)
[X] Rule 506(b)
[ ] Rule 506(c)
[ ] Securities Act Section 4(a)(5)

[X] Section 3(c)(1)
[ ] Section 3(c)(2)
[ ] Section 3(c)(3)
[ ] Section 3(c)(4)
[ ] Section 3(c)(5)
[ ] Section 3(c)(6)
[ ] Section 3(c)(7)
[ ] Section 3(c)(9)
[ ] Section 3(c)(10)
[ ] Section 3(c)(11)
[ ] Section 3(c)(12)
[ ] Section 3(c)(13)
[ ] Section 3(c)(14)

## 7. Type of Filing

[X] New Notice Date of First Sale 2022-07-18 [ ] First Sale Yet to Occur
[ ] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? [ ] Yes [X] No

## 9. Type(s) of Securities Offered (select all that apply)

[X] Equity
[ ] Debt
[ ] Option, Warrant or Other Right to Acquire Another Security
[ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
[X] Pooled Investment Fund Interests
[ ] Tenant-in-Common Securities
[ ] Mineral Property Securities
[ ] Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $0 USD

## 12. Sales Compensation

Recipient: Revere Securities LLC
Recipient CRD Number [ ] None: 14178
(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None
Street Address 1: 650 Fifth Avenue
Street Address 2: 35th Floor
City
State/Province/Country
ZIP/Postal Code

New York NEW YORK 10019

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States

[ ] All States [X] Foreign/non-US

## 13. Offering and Sales Amounts

| | | |
|---|---|---|
| Total Offering Amount | | USD or [X] Indefinite |
| Total Amount Sold | $200,000,000 | USD |
| Total Remaining to be Sold | | USD or [X] Indefinite |

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 1

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $3,000,000 USD [X] Estimate

Finders' Fees $500,000 USD [X] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$477,000 USD [X] Estimate

Clarification of Response (if Necessary):

Represents a Management Fee payable to Revere Manager LLC.

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

### Terms of Submission

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is

filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| REVERE MASTER SPV LLC - SERIES VII - A (BYJUS) | /s/ Kyle Wool | Kyle Wool | Managing Member of the Manager | 2022-08-01 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.