**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Pacifica of the Valley Corp.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH) |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION SECURED FINANCING AND (B) UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley, the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11[2] case (the "Chapter 11 Case"), by and through its undersigned counsel, hereby moves (the "Motion"),[3] pursuant to §§ 105, 362, 363, and 364, Bankruptcy Rules 4001 and 6004, and Local Rule 4001-2, for entry of an interim order (substantially in the form attached hereto as **Exhibit A**, the "Interim Order") and a final order (the "Final Order" and together with the Interim Order, the "Orders"): (i) authorizing the Debtor to (a) obtain postpetition secured financing and (b) utilize Cash Collateral; (ii) granting, subject and subordinate to the Carve-Out and/or as otherwise set forth herein, senior liens and superpriority administrative expense status to the Debtor's existing

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley [7312]. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532; all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure; and "Local Rule" references are to the Local Rules of the United States Bankruptcy Court for the District of Delaware.

[3] Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration, Interim Order, or DIP Agreement (each as defined below).

prepetition secured creditor, Axios Capital Solutions, LLC ("Axios" or, in such capacity, the "DIP Lender") to secure the DIP Obligations; (iii) granting adequate protection; (iv) modifying the automatic stay imposed by § 362 and any other applicable stay (including Bankruptcy Rule 6004) to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents; (v) scheduling a final hearing (the "Final Hearing"); and (vi) granting related relief.

In support of this Motion, the Debtor submits the *Declaration of Peter Chadwick in Support of the Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "Chadwick Declaration"), attached hereto as **Exhibit B**, and the *Declaration of Andrew Turnbull in Support of the Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "Turnbull Declaration"), attached hereto as **Exhibit C**. In further support of the Motion, the Debtor incorporates by reference the *Declaration of Precious Mayes in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 16] (the "First Day Declaration") and respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Debtor filed this Chapter 11 Case in severe financial distress amidst pending litigation to protect patient care and its employees; to preserve the Debtor's operations at its hospital (the "Hospital"), Subacute Skilled Nursing Facility, and Behavioral Health Urgent Care

Clinic, and other programs (collectively, the "Health Care System"); and to preserve the going-concern value of the Debtor's business for its stakeholders and parties in interest.

2. Since the Petition Date, the Debtor has continued to operate without the benefit of debtor in possession financing and with limited liquidity available to sustain operations and administer this Chapter 11 Case. However, absent immediate access to DIP financing and Cash Collateral use, the Debtor will suffer immediate and irreparable harm.

3. After months of extensive negotiations among numerous stakeholders, including Axios, the Committee, and the Debtor's landlord, the Debtor is pleased to report that it has reached a resolution in principle with Axios that provides the Debtor immediate and necessary financing and a clear path toward confirmation of a chapter 11 plan. The DIP Facility represents the best and only path forward for this Chapter 11 Case. It remains in discussions with the Committee and hopes to have their support in advance of the hearing on the Motion.

4. The relief requested in this Motion authorizes the Debtor to enter into a senior secured, superpriority debtor in possession financing facility that represents the only viable financing alternative available under the circumstances. The Debtor was unable to obtain financing on an unsecured, administrative-expense, or otherwise more favorable basis. Critically, the DIP Lender is the holder of the Debtor's prepetition secured debt and has agreed to provide the DIP Facility, which obviates the need for the Debtor to seek to prime an objecting secured creditor or engage in costly and protracted priming litigation.

5. The DIP Facility also requires the Debtor to proceed toward the formulation and filing of a chapter 11 plan consistent with the plan term sheet attached thereto (the "Plan Term Sheet"), which contemplates, among other things, (a) the sale of the Health Care System to Axios, (b) the establishment of a litigation trust funded with certain Excluded Assets, including

avoidance actions and other estate causes of action, for the benefit of general unsecured creditors and (c) the funding of the administrative expenses of the Chapter 11 Case.

6. The DIP Facility therefore provides the liquidity necessary to support the Debtor's ongoing operations and to fund a plan confirmation process, paving the way for a resolution of this Chapter 11 Case. Without the DIP Facility, the Debtor would lack a viable path to continue operations, preserve patient care and approximately 687 jobs, satisfy administrative claims or consummate a plan. Moreover, the value of the estate would rapidly erode to the detriment of all stakeholders. The proposed financing therefore satisfies the requirements of § 364 and reflects the Debtor's sound exercise of business judgment.

7. In short, the DIP Facility is the product of extensive, months long, good-faith and arm's-length negotiations, and contains market-standard terms and protections. The DIP Facility is necessary to maintain patient care, preserve value, avoid irreparable harm, and maximize recoveries for all parties in interest. Accordingly, the Debtor respectfully submits that the relief requested herein is fair, reasonable, and in the best interests of the Debtor, its estate, and all stakeholders, and should be approved on an interim and final basis.

**SUMMARY OF REQUESTED RELIEF STATEMENT**

8. By this Motion, the Debtor requests entry of the Interim Order and the Final Order:

i. authorizing senior secured postpetition financing in an aggregate principal amount of up to $52,500,000 (the "DIP Facility," and the loans provided to the Debtor thereunder, the "DIP Loans"), consisting of (a) new money term loans, in an amount of $21,000,000, which new money term loans shall be made available to the Debtor in multiple tranches pursuant to the terms and subject to the conditions set forth in the DIP Term Sheet and the Orders (the "New Money Loan"); (b) a $2.1 million commitment fee (the "Commitment Fee"); and (c) a "roll up" of the principal amount of Prepetition Obligations, plus interest, fees, and other amounts due thereunder that will be deemed "rolled up" as loans under the DIP Facility on a 1.5x basis (i.e., 1.5 times the dollar amount of cash

actually advanced postpetition) pursuant to the terms and subject to the conditions set forth in the DIP Term Sheet and the Interim Order (the "Roll Up");

ii. Entry into (a) that certain Debtor In Possession Loan Term Sheet (the "DIP Term Sheet"), substantially in the form attached to the Interim Order as **Exhibit 1**, by and among the Debtor and the DIP Lender, and (b) the documents related to the DIP Term Sheet (together with the DIP Term Sheet, the "DIP Documents");

iii. Borrowing, on an interim basis, pursuant to the DIP Documents and this Interim Order, postpetition financing in an aggregate principal amount of up to (a) $7,000,000 of New Money Loans plus (b) the Roll Up (in an amount up to $10,500,000) for an aggregate principal amount on an interim basis of $17,500,000 (the "Interim DIP Facility");

iv. Borrowing, on a final basis, pursuant to the DIP Documents and the Final Order, postpetition financing in an aggregate principal amount of up to $52,500,000, consisting of $21,000,000 of New Money Loans and up to $31,500,000 of Roll Up, upon entry of the Final Order and certain other conditions precedent;

v. Executing and delivering the DIP Term Sheet and the other DIP Documents to the DIP Lender pursuant thereto;

vi. Granting to the DIP Lender the DIP Liens on all of the DIP Collateral to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and the Orders, as applicable (collectively, and including all "Obligations" as defined in the DIP Term Sheet, the "DIP Obligations"), subject only to prior payment of the Carve-Out;

vii. Granting to the DIP Lender allowed superpriority administrative expense claims in this Chapter 11 Case for all DIP Obligations;

viii. Using the proceeds of the DIP Facility in accordance with the DIP Term Sheet, the DIP Documents, and the Interim Order, in all cases in accordance with the Budget, a copy of which is attached to the Interim Order as **Exhibit 2**, and as otherwise provided in the DIP Documents;

ix. Using any Prepetition Collateral, including the Cash Collateral, and provide adequate protection to those parties set forth herein that may

have an interest in such Prepetition Collateral, including Cash Collateral, for any possible Diminution;

x. Modifying the automatic stay imposed by § 362 solely to the extent necessary to implement and effectuate the terms of the DIP Documents and the Interim Order;

xi. Scheduling a Final Hearing to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

xii. Waiving, to the extent applicable, any stay of the immediate effectiveness of an Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that the Interim Order shall be immediately effective upon its entry on the Court's docket.

