# EXHIBIT A

## Proposed Form of Interim Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Pacifica of the Valley Corp.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH)<br><br>**Ref. Docket No. ____** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION SECURED FINANCING; (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL; AND (VI) SCHEDULING A FINAL HEARING**

Upon the motion (the "Motion")[2] of Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley, the above-captioned debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), pursuant to §§ 105, 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the corresponding local rules of this District (the "Local Rules"), requesting entry of an interim order (this "Interim Order") and Final Order authorizing the Debtor to, among other things:

i. Obtain senior secured postpetition financing in an aggregate principal amount not to exceed $52,500,000.00 (the "DIP Credit Facility," and the loans provided to the Debtor thereunder, the "DIP Loans"), consisting of (a) new money term loans, in an aggregate principal amount which shall not exceed $21,000,000.00, which new money term loans shall be made available to the Debtor from time to time pursuant to the terms and subject to the conditions set forth in the DIP Term Sheet and the Orders (the "New Money Term Loan") and (b) a contemporaneous "roll-up" of the Prepetition Senior Loan Obligations in an amount equal to one and half times (1.5x) the amount of cash advanced under the New Money Term Loan (up to $31,500,000.00) (the "Roll Up"), plus interest, fees, and other amounts due

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is 7312. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

thereunder pursuant to the terms and conditions of the DIP Documents and this Interim Order;

ii. Enter into (a) that certain DIP Term Sheet (the "DIP Term Sheet") attached as **Exhibit 1** hereto, by and among the Debtor and Axios Capital Solutions, LLC (in such capacity, the "DIP Lender") as lender and (b) the documents related to the DIP Term Sheet (together with the DIP Term Sheet, the "DIP Documents");

iii. Borrow, on an interim basis, pursuant to the DIP Documents and this Interim Order, postpetition financing in an aggregate principal amount of up to (a) $[7,000,000.00] in New Money Term Loans and (b) [$10,500,000] of the Roll Up (the "Interim DIP Credit Facility");

iv. Borrow, on a final basis, pursuant to the DIP Documents and the Final Order, postpetition financing in an aggregate principal amount of up to $52,500,000.00, upon entry of a Final Order;

v. DIP Lender shall also be entitled to a DIP Facility Fee of 10%, up to $2,100,000.

vi. Execute and deliver the DIP Term Sheet and the other DIP Documents to the DIP Lender pursuant thereto;

vii. Grant to the DIP Lender the DIP Liens on all of the DIP Collateral to secure the DIP Credit Facility and all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and the Interim Order and the Final Order, as applicable (collectively, and including all "Obligations" as defined in the DIP Term Sheet, the "DIP Obligations"), subject only to prior payment of the Carve-Out;

viii. Grant to the DIP Lender allowed superpriority administrative expense claims in the Chapter 11 Case for all DIP Obligations;

ix. Use the proceeds of the DIP Credit Facility in accordance with the DIP Term Sheet, the DIP Documents and this Interim Order, in all cases in accordance with the Budget, and as otherwise provided in the DIP Documents;

x. Use any Prepetition Collateral, including the Cash Collateral, and provide adequate protection to those parties set forth herein that may have an interest in such Prepetition Collateral, including Cash Collateral, for any possible Diminution;

xi. Vacate and modify the automatic stay imposed by § 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

xii. Schedule a final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

xiii. Waive, to the extent applicable, any stay of the immediate effectiveness of this Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that this Interim Order shall be immediately effective upon its entry on the Court's docket.

The Court having considered the Motion, the Chadwick Declaration, the Turnbull Declaration, the DIP Term Sheet, and the evidence submitted or adduced and the arguments of counsel made at the hearing on this Interim Order (the "Interim Hearing"); and notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014; and the Interim Hearing having been held and concluded; and it appearing that granting the relief requested in the Motion on an interim basis is an appropriate exercise of the Debtor's business judgment, necessary to avoid immediate and irreparable harm to the Debtor pending the Final Hearing, and is otherwise fair and reasonable and in the best interests of the Debtor, its estate and its creditors, and is essential for the preservation of the value of the Debtor's property; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**IT IS FOUND AND DETERMINED THAT:**

A. Petition Date. On July 4, 2026 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code with this Court.

B. Jurisdiction and Venue. This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, and over the persons and property affected hereby. Venue for the Chapter 11 Case and the proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of the Motion constitutes a

core proceeding under 28 U.S.C. § 157(b)(2). This Court may enter a final order consistent with Article III of the United States Constitution.

C. Notice. Notice of the Interim Hearing and notice of the Motion has been given by the Debtor to (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (ii) the Debtor's thirty (30) largest unsecured creditors; (iii) counsel to the DIP Lender and to the Prepetition Secured Parties; (iv) all known holders of liens upon the Debtor's assets; (v) the attorneys general in the states in which the Debtor conducts its business; (vi) the Internal Revenue Service; (vii) the United States Securities and Exchange Commission; and (viii) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002; in each case by email, overnight courier and/or hand delivery. Under the circumstances, such notice of the Interim Hearing and Motion and the relief provided for in this Interim Order complies with § 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and the Local Rules and no further notice of the Interim Hearing is required.

D. Debtor's Stipulations. In requesting the financing from the DIP Lender and in exchange for and as a material inducement to the DIP Lender to agree to provide the financing in accordance with the DIP Credit Facility, the Debtor acknowledges, represents, stipulates and agrees, for itself and its estate, subject to the Challenge rights set forth in Paragraph 21 of this Interim Order (solely with respect to the Prepetition Senior Lender) and without prejudice to the rights of interested parties other than the Debtor, as follows (the "Stipulations"):

i. As of the Petition Date, the Debtor has senior secured indebtedness in an aggregate outstanding amount of approximately $50,943,321.41, inclusive of all accrued and unpaid interest, but exclusive of fees, costs, and expenses (collectively, the "Prepetition Senior Loan Obligations"), owed pursuant to that certain Main Street Priority Loan Agreement, dated as

of December 10, 2020 (the "Prepetition Senior Loan Agreement" and all documents related thereto, the "Prepetition Senior Loan Documents"), by and among the Debtor and First Western Trust Bank ("First Western") and the Federal Reserve Bank of Boston (the "Federal Reserve"), pursuant to which First Western extended a senior secured loan to the Debtor in the principal amount of $35,000,000. In November 2025, Axios Capital Solutions, LLC ("Axios") purchased the Prepetition Loan Agreement from First Western (Axios, in such capacity, the "Prepetition Senior Lender"). The Prepetition Senior Loan Obligations are secured by liens on substantially all assets of the Debtor (the "Prepetition Senior Loan Collateral" and the liens securing the Prepetition Senior Loan Obligations, the "Prepetition Senior Liens"). The Prepetition Senior Lender and the Debtor's landlord, Reliq Pacifica LLC and Beverly Gemini Investments, LLC ("Landlord"), are referred to herein collectively as the "Prepetition Secured Parties," the obligations owed to each of the Prepetition Secured Parties are referred to herein collectively as the "Prepetition Secured Obligations", the liens securing the Prepetition Secured Obligations are referred to herein collectively as the "Prepetition Liens," and the Debtor's assets subject to the Prepetition Liens are referred to herein collectively as the "Prepetition Collateral." Landlord's liens are subordinated to the liens of Prepetition Senior Lender pursuant to, and to the extent set forth in, that certain Lien Subordination Agreement, dated December 17, 2020 between those parties (the "Subordination Agreement").

ii. As of the Petition Date: (a) the Prepetition Senior Loan Obligations constitute legal, valid, and binding obligations of the Debtor, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from § 362 of the Bankruptcy Code to the extent applicable); (b) no recoupments, offsets, defenses, or counterclaims exist to the Prepetition Senior Loan Obligations; and (c) no portion of the Prepetition Senior Loan Obligations

or any payments or other transfers made to the Prepetition Senior Lender or applied to the Prepetition Senior Loan Obligations prior to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack, recoupment, offset, counterclaim, crossclaim, defense, or claim (as defined in § 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

iii. The Prepetition Senior Liens constitute valid, binding, enforceable (other than with respect to the stay of an enforcement arising from § 362 of the Bankruptcy Code) and perfected liens with priority over any and all other liens in the Prepetition Senior Loan Collateral (except as otherwise provided in the Prepetition Senior Loan Documents), and are not subject to any challenge or defense, including without limitation, avoidance, subordination, recharacterization, recovery, reduction, set-off, offset, attack, counterclaim, crossclaim, or claim (as defined in § 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

iv. The Debtor has waived, discharged, and released any right it may have to challenge the Prepetition Senior Loan Obligations and the Prepetition Senior Liens on the Prepetition Senior Loan Collateral and to assert any recoupments, offsets, defenses, claims, objections, challenges, causes of action and/or causes of action against the Prepetition Senior Lender with respect to the Prepetition Senior Loan Documents, the Prepetition Senior Obligations, the Prepetition Senior Liens, or the Prepetition Senior Loan Collateral;

v. Any payments made on account of the Prepetition Senior Loan Obligations before the Petition Date were payments made (a) out of the Prepetition Senior Loan Collateral, and/or (b) in the ordinary course of business and in exchange for reasonably equivalent value and did not diminish any property otherwise available for distribution to unsecured creditors;

vi. All of the Debtor's cash, including the cash in its deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Senior Collateral, constitutes Cash Collateral;

vii. Neither the DIP Lender nor any of the Prepetition Secured Parties is a control person or insider (as defined in § 101(31) of the Bankruptcy Code) of the Debtor;

viii. Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtor shall not in any way prime (or otherwise cause to be subordinated in any way) or seek to prime (unless such proposal, if approved, would satisfy the DIP Obligations in full in cash), (a) the liens provided to the DIP Lender, or (b) the Prepetition Senior Liens securing the Prepetition Senior Loan Collateral, in each case by granting a subsequent lender, or any party-in-interest, a superior or pari passu lien or claim with respect to the DIP Collateral or the Prepetition Senior Loan Collateral, as applicable, pursuant to § 364(d) of the Bankruptcy Code or otherwise, except with respect to the Carve-Out;

ix. Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtor shall not in any way or at any time seek (unless such proposal, if approved, would satisfy the DIP Obligations in full in cash) allowance of any administrative expense claim against the Debtor of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under §§ 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code that is superior to or pari passu with the DIP Superpriority Claim and the Adequate Protection Liens provided herein, except with respect to the Carve-Out;

x. The Prepetition Secured Parties are entitled, pursuant to §§ 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the

Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date (the "Diminution"), that may be caused by or arising as a result of (a) the incurrence and payment of the DIP Obligations, (b) the use of Prepetition Collateral (including Cash Collateral), (c) the granting of the DIP Liens and the DIP Superpriority Claim, (d) the subordination of the Prepetition Secured Obligations to the DIP Obligations and the Carve-Out, (e) the subordination of the Prepetition Secured Obligations to the Carve-Out, and (f) imposition of the automatic stay pursuant to § 362 of the Bankruptcy Code.

E. Cash Collateral. For the purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in § 363 of the Bankruptcy Code, in or on which the DIP Lender or the Prepetition Secured Parties have a lien, security interest, or any other interest (including, without limitation, any Adequate Protection Liens or security interests), whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise, and shall include, without limitation: (i) all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, in or on which the DIP Lender or the Prepetition Secured Parties have a lien or a replacement lien, whether as part of the DIP Collateral or the Prepetition Collateral, or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of the Chapter 11 Case, or arose or was generated thereafter; (ii) all of the respective deposits, refund claims, and rights in retainers of the Debtor on which the DIP Lender or the Prepetition Secured Parties hold a lien or replacement lien, whether as part of the DIP Collateral or Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise; (iii) all cash and cash equivalents held in any depository or other accounts maintained by the Debtor, whether such

cash and cash equivalents existed as of the commencement of the Chapter 11 Case, or arose or was generated thereafter; and (iv) the proceeds of any sale, transfer or other disposition of DIP Collateral or Prepetition Collateral. For the avoidance of doubt, and subject to the Interim Order and Final Order, the Debtor's authorization to use Cash Collateral shall automatically terminate, without further order of the Court, upon the earliest of: (a) the Maturity Date; (b) entry of any order by the Bankruptcy Court denying or terminating the Debtor's authority to use Cash Collateral; or (c) upon the occurrence or continuation of an Event of Default.

F. Findings Regarding the DIP Credit Facility.

a. *Need for the DIP Credit Facility and to Use Cash Collateral*. An immediate need exists for the Debtor to obtain funds pursuant to borrowings under the Interim DIP Credit Facility and to use Cash Collateral in order to continue operations, fund payroll, and operating expenses, and administer and preserve the value of its estate pending the Final Hearing. The ability of the Debtor to finance its operations through the Interim DIP Credit Facility and use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtor's estate, to maximize the value of the Debtor's assets for the benefit of its creditors, and to avoid immediate and irreparable harm to the Debtor, its estate and its creditors.

b. *Priming of Any Prepetition Liens*. Upon the entry of this Interim Order, the priming of any of the Primed Liens, is a condition to the Debtor's borrowings under the DIP Credit Facility, which borrowing is necessary for the Debtor to be able to continue to operate its business and administer the Chapter 11 Case for the benefit of its estate and creditors. The Prepetition Senior Lender has consented to the priming of its Prepetition Senior Liens and the Landlord is bound by the Subordination Agreement not to object to any financing, including a priming facility, supported by the Prepetition Senior Lender, and thus is deemed to have consented to such treatment. The terms of the adequate protection arrangements provided for herein are fair and reasonable and otherwise sufficient under the circumstances to adequately protect the Prepetition Secured Parties against any Diminution with respect to the Prepetition Collateral as provided for herein.

c. *No Credit Available on More Favorable Terms*. The Debtor has been unable to obtain (a) unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense, or (b) credit for money borrowed secured by a lien on property of the estate on more favorable terms and conditions than those provided in the DIP Term Sheet and this Interim Order. The Debtor is unable to obtain credit for borrowed money without granting to the DIP Lender the DIP Protections.

d. *Sections 506(c) and 552(b) Waivers*. In light of (i) the DIP Lender's agreement to subordinate its liens and superpriority claims to the Carve-Out, and in exchange for and as a material inducement to the DIP Lender to agree to provide the DIP Credit Facility and (ii) the Prepetition Senior Lender's agreement to subordinate its liens, and the Landlord's deemed consent under the Subordination Agreement to subordinate its liens, to the DIP Obligations, the Carve-Out, and the DIP Liens, and to permit the use of the Prepetition Collateral (including Cash Collateral for payments made in accordance with the Budget and the terms of this Interim Order), each of the DIP Lender and, subject to entry of the Final Order, the Prepetition Secured Parties are entitled to a waiver of the provisions of § 506(c), and, subject to entry of the Final Order, the Prepetition Secured Parties are entitled to a waiver of the exceptions provided in §§ 552(b)(1) and (2) of the Bankruptcy Code, in each case as provided for herein.

e. *Use of Proceeds of the DIP Credit Facility*. Proceeds of the DIP Credit Facility (net of any amounts used to pay fees, costs, and expenses under the DIP Documents) shall be used in a manner consistent with the terms and conditions of the DIP Term Sheet and this Interim Order and in accordance with the Budget.