## JURISDICTION AND VENUE

9. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue of the Chapter 11 Case and related proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10. The statutory bases for the relief requested herein are §§ 105(a), 361, 362, 363, 364, 506(c), 507, and 552, Bankruptcy Rules 2002, 4001, 6003(b), 6004(a), 6004(h), 9013, and 9014, and Local Rules 2002-1, 4001-1, 4001-2, and 9013-1.

## BACKGROUND

### A. General Background

11. On July 4, 2026 (the "Petition Date"), the Debtor commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 11. The Debtor has continued in the possession of its property and continues to operate and manage its business as a debtor in possession pursuant to §§ 1107(a) and 1108.

12. The Debtor's Hospital is a safety net, 231-bed acute care hospital located in Sun Valley, California that offers a full range of inpatient and outpatient services, including 24-hour emergency care, and treats more than 50,000 emergency patients each year. The Debtor also operates a 98-bed, separately licensed subacute Skilled Nursing Unit, a Behavioral Health Urgent Care Clinic, and a Medical Surgical Program. Approximately 84% of the Debtor's patients live at or below the poverty line, and the Debtor is heavily dependent on Medi-Cal, which provides approximately 85% of the Debtor's total revenue. As of July 4, 2026, the Debtor had approximately 697 employees, including registered nurses, technicians, housekeepers, and food-service workers, all of whom are vital to patient care.

13. As set forth in the First Day Declaration, the Debtor faced significant financial challenges as a result of the COVID-19 pandemic, and also faced rising labor costs, state-mandated seismic retrofit requirements and delayed Hospital Quality Assurance Fees ("HQAF") and Disproportionate Share Hospital government reimbursement payments. These factors, among others, contributed to the Debtor's liquidity crisis and the commencement of this Chapter 11 Case.

14. The factual background regarding the Debtor, including its current and historical business operations and the events precipitating its chapter 11 filing, is set forth in detail in the First Day Declaration.

15. On July 20, 2026, the U.S. Trustee appointed a five-member Committee of Unsecured Creditors (the "Committee"). *See* Docket No. 78. No trustee or examiner has been appointed in the Chapter 11 Case.

**B. The Debtor's Prepetition Indebtedness**

**a. The Main Street Priority Loan**

16. On December 10, 2020, the Debtor entered into that certain Main Street Priority Loan Agreement (the "MSL" or "Prepetition Loan") with First Western Trust Bank ("First Western") and the Federal Reserve Bank of Boston (the "Federal Reserve"), pursuant to which First Western extended a senior secured loan to the Debtor in the principal amount of $35,000,000. In connection with the MSL, the Debtor executed a Pledge and Security Agreement granting First Western a security interest in all its personal property.

17. In November 2025, Axios purchased the MSL from First Western. As of the Petition Date, the outstanding balance under the Prepetition Loan is approximately $50,943,321.41, inclusive of all accrued and unpaid interest, fees, costs, and expenses (collectively, the "Prepetition Obligations"). The Prepetition Obligations are secured by liens on substantially all personal property assets of the Debtor (the "Prepetition Collateral" and the liens securing the Prepetition Obligations, the "Prepetition Liens").

18. In May 2025, First Western filed a breach of contract lawsuit (the "Colorado Litigation") styled *First Western Trust Bank v. Pacifica of the Valley Corporation and Paul R. Tuft*, Case No. 2025CV31732 (Division 209), in the District Court of Denver County, Colorado (the "Colorado Court"), over the Debtor's alleged failure to timely repay the MSL. *See* First Day Declaration ¶ 45; *see also* ¶ 12 [Docket No. 36]. In November 2025, after purchasing the MSL, Axios substituted into the Colorado Litigation. *See* ¶ 12 [Docket No. 36]. The Colorado

Court appointed a Special Monitor to investigate Pacifica's operations on May 15, 2026, *see id*. ¶ 13, and later denied Axios's motion for summary judgment on June 26, 2026, ruling that a jury must first resolve questions regarding whether common ownership made the MSL transfer invalid. *See* First Day Declaration ¶ 45 & Ex. B. The Debtor removed the Colorado Litigation to the United States District Court for the District of Colorado, and Axios has filed a motion to remand portions of the Colorado Litigation against defendants other than the Debtor, which is still pending.

**b. The Landlord**

19. The Debtor has operated its Hospital pursuant to a long-term Master Lease with Reliq Pacifica LLC, Beverly Gemini Investments, LLC, Taking the 5th, LLC and Fifth/Arizona Investors, LLC (together, the "Landlord"). As of the Petition Date, the Landlord asserts it is owed approximately $9.5 million on account of accrued and unpaid rent and other obligations under the Master Lease. The Landlord filed a UCC-1 financing statement in November 2022 seeking to perfect a lien in all personal property of the Debtor. That lien was subordinated to First Western's interest (now Axios's interest) pursuant to a Subordination Agreement. The Landlord asserts a security interest in all personal property of the Debtor.

**c. Security Interest in Favor of L.A. Care**

20. Prior to the Petition Date, the Debtor and the Local Initiative Health Authority for Los Angeles County, which operates as L.A. Care Health Plan ("L.A. Care") entered into two purchase agreements pursuant to which the Debtor sold to L.A. Care the right to receive designated future HQAF receivables in exchange for immediate cash consideration. These transactions were structured as true sales, transfers, assignments, and conveyances of the Debtor's right, title, and interest in the designated receivables ($7,500,000 in HQAF payments

expected to be received later this year) to L.A. Care. As a protective measure, the Debtor also granted L.A. Care a back-up security interest in the assigned receivables.

21. On August 3, 2026, the Court entered an order [Docket No. 115] (the "L.A. Care Sale Order") which, among other things, provided that the Debtor stipulated that such prepetition transactions were true sales subject only to a currently pending challenge period provided to the Committee and Axios.

## C. Summary of Terms of DIP Financing

22. In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, the below chart summarizes the significant terms of the proposed DIP Facility and DIP Documents.[4]

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Pacifica of the Valley Corp. d/b/a Pacifica Hospital of the Valley | Interim Order, Preamble (ii); DIP Term Sheet |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | N/A. | N/A |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | N/A. | N/A |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Axios Capital Solutions, LLC, or one or more of its designated affiliates | Interim Order, Preamble (ii); DIP Term Sheet |