G. Application of Proceeds of DIP Collateral. Subject solely to the Challenge rights reserved in ¶ 21 of this Interim Order, all net proceeds of any sale or other disposition of the DIP Collateral, if any, shall, subject to the Carve-Out, be applied first to repay the DIP Obligations in full.

H. Effect of Reversal; Good Faith. The DIP Lender has indicated a willingness to provide financing to the Debtor solely in accordance with the DIP Term Sheet and this Interim Order, provided that the DIP Obligations, DIP Liens and other protections granted by this Interim Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Interim Order to the extent provided in § 364(e) of the Bankruptcy Code. The DIP Lender has acted in good faith in agreeing to provide the DIP Credit Facility approved by this Interim Order.

I. Roll Up. Subject to the provisions of Paragraph 21 of this Interim Order and subject to the Carve-Out, as and when each draw of the New Money Term Loan is funded, one and half times (1.5x) of such amount funded of the outstanding Prepetition Loan Obligations, up to a principal amount of $10,500,000.00 on an interim basis and up to a total of $31,500,000.00 on a

final basis, shall be rolled up and converted into DIP Obligations (the "Roll Up"). The Prepetition Senior Lender, who is also the DIP Lender, would not have consented to extend DIP Loans or other financial accommodations to the Debtor without the inclusion of the Roll Up in the DIP Obligations. Thus, the Roll Up is consideration for, and solely on account of, the agreement of the DIP Lender to extend the DIP Loans and not on account of the Prepetition Loan Obligations.

J. Business Judgment and Good Faith Pursuant to Section 364(e). (i) The terms and conditions of the DIP Credit Facility and the DIP Documents as set forth in this Interim Order or the Motion, and the terms and conditions thereunder are fair, reasonable, and the best reasonably available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration; (ii) the DIP Documents and use of Cash Collateral were negotiated in good faith and at arms' length between the Debtor and the DIP Lender and the Prepetition Secured Parties; and (iii) the DIP Credit Facility loan proceeds to be funded to the Debtor pursuant to the DIP Documents will be advanced in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the protection and benefits of § 364(e) of the Bankruptcy Code.

K. Immediate Entry of Interim Order. The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b). The permission granted herein to enter into the DIP Documents, to obtain funds thereunder and to use the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order is necessary to avoid immediate and irreparable harm to the Debtor and its estate. This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for access to the financing necessary to

administer the Chapter 11 Case, to sustain the operation of the Debtor's existing business and to further enhance the Debtor's prospects for a successful reorganization.

**NOW, THEREFORE**, based upon the foregoing findings, and upon consideration of the Motion and the record made before this Court with respect to the Motion, including the record created during the Interim Hearing, all papers filed on the docket, and with the consent of the Debtor, the DIP Lender, and the Prepetition Secured Parties to the form and entry of this Interim Order, and good and sufficient cause appearing therefor, and the Court being otherwise fully advised in the premises;

**IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1. **Motion Granted**. The Motion is **GRANTED** in accordance with the terms and conditions set forth in this Interim Order. Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn, waived, or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.

2. **The DIP Documents**.

a) *Approval of Entry into the DIP Documents*. The Debtor is authorized to execute, deliver and perform in accordance with the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute and deliver all instruments and documents which may be required or necessary for the performance by the Debtor under the DIP Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents. Upon entry of this Interim Order, and subject to the provisions of Paragraph 21 hereof and the Carve-Out, as and when New Money Term Loans are advanced under the DIP Facility, one and half times (1.5x) of such amount funded of outstanding Prepetition Senior Loan

Obligations shall be deemed rolled up and converted into DIP Obligations, up to an aggregate principal amount of $10,500,000.00 under this Interim Order (the "Roll-Up"). The Debtor is authorized to take such acts as shall be necessary or desirable to effect the Roll-up and conversion of the Prepetition Senior Loan Obligations to DIP Obligations. The Debtor is hereby authorized to use Cash Collateral subject to the terms of this Interim Order. The Debtor is hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Term Sheet and all other DIP Documents as such become due.

b) *Authorization for DIP Financing*. To enable the Debtor to continue to preserve the value of its estate during the period prior to entry of the Final Order (the "Interim Period") and subject to the terms and conditions of this Interim Order, the Budget (a copy of which is attached hereto as **Exhibit 2**), and the DIP Documents, upon the execution of the DIP Term Sheet, the Debtor is hereby authorized to borrow, pursuant to the Interim DIP Credit Facility, the aggregate principal amount of up to (a) $7,000,000.00 in New Money Term Loans, plus (b) $10,500,000 of Roll Up.

c) *Conditions Precedent*. The DIP Lender shall have no obligation to make any loans under the DIP Term Sheet during the Interim Period unless the conditions precedent to making such loans under the DIP Term Sheet have been satisfied in full or waived by the DIP Lender in its sole discretion.

d) *Enforceable Obligations*. The DIP Documents shall constitute and evidence the valid and binding obligations of the Debtor, which obligations shall be enforceable against the Debtor, its estate and any successors thereto, and its creditors or representatives thereof, in accordance with their terms.

e) *Protection of the DIP Lender and Other Rights*. From and after the Petition Date, the Debtor shall use the proceeds of the DIP Credit Facility only for the purposes specifically set forth in the DIP Term Sheet, this Interim Order, and, notwithstanding any other order of this Court authorizing disbursements by the Debtor, in strict compliance with the Budget (subject only to any variances thereto that may be permitted by the DIP Term Sheet or the Budget).

3. **The DIP Lien Priority**.

a) To secure the DIP Obligations, the DIP Lender is hereby granted pursuant to, and in accordance with, §§ 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, valid, enforceable and fully perfected liens (the "DIP Liens") in and on all of the DIP Collateral, including, without limitation, all of the Debtor's now owned or hereafter acquired right, title, and interest in and to all cash, accounts, accounts receivable, goods, inventory, property, plant and equipment, commercial tort claims, intellectual property, contract rights, tax refunds, prepaid expenses, deposits, general intangibles, real estate, leaseholds, all intercompany claims, all claims, and causes of action of the Debtor or its estate (including, without limitation, all commercial tort claims of every kind and description, whether described in specificity in the DIP Documents or not) and any and all proceeds and property recovered therefrom, any and all proceeds arising from insurance policies, all intellectual property, which for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of the Debtor that constitute Prepetition Collateral, and all other property and assets including, without limitation, Cash Collateral, all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above, and subject to entry of the Final Order, any and all proceeds or property recovered in connection with any and all claims, causes of action, rights, or remedies of the Debtor or its estate arising under chapter 5 of the Bankruptcy Code (including, without

limitation, §§ 544, 545, 547, 548, 549, 550, and 553 thereof), and any similar or related claims, causes of action, or rights arising under applicable state or other non-bankruptcy law ("Avoidance Actions"), but, for the avoidance of doubt, excluding the Avoidance Actions themselves, (collectively, the "DIP Collateral"), subject only to prior payment of the Carve-Out and any Prior Permitted Liens;

b) The DIP Liens shall be effective immediately upon the entry of this Interim Order other than the DIP Liens on the proceeds of Avoidance Actions, which shall be effective upon entry of the Final Order, and the DIP Liens shall not at any time be made subject or subordinated to, or made pari passu with, any other lien, security interest or claim existing as of the Petition Date or created thereafter, including under §§ 363 or 364(d) of the Bankruptcy Code or otherwise, other than prior payment of the Carve-Out and the Prior Permitted Liens;

c) The DIP Liens shall be, and hereby are deemed, fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreements or any other agreements, filings or instruments, such that no action whatsoever need be taken by the DIP Lender, the Debtor, or any other party (including, without limitation, any depository bank or securities intermediary) to perfect such interests.

d) For the avoidance of doubt, until indefeasible payment in full in cash of the DIP Obligations, and subject in all cases to the Carve-Out and the terms of the Interim Order and Final Order, the DIP Lender shall have the following priority claims and liens: (i) pursuant to § 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against the Debtor and its estate with priority over any and all administrative expenses and other claims

of the kind specified in §§ 503(b) or 507(b) of the Bankruptcy Code, subject to, solely with respect to the Roll Up, the Challenge rights reserved in Paragraph 21 of this Interim Order; (ii) pursuant to § 364(c)(2) of the Bankruptcy Code, perfected first priority, senior liens on and security interests in all DIP Collateral that, as of the Petition Date, was not subject to any valid, perfected, and unavoidable lien, or was subject only to invalid, unperfected, or avoidable liens; (iii) pursuant to § 364(c)(3) of the Bankruptcy Code, perfected junior liens on, and security interests in, all DIP Collateral that, as of the Petition Date, was subject to a valid, perfected, and unavoidable lien in existence at the commencement of the Chapter 11 Case, other than the Primed Liens (such third-party senior liens, "Prior Permitted Liens"); and (iv) pursuant to § 364(d)(1) of the Bankruptcy Code, and except with respect to any property subject to Prior Permitted Liens, perfected, first-priority senior priming liens on, and security interests, in all DIP Collateral that is subject to the existing liens in favor of the Prepetition Secured Parties (the "Primed Liens"), which Primed Liens shall be primed by and made subject and subordinate to the perfected first-priority senior priming DIP Liens granted to the DIP Lender hereunder; such priming DIP Liens shall also prime any liens granted after the Petition Date as adequate protection of any Primed Liens, all as provided in the Interim Order and Final Order; *provided* that notwithstanding the foregoing, upon the effectiveness of the Roll Up as provided herein, any prepetition liens and security interests securing the Prepetition Senior Loan Obligations are hereby deemed replaced by the DIP Liens securing the DIP Obligations (including the Roll Up), as provided in this Interim Order and the Final Order, subject to the Challenge rights reserved in Paragraph 21 of this Interim Order.

4. **Superpriority Administrative Claim**. The DIP Lender is hereby granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim," together with the DIP Liens, the "DIP Protections") pursuant to § 364(c)(1) of the Bankruptcy Code in the

Chapter 11 Case and in any Successor Case(s) for all DIP Obligations, including the Roll Up (subject to the Challenge rights reserved in Paragraph 21 of this Interim Order), having priority over any and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under §§ 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (with respect to the Roll Up, subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from all pre- and post-petition property of the Debtor and all proceeds thereof, including, without limitation, and after entry of a Final Order, proceeds or property recovered in connection with the pursuit of Avoidance Actions (but excluding the Avoidance Actions themselves). The DIP Superpriority Claim shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out. The DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in the Chapter 11 Case.

5. **Authorization to Use Proceeds of the DIP Credit Facility and Cash Collateral**. Pursuant to the terms and conditions of this Interim Order, the DIP Term Sheet and the other DIP Documents, and in accordance with the Budget and any variances thereto that may be permitted pursuant thereto or pursuant to the DIP Term Sheet, the Debtor is authorized to use the borrowings pursuant to the DIP Term Sheet and to use Cash Collateral during the Interim Period until the earliest to occur of the (a) the Maturity Date; (b) entry of any order by the Bankruptcy Court denying or terminating the Debtor's use of Cash Collateral; or (c) upon the occurrence or continuation of an Event of Default. Subject to the terms of the DIP Term Sheet, the Debtor and the DIP Lender may agree in writing to modify the Budget in the DIP Lender's sole discretion at

any time that the DIP Credit Facility remains outstanding. Silence, inaction, course of dealing, or funding of any advance shall not constitute approval of any Budget modification or variance.

6. **Relief from the Automatic Stay**.

a. Upon the occurrence and during the continuance of an Event of Default, the DIP Lender shall have no obligation to make further advances or consent to further use of Cash Collateral. Upon five (5) Business Days' prior written notice to the Debtor (the "Remedies Notice Period"), counsel to the Official Committee of Unsecured Creditors (the "Committee"), the Prepetition Secured Parties, and the U.S. Trustee, the DIP Lender is hereby granted relief from any stay of proceeding (including, without limitation, the automatic stay applicable under § 362 of the Bankruptcy Code to the holder or holders of any security interest) to permit the DIP Lender, upon the occurrence of and continuance of an Event of Default, to exercise any rights and remedies provided to the DIP Lender under the DIP Documents or at law or equity, including all remedies provided under the Bankruptcy Code. Furthermore, the DIP Lender is hereby granted immediate relief from the automatic stay to take steps to perfect the DIP Liens, as described below. The automatic stay of § 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtor, the Committee, the Prepetition Secured Parties, and/or the U.S. Trustee have not obtained an order providing otherwise (a "Stay Enforcement Order") from this Court prior to the expiration of the Remedies Notice Period; *provided* that the hearing on whether the automatic stay shall be terminated may be sought on an expedited basis.

b. Upon an Event of Default and subject to the expiration of the Remedies Notice Period without entry of a Stay Enforcement Order, and notwithstanding § 362, the Prepetition Senior Lender, solely in its capacity as party to any deposit account control agreement(s)

or similar control agreements in effect as of the Petition Date with respect to any Debtor's deposit, securities, or other bank accounts (collectively, "DACAs"), shall be granted limited relief from the automatic stay to deliver any "notice of exclusive control," "activation notice," or similar instruction required under the DACAs to acknowledge and implement that the Prepetition Senior Lender has exclusive control over the applicable account(s) for the benefit of itself and the DIP Lender pursuant to this Interim Order. Any bank, financial institution, depository, or securities intermediary subject to a DACA (each, a "Depository Institution") is authorized to comply with any such notice or instruction without further order of the Court, and shall have the protections of § 364(e) and any other applicable protections afforded by this Interim Order for taking such actions in good faith. For the avoidance of doubt, any such exercise shall be limited to effectuating the Prepetition Senior Lender's and the DIP Lender's exclusive control consistent with the DIP Documents and this Interim Order. Nothing in this paragraph requires the Prepetition Senior Lender or any Depository Institution to sweep, transfer, or apply funds in any account before the expiration of the Remedies Notice Period. All parties' rights with respect to cash management relief and orders remain reserved, and this Paragraph is intended to complement, and not conflict with, any cash management order entered in the Chapter 11 Case.