[4] The following summary of the terms of the DIP Agreement is subject entirely to the express terms of the DIP Agreement or Interim Order, as applicable. If there are any inconsistencies between the summary below and the DIP Agreement, then the DIP Agreement shall control. If there are any inconsistencies between the summary below and the Interim Order, then the Interim Order shall control.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(i)(A) and (B) | Senior secured super-priority term loan in an aggregate principal amount of $52,500,000, consisting of (i) the Roll Up, being 1.5 times the dollar amount of cash actually advanced postpetition under the DIP Facility, and (ii) New Money Term Loans of $21,000,000, such that, when combined with the Roll-Up, the total outstanding principal amount of the DIP Facility shall not exceed $52,500,000, which New Money Term Loans shall be made available to the Debtor in multiple tranches as follows: (a) an initial advance of $7,000,000 upon entry of the Interim Order; (b) a second advance of $4,000,000 upon entry of the Final Order; (c) a third advance of $3,000,000 payable upon the Debtor's filing of the Plan or Private Sale Motion, as applicable; and (d) a fourth advance of $7,000,000 payable upon the earlier to occur of the Plan Confirmation Milestone (as defined below) and the Sale Closing Milestone. | Interim Order, Preamble (i)-(ii); DIP Term Sheet |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(A), (a)(iii) | Up to (i) $21,000,000 of new money upon entry of the Final Order and satisfaction of all applicable conditions, and (ii) the aggregate principal amount of up to the $7,000,000 Initial Advance, upon entry of the Interim Order. | Interim Order, Preamble (i); DIP Term Sheet |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(iii) | The DIP Facility shall be governed by the approved budget (the "Budget") which shall be in form and substance acceptable to the Debtor and the DIP Lender.<br><br>Starting on the second Monday following entry of the Interim Order, the Budget shall be subject to customary variance testing for operating disbursements, with permitted variances of 15% in the aggregate and 20% for each line item (the "Permitted Variances"). Each variance shall be measured solely on a cumulative basis by comparing actual operating disbursements from the beginning of the applicable budget period through the relevant testing date against budgeted operating disbursements for the same cumulative period, and not on a standalone weekly basis.<br><br>No proceeds of the DIP Facility (except as specifically set forth in the DIP Documents) shall be used to | Interim Order, Preamble (viii); DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | investigate, challenge, object to, contest or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under or the liens or claims granted under or in connection with the Prepetition Secured Debt, the Debtor's Master Lease with the Landlord or the prepetition sales of receivables to L.A. Care.<br><br>The Debtor shall be obligated to comply with the Budget, subject to the Permitted Variances. The Debtor's failure to comply with such requirement shall constitute an immediate Event of Default. | |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Base Interest Rate</u>: 12% per annum from the date of borrowing until repaid, which will be paid in kind (monthly, in arrears) on the then principal amount of the DIP Loan by increasing the principal amount of the DIP Loan.<br><br><u>Default Interest Rate</u>: 4% per annum plus the interest rate otherwise accruing or payable thereon.<br><br>All interest shall be computed on the basis of a three hundred sixty- (360)-day year for the actual number of days elapsed. | DIP Term Sheet |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B), (M) | Proceeds of the DIP Facility may be used solely for the following purposes, in each case, in accordance with and subject to the Budget then in effect, subject to the Permitted Variances: (i) working capital and other ordinary-course operating expenses; (ii) costs and expenses of administering the Chapter 11 Case; (iii) funding of an escrow pursuant to the Budget for payment of documented, reasonable, and court-allowed estate professional fees and expenses; (iv) payment of amounts expressly authorized under the DIP documents or by the Court; (v) the payment of documented and reasonable fees and expenses of Lender's professionals in Axios' capacity as Lender, including negotiation and preparation of the DIP documents (for the avoidance of doubt, all other obligations under the DIP Facility shall be paid-in-kind); and (vi) other purposes identified in the Budget.<br><br>Commitment Fee: There shall also be a fee (a "<u>Commitment Fee</u>") of 10%, which shall be fully | DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | earned and non-refundable upon entry of the Interim Order. | |
| **Maturity Date** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii); Local Rule 4001-2(a)(i)(B), (M), (a)(ii) | All unfunded DIP commitments of the DIP Lender will terminate, and all DIP obligations of the Debtor will be immediately due and payable in full in cash on the earliest of: (a) December 4, 2026 (the "Maturity Date"); (b) the date upon which a Milestone is missed and not waived by the DIP Lender; (c) the date of consummation of any sale of all or substantially all of the assets of Pacifica pursuant to § 363; (d) the date of acceleration of the DIP Loans and the termination of the DIP commitments pursuant to the terms of the DIP Term Sheet or DIP Credit Agreement (e.g., occurrence of event of default); (e) the effective date of the Plan or any plan of reorganization in the Chapter 11 Case (the "Effective Date"); (f) appointment of a chapter 11 trustee in the Chapter 11 Case; and (g) conversion of the Chapter 11 Case to a case under Chapter 7 or dismissal of the Chapter 11 Case (such earliest date of (a)-(g), the "Termination Date"). | Interim Order, ¶ 14; DIP Term Sheet |
| **Collateral and Priority** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Subject to the Carve-Out and the Excluded Assets (as defined in the DIP Term Sheet), and to the extent of funds actually advanced under the DIP Facility, the DIP Lender will receive: (i) a superpriority administrative expense claim under § 364(c)(1); (ii) first-priority liens under § 364(c)(2) on unencumbered property of the estate including without limitations all proceeds of HQAF receivables, and avoidance and preference causes of actions (subject to the DIP Lender's agreement as set forth in the DIP Term Sheet with respect to Excluded Assets); (iii) junior liens under § 364(c)(3) junior to prior permitted senior liens under the Prepetition Loan Documents (as defined in the DIP Term Sheet); and (iv) priming liens under § 364(d) on all collateral securing the Prepetition Secured Debt except for prior permitted senior liens under the Prepetition Loan Documents. | Interim Order, ¶ 3(a); DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(H), (M) | The DIP Documents contain affirmative covenants as are usual and customary for debtor in possession financings, including: compliance with the Budget (subject to the Permitted Variances); weekly liquidity reports, budget-to-actual reporting, and information concerning the plan solicitation and confirmation process to be provided simultaneously to the DIP Lender and the Committee; that the Debtor shall not use funds of the DIP Facility to investigate, challenge, object to, contest, or raise defenses related to the Prepetition Obligations; and such other covenants as agreed to by the DIP Lender and the Borrower. | DIP Term Sheet |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(S) | Such events of default indicated in the DIP Term Sheet and as are customary and/or appropriate for transactions of this type, including: failure to comply with the Budget with Permitted Variances, failure to make timely payments, incurrence of any unauthorized debt, unauthorized sale of assets, breaches of representations or warranties, change of control, Documentation not in form reasonably satisfactory to the DIP Lender, failure to satisfy a Milestone, occurrence of a Termination Date. | DIP Term Sheet |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | The Debtor shall achieve each of the following milestones (as may be extended with the consent of the DIP Lender):<br>(i) <u>Initial Milestone</u>: No later than September 29, 2026, the Bankruptcy Court shall have entered the Interim Order, in form acceptable to Lender.<br>(ii) <u>Lease Extension Milestone</u>: No later than October 5, 2026, the Debtor shall have filed a motion pursuant to § 365(d)(4)(B)(i) to extend the time within which the Debtor may assume or reject the Master Lease, and no later than October 30, 2026, the Court shall have entered an order extending such time through a date not earlier than January 29, 2027.<br>(iii) <u>Sale Closing Milestone</u>: If the DIP Lender elects to purchase the Debtor's | DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | assets via Private Sale, such sale shall close on or before 30 days after such election.<br>(iv) Plan Confirmation Milestone: If the DIP Lender elects to purchase the Debtor's assets pursuant to the Plan, the Debtor shall have confirmed the Plan that is in all respects consistent with the Plan Term Sheet and otherwise in a form and substance reasonably agreeable to the DIP Lender on or before December 4, 2026. | |
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(F), (M) | The DIP liens, replacement liens, superpriority claims, prepetition liens and other protections granted to Lender shall be subject to a "Carve-Out."<br>"Carve-Out" shall mean the sum of the following amounts as of the earlier of the day the Lender issues a Carve-Out Trigger Notice, or the Maturity Date: (i) fees payable to the Clerk of the Bankruptcy Court and the Office of the United States Trustee; (ii) statutory fees payable under 28 U.S.C. § 1930; (iii) allowed professional fees and expenses incurred by Pacifica and the Committee before delivery of a Carve-Out Trigger Notice to the extent consistent with the Approved Budget; and (iv) a post-trigger professional-fee reserve in the amount of $200,000 ("Wind-Down Carve Out").<br>The Carve-Out (including the Wind-Down Carve-Out) shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the Debtor, the Lender, L.A. Care, or the Landlord (except as provided herein) or any affiliates of any of the foregoing entities, or any of their respective officers, directors, employees, agents, advisors, and counsel, including but not limited to challenging the amount, validity, perfection, priority, or enforceability of or asserting any defense, counterclaim or offset to, the obligations and liens and security interests in favor of the Debtor or the Lender. | Interim Order, ¶ 9; DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Prepayments** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(I) | Upon the Debtor's receipt of HQAF funds the Debtor shall be required to use such funds first to pay down the DIP Loan except to the extent such HQAF funds are HQAF Program 8 or 9 funds identified in the current Budget, in which event the Debtor may use such identified HQAF Program 8 or 9 funds in accordance with the Budget. | DIP Term Sheet |