7. **Postpetition DIP Lien Perfection**.

a) This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding

the foregoing, the DIP Lender may, at its sole discretion, file financing statements, without notice to the Debtor, with all appropriate jurisdictions to perfect or protect the DIP Lender's interest or rights hereunder, including a notice that any disposition of the DIP Collateral, by the Debtor or any other Person, shall be deemed to violate the rights of the DIP Lender under the Uniform Commercial Code. Such financing statements may indicate the DIP Collateral as "all assets of the Borrower" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in the DIP Lender's discretion, and is hereby granted relief from the automatic stay of § 362 of the Bankruptcy Code in order to do so, and any and all of such financing statements, mortgages, notices of lien and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Case.

b) The Debtor shall from time to time execute and deliver to the DIP Lender, at the written request of the DIP Lender, all negotiable collateral, all financing statements and other documents that the DIP Lender may reasonably request, in form satisfactory to the DIP Lender, to perfect and continue the perfection of the DIP Lender's security interests in the DIP Collateral and in order to fully consummate all of the transactions contemplated under the DIP Documents.

8. **Authorization and Direction for Payment of DIP Lender and Prepetition Secured Parties' Fees and Expenses**. The Debtor shall pay all reasonable and documented prepetition and postpetition out of pocket costs and expenses of DIP Lender in connection with the Chapter 11 Case and any Successor Case(s), including, without limitation, in connection with (a) the preparation, negotiation, execution and delivery of the DIP Documents, this Interim Order, and any Final Order, and the funding of all DIP Loans under the DIP Credit Facility, (b) the administration of the DIP Credit Facility and any amendment or waiver of any provision of the DIP Documents, this Interim Order, and any Final Order, (c) the administration of the Chapter 11

Case and any Successor Case(s), (d) the enforcement or protection of the DIP Lender's rights and remedies under the DIP Documents, this Interim Order, and any Final Order, and (e) as provided in Paragraph 12(d). Notwithstanding anything to the contrary herein, the payment of all such reasonable and documented fees, costs and expenses of the DIP Lender, whether incurred before or after the Petition Date, including, without limitation, all reasonable and documented fees referred to in the DIP Documents, all fees referred to in Paragraph 12(d) and all attorneys' fees and expenses, shall (i) be subject to Paragraph 21 of this Interim Order, be deemed non-refundable and irrevocable, and (ii) not be subject to the Budget. None of DIP Lender's or the Prepetition Secured Parties' attorneys' fees or disbursements shall be subject to the approval (whether prior to payment or after) of this Court or the guidelines of the Office of the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. Any such fees, costs and expenses shall be paid by the Debtor within fourteen (14) days after delivery of a summary invoice to the Debtor and without the need for application to or order of the Court. Such summary invoice may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law. [A copy of such summary invoice shall be provided by DIP Lender or the Prepetition Secured Parties, as applicable to the U.S. Trustee contemporaneously with the Debtor's receipt of such summary invoice]. Notwithstanding the foregoing, if (x) the Debtor or the U.S. Trustee objects to the

reasonableness of a summary invoice submitted by the DIP Lender and (y) the parties cannot resolve such objection, in each case within the fourteen (14) day period following receipt of such summary invoice, the Debtor or the U.S. Trustee, as the case may be, shall file with the Court and serve on the DIP Lender submitting the fee request a fee objection (a "Fee Objection"), which Fee Objection shall be limited to the issue of the reasonableness of such fees and expenses.

9. **Carve-Out; Professional Fee Escrow**.

a) "Carve-Out" means (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) (without regard to the notice set forth in (c) below) (the "U.S. Trustee Fees"); (b) to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court, solely to the extent provided for in the Budget, all unpaid fees (including, without limitation, transaction fees paid upon the closing of the respective transaction but excluding success fees) and expenses (collectively, the "Professional Fees") accrued or incurred by persons or firms retained by the Debtor pursuant to §§ 327, 328, or 363 of the Bankruptcy Code (the "Professionals") and professionals employed by the Committee (the "Committee Professionals" and, together with the Professionals, the "Professional Persons") at any time on or prior to delivery by or on behalf of the DIP Lender of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (c) the Professional Fees in an aggregate amount not to exceed $200,000.00 for amounts incurred after the date of delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court (the amounts set forth in this clause (c) being the "Post-Carve-Out Trigger Notice Cap"). "Carve-Out Trigger Notice" means a written notice delivered by email (or other electronic means) to the Debtor and its counsel, the U.S. Trustee, and counsel to the Committee, and the Prepetition Secured

Parties, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Documents, stating (x) that the Post-Carve-Out Trigger Notice Cap has been invoked, (y) the DIP Loans have been accelerated, and (z) the DIP Lender does not intend to fund further advances under the DIP Loans or consent to further use of Cash Collateral. Except as otherwise provided herein, no portion of the Carve-Out or proceeds of the DIP Credit Facility may be used for the payment of the fees and expenses of any person incurred in challenging, or in relation to the Challenge of, (a) the liens and/or claims of the DIP Lender or the Prepetition Secured Parties, or the initiation or prosecution of any claim or action against the DIP Lender or the Prepetition Secured Parties, including, without limitation, any Avoidance Actions, and any other federal, state or foreign law, in respect of the DIP Documents or (b) any claims or causes of actions against the DIP Lender or the Prepetition Secured Parties, their advisors, professionals, agents and sub-agents, including formal discovery proceedings in anticipation thereof.

b) The Debtor shall wire transfer funds, on a weekly basis, to an escrow account establish by Verita, its claims agent, in an amount equal to, but not to exceed, the amounts set forth in the professional fee line items under the "Restructuring Disbursements" subheading in the Budget for each such week (the "Professional Fee Escrow"). The Debtor shall use funds held in the Professional Fee Escrow exclusively to pay Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, in accordance with any interim or final orders of the Court; *provided, however*, that the Debtor's obligations to pay such allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fee Escrow. Upon delivery of a Carve-Out Trigger Notice, the Debtor may also fund the Professional Fee Escrow with the amount of the Post-Carve-Out Trigger

Notice Cap. Except as provided in this Interim Order, no funds of the Debtor shall be transferred or otherwise deposited into the Professional Fee Escrow. The amount transferred to the Professional Fee Escrow in any week shall not exceed the amount expressly scheduled for that week in the Approved Budget (other than an initial catch up escrow to amounts accrued prior to the Initial Advance), and the aggregate pre-Trigger Notice amount shall not exceed the aggregate amount scheduled in the Approved Budget. No transfer to the Professional Fee Escrow may be made after delivery of a Carve-Out Trigger Notice other than the fixed Post-Carve-Out Trigger Notice Cap. The Professional Fee Escrow shall not be subject to the control of the DIP Lender, and the funds transferred to the Professional Fee Escrow shall not be subject to the DIP Liens, the Adequate Protection Liens or any other liens, nor constitute DIP Collateral, Prepetition Collateral or collateral for any other obligation; *provided, however*, that the DIP Liens shall automatically attach to any residual interest in the Professional Fee Escrow (which liens shall be deemed automatically perfected liens as of entry of this Interim Order), and upon satisfaction of all amounts payable from the Professional Fee Escrow, any excess proceeds shall revert to the DIP Lender until the DIP Obligations have been satisfied in full and thereafter to the Debtor (including as reorganized pursuant to a chapter 11 plan).

c) The Debtor shall not sell, assign, factor, advance against, compromise, settle, transfer, or otherwise dispose of any HQAF receivable or any related proceeds without the DIP Lender's prior written consent in its sole discretion and, if required by applicable law, further order of this Court. Notwithstanding the foregoing or any anything else herein to the contrary, in the event there is a Carve Out Trigger Notice, the DIP Lender and Prepetition Senior Lender hereby consent to the Debtor entering into one or more agreements for the advancement or sale of HQAF receivables with such amounts to be used for reasonable, necessary and documented costs

(excluding legal fees) to safely close the Hospital, to be determined in consultation with the DIP Lender, with any excess amounts to be turned over to the DIP Lender.

10. For the avoidance of doubt, notwithstanding any (i) occurrence of any Event of Default, (ii) delivery of a Carve-Out Trigger Notice, or (iii) termination of the DIP Documents, the Debtor shall be permitted to fund and make payments from the Professional Fee Escrow in accordance with the Budget and this Interim Order; *provided, that*, for the further avoidance of doubt, nothing in this subparagraph is intended or shall be deemed to obligate the DIP Lender to make any further DIP Loans or advance any further funds under the DIP Facility upon the occurrence of any of the events identified at (i), (ii), and (iii) in this subparagraph.

11. **Payment of Compensation**. Nothing herein shall (i) limit or cap the amount of U.S. Trustee Fees or any professional fees of the Debtor or Committee that may ultimately be allowed or paid from sources other than the DIP Collateral or Prepetition Collateral, or (ii) be construed as consent to the allowance of any professional fees or expenses of the Debtor or Committee or affect the right of any party in interest to object to the allowance and payment of such fees and expenses.

12. **Adequate Protection for Prepetition Secured Parties**. As adequate protection in respect of, and as consideration for any Diminution resulting from any of the incurrence and payment of the DIP Obligations, the use of Cash Collateral, the use of other Prepetition Collateral, the granting of the DIP Liens and the DIP Superpriority Claim, the subordination of the Prepetition Secured Obligations to the DIP Obligations and the Carve-Out and the imposition of the automatic stay pursuant to § 362 of the Bankruptcy Code, the Prepetition Secured Parties are hereby granted (in each case subject only to the DIP Liens, the DIP Superpriority Claim, and prior payment of the Carve-Out) the following adequate protection:

a) *Adequate Protection Liens*. The Prepetition Secured Parties are hereby granted (effective and perfected by operation of law immediately upon entry of this Interim Order and without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements, account control agreements and other agreements, filings or instruments) valid, perfected, postpetition security interests and liens (the "Adequate Protection Liens") in and on all of the DIP Collateral, with a priority subject and subordinate only to (i) the DIP Liens, (ii) prior payment of the Carve-Out and (iii) any liens senior by operation of law or otherwise permitted under the Prepetition Loan Documents (solely to the extent that any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, or valid, non-avoidable senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by § 546(b) of the Bankruptcy Code).

b) *Superpriority Claims*. Administrative superpriority expense claims in the Chapter 11 Case (the "Adequate Protection Superpriority Claims"), junior and subordinate only to the DIP Obligations and the Carve-Out, pursuant to section 507(b) having priority over any and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under §§ 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed Adequate Protection Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof including, without limitation, and after

entry of a Final Order, any proceeds or property recovered in connection with the pursuit of Avoidance Actions. The DIP Superpriority Claim shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out. For the avoidance of doubt, the Adequate Protection Superpriority Claims are junior and subordinate in all respects to (i) the Carve-Out and (ii) the DIP Superpriority Claim and all other DIP Obligations.

c) *506(c) and 552(b) Waivers*. Upon the entry of the Final Order, the Prepetition Secured Parties' consent to use of Cash Collateral and Prepetition Collateral under this Interim Order and the Final Order and the Debtor's right to use Cash Collateral and Prepetition Collateral: (i) is in lieu of any § 506(c) claim, payment or priority for the costs or expenses of the administration of the Chapter 11 Case; and (ii) is granted as consideration for (among other things) the waiver of the exceptions provided in §§ 552(b)(1) and (2) of the Bankruptcy Code.

d) *Fees and Expenses*. The Debtor shall pay all postpetition reasonable and documented fees and expenses incurred by the DIP Lender, including, without limitation, the reasonable and documented fees and expenses of counsel to the Prepetition Senior Lender; including fees and expenses incurred in connection with negotiations in connection with the DIP Term Sheet and Plan Term Sheet and related documents; provided, however, that the DIP Lender shall not be entitled to reimbursement for any fees or expenses incurred in connection with (i) the acquisition of the Hospital or the transfer of operations at the Hospital (including in connection with regulatory approval, interim management agreement or similar arrangement, or negotiation of a lease with the Landlord), or (ii) the negotiation, preparation, or documentation of any asset purchase agreement, or (iii) any other activities undertaken in furtherance of the DIP Lender's acquisition of the Debtor's assets. No provision of this Interim Order shall impair the DIP Lender's right to reimbursement for reasonable expenses incurred to preserve, monitor, enforce, protect, or

realize upon its rights and collateral, including in connection with a court-approved sale process or credit bid as DIP Lender.

13. **Credit Bid Rights**. In connection with any sale or disposition of all or any portion of the DIP Collateral, including in each case pursuant to §§ 9-610 or 9-620 of the Uniform Commercial Code, at any sale thereof conducted under the provisions of the Bankruptcy Code, including § 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under § 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by the DIP Lender, by a chapter 7 trustee under § 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, § 363(k) of the Bankruptcy Code, the DIP Lender shall have the power and right to "credit bid" the full amount (or any portion) of all DIP Obligations (inclusive of the Roll Up, subject to the Challenge rights in Paragraph 21 of this Interim Order) in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP Collateral and (b) subject to the terms of Paragraph 21 herein, the Prepetition Senior Lender shall have the right to credit bid the full amount (or any portion) of the Prepetition Senior Loan Obligations, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Prepetition Collateral. The Debtor, on behalf of itself and the estate, further hereby agrees not to challenge the rights granted to the DIP Lender and the Prepetition Senior Lender in this paragraph. The DIP Lender and each of its affiliates, designees, and acquisition vehicles may credit bid all or any portion of the full amount of the DIP Obligations, including principal, accrued interest, fees, expenses, protective advances, and other obligations under the DIP Documents, in any sale or disposition of DIP Collateral. No Challenge shall limit such credit-bid right absent a final, non-appealable order expressly determining the specific amount of DIP Obligations that may not be credit bid.