| **Conditions to Closing of DIP Facility** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E) | Conditions to the Initial Advance: (i) the Documentation shall be in form and substance reasonably satisfactory to the Lender; (ii) the Bankruptcy Court will have entered the Interim Order in form and substance acceptable to the DIP Lender, and such order has not been stayed or reversed; (iii) the DIP Lender shall have received and approved the Budget; (iv) no event of default shall have occurred; (v) the Interim Order, as approved, provides that the DIP Lender has at all times acted in good faith and is entitled to the protections of § 364(e); and (vi) upon entry of the Interim Order, the DIP Lender is granted the Super-Priority DIP claim and valid and perfected liens on the DIP Collateral. The DIP Lender may waive any of the conditions precedent at any time, such waiver being sufficient upon confirmation by electronic mail.<br><br>Conditions to Subsequent Advances: (i) the Final Order shall remain in effect; (ii) there shall exist no default (or event that would constitute a default with the giving of notice or lapse of time) under the DIP Facility, including satisfaction of applicable milestones, and all the representations and warranties contained in the DIP Facility shall be true and correct in all respects; (iii) all fees and expenses owing to the Lender in connection with the DIP Facility shall have been paid; (iv) there shall have occurred no material adverse change in the Debtor's (financial, environmental, or otherwise) operations, performance, or properties (other than, in each case, the commencement and continuation of the Chapter 11 Case), since the entry of the Interim Order, that in the reasonable judgment of the Lender, has or can reasonably be expected to have a material adverse effect on the rights and remedies of the Lender or the ability of the Debtor to perform its obligations to them | DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | under the DIP Facility; and (v) the Landlord shall not, in Lender's reasonable judgment, have repudiated or otherwise abandoned the agreement in principle reflected in the Lease Term Sheet. | |
| **DIP Facility Super-Priority Claims** Bankruptcy Rule 4001(c)(1)(B)(i) | All DIP Obligations of the Debtor under the DIP Facility shall be secured by the DIP Liens granted in the DIP Documents and approved by the Court in the Interim Order and the Final Order. The DIP Obligations shall, pursuant to § 364(c)(1), be entitled to superpriority administrative expense claim status in the Chapter 11 Case, which Superpriority Claim shall have priority over any and all claims against the Borrower, including claims under §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114, subject to the terms of the Orders. | Interim Order, ¶ 12(b); DIP Term Sheet |
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | N/A. | Interim Order, D(i); DIP Term Sheet |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) | As adequate protection for diminution in value of its interests in prepetition collateral, Axios shall receive: (i) replacement liens on its prepetition collateral; (ii) reimbursement of actual and documented fees and expenses of Axios in its capacity as Lender in connection with the Chapter 11 Case (including in connection with negotiating this DIP Term Sheet, the Lease Term Sheet, the Credit Agreement and related documents); subject to customary review and payment procedures allowing UST and Committee review; and (iii) stipulations and releases. | DIP Term Sheet |
| **Determination Regarding Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | Subject to the Challenge Rights, the Debtor stipulates and agrees that: (i) the DIP Lender holds valid and enforceable prepetition claims against the Debtor in the aggregate amount of $50,943,321.41 as of the Petition Date; (ii) the DIP Lender's prepetition claims are secured by valid, binding, enforceable, perfected, and non-avoidable liens on and security interests in the applicable prepetition collateral; (iii) the prepetition obligations and related liens are not subject to avoidance, recharacterization, subordination, disallowance, reduction, offset, recoupment, | Interim Order, ¶ D(ii), 21; DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | counterclaim, defense, or other challenge; (iv) the Debtor has no claims or causes of action against the DIP Lender arising from or relating to the Prepetition Loan Document (as defined in the DIP Term Sheet); (v) the assignment of the MSL and any associated documents from First Western to the DIP Lender is valid and enforceable and the DIP Lender has standing to seek to enforce such documents; (vi) neither the DIP Lender nor its principals are an affiliate of the Debtor as defined in the CARES Act or the Bankruptcy Code or an insider of the Debtor; and (vii) all payments made to or for the benefit of the DIP Lender before the Petition Date were valid and not avoidable. | |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi); Local Rule 4001-2(a)(i)(U) | N/A. | N/A |
| **Effect of Debtor's Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii), (vii), (viii) | The Debtor's stipulations shall be binding immediately upon the Debtor and all other parties in interest upon entry of the Final Order. | Interim Order, ¶ D(i); DIP Term Sheet |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv); Local Rule 4001-2(a)(i)(S) | The automatic stay shall be modified to allow the DIP Lender the right to realize on all DIP Collateral, the right to exercise any remedy available under applicable law on 5 business days' notice, subject to obtaining relief from the Bankruptcy Court. | Interim Order, ¶ 6; DIP Term Sheet |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Pursuant to the Interim Order and Final Order, the DIP Lender will be indemnified and held harmless by the Debtor regarding any claim or liability incurred in respect thereof or in any way related thereto, provided that no such party will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent | Interim Order, ¶ 20 |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | jurisdiction to have resulted primarily from such party's actual fraud, gross negligence, bad faith, or willful misconduct. | |
| **Section 506(c) Waiver and Section 552(b) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | Upon entry of the Final Order, the Debtor will waive its rights under § 552(b) and § 506(c). | Interim Order, ¶ 12(c); DIP Term Sheet |
| **Any Provision That Limits the Court's Power to Enter Future Orders**<br>Local Rule 4001-2(a)(i)(C) | N/A. | N/A |
| **Any Provision that Provides for the Funding of Non-Debtor Affiliates**<br>Local Rule 4001-2(a)(i)(D) | N/A. | N/A |
| **Any Provision that Provides for Postpetition Liens on Unencumbered Assets**<br>Local Rule 4001-2(a)(i)(G) | The DIP Term Sheet provides the DIP Lender first-priority liens under § 364(c)(2) on all unencumbered property of the estate. | DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **In Jointly Administered Cases, any Provision Governing Joint Liability of the Debtor**<br>Local Rule 4001-2(a)(i)(J) | N/A. | N/A |
| **Any Provision that Requires the Debtor to Pay an Agent or Lender's Expenses and Attorneys' Fees with no Notice or Review by the UST and Committee**<br>Local Rule 4001-2(a)(i)(K) | N/A. | N/A |
| **Any Provision that Prohibits the Use of Estate Funds to Investigate Liens and Claims of Prepetition Lenders**<br>Local Rule 4001-2(a)(i)(L) | The Committee's right to challenge (i) the Stipulations and Releases set forth in the DIP Term Sheet and (ii) with the consent of L.A. Care, any prepetition transactions between the Debtor and L.A. Care (collectively, the "Challenge Rights") shall be tolled through the Plan Effective Date and, upon the occurrence of the Plan Effective Date, shall be deemed waived and released in accordance with the terms and conditions of the Plan consistent with the Plan Term Sheet; *provided*, *however*, that if the Plan is not confirmed due exclusively to the DIP Lender's failure to fund its obligations under the DIP Facility (it being understood that the DIP Lender's declining to fund any advance as to which any condition precedent has not been satisfied, or following the occurrence of an Event of Default or the Termination Date, shall not constitute a failure to fund), the Committee shall have fourteen (14) days following such breach by Lender to commence and pursue any Challenge Rights. For the | Interim Order, ¶ 22; DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | avoidance of doubt, the Challenge Rights shall be waived and released if the Plan is not confirmed for any reason other than the DIP Lender's failure to fund its obligations under the DIP Facility.. | |
| **Any Provisions granting Cross-Collateralization**<br>Local Rule 4001-2(a)(i)(N) | N/A. | N/A |
| **Any Provisions Deeming Prepetition Debt to be Postpetition Debt**<br>Local Rule 4001-2(a)(i)(O) | DIP Facility provides for a roll-up of the Prepetition Secured Debt in an amount equal to 1.5x of the dollar of cash actually advanced to the Debtor postpetition under the DIP Facility, with such corresponding amount of Prepetition Secured Debt to be automatically rolled up, refinanced, and converted into postpetition obligations under the DIP Facility as and when each such advance is funded. Such roll-up shall constitute a refinancing and continuation, and not a novation, satisfaction, or discharge, of the Prepetition Secured Debt, and the obligations so rolled up shall continue to constitute senior indebtedness for all purposes of any subordination, intercreditor, or similar agreement in favor of the holder of the Prepetition Secured Debt. | Interim Order, ¶¶ I, 4; DIP Term Sheet |
| **Any Provisions Priming Secured Liens Without Consent of Lienholder**<br>Local Rule 4001-2(a)(i)(P) | N/A. | N/A |
| **Any Provisions Binding the Estate to Validity, Perfection or Amount of Secured Debt** | Subject to the Challenger Rights (as defined in the DIP Term Sheet), Pacifica stipulates and agrees that:<br>• Axios holds valid and enforceable prepetition claims against Pacifica in the aggregate amount $50,943,321.41 as of the Petition Date;<br>• Axios's prepetition claims are secured by valid, | Interim Order, ¶ D(i); DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| Local Rule 4001-2(a)(i)(Q) | binding, enforceable, perfected, and non-avoidable liens on and security interests in the applicable prepetition collateral;<br><br>• the prepetition obligations and related liens are not subject to avoidance, recharacterization, subordination, disallowance, reduction, offset, recoupment, counterclaim, defense, or other challenge;<br><br>• Debtor has no claims or causes of action against Axios arising from or relating to the Prepetition Loan, Security Agreement, the Prepetition Secured Debt or otherwise;<br><br>• The assignment of the Prepetition Loan from First Western to Axios is valid and enforceable and Axios has standing to seek to enforce the Prepetition Loan; and<br><br>• all payments made to or for the benefit of Axios before the Petition Date were valid and not avoidable. | |
| **Provisions that Immediately Approve All Terms and Conditions of the Underlying Loan Agreement**<br><br>Local Rule 4001-2(a)(i)(R) | N/A. | N/A |
| **Provisions Limiting What Parties-in-Interest May Raise at Emergency Hearings**<br><br>Local Rule 4001-2(a)(i)(T) | N/A. | N/A |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Provisions that Immediately Shield the Lender from the Equitable Doctrine of Marshalling**<br>Local Rule 4001-2(a)(i)(X) | Upon entry of the Final Order, the Debtor agreed to waive the Doctrine of Marshalling. | DIP Term Sheet |