14. **Maturity Date**. All unfunded DIP commitments of the DIP Lender will terminate, and all DIP Obligations of the Debtor will be immediately due and payable in full in cash on the earliest of: (a) December 11, 2026, unless a Confirmation Order is entered, in form and substance reasonably acceptable to DIP Lender, approving the Plan, Disclosure Statement and related sale of the Debtor's assets to the DIP Lender (or its designee), in which case such date shall be extended to the occurrence of the effective date of the Plan and closing of such sale (the "Maturity Date"); (b) the date upon which a Milestone is missed and not waived by the DIP Lender; (c) the date of consummation of any sale of all or substantially all of the assets of the Debtor pursuant to § 363 of the Bankruptcy Code; (d) the date of acceleration of the DIP Loans and the termination of the DIP commitments pursuant to the terms of the DIP Documents (e.g., occurrence of an Event of Default); (e) the effective date of a plan of reorganization in the Chapter 11 Case; (f) appointment of a chapter 11 trustee in the Chapter 11 Case; or (g) conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11 Case.

15. **Events of Default**. The occurrence of an "Event of Default" by the Debtor pursuant to the DIP Term Sheet shall constitute an event of default under this Interim Order, unless expressly waived by the DIP Lender in its sole discretion in writing in accordance with the DIP Documents (each, an "Event of Default"). The Debtor shall provide the DIP Lender immediate written notice of any Event of Default or event that, with notice, passage of time, or both, would become an Event of Default.

16. **Rights and Remedies Upon Event of Default**. Upon the occurrence and during the continuance of an Event of Default, the DIP Lender shall have the rights to which it is entitled under the DIP Term Sheet and this Interim Order, subject to the rights and defenses of the Debtor under this Interim Order.

17. **Proofs of Claim**. Neither the DIP Lender nor the Prepetition Secured Parties shall be required to file proofs of claim in the Chapter 11 Case or Successor Cases for any claim allowed herein.

18. **Other Rights and Obligations**.

a) *Good Faith Under Section 364(e) of the Bankruptcy Code*. The DIP Lender and the Prepetition Secured Parties have acted in good faith in connection with (i) negotiating the DIP Documents and the loans to be made pursuant thereto, (ii) consenting to the Debtor's use of Cash Collateral, and (iii) their reliance on this Interim Order. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with § 364(e) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), in the event any or all of the provisions of this Interim Order are hereafter reversed or modified by a subsequent order of this or any other Court, the DIP Lender and the Prepetition Secured Parties are entitled to all of the benefits and protections to the extent provided in § 364(e) of the Bankruptcy Code.

b) *Binding Effect*. The DIP Liens, DIP Superpriority Claim, and the Adequate Protection Liens and other rights and remedies granted under this Interim Order to the DIP Lender and the Prepetition Secured Parties, as applicable, shall continue in the Chapter 11 Case and any Successor Case(s), and shall be valid and enforceable against any trustee appointed in the Debtor's Chapter 11 Case and upon the dismissal of the Debtor's Chapter 11 Case, or in any Successor Case(s), and such liens and security interests shall maintain their priority as provided in this Interim Order until all the DIP Obligations or the Prepetition Obligations, as applicable, have been indefeasibly paid in full in accordance with the DIP Documents, the Prepetition Documents or this Interim Order, as applicable; *provided*, for the avoidance of doubt, that the DIP Liens (to the extent of the Roll Up), DIP Superpriority Claim (to the extent of the Roll Up), and the Adequate

Protection Liens shall be subject to the Challenge rights reserved in Paragraph 21 of this Interim Order.

c) *DIP Lender's Liability for DIP Collateral*. So long as the DIP Lender complies with reasonable commercial lending practices, the DIP Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the DIP Collateral; (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (iii) any diminution in the value thereof; or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever, provided that this paragraph shall not apply to CERCLA liability. All risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtor.

d) *Demand; Protest*. The Debtor waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by the DIP Lender on which the Debtor may in any way be liable.

e) *No Other Financing.* Except as provided in the DIP Term Sheet, the Debtor shall not seek, solicit, entertain, negotiate, or support any alternative financing (including not entering into any future sale or financing transactions with L.A. Care, or any other person, regarding HQAF receivables or otherwise, and not using or pledging cash collateral other than as set forth in the Approved Budget) or priming proposal without the DIP Lender's prior written consent unless such financing would indefeasibly repay all DIP Obligations in full in cash at or prior to consummation.

19. **Releases**. The release, discharge, waivers, settlements, compromises, and agreements set forth in this Paragraph 19 (the "Releases") and the Stipulations set forth in

Paragraph D of this Interim Order shall be deemed effective upon entry of this Interim Order, subject only to the rights set forth in Paragraph 21 below. The Debtor forever and irrevocably releases, discharges, and acquits (i) the DIP Lender, solely in its capacity as DIP Lender, under the DIP Documents; (ii) the DIP Lender's affiliates and predecessors in interest; and (iii) the DIP Lender's former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants, and attorneys, solely in their capacity as such (collectively, the "DIP Lender Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type at any time arising prior to the Petition Date, including without limitation, all Avoidance Actions, provided that no such parties will be released, discharged, and acquitted for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such parties' actual fraud, gross negligence, bad faith, self-dealing or willful misconduct. For the avoidance of doubt, nothing contained herein shall relieve the DIP Lender from fulfilling any of its commitments under this Interim Order or the DIP Documents. Subject to (i) entry of the Final Order and (ii) the Challenge rights set forth in Paragraph 21 of this Interim Order and without prejudice to the rights of interested parties under Paragraph 21 of this Interim Order, the Debtor forever and irrevocably releases, discharges, and acquits the Prepetition Senior Lender, solely in its capacity as such, under the Prepetition Senior Loan Documents, and their affiliates and predecessors in interest, and their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants, and attorneys, solely in their capacity as such (collectively, the "Prepetition Secured Party Releasees"),

of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type at any time arising prior to the Petition Date, including without limitation, all Avoidance Actions, provided that no such parties will be released, discharged, and acquitted for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such parties' actual fraud, gross negligence, bad faith, self-dealing or willful misconduct. For the avoidance of doubt, the foregoing release applies only to conduct, acts and omissions that occurred on or prior to the entry of the Final Order, and the release does not apply to future conduct, acts or omissions or ongoing obligations of the Prepetition Senior Lender to the Debtor under the Prepetition Senior Loan Documents.

20. **Indemnification**. The DIP Lender has acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Loans, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Credit Facility, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, the DIP Lender shall be and hereby is indemnified and held harmless by the Debtor in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such party will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such party's actual fraud, gross negligence, bad faith, or willful misconduct; *provided, further*, that, notwithstanding anything to the contrary herein or in the DIP Term Sheet or any other related document, no Debtor shall have any obligation to indemnify,

contribute to, or reimburse the DIP Lender or any of its affiliates, agents, or representatives for any losses, claims, damages, liabilities, or expenses to the extent arising from or relating to a successful Challenge (as defined in Paragraph 21 of this Interim Order).

21. **Reservation of Certain Third-Party Rights and Bar of Challenges and Claims**. The Releases set forth in Paragraph 19 above and the Stipulations set forth in Paragraph D of this Interim Order shall be binding upon the Debtor and any of its respective successors and assigns in all circumstances and for all purposes, and the Debtor is deemed to have irrevocably waived and relinquished all Challenges as of the Petition Date. In addition, the Committee's right to challenge (i) the Stipulations and Releases set forth herein and (ii) with the consent of L.A. Care, any prepetition transactions between the Debtor and L.A. Care (collectively, the "Challenge Rights") shall be tolled through the effective date of any chapter 11 plan filed and approved in this Chapter 11 Case and, upon the occurrence of the effective date of such plan, shall be deemed waived and released in accordance with the terms and conditions of such plan consistent with the Plan Term Sheet; provided, however, that such tolling period shall expire in the event the Plan is not confirmed due to the DIP Lender's failure to fund its obligations under the DIP Facility, at which time the Committee will have 14-days to pursue a challenge. If such 14-day period expires without a challenge, the Committee's right to challenge will be terminated. No extension of the Challenge Period shall be effective without the prior written consent of the DIP Lender and the Prepetition Senior Lender. The Committee shall have derivative standing to bring a challenge against the Prepetition Senior Lender or the Prepetition Senior Liens provided it satisfies the requirements set forth in, and consistent with, this paragraph. A timely Challenge must be commenced by a properly filed adversary complaint or contested matter that identifies with particularity each challenged lien, obligation, payment, or transaction and the specific legal and factual basis for relief. A request for

Rule 2004 examination, discovery request, motion to extend, objection, reservation of rights, or other preliminary proceeding shall not constitute a Challenge. Pending a final, non-appealable order sustaining a timely and properly commenced Challenge solely as to a specifically identified portion of the Roll-Up, the Roll-Up shall remain a valid and enforceable DIP Obligation entitled to all DIP Protections. No Challenge, investigation, discovery request, grant of standing, reservation of rights, or other proceeding shall affect the New Money Term Loans or their associated DIP Protections.

22. **Restriction on Use of Funds**. Subject to the final sentence of this paragraph 22, but notwithstanding any other provision in this Interim Order or the DIP Documents to the contrary, without the express written consent of the DIP Lender, no proceeds of the DIP Credit Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used to pay any claims for services rendered by any professionals retained by the Debtor, any creditor or party in interest, the Committee, any trustee appointed under the Chapter 11 Case or any Successor Case(s), or any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to § 364 of the Bankruptcy Code or otherwise, other than from the DIP Lender, unless the proceeds of such loans or accommodations are or will be sufficient, and will be first used, to indefeasibly pay in full in cash all DIP Obligations; (b) investigate (except as set forth in this paragraph below), assert, join, commence, support or prosecute any Challenge or other action or claim, counter-claim, proceeding, application, motion, objection, defense, or other adversary proceeding or contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of the DIP Lender or any other DIP Lender Releasee or the Prepetition Senior Lender with respect to any transaction, occurrence, omission, or action including, without limitation, (i)

any Avoidance Actions, (ii) any action relating to any act, omission or aspect of the relationship between or among any of the DIP Lender Releasees or the Prepetition Senior Lender Releases, on the one hand, and any of the Debtor, on the other, (iii) any action with respect to the validity and extent of the DIP Obligations, the Prepetition Senior Secured Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition Senior Liens or the Adequate Protection Liens, (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Liens, the Prepetition Senior Secured Obligations, the Prepetition Senior Liens, or the Adequate Protection Liens, or (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) DIP Lender in respect of the enforcement of the DIP Liens; (c) subject to authority provided to the Debtor pursuant to the DIP Documents, pay any claim (as defined in the Bankruptcy Code) of a prepetition creditor (as defined in the Bankruptcy Code) if the Debtor has received a written objection to such payment from the DIP Lender; and/or (d) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby or by the DIP Documents, without the express written consent of the DIP Lender. Notwithstanding the foregoing, up to $25,000 (the "Challenge Budget") in the aggregate of the DIP Credit Facility, DIP Collateral, Cash Collateral and Carve-Out may be used by the Committee to investigate Challenges against the Prepetition Secured Party Releasees and the legality, validity, priority, perfection, enforceability and extent of the Prepetition Senior Liens. The Challenge Budget is a hard aggregate cap and may be used solely for an initial investigation by Committee Professionals. It may not be used to seek or litigate an extension of the Challenge Period, prosecute an appeal, conduct discovery beyond that reasonably necessary for the investigation, challenge New Money Term Loans or related DIP Protections, or pursue claims against any person other than the Prepetition Senior Secured Party Releasees. No unused portion

of the Challenge Budget may be reallocated for any other purpose without the DIP Lender's prior written consent.

23. **Limitation on Surcharge**. Without limiting the terms of the Carve-Out (and subject to the entry of the Final Order solely with respect to (i) the Prepetition Secured Parties and (ii) the Roll Up), no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any Successor Case(s) at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the DIP Lender, the Prepetition Secured Parties, the Carve-Out (other than the Professional Persons that are the beneficiaries of the Carve-Out as provided for in the Budget), the DIP Collateral or the Prepetition Collateral, pursuant to §§ 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender and the Prepetition Secured Parties (and the Professional Persons that are the beneficiaries of the Carve-Out as provided for in the Budget in the case of an asserted surcharge against the Carve-Out); *provided* that nothing herein shall alter the Challenge Budget. No action, inaction or acquiescence by the DIP Lender or the Prepetition Secured Parties shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against either DIP Lender, the DIP Collateral, the Prepetition Secured Parties or the Prepetition Collateral.

24. **No Marshaling**. Subject to entry of the Final Order, the Prepetition Secured Parties and the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, and subject to entry of the Final Order, no party (other than the Prepetition Secured Parties and the DIP Lender) shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or

otherwise) to marshal or otherwise control the disposition of the DIP Collateral or the Prepetition Collateral (as applicable) after an Event of Default under the DIP Documents.