**D. The Debtor's Need for Postpetition Financing**

23. A critical need exists for the Debtor to obtain access to the DIP Facility in order to, among other things, protect patient care and employees, ensure the continued operation of the Debtor's Health Care System, administer and preserve the value of the Debtor's estate, satisfy administrative expenses, including fees and expenses of retained professionals as well as those of the DIP Lender, and satisfy other ordinary course working capital and operational needs. As a safety net hospital serving a vulnerable patient population, the Debtor's continued operation is critical to the health and welfare of the communities it serves. Furthermore, over the next two weeks, the Debtor forecasts expenses will exceed receipts by $5.6 million because the Debtor must renew its medical malpractice insurance and pay certain monthly premiums, rent, physician compensation, and legally required scheduled capital expenditures (for which the Debtor is currently accruing $5,000 in penalties per day). Chadwick Decl., ¶ 12.

24. The DIP Facility will provide the Debtor with $21,000,000 in new money borrowing capacity to ensure the Debtor will have sufficient liquidity to fund operations and to file and confirm a chapter 11 plan. The DIP Facility will provide funding for continued patient care and Hospital operations, payroll and other ordinary course operating expenses, payments to essential vendors, paying the costs of administering this Chapter 11 Case, including professional fees, and the Debtor pursuing confirmation of a chapter 11 plan. Without access to

this liquidity, the Debtor may be required to curtail operations, halt new patient intakes, and begin transferring patients to other facilities. In the absence of the DIP Facility, the continued operation of the Debtor's business and the administration of this Chapter 11 Case through a plan process would not be possible. The access of the Debtor to sufficient capital and liquidity through the DIP Facility is therefore necessary to preserve the Debtor's operations and permit the Debtor to continue pursuing a value maximizing transaction.

**E. The Debtor's Efforts to Obtain Postpetition Financing**

25. The Debtor and its professionals have worked collaboratively to secure debtor in possession financing, culminating in the Debtor's prepetition secured lender, Axios, agreeing to provide the DIP Facility. In the months following the Petition Date, the Debtor's advisors contacted certain capital providers to assess their willingness to provide debtor in possession financing on more favorable terms. No party was willing to offer financing sufficient to support a restructuring of the Debtor's operations and business on terms more favorable than the DIP Facility. *See* Turnbull Declaration at ¶ 11. Furthermore, based on the facts and circumstances of this Chapter 11 Case, and the events leading thereto, it is highly unlikely that there exists any financing reasonably attainable by the Debtor on more favorable terms than provided through the DIP Facility, particularly where, as here, the Prepetition Lender must consent to priming or otherwise be primed over its objection. *Id.*

26. Furthermore, as set forth herein and in the declarations in support of the Motion, the Debtor's continued operations and the administration of this Chapter 11 Case would not be possible in the absence of the availability of the DIP Facility. The DIP Facility is contingent on a transaction to transition the Hospital's ownership to the DIP Lender through a chapter 11 plan or private sale, in which the DIP Lender intends to acquire the Hospital as consideration for its

DIP Claim. *Id.*, ¶ 17. Based on the marketing process conducted to date, there may not be other viable parties positioned to provide an overbid under these conditions. *Id.* The Hospital has significant seismic remediation and other capital expenditure requirements, which will require a substantial capital commitment from a prospective acquirer. *Id.* The transaction also involves meaningful turnaround execution risk and the continuation of considerable federal and state supplemental funding programs. *Id.* Notwithstanding these challenges, the Debtor, Axios and the Debtors' landlord have been able to reach a non-binding term sheet to assist the DIP Lender in its reinvestment and turnaround efforts. *Id.*

## BASIS FOR RELIEF

### A. The Debtor Should Be Authorized to Grant Superiority Claims

27. Section 364 distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. *See* 11 U.S.C. § 364. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to § 364(b), a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination of the foregoing. *See* 11 U.S.C. § 364. In addition, pursuant to § 364(d), a court may authorize a debtor to obtain postpetition credit secured by a lien that is equal or senior in priority to existing liens on encumbered property (i.e., a "priming" lien) when a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or if the existing lienholders consent to such priming.