25. **Allocation of Proceeds of Excluded Assets**. Notwithstanding anything to the contrary in this Interim Order, the Final Order, the DIP Documents, or the Prepetition Loan Documents, the DIP Lender and the Prepetition Senior Lender agree that any credit bid of the DIP Lender or its affiliates shall not include the Excluded Assets (as defined in the DIP Term Sheet and Plan Term Sheet), including Avoidance Actions, and the proceeds thereof, after payment of all reasonable and documented costs and expenses incurred in prosecuting, settling, or otherwise realizing upon such Excluded Assets, shall be distributed as follows: (a) the first $1 million shall be retained by the Debtor's estate (or applicable litigation trust) for distribution to holders of allowed General Unsecured Claims and/or payment of expenses for payment; (b) then, a 50%/50% sharing between the Prepetition Senior Lender and the holders of allowed General Unsecured Claims, until the Prepetition Senior Lender has received $4 million from net proceeds; and (c) then, 75% of subsequent net proceeds shall be distributed to holders of allowed General Unsecured Claims and 25% shall be distributed to the Prepetition Senior Lender, until the Prepetition Senior Lender is paid up a total of $20 million (i.e., $4 million ((iii) above) + $16 million), at which time all subsequent net proceeds shall be distributed to holders of allowed General Unsecured Claims. No Excluded Asset may be compromised, settled, released, abandoned, or otherwise disposed of in a manner reasonably expected to impair the DIP Lender's rights under this paragraph without prior written notice to, and consent of, the DIP Lender. Notwithstanding the foregoing, in the event the DIP Lender consents to a form of plan of reorganization ("Plan") that contains an alternative distribution waterfall, then such waterfall under the Plan shall govern.

26. **Survival of Interim Order**. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any Plan in the Chapter 11 Case, (b) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or a Successor Case, (c) to the extent authorized by applicable law, dismissing the Chapter 11 Case, (d) withdrawing the reference of the Chapter 11 Case from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Case in this Court and this Interim Order. The terms and provisions of this Interim Order shall be binding upon the Debtor, the DIP Lender, the Prepetition Secured Parties and each of their respective successors and assigns, and shall inure to the benefit of the Debtor and the DIP Lender, the Prepetition Secured Parties and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed or elected in a case for the Debtor under any chapter of the Bankruptcy Code, including any Successor Case.

27. **Survival of L.A. Care Sale Order**. For the avoidance of doubt, nothing in this Interim Order shall alter, modify, impair, or limit any rights, obligations, releases, stipulations, or other provisions by or in favor of the Debtor, L.A. Care, or any other party under the *Order Granting Debtor's Emergency Motion to (I) Sell HQAF Receivables to L.A. Care Pursuant to Section 363, (II) Stipulate to the Validity and Non-Avoidability of Prepetition Sales of HQAF Receivables to L.A. Care (III) Grant L.A. Care a Release of Any Estate Claims (IV) Grant Administrative Claims in Favor of L.A. Care, (V) to the Extent Necessary, Modify the Automatic Stay and (VI) Grant Related Relief* [Docket No. 115] (the "L.A. Care Sale Order"); *provided*, *however*, that, to the extent L.A. Care is ultimately determined to hold a valid prepetition security interest in any assets of the Debtor, L.A. Care shall receive adequate protection for any diminution

in value of such security interest as a Prepetition Secured Party under this Interim Order in exchange for L.A. Care being subordinated to (i) the Carve-out (ii) the priming of such security interest by the DIP Liens and (iii) the Adequate Protection Superpriority Claims, in each case to the extent and on the terms provided in this Interim Order.

28. **Lender Information, Reporting, And Collateral-Preservation Covenants**. Beginning on the second Monday after entry of this Interim Order, the Debtor shall deliver to the DIP Lender: (i) weekly thirteen-week Budget-to-actual reports, including explanations for all variances; (ii) weekly accounts receivable aging, reimbursement, payor, denial, recoupment, setoff, and HQAF reports; (iii) weekly reports regarding payroll, vendor obligations, patient census, licensure, provider agreements, and material regulatory matters; and (iv) immediate notice of any Event of Default, material litigation, material regulatory notice or proceeding, casualty, loss of material provider status, or threatened impairment of material reimbursement rights. The Debtor shall preserve all material licensure, provider agreements, reimbursement rights, and governmental-program participation, and shall not settle, compromise, sell, assign, factor, advance against, or otherwise dispose of any material receivable or reimbursement right without the DIP Lender's prior written consent.

29. **Final Hearing; Objection Deadlines**. The Final Hearing to consider entry of the proposed Final Order and final approval of the DIP Credit Facility is scheduled for __________, 2026 at __________ [a.m./p.m.] prevailing Eastern Time at the United States Bankruptcy Court for the District of Delaware. Any objections or responses to entry of the proposed Final Order shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on ____________, 2026, and served on the following parties: (i) counsel to the Debtor, (ii) counsel to the Committee, (iii) counsel to the DIP Lender and the Prepetition Secured Parties, and (iv) the Office of the U.S. Trustee for the

District of Delaware, 844 N. King Street, Room 2207, Lockbox 35, Wilmington, Delaware 19801. If no objections to the entry of the proposed Final Order are filed and served in accordance with this Interim Order, no Final Hearing may be held, and the proposed Final Order may be presented by the Debtor under certification of counsel and entered by this Court.

30. **Notice of Entry and Service**. Within two (2) business days following entry of this Interim Order, the Debtor shall serve notice of the entry of this Interim Order and of the Final Hearing, together with copies of this Interim Order and the Motion, on: (i) the parties having been given notice of the Interim Hearing; and (ii) any party which has filed prior to such date a request for notices with this Court.

31. **Inconsistency**. In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control. To the extent any inconsistency between this Interim Order and the L.A. Care Sale Order shall exist, the terms and conditions of this Interim Order shall govern and control.

**32.** **Enforceability**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable effective as of the Petition Date immediately upon entry of this Interim Order. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order. The rights of all parties in interest to object to the terms of the Final Order, including the DIP Documents at the Final Hearing are expressly reserved.

33. **Retention of Jurisdiction**. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order, the DIP Documents, and all rights and remedies of the DIP Lender hereunder.

# **Exhibit 1**

## **DIP Term Sheet**

**DIP FINANCING**
**TERM SHEET**

This term sheet (the "DIP Term Sheet") summarizes the principal terms of a proposed debtor in possession financing and restructuring arrangement between Pacifica of the Valley Corporation ("Pacifica" or "Debtor") and Axios Capital Solutions, LLC ("Axios"). This DIP Term Sheet is binding[1] and shall not become effective unless and until it is executed by both parties and approved by the Bankruptcy Court pursuant to the DIP Order in form and substance mutually acceptable to the Debtor and Axios.

**Proposed Terms**

| | |
|---|---|
| **Chapter 11 Case** | On July 4, 2026 ("Petition Date"), Pacifica commenced a voluntary chapter 11[2] proceeding in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The case is pending before Judge Thomas M. Horan, bearing Case No. 26-11060 (the "Chapter 11 Case"). |
| **DIP Lender** | Axios, or one or more of its designated affiliates, successors, or assigns ("Lender"). |
| **DIP Facility** | Lender shall provide Pacifica with a multi-draw senior secured, superpriority debtor in possession financing facility in the aggregate principal amount of $21,000,000 (the "DIP Facility").<br><br>Borrowings under the DIP Facility (the "DIP Loans") shall, subject to the borrowing conditions set forth herein, in the DIP Credit Agreement and in the applicable DIP Order, be incurred in multiple tranches as follows:<br><br>(a) an initial advance of $7 million (the "Initial Advance") payable upon the Bankruptcy Court's entry of an Order approving the DIP Facility on an interim basis (the "Interim DIP Order");<br><br>(b) a second advance of $4 million (the "Second Advance") payable upon the Bankruptcy Court's entry of an order approving the DIP Facility on a final basis (the "Final DIP Order" and together with the Interim DIP Order, the "DIP Order");<br><br>(c) a third advance of $3 million (the "Third |

[1] At the time of filing, this term sheet is not executed by the parties and remains subject to client approval.

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, §§ 101 - 1532.

Advance") payable upon the Debtor's filing of the Plan or Private Sale Motion, as applicable; and

(d) a fourth advance of $7 million (the "Fourth Advance", and together with the Second Advance and the Third Advance, the "Subsequent Advances") payable upon the earlier to occur of (i) the Plan Confirmation Milestone (defined below) and (ii) the Sale Closing Milestone.

The DIP Facility shall be used to fund Pacifica's operations and the Chapter 11 Case through the effective date of the Plan, subject to the Approved Budget (defined below), agreed milestones, occurrence of no event of default, and entry of the DIP Order by the Bankruptcy Court.

The approved disbursements and timing of the draws under the DIP Facility shall be further set forth in an agreed 13-week cash-flow budget and funding schedule, approved by the Lender and attached hereto as Schedule 1 (the "Approved Budget").

**Certain Litigation**

*Landlord*. The Debtor, Axios, and Reliq Pacifica LLC, Beverly Gemini Investments, LLC, Taking the 5th, LLC and Fifth/Arizona Investors, LLC (collectively, the "Landlord") have entered into a non-binding Term Sheet, dated September 15, 2026 (the "Lease Term Sheet"), setting forth the parties' agreement in principle regarding lease terms in the event Axios acquires Pacifica Hospital of the Valley (the "Hospital") which is attached hereto as Schedule 2. If Landlord has repudiated or otherwise abandoned the agreement in principle reflected in the Lease Term Sheet (or an agreement is not reached by October 21, 2026), then the Committee and Axios each shall be immediately deemed to have been granted standing to commence litigation against the Landlord to assert any and all claims and causes of action of the Debtor's estate against the Landlord, including, without limitation, seeking recharacterization of the Debtor's Master Lease with the Landlord and the restriction on use of DIP proceeds to prosecute such litigation shall be deemed terminated. The Committee will discuss with Axios and the Debtor pursuing such litigation against Landlord, and shall commence any such litigation within five (5) business days of such repudiation or abandonment by Landlord (or after October 21, 2026) unless the Committee reasonably determines such claim lacks

| | |
| --- | --- |
| | merit; after which time, Axios may commence any such litigation. Upon the Plan Effective Date, if such dispute is not resolved, the litigation shall be handled by Newco (as defined in the Plan Term Sheet) or its designated counsel for the benefit of Newco. Any settlement, compromise, or release of any such claims or causes of action against the Landlord (whether commenced by the Committee, the Debtor, or Axios) shall require the prior written consent of Axios. For the avoidance of doubt, neither the absence of an agreement with the Landlord nor the pendency of any such litigation shall be a condition to, or shall excuse or delay the consummation of, the sale of the Debtor's assets to Lender pursuant to the Plan or a Private Sale; in such event the Master Lease shall be assumed and assigned to Newco pursuant to section 365 solely to the extent it constitutes a true lease and expressly without prejudice to, or waiver, release, or ratification of, any claim or cause of action of the estate against the Landlord (including recharacterization), all of which shall be preserved pursuant to section 1123(b)(3)(B) (or sold to Axios under section 363) and vested in Newco. |
| **Use of Proceeds** | Proceeds of the DIP Facility may be used solely for the following purposes, in each case, in accordance with and subject to the Approved Budget then in effect, subject to the Permitted Variance:<br>• Working capital and other ordinary-course operating expenses;<br>• costs and expenses of administering the Chapter 11 Case;<br>• funding of an escrow pursuant to the Approved Budget for payment of documented, reasonable, and court-allowed estate professional fees and expenses;<br>• payment of amounts expressly authorized under the DIP documents or by the Bankruptcy Court;<br>• the payment of documented and reasonable fees and expenses of Lender's professionals in Axios' capacity as Lender, including negotiation and preparation of the DIP documents (for the avoidance of doubt, all other obligations under the DIP Facility shall be paid-in-kind); and |

- other purposes identified in the Approved Budget.

The DIP Facility shall be governed by the Approved Budget which shall be in form and substance acceptable to Pacifica and Axios.

Starting on the second Monday following entry of the Interim DIP Order, the Approved Budget shall be subject to customary variance testing for operating disbursements, with permitted variances of 15% in the aggregate and 20% for each line item (the "Permitted Variances"). Each variance shall be measured solely on a cumulative basis by comparing actual operating disbursements from the beginning of the applicable budget period through the relevant testing date against budgeted operating disbursements for the same cumulative period, and not on a standalone weekly basis.

**Budget**

No proceeds of the DIP Facility (except as specifically set forth herein) shall be used to investigate, challenge, object to, contest or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under or the liens or claims granted under or in connection with the Prepetition Secured Debt, the Debtor's Master Lease with the Landlord or the prepetition sales of receivables to L.A. Care.

Reporting to include weekly liquidity reports, budget-to-actual reporting, information concerning the Plan solicitation and confirmation process to be provided simultaneously to the Lender and the Committee.

The Debtor shall be obligated to comply with the Approved Budget, subject to the Permitted Variances. The Debtor's failure to comply with this requirement shall constitute an immediate Event of Default.

"Prepetition Secured Debt" means indebtedness or obligations arising in connection with the Main Street Priority Loan Agreement dated as of December 10, 2020 (the "Prepetition Loan Agreement") among the Debtor and Axios, as successor to First Western Trust Bank ("FWTB"), as also evidenced by the Promissory Note made and delivered by the Debtor to FWTB dated as of December 10, 2020, in the original amount of $35,000,000, and the Pledge and Security Agreement dated as of December 10, 2020 (the "Prepetition

Security Agreement" and together with the Prepetition Loan Agreement and all ancillary documents related thereto, the "Prepetition Loan Documents"), between the Debtor, as grantor, and Axios, as successor in interest to FWTB.

**Stipulations Concerning Axios's Prepetition Claims and Liens**

Subject to the Challenge Rights described below, Pacifica stipulates and agrees that:

- Axios holds valid and enforceable prepetition claims against Pacifica in the aggregate amount $50,943,321.41 as of the Petition Date (the "Allowed Prepetition Secured Debt Amount");
- Axios's prepetition claims are secured by valid, binding, enforceable, perfected, and non-avoidable liens on and security interests in the applicable prepetition collateral;
- the prepetition obligations and related liens are not subject to avoidance, recharacterization, subordination, disallowance, reduction, offset, recoupment, counterclaim, defense, or other challenge;
- Pacifica has no claims or causes of action against Axios arising from or relating to the Prepetition Loan Documents;
- The assignment of the Prepetition Loan Documents from FWTB to Axios is valid and enforceable and Axios has standing to seek to enforce the Prepetition Loan Documents;
- Neither Axios nor its principals are an affiliate of the Debtor as defined in the CARES Act or the Bankruptcy Code or an insider of the Debtor; and
- all payments made to or for the benefit of Axios before the Petition Date were valid and not avoidable.