28. The Debtor proposes to grant the DIP Lender a priming first lien security interest on substantially all of the prepetition secured parties' assets (collectively, the "Priming Liens"). Therefore, the approval of the DIP Facility is governed by both §§ 364(c) and 364(d).

**a. The Debtor Satisfies the Conditions of Section 364(c) to Obtain Financing on a Senior Secured and Superpriority Basis.**

29. In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under § 503(b)(1), § 364(c) provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

30. Courts have articulated a three-part test to determine whether a debtor is entitled to enter into financing under § 364(c). Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under § 364(b) (*i.e.*, by allowing an administrative claim);
- the credit transaction is necessary to preserve the assets of the estate; and
- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*,115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990);; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

31. To satisfy the requirements of § 364(c), a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative

expense basis. *In re Crouse Grp., Inc.*, 71 B.R. at 549 (finding that secured credit under § 364(c) is authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also In re Snowshoe Co*., 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused to grant unsecured loans was sufficient to support the conclusion that the requirements of § 364 were met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of § 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

32. In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under § 503(b)(1), § 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in §§ 503(b) or 507(b); (2) secured by a lien on property of the

estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

33. As set forth in the Turnbull Declaration, the Debtor believes, having consulted with its advisors, that the DIP Facility represents the best and only option available to address its immediate liquidity needs. Turnbull Declaration, ¶ 11. The Debtor only received one actionable proposal for postpetition financing—the proposal from the DIP Lender—and a second non-actionable proposal that, even if actionable, the Debtor determined in its business judgment would not be superior to the proposed DIP Financing. *Id.* In addition, the DIP Facility is the only proposal that provides adequate funding for the Debtor to confirm a chapter 11 plan and bring a resolution to this Chapter 11 Case. As a result, the Debtor submits that it could not have obtained financing on more favorable terms from sources other than the DIP Lender and is similarly unable to obtain adequate unsecured credit allowable under § 503(b)(1) as an administrative expense.

34. Further, § 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest. *See In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."). The required showing under § 364 that unsecured credit was not available is not

rigorous. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that § 364(d) imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

35. As set forth above, the Debtor is not aware of any available financing on equal or better terms than provided by the DIP Lender. Therefore, the Debtor submits that the requirement under § 364 that alternative financing on more favorable terms be unavailable has been satisfied.

**b. The Debtor Should be Authorized to Obtain Priming Liens Under § 364(d).**

36. Section 364(d) provides that debtors may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate and which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtor may incur "priming" liens under the DIP Facility if it is unable to obtain unsecured or junior secured credit and either (a) the affected secured lenders consent, or (b) adequate protection exists for such priming lien. *See Anchor Says. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, these [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

37. When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by § 364(d), courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

a. whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

b. whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business;

c. whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s);

d. whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

e. whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *see also* 3 Collier on Bankruptcy, ¶ 364.04[1] (15th ed. rev. 2008).

38. The Debtor submits that the priming of the Prepetition Liens by the DIP Liens should be approved by the Court. First, the Debtor was unable to find alternative financing that would sufficiently fund the Chapter 11 Case, and no potential financing party was willing to provide the Debtor with unsecured or junior secured financing. The Debtor has an extremely limited pool of unencumbered assets that was insufficient to attract potential financing counterparties. Additionally, in the face of a near-term potential shutdown of the Debtor's operations, no counterparty was willing to assume the risk of extending credit on an unsecured or junior secured basis. The DIP Lender was not willing to extend the $21 million in new capital absent being provided priming liens. Turnbull Declaration, ¶ 14.

39. Second, the DIP Facility is necessary to preserve the Debtor's estate and the Debtor's ability to provide continued care to its patients. Without the DIP Facility, the Debtor faces an imminent shutdown of its operations, requiring it to halt all new patient intakes and begin moving patients to other hospitals. Moving patients, particularly fragile and heavily

dependent patients such as those treated by the Debtor, will inevitably result in transfer trauma, also known as relocation stress syndrome. Studies have shown that transfer trauma can cause a drastic spike in depression, cognitive decline and premature mortality amongst frail individuals. *See, e.g.*, A. Montoya, et al., *Transfer Trauma Among Nursing Home Residents: Development of a Composite Measure*, The Gerontologist (2024), available at https://pubmed.ncbi.nlm.nih.gov/37392460/.

40. Courts have also authorized financing involving priming liens to avoid imminent liquidation. *See, e.g., In re True Religion Apparel, Inc.*, Case No. 20-10941 (Bankr. D. Del. 2020); *In re Erickson Inc.*, Case No. 16-34393 (HDH) (Bankr. N.D. Tex. Dec. 2, 2016); *In re Vitality Health Plan of California, Inc.*, Case No. 2:20-bk-21041-WB (Bankr. C.D. Cal. Oct. 21, 2021); *In re Advanced Living Techs., Inc.*, No. 13-10313-HCM, 2013 WL 1857803 (Bankr. W.D. Tex. Apr. 30, 2013).

41. Third, the terms of the DIP Facility are reasonable under the circumstances, and provide for financing on terms that are comparable to other DIP financings and generally consistent with market terms for companies facing similar circumstances as the Debtor.

42. Fourth, the DIP Facility was negotiated at arm's length and in good faith and is the result of a thorough parallel marketing process. Turnbull Declaration, ¶ 13. Entry into the DIP Facility with these terms thus reflects the sound exercise of the Debtor's business judgment.

43. Additionally, because the DIP Lender is the same entity as the Prepetition Lender, the adequate protection analysis is straightforward. The Prepetition Lender will receive the Adequate Protection Liens on all assets of the Debtor (subject and subordinate to the Carve-Out and the DIP Liens). Further, the Prepetition Lender will benefit from the Roll Up, which will convert a portion of its prepetition debt into DIP obligations, gaining the protections of a

superpriority administrative expense claim and enhanced collateral coverage. The agreed Roll Up is 1.5 times the dollar amount of cash actually advanced postpetition under the DIP Facility, automatically rolled up, refinanced, and converted into postpetition obligations as and when each such advance is funded. This structure is fair and reasonable, particularly where, as here, the Debtor has no other sources of funding and no other way to secure immediate liquidity. Turnbull Declaration, ¶ 11.

44. The DIP Facility will provide the Debtor with the funding necessary to provide essential patient care to vulnerable patients, pay the doctors, nurses and other essential employees who provide that medical care, to pay vendors, and continue the Hospital's operations. The preservation, maintenance, and enhancement of patient care, and thereby the going-concern value of the Debtor that will result from the DIP Financing will ultimately inure to the benefit of Axios as both the holder of the MSL and DIP Lender.

45. Because the DIP Lender is the same entity as the Prepetition Lender, no priming of a non-consenting secured creditor is required. Axios, as both the holder of the MSL and the DIP Lender, has consented to the terms of the DIP Facility, including the superpriority liens that will prime its prepetition security interest. Further, the Landlord is party to a prepetition subordination agreement pursuant to which it is required to consent to any debtor in possession financing approved by Axios.