These stipulations shall be binding immediately upon Pacifica and all other parties in interest upon entry of the Final DIP Order subject only to the Challenge Rights.

**Challenge Rights**

The Committee's right to challenge (i) the Stipulations and Releases set forth in this DIP Term Sheet and (ii) with the consent of L.A. Care, any prepetition transactions between the Debtor and L.A. Care (collectively, the "Challenge Rights") shall be tolled

| | |
|---|---|
| | through the Plan Effective Date and, upon the occurrence of the Plan Effective Date, shall be deemed waived and released in accordance with the terms and conditions of the Plan consistent with the Plan Term Sheet; provided, however, that if the Plan is not confirmed due exclusively to the Lender's failure to fund its obligations under the DIP Facility (it being understood that Lender's declining to fund any advance as to which any condition precedent has not been satisfied, or following the occurrence of an Event of Default or the Termination Date, shall not constitute a failure to fund), the Committee shall have fourteen (14) days following such breach by Lender to commence and pursue any Challenge Rights. For the avoidance of doubt, the Challenge Rights shall be waived and released if the Plan is not confirmed for any reason other than the Lender's failure to fund its obligations under the DIP Facility. |
| **DIP Liens and Superpriority Claims** | Subject to the Carve-Out and the Excluded Assets (defined below), and to the extent of funds actually advanced under the DIP Facility, Axios shall receive:<br>• a superpriority administrative expense claim under section 364(c)(1);<br>• first-priority liens under section 364(c)(2) on unencumbered property of the estate including without limitation all proceeds of HQAF receivables, and avoidance and preference causes of action (subject to Lender's agreement as set forth below with respect to Excluded Assets);<br>• junior liens under section 364(c)(3) junior to prior permitted senior liens under the Prepetition Loan Documents; and<br>• priming liens under section 364(d) on all collateral securing the Prepetition Secured Debt except for prior permitted senior liens under the Prepetition Loan Documents.<br>Debtor agrees not to seek any alternative financing that would seek to prime the Lender or use cash collateral, without payment in full of the DIP obligations or Lender's consent. |
| **Excluded Assets** | Notwithstanding anything to the contrary herein, all assets designated to be contributed to the Liquidating |

| | |
|---|---|
| | Trust in the Plan Term Sheet, including, without limitation, (i) the QAF Delta (as defined in the Plan Term Sheet), (ii) any estate interest in or related to Pacific Gardens Medical Center, and (iii) all causes of action, claims, and rights of recovery to be contributed to the Liquidating Trust, including chapter 5 causes of action, D&O claims, and any other litigation claims (collectively, the "Excluded Assets"), shall be included and subject to, the liens, security interests, claims, encumbrances, or other interests of Axios arising under or in connection with any prepetition or postpetition financing or indebtedness; however, Lender has agreed to gift the proceeds of Excluded Assets purchased through a Private Sale or a Plan as set forth in the Plan Term Sheet.<br><br>Upon the occurrence of the Plan Effective Date and the contribution of the Excluded Assets to the Liquidating Trust in accordance with the Plan Term Sheet, the Excluded Assets shall be released from and shall not be subject to any DIP Liens, adequate protection liens, replacement liens, superpriority claims, or claims arising under section 507(b) of the Bankruptcy Code granted to or for the benefit of Axios. The DIP Order shall expressly provide for the foregoing carve-out and shall provide that, upon the Plan Effective Date, the Excluded Assets shall be contributed to the Liquidating Trust free and clear of all such liens, claims, and interests of Axios. |
| **Roll-Up** | The DIP Facility shall provide for a roll-up of the Prepetition Secured Debt in an amount equal to 1.5x of cash actually advanced to the Debtor postpetition under the DIP Facility, with such corresponding amount of Prepetition Secured Debt to be automatically rolled up, refinanced, and converted into postpetition obligations under the DIP Facility as and when each such advance is funded. Such roll-up shall constitute a refinancing and continuation, and not a novation, satisfaction, or discharge, of the Prepetition Secured Debt, and the obligations so rolled up shall continue to constitute senior indebtedness for all purposes of any subordination, intercreditor, or similar agreement in favor of the holder of the Prepetition Secured Debt. |
| **Adequate Protection** | As adequate protection for diminution in value of its interests in prepetition collateral, Axios shall receive:<br><br>• Replacement liens on its prepetition collateral; |

- Reimbursement of actual and documented fees and expenses of Axios in its capacity as Lender in connection with the Chapter 11 Case (including in connection with negotiating this DIP Term Sheet, the Lease Term Sheet, the Credit Agreement and related documents); subject to customary review and payment procedures allowing UST and Committee review; and
- Stipulations and releases (detailed below).

**Surcharge; Equities of the Case; Marshalling**

Upon entry of the Final DIP Order, waiver of:

- Section 552(b) Equities-of-the-Case;
- Section 506(c) Surcharge; and
- Marshalling.

**Carve Out**

The DIP liens, replacement liens, superpriority claims, prepetition liens and other protections granted to Lender shall be subject to a "Carve-Out" as described herein.

"Carve-Out" shall mean the sum of the following amounts as of the earlier of (i) the day the Lender issues a Carve-Out Trigger Notice (defined in the applicable DIP Order), or (ii) the Maturity Date ("Carve-Out Effective Date"):

- fees payable to the Clerk of the Bankruptcy Court and the Office of the United States Trustee;
- statutory fees payable under 28 U.S.C. § 1930;
- allowed professional fees and expenses incurred by the Debtor and the Committee before delivery of a Carve-Out trigger notice to the extent consistent with the Approved Budget; and
- a post-trigger professional-fee reserve in the amount of $200,000 (the "Wind-Down Carve-Out") For avoidance of doubt, this shall not result in any additional funding obligation by the Lender.

Notwithstanding any other provision herein, the Carve-Out (including the Wind-Down Carve-Out) shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with the investigation, initiation, or prosecution of any claims,

causes of action, adversary proceedings, or other litigation against the Debtor, the Lender, L.A. Care, or the Landlord (except as provided herein) or any affiliates of any of the foregoing entities, or any of their respective officers, directors, employees, agents, advisors, and counsel, including but not limited to challenging the amount, validity, perfection, priority, or enforceability of or asserting any defense, counterclaim or offset to, the obligations and liens and security interests in favor of the Debtor or the Lender.

**Milestones**

The following milestones ("Milestones") shall apply, subject to agreed extensions by Lender and appropriate Bankruptcy Court relief:

- Initial Milestone: No later than September 29, 2026, the Bankruptcy Court shall have entered the Interim DIP Order, in form acceptable to Lender.

- Lease Extension Milestone: No later than October 5, 2026, the Debtor shall have filed a motion pursuant to section 365(d)(4)(B)(i) to extend the time within which the Debtor may assume or reject the Master Lease, and no later than October 30, 2026, the Bankruptcy Court shall have entered an order extending such time through a date not earlier than January 29, 2027.

- Sale Closing Milestone: If Axios elects to purchase the Debtor's assets via Private Sale, such sale shall have an initial close on or before 30 days after such election and the Debtor and Axios will enter into an interim management agreement or similar agreement while Axios obtains regulatory approvals, and the Debtor and Axios shall close thereafter.

- Plan Confirmation Milestone: If Axios elects to purchase the Debtor's assets pursuant to the Plan, the Debtor shall have confirmed the Plan that is in all respects consistent with the Plan Term Sheet and otherwise in a form and substance reasonably agreeable to Axios on or before December 8, 2026.

Failure to satisfy a Milestone shall constitute an event

| | |
|---|---|
| | of default unless waived or extended in writing by Lender. |
| | The Debtor shall not assume, reject, or seek to extend, amend, or modify the Master Lease, and shall not stipulate to or agree upon any cure amount or adequate assurance of future performance with respect to the Master Lease, in each case without the prior written consent of Lender. |
| **Interest & Fees** | Base Interest Rate: 12% per annum from the date of borrowing until repaid, which will be paid in kind (monthly, in arrears) on the then principal amount of the DIP Loan by increasing the principal amount of the DIP Loan.<br>Default Interest Rate: 4% per annum plus the interest rate otherwise accruing or payable thereon.<br>All interest shall be computed on the basis of a three hundred sixty- (360)-day year for the actual number of days elapsed.<br>Commitment Fee: 10% of the amount of the DIP Facility shall be fully earned and non-refundable upon entry of the Interim DIP Order. |
| **Maturity** | All unfunded DIP commitments of Lender will terminate, and all DIP obligations of the Debtor will be immediately due and payable in full in cash on the earliest of: (a) December 8, 2026 (the "Maturity Date"); (b) the date upon which a Milestone is missed and not waived by Lender; (c) the date of consummation of any sale of all or substantially all of the assets of Pacifica pursuant to section 363; (d) the date of acceleration of the DIP Loans and the termination of the DIP commitments pursuant to the terms of this DIP Term Sheet or DIP Credit Agreement (e.g., occurrence of event of default); (e) the effective date of the Plan or any plan of reorganization in the Chapter 11 Case (the "Effective Date"); (f) appointment of a chapter 11 trustee in the Chapter 11 Case; and (g) conversion of the Chapter 11 Case to a case under Chapter 7 or dismissal of the Chapter 11 Case (such earliest date of (a)-(g), the "Termination Date"). |
| **Mandatory Prepayment** | Upon Debtor's receipt of HQAF funds Debtor shall be required to use such funds first to pay down the DIP Loan except to the extent such HQAF funds are HQAF Program 8 or 9 funds identified in the current Approved |

Budget (excluding QAF Delta), in which event the Debtor may use such identified HQAF Program 8 or 9 funds in accordance with the Approved Budget (excluding QAF Delta).

**Conditions Precedent to Initial Advance**

The obligation of the Lender to fund the Initial Advance shall be subject to the condition precedent that on the date of such release, the following statements shall be true:

(i) The Documentation shall be in form and substance reasonably satisfactory to the Lender;

(ii) The Bankruptcy Court has entered the Interim DIP Order in form and substance acceptable to the Lender, authorizing the Debtor to enter the DIP Facility, and such Interim DIP Order has not been otherwise stayed or reversed;

(iii) The Lender shall have received and shall have approved the Budget;

(iv) No event of default shall have occurred;

(v) The Interim DIP Order provides that the Lender has at all times acted in good faith and is entitled to the protections of section 364(e); and

(vi) Upon the entry of the Interim DIP Order, the Lender shall have as collateral for the Initial Advance, the Super-Priority DIP claim and valid and perfected liens on the DIP collateral as set forth in this DIP Term Sheet and in the Documentation.

Subject to the foregoing conditions being satisfied, the Lender shall release funds to the Debtor under the terms set forth herein. For the avoidance of doubt, the Lender may waive any of the conditions precedent at any time, such waiver being sufficient upon confirmation by electronic mail.

**Conditions to Subsequent Advances**

The obligation of the Lender to fund any Subsequent Advance shall be subject to the condition precedent that on the date of such release, the following statements shall be true:

i. The Final DIP Order shall remain in effect and be a final non-appealable order of the Bankruptcy Court.

ii. There shall exist no default (or event that would constitute a default with the giving of notice or lapse of time) under the DIP Facility, including

satisfaction of applicable milestones, and all the representations and warranties contained in the DIP Facility shall be true and correct in all respects.

iii. All fees and expenses owing to the Lender in connection with the DIP Facility shall have been paid.

v. There shall have occurred no material adverse change in the Debtor's (financial, environmental, or otherwise) operations, performance, or properties (other than, in each case, the commencement and continuation of the Chapter 11 Case), since the entry of the Interim DIP Order, that in the reasonable judgment of the Lender, has or can reasonably be expected to have a material adverse effect on the rights and remedies of the Lender or the ability of the Debtor to perform its obligations to them under the DIP Facility.

vi. The Landlord shall not, in Lender's reasonable judgment, have repudiated or otherwise abandoned the agreement in principle reflected in the Lease Term Sheet.

**Sale/Plan Election Process and Credit Bid**

Lender may elect to purchase the Debtor's assets either pursuant to the Plan or a motion to sell ("Private Sale Motion") substantially all its assets pursuant to a private sale under section 363 (a "Private Sale").

If Lender elects to purchase the assets via a Private Sale, such sale shall close by the Sale Closing Milestone and Lender shall be responsible for all operating costs of the Hospital from and after the closing of such sale.

If Lender elects to purchase the assets pursuant to the Plan, the Plan shall be confirmed on or before the Plan Confirmation Milestone.

Regardless whether Lender has elected to purchase the assets via a Private Sale or a Plan, Lender and Debtor shall enter into a mutually acceptable interim management agreement or other similar arrangement, in form and substance acceptable to Lender, on or before [a date to be determined], pursuant to which, for the period commencing upon the entry into such agreement and ending

upon the closing of Private Sale or the sale contemplated by the Plan, Lender shall retain all net operating profits of the Hospital and shall fund operating shortfalls of the Hospital (a) during the period covered by the Approved Budget, solely to the extent set forth therein, by means of advances under the DIP Facility, and (b) thereafter through such closing, by additional advances that shall constitute DIP Obligations for all purposes hereunder (the "Operating Advances"); provided that Lender shall not assume, and nothing herein shall be construed to impose on Lender, any liability of the Debtor arising or accruing prior to entry into such interim management agreement for any professional liability, regulatory, seismic, tax, or similar liability of the Debtor or the Hospital, other than ordinary course payables that become due after the period covered by the Approved Budget and prior to such closing.