46. To the extent the consent of L.A. Care is required, L.A. Care's interest is limited to the HQAF Receivables and does not extend to the Debtor's other assets. The Debtor has stipulated that $7.5 million of the HQAF Receivables were sold to L.A. Care prepetition, subject to the challenge period afforded to the Committee and Axios under the L.A. Care Order. Accordingly, to the extent any successful challenge results in L.A. Care being deemed a secured

creditor with a lien on the HQAF Receivables rather than the owner thereof, L.A. Care has consented to the DIP Facility. This consensual priming eliminates the need for the Debtor to undertake costly and protracted priming litigation and ensures that the DIP Facility can be approved promptly on the terms negotiated between the parties.

**c. Entry into the DIP Facility is an Exercise of the Debtor's Sound Business Judgment.**

47. Additionally, § 364 allows a debtor to obtain superpriority financing under a deferential standard. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See*, *e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. at 313 ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, among other things, an exercise of "sound and reasonable business judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

48. Bankruptcy courts should not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513–14 (Bankr. D. Utah. Oct 8, 1981). To determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under the circumstances." *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

49. In determining whether the Debtor has exercised sound business judgment in entering into the DIP Facility, the Court should consider the economic terms of the financing under the totality of circumstances. *See In re Lyondell Chem. Co.*, No. 09-10023 (REG), Hr'g Tr. at 733:8-734:25, 735:1-10 (Bankr. S.D.N.Y. Feb. 27, 2009) (considering, in determining whether DIP financing reflected sound and reasonable business judgment, whether "the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor/borrower and the proposed lender," the debtors' efforts "to negotiate the best terms they could," and "the present state of the financial markets"); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). Moreover, the Court may appropriately take into consideration noneconomic benefits to the Debtor offered under the proposed postpetition facility. *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (holding that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms. . . . [r]elevant features of the financing must be evaluated, including non-economic elements such as the

timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.”).

50. The Debtor’s decision to enter into the DIP Facility is an exercise of its sound business judgment. The Debtor has a critical need for liquidity to continue its operations, including essential medical care, during the Chapter 11 Case. Chadwick Declaration, ¶ 12. Without the DIP Facility, the Debtor may be unable to continue to provide patient care, satisfy administrative expenses, and satisfy other ordinary course working capital and operational needs. *Id.* The DIP Facility and its $21 million in New Money Loans thus provides the only viable path forward to continuity of medical care.

51. Additionally, as further discussed in the Turnbull Declaration, the DIP Facility was a product of good faith arm’s length negotiation among the Debtor and the DIP Lender, which was the best (and only) available source of postpetition financing under present circumstances. Turnbull Declaration, ¶¶ 10, 13. The Debtor has satisfied the legal requirements to incur the obligations under the DIP Facility on the terms and conditions set forth in the DIP Documents.

52. Even if the Court were to conclude that the Debtor’s entry into the DIP Facility is subject to a heightened standard of review, including an entire-fairness standard, rather than the business judgment rule, the DIP Facility readily satisfies that standard. The terms of the DIP Facility are the product of extensive, good-faith, arm’s-length negotiations between sophisticated parties whose interests have historically been adverse—including through years of litigation between the Debtor and the DIP Lender and its predecessors—and thus were not dictated by or for the benefit of the DIP Lender. Moreover, while those negotiations were ongoing, the Debtor, with the assistance of its investment banker, conducted a parallel

marketing process to identify potential alternative sources of postpetition financing and thereby market-test the terms offered by the DIP Lender. That process produced no superior or actionable alternative financing proposal. Against that backdrop, both the process by which the DIP Facility was negotiated and the economic terms ultimately obtained are fair to the Debtor and its estate. Accordingly, even under a heightened standard of review, the DIP Facility is entirely fair, reasonable, and appropriate and should be approved.

53. Section 363(b) permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose. *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986). The business judgment rule shields such business decisions from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

**B. The Roll Up is Appropriate and Should Be Approved.**

54. The repayment of prepetition funded indebtedness with postpetition financing (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements. Courts in this jurisdiction and other jurisdictions have approved similar DIP financing features, including on an interim basis. *See, e.g., In re Del Monte Foods Corp. II, Inc.*, No. 25-16984 (MBK) (Bankr. D. N.J. Aug. 12, 2025) (approving $165 million, multi-draw, DIP financing with a $247.5 million roll up); *In re Meyer Burger (Holding) Corp.*, No. 25-11217 (CTG) (Bankr. D. Del. July 17, 2025) (authorizing an approximately $9.2 million delayed-draw DIP financing that included an interim roll up and, ultimately, a dollar-for-dollar roll up for actually-advanced funds); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del.

July 23, 2019) (authorizing an approximately $240 million DIP financing that included a roll-up of $70 million in prepetition term loans debt and up to $82 million of prepetition ABL debt pursuant to interim order).

55. Here, the DIP Facility includes a negotiated roll-up feature: upon entry of the Interim Order, a portion of the Prepetition Obligations shall be rolled up into DIP Obligations on a 1.5x basis relative to the cash amount actually advanced postpetition under the DIP Facility, automatically rolled up, refinanced, and converted into postpetition obligations under the DIP Facility as and when each such advance is funded. Upon incurrence of the Roll Up, the corresponding portion of the Prepetition Obligations shall be automatically and irrevocably deemed satisfied in full.

56. The Roll Up is a required and integral component of the DIP Facility. Axios was unwilling to provide new money financing without the Roll Up, and no alternative financing is available on better terms. Turnbull Declaration, ¶ 14. The Roll Up appropriately harmonizes the prepetition and postpetition financing into a single, integrated transaction and provides the Debtor with access to new money necessary to fund operations and this Chapter 11 Case.

57. Accordingly, the Roll Up is reasonable and should be approved.

**C. The Carve-Out is Appropriate**

58. The liens and superiority claims granted to the DIP Lender and the Prepetition Lender pursuant to the Proposed Orders, are subject and subordinate to the Carve-Out. The Carve-Out contains similar terms to others that the Court has found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. Without the Carve-Out, the Debtor's estate may be deprived of possible rights and powers if the services for which professionals may be compensated is restricted. *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals

representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of this Chapter 11 Case by ensuring that assets remain for the payment of fees to the U.S. Trustee and professional fees. Accordingly, the Carve-Out is appropriate and should be approved.

**D. The Rates and Fees of the DIP Facility Are Reasonable**

59. The DIP Facility bears interest at a base rate of 12% per annum from the date of borrowing until repaid, which will be paid in kind (monthly, in arrears) on the then principal amount of the DIP Loan by increasing the principal amount of the DIP Loan. Default interest is 4% per annum plus the interest rate otherwise accruing. The commitment fee is 10% of the principal of the DIP Facility, which shall be fully earned and non-refundable upon entry of the Interim Order. As set forth in the Turnbull Declaration, the interest rate and commitment fee are consistent with prevailing market terms for debtor in possession financing under circumstances comparable to those presented here. *See* Turnbull Declaration, ¶ 13. Thus, the economics of the DIP Facility are straightforward and favorable to the Debtor, particularly in light of the Debtor's immediate liquidity needs and the absence of any superior actionable financing alternative.

60. The Debtor respectfully submits that the interest rate, commitment fee and other economic terms of the DIP Facility are fair and reasonable and should be approved.

**E. The Milestones, Conditions Precedent and Events of Default Imposed by the DIP Facility are Reasonable**

61. As set forth in the chart above, the DIP Term Sheet also contemplates, as a condition to providing the DIP Facility, certain (i) conditions precedent; (ii) milestones

(the "Milestones") in connection with this Chapter 11 Case; and (iii) events of default, all of which are customary for postpetition financing in chapter 11.