In connection with any such sale, whether consummated pursuant to the Plan or a Private Sale Motion, the Lender shall credit bid not less than $40 million of the obligations outstanding under the DIP Facility, including the Commitment Fee, Roll-Up and Operating Advances. Any amount of the DIP Facility not credit bid and any portion of the Prepetition Secured Debt not rolled up into the DIP Facility and not credit bid, shall not be waived, released, satisfied, or discharged by the credit bid, the sale, or the Plan; provided that (i) Axios shall not assert against the Debtor's estate or for purposes of sharing in the proceeds of the Excluded Assets, more than $20 million (with any remaining obligations under the DIP Facility to be satisfied first) and (ii) any aggregate allowed claim amounts above $20 million shall be assumed by Newco as senior secured indebtedness (the "Assumed Axios Debt"), in each case on the terms set forth in the Plan Term Sheet. For the avoidance of doubt, following the consummation of a sale either through a Plan or a Private Sale, Axios shall not recover or claw back any amounts paid during the Chapter 11 Case, or recover from the Debtor's estate or Liquidating Trust more than $20 million in the aggregate.

For the avoidance of doubt, the Debtor's election to pursue a sale pursuant to a Private Sale Motion shall not preclude, restrict, or otherwise prevent the Debtor from concurrently pursuing, filing, or prosecuting a plan of liquidation consistent with the Plan Term Sheet.

The Debtor shall prepare, file, solicit, prosecute, and seek confirmation of a combined disclosure statement and chapter 11 plan (the "Plan") that is consistent in all material respects with the plan term sheet attached hereto as **Exhibit A** (the "Plan Term Sheet"), together with all other documents necessary or appropriate to effectuate such plan (collectively, the "Plan Documents").

The Debtor shall use commercially reasonable efforts to obtain entry of an order confirming such plan as soon as reasonably practicable and, in any event, on or before December 8, 2026.

The Plan and Plan Documents shall be in form and substance reasonably satisfactory to the Lender. The Debtor shall not file, support, consent to, or seek confirmation of any plan, or agree to any amendment, modification, or supplement to any Plan Document, that is inconsistent in any material respect with the Plan Term Sheet without the prior written consent of the Lender.

**Lender Support of Plan**

Subject to the Plan and the Plan Documents being consistent in all material respects with the Plan Term Sheet, the Lender shall support the Plan and the transactions contemplated thereby and shall use commercially reasonable efforts to facilitate the confirmation and consummation of the Plan.

Without limiting the foregoing, the Lender shall: (i) timely vote all claims held or controlled by it (in any capacity) that are entitled to vote on the Plan to accept the Plan and shall not change or withdraw such vote; (ii) not object to, delay, impede, or take any action inconsistent with or that would reasonably be expected to interfere with the solicitation, confirmation, or consummation of the Plan or the transactions contemplated by the Plan Term Sheet; (iii) support, and not object to, the approval and implementation of the Plan Documents and the transactions contemplated

| | |
|---|---|
| | thereby; (iv) not propose, support, solicit, encourage, or vote in favor of any alternative chapter 11 plan, restructuring, sale, recapitalization, liquidation, or other transaction that is inconsistent with the Plan Term Sheet; and (v) take such actions as are reasonably necessary or appropriate to support and effectuate the Plan and the transactions contemplated by the Plan Term Sheet.<br><br>For the avoidance of doubt, the Lender's support obligations shall include support for the establishment and funding of the Liquidating Trust and the contribution of the Excluded Assets thereto free and clear of all liens, claims, security interests, superpriority claims, adequate protection claims, and other interests of the Lender as set forth in the Plan Term Sheet. |
| **Litigation** | Within five (5) business days after entry of the Interim DIP Order, Pacifica agrees to the remand of the Colorado Litigation to the Colorado District Court and to not object to Axios's pursuit of a judgment and recovery from Tuft, including the continuation of the Colorado proceeding (including collection) against Tuft.<br><br>Axios agrees (a) upon the proceedings return to the Colorado District Court, to dismiss the Colorado complaint against Pacifica without prejudice, and (b) to not seek recovery of an amount greater than the Allowed Prepetition Secured Debt Amount, together with interest, fees, costs, and expenses accruing after the Petition Date under the applicable guaranty, from Tuft. |
| **Hospital Closure** | In the event the Plan is not confirmed and the alternative private sale as contemplated in the Plan Term Sheet does not occur, and the Debtor determines to proceed to an orderly closing of Pacifica Hospital, Lender agrees to consent to the Debtor entering into an agreement with L.A. Care or other party to reasonably fund the wind-down in exchange for HQAF funds, similar to the recent transaction the Debtor entered into with L.A. Care with such amounts to be used for reasonable, necessary and documented costs (excluding legal fees) to safely close the Hospital, with any excess amounts to be turned over to Lender. |
| **Proof of Funds** | Axios shall provide proof of funds by September 28, 2026, consisting of evidence reasonably satisfactory to the Debtor and the Committee (to be provided on a confidential, professionals'-eyes-only basis to counsel |

for the Debtor and the Committee) of immediately available, unrestricted funds of not less than $26,000,000 (or a binding funding commitment from a creditworthy affiliate of Axios). Delivery of such proof of funds shall be a condition to the Debtor's execution of this DIP Term Sheet and to entry of the Interim DIP Order.

The Initial Advance shall be funded upon entry of an Interim DIP Order and this DIP Term Sheet, in each case in form and substance satisfactory to the Lender. The Lender shall have no obligation to provide further funding without an agreed upon DIP Credit Agreement. This DIP Term Sheet, the DIP Credit Agreement, the DIP Order, and any other document(s) and/or instrument(s) required to be executed by the Lender shall constitute the definitive DIP documents (the "Documentation").

**Documentation**

The Documentation shall contain customary (a) representations and warranties, (b) events of default (including, but not limited to, failure to comply with the Approved Budget with Permitted Variances, failure to make timely payments, incurrence of any unauthorized debt, unauthorized sale of assets, breaches of representations or warranties, change of control, Documentation not in form reasonably satisfactory to Lender, failure to satisfy a Milestone, occurrence of a Termination Date), (c) remedies (including, without limitation, modification of automatic stay (after default notice provided), the right to realize on all DIP Collateral, the right to exercise any remedy available under applicable law on 5 business days' notice, without the necessity of obtaining further relief or order from the Bankruptcy Court), (d) § 506(c) and § 510 waivers, and (e) § 552(b)(1) entitlement, and be in form and substance reasonable satisfactory to the Lender. The Documentation shall conform to this DIP Term Sheet and otherwise shall be in form and substance reasonably acceptable to the Lender. In the event of any inconsistency between the Documentation and the DIP Order, the DIP Order shall control (subject only to the requirement that it be in a form acceptable to the Lender).

**Governing Law**

This DIP Term Sheet and the definitive DIP documents shall be governed by the laws of the State of New York, except to the extent governed by the Bankruptcy Code

or other applicable federal law.

**If the foregoing is acceptable to you, please so indicate by signing a copy of this proposal in the space provided below and return an executed copy at your earliest convenience.**

PACIFICA OF THE VALLEY CORPORATION

By: ________________________________
Name:
Title:
Date:

AXIOS CAPITAL SOLUTIONS, LLC

By: ________________________________
Name:
Title:
Date:

**Exhibit A**

# PLAN TERM SHEET

On July 4, 2026 ("Petition Date"), Pacifica of the Valley Corporation ("Pacifica" or "Debtor") commenced a voluntary chapter 11[1] proceeding in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The case is pending before Judge Thomas M. Horan, bearing Case No. 26-11060 (the "Case").

This term sheet ("Term Sheet") between Pacifica and Axios Capital Solutions, LLC ("Axios") describes the principal terms of a proposed plan of reorganization for the Debtor ("Plan") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Plan is subject to, inter alia, definitive documentation satisfactory to the Debtor and Axios, and to compliance with statutory confirmation requirements and the occurrence of the effective date of the Plan (the "Effective Date") in accordance with the provisions of chapter 11 of the Bankruptcy Code.

This Term Sheet is not a solicitation of acceptances or rejections with respect to any chapter 11 plan. Any such solicitation will comply with the provisions of the Bankruptcy Code. However, the terms set forth herein are binding in connection with the parties obligations under the DIP Facility (defined below).

The distributions under, and other benefits provided in, the Plan constitute a resolution, compromise and settlement of claims and causes of action between the Parties, including addressing the Debtor's funding needs for the Case.

| | |
|---|---|
| **Plan Sponsor** | Axios, or one or more of its designated affiliates, successors, or assigns ("Sponsor"). |
| **Restructuring Summary** | The Plan will provide for the sale of all the Debtor's assets to Sponsor free and clear of all liens, claims and encumbrances, except for certain assets expressly excluded that will be transferred to a liquidating trust. To provide critical funding for the Case, and in conjunction with the restructuring, the Sponsor has agreed to provide a debtor-in-possession financing facility up to $21 million plus a 1.5X roll up of the Axios Prepetition Claim (defined below) for an aggregate principal amount of $52.5 million (such facility as more fully described in the DIP Term Sheet, the "DIP Facility"), which shall be credit bid under the Plan in an amount not less than $40 million.<br><br>Any and all estate claims against Axios shall be released and there shall be no challenge to the Axios Prepetition Claim and related liens except that solely the Committee will retain a right to a 14-day period to challenge the Axios Prepetition Claim and related liens, which will not be pursued and such period shall be tolled until the occurrence of the Effective Date of the Plan (or the closing of the alternative private sale, as set forth in the |

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, §§ 101 - 1532.

Plan), at which time the Committee's challenge right shall be terminated; however, such tolling period shall terminate in the event the Plan is not confirmed due to the DIP Lender's failure to fund its obligations under the DIP Facility at which time the Committee will have 14-days to pursue a challenge (as set forth in the DIP Term Sheet). If such 14-day period expires without a challenge, the Committee's right to challenge will be terminated.

**Key Plan Terms**

The Plan shall contain the following key terms:

i. Axios's prepetition secured claim is allowed in full as a secured claim with full credit bid rights ("Axios Prepetition Claim");

ii. Sponsor or its designee ("Newco") shall acquire all the assets of the Debtor, including, assuming the lease, as amended (or entering into a new lease) pursuant to that non-binding Term Sheet, dated September 15, 2026 (the "Lease Term Sheet"), between the Debtor, Axios, and Reliq Pacifica LLC and Beverly Gemini Investments, LLC (together, the "Landlord"), which set forth the parties' agreement in principle regarding lease terms in the event Axios acquires Pacifica Hospital of the Valley (the "Hospital")) except for the Excluded Assets (defined below) which shall not be assets acquired by Sponsor under the applicable sale documents;

iii. A liquidating trust ("Liquidating Trust") shall be established, and the Excluded Assets will be transferred to the Liquidating Trust subject to all liens, claims and encumbrances of Axios and to the distribution waterfall set forth herein;

iv. Funding for the Plan shall be proceeds from the DIP Facility and the Excluded Assets in the Liquidating Trust; and

v. The claim treatment provided below.

**Claim Treatment**

The Plan shall provide for the following claim treatment:

i. Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) (to the extent not already paid during the chapter 11 case), shall receive payment in full (in cash) of the unpaid portion of its allowed administrative claim

on the Effective Date or as soon thereafter as practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such claim and the Debtor;

ii. Holders of priority tax claims shall be treated in accordance with section 1129(a)(9)(C), and will be unimpaired;

iii. Holders of a secured claim (other than Axios) shall receive the following treatment, at the option of the Debtor: (a) payment in full (in cash) on the Effective Date or as soon thereafter as practicable to the extent secured; (b) delivery of collateral securing any such claim and payment of any interest required under section 506(b); or (c) other treatment rendering such claim unimpaired. The Subordination Agreement between Axios and the Landlord shall be enforced.

iv. Axios shall have a secured claim in the aggregate amount of any remaining DIP Obligations and Axios Prepetition Claim after its credit bid; provided that it shall not assert against the Debtor's estate or for purposes of sharing in the proceeds of the Excluded Assets, more than $20 million (with any remaining obligations under the DIP Facility to be satisfied first) and shall receive an interest in the proceeds of the Liquidating Trust subject to the sharing percentages as set forth below. Newco will assume any remaining debt in excess of $20 million, including under the DIP Facility or the Axios Prepetition Claim (which is secured). For the avoidance of doubt, following the consummation of a sale either through a Plan or a Private Sale, Axios shall not recover or claw back any amounts paid during the Chapter 11 Case, or recover from the Debtor's estate or Liquidating Trust more than $20 million in the aggregate.

v. Holders of General Unsecured Claims shall receive their *pro rata* share of the interest in the Liquidating Trust with the right to proceeds thereof subject to the sharing percentages as set forth below.

vi. Equity holder(s) shall receive no recoveries under the Plan.

| | |
|---|---|
| **Sale Toggle** | In the event confirmation of the Plan does not or cannot occur, the Debtor shall promptly execute a private sale to Sponsor maintaining the same economic terms for Axios and the Excluded Assets waterfall as if the sale occurred under the Plan.<br><br>Under either sale process, Axios shall receive the assets free and clear of all liens, claims and encumbrances and assets shall be purchased in accordance with the DIP Term Sheet. The DIP Term Sheet contains terms relating to the Plan and Sale Toggle process and deadlines that are incorporated herein. |
| **Excluded Assets** | The following assets (collectively, the "Excluded Assets") shall not be acquired by Newco and shall vest in the Liquidating Trust:<br><br>i. The Debtor's interests in or related to Pacific Gardens Medical Center;<br><br>ii. Chapter 5 causes of action;<br><br>iii. Other litigation causes of action;<br><br>iv. Director & Officer Insurance claims;<br><br>v. Any excess QAF revenue generated by the Debtor from successfully reducing asserted setoffs or recoupment amounts in excess of the Approved Budgeted QAF (the "QAF Delta"), provided that any such additional amounts will not negatively impact future QAF receipts (*i.e.*, QAF 9, 10, 11 etc. other than the QAF identified in the Approved Budget); and<br><br>vi. The Debtor's cash on hand as of the Effective Date under ordinary course of business (*e.g.*, no discounts to accelerate payments) and excluding cash from any QAF funds that are not identified in the Approved Budget or from (v) hereof (collectively, (i)-(vi), the "Excluded Assets"). |
| **Liquidating Trust** | The Liquidating Trust shall have a three-member oversight committee, with 2 members selected by the Committee and 1 member selected by Axios. The Liquidating Trustee will be selected by the Committee, in consultation with the Debtor and Axios.<br><br>Net recoveries (*i.e.*, after all costs and expenses of the Liquidating Trust) from the assets in the Liquidating Trust shall |

be distributed as follows:

i. The first $1 million shall be retained by the Liquidating Trust for distribution to holders of allowed General Unsecured Claims and/or payment of expenses for payment;

ii. Then, a 50%/50% sharing between Axios and the holders of allowed General Unsecured Claims, until Axios has received $4 million from net proceeds; and

iii. Then, 75% of subsequent net proceeds shall be distributed to holders of allowed General Unsecured Claims and 25% shall be distributed to Axios, until Axios is paid up a total of $20 million (*i.e.*, $4 million ((iii) above) + $16 million), at which time all subsequent net proceeds shall be distributed to holders of allowed General Unsecured Claims.