62. The DIP Facility is a critical component of the Debtor's chapter 11 efforts because it provides the Debtor with the stability and certainty needed to continue patient care and fund its case. The continued operation of the Debtor's Health Care business during this case would not be possible absent access to the DIP Facility. The DIP Facility will prevent interruptions to the Debtor's Health Care System's operations, preserve and promote patient health and safety, preserve the Debtor's ability to maintain ordinary course relationships with key vendors and counterparties, and satisfy working capital needs in the ordinary course during the Chapter 11 Case.

63. Moreover, the Milestones, conditions precedent, and events of default are reasonable and appropriately tailored to protect the DIP Lender, maintain the status quo of the business and ensure transparency, accountability, and progress in the chapter 11 process, without unduly constraining the Debtor's ability to operate its Health Care System or administer the Chapter 11 Case. The provisions of the DIP Term Sheet are not designed to create technical defaults or render the Debtor disproportionately susceptible to a breach. The Milestones, in particular, reflect a realistic and achievable timeline developed in constructive cooperation with the DIP Lender and are intended to facilitate, rather than impede, a successful restructuring pursuant to the Restructuring Agreement.

64. The Milestones and the related conditions precedent and events of default are fair, reasonable, and should be approved.

**F. The DIP Lender Should Be Deemed a Good Faith Lender under Section 364(e)**

65. Section 364(e) protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to

obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

66. Here, the DIP Facility is the result of: (i) the Debtor's reasonable business judgment that the DIP Lender providing the best (and only) reasonable postpetition financing alternative available under the circumstances; and (b) extended arm's length, good-faith negotiations between the Debtor and the DIP Lender. *See* Turnbull Declaration at ¶¶ 12, 13. Under the circumstances, the terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the Orders and the DIP Documents, and in accordance with the Budget (subject to the Permitted Variances). Further, no consideration is being provided to any party other than as described herein, in the DIP Documents, the Turnbull Declaration, and the Chadwick Declaration.

67. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of § 364(e) and that the DIP Lender thus is entitled to all of the protections afforded therein.

## G. Modification of the Automatic Stay is Warranted

68. The relief requested herein contemplates a modification of the automatic stay to permit, among other things: (i) the Debtor to grant the security interests, liens, and superpriority

claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) upon the occurrence of an Event of Default (as defined in the DIP Documents), subject to the notice periods set forth in the DIP Term Sheet, the DIP Lender to exercise any available remedies under the DIP Documents and applicable law; and (iii) the Debtor to implement the terms of the Orders, including payment of all amounts provided under the DIP Documents.

69. Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtor's business judgment, are appropriate under the present circumstances. Accordingly, the Debtor requests that the Court modify the automatic stay solely to the extent contemplated by the DIP Documents and the Orders.

70. Section 363(c)(2) provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

**H. The Debtor Should be Authorized to Use Cash Collateral**

71. The Debtor has an urgent need for the immediate use of Cash Collateral and seeks to use all Cash Collateral pursuant to the terms of the DIP Documents. The Debtor needs the Cash Collateral to pay operating expenses, including essential vendors, to ensure continued services essential to the Debtor's healthcare business, as well as fund this Chapter 11 Case.

72. The Debtor believes that the terms and conditions of its use of Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. Furthermore, Axios has consented to the Debtor's use of the Cash

Collateral subject to the terms and conditions of the DIP Documents and the proposed Interim Order.

73. The Debtor was unable to confer with the Landlord and L.A. Care regarding the use of Cash Collateral before filing this Motion, but intends to do so before the hearing. In any event, no further consent should be required. The Landlord is party to a prepetition subordination agreement with Axios that prohibits it from contesting the Debtor's use of Cash Collateral to the extent approved by Axios. And, subject to the challenge period under the L.A. Care Order, the Debtor has stipulated that L.A. Care validly purchased $7.5 million of HQAF receivables before the Petition Date, which necessarily means that L.A. Care holds no interest in such receivables as Cash Collateral. Accordingly, although the Debtor will confer with both parties before the hearing, it respectfully submits that no additional consent is necessary and that the Debtor should be authorized to use Cash Collateral on the terms set forth in the DIP Documents.

## I. Interim Approval Should Be Granted

74. Bankruptcy Rule 4001(c)(2) provides that, with respect to motions for authority to obtain credit:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

75. Similarly, to the extent the Debtor is seeking authority to use, sell, or otherwise incur an obligation regarding property of its estate, Bankruptcy Rule 6003(b) provides that the Court may only grant immediate relief to the extent it is necessary to avoid immediate and irreparable harm.

76. Generally, courts find "immediate and irreparable harm" exists where loss of the business threatens a debtor's ability to reorganize. *See In re Ames*, 115 B.R. at 36, n.2. Granting the relief requested on an interim basis is left to the Court's discretion as informed by the facts of the case. In examining requests for interim relief, courts apply the same business judgment standard applicable to other business decisions, and a debtor should be entitled to borrow those amounts that it believes prudent in the operation of its business. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974; *In re Ames*, 115 B.R. at 40. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *In re Ames*, 115 B.R. at 36.

77. The Debtor seeks approval of the relief requested for the Interim DIP Facility, in light of the immediate and irreparable harm that the Debtor's estate will incur unless the Debtor obtains the financing necessary to sustain its business. Absent sufficient funds, the Debtor's business and assets will quickly erode to the detriment of the Debtor's estate and stakeholders. For the reasons set forth herein, the Debtor submits that immediate access to the DIP Facility is necessary to preserve the value of the Debtor's estate for the benefit of all parties-in-interest.

**REQUEST FOR FINAL HEARING**

78. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for consideration of entry of the Final Order (the "Final Hearing") that is as soon as practicable, in accordance with the Milestones, and fix the time and date prior to the Final Hearing for parties in interest to file objections to this Motion.

79. The Debtor requests that it be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon

the notice parties listed below. The Debtor further requests that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

80. The Debtor respectfully requests that the Court waive any stay of the effectiveness of the Orders. Pursuant to Bankruptcy Rule 6004(h), "[u]nless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than Cash Collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). The Debtor submits that granting this Motion such that it is effective immediately is essential to prevent irreparable damage to the Debtor and its estate.

81. Accordingly, the Debtor respectfully submits that the relief requested herein is appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

82. Finally, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) because the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtor's estate, is narrowly tailored to the exigencies of this Chapter 11 Case, and any delay resulting from compliance with the notice requirements would materially prejudice the Debtor, its estate, and stakeholders by jeopardizing the Debtor's access to critical financing and its ability to continue operations in the ordinary course.

## NOTICE

Notice of this Motion shall be given to the following parties: (i) the U.S. Trustee; (ii) the Debtor's thirty (30) largest unsecured creditors (excluding insiders); (iii) counsel to Axios; (iv) all known holders of liens upon the Debtor's assets; (v) the attorneys general in the states in which the Debtor conducts its business; (vi) the Internal Revenue Service; (vii) the United States Securities and Exchange Commission; and (viii) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002, in each case by facsimile transmission, email,

overnight courier and/or hand delivery. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests entry of the Orders: (i) granting the relief requested herein; and (ii) granting the Debtor such other and further relief as the Court deems just and proper.

Dated: September 27, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
919 North Market Street, 17th Floor
Wilmington, DE 19899
Tel: (302) 652-4100
Email: ljones@pszjlaw.com

-and-

**DENTONS US LLP**

Tania M. Moyron (admitted *pro hac vice*)
Samuel R. Maizel (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Tel: (213) 623-9300
Email: tania.moyron@dentons.com
samuel.maizel@dentons.com

John D. Beck (admitted *pro hac vice*)
Geoffrey M. Miller (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Tel: (212) 768-6700
Email: john.beck@dentons.com
geoffrey.miller@dentons.com

*Counsel for Debtor and Debtor in Possession*