**Other Litigation**

*L.A. Care*. Neither Axios, the Committee, nor the Liquidating Trust will pursue a challenge against L.A. Care in respect of the $7.5 million in QAF receivables that are the subject of the 2026 prepetition agreements with L.A. Care.

*Landlord*. The lease relating to Landlord (as defined in the DIP Term Sheet) will be handled as set forth in the DIP Term Sheet, which is incorporated herein.

**Conditions Precedent to Plan Confirmation**

(i) The agreement in principle reflected in this Term Sheet shall not have been repudiated or otherwise abandoned, and no Plan with terms contrary to this Term Sheet shall have been proposed; (ii) the Disclosure Statement shall have been approved; (iii) an asset purchase agreement shall have been agreed upon in form and substance reasonably satisfactory to the Debtor and Sponsor; (iv) the Plan, including any amendments, modifications or supplements thereto, and all documentation contemplated by this Term Sheet or the Plan, shall be in form and substance reasonably satisfactory to the Sponsor; (v) there shall not have occurred a force majeure event (to be defined as a significant global disruption in the financial markets caused by outbreak of war, terrorism, or other incidents, but not adverse changes in the financial, banking or capital markets generally); and (vi) the Bankruptcy Court shall have entered an order approving the Disclosure Statement and confirming the Plan ("Confirmation Order"), which order shall be in form and substance reasonably satisfactory to the Debtor

| | |
|---|---|
| | and Sponsor. |
| **Conditions Precedent to Plan Consummation** | (i) Contemporaneous effectiveness of the Sale (and related documents such as an interim management agreement or management operations transfer agreement ("MOTA")); and (ii) No modification or stay of the Confirmation Order or entry of other court order prohibiting Plan transactions from being consummated. |
| **Documentation** | The agreed upon funding by Sponsor shall be pursuant to this Term Sheet, the Plan, the Confirmation Order, the "Asset Purchase Agreement," the MOTA, and any other document(s) and/or instrument(s) required to be executed by the Sponsor or Newco shall constitute the definitive Plan documents (the "Documentation"). The Documentation shall contain customary provisions, such as, among other things, representations and warranties, events of default, Documentation not in form reasonably satisfactory to Sponsor or Newco, etc. The Documentation shall conform to this Term Sheet and otherwise shall be in form and substance reasonably acceptable to the Sponsor. In the event of any inconsistency between the Documentation and the Confirmation Order, the Confirmation Order shall control (subject only to the requirement that it be in a form acceptable to the Sponsor). |
| **Regulatory Cooperation** | The Debtor shall (i) within [TBD] business days after Lender's written request, execute and deliver all notices, applications, consents and other documents required of the current licensee, provider, enrollee, registrant or contracting party in connection with the transfer to Lender or its designee of the Hospital's licenses, permits, registrations, certificates, designations, accreditations, provider agreements, program participations and other governmental and accreditation authorizations, including without limitation the notice required by 22 C.C.R. § 70125, the licensee's portions of the CDPH change-of-ownership application, Form CMS-855A, DHCS Medi-Cal and Hospital Quality Assurance Fee program filings, HCAI notices and pending seismic compliance filings, LA County DMH (LPS designation) and EMS Agency designations, DEA, CLIA, pharmacy and radiologic health registrations, accreditation-body notifications, and the assignment of managed care, payor and graduate medical education participating-site agreements; (ii) promptly furnish all information and documents reasonably required for such filings; (iii) cooperate with Lender and its regulatory counsel in all communications with the foregoing agencies and bodies; (iv) maintain all such authorizations in good standing and not |

| | |
|---|---|
| | take or omit any action that would impair them; (v) timely file all Medicare and Medi-Cal cost reports, including any terminating cost report, in a form reasonably acceptable to Lender; and (vi) execute and file, subject to any required approvals, the notices and applications associated with any interim arrangement contemplated hereby. |
| **Preservation of Rights** | This Term Sheet is part of a proposed settlement among the Parties with respect to their Claims. Nothing herein shall be deemed to be an admission of any kind. To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this Term Sheet and all negotiations relating thereto shall not be admissible into evidence in any proceeding. Except as expressly provided in this Term Sheet, nothing herein is intended to, and shall not be deemed to in any manner waive, limit, impair, or restrict the ability of Axios to protect and preserve its rights, remedies, and interests, including its Claims against the Debtor or any other person, any liens or security interests it may have in any assets of the Debtor, or its full participation in the Chapter 11 Case, including with respect to any matters covered by this Term Sheet. Without limiting the previous sentence in any way, if the transactions contemplated by this Term Sheet or otherwise set forth in the Term Sheet are not consummated as provided herein, or if this Term Sheet is repudiated or abandoned for any reason, the Parties each fully reserve any and all of their respective rights, remedies, and interests. |
| **Governing Law** | The definitive Plan Documents would be governed by the laws of the State of New York, except to the extent governed by the Bankruptcy Code or other applicable federal law. |

**If the foregoing is acceptable to you, please so indicate by signing a copy of this proposal in the space provided below and return an executed copy at your earliest convenience.**

**PACIFICA OF THE VALLEY CORPORATION**

By: ________________________________
Name:
Title:

**AXIOS CAPITAL SOLUTIONS, LLC**

By: ________________________________
Name:
Title:

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: ________________________________
Name:
Title:

**<u>Exhibit 2</u>**

**Budget**

Pacifica of the Valley Corporation
13-Week Cash Flow Forecast

| Week # | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 13 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 10/3/26 | 10/10/26 | 10/17/26 | 10/24/26 | 10/31/26 | 11/7/26 | 11/14/26 | 11/21/26 | 11/28/26 | 12/5/26 | 12/12/26 | 12/19/26 | 12/26/26 | Total |
| Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **I. Receipts** | | | | | | | | | | | | | | |
| 1.) Government | $ 451,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 951,828 | $ 951,828 | $ 951,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 7,373,765 |
| 2.) Non-Government | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 1,697,073 |
| 3.) QAF | - | - | - | - | 2,121,620 | - | 547,147 | 1,998,647 | - | 547,147 | - | - | - | 5,214,561 |
| 4.) Sale to LA Care of QAF | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 5.) DSH | - | - | - | 850,000 | - | - | - | - | - | - | - | 850,000 | - | 1,700,000 |
| 6.) LACare | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 2,875,795 |
| 7.) Other | 613,402 | 435,781 | 689,781 | 89,781 | 439,781 | 189,781 | 89,781 | 89,781 | 89,781 | 539,781 | 89,781 | 89,781 | 89,781 | 3,536,779 |
| 8.) **Total Receipts** | **$ 1,416,989** | **$ 1,239,369** | **$ 1,493,369** | **$ 1,743,369** | **$ 3,364,989** | **$ 993,369** | **$ 1,440,516** | **$ 3,392,016** | **$ 1,393,369** | **$ 2,390,516** | **$ 893,369** | **$ 1,743,369** | **$ 893,369** | **$ 22,397,973** |
| **II. Operating Disbursements** | | | | | | | | | | | | | | |
| 9.) Payroll | $ 833,850 | $ 740,831 | $ 851,474 | $ 700,681 | $ 851,474 | $ 700,681 | $ 851,474 | $ 700,681 | $ 851,474 | $ 700,681 | $ 851,474 | $ 700,681 | $ 851,474 | $ 10,186,932 |
| 10.) Payroll Taxes | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 4,325,099 |
| 11.) Benefits | 417,279 | 576,269 | 415,842 | 340,430 | 501,261 | 310,857 | 308,580 | 339,273 | 290,111 | 1,254,720 | 190,826 | 209,253 | 190,826 | 5,345,527 |
| 12.) Rent | - | 646,240 | - | 646,240 | - | - | - | - | 646,240 | - | - | - | 1,195,704 | 3,134,424 |
| 13.) Supplies | 211,559 | 117,150 | 110,500 | 114,770 | 106,200 | 103,300 | 101,000 | 107,770 | 94,200 | 117,800 | 101,000 | 89,750 | 113,320 | 1,488,319 |
| 14.) Pharmaceuticals | 18,000 | 10,000 | 10,000 | 11,500 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 11,500 | 141,000 |
| 15.) Purchased Services | 312,411 | 191,940 | 97,954 | 105,263 | 173,902 | 129,411 | 64,732 | 80,600 | 81,910 | 252,808 | 63,800 | 66,532 | 86,910 | 1,708,173 |
| 16.) Repairs and Maintenance | 4,090 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 186,826 |
| 17.) Utilities | 8,000 | 86,400 | 1,175 | 13,000 | - | 93,950 | 5,000 | 1,175 | 8,000 | 85,950 | 13,000 | 1,175 | 8,000 | 324,826 |
| 18.) Insurance | 252,752 | 308,441 | - | - | 326,840 | 4,286 | - | 2,576 | 41,156 | 331,126 | - | - | 23,322 | 1,290,500 |
| 19.) QAF Fees | - | 140,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 250,000 |
| 20.) Medical Professional Fees | 120,000 | 263,685 | - | - | - | 368,685 | - | - | - | 368,685 | - | - | - | 1,121,055 |
| 21.) Other | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 650,000 |
| 22.) CapEx - Seismic and Opening Beds | - | 243,112 | 21,600 | - | - | 48,677 | 172,384 | - | 350,000 | 640,554 | - | - | - | 1,476,327 |
| 23.) **Total Operating Disbursements** | **$ 2,639,832** | **$ 3,629,606** | **$ 1,995,663** | **$ 2,247,424** | **$ 2,456,796** | **$ 2,085,387** | **$ 2,000,288** | **$ 1,557,616** | **$ 2,860,209** | **$ 4,077,864** | **$ 1,717,218** | **$ 1,392,931** | **$ 2,968,174** | **$ 31,629,008** |
| 24.) **Net Operating Cash Flow** | **$ (1,222,843)** | **$ (2,390,238)** | **$ (502,295)** | **$ (504,055)** | **$ 908,193** | **$ (1,092,018)** | **$ (559,773)** | **$ 1,834,400** | **$ (1,466,840)** | **$ (1,687,348)** | **$ (823,850)** | **$ 350,438** | **$ (2,074,806)** | **$ (9,231,035)** |
| **III. Bankruptcy Related Disbursements** | | | | | | | | | | | | | | |
| 25.) Professional Fees | $ - | $ 2,595,000 | $ 1,951,000 | $ 1,951,000 | $ 1,976,000 | $ 1,308,500 | $ 89,000 | $ - | $ - | $ 3,101,500 | $ 670,000 | $ 581,000 | $ 581,000 | $ 14,804,000 |
| 26.) UST Fees | - | - | - | 250,000 | - | - | - | - | - | - | - | - | - | 250,000 |
| 27.) Other Non-Recurring | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 28.) **Total Non-Operating Disbursements** | **$ -** | **$ 2,595,000** | **$ 1,951,000** | **$ 2,201,000** | **$ 1,976,000** | **$ 1,308,500** | **$ 89,000** | **$ -** | **$ -** | **$ 3,101,500** | **$ 670,000** | **$ 581,000** | **$ 581,000** | **$ 15,054,000** |
| 29.) **Net Cash Flow** | **$ (1,222,843)** | **$ (4,985,238)** | **$ (2,453,295)** | **$ (2,705,055)** | **$ (1,067,807)** | **$ (2,400,518)** | **$ (648,773)** | **$ 1,834,400** | **$ (1,466,840)** | **$ (4,788,848)** | **$ (1,493,850)** | **$ (230,562)** | **$ (2,655,806)** | **$ (24,285,035)** |
| **VI. Liquidity Summary** | | | | | | | | | | | | | | |
| 30.) Beginning Cash Balance | $ 1,551,056 | $ 7,328,212 | $ 2,342,975 | $ 3,889,680 | $ 4,184,625 | $ 3,116,818 | $ 716,299 | $ 67,527 | $ 1,901,927 | $ 435,086 | $ 2,646,238 | $ 1,152,388 | $ 921,826 | $ 1,551,056 |
| 31.) Net Cash Flow | (1,222,843) | (4,985,238) | (2,453,295) | (2,705,055) | (1,067,807) | (2,400,518) | (648,773) | 1,834,400 | (1,466,840) | (4,788,848) | (1,493,850) | (230,562) | (2,655,806) | (24,285,035) |
| 32.) DIP Draws | 7,000,000 | - | 4,000,000 | 3,000,000 | - | - | - | - | - | 7,000,000 | - | - | - | 21,000,000 |
| 33.) **Ending Cash Balance** | **$ 7,328,212** | **$ 2,342,975** | **$ 3,889,680** | **$ 4,184,625** | **$ 3,116,818** | **$ 716,299** | **$ 67,527** | **$ 1,901,927** | **$ 435,086** | **$ 2,646,238** | **$ 1,152,388** | **$ 921,826** | **$ (1,733,980)** | **$ (1,733,980)** |

**Footnotes:**
- *Forecast has not yet been agreed to by the DIP Lender.*
- *Forecast assumes ordinary course operations throughout the 13-weeks and does not contemplate any of the potential transactions identified in the Term Sheet.*
- *Does not include DIP Lender contributions to operating losses after 11/7/2026 which are being discussed.*
- *The Fourth Advance ($7mm) during the week ending 12/5/2026 is intended to support costs associated with Plan Confirmation.*
- *The three weeks ending 11/28/2026 show professional fee escrow payments being deferred.*